# COMPLIANCE OFFICER AND COMMUNITY LIAISON

## *Quarterly Report: Quarter 3 Updates and Analysis*

**Prepared By:**

**ROSENBAUM & ASSOCIATES, LLP**

**For the City of Portland, Oregon**

**July 1, 2022 to September 30, 2022**

**March 9, 2023**



**Exhibit A**

# TABLE OF CONTENTS

INTRODUCTION........................................................................................................2

EXECUTIVE SUMMARY ...........................................................................................3

REPORT CARD ........................................................................................................13

III. USE OF FORCE ................................................................................................30

IV: TRAINING.........................................................................................................48

V. COMMUNITY-BASED MENTAL HEALTH SERVICES.............................................93

VI. CRISIS INTERVENTION ....................................................................................98

VII. EMPLOYEE INFORMATION SYSTEM ..............................................................130

VIII. OFFICER ACCOUNTABILITY .........................................................................139

IX. COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY

ENGAGED POLICING ............................................................................................165

XI. ADDITIONAL REMEDIES .................................................................................196

LIST OF ABBREVIATIONS......................................................................................213

LIST OF PERSONNEL.............................................................................................215

APPENDIX A ........................................................................................................216

APPENDIX B ........................................................................................................223

# **INTRODUCTION**

This is the Compliance Officer/Community Liaison's (COCL) third quarter report for 2022, as required by the Amended Settlement Agreement between the City of Portland (the City) and the United States Department of Justice (DOJ), Case No. 3:12-cv-02265-SI, entered April 29, 2022. This report covers the three-month period from July 1, 2022, to September 30, 2022.

The COCL continues to evaluate whether the systems required by the Settlement Agreement have been sustained or restored to ensure constitutional policing in Portland. For the third quarter of 2022, most systems remained intact, but some have not been fully repaired since 2020 and thus are unable or unlikely to produce the desired outcomes.

2

**Exhibit A**

# EXECUTIVE SUMMARY

In this third quarter of 2022, the Portland Police Bureau (PPB) and the City of Portland remained in Substantial Compliance for most of the paragraphs in the Settlement Agreement. Equally important, they were able to move from Partial to Substantial Compliance for seven paragraphs. However, they were found to be in Partial Compliance for 16 of the original paragraphs and six of the new remedies, as described in this report. The paragraph-by-paragraph ratings can be found in the Report Card that follows this narrative summary.

## III. USE OF FORCE

During the third quarter of 2022, three paragraphs (Pars. 66, 67, and 69) were moved into Substantial Compliance from Partial Compliance, resulting in a total of six paragraphs now in Substantial Compliance (also including Pars. 68, 71, and 72). However, six of the twelve paragraphs for Section III remain out of Substantial Compliance due to persistent issues we have found in the previous quarters, and which remained problematic during the third quarter. For instance, it continues to remain unclear to the COCL how the PPB decides when it is most appropriate to address a problem with supervisor counseling or when it is most appropriate to refer the case for formal investigation (Pars. 73-75; 77). There also appears to be confusion on the definition of "treatment" at a hospital (e.g., whether an individual was admitted or not) that caused conflicts between reviewing cases as a Category III instead of a Category II Use of Force (Par. 70). The COCL also continues to find inconsistent language in PPB's Force Data Collection Reports (FDCRs) as they define and describe "de-escalation," which raises a concern about the reliability and validity of force report data (Pars. 67, 69, 74, 75, 77).

As with previous quarters, the PPB also remains out of Substantial Compliance with the audit process required of the Force Inspector (Pars. 74-77). The Force Inspector has continued to forward the entire force applications report to the Responsibility Unit (RU) managers instead of narrowly focusing on the specific officers who demonstrate a need for more in-depth review. Additionally, the force statistics reported by PPB could be enhanced to provide greater insight into PPB's use of force. Although PPB has done well collecting and reporting the use of force data, there is potential to explore the data further to address emergent trends.

## IV: TRAINING

Compliance ratings for Training have not changed from the second to third quarter of 2022. The PPB was found to be in Substantial Compliance with eight of the 10 paragraphs in Section IV,

**Exhibit A**

leaving only paragraphs 78 and 84 in Partial Compliance. PPB continues to maintain a robust system of data collection and analysis to evaluate their training programs and fulfill its obligation to seek input from a variety of sources to develop its Needs Assessment and Training Plan.

During the third quarter of 2022 the COCL observed and evaluated three different trainings – In-Service Training for all officers, refresher training for the Enhanced Crisis Intervention Team (ECIT), and specialty training for its Special Emergency Reaction Team (SERT) and Crisis Negotiation Team (CNT). We also reviewed the online training delivered by the PPB during the third quarter. In general, the three in-person trainings were informative and well executed. Specific recommendations for improvement are included in this report.

However, PPB did not return to Substantial Compliance during the third quarter for paragraphs 78 and 84 because they have yet to provide crowd control training that (1) incorporates changes to polices related to use of force (i.e., Directives 910.00, 1010.00, and 1015.00) and crowd control (Directive 635.10), (2) incorporates both internal and external assessments of training needs, and (3) provides scenarios or exercises to practice appropriate crowd control skills. This training cannot be delivered until the policies on use of force and crowd control have been revised and approved by DOJ. This review process was still underway at the end of the third quarter. Our expectation is that the In-service training starting in 2023 will address many of these concerns and requirements.

COCL's overall assessment of online training remains positive. The Training Division continues to provide a wide range of online training and educational materials using their Learning Management System (LMS). However, some training should be moved to the in-person format, including those that require in-class discussions (e.g., difficult conversations around bias-free policing or responses to the LGBTQIA2S+/Queer community) and some require in-class practice of skills (e.g., de-escalation and procedural justice). From our perspective, the PPB has yet to adequately integrate these sensitive topics into in-person training, although the Equity and Inclusion Office (EIO) has made proposals. The PPB administration could demonstrate a strong commitment to fair and impartial policing by making Equity and Procedural Justice trainings a priority within the in-person training format.

Because consent searches are important to the community, COCL gave particular attention to the training videos designed to help officers understand and apply Directive 650.00. This multi-step process is complex, and therefore, the COCL encourages PPB to conduct an audit upfront to ensure that consent searches are being conducted properly and the language cards (describing the right to refuse the search) are being distributed.

**Exhibit A**

For in-person learning, the COCL will continue to call for more training that follows the fundamental principles of adult learning and problem-based learning and allows officers to practice good decision-making skills. The PPB has made considerable progress in this area, but more work is needed. Also, the COCL will continue to call for more evidence-based training in areas such as de-escalation and procedural justice where research has documented effective training methods. We also anticipate the day when PPB's evidence-based training draws upon local data from body-worn camera footage and contact surveys. Our hope is that the evidence-based findings will clearly illustrate to officers where specific improvements in performance are needed when interacting with the public.

For this report, the COCL conducted an outcome assessment for training, which appears at the end of Section IV in this report. Here we looked at the ECIT training data. We also provided an assessment of Supervisory training pertaining to PPB's Annual Performance Evaluation because we believe this evaluation process could serve as an important mechanism for changing the organizational culture and street-level behavior. For instance, after examining more than 2,000 ratings, the COCL found that not a single patrol officer received a "Needs Improvement" rating on any of the metrics used in the annual performance evaluation. Thus, the COCL has recommended that PPB re-examine its evaluation system and associated training, so that supervisors are prepared to give "Needs Improvement" ratings, and officers will not view them as a punishment. "Needs Improvement" should be seen as an opportunity for coaching and constructive feedback for officers.

Finally, we are pleased that the PPB's Training Division is beginning to adopt additional on-the-job outcome measures to evaluate training effectiveness, and we are hoping for more sophisticated evaluation designs. Strong future evaluations will allow PPB to identify effective and ineffective training programs and adjust accordingly. The PPB Training Division should be credited for moving in this direction regarding ECIT training.

## V. COMMUNITY-BASED MENTAL HEALTH SERVICES

In the third quarter of 2022, the PPB and the City remained in Substantial Compliance for all paragraphs in Section V. The paragraphs within Section V (Community-Based Mental Health Services) remain part of a broader mental health response system. PPB and the City are partners in this system but are not necessarily drivers of the system. The City and PPB continued to participate through engagement in various committees and workgroups. These include the Behavioral Health Unit Advisory Committee (BHUAC), the Behavioral Health Coordination Team (BHCT), the Unity Transportation Work Group, and the Legacy ED

**Exhibit A**

Community Outreach Group. These groups have continued to address important issues in city, county, and state approaches to providing comprehensive mental health services.

During the third quarter, the Bureau of Emergency Communication (BOEC) maintained Portland Street Response (PSR) dispatch protocols and training for telecommunicators, both of which were previously reviewed by the BHUAC.[1] Also, as part of Section V, the Unity Center continues to act as a drop-off center for first responders to transport persons in mental health crisis. As we noted in prior reports, the Unity Center conforms to the intent of the Settlement Agreement as well as the intent of drop-off centers as outlined in the Memphis Model of mental health crisis response. Furthermore, PPB has continued to participate in AMR (ambulance service) training for transporting persons in mental health crises. Additionally, PPB continues to participate in the Transportation Workgroup.

## VI. CRISIS INTERVENTION

As we have done in the past, we evaluated PPB and the City's system of mental health response in two ways: (1) Primary Response, including Enhanced Crisis Intervention Team (ECIT) officers and Portland Street Response (PSR); and (2) Secondary Response, including Behavioral Health Response Team (BHRT) and Service Coordination Team (SCT). We also evaluated the steps taken once a call involving a person in mental health crisis is received by BOEC, as well as PPB's response to such calls. Finally, we examined what follow-up steps occur when a person demonstrates behavior that may warrant additional contact by PPB. During the first quarter of 2022, the PPB and the City fell out of compliance with Section VI as a result of lapses with paragraphs related to the BHUAC (see Par. 95, Par. 96, Par. 98), and remained there until this quarter.

During the third quarter, BOEC maintained their policies and training for telecommunicators on dispatching officers to calls involving a mental health component. They continued to use seven call characteristics to determine whether a specialized ECIT officer should be dispatched.

---

[1] Portland Street Response (PSR) is an emergency response program where civilians with expertise, rather than police officers, are dispatched to assist people experiencing mental health and behavioral health crises.

**Exhibit A**

However, there remains a need to adopt official policies and training for PSR. BOEC presented updated SOPs to the BHUAC in the third quarter of 2022, which was well received, though a formal policy is still needed. For their part, the PPB continued to maintain directives related to crisis response, including 850.20 (Police Response to Mental Health Crisis), 850.21 (Peace Officer Custody – Civil), 850.22 (Police Response to Mental Health Director Holds and Elopement), and 850.25 (Police Response to Mental Health Facilities). The PPB also continued to provide training to new officers as well as current officers through annual In-service training. Additionally, PPB maintained their specialized response approach through the use of ECIT officers.

The PPB has maintained the use of the BHRT to assist individuals who represent an escalating risk of harm. While the Settlement Agreement only requires three teams for each precinct, the PPB had made plans to return to five BHRTs over time and are in the process of doing so. The PPB has also maintained the Service Coordination Team (SCT) to facilitate the provision of services to persons who are chronically houseless, suffer chronic addiction, and are chronically in and out of the criminal justice system. For both programs, we provide ongoing operational statistics, including statistics related to decision-making and outcomes. Finally, the BHUAC continued to meet during the third quarter of 2022, utilizing the expertise of individuals at PPB, BOEC, and the City, as well as other agencies, stakeholders, advocates, and service providers. We found that in the third quarter, many of the issues mentioned in our previous reports regarding BHUAC had been remedied. Meetings were largely productive and met quorum, and meaningful steps were taken to address COCL's prior TA statement. For these reasons, we find the City has returned to Substantial Compliance on paragraphs 95, 96 and 98, though Substantial Compliance for Pars. 95 and 96 are conditioned on PPB providing force data and OIS facts to BHUAC in their March meeting, per an agreement between the Parties.

## VII. EMPLOYEE INFORMATION SYSTEM

Throughout the third quarter of 2022, the PPB remained in Substantial Compliance with three of the five paragraphs in Section VII (Pars. 118, 199, and 120), as the current Employee Information System (EIS) thresholds identify potentially problematic trends, and thus, meet the requirements of the Settlement Agreement. However, we maintain that PPB is not currently using EIS to its full potential and interventions based on the peer-comparison approach are rare.

The PPB remains in Partial Compliance for Pars. 116 and 117 as we continue to find the Force Inspector needs to take a narrower focus on specific members for whom force statistics are elevated compared with other officers. Furthermore, upon identification, supervisors should

**Exhibit A**

proactively employ constructive interventions to correct the potentially problematic behaviors. For the third quarter, we did not find supervisors employed any such interventions for these officers. Finally, Pars. 118-120 remain in Substantial Compliance regarding EIS interventions and the hiring of the second EIS administrator.

## VIII. OFFICER ACCOUNTABILITY

During the third quarter of 2022, the PPB did not return to Substantial Compliance with Section VIII. We note several paragraphs within this Section where the PPB and the City have maintained Substantial Compliance, including paragraphs related to Officer-Involved Shooting (OIS) investigation procedures, Independent Police Review (IPR) documentation/notification requirements, and Citizen Review Committee (CRC) operations. Furthermore, the City and the Police Review Board (PRB) maintained Substantial Compliance for all paragraphs related to timely investigations. Additionally, we found that recent PRB meetings conform to the letter and intent of Par. 131.

For other paragraphs, however, we continue to observe issues that prevent the City from achieving Substantial Compliance (Pars. 126, 128, 129, 134, and 169). For instance, while we have found that the IPR continues to function well and even began hiring for open positions, there remains an issue with the Records Division backlog of 45,000 to 50,000 documents. While we have not received an update on the current size of the backlog, the PPB is still taking steps to resolve this backlog by hiring more staff in the Records Division. The COCL will need to see evidence that the backlog is being reduced before we can find Substantial Compliance again.

 Additionally, we are awaiting an updated SOP from IPR before we can assign Substantial Compliance with the requirements of Par. 129. We have also found that the PPB continues to remain in Partial Compliance with the requirements of Par. 126, as they have not been responsive to our guidance. One year ago, the COCL stated that policy and protocol would need to be changed to allow for situations where any officer is mentally incapacitated following an OIS event. Changes have yet to be made. Finally, the COCL finds, based on aggregate findings, that PPB remains in Partial Compliance with the requirements of Par. 169 paragraph to "apply policies uniformly and hold officers accountable for complying with PPB policy and procedure."

## IX. COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING (PCCEP)

In the third quarter of 2022, PCCEP continued on the path of returning to full functionality as a legitimate body for community engagement, after facing many challenges over the past several

quarters. The PCCEP was fully seated at 13 members and staffed by a project manager and a quarter-time project assistant. The PCCEP's full committee was productive, including co-hosting a Town Hall with the COCL, reviewing PPB's Stops Data report, and preparing for the Status Conference. However, when asked to reflect on the past six months, most of the PCCEP members interviewed by COCL felt that PCCEP had not been effective at accomplishing many of its authorized duties and responsibilities, including community engagement. At the end of the third quarter, the City had yet to formally respond to three recommendations made by PCCEP in 2021, and thus remains in Partial Compliance for Par. 142. Furthermore, PCCEP had yet to resume subcommittee work during the third quarter, which is where most prior PCCEP recommendations have originated.

As for the PPB's community engagement efforts, they continued to engage the community through a wide range of formal and informal advisory groups as well as some public events. Racial disparities in traffic stops and consent searches remained a problem, but the PPB had begun to address this with an updated directive on "Search, Seizures, and Inventories" and new training on this directive. However, as noted in Section IV, additional training is recommended to increase access to services for LEP individuals who are being asked for a consent search. Also, the City should continue to explore new ways of measuring the quality of police-community interactions.

The COCL's Outcome Assessment on Community Engagement revealed several areas where additional work was still needed: (1) the City's website had yet to build a platform that allows the public to stay informed about PPB's community engagement efforts and the work of its advisory groups; (2) PPB had yet to develop a comprehensive language access plan, a LEP directive, or adequate LEP training that would allow PPB officers to communicate effectively with persons who have limited English proficiency; (3) Aside from its advisory councils, the outcome assessment shows that PPB's attendance at community events had rapidly declined over the past five years, or at best, reporting such events was no longer a priority; and (4) PPB had not expressed a commitment to continue or expand its training on Equity or Procedural Justice at a time when these training classes have become essential to providing respectful and unbiased policing. During the fourth quarter, some action was taken to address the first two concerns (to be addressed in COCL's Q4 report), although results are not expected until 2023. The COCL recommends that community engagement be decentralized, given higher priority, and be measured with a new set of performance metrics.

Finally, to truly engage the broader Portland community (beyond advisory groups) and give voice to the thousands of residents who have lived experience interacting with the PPB officers, we continue to encourage the City to introduce a contact survey to measure the level of

procedural justice and public satisfaction with police services. Improvements in police-community interactions are most likely to occur when the City begins to measure what matters to the public (i.e., whether they are treated respectfully, fairly, and given a voice) and using these data to evaluate and coach officers at the individual level.

## XI. ADDITIONAL REMEDIES

During the first half of 2022, the Parties, the Portland City Council, and the Federal court agreed to amend the Settlement Agreement to include eight new remedies to help reform the PPB. As a result, Section XI has been added, with eight new paragraphs (188 to 195). The COCL's compliance assessment for Section XI began in the second quarter.

Here we continue to report on the requirements and progress to date on these new remedies. The City has achieved Substantial Compliance for Par. 188, 190, and 193, but only Partial Compliance for Par. 189, 191, 192, 194, and 195.

The Par. 188 Requirement: "The City shall revise Force Data Collection Report (FDCR) and After Action Report forms to capture when the forms are edited and completed." COCL Assessment: Under the new Office365 program, the forms are currently in-place, and after reviewing a sample of cases, we can conclude that the forms are being used by officers and supervisors. Hence, the PPB has achieved Substantial Compliance for Par. 188.

The Par. 189 Requirement: "The City shall provide funding for a qualified outside entity to critically assess the City's response to crowd control events in 2020." COCL Assessment: The work of the Independent Monitor, LLC (IMLLC) -- the group hired to conduct the critical assessment -- continued in the third quarter of 2022, including information gathering and document reviews. We expect that the IMLLC will prepare a report in 2023 and that the PPB will use these findings to modify policy and training accordingly. The IMLLC must also prepare a follow-up report to review the City's response to their original recommendations.

The Par. 190 Requirement: "The City shall provide in the budget a separate line item for overtime costs to conduct necessary training for PPB officers." COCL Assessment: The City Council has included a separate line item for these overtime costs in the City's FY 2023 budget. Hence, the City has achieved Substantial Compliance with Par. 190.

Par. 191 Requirement: "The City shall budget for a qualified civilian in PPB to direct all educational aspects of PPB's Training Division." COCL Assessment: The original offer was rescinded, and the hiring process was restarted in the third quarter. COCL has recommended greater community engagement in the hiring process, uncompromised authority for this

**Exhibit A**

individual within PPB, and adequate staff support. This individual should have expertise in both policing practices and pedagogy.

Par. 192 Requirement: (summarized): The City shall initiate an appropriate investigation through IPR to identify and hold accountable those within the PPB who trained or directed PPB officers to use force in violation of policy during the crowd control events of 2020, or failed to ensure that force reports were completed and reviewed properly. COCL Assessment: The IPR is currently in the process of conducting a series of investigations and COCL cannot report on these investigations until they are completed.

Par. 193 Requirement: "PPB shall release its Annual Report and hold the required precinct meetings no later than September 20 of each year for the duration of this Agreement." COCL Assessment: PPB was able to achieve this requirement in the third quarter, as it presented its 2021 Annual report at three precinct meetings in July of 2022. Hence, PPB has achieved Substantial Compliance for Par. 193.

The Par. 194 Requirement: "The City shall implement body-worn cameras (BWCs) pursuant to a policy that is subject to the policy-review-and-approval provisions of this Agreement." COCL Assessment: The City is continuing to progress towards the implementation of a BWC policy and program. A vendor was selected (Axon) and a contract was being negotiated. However, the completion of the BWC program and policy will not occur until the union bargaining process is complete and all parties agree on terms for the program – outcomes that were not achieved in the third quarter. During the bargaining process, we have encouraged the City to incorporate recommendations from the community, the COCL and the DOJ. For example, the community forum and community survey (facilitated by COCL and PCCEP) early in 2022 underscored the importance of open access to the BWC recordings and not allowing officers to "preview" the recordings, i.e., review them prior to writing their use of force reports (Although we believe officers should be allowed to prepare supplemental reports after reviewing the BWC recordings). In addition, COCL recommended that the PPB acquire software for analyzing BWC data and for identifying patterns in police-community interactions that can be used for the training and coaching of officers. Supervisors should also be trained in how to interpret these findings and provide effective coaching.

The Par. 195: Requirement (summarized): As required by Portland voters and now by the Settlement Agreement, the City shall create a new Community Oversight Board to replace IPR for investigating certain complaints of police misconduct and replace the Chief of Police for imposing discipline. COCL Assessment: Progress has been made by the 20-member Police Accountability Commission (PAC), appointed by the City to develop a proposal for the Community Oversight Board. In the third quarter, the PAC held numerous meetings of the full

**Exhibit A**

commission and its sub-committees to continue its Fact-Finding phase. The PAC published its first report on September 29, 2022, which summarizes barriers and best practices in police oversight into major themes, such as lack of transparency; complexities within the current system; accessibility and equity; trust; laws and policies; conflicts and bias; culture; and resources for community oversight. Thus, the PAC has worked hard to provide a process and framework for this remedy and is supported by competent and committed City staff. There is also a transition plan in place to sustain IPR as an independent entity until the new Oversight Board is functional, although maintaining adequate IPR staffing is a concern. Hence, the PAC must be conscious of time constraints during this transition period. Eventually, the City, along with COCL and DOJ, will review a proposal from the PAC to implement a new Community Police Oversight Board.

# REPORT CARD

This report includes a "Report Card" that provides a separate assessment of each paragraph in the Agreement. This format gives the City clarity about what is needed to achieve Substantial Compliance. All paragraphs are reviewed and evaluated using the following standards:

- **Substantial Compliance**: The City/PPB has satisfied the requirement of the provision in a comprehensive fashion and with a high level of integrity.
- **Partial Compliance**: The City/PPB has made significant progress towards the satisfaction of the provision's requirements, though additional work is needed.
- **Non-Compliance but Initial Steps Taken**: The City/PPB has begun the necessary steps toward compliance, though significant progress is lacking.

In the third quarter of 2022, the Portland Police Bureau (PPB) and the City of Portland remained in Substantial Compliance for most of the paragraphs in the Settlement Agreement. However, they remained in Partial Compliance for the following paragraphs regarding Use of Force (Pars. 70, 73, 74, 75, 76, 77), Training (Pars. 78, 84), Employee Information System (Pars. 116, 117), Officer Accountability (Pars. 126, 128, 129, 134, 169), Community Engagement (Pars. 142), and Additional Remedies (Pars. 188, 189, 191, 192, 194, 195).

During the third quarter, the PPB and the City did not lose any further ground in compliance ratings, and in fact, they made headway in several areas. They were able to move from Partial Compliance to Substantial Compliance in Crisis Intervention (95, 96, 98), Community Engagement (143, 144,150), and Additional Remedies (193). These build on some positive changes from Partial to Substantial Compliance that were documented in the second quarter (97, 131, 190).

**Exhibit A**

The table below summarizes the compliance status and recommendations for all paragraphs reviewed by the COCL.

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| **III. USE OF FORCE** | | |
| Par. 66 | Substantial Compliance | • To maintain Substantial Compliance, continue evidencing positive force events<br>• To maintain Substantial Compliance, revise and re-issue guidance on de-escalation |
| Par. 67 | Substantial Compliance | • To maintain Substantial Compliance, continue evidencing positive force events<br>• To maintain Substantial Compliance, revise and re-issue guidance on de-escalation |
| Par. 68 | Substantial Compliance | • Resolve confusion regarding CEW applications |
| Par. 69 | Substantial Compliance | • To maintain Substantial Compliance, continue evidencing positive force events<br>• To maintain Substantial Compliance, revise and re-issue guidance on de-escalation |
| Par. 70 | Partial Compliance | • To achieve Substantial Compliance, review cases and take corrective action |
| Par. 71 | Substantial Compliance | • Continue monitoring and reporting ratio of officers to sergeants |
| Par. 72 | Substantial Compliance | • Continue regular reviews of AAR form |
| Par. 73 | Partial Compliance | • To achieve Substantial Compliance, ensure that chain-of-command supervisors are held |

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| | | accountable for inadequate reports and analysis<br>• To achieve Substantial Compliance, clearly distinguish conduct that requires formal review from that which can be corrected by informal counseling |
| Par. 74 | Partial Compliance | • To achieve Substantial Compliance, clearly distinguish conduct that requires formal review from that which can be corrected by informal counseling |
| Par. 75 | Partial Compliance | • To achieve Substantial Compliance, clearly distinguish conduct that requires formal review from that which can be corrected by informal counseling |
| Par. 76 | Partial Compliance | • To achieve Substantial Compliance, comment on trends over time and make suggestions for correcting/duplicating elsewhere<br>• To achieve Substantial Compliance, resume the practice of the Force Inspector identifying potentially problematic officers |
| Par. 77 | Partial Compliance | • To achieve Substantial Compliance, clearly distinguish conduct that requires formal review from that which can be corrected by informal counseling |
| | | |

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| **IV. TRAINING** | | |
| Par. 78 | Partial Compliance | • To achieve Substantial Compliance, PPB must substantially comply with all paragraphs within Section IV |
| Par. 79 | Substantial Compliance | • Include training with robust scenarios and feedback loops to strengthen interpersonal communication skills<br>• When the external Critical Incident assessment of Crowd Control has been completed, incorporate the training implications of this study into PPB's training needs assessment |
| Par. 80 | Substantial Compliance | • Return all Training Analysts to their original jobs and hire more analysts to ensure the best training needs assessment, training plan, and scientific knowledge about the quality and effectiveness of training<br>• Make training surveys mandatory, not optional, to improve response rates and produce valid survey findings<br>• Conduct more scientific evaluations of on-the-job outcomes, and include contact surveys to measure the impact of training on police-community interactions and procedural justice |
| Par. 81 | Substantial Compliance | • No recommendations at this time |
| Par. 82 | Substantial Compliance | • Include both internal and external training classes in the semi-annual training report |
| Par. 83 | Substantial Compliance | • No recommendations at this time |

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| Par. 84 | Partial Compliance | • To achieve Substantial Compliance, Crowd Control and Management training should be updated based on both the internal and external needs assessments regarding PPB's response to mass demonstrations<br>• To achieve Substantial Compliance, develop and deliver training with "role playing scenarios and interactive exercises that illustrate proper use of force decision making" (Par. 84) including in crowd control settings. This should include opportunities to practice de-escalation techniques and procedurally just responses to difficult interactions, including resistance and arrest<br>• To achieve Substantial Compliance, incorporate recent changes to the PPB's force-related Directives into training (910.00, 1010.00, and 1015.00)<br>• Increase training that incorporates adult education and problem-based learning principles<br>• Make Equity training a higher priority and include it routinely in PPB's in-person training schedules<br>• Introduce in-person training on procedural justice with enough dosage to make a difference<br>• Continue to support the development of sophisticated online training that allows for interactivity and is linked to subsequent in-person skills development |

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| | | • Provide refresher training on First Amendment rights that can address any PPB bias against peaceful protestors<br>• Make the investigation of RRT training and the resulting accountability a high priority |
| Par. 85 | Substantial Compliance | • To remain in Substantial Compliance, the PPB should produce a Training Division Audit report by the end of the fourth quarter of 2022<br>• We recommend that the audit evaluate record keeping on specialty classes and outside trainings<br>• We recommend that the audit give attention to the delivery of in-service training for officers and supervisors, with particular attention to equity classes |
| Par. 86 | Substantial Compliance | • The Force Inspector should work with the TAC to find a better way to deliver the use of force presentations, including the coverage of inequities<br>• The TAC should consider following up with the Chief's office regarding responses to TAC recommendations that require further clarification or action |
| Par. 87 | Substantial Compliance | • No recommendations at this time |
| **V. COMMUNITY-BASED MENTAL HEALTH SERVICES** | | |
| Par. 88 | Substantial Compliance | • No recommendations at this time |
| Par. 89 | Substantial Compliance | • No recommendations at this time |

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| Par. 90 | Substantial Compliance | • PPB, BOEC, and PSR should continue to work together to address officers' concerns |
| **VI. CRISIS INTERVENTION** | | |
| Par. 91 | Substantial Compliance | • Continue to update the COCL and the DOJ on changes to personnel when applicable |
| Par. 92 | Substantial Compliance | • Continue to collect and review data on mental health services, and use this information to update services as needed |
| Par. 93 | Substantial Compliance | • Continue to collect and review data on mental health services, and use this information to update services as needed |
| Par. 94 | Substantial Compliance | • Continue to encourage regular attendance |
| Par. 95 | Substantial Compliance | • Provide use of force statistics and OIS facts to BHUAC in the March 2023 meeting |
| Par. 96 | Substantial Compliance | • Provide use of force statistics and OIS facts to BHUAC in the March 2023 meeting |
| Par. 97 | Substantial Compliance | • Consider seeking BHUAC input during training development rather than after training has been developed |
| Par. 98 | Substantial Compliance | • Consider seeking BHUAC input during training development rather than after training has been developed |
| Par. 99 | Substantial Compliance | • No recommendations at this time |

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| Par. 100 | Substantial Compliance | • Continue utilizing existing data to assess demand for ECIT services |
| Par. 101 | Substantial Compliance | • Re-engage the BHUAC regarding ECIT participation criteria |
| Par. 102 | Substantial Compliance | • Continue to seek out recommendations from the BHUAC on ECIT training |
| Par. 103 | Substantial Compliance | • No recommendations at this time |
| Par. 104 | Substantial Compliance | • Provide the CIT International Conference presentation to BHUAC and publicly post it |
| Par. 105 | Substantial Compliance | • No recommendations at this time |
| Par. 106 | Substantial Compliance | • No recommendations at this time |
| Par. 107 | Substantial Compliance | • No recommendations at this time |
| Par. 108 | Substantial Compliance | • Provide eligibility spreadsheet for officer beginning BHRT service in Q4 |
| Par. 109 | Substantial Compliance | • No recommendations at this time |
| Par. 110 | Substantial Compliance | • Continue to collect data and create reports on mental health services |
| Par. 111 | Substantial Compliance | • No recommendations at this time |
| Par. 112 | Substantial Compliance | • No recommendations at this time |
| Par. 113 | Substantial Compliance | • Create BOEC PSR policy |

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| Par. 114 | Substantial Compliance | • Develop focused training for PSR |
| Par. 115 | Substantial Compliance | • Continue to address PSR issues and determine their implications for policy and training |
| **VII. EMPLOYEE INFORMATION SYSTEM** | | |
| Par. 116 | Partial Compliance | • To achieve Substantial Compliance, require the Force Inspector to conduct the Type III alert process in accordance with Directive 345.00<br>• To achieve Substantial Compliance, implement corrective action for Precinct Commanders when significant review failures occur<br>• Continue contributing to the development of the EIS evaluation |
| Par. 117 | Partial Compliance | • To achieve Substantial Compliance, require the Force Inspector to conduct the Type III alert process in accordance with Directive 345.00<br>• To achieve Substantial Compliance, implement corrective action for Precinct Commanders when significant review failures occur<br>• Continue contributing to the development of the EIS evaluation |
| Par. 118 | Substantial Compliance | • No recommendations at this time |
| Par. 119 | Substantial Compliance | • No recommendations at this time |
| Par. 120 | Substantial Compliance | • No recommendations at this time |

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| **VIII. OFFICER ACCOUNTABILITY** | | |
| Par. 121 | Substantial Compliance | • Continue ensuring cases are closed within 180 days |
| Par. 122 | Substantial Compliance | • No recommendations at this time |
| Par. 123 | Substantial Compliance | • Maintain self-improvement loop for stages that exceed their stage timeline even if the case does not exceed the 180-day timeline |
| Par. 124 | Substantial Compliance | • No recommendations at this time |
| Par. 125 | Substantial Compliance | • No recommendations at this time |
| Par. 126 | Partial Compliance | • To achieve Substantial Compliance, revise Directive 1010.100 to allow for the potential for witness officers being incapacitated for mental health reasons<br>• Provide criteria for detectives to make such a determination |
| Par. 127 | Substantial Compliance | • No recommendations at this time |
| Par. 128 | Partial Compliance | • To achieve Substantial Compliance, the PPB should resolve the records backlog in the Records Division |
| Par. 129 | Partial Compliance | • To return to Substantial Compliance, complete the revisions to the SOP that would codify Administrative Closures – Complainant Unavailable |

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
|  |  | • To return to Substantial Compliance, re-emphasize the responsibilities of on-scene supervisors and provide documentation of efforts to COCL |
| Par. 130 | Substantial Compliance | • No recommendations at this time |
| Par. 131 | Substantial Compliance | • No recommendations at this time |
| Par. 132 | Substantial Compliance | • No recommendations at this time |
| Par. 133 | Substantial Compliance | • No recommendations at this time |
| Par. 134 | Partial Compliance | • To return to Substantial Compliance, evaluate functional concerns and resolve them |
| Par. 135 | Substantial Compliance | • No recommendations at this time |
| Par. 136 | Substantial Compliance | • No recommendations at this time |
| Par. 137 | Substantial Compliance | • To maintain Substantial Compliance, update Directive 338.00 by the end of Q1 2023, publicly post the directive, and provide link to CAG. |
| Par. 138 | Substantial Compliance | • No recommendations at this time |
| Par. 139 | Substantial Compliance | • No recommendations at this time |
| Par. 140 | Substantial Compliance | • No recommendations at this time |
| Par. 169 | Partial Compliance | • To achieve Substantial Compliance, PPB should expand their approach to conducting objective |

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| | | investigations and hold officers accountable when policy violations are found |
| **IX. COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING** | | |
| Par. 141 | Substantial Compliance | • No recommendations at this time |
| Par. 142 | Partial Compliance | • To achieve Substantial Compliance with Par. 142, the City should respond to PCCEP's 2021 third quarter recommendations |
| Par. 143 | Substantial Compliance | • To maintain Substantial Compliance with Par. 143, the City should continue to identify and recruit sufficient PCCEP members to maintain a full body |
| Par. 144 | Substantial Compliance | • To maintain Substantial Compliance, continue adequate staffing dedicated to supporting PCCEP<br>• To maintain Substantial Compliance, post minutes of PCCEP meetings within 10 business days after a PCCEP meeting, including in the Documents section of PCCEP's website |
| Par. 145 | Substantial Compliance | • Seek to improve access to police and City services for individuals with Limited English Proficiency (LEP) through updated policy, training, and dedicated personnel. Make LEP training a priority<br>• Officers' use of the Community Events App should be mandatory, not voluntary, and memorialized in a PPB directive and new training. In essence, PPB should make |

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| | | • community engagement by officers a higher priority<br>• Continue to invest in a one-stop website where community and PPB members can learn about various advisory groups and community engagement events<br>• Make Equity training a higher priority for all officers, with a transition from online to in-person delivery, supported by community partners |
| Par. 146 | Substantial Compliance | • Continue to explore new ways of measuring the quality of police-community interactions |
| Par. 147 | Substantial Compliance | • No recommendations at this time |
| Par. 148 | Substantial Compliance | • To remain in Substantial Compliance for Par. 148, the PPB will need to show that records are being kept consistent with the new Oregon law to improve the measurement of possible discriminatory policing<br>• We recommend that PPB:<br>  ○ Provide additional online training on the search cards<br>  ○ Provide refresher training on bias-free, impartial policing<br>  ○ Continue the dialogue with community members around racial disparities in traffic stops and searches |
| Par. 149 | Substantial Compliance | • As part of everyday policing, introduce a contact survey to measure the level of procedural justice and public satisfaction with |

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| | | police-public interactions, especially interactions with constitutionally-protected populations<br>• Implement anonymous internal surveys of the PPB employees to measure police-community interactions, internal procedural justice, wellness, police culture, and employee satisfaction<br>• Acquire and use software to analyze body worn camera data<br>• As a learning organization, introduce programs, polices, and training curricula that are responsive to these new databases |
| Par. 150 | Substantial Compliance | • No recommendations at this time |
| Par. 151 | Substantial Compliance | • Standardize training for new PCCEP members; Ensure current and future PCCEP members participate in all required trainings and are offered a meaningful opportunity to participate in any optional training |
| Par. 152 | Substantial Compliance | • Standardize training for new PCCEP members; Ensure current and future PCCEP members participate in all required trainings and are offered a meaningful opportunity to participate in any optional training |
| **XI. ADDITIONAL REMEDIES** | | |
| Par. 188 | Substantial Compliance | • No recommendations at this time |
| Par. 189 | Partial Compliance | • To achieve Substantial Compliance, the outside organization, the Independent Monitor, LLC |

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| | | (IMLLC), must collect and analyze data consistent with the Scope of Work, and prepare a report that critically assesses the City's response to the 2020 demonstrations<br>• To achieve Substantial Compliance, the City must use this report to prepare a training needs assessment<br>• To achieve Substantial Compliance, the IMLLC must prepare a follow-up report that reviews the City's response to their original report, including the City's training needs assessment<br>• The City should keep COCL informed of the work planned and completed by IMLLC<br>• The City should provide COCL with IMLLC's reports and the City's training needs assessment report |
| Par. 190 | Substantial Compliance | • To remain in Substantial Compliance, the City must continue to provide a separate line item for PPB training-related overtime expenses<br>• Revisit the staffing and budget for the Training Division, keeping in mind the option of hiring more civilians |
| Par. 191 | Partial Compliance | • To achieve Substantial Compliance, the City and PPB should build in more opportunities for community involvement in the process of hiring the Police Education Director. However, the final decision should be left to the Chief of Police<br>• The City and PPB should look for candidates who understand both policing practices and best practices in teaching and evaluation |

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
|  |  | • The Police Education Director and Captain of the Training Division should report to the same Assistant or Deputy Chief<br>• The Police Education Director should explore professional development classes for PPB Training instructors |
| Par. 192 | Partial Compliance | • To achieve Substantial Compliance, complete a thorough and accurate investigation of the command personnel associated with the 2020 crowd control<br>• To achieve Substantial Compliance, hold accountable the investigated command personnel members who were found to have violated PPB policies (including this Agreement) as described in Par. 192 |
| Par. 193 | Substantial Compliance | • No recommendations at this time |
| Par. 194 | Partial Compliance | • To achieve Substantial Compliance, the City "shall implement body-worn cameras (BWCs) pursuant to a policy that is subject to the policy-review-and-approval provisions of this Agreement" (Par. 194). This means that (1) once bargaining has been completed and (2) the BWC policy has been finalized, the City will need to (3) introduce adequate training, and (4) complete a successful pilot test, followed by (5) full-scale implementation of BWCs for PPB officers<br>• During the bargaining process, we encourage the City to incorporate the recommendations from the community, the COCL and the DOJ |

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| | | • The PPB should seek to acquire software for analyzing BWC data and identifying patterns in police-community interactions that can be used for training and coaching |
| Par. 195 | Partial Compliance | • To achieve Substantial Compliance, the PAC must submit to the City Council a clear and reasonable proposal for the implementation of a Community Police Oversight Board (CPOB) as defined in Par. 195 and compliant with collective bargaining obligations<br>• To achieve Substantial Compliance, the City must implement a functional CPOB that is properly staffed, trained, operational, and able to effectively investigate and dispose of use of force and misconduct cases |

# III. USE OF FORCE

## A. Use of Force Policy

---

**Settlement Agreement Paragraph**

66. PPB shall maintain the following principles in its existing use of force policies: (a) PPB shall use only the force reasonably necessary under the totality of circumstances to lawfully perform its duties and to resolve confrontations effectively and safely; and (b) PPB expects officers to develop and display, over the course of their practice of law enforcement, the skills and abilities that allow them to regularly resolve confrontations without resorting to force or the least amount of appropriate force.

67. <u>COCL Summary</u>: Paragraph 67 establishes that the PPB shall add several core use of force principles to its force policy: the use of disengagement and de-escalation techniques, calling in specialized units when practical, taking into account all available information about actual or perceived mental illness of the individual, and the appropriate de-escalation of force when no longer necessary. Par. 67 also indicates that the force policy should include mention that unreasonable uses of force shall result in corrective action and/or discipline. (For details and exact language, see the Settlement Agreement)

| | |
|---|---|
| **Compliance Label** | Par. 66 Substantial Compliance |
| | Par. 67 Substantial Compliance |
| **Methodology** | Review force case sample |

**Compliance Assessment**

As part of our regular review of PPB force events, we evaluated 20 cases which represent a randomly-drawn cross-section of PPB's use of force, including force from different categories, from different precincts, involving the use of a CEW, and against persons in mental health crisis. For this quarter, all cases we reviewed were consistent with the requirements of Pars. 66 and 67. Overall, we found that applications of force were reasonable, and officers demonstrated sound tactics in their approach to events as well as in their attempts to minimize

---

the force necessary for the safe resolution of the events. In some cases, we were impressed with the overall restraint demonstrated by officers, a fact that was also reflected in the witness statements we reviewed. The cases we reviewed this quarter demonstrated adherence to the core use-of-force principles that PPB has memorialized in their policies and training. We therefore find PPB has returned to Substantial Compliance for this quarter with respect to this paragraph.

As with prior quarters, we did not find any cases where officers did not attempt de-escalation tactics when reasonably able to do so. However, we do continue to see inconsistencies in officers' descriptions of de-escalation. This continues to be a trend from prior quarters and PPB has yet to address it despite its implications for data accuracy, policy compliance, and the ability of PPB to reliably serve as an evidence-based learning organization. Therefore, if PPB does not address this issue by the end of the second quarter (more than five months from this report), we will no longer be able to find them in Substantial Compliance with this paragraph.

In doing so, we recommend PPB revise and re-issue prior guidance to all officers on what does and does not constitute de-escalation. In the past, PPB had issued guidance on this, and in the immediate quarters following, we saw a marked improvement in overall descriptions of de-escalation. This could either be done as an online training, roll-call training, or in PPB's upcoming in-service. In developing the guidance, we suggest PPB provide COCL with timely drafts so as to be able to offer real-time feedback. After the training, we would also suggest PPB conduct an evaluation to determine whether officers have improved in the accuracy and consistency of describing de-escalation. As always, we would be happy to provide PPB technical assistance in conducting this evaluation too.

| | |
|---|---|
| **COCL Recommendations** | <ul><li>To maintain Substantial Compliance, continue evidencing positive force events</li><li>To maintain Substantial Compliance, revise and re-issue guidance on de-escalation</li></ul> |
| **Assessment Based On** | COCL review of force sample |

## 1. Electronic Control Weapons

---

### Settlement Agreement Paragraph

68. COCL Summary: The PPB shall revise PPB Directive 1051.00 regarding Taser, Less-Lethal Weapons System to include several core principles: ECWs will not be used for pain compliance against those suffering from mental illness or emotional crisis except in rare circumstances; officers shall issue verbal warnings or hand signals (if communication barriers exist); conventional standards for using ECW should be followed (e.g. one ECW at a time, re-evaluation; attempt hand-cuffing between cycles). Officers shall describe and justify their use of ECW in their Force Report, and receive annual training in ECW use. (For details and exact language, see the Settlement Agreement).

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review force case sample |

### Compliance Assessment

Based on our review of PPB force events, we find that PPB officers continue to use CEWs in accordance with the Settlement Agreement (Par. 68). For this quarter, we reviewed a total of five force events involving an officer's use of a CEW. In each case, we found the use of CEW to be reasonable. In the five cases, none of the cases were CEWs used for pain compliance, or more than one CEW was used at a time. For each of the CEW force events, officers were able to place the subject in custody without having to resort to a higher level of force.

However, we found two CEW cases which appear to indicate some confusion with regards to each CEW cycle requiring independent justification. For instance, in one case, a supervisor did not independently evaluate a second CEW application since "the second activation is not a force application due to no charge being delivered to the subject in question." In the second case, however, two officers indicated that attempted CEW charges were not successfully delivered; in that case, the sergeant did independently evaluate each attempted application, even when they didn't deliver a current. This second case is the correct approach as it adheres to the PPB policy and training that COCL and DOJ had approved in the past. Going forward, PPB should ensure that all CEW cycles are independently evaluated during the AAR process, in

---

**Exhibit A**

accordance with Directive 1015.00 (Less Lethal Weapons and Tools) (see Section 7.1.8 and definition of CEW cycle). The first case also represents a substantial error on the part of the reviewing supervisor as well as the chain-of-command (who did not correct the supervisor's error), an issue we include in our discussion of Par. 70.

| **COCL Recommendations** | • Resolve confusion regarding CEW applications |
|---|---|
| **Assessment Based On** | COCL review of CEW cases |

## 2. Use of Force Reporting Policy and Use of Force Report

| **Settlement Agreement Paragraph** |
|---|
| 69. PPB shall revise its policies related to use of force reporting, as necessary, to require that: (a) All PPB officers that use force, including supervisory officers, draft timely use of force reports that include sufficient information to facilitate a thorough review of the incident in question by supervisory officers; (b) All officers involved or witnesses to a use of force provide a full and candid account to supervisors; (c) In case of an officer involved shooting resulting in death, use of lethal force, or an in-custody death, PPB will fulfill its reporting and review requirements as specified in directive 1010.10, as revised. This will take place of Directive 940.00 reports for the purposes of paragraphs 70, and 72-77 of this Agreement. |

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Review force case sample |

| **Compliance Assessment** |
|---|
| As noted in our assessment of Pars. 66 and 67, our review of 20 PPB force events did not find any cases in which the FDCRs would be considered below standards. For all force events, we found officers' reports to be comprehensive and, where minor deficiencies were present, they |

**Exhibit A**

were regularly identified and resolved by the chain of command. As a result, we find that PPB has returned to Substantial Compliance for this paragraph in this quarter. However, as discussed above, we continue to find inconsistency in descriptions of de-escalation, leading us to recommend PPB revise and re-issue previous guidance on what is and is not considered de-escalation in order to maintain compliance with this paragraph.

| **COCL Recommendations** | • To maintain Substantial Compliance, continue evidencing positive force events<br><br>• To maintain Substantial Compliance, revise and re-issue guidance on de-escalation |
|---|---|
| **Assessment Based On** | COCL review of force cases |

### 3. Use of Force Supervisory Investigations and Reports

| **Settlement Agreement Paragraph** |
|---|
| 70. COCL Summary: Paragraph 70 states, "PPB shall continue enforcement of Directive 940.00, which requires supervisors who receive notification of a force event to respond to the scene, conduct an administrative review and investigation of the use of force, document their findings in an After Action Report and forward their report through the chain of command." Paragraph 70 continues on to describe what is required of supervisory officers when a use of force event occurs, including timeframes for After Action Reports, notification requirements of serious use of force, force against individuals with mental illness, suspected misconduct, procuring medical attention, and officer interviews (For details and exact language, see the Settlement Agreement). |

| **Compliance Label** | Partial Compliance |
|---|---|
| **Methodology** | Review of force cases |
| **Compliance Assessment** | |

As noted above, as part of our regular review of PPB force events, we evaluated 20 cases which represent a cross-section of PPB use of force. Overall, we find that the After-Action Reviews (AARs) we evaluated for this quarter to be consistent with the letter and intent of Par. 70. Specifically, we continue to be impressed with the supervisors' attention to detail and correcting report-writing deficiencies in a timely manner. While we do not find the incorrect review of CEW applications discussed in Par. 68 to be consistent with Par. 70, this is only one of the 20 AARs we reviewed.

In providing an update from prior reports, there continued to be cases in which a Category II use of force was reviewed as a Category III (i.e., a downgrade the seriousness of the force used). In speaking with the Force Inspector, we were informed that this was due to confusion with the definition of "treatment" at the hospital (e.g., whether an individual was admitted or not). The underlying issue has since been resolved with the revisions to Directives 1010.00 and 910.00 though we maintain our position that corrective action be taken. We also maintain that corrective action be taken against supervisors for significantly deficient reports that we have discussed in prior compliance assessments. We discuss these issues in our assessment of Par. 73 as well.

| | |
|---|---|
| **COCL Recommendations** | • To achieve Substantial Compliance, review cases and take corrective action |
| **Assessment Based On** | COCL review of force cases |

| **Settlement Agreement Paragraph** | |
|---|---|
| 71. PPB shall maintain adequate patrol supervision staffing, which at a minimum, means that PPB and the City shall maintain its current sergeant staffing level, including the September 2012 addition of 15 sergeants. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review rate of officers to supervisors |

**Compliance Assessment**

The PPB has maintained an adequate patrol-supervision staffing level in accordance with Par. 71. As noted in prior reports, the rate of officers to sergeants is a better metric than the raw number of sergeants. In the third quarter of 2022, the PPB reported a staffing ratio of 6.3 officers for every sergeant (including Acting Sergeants) across the three precincts. In Q3 the PPB is currently operating with twelve sergeants under their authorized amount, which represents an even larger deficiency than we reported in our last report when they were operating ten sergeants under their authorized amount. As shown in Figure 3.1, we see the highest ratio of officers to sergeants when compared to recent years. While we still maintain that the ratios are reasonable across all three precincts (and therefore continue to find Substantial Compliance with this paragraph), PPB should continue to monitor these ratios to ensure they don't become so high that sergeants are unable to manage the number of officers under their supervision.

**Figure 3.1**



### Officers to Sergeants Ratio

| | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 |
|---|---|---|---|---|---|---|---|---|---|
| | 4.8 | 4.8 | 5 | 5 | 5.4 | 5.5 | 5.4 | 5.9 | 6.3 |
| | 2020 | | 2021 | | | | 2022 | | |

**Exhibit A**

| COCL Recommendations | • Continue monitoring and reporting ratio of officers to sergeants |
|---|---|
| Assessment Based On | COCL review of ratio of officers to sergeants |

---

**Settlement Agreement Paragraph**

72. PPB shall develop a supervisor investigation checklist to ensure that supervisors carry out these force investigation responsibilities. PPB shall review and revise the adequacy of this checklist regularly, at least annually.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review current AAR form; Review upcoming web form |

**Compliance Assessment**

Presently, the After-Action Report (AAR) form contains the checklist, and therefore we find the PPB has remained in Substantial Compliance with the requirements of Par. 72. Although we assess PPB's use of the AAR form as the "investigation checklist" to be in compliance with this paragraph, we refer the reader to our assessment of other paragraphs for commentary on the use of the AARs themselves.

During the third quarter of 2022, the SharePoint web-based AAR form was launched throughout the entire Bureau. As part of the launch, the PPB provided supervisors with video LMS training and provided further training in the Q4 Supervisors In-Service training (as noted in our last report, the COCL had provided comments on this training). The updated AAR captures data on each of the force investigation responsibilities for supervisors as well as the timelines for each review level. We therefore continue to find Substantial Compliance with the requirements of Par. 72.

| **COCL Recommendations** | • Continue regular reviews of AAR form |
|---|---|
| **Assessment Based On** | COCL review of AAR form |

---

### Settlement Agreement Paragraph

73. COCL Summary: Paragraph 73 directs the PPB to revise its policies concerning chain of command reviews of After Action Reports (940s) to ensure that the reviews are accurate and thorough; that all comments are recorded in the EIS tracking system; that supervisors in the chain are held accountable for inadequate reports and analysis through corrective action (including training, demotion and/or removable from their supervisory position); and that when use of force is found to be outside of policy, that it be reported and appropriate corrective action be taken with the officer and the investigation itself (For details and exact language, see the Settlement Agreement).

| **Compliance Label** | Partial Compliance |
|---|---|
| **Methodology** | Review force case sample |

### Compliance Assessment

As noted in prior paragraphs, we reviewed 20 cases which represent a cross-section of the PPB use of force as well as reviewed the force audit notes compiled by the Force Inspector. Through the combination of the Force Inspector's audit notes as well as in our findings from prior quarters, we have seen several instances in which supervisors have not been held accountable for inadequate reports and analysis, including verifying the correct level of review for force events. In general, PPB appears to address these issues by noting the deficiency and making EIS entries though as we have stated in the past, EIS is not an accountability system, nor does it constitute "corrective action." We therefore continue to recommend PPB provide us with an operational definition for the difference between minor mistakes that can be addressed by supervisor counseling (i.e., EIS) and those that require a more formal review. While PPB

**Exhibit A**

indicates they are currently in the process of drafting such language, we will need to see it incorporated into policy before being able to find PPB has returned to Substantial Compliance for this paragraph. In addition to the outstanding request for clear language on *minor* mistakes, we have also recommended PPB hold supervisors accountable for accurate force reviews given the clear policy language and adequate training they have received. We have previously recommended this in the context of fulsome force evaluation and correct categorization of force and, for this quarter, in the context of accurate CEW review. The need for PPB to hold chain-of-command supervisors accountable remains a barrier to achieving Substantial Compliance for this paragraph.

| | |
|---|---|
| **COCL Recommendations** | • To achieve Substantial Compliance, ensure that chain-of-command supervisors are held accountable for inadequate reports and analysis <br><br> • To achieve Substantial Compliance, clearly distinguish conduct that requires formal review from that which can be corrected by informal counseling |
| **Assessment Based On** | COCL review of force cases <br><br> Lack of clarity in conduct that requires formal review |

**B. Compliance Audits Related to Use of Force**

| |
|---|
| **Settlement Agreement Paragraph** <br><br> 74. COCL Summary: Paragraph 74 states that "In consultation with the COCL, the Inspector, as part of PPB's quarterly review of force, will audit force reports and Directive 940.00 Investigation Reports" and will do this to ensure that the officer's force report is complete and accurate and that the officer's actions in the field are in line with PPB policy. The audit of force reports seeks to ensure that force is used in a way that is lawful and appropriate to the circumstances; that de-escalation is used appropriately; that ECW is used appropriately and within policy; and that specialty units and medical care are called in appropriately. In terms of force reporting, the audit seeks to ensure that reports are submitted in a timely manner; that they include detailed information about the event, the decision to use force, the type of force |

used, any subject resistance and any injuries to the parties; that the report includes the mental health status of the subject of force, documentation of witnesses and contact information, and other details as required by the Settlement. There should be sufficient information in the report to allow supervisors to evaluate the quality of the officer's decision making regarding the use of force. (For details and exact language, see the Settlement Agreement)

75. COCL Summary: Paragraph 75 states that, "In consultation with the COCL, the Inspector shall audit force reports and Directive 940.00 investigations" to determine whether supervisors consistently engage in a variety of behaviors when reviewing use of force reports and supervising their employees. Specifically, the Settlement requires that supervisors complete an After Action Report within 72 hours of being notified of the incident; To perform well at this task, supervisors would need to review all use of force reports for completeness, determine whether the officer's actions are consistent with PPB policy, the Settlement Agreement and best practices; and take all appropriate actions as a supervisor, including determining any training or counseling needs for the officer; taking corrective action on omissions or inaccuracies in the force report; notifying appropriate authorities when criminal conduct is suspected; and documenting all of the above-named actions. (For details and exact language, see the Settlement Agreement)

77. COCL Summary: "In consultation with the COCL, the Inspector shall audit the adequacy of chain of command reviews of After Action Reports." This type of audit by the Inspector will ensure that supervisors at all levels in the chain of command are conscientiously reviewing all After Action (940) Reports using the appropriate legal and administrative performance standards, and taking appropriate action. The reviewers of After Action reports should be assessing the completeness of reports and evaluating the findings using a "preponderance of the evidence" standard. Where appropriate, reviewers should modify findings that do not seem justified, speak with the original investigator, order additional investigations, identify any deficiencies in training, policy or tactics, ensure that supervisors discuss poor tactics with the officer involved, and document the above in EIS. (For details and exact language, see the Settlement Agreement.)

| | |
|---|---|
| **Compliance Label** | Par. 74 Partial Compliance |
| | Par. 75 Partial Compliance |

| | |
|---|---|
| | **Par. 77 Partial Compliance** |
| **Methodology** | Review Quarterly Force Audit Report; Review Force Inspector Memos; Review Force Inspector Phase II Spreadsheet |

<u>**Compliance Assessment**</u>

On a quarterly basis, PPB conducts the audits of force events required by Pars. 74, 75, and 77. As with prior quarters, both PPB officers (through FDCRs) and PPB supervisors (through AARs) continue to demonstrate approximately 99% accuracy in their reporting based on the audits. For instance, during the third quarter, a total of 148 FDCRs were audited and each FDCR had 38 points of review, resulting in a total of 5,624 audit points. Throughout the quarter, the PPB force auditors identified 9 total reporting deficiencies. This equates to 99.8% of reporting accuracy rate or .06 deficiencies per every FDCR (9 total deficiencies divided by 148 total FDCRs). This means that for nearly every seventeen FDCRs audited by PPB, there was one reporting deficiency. Similarly, sergeant reporting (99%) and command review (97%) were both exceptionally high, leading us to the conclusion that, based on their audit methodology, PPB has consistently and reliably reported the circumstances by which they use force.[2]

In addition to ensuring reporting compliance, the Force Inspector reviews force events to find broader issues related to policy, training, equipment, or personnel concerns. In the third quarter of 2022, we saw evidence that the Force Inspector was sending these issues to the appropriate personnel (i.e., RU Managers and Training) using PPB's standardized feedback form. Based on the audit spreadsheet and our review of the feedback forms, the Force Inspector forwarded two cases to Training for review, one case to the Policy division, and four cases to Commanders for various reasons. In addition, there were five events which the Inspector indicated were referred to IA for an investigation of improper or excessive force.

---

[2] As part of our next outcome assessment for Section III, we will conduct an "audit of the audit" to provide independent validation of the audit team's findings.

**Exhibit A**

Overall, the concerns we had noted in prior quarters were absent this quarter as it relates to the Force Inspector demonstrating a willingness to identify potential issues and forward them to the necessary personnel within the Bureau.

However, as discussed in prior paragraphs as well as prior reports, we are still awaiting a defined distinction between what may be handled through informal discussion (i.e., EIS entry) and what is more appropriately handled through formal channels (i.e., referral to IA). Although we recognize the Force Inspector's positive efforts this quarter, the lack of clear distinction continues to prevent PPB from returning to Substantial Compliance with this paragraph.

| | |
|---|---|
| **COCL Recommendations** | • To achieve Substantial Compliance, clearly distinguish conduct that requires formal review from that which can be corrected by informal counseling |
| **Assessment Based On** | Review of Force Audit Report<br><br>Review of Feedback forms |

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 76. In consultation with the COCL, the Inspector shall conduct a quarterly analysis of force data and supervisors' Directive 940.00 reports designed to: (a) Determine if significant trends exist; (b) Determine if there is variation in force practice away from PPB policy in any unit; (c) Determine if any officer, PPB unit, or group of officers is using force differently or at a different rate than others, determine the reason for any difference and correct or duplicate elsewhere, as appropriate; (d) Identify and correct deficiencies revealed by the analysis; and (e) Document the Inspector's findings in an annual public report. | |
| **Compliance Label** | Partial Compliance |
| **Methodology** | Reviewed Quarterly Force Reports |

**Exhibit A**

**Compliance Assessment**

For each of the subsections of Par. 76, the PPB possesses a tool or process to achieve Substantial Compliance. For instance, in addressing subsection (a), the PPB continues to produce quarterly and annual force reports including several important data points and comparisons to prior quarters. Subsection (a) is also addressed, in part, through the Phase II review wherein the Force Inspector identifies organizational trends. For subsections (b) and (c), the Force Inspector reviews the findings of a comparative analysis of each officer, unit, and group (as defined by common days off), identifying differences and discussing the analysis with each patrol RU Manager. For subsection (d), the Force Inspector either provides a memo to the RU Manager or creates a manual EIS alert (see also Par. 117). Finally, for subsection (e), the Force Inspector memorializes findings of the reviews in annual reports, including the Annual Force Summary Report and Annual Force Audit Summary Report.

These processes often provide important information regarding use of force trends which can be viewed in a number of lights. One light is the relative frequency by which the PPB uses force. For instance, the third quarter Force Analysis Summary Report indicates that the number of force cases remained the same between the second and third quarters of 2022 (169 cases involving force) and the number of individuals experiencing some type of force by a PPB officer was 170 (compared with 171 in Q2). This number may be further contextualized by the fact that the third quarter contains 92 days, meaning that for each day, an average of 1.85 individuals experienced some type of force by PPB officers. Breaking this down even further this also means that, even if only considering the three main precincts, there is an average of .62 uses of force per day in each precinct. This also doesn't account for uses of force outside of precinct patrol (e.g., uses of force by the Detectives Division) meaning that average patrol officers are using force a lower rate than .62 times per day per Precinct. Even further informing this is the fact that 61% of force applications by PPB are resisted handcuffing and control against resistance, neither of which results in a subject injury and neither of which is categorized as force in the broad majority of law enforcement agencies across the nation.

Taken together, PPB does not appear to use a high <u>number</u> of force and the force that <u>is</u> used appears relatively minor.[3]

However, despite relatively low raw numbers of Category II-IV use of force, there are trends within the trends that PPB can take a closer look at to consider remedial action. For instance, as noted in the past, we continue to have concerns with how outlying officers (subsection c of Par. 76) are identified and addressed. We discuss these issues in much greater depth in our assessment of Pars. 116 and 117, though for this paragraph, discuss simple distributions across officers. In reviewing PPB's Q3 force data, we identified 166 officers across the three precincts that used force at least one time. Of officers that used force, approximately 95% used force three or fewer times throughout the quarter. However, there were two officers who used force seven times and one officer who used force eight times. These three members represent 0.9% of all officers identified in the spreadsheet and only 1.8% of officers who used force. Yet, they represent 7.4% of all FDCRs authored for the quarter. However, these members were not specifically referred for any type of remedial training on force avoidance tactics or any other type of intervention (again, see further discussion of this in our assessment of Pars. 116/117).

**Table 3.1**

| # of FDCRs | Central A-Shift | Central C-Shift | Central E-Shift | East A-Shift | East C-Shift | East E-Shift | North A-Shift | North C-Shift | North E-Shift |
|---|---|---|---|---|---|---|---|---|---|
| 8 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 7 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |
| 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 5 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| 4 | 0 | 0 | 0 | 3 | 0 | 1 | 0 | 0 | 0 |
| 3 | 1 | 5 | 4 | 5 | 3 | 5 | 1 | 1 | 0 |
| 2 | 3 | 4 | 6 | 3 | 13 | 6 | 2 | 3 | 2 |
| 1 | 13 | 10 | 7 | 10 | 13 | 8 | 5 | 15 | 9 |
| 0 | 17 | 13 | 15 | 14 | 13 | 9 | 22 | 27 | 18 |
| TOTAL OFFICERS | 34 | 34 | 32 | 35 | 43 | 31 | 30 | 46 | 29 |
| TOTAL FDCRs | 22 | 48 | 31 | 43 | 53 | 51 | 12 | 24 | 13 |

---

[3] We recognize that these numbers are based on the use of force reported on PPB's publicly available dashboard, which does not include crowd control or OIS events. Particularly given that PPB has had 17 OIS events in the past two years (the highest 2-year total since at least 2010), the reader should interpret our analysis with this in mind.

**Exhibit A**

Furthermore, as it relates to force against persons in mental health crisis, we have commented in the past that the proportion of uses of force against persons in mental health crisis has increased in the past several years. For the third quarter of 2022, the proportion was 16.5%, consistent with the Q2 data though still representing an overall upward trend over time. In their analysis, PPB noted that the proportion of <u>armed</u> persons in mental health crisis was increasing at a greater rate than those not in mental health crisis, thus providing one potential explanation. Consistent with PPB, our own analysis demonstrates this as well. For instance, in 2017, persons in mental health crisis were considered unarmed in 64.2% of use of force events – in 2022 (YTD), they were unarmed in only 42% of use of force events. For persons not in mental health crisis, this decline was less dramatic, going from 68% in 2017 down to 57% in 2022 (YTD).

**Figure 3.2**



While PPB had identified this trend, it is less clear whether PPB has taken any action to address the trend. One way to do this is by digging further into the data to identify specific incidents that PPB could focus on. For instance, looking across the last three years, the greatest increase in armed status for persons in mental health crisis has been "Needle/Spit," moving from 4.7% in 2020 (a total of 6 instances) to 11.8% in 2022 YTD (a total of 13 instances) (this also includes

persons in mental health crisis that were considered unarmed or where there was a weapon present but not used). Put differently, a ratio of 1 out of every 20.3 persons in mental health crisis were categorized as armed with "Needle/Spit" in 2017; in 2022, this had increased to 1 out 7.8 persons in mental health crisis (a more than 2.5X increase). Recognizing this increase, PPB could consider identifying specific force avoidance tactics for persons categorized as armed in this way (consistent with subsection d of Par. 76).

**Table 3.2**

| | Persons in Mental Health Crisis - Armed Status | | |
|---|---|---|---|
| | 2020 | 2021 | 2022 (YTD) |
| Unarmed | 54.7% (N=70) | 52.4% (N=87) | 42.7% (N=47) |
| Blunt Weapon | 7% (N=9) | 7.8% (N=13) | 7.3% (N=8) |
| Firearm | 0% (N=0) | 0.6% (N=1) | 0.9% (N=1) |
| Knife/Edged Weapon | 12.5% (N=16) | 8.4% (N=14) | 12.7% (N=14) |
| Needle/Spit/Bodily Fluid | 4.7% (N=6) | 7.8% (N=13) | 11.8% (N=13) |
| Weapon Present But Not Used | 16.4% (N=21) | 19.3% (N=32) | 16.4% (N=18) |

In sum, we continue to find that PPB does an exceptional job at collecting and reporting data (i.e., making the data publicly available either through the public dashboard or through quarterly reports). However, we continue to note greater potential for exploring the data and using it to, where possible, decrease the use of force. This can either be by identifying individual officers showing disproportionately higher force utilization or by identifying specific characteristics of force that can be addressed in unique ways. While we have seen improvement in the Force Inspector identifying individual incidents that warrant forwarding to other appropriate PPB personnel (see our assessment of Pars. 74, 75, and 77, above), this should also be expanded to broader trends through more extensive data analysis.

| | |
|---|---|
| **COCL Recommendations** | • To achieve Substantial Compliance, comment on trends over time and make suggestions for correcting/duplicating elsewhere <br><br> • To achieve Substantial Compliance, resume the practice of the Force Inspector identifying potentially problematic officers |
| **Assessment Based On** | COCL review of quarterly Force Data Summary Reports |

| | COCL review of PPB data |
|---|---|

# IV: TRAINING

**Overview of Training Systems**

The COCL's framework for assessing compliance with Section IV remains unchanged. Specifically, we assess the extent to which the PPB's training systems: (1) identify areas where officers require training; (2) develop and deliver appropriate and high-quality training; (3) develop and implement a valid and useful system of training evaluation both in the short and long term; (4) document and report training delivered and received; and (5) audit the overall training system to ensure that it is accountable to the administration and the public.

**Overview of Methods**

The COCL continues to review and critique training documents, including training needs assessment reports, training plans, lesson plans, PowerPoint presentations, evaluation instruments, and evaluation reports. The COCL also continues to observe training (either in-person or online), observe TAC meetings, and conduct interviews with the PPB members and others as needed. Our reviews, observations, and analyses allow us to assess the adequacy of the training systems and whether officers are being properly prepared to protect the constitutional rights of all individuals, including those who have or are perceived to have mental illness.

**Assessment of Compliance**

| **Settlement Agreement Paragraph** | |
|---|---|
| 78. All aspects of PPB training shall reflect and instill agency expectations that officers are committed to the constitutional rights of the individuals who have or are perceived to have mental illness whom they encounter and employ strategies to build community partnerships to effectively increase public trust and safety. To achieve these outcomes, PPB shall implement the requirements below. | |
| **Compliance Label** | Partial Compliance |

| Methodology | This is a summative judgment that is contingent upon satisfying all paragraphs in Section IV |
|---|---|

**Compliance Assessment**

The PPB has achieved only Partial Compliance with Paragraph 78 because Substantial Compliance requires the PPB to "implement the requirements below." Because this is a summative paragraph, compliance will be assessed in terms of the achievement of all requirements of the Settlement Agreement pertaining to Section IV, Training.

We will continue to focus on the primary training for all officers and supervisors, and special mental health trainings for ECIT, as these are the training courses most central to the Settlement Agreement. However, given the problems that occurred with the PPB's crowd management during the 2020 protests, the COCL added this subject to our training evaluation agenda beginning in 2021.

We will continue to evaluate training progress in terms of the fidelity of implementation and whether these trainings are likely to achieve the desired outcomes listed in Par. 78.

| COCL Recommendations | • To achieve Substantial Compliance, the PPB must substantially comply with all paragraphs within Section IV |
|---|---|
| Assessment Based On | Summative and contingent upon satisfying all paragraphs of Section IV, based on the methods identified for each |

**Assess Training Needs**

| | |
|---|---|
| **Settlement Agreement Paragraph** | |

79. The Training Division shall review and update PPB's training plan annually. To inform these revisions, the Training Division shall conduct a needs assessment and modify this assessment annually, taking into consideration: (a) trends in hazards officers are encountering in performing their duties; (b) analysis of officer safety issues; (c) misconduct complaints; (d) problematic uses of force; (e) input from members at all levels of PPB; (f) input from the community; (g) concerns reflected in court decisions; (h) research reflecting best practices; (i) the latest in law enforcement trends; (j) individual precinct needs; and (k) any changes to Oregon or federal law or PPB policy.

| Compliance Label | Substantial Compliance |
|---|---|
| **Methodology** | Interviewed PPB staff and reviewed internal training documents.<br><br>Eventually, COCL will assess the extent to which PPB has incorporated the findings of the independent Critical Incident Assessment of 2020 crowd control into its Crowd Management training needs assessment. |

**Compliance Assessment**

During the third quarter of 2022, the Training Division finalized its annual training needs assessment and crowd management needs assessment reports. They continued to refine their 2022 training plans and did considerable work on planning their crowd management training that is scheduled to begin in January 2023.

For the Annual Training Needs Assessment, the Training Division gathered information on use of force and injuries, DOJ priorities, misconduct complaints, changes in PPB policy, changes in Oregon law, and research on best practices and trends in policing. This required separate meetings with the Inspector General, Force Inspector, Force Audit Team, IPR Director, PPB's Policy Team, Training's In-Service Management, and others to discuss and evaluate this information.

The Training Division also sought input from PPB members (via In-Service surveys), and from the Portland community via the Training Advisory Council (TAC), the Coalition of Advisory Groups (CAG), and PPB's Equity & Inclusion Office (EIO). COCL is satisfied that the Training Division continues to conduct a thorough assessment of training needs, thus meeting and exceeding the requirements of Par. 79.

_Crowd Control Needs Assessment_. Beginning in 2021, the PPB has invested considerable time and resources seeking to prepare for crowd management training in 2023. The same sources of information and City units cited above were also used to prepare their Crowd Management Needs Assessment this quarter. In addition, this required special meetings to review changes in PPB's directives (e.g., 1010.00 and 635.10), Oregon and Federal Law, and recent Court decisions. Also, to plan for crowd management, meetings were held with the Incident Management Team, Crowd Management Incident Commander management, Training Division management, Specialized Resource Division management, Lead Instructors, and Training Analysts. The Training Division also examined local data, research studies, and reports on topics such as use of less lethal force, complaints, and police responses relevant to public demonstrations.

We appreciate that PPB has sought to learn from existing reports on best practices. For example, PPB reports that they have reviewed the crowd management guidelines from the United Nations' Human Rights Committee: _General comment No. 37 (2020)_ on the right of peaceful assembly, the ACLU's _Know Your Rights: Protesters' Rights_, and Amnesty's International's _Good Practice for Law Enforcement Officials Policing Demonstrations._ Also, COCL has recommended that Portland learn from the crowd management experiences of other law enforcement agencies in the United States by reading the Police Executive Research Forum's report (2022) _Rethinking the Police Response to Mass Demonstrations: 9 Recommendations._[4]

---

[4] https://www.policeforum.org/assets/ResponseMassDemonstrations.pdf

**Exhibit A**

The Training Division also sought input from the community and other stakeholders when preparing its Crowd Management Needs Assessment. They have looked at literature on local protesting and extremist groups, DHM's 2020 survey on the public's view of the protests,[5]

and information from neighborhood organizations, TAC, Portland Business Alliance, and others. Furthermore, the Needs Assessment Analyst has reviewed the logs of Incident Command System Activity for additional information about crowd dynamics, criminal activity, and de-escalation practices. In summary, the Training Division and other City personnel have done their homework on crowd management.

The remaining question is – what has PPB learned from this body of knowledge and how can it be applied to future training? First, we note that PPB's Training Needs Assessment report now includes Crowd Management Training along with all other PPB training programs. It identifies 12 specific topics/skill areas for general In-Service training (all officers) and six topics/skill areas for Supervisor In-Service training. (See pages 10-13). PPB's Crowd Management report goes further to cover topics/skill areas not only for all officers and supervisors, but for the Incident Management Team. It also includes training recommendations around the Specialized Incident Command System.

COCL will not review all these topics here, but any readers interested in the details are encouraged to read these reports. Here we provide a few comments. First, we are pleased to see renewed attention to the Incident Management team and the importance of their role in managing personnel, communicating with the public in a transparent manner, and documenting events that occur. Second, we appreciate that some attention is given to enhancing skills in communication, procedural justice, and de-escalation when interacting with the public. We look forward to observing the extent to which the many gaps in skills and knowledge are addressed in the 2023 In-Service training. As the report indicates, some of these skills have already been addressed in previous trainings, including the FEMA training,

---

[5] 2020 Public Perspectives Survey Results Summary of Oregon Protests -
extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.dhmresearch.com/wp-content/uploads/2020/09/DHM-Panel-Protests-memo_final-September-2020.pdf

**Exhibit A**

but PPB admits that other skills require additional training. Finally, we continue to emphasize the importance of role-play scenarios and debriefings as effective training tools.

The COCL continues to appreciate this preparatory work on crowd management and believes that it is an excellent investment of time and resources, especially considering our expressed concerns about PPB's response to the 2020 protests. This work contributes to COCL's rating of Substantial Compliance with Par. 79. However, we expect that PPB will eventually supplement its own needs assessment with the needs assessment that results from the external Critical Assessment of the 2020 protests (see Par. 189). Failure to do so will result in a return to Partial Compliance for Par. 79, but at this point, the PPB is doing what it can under the circumstances. COCL will conduct a separate compliance review of the external assessment under Par. 189.

| **COCL Recommendations** | • Include training with robust scenarios and feedback loops to strengthen interpersonal communication skills<br><br>• When the external Critical Incident assessment of Crowd Control has been completed, incorporate the training implications of this study into PPB's training needs assessment |
|---|---|
| **Assessment Based On** | Review of the PPB's internal training documents and interviews with the PPB personnel |

**Evaluate Training**

**Settlement Agreement Paragraph**

80. Within 180 days of the Effective Date, PPB shall develop and implement a process that provides for the collection, analysis, and review of data regarding the effectiveness of training for the purpose of improving future instruction, course quality, and curriculum. These evaluations shall measure and document student satisfaction with the training received; student learning as a result of training; and the extent to which program graduates are applying the knowledge and skills acquired in training to their jobs. This audit shall be

reported to the Training Division Manager and shall include student evaluations of the program and the instructor.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Interviewed PPB staff and reviewed internal training documents<br><br>Assessed the methods of evaluation, content, and the presence of a complete evaluation system with feedback loops |

**Compliance Assessment**

The PPB's training evaluation system continues to rely on multiple methods of data collection, analysis and reporting. The Training Division administers in-class quizzes/surveys, anonymous post-class evaluation surveys, knowledge tests, scenario skills tests, and classroom observations. We continue to review these instruments and methods and provide the PPB with feedback from a scientific research perspective. Overall, we continue to be satisfied with the methods and measures employed by the PPB in the third quarter of 2022 and continue to offer a few recommendations for improvement.

During the third quarter, the Training Division continued to evaluate various trainings. The Evaluation team collected data during In-Service training for all officers and Advanced Academy training for new recruits. They also finalized their evaluation report for the 2021 Enhanced Crisis Intervention Team (ECIT) training, which is reviewed by COCL in the Training Outcome Assessment for this report. The Training Evaluation team also produced internal reports for the Training Division and PPB members (including six reports on student evaluations of online training). Using these reports, the Analyst continued to meet with the Training Division managers and lead instructors to discuss the evaluation results and to evaluate student performance in skill drills and scenario training. Overall, COCL is satisfied with the content of the exams, surveys, and scenario scoring procedures used to evaluate training in the third quarter.

**Recommendations and Responses**

Over the years, the COCL has made various recommendations to improve the evaluation of training programs, and to a large extent, the Training Division has been responsive to these suggestions. Here we review these ideas.

The COCL has encouraged role-play scenarios and is satisfied with the "Scenario Scoring Rubric" used to evaluate students during the In-Service Patrol Procedure scenarios. This scenario evaluation tool covers use of force decisions, force warnings, de-escalation, emergency medical aid, and procedural justice, with scores of "Unacceptable," "Needs Improvement," and "Acceptable." We continue to advocate for occasional scenarios where officers can be evaluated individually rather than in groups. We also encourage PPB to keep documentation of student performance on specific skills.

Despite limited staffing, the evaluation team has been productive. Yet, much more would be possible if the Training Division had more analysts. The evaluation of training quality and effectiveness must be a pillar of police reform. Frankly, the Training Division is understaffed and underbudgeted, and this problem spills over onto the analyst positions. Again, we point out that analysts have been tasked with work that others should be doing (e.g., developing lesson plans and helping with the TAC). Also, turnover has been high in these research positions. The turnover in sworn personnel at the Training Division is also problematic (e.g., four different Captains running the Training Division over the past two years), with projects starting and stopping under the "musical chairs" of management. Hopefully, the Civilian Dean can address this problem and help create a more supportive and stable work environment for everyone.

Previously, COCL recommended that PPB look for ways to ensure that officers have time to complete LMS online trainings. Through the evaluation surveys, officers have expressed their concern about watching videos in their vehicle, especially with the increase in violent crime. As a result, some Training Division staff have recommended that PPB schedule certain times each week, such as right after roll call, for this training. Officers could be assigned separate times each week to spread out the workload. Also, we understand that the Training Division is shortening the online trainings and posting fewer of them to help alleviate this problem. Watching videos while on the job is not the best learning environment, especially for new material.

The Training Division should introduce outcomes metrics to capture "the extent to which program graduates are applying the knowledge and skills acquired in training to their jobs."

**Exhibit A**

(Par. 80). This quarter, the Training Division has moved in this direction. The evaluation of the ECIT program is a fine example, where analysts have examined several post-training metrics to estimate whether training is making a difference on the job. Data from the mental health template and BOEC dispatch data, for example, were used to look at how officers are responding to ECIT calls and using mental health resources.

As part of this outcome assessment, the Training Division compiled data from post-training surveys between 2013 and 2021. While the survey questions were good, COCL remains concerned about the low response rates for these online surveys. Between 2013 and 2021, the average number of surveys completed per year was 10. Of the 29 ECIT officers who received the training in 2021, only 4 completed the survey, resulting in a 13.8% response rate. The problem with a small sample from a much larger population of ECIT officers is that it is very unlikely to represent the larger population that received the training, and therefore, is likely to produce misleading results. The PPB acknowledges this problem, but here we recommend specific and highly effective action to correct it. Specifically, the COCL continues to recommend that the completion of these surveys be mandatory for all officers. Also, for in-person classes, the students should be required to take the survey before they leave the classroom, which is typically the case. We acknowledge the Training Division's strong objection to mandatory surveys, but COCL views these surveys as no different that tests or exams administered here or in a college class – they are a fundamental part of the training/educational process, not an independent research project designed to advance knowledge in the field. When the latter is true, informed consent should be obtained.

While we applaud the Training Division for looking at potential outcome metrics and possible improvement over time, the current approach to evaluating training will not allow the PPB to say, with confidence, that the changes are due to training. Such a conclusion is possible only with stronger evaluation designs, namely, designs that include pretest and posttest measures for both treatment and control groups. To increase confidence that positive outcomes are due to training and not the result of other events experienced by PPB officers, COCL has recommended that PPB go further to introduce the strongest evaluation design, the Randomized Control Trial (RCT), where officers are randomly assigned to receive the new

**Exhibit A**

training or receive the control group training[6]. We encourage the new civilian Director of Training to promote this type of evidence-based practice within the PPB, so that knowledge regarding training effectiveness can be advanced much more rapidly.

| | |
|---|---|
| **COCL Recommendations** | • Return all Training Analysts to their original jobs and hire more analysts to ensure the best training needs assessment, training plan, and scientific knowledge about the quality and effectiveness of training<br><br>• Make training surveys mandatory, not optional, to improve response rates and produce valid survey findings<br><br>• Conduct more scientific evaluations of on-the-job outcomes, and include contact surveys to measure the impact of training on police-community interactions and procedural justice |
| **Assessment Based On** | COCL review of training evaluation tools, quality of data, and systems of reporting and feedback |

**Document Training Delivered and Received**

| |
|---|
| **Settlement Agreement Paragraph**<br><br>81. PPB shall ensure that the Training Division is electronically tracking, maintaining, and reporting complete and accurate records of current curricula, lesson plans, training delivered, attendance records, and other training material in a central, commonly accessible, and |

---

[6] Officers in the control group should receive the new training at a later date, assuming it is effective (which is unknown). However, training on legal and policy changes cannot be delayed.

organized file system. Each officer's immediate supervisor shall review the database for the officers under his/her command at least semi-annually.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Requested and reviewed LMS records for the second quarter; Requested and observed electronic inquiries of LMS files |

**Compliance Assessment**

The Training Division continues to use the Cornerstone Learning Management System (LMS) to record officer training. LMS attendance records were updated in the third quarter for all in-person and online trainings completed by PPB members, including videos, directives, legal updates, knowledge checks, weapons qualifications, and Tips & Techniques. This included seven training videos and eight PPB directives in the third quarter (See Par. 84). Records of external trainings continue to be maintained for any training that is reported to the Training Division.

During our site visit, we looked at the LMS master list of trainings. We randomly selected supervisors and officers and then confirmed that PPB had recorded their attendance at the required trainings. We confirmed that officers' attendance at the specialty training for SERT and CNT at Camp Rilea had been recorded in LMS. We also checked that officers had read the force-related directives (0910.00, 1010.00, and 1015.00) and mental health-related directives (0850.20, 0850.21, 0850.22, and 0850.25), and had completed the video training on consent searches (0650.00). Finally, we confirmed that PPB members had read the amended Settlement Agreement.

By reviewing LMS training hours, the Training Division can ensure that the PPB members remain in compliance with Oregon state standards and have received the training required by the PPB. LMS is used to ensure that the PPB employees who are not on leave are completing their required training and that these records are reviewed by supervisors.

The review and compliance process has not changed: the PPB employees are given 30 days to complete training and are sent email reminders 14 days, seven days, and one day before the due date, and one day past the due date. Their RU manager sends emails regarding training delinquencies at one, five, and 21 days past the due date.

When the PPB members fail to complete online training in this time period, the Training Division sends non-compliance memos to the Chief's office, which COCL has reviewed. Focusing on sworn PPB members, ten such memos (covering ten classes) were sent to the Chief's office for review during the third quarter of 2022. The COCL found that, in total, there were 24 cases where an officer did not complete one or more classes.[7] If the absence is justified (e.g., long-term medical leave), the Training Division is notified and the LMS records are updated. In the case that the absence does not appear to be justified, then the employee's supervisor or unit manager is notified, and the training must be completed immediately under supervision. At the request of COCL, PPB has given more attention to documenting the status of these cases where training has not been completed.

Finally, we note that LMS allows supervisors to query transcript reports at any time. In fact, supervisors are required to examine these records to complete the annual performance evaluations of their subordinates and confirm, electronically, that they have completed this LMS query. Thus, COCL finds that PPB has remained in Substantial Compliance with Par. 81. The continuous review of training records by LMS and the chain of command, including periodic reviews by immediate supervisors, is sufficient to be assigned Substantial Compliance for Par. 81. Also, PPB has taken some actions to ensure that all training, including specialty unit training, is approved in advance and recorded in LMS, and we expect that the next training audit will confirm the adequacy of this methodology (Par. 85).

| **COCL Recommendations** | • No recommendations at this time |
|---|---|

---

[7] The total number of officers who missed classes may be less than 24 if certain officers missed more than one class because of long-term medical leave. The total number of misses (not officers) in the third quarter is 24.

**Exhibit A**

---

**Settlement Agreement Paragraph**

82. PPB shall report training delivered and received semi-annually to the Assistant Chief of Operations and, during the pendency of this Agreement, to DOJ.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review Semi-Annual Training Reports |

**Compliance Assessment**

The PPB's Semi-Annual Training Report was not due this quarter. It will be delivered to the Deputy and Assistant Chief in the fourth quarter. In the meantime, the PPB remains in Substantial Compliance for Par. 82. We continue to recommend that the Semi-Annual Training Report include both internal and external training classes, including specialty units.

| COCL Recommendations | • Include both internal and external training classes in the semi-annual training report |
|---|---|
| Assessment Based On | Delivery and content of Semi-Annual Training Reports |

---

**Trainer Qualifications**

---

**Settlement Agreement Paragraph**

83. PPB shall institute guidelines to govern its selection of officers that serve as trainers and shall ensure that those officers do not have a history of using excessive force. The trainer selection guidelines shall prohibit the selection of officers who have been subject to disciplinary action based upon the use of force or mistreatment of people with mental illness within the three (3) preceding years, or twice in the preceding five (5) years and will take into

---

account if a civil judgment has been rendered against the City in the last five (5) years based on the officer's use of force.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Reviewed "Work History Review Sheet" for the third quarter hires and ensured that PPB is following S.O.P. #1-19 standards. |

**Compliance Assessment**

During the third quarter, one officer was assigned to the Training Division, thus activating the review process pursuant to S.O.P. #1-19. The COCL reviewed the Work History Review Sheet for this individual and found no evidence of civil judgments, discipline, or mistreatment of people with mental illness as defined in Par. 83.

| COCL Recommendations | • No recommendations at this time |
|---|---|
| Assessment Based On | COCL review of "Work History Review Sheet" and S.O.P. #1-19 standards |

**Deliver Appropriate and High-Quality Training**

**Settlement Agreement Paragraph**

84. (COCL Summary) Paragraph 84 describes the content and delivery of training that is expected for patrol officers and supervisors. PPB is expected to develop and implement a high-quality system of training that is consistent with PPB's policies as well as federal and state laws, and must cover specific topics, including use of force, de-escalation techniques, procuring medical care, proactive problem solving, civil and criminal liability, and positive communication skills. PPB training is also required to give particular attention to police responses to individuals who have, or are perceived to have, mental illness. PPB's training of

officers must include "role playing scenarios and interactive exercises that illustrate proper use of force decision making" as well as peer intervention. In addition to all sworn personnel, paragraph 84 requires supervisor training, including conducting use of force investigations, evaluation of officer performance, and positive career development/disciplinary actions.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Observed In-Service Training, ECIT Training, and Specialty Training. Also observed online trainings made available through the LMS during the third quarter<br><br>Interviewed PPB personnel |

### Compliance Assessment

During the third quarter of 2022 the COCL was able to observe and evaluate three different trainings – In-Service Training for all officers, ECIT refresher training for current ECIT officers, and Specialty Training for SERT and CNT units. We also provide an overview and assessment of the online training delivered by the PPB during the third quarter. The PPB did not return to Substantial Compliance during the third quarter because they have yet to provide crowd control training that (1) incorporates changes to polices related to use of force (i.e., Directives 910.00, 1010.00, and 1015.00) and crowd control (Directive 635.10), (2) incorporates both internal and external assessments of training needs, and (3) provides scenarios or exercises to practice appropriate crowd control skills. This training cannot be delivered until the policies on use of force and crowd control have been revised and approved. This review process was still underway at the end of the third quarter.

PPB plans to conduct crowd control training with all PPB members beginning in January of 2023. However, the external assessment of crowd control (Par. 189), which started in the third quarter, will not be completed by January. Therefore, to achieve Substantial Compliance with Par. 84, the PPB will need to provide additional crowd control training at a later date that incorporates these external findings into their Training Needs Assessment and Training curriculum.

**Exhibit A**

**In-Service Training**

In the third quarter of 2022 the PPB conducted the second half of their two-day annual in-service training for all officers. This in-service was held over the course of multiple weeks and officers were assigned one day to attend. During the day, PPB held three classroom sessions as well as a scenario session. The COCL observed this training and provides a summary of the individual sessions below.

*Use of Force/Directive 1010.00:* The first session covered use of force and the updates to Directive 1010.00. The instructor was from the City Attorney's Office. One of the main points regarding the revision to Directive 1010.00 was to focus on the Graham standard and have officers apply the policy based on the circumstances of a situation instead of simply following hard and fast rules. The goal was to allow for more flexibility for officers, but this also comes with a stricter requirement for officers to explain their reasoning for using force. One of the changes to Directive 1010.00 includes having only two categories of resistance (passive and active). The instructor went through different definitions found in the policy including constitutional force standard, resistance, and feasible. The instructor broke down each definition and helped facilitate robust discussions from the attendees regarding the definitions, including objectively reasonable. Force must be objectively reasonable, but objectively reasonable is based on case law and the totality of circumstances, not the opinions of other officers. The instructor emphasized the importance of staying on top of case law updates to ensure officers are aware of what might be considered objectively reasonable use of force.

Another change to Directive 1010.00 includes two categories of de-escalation. The first being proactive and the second being reactive. Proactive de-escalation is about preventing the need to use force. An example of proactive de-escalation given was having numerical superiority, with more officers present. Reactive de-escalation is about reducing the level of force used. Additionally, Directive 1010.00 contains a new warning policy. Now, when feasible, members shall issue a clear and intelligible verbal warning before using any force. The instructor walked the group through a few examples to show when a warning would be required compared to when a warning would not be feasible. The new FDCR form includes a field for the new warning requirement. Directive 910, which focuses on force reporting, was also updated.

The instructor introduced additional considerations that officers should keep in mind before using force. These include observed behavior, known mental health history, and prohibited uses of force, among others. Prohibited uses of force include force against passive resisters

**Exhibit A**

that does not impede a lawful objective, against individuals expressing verbal discontent with officers, and solely because another member is using force. Officers are also required to attempt to avoid or minimize force against individuals in an actual or perceived mental health crisis. When possible, officers shall direct them to appropriate services.

Overall, the session was informative regarding the updates to Directive 1010.00. The instructor provided real-world examples to help demonstrate the importance of the changes to the policy. The officers in attendance were engaged and participated in discussions facilitated by the instructor.

*Use of Force Scenarios:* After the classroom session on Directive 1010.00, the officers went through two scenarios to reinforce what they just learned. The first scenario consisted of two officers being called to a scene where a man was pounding on a front door and yelling to be let in. The goal of the scenario was for the officers to use de-escalation tactics. After talking with the man, the officers would learn more about his circumstances: he lives at the address, and his son had locked him out because he was angry that his father had taken his phone away.

Each group of two officers that went through the scenario asked the man questions to figure out what was happening and attempted to focus his attention away from the door in order to calm him down. After the scenario was completed, each group participated in a debrief during which the officers were asked to identify things they did to de-escalate the situation. The debrief included a discussion of using procedural justice to de-escalate. They also discussed the legality of what they were able to do to help the man since he lives at that address.

The second scenario involved two officers arriving on the scene to hear another officer screaming for help while being pinned down by a suspect who was in possession of a hammer. The scenario was designed to elicit a wide array of responses from officers. On the day that we observed, most groups immediately fired shots at the person after assessing the situation, while one group approached the suspect and physically pulled the person off the other officer. During the debrief of this scenario each group walked through their decision-making process. There was a discussion of whether a warning was issued before using force and if it was feasible to issue one or not.

In the COCL's summary of a previous training we recommended the PPB utilize some scenarios with small groups of officers instead of large group scenarios, so all officers would play an active role in the scenario. We were pleased to see this occurred with this in-service, even though it only lasted a few minutes. While there was no opportunity for officers to

**Exhibit A**

observe each other's decision making during this scenario, some discussion of what other groups did could be helpful in assessing other ways to approach the situation. Additionally, the PPB should consider a video recording for selected scenarios so that officers can observe their own behavior. This can be educational. For example, one officer asserted he was approximately 20 feet away when he fired shots, but in actuality, he was much closer. Beyond scenarios, we recommend that PPB develop a system to review videos for training purposes once body worn cameras have been implemented.

*ABLE Reinforcement:* This 2-hour session served as the second of three follow-up classes to reinforce the teachings from the original 8-hour ABLE training that all officers received. The purpose of ABLE is to empower officers to intervene to prevent harm by other officers, teach them how to intervene and accept interventions, protect those who intervene, and create a culture that expects and supports intervention. At the beginning of the session the ABLE resource packet was distributed that includes a personal wellness checklist/roadmap, social media and mindfulness tips, healthy eating, and sleep tips. Small groups were asked to summarize a section of the packet for the entire group. The instructor facilitated a discussion around things that prevent people from intervening. Officers were also encouraged to discuss indicators of health and wellness, stress, and unhealthy coping. The group was asked to identify instances in which intervening could be necessary and the best ways to intervene. This discussion included who is the best person to intervene, and what, when, and where would be the most effective intervention.

This training utilized three short video testimonials that were included in the PowerPoint from the creators of ABLE at the Georgetown University Law Center. The videos included personal stories of officers wishing they had intervened, deciding to help others, and strategies to help oneself. The session finished with tips on caring for oneself inside and outside of work. The mental health resources that are available to officers were also noted.

This ABLE training appeared to be well received by most officers. The instructor did an excellent job of relating to the officers and prompting discussions. The topics covered in the course are not easy to talk about, but the instructor was able to do so in a respectful and meaningful way.

*Workplace Harassment, Discrimination, Racism, and Retaliation:* The last session of the in-service training reviewed the City of Portland's policies regarding workplace harassment. The presentation included definitions and examples of harassment, discrimination, racism, and retaliation. The types of prohibited harassment discussed included prohibited behavior on social media and texting. Additionally, there was a discussion around what defines a

**Exhibit A**

"workplace setting" and how officers must follow these policies even when they are not on duty.

**Specialty Unit Training: ECIT**

In the third quarter the PPB held a full day of In-service training for current ECIT members. The training was split into two training modules.

*Targeted Violence and Threat Assessment*. The first ECIT class was about three hours and covered the topics of Targeted Violence and Threat Assessment. The aim of this lesson is to help officers identify individuals who may be planning targeted violence and to prevent that from occurring. The training was broken down into 3 main sections: (1) theory, (2) PPB's approach, and (3) application. The first part of the training was spent on understanding the theoretical foundations for this approach, learning key definitions, and going over a case study. In the second part, ECIT members learned more about the PPB's approach to addressing targeted violence with their Threat Assessment Referral Program (TARP)[8]. Taking the information, they learned from Section 1, officers were instructed to fill out a TARP if they have an interaction that meets the criteria. The officers were encouraged to err on the side of caution by reporting something if they are unsure if it qualifies and then the BHU Sergeant would review it. ECIT members learned that once a referral moves through level one, at level two, a multidisciplinary team, involving members from different organizations across the community, would come up with a case management plan. Importantly this plan is aimed at trying to get the individual connected with services to improve their life and mitigate the risk of violence.

In the third section of this training, members applied the information they learned with examples of real scenarios that had previously been through the TARP. With one case study, the trainees were given handouts of police reports, contact logs, and other evidence, similar

---

[8] PPB has a new TARP app that officers are expected to use when they make a threat assessment report.

**Exhibit A**

to how an officer might receive information when reviewing a case. Together, the members came up with a case management plan.

To finish up the training, officers were given a list of different real-life scenarios that the PPB had previously processed and asked them to decide whether they should be assigned or unassigned based off the criteria. Overall, the training was interactive and used many different approaches to help the students learn the material. There was small group discussion, large group discussion, individual work, lecture, information gathering, and the instructors probed the students for thoughtful responses. The class was well delivered and applicable to the work of ECIT officers.

*Motivational Interviewing (MI)*. The second training module was on Motivational Interviewing <u>(MI)</u> and was led by an outside consultant who was local and had previously worked as a Probation Officer. The training took about five hours. The instructor broke the training up into different activities, including watching videos, having small and large group discussions, and lecture. First, she went over the theory of MI, and then the officers were exposed to the skills required to achieve MI and how to implement them. The officers were provided with a workbook that they filled out during the training, as well as sheets of information covering important definitions and concepts. Topics covered included, using affirmations, active/reflective listening, avoiding the righting reflex, brain activity during crisis and/or ambivalence, and the language of change talk. The instructor used videos of real recordings of clinicians interacting with a client. The videos were engaging and kept the class interested. The instructor also used examples of statements that officers might interact with and asked how they could reply using affirmations, reflective listening, and change talk. Overall, the class was engaging and seemed to be well received. For many years, COCL has strongly recommended PPB training on these interpersonal communication skills, so we consider this coverage important.

*Room for Improvement*. We are pleased with this training overall, but there are a few things that could be improved. MI is typically geared towards clinicians and people who deal with clients in a therapeutic setting. Applying MI to police officers is a novel approach, and we credit PPB for bring something new into the field, but this also means there is work to be done to translate it to a law enforcement setting. The interactive components, such as dealing with statements that an individual might make to an officer, were geared to law enforcement, but the videos were designed in a clinical setting. The instructor did state there was a reason for this, that there were no real-life videos of police-individual interactions, and that the only ones available for MI with law enforcement were staged and role played, thus losing their authenticity. The officers can still learn something from watching how a clinician

interacts with a client using MI, but there also needs to be conversation about how to apply it on the job. More specifically, it would have been helpful to show how MI can be used by ECIT officers when dealing with people in crisis. When COCL provided PPB with feedback on these lesson plans, we stated that "the material is largely theoretical and abstract. Implementation must be localized and context specific, so it will be up to the Training Division to ensure that this module will meet the needs of PPB officers." Thus, we encourage the Training Division to advise the Behavioral Health Unit on this recommendation, as they work with the contractor who provided this training. Also, we strongly encourage the PPB to use BWC video footage when it becomes available to provide officers with concrete examples of motivational interviewing and procedural justice skills.

One other element of the training that could be improved has to do with the high level of information and the gap between training and implementation. Miller & Moyers (2006)[9] explain that there are eight components of motivational interviewing and that the skills are best acquired through an ordered sequence, building off each other. The earlier steps are logical prerequisites for later stages of skill acquisition. This necessitates time and repetition of the skills. Given that this was a one-day training with a lot of information covered, the motivational interviewing process may not be fruitful, for officers may not be able to build up skills over time. A randomized control trial (Miller et al., 2004) compared those who just received a workshop in MI to those who received a workshop with continued feedback and coaching. The authors found that those who received the coaching and feedback performed much better in the skills of MI at later follow up points. Over the years, COCL has consistently underscored the importance of allowing officers to practice these skills and receive feedback.

---

[9] See Miller, W. R., & Moyers, T. B. (2006). Eight stages in learning motivational interviewing. *Journal of Teaching in the Addictions*, 5(1), 3-17.

Miller, W. R., & Rollnick, S. (2012). *Motivational Interviewing*; New York: Guilford Press.

Miller, W. R., Yahne, C. E., Moyers, T. B., Martinez, J., & Pirritano, M. (2004). A randomized trial of methods to help clinicians learn motivational interviewing. *Journal of consulting and Clinical Psychology*, 72(6), 1050.

**Exhibit A**

We applaud the PPB for bringing this curriculum to ECIT officers and believe that the training was well delivered. There is a need for PPB to develop a program that addresses the gap between training and implementation. A coaching program that has officers work on certain skills of MI or other behavioral management and interpersonal communication would be a welcomed addition. A brief but consistent opportunity for officers to work with a coach (e.g., a trained peer), plan how they will use a skill, and then review the skill with their coach would further improve the skills of ECIT officers.

Going even further, our hope is that someday, the City will invest in PPB Training to the point that officers will be individually recorded at the Training Division after learning about these skills. When giving feedback to PPB on these ECIT lesson plans, we made the following statement: "COCL will continue to maintain that these interpersonal communication skills, such as "reflective listening," must be practiced over and over. Individual officers – both ECIT and others -- should be tested in live scenarios to determine their level of competence and identify particular deficiencies that require more practice." Finally, we encourage the PPB to integrate this training with additional training on procedural justice and draw upon future data from contact surveys and BWCs. This topic is sufficiently important that the COCL will provide a separate technical assistance report.

**Specialty Unit Training: SERT and CNT**

The PPB typically holds quarterly training on "Critical Incident Command" for its Special Emergency Reaction Team (SERT) and Crisis Negotiation Team (CNT), covering directive 720.00 and related policies. According to PPB's Training Division, the CIC trainings "are for those that provide on-call command response to all SERT and CNT activations, high-risk warrants or any other event designated by the Chief of Police or designee." In the third quarter, COCL reviewed the lesson plans and observed the training of SERT and CNT.

We observed the SERT/CNT joint training at Camp Rilea. The purpose of the training was to practice responses to high-risk situations requiring advanced tactics and response options. Overall, this training was executed very well and required PPB members to demonstrate skills related to critical thinking, de-escalation, communication, and respect for the sanctity of life. As part of the training, we observed several scenarios, including serving a high-risk warrant, hostage rescues, barricade situations, and events requiring a language interpreter. These scenarios were developed using common events and elements that SERT/CNT may expect to see in their normal callouts.

**Exhibit A**

Prior to each scenario, members were provided with background information they would be expected to collect prior to engaging with a subject. For instance, in the warrant scenario officers were prepped from a warrant worksheet (including each subjects' name, photo, and criminal history) as well as situational considerations such as the presence of weapons, the on-scene personnel and roles (including medical personnel), and the vehicle order when arriving on-scene. In addition to the on-scene personnel, the scenarios included roles and responsibilities for off-scene personnel, including individuals responsible for providing real-time intelligence, contacting subjects via telephone, and maintaining a timeline of how an event unfolded. Finally, SERT/CNT commanders sat together, listening to the event unfolding, gathering information, directing resources, and working together to manage the event.

After each scenario, the groups came together to debrief the actions of team members, including approach, information gathering, communication skills, tactical decisions, and, where appropriate, uses of force. Debriefs covered not only <u>what</u> members did but also <u>why</u> they decided to act in certain ways. Overall, we found the debriefs to be extremely comprehensive and allowed all members to discuss not only their actions, but the actions of other members in the scenario.

Although we found the training and debriefs to have been successful overall, we offer two suggestions for future training. For the debriefs, we found that they focused primarily on what the members did (or didn't) do as a result of the situation. We suggest future debriefs to discuss what a member may have done if a situation had unfolded differently. While we don't expect members to re-run each situation with all potential possibilities, the debrief offers an opportunity to discuss "If X had happened instead, how might you have adjusted your approach?"

As a second suggestion, one scenario involved an officer firing their weapon, which in the real-world would have triggered several post-lethal requirements. We recognize that the scenarios were time-intensive (at times running multiple hours) and therefore we would not expect members to run through the full post-lethal force protocols (e.g., waiting for detectives to conduct an on-scene walk-through). However, there did appear enough time to practice initial protocols (e.g., separating witness/involved members, requesting BOEC to send a lethal-force page to required personnel, etc.). While these requirements were mentioned later in the debrief, we suggest including some of them as part of the scenarios. Also, officers could be reminded of the key elements of the search warrant policy.

**Exhibit A**

**In-service: Online Training**

In the third quarter, the PPB continued to provide online classes and educational material using their Learning Management System (LMS). A total of 18 items were delivered virtually to PPB members during the quarter. This included training videos, the amended Settlement Agreement, and nine Bureau directives.[10] For two of the directives (0835.00 Managing Public Spaces and 0650.00 Search, Seizures, and Inventories) training videos were made available for PPB members through the LMS. Below are COCL's synopses of these training videos created and posted by PPB in the third quarter.

**Online Training on Consent Searches**

PPB has provided officers with two online videos to help them understand and apply Directive 650.00 regarding consent searches. A four-minute video does a reasonably good job of explaining to PPB officers the new requirements of this directive when conducting searches. The video begins with the Chief asking officers to pay close attention to the new requirement that officers must inform people of their right to refuse or revoke consent to be searched, pointing out that informing people of their rights in this context "is procedurally just and the right thing to do."

The video includes pieces of a role-playing scenario involving a stop and search setting, while reminding officers of the conditions under which they may request consent to search, i.e., when they have reasonable suspicion or probable cause of a crime. The video emphases the need to inform people of their right to refuse or revoke consent at any time. By policy, consent must be "clear, specific, unequivocal, voluntary, and obtained without coercion." When making the decision to request a search, officers are reminded to be aware of the

---

[10] The directives covered were: 0835.00 Managing Public Spaces, 0850.20 Police Response to Mental Health Crisis, 0850.21 Peace Officer Custody (Civil), 0850.22 Police Response to Mental Health Director Holds and Elopement, 0850.25 Police Response to Mental Health Facilities, 0910.00 Use of Force Reporting, Review, and Investigation, 1010.00 Use of Force, 1015.00 Less Lethal Weapons and Tools, and 0650.00 Search, Seizures, and Inventories.

**Exhibit A**

"cultural, social, or power dynamics at play that may affect a person's perception of being able to decline consent or not."

The video explains that PPB officers are required to audio record any request to search a community member using their PPB phone. Prior to asking for consent, it states "you must inform the person of your intent to record the interaction." The recording must document the entire search process including the request for consent, the person's response, and any revocation of that consent. They must also provide the person with PPB's information card that explains their rights. For individuals with limited English proficiency (LEP), the officer is required to offer an interpreter to translate the card and search interaction. However, no mention was made of the fact that the cards are available in the five most spoken languages in Portland. In fact, directive 650.00 gives limited attention to the LEP issue. Section 2.5.4.3.2 simply states that "Members shall provide the consenting person with a Bureau issued information card regarding consent searches." Neither the directive nor the training indicates when the card should be provided, and the entire issue of language access is never mentioned in the directive. We acknowledge that LEP guidance is provided in a separate directive, but the directive and training on consent searches should give attention to the cards, which are essential for achieving consent.[11]

The role playing also offers some guidance on how to perform a weapons frisk, but unfortunately, the officer commands the person to "turn around and put your hands on your head…" instead of politely saying, "Please turn around and put your hands on your head…" (A lack of procedural justice). An audio recording of weapons frisk is not required by the directive. The video encourages officers to respect the gender identity expressed by the person and, if possible, respect their request that a particular gender conduct the search.

Officers also watched a two-minute training video on how to record a community members consent using the Voice Record Pro app. There are several steps involved: The officer must install the app on their PPB phone, open the app, tap the record button, set the record quality to "medium," tap the record button, place the phone in the front pocket pointing up,

---

[11] We note that LEP is not just a policy issue. It is required by Title VI and must be followed for all recipients of federal funds

stop the recording when done, upload the completed file to DMS by saving it in the Photo Album, open the System Template, export the photo to the Movie Library in MP4, and then submit the file to the PPB's DIMS system. Finally, once the consent search recording has been submitted prior to the end of the officer's shift, it is supposed to be deleted from the officer's phone.

This process of recording could be difficult for some officers and mistakes are likely to occur until the system becomes familiar to all officers. As a result, PPB should perform some type of audit to ensure that the new consent search process is being conducted in accordance with Directive 650.00, including the timely submission of the recordings.

**Online Training on Managing Public Spaces**

PPB has posted a training video to the LMS to accompany the updates to Directive 0835.20 - Managing Public Spaces. This directive specifically focuses on campsites on public property and PPB's role and resources for camp cleanups. In the nine-minute training, a Neighborhood Response Team (NRT) Sergeant goes over protocols, roles, and procedures for PPB members in City-ordered Coordinated Camp Cleanups, Police-ordered Summary Abatements, and Police-ordered Emergency Abatements.

City-ordered Coordinated Camp Cleanups: These types of cleanups require a 72-hour notification prior to the removal of the campsite and property. While the expectation is that the precinct's NRT will offer police support in the discussed campsite removal processes, training is being offered to all PPB members in case they are called upon to assist in place of the NRT. When offering support for a campsite clean-up, bureau members are required to stay on-scene until the clean-up is complete, and they are released by a City Employee or Contractor leading the cleanup, attempt to identify the individuals inhabiting the campsite and offer service and shelter referrals, and complete a General Offense Report using the Livability Improvement Project code. The training covers what officers must do if they confiscate weapons, or potentially stolen goods from the camp and requires them to adhere to the standards set forth in Directive 660.10 - Property and Evidence Procedures. While the directive states that officers shall issue a property receipt when confiscating property, the training video does not mention this. Going forward PPB should seek to include this information in the training as not complying with that portion of the directive could implicate Fifth Amendment issues.

**Exhibit A**

Summary Abatements: PPB members are authorized to remove nuisance items (anything short of a campsite) from the public way. The items must be impacting the normal flow of pedestrian or vehicular traffic or impacting sanitary conditions. Essentially, this is a way for officers to facilitate trash pickup in the public way. Personal property or property of value in these situations should be dealt with as found property in accordance with Directive 660.10. Officers can initiate this process by removing the trash on their own or by scheduling removal with other city employees. A report is not required for a summary abatement.

Police-ordered Emergency Abatements: These are immediate removals of a campsite that do not require a 72-hour advance notification of removal. These emergency abatements are meant to take place only in limited circumstances in extreme situations. The abatements can occur if there is reason to believe that illegal actions, aside from camping, are taking place within the campsite, or if the officer can articulate an emergent issue at the campsite such as a threat to public health, there are hazardous materials within the campsite, or it presents a threat to human life or safety. All emergency abatements must be approved by a supervisor and should only be conducted if there is an immediate threat to safety. During the process of an emergency abatement officers should verbally inform the residents of the removal, allow them enough time to remove personal items, post removal notifications, take before and after photos, write a report that explains the reasons for the abatement, with supporting information, and offer campsite residents information on services and shelter options.

### Online Training on Crowd Management

The City and PPB have sought to provide crowd management training over the past year in response to widespread criticism of PPB's response to the 2020 protests, as well as criticism of the RRT training slides from 2018. To that end, PPB provided crowd management training to PPB members through a 15-minute training video posted to the LMS. In this video, the Deputy City Attorney discusses the legal landscape of crowd management in Portland following the 2020 protests and the passage of House Bill (HB) 2928 in 2021 and its subsequent replacement with HB 4008 in 2022. The video covers legal requirements established for all Oregon law enforcement agencies under HB 4008 and highlights frequently asked questions related to crowd management. The video utilizes a question-and-answer format to discuss topics such as which weapons and tools are governed by HB 4008, when and under what circumstances the weapons can be used, uniform standards in crowd management situations, and how the standards set forth in HB 4008 impact PPB and overlay local requirements and PPB directives. This video is meant to serve as an introduction for

crowd management with a more in-depth class on Mobile Field Force training to follow in 2023.

Because good crowd management is essential for achieving compliance with the Settlement Agreement, the COCL will continue to report on these trainings and make recommendations. As we noted previously, the emphasis has been on providing legal updates around the use of force, although the force policy (Directive 1010) was still under review by DOJ and COCL in the third quarter. Thus, a comprehensive approach to crowd management has yet to be implemented and will require that PPB incorporate the latest changes to policies related to use of force and crowd control, as well as findings from PPB's Needs Assessment on demonstrations and findings from the external Critical Incident Assessment on demonstrations. Hopefully, the In-service training beginning in 2023 will address many of these requirements.

Roughly two years after the protests, the City hired an organization, Independent Monitor, LLC, (IMLLC) to conduct the external critical incident assessment. This group met with City officials in June of 2022. IMLLC sought input from the community in the fourth quarter (October 12th) when PCCEP hosted a town hall to discuss PPB's response to the 2020 protests. This company eventually sought input from the COCL in the fourth quarter (October 18th).

By the end of the third quarter, the PPB had not decided whether another specialty unit would be used for protest events. In the meantime, the Mobile Field Force (MFF) from each precinct will respond to demonstrations.

**Online Training on ABLE Performance Reviews**

All Sworn PPB members have completed the core ABLE training, but PPB added a section within performance reviews to allow for discussions around the application and use of ABLE principles. Because the performance review process is different for represented and non-represented sworn PPB members, PPB posted two videos to the LMS which demonstrate how to complete the ABLE-related portion of the performance review. While the discussion on ABLE principles takes place within the performance reviews, it is not a factor used to evaluate performance. Because the training program requires that supervisors meet with their supervisees to discuss ABLE as it applies to their work, the PPB leadership determined that this was the best place to house these discussions. For more information about annual performance reviews, see COCL's Training Outcome Assessment and Appendix B.

**Exhibit A**

**Online Equity Training and Beyond**

In the second quarter of 2022, the Equity and Inclusion Office (EIO) posted the final two videos in their sequence of trainings focused on interacting with members of the LGBTQIA2S+/Queer community. During the third quarter EIO continued to focus on shifting their training to an in-person model. EIO did not produce new online equity training videos in Q3. Instead, EIO staff have been in discussion with the Training Division to schedule time during the In-service training. So far, the Training Division has not made time in the training schedule to accommodate in-person equity training.

EIO has also been focused on responding to feedback shared by PPB members on the previous training sequence focused on interacting with the LGBTQIA2S+/Queer community. While there was positive feedback on the training from some members, there was also concerning feedback that can be perceived as indications of problematic thinking among a few PPB members. The language used in some of the feedback was indicative of racial bias, ableism, and White supremacy ideology. The feedback was elevated to the Chief's office prior to the end of the second quarter, and PPB has yet to develop a plan to address the perspectives expressed in the feedback. We have been informed that the Chief's office has consulted with the EIO, but nothing further has occurred. While respecting officers' First Amendment rights, the COCL hopes to see some action from the administration to address the feedback offered by PPB members, especially when the feedback indicates problematic ideology that could be impacting the way Bureau members interact with members of the community and with each other.

EIO also continued to work on providing more training opportunities to sworn, and non-sworn, PPB members. To this end, EIO has once again offered a community engagement 101 course for new recruits who completed the Advanced Academy. The 40-hour, in-person course includes a racial equity course, walkabouts, and chances to connect community members and specialty officers, as well as conversations on how to police in communities that may have a distrust of officers. During the third quarter, 16 new officers completed the course. Additionally, PPB was given the opportunity to receive online version of an in-person training developed by the Department of Justice called "Engaging and Building Relationships with the Transgender Community." During the fourth quarter of 2021, about 40 PPB members were able to attend the in-person version of the training. When the online training was offered to PPB, the response from leadership was that they preferred the in-person version but there was no time for the in-person version in the training schedule.

**Exhibit A**

*Overall Assessment of Online Training*: The Training Division continues to provide a wide range of online trainings and educational materials. As noted earlier, some critical feedback is described under Par. 80 above. We feel the PPB is engaging in a good faith effort to find the right balance of virtual trainings that includes asynchronous videos, and live interactions with instructors. The COCL and PPB agree that some training topics require in-class discussions (e.g., difficult conversations around bias-free policing or responses to the LGBTQIA2S+/ Queer community) and some require in-class practice of skills (e.g., de-escalation and procedural justice). PPB has yet to integrate these sensitive topics into in-person training. COCL hopes to see PPB make a concerted effort to bring these sensitive, and sometimes difficult topics into an in-person format. We recognize that the PPB is facing limited resources and conflicting priorities for their in-person training hours, but we will continue to express the importance of equity and impartial policing, as required by the constitution.

### The RRT Training Investigation

By the end of the third quarter, we were informed that the investigation of the offensive training materials used in 2018 training of the Rapid Response Team (RRT) was still ongoing. One reason for the slowness of this investigation is the extensive work needed to locate and review hundreds of files and emails across numerous computers and individuals associated with this case. For legal reasons, we are unable to discuss any details – that is the responsibility of the City when the case has been completed. However, we encourage the City to make this investigation and the resulting accountability a high priority.

Although accountability for past unprofessional conduct is extremely important, COCL has taken a preventative approach and has given attention to the oversight and approval of future trainings. The Training Division is required to review and approve <u>all</u> training material used to train PPB personnel, per Directive 1500.00 and S.O.P #1-21[12], but the PPB did not enforce these regulations with the 2018 RRT training. Fortunately, the PPB has taken steps to

---

[12] https://www.portlandoregon.gov/police/article/680811

**Exhibit A**

correct this problem by notifying all officers of these regulations and including all planned training for Specialty units in its revised 2022 Annual Training Plan.

RRT no longer exists, so for now, PPB is planning to use the MFF to respond to protest events and provide appropriate training. The COCL will continue to provide recommendations for improving training, policy, and performance evaluations as they relate to crowd management and organizational culture in general. As such, this quarter the COCL decided to give additional attention to PPB's annual performance evaluations by supervisors, which can serve as an important mechanism for changing the organizational culture and street-level behavior.

For crowd control, in addition to the internal and external assessments of the 2020 protests, we continue to recommend that the PPB and the City give serious attention to the report by the Police Executive Research Forum (PERF, February 2022) *Rethinking the Police Response to Mass Demonstrations: 9 Recommendations.*[13] The PERF report provides important recommendations – consistent with the COCL's emphasis on communication, community engagement, and de-escalation.

### Training Summary and Conclusions

PPB continues to maintain a robust system of data collection and analysis to evaluate their training programs and fulfill its obligation to seek input from a variety of sources to develop its Needs Assessment and Training Plan. However, more resources should be devoted to this important work, especially the training evaluation component.

During the third quarter of 2022 the COCL observed and evaluated three different trainings – In-Service Training for all officers, ECIT refresher training for ECIT officers, and Specialty Training for its Special Emergency Reaction Team (SERT) and Crisis Negotiation Team (CNT). We also reviewed the online training delivered by the PPB during the third quarter. In general, these trainings were informative and well executed. Specific recommendations for improvement are included above.

---

[13] https://www.policeforum.org/assets/ResponseMassDemonstrations.pdf

**Exhibit A**

However, PPB did not return to Substantial Compliance during the third quarter because they have yet to provide crowd control training that (1) incorporates changes to polices related to use of force (i.e., Directives 910.00, 1010.00, and 1015.00) and crowd control (Directive 635.10), (2) incorporates both internal and external assessments of training needs, and (3) provides scenarios or exercises to practice appropriate crowd control skills. This training cannot be delivered until the policies on use of force and crowd control have been revised and approved. This review process was still underway at the end of the third quarter. Our expectation is that the In-service training beginning in 2023 will address many of these concerns and requirements.

COCL's overall assessment of online training remains positive. The Training Division continues to provide a wide range of online training and educational materials using their Learning Management System (LMS). However, some training should be moved to the in-person format, including those that require in-class discussions (e.g., difficult conversations around bias-free policing or responses to the LGBTQIA2S+/Queer community) and some require in-class practice of skills (e.g., de-escalation and procedural justice). From our perspective, the PPB has yet to adequately integrate these sensitive topics into in-person training, although the Equity and Inclusion Office (EIO) has made proposals. The PPB administration should demonstrate a strong commitment to fair and impartial policing by making Equity and Procedural Justice trainings a priority within the in-person training format. Also, because consent searches are important to the community and the new procedure is somewhat complex, the COCL encourages PPB to conduct an audit upfront to ensure that they are being executed properly and the language cards (describing the right to refuse the search) are being distributed.

For in-person learning, COCL will continue to call for more training that follows the fundamental principles of adult learning and problem-based learning and allows officers to practice good decision making. The PPB has made considerable progress in this area, but more work is needed. Also, COCL will continue to call for more evidence-based training in procedural justice where research has documented effective training methods. We also look forward to the day when PPB's evidence-based training draws upon local data from body-worn camera footage and contact surveys to clearly illustrate to officers where specific improvements in performance are needed when interacting with the public.

COCL conducted an outcome assessment for training, which appears at the end of Section IV. Here we looked at the ECIT training data. We also provided an assessment of Supervisory training pertaining to PPB's Annual Performance Evaluation because we believe this evaluation process could serve as an important mechanism for changing the organizational

culture and street-level behavior. When evaluating officers, the fact that supervisors never use the rating "Needs Improvement" on any of the 62 metrics is troubling. Thus, COCL has recommended that PPB re-examine its evaluation system and associated training, so that supervisors are prepared to give "Needs Improvement" ratings and officers will not view it as a punishment. "Needs Improvement" should be seen as an opportunity for coaching and constructive feedback.

On a positive note, we are pleased that the PPB's Training Division is beginning to adopt additional on-the-job outcome measures to evaluate training effectiveness, and we are hoping for more sophisticated evaluation designs. Such designs will allow PPB to identify effective and ineffective training programs and adjust accordingly. The PPB Training Division should be credited for moving in this direction regarding ECIT training. COCL will provide additional recommendations for measuring on-the-job performance via contact surveys in a separate technical assistance report.

The PPB remains in Substantial Compliance for all paragraphs in Section IV (Training), except for Par. 78 and 84. The City has outsourced the independent Critical Incident Assessment of crowd control that should have significant implications for future training (See Par. 189), and as such, the COCL expects that these external findings will be incorporated into PPB's Training Needs Assessment. The PPB will remain in Partial Compliance until the required recommendations listed below have been implemented.

| | |
|---|---|
| **COCL Recommendations** | • To achieve Substantial Compliance, Crowd Control and Management training should be updated based on both the internal and external needs assessments regarding PPB's response to mass demonstrations<br><br>• To achieve Substantial Compliance, develop and deliver training with "role playing scenarios and interactive exercises that illustrate proper use of force decision making" (Par. 84) including in crowd control settings. This should include opportunities to practice de-escalation techniques and procedurally just responses to difficult interactions, including resistance and arrest |

|  | <ul><li>To achieve Substantial Compliance, incorporate recent changes to the PPB's force-related Directives into training (910.00, 1010.00, and 1015.00)</li><li>Increase training that incorporates adult education and problem-based learning principles</li><li>Make Equity training a higher priority and include it routinely in PPB's in-person training schedules</li><li>Introduce in-person training on procedural justice with enough dosage to make a difference</li><li>Continue to support the development of sophisticated online training that allows for interactivity and is linked to subsequent in-person skills development</li><li>Provide refresher training on First Amendment rights that can address any PPB bias against peaceful protestors</li><li>Make the investigation of RRT training and the resulting accountability a high priority</li></ul> |
|---|---|
| **Assessment Based On** | COCL's observation/assessment of training content, delivery, and consistency with adult-learning principles and best practices<br><br>Processes described by PPB personnel<br><br>Future content assessment: Whether the PPB can provide training on crowd control and force reporting that is based on a comprehensive assessment of problems that occurred during the 2020 protests and includes the requirements of Par. 84 |

**Audit the Training Program**

<table>
<tr><td colspan="2" align="center"><strong>Settlement Agreement Paragraph</strong></td></tr>
<tr><td colspan="2">85. In consultation with the COCL, the Inspector shall audit the training program using the following performance standards to ensure that PPB does the following: (a) Conducts a comprehensive needs assessment annually; (b) Creates a Training Strategic Plan annually; (c) Within 180 days of the Effective Date, develops and implements a process for evaluation of the effectiveness of training; (d) Maintains accurate records of Training delivered, including substance and attendance; (e) Makes Training Records accessible to the Director of Services, Assistant Chief of Operations, and DOJ; (f) Trains Officers, Supervisors, and Commanders on areas specific to their responsibilities; and (g) Ensures that sworn PPB members are provided a copy of all PPB directives and policies issues pursuant to this Agreement, and sign a statement acknowledging that they have received, read, and had an opportunity to ask questions about the directives and/or policies, within 30 days of the release of the policy.</td></tr>
<tr><td><strong>Compliance Label</strong></td><td>Substantial Compliance</td></tr>
<tr><td><strong>Methodology</strong></td><td>COCL will review the audit report for accuracy and completeness</td></tr>
<tr><td colspan="2" align="center"><strong>Compliance Assessment</strong></td></tr>
<tr><td colspan="2">COCL has consistently recommended that PPB undertake another audit because of changes that have occurred since the last formal audit in 2018 and due to the bigger changes that are planned, including the hiring of a civilian head of the PPB's Training Division. Also, the problems associated with the RRT training suggest that the process of reviewing training materials for all units deserves attention, as well as classes that reinforce a healthy view of the community.

The PPB's Office of the Inspector General (OIG) is now adequately staffed to conduct a new audit of PPB's training program. The audit plan was produced in the second quarter and reviewed by the COCL. The audit is now underway and is expected to be completed by the end of the fourth quarter. In the meantime, the Training Division has continued to perform the functions identified in Par. 85 as judged by COCL in this report (See Pars. 79-87).</td></tr>
</table>

**Exhibit A**

The COCL has suggested to PPB that the new audit give some attention to training classes for all officers and for supervisors rather than focus on training for new recruits (as it did in 2018), and address Directive 1500, which requires all training plans be approved by the Training Division. Also, we continue to emphasize the need to evaluate the organizational structure and resources within the Training Division to ensure that the new civilian Dean has the freedom and support to introduce real change without unnecessary administrative or bureaucratic barriers. The hiring of additional civilians should be considered. Also, classes that give attention to equity and bias should be given special attention, including how they are evaluated, since these classes are important for improving police culture and ensuring constitutional policing.

Because the Settlement Agreement did not specify the interval for conducting follow-up audits and due to staffing problems within OIG, the COCL has been flexible in past reviews. However, in recent reports, COCL has insisted on deadlines for the next audit plan and audit completion. Thus, to remain in Substantial Compliance, the audit must be completed by the end of the fourth quarter of 2022.

| | |
|---|---|
| **COCL Recommendations** | <ul><li>To remain in Substantial Compliance, the PPB should produce a Training Division Audit report by the end of the fourth quarter of 2022</li><li>We recommend that the audit evaluate record keeping on specialty classes and outside trainings.</li><li>We recommend that the audit give attention to the delivery of in-service training for officers and supervisors, with particular attention to equity classes</li></ul> |
| **Assessment Based On** | COCL's review the audit plan based on identified needs of the Training Division, auditing standards, and the timeline for completion of the audit |

**Exhibit A**

**Analyze and Report Force Data**

| **Settlement Agreement Paragraph** |
| --- |
| 86. In consultation with the COCL, the Inspector shall gather and present data and analysis on a quarterly basis regarding patterns and trends in officers' uses of force to the Chief, the PPB Training Division, and to the Training Advisory Council. The Training Division and Training Advisory Council shall make recommendations to the Chief regarding proposed changes in policy, training, and/or evaluations based on the data presented. The Inspector shall also, in coordination with the COCL and PSD, identify problematic use of force patterns and training deficiencies. The Chief's Office shall assess all use of force patterns identified by the Training Division and/or Training Advisory Council and timely implement necessary remedial training to address deficiencies so identified. |

| **Compliance Label** | Substantial Compliance |
| --- | --- |
| **Methodology** | Reviewed Training Advisory Council (TAC) meeting agenda and minutes; Reviewed TAC reports and recommendations |

| **Compliance Assessment** |
| --- |
| The Force Inspector continues to gather force data on a quarterly basis and examine it for patterns and trends (See Section III on Use of Force). Protest-related force statistics are included at the end of the quarterly reports and on the PPB's Open Data Portal, which lists the number and types of crowd control force incidents. Thus, the COCL continues to find the PPB in compliance with this component of Par. 86.

TAC held two meetings in the third quarter of 2022 (July 13 and September 14) that were open to the public as required by Paragraph 87. At the July 13 meeting, an analyst from the OIG, substituting for the Force Inspector, provided a summary of the findings contained in PPB's 2022 Q1 Force Analysis Summary Report. Their PowerPoint presentation covered the basic statistics and trends in non-crowd control use of force incidents. A few TAC and community members suggested additional types of analysis (e.g., by type of incident, by race, by number of people involved, and officer-involved shootings). The TAC chair has previously expressed interest in working with the Force Inspector to come up with an approach to sharing data that would be more useful to TAC. This quarter, the TAC expressed a desire to |

see the PPB and the Portland Street Response work together to share and coordinate their separate datasets on use of force, although these were not formal recommendations.

During the September 14 meeting the Training Division Analyst offered a detailed presentation on PPB's Training Needs Assessment process, a system used to identify training needs that can be used to inform training plans (See Par. 79). During this meeting, the TAC formed some new "Task Groups"[14] to make recommendations and create a Steering Committee to advise the new Chair and help set the agenda for meetings.

We credit the TAC for submitting seven reports in 2022 to the Chief and Training Division with specific recommendations. Their July report, for example, suggests ways to improve and expand the Officer Wellness training. However, one existing Task Group on Crowd Control, after doing considerable research, was unable to make any concrete recommendations because of the complexity of the problem. Nevertheless, the TAC decided to revisit this issue down the road because of its importance.

On its webpage, the Training Division posts any formal recommendations from the TAC (https://portland.gov/police/tac/ppbtacrecs), and the Chief's office continues to respond in a timely manner. In the third quarter, the Chief responded to TAC's Continuous Quality Improvement (CQI) Task Group and each of their seven thoughtful recommendations, including their call to institute contact surveys to evaluate officer performance. The Chief's response to these recommendations has been positive overall but often the message is that PPB will look into it without any specifics.

In terms of community engagement, the TAC and the PPB Training Division continue to have a productive relationship. At the July 13th meeting, the Training Division Captain gave TAC members a preview of upcoming trainings and invited their participation and feedback in "dry run" sessions of the Supervisor In-Service and All-member In-Service training. Ride-alongs for TAC members were also mentioned. The TAC has accepted these offers in the past, and during the third quarter, authored a detailed report on the "dry run" of a new 2-hour supplemental training to the ABLE program.

---

[14] TAC is moving away from the term "Task Force" to "Task Group."

**Exhibit A**

As noted in our last report, one administrative barrier for the TAC is the inability to directly update their website, and the City has been somewhat slow to post information. At their September meeting they voted to begin posting meeting recordings on YouTube.

Although improvements are possible, the COCL continues to maintain that the current system of force reporting and the relationship between the TAC and PPB meet the standards articulated in Par. 86.

| | |
|---|---|
| **COCL Recommendations** | • The Force Inspector should work with the TAC to find a better way to deliver the use of force presentations, including the coverage of inequities<br><br>• The TAC should consider following up with the Chief's office regarding responses to TAC recommendations that require further clarification or action |
| **Assessment Based On** | PPB's presentation of quarterly force reports and inclusion of trends<br><br>The TAC's recommendations<br><br>PPB's responsiveness to the TAC's recommendations |

| | |
|---|---|
| **Settlement Agreement Paragraph**<br><br>87. Training Advisory Council meetings will be open to the public unless the matter under discussion is confidential or raises public safety concerns, as determined by the Chief. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review of PPB website regarding TAC; Review TAC agendas and minutes; Observe TAC meetings |

**Compliance Assessment**

Two TAC meetings were held in the third quarter of 2022 (July 13th and September 14th) and were open to the public as required by Paragraph 87. The COCL continues to observe these Zoom meetings and the public has been allowed to listen and make comments. The PPB continues to use a public email distribution list to send reminders of the meetings to the public. The PPB also continues to post the TAC meeting agendas and minutes on the PPB's website.[15]

| COCL Recommendations | • No recommendations at this time |
|---|---|
| Assessment Based On | COCL review of information available on PPB website<br><br>COCL observation of TAC meetings and review of TAC minutes |

**Training Outcome Assessment**

This quarter the COCL provides an outcome assessment for ECIT training. We also provide a narrower assessment of supervisory training pertaining to PPB's Annual Performance Evaluation of officers because this could be a significant tool for improving police performance during police-public encounters.

In general, the COCL's outcome assessments look at both the creation of sustainable systems (Par. 170), such as PPB's training evaluation program and the achievement of specific programmatic outcomes, such as immediate training effects on students. We assess sustainable systems under our quarterly Compliance reviews of each paragraph. Here, our training

---

[15] https://www.portland.gov/police/tac/events/past

**Exhibit A**

outcome assessment focuses primarily on whether specific classes were well received by the students and whether the students learned anything from the training. Our assessment of the PPB's Annual Performance Evaluation system focuses on the actual evaluation data produced by supervisors. Below we provide brief summaries of these outcome assessments. The full assessments can be found in Appendix A and B of this report.

*ECIT Outcome Assessment*

PPB's Enhanced Crisis Intervention Team (ECIT) has been receiving PPB specialty training in crisis intervention since 2013. At present, 139 sworn personnel are currently serving as ECIT officers in patrol positions, and they are dispatched by BOEC to calls for service with a mental health component. During the third quarter, the Training Division prepared a report, *Evaluation Report: 2021 Enhanced Crisis Intervention Training* (October 2022), which serves as the basis for COCL's outcome assessment.[16] Our assessment focuses on the 2021 ECIT training (See Appendix A).

To evaluate the ECIT training, the PPB's Training Evaluation team used multiple methods. For this outcome assessment, the COCL focuses on knowledge tests and feedback surveys. The knowledge tests are used to determine whether officers have acquired the basic knowledge articulated in the Learning/Performance Objectives. The feedback surveys gave students the opportunity to evaluate the quality of the instruction and their perceptions of what they learned, as well as make recommendations for current and future trainings. We credit the Training Division's analysts for using this data to provide regular feedback reports to training managers to improve future training. The COCL has reviewed these internal reports and finds them useful for making improvements to training. In fact, PPB has made noticeable improvements to the 2019 and 2021 ECIT training classes based on earlier feedback received from students.

The ECIT training covered a range of topics, including crisis communication skills, mental illness indicators, interactions with consumers and family members, and scenario exercises. Overall, the 2021 ECIT training was given positive reviews by the students. All students reported being

---

[16] This report also serves as an excellent source for readers interested in ECIT's mission, services, and training objectives.

**Exhibit A**

either "Generally Satisfied" (32.1%) or "Very Satisfied" (67.9%). No students were dissatisfied with the ECIT training. However, some students provided useful recommendations to improve future ECIT trainings, including smaller class sizes and more time for communication skills.

ECIT students participated in nine role-play scenarios over a two-day period and were then asked to evaluate the scenarios. COCL has encouraged more role-play scenarios for many PPB trainings, so we are pleased to see this level of investment in skills training for responding to mental health incidents. On the post-scenario surveys, student gave very positive evaluations of most scenarios – they were viewed as plausible, appropriately challenging, a good use of their time, and educational. The scenario debriefings were viewed as helpful to their learning and the trainer was judged to be organized and well prepared. Students also provided some constructive comments and, as a result, one scenario will be revised or dropped for future ECIT trainings.

In the past, COCL has recommended that PPB begin to look at on-the-job outcomes that can be linked to Training, and they have been doing so with some training classes. For ECIT, the PPB reported extensively on efforts to survey officers three to five months after they had completed their ECIT training (from 2013 to 2021). PPB's evaluation also looked at other outcomes related to ECIT officers' response to calls for service data, utilization of health facilities and community-based mental health services, and de-escalation techniques. Although we have concerns with the survey response rates, we commend the PPB for pursuing on-the-job metrics and we will report on this information when we provide our next outcome assessment on mental health.

### *Annual Performance Evaluation Outcome Assessment*

Supervisors are required to complete an "Annual Performance Evaluation" for each PPB officer under their command and are trained in how to perform this function. COCL has included this training in our Outcome Assessment because supervisors play such a critical role in maintaining or changing organizational culture and street-level behaviors of those they supervise. Appendix B contains our assessment and technical assistance on how to improve this system of review.

The Annual Performance Evaluations by Sergeants are expected to "give direction and reinforcement of how officers should work, behave, and conduct themselves," as well as "draw attention to areas of concern." After completing the review, Sergeants are required to hold a debriefing with the officer being evaluated.

For this outcome assessment and technical assistance report, we have conducted a brief analysis of the actual data collected in these annual evaluations, including training implications. The purpose of the COCL's analysis is (1) to encourage PPB to explore these data further to better understand how supervisors are reviewing PPB officers; (2) to suggest improvements in

this system of review to improve its effectiveness; and (3) as a result, enhance the training of supervisors who conduct these reviews. With these actions, we would expect that the annual evaluation becomes an effective mechanism for enhancing both individual and organizational performance.

From COCL's perspective, the PPB has a comprehensive evaluation system that covers a wide range of performance metrics. These metrics go far beyond traditional measures of police performance (e.g., arrests and citations) and give considerable attention to actions that reflect community policing and procedural justice, including the communication skills needed to de-escalate conflict, responses to individuals facing a mental health crisis, methods of collecting good evidence at crime scenes and whether they are respectful of community members. The evaluation system also gives attention to the officer's ability to get along with peers, be organized, produce good reports, and follow the law. The evaluation form has 11 sections and a total of 62 separate measures of performance.

The main problem lies in the way that supervisors complete these evaluations (but also with the wording of the evaluation scale). The rating system is relatively simple. Supervisors evaluate each officer on 62 dimensions using the following evaluation scale:

- <u>Exceptional/Exceeds Standards</u>: "Performance significantly exceeds the requirements of the assignment. Consistently achieves objectives at a superior level and demonstrates exceptional skills and innovation in work performance."

- <u>Meets Standards</u>: "Performance consistently met standards in all essential areas of responsibility and the quality of work overall was good."

- <u>Needs Improvement</u>: "Performance failed to meet expectations in one or more of the rated areas. Performance was consistently below expectations in most essential areas of responsibility. Significant improvement is needed in one or more areas."

- <u>Not Observed</u>: Supervisors were also given the option of checking "Not Observed" if they did not have sufficient data to evaluate the officer on a particular metric.

PPB supervisors are also required to make comments in some instances.

To avoid burdening the PPB with a large data request, the COCL requested 40 randomly selected and de-identified files from the list of officers whose performance was reviewed in 2021. In the final analysis, our report is based on complete data from 36 patrol officers spread across all three precincts.

Overall, 2,133 ratings were given to the 36 patrol officers in the study. The rating average was 2.27 (Slightly above "Meets Standards"). As shown in the bar chart below, the majority of

ratings were "Meets Standards" (73%; n=1,633), while roughly one-quarter of the ratings were "Exceeds Standards" (26%; n=580). Only 19 ratings (0.01%) were "Not Observed" or were left blank. However, the most important finding from this analysis is that, after examining more than 2,000 ratings across 28 supervisors, not a single patrol officer received a "Needs Improvement" rating on any of the 62 metrics used on their annual performance evaluation (0.00%; n=0).

**Figure 4.1**



In conclusion, COCL recommends a culture change on performance evaluations, along with new training, so that supervisors are prepared to give "Needs Improvement" ratings and officers will not view it as a punishment. "Needs Improvement" should be viewed as an opportunity to provide coaching and constructive feedback. We recommend the following: (1) modify the definition of "Needs Improvement" on the form so it doesn't appear so negative; (2) have senior administrators weigh in on the importance of meaningful and constructive feedback; and (3) change the supervisor training regarding Annual Performance Evaluations so that the "Needs Improvement" option is used more frequently.

Other recommendations follow from our analysis. This reexamination of the performance evaluation system should include additional guidance from Lieutenants and above on the written comments provided by supervisors. Some supervisors gave very few written comments to justify their evaluations or provide constructive feedback that could be used to improve the performance of their officers. Others took the time to make constructive comments, and some even wrote lengthy comments.

At present, this system has 62 evaluation metrics, which may be excessive and overly burdensome on supervisors. Therefore, we encourage the PPB to (1) automate the dataset (2) conduct analyses to determine which dimensions are working for them (e.g., show differences between officers); and (3) have a team of managers review the metrics carefully to ensure that only valuable metrics are retained. Also, the Training Division should consider expanding the rating system from 3 options to 4 or 5 options, including at least two levels of "needs improvement."

In summary, the PPB has constructed a comprehensive set of performance metrics, but without good variance in the actual performance evaluations, both within and across officers, this annual process can do little to provide useful feedback to officers and shape behavior on the job. We encourage PPB to explore this dataset and look for patterns that can improve the evaluation system. In doing so, PPB should also be able to identify supervisors who provide exemplary evaluations, showing variation in ratings within and across individual officers, within and across categories, and who provide thoughtful and constructive written comments. These model supervisors should be rewarded for their performance, while other supervisors should receive constructive, non-punitive guidance. Importantly, these changes should result in new training classes on Annual Performance Evaluations for both officers and supervisors.

## V. COMMUNITY-BASED MENTAL HEALTH SERVICES

### Settlement Agreement Paragraph

88. The absence of a comprehensive community mental health infrastructure often shifts to law enforcement agencies throughout Oregon the burden of being first responders to individuals in mental health crisis. Under a separate agreement, the United States is working with State of Oregon officials in a constructive, collaborative manner to address the gaps in state mental health infrastructure. The state-wide implementation of an improved, effective community-based mental health infrastructure should benefit law enforcement agencies across the State, as well as people with mental illness. The United States acknowledges that this Agreement only legally binds the City to take action. Nonetheless, in addition to the City, the United States expects the City's partners to help remedy the lack of community-based addiction and mental health services to Medicaid clients and uninsured area residents. The City's partners in the provision of community-based addiction and mental health services include: the State of Oregon Health Authority, area Community Care Organizations ("CCOs"), Multnomah County, local hospitals, health insurance providers, commercial health providers, and existing Non-Governmental Organizations ("NGOs") such as community-based mental health providers, and other stakeholders.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Monitor the City and PPB continuing to work with community partners |

### Compliance Assessment

This paragraph is assessed based on the City and the PPB's continuing relationship with community partners. As this is a summative paragraph, compliance is dependent upon compliance with other paragraphs within this section. Since all other paragraphs within this section remain in Substantial Compliance, so too does Par. 88.

| COCL Recommendations | • No recommendations at this time |
|---|---|

**Exhibit A**

| | |
|---|---|
| **Assessment Based On** | N/A – Summative paragraph |

---

### Settlement Agreement Paragraph

89. The United States expects that the local CCOs will establish, by mid-2013, one or more drop-off center(s) for first responders and public walk-in centers for individuals with addictions and/or behavioral health service needs. All such drop off/walk in centers should focus care plans on appropriate discharge and community-based treatment options, including assertive community treatment teams, rather than unnecessary hospitalization.

| | |
|---|---|
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review status of Unity Center; Interview with PPB Personnel |

### Compliance Assessment

The COCL continues to acknowledge that the focus of Par. 89 is on the Community Care Organizations and the expectation that they establish one or more drop-off center(s). The Settlement Agreement does not hold any authority over these organizations, but our assessment remains focused on the City's activities and reasonable expectations regarding their involvement with the drop-off/walk-in center(s).

Related to the focus of Par. 89, The Unity Center remains the drop off center for individuals experiencing behavioral health needs. The facility has been operating in this capacity since it opened in May 2017. The PPB has two policies related to this paragraph, including Directive 850.21 (Peace Officer Custody (Civil)) and 850.25 (Police Response to Mental Health Facilities). These directives provide the protocol for officers to contact AMR for ambulance transport to the Unity Center. These directives have remained the same throughout 2021 though are currently in the review process with the entire suite of directives related to mental health response. In the third quarter of 2022, the COCL team was provided the opportunity to review these directives and we will therefore provide an update in our next report.

Since the opening of the Unity Center, a Transportation Workgroup has met regularly in quarterly meetings to discuss the operation of the Center. This workgroup includes members of

Unity, the PPB, AMR, Multnomah County and Legacy ED Health. The group met for their quarterly meeting during the third quarter of 2022.[17] At previous meetings, parties discussed some concerns around PPB officers not locking up their weapons in their cars while at Unity. It was confirmed that these were isolated events typically stemming from new officers unfamiliar with the policy. Since then, BHU personnel have made sure to communicate this requirement to officers in order to make sure they are aware of it. At the moment, this does not appear to be an ongoing issue.

Another previous discussion point was how to improve communication between transportation partners when an individual comes into Unity. Due to the policy of ambulance transport, there is sometimes a lack of communication between the officer and Unity staff after an individual is placed in the care of Unity. The PPB has been reinforcing the practice of officers leaving their card or contact information so Unity staff can contact them to get context on the situation. This practice has been working well and community partners continue to work together to address a continuum of care and making sure all information gets passed between one another. Based on the PPB and the City's ongoing participation in the process to date, we believe they have substantially complied with all reasonable expectations for them related to this paragraph.

| | |
|---|---|
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Based On** | Interview with PPB Personnel |

---

[17] No meeting minutes from this quarter were provided due to an administrative issue. Therefore, this information is based on conversations with PPB staff though we anticipate meeting minutes will continue in the next quarter.

**Exhibit A**

**Settlement Agreement Paragraph**

90. The CCOs will immediately create addictions and mental health-focused subcommittee(s), which will include representatives from PPB's Addictions and Behavioral Health Unit ("ABHU") [Now called Behavioral Health Unit or "BHU"], the ABHU Advisory Board [Now called the BHU Advisory Committee or "BHUAC"], Portland Fire and Rescue, Bureau of Emergency Communications ("BOEC") and other City staff. These committees will pursue immediate and long-term improvements to the behavioral health care system. Initial improvements include: (COCL Summary) increased sharing of information (subject to lawful disclosure); creation of rapid access clinics; enhanced access to primary care providers; expanded options for BOEC operators to divert calls to civilian mental health services, addressing unmet needs identified by Safer PDX; expanding and strengthening networks of peer mediated services; and pursue tele-psychiatry.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review Community Outreach Meeting minutes; Review PSU evaluation on PSR |

**Compliance Assessment**

As with the above paragraph, Par. 90 holds expectations of CCOs to create subcommittees for PPB to serve on, with a list of initial goals to be accomplished. However, CCO's are not under the authority of the Settlement Agreement, and we therefore only evaluate the City on what can reasonably be expected of the agency given the lack of opportunity from CCOs.

During the third quarter of 2022, Legacy Community Outreach met twice, and minutes and a resource list were provided for those meetings. At the August 2022 meeting, presentations were made regarding community resources such as Operation Night Watch at St. Stephen's Episcopal Church, which offers drop-in services for the houseless community. Another presentation was made by the Better Outcomes through Bridges (BOB) program, which consists of peer support and outreach specialists that aim to provide a continuum of care to individuals. The September 2022 meeting had three presentations from community programs. Boulder presented on their telehealth services for outpatient substance use disorder. The PAW Team provides free vet care to the pets of homeless individuals. The third presentation

**Exhibit A**

was given by Providence Elder Place (PACE program) and talked about the wrap around services they provide for elder citizens. Through the combination of these, we continue to find that PPB gathers information about community resources which help address unmet needs of individuals. Working with community partners continues to achieve the goal of long-term improvements to the behavioral health care system as outlined in paragraph 90.

Additionally, this quarter, as it relates to "expanded options for BOEC operators to divert calls to civilian mental health services" (Par. 90), the PPB provided an in-service training to all officers discussing the functional similarities and differences between Portland Street Response (PSR), Project Respond, and ECIT officers. We found the training to be informative though, and as part of discussion during the training, we heard officers say that PSR was not always available, thereby limiting the ability to call them in as a resource. There is some truth to this, as discussed further in our assessment of Par. 115, since there are times when PSR cannot take any additional calls and is required to close their queue with BOEC. We suggest PPB, BOEC, and PSR continue to work together to address these concerns, so officers feel comfortable knowing that PSR is a consistent choice for them when responding to a non-violent person in mental health crisis.

| **COCL Recommendations** | • PPB, BOEC, and PSR should continue to work together to address officers' concerns |
|---|---|
| **Assessment Based On** | PPB involvement with Behavioral Health Collaborative Team<br>PPB involvement with Legacy ED Community Outreach |

# VI. CRISIS INTERVENTION

## A. Addictions and Behavioral Health Unit and Advisory Committee

<table>
<tr><td colspan="2" align="center"><strong>Settlement Agreement Paragraph</strong></td></tr>
<tr><td colspan="2">

91. In order to facilitate PPB's successful interactions with mental health consumers and improve public safety, within 60 days of the Effective Date, PPB shall develop an Addictions and Behavioral Health Unit ("ABHU") within the PPB. PPB shall assign command-level personnel of at least the rank of Lieutenant to manage the ABHU. ABHU shall oversee and coordinate PPB's Crisis Intervention Team ("C-I Team"), Mobile Crisis Prevention Team ("MCPT"), and Service Coordination Team ("SCT"), as set forth in this Agreement.

*[As a point of clarification, since the writing of the Agreement, the ABHU is known as Behavioral Health Unit ("BHU"), the C-I Team is known as Enhanced Crisis Intervention Team ("ECIT"), and the MCPT is known as Behavioral Health Response Team ("BHRT"). Discussion of these entities, and their reference in subsequent Agreement paragraphs, will use their current nomenclatures].*

</td></tr>
<tr><td><strong>Compliance Label</strong></td><td>Substantial Compliance</td></tr>
<tr><td><strong>Methodology</strong></td><td>Review BHU Unit Structure</td></tr>
<tr><td colspan="2" align="center"><strong>Compliance Assessment</strong></td></tr>
<tr><td colspan="2">

In terms of personnel and BHU's general oversight, the BHU continues to conform to the requirements of Par. 91, as evidenced by the BHU unit structure, and our observations of the BHU coordinating ECIT, BHRT, and SCT operations. While the BHU provides oversight to the ECIT program (including ECIT training, dispatch criteria, ECIT data collection, etc.), ECIT officers directly report to their precinct level chain of command. This command structure conforms to the Memphis Model. There have been no major changes to the structure of the unit and PPB is expected to provide updates on personnel changes.

In the third quarter of 2022, PPB provided the COCL with the updated organization chart for the Specialized Resources Division, which houses the BHU. During the third quarter, the PPB and City continued planning to make the switch to having all BHRT clinicians being in-house (as opposed to contracting with Cascadia). During this quarter, the City began screening applicants

</td></tr>
</table>

for the Mental Health Crisis Responder clinician position after posting the position in the second quarter. The City is expecting to extend job offers to successful applicants early in the fourth quarter. Similarly, in the third quarter, the BHU filled an open BHRT officer position, though by the end of the quarter, the officer had not yet assumed the position. Based on PPB's ongoing unit structure as well as the regular updates provided to COCL, we continue to find that PPB remains in Substantial Compliance with this paragraph.

| **COCL Recommendations** | • Continue to update the COCL and the DOJ on changes to personnel when applicable |
|---|---|
| **Assessment Based On** | COCL review of unit structures and personnel |

| **Settlement Agreement Paragraph** ||
|---|---|
| 92. [BHU] will manage the sharing and utilization of data that is subject to lawful disclosure between PPB and Multnomah County, or its successor. PPB will use such data to decrease law enforcement interactions or mitigate the potential uses of force in law enforcement interactions with consumers of mental health services. ||
| 93. [BHU] shall track outcome data generated through the [ECIT], [BHRT], and SCT, to: (a) develop new response strategies for repeat calls for service; (b) identify training needs; identify and propose solutions to systemic issues that impede PPB's ability to provide an appropriate response to a behavioral crisis event; and (c) identify officers' performance warranting commendation or correction. ||
| **Compliance Label** | 92. Substantial Compliance |
| | 93. Substantial Compliance |
| **Methodology** | Review BHUCT, BHRT, and SCT coordination team meeting agendas and minutes; Review ECIT, BHRT, and SCT outcome measures |

**Compliance Assessment**

The PPB continues to utilize a number of work groups to collaborate on ways to "decrease law enforcement interactions [and] mitigate the potential uses of force in law enforcement interactions with consumers of mental health services" (Par. 92). BHU staff meet weekly to discuss the BHRT caseload, and the Behavioral Health Unit Coordination Team (BHUCT) meets on a bi-weekly basis to discuss current and potential BHRT clients. The BHUCT is composed of several community partners including representatives from Multnomah County, Cascadia, and Federal/State law enforcement. PPB provided us with meeting minutes and agendas indicating that a core group of partners attends consistently, with other partners attending as needed.

The discussions during these meetings are designed to problem-solve and create strategies to reduce future criminal justice contacts for individuals that have frequent contact but have been difficult to engage in ongoing services. BHU personnel indicate that information on individuals discussed is shared only if it is subject to lawful disclosure. BHU personnel indicate the BHUCT has been a particularly valuable collaborative strategy.

The Service Coordination Team also conducts weekly meetings to discuss potential clients and make determinations about eligibility for SCT Services. The meetings include community partners and representatives from various entities in Multnomah County. The meetings also review current SCT clients in order to "facilitate continuation of care" for clients. We believe these meetings meet the spirit of Par. 92.

The PPB continues to provide the COCL with the documentation for all meetings occurring within the BHU, including minutes from each SCT, BHU, and BHUCT meeting. Additionally, the PPB provided the COCL with copies of the BHRT fliers that are used to communicate with partners about individuals they are trying to connect with services. This information is also supplemented through data collected on the Mental Health Template (MHT) by identifying individuals and locations with repeat calls for service and developing response strategies.

Relevant outcome measures are collected for BHRT and SCT, and the PPB provides the COCL with quarterly reports summarizing these data. Altogether, the BHU system has multiple avenues for sharing and receiving information with such entities as the BHCT, BHCC (Behavioral Health Call Center), BOEC, and BHUAC. Thus, we find that the PPB remains in Substantial Compliance with the requirements of Pars. 92 and 93.

| COCL Recommendations | • Continue to collect and review data on mental health services, and use this information to update services as needed |
|---|---|
| Assessment Based On | BHCT, BHRT, and SCT coordination meeting agendas and minutes ECIT, BHRT, and SCT outcome measures |

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 94. Within 90 days of the Effective Date, PPB shall also establish a [BHU] Advisory Committee. The [BHU] Advisory Committee shall include representation from: PPB command leadership, [ECIT], [BHRT], and SCT; BOEC; civilian leadership of the City government; and shall seek to include representation from: the Multnomah County Sheriff's Office; Oregon State Department of Health and Human Services; advocacy groups for consumers of mental health services; mental health service providers; coordinated care organizations; and persons with lived experience with mental health services. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review BHUAC roster of members; Review BHUAC minutes; Observe BHUAC meetings |
| **Compliance Assessment** | |

In the third quarter of 2022, the Behavioral Health Unit Advisory Committee (BHUAC) continued to meet regularly, holding meetings on July 27, August 24, and September 28. The minutes of these meetings have been documented and shared with COCL and are found on the PPB's website (https://www.portland.gov/police/bhu-advisory/documents).

Membership requirements of the BHUAC as outlined in Paragraph 94 continue to be met, with a current roster of 15 voting members, representing a variety of entities involved in the mental health response systems. Beyond the roster requirements, voting members are expected to

**Exhibit A**

attend, and there needs to be at least eight voting members present for quorum. For all three of the meetings held in the third quarter, a quorum was met. Additionally, at the August 2022 meeting, BHUAC members suggested additional individuals who may be invited to join the committee, though no further follow-up on this occurred in in the third quarter. We will follow-up with this to determine whether any additions to BHUAC will be made (thereby helping to ensure that each meeting has a quorum and is representative of different perspectives within the community mental health system) though, for this report, we continue to find PPB to be in Substantial Compliance with this paragraph.

| **COCL Recommendations** | • Continue to encourage regular attendance |
|---|---|
| **Assessment Based On** | BHUAC roster<br><br>BHUAC minutes<br><br>Observations of BHUAC meetings |

| **Settlement Agreement Paragraph** |
|---|
| 95. The [BHU] Advisory Committee shall provide guidance to assist the City and PPB in the development and expansion of [ECIT], [BHRT], SCT, BOEC Crisis Triage, and utilization of community-based mental health services. The [BHU] Advisory Committee shall analyze and recommend appropriate changes to policies, procedures, and training methods regarding police contact with persons who may be mentally ill or experiencing a mental health crisis, with the goal of de-escalating the potential for violent encounters. The [BHU] Advisory Committee shall report its recommendations to the [BHU] Lieutenant, PPB Compliance Coordinator, COCL (as described herein), and the BOEC User Board. |

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Review BHUAC minutes; Observe BHUAC meetings |

**Compliance Assessment**

Paragraph 95 envisions that the BHUAC committee members will assist "the City and PPB in the development and expansion of [ECIT], [BHRT], SCT, BOEC Crisis Triage, and utilization of community-based mental health services." The BHUAC continued to hold monthly meetings in the third quarter of 2022. The meeting agendas included a variety of topics. The July Meeting included presentations on the CIT lesson plans for In-service training and the CIT for Advanced Academy curriculum. The meeting also included a presentation from a BOEC representative on the draft forms of the SOP's for Portland Street Response (PSR) and the training for call takers and dispatchers on PSR and mental health call triaging. BOEC solicited feedback and said they will circle back for more feedback before the SOP's become official.

At the August meeting, PPB provided the committee with a presentation on the upcoming ECIT Certification Course Lesson Plan. The presentation provided overviews of each course and their learning objectives. In addition to course material, the committee was also provided materials on mental health data, community resources, and vignettes describing seven different scenarios and five different situations used for skill builders. BHUAC members were provided with the contents a week before the meeting and then were able to provide feedback after a presentation by PPB staff. The discussion following the presentation was engaging and members were able to share feedback and provide formal recommendations. Beyond the training presentation, the committee discussed new individuals for BHUAC membership.

The September 2022 meeting included two presentations. The first one was presented by a BHRT officer about the proposal to hire a Crisis Response Dog (CRD) as a resource for BHU. The second presentation was from the Office of Inspector General and went over the proposal to present force data to the BHUAC annually. This report will go over force data from non-deadly use of force events. There is ongoing discussion on the appropriate method for review of lethal force events. BHUAC members were engaged in the presentation and had many comments and questions to make sure they understood all the information being presented. No formal vote was taken at this time, but members generally seemed open to this proposal.

After the September meeting, additional communication between PPB, DOJ, and COCL was held to finalize the process as it relates to lethal force events. In October, the Parties agreed that during BHUAC's March meeting of each year, summary statistics of non-lethal force would

be provided as well as a discussion of the essential facts for lethal force events that occurred in the prior year.

As it relates to our prior technical assistance (TA) statement, we find that the PPB and BHUAC have been responsive to each of our concerns. The BHUAC has resolved issues regarding quorum and has nominated new members to assist in ensuring future quorums. Furthermore, the BHUAC has demonstrated maximum efficiency during this quarter through their meetings and has taken the steps to maintain such efficiency through an improved recommendation process (see also Par. 96). We therefore find that PPB and the BHUAC have returned to Substantial Compliance with the requirements of this paragraph. However, we note that Substantial Compliance is conditioned upon the COCL team being able to observe the use of force presentation in March in order to ensure that it meets the intent and scope of the Parties agreement. We will provide updates in our 2023 Q1 report.

| **COCL Recommendations** | • Provide use of force statistics and OIS facts to BHUAC in the March 2023 meeting |
| --- | --- |
| **Assessment Based On** | Review of BHUAC minutes and agendas<br><br>Observation of BHUAC meetings |

| **Settlement Agreement Paragraph** | |
| --- | --- |
| 96. Within 240 days of the Effective Date of this Agreement, the [BHU] Advisory Committee will provide status reports on the implementation of the [BHU] and BOEC Crisis Triage, and identify recommendations for improvement, if necessary. PPB will utilize the [BHU] Advisory Committee's recommendations in determining appropriate changes to systems, policies, and staffing. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review BHUAC recommendations found in BHUAC minutes |

**Exhibit A**

**Compliance Assessment**

In accordance with Paragraph 96, the BHUAC continues to provide the COCL with a report of their votes and recommendations for the implementation of the BHU and BOEC. In the third quarter of 2022, the BHUAC made seven formal recommendations. Two recommendations were made to update language in a directive. Another recommendation was made to update a the BHUAC Mental Health Response Guide with the new 988 number (which replaces the previous national suicide hotline number) as well as a recommendation to make the Response Guide available at various locations throughout the city (e.g., City Hall, the Sheriff's Office, and at various Central City Concern locations). After the ECIT course certification presentation, members made three recommendations regarding the trainings' scenarios. One recommendation was to change the language in a scenario to be more in-line with best language practices. Another one suggested that there be a scenario involving an individual experiencing methamphetamine psychosis. The third recommendation suggested that ECIT in-training officer go through a scenario simulating the experience of having auditory and visual hallucinations. For all formal recommendations from the BHUAC, we also reviewed responses from the BHU, indicating that each recommendation was taken seriously and that each would be immediately implemented or become the subject of future meeting discussions.

In direct response to prior COCL comments, the BHUAC meetings in the third quarter emphasized drafting formal recommendations and making sure to note when something is informal feedback versus a formal recommendation. This emphasis resulted in a greater number of recommendations being made in the third quarter. It also served to focus the meetings to accomplish their intended function, which is to provide formal and direct feedback on PPB operations. While we understand that not every meeting will result in formal recommendations being made, the emphasis on formal recommendations during this quarter was a positive development.

For similar reasons as with Par. 95, we find that the BHUAC and PPB have satisfactorily responded to each of our concerns with respect to meeting quorums, meeting efficiency, and the presentation of force statistics during BHUAC meetings. As a result, we find conditional Substantial Compliance for this paragraph as well, though as noted above, we will need to observe the March 2023 meeting to ensure that all conditions have been met. We will provide an update in our 2023 Q1 report.

**Exhibit A**

| | |
|---|---|
| **COCL Recommendations** | • Provide use of force statistics and OIS facts to BHUAC in the March 2023 meeting |
| **Assessment Based On** | BHUAC status reports and recommendations<br><br>PPB responses to BHUAC recommendations |

## B. Continuation of C-I Program

| **Settlement Agreement Paragraph** |
|---|
| 97. PPB provides C-I Training to all its officers. C-I is a core competency skill for all sworn police officers in the City. PPB shall continue to train all officers on C-I.<br><br>98. PPB agrees to continue to require a minimum of 40 hours of C-I training to all officers before officers are permitted to assume any independent patrol or call-response duties. Additionally, PPB shall include C-I refresher training for all officers as an integral part of PPB's on-going annual officer training. PPB's Training Division, in consultation with [BHU] Advisory Committee, shall determine the subjects and scope of initial and refresher C-I training for all officers. |

| | |
|---|---|
| **Compliance Label** | 97. Substantial Compliance |
| | 98. Substantial Compliance |
| **Methodology** | Review of the PPB in-service training |

| **Compliance Assessment** |
|---|
| The PPB continues to emphasize crisis response as a core competency in their training. For instance, all officers are required to receive a minimum of 40 hours of crisis intervention training prior to graduating from the Advanced Academy. In the third quarter of 2022, the PPB began a new Advanced Academy in September and provided 4.5 hours of Crisis Intervention |

**Exhibit A**

training to recruits, with additional hours to be provided in the fourth quarter as well. This complements the 28 hours of C-I training that all recruits get in the statewide DPSST Basic Academy.

At the July BHUAC meeting, members were presented with the CIT Annual Update lesson plans for In-service training for all officers. This training covered the changes to Directive 850.20 Police Response to Mental Health Crisis and addressing the difference between PSR and Project Respond. Members were able to provide feedback and suggestions to the presenters regarding this training. As a result, the prior failure of PPB to allow BHUAC the opportunity to review refresher training has been resolved, and we now find that PPB has returned to Substantial Compliance with the requirements of this paragraph. However, we maintain our suggestion that PPB need not wait to consult BHUAC until after training has been developed and could rather request BHUAC input during the development phase.

| **COCL Recommendations** | • Consider seeking BHUAC input during training development rather than after training has been developed |
|---|---|
| **Assessment Based On** | PPB In-service training |

**C. Establishing "Memphis Model" Crisis Intervention Team**

<table>
<tr><td colspan="2" align="center"><b>Settlement Agreement Paragraph</b><br><br>99. Within 120 days of the Effective Date, PPB shall establish a Memphis Model Crisis Intervention team ("[ECIT]").</td></tr>
<tr><td><b>Compliance Label</b></td><td>Substantial Compliance</td></tr>
<tr><td><b>Methodology</b></td><td>Review BHU/ECIT data; Interview PPB Personnel; Review Mental Health Template data; Review BOEC data</td></tr>
<tr><td colspan="2">

<b>Compliance Assessment</b>

The PPB continues to operate under a modified "Memphis Model" of crisis intervention. In this specialized response system, a select group of officers receive an additional 40 hours of training to become Enhanced Crisis Intervention Team (ECIT) officers. As part of ECIT operations, PPB has Directive 850.20 (Police Response to Mental Health Crisis) which was revised during the third quarter, then subsequently presented to officers during the Q3 In-service training. Along with discussing the revisions, the PPB provided a brief training that distinguished between the roles and responsibilities of ECIT, Portland Street Response, and Project Respond. We therefore continue to find that PPB has sufficiently memorialized their crisis response model in both policy and training.

In the third quarter of 2022, PPB reported 138 active members on the ECIT roster. There are plans for an ECIT certification course in the fourth quarter that will increase the number of active ECIT members by 20. We will provide updated ECIT roster numbers in our next report after this training occurs.

Additionally, the BHU continued to hold ECIT advisory meetings. During the third quarter, ECIT members from all precincts discussed topics related to ECIT Course Certification, BHU caseload, and BOEC dispatch. For instance, the minutes from the meeting noted positive elements such as the fact that there is a reduction in police contact when a person is on a BHU caseload and that BOEC dispatch is doing a good job of dispatching ECIT officers. The notes also discussed the upcoming ECIT course certification.

</td></tr>
</table>

**Exhibit A**

As a result, maintaining their model, we continue to find PPB has substantially complied with the requirements of Par. 99.

| | |
|---|---|
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Based On** | ECIT roster<br><br>PPB's Semi-Annual Mental Health Crisis Response Report |

**Settlement Agreement Paragraph**

100. PPB's [ECIT] shall be comprised of officers who volunteer for assignment to the [ECIT]. The number of [ECIT] members will be driven by the demand for [ECIT] services, with an initial goal of 60-80 volunteer, qualified officers.

| | |
|---|---|
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review ECIT Roster; Interview PPB personnel |

**Compliance Assessment**

The PPB continues to follow the practice of accepting volunteer officers for ECIT certification. In the third quarter of 2022, the PPB had 138 total ECIT members, which also includes the reduction in number from the de-certification process described in prior report.

In reviewing their most recent semi-annual assessment of ECIT calls, PPB reported a 68% response rate for ECIT officers to calls where they were requested. This represents a slight decrease from the previous reporting period (70%) though it also represents a larger decrease from the previous years' response rate of 75%. As PPB has an ECIT training planned for the fourth quarter of 2022, we will need to see whether this will increase the response rate for ECIT officers to calls. However, in the event that the response rate does not increase after the training, we suggest PPB consider alternative approaches for increasing the

**Exhibit A**

response rates. For instance, PPB may consider doing additional targeted ECIT recruitment in North Precinct, which had a 60% response rate (the lowest of the three precincts), particular with officers working between 10:00 pm and 2:00 am (39% response rate during this timeframe).

While we do not find PPB out of compliance with this paragraph for this report, we look forward to seeing the next semi-annual evaluation to see whether these statistics have improved in order to demonstrate that the number of ECIT officers continues to be "driven by the demand for [ECIT] services."

**Figure 5.1: ECIT Calls for Service (provided by PPB)**



**Exhibit A**

**Table 5.1: ECIT Calls and ECIT On Scene by Shift Block (provided by PPB)**

### Central
### 04/01/2022 - 09/30/2022

|  | % of ECIT Calls | % Receiving ECIT Response |
|---|---|---|
| 2:00 AM to 8:59 AM | 16% | 73% |
| 9:00 AM to 3:59 PM | 34% | 72% |
| 4:00 PM to 9:59 PM | 33% | 74% |
| 10:00 PM to 1:59 AM | 17% | 78% |
| TOTAL | 100% | 74% |

### East
### 04/01/2022 - 09/30/2022

|  | % of ECIT Calls | % Receiving ECIT Response |
|---|---|---|
| 2:00 AM to 8:59 AM | 14% | 63% |
| 9:00 AM to 3:59 PM | 34% | 65% |
| 4:00 PM to 9:59 PM | 35% | 70% |
| 10:00 PM to 1:59 AM | 18% | 70% |
| TOTAL | 100% | 67% |

### North
### 04/01/2022 - 09/30/2022

|  | % of ECIT Calls | % Receiving ECIT Response |
|---|---|---|
| 2:00 AM to 8:59 AM | 15% | 85% |
| 9:00 AM to 3:59 PM | 32% | 56% |
| 4:00 PM to 9:59 PM | 34% | 60% |
| 10:00 PM to 1:59 AM | 19% | 39% |
| TOTAL | 100% | 60% |

**Exhibit A**

| COCL Recommendations | • Continue utilizing existing data to assess demand for ECIT services |
|---|---|
| **Assessment Based On** | Mental Health Template data<br><br>ECIT roster<br><br>PPB's Semi-Annual Mental Health Crisis Response Report |

<br>

| **Settlement Agreement Paragraph** |
|---|
| 101. No officers may participate in [ECIT] if they have been subject to disciplinary action based upon use of force or mistreatment of people with mental illness within the three years preceding the start of [ECIT] service, or during [ECIT] service. PPB, with the advice of the [BHU] Advisory Committee, shall define criteria for qualification, selection, and ongoing participation of officers in the [ECIT]. |

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Review evaluation documents for potential ECIT officers |

| **Compliance Assessment** |
|---|
| In the third quarter of 2022, the PPB did not add any new ECIT members, and no changes were made to the qualifications. The BHU did begin taking applications and started the vetting process for the upcoming ECIT certification course. The goal is to select 20 members to participate in the certification training. The PPB last taught a new training class for ECIT during the fourth quarter of 2021. COCL's previous report analyzed the roster and determined that the PPB followed the qualifications outlined in Paragraph 101. The COCL continues to suggest that the PPB seek input from the BHUAC for any updates to the qualifications that might benefit the program and to do so before delivering future ECIT training classes. At this point, we find the PPB to be in compliance with the requirements outlined in Paragraph 101. |

**Exhibit A**

| COCL Recommendations | • Re-engage the BHUAC regarding ECIT participation criteria |
|---|---|
| Assessment Based On | PPB ECIT evaluation documents |

| **Settlement Agreement Paragraph** | |
|---|---|
| 102. PPB shall specially train each [ECIT] member before such member may be utilized for [ECIT] operations. PPB, with the advice of the [BHU] Advisory Committee, shall develop such training for [ECIT] members consistent with the Memphis Model. | |
| Compliance Label | Substantial Compliance |
| Methodology | Review PPB supplemental documents |

**Compliance Assessment**

No new ECIT members were added to the roster in the third quarter of 2022, thus there was no certification training. All ECIT members did attend an in-service training held in the third quarter. The in-service training was a full day and covered two main topics: threat assessment and motivation interviewing. A COCL member was able to attend the training and COCL's review of the training can be found in the training section of this report under paragraph 84.

We continue to appreciate the PPB's dedication to their ECIT model and commend their efforts to provide thorough training. We recommend the PPB continue to analyze and update their materials for ECIT training on an ongoing basis and to utilize outside perspectives, such as those from the BHUAC to help inform training content.

| COCL Recommendations | • Continue to seek out recommendations from the BHUAC on ECIT training |
|---|---|
| Assessment Based On | PPB supplemental documents |

**Exhibit A**

| | Observation of BHUAC meeting |
|---|---|

| **Settlement Agreement Paragraph** | |
|---|---|
| 103. [ECIT] members will retain their normal duties until dispatched for use as [ECIT]. BOEC or PPB may dispatch [ECIT] members to the scene of a crisis event. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review PPB policy |
| **Compliance Assessment** | |
| In accordance with Par. 103 (and the Memphis model of mental health crisis response), ECIT members retain their normal duties until dispatched for use as ECIT. BOEC personnel have received training on the criteria for dispatching an ECIT to a call. Additionally, the PPB's Directive 850.20 includes the requirement for officers to consider calling in specialized units (including ECIT) as necessary. Overall, we find PPB has maintained compliance with Par. 103. | |
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Based On** | PPB policy |

| **Settlement Agreement Paragraph** | |
|---|---|
| 104. PPB will highlight the work of the [ECIT] to increase awareness of the effectiveness of its work. | |

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review PPB public awareness efforts; Review BHU website; Review BHUAC minutes |

**Compliance Assessment**

The PPB continues to perform a wide variety of tasks designed to increase awareness of the work performed by BHU, ECIT, BHRT, and SCT. This work includes flash alert emails, newsletters, conference presentations, conference attendance, community outreach training and presentations, social media, and other efforts. We believe that the PPB has made a serious effort to highlight the work of the BHU in its entirety, not only the ECIT.

For instance, in the third quarter of 2022, the BHU Newsletter discussed the BHU's participation in the Crisis Intervention Team (CIT) International Conference, introduced a new BHU clinician, and discussed data findings from the Semi-Annual Outcome Assessment. During the third quarter of 2022, we also observed a BHU presentation at the CIT International Conference. The presentation focused on PPB's data evaluation processes and how data can be utilized for organizational improvement. We found the presentation was well executed and well received by other conference attendees. We have suggested PPB provide this presentation to the BHUAC as well as post a version of it for community review to demonstrate the ways in which PPB is shaping current discourse in mental health crisis response. Based on this and our previous review of the PPB outreach efforts, we believe the PPB has substantially complied with the requirements of Par. 104.

| COCL Recommendations | • Provide the CIT International Conference presentation to BHUAC and publicly post it |
|---|---|
| Assessment Based On | Public awareness and education documents |

**Settlement Agreement Paragraph**

105. For each crisis event to which [ECIT] is dispatched, the [ECIT] member shall gather data that [BHU] shall utilize to track and report data on public safety system interactions with individuals with perceived or actual mental illness or who are in crisis. These data shall include: (COCL summary) the required tracking of details about the context and nature of incident, information about the subject, techniques used, injuries, disposition, presence of mental health professional on scene, and a narrative of the event.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review Mental Health Template data; Interview PPB personnel |

**Compliance Assessment**

In accordance with this paragraph, the PPB must collect data on mental health calls, and the BHU is required to report on the data collected. In the third quarter of 2022, the PPB continued to use the Mental Health Template (MHT) as the method for collecting the data points required in Par. 105. The PPB's quality assurance plan for ECIT-related data and outcomes includes analysts auditing associated data on a monthly basis.

The BHU provided COCL with a quarterly report describing MHT data for ECIT calls in the third quarter of 2022. In the third quarter, the PPB received 380 MHTs. On 366 calls, it was reported that an ECIT officer was on scene (a single call may result in more than one MHT being completed). ECIT officers authored 258 (68%) of the MHTs. For the 366 calls, the most common technique used was de-escalation (41%). A total of 20 calls (5% of the total) reported a use of force. For the disposition of the 366 calls, the most common clearance type was report completed (84% of calls), followed by about 7% of calls being cleared by arrest (physical). All these statistics are similar to prior quarters.

The PPB also continued their practice of providing semi-annual reports evaluating the ECIT program during this quarter. In December 2022, PPB released their second report for the year, covering the time period from April 1, 2022 to September 30, 2022. The data in the report indicate that non-ECIT calls have a 24% greater likelihood of the person being transported to the hospital when an ECIT officer is on-scene. This is a reduction from the previous reporting period (50%), indicating that outcomes between calls involving ECIT officers and those that do

not involve an ECIT are becoming more similar. This is also the case for arrest outcomes, for the data for this report indicated no difference between calls involving an ECIT officer and calls not involving an ECIT officer as it relates to transporting the person to jail. For this outcome, two of the last four assessments have found no difference, as well as each assessment done prior to April 2020.

Due to the nature and extent of data collected and analyzed on ECIT dispatches the PPB remains in Substantial Compliance with Par. 105

| | |
|---|---|
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Based On** | Mental Health Template data |

## D. Mobile Crisis Prevention Team

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 106. PPB currently has a [BHRT] comprised of a two-person team, one sworn officer and one contractor who is a qualified mental health professional. Within 120 days of the Effective Date, City shall expand [BHRT] to provide one [BHRT] car per PPB precinct. | |
| 107. Each [BHRT] car shall be staffed by one sworn PPB officer and one qualified mental health professional. [BHRT] shall be the fulltime assignment of each such officer. | |
| **Compliance Label** | 106. Substantial Compliance |
| | 107. Substantial Compliance |
| **Methodology** | Review BHU Unit Structure; Review of BHUAC meeting, Interview PPB Personnel |

**Exhibit A**

**Compliance Assessment**

The PPB continues to have a BHRT car in each precinct composed of one officer and one qualified mental health professional. For the officer, the BHRT is considered their full-time assignment. As an update to prior reports, the PPB continued in their efforts to expand the number of BHRT teams back to five. In the third quarter of 2022, maintained four total BHRT teams. The PPB did make an offer to an officer to fill the position of the fifth BHRT team. This officer is expected to assume their role in the fourth quarter. As a result of their current efforts, we continue to find PPB is in Substantial Compliance with the requirements of Pars. 106 and 107.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | BHU Unit Structure |


**Settlement Agreement Paragraph**

108. No officers may participate in [BHRT] if they have been subject to disciplinary action based upon use of force or mistreatment of people with mental illness within the three years preceding the start of [BHRT] service, or during [BHRT] service. PPB, with the advice of [BHU] Advisory Committee, shall define criteria for qualification, selection, and ongoing participation of officers in the [BHRT].

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Review evaluation documents for potential ECIT officers |

**Compliance Assessment**

All BHRT officers are ECIT certified and are held to the same eligibility standards as ECIT officers. In addition, S.O.P. #43 covers the ongoing participation of officers involved with BHRT.

**Exhibit A**

The BHU Sergeants and the Lieutenant monitor all current BHRT members through the Employee Information System (EIS) and PSD to ensure qualifications are maintained. For the new BHRT officer who will be assuming the role in Q4, we were not provided with the evaluation spreadsheet demonstrating compliance with this paragraph. However, as the officer was not expected to begin BHRT service until the fourth quarter, we will verify their eligibility in our next report. For this quarter, we continue to find the PPB remains in Substantial Compliance with Paragraph 108.

| **COCL Recommendations** | • Provide eligibility spreadsheet for officer beginning BHRT service in Q4 |
|---|---|
| **Assessment Based On** | PPB policy |

| **Settlement Agreement Paragraph** |
|---|
| 109. PPB shall specially train each [BHRT] member before such member may be utilized for [BHRT] operations. PPB, with the advice of the [BHU] Advisory Committee, shall develop such training for [BHRT] members. |

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Review reported trainings for BHRT members |

| **Compliance Assessment** |
|---|

The BHU continues to promote supplemental training for supervisors and BHRT members. In the third quarter of 2022, members took part in external supplemental training and conferences. Some BHU members attended the CIT International Conference as well as the Threat Management Conference. A BHRT officer attended a certification class about Suicide Prevention. Another BHU member attended a presentation about a growing white supremacist movement. It appears that the BHU has continued to forge a culture in which ongoing learning

| | |
|---|---|
| and training is promoted and encouraged. We therefore find the PPB to remain in Substantial Compliance with Paragraph 109. | |
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Based On** | PPB quarterly report identifying supplemental BHRT training |


| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 110. [BHRT] shall utilize [ECIT] data to proactively address mental health service, in part, by connecting service recipients with service providers. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review Mental Health Template summary data; Review BERS summary data |
| **Compliance Assessment** | |
| The PPB has continued the practice of collecting data through the Mental Health Template (MHT). When an officer has an encounter with a mental health component, they will complete the MHT, and this information is used to address mental health service needs. If an individual is a subject of three Mental Health Templates (MHTs) in a 30-day period, then they will be referred to the Behavioral Health Unit Electronic Referral System (BERS) (if a referral had not already been made). | |
| Once an individual is referred, a team will look at specific criteria including: a demonstration of escalating behavior, frequent contacts with the PPB, considered a risk to self or others, and whether case-specific information indicates a potential need for BHRT intervention. If the individual is deemed an appropriate candidate for additional intervention, then the Behavioral Health Unit Coordination Team (BHUCT) (which is composed of law enforcement, court, service | |

**Exhibit A**

provider, and hospital provider personnel, among other relevant stakeholders) will discuss a plan of action.

The PPB has continued to conduct analysis of BHRT operations on a quarterly basis to identify potential trends as well as ensure ongoing system function. In the third quarter of 2022, a total of 223 referrals were processed by the BHU. Of the 223 referrals, 123 (55%) were assigned to the BHRT caseload. This assignment rate represents an increase from the previous three quarters (47%, 50%, and 52% respectively). Historically, acceptance rates have generally been between 45% and 55%.

In the third quarter of 2022, 96 individuals transitioned to inactive status with BHRT. Of those individuals, 27 (28%) had been previously assigned to the BHRT caseload in a different quarter and continued into the third quarter of 2022.

As shown in the figure below, this quarter saw that the most common reason for a referral to be assigned was for Frequent Contacts (39%), closely followed by Escalating Behavior (37%).

**Figure 5.2 Assigned Cases Reason for Referral (provided by PPB)**



When looking at the outcomes of referrals for inactive cases in the third quarter of 2022, the most common outcome was Concern Mitigated (22%), closely followed by Jail/Criminal Justice System (18%) and Coordinated Services (17%),



**Figure 5.3: Inactive Cases Outcome of Referral (provided by PPB)**

N=96

The PPB's current practice of collecting data through the MHT, meeting weekly to share information and using data to inform service needs fulfills the requirements outlined in Par. 110 and we continue to find them in Substantial Compliance.

| COCL Recommendations | • Continue to collect data and create reports on mental health services |
|---|---|
| Assessment Based On | Mental Health Template data<br>BERS referral data |

| **Settlement Agreement Paragraph** | |
|---|---|
| | 111. Within 180 days of the Effective Date, PPB, with the advice of [BHU] Advisory Committee, shall develop policies and procedures for the transfer of custody or voluntary referral of individuals between PPB, receiving facilities, and local mental health and social service agencies. These policies and procedures shall clearly describe the roles and responsibilities of these entities and of [BHRT] officers in the process. |
| Compliance Label | Substantial Compliance |
| Methodology | Review Directives 850.20, 850.21, 850.22, and 850.25; Interview PPB personnel |

**Exhibit A**

**Compliance Assessment**

The PPB continues to operate under the Directives 850.20, 850.21, 850.22, and 850.25, which dictate the procedures for AMR to provide transportation for a person in a mental health crisis. These directives were also reviewed by the BHUAC during the first quarter of 2022. In the third quarter of 2022, in-service training provided an overview of the updates made to Directive 850.20. Furthermore, the PPB continues to collaborate with AMR when issues arise in the transportation of an individual dealing with a mental health crisis (see our assessment of Par. 89). The PPB also has a designated liaison Sergeant at each precinct to respond, in real time, to any transportation issues. As PPB continues to uphold these procedures, we find them to remain in Substantial Compliance with Paragraph 111.

| | |
|---|---|
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Based On** | Directives 850.20, 850.21, 850.22, and 850.25<br><br>PPB interviews |

**E. Service Coordination Team**

**Settlement Agreement Paragraph**

112. The Service Coordination Team ("SCT"), or its successor, shall serve to facilitate the provision of services to individuals who interact with PPB that also have a criminal record, addiction, and highly acute mental or physical health service needs.

| | |
|---|---|
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review SCT outcome measures; Review SCT Referrals Report |

**Exhibit A**

**Compliance Assessment**

The PPB continues to facilitate the provision of services to individuals who experience drug-addiction, mental illness, and are chronically involved in criminal behavior. The SCT coordinates access to housing, medical, counseling, and addiction/mental health services. Members of the SCT are proactive in seeking out collaborations with other stakeholders in the State of Oregon.

The PPB also continues to provide data demonstrating that, over the years, SCT has consistently grown in the number of people referred to the program as well as the number of people served by the SCT. For the third quarter of 2022, the number of referrals was 263, as shown in the table below. This is a decrease from the previous quarter (318). Of these referrals, the SCT accepted 71.5% while the other 28.5% did not meet the assignment criteria. The primary reasons for not meeting criteria were the lack of recent crimes (28%) and lack of criminal history (21%).

**Table 5.2: SCT Referrals (provided by PPB)**

| SCT Referrals, 2022 Q3 | N | % of Total |
|---|---|---|
| Number of Referrals | 263 | - |
| Number of Individuals Referred* | 254 | - |
| Number of Referrals That Met Assignment Criteria | 188 | 71.5% |
| Number of Referrals That Did Not Meet Assignment Criteria | 75 | 28.5% |
| Reason for Not Meeting Assignment Criteria | N | % of Not Meeting Assignment Criteria |
| Lacks recent crimes | 21 | 28% |
| Lacks criminal history | 16 | 21% |
| Other | 7 | 9% |
| Unable to Locate | 7 | 9% |
| Sex Offender | 6 | 8% |
| Higher level of care needed | 6 | 8% |
| Aggression | 6 | 8% |
| Arson | 5 | 7% |
| Crimes outside Portland | 1 | 1% |

Additionally, the Supportive Transitions and Stabilization (STS) Program is an expansion of the SCT operation and is run by the Central City Concern's Housing Rapid Response. It is intended to address the needs of those with mental illness and co-occurring disorders who temporarily

**Exhibit A**

require a more extensive level of care by creating a direct housing resource. In the third quarter of 2022, 19 individuals were referred, 12 of the referrals were accepted, and a total of five new participants were served, as shown in the table below. Furthermore, PPB anticipates that restoring the fifth BHRT team will continue to raise referrals and we will continue to provide updates on these trends.

**Table 5.3: STS Referrals (provided by PPB)**

| STS Referrals, 2022 Q3 | |
|---|---|
| Number of Referrals* | 19 |
| Number of Individuals Referred | 19 |
| Average Age of Individuals Referred | 40.4 yrs |
| Number of Referrals Accepted (Met Criteria) | 12 |
| Number of Referrals Declined | 7 |
| Number of new participants served during Quarter | 5 |
| Number of participants who successfully completed | 1 |
| Participants terminated for cause/non-compliance | 2 |
| Participants who voluntarily withdrew from program | 4 |
| Average Length of Stay (days) of those who exited during Quarter | 79.1 |
| Bed utilization rate | 76.2% |

| | |
|---|---|
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Based On** | SCT process<br><br>SCT outcome measures |

**F. BOEC**

<table>
<tr><td colspan="2" align="center"><b>Settlement Agreement Paragraph</b><br><br>113. Within 120 days of the Effective Date, BOEC and PPB, with the advice of the [BHU] Advisory Committee, shall complete policies and procedures to triage calls related to mental health issues, including changes to protocols for assigning calls to [Behavioral Health Call Center - BHCC], and adding new or revised policies and protocols to assign calls to the PPB [BHU] or directly to NGOs or community-based mental health professionals.</td></tr>
<tr><td><b>Compliance Label</b></td><td>Substantial Compliance</td></tr>
<tr><td><b>Methodology</b></td><td>Interview BOEC personnel; Review BOEC protocols</td></tr>
<tr><td colspan="2"> <b>Compliance Assessment</b> <br>BOEC has completed and maintained the policies and procedures prescribed within Par. 113. BOEC's Mental Health and ECIT dispatch Protocol S.O.P. identifies seven call characteristics where an ECIT dispatch officer will be dispatched. These characteristics include when there is a mental health component and: (1) a weapon is present; (2) the person is violent; (3) the call is at a mental health facility; (4) the caller is threatening suicide and has the means to carry it out; (5) at the request of a community member; (6) at the request of another officer; (7) or when the person represents an escalating risk of harm to self or others.<br><br>BOEC has maintained their policy criteria for ECIT dispatch, which partially satisfies the requirement for crisis triage. In addition, BOEC has updated criteria for forwarding calls to the Behavioral Health Call Center (BHCC). BOEC also has triage protocol in place for PSR, though due to continued negotiations between the City and PPA, BOEC does not presently have an official policy for PSR. Although BOEC has not been able to adopt official policies yet, during the third quarter they worked on the PSR SOP. The draft of SOP 6.011 Portland Street Response was reviewed by BHUAC at the July meeting. At the August meeting, the BHUAC voted to approve BOEC SOP 6.011 Portland Street Response. All voting members present at the meeting voted to approve. In total, the triage protocols for mental health calls satisfies Par. 113 and BOEC remains in Substantial Compliance</td></tr>
</table>

| COCL Recommendations | • Create BOEC PSR policy |
|---|---|
| **Assessment Based On** | BOEC protocols for ECIT dispatch<br><br>BOEC protocols for BHCC referral<br><br>BOEC protocols for PSR dispatch |

---

| **Settlement Agreement Paragraph** | |
|---|---|
| 114. Within 180 days of the Effective Date, the City will complete training of all BOEC Dispatchers in Crisis Triage. The City, with the advice of the [BHU] Advisory Committee, shall develop ongoing training for BOEC Dispatchers. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Interview BOEC personnel |

**Compliance Assessment**

BOEC staff continue to receive training in crisis triage and during the third quarter they presented on and elicited feedback from the BHUAC on in-service training. BOEC is also currently in the process of continuing to hire more employees and, as with prior cohorts, will continue to send them to CIT Training for Dispatchers in upcoming quarters.

With the addition of Portland Street Response, BOEC has a new element within their crisis triage to consider when implementing future trainings. However, BOEC has not developed a focused training on PSR yet, as no official policies have been adopted, though have continued to update BOEC employees on program developments. We will continue to provide updates in future quarters though note that a focus training will need to be developed for PSR once official policies have been adopted.

| COCL Recommendations | • Develop focused training for PSR |
|---|---|
| Assessment Based On | Prior observation of BOEC training<br>Interview with BOEC personnel |

### Settlement Agreement Paragraph

115. Within 180 days of the Effective Date, the City shall ensure Crisis Triage is fully operational to include the implementation of the policies and procedures developed pursuant to the above paragraph and operation by trained staff.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review of BOEC data; Interview with BOEC personnel |

### Compliance Assessment

COCL reviewed data related to the operation of BOEC, not only in the context of PPB's crisis response but also in the context of other triage options, including transferring calls to the BHCC and dispatching PSR to calls that meet the necessary criteria. For instance, in the third quarter evaluation of mental health calls, BOEC reported setting up 5,170 calls with a mental health component that did not receive an ECIT dispatch. BOEC audited a total of 349 of these calls. In 17 of those calls (4.9%) BOEC's audit later found that sufficient information existed at the time of the call to warrant it being dispatched as ECIT. This rate is consistent with prior reporting periods. BOEC also assessed accuracy for calls transferred to the BHCC, with 16 out of 272 calls being kicked back to BOEC for ECIT dispatch (we note this may not indicate fault with the telecommunicators decision since BHCC operators may learn additional information warranting emergency response).

We also reviewed the integral role that BOEC has played with respect to the city-wide expansion of PSR. In the third quarter, BOEC set up 1877 calls for PSR, a decrease of 22% from the second quarter. However, there continue to be inconsistencies in when PSR has been able

**Exhibit A**

to field all calls for service which meet their response criteria. In speaking with both BOEC and PSR representatives, we were informed that approximately twice per day, BOEC is forced to close the PSR queue and divert all calls to PPB members due to no PSR teams being available. When this happens, the queue is normally closed for thirty minutes to an hour, at which point, the queue is re-opened and callers will receive a PSR response. PSR is attempting to resolve these issues through increased staff resources and expanded funding opportunities. For instance, PSR is exploring certification in mobile crisis response, opening the door for federal money as part of the CAHOOTS Act.

The delays experienced by PSR also appear to have an impact on the views of PPB officers regarding the PSR program. We were informed that officers may not consider PSR a consistent resource as they are not always able to respond in a timely manner. For instance, officers may be required to sit on a call waiting for Project Respond, a role which is more appropriate for PSR rather than an officer. Without assurance that PSR can consistently and reliably take over such calls, officers may be less likely to call them, undermining the legitimacy of PSR in the eyes of PPB officers. To address this issue, we are aware that PSR and PPB are taking steps to improve their relationship and better work as part of an overall City approach to mental health crises. We suggest PSR and PPB continue these efforts in order to maintain PSR as a critical resource for PPB members.

In all, it appears that BOEC, PPB, and PSR are aware of the growing pains associated with moving from an 18-person team to a 60-person team within the last year. However, while the process of the roll-out has experienced some hiccups, we are also aware of current efforts being taken to resolve the issues as they have come up. Moving forward, we will continue to monitor the progress of PSR, including the operation of BOEC as it relates to being able to dispatch them when the response criteria are met. However, for this quarter, we continue to find BOEC to be in Substantial Compliance with the requirements of this paragraph.

| **COCL Recommendations** | • Continue to address PSR issues and determine their implications for policy and training |
|---|---|
| **Assessment Based On** | Review of BOEC data<br>Interview with BOEC personnel<br>Interview with PSR personnel |

**Exhibit A**

# VII. EMPLOYEE INFORMATION SYSTEM

**Settlement Agreement Paragraph**

116. PPB has an existing Employee Information System ("EIS") to identify employees and design assistance strategies to address specific issues affecting the employee. *See* PPB Manual 345.00. PPB agrees to enhance its EIS to more effectively identify at-risk employees, supervisors and teams to address potentially problematic trends in a timely fashion. Accordingly, within 90 days of the Effective Date, PPB shall: (a) Require that commanders and supervisors conduct prompt reviews of EIS records of employees under their supervision and document the review has occurred in the EIS performance tracker; (b) Require that commanders and supervisors promptly conduct reviews of EIS for officers new to their command and document the review has occurred in the EIS performance tracker; and (c) Require that EIS staff regularly conduct data analysis of units and supervisors to identify and compare patterns of activity.

117. PPB agrees to use force audit data to conduct similar analyses at supervisor- and team-levels.

| | |
|---|---|
| **Compliance Label** | 116. Partial Compliance |
| | 117. Partial Compliance |
| **Methodology** | Interview EIS/PPB personnel; Review PPB EIS analysis |

**Compliance Assessment**

The PPB continued to use the Employee Information System (EIS) as their primary system for identifying at-risk members and potentially problematic trends and "design[ing] assistance strategies to address specific issues affecting the employee" (Par. 116). As for the PPB's current procedure of evaluating subsections (a) and (b) of Par. 116, the PPB reports rates of compliance with supervisory reviews that are consistent with prior quarters. As shown in the figure below, for subsection (a) (supervisors performing annual reviews), compliance was at approximately 99% for the third quarter of 2022. For subsection (b) which requires "new-to-command" reviews, compliance rates increased in the third quarter over the second quarter,

**Exhibit A**

going from 89% to 93%, the highest compliance rate with subsection b in the past five quarters. Finally, for subsection (c) (which looks at all opportunities for Par. 116 compliance), there was a 97.3% compliance rate, which is again a five-quarter high for all opportunities for Par. 116 compliance.

**Figure 7.1: Compliance with Reviews Directive 345.00 Reviews (provided by PPB)**



However, we continue to find that the way PPB and the Force Inspector identifies "at-risk employees, supervisors, [or] teams" is undervalued and underutilized. PPB possesses a Force Applications Spreadsheet which lists each officer in PPB, grouping them by Precinct and Shift, and conducting a comparative analysis of their overall use of force (in raw numbers), each type of force used, and standardized statistics comparing FDCRs and applications to the number of calls for service, reports written, and arrests. This spreadsheet provides an opportunity for the Force Inspector to take a narrowed focus on <u>specific members</u> for whom force statistics are elevated and have an in-depth conversation with their supervisors to identify solutions to reducing their overall uses of force. For instance, in reviewing the Q3 Force Applications spreadsheet, one officer had the following statistics compared to other officers within the same Precinct and Shift:

| Table 7.1 | | |
|---|---|---|
| **Standardized Comparison** | **Officer X** | **Mean for Precinct/Shift** |
| Applications per FDCR | 1.9 | 1.7 |
| FDCRs to Reports | 11.8% | 3.2% |
| Force Applications to Reports Written | 22.1% | 5.6% |
| FDCRs to Arrests | 34.8% | 11.5% |
| Force Applications to Arrests | 65.2% | 20.8% |
| FDCRs to Calls for Service | 1.6% | .4% |
| Force Applications to Calls for Service | 2.9% | .6% |

For many of these statistics, the officer was 3-4 times higher than the average of all other officers. For instance, the mean for the Precinct/Shift in FDCRs (i.e., use of force events) to calls for service was .4%, meaning that, on average, officers in that Precinct/Shift had a force event once every 250 calls for service during the third quarter. For this specific officer, they had a force event once every 62.5 calls for service during the third quarter.

Other officers follow similar trends. For instance, the spreadsheet for 2021 Q4 to 2022 Q3 spreadsheet (a one-year comparison) identified one officer with a .9% FDCR to calls for service average whereas their Precinct/Shift had a .2% average. This officer had 18 FDCRs though other similarly-situated officers (i.e., officers in the same Precinct/Shift with similar numbers of calls for service, reports written, and arrests) had 7 or fewer FDCRs in the one-year period.

Similarly, using the one-year comparison spreadsheet, one officer had comparatively few calls for service – out of the 46 officers listed on the spreadsheet for the Precinct/Shift, the officer ranked 5th from the bottom with respect to calls for service with 675 calls for service (the average for the Precinct/Shift for the year was 1,391.7). However, the officer had 5 FDCRs whereas the entire Shift/Precinct had an average of 3.28 FDCRs for the year. Therefore, despite being 52% below the average in calls for service, the officer was 52% above the average in use of force events for the year.

**Exhibit A**

As noted in prior reports, we do not believe these types of comparisons are being thoroughly discussed nor do we believe that sufficient force mitigation efforts are being taken as a result of the peer-comparison. During the fourth quarter (though focusing on third-quarter data), we observed two meetings between the Force Inspector and Precinct Commanders. Although we found that they did discuss some particular officers that had higher rates of force, the higher rates were dismissed for reasons that did not fully explain the disparity. For instance, in discussing one officer, we heard that the higher rates of force were due to the officer being part of a partner car and therefore often acting as cover. However, this does not explain the fact that other officers are also working partner cars and still have relatively lower rates of force. Furthermore, as discussed below, PPB possesses intervention options that would address these causes (e.g., temporary re-assignment) and therefore the officer's assignment should not be the sole justification for dismissing the higher force rates.

Furthermore, in reviewing the Q3 responses from Precinct Commanders and Captains based on the Q2 spreadsheet, we noted one stated that they further reviewed nine specific officers. This is wholly in line with what we would expect for this process. However, the review consisted of reviewing the specific force events, finding them in-policy and consistent with training. This is what the AAR process is for and this does not explain why, compared to their similarly-situated peers, these officers still exhibited higher rates of force.

The peer-comparison EIS process that PPB uses has the potential to better manage force throughout the Bureau. However, we do not currently believe PPB is currently using EIS to its full potential and interventions based on the peer-comparison approach are rare. In order to best utilize the system, as well as to return PPB to substantial compliance with this paragraph, we provide the following technical assistance.

Each quarter, the Force Inspector generates the Force Applications Spreadsheet for both the specific quarter as well as for a one-year retrospective. Where a sufficient number of events exist (i.e., calls for service, arrests, or reports written), the Force Inspector should identify members who have engaged in significantly higher rates of force compared to other, comparable, officers. While we recognize that this requires some subjectivity, we recommend the Force Inspector use the above officer descriptions as examples of individuals who may be considered potentially problematic. We further acknowledge that, by the sheer nature of statistics, there will always be an officer who used the "most force" in a given period. However, the officers in our examples were not simply at the end of the bell-curve; they represented outlying cases that exceeded 3 (and at times 4 or more) standard deviations above the mean. As it is the Force Inspector's role to manage force within the Bureau (see Par. 35), it is their

**Exhibit A**

responsibility to identify these outliers who represent the largest cause for concern. During this quarter, the inspector failed to do so.

Once identified, the Force Inspector should discuss these individuals with the Precinct Commander. We note here that these discussions should not be automatically framed as blaming the officer or attempting to find fault. At its core, EIS is non-disciplinary and an elevated number of force events does not mean that any force was out of policy nor that the officer inherently uses deficient tactics. By taking a punitive approach to EIS (or even a "nit-picky" approach), the legitimacy of the system itself can be undercut (see, for example, Walker, 2012 and Walker, et. al., 2006). Rather, the conversations should set about discussing the statistical facts: the officers in question show an elevated number of force events compared with all other officers within that Shift/Precinct.

Based on these discussions, the officers should be referred to EIS to have an alert opened on them. The alert should then be forwarded to a direct supervisor who should identify potential reasons for the statistically heightened uses of force and make tailored recommendations for intervention as appropriate. We reiterate here that supervisors should not be attempting to re-evaluate whether individual force events were within policy. Instead, supervisors should be reviewing the officer, including through EIS data sources and prior PDT entries, though also through conversations with the officer to better understand the reasons for the comparatively higher use of force events.

Based on the review of data and conversations with officers, supervisors should then recommend non-punitive interventions that may reduce the officers' frequency of force events. PPB provides a list of potential interventions within Directive 345.00, including "coaching, commending, debriefing, monitoring, referring to the Employee Assistance Program (EAP), requiring training, temporarily re-assigning, or some other form of non-disciplinary action." Therefore, even when there is potentially no policy or tactical deficiencies in the actions of the officer, the supervisor still has at his or her disposal the ability to address the underlying trend through additional means.

Overall, we refer to the description of EIS that PPB uses within its own supervisor academy:

*"EIS is designed to **capture outliers when comparing officers to their peers**. We identify outliers to **address problematic trends with constructive interventions**. We seek to prevent poor outcomes – **to the community and to officers** – before they occur, and prevent career-ending behavior"* (emphasis added).

At its core, PPB's Force Applications Spreadsheet allows the Force Inspector to capture such outlier officers compared to their peers, implement non-punitive interventions that may reduce the officers' frequency of force events, and address the underlying trends. However, at present, the system is not being used this way and appears to be distrusted and viewed as punitive by PPB members, potentially rendering it ineffective (though further analysis is necessary to determine whether the system is truly ineffective). To overcome this, we continue to work with PPB to conduct an evaluation of the system as a whole in order to identify areas where it is most effective as well as areas where the system could be enhanced to meet the terms of the Settlement Agreement.

| **COCL Recommendations** | <ul><li>To achieve Substantial Compliance, require the Force Inspector to conduct the Type III alert process in accordance with Directive 345.00.</li><li>To achieve Substantial Compliance, implement corrective action for Precinct Commanders when significant review failures occur</li><li>Continue contributing to the development of the EIS evaluation</li></ul> |
|---|---|
| **Assessment Based On** | EIS and threshold review process |

**Settlement Agreement Paragraph**

118. PPB shall continue to use existing thresholds, and specifically continue to include the following thresholds to trigger case management reviews: (a) Any officer who has used force in 20% of his or her arrests in the past six months; and (b) Any officer who has used force three times more than the average number of uses of force compared with other officers on the same shift.

119. Within 90 days of the Effective Date, PPB shall add one additional threshold to trigger case management review of any officer who has three uses of force in a one-month period.

| Compliance Label | 118. Substantial Compliance |
| | 119. Substantial Compliance |
| Methodology | Interview EIS/PPB personnel; Reviewed EIS program data |

### Compliance Assessment

The thresholds the PPB are required to maintain for Par. 118 continue to be used to flag officers for supervisory reviews. The PPB continues to collate data from a variety of sources, including force events, traumatic incidents (captured in Regional Justice Information Network (RegJIN)), complaints, and commendations (captured in Administrative Investigations Management (AIM)). This data is then used to identify potentially problematic behavior with the predetermined thresholds identified by these paragraphs.

In the second quarter of 2022, EIS Administrators reviewed a total of 318 alerts and sent 183 (57.5%) on for RU Manager review (see Figure 5). When forwarded to the RU Manager, the alert may be reviewed and closed by the RU Manager or sent on to the officer's supervisor for either closure or an intervention (i.e., coaching, commending, debriefing, monitoring, referring to the Employee Assistance Program (EAP), training, or temporary reassignment). For alerts closed in the third quarter of 2022 (which may also include cases opened in prior quarters), there were 174 alerts sent to the RU Manager and for 103 (59.2%) of those instances, the alert was sent on for further supervisor review (the lowest percentage in the prior five quarters). Additionally, of alerts sent to the officer's supervisor during the third quarter of 2022, 79.6% resulted in some type of intervention for the officer. The information provided by the PPB indicates that most of the interventions involved a debriefing though one involved an EAP referral. Of the 318 alerts that were created in the second quarter of 2022, 145 (45.6%) were force related. Of the force-related alerts 11% included a threshold break for three or more uses of force over the prior 30 days.

As discussed in our assessment of Par. 116, we will need to conduct a comprehensive review to determine the relative effectiveness of EIS interventions, both from empirical data analyses as well as through conversations with key stakeholders in the EIS process. However, as PPB continues to use the thresholds as outlined by Pars. 118 and 119, we continue to find they have substantially complied with these paragraphs.

**Exhibit A**



**Figure 7.2: EIS Alerts and Alerts Sent to RU Manager (provided by PPB)**

**Table 7.2: EIS Alerts and Interventions**

|  | 2021 Q3 | 2021 Q4 | 2022 Q1 | 2022 Q2 | 2022 Q3 |
|---|---|---|---|---|---|
| Alerts Closed by RU | 263 | 215 | 170 | 174 | 174 |
| Alerts Sent to Supervisor (Percent of Alerts Sent to RU) | 210 (79.8%) | 181 (84.2%) | 112 (65.9%) | 126 (72.4%) | 103 (59.2%) |
| Interventions (Percent of Alerts Sent to RU) | 160 (60.8%) | 162 (75.3%) | 88 (51.8%) | 94 (54.0%) | 82 (47.1%) |
| Interventions (Percent of Alerts Sent to Supervisor) | 160 (76.2%) | 162 (89.5%) | 88 (78.6%) | 94 (74.6%) | 82 (79.6%) |
| **COCL Recommendations** | • No recommendations at this time | | | | |

**Exhibit A**

| **Assessment Based On** | Current EIS thresholds and associated data |
|---|---|

| **Settlement Agreement Paragraph** | |
|---|---|
| 120. Within 90 days of the Effective Date, PPB shall identify and train a second EIS administrator. This individual may be assigned to other tasks within the Professional Standards Division or as otherwise needed. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Reviewed Directive 345.00; Reviewed EIS Program |
| **Compliance Assessment** | |
| Paragraph 120 requires that the PPB "identify and train a second EIS administrator." During the third quarter of 2022 the PPB maintained the second EIS administrator that was trained and joined the team in the first quarter of 2022. We therefore find that the PPB has maintained compliance with Par. 120. | |
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Based On** | Maintenance of second EIS Administrator |

# VIII. OFFICER ACCOUNTABILITY

## A. Investigation Timeframe

<table>
<tr><td colspan="2" align="center">**Settlement Agreement Paragraph**</td></tr>
<tr><td colspan="2">121. PPB and the City shall complete all administrative investigations of officer misconduct within one-hundred eighty (180) days of a complaint of misconduct, or discovery of misconduct by other means. For the purposes of this provision, completion of administrative investigations includes all steps from intake of allegations through approval of recommended findings by the Chief, excluding appeals, if any, to CRC. Appeals to CRC should be resolved within 90 days.</td></tr>
<tr><td>**Compliance Label**</td><td>Substantial Compliance</td></tr>
<tr><td>**Methodology**</td><td>Review IPR Quarterly Data Analysis; Review Administrative Investigation Management (AIM) System data</td></tr>
<tr><td colspan="2" align="center">**Compliance Assessment**</td></tr>
<tr><td colspan="2">On a quarterly basis, the IPR provides summary statistics for all full administrative investigations which are closed within 180 days of their initiation date. Using the quarter in which the cases were opened as reference, the IPR statistics show that of the 21 cases that were opened in the first quarter of 2022 (the last quarter for which 180 days could have passed for this report), only 2 cases exceeded the 180-day timeline (10%). Additionally, the quarterly statistics indicate that 8 cases from the second quarter of 2022 have already been completed within 180 days while 16 remain open (though still within 180-day timeframe). We find that timelines have generally been sustained and therefore find the City and the PPB continue to maintain Substantial Compliance with the requirements of Par. 121.</td></tr>
<tr><td>**COCL Recommendations**</td><td>• Continue ensuring cases are closed within 180 days</td></tr>
<tr><td>**Assessment Based On**</td><td>IPR data indicating adherence to 180-day timeline</td></tr>
</table>

**Exhibit A**

| **Settlement Agreement Paragraph** |
|---|
| 122. PPB shall conduct administrative investigations concurrently with criminal investigations, if any, concerning the same incident. All administrative investigations shall be subject to appropriate tolling periods as necessary to conduct a concurrent criminal investigation, or as otherwise provided by law, or as necessary to meet the CRC or PRB recommendation to further investigate. |

| | |
|---|---|
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review Criminal-IA Concurrent Investigation Audit Reports; Review Directive 0330.00 |

| **Compliance Assessment** |
|---|
| In the third quarter of 2022, the PPB continued to provide documentation indicating when an Internal Affairs investigation began compared to when the criminal investigation began. This quarter there were thirteen cases that required both a criminal investigation and an Internal Affairs investigation. For twelve of the cases, both the Internal Affairs investigation and the criminal investigation began on the same day and, in the final case, the criminal investigation was initiated on a Friday and the Internal Affairs investigation was initiated on the following Monday. We therefore find that all thirteen cases met the criteria for "concurrent" and, as a result, continue to find that PPB has maintained compliance with Par. 122. |

| | |
|---|---|
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Based On** | Criminal-IA Concurrent Investigation Audit reports |

| **Settlement Agreement Paragraph** | |
| --- | --- |
| 123. If PPB is unable to meet these timeframe targets, it shall undertake and provide to DOJ a written review of the IA process, to identify the source of the delays and implement an action plan for reducing them. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review Administrative Investigations Report |

| **Compliance Assessment** |
| --- |
| During the third quarter of 2022, the PPB closed 30 administrative investigations. The PPB provided the COCL with an Administrative Investigations Report which noted that one case exceeded the 180-day timeline. PPB stated that the administrative investigation exceeded the 180-day timeline due to a data-entry error that caused the case to fall out of the tracking system. PPB has since reprogrammed the system to ensure that data-entry errors do not cause cases to fall out of the tracking system. This process, in all phases, is consistent with the intent of this paragraph in that PPB was able to identify an untimely investigation, determine the reasons for it being tardy, and take immediate corrective action to avoid the potential for the same problem in the future. |

In addition, we continue to evaluate stage timelines to see whether consistent processes occurred at a micro-level. During this quarter, 29 cases did not exceed the 180-day timeline overall but had stages which exceeded the stage-timeline. In some of the cases there was an intentional delay in order to focus on other cases. At other times, there were delays in stages based on leaves of absences, delays in the criminal investigations, and delays in IPR's intake process, among others. When outlining the reasons for stage-timeline delays, IA lieutenants typically did not make any recommendations for addressing those delays with the reasoning being that there was no need to make recommendations as the overall timeline did not extend beyond 180-days.

Since PPB has continued to document clear explanations for cases that exceed their allotted timeline, as well as take remedial action to address reasons for delays, we continue to find them in Substantial Compliance with the requirements of Par. 123. However, we maintain our

| | |
|---|---|
| | ongoing suggestion that supervisors identify remedies for delays in individual stages, even if the entire investigation timeline was under 180-days. |
| **COCL Recommendations** | • Maintain self-improvement loop for stages that exceed their stage timeline even if the case does not exceed the 180-day timeline |
| **Assessment Based On** | Administrative Investigations Report |

**B. On Scene Public Safety Statements and Interviews**

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 124. Within 90 days of the Effective Date, the City and PPB shall review its protocols for compelled statements to PSD and revise as appropriate so that it complies with applicable law and current professional standards, pursuant to *Garrity v. New Jersey*, 385 U.S. 493 (1967). The City will submit the revised protocol to DOJ for review and approval. Within 45 days of obtaining DOJ's approval, PPB shall ensure that all officers are advised on the revised protocol. | |
| Compliance Label | Substantial Compliance |
| Methodology | Review Directive 1010.10 |
| **Compliance Assessment** | |
| During the third quarter of 2022, the PPB maintained their protocols for compelled statements to PSD and all officers have been advised on the protocol. As a result, we find the PPB has maintained compliance with Par. 124. | |
| **COCL Recommendations** | • No recommendations at this time |

**Exhibit A**

| Assessment Based On | Current PPB policy |
|---|---|

| **Settlement Agreement Paragraph** |
|---|
| 125. Separation of all witnesses and involved officers to lethal force events is necessary in order to safeguard the integrity of the investigation of that event. Immediately following any lethal force event, PPB shall continue to issue a communication restriction order ("CRO") to all witness and involved officers, prohibiting direct or indirect communications between those officers regarding the facts of the event. The CRO will continue, unless extended further, until conclusion of the Grand Jury or, if no Grand Jury is convened, until a disposition is determined by the District Attorney. |

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Reviewed CROs for 2022 Second Quarter OIS events |

| **Compliance Assessment** |
|---|
| In the third quarter of 2022, there were four OIS incidents. In the first OIS, which occurred on July 24, 2022, PPB issued three CROs. In the second OIS, which occurred on July 26, 2022, PPB issued two CROs. In the third OIS, which occurred on July 27, 2022, PPB issued nine CROs. In the fourth and final OIS in Q3, which occurred on August 16, 2022, PPB issued 10 CROs. The PPB provided the COCL with copies of the CROs for each of the OIS incidents and a review of the CROs indicates they were issued within a reasonable amount of time after the OIS. As PPB continues to issue CROs in OIS events COCL finds that PPB remains in compliance with the requirements of Par. 125. |

| COCL Recommendations | • No recommendations at this time |
|---|---|
| Assessment Based On | CROs for 2022 first quarter OIS events |

| **Settlement Agreement Paragraph** |
| --- |
| 126. PPB shall continue to require witness officers to lethal force events to give an on-scene briefing to any supervisor and/or member of the Detective Division to ensure that victims, suspects, and witnesses are identified, evidence is located, and provide any information that may be required for the safe resolution of the incident, or any other information as may be required. |

| **Compliance Label** | Partial Compliance |
| --- | --- |
| **Methodology** | Review Officer-Involved Shooting case file excerpts |

| **Compliance Assessment** |
| --- |
| During the third quarter of 2022 there were four OIS incidents. PPB provided evidence that a witness officer conducted an on-scene walkthrough following each of the OIS incidents. |
| However, in both our 2021 Q3 report and our 2022 Q2 report we noted that PPB should review and revise Directive 1010.10 to include mental health in the definition of incapacitation as a reason not to complete an on-scene walkthrough, as well as establish criteria and training for detectives to evaluate and determine when someone meets the criteria. As of the writing of this report, Directive 1010.10 has not been revised and we therefore continue to find that PPB has not returned to substantial compliance with the requirements of Par. 126. |

| **COCL Recommendations** | • To achieve Substantial Compliance, revise Directive 1010.10 to allow for the potential for witness officers being incapacitated for mental health reasons<br>• Provide criteria for detectives to make such a determination |
| --- | --- |
| **Assessment Based On** | OIS case file excerpts<br><br>Review of Directive 1010.10 |

**Exhibit A**

| **Settlement Agreement Paragraph** | |
|---|---|
| 127. In agreement and collaboration with the Multnomah County District Attorney, PPB shall request that involved officers in lethal force and in-custody death events provide a voluntary, on-scene walk-through and interview, unless the officer is incapacitated. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review Officer Involved Shooting case files excerpts |
| **Compliance Assessment** | |
| In the third quarter of 2022 there were four OIS incidents. As has been the case in prior lethal force incidents, the involved member in each case declined to participate in an on-scene walkthrough and interview. Regardless, as a result of the PPB requests, we continue to find the PPB has substantially complied with the requirements of Par. 127. | |
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Based On** | OIS case file excerpts |

## C. Conduct of IA Investigations

| **Settlement Agreement Paragraph** | |
|---|---|
| 128. Currently, both IPR and PPB's PSD have authority to conduct administrative investigations, provided that IPR interview of PPB Officers must only be conducted jointly with IA. Within 120 days of the Effective Date, the City will develop and implement a plan to reduce time and effort consumed in the redundant interview of witnesses by both IPR and IA, and enable meaningful independent investigation by IPR, when IPR determines such independent investigation is necessary. | |

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review Police Accountability Commission agendas |

**Compliance Assessment**

During the third quarter of 2022, both the IPR and IA maintained their respective administrative investigations using the system we have previously found compliant with Par. 128. Also during the third quarter, IPR experienced some hurdles as part of becoming a fully independent office though this appears related to having new responsibilities that were previously performed by the Auditor. For instance, IPR is now able to recruit and hire new employees independently. Overall, however, IPR reports being back to pre-2020 operations with respect to incoming complaints, investigations, and staffing. Although we will still want to observe IPR's role in helping with the transition to the new accountability system, it appears the City has ensured meaningful independent investigation through IPR in the interim.

However, we have yet to receive an update to the approximate 45,000-50,000 document Records Division backlog (as we have not yet received an update, we are also not aware as to whether this still reflects the true size of the backlog). Although the City continues to report efforts to hire additional personnel within the Records Division, we maintain that the backlog requires resolution prior to returning to Substantial Compliance. We look forward to future updates from the City related to this matter.

| **COCL Recommendations** | ● To achieve Substantial Compliance, the PPB should resolve the records backlog in the Records Division |
|---|---|
| **Assessment Based On** | Accountability system transition plan<br><br>Ongoing Records Division Backlog<br><br>Police Accountability Commission meetings |

**Exhibit A**

**Settlement Agreement Paragraph**

129. The City and PPB shall ensure that all allegations of use of excessive force are subject to full and completed IA investigations resulting in findings, unless there is clear and convincing evidence to IPR that the allegation has no basis in fact.

| | |
|---|---|
| **Compliance Label** | Partial Compliance |
| **Methodology** | Review administrative closure justifications for allegations of excessive force |

**Compliance Assessment**

In the third quarter of 2022, data provided by IPR indicated that there were four administrative complaints containing allegations of excessive use of force that were administratively closed by IPR. For two of these, IPR administratively closed the allegations as "no misconduct" since both cases contained sufficient evidence, including community member eyewitness interviews, that no excessive force had occurred.

For the other two administrative closure, IPR utilized the administrative closure category "Complainant Unavailable". In both cases for this quarter, IPR investigators made several attempts to contact the complainant (either individually or through their legal representation) to schedule an interview. However, as we have noted in prior reports, the process being used by IPR currently requires them to change their SOPs to support the use of this closing category for force events. At present, it appears that revisions are being reviewed by the City though the SOP will need to be finalized to return to Substantial Compliance.

Additionally, as follow-up to our prior report, we are awaiting the findings of an administrative investigation involving a supervisor who, through their actions, effectually created an administrative closure of a force allegation by not forwarding the allegation on to IPR for consideration. This investigation was opened in the third quarter of 2022 and we will await the completed investigation before providing commentary. We will also need to verify that supervisors have received refresher training on their responsibilities with respect to allegations of excessive force, a requirement for substantial compliance we have included in prior repots based on an identified trend from our review of force cases.

| | |
|---|---|
| **COCL Recommendations** | • To return to Substantial Compliance, complete the revisions to the SOP that would codify Administrative Closures – Complainant Unavailable<br>• To return to Substantial Compliance, re-emphasize the responsibilities of on-scene supervisors and provide documentation of efforts to COCL |
| **Assessment Based On** | Administrative closure of allegations of excessive force |

<br>

**Settlement Agreement Paragraph**

130. The City and PPB shall continue to expressly prohibit all forms of retaliation, including discouragement, intimidation, coercion, or adverse action, against any person who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct.

| Compliance Label | Substantial Compliance |
|---|---|
| **Methodology** | Review Directive 310.20 |

**Compliance Assessment**

During the third quarter of 2022 the PPB maintained Directive 310.20 (Discrimination, Harassment, and Retaliation Prohibited) which contains the requirements of Par. 130 (see Policy #2 within the Directive). There were no complaints made with allegations of harassment/retaliation during the third quarter. For this reporting period, PPB remains in Substantial Compliance with Par. 130 because they have maintained their directive and we continue to see evidence that the PPB is willing to investigate potential violations of the directive.

| | |
|---|---|
| **COCL Recommendations** | • No recommendations at this time |

**Exhibit A**

| Assessment Based On | Directive 310.20 |
|---|---|

---

**Settlement Agreement Paragraph**

131. <u>COCL Summary</u>. Paragraph 131 states that "The City and PPB shall retain Police Review Board procedures currently utilized for purposes of investigation and making recommended findings on administrative complaints, except as outlined below." The subsections of Par. 131 refer to PRB membership, rotation of CRC members serving on the PRB, requirements and qualifications for PRB members, provisions for removing community members or CRC members serving on the PRB, term limits for CRC members serving on the PRB, the requirement for CRC members to recuse themselves from the CRC if part of the PRB hearing the case, and stipulated discipline. (For details and exact language, see the Settlement Agreement).

| Compliance Label | <span style="background-color:green">Substantial Compliance</span> |
|---|---|
| Methodology | Review Directive 336.00; Review City Code 3.20.140 |

---

**Compliance Assessment**

The PPB's Directive 336.00 and the City's Code 3.20.140 have been maintained, which outline the operations of the PRB. However, in 2021 the COCL found that the operation of the PRB was inconsistent with the requirements of Par. 131, specifically subsection (c) which requires all participating PRB members to "make thoughtful, unbiased, objective recommendations to the Chief of Police and Police Commissioner that are based on facts." In the six most recent PRBs between the first and second quarter of 2022, we did not find issue with the application of the Graham standard or other issues with the PRB process. As no PRBs were held in the third quarter, we have no updates and therefore continue to find Substantial Compliance for this paragraph.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|

| **Assessment Based On** | Observation of PRBs and PRB documents |
|---|---|

### Settlement Agreement Paragraph

132. By majority vote, the PRB may request that investigations of misconduct be returned to its investigating entity, i.e. PSD or IPR, to complete the investigation as to factual matters necessary to reach a finding regarding the alleged misconduct. The investigating entity must make reasonable attempts to conduct the additional investigation or obtain the additional information within 10 business days or provide a written statement to the PRB explaining why additional time is needed.

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Review PPB Directive 336.00 |

### Compliance Assessment

During the third quarter of 2022, the PPB maintained Directive 336.00 (Police Review Board) which memorializes the authority of PRB to send a case back for additional investigation. There were no such instances during this quarter. As Par. 132 has adequately been placed into policy, we find PPB has maintained Substantial Compliance with the requirements of this paragraph.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | PPB Directive 336.00 |

**Settlement Agreement Paragraph**

133. <u>COCL Summary</u>: Paragraph 133 states that, "If an officer's use of force gives rise to a finding of liability in a civil trial," PPB shall be required to take various actions. The subsections of Par. 133 include requirements for findings of liability including EIS documentation, re-evaluation for specialized units, automatic IA investigations, review of previous IA investigation if one was already completed, and a published summary if IA investigation did not reach the same finding. (For details and exact language, see the Settlement Agreement).

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review S.O.P. #32 and #42 |

**Compliance Assessment**

During the third quarter of 2022, the PPB maintained S.O.P. #32 (Civil Liability and Tort Claims) and S.O.P. #42 (Evaluation of Members Fitness to Participate in All Current and Prospective Specialized Units when the Use of Force Results in a Finding of Liability in a Civil Trial). The combination of these two S.O.P.s contains the requirements of Par. 133. There were no findings of liability during the third quarter. As a result of PPB possessing these S.O.P.s, we find they have maintained compliance with the requirements of Par. 133. However, a finding of liability did occur in the fourth quarter of 2022 and we will provide updates in our next report.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | S.O.P. #32 and #42 |

**Exhibit A**

**D. CRC Appeals**

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 134. The City shall expand the membership of the CRC to 11 members, representative of the many and diverse communities in Portland, who are neutral, unbiased, and capable of making objective decisions. The quorum of CRC members necessary to act may remain at its existing level. | |
| **Compliance Label** | Partial Compliance |
| **Methodology** | Review City Code 3.21.080 Review CRC meeting; communication with City staff; communication with CRC leadership |

**Compliance Assessment**

The CRC continues to include 11 community members who are representative of the community at large. During the third quarter the CRC met twice – August and September and transcripts of the meetings are found on the Auditor's Office website (https://efiles.portlandoregon.gov/Record/14957290/). While this addresses one of our prior reports recommendations, we had also needed to see improved functionality with the group based on prior in-fighting during meetings. During this quarter, in observing the CRC meetings and in reviewing the posted minutes, we found a much-improved process, with meetings containing informative discussion and deliberation. However, we will need to see such functionality continue in future quarters to return to Substantial Compliance.

Finally, during the third quarter, we heard concerns from a CRC member that the City undervalues their work. This was also heard in discussions with IPR personnel who noted that there is the potential for CRC members to become disinterested in the work if they are not receiving feedback or affirmation from the City with regards to the committee's efforts. While not directly tied to the Settlement Agreement, this does represent a real concern on the part of CRC and we therefore suggest the City provide feedback on all CRC products in order to maintain the desire to be a part of this important committee.

**Exhibit A**

| COCL Recommendations | • To return to Substantial Compliance, evaluate functional concerns and resolve them |
|---|---|
| Assessment Based On | City Code 3.21.080<br><br>Review of CRC Minutes and CRC related personnel |

---

**Settlement Agreement Paragraph**

135. The City and PPB agree that the CRC may find the outcome of an administrative investigation is unreasonable if the CRC finds the findings are not supported by the evidence.

136. In its review process for purposes of the appeal, the CRC may make one request for additional investigation or information to the investigating entity, i.e., PSD or IPR at any point during its review. The investigating entity must make reasonable attempts to conduct the additional investigation or obtain the additional information within 10 business days or provide a written statement to the CRC explaining why additional time is needed. The request for additional investigation or information may contain multiple points of inquiry, but no follow-up requests will be permitted. The additional request may be voted on by a quorum, the members voting must have read the Case File in order to vote, and any request with multiple points of inquiry must be prioritized.

| Compliance Label | 135. Substantial Compliance |
|---|---|
|  | 136. Substantial Compliance |
| Methodology | Review PSF-5.03; Communications with City staff and CRC leadership |

**Compliance Assessment**

The City maintains PSF-5.03 which memorializes the CRC's authority as related to Pars. 135 and 136. Our observations of third quarter CRC meetings indicate that the CRC retains the authority to request an additional investigation and we have seen evidence of this process in prior

**Exhibit A**

| | quarters. Therefore, we find the City has maintained Substantial Compliance with this paragraph. |
|---|---|
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Based On** | Charter Code and Policy Code PSF-5.03<br><br>Meeting observation |

**E. Discipline**

| **Settlement Agreement Paragraph** |
|---|
| 137. Within 60 days of the Effective Date, PPB and the City shall develop and implement a discipline guide to ensure that discipline for sustained allegations of misconduct is based on the nature of the allegation and defined, consistent, mitigating and aggravating factors and to provide discipline that is reasonably predictable and consistent. |

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Review Directive 338.00 and corresponding matrix guide; Review Corrective Action Recommendation documents; Review of Department of Justice Letter |

| **Compliance Assessment** |
|---|
| In the third quarter of 2022, the PPB maintained Directive 338.00 (Discipline Guide) as well as the matrix guide that is easy to read and facilitates reasonably predictable and consistent discipline. Additionally, the guide allows for the integration of mitigating and aggravating factors and provides examples of each. We reviewed six Corrective Action Recommendation (CAR) documents provided by the PPB for the third quarter of 2022. In each, the RU Manager |

**Exhibit A**

provided mitigating and aggravating factors, rationale for their discipline recommendation and any corrective action history. Additionally, in three of the six CARs, supervisors provided a summary of the case facts, providing greater context for their overall decision-making.

The new Corrective Action Guide (CAG) was approved in the first quarter of 2022 though is still not consistently used in determining discipline. This is because cases that were opened when the prior discipline matrix was in effect still use that matrix. However, PPB still needs to update Bureau policy (i.e., Directive 338.00 – Discipline Guide) and post the new CAG on their website (which still contains a link to the prior discipline guide).

In the DOJ's Sixth Periodic Compliance Assessment Report, they noted conditional approval of the CAG "subject to the City timely revising Directive 338.00." This conditional approval was provided on February 22, 2022 and, as of the third quarter, the directive had yet to be revised. Therefore, in order to maintain Substantial Compliance with the requirements of this paragraph and comply with the conditional approval provided by DOJ, the PPB will need to revise Directive 338.00 by the end of the first quarter in 2023 (more than one year after DOJ issued the conditional approval). We will then need to see the updated directive posted to the PPB website as well as a link to the new CAG.

| | |
|---|---|
| **COCL Recommendations** | • To maintain Substantial Compliance, update Directive 338.00 by the end of Q1 2023, publicly post the directive, and provide link to CAG. |
| **Assessment Based On** | Corrective Action Recommendations |

**F. Communication with Complainant and Transparency**

| **Settlement Agreement Paragraph** |
|---|
| 138. Within 180 days of the Effective Date, the City shall enhance its existing website to ensure that a complainant can file and track his or her own complaint of officer misconduct. |

139. Within 120 days of the Effective Date, the City shall review its protocols to ensure that the City shares with complainants requested documentation about his or her own complaint to the extent permitted by law.

140. The City shall ensure that IPR provides each complainant a tracking number upon receipt of the complaint, informs each complainant of the complaint classification, assignment (precinct or IA) and outcome of the compliant (sustained, unproven, etc.) in writing (whether mail, email/text, or fax), including information regarding whether the City took any corrective action. The City Attorney's Office shall determine whether disclosures regarding corrective action are required on a case-by-case basis consistent with Oregon's Public Records Law.

| Compliance Label | 138. Substantial Compliance |
| | 139. Substantial Compliance |
| | 140. Substantial Compliance |
| Methodology | Review IPR website; Review IPR policy; Review findings letters |

**Compliance Assessment**

We continue to see evidence of IPR conforming with Pars. 138, 139, and 140. IPR has maintained many different avenues for submitting a complaint. When an individual submits a complaint online, they receive a unique tracking number and can request a status update with that number. If they submit a complaint through another avenue, such as mail, telephone, or walk in, the IPR employee will submit the complaint through their online system to generate a tracking number which will be given to the complainant. IPR and the City will share requested documents with complainants in line with Oregon Public Records Request laws. From a protocol and operation standpoint, IPR has systems in place to ensure that they are complying with the requirements of Pars. 138, 139, and 140.

As with previous quarters, we reviewed a random sample of case files and, as related to these paragraphs, were able to locate consistent documentation sent to complainants regarding the status of their cases, including when the cases were opened, when findings had been made,

and when the cases were closed. As such, the COCL finds that the city to be in Substantial Compliance with Pars. 138, 139, and 140.

As an update to our prior report, the City has now added an "IPR Complaint Status Request" button to the IPR website. Previously, it was extremely difficult to navigate to the page where a person could submit a status request. By adding this button, requesting a status on an administrative complaint is no longer an onerous task and we credit the City and IPR for making the swift upgrade.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | IPR policy<br><br>Complaint tracking webpage<br><br>Finding and closure letters to complainant<br><br>Interview of IPR personnel |

| **Settlement Agreement Paragraph** |
|---|
| 169. PPB shall apply policies uniformly and hold officers accountable for complying with PPB policy and procedure. |

| **Compliance Label** | <mark>Partial Compliance</mark> |
|---|---|
| **Methodology** | Review sample of accountability cases; Review use of force events; Review EIS entries; Review force audit; Interviews with PPB and City personnel |

| **Compliance Assessment** |
|---|

As demonstrated in our assessment of other paragraphs, the accountability system operating within PPB and the City continues to demonstrate both strengths and weaknesses. For instance, during this quarter, we found each administrative complaint we reviewed had been handled appropriately (either as an administrative closure, SI, PR, or full investigation). Additionally, we found that each case we reviewed which led to an investigation with findings

was conducted in accordance with best practices and the findings were reasonable under a preponderance of evidence standard. Similarly, although no PRBs occurred in the third quarter, our reviews of PRBs over the prior two quarters demonstrated improvement in process.

However, remaining concerns keep us from being able to find that PPB and the City have consistently been able to "apply policies uniformly and hold officers accountable for complying with PPB policy and procedure." For instance, we are still waiting for a definition of when officers should be subjected to the accountability process rather than informally counseled. Additionally, the changing landscape of the City's accountability system will necessitate future evaluation to ensure that the changes have not undercut a fair and impartial accountability system. To achieve Substantial Compliance with this paragraph, we will need to see each corner of the accountability system functioning as a unit and we will continue to provide updates in future reports.

| | |
|---|---|
| **COCL Recommendations** | • To achieve Substantial Compliance, PPB should expand their approach to conducting objective investigations and hold officers accountable when policy violations are found |
| **Assessment Based On** | Sample of accountability cases<br><br>Sample of use of force events<br><br>Interviews with PPB and City personnel |

**Accountability Outcome Assessment**

While the COCL reports on outcomes as they relate to the compliance of each paragraph of the Settlement Agreement, we also are using this section to look at outcomes from the perspective of a sustainable system (see Par. 170). Using the data from IPR we have conducted an analysis on officer accountability. The dataset includes all complaints received from January 1, 2020 through September 30th, 2022.

*Allegation Types*: Since 2020, there have been 1,675 allegations against PPB officers, including both bureau-initiated allegations (N=265, 15.8% of all allegations) as well as civilian-initiated (N=1,410, 84.2% of all allegations). As seen in Figure 8.1, the total number of allegations against officers has largely been decreasing yet the third quarter of 2022 saw the highest number of Bureau-initiated since the second quarter of 2020 (31 and 39, respectively). As a result, nearly one third of the allegations in this quarter were initiated by PPB themselves.

**Exhibit A**

Figure 8.1



In looking at specific allegation types, Table 8.1 demonstrates that the three most common types of allegations continue to be Conduct (28.9%), Procedure (26.3%), and Force (24.8%). However, as with all allegations, there has been dramatic reduction in their frequency since the second quarter of 2020. For Conduct allegations, the decrease in raw numbers has been much more gradual though has consistently been reduced in the past two years.

**Table 8.1**

| Allegation Type | Number of Allegations (%) |
|---|---|
| Conduct | 485 (28.9%) |
| Procedure | 440 (26.3%) |
| Force | 416 (24.8%) |
| Courtesy | 195 (11.6%) |
| Disparate Treatment | 50 (3.0%) |
| Blank | 50 (3.0%) |
| Control | 27 (1.6%) |
| Policy Issue | 12 (0.7%) |
| Grand Total | 1675 |

**Exhibit A**

**Figure 8.2**



*Officer Breakdown*: In our 2022 Q1 report we reported there was no specific employee identified in 17.2% of allegations. For the second and third quarter of 2022, of the 194 allegations there was no employee identified in 11.9% of allegations. We recognize there are many factors outside of the PPB's control in identifying officers in allegations, but we want to report on the reduction in unidentified officers over the past two quarters as it is a positive trend. There were 546 identified officers who were the subject of a least one administrative investigation between January 1, 2020 and September 30, 2022. The second quarter of 2022 saw the lowest number of average allegations per officer across the dataset. The average for the third quarter saw a slight increase compared to Q2, but this is due to one officer having six allegations against them and another having seven allegations against them both in the month of July. A total of 105 officers received allegations in the second and third quarters of 2022 and the majority (73%) of them received only one allegation against them.

**Exhibit A**

**Figure 8.3**



*Findings:* 1,477 allegations have been closed since January 1, 2020. 125 allegations were closed in the second and third quarters of 2022. An allegation can take multiple different routes to being closed. One way, and the most common (37.5%), is an administrative closure. Administrative closure occurs for instances when there was clearly no misconduct, the allegation was previously investigated, or the officer is unidentifiable.

If an allegation proceeds to a full investigation, there are four possible results: sustained, not sustained, unfounded, and exonerate. A sustained finding occurs when the preponderance of evidence proves a violation of policy or procedure. Not sustained occurs when the evidence is insufficient to prove a violation of policy or procedure. Exonerated occurs when the preponderance of evidence proves the member's conduct was lawful and within policy. Unfounded occurs when the preponderance of evidence proves the allegation was false or devoid of fact or there was not a credible basis for a possible violation of policy or procedure. Of investigation findings, the most common finding for an allegation is exonerate (40.8%) (see Figure 8.4).

Instead of a full investigation, an allegation can be referred for a Supervisor Investigation (SI) in which the officer's supervisor reviews the allegation with the officer. In SIs there are two possible findings: unsubstantiated and substantiated. A substantiated finding cannot result in

**Exhibit A**

disciplinary action. Of the 150 allegations that were referred for an SI across the dataset, 36 (24%) resulted in a substantiated finding (see Figure 8.5). Over the second and third quarters of 2022, 22 full investigations and 12 SIs were completed.

**Figure 8.4**



**Figure 8.5**



# IX. COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING

In addition to the regular compliance reviews, this quarter the COCL will provide an outcome assessment on community engagement. This outcome assessment will appear immediately after the compliance reviews for Section IX and prior to the Section IX Summary.

**Portland Committee on Community Engaged Policing (PCCEP)**

| **Settlement Agreement Paragraph** |
| --- |
| 141. To leverage the ideas, talent, experience, and expertise of the community, the City, in consultation with the DOJ, shall establish a Portland Committee on Community Engaged-Policing ("PCCEP"), within 90 days of the Effective Date of the relevant amendments to this Agreement. |
| 142. The PCCEP shall be authorized to: (a) solicit information from the community and the PPB about PPB's performance, particularly with regard to constitutional policing; (b) make recommendations to the Chief, Police Commissioner, the Director of the Office of Equity and Human Rights, and community and, during the effective period of this Agreement, to the DOJ; (c) advise the Chief and the Police Commissioner on strategies to improve community relations; (d) contribute to the development and implementation of a PPB Community Engagement Plan; and (e) receive public comments and concerns. The composition, selection/replacement process and specific duties of the PCCEP shall be set forth in a separate Plan for Portland Committee on Community-Engaged Policing ("the PCCEP Plan") which shall be substantially similar to Exhibit 1 to this Agreement. Amicus AMAC and Intervenor PPA shall be consulted regarding and DOJ shall review and approve any amendments to the PCCEP Plan proposed to occur during the effective period of this Agreement. |
| 143. PCCEP's membership will come from a reasonably broad spectrum of the community. PCCEP members shall not have an actual or perceived conflict of interest with the City of Portland. |

| **Compliance Label** | 141. Substantial Compliance |
| --- | --- |

| | |
|---|---|
| | <span style="background-color: yellow">142. Partial Compliance</span> |
| | <span style="background-color: green">143. Substantial Compliance</span> |
| **Methodology** | Observation of PCCEP meetings; Review of minutes, reports, and recommendations; Interviews with City staff and PCCEP |

### Compliance Assessment

In the third quarter of 2022, PCCEP continued returning to functionality as a legitimate body for community engagement, after facing numerous challenges over the past several quarters.

By the end of the third quarter, PCCEP was fully seated at 13 members, and staffed by a project manager and a quarter-time project assistant.

Highlights of PCCEP's work as a full committee in the third quarter included co-hosting a Town Hall with the COCL on the 2022 first quarter report and reviewing PPB's Stops Data Report. PCCEP also worked on a statement for the July status conference hearing, and by the end of the quarter, the group was working on a follow-up statement for a fourth quarter status conference hearing.

In the third quarter of 2022, PCCEP continued monthly general meetings via Zoom with members of the community also in attendance. However, subcommittees have not yet resumed their work in the third quarter.

Three PCCEP recommendations dating back to the third quarter of 2021 have been pending a response from the City to PCCEP. These delays have been attributed to turnover and changes in staffing within the Mayor's Office; a staff member responsible for ensuring responses to PCCEP recommendations departed the Mayor's office in early 2021.

In the first quarter of 2022, the COCL had lowered the compliance rating on Par. 142 to Partial Compliance, as PCCEP's ability to function effectively has been compromised by the City's lack of responsiveness to PCCEP's recommendations.

Further review by current City staff has identified written responses to two of the three issues, which were shared with other parties (such as the Citizen Review Committee) or some (but not all) PCCEP members at the time. These include:

- PCCEP's elevation of the recommendations of the Citizen Review Committee regarding 2020 protests at the September PCCEP meeting.

  - The Police Chief responded to the CRC on September 24, 2021, shortly before PCCEP voted to amplify CRC's recommendations. This response was not shared with PCCEP at the time.

- A letter signed by the PCCEP co-chairs and leaders from the Citizen Review Committee and the Training Advisory Council—and noted in the Recommendations section of PCCEP's quarterly report—requesting data transparency, and specifically public release of all FDCRs.

  - The Auditor responded to the letter's authors on August 15, 2021, regarding aggregated data developed by Independent Police Review; this response went to four PCCEP members, and PCCEP's staff, though it's not clear if this update was shared with the entire PCCEP. The Auditor deferred "to the Mayor and the Police Chief to respond to your request for force reports and disciplinary data, which they control." COCL has not yet been made aware of a follow up response to the letter from either the Mayor or Police Chief.

City staff plan to share these substantive responses with PCCEP, and COCL will consider these issues resolved at that time.

A third recommendation related to codification of PCCEP was approved at the August 2021 PCCEP meeting; a previous PCCEP recommendation to codify PCCEP (in February 2021) had been adopted by the Mayor. While this second recommendation did not receive a formal "adoption" response, the Mayor's Office responded in April 2022 by presenting and discussing the Mayor's Proposed PCCEP Plan, based on PCCEP's September Recommendation. As noted in previous quarterly reports, at the June 2022 PCCEP meeting, City staff noted that codification would be brought to the City Council along with the updated PCCEP Plan. While codification itself is still pending as of the date of this report, COCL will consider the recommendation resolved based on the substantive follow-up work related to the recommendation.

During the first and second quarters, the COCL was very concerned with the attrition of PCCEP members, and lack of urgency on the part of the City to identify and recruit new PCCEP members to maintain a full 13-member body.

Significant progress was made on this front during the third quarter, with six new members appointed. City staff also worked to update records of PCCEP member terms, and align term start and end dates, to streamline PCCEP turnover and mid-term replacements in the future. As

a full body, PCCEP comes from a reasonably broad spectrum of the community, with gender balance, and approximately half of the membership identifying as BIPOC. However, it is worth noting that PCCEP's two youth members – one appointed in August, and one in September – did not participate in meetings during in the third quarter.

The COCL is updating the compliance rating on Par. 143 to Substantial Compliance due to the confirmation of additional PCCEP members.

In this quarter, the COCL has not identified or been notified of an actual or perceived conflict of interest with a PCCEP member and the City of Portland.

| | |
|---|---|
| **COCL Recommendations** | <ul><li>To achieve Substantial Compliance with Par. 142, the City should respond to PCCEP's 2021 third quarter recommendations.</li><li>To maintain Substantial Compliance with Par. 143, the City should continue to identify and recruit sufficient PCCEP members to maintain a full body.</li></ul> |
| **Assessment Based On** | Content of PCCEP meetings<br><br>Interview with City staff<br><br>Substance of reports and recommendations<br><br>Level of community engagement |

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 144. The City shall provide administrative support so that the PCCEP can perform the duties and responsibilities identified in this Agreement and in the PCCEP Plan. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Observation of PCCEP meetings; Review of minutes, reports, and recommendations; Interviews with City staff and PCCEP |

**Compliance Assessment**

Administrative support for PCCEP improved significantly in the third quarter, with both a PCCEP project manager and part-time project assistant now on board to support PCCEP's work.

Meeting notes are now being posted in a timely fashion on the meeting's event page; COCL recommends PCCEP staff also consistently post these important records in the Documents section of PCCEP's website for accessibility (the Documents page allows filtering by record type, such as agendas or minutes). Videos of meetings have continued to be posted in a timely manner, and the link to PCCEP's YouTube channel is accessible from PCCEP's home page.

For the third quarter, the City's level of support for PCCEP was sufficient to return to Substantial Compliance for Par. 144.

We continue to recommend that the City maintain timely posting of information about PCCEP's work so that the public is kept informed about these community engagement opportunities and productions. In addition, we recommend the City continue to fully support the PCCEP staff in their roles.

| | |
|---|---|
| **COCL Recommendations** | • To maintain Substantial Compliance, continue adequate staffing dedicated to supporting PCCEP.<br>• To maintain Substantial Compliance, post minutes of PCCEP meetings within 10 business days after a PCCEP meeting, including in the Documents section of PCCEP's website. |
| **Assessment Based On** | Review of PCCEP website and YouTube channel<br><br>Interviews with staff |

**Portland Police Bureau's Role in Public Engagement and Outreach**

*System Overview*

Under the Settlement Agreement, the PPB is expected to introduce or expand its systems of community engagement, both with the PCCEP and other resources. This includes maintaining or

expanding its systems of measurement to better understand police-community relations and develop tailored responses to issues or concerns.

*The Community Engagement Plan*

| **Settlement Agreement Paragraph** | |
|---|---|
| 145. To ensure constitutional policing, to closely interact with the community to resolve neighborhood problems, and to increase community confidence, PPB shall work with City resources knowledgeable about public outreach processes to develop and finalize a CEO Plan.<br><br>146. Within 120 days of the effective date of the relevant Amendments to this Agreement, the City, in consultation with the PCCEP, will conduct another reliable, comprehensive and representative survey of members of the Portland community regarding their experiences with and perceptions of PPB's community outreach efforts and accountability efforts and where those efforts could be improved, to inform the work of the PCCEP and the development and implementation of the Community Engagement Plan. | |
| **Compliance Label** | 145. Substantial Compliance |
| | 146. Substantial Compliance |
| **Methodology** | Monitor progress on the implementation of the Community Engagement Plan; Interview City personnel and advisory groups members about community engagement and support |
| **Compliance Assessment** | |
| PPB has continued its systems of community engagement, especially with their many community advisory groups. The COCL continues to use the Community Engagement Plan (CEP) as a framework for assessing PPB's progress on community engagement under the Settlement Agreement. However, COCL's assessment of this Plan has been incorporated into the Outcome Assessment at the end of Section IX. At this point, COCL will simply say that the evidence is sufficient in the third quarter to show that PPB should remain in Substantial Compliance for Paragraphs 145 and 146. The outcome assessment includes an assessment of PPB's Community | |

| | |
|---|---|
| | Engagement Plan as a system to achieve this goal. Although PPB is still in compliance, we have several concerns that are expressed in the Outcome Assessment. |
| **COCL Recommendations** | For Par. 145:<br><br>• Seek to improve access to police and City services for individuals with Limited English Proficiency (LEP) through updated policy, training, and dedicated personnel. Make LEP training a priority<br>• Officers' use of the Community Events App should be mandatory, not voluntary, and memorialized in a PPB directive and new training. In essence, PPB should make community engagement by officers a higher priority.<br>• Continue to invest in a one-stop website where community and PPB members can learn about various advisory groups and community engagement events<br>• Make Equity training a higher priority for all officers, with a transition from online to in-person delivery, supported by community partners |
| **Assessment Based On** | Reviews of City and the PPB reports<br><br>Feedback from the City, the PPB, and advisory groups<br><br>Implementation of the Community Engagement Plan |

*Data Collection, Analysis, and Reporting*

The PPB is required to collect, analyze, and report demographic data about police interactions with the community to ensure constitutional policing and build community trust (Par. 147-150).

| |
|---|
| **Settlement Agreement Paragraph**<br><br>147. PPB shall continue to collect appropriate demographic data for each precinct so that the Precinct Commander, considering any input from the PCCEP, may develop outreach and |

policing programs specifically tailored to the residents of the precincts. The data shall also be provided to PCCEP to inform its work.

148. PPB shall continue to require that officers document appropriate demographic data regarding the subjects of police encounters, including the race, age, sex and perceived mental health status of the subject, and shall provide such information to the PCCEP and make such information publicly available to contribute to the analysis of community concerns regarding discriminatory policing. PPB shall consider enhancements to its data collection efforts, and report on its efforts to enhance data collection to the DOJ by no later than December 31, 2013, and quarterly thereafter.

| **Compliance Label** | 147. Substantial Compliance |
|---|---|
| | 148. Substantial Compliance |

**Compliance Assessment**

The PPB remains in Substantial Compliance with Par. 147 because they have compiled and reported demographic data pertinent to each precinct and posted them on their website,[18] and they have provided new demographic data based on the latest information from the Census Bureau's American Community Survey. They have kept Precinct Commanders, PCCEP, and the community informed of these data as well as other data posted on their website. [19]

For now, the PPB remains in Substantial Compliance with Par. 148 as they continue to collect, analyze, and report demographic data from individuals who are stopped by the PPB using its Stops Data Collection app. In terms of data analysis and reporting requirements, the PPB's Strategic Service Division continued to produce high-quality Stops Data Collection reports, both quarterly and annually, and share them with PCCEP and the public.

---

[18] https://www.portlandoregon.gov/Police/article/780347

[19] https://www.portlandoregon.gov/police/71673

This quarter, COCL provides a summary of PPB's quarterly stops reports for the first three quarters of 2022.[20] COCL continues to focus on data pertaining to racial disparities in police traffic stops. The rate of stopping Black/African American drivers increased 3.3 percentage points in the third quarter to 20.0% (see Table 9-1) and for Hispanic/Latino drivers, the rate increased only 0.7 percentage points to 12.4% (see Table 9-2). Using population statistics, these rates show racial disparities, as Black/African Americans make up only 5.8% of the Portland population, and Hispanic/Latinos make up only 9.7% of the population. In the third quarter, the rate of stops for Black/African American drivers increased in all three precincts, while the rate for Hispanic/Latino drivers showed a reduction in the Central Precinct, where rates have been unusually high in the past. The Central Precinct rate is now only 3.5 percentage points above the Hispanic/Latino population rate. In the third quarter, the increase in the overall rate of stops from the second to third quarter is due to the actions of Non-Traffic officers, who account for the majority of stops. More specifically, for both Black/African American and Hispanic/Latino drivers, the third quarter rates decreased for Traffic officers and increased for Non-Traffic officers.

---

[20] For a summary of PPB's 2021 annual stops report, see COCL's second quarterly report. In that report, we also commend the PPB analysts for high-quality analysis and candid reporting of the findings.

**Exhibit A**

| **Table 9.1 Traffic Stops by Precinct and Division: Black/African American Drivers** | | | | |
|---|---|---|---|---|
| **Precinct** | **Percentage of Population that is Black/ African American[21]** | **Percentage of Stops with Black/African American Drivers** | | |
| | | **Q1 2022** | **Q2 2022** | **Q3 2022** |
| Central | 2.9% | 13.9% | 11.8% | 14.6% |
| East | 5.6% | 20.9% | 18.5% | 22.3% |
| North | 8.8% | 24.3% | 21.6% | 24.6% |
| Traffic Officers | NA | 12.3% | 11.7% | 9.0% |
| Non-Traffic Officers | NA | 20.2% | 19.2% | 22.9% |
| Citywide | 5.8% | 19.0% | 16.7% | 20.0% |

---

[21] Source: Census data at https://www.census.gov/quickfacts/portlandcityoregon, and PPB reports at: https://www.portland.gov/police/open-data/stops-data

**Exhibit A**

| Table 9.2 Traffic Stops by Precinct and Division: Hispanic/Latino Drivers | | | | |
|---|---|---|---|---|
| Precinct | Percentage of Population that Hispanic/ Latino[22] | Percentage of Stops with Hispanic/Latino Drivers | | |
| | | Q1 2022 | Q2 2022 | Q3 2022 |
| Central | 6.2% | 9.7% | 11.2% | 9.7% |
| East | 12.0% | 12.2% | 11.7% | 14.0% |
| North | 10.2% | 11.7% | 12.1% | 12.6% |
| Traffic Officers | NA | 12.1% | 13.6% | 10.7% |
| Non-Traffic Officers | NA | 11.6% | 10.7% | 12.8% |
| Citywide | 9.7% | 11.7% | 11.7% | 12.4% |

*Action Implications of Stops Data Patterns*

PPB's *Stops Data Collection Annual Reports* for 2020 and 2021 confirm certain patterns over time which have driven COCL to recommend specific interventions throughout 2022. As we noted in our last report, traffic stops and consent searches declined in 2021, including stops for minor violations. Yet some problematic trends continued. PPB's *2021 Stops Data Collection*

---

[22] Source: Census data at https://www.census.gov/quickfacts/portlandcityoregon, and PPB reports at: https://www.portland.gov/police/open-data/stops-data

**Exhibit A**

*Annual* Report indicates that (1) Black/African American drivers are stopped at a higher rate for "Non-Moving Violations," which are often called "investigatory" or "pretext" stops that suggest racial bias; and (2) Black/African American drivers were significantly more likely than other drivers to be asked to consent to a search and were less likely to refuse consent than White drivers; and (3) Hispanic/Latino drivers were significantly more likely to receive a citation than other drivers (rather than a warning), regardless of the reason for the stop.

After highlighting persistent racial disparities over the past five years of data collection, PPB's 2020 annual stops report concludes, "*The long-term nature of these disparate search rates indicates they are unlikely to change unless the Bureau actively works to reduce these search disparities through adjustments to policy and practice.*" (p. 19).

Consistent with COCL's recommendations, the authors of PPB's 2021 annual stops report encouraged PPB to finalize Directive 650.00 ("Search, Seizures, and Inventories"), which requires officers to inform community members of their right to refuse a consent search and produce an audio recording of this process. On a positive note, we can report that PPB has finalized this directive in the third quarter (with an August 1st effective date), and on July 5th, notified all members in advance of the significant changes they can expect in this directive regarding consent searches. Importantly, PPB provided officers with additional training on this process. As noted under Par. 84 (Online Training), PPB released a 4-minute video in LMS to help officers understand the new requirements of Directive 650.00 when performing consent searches. In addition, PPB provided officers with a 2-minute training video on how to record a community member's consent using the Voice Record Pro app.

As noted earlier, we have some concerns that the recording process is complex and will be difficult for some officers; that the role playing showed a lack of procedural justice in some places; and that the training did not mention that the consent cards for community members are available in five languages.[23] However, overall, we are very satisfied with this online training and its coverage of the revisions to Directive 650.00. We expect additional clarification

---

[23] The July 5th memo to PPB members summarizing key changes to directive 0650.00, states that members are required to "provide a Bureau issued information card," but makes no reference to the language access issue that provided the impetus for this card.

**Exhibit A**

on the consent cards and the LEP problem due to the community working extremely hard to assist PPB in preparing them, and some incidents can quickly become problematic if communication is misunderstood.

Since 2020, COCL has been strongly recommending these actions, so we are pleased to see action on PPB's search policy and its implementation. The PPB will remain in Substantial Compliance with Par. 148. However, COCL does expect that PPB will provide evidence that they are producing records of these events required by law and policy that will "contribute to the analysis of community concerns regarding discriminatory policing," (Par. 148). The Directive requires officers to document the reason for the search on their Stops app ("mask"), which will give PPB analysts additional data and insights regarding search disparities. We credit PPB's research team for their thorough analysis of stops data and look forward to additional training that will help to address community concerns about discriminatory policing.

| | |
|---|---|
| **COCL Recommendations** | • To remain in Substantial Compliance for Par. 148, the PPB will need to show that records are being kept consistent with the new Oregon law to improve the measurement of possible discriminatory policing<br><br>• We recommend that PPB:<br>    ○ Provide additional online training on the search cards<br>    ○ Provide refresher training on bias-free, impartial policing<br>    ○ Continue the dialogue with community members around racial disparities in traffic stops and searches |
| **Assessment Based On** | COCL review of the PPB precinct demographic reports<br><br>COCL review of the PPB Stops Data Collection reports<br><br>COCL review of relevant PPB directives |

**Exhibit A**

**Settlement Agreement Paragraph**

149. The COCL, PPB, and DOJ will jointly develop metrics to evaluate community engagement and outreach. PCCEP may review these metrics and may suggest additional metrics to DOJ and PPB.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review metrics requirement |

**Compliance Assessment**

The City has completed the requirement to develop a set of metrics to evaluate community engagement, and therefore remains in Substantial Compliance. These metrics are used by the PPB to guide their Community Engagement Plan.

Recently, PCCEP has expressed a stronger interest in community engagement around police performance, as required by the Settlement Agreement, and COCL has repeatedly expressed a desire to see the City expand the way it thinks about engagement.

As technical assistance, the COCL continues to encourage the City and the PPB to gather more specific outcome data relevant to police-community interactions - data that will give voice to the community and can be used to track and enhance organizational performance. Also, such data were included in the set of metrics developed for Par. 149.

Specifically, we continue to recommend that the City measure the quality of police-community interactions for all encounters using data from community contact surveys, body-worn cameras, and officer surveys. These datasets can provide a foundation for an evidence-based, data-driven police organization, including supervisor coaching and feedback to officers based on performance metrics. We encourage the PPB to incorporate these outcome measures as part of the remedies being pursued in Section XI. COCL is preparing a technical assistance report on contact surveys and will encourage the City to work in partnership with an external organization to establish and maintain these metrics.

| COCL Recommendations | • As part of everyday policing, introduce a contact survey to measure the level of procedural justice and public satisfaction |
|---|---|

**Exhibit A**

| | with police-public interactions, especially interactions with constitutionally-protected populations |
| | • Implement routine, anonymous internal surveys of the PPB employees to measure police-community interactions, internal procedural justice, wellness, police culture, and employee satisfaction |
| | • Acquire and use software to analyze body worn camera data |
| | • As a learning organization, introduce programs, polices, and training curricula that are responsive to these new databases |
| **Assessment Based On** | The development of metrics that capture multiple dimensions of community engagement |

| | |
|---|---|
| | **Settlement Agreement Paragraph** |
| | 150. Annually, PPB shall issue a publicly available PPB Annual Report, which shall include a summary of its problem-solving and community policing activities. A draft of the Annual Report shall be provided to the PCCEP for review and comment before the report is finalized and released to the public. Once released, PPB shall hold at least one meeting in each precinct area and at a City Council meeting, annually, to present its Annual Report and to educate the community about its efforts in community policing in regard to the use of force, and about PPB's policies and laws governing pedestrian stops, stops and detentions, and biased-free policing, including a civilian's responsibilities and freedoms in such encounters. |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Reviewed the PPB's Annual Report; Interviewed PPB and City staff involved with PCCEP |
| | |

**Exhibit A**

**Compliance Assessment**

The PPB remains in Substantial Compliance with Par. 150 for the third quarter of 2022. A draft of PPB's 2021 Annual Report was completed in May of 2022, and thus PPB was responsive to concerns about late production that occurred in previous years. Also, COCL reviewed the draft and found that the content complies with the requirements of Paragraph 150.[24] The report covers problem solving and community policing as it reviews the work of all branches of the PPB, as well as PPB's community engagement efforts. Both accomplishments and challenges are covered, including crime statistics, force statistics, and the impact of budget deficits on police services.[25]

As required by Par. 150, the draft was shared with the PCCEP on May 27, giving PCCEP members time to review it before their June meeting. The draft was also posted on the PCCEP website. The 2021 Annual Report was discussed at the June PCCEP meeting, and PPB received some feedback. Written comments from PCCEP were also allowed for one week. The Portland community was notified about, and given access to, the Annual Report through large audiences on Twitter, Facebook, YouTube, and NextDoor.[26]

As required by Par. 150, the PPB held one meeting in each precinct to discuss the PPB's Annual Report. These meetings were held on July 13th (East Precinct), July 20th (North Precinct), and July 21st (Central Precinct). The COCL confirmed that the meetings were publicized in advance.[27] During these meetings, the Chief of Police and command-level personnel provided an overview of the Annual Report. Consistent with Par. 150, they sought to educate the community about 2021 statistics on use of force and police stops, as well as the new PPB policy and state law on consent searches.

---

[24] The Annual Report can be found at: https://www.portland.gov/sites/default/files/2022/ar_2021_final.pdf

[25] Force statistics include a breakdown by race, but only raw frequencies are provided. No percentages are reported, so disparities are difficult to calculate.

[26] This includes more than 250,000 viewers on Twitter and more than 300,000 viewers on NextDoor.

[27] For example, 77 email invitations were sent out in the Central Precinct and four large community and service organizations in the North Precinct; East Precinct invitations are unknown to COCL.

**Exhibit A**

| | |
|---|---|
| In response to community feedback and City Council approval, the Chief of Police waited until all precinct meetings were completed before presenting the Annual Report to the City Council on August 31st. Thus, PPB remains in Substantial Compliance with Par. 150. | |
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Based On** | Review of progress on the content and presentation of the PPB's Annual Report |

**Community Engagement Outcome Assessment**

This is a two-part outcome assessment. The first part will focus on community engagement around PCCEP and the second part will focus on PPB's community engagement efforts. These will include both qualitative and quantitative outcome measures to assess whether the City and PPB have created "robust systems of community engagement." (Par. 170).

*PCCEP Community Engagement Outcome Assessment*

In December 2022, the COCL team reached out to all 12 current PCCEP members, requesting time to interview each member individually. Six members responded, and each completed a telephone interview with a member of the COCL team. Three of these interviews were with people who have been on PCCEP prior to 2022, and three were with people who were appointed in 2022.

We asked how well PCCEP has been able to fulfill the five authorized PCCEP duties and responsibilities, as outlined in Par. 142[28], during the second and third quarters of 2022. A strong majority of PCCEP members interviewed felt PCCEP has not been effective at accomplishing many of its authorized duties and responsibilities during this time period.

- Only one PCCEP member interviewed felt PCCEP has been very effective in soliciting information from the community about PPB's performance. Another felt PCCEP has been somewhat effective, and four felt PCCEP has not been effective. Members cited the PCCEP's pause in certain activities in 2022—including holding subcommittee meetings—as well as a lack of proactive outreach to the community as reasons for the lack of effectiveness.
- All PCCEP members interviewed felt PCCEP has been ineffective at making recommendations to the Chief, Police Commissioner, the community, and DOJ. All but one PCCEP member interviewed felt PCCEP has not been effective in advising the Chief and the Police Commissioner on strategies to improve community relations; the sixth PCCEP member surveyed felt PCCEP has been somewhat effective. Members cited the lack of subcommittee activity—where previous recommendations have typically been drafted to submit to the full committee—as a major driver of the pause in PCCEP recommendations, with some expressing optimism that the recent convening of a PCCEP Community Engagement Subcommittee will turn this around. Other members noted the Chief and Mayor (and more recently, mayor's staff) have not been attending PCCEP meetings.
- Most PCCEP members interviewed felt PCCEP has not been effective in contributing to the development and implementation of a PPB Community Engagement Plan; one felt PCCEP has been somewhat effective. Members noted that PCCEP has not been involved in the PPB community engagement plan over the past year and have not heard updates

---

[28] The PCCEP shall be authorized to: (a) solicit information from the community and the PPB about PPB's performance, particularly with regard to constitutional policing; (b) make recommendations to the Chief, Police Commissioner, the Director of the Office of Equity and Human Rights, and community and, during the effective period of this Agreement, to the DOJ; (c) advise the Chief and the Police Commissioner on strategies to improve community relations; (d) contribute to the development and implementation of a PPB Community Engagement Plan; and (e) receive public comments and concerns.

**Exhibit A**

about its implementation. One member believed the police bureau scaled back their engagement with PCCEP while the group was rebuilding membership.

- Opinions on PCCEP's effectiveness regarding receiving public comments and concerns were mixed; half of those interviewed felt PCCEP has been somewhat effective, one felt PCCEP has been very effective, and the sixth member interviewed felt PCCEP has not been effective. Again, the pause in subcommittee work was cited as a major driver of the lack of effectiveness; other members noted changes in how members of the public can engage during PCCEP meetings, including when members of the public are able to provide written comments in the Zoom chat window or provide verbal comments.

PCCEP members interviewed were also asked to provide feedback related to Par. 144, which requires the City to "provide administrative support so that the PCCEP can perform the duties and responsibilities identified in this Agreement and in the PCCEP Plan." Half of PCCEP members interviewed felt the City had not provided enough support to PCCEP, and another two felt the City had provided some support. The sixth member interviewed felt the City had provided a lot of support.

Most PCCEP members interviewed had positive comments about the staff recently hired to support PCCEP and noted that any lack in support is largely due to the staff coming on board very recently. Staff had full plates getting up to speed on PCCEP's work while simultaneously working to replenish the group's membership. Members hope to see more support in areas like training, PCCEP recommendations—including ensuring they "get to the right people"—and "organizing us." At the same time, one member expressed concern that staff take too strong a hand in PCCEP's administration, from drafting agendas, modifying how virtual meetings are run, and suggesting changes to PCCEP bylaws. There is a tension between PCCEP's independence and its need for strong administrative support to be able to fulfill its mission; this is a topic that would be worth in-depth discussion amongst the group, potentially informed by the experience of volunteers from other City committees and commissions who can share what works well to advance their missions.

PCCEP members interviewed were asked whether PCCEP is fulfilling its mission[29]. Two thirds of those interviewed said it was not—but most expressed optimism that PCCEP's recent work to re-establish subcommittees signals movement toward being better able to fulfill the PCCEP mission. Another pointed to PCCEP's recent collaboration on a statement to Judge Simon as an example of PCCEP's recent shift toward effectiveness. "We are still here, and we will bring the right people to the table," one member said, though others noted PPB, the Police Chief, the Mayor, and mayor's staff also need to step up their efforts to engage with PCCEP. "PCCEP members are doing the best that they can, but it is like 'one hand clapping.' You're making the motions, but nothing is happening; where are the rest of the partners?"

PCCEP members characterized their working relationship with the Mayor/Police Commissioner and PPB as poor. While many said PPB/the Mayor's office is "not engaged and not participating," Several held PCCEP responsible for the lacking relationship, noting a perception of anti-police sentiment from some previous members, as well PCCEP's need to do their own work—for example, by crafting well-informed policy recommendations, and ensuring members' public comments about PPB are accurate. "Part of PCCEP's mission is improving trust; when you're in a Zoom meeting once a month and you say the police are terrible, sometimes it's accurate and sometimes it's not. It's one thing when it's true, but when it's false and misleading, it's inconsistent with our mission and just lazy."

PCCEP members felt PCCEP has been somewhat or very ineffective in working with Portland's diverse communities. There is a strong desire amongst PCCEP members to do more robust outreach and improve ways in which information about PCCEP's meetings is shared with the public, with many looking to the new community engagement subcommittee to lead this work.

However, PCCEP members, as volunteers, are also looking to the City to bolster these efforts, through existing staff or by revisiting previous conversations about funding dedicated community engagement/outreach staff to support PCCEP's work. Members were asked if they

---

[29] The mission of the Portland Committee on Community-Engaged Policing (PCCEP) is to work with the Mayor/Police Commissioner, Portland Police Bureau, and Portland's diverse constituencies to solicit and exchange information between the community and Portland Police Bureau (PPB) to achieve the desired outcomes of equitable policing which exceeds constitutional requirements, and meaningful community engagement with and trust in PPB.

personally have met with other community-based organizations, solicited community input on reports, policies, or other PCCEP agenda items, shared information about PCCEP meetings, or otherwise individually worked to engage other Portlanders in PCCEP's work. All PCCEP members surveyed said they have shared information about PCCEP's meetings, and most said they had solicited input from Portlanders about PCCEP's work, with some meeting with other community-based organizations, and others talking to people during their everyday activities.

Overall, while PCCEP's assessment of its work and role regarding community engagement is mixed at best, most members retain a level of optimism that PCCEP's effectiveness will improve, and the group will be able to make a difference. One noted they hoped PCCEP could work on another broad community survey to gauge Portlanders' opinions on PPB and community engagement. Another shared their hope that PCCEP's re-assignment under the City's Community Safety Division would lead to more connections with partners—but that hasn't been the case to-date. As noted above, many point to the new Community Engagement Subcommittee as a significant opportunity to bolster PCCEP's efforts on this key aspect of their duties and responsibilities, and there is strong desire to improve the working relationship with PPB and the City/Mayor's office toward the shared goals of improving police-community relations.

**PPB Community Engagement Outcome Assessment**

PPB's Community Engagement Plan provides the framework for conducting this Outcome Assessment of PPB's work. The Plan has four components: Public involvement, Communications, Access, and Training. Each is summarized below.

*Public Involvement:* The CEP specifies three PPB goals with respect to public involvement: (1) Maintain and expand upon current opportunities for meaningful community interactions, (2) Develop a shared understanding of what community engagement means, and (3) Enhance existing opportunities for community/PPB partnerships.

The PPB's Office of Community Engagement (OCE) continues to work closely with community leaders to achieve these goals, especially through its advisory groups. During the third quarter, the OCE continued to work closely with its Community and Culturally Specific Councils, especially the Asian Pacific Islander American Advisory Council (APIA), Latino Advisory Council (LAC), and Muslim Advisory Council (MAC). The LAC held its first strategic retreat to build trust and exchange ideas, including methods of connecting with frontline police officers and increasing LAC's social media visibility in the Latino community. The APIA served as an effective bridge and facilitator in the dialogue between the APIA community and the PPB to discuss a

**Exhibit A**

particular shooting as well as the rise in anti-Asian hate crimes. The MAC has played a similar role when discussing a public safety incident that affected members of the Southwest Islamic Mosque in the Central Precinct.

With the help of the OCE and the advisory councils, the PPB has been willing to engage in some uncomfortable meetings. Of course, police organizations, seeking to manage their public image, are always more willing to attend "fun" events, like summer festivals, but the recent intense meetings with the Asian and Muslim communities are especially important to mitigate conflict and avoid a crisis. These meetings can offer timely updates to avoid the escalation of tension between PPB and the community.[30] To maintain legitimacy, the PPB must be prepared to listen to community members who are upset about specific issues at the community level.

Representatives of these PPB advisory groups continue to meet as part of the Coalition of Advisory Groups (CAG) to enhance collaboration and mutual support. In addition to their monthly meetings with the Chief's office, the CAG held its first strategic retreat in the third quarter, where council chairs shared the history of their cultural councils and exchanged ideas about strategic plans. The CAG continued to maintain its relationship with City Commissioners to discuss community safety issues and relevant programs, including PPB training, the PS3 program, the Behavioral Health Unit, the houseless population, and BOEC.[31]

The COCL has repeatedly recommended greater public awareness of these advisory groups and has been critical of the City's new website for being unable to achieve this goal. We are pleased to report, however, that the Chief's Office Media team has stepped in and is making progress by working with these advisory councils to design a "CAG log" for the CAG's social media/public platform, including a logo and trial content. This public-facing website, likely to launch in the first quarter of 2023, is expected to include minutes of meetings, scheduled events, a contact email address, and other information.

---

[30] For example, the Muslim community was prepared to mobilize for a protest because they were not receiving timely updates from PPB on the incident that occurred in their community, but through the efforts of MAC and OCE to create a dialogue, the tension was dissipated, and the protest was prevented.

[31] While BOEC is a separate City agency from PPB, they are intimately connected, as BOEC receives calls for service from the community and dispatches PPB officers. The shortage of personnel at BOEC and PPB is a crisis that has resulted in lengthy wait times for emergency calls and absurd wait times for non-emergency calls.

**Exhibit A**

Finally, PPB's Operational Councils, such as the Behavioral Health Unit Advisory Committee (BHUAC), the Equity Advisory Council (EAC), and the Training Advisory Council (TAC), continue to meet regularly and post their meeting results on the PPB website. The TAC continues to provide the PPB with feedback on its training programs.

_Communication:_ The CEP specifies two goals in communication: (1) Expand communication strategies to facilitate interface with underrepresented populations, and (2) Improve public awareness of the current communication strategies utilized. In the third quarter, the PPB continued to use social media to communicate with the public and used other mechanisms, including press releases, emails, brochures, and presentations to reach the public.

Our impression is PPB's Media team gives considerable attention to press releases, which are unlikely to reach a broad spectrum of Portland residents, and the focus tends to be on homicides and car crashes. Less attention is given to community engagement events.

On the quantitative side of the outcome assessment, COCL has given attention to the number of community events that officers have attended. We credit PPB with using an app developed in-house to document such events and produce a monthly report, _Community Engagement Events_. To control seasonal effects, COCL has compared the second quarter of 2022 with all second quarter data over the past five years. As shown in Figure 9.1 below, the total number of community events involving PPB officers that are recorded by the app has declined dramatically, from 564 in 2018 to 61 in 2022.[32] We encourage the PPB to take note of this rapid decline and consider ways to correct this trend.

---

[32] For those who are interested, the total number of community events for the third quarter of 2022 is 51.

Figure 9.1



There are several possible explanations for this dramatic decline in the numbers reported. First, COVID likely reduced the number of in-person community events in 2020 and 2021, but the numbers should have increased in 2022. Also, officers could attend virtual meetings of neighborhood associations and other planned events during COVID, but that does not appear to have happened. Second, PPB is facing staffing issues within the precincts, and thus, the Neighborhood Response Team (NRT) members are now required to handle calls rather than attend community events. But COCL would argue that attendance at events is still possible if planned by supervisors. Finally, there is the real possibility that PPB officers have decided not to record the events they attend.

One key problem is that the use of the Community Events App and the documentation of community engagement by PPB officers is optional. Thus, COCL wonders whether community engagement at the precinct, district, or officer level is a priority within the PPB. If so, the use of the App should be mandatory and should be memorialized in PPB policy and an S.O.P. Any time that documentation of events is optional, why should officers do it? We encourage PPB to decentralize community engagement, moving it from the Chief's office to the streets of

**Exhibit A**

Portland. Command-level personnel should not be the only ones who attend virtual meetings. Community members should be allowed to have contact with officers from their own precinct and district.

COCL feels that PPB's Community Engagement App is a valuable tool and should be the foundation for a national model. It has the potential to do more than simply count the number and type of events. It could be used to identify gaps in community engagement. For example, is PPB reaching immigrants, people of color, those who are marginalized, or those at greatest risk of criminal victimization? The App also allows officers to make comments and recommendations regarding engagement. For PPB to expand or re-envision its community engagement strategy within Precincts, it must first ensure that the necessary data is being collected. Also, by collecting community engagement data at the officer level, PPB has a new set of metrics by which to evaluate officer performance. The COCL's special report on police performance evaluation (using contact surveys and body-worn cameras) underscores the importance of individual-level metrics to improve street-level services and improve police-community relations. New community engagement metrics can be added to this measurement paradigm.

_Access:_ The CEP specifies four goals for Access: (1) Develop a comprehensive language access plan, (2) Provide comprehensive training to all the PPB members on how to utilize this corps of officers and interpreters, (3) Inform/advise all communities of the existence of this resource/service, and (4) Create/update appropriate directives for spoken language and deaf/hard of hearing.

Last quarter, we reported, on the positive side, that more PPB officers are getting tested and certified as language interpreters and are receiving compensation as a qualified multilingual City employee via the Office of Equity and Human Rights.[33] However, on the negative side, COCL PPB's language access plan, directive, and training were not developed in the third quarter. Also, the respected LanguageLine software has been implemented, but officers have not been sufficiently trained and do not have an LEP policy to guide their actions. We have

---

[33] https://www.portlandoregon.gov/oehr/81684

learned that PPB drafted a LEP policy in the fourth quarter, so COCL will revisit this issue down the road.

We continue to acknowledge that the PPB has, in the past, worked with community members to develop a video to educate all the PPB members on how to respond appropriately to individuals needing language access services and that the PPB has worked with community members to translate search cards into the five most used languages. However, a more comprehensive and systematic approach is needed for responding to LEP individuals and those who are deaf/hard of hearing. When LEP community members can communicate clearly with the police, they receive better service and treatment, and public safety is improved for all parties. We continue to recommend that PPB hire a full-time LEP manager and encourage PPB to look at the Chicago model.

_Training:_ The CEP specified three goals for Training: (1) To develop a variety of tools to help guide both police and ethnically and religiously diverse communities in efforts to address their unique concerns, (2) Create a workforce that is knowledgeable about the City and its history, and (3) Greater involvement of community members in the training of Bureau members.

In the first and second quarters, COCL has credited PPB with training related to these goals, including a series of equity trainings focused on interacting with historically marginalized groups and with the LGBTQIA2S+ community. These trainings were not repeated in the third quarter. Also, PPB's Community Police Academy (CPA), which allows community members to become more familiar with police work in Portland, was not offered in the third quarter. However, COCL has learned that the OCE partnered with community members to provide a 3-hour class to new recruits on community engagement and community policing. We did not observe it, but apparently, the class received positive feedback from both officers and participating community members. If so, PPB should explore this model further, where officers are matched with community members to learn from each other.

At this point, we have two concerns with training around community engagement. First, a comprehensive LEP training has yet to be provided and is awaiting the finalization of a LEP directive, as noted above. Second, we wonder what is happening to Equity training and why it has not been continued and expanded. As noted under Par. 84, we feel this type of training should be a priority within PPB, regardless of how officers respond to it, because it can address cultural issues around racism, sexism, homophobia, transphobia, and other forms of prejudice that negatively affect police-community interactions on the streets of Portland.

**Exhibit A**

*Summary of PPB's Community Engagement*

The PPB has continued to implement its Community Engagement Plan in the third quarter by maintaining a working relationship with its advisory councils. The Office of Community Engagement continued to partner with diverse communities through its advisory councils. The PPB's Operational Councils (such as the Behavioral Health Unit Advisory Committee, the Equity Advisory Council, and the Training Advisory Council) continued to meet regularly and have current postings on the PPB website. The PPB's diverse advisory groups (Community and Culturally Specific Councils), as well as the CAG, continue to meet with the PPB leadership, City Commissioners, and the communities they represent.

However, as COCL's Outcome Assessment has shown, more work is needed in several areas. First, the City's website had yet to build a platform that allows the public to stay informed about PPB's community engagement efforts and the work of its advisory groups. However, the Chief's Office Media team has stepped up to help design a social media/public platform working for the CAG that should be active in 2023.

Second, PPB has yet to develop a comprehensive language access plan, a LEP directive, or an adequate LEP training that will allow PPB officers to communicate effectively with persons who have limited English proficiency. The City and PPB have been slow to fill this gap. COCL continues to call for a more comprehensive effort to develop, implement, and monitor the LEP initiative.

Third, aside from its advisory councils, PPB's effort to reach out and engage directly with Portland communities, as measured by the number of community events attended, seems to be rapidly declining, or at best, is not a priority. Officers' use of the Community Events App should be mandatory, not voluntary, and memorialized in a PPB directive and new training. In essence, we encourage PPB to make community engagement by officers a higher priority. We encourage PPB to decentralize community engagement, moving it from the Chief's office to the streets of Portland. PPB's App is truly the best practice in the field, but it must be supported by a substantive community engagement program to have a real impact. Years ago, the PPB was considered a leader in community policing. COCL's hope is that PPB can return to this status.

Fourth, PPB has shown its ability to develop and deliver some excellent training on Equity, but we see little effort to continue and expand these efforts. Similarly, COCL has repeatedly recommended stronger training in Procedural Justice, but PPB has shown little interest in doing so. The fact that programs such as Equity and Procedural Justice often receive more criticism from PPB officers than other training classes should be considered evidence that this type of training needs to be continued and strengthened to challenge any subcultural opposition within the larger police force. Recently, we have seen, nationwide, that prejudice and discrimination

**Exhibit A**

against various groups remain widespread in our society, so Portland needs a police force that understands and can respond appropriately to these actions. No doubt, most PPB officers believe in equitable treatment, but it needs to be reinforced for others.

The PPB remains in Substantial Compliance for Pars. 145 and 146, but to remain in compliance, the COCL expects that PPB will address the limitations noted in COCL's Community Engagement Outcome Assessment. In sum, PPB should pursue a more systematic approach to community engagement and training to ensure sensitivity to diverse populations in Portland. To be effective, performance metrics should be expanded to include the level of community engagement by individual officers.

The PPB continued to meet the requirement to collect, analyze and post information about its performance on a variety of dimensions. The PPB continued to produce high-quality quarterly and annual reports on traffic stops and use of force with breakdowns by demographic characteristics. The number of stops and searches declined in 2021, but racial disparities in traffic stops and searches continued for Black/African Americans, and disparities in citations occurred for Latino drivers. PPB will need to remain attentive to these disparities.

On a positive note, PPB has taken considerable action in 2022 to address these problems. In addition to guidance from the Chief of Police, PPB has introduced a revised directive on police stops and consent searches, as well as training on this directive. Thus, PPB will remain in Substantial Compliance with Par. 148 because they have taken the steps recommended by COCL related to "community concerns regarding discriminatory policing." (Par. 148). Again, we encourage the PPB and the community to continue monitoring these enforcement actions and discuss any concerning patterns.

Finally, to truly engage the broader Portland community (beyond advisory groups) and give voice to the thousands of residents who have lived experience interacting with the PPB officers, we continue to encourage the City to introduce a contact survey to measure the level of procedural justice and public satisfaction with police services. By measuring what matters to the public (e.g., whether they are treated respectfully, fairly, and given a voice) and using these data to evaluate and coach officers at the individual level, we can expect improvements in police-community relations and public trust in the PPB.

**Exhibit A**

**Settlement Agreement Paragraph**

151. PCCEP shall meet as needed to accomplish their objectives as set forth in the PCCEP Plan. PCCEP shall hold regular Town Hall meetings which shall be open to the public. To the extent that PCCEP meetings are subject to the Oregon Public Meetings Law, or similar regulatory or statutory requirements, the City shall be responsible to give advice necessary to the PCCEP to ensure compliance with those laws and agrees to represent PCCEP in any challenges regarding compliance with those laws.

152. The City shall provide PCCEP members with appropriate training necessary to comply with requirements of City and State law.

| **Compliance Label** | 151. Substantial Compliance |
| | 152. Substantial Compliance |

**Compliance Assessment**

PCCEP met monthly as a full body throughout the third quarter, the minimum needed to accomplish their objectives as set forth in the PCCEP Plan. As noted elsewhere in this report, PCCEP's subcommittee work is still on hiatus—and it is in subcommittees where PCCEP recommendations have historically been proposed, developed, and advanced to the full membership for consideration. This subcommittee hiatus has hampered PCCEP's ability to "develop recommendations for PPC systems to engage meaningfully, both short-term and long-term, Portland's diverse committees and improve community relations" and review and make recommendations on PPB directives. However, developing recommendations is an authorized—though not required—objective in the PCCEP plan.

At least one representative of the City Attorney's Office attends PCCEP meetings and continued to advise the PCCEP as necessary to ensure compliance with public meetings law.

Previously the City has trained new PCCEP appointees as needed based on the "*Guide for Volunteer Boards & Commissions*" presentation prepared for all City advisory boards. This presentation covers the Oregon Government Ethics Commission guide for public officials, the City's code of ethics, restrictions on political activity for public officials, and the Oregon Attorney General's Public Records and Public Meetings Manual.

**Exhibit A**

| | |
|---|---|
| In the third quarter, additional training was provided to PCCEP members on the history of the Settlement Agreement; ten PCCEP members attended. This public meeting featured presentations from representatives of the City and DOJ, with opportunities for questions. | |
| **COCL Recommendations** | • Standardize training for new PCCEP members; Ensure current and future PCCEP members participate in all required trainings and are offered a meaningful opportunity to participate in any optional training. |
| **Assessment Based On** | Regularity and content of PCCEP meetings<br><br>Provision of City's legal advice and training for PCCEP |

**Overall Assessment of Section IX**

In the third quarter of 2022, PCCEP continued returning to full functionality as a legitimate body for community engagement, after facing many challenges over the past several quarters. The PCCEP was fully seated at 13 members and staffed by a project manager and part-time project assistant. PCCEP's full committee was productive, including co-hosting a Town Hall with the COCL, reviewing PPB's Stops Data report, and preparing for the status conference.

However, the City has yet to formally respond to three recommendations made by PCCEP in 2021, and thus remains in Partial Compliance for Par. 142. PCCEP has also not yet resumed subcommittee work, which is where most prior PCCEP recommendations have originated.

The PPB has continued to engage the community through a wide range of formal and informal advisory groups as well as through public events. Racial disparities in traffic stops and consent searches remain a problem, but PPB has addressed this with an updated directive on "Search, Seizures, and Inventories" and new training on this directive. However, additional training is recommended to increase access to services for LEP individuals who are being asked for a consent search.

COCL's Outcome Assessment on Community Engagement revealed several areas where additional work was still needed by the end of the third quarter: (1) the City's website had yet to build a platform that allows the public to stay informed about PPB's community engagement efforts and the work of its advisory groups; (2) PPB had yet to develop a comprehensive language access plan, a LEP directive, or adequate LEP training that will allow PPB officers to

**Exhibit A**

communicate effectively with persons who have limited English proficiency; (3) Aside from its advisory councils, the outcome assessment shows that PPB's attendance at community events has rapidly declining over the past five years, or at best, reporting such events is no longer a priority; and (4) PPB has not expressed a commitment to continue or expand its training on Equity or Procedural Justice at a time when these training classes have become essential to providing respectful and unbiased policing. During the fourth quarter, some action has been taken to address the first two concerns, although results are not expected until 2023. COCL recommends that community engagement be decentralized, given higher priority, and be measured with a new set of performance metrics.

# XI. ADDITIONAL REMEDIES

After five mediation meetings, the City and DOJ reached agreement on a set of remedies to achieve compliance with the terms of the Settlement Agreement[34]. On January 10, 2022, the DOJ and the City filed their final "Joint Status Report" in the U.S. District Court (ECF 275), summarizing the mediation results and the specific remedies on which the parties agreed in principle. Essentially, the parties have agreed to add a new section to the Settlement Agreement - Section XI - that contains eight new paragraphs 188 to 195.

These remedies were approved by the Portland City Council on February 9, 2022, and by the federal judge at the Fairness Hearing on April 29, 2022. Because the final approval of this amendment occurred in the second quarter of 2022, COCL began its compliance assessment for these eight remedies at that time.

| Settlement Agreement Paragraph |
|---|
| 188. The City shall revise Force Data Collection Report (FDCR) and After Action Report forms to capture when the forms are edited and completed as part of PPB's implementation of Office365, which is ongoing. In the interim, pursuant to a process approved by the United States, PPB shall capture in the existing FDCR and After Action Report forms the author's name and the time and date of initial submission and any subsequent edits, as well as the name, time, and date of each level of review. |

| Compliance Label | Substantial Compliance |
|---|---|
| **Methodology** | Review of AAR and FDCR forms |
| | |

---

[34] These meetings included the Intervenor-Defendant Portland Police Association (PPA), the Enhanced Amicus Curiae Albina Ministerial Alliance Coalition for Justice and Police Reform (AMAC), and Amicus Curiae Mental Health Alliance (MHA).

**Exhibit A**

| **Compliance Assessment** |
|---|
| During the third quarter of 2022, we reviewed a sample of PPB cases, many of which used the updated FDCR and AAR forms which captured officers and reviewing supervisors names as well as the time and dates of submissions and reviews. Additionally, an in-person refresher training and Q&A session regarding the updated forms will be a part of PPB's supervisor in-service, scheduled to begin in January of 2023. However, during this quarter, the Force Inspector provided guidance to members involving identified trends regarding the updated AAR. As the forms are currently in-place and we saw evidence that they are being used by officers and supervisors, we now find that the City and PPB have substantially complied with the requirements of Par. 188. |

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | Updated FDCR and AAR forms and use by officers and supervisors |

| **Settlement Agreement Paragraph** |
|---|
| 189. Before November 25, 2021, the City shall provide funding for a qualified outside entity to critically assess the City's response to crowd control events in 2020 in a public-facing report and prepare a follow-on review of the City's response to the report. The City will use the report to prepare a training needs assessment. The report, training needs assessment, and follow-on review will be completed consistent with a Scope of Work and deadlines agreed upon by the City and the United States, and such agreement shall not be unreasonably withheld by either Party. If the City demonstrates to the United States that significant progress is being made toward meeting the obligations under the agreed upon Scope of Work and deadlines, the City may request a reasonable modification of the Scope of Work or extension of deadlines, which the United States shall not unreasonably decline. |

| **Compliance Label** | Partial Compliance |
|---|---|
| **Methodology** | Interviews with PPB officials and review of documents |
|  |  |

**Exhibit A**

**Compliance Assessment**

The work of IMLLC (the group hired to conduct the critical assessment) continued in the third quarter of 2022, including information gathering and document reviews. More direct interviews and community outreach occurred in the fourth quarter of 2022, and we will therefore supply further updates in our next report. For this quarter, the City remained in Partial Compliance. The requirements for Substantial Compliance are listed below in our recommendations.

| | |
|---|---|
| **COCL Recommendations** | • To achieve Substantial Compliance, the IMLLC must collect and analyze data consistent with the Scope of Work, and prepare a report that critically assesses the City's response to the 2020 demonstrations<br><br>• To achieve Substantial Compliance, the City must use this report to prepare a training needs assessment<br><br>• To achieve Substantial Compliance, the IMLLC must prepare a follow-up report that reviews the City's response to their original report, including the City's training needs assessment<br><br>• The City should keep COCL informed of the work planned and completed by the IMLLC<br><br>• The City should provide COCL with IMLLC's reports and the City's training needs assessment report |
| **Assessment Based On** | Evaluation of progress used to hire an outside entity<br><br>Evaluation of the products planned and delivered by the outside entity |

**Settlement Agreement Paragraph**

190. Before November 25, 2021, the City shall provide in the budget a separate line item for overtime costs to conduct necessary training for PPB officers. The City shall include a similar line item in subsequent budgets for the duration of this Agreement.

**Exhibit A**

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review of budget documents |

**Compliance Assessment**

To conduct necessary training for PPB officers, the City Council has included a separate line item for these overtime costs in the City's FY 2023 budget. Hence, the COCL finds that the City has achieved Substantial Compliance with the requirements of Par. 190. If the budget line item is removed in the next budget, then the City will be assigned Partial Compliance. Also, COCL recommends that the City and PPB reconsider the total budget and staffing for the Training Division after the civilian dean is hired.

| | |
|---|---|
| **COCL Recommendations** | • To remain in Substantial Compliance, the City must continue to provide a separate line item for PPB training-related overtime expenses.<br><br>• Revisit the staffing and budget for the Training Division, keeping in mind the option of hiring more civilians. |
| **Assessment Based On** | Review of budget documents and amount of overtime funding included in the budget. |

**Settlement Agreement Paragraph**

191. Before November 25, 2021, the City shall budget for a qualified civilian in PPB to direct all educational aspects of PPB's Training Division alongside the Captain of the Training Division, who will direct administrative aspects of PPB's Training Division. The respective roles and responsibilities of the civilian and the Captain are outlined in Attachment 1 appended to this Agreement, provided that the Parties may agree to modify those roles and will not unreasonably withhold such agreement. Once funding is provided, the City shall post the position within 90 days. Once the position is posted, the City shall make a job offer to a suitable candidate and complete any required background screenings within 150 days. If the City demonstrates to the United States that no suitable candidate applied for or accepted the position, or that the City is otherwise making significant progress toward meeting the

deadlines in this Paragraph, the City may request a reasonable extension of time to fill the position, which the United States shall not unreasonably withhold.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Tracking the hiring process for the Police Education Director |

### Compliance Assessment

In the previous quarterly report, COCL shared that PPB had nearly completed the hiring process for the Police Education Director position (also referred to as the civilian training dean or police academic dean). At the beginning of the third quarter, the Chief of police made a conditional offer to one of the two finalists that were interviewed for the position. However, shortly after the news of the conditional offer of employment was made public, the city received some information about the candidate that prompted the Chief to rescind the offer.

The City and PPB began the work of restarting the hiring process for the Police Education Director position. The City reached out to COCL among others for suggestions on how the process could be improved. COCL offered feedback, with several recommendations centered around increasing community involvement in the hiring process.

Specifically, the COCL team recommended the following:

- PPB could more broadly solicit the community for potential interview questions
    - In the previous process, PPB reached out to groups that comprise their advisory councils – which was a good first step but there is an opportunity to receive broader input.
- PPB could build time into the process for a community forum with the finalists, where community members can hear from the finalist directly and ask their own questions.
    - This has been done in other jurisdictions with hiring for highly visible police oversight related positions.

At the close of the third quarter, there were plans for the position to be posted once again during the month of October. As PPB and the City move forward with this new hiring process, we hope to see more, and fuller, community involvement within the process. COCL will continue to monitor this process as it advances. For this quarter, COCL will maintain the rating of Partial Compliance. While the City and PPB had to unexpectedly reinitiate the hiring

process and went beyond the 150-day timeline established within the Settlement Agreement, they continue to work actively to fill the position.

The Police Education Director will need staff support (which the City has provided in the budget) and independence to develop and implement new training without interference. We acknowledge that the Police Education Director will function within the PPB bureaucracy and report to an Assistant or Deputy Chief but should have a significant role in determining the direction of training at PPB. Also, we recommend that the Education Director and the Captain report to the same individual to minimize power struggles within the Training Division.

Regarding the public's concern about any candidate's background, COCL does not have a problem with someone who has served as a police officer in the past (that experience can be very helpful), but the individual hired should also have experience with research and educational methods that reach far beyond the experience of being a police officer (the civilian who serves in a similar role in the Baltimore Police Department, Dr. Gary Cordner, is an excellent example).

Finally, we encourage the person hired to take seriously the responsibility to "provide professional development and continuing education to Training Division instructors to ensure that all personnel are highly qualified and well equipped to perform their duties in an equitable, lawful, impartial manner." (Job posting). Along these lines, COCL has emphasized, on several occasions, the need for instructor development classes and certification of teaching skills.

| | |
|---|---|
| **COCL Recommendations** | • To achieve Substantial Compliance, the City and PPB should build in more opportunities for community involvement in the process of hiring the Police Education Director. However, the final decision should be left to the Chief of Police<br><br>• The City and PPB should look for candidates who understand both policing practices and best practices in teaching and evaluation<br><br>• The Police Education Director and Captain of the Training Division should report to the same Assistant or Deputy Chief<br><br>• The Police Education Director should explore professional development classes for PPB Training instructors |
| **Assessment Based On** | The City's ability to conduct a search and hire a qualified candidate within a reasonable time period |

**Exhibit A**

**Settlement Agreement Paragraph**

192. Within 60 days of the date that this paragraph is entered as an order of the Court, the City shall initiate an appropriate investigation through IPR to identify: (a) the PPB Lieutenant(s) and above who trained Rapid Response Team members to believe that they could use force against individuals during crowd control events without meeting the requirements of PPB Directive 1010.00; (b) the PPB incident commander(s) and designee(s) with the rank of Lieutenant or above who directed or authorized any officer to use force in violation of PPB Directive 1010.00, or who failed to ensure that FDCRs and After Action Reports arising from the crowd control events starting on May 29, 2020, and ending on November 16, 2020, were completed as required by Section 13.1 of PPB Directive 635.10; and (c) the PPB Commanders and above who failed to timely and adequately clarify misunderstandings and misapplications of PPB policy (including this Agreement) governing the use, reporting, and review of force during the crowd control events starting on May 29, 2020, and ending on November 16, 2020. Once the IPR investigation is complete, the Police Commissioner and/or the Chief of Police, as required by this Agreement, shall hold accountable those investigated members of the rank of Lieutenant and above who are determined to have violated PPB policies (including this Agreement) as outlined in this paragraph. The Parties affirm the obligation in this Agreement and Directive 330 for IPR and PPB to investigate any sworn member if, during the investigations of Lieutenants and above required by this paragraph, information is discovered suggesting that any sworn member may have violated PPB policy or this Agreement.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Interviewed PPB, CAO, and IPR personnel |

**Compliance Assessment**

The IPR is currently in the process of conducting the series of investigations required by Par. 192. Presently, the IPR considers there to be four primary investigative areas: (1) providing deficient and contradictory training to RRT members; (2) directing or authorizing force in violation of 1010.00; (3) deficient FDCR and AAR reports, and; (4) command staff and above who did not correct misunderstandings and misapplications of PPB policy with regards to crowd control events. As such, IPR opened four cases, each currently in different stages of investigation. For instance, in some cases, they have identified specific alleged PPB members, developed specific allegation language, and are in the process of preparing investigative

**Exhibit A**

reports. For others, they are still attempting to determine whether the underlying assumption of Par. 192's language can be demonstrated and, subsequently, which PPB member should be investigated.

At this moment, the cases are still being investigated, and we are not privy to all the facts of the investigation until they are completed. Therefore, we must continue to find the City in Partial Compliance with the requirements of Par. 192. Substantial Compliance will require us to review each investigation to ensure that it was conducted in a fair and reasonable manner and is of a quality consistent with other investigations.

| | |
|---|---|
| **COCL Recommendations** | • To achieve Substantial Compliance, complete a thorough and accurate investigation of the command personnel associated with the 2020 crowd control and the training they provided<br><br>• To achieve Substantial Compliance, hold accountable the investigated command personnel members as appropriate who are found to have violated PPB policies (including this Agreement) as described in Par. 192. |
| **Assessment Based On** | Discussions with City personnel |

**Settlement Agreement Paragraph**

194. Within 210 days of the date this paragraph is entered as an order of the Court, the City shall implement body-worn cameras (BWCs) pursuant to a policy that is subject to the policy-review-and-approval provisions of this Agreement; provided, however, if the City is making substantial progress this deadline may be extended by agreement of the United States, which shall not be unreasonably withheld.

a. The City will comply with any collective bargaining obligations it may have related to BWCs, which the City agrees to fulfill expeditiously and in compliance with its obligation to bargain in good faith.

b. Within 60 days of the date this paragraph is entered as an order of the Court, the Compliance Officer shall gather public input on the use of BWCs and provide this information and any technical assistance to the public and the Parties to inform the drafting of a policy.

**Exhibit A**

The United States reserves its policy review rights related to the BWC program under the terms of this Agreement.

c. If the City has not finally discharged its collective bargaining obligations as to BWCs within 120 days of the date this paragraph is entered as an order of the Court, the Parties stipulate that the Court may thereafter hold periodic status conferences every 60 days to receive an update on the procedural status of the collective bargaining process related to BWCs. The City will provide a final procedural status update upon the completion of the collective bargaining process.

d. The United States reserves its enforcement rights related to the BWC program under the terms of this Agreement. If collective bargaining or any related arbitration or appeal results in a BWC program that the United States determines, in its sole and absolute discretion, will not adequately resolve the compliance concerns identified in the April 2, 2021 notice of noncompliance, the Parties agree that the United States can seek court enforcement pursuant to paragraph 183, without having to repeat the steps laid out in paragraphs 178 to 182.

| Compliance Label | Partial Compliance |
| --- | --- |
| Methodology | Review of November BWC Status Report<br>Communication with PPB personnel |

**Compliance Assessment**

The City is continuing to progress towards the implementation of a body-worn camera (BWC) policy and program. In the first quarter of 2022, PPB released a Request for Proposal (RFP) to solicit BWC vendors capable of supplying Portland with the equipment necessary for a BWC program. Additionally, the PPB started a process to gather subject-matter experts to assist in the scoring process, which is expected to continue into November 2022. This process continues to be ongoing as negotiations with the Portland Police Association (PPA) and Portland Police Commanding Officers Association (PPCOA) continue the bargaining process, which includes the creation of a BWC program and policy. The completion of the BWC program and policy can only happen once bargaining concludes and all parties agree on terms for the program.

The City requested that the DOJ set principles to govern a BWC policy, and in response, the DOJ released a letter to the City on November 15, 2021, addressing key issues, including

**Exhibit A**

deployment, notice, activation/deactivation/buffering, authorized users, prereview, control of videos, and accountability. The DOJ additionally stated that public input should drive a BWC policy and be collected expeditiously before the PPB drafts and adopts such a policy. As discussed in COCL's first quarter report, part of the public input process was a public forum and community survey, facilitated by COCL, that brought together PPB, city stakeholders, community groups, PCCEP members, and the public to discuss questions and concerns.

As reported in federal court on April 29, 2022, the COCL underscored two findings from the community forum and survey regarding access to the BWC recordings. First, the community wants open access to the recordings for PPB supervisors, trainers, and auditors, as well as the general public. Second, in deadly force incidents, most survey respondents felt that PPB officers should not review the camera footage until after they have written their force report (called the "prereview" issue). We continue to maintain that this viewpoint is consistent with the Supreme Court's "Graham standard," which prohibits 20/20 hindsight, meaning that we should evaluate the use of force based on what the officer knew at the time, not what they learned later.

In the second quarter of 2022, the PPB underwent a series of next steps for the BWC program implementation including demonstrations from the top vendors; scoring of those vendors; vendor selection; grant application submission; and contract negotiations. The two remaining vendors demonstrated their products in May and were scored to determine which one will move on to the pilot program. This scoring process resulted in the selection of Axon, which is heavily utilized by police departments of various sizes throughout the US. If Axon proves to be a successful selection, they will transition into full implementation at the completion of the pilot program. During the third quarter of 2022, PPB held a Zoom meeting with Axon to discuss remaining issues in the contract. PPB believes they are close to finalizing the contract with Axon and moving forward with the BWC pilot.

In the second quarter, the PPB submitted a grant to the Bureau of Justice Assistance for the Body-Worn Camera Policy and Implementation Program. This grant assists and funds law enforcement agencies that seek to obtain BWCs for the purpose of establishing or expanding a BWC program in their respective departments. Unfortunately, in the third quarter, PPB was notified that their proposal for the BJA grant was not accepted. Considering this information,

COCL continues to hope that the PPB and the City will use the pilot as an opportunity to exploit the rich data that will be produced from BWCs.[35]

If the City partners with researchers who have the right software, then the BWC data can be used to identify specific types of interpersonal communication that lead to the escalation of conflict and the use of force, so that such encounters can be prevented or minimized in the future. Also, disparities in police treatment can be examined across various constitutionally protected classes. The COCL has also recommended that first-line supervisors be trained to use BWC data for coaching and feedback to individual officers under their supervision, but these initiatives are down the road. PPB must first develop a sound BWC policy, basic training, and a pilot program.

The third quarter of 2022 saw further discussions with the City Attorney's Office and the City Procurement department to work out the details of the pilot contract. Additionally, PPB hired 3 of 5 positions required in Records for redactions and 1 of 1 position required in IT for programmatic support. Moreover, PPB has begun the process of preparing the Central Precinct with electrical capacity for BWC equipment to support the pilot test.

The PPB continues bargaining with the Portland Police Association (PPA) throughout the third quarter - a process that has extended for many months. The City anticipated a conclusion to bargaining by the end of November, but that did not happen, as we will discuss in our fourth quarter report. If the City and the PPA cannot reach agreement, they will need arbitration to remove the impasse, which could add another six to nine months to the process before the pilot program can be introduced.

| **COCL Recommendations** | • To achieve Substantial Compliance, the City "shall implement body-worn cameras (BWCs) pursuant to a policy that is subject to the policy-review-and-approval provisions |
|---|---|

---

[35] Previously, COCL recommended that PPB use Axon's MY90 contact survey to measure public satisfaction with police services, but we have since decided that the survey must be independent of the PPB. The COCL will provide a technical assistance report on this subject.

**Exhibit A**

|  | of this Agreement" (Par. 194). This means that the City will need to: <br><br>    o   Complete the bargaining process <br><br>    o   Finalize the BWC policy <br><br>    o   Develop and implement BWC training <br><br>    o   Complete a successful pilot test in the field <br><br>    o   Achieve full-scale implementation of BWCs for PPB officers <br><br> • During the bargaining process, we encourage the City to incorporate the recommendations from the community, the COCL and the DOJ <br><br> • The PPB should seek to acquire software for analyzing BWC data and identifying patterns in police-community interactions that can be used for training and coaching |
|---|---|
| **Assessment Based On** | Review of any progress made in bargaining, policy development, hiring a qualified BWC vendor, hiring PPB personnel for BWC program, and preparing the identified precinct for pilot testing. |

**Settlement Agreement Paragraph**

195. In 2020, the City referred to voters a ballot measure that would overhaul the police accountability system incorporated into this Agreement by establishing a new Community Police Oversight Board to replace IPR for investigations of certain complaints of police misconduct and to replace the Chief of Police for imposition of discipline. City voters approved the ballot measure. The City has since empowered a 20-member civilian Commission to define the duties and authority of the Oversight Board and submit a proposal to City Council for final approval.

a. Before January 1, 2022, the City Council and Auditor shall each present a plan to the United States for an orderly transition to the Community Police Oversight Board by ensuring the continuity of IPR operations while the Commission develops the Oversight Board for City Council's approval. The United States shall determine whether either of these two plans is

acceptable. City Council will then adopt a plan that the United States has determined is acceptable. The Parties agree that the adopted plan shall be appended to this Agreement and will become part of this Order, provided that the Parties may agree to modify the plan if warranted by the circumstances. Until the Oversight Board becomes operational, the City shall ensure that administrative investigations are completed as required by Section VIII – Officer Accountability and that officers are held accountable for violating PPB policy and procedure as required by Paragraph 169.

b. Within 18 months of the date this paragraph is entered as an order of the Court, the Commission shall propose to City Council changes to City Code to create a new police oversight system as reflected in the City of Portland Charter amendment establishing a Community Police Oversight Board. Within 60 days of receiving the Commission's proposal, the City will propose amendments to City Code to address the Commission's proposal, and corresponding amendments to this Agreement, subject to the United States' and the Court's approval, to ensure full implementation of the Oversight Board and effective police accountability, consistent with the requirements of this Agreement. Within 21 days of the approval of the amendments to the Agreement by the United States and the Court, the City Council shall consider and vote on the conforming City Code provisions creating the Oversight Board. Within 12 months of the Council's adoption of the City Code provisions, the new Oversight Board shall be staffed and operational, and IPR shall then cease taking on new work and complete any pending work. For good cause shown, the deadlines imposed by this subparagraph (b) may be reasonably extended provided that the City is in substantial compliance with subparagraph (a).

c. The City will comply with any collective bargaining obligations it may have related to the Oversight Board, which the City agrees to fulfill expeditiously and in compliance with its obligation to bargain in good faith.

| Compliance Label | Partial Compliance |
|---|---|
| **Methodology** | Observation of Police Accountability Commission (PAC) meetings<br><br>Communication with City support staff<br><br>Review of PAC's Quarterly Report, July-September 2022<br><br>Review of PAC's report: PAC Areas of Agreement on Barriers to Police Accountability, and Best Practices, in Portland's Current System |

**Compliance Assessment**

The City is currently in Partial Compliance with the requirements of Par. 195, but considerable work remains to be done. On November 3, 2020, Portland voters passed Ballot Measure 26-217 to create this Community Police Oversight Board (CPOB) that would provide an entirely new police accountability system. The CPOB, which would replace IPR and even replace the Chief of Police for disciplinary decisions, will act as an independent body that has the authority to:

- Investigate all deaths in custody and uses of deadly force

- Investigate all complaints of force that result in injury, discrimination against a protected class, violations of federal or state constitutional rights

- Investigate other complaints or incidents of misconduct as they see fit or mandated by City Code

- Subpoena, gather, and compel documents and all evidence, including the ability to compel statements from witnesses and officers

- Compel sworn members of the PPB and supervisors to participate in investigations.

- Make policy recommendations to the PPB and City Council, and

- Impose discipline, including termination.[36]

To establish the community oversight board, in July of 2021, the City Council created a Police Accountability Commission (PAC), composed of 20 community members, with the directive of developing the new oversight board for the Portland Police. In furtherance of this mission, the PAC held 22 public meetings during the third quarter of 2022. In July, the PAC held three meetings of the full commission and three meetings with the sub-committees. The full commission meetings hosted City Commissioners, the Portland Police Association, and Settlement Agreement amici – Mental Health Alliance and Albina Ministerial Alliance Coalition for Justice and Police Reform – to discuss barriers to the current accountability

---

[36] https://www.portland.gov/sites/default/files/2021/portland-ballot-measure-26-217-11-03-2020.pdf

**Exhibit A**

system. The sub-committees presented research to develop a spreadsheet of best practices from several jurisdictions and discussed planning of future town halls with community-based organizations.

In August, the PAC held three full commission meetings and five sub-committee meetings. The commission meetings heard reports from the sub-committees of their progress, requested and received public comment, and held equity training. The sub-committees continued their work from July discussing engagement with CBOs for future town halls and presenting research of best practices to be included in draft documents for presentation to the full commission. In September of Q3, the end of the third quarter, the full commission and sub-committees held three and five meetings, respectively, to review reports and continue discussions about draft reports. While a draft report was published at the end of the third quarter, the commission continued its Fact-Finding Phase into Q4.

As previously reported by COCL, PAC entered its Fact-Finding Phase of work in the second quarter of 2022 – that work continued into the third quarter. PAC's Fact-Finding phase focuses on gaining an understanding of the issues that PAC is aiming to fix and the ways they can learn from other jurisdictions, affected communities, and subject matter experts. In the Fact-Finding Phase, the PAC published a report detailing several barriers to the police accountability system in Portland and best practices. The report summarizes barriers and best practices into major themes such as lack of transparency; complexities within the current system; accessibility and equity; trust; laws and policies; conflicts and bias; culture; and resources for community oversight. The PAC points to transparency challenges the community encounters with the complaint process to include the investigation, policies, and the ability to track a complaint from beginning to end. Additionally, the report points to the lack of trust the community has in the system that is outlined by overlapping layers of policies and laws that are conflicting at times. In the concluding section of the report, the PAC states they will prioritize the small number of best practices utilized in Portland such as the involvement of civilian staff in the investigative process and the quality of investigators. This report, *Police Accountability Commission Areas of Agreement on Barriers to Police Accountability, and Best Practices, in the Current System in Portland*, was made publicly available on September 29, 2022, and demonstrates a major step to moving the PAC forward into the next planned phase of work.

In response to Par 195(a), plans have been submitted to DOJ "for an orderly transition to the Community Police Oversight Board." Effective June 30, 2022, IPR was removed from the City Auditor's office by amending Portland City Code (PCC) 3.21. The plan to remove IPR was submitted in January of this year. IPR is now recognized as an agency independent of the City

**Exhibit A**

Council and other city bureaus. Under this amendment to the PCC, IPR can request services, assistance, and advice from any City department, officer, administrative agency, or bureau in the performance of its duties. To ensure continuity of resources to IPR, the City Council will fund IPR at the amount necessary to maintain operations until IPR transitions to the new Community Police Oversight Board. Similarly, non-represented IPR employees will be allowed to transfer to an equivalent (or suitable) position offered by the City Council, or to the Auditor's office if offered. For represented IPR employees, the City will negotiate with the AFSCME to discuss the alternatives available to ensure the retention of represented employees. During the third quarter, COCL observed IPR facing the challenge of low staffing levels, most likely due to the uncertainty of how long they will continue to operate. This highlights the need for the work of the PAC to move in a timely manner.

The work of the PAC should eventually lead them to submit a proposal to the City Council that will include "changes to City Code to create a new police oversight system as reflected in the City of Portland Charter amendment establishing a Community Police Oversight Board." (Par. 195 (b)). Clearly, there is much work to be done before such a proposal is ready to be submitted. Finally, the City will need to ensure that the proposed changes to the City code "comply with any collective bargaining obligations" (Par. 195(c)). The COCL will closely monitor the implementation of the amendment in the months ahead.

The PAC has worked hard to provide a process and framework for this remedy, and the Committee is supported by competent and committed City staff. There is also a transition plan in place to sustain IPR until the new Board is functional, but as mentioned above, there must be a continued focus to complete the work and form the Board in a timely manner. Therefore, COCL provides an initial rating of Partial Compliance for Par. 195, but notes this is subject to change based on a concerning issue to timeliness. While COCL is impressed with the volume of topics addressed by the PAC, we encourage the members to remain focused on the duties of the Oversight Board as defined in the Settlement Agreement and the constraints of the City Council and collective bargaining obligations.

| | |
|---|---|
| **COCL Recommendations** | • To achieve Substantial Compliance, the PAC must submit to the City Council a clear and reasonable proposal for the implementation of a Community Police Oversight Board (CPOB) as defined in Par. 195 and compliant with collective bargaining obligations<br><br>• To achieve Substantial Compliance, the City must implement a functional CPOB that is properly staffed, trained, |

**Exhibit A**

|  | operational, and able to effectively investigate and dispose of use of force and misconduct cases. |
|---|---|
| **Assessment Based On** | Progress achieved by PAC toward developing the CPOB. Implementation and functioning of the CPOB. |

# LIST OF ABBREVIATIONS

**AAR:** After Action Report (also referred to as 940)

**ADORE:** Automated Observation Reports and Evaluations

**AMR/EMS:** American Medical Response/Emergency Medical Service

**BHRT:** Behavioral Health Response Team

**BHCC:** Behavioral Health Call Center

**BHCT:** Behavioral Health Coordination Team

**BHU:** Behavioral Health Unit

**BHUAC:** Behavioral Health Unit Advisory Committee

**BOEC:** Bureau of Emergency Communications

**CAG:** Coalition of Advisory Groups

**CEW:** Conducted Electric Weapons

**CCO:** Coordinated Care Organization

**CI Training:** Crisis Intervention Training

**CIT:** Crisis Intervention Team

**COCL:** Compliance Officer and Community Liaison

**CRC:** Citizen Review Committee

**CRO:** Communication Restriction Order

**DOJ:** Department of Justice

**ECIT:** Enhanced Crisis Intervention Team

**ECW:** Electronic Control Weapons

**EIS:** Employee Information System

**FED:** Forensic Evidence Division

**FMLA**: Family and Medical Leave Act

**FSD:** Family Services Division

**FTO:** Field Training Officer

**Exhibit A**

**FDCR:** Force Data Collection Report

**HRC:** Human Rights Commission

**IA:** Internal Affairs

**IMLLC**: Independent Monitor, LLC

**IPR:** Independent Police Review

**JOBS**: Job Opportunity and Basic Skills (JOBS)

**LMS:** Learning Management System

**PAC**: Police Accountability Commission

**PCCEP:** Portland Committee on Community Engaged-Policing

**PED:** Property and Evidence Division

**PES:** Psychiatric Emergency Services

**POH:** Police Officer Hold

**PPB:** Portland Police Bureau

**PRB:** Police Review Board

**PSD:** Professional Standards Division

**PS3:** Public Safety Support Specialist

**RU:** Responsibility Unit

**SCT:** Service Coordination Team

**SNAP**: Supplemental Nutrition Assistance Program

**S.O.P.:** Standard Operating Procedure

**SSD:** Strategic Services Division

**TA Statement:** Technical Assistance Statement

**TAC:** Training Advisory Council

**TANF**: Temporary Assistance for Needy Families

**TOD:** Tactical Operations Division

**UDAR**: Uniform Daily Assignment Roster

**YSD:** Youth Services Division

**Exhibit A**

## LIST OF PERSONNEL

Chief of Police: Chuck Lovell

Deputy Chief of Police: Michael Frome

Assistant Chief of Operations: Brian Ossenkop

Assistant Chief of Services: Michael Leasure

Assistant Chief of Investigations: Jami Resch

Commander of Professional Standards Division/Compliance Coordinator: Jeff Bell

Inspector General/DOJ Compliance team: Mary Claire Buckley

Force Inspector: Peter Helzer

Behavioral Health Unit (BHU): Casey Hettman

EIS Supervisor: Matthew Engen

EIS Administrator: Dan Spiegel

Training Captain: Christopher Gjovic

Auditor: Mary Hull Caballero

IPR Director: Ross Caldwell

BOEC Director: Bob Cozzie

BOEC Training and Development Manager: Melanie Payne

# APPENDIX A

### ECIT Training Outcome Assessment

PPB's Enhanced Crisis Intervention Team (ECIT) has been receiving PPB specialty training in crisis intervention since 2013[37]. At present, 139 sworn personnel are currently serving as ECIT officers in patrol positions, and they are dispatched by BOEC to calls for service with a mental health component. During the third quarter, the Training Division prepared a report, *Evaluation Report: 2021 Enhanced Crisis Intervention Training* (October 2022), which serves as the basis for COCL outcome assessment. Our assessment focuses on the 2021 ECIT training.

To evaluate the ECIT training, the PPB's Training Evaluation team used multiple methods. Here, we focus on the knowledge tests and feedback surveys related to the classroom and scenario training. The knowledge tests are used to determine whether officers have acquired the basic knowledge articulated in the Learning/Performance Objectives. The feedback surveys gave students the opportunity to evaluate the quality of the instruction and their perceptions of what they learned, as well as make recommendations for current and future trainings. We credit the Training Division's analysts for using this data to provide regular feedback reports to training managers to improve future training. The COCL has reviewed these internal reports and find them useful for making improvements to training. In fact, PPB has made noticeable improvements to the 2019 and 2021 ECIT training classes based on earlier feedback received from students.

The ECIT training covered a range of topics, including crisis communication skills, mental illness indicators, interactions with consumers and family members, and scenario exercises. Overall, the 2021 ECIT training was given positive reviews by the students, as shown in the tables below. However, students also provided useful recommendations to improve future trainings,

---

[37] With the exception of 2020, where COVID and staffing shortages prohibited such training. The 2021 training classes were larger than normal to make up for this gap and required additional time (50 hours instead of 40). This training is for ECIT officers and is more comprehensive than the Crisis Intervention Training received by new officers.

including smaller class sizes, more time to practice communications skills, and more realistic scenarios.[38]

Below we provide a summary of the findings from the knowledge tests and feedback surveys connected to the 2021 ECIT Training.

*Knowledge Tests:* PPB provided students with a 20-question multiple-choice knowledge test at the end of the training. COCL is satisfied that these 20 questions provide relatively good coverage of the material contained in the ECIT training. The test results have yet to be released, but COCL was allowed access to an internal draft copy. Overall, the 29 students performed very well and answered most of the questions correctly. They did less well on four of the 20 test questions, but each of these questions asked students to "Select all that apply" and required multiple answers to receive full credit. In the past, COCL has consistently rated these questions as difficult to answer. Notably, the knowledge test was administered at the conclusion of the 5-day training, so we consider these results very encouraging, as students were required to remember training content from several days earlier. Overall, we are satisfied with the PPB's efforts to assess student's knowledge acquired as a result of ECIT training.

*Feedback Surveys: ECIT Classes:* The ECIT officers were given the opportunity to evaluate the classes received in Days 1, 2, and 3, as well as the scenarios they participated in during Days 4 and 5.

The ECIT classes covered a range of topics, as noted earlier. Overall, the 2021 ECIT classes were given very positive reviews by the students. For the class evaluations, the PPB asked some standard questions that they used for most trainings. As shown in Table 9-1, most ECIT officers felt that all the classes were a good use of their time and expanded their previous knowledge base.

---

[38] For additional recommendations regarding ECIT training in general, we encourage the reader to see our evaluation of the 2022 one-day ECIT training that appeared under Par. 84.

**Exhibit A**

**Table A.1: Student Feedback for 2021 ECIT Training[39]**

(% of Students who Agree or Strongly Agree)

| Class | The Class was a Good Use of My Training Time | The Class Expanded my Previous Knowledge Base |
|---|---|---|
| **DAY 1** | | |
| ECIT Overview | 100% | (Not Asked) |
| Crisis Response for ECIT | 100% | 82.7% |
| Peer Recovery Movement | 93.1% | 89.7% |
| Consumer Panel Discussion | 89.6% | 93.1% |
| Psychosis and Communication | 89.7% | 79.3% |
| **DAY 2** | | |
| ECIT Calls for Service Data | 92.3% | 96.1% |
| Multnomah Co. Threat Assessment Team | 100% | 100% |
| Trauma Informed Care | 84.6% | 73.1% |

---

[39] Compiled by COCL from tabular data found in *Evaluation Report: 2021 Enhanced Crisis Intervention Training*. Portland Police Bureau Training Division, October, 2022.

**Exhibit A**

| Class | The Class was a Good Use of My Training Time | The Class Expanded my Previous Knowledge Base |
|---|---|---|
| NAMI Overview | 84.6% | 80.8% |
| Family Member Panel Discussion | 84.6% | 88.5% |
| Mental Health Facilities Response | 100% | 92.3% |
| Site Visit Presentation and Discussion | 100% | 100% |
| **DAY 3** | | |
| Brain, Mental Illness and Treatment | 95.9% | 91.6% |
| Mental Health Risk Assessment | 95.6% | 95.8% |
| Communication Team Kit (COMTEK) | 100% | 100% |
| Community Resource Forum | 87.0% | 95.8% |
| Suicide Intervention | 95.6% | 95.8% |
| **DAYS 3 and 4** | | |
| Crisis Communication Skills Exercises | 95.4% | 95.5% |
| Patrol Response | 100% | 95.8% |
| Practical Implications of Directive 850.20 (Recognize, Consider, Decide) | 100% | 95.8% |
| **Day 4** | | |
| 9th Circuit Lukus Glenn Case (Tabletop Exercise) | 90.9% | 77.3% |

**Exhibit A**

| Class | The Class was a Good Use of My Training Time | The Class Expanded my Previous Knowledge Base |
|---|---|---|
| ECIT Scenarios | (Not Asked – see Breakdown) | |

*Feedback Surveys: ECIT Scenarios:* ECIT students participated in nine role-play scenarios over a two-day period and were then asked to evaluate the scenarios. COCL has encouraged more role-play scenarios for many PPB trainings, so we are pleased to see this level of investment in officers' responses to mental health events.

As shown in Table 9-2, nearly all students reported that the scenario trainer was organized and well prepared, that the scenario facts were plausible, that the scenarios were appropriately challenging, and that they learned a lot from watching other students engage in the scenarios. As shown in Table 9-3, as shown most ECIT officers felt that the role-play scenarios were a good use of their time, that the scenario debrief aided their learning, and that the scenario complexity was "about right" (and not too simple or too complex). Students also provided some constructive comments and as a result, one scenario will be revised or dropped for future ECIT trainings.

**Table A.2. Overall Assessment of 2021 ECIT Scenarios**

(% of Students who Agree or Strongly Agree)

| | Trainer was Organized and Well Prepared | Facts were Plausible | Appropriately Challenging | Learned a Lot from Watching Scenarios |
|---|---|---|---|---|
| Day 4 Scenarios (3 Scenarios) | 100% | 95.2% | 90.5% | 100% |
| Day 5 Scenarios (6 Scenarios) | 96.5% | 93.1% | 79.3% | 93.1% |

**Exhibit A**

**Table A.3. Individual Assessments of 2021 ECIT Scenarios**

**(% of Students who Agree or Strongly Agree; "Complexity" question defined separately)**

| Scenario | Good Use of My Training Time | Debriefing Aided my Learning | Complexity "About Right" (not too Simple or Complex) |
|---|---|---|---|
| **DAY 4** | | | |
| Crisis Communication: Suicidal Person on Ledge | 100% | 100% | 81.0% |
| First Break College Student | 100% | 100% | 76.2% |
| Wanted Person on Bus | 80.9% | 85.7% | 47.6% |
| **DAY 5** | | | |
| Family Member Assistance | 93.1% | 93.1% | 93.1% |
| Woman in Alcove with Knife | 72.4% | 79.3% | 65.5% |
| Person in Crisis on Bridge with Firefighters On-scene | 93.1% | 96.5% | 86.2% |
| 7-Eleven Police Officer Custody | 86.2% | 86.2% | 75.9% |
| Mental Health Facility Response | 86.2% | 82.8% | 86.2% |

**Exhibit A**

| Scenario | Good Use of My Training Time | Debriefing Aided my Learning | Complexity "About Right" (not too Simple or Complex) |
|---|---|---|---|
| Force Options: Man with Paranoia at Homeless Shelter | 96.5% | 96.5% | 82.8% |

*Overall satisfaction*. Students were asked, "Overall, how satisfied or dissatisfied are you with your ECIT training experience?" All students reported being either "Generally Satisfied" (32.1%) or "Very Satisfied" (67.9%). No students were dissatisfied with the ECIT training.

**Conclusions and Recommendations**

Overall, COCL is satisfied that the Training Division has maintained a system of evaluation for ECIT training that has led to useful findings. As part of the Feedback surveys, ECIT officers provided a range of comments and recommendations to improve the ECIT training. These recommendations included smaller class sizes, more time for communications skills, and (in a few cases) more realistic scenarios, among other suggestions.

**Exhibit A**

# APPENDIX B

**COCL Report on PPB's Annual Performance Evaluations:
Sergeant Training Outcome Assessment and Technical Assistance**

## Introduction

As COCL has noted repeatedly, organizational reform that increases organizational legitimacy and constitutional policing is most likely to occur when policy, training, and supervision are modified to reflect best practices in policing. In terms of supervision, this report gives special attention to PPB's annual performance evaluations, which should be a critical mechanism for changing organizational culture and street-level behaviors. Supervisors are required to complete an "Annual Performance Evaluation" for each PPB officer under their command.

In the second quarter of 2022, new supervisors were given a class on how to evaluate their officer's performance over the last year and how to give feedback. This class gave new Sergeants guidance on completing these annual evaluations for officers who they supervise. The class gave attention to "where to locate necessary information to give feedback and direction to Officers" (e.g. EIS entries, Training records, reports written by the officer, and on-the-job behavior). These reviews are expected to "give direction and reinforcement of how Officers should work, behave, and conduct themselves," as well as "draw attention to areas of concern." After completing the review, Sergeants are required to hold a debriefing with the officer being evaluated.

Given the importance of the annual performance evaluations, COCL provided PPB with feedback on the Lesson Plans and has reviewed the actual evaluation reports. For this outcome assessment and technical assistance report, we have conducted a brief analysis of these data with the results reported here, including training implications. The purpose of this analysis is (1) to encourage PPB to explore these data further to better understand how supervisors are reviewing PPB officers; (2) to suggest improvements in this system of review to improve its effectiveness; and (3) as a result, enhance the training of supervisors who conduct these reviews. This annual evaluation should be a key mechanism for enhancing both individual and organizational performance.

## Background on PPB's Annual Officer Performance Evaluation

**Exhibit A**

From COCL's perspective, the PPB has one of the most comprehensive evaluation systems in the United States in that it covers a wide range of performance metrics. These metrics go far beyond traditional measures of police performance (e.g. arrests and citations) and give considerable attention to actions that reflect community policing and procedural justice, including the communication skills needed to de-escalate conflict, responses to individuals facing a mental health crisis, the collection of good evidence on crimes, and being respectful of community members. The evaluation system also gives attention to the officer's ability to get along with peers, be organized, produce good reports, and follow the law. The evaluation form has 11 sections and a total of 62 separate measures of performance.

The sections are defined as:

1. Community Engagement and Customer Service
2. Working relationships and interpersonal communication
3. Officer safety
4. Conflict management
5. Working with people in crisis
6. Initiative and problem solving
7. Organization and management
8. Preparation, presentation, and accuracy of required reports
9. Knowledge and adherence to Bureau policies, state statutes, city ordinances and case law
10. Investigation, interview, collection of evidence and case follow-up
11. General performance

Several of these sections, while independent, share an interest in measuring communication skills that COCL has emphasized for 7 years. For example:

- Section 1: "Demonstrated ability to communicate and build rapport across diverse backgrounds"

- Section 5: "Skilled at recognizing the level of crisis and adapts their communication and tactical techniques for that level of crisis"

- Section 10: "Uses good communication and investigative skills to locate and collect evidence not easily found or readily identifiable"

- Section 11: "Leads by respect, honesty, integrity and fairness"

### *The Rating System*

The rating system is relatively simple. Supervisors evaluate each officer on 62 dimensions using the following evaluation scale:

**Exhibit A**

<u>Exceptional/Exceeds Standards</u>: "Performance significantly exceeds the requirements of the assignment. Consistently achieves objectives at a superior level and demonstrates exceptional skills and innovation in work performance."

<u>Meets Standards</u>: "Performance consistently met standards in all essential areas of responsibility and the quality of work overall was good."

<u>Needs Improvement</u>: "Performance failed to meet expectations in one or more of the rated areas. Performance was consistently below expectations in most essential areas of responsibility. Significant improvement is needed in one or more areas."

<u>Not Observed</u>: Supervisors were also given the option of checking "Not Observed" if they did not have sufficient data to evaluate the officer on a particular metric.

Comments from the rater are also required in some instances (discussed below).

**Methodology**

*Sample Selection*

The objective of this analysis was to see how PPB supervisors use the Annual Performance Evaluation to evaluate their police officers. We were informed that PPB's annual performance evaluation data were retained in hard copy files only. Thus, to avoid burdening the PPB with a large data request, the COC requested 40 de-identified files from the list of officers whose performance was reviewed in 2021. In the final analysis, the present report is based on complete data from 36 randomly selected patrol officers assigned to all three precincts. Within the sample, fifteen patrol officers worked in the Central Precinct, eleven patrol officers worked in the East Precinct, and ten patrol officers worked in the North Precinct.

*Metric Scoring*

For our analysis, the numerical values assigned to the ratings were as followed: 1 = "Needs Improvement," 2 = "Meets Standards," and 3 = "Exceeds Standards." The response option, "Not Observed" as well as blank responses, were treated as missing so that the data would not become skewed or misrepresented. The analysis relied on calculating the average of the ratings (means) and the dispersion of the ratings around the mean (standard deviation).

**Results**

Overall, 2,133 ratings were given to the 36 patrol officers in the study. The rating average was 2.27 (Slightly above "Meets Standards"). As shown in the bar chart below, the majority of ratings were "Meets Standards" (73.16%; n=1,633), while roughly one-quarter of the ratings

were "Exceeds Standards" (25.99%; n=580). Only 19 ratings (0.01%) were "Not Observed" or were left blank. However, not a single patrol officer on any of the 62 metrics received a "Needs Improvement" rating on his or her annual performance evaluation (0.00%; n=0).

**Figure B.1**



*Sections*

The mean and standard deviation was calculated for each of the eleven sections of PPB Annual Performance Evaluation. As shown in the bar chart below, Section 5 ("Working with people in crisis") had the highest average ratings (mean= 2.37) and Section 9 ("Knowledge and adherence to Bureau policies, state statutes, city ordinances and case law") had the lowest average ratings (mean=2.08).

**Exhibit A**

**Figure B.2**



### Precincts

We examined the data for possible differences between precincts. As shown in the bar chart below, the North Precinct gave out the highest proportion of "Exceeds Standards" rating (31.83%), followed by the East Precinct (27.43%). Supervisors in the Central Precinct gave out the lowest proportion of "Exceeds Standards" ratings (21.18%).

**Exhibit A**

**Figure B.3**



**Supervisors**

The sample consisted of twenty-eight supervisors from all three precincts. We looked at the mean ratings for each supervisor across all precincts. Supervisors' average (mean) ratings ranged from 2.0 to 2.89. Thus, we find fairly large differences between supervisors, although the samples are small and may not be reliable.

Supervisors are required to give an "example or comment" to justify any ratings that "Exceeds Standards" or "Needs Improvement." They are also required to give examples or comments in at least 3 categories regardless of the rating level. In the future, we encourage PPB to look at the comments provided to ensure that the requirements are being met and to learn more about individual supervisors and how they evaluate officers (e.g. who gives substantive, detailed and nuanced comments that would be helpful to officers and who does not?}.

**Shifts**

Portland patrol officers can be assigned to four different shifts: 7am-5pm, 12pm-10pm, 4pm-2am, or 10pm-8am. The 7am-5pm shift and the 4pm-2am shift appeared the most in the sample (11 times each), and they had identical averages of 2.23. The 10pm-8am shift had the

**Exhibit A**

lowest average (mean= 2.18) out of the four shifts, and the "Unknown" shifts had the highest average (mean= 2.47).

**Overall Conclusions and Implications**

PPB deserves credit for using a multi-dimensional evaluation system that values community policing and communication skills that are needed to treat people with dignity and respect, respond appropriately to person facing a mental health crisis, de-escalate conflict to minimize the use of force, and build public trust in the Portland Police Bureau. At present, this system contains 62 evaluation metrics, which may be excessive and overly burdensome on supervisors. Therefore, we encourage the PPB to (1) automate the dataset (2) conduct analyses to determine which dimensions are working for them (e.g. show differences between officers); and (3) have a team of managers review the metrics carefully to ensure that only valuable metrics are retained.

The results show some differences in ratings between the three precincts and more sizeable differences in rating between supervisors. Clearly, some supervisors provide higher ratings than others, although a larger sample would be needed to confirm the size of these differences. Our sample is limited in size (to avoid burdening the PPB staff who had to pull these files). Although the sample was drawn randomly and stratified by precinct to avoid bias, differences might be found with a larger sample of performance evaluations.

The most important finding from this analysis is that, after examining more than 2,000 ratings across 28 supervisors, not a single patrol officer on any of the 62 metrics received a "Needs Improvement" rating on his or her annual performance evaluation.

By far, the most common response was "Meets standard." In fact, some supervisors gave ratings of "Meetings standards" for nearly all 62 dimensions of performance, while others provided their officers with more nuanced evaluations, using both "Meets" and "Exceeds" standards. "Meets standards" might be adequate to ensure a minimal level of compliance with PPB standards (assuming it is based on data regarding actual performance), but it is not sufficient for improving performance on any of the dimensions being measured.

Clearly, there is a need for culture change so that supervisors are not reluctant to give "Needs Improvement" ratings, and officers will not view it as a punishment. "Needs Improvement" should be viewed as an opportunity to provide coaching and constructive feedback. We recommend the following: (1) modify the definition of "Needs Improvement" on the form so it doesn't appear so negative; (2) have senior administrators weigh in on the importance of

**Exhibit A**

meaningful and constructive feedback; and (2) change the supervisor training regarding Annual Performance Evaluations so that this rating option is used more frequently.

This reexamination of the performance evaluation system should include additional guidance from Lieutenants and above on the written comments provided by supervisors. Some supervisors gave very few written comments to justify their evaluations or provide constructive feedback that can be used to improve the performance of their officers. Others took the time to make constructive comments, and some even wrote lengthy comments.

Improved evaluations will also require good data. To achieve the higher standard of providing a nuanced evaluation with a range of scores for each officer (or even variation in scores between officers) and helpful comments, the PPB supervisors would need to observe officers' behavior and decision making in many settings or have additional data sources at hand. In other words, to truly understand officers' performance on the street – supervisors would need to: (1) get out of the office frequently, ride along, and observe their officers' performance on the job, (2) carefully examine existing records such as officer's use of force and complaints (both internal and external), and (3) in the future, examine data from BWCs or contact surveys that will give a much clearer picture of officer-community interactions. For example, without extensive information regarding an officer's daily functioning on the job, how could supervisors ascertain whether the officer "processes a working knowledge of and adheres to Bureau policies, State statutes, City ordinances and case law?" (Just one of the 62 metrics used). Also, PPB should consider truncating the evaluation system by reducing any metrics that appear to be redundant with one another, thus making it more manageable for supervisors who would be asked to conduct more careful, data-driven annual assessments.

In summary, the PPB has constructed a comprehensive set of performance metrics, but without good variance in the actual performance evaluations both within and across officers, this annual process can do little to provide useful feedback to officers and shape behavior on the job. We encourage PPB to explore this dataset and look for patterns that can improve the evaluation system. In doing so, PPB should also be able to identify supervisors who are exemplary, showing variation in ratings within and across individual officers, within and across categories, and who provide thoughtful and constructive written comments. These model supervisors should be considered as possible instructors for future training on the Annual Performance Evaluations and supervision in general.

**Exhibit A**