# COMPLIANCE OFFICER AND COMMUNITY LIAISON

# *Quarterly Report: Quarter 4 Updates and Analysis*

**Prepared By:**

**ROSENBAUM & ASSOCIATES, LLP**

**For the City of Portland, Oregon**

**October 1, 2022 to December 31, 2022**

**May 25, 2023**



**Exhibit A**

# TABLE OF CONTENTS

TABLE OF CONTENTS .............................................................................................................1

INTRODUCTION ...................................................................................................................2

EXECUTIVE SUMMARY ........................................................................................................3

REPORT CARD ...................................................................................................................13

III. USE OF FORCE ............................................................................................................33

IV: TRAINING....................................................................................................................55

V. COMMUNITY-BASED MENTAL HEALTH SERVICES..............................................................90

VI. CRISIS INTERVENTION .................................................................................................94

VII. EMPLOYEE INFORMATION SYSTEM ............................................................................128

VIII. OFFICER ACCOUNTABILITY ........................................................................................135

IX. COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY

ENGAGED POLICING .........................................................................................................157

XI. ADDITIONAL REMEDIES ...............................................................................................174

LIST OF ACRONYMS .........................................................................................................191

LIST OF PERSONNEL.........................................................................................................193

# **INTRODUCTION**

This is the Compliance Officer/Community Liaison's (COCL) fourth quarter report for 2022, as required by the Amended Settlement Agreement between the City of Portland (the City) and the United States Department of Justice (DOJ), Case No. 3:12-cv-02265-SI, entered April 29, 2022. This report covers the three-month period from October 1, 2022, to December 31, 2022.

The COCL continues to evaluate whether the systems required by the Settlement Agreement have been sustained or restored to ensure constitutional policing in Portland. We found very few changes in compliance status between the third and fourth quarters of 2022. The Executive Summary below is followed by a Report Card that lists the compliance rating for each paragraph reviewed by the COCL.

# EXECUTIVE SUMMARY

In this fourth quarter of 2022, the Portland Police Bureau (PPB) and the City of Portland remained in Substantial Compliance for most of the paragraphs in the Settlement Agreement. Only two changes occurred: The City /PPB was moved to Partial Compliance for Paragraphs 81 (Training) and 131 (Accountability). Thus, they were found to be in Partial Compliance for 18 of the original paragraphs and five of the new remedies (a total of 23 paragraphs), as described in this report. The paragraph-by-paragraph ratings can be found in the Report Card that follows this narrative summary.

## III. USE OF FORCE

During the fourth quarter of 2022, there were no changes to any compliance ratings and six of the twelve paragraphs remain in Substantial Compliance (Pars. 66, 67, 68, 69, 71, and 72) while the remaining six continue to be in Partial Compliance (Pars. 70, 73, 74, 75, 76, and 77). In conducting our review of a random sample of use of force events, we found that each application of force was reasonable and justified. However, we found four cases (representing 25% of our sample) where the supervisors' After-Action Reviews were deficient in critical ways. In some instances, a summary of the event was either lacking important detail or absent altogether. Furthermore, these deficiencies were not identified by the chain-of-command and therefore were never corrected. Taken together, this raises concerns about the comprehensiveness of force reviews.

We continue to work with the PPB to better assess individual officers who use comparatively higher levels of force. We have stressed the fact that, even if the force itself is within policy, the higher rates may represent an area for officer improvement. We have also noted that the process should not be limited to criticism and should acknowledge good performance. Many PPB officers respond to a high number of calls for service and make many arrests, but they do not use any force at all. While some of this may be due to their role on a call (i.e., acting as a cover officer), the fact that many officers go an entire year without using force is a finding worth exploring for the benefit of the Bureau.

Finally, we identify data reliability concerns for some fields on the Force Data Collection Report (FDCR) that are completed by officers after a force event. This problem is particularly acute for fields related to de-escalation and the other force options reasonably considered by the officer. For both of these, we are concerned about data validity issues that can arise when, over time, input data becomes inconsistent with the intent of the data collection field. When this happens, the variable does not actually measure what it's designed to measure and becomes void as a

source of information. Should the Office of Inspector General attempt to assess these concepts in the future, conclusions drawn from the data would be questionable.

## IV: TRAINING

The PPB was found to be in Substantial Compliance with seven of the 10 paragraphs in Section IV, leaving paragraphs 78, 81, and 84 in Partial Compliance. The PPB continues to maintain a robust system of data collection and analysis to evaluate their training programs and fulfill its obligation to seek input from a variety of sources to develop its Needs Assessment and Training Plan.

During the fourth quarter of 2022, the COCL observed and evaluated the Supervisor training. In general, this training was informative and well executed. Specific recommendations for improvement are included in this report. The COCL encourages the PPB to add a mental health crisis response component to the Supervisor In-Service training, especially when sergeants are expected to manage the dispatch and use of ECIT members and coordinate with BOEC.

The PPB did not return to Substantial Compliance for Par. 84 because they have yet to provide the Public Order training that (1) incorporates changes to polices related to use of force (i.e., Directives 910.00, 1010.00, and 1015.00) and the policy related to PPB's response to public order events (Directive 0635.10), (2) incorporates both internal and external assessments of training needs, and (3) provides scenarios or exercises to practice appropriate crowd control skills. On a positive note, the policies on use of force and crowd control were finalized and approved in the fourth quarter. Our expectation is that the In-service training beginning in 2023 will address many of these concerns and requirements. Eventually, the findings from the independent Critical Incident Assessment of crowd control (See Par. 189) will need to be incorporated into the PPB's Training Needs Assessment, Training Plan, and actual training on PPB's response to public order events.

The COCL's overall assessment of online training remains positive. The Training Division continues to provide a wide range of online training and educational materials using the Cornerstone Learning Management System (LMS). However, we continue to recommend supplemental training on consent searches that gives attention to the distribution of consent cards in different languages. Furthermore, the COCL recommends that, at some point, the PPB conduct an audit of the consent search process to ensure that it is being implemented in a manner consistent with PPB policy and state law.

The PPB has yet to integrate equity-focused material into in-person training. The COCL hopes to see the PPB make a concerted effort to bring these sensitive, and sometimes difficult topics

into an in-person format. This is especially important in light of homophobic and transphobic feelings expressed by some officers within the PPB culture. We recognize that the PPB is facing limited resources and conflicting priorities for their in-person training hours, but we will continue to express the importance of equity and impartial policing, as required for constitutional policing.

For in-person learning, the COCL will continue to call for more training that follows the fundamental principles of adult learning and problem-based learning and allows officers to practice good decision-making. The PPB has made considerable progress in this area, but more work is needed. A Training Summit in December recommended that the PPB provide more consistent leadership in the Training Division, give more attention to instructor development, provide the same reporting lines for the Captain and new Dean of Training, and hire more civilian employees in light of budget constraints and staff shortages.

The COCL is pleased that the PPB's Training Division is beginning to adopt additional on-the-job outcome measures to evaluate training effectiveness. Continued attention to this subject will benefit both the police and the community. To support this work, the COCL continues to recommend a contact survey program that will give voice to the thousands of residents who have real experience interacting with PPB officers. By measuring what matters to the public (I.e., whether they are treated respectfully and fairly, given a voice, and shown empathy) and using these data to evaluate and coach officers, we can expect improvements in police-community relations and public trust in PPB. The reader is encouraged to read COCL's technical assistance report, *Measuring what Matters to the Community: A New Performance Evaluation System*.[1] Our report was published in the first quarter of 2023, so the COCL will discuss community responses in our next report.

The Force Inspector continues to report quarterly force data to the Chief, Training Division, and Training Advisory Council (TAC), and the Training Division continues to work with TAC to improve relevant training. However, the PPB's response to TAC's formal (written) recommendations has some room for improvement in terms of detail and public postings. Also, while TAC has a solid working relationship with the Training Division, TAC should have been included on the panel to select the civilian Dean of Training, but that did not happen.

The Training Division continues to use LMS to keep records of officer training. LMS attendance records are expected to include all in-person and online trainings completed by PPB members. However, an audit conducted by the Office of the Inspector General (OIG) during the fourth quarter (Par. 86) found that, "Rosters identifying members with specialty certifications were not up-to-date" and that the OIG's review of records "found gaps in the processes for ensuring

---

[1] https://www.portlandcocl.com/reports/2023/02/contact-survey-program-technical-assistance-report

record accuracy as evidenced by incomplete records." Thus, the COCL has moved Par. 81 to Partial Compliance. To return to Substantial Compliance, the Training Division must update certification rosters and develop a process to ensure that they are maintained and accurate.

## V. COMMUNITY-BASED MENTAL HEALTH SERVICES

In the fourth quarter of 2022, the PPB and the City remained in Substantial Compliance for all paragraphs in Section V, Community-Based Mental Health Services. These paragraphs refer to services that are part of a broader mental health response system. The PPB and the City are partners in this system but are not necessarily drivers of the system. The City and the PPB continued to participate through engagement in various committees and workgroups. These include the Behavioral Health Unit Advisory Committee (BHUAC), the Behavioral Health Coordination Team (BHCT), the Unity Transportation Work Group, and the Legacy ED Community Outreach Group. These groups have continued to address important issues in city, county, and state approaches to providing comprehensive mental health services.

During the fourth quarter, the Bureau of Emergency Communication (BOEC) maintained the Portland Street Response (PSR) dispatch protocols and training for telecommunicators, both of which were previously reviewed by BHUAC. Also, as part of Section V, the Unity Center continues to act as a drop-off center for first responders to transport persons in a mental health crisis. As noted in prior reports, the Unity Center conforms to the intent of the Settlement Agreement and of drop-off centers as outlined in the Memphis Model of mental health crisis response. Furthermore, the PPB has continued to participate in AMR (ambulance service) training for transporting persons in mental health crises. Additionally, PPB continues to participate in the Transportation Workgroup.

## VI. CRISIS INTERVENTION

As we have done in the past, we evaluated the PPB and the City's system of mental health response in two ways: (1) Primary Response, including Enhanced Crisis Intervention Team (ECIT) officers and Portland Street Response (PSR); and (2) Secondary Response, including Behavioral Health Response Team (BHRT) and Service Coordination Team (SCT). We also evaluated the steps taken once a call involving a person in a mental health crisis is received by BOEC and PPB's response to such calls. Finally, we examined what follow-up steps occur when a person demonstrates behavior that may warrant additional contact by the PPB. We continue to find Substantial Compliance with all paragraphs within Section VI.

**Exhibit A**

During the fourth quarter, BOEC maintained their policies and training for telecommunicators on dispatching officers to calls involving a mental health component. They continued to use seven call characteristics to determine whether a specialized ECIT officer should be dispatched. BOEC presented updated SOPs to BHUAC in the third quarter of 2022, and the policy was finalized internally in the fourth quarter. The policy was also updated to account for the addition of a new floater PSR unit. For their part, the PPB continued to maintain directives related to crisis response, including 850.20 (Police Response to Mental Health Crisis), 850.21 (Peace Officer Custody – Civil), 850.22 (Police Response to Mental Health Director Holds and Elopement), and 850.25 (Police Response to Mental Health Facilities). The PPB also continued to provide training to new officers as well as current officers through annual In-service training. Additionally, the PPB maintained their specialized response approach through the use of ECIT officers. The PPB held an ECIT certificate training in the fourth quarter and 18 new ECIT officers were added to the roster. Under Training (Section IV), we encouraged the PPB to provide additional mental health crisis response training for first-line supervisors.

The PPB has maintained the use of BHRT to assist individuals who represent an escalating risk of harm. While the Settlement Agreement only requires three teams for each precinct, in the fourth quarter the PPB was able to return to five BHRTs, and all clinicians became city employees. The PPB has also maintained the Service Coordination Team (SCT) to facilitate the provision of services to persons who are chronically houseless, suffer chronic addiction, and are chronically in and out of the criminal justice system. For both programs, we provide ongoing operational statistics, including statistics related to decision-making and outcomes.

Finally, BHUAC continued to meet during the fourth quarter of 2022, utilizing the expertise of individuals at the PPB, BOEC, and the City, as well as other agencies, stakeholders, advocates, and service providers. We found that in the fourth quarter, many of the issues mentioned in our previous reports regarding BHUAC had been remedied. Meetings were largely productive and met quorum, and meaningful steps were taken to address the COCL's prior TA statement. For these reasons, we find the City has returned to Substantial Compliance on paragraphs 95, 96 and 98, though Substantial Compliance for Pars. 95 and 96 are conditioned on PPB providing force data and OIS facts to BHUAC in their March 2023 meeting, per an agreement between the Parties.


## VII. EMPLOYEE INFORMATION SYSTEM

Throughout the fourth quarter of 2022, the PPB remained in Substantial Compliance with three of the five paragraphs in Section VII (Pars. 118, 199, and 120), as the current Employee Information System (EIS) thresholds identify potentially problematic trends, and thus, meet the

requirements of the Settlement Agreement. However, we maintain that the PPB is not currently using EIS to its full potential, and interventions based on the peer-comparison approach are rare.

The PPB remains in Partial Compliance for Pars. 116 and 117 as we continue to have concerns with how the PPB and the Force Inspector identify "at-risk employees, supervisors, and teams." During this quarter, we were able to listen-in on conversations between the Force Inspector and Precinct commanders. In the meetings we observed, the Force Inspector and commanders discussed several individual officers who were identified by the Force Inspector as being force outliers. This represents a positive step toward using these data to effectively identify a narrowed set of individuals whose force statistics warrant further review. However, additional information is required before we can find that the PPB has returned to Substantial Compliance with these paragraphs. For instance, we are confused as to why certain officers were identified and why other officers were not. This confusion could largely be addressed by the Force Inspector meeting with us prior to meeting with the Precinct commanders, and we have recommended PPB do so moving forward.


## VIII. OFFICER ACCOUNTABILITY

During the fourth quarter of 2022, the City maintained Substantial Compliance for several paragraphs in Section VIII, Officer Accountability, including paragraphs related to Officer-Involved Shooting (OIS) investigation procedures, Independent Police Review (IPR) documentation/notification requirements, and Citizen Review Committee (CRC) operations. Furthermore, the City and the Police Review Board (PRB) maintained Substantial Compliance for all paragraphs related to timely investigations.

However, we continue to observe issues that prevent the City from achieving Substantial Compliance (Pars. 126, 128, 129, 131, 134, and 169). For instance, while we have found that IPR continues to function well and even began hiring for open positions, there remains an issue with PPB's Records Division backlog, which is now at approximately 100,000 documents. Additionally, we are still awaiting an updated SOP from IPR before we can assign Substantial Compliance with the requirements of Par. 129. In the meantime, IPR has continued to use the use the administrative closure category of "complainant unavailable" without it being supported in their official SOP. Furthermore, as related to Par. 129, we identified one case where a sergeant did not forward an allegation of excessive force to IPR for intake investigation.

The PPB continues to remain in Partial Compliance with the requirements of Par. 126, as they have yet to make policy and protocol changes to allow for situations where an officer is

mentally incapacitated following an OIS event. Furthermore, based on our observation of a Police Review Board in the fourth quarter of 2022, we no longer find Par. 131 to be in Substantial Compliance. The presentation of facts during the PRB did not facilitate participants' ability to "make thoughtful, unbiased, objective recommendations to the Chief of Police and Police Commissioner that are based on facts" (Par. 131). Finally, the COCL finds, based on aggregate findings, that the PPB remains in Partial Compliance with the requirements of Par. 169 paragraph to "apply policies uniformly and hold officers accountable for complying with PPB policy and procedure."

## IX. COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING (PCCEP)

In the fourth quarter, PCCEP was functioning as a legitimate body for community engagement, hosting town hall meetings and monthly general meetings, with members of the community in virtual attendance. PCCEP elected co-chairs and resumed subcommittee work on Community Engagement, Racial Equity, and Settlement Agreement and Policy. PCCEP began the fourth quarter with a full 13-member body that represented a reasonably broad spectrum of the community. Also, PCCEP was fully staffed by three competent individuals, and meeting notes were posted in a timely fashion. The City has continued to provide legal and technical support as needed. Our only concern is that some PCCEP recommendations were still pending a response from the City during the fourth quarter. We will provide an update on this concern in our next report.

In the fourth quarter, the PPB continued to implement its Community Engagement Plan. The PPB's diverse advisory groups (Community and Culturally Specific Councils), as well as the Coalition of Advisory Groups (CAG), continue to meet with PPB leadership, City Commissioners, and the communities they represent. The PPB has completed, but has not yet adopted, its Language Access directive. When it has been adopted, the PPB will need to provide additional training that will guide the PPB officers on how to communicate effectively with persons who have limited English proficiency.

We encourage the PPB to make community engagement by officers a higher priority. The PPB's Community Events App has the potential to be a best practice in the policing field, but it must be supported by the PPB and properly implemented to have a real impact on the community. The COCL is impressed that the Office of Community Engagement is seeking new models of community engagement that are more decentralized. If the PPB continues to support the Office of Community Engagement, innovative partnerships between the police and the community can be expected.

In the past, the PPB has shown its ability to develop and deliver some excellent training on Equity, but this program needs to be continued and expanded. Similarly, the COCL has repeatedly recommended stronger training in Procedural Justice. However, the PPB has shown little interest in expanding training on either of these topics. Nationwide, prejudice and discrimination against various groups have remained widespread in our society, so Portland needs a police force that fully understands and can respond appropriately to diverse communities. No doubt, most of the PPB officers believe in equitable treatment, but it needs to be continuously reinforced during these challenging times. We find that the PPB is in Substantial Compliance for Pars. 145 and 146, but to maintain Substantial Compliance, the COCL expects that the PPB will make equity and procedural justice training a higher priority and engage the community in these training initiatives.

The PPB continued to produce high-quality quarterly and annual reports on traffic stops and use of force with breakdowns by demographic characteristics. However, to maintain Substantial Compliance with Par. 148, the PPB will need to show that records are being kept consistent with Oregon law SB 1510, which was passed in 2022 to prohibit unreasonable stops and searches and reduce discriminatory policing. Specifically, the PPB should demonstrate to the public that consent searches are being conducted properly, documented properly, and that language cards (describing the right to refuse the search) are being distributed. This effort will ensure compliance with the 4th Amendment protection against unreasonable searches and seizures.


## XI. ADDITIONAL REMEDIES

During the first half of 2022, the Parties, the Portland City Council, and the Federal court agreed to amend the Settlement Agreement to include eight new remedies to help reform the PPB. As a result, Section XI has been added, with eight new paragraphs (188 to 195). The COCL's compliance assessment for Section XI began in the second quarter.

 Compliance ratings for these new remedies did not change in the fourth quarter. Specifically, the City has achieved Substantial Compliance for Par. 188, 190, and 193, but only Partial Compliance for Par. 189, 191, 192, 194, and 195. Here we report on the requirements of each paragraph and the progress to date.

Par. 188 Requirement: "The City shall revise Force Data Collection Report (FDCR) and After Action Report forms to capture when the forms are edited and completed." COCL's Assessment: Under the new Office365 program, the forms are currently in-place, and after reviewing a sample of cases, we can conclude that the forms continue to be used by officers

and supervisors to capture the relevant data. Hence, the PPB has achieved Substantial Compliance for Par. 188.

Par. 189 Requirement: "The City shall provide funding for a qualified outside entity to critically assess the City's response to crowd control events in 2020." COCL's Assessment: The Independent Monitor, LLC (IMLLC) continued to gather information in the fourth quarter, as they spent time conducting interviews, reviewing documents, and listening to various stakeholders. After meeting with IMLLC, the COCL is satisfied that this group is competent and capable of performing this work. We expect that IMLLC will prepare a report in 2023 and that the PPB will use these findings to modify policy and training accordingly.

Par. 190 Requirement: "The City shall provide in the budget a separate line item for overtime costs to conduct necessary training for PPB officers." COCL's Assessment: The City Council has included a separate line item for these overtime costs in the City's FY 2023 budget. Hence, the City has achieved Substantial Compliance with Par. 190.

Par. 191 Requirement: "The City shall budget for a qualified civilian in PPB to direct all educational aspects of PPB's Training Division." COCL's Assessment: The City reposted the position in October and closed the application period at the end of the month. A scoring panel determined that five applicants would move forward in the hiring process. Interviews were scheduled to take place in early January 2023. The COCL continues to recommend community engagement in the hiring process, uncompromised authority for this individual within PPB, and adequate staff support.

Par. 192 Requirement: (summarized): The City shall initiate an appropriate investigation through IPR to identify and hold accountable those within the PPB who trained or directed PPB officers to use force in violation of policy during the crowd control events of 2020, or failed to ensure that force reports were completed and reviewed properly. COCL's Assessment: IPR is currently in the process of conducting a series of investigations, and the COCL cannot report on these investigations until they are completed.

Par. 193 Requirement: "PPB shall release its Annual Report and hold the required precinct meetings no later than September 20 of each year for the duration of this Agreement." COCL's Assessment: The PPB achieved this requirement in the third quarter, as it presented its 2021 Annual report at three precinct meetings in July of 2022. Hence, the PPB has achieved Substantial Compliance for Par. 193.

Par. 194 Requirement: "The City shall implement body-worn cameras (BWCs) pursuant to a policy that is subject to the policy-review-and-approval provisions of this Agreement." COCL's Assessment: During the fourth quarter, the City continued to negotiate with the Portland Police Association (PPA) and Portland Police Commanding Officers Association (PPCOA) regarding the

introduction of a BWC program and policy. Although preparations have been made for the introduction of a pilot BWC program in the Central District, the pilot cannot begin until the union bargaining process is complete, and DOJ has approved the BWC policy.

Par. 195: Requirement (summarized): As required by Portland voters and now by the Settlement Agreement, the City shall create a new Community Oversight Board to replace IPR for investigating certain complaints of police misconduct and replace the Chief of Police for imposing discipline. COCL's Assessment: Progress has been made by the 20-member Police Accountability Commission (PAC), appointed by the City to develop a proposal for the Community Oversight Board, but progress has been slow. In the fourth quarter, the PAC entered its third phase of work – Powers and Duties Phase. In this phase, the PAC began to develop three "Areas of Agreement" in the new system: Access to Information, Officer Accountability, and Structural Oversight.

The PAC has worked hard to provide a process and framework for this remedy, and the Commission is supported by competent and committed City staff. Despite 17 meetings in the fourth quarter, there is some concern about the slowness of this process, and the resignation of PAC members and the absenteeism of one member. The PAC requested that the City Council extend the deadline for their work product from June 9, 2023 to October 29, 2023, but the Council did not act on this request in the fourth quarter. Any proposal for a Community Police Oversight Board must be reviewed by the City Council, PPA, and DOJ, which will extend the planning process.

# REPORT CARD

This report includes a "Report Card" that provides a separate assessment of each paragraph in the Agreement. Under "Recommendations," this format gives the City clarity about what is needed "*to achieve Substantial Compliance.*" We also give the City guidance on what is needed "*to maintain Substantial Compliance*." Finally, when this language is not used, the COCL is offering recommendations that are not required for compliance, but we feel would have a significant positive impact on the PPB if implemented. All paragraphs are reviewed and evaluated using the following standards:

- **Substantial Compliance**: The City/PPB has satisfied the requirement of the provision in a comprehensive fashion and with a high level of integrity.
- **Partial Compliance**: The City/PPB has made significant progress towards the satisfaction of the provision's requirements, though additional work is needed.
- **Non-Compliance but Initial Steps Taken**: The City/PPB has begun the necessary steps toward compliance, though significant progress is lacking.

In the fourth quarter of 2022, the City/PPB remained in Substantial Compliance for most of the paragraphs in the Settlement Agreement. Only two changes occurred: The City /PPB was moved to Partial Compliance for Paragraphs 81 (Training) and 131 (Accountability). Thus, at the conclusion of the fourth quarter, Partial Compliance ratings were given for the following paragraphs: Use of Force (Pars. 70, 73, 74, 75, 76, 77), Training (Pars. 78, 81, 84), Employee Information System (Pars. 116, 117), Officer Accountability (Pars. 126, 128, 129, 131, 134, 169), Community Engagement (Pars. 142), and Additional Remedies (Pars. 189, 191, 192, 194, 195).

The table below summarizes the compliance status and recommendations for all paragraphs reviewed by the COCL.

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| **III. USE OF FORCE** | | |
| Par. 66 | Substantial Compliance | • To maintain Substantial Compliance, continue evidencing positive force events<br>• To maintain Substantial Compliance, revise and re-issue guidance on de-escalation |
| Par. 67 | Substantial Compliance | • To maintain Substantial Compliance, continue evidencing positive force events<br>• To maintain Substantial Compliance, revise and re-issue guidance on de-escalation |
| Par. 68 | Substantial Compliance | • No recommendations at this time |
| Par. 69 | Substantial Compliance | • To maintain Substantial Compliance, continue evidencing positive force events<br>• To maintain Substantial Compliance, revise and re-issue guidance on de-escalation |
| Par. 70 | Partial Compliance | • To achieve Substantial Compliance, review cases and take corrective action |
| Par. 71 | Substantial Compliance | • Continue monitoring and reporting the ratio of officers to sergeants<br>• Conduct assessment of impact on affected members |
| Par. 72 | Substantial Compliance | • Ensure supervisors reliably and consistently use the AAR for future force events |

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| Par. 73 | Partial Compliance | • To achieve Substantial Compliance, ensure that chain-of-command supervisors are held accountable for inadequate reports and analysis<br><br>• To achieve Substantial Compliance, clearly distinguish conduct that requires formal review from that which can be corrected by informal counseling |
| Par. 74 | Partial Compliance | • To achieve Substantial Compliance, ensure significant deficiencies are identified and resolved<br><br>• To achieve Substantial Compliance, provide evidence of Inspector review documents and findings<br><br>• To achieve Substantial Compliance, clearly distinguish conduct that requires formal review from that which can be corrected by informal counseling |
| Par. 75 | Partial Compliance | • To achieve Substantial Compliance, ensure significant deficiencies are identified and resolved<br><br>• To achieve Substantial Compliance, provide evidence of Inspector review documents and findings<br><br>• To achieve Substantial Compliance, clearly distinguish conduct that requires formal review from that which can be corrected by informal counseling |
| Par. 76 | Partial Compliance | • To achieve Substantial Compliance, comment on trends over time and make |

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| | | suggestions for correcting/duplicating elsewhere<br><br>• To achieve Substantial Compliance, work with the COCL to identify statistically significant members on both ends of the spectrum to better manage force |
| Par. 77 | Partial Compliance | • To achieve Substantial Compliance, ensure significant deficiencies are identified and resolved<br><br>• To achieve Substantial Compliance, provide evidence of Inspector review documents and findings<br><br>• To achieve Substantial Compliance, clearly distinguish conduct that requires formal review from that which can be corrected by informal counseling |
| **IV. TRAINING** | | |
| Par. 78 | Partial Compliance | • To achieve Substantial Compliance, PPB must substantially comply with all paragraphs within Section IV |
| Par. 79 | Substantial Compliance | • In future training plans, give higher priority to training with robust scenarios and feedback loops to strengthen interpersonal communication skills in de-escalation and procedural justice<br><br>• When the external Critical Incident assessment of Crowd Control has been completed, incorporate the training |

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| | Substantial Compliance | implications of this study into PPB's training needs assessment |
| Par. 80 | Substantial Compliance | • Add role-play scenarios where officers can be evaluated individually rather than in groups<br><br>• Return all Training Analysts to their original job duties and hire additional analysts to ensure the best training needs assessment, training plan, and scientific knowledge about the quality and effectiveness of training<br><br>• When contact survey data become available, modify the training needs assessment and training plan to target specific behaviors that can improve procedural justice on the job and enhance public trust |
| Par. 81 | Partial Compliance | • To return to Substantial Compliance, the Training Division must update certification rosters and develop a process to ensure that they are maintained and accurate. Additional attention is needed for specialty trainings |
| Par. 82 | Substantial Compliance | • Include both internal and external training classes in the semi-annual training report |
| Par. 83 | Substantial Compliance | • No recommendations at this time |
| Par. 84 | Partial Compliance | • To achieve Substantial Compliance, update the Crowd Control and Management training (now called Response to Public Order Events) based on both the internal |

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| | | and external needs assessments regarding PPB's response to mass demonstrations |
| | | • To achieve Substantial Compliance, develop and deliver training with "role playing scenarios and interactive exercises that illustrate proper use of force decision making" (Par. 84) including in Public Order Event settings. This should include opportunities to practice de-escalation techniques and procedurally just responses to difficult interactions, including resistance and arrest |
| | | • To achieve Substantial Compliance, incorporate recent changes to PPB's force-related Directives into training (910.00, 1010.00, and 1015.00) |
| | | • Increase training that incorporates adult education and problem-based learning principles |
| | | • Make Equity training a higher priority and include it routinely in PPB's in-person training schedules |
| | | • Add a mental health component to future Supervisor In-Service training |
| | | • Introduce in-person training on procedural justice with enough dosage to make a difference |
| | | • Continue to support the development of sophisticated online training that allows for interactivity and is linked to subsequent in-person skills development |

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
|  |  | • Ensure that all online training slides remain on the screen long enough for students to read and absorb all of the written content<br><br>• Provide refresher training on First Amendment rights that can address any PPB bias against protesters<br><br>• Provide additional online training on the Consent Search cards |
| Par. 85 | Substantial Compliance | • The Training Division should formally respond to the recommendations provided in the Training Audit conducted by the Office of the Inspector General<br><br>• The next audit of the Training Divisions should give special attention to civilianization, including the level of support for the Training Dean and the development of both civilian and sworn instructors.<br><br>• We continue to recommend that a future audit give attention to the content of in-person training for officers and supervisors, with particular attention to equity and procedural justice classes |
| Par. 86 | Substantial Compliance | • The Force Inspector should be more sensitive to the way that statistics are communicated to the public, and fully appreciate the context and underlying factors associated with any racial disparities in police custodies and use of force. |

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| | | • TAC should continue to explore new ways of tracking the Chief's office response to formal TAC recommendations<br><br>• The City should review the process of community engagement for selecting the Training Dean to ensure that oversights are avoided in the future |
| Par. 87 | Substantial Compliance | • No recommendations at this time |
| **V. COMMUNITY-BASED MENTAL HEALTH SERVICES** | | |
| Par. 88 | Substantial Compliance | • No recommendations at this time |
| Par. 89 | Substantial Compliance | • No recommendations at this time |
| Par. 90 | Substantial Compliance | • No recommendations at this time |
| **VI. CRISIS INTERVENTION** | | |
| Par. 91 | Substantial Compliance | • Continue to update the COCL and DOJ on changes to personnel when applicable |
| Par. 92 | Substantial Compliance | • Continue to collect and review data on mental health services, and use this information to update services as needed |
| Par. 93 | Substantial Compliance | • Continue to collect and review data on mental health services, and use this information to update services as needed |
| Par. 94 | Substantial Compliance | • No recommendations at this time |

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| Par. 95 | Substantial Compliance | • No recommendations at this time |
| Par. 96 | Substantial Compliance | • Provide responses to BHUAC recommendations |
| Par. 97 | Substantial Compliance | • Consider seeking BHUAC input during training development rather than after training has been developed |
| Par. 98 | Substantial Compliance | • Consider seeking BHUAC input during training development rather than after training has been developed |
| Par. 99 | Substantial Compliance | • No recommendations at this time |
| Par. 100 | Substantial Compliance | • Continue utilizing existing data to assess demand for ECIT services |
| Par. 101 | Substantial Compliance | • Re-engage BHUAC regarding ECIT participation criteria |
| Par. 102 | Substantial Compliance | • Continue to seek out recommendations from BHUAC on ECIT training |
| Par. 103 | Substantial Compliance | • Reconsider revisions to 850.20 |
| Par. 104 | Substantial Compliance | • No recommendations at this time |
| Par. 105 | Substantial Compliance | • No recommendations at this time |
| Par. 106 | Substantial Compliance | • No recommendations at this time |
| Par. 107 | Substantial Compliance | • No recommendations at this time |
| Par. 108 | Substantial Compliance | • No recommendations at this time |

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| Par. 109 | Substantial Compliance | • No recommendations at this time |
| Par. 110 | Substantial Compliance | • Continue to collect data and create reports on mental health services |
| Par. 111 | Substantial Compliance | • No recommendations at this time |
| Par. 112 | Substantial Compliance | • No recommendations at this time |
| Par. 113 | Substantial Compliance | • Create BOEC PSR policy |
| Par. 114 | Substantial Compliance | • Develop focused training for PSR |
| Par. 115 | Substantial Compliance | • Continue to address PSR issues and determine their implications for policy and training |
| **VII. EMPLOYEE INFORMATION SYSTEM** | | |
| Par. 116 | Partial Compliance | • To achieve Substantial Compliance, require the Force Inspector to conduct the Type III alert process in accordance with Directive 345.00<br><br>• To achieve Substantial Compliance, implement corrective action for Precinct Commanders when significant review failures occur<br><br>• Continue contributing to the development of the EIS evaluation |
| Par. 117 | Partial Compliance | • To achieve Substantial Compliance, require the Force Inspector to conduct the Type III |

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| | | alert process in accordance with Directive 345.00<br><br>• To achieve Substantial Compliance, implement corrective action for Precinct Commanders when significant review failures occur<br><br>• Continue contributing to the development of the EIS evaluation |
| Par. 118 | Substantial Compliance | • No recommendations at this time |
| Par. 119 | Substantial Compliance | • No recommendations at this time |
| Par. 120 | Substantial Compliance | • No recommendations at this time |
| **VIII. OFFICER ACCOUNTABILITY** | | |
| Par. 121 | Substantial Compliance | • Conduct case-study evaluation on OIS events and other high-visibility cases to identify unique opportunities for reducing timelines |
| Par. 122 | Substantial Compliance | • No recommendations at this time |
| Par. 123 | Substantial Compliance | • Maintain self-improvement loop for stages that exceed their stage timeline even if the case does not exceed the 180-day timeline |
| Par. 124 | Substantial Compliance | • No recommendations at this time |
| Par. 125 | Substantial Compliance | • No recommendations at this time |

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| Par. 126 | Partial Compliance | • To achieve Substantial Compliance, revise Directive 1010.10 to allow for the potential for witness officers being incapacitated for mental health reasons<br><br>• Provide criteria to make such a determination |
| Par. 127 | Substantial Compliance | • No recommendations at this time |
| Par. 128 | Partial Compliance | • To achieve Substantial Compliance, r address the identified gap in the size of the records backlog |
| Par. 129 | Partial Compliance | • To return to Substantial Compliance, complete the revisions to the SOP that would codify Administrative Closures – Complainant Unavailable<br><br>• To return to Substantial Compliance, initiate accountability mechanisms for the supervisor who failed to forward the allegations for full investigation<br><br>• To return to Substantial Compliance, re-emphasize the responsibilities of on-scene supervisors and provide documentation of efforts to COCL |
| Par. 130 | Substantial Compliance | • No recommendations at this time |
| Par. 131 | Partial Compliance | • To return to Substantial Compliance, ensure all PRBs contain an assessment of each application of force as well as discussion about the decision-making of each member during the force event |

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| Par. 132 | Substantial Compliance | • No recommendations at this time |
| Par. 133 | Substantial Compliance | • Consider expanding the interpretation of Par. 133's intent |
| Par. 134 | Partial Compliance | • To return to Substantial Compliance, follow through on the planning for the next quarter<br>• To return to Substantial Compliance, ensure feedback is provided on all CRC products |
| Par. 135 | Substantial Compliance | • No recommendations at this time |
| Par. 136 | Substantial Compliance | • No recommendations at this time |
| Par. 137 | Substantial Compliance | • To maintain Substantial Compliance, update Directive 338.00, publicly post the directive, and provide link to the Corrective Action Guide . |
| Par. 138 | Substantial Compliance | • No recommendations at this time |
| Par. 139 | Substantial Compliance | • No recommendations at this time |
| Par. 140 | Substantial Compliance | • No recommendations at this time |
| Par. 169 | Partial Compliance | • To achieve Substantial Compliance, PPB should expand their approach to conducting objective investigations and hold officers accountable when policy violations are found |

