# LETTER OF AGREEMENT

The parties to this Letter of Agreement (LOA) are the City of Portland (City) and the Portland Police Association (Union).

## Background

1. The City and PPA are parties to a collective bargaining agreement (CBA) effective July 1, 2021 through June 30, 2025.
2. The Parties have reached agreement on a Body Worn Camera (BWC) policy to start a BWC program at the City of Portland.

## Agreement

The Parties agree as follows:

1. The following written instruction will be given prior to any interview of an officer involved in a use of force event (the written instruction will be provided prior to the interview, and once on the record the investigator will ask the officer if they have read the instruction prior to turning on the recorder for the interview). PPB shall provide training on the instruction below to members, which will include furnishing a copy of, or access to, the written instructions.

   The written instructions shall state the following:

   Under the PPB BWC Policy, "Although BWC recordings have evidentiary value, they may not capture the entirety of an incident or the actual vantage point of the Bureau member, and footage may not necessarily depict the entire scene, circumstances, or incident in the way that it may have been perceived or experienced by any person present. BWC recordings serve as additional evidence related to an incident, but the footage is only an individual piece of evidence and should not be used in lieu of a complete and thorough police report or a complete and thorough investigation of any incident. Persons reviewing BWC recordings must be cautious before reaching conclusions about what the recordings show."

   Consistent with *Graham v. Connor,* "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight", including the 20/20 hindsight afforded by video evidence. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments about the amount of force that is necessary in a particular situation in circumstances that are tense, uncertain, and rapidly evolving. Thus, your perceptions and real-time experience of a use of force event at the time the event occurred are important because they reflect your subjective perception, which is part of the consideration under *Graham*.

In this case, there is video evidence that you will have an opportunity to view. Video evidence has limitations and may depict the events differently than you recall and may not depict all of the events as seen or heard by you. Video has a limited field of view and may not capture events normally seen by the human eye. The frame rate of video may limit the camera's ability to capture movements normally seen by the human eye. Videos are a two-dimensional medium and may not capture depth, distance, or positional orientation as well as the human eye. Remember, the video evidence is intended to assist your memory and ensure that your statements explain your state of mind at the time of the incident.

In this portion of the interview, I will be using cognitive interviewing techniques to help you provide me with a thorough account of your perceptions and actions during the use of force event. Videos cannot replace the human perspective. You are not expected to speculate or guess when recounting information. During the interview, you may offer or I may ask you whether you: (1) noticed items on the video you did not perceive in real-time; or (2) perceived anything in real-time that is not reflected on the video. This will help to identify and, if possible, address any discrepancies between your memory and the video. Importantly, you are not expected to "explain away" or reconcile the differences, as we can all acknowledge that during the incident, you were focused on experiencing the event and solving the problems within it, and not focused on creating a perfect record of what occurred.

Simply because your perceptions are different than the video does not mean you are lying. Further, it is acceptable if you did not perceive something that is on video or are unsure about a detail. I will use open-ended, non-leading questions to help you remember important details of your experience without pressuring you to remember precise details or quotes. I will not ask questions about the differences in the video and your memory that may call for creation of false memory, confabulation, or speculation

2. The parties recognize that the inability to review video can impact reporting accuracy. They further recognize the likelihood that there may be differences and discrepancies between an employee's perceptual statement/interview and the video where the employee was prohibited from watching the video prior to making such perceptual statement/interview. The perceptual statement protocol is intended to capture a perceptual statement untainted by the review of any external evidence. Differences between perception and other sources such as video may be due, among other things, to the limits of human perception and memory (e.g. – selective focus, influence of adrenaline, fight or flight response, tunnel vision) and expanded capacity of video sources (e.g. – wider field of vision and consistent focal range).

   As such, the parties agree that in force reviews and disciplinary/corrective action matters where the employee was not permitted to review video, the decisionmaker should not

automatically provide a video recording with greater evidentiary value than an employee's statement. The parties recognize that there are inherent limitations as to (i) what the human brain can attend to and cognitively integrate into memory; (ii) what ultimately solidifies into memory is only a fraction of all sensory inputs received; (iii) factors or events that may be perceivable at a scene and relevant to the subject report may not have solidified into memory at the time a report is drafted; and (iv) given that officers' reports and statements are written after an incident has resolved, away from the scene, and based on the recall ability of the officer at the time they are writing the report, an officer may not be able to recall at the time they are writing the report all information they in fact perceived that may be salient to the incident.

The parties recognize that due to the limitation of watching the video prior to perceptual statements/interviews, the potential for accuracy of the statement/interview may be diminished. An officer may not receive any discipline for any allegation of wrongdoing based upon a difference or discrepancy between the officer's statement/interview prior to watching video evidence and any other evidence unless the City can prove that the employee knew the information was discrepant and provided the discrepant information with an intent to deceive the City.

Absent dishonesty, inconsistencies between BWC footage and officer perceptions are normal and will not implicate Directive 320.00 - Portland Police Bureau Reporting of Potential Exculpatory or Impeachment Information, as it relates to inconsistent statements.

3. Within sixty (60) days of the date of this letter of agreement, PPB will provide training to its IA investigators using BWC footage in use of force investigations, limitations of video evidence, human performance dynamics and limitations, and cognitive interviewing techniques. As soon as reasonably possible, PPB will also provide this training to supervisors and managers.

4. Body-Worn Camera Issuance Pilot Program.
    a. The Bureau shall individually issue BWCs to all members who are assigned to Central Precinct and the Focused Intervention Team.
    b. Before implementing BWCs for use, the Bureau shall provide training on the proper operation and care of the device, and the Bureau's policy regarding the authorized use of BWCs.
    c. Members shall only use Bureau-authorized and -issued BWCs.
    d. Pilot Period.
        i. The duration of the pilot period is two months (60 calendar days) from the date of first issuance to the pilot group. The pilot period may be extended upon agreement between the City and bargaining unit representatives. Upon conclusion of the pilot period, the City and bargaining unit

      representatives shall meet and discuss any mutually agreeable modifications to this Policy.

    ii. During this pilot period, members will not be subject to discipline for nonintentional violations of this policy. Existing systems for coaching and counseling shall be used to address such matters, but not included in performance evaluations.

    iii. Intentional member violations of this Policy shall be subject to discipline during the pilot period.

5. The parties understand that the City is one entity, and therefore City bureaus and City offices outside of PPB will have access to BWC footage.

6. Either the PPA or the City may reopen the BWC policy for bargaining during successor contract negotiations under the PECBA.

7. This Agreement shall be effective once all signatories have executed it and only after authorized by Council via ordinance.

For the City:                                                                                              For the Union:

_____                              _____ 4/19/23
Charles Lovell,            Date                                                     Aaron Schmautz,           Date
Police Chief                                                                           PPA President

For Cathy Bless
*Ronald Zito*                    4/20/23
_____
Cathy Bless,                Date
BHR Director

Approved as to Form:

*Heidi Brown*                    4/20/2023
_____
Heidi Brown,               Date
Chief Deputy City Attorney