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
|  |  | • To achieve Substantial Compliance, remedy barriers to ensure a fair and consistent accountability system |
| **IX. COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING** | | |
| Par. 141 | Substantial Compliance | • No recommendations at this time |
| Par. 142 | Partial Compliance | • To achieve Substantial Compliance with Par. 142, the City should respond to PCCEP's 2021 third quarter recommendations |
| Par. 143 | Substantial Compliance | • To maintain Substantial Compliance with Par. 143, the City should continue to identify and recruit sufficient PCCEP members to maintain a full body |
| Par. 144 | Substantial Compliance | • To maintain Substantial Compliance, continue adequate staffing dedicated to supporting PCCEP<br><br>• To maintain Substantial Compliance, post minutes of PCCEP meetings within 10 business days after a PCCEP meeting, including in the Documents section of PCCEP's website |
| Par. 145 | Substantial Compliance | • To maintain Substantial Compliance, make equity and procedural justice training a higher priority and engage the community in these training initiatives |

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| | | • Seek to improve access to police and City services for individuals with Limited English Proficiency (LEP) and hearing impairments through updated policy, training, and dedicated personnel.<br><br>• Officers' use of the Community Events App should be mandatory, not voluntary, and memorialized in a PPB directive and new training. In essence, PPB should make community engagement by officers a higher priority.<br><br>• Continue to invest in a one-stop website where community and PPB members can learn about various advisory groups and community engagement events |
| Par. 146 | Substantial Compliance | • Continue to explore new ways of measuring the quality of police-community interactions |
| Par. 147 | Substantial Compliance | • To maintain Substantial Compliance with Par. 147, update the precinct demographics based on the 2017–2021 American Community Survey 5-Year Estimates provided by the U.S. Census Bureau. |
| Par. 148 | Substantial Compliance | • To maintain Substantial Compliance for Par. 148, PPB will need to show that records are being kept consistent with the new Oregon law to improve the measurement of possible discriminatory policing |

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| | | • Provide additional online training on the search cards<br><br>• Provide refresher training on bias-free, impartial policing<br><br>• Continue the dialogue with community members around racial disparities in traffic stops and searches |
| Par. 149 | Substantial Compliance | • As part of everyday policing, introduce a contact survey to measure the level of procedural justice and public satisfaction with police-public interactions, especially interactions with constitutionally-protected populations<br><br>• Implement anonymous internal surveys of PPB employees to measure police-community interactions, internal procedural justice, wellness, police culture, and employee satisfaction<br><br>• Acquire and use software to analyze body worn camera data<br><br>• As a learning organization, introduce programs, polices, and training curricula that are responsive to these new databases |
| Par. 150 | Substantial Compliance | • No recommendations at this time |
| Par. 151 | Substantial Compliance | • Standardize training for new PCCEP members; Ensure current and future PCCEP members participate in all required trainings and are offered a meaningful opportunity to participate in any optional training |

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| Par. 152 | Substantial Compliance | • Standardize training for new PCCEP members; Ensure current and future PCCEP members participate in all required trainings and are offered a meaningful opportunity to participate in any optional training |
| **XI. ADDITIONAL REMEDIES** | | |
| Par. 188 | Substantial Compliance | • No recommendations at this time |
| Par. 189 | Partial Compliance | To achieve Substantial Compliance:<br><br>• The IMLLC must collect and analyze data consistent with the Scope of Work, and prepare a report that critically assesses the City's response to the 2020 demonstrations<br><br>• The City must respond to the IMLLC report<br><br>• PPB must use the IMLLC report to prepare a training needs assessment<br><br>• The IMLLC must prepare a follow-up report that reviews the City's response to their original report, including the PPB's training needs assessment<br><br>• The City should keep COCL informed of the work planned and completed by IMLLC<br><br>• The City should provide COCL with IMLLC's reports and the City's training needs assessment report |
| Par. 190 | Substantial Compliance | • To maintain Substantial Compliance, the City must continue to provide a separate |

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| | | line item for PPB training-related overtime expense<br><br>• Revisit the staffing and budget for the Training Division, keeping in mind the option of hiring more civilians |
| Par. 191 | Partial Compliance | • To achieve Substantial Compliance, the City and PPB should create more opportunities for community involvement in the process of hiring and orienting the new Police Education Director.<br><br>• The City and PPB should look for candidates who understand both policing practices and best practices in teaching and the evaluation of training<br><br>• The Police Education Director and Captain of the Training Division should report to the same Assistant or Deputy Chief<br><br>• The Police Education Director should explore professional development classes for PPB Training instructors |
| Par. 192 | Partial Compliance | • To achieve Substantial Compliance, complete a thorough, fair, and reasonable investigation of the command personnel associated with the 2020 crowd control and the training they provided<br><br>• To achieve Substantial Compliance, hold accountable the investigated command personnel members as appropriate who are found to have violated PPB policies (including this Agreement) as described in Par. 192 |

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| Par. 193 | Substantial Compliance | • No recommendations at this time |
| Par. 194 | Partial Compliance | • To achieve Substantial Compliance, the City "shall implement body-worn cameras (BWCs) pursuant to a policy that is subject to the policy-review-and-approval provisions of this Agreement" (Par. 194). This means that (1) once bargaining has been completed and (2) the BWC policy has been finalized, the City will need to (3) introduce adequate training, and (4) complete a successful pilot test, followed by (5) full-scale implementation of BWCs for PPB officers<br><br>• During the bargaining process, we encourage the City to incorporate the recommendations from the community, the COCL and DOJ<br><br>• PPB should seek to acquire software for analyzing BWC data and identifying patterns in police-community interactions that can be used for training and coaching |
| Par. 195 | Partial Compliance | • To achieve Substantial Compliance, the PAC must submit to the City Council a clear and reasonable proposal for the implementation of a Community Police Oversight Board (CPOB) as defined in Par. 195 and compliant with collective bargaining obligations<br><br>• To achieve Substantial Compliance, the City must implement a functional CPOB that is properly staffed, trained, operational, and |

| **Paragraph** | **Compliance Label** | **COCL Recommendations** |
|---|---|---|
|  |  | able to effectively investigate and dispose of use of force and misconduct cases |

# III. USE OF FORCE

### A. Use of Force Policy

---

**Settlement Agreement Paragraph**

66. PPB shall maintain the following principles in its existing use of force policies: (a) PPB shall use only the force reasonably necessary under the totality of circumstances to lawfully perform its duties and to resolve confrontations effectively and safely; and (b) PPB expects officers to develop and display, over the course of their practice of law enforcement, the skills and abilities that allow them to regularly resolve confrontations without resorting to force or the least amount of appropriate force.

67. COCL Summary: Paragraph 67 establishes that PPB shall add several core use of force principles to its force policy: the use of disengagement and de-escalation techniques, calling in specialized units when practical, taking into account all available information about actual or perceived mental illness of the individual, and the appropriate de-escalation of force when no longer necessary. Par. 67 also indicates that the force policy should include mention that unreasonable uses of force shall result in corrective action and/or discipline. (For details and exact language, see the Settlement Agreement)

| Compliance Label | Par. 66 Substantial Compliance |
|---|---|
| | Par. 67 Substantial Compliance |
| **Methodology** | Review force case sample |

**Compliance Assessment**

As part of our regular review of PPB force events, we evaluated 20 cases which represent a randomly drawn cross-section of the PPB's use of force, including force from different categories, from different precincts, involving the use of a CEW, and against persons in a mental health crisis. For this quarter, all cases we reviewed were consistent with the requirements of Pars. 66 and 67. Overall, we found that applications of force were reasonable

---

and that officers demonstrated overall sound tactics in their approach to events as well as in their attempts to minimize the force necessary for the safe resolution of the events.

However, in our review of the force case sample this quarter, we identified individual cases, as well as broader trends, which, if left unchecked, may limit future ability to reliably assess these paragraphs. As one example (and consistent with prior findings), we identified several cases where descriptions of de-escalation (see Par. 67(a)) were inconsistent with the conventional conception of the term. For instance, one use of force event involved a traffic stop of a stolen vehicle. In the de-escalation section of the FDCR, the officer indicated that they "activated their overhead lights so that the suspect knew I was a police officer attempting to perform a traffic stop" and that they "gave the suspect time to react to my overhead lights." The information that follows these statements do not appear to be related to de-escalation at all. In the AAR for this event, the supervisor states that "time" and "tactics" were employed as de-escalation attempts. As the officer had no communication with the subject (the use of force was a vehicle intervention), there would not be an opportunity to use de-escalation skills. We identified two other cases involving box-ins where the subjects were asleep in a running vehicle capable of being driven (in both cases, the circumstances indicated that the person was under the influence of either alcohol or another substance). For both situations, there was no communication with the subject and the subject was not in an escalated state as they were unconscious.

Another trend we found was how members were describing other force options that they reasonably considered prior to using a particular force type (see Par. 66(b)). In several instances, we identified officers indicating that they "reasonably considered" force options that, had they actually used them, would have likely violated the Graham standard. For example, one officer indicated that he reasonably considered using OC spray on a subject on a gurney with "other officers, EMT's and facility staff" in close quarters. Although the officer noted this as the reason to why they did not use OC, it is doubtful that this would have been "reasonably considered" given the situation. In another force event, an officer cleanly stated that "deadly force would not have been authorized." That too would mean it was not "reasonably considered" and therefore should not have been included in that data point.

For both issues, we do not raise them to nit-pick. Rather, we raise them as an example of potential validity issues that can arise when, over time, input data becomes inconsistent with the intent of the data collection field. When this happens, the variable does not actually measure what it's designed to measure and becomes void as a source of information. Should the Office of Inspector General attempt to assess these concepts in the future, conclusions drawn from the data would be largely questionable.

Because we found that officers' overall uses of force this quarter were reasonable and that officers used relatively low levels of force, we find the PPB has remained in Substantial Compliance with these paragraphs. However, in doing so, we recommend the PPB revise and re-issue prior guidance to all officers on what does and does not constitute de-escalation. In doing so, we urge the PPB to recognize positive examples of de-escalation when clarifying what is and is not de-escalation. For instance, in one case we reviewed for this quarter, a sergeant demonstrated exemplary de-escalation skills in calming an agitated female. Upon arriving on-scene, the sergeant recognized that the woman was narrowly focused on the officers who had used force on her family member and was following the officers into the street. The sergeant quickly recognized that the officers were a trigger for the woman and ordered them to leave the scene for her to calm down. This appeared to have worked as she was able to speak with the sergeant afterwards, and the sergeant's actions should be recognized as a good example of de-escalation when creating the guidance.

When developing the training, we also continue to suggest that the PPB provide the COCL with timely drafts so that we are able to offer real-time feedback and engage in a collaborative process for developing a durable remedy. Should other data validity trends be identified (we do not yet conclude that our concerns with "other reasonably considered force options" data constitute a trend), the PPB should consider them opportunities for self-improvement and use a similar refresher training.[2] We will continue to work with the PPB in the next quarter to determine whether the same data validity issues exist.

| **COCL Recommendations** | • To maintain Substantial Compliance, revise and re-issue guidance on de-escalation |
|---|---|
| **Assessment Based On** | The COCL review of force sample |

---

[2] We have stated in the past that training on these issues need not be an in-person training. Rather, some type of Tips and Techniques reminder should initially suffice unless PPB continues to see the same trends continue in the future.

## 1. Electronic Control Weapons

### Settlement Agreement Paragraph

68. COCL Summary: PPB shall revise PPB Directive 1051.00 regarding Taser, Less-Lethal Weapons System to include several core principles: ECWs will not be used for pain compliance against those suffering from mental illness or emotional crisis except in rare circumstances; officers shall issue verbal warnings or hand signals (if communication barriers exist); conventional standards for using ECW should be followed (e.g. one ECW at a time, re-evaluation; attempt hand-cuffing between cycles). Officers shall describe and justify their use of ECW in their Force Report, and receive annual training in ECW use. (For details and exact language, see the Settlement Agreement).

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review force case sample |

### Compliance Assessment

Based on our review of PPB force events, we find that the PPB officers continue to use CEWs in accordance with the Settlement Agreement (Par. 68). For this quarter, we reviewed a total of two force events involving an officer's use of a CEW which represented 20% of CEW events in the quarter and included the sole event where a CEW was used on a person in mental health crisis. In each case, we found the use of CEW to be reasonable and in neither of the cases were CEWs used for pain compliance, or more than one CEW used at a time. For each of the CEW force events, officers were able to place the subject in custody without having to resort to a higher level of force. As a result, we continue to find the PPB in Substantial Compliance with the requirements of this paragraph.

| COCL Recommendations | • No recommendations at this time |
|---|---|
| Assessment Based On | The COCL review of CEW cases |

**2. Use of Force Reporting Policy and Use of Force Report**

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 69. PPB shall revise its policies related to use of force reporting, as necessary, to require that: (a) All PPB officers that use force, including supervisory officers, draft timely use of force reports that include sufficient information to facilitate a thorough review of the incident in question by supervisory officers; (b) All officers involved or witnesses to a use of force provide a full and candid account to supervisors; (c) In case of an officer involved shooting resulting in death, use of lethal force, or an in-custody death, PPB will fulfill its reporting and review requirements as specified in directive 1010.10, as revised. This will take place of Directive 940.00 reports for the purposes of paragraphs 70, and 72-77 of this Agreement. | |

| | |
|---|---|
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review force case sample |

| | |
|---|---|
| **Compliance Assessment** | |
| As noted in our assessment of Pars. 66 and 67, our review of force cases did not find any which would be considered a deficient reporting of the force event. Although we discuss several minor data deficiencies above, we overall found FDCRs to contain sufficient information to allow a supervisor to conduct a fulsome investigation of the event (though see our assessment of Pars. 70 and 73 regarding the actual investigations conducted by supervisors). We therefore continue to find Substantial Compliance for Par. 69 though maintain our requirement for the PPB to re-issue guidance on what is and is not considered de-escalation in accordance with our comments above. | |

| | |
|---|---|
| **COCL Recommendations** | • To maintain Substantial Compliance, revise and re-issue guidance on de-escalation |
| **Assessment Based On** | The COCL review of force cases |

**Exhibit A**

## 3. Use of Force Supervisory Investigations and Reports

<div style="border:1px solid black; padding:10px;">

### Settlement Agreement Paragraph

70. COCL Summary: Paragraph 70 states, "PPB shall continue enforcement of Directive 940.00, which requires supervisors who receive notification of a force event to respond to the scene, conduct an administrative review and investigation of the use of force, document their findings in an After Action Report and forward their report through the chain of command." Paragraph 70 continues on to describe what is required of supervisory officers when a use of force event occurs, including timeframes for After Action Reports, notification requirements of serious use of force, force against individuals with mental illness, suspected misconduct, procuring medical attention, and officer interviews (For details and exact language, see the Settlement Agreement).

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review of force cases |

### Compliance Assessment

As noted above, as part of our regular review of PPB force events, we evaluated 20 cases which represent a cross-section of PPB use of force. For this quarter, we identified four cases (20% of the sample) where supervisor reviews of force events fell short of the expectations of the Settlement Agreement. For instance, in one event, the sergeant's report only describes their actions after arriving on-scene (e.g., their interaction with a witness). The sergeant's report does not summarize the information learned from the involved officers, does not allow the reader to evaluate the weight of the evidence (see also Par. 75), and provides little investigation for chain-of-command to actually review. As this was a Category IV use of force, it was only reviewed at the lieutenant level. In the lieutenant review, none of the information they cited as justification for their findings was actually discussed in the sergeant's investigation; rather, the information came from the officers' reports.

In another event, an officer stated that a person in mental health crisis "attempted to walk past me into the kitchen area. I stepped into the doorway and just took control of his left wrist telling him that he could not leave, when he sucker punched me directly in the face with his free right hand balled into a fist." However, the fact that the officer grabbed the wrist of the subject first is not discussed in the AAR. The sergeant states, "Eventually [SUBJECT] tried

</div>

to walk away from the officers towards the kitchen and officers told him to stop. [SUBJECT] then unexpectedly punched [OFFICER] in the left side of the face." The fact-pattern of the sergeant is inconsistent with the report of the officer who was actually punched in the face. At no point does the Sergeant attempt to evaluate the actions of the officer immediately preceding the force event (i.e., grabbing the person's wrist). Rather, the supervisor draws the unsupported conclusion that "officers could not have anticipated [SUBJECT] would suddenly, violently attack" the officer. Furthermore, the supervisor did not attempt to conduct an interview with the subject. As part of the event, he was chemically incapacitated though the sergeant's statement says "AMR paramedics stated the chemical restraint would last about six hours so it was not feasible to attempt a productive interview." As AARs have a 72-hour window, it's unclear why the sergeant did not interview the subject after six hours.

We found one FDCR which includes offensive language in describing a person in mental health crisis which was not addressed. The officer's FDCR stated that the subject:

> "...emphatically stated she would not go to the hospital and that she hated police, mentioning that they had killed her brother (I understood this to have happened in her native [COUNTRY]). The subject was breaking various items in her reach and tearing up paperwork from the walls of the facility. Facility staff had informed us that the subject had a schizoaffective disorder and had been 'actively' suicidal over the past two days. With this knowledge in mind I believed her behavior stemmed in part from a mental health crisis. <u>At one point in her teenage temper tantrum</u>, she placed her hand on my sidearm as if she might attempt to draw it. This appeared to be an attempt at drama rather than a serious attempt to take control of the weapon" (emphasis added).

In this event, the officer appears to recognize that this individual (1) was diagnosed with a schizoaffective disorder, (2) had been actively suicidal in recent days, (3) was in the midst of a mental health crisis, and (4) had lived experience with losing family members to law enforcement (even if in another country). To label this event as a "teenage temper tantrum" is inconsistent with the intent of the Settlement Agreement (see Par. 84(a)(vi)) and PPB policy (for example, see Directive 850.20, Policy paragraph #2). Despite this, neither the sergeant nor any individual in the chain of command review commented or corrected the use of this term for someone who by all accounts was in an acute mental health crisis. There does not appear to have been any accountability for the use of the term, in violation of Par. 73(c).

Finally, we identified one case where a supervisor's review of officers' force warnings was in direct contradiction to PPB policy. In that case, the sergeant stated "It is reasonable that all three officers checked "Yes" for subsequent force applications as they had already given a force warning before the first application of force. Therefore, the force warning given prior

and during the force event should suffice for additional applications of force." This is not accurate as Directive 1010.00 (section 5.1) states "When feasible, members shall issue a clear and intelligible verbal warning, before using any force." Despite this, the error is not corrected by anyone in the chain of command.

As a result of these deficiencies, we find the PPB continues to remain in Partial Compliance with the requirements of this paragraph. As with prior reports, we maintain that corrective action be taken against supervisors throughout the chain of command for significantly deficient reporting and reviews (see also Par. 73).

| **COCL Recommendations** | • To achieve Substantial Compliance, review cases and take corrective action |
| --- | --- |
| **Assessment Based On** | The COCL review of force cases |

| **Settlement Agreement Paragraph** |
| --- |
| 71. PPB shall maintain adequate patrol supervision staffing, which at a minimum, means that PPB and the City shall maintain its current sergeant staffing level, including the September 2012 addition of 15 sergeants. |

| **Compliance Label** | Substantial Compliance |
| --- | --- |
| **Methodology** | Review rate of officers to supervisors |

| **Compliance Assessment** |
| --- |

The PPB has maintained an adequate patrol-supervision staffing level in accordance with Par. 71. As noted in prior reports, the rate of officers to sergeants is a better metric than the raw number of sergeants. In the fourth quarter of 2022, the PPB reported a staffing ratio of 6.6 officers for every sergeant (including Acting Sergeants) across the three precincts. In Q4, the PPB is currently operating with seventeen sergeants under their authorized amount, which represents an even larger deficiency than we reported in our last report (Q3) when they were operating twelve sergeants under their authorized amount. This is also an increase in the

number of vacant positions compared with Q2 when they were operating ten sergeants under their authorized amount. As shown in Figure 3.1, we see the highest ratio of officers to sergeants when compared to recent years and note that the current ratio represents a 37.5% increase over the last 2+ years.

We note that maintaining the "current staffing level" from approximately 10 years ago is the minimum requirement for achieving compliance with Par. 71. We therefore continue to find Substantial Compliance with the requirements of this paragraph. However, as a matter of technical assistance, the increasing burden on sergeants across the last 2+ years should not be ignored. In that time period, there has been an increase of nearly two officers added under each sergeant's responsibility. Furthermore, in addition to call-response duties, this also means a 37.5% increase in paperwork over the past 2+ years. Such a stark increase over a relatively short period of time could create stress and burnout and may ultimately impact the sergeant's ability to do his or her job. We have received no evidence from the PPB indicating that the trend seen in Figure 3.1 is being addressed and, at minimum, we suggest the PPB attempt to measure the impact of the trend across the affected members.

**Figure 3.1**



Officers to Sergeants Ratio

**Exhibit A**

| COCL Recommendations | • Continue monitoring and reporting the ratio of officers to sergeants<br><br>• Conduct assessment of impact on affected members |
| --- | --- |
| Assessment Based On | The COCL review of ratio of officers to sergeants |

| **Settlement Agreement Paragraph** |
| --- |
| 72. PPB shall develop a supervisor investigation checklist to ensure that supervisors carry out these force investigation responsibilities. PPB shall review and revise the adequacy of this checklist regularly, at least annually. |

| Compliance Label | Substantial Compliance |
| --- | --- |
| Methodology | Review current AAR form; Review upcoming web form |

| **Compliance Assessment** |
| --- |
| Presently, the After-Action Report (AAR) form contains the checklist, and therefore we find the PPB has remained in Substantial Compliance with the requirements of Par. 72. Although we assess the PPB's use of the AAR form as the "investigation checklist" to be in compliance with this paragraph, we refer the reader to our assessment of other paragraphs for critical deficiencies in how supervisors have completed the AAR. |

| COCL Recommendations | • Ensure supervisors reliably and consistently use the AAR for future force events |
| --- | --- |
| Assessment Based On | The COCL review of AAR form |

### Settlement Agreement Paragraph

73. COCL Summary: Paragraph 73 directs PPB to revise its policies concerning chain of command reviews of After Action Reports (940s) to ensure that the reviews are accurate and thorough; that all comments are recorded in the EIS tracking system; that supervisors in the chain are held accountable for inadequate reports and analysis through corrective action (including training, demotion and/or removable from their supervisory position); and that when use of force is found to be outside of policy, that it be reported and appropriate corrective action be taken with the officer and the investigation itself (For details and exact language, see the Settlement Agreement).

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review force case sample |

### Compliance Assessment

Our assessment of force cases during this quarter revealed several cases where after-action reviews were not accurate or thorough, and supervisors were not held accountable for inadequate reports and analysis. We thoroughly discuss these issues in Par. 70 though also note that no member in the chain-of-command commented on the deficiencies and no member in the chain-of-command was held accountable for the deficient reporting. Therefore, the City remains in Partial Compliance for the requirements of this paragraph. To achieve Substantial Compliance, the PPB should ensure that supervisors are able to reasonably critique officers' decisions and that, should the investigating supervisor not do so, the chain-of-command corrects that supervisor. Regardless of whether the overall use of force is within policy, the Bureau should always be seeking to improve AARs and mitigate potential errors in reviews of future uses of force.

| **COCL Recommendations** | <ul><li>To achieve Substantial Compliance, ensure that chain-of-command supervisors are held accountable for inadequate reports and analysis</li><li>To achieve Substantial Compliance, clearly distinguish conduct that requires formal review from that which can be corrected by informal counseling</li></ul> |
|---|---|

| **Assessment Based On** | The COCL review of force cases |
|---|---|
| | Lack of clarity in conduct that requires formal review |

**B. Compliance Audits Related to Use of Force**

---

**Settlement Agreement Paragraph**

74. COCL Summary: Paragraph 74 states that "In consultation with the COCL, the Inspector, as part of PPB's quarterly review of force, will audit force reports and Directive 940.00 Investigation Reports" and will do this to ensure that the officer's force report is complete and accurate and that the officer's actions in the field are in line with PPB policy. The audit of force reports seeks to ensure that force is used in a way that is lawful and appropriate to the circumstances; that de-escalation is used appropriately; that ECW is used appropriately and within policy; and that specialty units and medical care are called in appropriately. In terms of force reporting, the audit seeks to ensure that reports are submitted in a timely manner; that they include detailed information about the event, the decision to use force, the type of force used, any subject resistance and any injuries to the parties; that the report includes the mental health status of the subject of force, documentation of witnesses and contact information, and other details as required by the Settlement. There should be sufficient information in the report to allow supervisors to evaluate the quality of the officer's decision making regarding the use of force. (For details and exact language, see the Settlement Agreement)

75. COCL Summary: Paragraph 75 states that, "In consultation with the COCL, the Inspector shall audit force reports and Directive 940.00 investigations" to determine whether supervisors consistently engage in a variety of behaviors when reviewing use of force reports and supervising their employees. Specifically, the Settlement requires that supervisors complete an After Action Report within 72 hours of being notified of the incident; To perform well at this task, supervisors would need to review all use of force reports for completeness, determine whether the officer's actions are consistent with PPB policy, the Settlement Agreement and best practices; and take all appropriate actions as a supervisor, including determining any training or counseling needs for the officer; taking corrective action on omissions or inaccuracies in the force report; notifying appropriate authorities when criminal conduct is suspected; and documenting all of the above-named actions. (For details and exact language, see the Settlement Agreement)

---

77. COCL Summary: "In consultation with the COCL, the Inspector shall audit the adequacy of chain of command reviews of After Action Reports." This type of audit by the Inspector will ensure that supervisors at all levels in the chain of command are conscientiously reviewing all After Action (940) Reports using the appropriate legal and administrative performance standards, and taking appropriate action. The reviewers of After Action reports should be assessing the completeness of reports and evaluating the findings using a "preponderance of the evidence" standard. Where appropriate, reviewers should modify findings that do not seem justified, speak with the original investigator, order additional investigations, identify any deficiencies in training, policy or tactics, ensure that supervisors discuss poor tactics with the officer involved, and document the above in EIS. (For details and exact language, see the Settlement Agreement.)

| Compliance Label | Par. 74 Partial Compliance |
| | Par. 75 Partial Compliance |
| | Par. 77 Partial Compliance |
| Methodology | Review Quarterly Force Audit Report; Review Force Inspector Memos; Review Force Inspector Phase II Spreadsheet |

## Compliance Assessment

On a quarterly basis, the PPB conducts the audits of force events required by Pars. 74, 75, and 77. As with prior quarters, both PPB officers (through FDCRs) and PPB supervisors (through AARs) continue to demonstrate approximately 99% accuracy in their reporting based on the audits. However, the audit failed to identify and correct significant deficiencies, regardless of the fact that they represent a small <u>number</u> of deficiencies overall. While this may demonstrate that the large majority of officers and sergeants are completing reports in a comprehensive fashion, it does not demonstrate an ability to resolve the issue when they don't. Furthermore, the COCL team was provided no evidence of the Force Inspector's Phase II tracker (identifying issues or trends which require resolution) nor were we provided with any feedback loop forms indicating that an issue or trend was forwarded on to any other unit.

As part of the supporting documents, we reviewed a Monthly Inspector Update document released by the Force Inspector, which discussed the revisions to 1010.00 that took effect in

the quarter. The document identifies what is and is not force under the new directive as well as changes in some drop-down options on the FDCRs. However, we found no other guidance documents which evidenced trends identified during the quarter.

As a result of this (as well as remaining conditions of compliance from prior reports), we continue to find the requirements of this paragraph have not been met.

| | |
|---|---|
| **COCL Recommendations** | • To achieve Substantial Compliance, ensure significant deficiencies are identified and resolved.<br><br>• To achieve Substantial Compliance, provide evidence of Inspector review documents and findings<br><br>• To achieve Substantial Compliance, clearly distinguish conduct that requires formal review from that which can be corrected by informal counseling |
| **Assessment Based On** | Review of Force Audit Report<br><br>Review of Feedback forms |

| **Settlement Agreement Paragraph** |
|---|
| 76. In consultation with the COCL, the Inspector shall conduct a quarterly analysis of force data and supervisors' Directive 940.00 reports designed to: (a) Determine if significant trends exist; (b) Determine if there is variation in force practice away from PPB policy in any unit; (c) Determine if any officer, PPB unit, or group of officers is using force differently or at a different rate than others, determine the reason for any difference and correct or duplicate elsewhere, as appropriate; (d) Identify and correct deficiencies revealed by the analysis; and (e) Document the Inspector's findings in an annual public report. |

| | |
|---|---|
| **Compliance Label** | <mark>Partial Compliance</mark> |
| **Methodology** | Reviewed Quarterly Force Reports |

**Compliance Assessment**

For each of the subsections of Par. 76, the PPB possesses a tool or process to achieve Substantial Compliance. For instance, in addressing subsection (a), the PPB continues to produce quarterly and annual force reports including several important data points and comparisons to prior quarters. Subsection (a) is also addressed, in part, through the Phase II review wherein the Force Inspector identifies organizational trends. For subsections (b) and (c), the Force Inspector reviews the findings of a comparative analysis of each officer, unit, and group (as defined by common days off), identifying differences and discussing the analysis with each patrol RU Manager. For subsection (d), the Force Inspector either provides a memo to the RU Manager or creates a manual EIS alert (see also Par. 117). Finally, for subsection (e), the Force Inspector memorializes findings of the reviews in annual reports, including the Annual Force Summary Report and Annual Force Audit Summary Report.

As we have stated in past reports, the PPB uses an overall low level of force (1.85 force events per day in our last report, with the majority of force events being only Category IV force types). However, as discussed in several areas within this assessment report, the PPB has still yet to fully explore ways to further manage uses of force, including by better assessing individual officers who use comparatively higher levels of force and scrutinizing actions that, even if within policy, may represent an area for improvement.

We also note that this process need not only be critical. Many PPB officers respond to a high number of calls for service and are in the higher echelon of those who make arrests though do not use any force at all. While some of this may be due to their particular role on a call (i.e., acting as a cover officer), the fact that many go an entire year without using force is something to be further explored for the benefit of the rest of the Bureau. The process should identify both extremes (those who use relatively higher numbers of force _and_ those who use relatively lower numbers of force or no force at all) in order to better manage the overall force within the Bureau.

| **COCL Recommendations** | <ul><li>To achieve Substantial Compliance, comment on trends over time and make suggestions for correcting/duplicating elsewhere</li><li>To achieve Substantial Compliance, work with COCL to identify statistically significant members on both ends of the spectrum to better manage force</li></ul> |
|---|---|

| **Assessment Based On** | The COCL review of quarterly Force Data Summary Reports |
| | The COCL review of PPB data |

**Outcome Assessment**

*Overall Force Statistics*

As part of our outcome assessment, we evaluated the data from the PPB's Use of Force Dashboard, examining trends over the past five years (2018-2022). In these five years, the PPB has responded to 1,600,630 calls, with an overall decrease of calls on a per-year basis during that span. In particular, the number of calls PPB responded to saw a significant decrease between 2019 and 2020 (a reduction of more than 56,000 calls) when COVID reduced the number of calls coming into the PPB and the 2020 protests reduced the number of calls the PPB were able to respond to. However, even in the past two years, the PPB continued to respond to a smaller number of calls. We note that this does not include the number of calls for service received but rather the number of calls that the PPB had the resources to respond to.

Furthermore, as seen in Figure 3.2 and 3.3 below, this reduction in calls responded to are also associated with a reduction in the number of custodies by the PPB (which includes arrests, citations, warnings, transports to detox, transports to hospitals, transports to mental health facilities, and protective custodies). Similarly, there is a reduction in the number of uses of force. However, when evaluating these proportionately, we see overall increases. For instance, the ratio of force events to overall the PPB custodies shows increasing proportions, going from 3.4% in 2019 to 6.25% in 2021. In 2022, the proportion reduced to 5.23% though this still represents an increase over the ratios in 2018 and 2019. At the same time, the proportion of calls that lead to a custody has been decreasing, moving from 6.73% of calls resulting in a custody in 2018 to less than 4.5% in the last two years. Taken together, it's likely that custodies for low-level offenses have been reduced, thereby leaving only high-level offenses which are more likely to involve force. While an understandable result, this also provides a potential area of focus for the PPB to evaluate high-level offenses to identify tailored force mitigation strategies.

**Exhibit A**

**Table 3.1: Number of calls responded to, custodies, and individuals force used on by year**

|  | Number of calls responded to | Number of custodies | Number of Individuals Force Used On |
|---|---|---|---|
| 2018 | 361,119 | 24,286 | 931 |
| 2019 | 366,105 | 23,468 | 800 |
| 2020 | 309,371 | 14,849 | 652 |
| 2021 | 285,907 | 12,070 | 754 |
| 2022 | 278,128 | 12,464 | 654 |

**Figure 3.2**



**Figure 3.3**



*Armed Status*

As touched upon in our last report, we also continue to see the proportion of force events involving an unarmed person decreasing, which appears to be a positive trend as shown in Figure 3.4. However, this does not mean that an increase proportion of force events involving an armed individual is solely responsible for this trend as it appears the option "Weapon present, not used" has increased in use (though we note that even if not used, the person is still considered "armed" in the context of the situation). Although further investigation will be required, this may reflect more reliable input data and the PPB making a better distinction with respect to the presence of a weapon. This may also used as an indicator of the level of threat posed to the officer if the subject is not indicating they plan to use the weapon. Overall, the proportion of subjects who had a weapon present, but not used, at the time of the force event increased 68.8% over the five-year timeframe.

Figure 3.4



_Mental Health Crisis_

Since 2019, the percentage of subjects who were experiencing a mental health crisis at the time of a force event has remained relatively stable between 17% and 20%. This has held true even while the overall number of uses of force has decreased across that timespan. Figure 3.5 displays the proportion of subjects in a mental health crisis at the time of the force event compared to those who were not in mental crisis.

**Figure 3.5**



*Transient*

We also analyzed the data related to the proportion of individuals who were listed as "transient" for their housing status at the time of the force event. As seen below in Figure 3.6, the overall proportion of individuals listed as transient has shown a slight decrease since 2019, moving from over half of all uses of force in that year to 44.3% in 2022.

**Figure 3.6**



*Race*

Finally, in looking at the race of the individual upon whom force is used, we have seen an overall small decrease in the proportion of force events involving a Black force recipient over the past four years (moving from 29% of force recipients in 2019 to 23.5% in 2022). Although this uses population as a baseline (which can be an unreliable baseline as the demographics of individuals who frequent a city can be vastly different than those who reside in the city[3]), the PPB indicated that they plan on diving further into these statistics and performing more nuanced analysis.4. Figure 3.7 shows the proportion of subject race in force events over the course of five years.

**Figure 3.7**



---

[3] For a review, see Alpert, G. P., Smith, M. R., & Dunham, R. G. (2004). "Toward a better benchmark: Assessing the utility of not-at-fault traffic crash data in racial profiling research." *Justice Research and Policy*, 6(1), 43-69.

[4] See 11/16/22 TAC meeting minutes: "We may be able to compare custodies involving force versus custodies not…I'll dig into that over the next couple of days and report back to everybody" (see also our assessment of Par. 86).

# IV: TRAINING

## Overview of Training Systems

The COCL's framework for assessing compliance with Section IV remains unchanged. Specifically, we assess the extent to which the PPB's training systems: (1) identify areas where officers require training; (2) develop and deliver appropriate and high-quality training; (3) develop and implement a valid and useful system of training evaluation both in the short and long term; (4) document and report training delivered and received; and (5) audit the overall training system to ensure that it is accountable to the administration and the public.

## Overview of Methods

The COCL continues to review and critique training documents, including training needs assessment reports, training plans, lesson plans, PowerPoint presentations, evaluation instruments, and evaluation reports. The COCL also continues to observe training (either in-person or online), observe TAC meetings, and conduct interviews with the PPB members and others as needed. Our reviews, observations, and analyses allow us to assess the adequacy of the training systems and whether officers are being adequately prepared to protect the constitutional rights of all individuals, including those who have or are perceived to have a mental illness.

## Training Summit

Before assessing compliance, we want to acknowledge a Training Summit that occurred in December involving the top administrators within the Training Division, DOJ, the COCL, and the City Attorney's Office. Everyone agreed that it would be better for PPB to receive feedback from DOJ more frequently than via an annual report, so they agreed to this Training Summit. DOJ brought in a training subject matter expert (SME) to assist the Training Division in achieving best practices in police training. Our opinion is that all participants felt that the meeting was productive and helpful. As a debrief, DOJ summarized four recommendations meant to assist PPB as it seeks to emulate best practices. We list them here and comment briefly on each:

(1) <u>Consistency in Training Academy Leadership</u>: the PPB has suffered from frequent turnover in leadership within the Training Division. Hopefully, this problem can be

corrected so that a stable and consistent environment in the PPB training can be achieved.

(2) Instructor Development Course: the PPB needs to shift from a reliance on lectures to more scenario-based approaches to training. The COCL has pushed for more adult learning techniques for many years, and the PPB has gradually moved in this direction. The COCL would like to see the PPB go a step further to offer more scenarios for individual officers where they can practice the skills involved in de-escalation and verbal communication (The PPB currently offers this type of training for physical control tactics and use of weapons). At a minimum, the PPB needs to give more attention to (1) selecting instructors (both sworn and civilian) with teaching skills and (2) give more attention to developing the teaching skills in current instructors, rather than assume that instructors who are knowledgeable about a particular topic in police work are also good instructors.

(3) Training Dean and Captain Equivalency: The new Dean and the Captain in the Training Division should report to the same individual so that neither's authority is weakened. Currently, that is not the plan.

(4) Resource Constraints: Budget constraints have hampered training opportunities. To offset this resource constraint, the PPB is exploring the idea of civilianizing certain aspects of the Training Division. The COCL has consistently called for more civilian analysts, but more civilian instructors should also be considered, with knowledge and experience in urban police and/or organizational behavior.

**Assessment of Compliance**

| **Settlement Agreement Paragraph** |
| --- |
| 78. All aspects of PPB training shall reflect and instill agency expectations that officers are committed to the constitutional rights of the individuals who have or are perceived to have mental illness whom they encounter and employ strategies to build community partnerships to effectively increase public trust and safety. To achieve these outcomes, PPB shall implement the requirements below. |

| **Compliance Label** | Partial Compliance |
| --- | --- |

| Methodology | This is a summative judgment that is contingent upon satisfying all paragraphs in Section IV |
|---|---|

### Compliance Assessment

The PPB has achieved only Partial Compliance with Paragraph 78 because Substantial Compliance requires the PPB to "implement the requirements below." Because this is a summative paragraph, compliance will be assessed in terms of the achievement of all requirements of the Settlement Agreement pertaining to Section IV, Training.

We will continue to focus on the primary training for all officers and supervisors, and special mental health training for Enhanced Crisis Intervention Team (ECIT), as these are the training courses most central to the Settlement Agreement. However, given the problems that occurred with the PPB's crowd management during the 2020 protests, the COCL added this subject to our training evaluation agenda beginning in 2021.

We will continue to evaluate training progress in terms of the fidelity of implementation and whether these trainings are likely to achieve the desired outcomes listed in Par. 78.

| **COCL Recommendations** | • To achieve Substantial Compliance, PPB must substantially comply with all paragraphs within Section IV |
|---|---|
| **Assessment Based On** | Summative and contingent upon satisfying all paragraphs of Section IV, based on the methods identified for each |

### Assess Training Needs

### Settlement Agreement Paragraph

79. The Training Division shall review and update PPB's training plan annually. To inform these revisions, the Training Division shall conduct a needs assessment and modify this assessment annually, taking into consideration: (a) trends in hazards officers are encountering in performing their duties; (b) analysis of officer safety issues; (c) misconduct complaints; (d) problematic uses of force; (e) input from members at all levels of PPB; (f) input from the community; (g) concerns reflected in court decisions; (h) research reflecting

best practices; (i) the latest in law enforcement trends; (j) individual precinct needs; and (k) any changes to Oregon or federal law or PPB policy.

| | |
|---|---|
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Interviewed PPB staff and reviewed internal training documents. |

### Compliance Assessment

Last quarter, we reported that the Training Division completed its annual training needs assessment and crowd management needs assessment reports, drawing on a wide range of sources. Using this information, during the fourth quarter, they were able to finalize their 2023 PPB Annual Training Plan report (December 2022).

Drilling down, the Training Division continued to refine the 2023-1 In-Service training plans for all members set to begin in January of 2023. This work included meetings with the Training Division management, the Specialized Resource Division management, the Office of the Inspector General management, the City Attorneys, the Lead Instructors, and the Needs Assessment Analyst. In the fourth quarter, they also attended a public order training by the U.S. Department of Homeland Security Federal Protective Service, and reviewed laws, lawsuits, and research related to crowd management.

Here, we provide a brief overview of the PPB's Annual Training Plan report. We believe the report is comprehensive in that it covers training for all sworn members, sworn supervisors, Enhanced Crisis Intervention Team, Behavioral Health Unit, weapons qualifications, crowd management, and unit specific training. Also, a range of online trainings are being planned.

Again, the COCL expresses appreciation for the considerable time, effort, and resources that the PPB and City have invested in crowd management training since 2021, including focused needs assessment and training plans (the COCL has listed these efforts in previous reports). This includes utilizing the Incident Command System training from the Federal Emergency Management Agency (FEMA), as well as other local, national, and international reports regarding mass demonstrations and human rights.

After problems with the Rapid Response Team (RRT) deployment during the 2020 protests, the PPB has been slow to assign another special unit to handle mass demonstrations. They have been waiting for the outside assessment of crowd control and other factors before finalizing this decision. In the meantime, PPB has decided to rely on its existing Mobile Field

Force (MFF), which will be the focal point of the In-Service training that begins in January. This crowd management training is detailed in the PPB's Annual Training Plan, and includes basic theory and principles of crowd management, current laws, and directives, the roles for the MFF, and other related topics. We have reviewed the lesson plans and will report on the execution of this training in our Q1 2023 report. However, we remind the PPB that the training needs assessment and training plan will need to be updated when the Independent Monitor, LLC, has completed its assessment of PPB's response to the 2020 protests.

We have a few general comments about the Training Plan. First, we are pleased that Active Bystandership for Law Enforcement (ABLE) remains a part of the PPB's In-Service training, although it is only one hour. Second, we are pleased to see that the PPB continues to mention procedural justice, but the COCL would like to see it receive more attention as a stand-alone class and be better integrated into other classes. The PPB has shown some movement in this direction, but there is room for improvement. In terms of needs assessment, we are confident that interviews and focus groups with the community would reveal that procedural justice is a critical training need for the PPB to achieve more public trust and legitimacy.

Finally, the audit of the Training Division conducted in December 2022 noted a significant gap between the needs assessment and the actual training plan, as only about one quarter of the needs are being addressed in the training plan (see Par. 85). Staffing and budget limitations are identified as the cause of this discrepancy, but we encourage the PPB to give serious attention to training needs that deserve the highest priority, such as role-playing scenarios and debriefings that focus on the communications skills needed to achieve de-escalation and procedurally just outcomes. These topics are mentioned in the In-Service training plan, but the number of hours and quality of execution have yet to be determined.

The COCL continues to provide a rating of Substantial Compliance for Par. 79. However, to maintain Substantial Compliance, the Training Division will need to supplement its own needs assessment with the needs assessment that results from the external Critical Assessment of the 2020 protests (see Par. 189).

| **COCL Recommendations** | <ul><li>In future training plans, give higher priority to training with robust scenarios and feedback loops to strengthen interpersonal communication skills in de-escalation and procedural justice</li><li>When the external Critical Incident assessment of Crowd Control has been completed, incorporate the training</li></ul> |
|---|---|

**Exhibit A**

| | implications of this study into PPB's training needs assessment |
|---|---|
| **Assessment Based On** | Review of PPB's internal training documents and interviews with PPB personnel |

**Evaluate Training**

| **Settlement Agreement Paragraph** | |
|---|---|
| 80. Within 180 days of the Effective Date, PPB shall develop and implement a process that provides for the collection, analysis, and review of data regarding the effectiveness of training for the purpose of improving future instruction, course quality, and curriculum. These evaluations shall measure and document student satisfaction with the training received; student learning as a result of training; and the extent to which program graduates are applying the knowledge and skills acquired in training to their jobs. This audit shall be reported to the Training Division Manager and shall include student evaluations of the program and the instructor. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Interviewed PPB staff and reviewed internal training documents<br><br>Assessed the methods of evaluation, content, and the presence of a complete evaluation system with feedback loops |
| **Compliance Assessment** | |
| The PPB's training evaluation system continues to rely on multiple methods of data collection, analysis and reporting that are being guided by the Kirkpatrick Model of training evaluation. The Training Division administers in-class quizzes/surveys, anonymous post-class evaluation surveys, knowledge tests, scenario skills tests, and classroom observations. Finally, they are exploring various ways of strengthening the evaluation designs and measuring on-the-job applications of training by working with university researchers and the Training | |

Advisory Council (TAC). We will continue to review these instruments and methods and provide the PPB with feedback from a scientific research perspective. Overall, we continue to be satisfied with the methods and measures employed by the PPB in the fourth quarter of 2022 and offer a few recommendations for improvement.

During the fourth quarter, the Training Division analysts were very busy producing numerous internal reports and two external reports. They produced more than 60 internal reports, including daily summaries spanning 12 weeks of Advanced Academy training for new officers. In addition to the Advanced Academy, the evaluation team collected survey and test data for the 2022-2 In-Service for all officers, the 2022 Supervisors In-Service, and the Online Training Program. They also worked on evaluation reports for the 2022-1 In-Service training and for the 2022 Online Training Program, which were completed in January of 2023 (and therefore, will be covered in our first quarter report). An internal report for program managers was prepared on the 2022 Enhanced Crisis Intervention Team (ECIT) training. Using these reports, the PPB's evaluation team held meetings with the Training Division managers and lead instructors to discuss the evaluation results and to evaluate student performance. This work helps to improve the training curricula, enhance pedagogical styles, and identify future training needs. Overall, the COCL continues to be satisfied with the content of the exams, surveys, and scenario scoring procedures used to evaluate training in the fourth quarter.

**Recommendations and Responses**

We continue to advocate for scenarios where officers are evaluated individually rather than in groups. We also encourage the PPB to keep documentation of student performance on specific skills, such as de-escalation and procedural justice. Measurement and feedback should be built into the training process to ensure that communication skills have reached an acceptable level prior to leaving the training.

We continue to recommend that the Training Division, despite staffing limitations, protect the time of the Training Analysts. The administration should return all Training Analysts to their original job duties and hire additional analysts to ensure that the best training needs assessment, training plan, and scientific knowledge about the quality and effectiveness of training are met.

Last quarter, we reminded the Training Division to introduce outcome metrics to capture "the extent to which program graduates are applying the knowledge and skills acquired in training to their jobs." (Par. 80), and work with "university researchers to conduct more scientific evaluations of on-the-job outcomes." The Training Division continues to move in this

direction as it seeks to collaborate with outside researchers at Washington State University, Portland State University, and TAC members. This work includes a more rigorous evaluation of the PPB's Wellness training program, as well as research on procedural justice-oriented outreach.

The COCL continues to recommend that the measurement of procedural justice outcomes be given a higher priority, but we want to clarify that such data collection should be done outside the PPB to achieve maximum credibility (See the COCL's report on the Contact Survey Program for details[5]). However, if a new contact survey program is introduced, it should be intimately linked to the Training Division, so that the training needs assessment and training plans can target specific behaviors that will enhance outcome performance over time.

| | |
|---|---|
| **COCL Recommendations** | <ul><li>Add role-play scenarios where officers can be evaluated individually rather than in groups</li><li>Return all Training Analysts to their original job duties and hire additional analysts to ensure the best training needs assessment, training plan, and scientific knowledge about the quality and effectiveness of training</li><li>When contact survey data become available, modify the training needs assessment and training plan to target specific behaviors that can improve procedural justice on the job and enhance public trust</li></ul> |
| **Assessment Based On** | The COCL review of training evaluation tools, quality of data, and systems of reporting and feedback |

---

[5] https://www.portlandcocl.com/reports/2023/02/contact-survey-program-technical-assistance-report

**Document Training Delivered and Received**

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 81. PPB shall ensure that the Training Division is electronically tracking, maintaining, and reporting complete and accurate records of current curricula, lesson plans, training delivered, attendance records, and other training material in a central, commonly accessible, and organized file system. Each officer's immediate supervisor shall review the database for the officers under his/her command at least semi-annually. | |
| **Compliance Label** | Partial Compliance |
| **Methodology** | Requested and reviewed LMS records for the second quarter; Requested and observed electronic inquiries of LMS files |

### Compliance Assessment

The Training Division continues to use the Cornerstone Learning Management System (LMS) to record officer training and provide a range of online trainings. LMS attendance records are expected to include all in-person and online trainings completed by PPB members, and in the fourth quarter, this included 10 directives. (See Par. 84 for a list of classes offered).

For the fourth quarter, we selected several trainings to confirm that the Training Division had recorded attendance in LMS. We examined both In-Service in-person and online classes, including Crisis Intervention for ECIT officers, ICS-100 Introduction to Incident Command System, Procedural Justice Directive 0025.00, the PPB's Response to Public Order Events Directive 0635.10, and Organizational Leadership (an external training). We also selected a random sample of PPB officers and sergeants to confirm that the Training Division had recorded their attendance at all relevant classes in the fourth quarter. We did not observe any irregularities or missing data in the LMS records.

Although the COCL did not identify any missing training records, an audit conducted by the Office of the Inspector General (OIG) during the fourth quarter found that, "Rosters identifying members with specialty certifications were not up-to-date" and that the "OIG review of records found gaps in the processes for ensuring record accuracy as evidenced by incomplete records." The Training Division is trying to correct this problem so that certifications can be tracked in LMS. The COCL concurs with the OIG's recommendation that

"the Training Division update certification rosters and develop a process to ensure that they are maintained and accurate." Until the rosters have been updated, the COCL has changed Paragraph 81 to Partial Compliance. Certification rosters are critically important training records that inform management and supervisors which of its members are properly trained to perform specialty functions, including CPR/First Aid, less lethal weapons (from CEW to 40mm operators), air support, crisis negotiation (CNT), behavioral health response (BHRT, ECIT), and other functions. Certifications expire and need to be renewed, so records are easily outdated. For emergencies, a centralized process is needed, with a list of names indicating who are currently qualified for specialty functions. At present, management would need to search the records of each employee to answer this question. We consider this non-compliance with the training records requirement of Par. 81, although we are confident this problem can be fixed within a reasonable timeframe.

The Training Division and the PPB supervisors review LMS training hours to ensure that the PPB members remain in compliance with Oregon state standards and have received the training required by the PPB. LMS is used to ensure that PPB employees who are not on leave are completing their required training and that these records are reviewed by supervisors. The review and compliance process has not changed: PPB employees are given 30 days to complete training and are sent email reminders 14 days, seven days, and one day before the due date, and one day past the due date. Their RU manager sends emails regarding training delinquencies at one, five, and 21 days past the due date.

When PPB members fail to complete online training in this window, the Training Division sends non-compliance memos to the Chief's office, which the COCL has reviewed. Focusing on sworn PPB members, nine such memos (covering nine classes) were sent to the Chief's office for review during the fourth quarter of 2022. The COCL found that, in total, there were only 26 cases where an officer did not complete one or more classes.[6] We note that for the trainings regarding use of force (Directive 1010.00) and use of less lethal weapons or tools (Directive 1015.00), only one sworn member missed these classes. For any class, if the absence is justified (e.g., long-term medical leave), the Training Division is notified and the LMS records are updated. When the absence does not appear to be justified, the employee's supervisor or unit manager is notified, and the training must be completed immediately under supervision.

---

[6] The total number of officers who missed classes may be less than 26 if certain officers missed more than one class because of long-term medical leave. The total number of misses (not officers) in the fourth quarter is 26.

| **COCL Recommendations** | • To return to Substantial Compliance, the Training Division must update certification rosters and develop a process to ensure that they are maintained and accurate. Additional attention is needed for specialty trainings |
| --- | --- |

| **Settlement Agreement Paragraph** |
| --- |
| 82. PPB shall report training delivered and received semi-annually to the Assistant Chief of Operations and, during the pendency of this Agreement, to DOJ. |

| **Compliance Label** | Substantial Compliance |
| --- | --- |
| **Methodology** | Review Semi-Annual Training Reports |

| **Compliance Assessment** |
| --- |
| Two Semi-Annual Training Reports were delivered to the Deputy and Assistant Chiefs on January 18, 2023. One report listed internal trainings and the other external trainings attended by PPB sworn members between July 1 and December 31, 2022. The list of external trainings is responsive to the COCL's request from last quarter. Thus, the PPB remains in Substantial Compliance for Par. 82. |

| **COCL Recommendations** | • No recommendations at this time |
| --- | --- |
| **Assessment Based On** | Delivery and content of Semi-Annual Training Reports |

**Trainer Qualifications**

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 83. PPB shall institute guidelines to govern its selection of officers that serve as trainers and shall ensure that those officers do not have a history of using excessive force. The trainer selection guidelines shall prohibit the selection of officers who have been subject to disciplinary action based upon the use of force or mistreatment of people with mental illness within the three (3) preceding years, or twice in the preceding five (5) years and will take into account if a civil judgment has been rendered against the City in the last five (5) years based on the officer's use of force. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Reviewed "Work History Review Sheet" for the third quarter hires and ensured that PPB is following S.O.P. #1-19 standards. |
| **Compliance Assessment** | |
| During the fourth quarter, three sergeants and three officers were assigned to the Training Division to assist with the In-Service training on crowd management scheduled to begin in January 2023. These assignments activated the review process pursuant to S.O.P. #1-19. The COCL reviewed the Work History Review Sheet for each of these individuals and found no evidence of civil judgments, discipline, or mistreatment of people with mental illness as defined in Par. 83. | |
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Based On** | The COCL review of "Work History Review Sheet" and S.O.P. #1-19 standards |

**Deliver Appropriate and High-Quality Training**

| **Settlement Agreement Paragraph** |
|---|
| 84. (<u>COCL Summary</u>) Paragraph 84 describes the content and delivery of training that is expected for patrol officers and supervisors. PPB is expected to develop and implement a high-quality system of training that is consistent with PPB's policies as well as federal and state laws, and must cover specific topics, including use of force, de-escalation techniques, procuring medical care, proactive problem solving, civil and criminal liability, and positive communication skills. PPB training is also required to give particular attention to police responses to individuals who have, or are perceived to have, mental illness. PPB's training of officers must include "role playing scenarios and interactive exercises that illustrate proper use of force decision making" as well as peer intervention. In addition to all sworn personnel, paragraph 84 requires supervisor training, including conducting use of force investigations, evaluation of officer performance, and positive career development/disciplinary actions. |

| **Compliance Label** | <mark>Partial Compliance</mark> |
|---|---|
| **Methodology** | Observed In-Service Training, ECIT Training, and Specialty Training. Also observed online trainings made available through the LMS during the third quarter<br><br>Interviewed PPB personnel |

| **Compliance Assessment** |
|---|
| During the fourth quarter of 2022, the COCL focused attention on the new Supervisor Training that was completed during this period. (Other major trainings were reviewed last quarter). In addition, we continue to provide an overview and assessment of the online training delivered by PPB during the fourth quarter. |
| The PPB did not return to Substantial Compliance during the fourth quarter because they have yet to provide crowd control training that (1) incorporates changes to polices related to use of force (i.e., Directives 910.00, 1010.00, and 1015.00) and crowd control (Directive 635.10), (2) incorporates both internal <u>and</u> external assessments of training needs, and (3) provides scenarios or exercises to practice appropriate crowd control skills. On a positive note, the process of reviewing and approving PPB's policies on use of force and crowd control |

was completed in the fourth quarter in time for the PPB to begin the crowd management training in January of 2023. However, the external assessment of crowd control (Par. 189), which started in the third quarter, will not be completed before the new training begins in January 2023. Therefore, to achieve Substantial Compliance with Par. 84, PPB's crowd control training (now called Response to Public Order Events) will need to be updated based on both the internal and external needs assessments regarding the PPB's response to mass demonstrations.

**Supervisor In-Service Training**

Between November 11 and December 15, the Training Division delivered eight sessions of the Supervisor In-service training, totaling 146 supervisor attendees. The COCL observed this training in mid-December. The COCL also provided feedback on the lesson plans in the third quarter of 2022.

The training began at 7 am and lasted until approximately 4 pm. About 20 supervisors (sergeants and above) were in attendance. The person in charge reminded all supervisors to sign the attendance rosters going around the room throughout the day.

The Supervisor training was divided into five distinct classes. Here, we review these classes in the order in which they occurred:

*Strategic Communications Training – the Public Information Officer (PIO):* The purpose of the Communications training was to empower supervisors to engage with the media present at PPB activities, give a narrative, and improve the image of the PPB while not increasing the work expected of supervisors. The instructor, a lieutenant, held the Communications discussion in lecture-format. A PowerPoint deck was used to supplement the lecture, and each item on each slide was covered. The PowerPoint was easy-to-follow with big-text, clip art, and media.

After describing the purpose of this class, the instructor went over the Strategic Communications Unit Staff. Next, he reviewed the different types of communications the PPB uses to communicate with the public (Twitter has the largest following). Most importantly, he stressed that the PPB members represent a critical mode of communication and create legitimacy with the public. Therefore, when talking to the media, the instructor wants officers to display the PPB's values, including integrity, compassion, accountability, respect, excellence, and service. To this list of values, he added humanity, professionalism, and competence.

After encouraging PPB supervisors not to shy away from talking with the media, the instructor discussed logistical considerations as captured in Dir. 631.35. Supervisors need to be aware of specific situations where officers should contact a PIO as soon as possible. If the media shows up to an occurrence, then PPB supervisors have the responsibility to alert the PIO team that the media is present, so that messaging is consistent and the PIO is prepared for follow-up questions. Additionally, PPB officers are discouraged from saying "no comment" because this can unintentionally create an adversary relationship. All media outlets present should get the same information to avoid any criticism of "playing favorites." Lastly, supervisors were reminded not to speculate but rather speak to the facts.

Overall, the Communications instructor was an engaging presenter. The videos he used in the presentation (including television clips) were relevant and strong examples of good communication. Supervisors listened and had chances to ask questions throughout the lesson.

*Workplace Harassment:* The instructor from the City's Bureau of Human Resources (BHR) immediately asked if supervisors have already been updated on this training. A few officers nodded their heads. After that, he flipped through the slides quickly and pointed out a few details, like the two-day reporting rule and the need to keep the complainant's identity confidential. The class was allotted an hour and a half, but after roughly 10 minutes, the instructor said, "Well, that's really all I have." Although the presentation may have been a refresher training, the instructor should have given more attention to this important subject (See City of Portland Bureau of Human Resources Administration Rule HRAR 2.02, "Prohibition Against Workplace Harassment, Discrimination and Retaliation"). The instructor was dry and not engaging. He did not ask whether the students had any questions or comments. There is much more to this topic aside from the requirement that any violation must be immediately reported to the Bureau of Human Resources. For example, how are retaliation, harassment, and discrimination different? How can supervisors identify each, and how should they respond other than simply reporting it? What other types of intervention and preventative strategies are possible and appropriate?

*Findings of Investigations - Professional Standard Division:* The purpose of this class, taught by a Captain, was to review the process of conducting an internal investigation, with particular attention to the role of Supervisor Investigations (SI). Instead of a full investigation, an allegation can be referred for a Supervisor Investigation (SI) in which the officer's supervisor reviews the allegation with the officer.

Like the two previous trainers, she relied on a PowerPoint to convey the lesson plan. The investigative process is rather complex (and changing), so some context was provided. She

explained that the Independent Police Review (IPR) is no longer in the City Auditor's office, but rather is on its own. IPR compels a review while the Citizen Review Committee (CRC) can arrange appeals. Internal Affairs within the PPB oversees the intake, case handling, and investigations, and can compel review by the Police Review Board (PRB). Supervisors and managers must review investigations, render findings, and recommend discipline. The complaint process provided within PowerPoint was a good visual for supervisors to follow. She also provided a list of what incidents will prompt an investigation. Incidents that are deemed larger or more serious must undergo more review, although the outcome of the PRB does not need to be unanimous.

The instructor then gave updates about the Police Accountability Commission (PAC), explaining that this group, created in November 2020 by City Council, is responsible for creating the new civilian oversight board.[7] She stated the earliest we can expect the new accountability system will be the end of 2024.

This class focused on reaching findings from investigations. The importance of findings was listed: they bring closure, they generate lessons learned, and they help do what is right/equitable. She pointed out that ethical standards and corruption emerge when a low level of misconduct is left unchecked. When writing the reports, supervisors must consider multiple people in the department as well as the complainant and the public. The instructor defined the "preponderance of the evidence" standard, and as well findings of Sustained, Exonerated, Unfounded, and Not sustained as they appear in Directive 0332.00.

Next, the instructor broke the room into three groups based on seating arrangements. Each group received a scenario to read/review the facts, identify the allegations, come to a finding, and report back with their findings and reasoning. The small groups seemed engaged and talked about material that was relevant to the training. Once all three scenarios were completed in small groups, they were called back together to discuss their conclusions.

Finally, this class covered the Performance Discussion Tracker (PDT) within the Employee Information System (EIS). The purpose of the EIS is to serve as a communication tool for supervisors which they can rely on as a "pointer system" (referring to other documents) and can be used to document conversations with subordinates. The PDT can be used for comments, both positive and corrective. PDT is a tool that can help supervisors check and

---

[7] To be more precise, the PAC does not create the oversight board. Rather, it makes recommendations to the City Council, and the City Council enacts changes to the City Code and proposes amendments to the Settlement Agreement. If DOJ approves the proposed amendments, the Court must then approve them at a Fairness Hearing.

track what is happening with their current employees, as well as new employees who transfer in from other units.

The instructor was energetic and passionate when teaching this class. She effectively encouraged supervisors to engage with each other during the exercises and reflect on how best to communicate accountability.

*After Action SharePoint Transition:* The objective of this class was to introduce supervisors to the new SharePoint system for writing After Action Reports (AARs) when force has been used and discuss the elements of the revised force reporting and review directives. The Lieutenant teaching this class lectured with PowerPoint slides to highlight key information.

The instructor explained the benefits of using SharePoint. The AAR will be a website-based form rather than PDF form. The website will save drafts and submitted versions of AARs. SharePoint streamlines the ability to meet the Settlement Agreement with automated timeline tracking and will auto-populate several fields on the form. Other benefits include not losing AARs in the email, and the need to download a form and have multiple copies.

The instructor acknowledged that there are some quirks that need to be worked out. If supervisors encounter any issues with SharePoint, specific individuals should be contacted, including the instructor. There is also a website for supervisors to post questions, receive answers, and watch videos on how to navigate SharePoint.

The language in the Force Data Collection Report (FDCR) and AAR is being updated, effective immediately, "Active aggression" will be removed. Resistance will change to active resistance or passive resistance. "Baton push" and "baton jab" are being added while baton pry, control holds with injury, firearm discharge, and static box-in are being removed. Lastly, "Sound/light distraction device" is changing to "Flash Sound Distraction Device" (FSDD). Another change is that specialty units and de-escalation efforts will no longer be Yes/No but there will be checkboxes with more options. Lastly, SharePoint does not change mandatory timelines, so the instructor provided a slide with the timeline of completion that has been established.

Throughout the class, the instructor frequently asked the supervisors if they had any questions about the content. At the conclusion, participants were given the opportunity to ask questions. Some concern was expressed that the new SharePoint system would be rushing or pressuring supervisors to finish their ARR report quickly rather than accurately. Also, supervisors sometimes get pulled away to respond to other problems.

*Critical Incident Management:* This class covered the role of supervisors in the management of critical incidents (Critical Incident Management was a focal point of the PPB's supervisor training one year earlier in the fall of 2021). The instructor did not use PowerPoint, but

instead wrote on the whiteboard and drew charts to make his presentation interactive. The class sought to remind supervisors of their role as Incident Commanders (ICs) and to avoid getting involved in lower-level functions. Understanding and successfully executing their supervisory responsibilities will prevent internal and external criticism.

The PPB's supervisory model continues to use the acronym PAID. The instructor had the students call out what each letter stands for in PAID: Prioritize our goal, Assign officers to oversee the important thing, Intent (give ground rules), and Define the event. He emphasized that supervisors need to think about the "what-ifs'' and plan accordingly. Next, the 4 C's that define the IC role (PPB's original conception) were also spelled out on the white board: Containment team leader, Custody team leader, Communications team leader, and Contingencies ("Contingencies'' may not be necessary in all events, so the instructor stated that supervisors can "get rid of it"). Supervisors should use PAID principles if they are assigned to one of the 4 C roles. Each C role should have a supervisor if possible or if not, an officer may need to fill this role.

The instructor then formed three groups (based on seating arrangements) to talk about one of the IC roles with the lens of PAID or a role that was loosely based on PAID. After five minutes, he brought everyone back together to discuss what the different groups had brainstormed. After this discussion and debriefing, the instructor placed them into groups of four or five to work on the tabletop exercises. Before they started, he thoroughly explained the purpose and approach they should take. Each group received one of the three scenarios on a sheet of paper and the instructor walked around to provide clarification if needed, and to check on the progress each group was making. When the group was called together, they each shared their results and thought processes used to complete the scenario. The instructor appeared satisfied with the participation from each group. He reminded supervisors that everyone involved in an incident needs to know who is in charge to avoid disarray within the team. The Incident Commander (IC) is in-charge of the entire call, and the IC is responsible for wide control and for assigning officers to individual components.

Overall, the instructor did a fine job of presenting and engaging the group throughout the training. This training looked at the "big picture," but lacked details to guide supervisors when things get difficult. Although the instructor lightly touched on unexpected incidents that may occur, future training should explain how supervisors should respond in these situations and what it means to have a "contingency" plan. Specifically, the instructor did not explore the different resources that supervisors have available within the department (people and technology). Also, there was no mention of how to debrief the officers or report the incident.

Finally, this training focused on critical incidents with a few individuals, so while some of the principles would apply to mass demonstrations, that bridge was not crossed.

*Conclusion:* In general, this supervisor training underscored the importance of supervisory accountability and communication within the PPB and with the media. In terms of pedagogy, most of the presenters relied on PowerPoint and checked in with students regarding their comprehension of the topic. Only two presenters used tabletop exercises, and the student seemed to enjoy the opportunity to converse within their group.

Over several years, the COCL has continued to emphasize the importance of adult learning methods, student engagement, and performance evaluation. The use of tabletop exercises is an important step in that direction (better than last year), but periodically, the supervisors and the officers should be given more opportunities to practice in live role-playing scenarios and be given feedback on their individual performances. Also, the supervisors should have the opportunity to practice debrief sessions as a mechanism to discuss lessons learned, both individually and collectively. Whether the current supervisor training effectively translates into on-the-job behavior is unknown, but something to consider in the future.

In terms of training content, we continue to encourage the PPB to revisit its annual performance evaluation system and train supervisors in methods of evaluating and providing feedback to the PPB members who report to them. Similarly, procedural justice during supervisors' communication with employees and supervisors' communication with the public are essential for gaining respect and should be included in all supervisor training. Along these lines, BHR's Workplace Harassment class for supervisors must be improved.

Finally, when the COCL reviewed the lesson plans, we noticed there was no mental health component to the Supervisor In-Service training and encouraged the PPB to add one. We acknowledge that ECIT is covered in the department-wide in-service, but supervisors have a very specific role to play during these incidents. In 2022, the Sergeants Academy training (for new sergeants) did a fine job of covering the role of first-line supervisors during critical incidents involving mental health, with attention to the Mental Health Audit Tool. In the future, we encourage the PPB to repeat some of this coverage for all supervisors, especially given the importance of mental health responses in the Settlement Agreement, and the fact that sergeants are expected to manage the dispatch and use of ECIT members and coordinate with BOEC. Supervisory attention to de-escalation at the scene of mental health calls is also of critical importance.

**In-service: Online Training**

In the fourth quarter of 2022, the PPB continued to provide online classes and educational material using their Learning Management System (LMS). A total of 21 items were delivered virtually to PPB members during the quarter. This included training videos, highlight memos of four directives, City Attorney's Office legal updates from May 2022, and 10 Bureau directives.[8] Last quarter, when we reviewed the online training on directive 0650.00 ("Search, Seizures, and Inventories"), we noted that it gave insufficient attention to the distribution of consent search cards in six languages – cards that would help persons with limited English proficiency. Hence, we will continue to recommend supplemental training on consent searches that would give specific attention to the required distribution of consent cards in different languages.

For the fourth quarter, the COCL reviewed a training video covering "Post Shooting Response" because of the importance of properly handling officer involved shootings.

*Online Training on Post Shooting Response*

The PPB provided officers with a seven-minute video meant to serve as a refresher on bureau procedures following an officer involved shooting. The video covers topics such as the acronym "CRCRC"[9], rendering aid to injured subjects, and on-scene supervisor responsibilities following the use of deadly force.

To cover these topics, the video uses a combination of an instructor discussing the procedures, a scenario of officers role-playing the procedures, and voiceover to both share information and show the process in action. While COCL appreciates the use of demonstrations of parts of the post-OIS process there is space for improvement of the video. For example, near the end of the training there were two separate lists of information put on the screen. The images of these lists were not left up long enough to be read in full by a viewer. Additionally, while we understand that the safety of officers is of the utmost

---

[8] The directives covered were: 0025.00 Procedural Justice, 0312.50 Identification, 0630.50 Medical Aid (and a Medical Aid highlight memo), 0635.10 Portland Police Bureau Response to Public Order Events, 0640.30 Child Abuse Investigations, 0640.70 Fingerprinting and Photographing Juvenile Offenders, 0850.30 Juvenile Interviews, Detention, and Custody, 0850.39 Missing, Runaway, Lost, or Disoriented Persons, and 0870.25 Temporary Detention Areas in Police Facilities.

[9] CRCRC stands for Cover (seek cover in case of return fire), Reload (check their firearm and reload it if necessary), Commands (issue commands to the subject), Radio (call for assistance and emergency medical services if it is safe to do so), and Check (yourself and others for injury).

**Exhibit A**

importance, there was not enough attention paid to the importance of swiftly offering aid to injured subjects. While there are procedures that need to be followed it should be balanced with protecting the sanctity of life of all those involved in a shooting incident. Overall, the video was well done but as said above, there is room for improvement.

*Online Equity Training and Beyond*

In the fourth quarter of 2022, there were no new online equity trainings and there were no requests for new online equity content. Additionally, the PPB has not made space in its schedule for in-person equity training, though this was highlighted as the intention moving forward. The priority given to Equity training remains a point of concern for the COCL and something we have been discussing since 2020.

Furthermore, in the previous quarter we reported some concerning survey responses following the series of online equity trainings focused on interactions with the LGBTQIA2S+ community. As we discussed in our 2022 Q1 and Q2 reports, there were three separate videos that covered the topic, and an anonymous survey was made available to participants after they viewed each training, with a total of 11 open-ended questions. COCL has reviewed all the survey responses and found some explicitly homophobic and transphobic comments, with some rooted in political or religious beliefs. Since the first draft of this report was made available for public comment, PPB has decided to post both the training videos and survey results for public review.[10] We will not review all of the problematic sentiments here as the survey results speak for themselves.

Overall, there was a mix of positive and problematic responses. Some officers found the training to be valuable and appreciated that members of the community were featured in the training. However, other respondents stated that the LGBTQIA2S+ training was "offensive" and "a complete waste of time" either because officers claimed they have no biases or because the training represents a "woke" agenda and the proper use of pronouns is a "pseudo reality." Although these views do not represent most officers who responded to the survey, they were sufficiently numerous to represent a concern.[11]

As we shared in our previous report, different units within the PPB have held meetings to discuss these signs of bias, and they shared these concerns with the administration. The

---

[10] Here is the link to the survey results and the training. The training can be found on YouTube. Link to survey results posted to the City of Portland Public Record Page.

[11] Because PPB combined the comments from all three videos into a single file, we cannot determine the number of officers who held these views, since a single individual can be represented several times in the data. But the negative comments were too numerous to be only a few individuals.

Chief's office also held meetings on this topic in the third quarter. The general conclusion was that the PPB cannot control a member's thoughts and is primarily concerned about their behavior on the job, so no further action was taken.  While we are not suggesting that the Bureau infringe on any member's First Amendment rights, we are recommending that the Bureau continue to communicate that such ideologies have no place within the PPB workplace.12 We were very pleased with the opening video for the Equity training, with comments from the Chief, Deputy Chief, and Assistant Chiefs indicating (1) that PPB's relationship with the LGBTQIA2S+ community needs to be, and can be, improved13 and (2) the current training is designed to help officers better understand the LGBTQIA2S+ community, both inside and outside the PPB, and be prepared to interact with them in a respectful way.

Making Equity training a higher priority is one important way to address these biases. Research has shown that we all hold a wide range of biases and thus, we need to work hard to keep prejudice from manifesting itself during interpersonal communication and decision making. Having an equity lens will help officers avoid discriminatory words or actions during encounters with the public.

Although the administration rightfully cares more about equity on the streets of Portland than officers' individual attitudes, frankly, PPB does not have a data system in place that can measure the actual treatment of LGBTQIA2S+ individuals or other marginalized populations. Hence, we have repeatedly recommended a Contact Survey Program to achieve this goal. Such a program appears to have growing community support and we hope some version will be adopted by the City (see COCL's Technical Assistance Report on our website at portlandcocl.com).

Portland prides itself—and is viewed nationally—as a welcoming city with a large LGBTQIA2S+ community. PPB officers are expected to treat all people with compassion and respect, and to acknowledge and respect people's sexual orientation, gender identity, and gender expression. The COCL believes that most officers do meet this standard, but this belief should be validated with evidence from contact surveys and body-worn cameras.

On a positive note, PPB has worked to create a safer and more supportive environment for the LGBTQIA2S+ community through policy development. The Bureau should be recognized

---

[12] However, training surveys <u>must</u> remain anonymous so that officers feel free to express their views and candidly evaluate training programs.

[13] As one indication, the Alliance for Safer Communities Advisory Council (the group that worked with the PPB and represented the LGBTQ+ community) was dissolved in January of 2022.

for creating a non-discrimination Directive that specifies expectations for respectfully engaging with members of the LGBTQIA2S+ community in the course of their work. We view this as a model policy.

However, we remain firm in our recommendation that equity training must be given a higher priority within the PPB and moved from a few online videos to in-person training, where officers have the opportunity to discuss difficult and sensitive issues in the classroom. Some of the survey comments were clearly intended as constructive criticism of the current Equity curriculum.  When revising the curriculum, we recommend that the developers seek input from both the community and PPB members, including officers working in the Training Division. We acknowledge that the LGBTQIA2S+ community is diverse, and these diverse perspectives should be recognized. Also, achieving "buy-in" from skeptical PPB members may require more input from a diverse group of PPB employees before the training is finalized.

There is no doubt that training on diversity, equity, and inclusion, as well as training on unconscious bias, can be difficult to design and execute. Research suggests that employees can get defensive (after being told they have biases) and feel they are being shamed or scolded, so in-person discussions are essential and must be respectful. From our perspective, PPB's equity training represents a solid start to increase awareness of diversity, equity, and inclusion, but awareness is only the first step in the process. To achieve effective training, employees must be taught how to manage their biases and change their behavior through practice and feedback. Furthermore, measuring and tracking performance is essential for achieving procedurally just actions by officers who interact with marginalized or disadvantaged individuals.

Today, we see equity programs being devalued nationwide at a time when cities and organizations should be doing just the opposite – investing more time and resources in these initiatives. Hopefully, PPB will find its own path to effective equity training that is collaborative and inclusive of all perspectives.


### The RRT Training Investigation

The investigation of the offensive training materials used in 2018 training of the Rapid Response Team (RRT) was still ongoing in the fourth quarter. For legal reasons, we are unable to discuss any details – that is the responsibility of the City when the case has been completed.

Looking to the future, the COCL continues to advocate for a preventative approach and has given attention to the oversight and approval of future trainings. The Training Division is

required to review and approve all training material used to train PPB personnel, per Directive 1500.00 and S.O.P #1-21.[14] The PPB has taken steps to correct this problem by notifying all officers of these regulations and including all planned training for Specialty units in its revised 2022 Annual Training Plan. However, as the Training Audit this quarter has shown (see Par. 85), more work is needed to ensure that the records of external training kept in the LMS system are complete and accurate (Par. 81).

RRT no longer exists to respond to public order events. At the November TAC meeting, the new Captain of the Training Division stated that "We're still going through the process of identifying...how we're going to rebuild a specialty team that deals with public order events in the future." In the meantime, the PPB is planning to use the MFF to respond to public order events and provide appropriate MFF training to all members beginning in January of 2023.

The COCL will continue to provide recommendations for improving training, policy, and performance evaluations as they relate to crowd management and organizational culture in general. As one example, the COCL requested that the PPB give additional attention to the annual performance evaluations by supervisors, which can serve as an important mechanism for changing the organizational culture and street-level behavior regarding engagement with community members. We have also recommended that the PPB be aware of research and reports on mass demonstrations in other cities, and the PPB has been responsive.

### Training Summary and Conclusions

During the fourth quarter of 2022, the COCL observed and evaluated the Supervisor training. In general, this training was informative and well executed. Specific recommendations for improvement are included above.

However, the PPB did not return to Substantial Compliance for Par. 84 because they have yet to provide the Public Order training that (1) incorporates changes to polices related to use of force (i.e., Directives 910.00, 1010.00, and 1015.00) and the policy on the PPB's response to public order events (Directive 0635.10), (2) incorporates both internal and external assessments of training needs, and (3) provides scenarios or exercises to practice appropriate crowd control skills. On a positive note, the policies on use of force and crowd control were finalized and approved in the fourth quarter. Our expectation is that the In-service training beginning in 2023 will address many of these concerns and requirements. Eventually, the

---

[14] https://www.portlandoregon.gov/police/article/680811

findings from the independent Critical Incident Assessment of crowd control (See Par. 189) can be incorporated into the PPB's Training Needs Assessment, Training Plan, and actual training on PPB's response to public order events.

The COCL's overall assessment of online training remains positive. The Training Division continues to provide a wide range of online training and educational materials using LMS. However, we have yet to see supplemental training on consent searches that gives attention to the distribution of consent cards in different languages. In addition to more training, the COCL recommends that the PPB audit the consent search process to ensure that, on the streets of Portland, it is being implemented in a manner consistent with the PPB policy and state law.

Most importantly, the PPB has yet to integrate equity-focused material into in-person training. We acknowledge that our third quarter recommendation was recent, so the PPB would not be expected to achieve this result in the fourth quarter of 2022. The COCL hopes to see the PPB make a concerted effort to bring these sensitive and sometimes difficult topics into an in-person format. We recognize that the PPB is facing limited resources and conflicting priorities for their in-person training hours, but we will continue to express the importance of equity and impartial policing, as required by the constitution.

For in-person learning, the COCLL will continue to call for more training that follows the fundamental principles of adult learning and problem-based learning and allows officers to practice good decision making. The PPB has made considerable progress in this area, but more work is needed, as discussed during the Training Summit in December. We also look forward to the day when the PPB's evidence-based training draws upon local data from body-worn camera footage and contact surveys to clearly illustrate to officers where specific improvements in performance are needed when interacting with the public.

The PPB will remain in Partial Compliance until the required recommendations listed below have been implemented. We understand that the PPB's training scheduled for next quarter is responsive to some of these recommendations.

| **COCL Recommendations** | • To achieve Substantial Compliance with Par. 84, update the Crowd Control and Management training (now called Response to Public Order Events) based on both the internal and external needs assessments regarding PPB's response to mass demonstrations |
|---|---|

|  | • To achieve Substantial Compliance with Par. 84, develop and deliver training with "role playing scenarios and interactive exercises that illustrate proper use of force decision making" (Par. 84) including in Public Order Event settings. This should include sufficient opportunities to practice de-escalation techniques and procedurally just responses to difficult interactions, including resistance and arrest |
|---|---|
|  | • To achieve Substantial Compliance with Par. 84, incorporate recent changes to PPB's force-related Directives into training (910.00, 1010.00, and 1015.00) |
|  | • Increase training that incorporates adult education and problem-based learning principles |
|  | • Make Equity training a higher priority and include it routinely in PPB's in-person training schedules |
|  | • Add a mental health component to future Supervisor In-Service training |
|  | • Introduce in-person training on procedural justice with enough dosage to make a difference |
|  | • Continue to support the development of sophisticated online training that allows for interactivity and is linked to subsequent in-person skills development |
|  | • Ensure that all online training slides remain on the screen long enough for students to read and absorb all of the written content |
|  | • Provide refresher training on First Amendment rights that can address any PPB bias against protesters |
|  | • Provide additional online training on the Consent Search cards |
| **Assessment Based On** | COCL's observation/assessment of training content, delivery, and consistency with adult-learning principles and best practices |

| | Processes described by PPB personnel |
|---|---|
| | Future content assessment: Whether PPB can provide training on crowd control and force reporting that is based on a comprehensive assessment of problems that occurred during the 2020 protests and includes the requirements of Par. 84 |

**Audit the Training Program**

<table>
<tr><td colspan="2" align="center"><strong>Settlement Agreement Paragraph</strong></td></tr>
<tr><td colspan="2">85. In consultation with the COCL, the Inspector shall audit the training program using the following performance standards to ensure that PPB does the following: (a) Conducts a comprehensive needs assessment annually; (b) Creates a Training Strategic Plan annually; (c) Within 180 days of the Effective Date, develops and implements a process for evaluation of the effectiveness of training; (d) Maintains accurate records of Training delivered, including substance and attendance; (e) Makes Training Records accessible to the Director of Services, Assistant Chief of Operations, and DOJ; (f) Trains Officers, Supervisors, and Commanders on areas specific to their responsibilities; and (g) Ensures that sworn PPB members are provided a copy of all PPB directives and policies issues pursuant to this Agreement, and sign a statement acknowledging that they have received, read, and had an opportunity to ask questions about the directives and/or policies, within 30 days of the release of the policy.</td></tr>
<tr><td><strong>Compliance Label</strong></td><td>Substantial Compliance</td></tr>
<tr><td><strong>Methodology</strong></td><td>COCL will review the audit report for accuracy and completeness</td></tr>
<tr><td colspan="2" align="center"><strong>Compliance Assessment</strong></td></tr>
<tr><td colspan="2">The COCL has consistently recommended that the PPB undertake another audit because of changes that have occurred since the last formal audit in 2018 and due to the bigger changes that are planned, including the hiring of a civilian head of the PPB Training Division. Also, the problems associated with the RRT training suggest that the process of reviewing training</td></tr>
</table>

materials for all units deserves attention, as well as classes that reinforce a healthy and appropriate view of the community. The COCL insisted the audit be completed in 2022 to maintain Substantial Compliance. The Office of the Inspector General (OIG) completed such an Audit on December 30, 2022. The COCL will make several comments about the 2022 Audit. First, we credit the OIG with preparing an Audit report that is candid and transparent, with little reluctance to point out problems when problems were identified. The audit takes a traditional auditing approach, focusing on record keeping and compliance with rules and regulations.

Second, several findings are noteworthy. The Audit covers the seven requirements of Par. 85 (a through g), so we will briefly comment on each:

*85a: Conducts a comprehensive needs assessment annually*

The OIG assessment is consistent with the COCL's finding that the source material used for the Needs Assessment is comprehensive and meets the requirements of Par. 85a. However, the OIG found that Directive 1500.00 and SOP 2-28 list different due dates for the Needs Assessment (August 1 and October 20, respectively). This should be clarified, and the COCL is in favor of the earlier date, since the primary purpose of the Needs Assessment is to inform the Training Plan for the following year. Also, the OIG could not confirm that the Needs Assessment was presented to the Chief of Police and sent to the Inspector, as required. This can be attributed to the high rate of turnover in the position of Training Manager and the absence of saved memos on this subject. OIG has recommended that such memos be stored in a common location accessible by other command staff.

*85b: Creates a Training Strategic Plan annually*

The OIG found that the Training Plan developed by the Training Division is based on information found in the Needs Assessment, Directive 1500, and many sources of information, consistent with the COCL's reports and the requirements of the Settlement Agreement. However, one thing missing from the Training Plan (as required by Directive 1500) is the time and location of the training. If corrected, this will help to track specialty training that does not occur at the Training Division.

A greater concern is OIG's finding that many of the needs identified in the Needs Assessment "could not be incorporated into the Training Plan due to budget and staffing limitations." (p. 2). In fact, OIG found that roughly "25% of the needs identified in the 2020 [Needs Assessment] were found in the 2021 Training Plan." (p. 9). The OIG recommends increased staffing and funding for the Training Division, and the COCL supports this recommendation. From the COCL's perspective, the new Training Dean should comment on the quantity and

quality of training needed on specific topics. We again recommend more training with scenarios and role playing that involve procedural justice and communication skills needed to prevent or de-escalate conflict — conflict that can result in the use of force or other serious outcomes during police-public interactions.

*85c: Within 180 days of the Effective Date, develops and implements a process for evaluation of the effectiveness of training*

The COCL agrees with the OIG that the Training Division has formal processes in place to evaluate the effectiveness of training. We differ in terms of recommendations. OIG offered no recommendations for improvement. The COCL has recommended that additional metrics and methods be implemented to assess student learning and on-the-job behavior. Student learning is best evaluated by collecting data before and after training and by comparing the results with a control group (the PPB currently only collects post-test data and only for the group receiving the training). Also, new methods are needed to evaluate the impact of training on the job, such as contact surveys of community members with a recent police interaction (See the COCL's technical assistance report on the proposed Contact Survey Program[15]). Finally, the COCL has recommended more attention be given to the evaluation of individual officer performance during skills training and role-playing scenarios. Currently, feedback and debriefing generally occur in a group setting.

85d and 85e: *Maintains accurate records of Training delivered, including substance and attendance; Makes Training Records accessible to the Director of Services, Assistant Chief of Operations, and DOJ*

Directive 1500.5 and SOP 1-20 provide guidance to the Training Division on record-keeping practices and indicate that records for all trainings should be kept in a central, accessible location and reported semi-annually to PPB administration. Although a system of training record keeping exists (Par. 85d), it is not centrally located – some material is kept in LMS and other documents, such as lesson plans and individual test scores, are kept in other locations in the Training Division. Nevertheless, the training records are judged to be accessible (Par. 85e). However, OIG discovered that "Rosters identifying members with specialty certifications were not up-to-date." The Training Division is trying to correct this problem so that certifications can be tracked in LMS. The OIG has recommended that "the Training Division update certification rosters and develop a process to ensure that they are maintained and accurate." In the meantime, the COCL has decided to change Paragraph 81 to Partial Compliance, as noted earlier, because of this audit finding.

---

[15] https://www.portlandcocl.com/reports/2023/02/contact-survey-program-technical-assistance-report

*85f: Trains Officers, Supervisors, and Commanders on areas specific to their responsibilities*

The requirement of 85f is not easy to conceptualize or quantify, and therefore, not easy to audit. Here, the OIG decided to focus on the Active Bystandership for Law Enforcement (ABLE) training, which seeks to prevent misconduct and mistakes through peer intervention. OIG focused on the program requirements, and the PPB's commitment to the 10 standards of this 8-hour program. Overall, the Training Division has complied with the requirements of the ABLE program, with a couple of exceptions. For example, in the PPB's annual performance evaluation, the mandatory reporting of successful or unsuccessful applications of ABLE skills is inconsistent with ABLE's standards and could create problems. Hence, the OIG has recommended that the reporting of such behavior be voluntary. The COCL has previously recommended that the annual performance evaluation process be reconfigured, and this issue simply adds another justification for such action. Also, OIG suggests that PPB's discipline-specific directives (335.00 and 338.00) should be revised to recognize a successful intervention as a potential mitigating factor in the discipline process.

*85g: Ensures that sworn PPB members are provided a copy of all PPB directives and policies issued pursuant to this Agreement, and sign a statement acknowledging that they have received, read, and had an opportunity to ask questions about the directives and/or policies, within 30 days of the release of the policy*

The Audit team concluded that the Directive review practices for members, driven by LMS, are in line with Directives 0010.00 and 315.00 and are consistent with the requirements of Par. 85. Only 20 members were found to have exceeded the 30-day requirement in 2021. Nearly half of these members had only one overdue training, and all delinquent incidents were reported to command staff for review. Command staff then insist that the training be done immediately.

Finally, this audit, with attention to bookkeeping and procedures, gave limited attention to staffing and management issues (e.g., rapid turnover in the Training Division). Hence, we recommend that this topic be addressed in the next audit. This is especially important given the hiring of a civilian Dean of Training and the need for additional civilianization. Also, we recommend that the next audit give more attention to the content of in-person training, especially since there exists a significant gap between what is recommended in the Needs Assessment and the training that is delivered. The COCL recommends more attention to equity and procedural justice training.

| | |
|---|---|
| **COCL Recommendations** | • The Training Division should formally respond to the recommendations provided in the Training Audit conducted by the Office of the Inspector General<br><br>• The next audit of the Training Division should give special attention to civilianization, including the level of support for the Training Dean and the development of both civilian and sworn instructors<br><br>• We continue to recommend that a future audit give attention to the content of in-person training for officers and supervisors, with particular attention to equity and procedural justice classes |
| **Assessment Based On** | COCL's review of the audit report based on identified needs of the Training Division, auditing standards, and the timeline for completion of the audit |

**Analyze and Report Force Data**

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 86. In consultation with the COCL, the Inspector shall gather and present data and analysis on a quarterly basis regarding patterns and trends in officers' uses of force to the Chief, the PPB Training Division, and to the Training Advisory Council. The Training Division and Training Advisory Council shall make recommendations to the Chief regarding proposed changes in policy, training, and/or evaluations based on the data presented. The Inspector shall also, in coordination with the COCL and PSD, identify problematic use of force patterns and training deficiencies. The Chief's Office shall assess all use of force patterns identified by the Training Division and/or Training Advisory Council and timely implement necessary remedial training to address deficiencies so identified. | |
| **Compliance Label** | Substantial Compliance |

| Methodology | Reviewed Training Advisory Council (TAC) meeting agenda and minutes; Reviewed TAC reports and recommendations |
|---|---|

**Compliance Assessment**

The Force Inspector continues to gather force data on a quarterly basis and examine it for patterns and trends (See Section III on Use of Force). Thus, the COCL continues to find the PPB in compliance with this part of Par. 86.

TAC held two meetings in the fourth quarter of 2022 (October 26 and November 16) that were open to the public. The October 26 meeting had a single agenda item – to discuss the frequency of TAC meetings. The present TAC bylaws call for bi-monthly meetings, and with the Force reports consuming considerable amounts of time, some members wanted additional time to discuss other matters and make recommendations. The group discussed whether to adopt Resolution 2022-1 that, "The TAC, by majority vote of the members present at any meeting, may choose to schedule additional plenary meetings (that is, of the whole TAC membership) between the bimonthly ones." After considerable debate, TAC passed this resolution.

The November meeting of TAC included a report by the Force Inspector on the PPB's Q2 Force Application Report, but the Q3 force report will not be presented until January of 2023 due to an agenda error. The Force Inspector's presentation was used as an opportunity by TAC members to continue their feedback to the PPB regarding the delivery of force-related statistics. Someone asked the Force Inspector if he could explain why Blacks comprised 20 percent of PPB custodies, but a much smaller percent of the Portland population (roughly 6 percent). His response focused on rates of criminality: "...we arrest people who commit crimes, and we don't arrest people who don't commit crimes." This caused a significant reaction within TAC given local and national concern about police bias when responding to people of color. The bottom line is that the Force Inspector was encouraged, in the future, to provide more context to these statistics, show greater sensitivity, and conduct more historical and statistical analysis of this complex problem. The Analyst agreed to do additional analyses with the data.

This dialogue, however, does not appear to have diminished the working relationship between TAC and the Training Division. The Training Division has invited TAC members to provide feedback on planned trainings, participate in ride-alongs, help judge the PPB

members seeking promotions, and other tasks. TAC has responded favorably to these opportunities for learning and input.

The Training Division posts the formal recommendations from TAC on its webpage (https://portland.gov/police/tac/ppbtacrecs). No formal recommendations were submitted by TAC in the fourth quarter. However, two separate reports will appear in the first quarter of 2023 based on TAC's observation of the PPB's training.

Although no formal recommendations were submitted, informal feedback from TAC remained strong during the fourth quarter. The Training Division gave TAC access to the lesson plans for the Public Order training scheduled to begin in January and invited them to observe the "dry run" of this training. TAC members did so, and felt that many of their informal, on the spot, recommendations to improve this training were adopted by the PPB prior to the roll out.

Additionally, TAC has been active with its Task Groups. The groups are created and disbanded as work is completed or when they have hit a dead end. During the fourth quarter, five Task Groups were active and able to produce future recommendations.[16]

In terms of the PPB's responsiveness to TAC's formal recommendations, the Chief's office has been responsive overall, but as noted previously, some of the responses indicate an inability to fully address the issues being raised because of limited time and resources. Also, while some of the PPB's responses are posted on the Training Division website, others are not. Hence, TAC is considering a Tracker that would allow them to be more proactive in holding the PPB accountable for an official response to TAC's recommendations.

Finally, there was one glitch that affected the relationship between the PPB and TAC in the fourth quarter. TAC was told they would have a TAC member on the panel that would select the civilian Dean of the Training Division - that never happened. TAC provided the Human Relations Division with two names and the contact information for each (one to serve as backup). The City had to reschedule the meeting of the panel, but no TAC member was present. The City claims an invitation was sent, but the TAC member disputes this claim. Apparently, invitations did not include an RSVP or any subsequent effort to reach the TAC alternate. We consider this an important oversight by the Human Relations Division because TAC made several formal recommendations regarding the Dean selection process nearly one

---

[16] The Task Groups during Q4 were: Advanced Academy, Continuous Quality Improvement, Officer-Community Relationships and Perceptions, Officer Wellness, and Restorative Justice. However, Officer Wellness was disbanded in November after completing its work.

year earlier, and the COCL has stressed the importance of community engagement in selecting the new Training Dean.

We have been informed that the relationship between TAC and PPB has improved in 2023. In the meantime, the COCL maintains that the system of force reporting and the relationship between TAC and the PPB in the fourth quarter meet the standards articulated in Par. 86.

| | |
|---|---|
| **COCL Recommendations** | • The Force Inspector should be more sensitive to the way that statistics are communicated to the public, and fully appreciate the context and underlying factors associated with any racial disparities in police custodies and use of force.<br><br>• TAC should continue to explore new ways of tracking the Chief's office response to formal TAC recommendations<br><br>• The City should review the process of community engagement for selecting the Training Dean to ensure that oversights are avoided in the future. |
| **Assessment Based On** | PPB's presentation of quarterly force reports and inclusion of trends; The TAC's recommendations; PPB's responsiveness to the TAC's recommendations |

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 87. Training Advisory Council meetings will be open to the public unless the matter under discussion is confidential or raises public safety concerns, as determined by the Chief. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review of PPB website regarding TAC; Review TAC agendas and minutes; Observe TAC meetings |

| **Compliance Assessment** |
|---|
| Two TAC meetings were held in the fourth quarter of 2022 (October 26 and November 16) and were open to the public as required by Paragraph 87. The COCL continues to observe these Zoom meetings and the public has been allowed to listen and comment. The PPB continues to use a public email distribution list to send reminders of the meetings to the public. The PPB also continues to post TAC meeting agendas and minutes on PPB's website.[17] |

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | COCL review of information available on PPB website; COCL observation of TAC meetings and review of TAC minutes |

---

[17] https://www.portland.gov/police/tac/events/past

# V. COMMUNITY-BASED MENTAL HEALTH SERVICES

### Settlement Agreement Paragraph

88. The absence of a comprehensive community mental health infrastructure often shifts to law enforcement agencies throughout Oregon the burden of being first responders to individuals in mental health crisis. Under a separate agreement, the United States is working with State of Oregon officials in a constructive, collaborative manner to address the gaps in state mental health infrastructure. The state-wide implementation of an improved, effective community-based mental health infrastructure should benefit law enforcement agencies across the State, as well as people with mental illness. The United States acknowledges that this Agreement only legally binds the City to take action. Nonetheless, in addition to the City, the United States expects the City's partners to help remedy the lack of community-based addiction and mental health services to Medicaid clients and uninsured area residents. The City's partners in the provision of community-based addiction and mental health services include: the State of Oregon Health Authority, area Community Care Organizations ("CCOs"), Multnomah County, local hospitals, health insurance providers, commercial health providers, and existing Non-Governmental Organizations ("NGOs") such as community-based mental health providers, and other stakeholders.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Monitor the City and PPB continuing to work with community partners |

### Compliance Assessment

This paragraph is assessed based on the City and the PPB's continuing relationship with community partners. As this is a summative paragraph, compliance is dependent upon compliance with other paragraphs within this section. With all the other paragraphs within this section remaining in Substantial Compliance, so too does Par. 88.

| COCL Recommendations | • No recommendations at this time |
|---|---|

| | |
|---|---|
| **Assessment Based On** | N/A – Summative paragraph |

---

### Settlement Agreement Paragraph

89. The United States expects that the local CCOs will establish, by mid-2013, one or more drop-off center(s) for first responders and public walk-in centers for individuals with addictions and/or behavioral health service needs. All such drop off/walk in centers should focus care plans on appropriate discharge and community-based treatment options, including assertive community treatment teams, rather than unnecessary hospitalization.

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Review status of Unity Center; Interview with PPB Personnel |

### Compliance Assessment

The COCL continues to acknowledge that the focus of Par. 89 is on the Community Care Organizations and the expectation that they establish one or more drop-off center(s). The Settlement Agreement does not hold any authority over these organizations, but our assessment remains focused on the City's activities and reasonable expectations regarding their involvement with the drop-off/walk-in center(s).

Related to the focus of Par. 89, the Unity Center remains the drop off center for individuals experiencing behavioral health needs. The facility has been operating in this capacity since it opened in May 2017. PPB has two policies related to this paragraph, including Directive 850.21 (Peace Officer Custody (Civil)) and 850.25 (Police Response to Mental Health Facilities). These directives provide the protocol for officers to contact AMR for ambulance transport to the Unity Center. These directives have remained the same throughout 2021 though are currently in the review process with the entire suite of directives related to mental health response.

Since the opening of the Unity Center, a Transportation Workgroup has met regularly in quarterly meetings to discuss the operation of the Center. This workgroup includes members of Unity, the PPB, AMR, Multnomah County, and Legacy ED Health. However, due to scheduling issues, the group was unable to meet in the fourth quarter of 2022. We will

therefore provide updates in our next report. Based on the PPB and the City's ongoing participation in the process to date, we believe they have substantially complied with all reasonable expectations for them related to this paragraph.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | Status of Unity Center and PPB policies |

**Settlement Agreement Paragraph**

90. The CCOs will immediately create addictions and mental health-focused subcommittee(s), which will include representatives from PPB's Addictions and Behavioral Health Unit ("ABHU") [Now called Behavioral Health Unit or "BHU"], the ABHU Advisory Board [Now called the BHU Advisory Committee or "BHUAC"], Portland Fire and Rescue, Bureau of Emergency Communications ("BOEC") and other City staff. These committees will pursue immediate and long-term improvements to the behavioral health care system. Initial improvements include: (COCL Summary) increased sharing of information (subject to lawful disclosure); creation of rapid access clinics; enhanced access to primary care providers; expanded options for BOEC operators to divert calls to civilian mental health services, addressing unmet needs identified by Safer PDX; expanding and strengthening networks of peer mediated services; and pursue tele-psychiatry.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review Community Outreach Meeting minutes; Review PSU evaluation on PSR |
| | |

**Compliance Assessment**

As with the above paragraph, Par. 90 holds expectations of CCOs to create subcommittees for PPB to serve on, with a list of initial goals to be accomplished. However, CCO's are not under the authority of the Settlement Agreement, and we therefore only evaluate the City on what can reasonably be expected of the agency given the lack of opportunity from CCOs.

During the fourth quarter of 2022, Legacy Community Outreach met three times, and minutes and a resource list were provided for those meetings. At the October 2022 meeting, presentations were made regarding community resources such as Mind Solutions and Another Chance, which both provide mental health and substance use treatment. The November 2022 meeting had two presentations from community programs. Clackamas County Coordinated Housing Access (CHA) and Washington County Community Connect presented their services that aim to help find housing for those experiencing houselessness. At the December 2022 meeting, another two organizations made presentations. The OHSU Housing Benefit Program shared information about their temporary housing services and other services that aims to help lead to permanent housing. The other presentation was from Juntos a community organization that provides services to Latino and Spanish speaking communities. Through the combination of these, we continue to find that the PPB gathers information about community resources which help address unmet needs of individuals. Working with community partners continues to achieve the goal of long-term improvements to the behavioral health care system as outlined in paragraph 90.

| | |
|---|---|
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Based On** | PPB involvement with Behavioral Health Collaborative Team; PPB involvement with Legacy ED Community Outreach |

# VI. CRISIS INTERVENTION

## A. Addictions and Behavioral Health Unit and Advisory Committee

---

### Settlement Agreement Paragraph

91. In order to facilitate PPB's successful interactions with mental health consumers and improve public safety, within 60 days of the Effective Date, PPB shall develop an Addictions and Behavioral Health Unit ("ABHU") within PPB. PPB shall assign command-level personnel of at least the rank of Lieutenant to manage the ABHU. ABHU shall oversee and coordinate PPB's Crisis Intervention Team ("C-I Team"), Mobile Crisis Prevention Team ("MCPT"), and Service Coordination Team ("SCT"), as set forth in this Agreement.

*[As a point of clarification, since the writing of the Agreement, the ABHU is known as Behavioral Health Unit ("BHU"), the C-I Team is known as Enhanced Crisis Intervention Team ("ECIT"), and the MCPT is known as Behavioral Health Response Team ("BHRT"). Discussion of these entities, and their reference in subsequent Agreement paragraphs, will use their current nomenclatures].*

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review BHU Unit Structure |

### Compliance Assessment

Regarding personnel and the BHU's general oversight, the BHU continues to conform to the requirements of Par. 91, as evidenced by the BHU unit structure, and our observations of the BHU coordinating ECIT, BHRT, and SCT operations. While the BHU provides oversight to the ECIT program (including ECIT training, dispatch criteria, ECIT data collection, etc.), ECIT officers directly report to their precinct level chain of command. This command structure conforms to the Memphis Model. There have been no major changes to the structure of the unit, and the PPB is expected to provide updates on personnel changes.

In the fourth quarter of 2022, PPB provided the COCL with the updated organization chart for the Specialized Resources Division, which houses the BHU. During the fourth quarter, the PPB and the City continued planning to make the switch to having all BHRT clinicians being in-

house as opposed to contracting with Cascadia. During this quarter, the City retained three clinicians as city employees and have sent out offer letters to two additional clinicians who are going through the Bureau's background process. Similarly, in the fourth quarter, the BHU filled an open BHRT officer position. Based on PPB's ongoing unit structure as well as the regular updates provided to the COCL, we continue to find that the PPB remains in Substantial Compliance with this paragraph.

| **COCL Recommendations** | • Continue to update the COCL and DOJ on changes to personnel when applicable |
|---|---|
| **Assessment Based On** | COCL review of unit structures and personnel |

---

| | **Settlement Agreement Paragraph** |
|---|---|

92. [BHU] will manage the sharing and utilization of data that is subject to lawful disclosure between PPB and Multnomah County, or its successor. PPB will use such data to decrease law enforcement interactions or mitigate the potential uses of force in law enforcement interactions with consumers of mental health services.

93. [BHU] shall track outcome data generated through the [ECIT], [BHRT], and SCT, to: (a) develop new response strategies for repeat calls for service; (b) identify training needs; identify and propose solutions to systemic issues that impede PPB's ability to provide an appropriate response to a behavioral crisis event; and (c) identify officers' performance warranting commendation or correction.

| **Compliance Label** | 92. Substantial Compliance |
|---|---|
| | 93. Substantial Compliance |
| **Methodology** | Review BHUCT, BHRT, and SCT coordination team meeting agendas and minutes; Review ECIT, BHRT, and SCT outcome measures |
| | **Compliance Assessment** |

The PPB continues to utilize a number of work groups to collaborate on ways to "decrease law enforcement interactions [and] mitigate the potential uses of force in law enforcement interactions with consumers of mental health services" (Par. 92). BHU staff meet weekly to discuss the BHRT caseload, and the Behavioral Health Unit Coordination Team (BHUCT) meets on a bi-weekly basis to discuss current and potential BHRT clients. The BHUCT is composed of several community partners including representatives from Multnomah County, Cascadia, and Federal/State law enforcement. The PPB provided us with meeting minutes and agendas indicating that a core group of partners attends consistently, with other partners attending as needed.

The discussions during these meetings are designed to problem-solve and create strategies to reduce future criminal justice contacts for individuals that have frequent contact with the police but have been difficult to engage in ongoing services. BHU personnel indicate information on individuals discussed is shared only if it is subject to lawful disclosure. BHU personnel indicate the BHUCT has been a particularly valuable collaborative strategy.

The Service Coordination Team also conducts weekly meetings to discuss potential clients and make determinations about eligibility for SCT Services. The meetings include community partners and representatives from various entities in Multnomah County. The meetings also review current SCT clients to "facilitate continuation of care" for clients. We believe these meetings meet the spirit of Par. 92.

The PPB continues to provide the COCL with the documentation for all meetings occurring within the BHU, including minutes from each SCT, BHU, and BHUCT meeting. Additionally, the PPB provided the COCL with copies of the BHRT flyers that are used to communicate with partners about individuals who they are trying to connect with services. This information is also supplemented through data collected on the Mental Health Template (MHT) by identifying individuals and locations with repeat calls for service and developing response strategies.

Relevant outcome measures are collected for BHRT and SCT, and the PPB provides the COCL with quarterly reports summarizing these data. Altogether, the BHU system has multiple avenues for sharing and receiving information with such entities as the BHCT, BHCC (Behavioral Health Call Center), BOEC, and BHUAC. Thus, we find that the PPB remains in Substantial Compliance with the requirements of Pars. 92 and 93.

| | |
|---|---|
| **COCL Recommendations** | • Continue to collect and review data on mental health services, and use this information to update services as needed |
| **Assessment Based On** | BHCT, BHRT, and SCT coordination meeting agendas and minutes; ECIT, BHRT, and SCT outcome measures |

| **Settlement Agreement Paragraph** |
|---|
| 94. Within 90 days of the Effective Date, PPB shall also establish a [BHU] Advisory Committee. The [BHU] Advisory Committee shall include representation from: PPB command leadership, [ECIT], [BHRT], and SCT; BOEC; civilian leadership of the City government; and shall seek to include representation from: the Multnomah County Sheriff's Office; Oregon State Department of Health and Human Services; advocacy groups for consumers of mental health services; mental health service providers; coordinated care organizations; and persons with lived experience with mental health services. |

| Compliance Label | Substantial Compliance |
|---|---|
| **Methodology** | Review BHUAC roster of members; Review BHUAC minutes; Observe BHUAC meetings |

| **Compliance Assessment** |
|---|
| In the fourth quarter of 2022, the Behavioral Health Unit Advisory Committee (BHUAC) continued to meet regularly, holding meetings on October 26 and December 7. The minutes of these meetings have been documented and shared with the COCL and can be found on the PPB's website (https://www.portland.gov/police/bhu-advisory/documents). |
| Membership requirements of BHUAC as outlined in Paragraph 94 continue to be met, with a current roster of 15 voting members, representing a variety of entities involved in the mental health response systems. Beyond the roster requirements, voting members are expected to attend, and there needs to be at least eight voting members present for quorum. For both of the meetings held in the fourth quarter, a quorum was met. Additionally, four new members |

| | |
|---|---|
| were added to the committee, and three of them were able to able to attend the December meeting. The new members represent a variety of community partners and will be a great new addition to the committee, helping to ensure a quorum and a variety of perspectives. We continue to find the PPB to be in Substantial Compliance with this paragraph. | |
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Based On** | BHUAC roster; BHUAC minutes; Observations of BHUAC meetings |

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 95. The [BHU] Advisory Committee shall provide guidance to assist the City and PPB in the development and expansion of [ECIT], [BHRT], SCT, BOEC Crisis Triage, and utilization of community-based mental health services. The [BHU] Advisory Committee shall analyze and recommend appropriate changes to policies, procedures, and training methods regarding police contact with persons who may be mentally ill or experiencing a mental health crisis, with the goal of de-escalating the potential for violent encounters. The [BHU] Advisory Committee shall report its recommendations to the [BHU] Lieutenant, PPB Compliance Coordinator, COCL (as described herein), and the BOEC User Board. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review BHUAC minutes; Observe BHUAC meetings |
| **Compliance Assessment** | |
| Paragraph 95 envisions that BHUAC committee members will assist "the City and PPB in the development and expansion of [ECIT], [BHRT], SCT, BOEC Crisis Triage, and utilization of community-based mental health services." BHUAC continued to hold monthly meetings in the fourth quarter of 2022. The meeting agendas included a variety of topics. The October meeting included presentations on the proposal to include a mental health professional and/or someone with lived experience on the Police Review Board (PRB) as well as a | |

presentation from the Multnomah County Mobile Crisis Response Procurement. The committee was presented with information about how the current iteration of PRB operates and why the addition of a person with experience in the mental health field would be beneficial for the board. The committee agreed that it would be beneficial but discussed some of the logistical challenges like the amount of time needed to review the cases, possible conflict of interest and thoughts regarding payment for the services provided. The group agreed to return to this issue at a later meeting. At the December meeting, a member of the PPB presented on SOP 3-3 on Enhanced Crisis Intervention Team. The committee asked about requirements for eligibility to be an ECIT officers and how hiring is impacted by distribution across precincts. The committee was interested in learning more about the eligibility criteria regarding past disciplinary action, and PPB was to provide the Corrective Action Guide to the committee so they have a better understanding of the disciplinary process. An additional presentation at the December meeting provided information on the BHU Behavioral Health Resource Guide. The PPB is updating their approach to the Guide and the 2022 version will be the final version in its current format. Moving forward, the PPB will be transitioning to using cards with phone numbers and QR codes.

We find that the PPB and BHUAC have maintained Substantial Compliance with the requirements of this paragraph, though note that compliance was conditioned upon PPB providing a force presentation during the March meeting. We recently observed this presentation and were overall impressed with the range of information offered to BHUAC. We will provide a complete update in our 2023 Q1 report.

| | |
|---|---|
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Based On** | Review of BHUAC minutes and agendas; Observation of BHUAC meetings |

**Settlement Agreement Paragraph**

96. Within 240 days of the Effective Date of this Agreement, the [BHU] Advisory Committee will provide status reports on the implementation of the [BHU] and BOEC Crisis Triage, and identify recommendations for improvement, if necessary. PPB will utilize the [BHU] Advisory

Committee's recommendations in determining appropriate changes to systems, policies, and staffing.

| Compliance Label | Substantial Compliance |
| --- | --- |
| Methodology | Review BHUAC recommendations found in BHUAC minutes |

**Compliance Assessment**

In accordance with Paragraph 96, BHUAC continues to provide the COCL with a report of their votes and recommendations for the implementation of the BHU and BOEC. In the fourth quarter of 2022, BHUAC made three formal recommendations. The first formal recommendation concerned the proposal of a force data presentation. BHUAC approves and recommends having the Office of Inspector General (OIG) present force data at the March meeting each year. This data will cover incidents with those persons in actual or perceived mental health crisis as well as the previous year's data on Officer involved shootings and in-custody deaths. In addition to the presentation on the annual data, BHUAC recommends that the OIG also provides quarterly force reports to the committee. BHUAC plans to review this process at the end of each year to identify any data gaps. The second recommendation from BHUAC was for the PPB to add an individual with lived or professional behavioral health experience to the membership of the Police Review Board (PRB). The third recommendation was for the PPB's BHU to transition their Mental Health Resource Guide to informational sheets with QR codes that officers can scan to access various community resources.

However, while BHUAC's recommendations appeared well thought-out and developed, we were not provided evidence from the PPB that the Committee received a response. Some recommendations may require additional steps and revisions to City code (for example, the recommendation to expand PRB membership to include an individual with lived or professional experience with mental illness). However, a formal response should still have been provided to memorialize how the PPB and the City intend to utilize the Committee's recommendations.

| COCL Recommendations | • Provide responses to BHUAC recommendations |
| --- | --- |

**Exhibit A**

| | |
|---|---|
| **Assessment Based On** | BHUAC status reports and recommendations; PPB responses to BHUAC recommendations |

## B. Continuation of C-I Program

<table>
<tr><td colspan="2" align="center"><strong>Settlement Agreement Paragraph</strong></td></tr>
<tr><td colspan="2">97. PPB provides C-I Training to all its officers. C-I is a core competency skill for all sworn police officers in the City. PPB shall continue to train all officers on C-I.</td></tr>
<tr><td colspan="2">98. PPB agrees to continue to require a minimum of 40 hours of C-I training to all officers before officers are permitted to assume any independent patrol or call-response duties. Additionally, PPB shall include C-I refresher training for all officers as an integral part of PPB's on-going annual officer training. PPB's Training Division, in consultation with [BHU] Advisory Committee, shall determine the subjects and scope of initial and refresher C-I training for all officers.</td></tr>
<tr><td rowspan="2"><strong>Compliance Label</strong></td><td>97. Substantial Compliance</td></tr>
<tr><td>98. Substantial Compliance</td></tr>
<tr><td><strong>Methodology</strong></td><td>Review of PPB in-service training</td></tr>
<tr><td colspan="2" align="center"><strong>Compliance Assessment</strong></td></tr>
<tr><td colspan="2">The PPB continues to emphasize crisis response as a core competency in their training. For instance, all officers are required to receive a minimum of 40 hours of crisis intervention training prior to graduating from the Advanced Academy. In the fourth quarter of 2022, the PPB continued the Advanced Academy that began in September and provided 18 hours of Crisis Intervention training to recruits, this is in addition to the 4.5 hours provided in the third quarter, bringing the total to 22.5 hours of C-I training. This complements the 28 hours of C-I training that all recruits get in the statewide DPSST Basic Academy, which exceeds the 40 hours of required C-I training</td></tr>
</table>

| COCL Recommendations | • Consider seeking BHUAC input during training development rather than after training has been developed |
|---|---|
| **Assessment Based On** | PPB In-service training |

### C. Establishing "Memphis Model" Crisis Intervention Team

| **Settlement Agreement Paragraph** |
|---|
| 99. Within 120 days of the Effective Date, PPB shall establish a Memphis Model Crisis Intervention team ("[ECIT]"). |

| Compliance Label | Substantial Compliance |
|---|---|
| **Methodology** | Review BHU/ECIT data; Interview PPB Personnel; Review Mental Health Template data; Review BOEC data |

| **Compliance Assessment** |
|---|
| The PPB continues to operate under a modified "Memphis Model" of crisis intervention. In this specialized response system, a select group of officers receive an additional 40 hours of training to become Enhanced Crisis Intervention Team (ECIT) officers. As part of ECIT operations, the PPB has Directive 850.20 (Police Response to Mental Health Crisis) which was revised during the third quarter, then subsequently presented to officers during the Q3 In-service training. Along with discussing the revisions, PPB provided a brief training that distinguished between the roles and responsibilities of ECIT, Portland Street Response, and Project Respond. We therefore continue to find that the PPB has sufficiently memorialized their crisis response model in both policy and training.

In the fourth quarter of 2022, the PPB reported 148 active members on the ECIT roster. This includes a new class of 18 officers who completed the ECIT certification class in the fourth quarter of 2022. Additionally, the BHU continued to hold ECIT advisory meetings. During the fourth quarter, ECIT members from all precincts discussed topics related to ECIT Course |

Certification, BHU caseload, BOEC dispatch, and New BHU Clinician Staff. For instance, the minutes from the meeting included conversation around how to manage chronic callers as well as how to share information between BHRT and ECIT officers so that officers are aware when an individual is on BHRT caseload.

As a result, maintaining their model, we continue to find the PPB has substantially complied with the requirements of Par. 99.

| COCL Recommendations | • No recommendations at this time |
|---|---|
| Assessment Based On | ECIT roster; PPB's Semi-Annual Mental Health Crisis Response Report |

---

**Settlement Agreement Paragraph**

100. PPB's [ECIT] shall be comprised of officers who volunteer for assignment to the [ECIT]. The number of [ECIT] members will be driven by the demand for [ECIT] services, with an initial goal of 60-80 volunteer, qualified officers.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review ECIT Roster; Interview PPB personnel |

**Compliance Assessment**

The PPB continues to follow the practice of accepting volunteer officers for ECIT certification. In the fourth quarter of 2022, 18 additional officers were ECIT-certified at the conclusion of the November certification course. This brought the total number of active ECIT members up to 148 members, with 125 being operational, which also includes the reduction in the number from the de-certification process described in the second quarter. Additionally, the distribution of ECIT officers across precinct and shift is consistent with patterns of ECIT calls

| | |
|---|---|
| (see our outcome assessment below). As a result, we continue to find Substantial Compliance with the requirements of this paragraph. | |
| **COCL Recommendations** | • Continue utilizing existing data to assess demand for ECIT services |
| **Assessment Based On** | Mental Health Template data; ECIT roster; PPB's Semi-Annual Mental Health Crisis Response Report |

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 101. No officers may participate in [ECIT] if they have been subject to disciplinary action based upon use of force or mistreatment of people with mental illness within the three years preceding the start of [ECIT] service, or during [ECIT] service. PPB, with the advice of the [BHU] Advisory Committee, shall define criteria for qualification, selection, and ongoing participation of officers in the [ECIT]. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review evaluation documents for potential ECIT officers |
| **Compliance Assessment** | |
| In the fourth quarter of 2022, the PPB added 18 new ECIT members, and no changes were made to the qualifications. As part of our assessment, we reviewed the Work History Review Sheet for the new ECIT members. The review sheet sufficiently addresses the requirements of this paragraph. | |
| As an update prior reports, we note that at the December 2022 meeting, the PPB made a presentation to BHUAC about ECIT recruitment, qualifications, and eligibility requirements. The Committee suggested that the ECIT SOP (SOP #3-3) should reflect that recruitment of ECIT officers should also be guided by shift-precinct needs. The PPB said they would come present to BHUAC with a modified version of the SOP. It is unclear when this presentation will | |

take place, but the COCL recommends it occur well before the next ECIT certification course, so that BHUAC recommendations can be incorporated into any recruitment efforts. As a result of the current process as well as engaging with BHUAC for the future process, we continue to find the PPB in Substantial Compliance with the requirements of this paragraph.

| **COCL Recommendations** | • Re-engage BHUAC regarding ECIT participation criteria |
|---|---|
| **Assessment Based On** | PPB ECIT evaluation documents |

| **Settlement Agreement Paragraph** | |
|---|---|
| 102. PPB shall specially train each [ECIT] member before such member may be utilized for [ECIT] operations. PPB, with the advice of the [BHU] Advisory Committee, shall develop such training for [ECIT] members consistent with the Memphis Model. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review PPB supplemental documents |

**Compliance Assessment**

In the fourth quarter of 2022, 18 new members completed the ECIT certification training. This certification training followed the same format and content as previously approved and delivered certification training. The PPB did share the contents of the training with BHUAC in the third quarter, and BHUAC members were able to comment and provide feedback. Some of the feedback was to make slight language changes in the presentations, which the PPB did update. Two other recommendations were made to include additional scenarios. One recommendation was to include a scenario with an emphasis on methamphetamine psychosis, and the other was a scenario in which the officer would vicariously experience auditory and visual hallucinations. The PPB provided a response to BHUAC indicating how they planned to incorporate each of the recommendations in future trainings.

We continue to appreciate the PPB's dedication to providing comprehensive ECIT training consistent with the Memphis Model. We recommend the PPB continue to analyze and update their materials for ECIT training on an ongoing basis and continue to utilize outside perspectives, such as those from BHUAC to help inform training content.

| COCL Recommendations | • Continue to seek out recommendations from BHUAC on ECIT training |
| --- | --- |
| Assessment Based On | PPB supplemental documents; Observation of BHUAC meeting |

### Settlement Agreement Paragraph

103. [ECIT] members will retain their normal duties until dispatched for use as [ECIT]. BOEC or PPB may dispatch [ECIT] members to the scene of a crisis event.

| Compliance Label | Substantial Compliance |
| --- | --- |
| Methodology | Review PPB policy |

### Compliance Assessment

In accordance with Par. 103 (and the Memphis Model of mental health crisis response), ECIT members retain their normal duties until dispatched for use as ECIT. BOEC personnel have received training on the criteria for dispatching an ECIT to a call. Additionally, the PPB's Directive 850.20 includes the requirement for officers to consider calling in specialized units (including ECIT) as necessary.

However, in the fourth quarter, the PPB revised Directive 850.20 to now read to mean that the originally responding officer remains the primary on the call even when an ECIT officer is requested or dispatched (see Section 6.1 of Directive 850.20, Police Response to Mental Health Crisis). The revision was approved by DOJ, though we note that this approach undercuts the value of Par. 103 by negating the purpose of dispatching a specially trained officer to the scene of a crisis event (i.e., an enhanced set of skills not possessed by non-ECIT officers). This also strays further from the Memphis Model (see Par. 99) which anticipates a

specialized response to all crisis calls and considers the specialized officer to be the "designated responder and lead officer in mental health crisis events" (CIT Core Elements, pg. 12[18]). It would seem natural that a specially trained officer being dispatched to the exact situation where they have received special training would take over as primary (i.e., "the lead officer in mental health crisis events"), unless it would serve as a detriment to the overall safe resolution of the event. However, the policy revision actually does the opposite and requires non-ECIT officers to remain as primary despite having a specially-trained officer on hand. Overall, we continue to find the PPB has maintained compliance with Par. 103 though we suggest the PPB reconsider the potential impact of this revision.

| **COCL Recommendations** | • Reconsider revisions to 850.20 |
| --- | --- |
| **Assessment Based On** | PPB policy |

| **Settlement Agreement Paragraph** |
| --- |
| 104. PPB will highlight the work of the [ECIT] to increase awareness of the effectiveness of its work. |

| **Compliance Label** | Substantial Compliance |
| --- | --- |
| **Methodology** | Review PPB public awareness efforts; Review BHU website; Review BHUAC minutes |

| **Compliance Assessment** |
| --- |
| The PPB continues to perform a wide variety of tasks designed to increase awareness of the work performed by the BHU, ECIT, BHRT, and SCT. This work includes flash alert emails, newsletters, conference presentations, conference attendance, community outreach training |

---

[18] http://www.cit.memphis.edu/information_files/CoreElements.pdf

and presentations, social media, and other efforts. We believe that the PPB has made a serious effort to highlight the work of the BHU in its entirety, not only the ECIT.

For instance, in the fourth quarter of 2022, the BHU Newsletter shared positive news about multiple graduates from the Service Coordination Team (SCT) program who were celebrating long term recovery. The newsletter also congratulated recent Supportive Transitions and Stabilization (STS) Program graduates. The newsletter mentioned upcoming BHUAC community engagement meetings, as well as shared biographies for new BHU members including three new clinicians and one new BHRT officer. Following the PPB's BHU presentation at the CIT international conference in the third quarter, the PPB was in contact with numerous agencies who were interested in learning more about their co-response model. The BHU held meetings with these agencies during the fourth quarter to help assist them with their co-response models. Based on this and our previous review of the PPB outreach efforts, we believe the PPB has substantially complied with the requirements of Par. 104.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | Public awareness and education documents |

| **Settlement Agreement Paragraph** |
|---|
| 105. For each crisis event to which [ECIT] is dispatched, the [ECIT] member shall gather data that [BHU] shall utilize to track and report data on public safety system interactions with individuals with perceived or actual mental illness or who are in crisis. These data shall include: (COCL summary) the required tracking of details about the context and nature of incident, information about the subject, techniques used, injuries, disposition, presence of mental health professional on scene, and a narrative of the event. |

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Review Mental Health Template data; Interview PPB personnel |

**Compliance Assessment**

In accordance with this paragraph, the PPB must collect data on mental health calls, and the BHU is required to report on the data collected. In the fourth quarter of 2022, PPB continued to use the Mental Health Template (MHT) as the method for collecting the data points required in Par. 105. The PPB's quality assurance plan for ECIT-related data and outcomes includes analysts auditing associated data on a monthly basis.

The BHU provided the COCL with a quarterly report describing MHT data for ECIT calls in the fourth quarter of 2022. In the fourth quarter, the PPB received 391 MHTs on 381 calls that reported an ECIT officer was on scene (a single call may result in more than one MHT being completed). ECIT officers authored 275 (70%) of the MHTs. For the 381 calls, the most common technique used was de-escalation (40%). A total of 13 calls (3% of the total) reported a use of force. For the disposition of the 366 calls, the most common clearance type was report completed (78% of calls), followed by about 9% of calls being cleared by arrest (physical). All these statistics are similar to prior quarters.

Due to the nature and extent of data collected and analyzed on ECIT dispatches, the PPB remains in Substantial Compliance with Par. 105

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | Mental Health Template data |

## D. Mobile Crisis Prevention Team

**Settlement Agreement Paragraph**

106. PPB currently has a [BHRT] comprised of a two-person team, one sworn officer and one contractor who is a qualified mental health professional. Within 120 days of the Effective Date, City shall expand [BHRT] to provide one [BHRT] car per PPB precinct.

107. Each [BHRT] car shall be staffed by one sworn PPB officer and one qualified mental health professional. [BHRT] shall be the fulltime assignment of each such officer.

| Compliance Label | 106. Substantial Compliance |
| --- | --- |
| | 107. Substantial Compliance |
| Methodology | Review BHU Unit Structure; Review of BHUAC meeting, Interview PPB Personnel |

### Compliance Assessment

The PPB continues to have a BHRT car in each precinct composed of one officer and one qualified mental health professional. For the officer, BHRT is considered their full-time assignment. As an update to prior reports, the PPB continued in their efforts to expand the number of BHRT teams back to five. In the fourth quarter of 2022, the PPB officially hired an additional BHRT officer, bringing the total from four to five BHRTs. PPB aims to maintain the five teams as the complete roster for BHRT. One BHRT is assigned to each of the precincts (East, Central and North), a fourth BHRT is assigned to Houseless Outreach, and a fifth BHRT is assigned to Proactive Follow-up. As a result of their current effort we continue to find the PPB is in Substantial Compliance with the requirements of Pars. 106 and 107.

| COCL Recommendations | • No recommendations at this time |
| --- | --- |
| Assessment Based On | BHU Unit Structure |

### Settlement Agreement Paragraph

108. No officers may participate in [BHRT] if they have been subject to disciplinary action based upon use of force or mistreatment of people with mental illness within the three years preceding the start of [BHRT] service, or during [BHRT] service. PPB, with the advice of [BHU] Advisory Committee, shall define criteria for qualification, selection, and ongoing participation of officers in the [BHRT].

| Compliance Label | Substantial Compliance |
| --- | --- |
| Methodology | Review evaluation documents for potential ECIT officers |

| Compliance Assessment |
| --- |
| All BHRT officers are ECIT certified and are held to the same eligibility standards as ECIT officers. In addition, S.O.P. #43 covers the ongoing participation of officers involved with BHRT. The BHU Sergeants and the Lieutenant monitor all current BHRT members through the Employee Information System (EIS) and PSD to ensure qualifications are maintained. For the new BHRT officer who assumed the role in Q4, we were provided with the evaluation spreadsheet and can confirm that the officer met the eligibility requirements. We therefore continue to find the PPB remains in Substantial Compliance with Paragraph 108. |

| COCL Recommendations | • No recommendations at this time |
| --- | --- |
| Assessment Based On | PPB policy |

| Settlement Agreement Paragraph |
| --- |
| 109. PPB shall specially train each [BHRT] member before such member may be utilized for [BHRT] operations. PPB, with the advice of the [BHU] Advisory Committee, shall develop such training for [BHRT] members. |

| Compliance Label | Substantial Compliance |
| --- | --- |
| Methodology | Review reported trainings for BHRT members |

| Compliance Assessment |
| --- |

The BHU continues to promote supplemental training for supervisors and BHRT members. In the fourth quarter of 2022, members took part in external supplemental training and conferences. For instance, the CIT Coordinator attended the CITCOE Summit and attended presentations, along with giving a presentation entitled "Empowering your community and building trust through community presentations". Some BHU members also went on a tour and meet and greet at the Oregon State Hospital. In addition, individual members attended some single day training covering topics such as: Addiction Resource and Supervision Models. It appears that the BHU has continued to forge a culture in which ongoing learning and training is promoted and encouraged. We therefore find the PPB has maintained Substantial Compliance with Paragraph 109.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | PPB quarterly report identifying supplemental BHRT training |

| **Settlement Agreement Paragraph** | |
|---|---|
| 110. [BHRT] shall utilize [ECIT] data to proactively address mental health service, in part, by connecting service recipients with service providers. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review Mental Health Template summary data; Review BERS summary data |
| **Compliance Assessment** | |

The PPB has continued the practice of collecting data through the Mental Health Template (MHT). When an officer has an encounter with a mental health component, they will complete the MHT, and this information is used to address mental health service needs. If an individual is a subject of three Mental Health Templates (MHTs) in a 30-day period, then they

will be referred to the Behavioral Health Unit Electronic Referral System (BERS) (if a referral had not already been made).

Once an individual is referred, a team will look at specific criteria including: a demonstration of escalating behavior, frequent contacts with the PPB, considered a risk to self or others, and whether case-specific information indicates a potential need for BHRT intervention. If the individual is deemed an appropriate candidate for additional intervention, then the Behavioral Health Unit Coordination Team (BHUCT) (which is composed of law enforcement, court, service provider, and hospital provider personnel, among other relevant stakeholders) will discuss a plan of action.

The PPB has continued to conduct analysis of BHRT operations on a quarterly basis to identify potential trends as well as ensure ongoing system function. In the fourth quarter of 2022, a total of 187 referrals were processed by the BHU. Of the 187 referrals, 107 (57%) were assigned to BHRT's caseload. This assignment rate represents an increase from the previous three quarters (47%, 50%, 52%, and 55% respectively). Historically, acceptance rates have generally been between 45% and 55%.

In the fourth quarter of 2022, 98 individuals transitioned to inactive status with BHRT. Of those individuals, 39 (40%) had been previously assigned to BHRT's caseload in a different quarter and continued into the fourth quarter of 2022.

As shown in Figure 6.1, this quarter saw that the most common reason for a referral to be assigned was for Frequent Contacts (42%), closely followed by Escalating Behavior (36%).

**Figure 6.1 Assigned Cases Reason for Referral (provided by the PPB)**



When looking at the outcomes of referrals for inactive cases in the fourth quarter of 2022 (Figure 6.2), the most common outcome was Concern Mitigated (21%), closely followed by Unable to Locate (16%) and Coordinated Services (16%).



**Figure 6.2: Inactive Cases Outcome of Referral (provided by the PPB)**

The PPB's current practice of collecting data through the MHT, meeting weekly to share information and using data to inform service needs fulfills the requirements outlined in Par. 110, and we continue to find them in Substantial Compliance.

| **COCL Recommendations** | • Continue to collect data and create reports on mental health services |
|---|---|
| **Assessment Based On** | Mental Health Template data; BERS referral data |

---

**Settlement Agreement Paragraph**

111. Within 180 days of the Effective Date, PPB, with the advice of [BHU] Advisory Committee, shall develop policies and procedures for the transfer of custody or voluntary referral of individuals between PPB, receiving facilities, and local mental health and social service agencies. These policies and procedures shall clearly describe the roles and responsibilities of these entities and of [BHRT] officers in the process.

| **Compliance Label** | Substantial Compliance |
|---|---|

| Methodology | Review Directives 850.20, 850.21, 850.22, and 850.25; Interview PPB personnel |
|---|---|

| **Compliance Assessment** |
|---|
| The PPB continues to operate under the Directives 850.20, 850.21, 850.22, and 850.25, which dictate the procedures for AMR to provide transportation for a person in a mental health crisis. These directives were also reviewed by BHUAC during the first quarter of 2022. In the third quarter of 2022, in-service training provided an overview of the updates made to Directive 850.20. Furthermore, the PPB continues to collaborate with AMR when issues arise in the transportation of an individual dealing with a mental health crisis (see our assessment of Par. 89). The PPB also has a designated liaison Sergeant at each precinct to respond, in real time, to any transportation issues. As the PPB continues to uphold these procedures, we find they have maintained Substantial Compliance with Paragraph 111. |

| COCL Recommendations | • No recommendations at this time |
|---|---|

| Assessment Based On | Directives 850.20, 850.21, 850.22, and 850.25; PPB interviews |
|---|---|

### E. Service Coordination Team

| **Settlement Agreement Paragraph** |
|---|
| 112. The Service Coordination Team ("SCT"), or its successor, shall serve to facilitate the provision of services to individuals who interact with PPB that also have a criminal record, addiction, and highly acute mental or physical health service needs. |

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review SCT outcome measures; Review SCT Referrals Report |

**Compliance Assessment**

The PPB continues to facilitate the provision of services to individuals who experience drug-addiction, mental illness, and are chronically involved in criminal behavior. The SCT coordinates access to housing, medical, counseling, and addiction/mental health services. Members of the SCT are proactive in seeking out collaborations with other stakeholders in the State of Oregon.

The PPB also continues to provide data demonstrating that, over the years, SCT has consistently grown in the number of people referred to the program as well as the number of people served by the SCT. For the fourth quarter of 2022, the number of referrals was 235, as shown in Table 6.1 below. This is a decrease from 2022 Q2 and Q3 the previous two quarters (318 and 263 respectively), though overall trends remain largely consistent with pre-2020 (when Covid caused a reduction in referrals). Of these referrals, the SCT accepted 70.6% while the other 29.4% did not meet the assignment criteria. The primary reasons for not meeting criteria were the lack of criminal history (33.3%) and lack of recent crimes (24.6).

**Table 6.1: SCT Referrals (provided by PPB)**

| SCT Referrals, 2022 Q4 | N | % of Total |
|---|---|---|
| Number of Referrals | 235 | - |
| Number of Individuals Referred* | 232 | - |
| Number of Referrals That Met Assignment Criteria | 166 | 70.6% |
| Number of Referrals That Did Not Meet Assignment Criteria | 69 | 29.4% |
| Reason for Not Meeting Assignment Criteria | N | % of Not Meeting Assignment Criteria |
| Lacks criminal history | 23 | 33.33% |
| Lacks recent crimes | 17 | 24.64% |
| Higher level of care | 10 | 14.49% |
| Unable to Locate | 8 | 11.59% |
| Other | 4 | 5.80% |
| Crimes outside Portland | 3 | 4.35% |
| Aggression | 2 | 2.90% |
| Arson | 1 | 1.45% |
| Sex Offender | 1 | 1.45% |

Additionally, the Supportive Transitions and Stabilization (STS) Program is an expansion of the SCT operation and is run by the Central City Concern's Housing Rapid Response. It is intended

to address the needs of those with mental illness and co-occurring disorders who temporarily require a more extensive level of care by creating a direct housing resource. In the fourth quarter of 2022, 20 individuals were referred, 15 of the referrals were accepted, and a total of five new participants were served, as shown in the table below (Table 6.2). Furthermore, the PPB anticipates that restoring the fifth BHRT team will continue to raise referrals and we will continue to provide updates on these trends.

**Table 6.2: STS Referrals (provided by PPB)**

| STS Referrals, 2022 Q4 | |
|---|---|
| Number of Referrals* | 20 |
| Number of Individuals Referred | 20 |
| Average Age of Individuals Referred | 43 yrs |
| Number of Referrals Accepted (Met Criteria) | 15 |
| Number of Referrals Declined | 5 |
| Number of new participants served during Quarter | 5 |
| Number of participants who successfully completed | 2 |
| Participants terminated for cause/non-compliance | 1 |
| Participants who voluntarily withdrew from program | 0 |
| Average Length of Stay (days) of those who exited during Quarter | 145.3 |
| Bed utilization rate | 69.1% |

| | |
|---|---|
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Based On** | SCT process; SCT outcome measures |

**F. BOEC**

**Settlement Agreement Paragraph**

113. Within 120 days of the Effective Date, BOEC and PPB, with the advice of the [BHU] Advisory Committee, shall complete policies and procedures to triage calls related to mental health issues, including changes to protocols for assigning calls to [Behavioral Health Call

| | |
|---|---|
| Center - BHCC], and adding new or revised policies and protocols to assign calls to PPB [BHU] or directly to NGOs or community-based mental health professionals. ||
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Interview BOEC personnel; Review BOEC protocols |

<div align="center">

**Compliance Assessment**
</div>

BOEC has completed and maintained the policies and procedures prescribed within Par. 113. BOEC's Mental Health and ECIT dispatch Protocol S.O.P. identifies seven call characteristics where an ECIT dispatch officer will be dispatched. These characteristics include when there is a mental health component and: (1) a weapon is present; (2) the person is violent; (3) the call is at a mental health facility; (4) the caller is threatening suicide and has the means to carry it out; (5) at the request of a community member; (6) at the request of another officer; (7) or when the person represents an escalating risk of harm to self or others.

BOEC has maintained their policy criteria for ECIT dispatch, which partially satisfies the requirement for crisis triage. In addition, BOEC has updated criteria for forwarding calls to the Behavioral Health Call Center (BHCC). BOEC also has triage protocol in place for PSR, though due to continued negotiations between the City and the PPA, BOEC does not presently have an official policy for PSR[19]. In total, the triage protocols for mental health calls satisfies Par. 113 and BOEC remains in Substantial Compliance though we will still await updates regarding an official PSR policy.

| | |
|---|---|
| **COCL Recommendations** | • Create BOEC PSR policy |
| **Assessment Based On** | BOEC protocols for ECIT dispatch; BOEC protocols for BHCC referral; BOEC protocols for PSR dispatch |

---

[19] The PPA represents both PPB officers and BOEC dispatchers and has the right to demand to bargain anything which includes BOEC policy.  Several City entities (including PPA) are in negotiations about the future of PSR and therefore, BOEC has been unable to release a policy that is currently subject to those negotiations.

| **Settlement Agreement Paragraph** | |
| --- | --- |
| 114. Within 180 days of the Effective Date, the City will complete training of all BOEC Dispatchers in Crisis Triage. The City, with the advice of the [BHU] Advisory Committee, shall develop ongoing training for BOEC Dispatchers. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Interview BOEC personnel |

| **Compliance Assessment** |
| --- |
| BOEC staff continue to receive training in crisis triage both as new employees as well as ongoing refresher training. With the addition of Portland Street Response, BOEC has a new element within their crisis triage to consider when implementing future trainings. In the fourth quarter, BOEC delivered in-service training to their employees. BOEC provided the COCL with the slides used to guide this training. Topics discussed at the training included: updates to the definition of mental health crisis, ECIT response, PSR, suicidal callers, and callers requesting an ambulance. In regard to ECIT response, trainers went over some data of the response, the importance of triaging for ECIT and addressed barriers for sending ECIT. Employees were also provided with the policy highlights for the SOP for PSR and were able to ask questions about the policy. During the in-service training, employees took a pre and post knowledge test to assess level of understanding for ECIT call classification. For example, employees were presented with five scenarios and asked whether they should receive an ECIT response. The trainers used the results of these tests to spark discussion and address misunderstandings. |
| No additional planning for trainings took place in the fourth quarter. BOEC does have a plan to release a self-study module for the PSR SOP once it is officially completed. We will continue to provide updates in future quarters though note that a focus training will need to be developed for PSR once official policies have been adopted. |

| **COCL Recommendations** | • Develop focused training for PSR |
| --- | --- |

| **Assessment Based On** | Prior observation of BOEC training; Interview with BOEC personnel |
|---|---|

---

### Settlement Agreement Paragraph

115. Within 180 days of the Effective Date, the City shall ensure Crisis Triage is fully operational to include the implementation of the policies and procedures developed pursuant to the above paragraph and operation by trained staff.

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Review of BOEC data; Interview with BOEC personnel |

### Compliance Assessment

The COCL reviewed data related to the operation of BOEC, not only in the context of the PPB's crisis response but also in the context of other triage options, including transferring calls to the BHCC and dispatching PSR to calls that meet the necessary criteria. For instance, in the fourth quarter evaluation of mental health calls, the PPB identified 6,000 calls with a mental health component. BOEC audited a random sample of 345 of these calls to ensure that dispatchers are applying the criteria appropriately. In 12 of those calls (3.5%) BOEC's audit later found that sufficient information existed at the time of the call to warrant it being dispatched as ECIT. This rate is consistent with prior reporting periods. BOEC also assessed accuracy for calls transferred to the BHCC, with 17 out of 313 calls being kicked back to BOEC for ECIT dispatch (we note this may not indicate fault with the telecommunicators decision, for BHCC operators may learn additional information warranting emergency response).

We also reviewed the integral role that BOEC has played with respect to the city-wide expansion of PSR. In the fourth quarter, BOEC set up 2,567 calls for PSR, an increase of 37% from the third quarter as additional PSR units were operational. Moving forward, we will continue to monitor the progress of PSR, including the operation of BOEC as it relates to being able to dispatch them when the response criteria are met. However, for this quarter, we continue to find BOEC to be in Substantial Compliance with the requirements of this paragraph.

| **COCL Recommendations** | • Continue to address PSR issues and determine their implications for policy and training |
|---|---|
| **Assessment Based On** | Review of BOEC data; Interview with BOEC personnel; Interview with PSR personnel |

**Mental Health Outcome Assessment**

*ECIT Training*

During the fourth quarter of 2022, the PPB provided a comprehensive evaluation of the 2021 ECIT training provided to officers. Although the COCL covered some of this data in our Q3 Outcome Assessment, we begin our Mental Health Outcome Assessment by highlighting some of the main findings pertaining to the use of mental health resources as well as those that lead to a physical arrest. As seen in the figures below (Figure 6.4 and Figure 6.5) provided by the PPB, an ECIT call is more likely than not to result in a transport, with over 60% of ECIT calls between 2019 and 2021 having this result. In events where a transport does not occur, approximately 20% have either a mental health professional on-scene or one was contacted. Additionally, the analysis shows that ECIT calls were cleared by a physical arrest in less than 5% of cases for the last four years. As such, the data analysis conducted by the PPB shows that when responding to an ECIT call, people in mental health crisis do not appear to be criminalized and they are most likely going to be transported to a location where they will be able to receive services.

**Figure 6.4: Percentage of ECIT Calls with a Mental Health Template Associated with a Police Officer Hold or Director's Hold**



**Figure 6.5: ECIT Calls Cleared by Physical Arrest**



*Calls Involving a Mental Health Component Data*

The COCL examined data regarding the PPB's response to calls involving a mental health component over the last two years. Using data from the fourth quarter of 2020 through the third quarter of 2022, we investigated possible trends and how that should inform the PPB mental health response.

**Table 6.3: Quarterly Calls with a Mental Health Component by Precinct**

|  | 2020 Q4 | 2021 Q1 | 2021 Q2 | 2021 Q3 | 2021 Q4 | 2022 Q1 | 2022 Q2 | 2022 Q3 | Average |
|---|---|---|---|---|---|---|---|---|---|
| **Central** | 342 | 332 | 333 | 289 | 302 | 296 | 258 | 315 | **308** |
| **East** | 300 | 271 | 261 | 237 | 232 | 188 | 191 | 225 | **238** |
| **North** | 268 | 282 | 280 | 204 | 218 | 190 | 145 | 168 | **219** |
| **Total** | 910 | 885 | 874 | 730 | 752 | 674 | 594 | 708 | 766 |
| Total Average Before PSR = 804 | | | | | Total Avg After PSR = 651 | | | | |

Table 6.3 highlights the distribution of calls with a mental health component by precinct during the past two years. On average, Central precinct received the highest number of calls with a mental health component (*Mean*=308), followed by East (*Mean*=238) and North (*Mean*=219). Portland Street Response (PSR) was implemented citywide at the end of the first quarter in 2022 (earlier, a pilot program was operating in a neighborhood of East precinct). Ideally, PSR would operate in such a way that it would reduce call volume in some capacity for the PPB. As such, we did see that there was a decrease in the number of calls with a mental health component after implementation of PSR. Before the citywide implementation of PSR, the average numbers of calls with a mental health component across all precincts was 804, which dropped to 651 after the citywide implementation. Although all three Precincts showed a reduction post-PSR implementation, the largest drop was seen in North Precinct which had a 35% reduction in calls with a mental health component. Central Precinct showed a 9% decrease post-PSR implementation. However, for all three Precincts, the decrease in calls with a mental health component was primarily due to the second quarter of 2022, and in the third quarter, all three demonstrated increases over the second quarter. Therefore, at this point, it is too soon to

tell how the implementation of PSR will affect the volume of calls with a mental health component, but the PPB should continue to collect and monitor this data to see if any trend occurs.

Paragraph 100 of the Settlement Agreement requires that the PPB distribute ECIT officers according to the need for services. Taking the averages of ECIT call distribution by precinct over the last two years, we used this information to compare against the current make-up of the ECIT roster. In the fourth quarter of 2022, the PPB reported that they had 125 operational ECIT officers. Distributed among the precincts, Central Precinct had 40 active ECIT members, East Precinct had 29 and North Precinct had 27. The remaining 29 operational ECIT officers were housed in the SRD (n=22), Detective Division (n=3), Personnel Division (n=2) and Training Division (n=2). As they were not assigned to a Precinct, they will not be included in this analysis. In reviewing the distribution of ECIT officers across the three Precincts and the distribution of ECIT calls (based on the data above), we see a high degree of parity, as shown in Table 6.4.

**Table 6.4: Proportion of ECIT Calls Compared to Proportion of ECIT Officers**

|         | **Proportion of ECIT Calls** | **Proportion of ECIT Officers** |
|---------|:---:|:---:|
| **Central** | 40.3% | 41.7% |
| **East** | 31.1% | 31.1% |
| **North** | 28.1% | 28.6% |

In addition, the overall distribution of ECIT officers across shifts is reasonable given trends in ECIT call volume. As seen in Figure 6.6 (figure provided by the PPB), the number of ECIT calls rise between the hours of 1:00 pm and 10:00 pm. These hours largely overlap with two PPB shifts: Shift A (7:00 am to 5:00 pm) and Shift C (3:00 pm to 1:00 am). In reviewing the breakdown of ECIT officers' shifts, we see that the majority of ECIT officers are on these shifts and where the shifts overlap (3:00 pm to 5:00 pm) are two of the hours with higher numbers of ECIT calls. Shift E (10:00 pm to 8:00 am) has the lowest proportion of ECIT officers (27.7%) though this shift typically sees fewer ECIT calls when compared to Shift A and Shift C (see Table 6.5). Overall, the data indicates that during the hours of the day which have the highest number of ECIT calls, those are also the hours of the day which have the highest number of ECIT officers working.

**Exhibit A**

### Table 4-1: CAD Calls 04/01/2022 - 09/30/2022
### Temporal Relationship of ECIT Calls
### All Calls

|  | Sun | Mon | Tue | Wed | Thu | Fri | Sat | Grand Total |
|---|---|---|---|---|---|---|---|---|
| 0 | 5 | 8 | 6 | 7 | 7 | 6 | 12 | 51 |
| 1 | 10 | 11 | 3 | 7 | 9 | 6 | 7 | 53 |
| 2 | 3 | 5 | 4 | 2 | 3 | 1 | 7 | 25 |
| 3 | 3 | 10 | 5 | 2 | 4 | 8 | 1 | 33 |
| 4 | 3 | 4 | 1 | 3 | 2 | 2 | 2 | 17 |
| 5 | 3 | 3 | 3 | 1 | 1 | 4 | 2 | 17 |
| 6 | 1 | 4 | 6 | 4 | 2 | 2 | 3 | 22 |
| 7 | 4 | 5 | 6 | 5 | 2 | 3 | 5 | 30 |
| 8 | 2 | 6 | 11 | 10 | 11 | 5 | 7 | 52 |
| 9 | 5 | 5 | 15 | 4 | 10 | 7 | 3 | 49 |
| 10 | 5 | 4 | 8 | 10 | 6 | 9 | 7 | 49 |
| 11 | 5 | 13 | 6 | 9 | 13 | 11 | 6 | 63 |
| 12 | 7 | 6 | 10 | 9 | 16 | 9 | 7 | 64 |
| 13 | 9 | 13 | 15 | 16 | 9 | 12 | 5 | 79 |
| 14 | 11 | 10 | 12 | 15 | 11 | 10 | 9 | 78 |
| 15 | 10 | 8 | 8 | 9 | 13 | 5 | 2 | 55 |
| 16 | 6 | 8 | 10 | 9 | 10 | 9 | 9 | 61 |
| 17 | 10 | 7 | 12 | 13 | 16 | 17 | 8 | 83 |
| 18 | 10 | 10 | 17 | 14 | 10 | 16 | 7 | 84 |
| 19 | 4 | 12 | 8 | 11 | 16 | 11 | 8 | 70 |
| 20 | 12 | 14 | 10 | 4 | 12 | 12 | 13 | 77 |
| 21 | 9 | 9 | 9 | 13 | 12 | 5 | 6 | 63 |
| 22 | 5 | 9 | 17 | 14 | 14 | 10 | 7 | 76 |
| 23 | 8 | 2 | 8 | 4 | 8 | 13 | 8 | 51 |
| Grand Total | 150 | 186 | 210 | 195 | 217 | 193 | 151 | 1302 |

### Table 6.5: Shift Distribution of ECIT Officers

| Shift | Hours | Number of ECIT Officers | Proportion of ECIT Officers |
|---|---|---|---|
| Shift A | 7:00 am to 5:00 pm | 32 | 35.6% |
| Shift C | 3:00 pm to 1:00 am | 33 | 36.7% |
| Shift E | 10:00 pm to 8:00 am | 25 | 27.8% |

After a call has been coded for ECIT response, another important metric to analyze is the response rate, or how often an ECIT officer was able to response to an ECIT call. The average response rate over the last two years has been 69.5%, which is in line with the historical

average. Table 6.6 looks at the average response rate by precinct over the four reporting periods.

**Table 6.6: Average Response Rate by Precinct**

|  | 2020 Q4 & 2021 Q1 | 2021 Q2 & 2021 Q3 | 2021 Q4 & 2022 Q1 | 2022 Q2 & 2022 Q3 | Average |
|---|---|---|---|---|---|
| Central | 72% | 73% | 74% | 74% | **73%** |
| East | 73% | 77% | 70% | 67% | **72%** |
| North | 63% | 63% | 65% | 60% | **63%** |

The North Precinct has a consistently lower response rate each reporting period, with the most recent reporting period indicating the lowest response rate (60%). Although our comparison of the average number of calls by precinct with the current roster of active ECIT officers by precinct suggests adequate staffing levels, the response rates may indicate that something else is at-play. The PPB should assess why the North Precinct has lower response rates and determine whether additional ECIT officers are needed to address this trend or whether other solutions may be needed.

The PPB provided data on the reasons why an ECIT officer was not on scene of an ECIT call. Table 6.7 provides a breakdown of these reasons across four reporting periods over the last two years. Over the last two years, an ECIT officer not being available accounted for 6% to 9% of the total reasons for not having an ECIT officer on the scene, indicating that the availability of ECIT officers has remained pretty stable over the last two years though remaining an area to maintain attention to. However, we note that "Not Dispatched" constituted nearly 20% of the reasons why an ECIT was not on-scene whereas in prior evaluations, this only accounted for approximately 10%. This data should be shared with BOEC to determine the range of reasons why an ECIT was not dispatched (as this is a vague category description) and identify potential resolutions.

**Table 6.7: Reason ECIT Officer Not On Scene of ECIT Call**

|  | 2020 Q4 & 2021 Q1 | 2021 Q2 & 2021 Q3 | 2021 Q4 & 2022 Q1 | 2022 Q2 & 2022 Q3 |
|---|---|---|---|---|
| Dispatched and Cleared | 61% | 66% | 63% | 54% |
| Not Dispatched | 11% | 9% | 13% | 19% |
| Other | 16% | 11% | 9% | 12% |
| Not Available | 6% | 8% | 6% | 9% |
| Related/duplicate call | 4% | 5% | 8% | 7% |
| On Scene per reporting other than CAD | 1% | 1% | 1% | 1% |
|  | n=553 | n=466 | n=423 | n=413 |

## VII. EMPLOYEE INFORMATION SYSTEM

### Settlement Agreement Paragraph

116. PPB has an existing Employee Information System ("EIS") to identify employees and design assistance strategies to address specific issues affecting the employee. *See* PPB Manual 345.00. PPB agrees to enhance its EIS to more effectively identify at-risk employees, supervisors and teams to address potentially problematic trends in a timely fashion. Accordingly, within 90 days of the Effective Date, PPB shall: (a) Require that commanders and supervisors conduct prompt reviews of EIS records of employees under their supervision and document the review has occurred in the EIS performance tracker; (b) Require that commanders and supervisors promptly conduct reviews of EIS for officers new to their command and document the review has occurred in the EIS performance tracker; and (c) Require that EIS staff regularly conduct data analysis of units and supervisors to identify and compare patterns of activity.

117. PPB agrees to use force audit data to conduct similar analyses at supervisor- and team-levels.

| Compliance Label | 116. Partial Compliance |
| | 117. Partial Compliance |
| Methodology | Interview EIS/PPB personnel; Review PPB EIS analysis |

### Compliance Assessment

The PPB continued to use the Employee Information System (EIS) as their primary system for identifying at-risk members and potentially problematic trends and "design[ing] assistance strategies to address specific issues affecting the employee" (Par. 116). As for the PPB's current procedure of evaluating subsections (a) and (b) of Par. 116, PPB reports rates of compliance with supervisory reviews that are consistent with prior quarters. As shown in the figure below, compliance for subsection (a) reviews (supervisors performing annual reviews) demonstrated that 99% of required reviews were completed on-time, whereas subsection (b) reviews ("new-to-command" reviews) were completed on-time for all cases (100%). This led to 99% on-time reviews for subsection (c), which looks at all opportunities for Par. 116

compliance. For all of these, there has been an overall upward trend of on-time reviews since the third quarter of 2021, as seen in Figure 7.1.

**Figure 7.1: Compliance with Reviews Directive 345.00 Reviews (provided by PPB)**



However, the COCL continues to have concerns with how the PPB and the Force Inspector identify "at-risk employees, supervisors, and teams." During this quarter, we were able to listen-in on conversations between the Force Inspector and Precinct commanders. In the meetings we observed, the Force Inspector and commanders discussed several individual officers who were identified by the Force Inspector as being force outliers. This represents a positive step forward to use effectively the data to identify a narrowed set of individuals whose force statistics warrant further review.

We acknowledge this step forward, but additional information is required before we can find that the PPB has returned to Substantial Compliance with this paragraph. For instance, we have requested the PPB meet with the COCL to discuss the Force Applications spreadsheet prior to the Force Inspector meeting with commanders. We have proposed this as a way to work collaboratively with the Force Inspector and better understand each other's thought processes when identifying the officers of highest priority for review and possible

intervention. For example, many of the officers discussed during the fourth quarter were the same officers whom we identified when reviewing the Force Applications spreadsheet as warranting further review. However, we were confused as to why other officers were identified and believe our confusion could have been resolved by meeting beforehand. A debriefing meeting afterwards did not resolve this confusion. Despite our request to work with the PPB and provide more direct technical assistance before the meetings with the commanders occur, the PPB has held the position that such technical assistance should be provided in our reports. This has slowed the process and the PPB's ability to improve its compliance rating.

In reviewing commanders' written responses for the individuals discussed during the meeting, we continue to see language which does not address the underlying concerns (i.e., that these individuals represent a statistical anomaly) but rather focuses on the specific uses of force. For instance, one officer had 8 FDCRs in 2022 Q3 (meetings which occur in Q4 use Q3 data to drive the discussion). In discussing this officer, the commander commented that they were "a highly active officer in a busy district [that] had 13 of 15 uses of force[20] that were cat 4, no concerns." This ignores the fact that all other officers with similar measures of being "highly active" (including one officer who had nearly double the number of calls for service and 3x the number of arrests) had three or fewer uses of force during the quarter. Another commander stated that the underlying force events for a different officer "were reviewed and found to be in policy without concern." This again ignores the fact that EIS is non-disciplinary and therefore whether or not the force was within policy should not be the evaluative focus – the focus instead should be on why the member is a statistical outlier and seek to determine if intervention, coaching, additional training, or other types of assistance "in a timely fashion" is necessary. We continue to point the PPB to their own training:

*"EIS is designed to **capture outliers when comparing officers to their peers**. We identify outliers to **address problematic trends with constructive interventions**. We seek to prevent poor outcomes – **to the community and to officers** – before they occur, and prevent career-ending behavior"* (emphasis added).

In addition, a meeting devoted to identifying the data associated with a comprehensive assessment of the PPB's EIS to determine the system's effectiveness occurred during the first quarter of 2023. We will therefore provide an update in our next report.

---

[20] The officer had 8 FDCRs and 15 applications of force

| | |
|---|---|
| **COCL Recommendations** | • To achieve Substantial Compliance, require the Force Inspector to conduct the Type III alert process in accordance with Directive 345.00.<br><br>• To achieve Substantial Compliance, implement corrective action for Precinct Commanders when significant review failures occur<br><br>• Continue contributing to the development of the EIS evaluation |
| **Assessment Based On** | EIS and threshold review process |

| | |
|---|---|
| **Settlement Agreement Paragraph** | |

118. PPB shall continue to use existing thresholds, and specifically continue to include the following thresholds to trigger case management reviews: (a) Any officer who has used force in 20% of his or her arrests in the past six months; and (b) Any officer who has used force three times more than the average number of uses of force compared with other officers on the same shift.

119. Within 90 days of the Effective Date, PPB shall add one additional threshold to trigger case management review of any officer who has three uses of force in a one-month period.

| | |
|---|---|
| **Compliance Label** | 118. Substantial Compliance |
| | 119. Substantial Compliance |
| **Methodology** | Interview EIS/PPB personnel; Reviewed EIS program data |

**Compliance Assessment**

The thresholds the PPB are required to maintain for Par. 118 continue to be used to flag officers for supervisory reviews. The PPB continues to collate data from a variety of sources, including force events, traumatic incidents (captured in Regional Justice Information Network

(RegJIN), complaints, and commendations (captured in Administrative Investigations Management (AIM)). These data are used to identify potentially problematic behavior with the predetermined thresholds identified by these paragraphs.

In the fourth quarter of 2022, EIS Administrators reviewed a total of 269 alerts and sent 152 (56.5%) on for RU Manager review (see Figure 7.2). When forwarded to the RU Manager, the alert may be reviewed and closed by the RU Manager or sent on to the officer's supervisor for either closure or an intervention (i.e., coaching, commending, debriefing, monitoring, referring to the Employee Assistance Program (EAP), training, or temporary reassignment). For alerts closed in the fourth quarter of 2022 (which may also include cases opened in prior quarters), there were 140 alerts sent to the RU Manager and for 100 (71.4%) of those instances, the alert was sent on for further supervisor review (the second highest percentage in the prior four quarters). Additionally, 73% of alerts sent to an officer's supervisor during the fourth quarter of 2022 resulted in some type of intervention. The information provided by PPB indicates that for all 73 alerts closed with an intervention, the intervention involved a debriefing or supervisors coaching (see Table 7.1).

As with Par. 116, we are continuing to work with the PPB to analyze the relative effectiveness of EIS interventions, both from empirical data analyses as well as through conversations with key stakeholders in the EIS process. However, the PPB continues to use the thresholds as outlined by Pars. 118 and 119, we continue to find they have substantially complied with these paragraphs.



Figure 7.2: EIS Alerts and Alerts Sent to RU Manager (provided by PPB)

### Table 7.1: EIS Alerts and Interventions

|  | 2021 Q4 | 2022 Q1 | 2022 Q2 | 2022 Q3 | 2022 Q4 |
|---|---|---|---|---|---|
| Alerts Closed by RU | 215 | 170 | 174 | 174 | 140 |
| Alerts Sent to Supervisor (Percent of Alerts Sent to RU) | 181 (84.2%) | 112 (65.9%) | 126 (72.4%) | 103 (59.2%) | 100 (71.4%) |
| Interventions (Percent of Alerts Sent to RU) | 162 (75.3%) | 88 (51.8%) | 94 (54.0%) | 82 (47.1%) | 73 (52.1%) |
| Interventions (Percent of Alerts Sent to Supervisor) | 162 (89.5%) | 88 (78.6%) | 94 (74.6%) | 82 (79.6%) | 73 (73%) |

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | Current EIS thresholds and associated data |

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 120. Within 90 days of the Effective Date, PPB shall identify and train a second EIS administrator. This individual may be assigned to other tasks within the Professional Standards Division or as otherwise needed. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Reviewed Directive 345.00; Reviewed EIS Program |
| **Compliance Assessment** | |
| Paragraph 120 requires that the PPB "identify and train a second EIS administrator." During the fourth quarter of 2022 PPB maintained the second EIS administrator that was trained and joined the team in the first quarter of 2022. We therefore find that the PPB has maintained compliance with Par. 120. | |
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Based On** | Maintenance of second EIS Administrator |

# VIII. OFFICER ACCOUNTABILITY

## A. Investigation Timeframe

| | |
|---|---|
| **Settlement Agreement Paragraph** | |

121. PPB and the City shall complete all administrative investigations of officer misconduct within one-hundred eighty (180) days of a complaint of misconduct, or discovery of misconduct by other means. For the purposes of this provision, completion of administrative investigations includes all steps from intake of allegations through approval of recommended findings by the Chief, excluding appeals, if any, to CRC. Appeals to CRC should be resolved within 90 days.

| Compliance Label | Substantial Compliance |
|---|---|
| **Methodology** | Review IPR Quarterly Data Analysis; Review Administrative Investigation Management (AIM) System data |

**Compliance Assessment**

On a quarterly basis, IPR provides summary statistics for all full administrative investigations which are closed within 180 days of their initiation date. Using the quarter in which the cases were opened as reference, IPR statistics show that of the 20 cases that were opened in the second quarter of 2022 (the last quarter for which 180 days could have passed for this report), only 3 cases exceeded the 180-day timeline (15%). Additionally, the quarterly statistics indicate that 5 cases from the third quarter of 2022 have already been completed within 180 days while 19 remain open (though still within 180-day timeframe).

Overall, between IA and IPR, there has a compliance rate between 80% and 90% since early 2021. However, we recognize that some cases do, by their nature go beyond 180-days. This has included OIS events, the investigation into the offensive slide deck, and the investigations associated with Par. 192. While all involved would like to see these cases resolved expeditiously, the PPB and IPR representatives have expressed a desire to make sure they are conducting a complete investigation for these cases. We understand the need to gather as much information as possible and go through the appropriate checks-and-balances built into the current Portland accountability system. However, given the context of Par. 129, PPB and

the City should continue to serve as learning organizations and explore the unique nature of these high-visibility cases to identify opportunities for reducing the investigative timeline. While we find the City and the PPB to have maintained Substantial Compliance with the requirements of Par. 121, we suggest the City conduct a case-study evaluation on these types of cases to see where such opportunities exist.

| **COCL Recommendations** | • Conduct case-study evaluation on OIS events and other high-visibility cases to identify unique opportunities for reducing timelines |
|---|---|
| **Assessment Based On** | IPR data indicating adherence to 180-day timeline |

| **Settlement Agreement Paragraph** |
|---|
| 122. PPB shall conduct administrative investigations concurrently with criminal investigations, if any, concerning the same incident. All administrative investigations shall be subject to appropriate tolling periods as necessary to conduct a concurrent criminal investigation, or as otherwise provided by law, or as necessary to meet the CRC or PRB recommendation to further investigate. |

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Review Criminal-IA Concurrent Investigation Audit Reports; Review Directive 0330.00 |

**Compliance Assessment**

In Q4 of 2022, the PPB continued to provide documentation indicating when an Internal Affairs investigation began compared to when the criminal investigation began. In this quarter there were four cases that required both a criminal and an Internal Affairs investigation. In all four cases, the Internal Affairs investigation and criminal investigation were initiated on the same day and a review of the AIMI data associated with each indicates that investigation occurred during the pendency of the criminal investigation.  We therefore

| | |
|---|---|
| find that all four cases met the criteria for "concurrent" and, as a result, continue to find that the PPB has maintained compliance with Par. 122. | |
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Based On** | Criminal-IA Concurrent Investigation Audit reports |

| **Settlement Agreement Paragraph** | |
|---|---|
| 123. If PPB is unable to meet these timeframe targets, it shall undertake and provide to DOJ a written review of the IA process, to identify the source of the delays and implement an action plan for reducing them. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review Administrative Investigations Report |
| **Compliance Assessment** | |

In the fourth quarter of 2022, the PPB closed 22 administrative investigations. The PPB provided the COCL with an Administrative Investigations Report which noted that one case exceeded the 180-day timeline. The PPB stated that the administrative investigation exceeded the 180-day timeline due to the investigation being considered "complicated." Essentially, this means that the case was initiated without there being an identified PPB member in the case as well as the case being returned to the investigator multiple times for additional interviews and the addition or alteration of allegations. The PPB considered this situation to be an exception to standard practices and therefore did not offer corrective actions to prevent a similar outcome in future cases.

In addition, we continue to evaluate stage timelines to see whether consistent processes occurred at a micro-level. During this quarter, 18 cases did not exceed the 180-day timeline

overall but had stages which exceeded the stage-timeline.[21] In some of the cases, there was an intentional delay in order to focus on other cases. At other times, there were delays in stages based on a leave of absence, delays in the criminal investigations, and delays in the CRC process, among others. When outlining the reasons for stage-timeline delays, IA lieutenants typically did not make any recommendations for addressing those delays, maintaining that there was no need to make recommendations as the overall timeline did not extend beyond 180-days.

Because the PPB has continued to document clear explanations for cases that exceed their allotted timeline, as well as take remedial action to address reasons for delays, we continue to find them in Substantial Compliance with the requirements of Par. 123. However, we maintain our ongoing suggestion that supervisors identify remedies for delays in individual stages, even if the entire investigation timeline was under 180-days.

| | |
|---|---|
| **COCL Recommendations** | • Maintain self-improvement loop for stages that exceed their stage timeline even if the case does not exceed the 180-day timeline |
| **Assessment Based On** | Administrative Investigations Report |

## B. On Scene Public Safety Statements and Interviews

| |
|---|
| **Settlement Agreement Paragraph** |
| 124. Within 90 days of the Effective Date, the City and PPB shall review its protocols for compelled statements to PSD and revise as appropriate so that it complies with applicable law and current professional standards, pursuant to *Garrity v. New Jersey*, 385 U.S. 493 (1967). The City will submit the revised protocol to DOJ for review and approval. Within 45 days of obtaining DOJ's approval, PPB shall ensure that all officers are advised on the revised protocol. |

| Compliance Label | Substantial Compliance |
|---|---|

---

[21] Additionally, there were three cases that did not exceed the 180-day timeline and also did not exceed the stage timelines.

| Methodology | Review Directive 1010.10 |
|---|---|

| | **Compliance Assessment** |
|---|---|
| | During the fourth quarter of 2022, the PPB maintained their protocols for compelled statements to PSD and all officers have been advised on the protocol. As a result, we find the PPB has maintained compliance with Par. 124. |

| **COCL Recommendations** | • No recommendations at this time |
|---|---|

| **Assessment Based On** | Current PPB policy |
|---|---|


| | **Settlement Agreement Paragraph** |
|---|---|
| | 125. Separation of all witnesses and involved officers to lethal force events is necessary in order to safeguard the integrity of the investigation of that event. Immediately following any lethal force event, PPB shall continue to issue a communication restriction order ("CRO") to all witness and involved officers, prohibiting direct or indirect communications between those officers regarding the facts of the event. The CRO will continue, unless extended further, until conclusion of the Grand Jury or, if no Grand Jury is convened, until a disposition is determined by the District Attorney. |

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Reviewed CROs for 2022 Second Quarter OIS events |

| | **Compliance Assessment** |
|---|---|
| | In the fourth quarter of 2022, there were three OIS incidents. In the first OIS, which occurred on October 14, 2022, the PPB issued one CRO. In the second OIS, which occurred on November 7, 2022, the PPB issued 19 CROs. In the third OIS, which occurred on November 19, 2022, the PPB issued five CROs. The PPB provided the COCL with copies of the CROs for |

each of the OIS incidents and a review of the CROs indicates they were issued within a reasonable amount of time after the OIS (e.g., within four to five hours of the event). As the PPB continues to issue CROs in OIS events COCL finds that the PPB remains in compliance with the requirements of Par. 125.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | CROs for 2022 first quarter OIS events |

---

**Settlement Agreement Paragraph**

126. PPB shall continue to require witness officers to lethal force events to give an on-scene briefing to any supervisor and/or member of the Detective Division to ensure that victims, suspects, and witnesses are identified, evidence is located, and provide any information that may be required for the safe resolution of the incident, or any other information as may be required.

| **Compliance Label** | <mark>Partial Compliance</mark> |
|---|---|
| **Methodology** | Review Officer-Involved Shooting case file excerpts |

**Compliance Assessment**

During the fourth quarter of 2022 there were three OIS incidents. The PPB provided evidence that a witness officer conducted an on-scene walkthrough following two of the OIS incidents. In the case of the third OIS, the one occurring on October 14, 2022, there were no witness officers who were present when the shooting occurred. Therefore, there was no witness officer on-scene walkthrough conducted for that OIS (though it appears a sergeant conducted a walk-through of evidence they found at the scene).

In our 2021 Q3 report, as well as our 2022 Q2 and Q3 reports, we noted that the PPB should review and revise Directive 1010.10 to include mental health in the definition of officer incapacitation as a reason not to complete an on-scene walkthrough, as well as establish

| | criteria and training to evaluate and determine when someone meets the criteria. As of the writing of this report, Directive 1010.10 has not been revised and we therefore continue to find that the PPB has not returned to substantial compliance with the requirements of Par. 126. |
|---|---|
| **COCL Recommendations** | • To achieve Substantial Compliance, revise Directive 1010.10 to allow for the potential for witness officers being incapacitated for mental health reasons<br><br>• Provide criteria to make such a determination |
| **Assessment Based On** | OIS case file excerpts; Review of Directive 1010.10 |

| **Settlement Agreement Paragraph** | |
|---|---|
| 127. In agreement and collaboration with the Multnomah County District Attorney, PPB shall request that involved officers in lethal force and in-custody death events provide a voluntary, on-scene walk-through and interview, unless the officer is incapacitated. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review Officer-Involved Shooting case file excerpts |
| **Compliance Assessment** | |
| In the fourth quarter of 2022, there were three OIS incidents with a total of five involved officers. As has been the case in prior lethal force incidents, the involved member in each case declined to participate in an on-scene walkthrough and interview. Regardless, as a result of the PPB requests, we continue to find the PPB has substantially complied with the requirements of Par. 127. | |
| **COCL Recommendations** | • No recommendations at this time |

**Exhibit A**

| | |
|---|---|
| **Assessment Based On** | OIS case file excerpts. |

### C. Conduct of IA Investigations

---

**Settlement Agreement Paragraph**

128. Currently, both IPR and PPB's PSD have authority to conduct administrative investigations, provided that IPR interview of PPB Officers must only be conducted jointly with IA. Within 120 days of the Effective Date, the City will develop and implement a plan to reduce time and effort consumed in the redundant interview of witnesses by both IPR and IA, and enable meaningful independent investigation by IPR, when IPR determines such independent investigation is necessary.

| **Compliance Label** | Partial Compliance |
|---|---|
| **Methodology** | Interviews of PPB and City Staff |

**Compliance Assessment**

During the fourth quarter of 2022, both IPR and IA maintained their respective administrative investigations using the system we have previously found compliant with Par. 128. Aside from their own independent investigations, our review of cases this quarter also highlighted IPR's thorough effort in conducting intake investigations for follow-up by the PPB, particularly the range and depth of information collected during the intake process.

However, the City and the PPB continue to be in Partial Compliance due to the Records Division backlog of documents, which is now estimated to be around 100,000 documents. The City notes that the Records Division is operating at approximately 85% capacity though they are in the process of hiring additional employees. The expectation is that with the additional employees (once they have been trained), they will be able to address the excess backlog by the end of 2023.

The concern with the document backlog originally stemmed from an incident where IPR was not provided with a key document as part of an investigation due to the backlog. This also led to uncertainty on the part of IPR as to whether documents may be missing for other

---

investigations though, to-date, the issue does not appear to have been repeated. However, the event identified a gap, and that gap has yet to be addressed. As complaints of misconduct can come from even the most minor of interactions, IPR having timely access to documents is important both for intake investigations and full investigations. And while the entire backlog may never be fully eliminated, given that records are continuously being added, the PPB is going in the wrong direction. The volume of the backlog has increased, approximately doubling from when the issue first came to our attention (from 45,000 to 50,000 to now 100,000). To return to Substantial Compliance, we will need to see PPB address the identified gap, reversing the size of the backlog and moving back towards a manageable volume which will limit the potential for a repeat event.

| **COCL Recommendations** | • To achieve Substantial Compliance, address the identified gap in the size of the records backlog |
|---|---|
| **Assessment Based On** | Ongoing Records Division Backlog |

| **Settlement Agreement Paragraph** |
|---|
| 129. The City and PPB shall ensure that all allegations of use of excessive force are subject to full and completed IA investigations resulting in findings, unless there is clear and convincing evidence to IPR that the allegation has no basis in fact. |

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review administrative closure justifications for allegations of excessive force |

| **Compliance Assessment** |
|---|
| In the fourth quarter of 2022, data provided by IPR indicated two complaints containing allegations of excessive force were administratively closed by IPR. In both cases the complaints were administratively closed due with the closure category of "complainant unavailable." IPR investigators made several attempts to contact the complainant (either |

individually or through their legal representation) to schedule an interview. In previous reports we have noted that the use of the "complainant unavailable" administrative closure category would require changes to IPR's SOPs. In the third quarter of 2022 we reported that the revisions were being reviewed by the City Attorney's Office. At present, IPR is still awaiting feedback from the City and so the SOP has not been finalized.

However, we continue to see incidents where explicit statements alleging excessive force on-scene are not forwarded to IPR or IA for a full and complete investigation. For instance, in one event the responding sergeant notes a direct witness' exclamations that "none of this had to happen!", "I was standing right there! He was not aggressive!", and "that did not need to happen." Later in the narrative, the sergeant also states, "I asked why [the arrested suspect] struggled with the Officers, he denied struggling or tensing up." Given that the suspect denied struggling, and the primary witness implied the force was excessive, this is a violation of Par. 129.

This is also another instance where we would recommend holding the supervisor (as well as the chain-of-command, see Par. 73) accountable for failing to forward the allegation onward (Another case is currently under investigation). As this trend continues, we maintain our recommendation that supervisors receive refresher training on their responsibilities with respect to allegations of excessive force.

| | |
|---|---|
| **COCL Recommendations** | • To return to Substantial Compliance, complete the revisions to the SOP that would codify Administrative Closures – Complainant Unavailable<br><br>• To return to Substantial Compliance, initiate accountability mechanisms for the supervisor who failed to forward the allegation for full investigation<br><br>• To return to Substantial Compliance, re-emphasize the responsibilities of on-scene supervisors and provide documentation of efforts to COCL |
| **Assessment Based On** | Administrative closure of allegations of excessive force |

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 130. The City and PPB shall continue to expressly prohibit all forms of retaliation, including discouragement, intimidation, coercion, or adverse action, against any person who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review Directive 310.20 |

**Compliance Assessment**

During the fourth quarter of 2022, the PPB maintained Directive 310.20 (Discrimination, Harassment, and Retaliation Prohibited) which contains the requirements of Par. 130 (see Policy #2 within the Directive). There were three complaints made with allegations of harassment/retaliation during the fourth quarter. One of the complaints was administratively closed due to the complainant being unavailable; the other two complaints were still being investigated at the close of Q4.

In discussing with IPR the decision to administratively close allegations of harassment or retaliation, we were provided with the intake investigation reports for six such closures since the fourth quarter of 2021. After reviewing the reports, we found each closure decision reasonable. For instance, closures were primarily due to either the complainant not being accessible (similar to issues IPR has had with use of force allegations, see Par. 129) or instances where the initial collected evidence was inconsistent with the allegations. Furthermore, to IPR's credit, two of the reports were forwarded on for precinct review for further discussion with members, reflecting a system of ongoing feedback and transparency.

As a result, we continue to find Substantial Compliance with the requirements of Par. 130.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | Directive 310.20 |

| **Settlement Agreement Paragraph** |
|---|
| 131. <u>COCL Summary</u>. Paragraph 131 states that "The City and PPB shall retain Police Review Board procedures currently utilized for purposes of investigation and making recommended findings on administrative complaints, except as outlined below." The subsections of Par. 131 refer to PRB membership, rotation of CRC members serving on the PRB, requirements and qualifications for PRB members, provisions for removing community members or CRC members serving on the PRB, term limits for CRC members serving on the PRB, the requirement for CRC members to recuse themselves from the CRC if part of the PRB hearing the case, and stipulated discipline. (For details and exact language, see the Settlement Agreement). |

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review Directive 336.00; Review City Code 3.20.140 |

| **Compliance Assessment** |
|---|
| The PPB's Directive 336.00 and the City's Code 3.20.140 have been maintained, which outline the operations of the PRB. However, in the fourth quarter of 2022, we observed one PRB which did not facilitate participants' ability to "make thoughtful, unbiased, objective recommendations to the Chief of Police and Police Commissioner that are based on facts" (Par. 131(c)). In that case, there was no presentation of each application of force and no serious discussions about the decision-making of members during the force event. We are limited in the information we can publicly reveal about our observations of PRB. Suffice it to say that the ability of PRB members to comply with this paragraph was hindered by the presentation. We therefore find the PPB has returned to Partial Compliance with this paragraph. We anticipate this case (as well as more recent cases) will be the subject of further discussion between DOJ, the City, and COCL. |

| **COCL Recommendations** | • To return to Substantial Compliance, ensure all PRBs contain an assessment of each application of force as well as discussion about the decision-making of each member during the force event |
|---|---|

| **Assessment Based On** | Observation of PRBs and PRB documents |
| --- | --- |

**Settlement Agreement Paragraph**

132. By majority vote, the PRB may request that investigations of misconduct be returned to its investigating entity, i.e. PSD or IPR, to complete the investigation as to factual matters necessary to reach a finding regarding the alleged misconduct. The investigating entity must make reasonable attempts to conduct the additional investigation or obtain the additional information within 10 business days or provide a written statement to the PRB explaining why additional time is needed.

| **Compliance Label** | Substantial Compliance |
| --- | --- |
| **Methodology** | Review PPB Directive 336.00 |

**Compliance Assessment**

During the fourth quarter of 2022, the PPB maintained Directive 336.00 (Police Review Board) which memorializes the authority of PRB to send a case back for additional investigation. There were no such instances during this quarter. As Par. 132 has been placed into policy and adequately covered, we find the PPB has maintained Substantial Compliance with the requirements of this paragraph.

| **COCL Recommendations** | • No recommendations at this time |
| --- | --- |
| **Assessment Based On** | PPB Directive 336.00 |

---

**Settlement Agreement Paragraph**

133. <u>COCL Summary</u>: Paragraph 133 states that, "If an officer's use of force gives rise to a finding of liability in a civil trial," PPB shall be required to take various actions. The subsections of Par. 133 include requirements for findings of liability including EIS documentation, re-evaluation for specialized units, automatic IA investigations, review of previous IA investigation if one was already completed, and a published summary if IA investigation did not reach the same finding. (For details and exact language, see the Settlement Agreement).

| Compliance Label | Substantial Compliance |
|---|---|
| **Methodology** | Review S.O.P. #32 and #42 |

**Compliance Assessment**

During the third quarter of 2022, the PPB maintained S.O.P. #32 (Civil Liability and Tort Claims) and S.O.P. #42 (Evaluation of Members Fitness to Participate in All Current and Prospective Specialized Units when the Use of Force Results in a Finding of Liability in a Civil Trial). The combination of these two S.O.P.s contains the requirements of Par. 133.

In the fourth quarter of 2022, there was a finding of liability as a result of a jury award to a woman who was pushed down by an unknown PPB member with a baton. IPR had previously initiated an investigation as a result of the lawsuit but was unable to identify the officer based on the available information. After the award, IPR re-initiated the case, incorporating the information found at trial, but was still unable to identify the officer. As a result, several of the steps required by Par. 133 could not be accomplished for the liable but unknown officer.

In this case, the exact letter of the Par. 133 was followed, and we therefore find the City and the PPB have remained in Substantial Compliance with the requirements of this paragraph. However, we suggest the City and the PPB consider expanding their understanding of the intent of this paragraph for future events. IPR attempted to identify the specific officer, but because this was a crowd control event, the review might have then transferred to the incident commander. Alternatively, the PPB could have taken the opportunity to evaluate their overall crowd control tactics in light of the findings. The jury found the woman was battered by PPB officers as part of a dispersal push that was a common tactic by PPB officers during the 2020 protests. Consistent with task #5 of Par. 133, PPB could have worked with IPR

**Exhibit A**

to identify the reason why the training and use of such tactics led to a civil trial finding that the tactic amounted to battery. As the language of Par. 133 anticipates an identified officer, and no identified officer exists, much of the paragraph's explicit requirements are "moot" (PPB 2022 Q4 Quarterly Update) though that does not mean the intent of the paragraph should be considered as such in the future[22].

| COCL Recommendations | • Consider expanding the interpretation of Par. 133's intent |
|---|---|
| **Assessment Based On** | S.O.P. #32 and #42 |

## D. CRC Appeals

| **Settlement Agreement Paragraph** |
|---|
| 134. The City shall expand the membership of the CRC to 11 members, representative of the many and diverse communities in Portland, who are neutral, unbiased, and capable of making objective decisions. The quorum of CRC members necessary to act may remain at its existing level. |

| Compliance Label | Partial Compliance |
|---|---|
| **Methodology** | Review City Code 3.21.080 Review CRC meeting; communication with City staff; communication with CRC leadership |

| **Compliance Assessment** |
|---|
| CRC continues to include 11 community members who are representative of the community at large. While one member of CRC resigned, they were replaced to maintain mandated |

---

[22] We recognize that a broader review of protest tactics is being conducted by IMLLC and that the investigations required by Par. 192 are also reviewing the actions of incident commanders. However, these are requirements of the Settlement Agreement the City and PPB should be prepared to conduct these steps for potential future findings of liability when the Settlement Agreement no longer exists

membership numbers. During the fourth quarter, CRC met once in November. The meeting recording can be found on the Auditor's Office website[23] as well as the meeting minutes.[24] During this quarter, in observing the CRC meeting and in reviewing the posted minutes, we found a process that continues to build on the progress of the third quarter. Furthermore, CRC is planning a robust first quarter for 2023 in the ways they will continue sub-committee meetings and information sharing with the Police Accountability Commission. We will need to see the functionality and follow-through on the planning for the next quarter to return to Substantial Compliance.

In the previous quarter, we heard concerns from a CRC member that the City undervalues their work. This was repeated in the fourth quarter in discussions, as City personnel informed us that there is the potential for CRC members to become disinterested in the work if they are not receiving feedback or affirmation from the City with regards to the committee's efforts. There is also a feeling amongst CRC members that City staff members outside of IPR are uninterested in their efforts and do not attend open and public CRC meetings. Should the perception of being undervalued develop into some type of distrust or animosity towards the City, this could potentially lead CRC members to harbor bias towards the City, thereby having compliance implications. Thus, we continue to suggest that the City provide feedback on all CRC products in order to maintain the desire to be a part of this important committee.

| | |
|---|---|
| **COCL Recommendations** | ● To return to Substantial Compliance, follow through on the planning for the next quarter<br><br>● To return to Substantial Compliance, ensure feedback is provided on all CRC products |
| **Assessment Based On** | City Code 3.21.080; Review of CRC Minutes and CRC related personnel |

---

[23] https://efiles.portlandoregon.gov/Record/14957290/

[24] https://efiles.portlandoregon.gov/Record/15919064/

| | |
|---|---|
| **Settlement Agreement Paragraph** | |

135. The City and PPB agree that the CRC may find the outcome of an administrative investigation is unreasonable if the CRC finds the findings are not supported by the evidence.

136. In its review process for purposes of the appeal, the CRC may make one request for additional investigation or information to the investigating entity, i.e., PSD or IPR at any point during its review. The investigating entity must make reasonable attempts to conduct the additional investigation or obtain the additional information within 10 business days or provide a written statement to the CRC explaining why additional time is needed. The request for additional investigation or information may contain multiple points of inquiry, but no follow-up requests will be permitted. The additional request may be voted on by a quorum, the members voting must have read the Case File in order to vote, and any request with multiple points of inquiry must be prioritized.

| Compliance Label | 135. Substantial Compliance |
|---|---|
| | 136. Substantial Compliance |
| **Methodology** | Review PSF-5.03; Communications with City staff and CRC leadership |

| | |
|---|---|
| **Compliance Assessment** | |

The City maintains PSF-5.03 which memorializes CRC's authority as related to Pars. 135 and 136. Our observation of the CRC meeting during the fourth quarter indicates that CRC retains the authority to request an additional investigation and we have seen evidence of this process in prior quarters. Therefore, we find the City has maintained Substantial Compliance with this paragraph.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | Charter Code and Policy Code PSF-5.03; Meeting observation |

**E. Discipline**

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 137. Within 60 days of the Effective Date, PPB and the City shall develop and implement a discipline guide to ensure that discipline for sustained allegations of misconduct is based on the nature of the allegation and defined, consistent, mitigating and aggravating factors and to provide discipline that is reasonably predictable and consistent. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review Directive 338.00 and corresponding matrix guide; Review Corrective Action Recommendation documents; Review of Department of Justice Letter |

**Compliance Assessment**

In the fourth quarter of 2022, the PPB maintained Directive 338.00 (Discipline Guide) as well as the matrix guide that is easy to read and facilitates reasonably predictable and consistent discipline. Additionally, the guide allows for the integration of mitigating and aggravating factors and provides examples of each. We reviewed six Corrective Action Recommendation (CAR) documents provided by the PPB for the fourth quarter of 2022. In five of the CARs, the RU Manager provided mitigating and aggravating factors, rationale for their discipline recommendation, and any corrective action history. In one instance, there was no clear and stated justification for the discipline recommended. However, the remainder of the CARs provided all other necessary information and reasonable discipline.

As noted in our prior report, the PPB does not have an updated Directive 338.00 (currently titled Discipline Guide) to reflect the new Corrective Active Guide, which has replaced the Discipline Guide. The PPB indicates that they currently have an Executive Order which temporarily supersedes Directive 338.00 though we have stated that the PPB would need to update the directive and post it to the PPB website by the end of 2023 Q1 to maintain Substantial Compliance. Although this report focuses on the fourth quarter (and we therefore continue to find Substantial Compliance for this quarter), we will also note that the revisions were not finalized by the end of the first quarter and our compliance rating will be updated in the next report.

| **COCL Recommendations** | • To maintain Substantial Compliance, update Directive 338.00, publicly post the directive, and provide link to the Corrective Active Guide |
|---|---|
| **Assessment Based On** | Corrective Action Recommendations |

### F. Communication with Complainant and Transparency

**Settlement Agreement Paragraph**

138. Within 180 days of the Effective Date, the City shall enhance its existing website to ensure that a complainant can file and track his or her own complaint of officer misconduct.

139. Within 120 days of the Effective Date, the City shall review its protocols to ensure that the City shares with complainants requested documentation about his or her own complaint to the extent permitted by law.

140. The City shall ensure that IPR provides each complainant a tracking number upon receipt of the complaint, informs each complainant of the complaint classification, assignment (precinct or IA) and outcome of the compliant (sustained, unproven, etc.) in writing (whether mail, email/text, or fax), including information regarding whether the City took any corrective action. The City Attorney's Office shall determine whether disclosures regarding corrective action are required on a case-by-case basis consistent with Oregon's Public Records Law.

| **Compliance Label** | 138. Substantial Compliance |
|---|---|
| | 139. Substantial Compliance |
| | 140. Substantial Compliance |
| **Methodology** | Review IPR website; Review IPR policy; Review findings letters |

**Compliance Assessment**

We continue to see evidence of IPR conforming with Pars. 138, 139, and 140. IPR has maintained many different avenues for submitting a complaint. When an individual submits a complaint online, they receive a unique tracking number and can request a status update with that number. If they submit a complaint through another avenue, such as mail, telephone, or walk in, the IPR employee will submit the complaint through their online system to generate a tracking number which will be given to the complainant. IPR and the City will share requested documents with complainants in line with Oregon Public Records Request laws. From a protocol and operation standpoint, IPR has systems in place to ensure that they are complying with the requirements of Pars. 138, 139, and 140.

As with previous quarters, we reviewed a random sample of case files with the requirements of these paragraphs in mind. We were able to locate consistent documentation sent to complainants regarding the status of their cases, including when the cases were opened, when findings had been made, and when the cases were closed. As such, the COCL finds that the City is in Substantial Compliance with Pars. 138, 139, and 140.

| | |
|---|---|
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Based On** | IPR policy; Complaint tracking webpage; Finding and closure letters to complainant; Interview of IPR personnel |

| **Settlement Agreement Paragraph** | |
|---|---|
| 169. PPB shall apply policies uniformly and hold officers accountable for complying with PPB policy and procedure. | |
| **Compliance Label** | <mark>Partial Compliance</mark> |
| **Methodology** | Review sample of accountability cases; Review use of force events; Review EIS entries; Review force audit; Interviews with PPB and City personnel |
| **Compliance Assessment** | |
| As demonstrated in our assessment of other paragraphs, the accountability system operating within the PPB and the City continues to demonstrate both strengths and weaknesses. For | |

instance, during this quarter, we found each administrative complaint we reviewed had been handled appropriately (either as an administrative closure, SI, PR, or full investigation). Additionally, we found that each case we reviewed led to an investigation with findings was conducted in accordance with best practices and the findings were reasonable under a preponderance of evidence standard.

However, remaining concerns keep us from finding that the PPB and the City have consistently been able to "apply policies uniformly and hold officers accountable for complying with PPB policy and procedure." For instance, as thoroughly discussed in our review of Section III, several force events revealed concerns that, while not undercutting the reasonableness of the use of force, should have received greater supervisor scrutiny and correction. However, our review indicates that they did not receive such attention, and no reviewing supervisor was held accountable by a superior for their deficient review, leaving the chain of command as one barrier to the accountability system.

We have also discussed how on-scene statements are not always forwarded on as allegations of misconduct (Par. 129). We also note that in this same event, a juvenile witness was described as saying "They took my picture, and I didn't say that it was okay." The statement appears to be that she believed the officers were wrong for doing this but there is no indication that the sergeant asked whether they were alleging misconduct and no indication as to whether their statements were followed up with by a supervisor (see also Directive 0330.00, sections 2.1.2, 2.1.2.1, and 2.1.2.2). At the least, the witness could have been provided contact information for IPR in the event she wanted to file a complaint later. Coupled with the fact that the other witness' statements should have prompted an allegation of excessive force, this event resulted in two complaints that were not opened, rendering the on-scene sergeant as another barrier to accountability.

As noted in our assessment of Par. 131, a PRB this quarter failed to address each application of force, thereby impacting the comprehensiveness and fairness of the proceeding. Although we saw that PRBs had been operating effectively for several prior quarters, they too have represented a barrier to accountability over the longer term.

Finally, without video evidence to consider during an administrative review of officers' behavior, some investigations will likely be suspect in the eyes of community members without verifiable footage. As covered in Section XI (Remedies), the City has not yet approved a policy for body-worn cameras. Therefore, the lack of objective video evidence is a final barrier to verifiable accountability, one that is unlikely to be remedied soon.

In all, we believe that the investigative abilities of the City and the PPB remain strong overall and when an investigation is conducted, it is conducted comprehensively. However, the

| | accountability system is not reliable if barriers to entry are not addressed and the system does not result in fair and consistent resolutions. |
|---|---|
| **COCL Recommendations** | • To achieve Substantial Compliance, PPB should expand their approach to conducting objective investigations and hold officers accountable when policy violations are found<br><br>• To achieve Substantial Compliance, remedy barriers to ensure a fair and consistent accountability system |
| **Assessment Based On** | Sample of accountability cases; Sample of use of force events; Interviews with PPB and City personnel |

# IX. COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING

**Portland Committee on Community Engaged Policing (PCCEP)**

| Settlement Agreement Paragraph |
|---|
| 141. To leverage the ideas, talent, experience, and expertise of the community, the City, in consultation with the DOJ, shall establish a Portland Committee on Community Engaged-Policing ("PCCEP"), within 90 days of the Effective Date of the relevant amendments to this Agreement. |
| 142. The PCCEP shall be authorized to: (a) solicit information from the community and PPB about PPB's performance, particularly with regard to constitutional policing; (b) make recommendations to the Chief, Police Commissioner, the Director of the Office of Equity and Human Rights, and community and, during the effective period of this Agreement, to the DOJ; (c) advise the Chief and the Police Commissioner on strategies to improve community relations; (d) contribute to the development and implementation of a PPB Community Engagement Plan; and (e) receive public comments and concerns. The composition, selection/replacement process and specific duties of the PCCEP shall be set forth in a separate Plan for Portland Committee on Community-Engaged Policing ("the PCCEP Plan") which shall be substantially similar to Exhibit 1 to this Agreement. Amicus AMAC and Intervenor PPA shall be consulted regarding and DOJ shall review and approve any amendments to the PCCEP Plan proposed to occur during the effective period of this Agreement. |
| 143. PCCEP's membership will come from a reasonably broad spectrum of the community. PCCEP members shall not have an actual or perceived conflict of interest with the City of Portland. |

| Compliance Label | |
|---|---|
| | 141. Substantial Compliance |
| | 142. Partial Compliance |
| | 143. Substantial Compliance |

| **Methodology** | Observation of PCCEP meetings; Review of minutes, reports, and recommendations; Interviews with City staff and PCCEP |
|---|---|

**Compliance Assessment**

In the fourth quarter of 2022, PCCEP continued to progress towards functionality as a legitimate body for community engagement.

Highlights of PCCEP's work as a full committee in the fourth quarter included hosting a town hall with Independent Monitor LLC to discuss the PPB's response to the 2020 protests, holding a special meeting on PCCEP's bylaws, and a hosting a Town Hall with the COCL on the 2022 second quarter report. PCCEP also held a special meeting to draft a statement for the November 9 Settlement Agreement status conference; a quorum of PCCEP members was present to approve it.

In the fourth quarter of 2022, PCCEP continued monthly general meetings, which include community members, via Zoom. PCCEP voted for co-chairs during the November full committee meeting and resumed subcommittee work in late November with subcommittees focused on Racial Equity, Settlement Agreement and Policy, and Community Engagement.

Three PCCEP recommendations dating back to the third quarter of 2021 have been pending a response from the City to PCCEP. The delays have been attributed to turnover and changes in staffing within the Mayor's Office; a staff member responsible for ensuring responses to PCCEP recommendations departed the Mayor's office in early 2021.

In the first quarter of 2022, the COCL lowered the compliance rating on Par. 142 to Partial Compliance, as PCCEP's ability to function effectively was compromised by the City's lack of responsiveness to PCCEP's recommendations. This issue will be addressed in our next report.

During the first half of 2022, the COCL was very concerned with the attrition of PCCEP members, and lack of urgency on the part of the City to identify and recruit new PCCEP members to maintain a full 13-member body. However, significant progress was made on this front during the third quarter, and PCCEP started the fourth quarter with a full body—though the two youth members did not attend meetings. One member's term expired in mid-December; this seat was not yet filled by the end of the quarter.

As a full body, PCCEP comes from a reasonably broad spectrum of the community, with gender balance, and approximately half of the membership identifying as BIPOC.

In this quarter, the COCL has not identified or been notified of an actual or perceived conflict of interest with a PCCEP member and the City of Portland.

| **COCL Recommendations** | • To achieve Substantial Compliance with Par. 142, the City should respond to PCCEP's 2021 third quarter recommendations<br><br>• To maintain Substantial Compliance with Par. 143, the City should continue to identify and recruit sufficient PCCEP members to maintain a full body |
|---|---|
| **Assessment Based On** | Content of PCCEP meetings; Interview with City staff; Substance of reports and recommendations; Level of community engagement |

| **Settlement Agreement Paragraph** | |
|---|---|
| 144. The City shall provide administrative support so that the PCCEP can perform the duties and responsibilities identified in this Agreement and in the PCCEP Plan. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Observation of PCCEP meetings; Review of minutes, reports, and recommendations; Interviews with City staff and PCCEP |

**Compliance Assessment**

PCCEP is staffed by a project manager and a part-time project assistant; in mid-November, another part-time project assistant added capacity to the PCCEP staff team.

Meeting notes are now being posted in a timely fashion on the meeting's event page; the COCL recommends PCCEP staff also consistently post these important records in the Documents section of PCCEP's website for accessibility (the Documents page allows filtering by record type, such as agendas or minutes). Videos of meetings have continued to be posted

in a timely manner, and the link to PCCEP's YouTube channel is accessible from PCCEP's home page.

We continue to recommend that the City maintain timely posting of information about PCCEP's work so that the public is kept informed about these community engagement opportunities and productions. In addition, we recommend the City continue to fully support the PCCEP staff in their roles.

| | |
|---|---|
| **COCL Recommendations** | • To maintain Substantial Compliance, continue adequate staffing dedicated to supporting PCCEP<br><br>• To maintain Substantial Compliance, continue posting minutes of PCCEP meetings within 10 business days after a PCCEP meeting, including in the Documents section of PCCEP's website |
| **Assessment Based On** | Review of PCCEP website and YouTube channel; Interviews with staff |

**Portland Police Bureau's Role in Public Engagement and Outreach**

*System Overview*

Under the Settlement Agreement, the PPB is expected to introduce or expand its systems of community engagement, both with PCCEP and other resources. This includes maintaining or expanding its systems of measurement to better understand police-community relations and develop tailored responses to issues or concerns.

*The Community Engagement Plan*

| |
|---|
| **Settlement Agreement Paragraph** |
| 145. To ensure constitutional policing, to closely interact with the community to resolve neighborhood problems, and to increase community confidence, PPB shall work with City resources knowledgeable about public outreach processes to develop and finalize a CEO Plan. |
| 146. Within 120 days of the effective date of the relevant Amendments to this Agreement, the City, in consultation with the PCCEP, will conduct another reliable, comprehensive and |

representative survey of members of the Portland community regarding their experiences with and perceptions of PPB's community outreach efforts and accountability efforts and where those efforts could be improved, to inform the work of the PCCEP and the development and implementation of the Community Engagement Plan.

| Compliance Label | 145. Substantial Compliance |
| | 146. Substantial Compliance |
| Methodology | Monitor progress on the implementation of the Community Engagement Plan; Interview City personnel and advisory groups members about community engagement and support |

### Compliance Assessment

The COCL continues to use PPB's Community Engagement Plan (CEP) to provide the framework for evaluating compliance with Par. 145 and 146. The Plan has four components: Public involvement, Communications, Access, and Training. The evidence is sufficient in the fourth quarter to show that the PPB should remain in Substantial Compliance for Paragraphs 145 and 146, although the COCL has expressed some areas of concern. Each component of the Community Engagement Plan is reviewed below.

*Public Involvement:* The CEP specifies three PPB goals with respect to public involvement: (1) Maintain and expand upon current opportunities for meaningful community interactions, (2) Develop a shared understanding of what community engagement means, and (3) Enhance existing opportunities for community/PPB partnerships.

The PPB's Office of Community Engagement (OCE) continues to work closely with community leaders to achieve these goals, especially through its advisory groups. During the fourth quarter, the OCE continued to work closely with several of its Community and Culturally Specific Councils. The five advisory groups (in alphabetical order) are: African American Advisory Council, Asian and Pacific Islander American Advisory Council, Latino Advisory Council, Muslim Advisory Council, and the Slavic Advisory Council.

During the fourth quarter, the Chief's office, OEC, and other PPB members were engaged with several of these advisory groups. For example, the Latino Advisory Council heard from the PPB's Policy Director on the Language Access policy, which was in final draft form. They

also heard from the PPB's Domestic Violence Reduction Unit about the roughly 12,000 domestic violence reports filed in 2022, and what can be done to address this problem. The Asian Pacific Islander American Advisory Council (APIA) continued to give attention to hate/bias crimes. Following a serious shooting incident in the previous quarter, the APIA continue to engage the PPB and community partners in at least two community-led, community-education meetings with Portland's Chinese community. The Muslim Advisory Council (MAC) was also engaged with the PPB regarding domestic violence and worked with different groups to hold meetings about this problem in the Muslim community, as well as gun violence.

Representatives of these PPB advisory groups continue to meet as part of the Coalition of Advisory Groups (CAG) to enhance collaboration and mutual support. The six Community and Culturally Specific Advisory Councils (CCSACs) listed above are part of CAG. The other two advisory councils affiliated with CAG are two of PPB's Operational Advisory Councils – the Behavioral Health Unit Advisory Council (BHUAC) and the Training Advisory Council (TAC). In the fourth quarter, the CAG continued to hold monthly meetings with the Chief's office and meetings with City Council Commissioners. In October, they hosted a meeting of command-level PPB members and invited community council members to discuss the lessons learned from the PPB's response to the 2020 protests. CAG members also attended a PCCEP meeting on this same subject and met with the COCL and DOJ personnel to provide additional community perspectives on the protests.

Finally, PPB's Operational Councils, such as the Behavioral Health Unit Advisory Committee (BHUAC), the Equity Advisory Council (EAC), and the Training Advisory Council (TAC), continue to meet regularly and post their meeting results on PPB website. TAC continues to observe and evaluate various PPB training programs and provide the Training Division with feedback.

*Communication:* The CEP specifies two goals in communication: (1) Expand communication strategies to facilitate interface with underrepresented populations, and (2) Improve public awareness of the current communication strategies utilized. In the fourth quarter, the PPB continued to use social media to communicate with the public and used other mechanisms, including press releases, emails, brochures, and presentations to reach the public.

The PPB's Media team is very active. They give considerable attention to press releases and flash alerts for the media (e.g. homicides and car crashes), but they also cover community engagement events through Instagram, Twitter, and other platforms. The Chief's Media Team continues to work with the PPB's advisory groups and CAG to give them more public visibility. These groups are unlikely to have their own social media platform, but they will have access to the City's website in early 2023.

As part of our Outcome Assessment last quarter, the COCL gave attention to the number of community events that officers have attended. We credit the PPB with using an app developed in-house to document such events and produce a monthly report, *Community Engagement Events*. However, the total number of community events involving PPB officers that are recorded by the app has declined dramatically, from 2018 to 2022. Thus, we have encouraged the PPB to take note of this rapid decline and consider ways to correct this trend. We have recommended that officers' use of the App should be mandatory (it is currently optional) and should be memorialized in the PPB policy and an S.O.P. However, the PPB seems unwilling to accept this recommendation, expressing concern that officers would be out of policy for non-compliance. The COCL's response is that important behaviors are captured in policy.

*Access:* The CEP specifies four goals for Access: (1) Develop a comprehensive language access plan, (2) Provide comprehensive training to all PPB members on how to utilize this corps of officers and interpreters, (3) Inform/advise all communities of the existence of this resource/service, and (4) Create/update appropriate directives for spoken language and deaf/hard of hearing.

Language access goals have taken time to achieve, but the PPB continues to make progress. As noted previously, the LanguageLine software has been implemented, but officers have not been sufficiently trained and the existing policy, "Communication with Hearing Impaired and Limited English Proficient Persons," (0640.36), has not been updated since 2013. By the end of the fourth quarter, however, a new policy, "Communication with Persons who have Limited English Proficiency" (0640.37) was revised and had received two universal reviews. Thus, the PPB is expecting that this policy will be adopted in the first quarter of 2023.[25]

The COCL has called for a more comprehensive and systematic approach to language access, and we credit the Office of Community Engagement (OCE) for moving in that direction with their "Language Justice program." OCE, along with the Policy Director, have done extensive reviews of existing policies, standards, and practices in other agencies, which led to the revised LEP policy. In 2020, OCE partnered with PPB's Strategic Services Division (SSD) analysts to conduct a survey of the PPB members and create a database of bilingual officers. In 2021, the City offered a language proficiency test. In 2022, with community support, OCE and the Training Division created six LMS language awareness videos, with most being posted in 2022. The same year, SSD analysts examined data from LanguageLine on usage patterns to help OCE identify LEP communities that are receiving and need LEP services.

---

[25] However, a separate policy will be needed for the Hearing Impaired.

**Exhibit A**

OCE has many other actions that are pending for 2023, as they demonstrate the benefits of an innovative, evidence-based Language Justice Program. However, to increase access to language services in the immediate future, the COCL continues to recommend that the PPB finalize the LEP policy and establish basic training for every officer around this policy.

*Training:* The CEP specified three goals for Training: (1) To develop a variety of tools to help guide both police and ethnically and religiously diverse communities in efforts to address their unique concerns, (2) Create a workforce that is knowledgeable about the City and its history, and (3) Greater involvement of community members in the training of Bureau members.

In the past, we have credited the PPB with training related to these goals, including a series of equity trainings focused on interacting with historically marginalized groups and with the LGBTQIA2S+ community. Because of the importance of equity training, we have recommended that it be continued and moved from online to In-person training (See Par. 84 for details).

We credit the PPB with offering a one-day Community Police Academy on December 10 to allow community members to become familiar with police work and police training. Members of various advisory groups, as well as elected officials, participated. The Academy covered control tactics and use of force in the morning and patrol tactics, de-escalation, and crisis intervention in the afternoon. Each community member was assigned to a PPB officer and engaged in role-play scenarios to receive a more intimate look at police practices.

At this point, our remaining concern is about the training around PPB's language access and hearing policy. When the policy is finalized, the PPB will need to revisit the training provided in 2022 and give more attention to the distribution of language cards[26]. Also, officers will need training regarding their response to individuals with hearing disabilities.

| **COCL Recommendations** | For Par. 145:<br><br>• To maintain Substantial Compliance, make equity and procedural justice training a higher priority and engage the community in these training initiatives |
| --- | --- |

---

[26] PPB has worked with community members to translate search cards into the six most used languages used in Portland (Chinese, English, Samali, Spanish, Russian and Vietnamese) to protect Fourth Amendment rights against unreasonable search and seizure. But more training is needed regarding the distribution of these cards.

| | |
|---|---|
| | • Seek to improve access to police and City services for individuals with Limited English Proficiency (LEP) and hearing impairments through updated policy, training, and dedicated personnel<br><br>• Officers' use of the Community Events App should be mandatory, not voluntary, and memorialized in a PPB directive and new training. In essence, PPB should make community engagement by officers a higher priority.<br><br>• Continue to invest in a one-stop website where community and PPB members can learn about various advisory groups and community engagement events |
| **Assessment Based On** | Reviews of City and PPB reports; Feedback from the City, PPB, and advisory groups; Implementation of the Community Engagement Plan |

*Data Collection, Analysis, and Reporting*

The PPB is required to collect, analyze, and report demographic data about police interactions with the community to ensure constitutional policing and build community trust (Par. 147-150).

---

**Settlement Agreement Paragraph**

147. PPB shall continue to collect appropriate demographic data for each precinct so that the Precinct Commander, considering any input from the PCCEP, may develop outreach and policing programs specifically tailored to the residents of the precincts. The data shall also be provided to PCCEP to inform its work.

148. PPB shall continue to require that officers document appropriate demographic data regarding the subjects of police encounters, including the race, age, sex, and perceived mental health status of the subject, and shall provide such information to the PCCEP and make such information publicly available to contribute to the analysis of community concerns regarding discriminatory policing. PPB shall consider enhancements to its data collection efforts, and report on its efforts to enhance data collection to the DOJ by no later than December 31, 2013, and quarterly thereafter.

---

| Compliance Label | 147. Substantial Compliance |
| | 148. Substantial Compliance |

**Compliance Assessment**

For Par. 147, PPB compiled and reported demographic data in 2020 pertinent to each precinct and posted it on their website. In the first quarter of 2023, the PPB intends to list updated demographics based on the 2017–2021 American Community Survey 5-Year Estimates provided by the U.S. Census Bureau. In doing so, they will remain in Substantial Compliance with Par. 147. Furthermore, they have kept Precinct Commanders, PCCEP, and the community informed of this data, as well as a wide array of other public safety data posted on the Bureau's Open Data portal.[27]

For now, the PPB remains in Substantial Compliance with Par. 148 as they continue to collect, analyze, and report demographic data from individuals who are stopped by the PPB using its Stops Data Collection app. In terms of data analysis and reporting requirements, the PPB's Strategic Service Division continued to produce high-quality Stops Data Collection reports, both quarterly and annually, and share them with PCCEP and the public. The Stops Data Collection Report for the third quarter was posted on November 16 but was included in the COCL's third quarter report. Hence, we will not report on stops data in this quarter, except to reiterate that the racial disparities in traffic stops continued.

The COCL has recommended corrective action since 2020, and the PPB has begun to take action. As noted previously, Directive 650.00 ("Search, Seizures, and Inventories"), was finalized and became effective on August 1, 2022. The PPB then provided officers with additional training on this directive using a 4-minute and 2-minute video. The PPB will remain in Substantial Compliance with Par. 148. However, to maintain Substantial Compliance for Par. 148, COCL expects that the PPB will provide evidence that they are producing records of these events, as required by Oregon law and PPB policy, that will "contribute to the analysis of community concerns regarding discriminatory policing," (Par. 148). The Directive requires officers to document the reason for the search on their Stops app, which will give the PPB analysts additional data regarding search disparities.

---

[27] https://www.portlandoregon.gov/police/71673

**Exhibit A**

| | |
|---|---|
| **COCL Recommendations** | • To maintain Substantial Compliance with Par. 147, update the precinct demographics based on the 2017–2021 American Community Survey 5-Year Estimates provided by the U.S. Census Bureau.<br><br>• To maintain Substantial Compliance for Par. 148, PPB will need to show that records are being kept consistent with the new Oregon law to improve the measurement of possible discriminatory policing |
| **Assessment Based On** | COCL review of PPB precinct demographic reports; COCL review of PPB Stops Data Collection reports; COCL review of relevant PPB directives |

### Settlement Agreement Paragraph

149. The COCL, PPB, and DOJ will jointly develop metrics to evaluate community engagement and outreach. PCCEP may review these metrics and may suggest additional metrics to DOJ and PPB.

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Review metrics requirement |

### Compliance Assessment

The City has completed the requirement to develop a set of metrics to evaluate community engagement, and therefore remains in Substantial Compliance. Several of these metrics have been used by PPB to guide their Community Engagement Plan. Others have yet to be implemented.

PCCEP has expressed a stronger interest in community engagement around police performance, as exhibited in the creation of a Community Engagement Subcommittee, and as

required by the Settlement Agreement. Along these lines, the COCL has repeatedly expressed a desire to see the City expand the way it thinks about engagement.

As technical assistance, the COCL has encouraged the City and the PPB to gather more specific outcome data relevant to police-community interactions - data that will give voice to the community and can be used to track and enhance organizational performance. Also, such data was included in the set of metrics proposed under Par. 149. The first major indicator of community engagement and outreach, as agreed upon by the parties, was stated as follows:

> "*Interactions with the public and general service delivery. PPB is expected to engage with diverse community members in a manner that is fair (unbiased), respectful, and helpful. Public perceptions of the PPB and the performance of its officers are considered important metrics, as they affect public trust and confidence in the police. These can be measured through community and/or contact surveys." (Metrics report for Par. 149).*

Specifically, we continue to recommend that the City measure the quality of police-community interactions for all encounters using data from community contact surveys, body-worn cameras, and officer surveys. These datasets can provide a foundation for an evidence-based, data-driven police organization, including supervisor coaching and feedback to officers based on performance metrics. We encourage the PPB to incorporate these outcome measures as part of the remedies being pursued in Section XI. In the first quarter of 2023, the COCL prepared a technical assistance report on contact surveys and encouraged the City to work in partnership with an external organization to establish and maintain these metrics. The COCL has taken the position that the City has achieved Substantial Compliance with Par. 149 based on two citywide surveys conducted several years ago and the metrics proposed by the COCL, the PPB, and DOJ. However, we encourage the Mayor's office, along with PCCEP, TAC, and other advisory groups, to seriously consider the proposed metrics, especially the creation of a sustainable Contact Survey Program as defined in our 2023 technical assistance[28]

| | |
|---|---|
| **COCL Recommendations** | • As part of everyday policing, the City should introduce a contact survey to measure the level of procedural justice and public satisfaction with police-public interactions, especially interactions with constitutionally-protected populations |

---

[28] COCL's report on the Contact Survey Program can be found at:
https://www.portlandcocl.com/reports/2023/02/contact-survey-program-technical-assistance-report

|  | • PPB should Implement routine, anonymous internal surveys of PPB employees to measure police-community interactions, internal procedural justice, wellness, police culture, and employee satisfaction<br><br>• Acquire and use software to analyze body worn camera data<br><br>• As a learning organization, introduce programs, polices, and training curricula that are responsive to these new databases |
|---|---|
| **Assessment Based On** | The development of metrics that capture multiple dimensions of community engagement |

---

| **Settlement Agreement Paragraph** |
|---|
| 150. Annually, PPB shall issue a publicly available PPB Annual Report, which shall include a summary of its problem-solving and community policing activities. A draft of the Annual Report shall be provided to the PCCEP for review and comment before the report is finalized and released to the public. Once released, PPB shall hold at least one meeting in each precinct area and at a City Council meeting, annually, to present its Annual Report and to educate the community about its efforts in community policing in regard to the use of force, and about PPB's policies and laws governing pedestrian stops, stops and detentions, and biased-free policing, including a civilian's responsibilities and freedoms in such encounters. |

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Reviewed PPB's Annual Report; Interviewed PPB and City staff involved with PCCEP |

| **Compliance Assessment** |
|---|
| The PPB remains in Substantial Compliance with Par. 150 for the fourth quarter of 2022. As we reported in our third quarter report, a draft of the PPB's 2021 Annual Report was completed in a timely manner, posted on the PCCEP website, discussed with PCCEP, presented and discussed at all precinct meetings, and presented before the City Council. We |

| | |
|---|---|
| do not expect a draft of the 2022 Annual Report until at least May of 2023. In the meantime, the compliance rating will remain unchanged. | |
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Based On** | Review of progress on the content and presentation of PPB's Annual Report |

**Settlement Agreement Paragraph**

151. PCCEP shall meet as needed to accomplish their objectives as set forth in the PCCEP Plan. PCCEP shall hold regular Town Hall meetings which shall be open to the public. To the extent that PCCEP meetings are subject to the Oregon Public Meetings Law, or similar regulatory or statutory requirements, the City shall be responsible to give advice necessary to the PCCEP to ensure compliance with those laws and agrees to represent PCCEP in any challenges regarding compliance with those laws.

152. The City shall provide PCCEP members with appropriate training necessary to comply with requirements of City and State law.

| | |
|---|---|
| **Compliance Label** | 151. Substantial Compliance |
| | 152. Substantial Compliance |

**Compliance Assessment**

PCCEP met many times as a full body throughout the fourth quarter and resumed subcommittee meetings.

At least one representative of the City Attorney's Office attends PCCEP meetings and continued to advise PCCEP as necessary to ensure compliance with public meetings law.

Previously the City has trained new PCCEP appointees as needed based on the "*Guide for Volunteer Boards & Commissions*" presentation prepared for all City advisory boards. This

| | presentation covers the Oregon Government Ethics Commission guide for public officials, the City's code of ethics, restrictions on political activity for public officials, and the Oregon Attorney General's Public Records and Public Meetings Manual. |
|---|---|
| **COCL Recommendations** | • Standardize training for new PCCEP members; Ensure current and future PCCEP members participate in all required trainings and are offered a meaningful opportunity to participate in any optional training. |
| **Assessment Based On** | Regularity and content of PCCEP meetings; Provision of City's legal advice and training for PCCEP |

*Summary of Section IX: Community Engagement by PCCEP and PPB*

PCCEP: In the fourth quarter of 2022, PCCEP was functioning as a legitimate body for community engagement. They hosted two town halls (with the COCL and IMLLC), held a special meeting on the Status Conference, and continued monthly general meetings via Zoom with members of the community also in attendance. PCCEP elected co-chairs during the November full committee meeting and resumed subcommittee work in late November with subcommittees focused on Racial Equity, Settlement Agreement and Policy, and Community Engagement. PCCEP began the fourth quarter with a full 13-member body that represented a reasonably broad spectrum of the community. Also, PCCEP was fully staffed by three competent individuals, and meeting notes were being posted in a timely fashion. The City has continued to provide legal and technical support as needed. Our only concern is that some PCCEP recommendations have been pending a response from the City. We will provide an update on this concern in our next report.

PPB: In the fourth quarter, PPB continued to implement its Community Engagement Plan. The PPB's diverse advisory groups (Community and Culturally Specific Councils), as well as the CAG, continue to meet with the PPB leadership, City Commissioners, and the communities they represent. The COCL has encouraged the PPB's advisory groups to seek more transparency with their community engagement activities and allow the public to stay informed about their work. We credit the CAG for moving in this direction.

PPB has completed, but not yet adopted, its Language Access directive. When it has been adopted, the PPB will need to provide additional training that will guide the PPB officers on how to communicate effectively with persons who have limited English proficiency.

Aside from its advisory councils, the PPB's effort to reach out and engage directly with Portland communities, as measured by the number of community events attended by sworn members, seems to have rapidly declined, as we noted in our third quarter report. Hence, we have recommended that officers' use of the Community Events App should be mandatory, not voluntary, and memorialized in a PPB directive and new training. The PPB is not inclined to accept this recommendation, so more discussion may be needed. In essence, we encourage the PPB to make community engagement by officers a higher priority. The PPB's Community Events App has the potential to be a best practice in the policing field, but it must be supported by PPB and properly implemented to have a real impact on the community.

In the past, the PPB has shown its ability to develop and deliver some excellent training on Equity, but this program needs to be continued and expanded. Similarly, the COCL has repeatedly recommended stronger training in Procedural Justice. However, the PPB has shown little interest in expanding training on either of these topics. Recently, we have seen, nationwide, that prejudice and discrimination against various groups remain widespread in our society, so Portland needs a police force that understands and can respond appropriately to these situations. No doubt, most PPB officers believe in equitable treatment, but it needs to be reinforced. We find that the PPB is in Substantial Compliance for Pars. 145 and 146, but to maintain Substantial Compliance, the COCL expects that the PPB will make equity and procedural justice training a higher priority and engage the community in these training initiatives.

We are pleased that the PPB is seeking new models of community engagement that are more decentralized. The COCL is impressed with the officer who holds the position of Community Engagement Lead in the Office of Community Engagement. She is promoting community engagement in new ways and thinking "outside the box." If the PPB continues to support the Office of Community Engagement, then innovative partnerships between the police and the community can be expected.

The PPB continued to meet the requirement to collect, analyze and post information about its performance on a variety of dimensions. The PPB continued to produce high-quality quarterly and annual reports on traffic stops and use of force with breakdowns by demographic characteristics. However, the COCL is now expecting some analysis and reporting on new stops data pertaining to the reason for the stop and consent searches. To date, the PPB has remained in Substantial Compliance with Par. 148 because they have taken the steps to address "community concerns regarding discriminatory policing" with policy and training. However, the job is not complete. To maintain compliance, the PPB will need to show that records are being kept consistent with Oregon law SB 1510, which was passed in 2022 to prohibit unreasonable

stops and searches and reduce discriminatory policing.[29] Whether this requires a separate audit or can be addressed in the PPB's Stops reports, the PPB should demonstrate to the public that consent searches are being conducted properly, documented properly, and that language cards (describing the right to refuse the search) are being distributed. This effort will ensure compliance with the 4th Amendment prohibition of unreasonable searches and seizures.

Finally, to truly engage the broader Portland community (beyond advisory groups) and give voice to the thousands of residents who have genuine experience interacting with PPB officers, we continue to encourage the City to introduce a contact survey to measure the level of procedural justice and public satisfaction with police services. By measuring what matters to the public (I.e., whether they are treated respectfully and fairly, given a voice, and shown empathy) and using these data to evaluate and coach officers at the individual level, we can expect improvements in police-community relations and public trust in the PPB. The reader is encouraged to read COCL's technical assistance report, *Measuring what Matters to the Community: A New Performance Evaluation System*[30]

---

[29] Senate Bill 1510 prohibits officers from stopping a driver solely for equipment violations ("secondary violations") such as a single taillight out or headlight out. Furthermore, if the officer wants to conduct a search of the vehicle, the driver must be informed they have the right to refuse the search. If the driver consents to a search, the officer must get written or recorded documentation of this consent.
https://olis.oregonlegislature.gov/liz/2022R1/Downloads/MeasureDocument/SB1510/Introduced#:~:text=Prohibits%20police%20officer%20from%20initiating,probation%20and%20post%2Dprison%20supervision.

[30] COCL's report on the Contact Survey Program can be found at:
https://www.portlandcocl.com/reports/2023/02/contact-survey-program-technical-assistance-report

**Exhibit A**

# XI. ADDITIONAL REMEDIES

After five mediation meetings, the City and DOJ reached agreement on a set of remedies to achieve compliance with the terms of the Settlement Agreement[31]. On January 10, 2022, DOJ and the City filed their final "Joint Status Report" in the U.S. District Court (ECF 275), summarizing the mediation results and the specific remedies on which the parties agreed in principle. Essentially, the parties have agreed to add a new section to the Settlement Agreement—Section XI—that contains eight new paragraphs, 188 to 195.

These remedies were approved by the Portland City Council on February 9, 2022, and by the federal judge at the Fairness Hearing on April 29, 2022.

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 188. The City shall revise Force Data Collection Report (FDCR) and After Action Report forms to capture when the forms are edited and completed as part of PPB's implementation of Office365, which is ongoing. In the interim, pursuant to a process approved by the United States, PPB shall capture in the existing FDCR and After Action Report forms the author's name and the time and date of initial submission and any subsequent edits, as well as the name, time, and date of each level of review. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review of AAR and FDCR forms |
| **Compliance Assessment** | |
| During the fourth quarter of 2022, our review demonstrated that the updated FDCR and AAR forms continue to be used and continue to capture the data required by Par. 188. We therefore continue to find that the City and the PPB have substantially complied with the requirements of Par. 188. | |
| **COCL Recommendations** | • No recommendations at this time |

---

[31] These meetings included the Intervenor-Defendant Portland Police Association (PPA), the Enhanced Amicus Curiae Albina Ministerial Alliance Coalition for Justice and Police Reform (AMAC), and Amicus Curiae Mental Health Alliance (MHA).

| **Assessment Based On** | Updated FDCR and AAR forms and use by officers and supervisors |
| --- | --- |

---

### Settlement Agreement Paragraph

189. Before November 25, 2021, the City shall provide funding for a qualified outside entity to critically assess the City's response to crowd control events in 2020 in a public-facing report and prepare a follow-on review of the City's response to the report. The City will use the report to prepare a training needs assessment. The report, training needs assessment, and follow-on review will be completed consistent with a Scope of Work and deadlines agreed upon by the City and the United States, and such agreement shall not be unreasonably withheld by either Party. If the City demonstrates to the United States that significant progress is being made toward meeting the obligations under the agreed upon Scope of Work and deadlines, the City may request a reasonable modification of the Scope of Work or extension of deadlines, which the United States shall not unreasonably decline.

| **Compliance Label** | Partial Compliance |
| --- | --- |
| **Methodology** | Interviews with PPB officials and review of documents |

### Compliance Assessment

The work of Independent Monitor, LLC (IMLLC, the group hired to conduct the critical assessment) continued in the fourth quarter of 2022, as they spent two weeks conducting interviews, reviewing documents, and listening to various stakeholders. On October 12, 2022, PCCEP hosted IMLLC for a town hall focused on the PPB's response to the 2020 protests, attended by more than 140 people. The IMLLC team introduced themselves and listened to the community describe their anger and trauma about the PPB's response to the 2020 protests, their negative sentiment toward the PPB in general, their frustration over the lack of accountability for misconduct, and their cynicism about whether anything can be done by IMLLC or others to improve the situation.

The COCL has reviewed the qualifications of the IMLLC and held a meeting with them on October 18, 2022. We are satisfied that this group has a strong background and is qualified to perform this work. We encouraged them to become familiar with the work that has been done in other cities, and to a large extent, they seemed knowledgeable about these reports.

**Exhibit A**

Our only concern at this point is the limited data available to IMLLC regarding what actually transpired during the 2020 protests. There will be some videos, but not the volume of close-up data that can be generated from body-worn cameras. Also, people's memories fade and become distorted with the passage of time. Our understanding is that IMLLC will give primary attention to the strategies and tactics employed by the PPB.

For this quarter, the City remains in Partial Compliance. The requirements for Substantial Compliance are listed below in our recommendations.

| | |
|---|---|
| **COCL Recommendations** | To achieve Substantial Compliance:<br><br>• The IMLLC must collect and analyze data consistent with the Scope of Work, and prepare a report that critically assesses the City's response to the 2020 demonstrations<br><br>• The City must respond to the IMLLC report<br><br>• PPB must use the IMLLC report to prepare a training needs assessment<br><br>• The IMLLC must prepare a follow-up report that reviews the City's response to their original report, including the PPB's training needs assessment<br><br>• The City should keep COCL informed of the work planned and completed by the IMLLC<br><br>• The City should provide COCL with IMLLC's reports and the City's training needs assessment report |
| **Assessment Based On** | Evaluation of the process employed by IMLLC and the products planned and delivered by this group |

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 190. Before November 25, 2021, the City shall provide in the budget a separate line item for overtime costs to conduct necessary training for PPB officers. The City shall include a similar line item in subsequent budgets for the duration of this Agreement. | |
| **Compliance Label** | Substantial Compliance |

| Methodology | Review of budget documents |
|---|---|

| | **Compliance Assessment** |
|---|---|
| | To conduct necessary training for the PPB officers, the City Council has included a separate line item for these overtime costs in the City's FY22-23 budget. Hence, the COCL finds that the City has achieved Substantial Compliance with the requirements of Par. 190. If the budget line item is removed in the next budget, then the City will be assigned Partial Compliance. Also, the COCL recommends that the City and the PPB reconsider the total budget and staffing for the Training Division after the civilian dean is hired. |

| **COCL Recommendations** | • To maintain Substantial Compliance, the City must continue to provide a separate line item for PPB training-related overtime expenses. <br><br> • Revisit the staffing and budget for the Training Division, keeping in mind the option of hiring more civilians. |
|---|---|
| **Assessment Based On** | Review of budget documents and amount of overtime funding included in the budget. |

| | **Settlement Agreement Paragraph** |
|---|---|
| | 191. Before November 25, 2021, the City shall budget for a qualified civilian in PPB to direct all educational aspects of PPB's Training Division alongside the Captain of the Training Division, who will direct administrative aspects of PPB's Training Division. The respective roles and responsibilities of the civilian and the Captain are outlined in Attachment 1 appended to this Agreement, provided that the Parties may agree to modify those roles and will not unreasonably withhold such agreement. Once funding is provided, the City shall post the position within 90 days. Once the position is posted, the City shall make a job offer to a suitable candidate and complete any required background screenings within 150 days. If the City demonstrates to the United States that no suitable candidate applied for or accepted the position, or that the City is otherwise making significant progress toward meeting the deadlines in this Paragraph, the City may request a reasonable extension of time to fill the position, which the United States shall not unreasonably withhold. |
| **Compliance Label** | Partial Compliance |

| **Methodology** | Tracking the hiring process for the Police Education Director |
|---|---|

**Compliance Assessment**

In the fourth quarter of 2022, the PPB reinitiated the process of filling the Police Education Director position (also known as the civilian training dean or police academic dean), who will lead all educational aspects of PPB's Training Division. As reported in our previous reports, the hiring process had to begin anew when the candidate selected for the position had the offer rescinded due to some information the Mayor received after the conditional offer had been made.

As planned, the City reposted the position in early October and closed the application period at the end of the month. In total, 16 applicants met the minimum qualifications for the position and then had their applications reviewed and scored by the Bureau of Human Resources. The scoring panel then met in December to decide which candidates would move forward to be interviewed for the position. The scoring panel was made up of five individuals which included representatives from PCCEP, PPB's Training Division, City Council, PPA and the Mental Health Association. The scoring panel determined that five applicants would move forward in the hiring process. Interviews were scheduled to take place in early January.

As we shared in our last report, the COCL offered suggestions to the City on how they could improve the hiring process for this position. These suggestions were made at the request of the City and paramount in our feedback was creating more space for the broader community to engage in the hiring process for this key position within the PPB. As a reminder, the COCL offered these specific pieces of feedback related to community engagement in the hiring process:

- The PPB could more broadly solicit the community for potential interview questions

    - In the previous process, the PPB reached out to groups that comprise their advisory councils – which was a good first step but there is an opportunity to receive broader input.

- The PPB could build time into the process for a community forum with the finalists, where community members can hear from the finalist directly and ask their own questions.

    - This has been done in other jurisdictions with hiring for highly visible police oversight related positions.

We are disappointed to report that at the close of the fourth quarter it appears that our feedback was not incorporated into the hiring process. Also, the promise to include a TAC

person on the scoring panel was never fulfilled (see Par. 86). Nevertheless, the City and the PPB continue to work actively to fill this position. They had to unexpectedly reinitiate the hiring process and went beyond the 150-day timeline established within the Settlement Agreement. Paragraph 191 includes a provision to extend the deadline if needed, and the City and the PPB have made progress on this second attempt. However, the City will remain in Partial Compliance for Par. 191 until it can figure out meaningful ways to engage the community with this new Police Education Director position.

The COCL will continue to monitor this process as it moves towards completion in the first quarter of 2023. There are a few points we would like to reiterate here:

- The Police Education Director will need staff support (which the City has provided in the budget) and independence to develop and implement new training without interference. We acknowledge that the Police Education Director will function within the PPB bureaucracy and report to an Assistant or Deputy Chief but should have a significant role in determining the direction of training at the PPB. Also, we recommend that the Education Director and the Captain report to the same individual to minimize power struggles within the Training Division. This recommendation resulted from the Training Summit held in December (see Par. 84).

- Regarding the public's concern about any candidate's background, the COCL does not have a problem with someone who has served as a police officer in the past (that experience can be very helpful), but the individual hired should also have experience with research and educational methods that reach far beyond the experience of being a police officer (the civilian who serves in a similar role in the Baltimore Police Department is an excellent example).

- Finally, we encourage the person hired to give priority to providing "professional development and continuing education to Training Division instructors to ensure that all personnel are highly qualified and well equipped to perform their duties in an equitable, lawful, impartial manner," as outlined in the job description. Along these lines, the COCL has on several occasions emphasized the need for instructor development classes and certification of teaching skills. This was also discussed at the Training Summit.

| **COCL Recommendations** | <ul><li>To achieve Substantial Compliance, the City and PPB should create more opportunities for community involvement in the process of hiring and orienting the new Police Education Director.</li></ul> |
|---|---|

|  | • The City and PPB should look for candidates who understand both policing practices and best practices in teaching and the evaluation of training |
|  | • The Police Education Director and Captain of the Training Division should report to the same Assistant or Deputy Chief |
|  | • The Police Education Director should explore professional development classes for PPB Training instructors |
| **Assessment Based On** | The City's ability to conduct a search and hire a qualified candidate within a reasonable time period. |

---

| **Settlement Agreement Paragraph** |
| --- |
| 192. Within 60 days of the date that this paragraph is entered as an order of the Court, the City shall initiate an appropriate investigation through IPR to identify: (a) the PPB Lieutenant(s) and above who trained Rapid Response Team members to believe that they could use force against individuals during crowd control events without meeting the requirements of PPB Directive 1010.00; (b) the PPB incident commander(s) and designee(s) with the rank of Lieutenant or above who directed or authorized any officer to use force in violation of PPB Directive 1010.00, or who failed to ensure that FDCRs and After Action Reports arising from the crowd control events starting on May 29, 2020, and ending on November 16, 2020, were completed as required by Section 13.1 of PPB Directive 635.10; and (c) the PPB Commanders and above who failed to timely and adequately clarify misunderstandings and misapplications of PPB policy (including this Agreement) governing the use, reporting, and review of force during the crowd control events starting on May 29, 2020, and ending on November 16, 2020. Once the IPR investigation is complete, the Police Commissioner and/or the Chief of Police, as required by this Agreement, shall hold accountable those investigated members of the rank of Lieutenant and above who are determined to have violated PPB policies (including this Agreement) as outlined in this paragraph. The Parties affirm the obligation in this Agreement and Directive 330 for IPR and PPB to investigate any sworn member if, during the investigations of Lieutenants and above required by this paragraph, information is discovered suggesting that any sworn member may have violated PPB policy or this Agreement. |

| **Compliance Label** | Partial Compliance |
| --- | --- |

| Methodology | Interviewed PPB, CAO, and IPR personnel |
|---|---|

**Compliance Assessment**

IPR is currently in the process of conducting the series of investigations required by Par. 192. As we have reported, IPR has approached this as four investigations, and as such, has opened four cases, each currently in different stages of investigation. The COCL will not be privy to all the facts of these investigations until they are completed. Also, if the COCL were to disclose information about any of these cases, it could jeopardize the fairness of the investigation.

At this point, we can report that IPR is working very diligently and, from our perspective, is conducting a thorough investigation of the evidence. The COCL believes it is more important that IPR get it right than rush to conclusions and risk making mistakes. We also respect IPR's willingness to analyze the assumptions behind each subsection of Par. 192 and ensure that each investigative question is reasonable and has merit. At this time, we continue to find the City in Partial Compliance with the requirements of Par. 192. Substantial Compliance will require IPR and the City to conduct investigations that are thorough, fair, and reasonable.

| **COCL Recommendations** | • To achieve Substantial Compliance, complete a thorough, fair, and reasonable investigation of the command personnel associated with the 2020 crowd control and the training they provided |
|---|---|
| | • To achieve Substantial Compliance, hold accountable the investigated command personnel members as appropriate who are found to have violated PPB policies (including this Agreement) as described in Par. 192 |
| **Assessment Based On** | Discussions with City personnel |

**Settlement Agreement Paragraph**

193. In addition to the requirements of paragraph 150 of this Agreement, PPB shall release its Annual Report and hold the required precinct meetings no later than September 20 of each year for the duration of this Agreement.

| Compliance Label | Substantial Compliance |
|---|---|

| Methodology | Confirmed the dates of completion, dissemination, and discussion of PPB' 2021 Annual Report |
| --- | --- |
| | Observed and reviewed Precinct Meetings |
| | Engaged in methods reported under Par. 150 |

| **Compliance Assessment** |
| --- |
| The COCL found the PPB to be in Substantial Compliance with Par. 150. In addition, we find PPB to be in Substantial Compliance with the added requirements of Par. 193. As noted earlier in Par. 150, a draft of the PPB's 2021 Annual Report was completed in May of 2022 and later revised in June based on feedback from PCCEP. The PPB posted the final version of the report and presented the relevant content at Precinct meetings on July 13, 20, and 21. Thus, the PPB has met the required deadline of September 20, 2022, to complete these tasks. |

| **COCL Recommendations** | • No recommendations at this time |
| --- | --- |
| **Assessment Based On** | Date PPB final report was completed; Date PPB final report was presented at three precinct meetings |

| **Settlement Agreement Paragraph** |
| --- |
| 194. Within 210 days of the date this paragraph is entered as an order of the Court, the City shall implement body-worn cameras (BWCs) pursuant to a policy that is subject to the policy-review-and-approval provisions of this Agreement; provided, however, if the City is making substantial progress this deadline may be extended by agreement of the United States, which shall not be unreasonably withheld. |
| a. The City will comply with any collective bargaining obligations it may have related to BWCs, which the City agrees to fulfill expeditiously and in compliance with its obligation to bargain in good faith. |
| b. Within 60 days of the date this paragraph is entered as an order of the Court, the Compliance Officer shall gather public input on the use of BWCs and provide this information and any technical assistance to the public and the Parties to inform the drafting of a policy. |

**Exhibit A**

The United States reserves its policy review rights related to the BWC program under the terms of this Agreement.

c. If the City has not finally discharged its collective bargaining obligations as to BWCs within 120 days of the date this paragraph is entered as an order of the Court, the Parties stipulate that the Court may thereafter hold periodic status conferences every 60 days to receive an update on the procedural status of the collective bargaining process related to BWCs. The City will provide a final procedural status update upon the completion of the collective bargaining process.

d. The United States reserves its enforcement rights related to the BWC program under the terms of this Agreement. If collective bargaining or any related arbitration or appeal results in a BWC program that the United States determines, in its sole and absolute discretion, will not adequately resolve the compliance concerns identified in the April 2, 2021 notice of noncompliance, the Parties agree that the United States can seek court enforcement pursuant to paragraph 183, without having to repeat the steps laid out in paragraphs 178 to 182.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review of November BWC Status Report<br>Communication with PPB personnel |

**Compliance Assessment**

The City is continuing its progress towards the implementation of a body-worn camera (BWC) policy and program. In the first quarter of 2022, PPB released a Request for Proposal (RFP) to solicit BWC vendors capable of supplying Portland with the equipment necessary for a BWC program. Additionally, the PPB started a process to gather subject-matter experts to assist in the scoring process, which continued into the fourth quarter. Negotiations with the Portland Police Association (PPA) and Portland Police Commanding Officers Association (PPCOA) regarding BWCs continued as well. The completion of the BWC program and BWC policy can only happen once bargaining concludes and all parties agree on terms for the program.

The City requested that DOJ set principles to govern a BWC policy, and in response, DOJ released a letter to the City on November 15, 2021, addressing key issues, including deployment, notice, activation/deactivation/buffering, authorized users, preview, control of videos, and accountability. DOJ additionally stated that public input should drive a BWC

policy and be collected expeditiously before PPB drafts and adopts such a policy. As discussed in the COCL's first quarter report for 2022, part of the public input process was a public forum and community survey, facilitated by the COCL, that brought together the PPB, City stakeholders, community groups, PCCEP members, and the public to discuss questions and concerns.

As reported in federal court on April 29, 2022, the COCL underscored two findings from the community forum and survey regarding access to the BWC recordings. First, the community wants open access to the recordings for the PPB supervisors, trainers, and auditors, as well as the general public. Second, when officers use force, most survey respondents felt that the PPB officers should not review the camera footage until after they have written their force report (called the "preview" issue). We continue to maintain that this viewpoint is supported by the Supreme Court's "Graham standard," which prohibits 20/20 hindsight, meaning that we should evaluate the use of force based on what the officer knew at the time, not what they learned later. We should capture the officer's unobstructed narrative as soon as possible after the incident so that we can understand what the officer was thinking at that time.

In the second quarter of 2022, the PPB underwent a series of next steps for the BWC program implementation including demonstrations from the top vendors; scoring of those vendors; vendor selection; grant application submission; and contract negotiations. The two remaining vendors demonstrated their products in May and were scored to determine which one will move on to the pilot program. This scoring process resulted in the selection of Axon, which is heavily utilized by police departments of many sizes throughout the US. If Axon proves to be a successful selection, they will transition into full implementation at the completion of the pilot program. During the third quarter of 2022, the PPB held a Zoom meeting with Axon to discuss the remaining issues in the contract. At that time, the PPB believed they were close to finalizing the contract with Axon and moving forward with the BWC pilot. However, the contract with Axon was not finalized as expected during the fourth quarter. Through discussion with the PPB personnel, they expect that the contract will be executed during the first quarter of 2023.

In the second quarter, the PPB submitted a grant to the Bureau of Justice Assistance for the Body-Worn Camera Policy and Implementation Program. This grant assists and funds law enforcement agencies that seek to obtain BWCs for the purpose of establishing or expanding a BWC program in their respective departments. Unfortunately, in the third quarter, PPB was notified that their proposal for the BJA grant was not accepted. Considering this information, the COCL continues to hope that the PPB and the City will use the pilot as an opportunity to exploit the rich data that will be produced from BWCs.   However, the process to start the

pilot program remains on hold as negotiations between the City and the police union (Portland Police Association or PPA) have persisted into the fourth quarter.

On several occasions, the COCL has recommended that, if the City partners with researchers who have the right software, then the BWC data can be used to identify specific types of interpersonal communication that lead to the escalation of conflict and the use of force, so that such encounters can be prevented or minimized in the future. Also, disparities in police treatment can be examined across various constitutionally protected classes. The COCL has also recommended that first-line supervisors be trained to use BWC data for coaching and feedback to individual officers under their supervision, but these initiatives are down the road. The PPB must first develop a sound BWC policy, basic training, and a pilot program.

As stated above, the fourth quarter of 2022 saw further discussions with the City Attorney's Office and the City Procurement department to work out the details of the pilot contract. In our previous report, we reported that the PPB hired 3 of 5 positions required in Records for redactions and 1 of 1 position required in IT for programmatic support. Furthermore, the PPB began the process of preparing the Central Precinct with electrical capacity for BWC equipment to support the pilot test.

The PPB continued bargaining with PPA throughout the fourth quarter, a process that has extended beyond the initial timeframe that was expected. The City anticipated a conclusion to bargaining by the end of November, but that did not happen. If the City and PPA cannot reach agreement, they will move to arbitration to resolve the impasse, which could add another six to nine months to the process before the pilot program can be introduced. The COCL is dismayed at the slowness of the negotiation process, as it hinders the finalization of the BWC policy and forward movement of a pilot program. We look to early 2023 for resolution in the bargaining process.

| | |
|---|---|
| **COCL Recommendations** | • To achieve Substantial Compliance, the City "shall implement body-worn cameras (BWCs) pursuant to a policy that is subject to the policy-review-and-approval provisions of this Agreement" (Par. 194). This means that the City will need to:<br><br>   o Complete the bargaining process<br><br>   o Finalize the BWC policy<br><br>   o Develop and implement BWC training<br><br>   o Complete a successful pilot test in the field |

| | |
|---|---|
| | ○ Achieve full-scale implementation of BWCs for PPB officer<br><br>• During the bargaining process, we encourage the City to incorporate the recommendations from the community, the COCL and DOJ<br><br>• PPB should seek to acquire software for analyzing BWC data and identifying patterns in police-community interactions that can be used for training and coaching |
| **Assessment Based On** | Review of any progress made in bargaining, policy development, hiring a qualified BWC vendor, hiring PPB personnel for BWC program, and preparing the identified precinct for pilot testing. |

---

**Settlement Agreement Paragraph**

195. In 2020, the City referred to voters a ballot measure that would overhaul the police accountability system incorporated into this Agreement by establishing a new Community Police Oversight Board to replace IPR for investigations of certain complaints of police misconduct and to replace the Chief of Police for imposition of discipline. City voters approved the ballot measure. The City has since empowered a 20-member civilian Commission to define the duties and authority of the Oversight Board and submit a proposal to City Council for final approval.

a. Before January 1, 2022, the City Council and Auditor shall each present a plan to the United States for an orderly transition to the Community Police Oversight Board by ensuring the continuity of IPR operations while the Commission develops the Oversight Board for City Council's approval. The United States shall determine whether either of these two plans is acceptable. City Council will then adopt a plan that the United States has determined acceptable. The Parties agree that the adopted plan shall be appended to this Agreement and will become part of this Order, provided that the Parties may agree to modify the plan if warranted by the circumstances. Until the Oversight Board becomes operational, the City shall ensure that administrative investigations are completed as required by Section VIII – Officer Accountability and that officers are held accountable for violating PPB policy and procedure as required by Paragraph 169.

b. Within 18 months of the date this paragraph is entered as an order of the Court, the Commission shall propose to City Council changes to City Code to create a new police oversight system as reflected in the City of Portland Charter amendment establishing a Community Police Oversight Board. Within 60 days of receiving the Commission's proposal, the City will propose amendments to City Code to address the Commission's proposal, and corresponding amendments to this Agreement, subject to the United States' and the Court's approval, to ensure full implementation of the Oversight Board and effective police accountability, consistent with the requirements of this Agreement. Within 21 days of the approval of the amendments to the Agreement by the United States and the Court, the City Council shall consider and vote on the conforming City Code provisions creating the Oversight Board. Within 12 months of the Council's adoption of the City Code provisions, the new Oversight Board shall be staffed and operational, and IPR shall then cease taking on new work and complete any pending work. For good cause shown, the deadlines imposed by this subparagraph (b) may be reasonably extended provided that the City is in substantial compliance with subparagraph (a).

c. The City will comply with any collective bargaining obligations it may have related to the Oversight Board, which the City agrees to fulfill expeditiously and in compliance with its obligation to bargain in good faith.

| Compliance Label | Partial Compliance |
|---|---|
| **Methodology** | Observation of Police Accountability Commission (PAC) meetings |
| | Communication with City support staff |
| | Review of PAC's Quarterly Report, October-December 2022 |

### Compliance Assessment

The City is currently in Partial Compliance with the requirements of Par. 195 and work remains to be done in order to achieve Substantial Compliance. On November 3, 2020, Portland voters passed Ballot Measure 26-217 to create this Community Police Oversight Board (CPOB) that would provide an entirely new police accountability system. The CPOB will act as an independent body that has the authority to:

- Investigate all deaths in custody and uses of deadly force

- Investigate all complaints of force that result in injury, discrimination against a protected class, violations of federal or state constitutional rights

- Investigate other complaints or incidents of misconduct as they see fit or mandated by City Code

- Subpoena, gather, and compel documents and all evidence, including the ability to compel statements from witnesses and officers

- Compel sworn members of the PPB and supervisors to participate in investigations.

- Make policy recommendations to the PPB and City Council, and

- Impose discipline, including termination.[32]

To establish the community oversight board, in July of 2021, the City Council created a Police Accountability Commission (PAC), composed of 20 community members, with the directive of developing the new oversight board for the Portland Police. In furtherance of this mission, the PAC held 17 public meetings during the fourth quarter of 2022. Recordings of each meeting held during the fourth quarter are publicly available on PACs city homepage.[33]

As previously reported by the COCL, PAC entered its second of six defined phases of work, the Fact-Finding Phase, in the second quarter of 2022, and that work continued into the beginning of the fourth quarter. As mentioned in the third quarter report, PAC released its report, *Areas of Agreement on Barriers to Police Accountability, and Best Practices, in the Current System in Portland* (made publicly available on September 29, 2022), demonstrating a major step toward moving the PAC into the next planned phase of work. This report received amendments on October 6, 2022. PAC's Fact-Finding Phase, which focused on gaining an understanding of the issues that PAC is aiming to fix and the ways they can learn from subject matter experts, other jurisdictions and affected communities, ended on October 6, 2022. At that point, the PAC entered its third phase of work – Powers and Duties Phase. In this phase, the PAC will seek to develop three "Areas of Agreement" in the new system: Access to Information, Officer Accountability, and Structural Oversight.

In response to Par 195(a), plans have been submitted to DOJ "for an orderly transition to the Community Police Oversight Board." Effective June 30, 2022, IPR was removed from the City Auditor's office by amending Portland City Code (PCC) 3.21. The plan to remove IPR was submitted in January of 2022. IPR is now recognized as an agency independent of the City Council and other city bureaus. Under this amendment to the PCC, IPR can request services, assistance, and advice from any City department, officer, administrative agency, or bureau in the performance of its duties. To ensure continuity of resources to IPR, the City Council will fund IPR at the amount necessary to maintain operations until IPR transitions to the new

---

[32] https://www.portland.gov/sites/default/files/2021/portland-ballot-measure-26-217-11-03-2020.pdf

[33] https://www.portland.gov/police-accountability/events/meetings?f%5B0%5D=year%3A2022

Community Police Oversight Board. Similarly, non-represented IPR employees will be allowed to transfer to an equivalent (or suitable) position offered by the City Council, or to the Auditor's office if offered. For represented IPR employees, the City will negotiate with AFSCME to discuss the alternatives available to ensure the retention of represented employees.

The PAC has worked hard to provide a process and framework for this remedy, and the Committee is supported by competent and committed City staff. For instance, the PAC entered the fourth quarter with a total of 2.25 FTE of staff support. The positions include a full-time Project Manager, a full-time Engagement and communications Coordinator, and a part-time Project Assistant. During the fourth quarter specifically, a second Project Assistant was hired. The fourth quarter saw a vacancy in the Research and Policy Coordinator position, which the PAC hopes to fill in the first quarter of 2023. Hopefully, the increase in PAC staff will assist in the work moving forward.

There is also a transition plan in place to sustain IPR until the new Board is functional, but as mentioned above, there must be a continued focus to complete the work and form the Board in a timely manner. One potential barrier to the submission of timely work is board vacancies. Three commissioners resigned from these volunteer positions during the fourth quarter and only one was replaced by City Council, on December 14. The PAC hopes to have these positions filled by mid-January, and the COCL will report back in the first quarter report of 2023. Along with resignations, the continuous absence of one commissioner caused the PAC to amend its Bylaws to create a firm footing for removal of a commissioner that is absent for four or more months. The minimum PAC membership has been 17 of 20 and so the COCL is less concerned about this issue being a significant factor, though one that we will need to continue monitoring.

To address concerns with the overall timeline, the PAC requested that the City Council extend the deadline for their work product from June 9, 2023 to October 29, 2023, but the Council did not act on this request in the fourth quarter. While we remain concerned about the length of this process overall (not just the PAC's work), we have empathy for a volunteer body that met 17 times in one quarter and faces a complex set of issues. The COCL is impressed with the volume of topics addressed by the PAC and the competency of the supporting staff, and we encourage the members to remain focused on the duties of the Oversight Board as defined in the Charter Agreement/City Code, as well as the constraints of the City Council and collective bargaining obligations.

The work of the PAC should eventually lead them to submit a proposal to the City Council that will include "changes to City Code to create a new police oversight system as reflected in the City of Portland Charter amendment establishing a Community Police Oversight Board."

**Exhibit A**

(Par. 195 (b)). There is much work to be done before such a proposal is ready to be submitted and the City will need to ensure that the proposed changes to the City code "comply with any collective bargaining obligations" (Par. 195(c)). We also note that any proposal for a Community Police Oversight Board must be reviewed by the City Council, PPA, DOJ and the Compliance officer/Monitor. Until the work delineated in Par. 195 has been completed, the City will remain in Partial Compliance. The COCL will closely monitor the implementation of the amendment in the months ahead.

| | |
|---|---|
| **COCL Recommendations** | • To achieve Substantial Compliance, the PAC must submit to the City Council a clear and reasonable proposal for the implementation of a Community Police Oversight Board (CPOB) as defined in Par. 195 and compliant with collective bargaining obligations<br><br>• To achieve Substantial Compliance, the City must implement a functional CPOB that is properly staffed, trained, operational, and able to effectively investigate and dispose of use of force and misconduct cases. |
| **Assessment Based On** | Progress achieved by PAC toward developing the CPOB.; Implementation and functioning of the CPOB. |

# LIST OF ACRONYMS

**AAR:** After Action Report (also referred to as 940)

**AMR/EMS:** American Medical Response/Emergency Medical Service

**BHR:** Bureau of Human Resources

**BHRT:** Behavioral Health Response Team

**BHCC:** Behavioral Health Call Center

**BHCT:** Behavioral Health Coordination Team

**BHU:** Behavioral Health Unit

**BHUAC:** Behavioral Health Unit Advisory Committee

**BOEC:** Bureau of Emergency Communications

**CAG:** Coalition of Advisory Groups

**CEW:** Conducted Electric Weapons

**CCO:** Coordinated Care Organization

**CI Training:** Crisis Intervention Training

**CIT:** Crisis Intervention Team

**COCL:** Compliance Officer and Community Liaison

**CRC:** Citizen Review Committee

**CRO:** Communication Restriction Order

**DOJ:** Department of Justice

**ECIT:** Enhanced Crisis Intervention Team

**ECW:** Electronic Control Weapons

**EIS:** Employee Information System

**FED:** Forensic Evidence Division

**FMLA**: Family and Medical Leave Act

**FSD:** Family Services Division

**FTO:** Field Training Officer

**FDCR:** Force Data Collection Report

**HRC:** Human Rights Commission

**IA:** Internal Affairs

**IMLLC**: Independent Monitor, LLC

**IPR:** Independent Police Review

**LMS:** Learning Management System

**PAC**: Police Accountability Commission

**PCCEP:** Portland Committee on Community Engaged-Policing

**PED:** Property and Evidence Division

**PES:** Psychiatric Emergency Services

**POH:** Police Officer Hold

**PPB:** Portland Police Bureau

**PRB:** Police Review Board

**PSD:** Professional Standards Division

**PSR:** Portland Street Response

**PS3:** Public Safety Support Specialist

**RRT**: Rapid Response Team

**RU:** Responsibility Unit

**SCT:** Service Coordination Team

**S.O.P.:** Standard Operating Procedure

**SSD:** Strategic Services Division

**TA Statement:** Technical Assistance Statement

**TAC:** Training Advisory Council

**TOD:** Tactical Operations Division

**UDAR**: Uniform Daily Assignment Roster

**YSD:** Youth Services Division

# **LIST OF PERSONNEL**

Chief of Police: Chuck Lovell

Deputy Chief of Police: Michael Frome

Assistant Chief of Operations: Jeffrey Bell

Assistant Chief of Services: Michael Leasure

Assistant Chief of Investigations: Jami Resch

Commander of Professional Standards Division/Compliance Coordinator: Kristina Jones

Inspector General/DOJ Compliance team: Mary Claire Buckley

Force Inspector: Peter Helzer

Behavioral Health Unit (BHU): Christopher Burley

EIS Supervisor: Matthew Engen

EIS Administrator: Dan Spiegel

Training Captain: Franz Schoening

Auditor: Mary Hull Caballero

IPR Director: Ross Caldwell

BOEC Director: Bob Cozzie

BOEC Training and Development Manager: Melanie Payne