**NATALIE K. WIGHT, OSB #035576**
United States Attorney
U.S. Attorney's Office for the District of Oregon
**JARED D. HAGER**
Trial Attorney, Special Litigation Section
Civil Rights Division, U.S. Department of Justice
1000 SW Third Ave., Suite 600
Portland, Oregon 97204-2902
Phone: 202.353.5432
Email: jared.hager2@usdoj.gov

**KRISTEN CLARKE**
Assistant Attorney General
Civil Rights Division
**STEVEN H. ROSENBAUM**
Chief
**LAURA L. COWALL**
Deputy Chief
**R. JONAS GEISSLER**
**AMY SENIER**
Trial Attorneys
Special Litigation Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, D.C.  20530
Phone: 202.514.6255
Fax:    202.514.4883
    Attorneys for Plaintiff United States

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | Case No. 3:12-cv-02265-SI |
| Plaintiff, | PLAINTIFF'S NOTICE OF SEVENTH PERIODIC COMPLIANCE ASSESSMENT REPORT |
| v. | |
| **THE CITY OF PORTLAND**, | |
| Defendant. | |

**Page 1    Plaintiff's Notice of Seventh Periodic Compliance Assessment Report**

Plaintiff United States of America (United States) submits this Notice of Seventh Periodic Compliance Assessment Report in advance of the Status Conference set for August 14, 2023.  The Report, attached as Exhibit 1, focuses on the compliance activity of Defendant the City of Portland (City) from March 31, 2022, to March 31, 2023, as relevant to eight sections of the Amended Settlement Agreement (Agreement)—Use of Force (Section III, ¶¶ 66–77); Training (Section IV, ¶¶ 78–87); Community-Based Mental Health Services (Section V, ¶¶ 88–90); -Crisis Intervention (Section VI, ¶¶ 91–115); Employee Information System (EIS) (Section VII, ¶¶ 116–120); Accountability (Section VIII, ¶¶ 121–140); Community Engagement and Creation of Portland Committee on Community Engaged Policing (PCCEP) (Section IX, ¶¶ 141–152); and Addendum of Additional Remedies (Section XI, ¶¶ 188–195).  *See* ECF 354-1, Am. Settlement Agreement.[1]

We assess the City's compliance using the following color-coded rating levels:

- Green:  substantial compliance with an ongoing obligation.  This level indicates that the City has implemented the provision as required by the Agreement and must continue implementing the provision to remain in substantial compliance.

- Yellow:  partial compliance with an ongoing obligation.  This level indicates that the City has made progress with implementation but must address specific concerns to achieve substantial compliance.

- Red: noncompliance.  This level indicates that we have identified barriers to implementation that the Parties must address by devising an appropriate remedy or

---

[1] On February 28, 2023, the Court formally approved a motion to amend the Agreement to add Section XI, entering the Agreement as an Order of the Court.  ECF 354, Order; ECF 276, Motion. The Court had earlier orally approved the amendments as fair, adequate, and reasonable after a hearing on April 29, 2022, entering a related Minute Order granting the motion.  ECF 290, Order.

modifying the Agreement to accomplish the same result as that intended by the provision in noncompliance.

This year, we assessed all 96 paragraphs in the Agreement (88 paragraphs in the original Agreement, plus the eight new paragraphs in Section XI added in April 2022). *See* ECF 290, Order. We found the City in substantial compliance with 71 paragraphs, or 74% of the Agreement.[2] Last year, we found the City in substantial compliance with 58 of the Agreement's 88 paragraphs (or 66%). ECF 292, Pl.'s Notice of Sixth Periodic Compliance Assessment Report, at 2–3. While there has been progress, more needs to be accomplished to attain substantial compliance with the entire Agreement.

The City made commendable strides in the areas of force, training, and community engagement, and achieved substantial compliance for the first time with half of the new remedies in Section XI. PPB officers and supervisors are putting the time and effort into implementing those areas of the Agreement that have remained or moved into substantial compliance. We expect the City and PPB will continue to support its personnel as they continue to work towards fully implementing all paragraphs of the Agreement.

Accountability remains a primary source of compliance concerns. Applying policies uniformly and holding people accountable for violating policies is a continuing challenge for the City and PPB. For example, in multiple accountability investigations this reporting period, PPB failed to analyze and apply rules to de-escalate force and to restrict shooting at moving vehicles. (Paragraph 169). Portland residents chose a new approach to police accountability through Ballot

---

[2] Our findings continue to be largely in line with the Compliance Officer's assessments. *See* ECF 364-1, COCL Q4 2022 Report, at 4 (rating substantial compliance for 65 of 88 paragraphs, 74%); COCL Q1 2023 Report (draft), at 3, available at https://perma.cc/JJ3G-VB7C (rating substantial compliance for 73 of 96 paragraphs, 76%).

Measure 26-217, which the Parties incorporated in Paragraph 195.  We await the results of the Police Accountability Commission's deliberations and subsequent decisions by City Council on its recommendations.  In the meantime, the City should apply the Agreement's requirements to existing mechanisms, such as After Action Reviews and Police Review Boards (PRBs), and embrace opportunities to conduct robust audits and implement audit recommendations.

On a positive note, the City and Intervenor Defendant Portland Police Association (PPA) resolved their bargaining impasse regarding a body-worn camera (BWC) policy.  PPB is preparing to roll out BWCs in Central Precinct and with the Focused Intervention Team across the City.  We will observe training in August and look forward to the City implementing this remedy, which can improve accountability systems, training, and officer performance by providing additional probative evidence of police encounters with civilians.

Our executive summary of the Report by section follows.  At the status conference scheduled for August 14, 2023, we anticipate presenting an overview of our compliance findings and answering any questions the Court may have.

**Force (Section III) (Paragraphs 66–77)**:  The City made significant headway in implementing Section III of the Agreement.  It not only maintained substantial compliance with Paragraphs 68 and 71, but returned to substantial compliance with Paragraphs 66, 67, and 72.  Though the City remains in partial compliance with Paragraphs 69, 70, and 73, regarding the reporting and review of force, officers and supervisors demonstrated marked improvement in these areas, indicating that PPB is on the path to substantial compliance if it continues to facilitate such progress.  The implementation of BWCs across PPB should assist that effort.  The City still needs to do more, however, to ensure that PPB's Force Inspector is adequately fulfilling its duties to

audit and analyze the use of force, particularly at the officer level, as required by Paragraphs 74 through 77.

**Training (Section IV) (Paragraphs 78–87)**:  Training was a bright spot for PPB during this reporting cycle.  Following collaborative meetings between the Training Division, Compliance Officer, City Attorney's Office, and DOJ and our expert consultants, the City is on the cusp of meeting all training-related obligations in the Agreement.  *See* ECF 195-1, DOJ 4th Report, at 20–30.  The City returned to substantial compliance with Paragraphs 79, 85, and 86, while maintaining substantial compliance with Paragraphs 80, 82, 83, and 87.  Significantly, after an exhaustive search, the City recently hired a civilian to direct the educational aspects of PPB's Training Division, achieving substantial compliance with Paragraph 191.  We look forward to monitoring continued improvements in training that should flow from successfully incorporating adult-based learning techniques.

**Community-Based Mental Health Services (Section V) (Paragraphs 88–90)**:  The City remains in substantial compliance with this section.  We are concerned with the durability of the City's current approach to crisis triage and the expanded options for Bureau of Emergency Communications (BOEC) to divert 911 calls from PPB to qualified mental health providers as first responders.  However, we are increasingly impressed with the reliable data showing that in Portland Street Response's (PSR) second year of operations,[3] it achieved even more positive outcomes for community members and the public safety system more broadly.

**Crisis Intervention (Section VI) (Paragraphs 91–115)**:  The structure and operation of PPB's Behavioral Health Unit's (BHU) and multi-faceted crisis intervention program continue to

---

[3] PSR, which is part of Portland Fire & Rescue, is a group of non-police first responders, including qualified mental health professionals, who assist people experiencing mental health and behavioral health crises, with teams that BOEC may directly dispatch to calls meeting certain criteria.

meet requirements.  The City thus maintained substantial compliance with 23 of the 25 paragraphs in Section VI.  In addition, in March 2023, PPB followed through on its pledge to enable the BHU Advisory Committee (BHUAC) to perform its mission of decreasing the potential for violent encounters between officers and those who may have a mental illness or be experiencing a mental health crisis.  As a result, the City re-achieved substantial compliance with Paragraph 95.

Conversely, the City failed to maintain substantial compliance with Paragraph 115 because, during this reporting period, (1) BOEC did not complete policies related to PSR to triage calls related to mental health by assigning calls directly to mental health professionals; and (2) the City did not ensure that its approach to crisis triage is fully operational by implementing PSR-related policies.

PSR continues to perform well.  Last year, we recognized the City's success in building on its innovative approach to crisis triage by enhancing first responder options available to 911 operators and expanding PSR based on reliable data showing positive outcomes for community members and the public safety system.  *See* ECF 292, Pl.'s Notice of Sixth Periodic Compliance Assessment Report, at 4 & n.3.  This year, PSR achieved more excellent results and was on the cusp of operating citywide 24/7, which could facilitate access to federal funding sources.  *See* Greg Townley & Emily Leickly, *Portland Street Response: Year Two Program Evaluation*, Portland State University (PSU) Homelessness Research & Action Collaborative, available at https://perma.cc/5QJH-G5RL.  In its second year (April 1, 2022 to March 31, 2023), PSR responded to 7,418 incidents, a 509% increase from the same period its first year; 94% of calls were dispatched directly by BOEC (73% from 911 calls and 21% from calls to the non-emergency number), and 6% from PSR self-dispatch; and of the 7,418 calls for service, PPB traditionally would have responded to 7,238 (97.6%) of these calls.  *Id.* at 7.  PSR is achieving three primary

goals:  (1) PSR reduced by 3.5% the total calls that police would have responded to during PSR's operating hours; (2) PSR reduced by 19% the calls for non-emergency welfare checks and unwanted persons that PPB would have responded to during PSR's operating hours; and (3) PSR resolved the vast majority of its calls in the field, with only 187 (2.5% of all calls) resolved by transport to the hospital for additional care.  *Id.* at 7–8.

While the Agreement does not require the City to create and support PSR, specifically, it does require the City to expand options for BOEC to directly dispatch non-police first responders to appropriate calls for service, and to implement policies to ensure that the City's approach to crisis triage is fully operational.  *See* ECF 354-1, Am. Settlement Agreement, ¶¶ 90(d), 113, 115. On July 11, 2023, the City informed us that BOEC finalized its PSR policy.  We will monitor the operationalization of the City's crisis triage approach, as required by Paragraph 115, and report to the Court next year.

**EIS (Section VII) (Paragraphs 116–120)**:  Two of three issues that we identified last year are still impeding the City from reattaining substantial compliance with Paragraphs 116 and 117: (1) EIS data is incomplete; and (2) PPB needs "to more effectively identify at-risk employees, supervisors and teams to address potentially problematic trends in a timely fashion."  We saw an improved use of EIS to track officers' recent performance, using the EIS Performance Data Tracker as a convenient "jacket" for supervisors' review of their officers.  The City also continued to apply the requirements in Paragraphs 118, 119, and 120 for EIS thresholds and staffing.

**Accountability (Section VIII) (Paragraphs 121–140)**:  Similar to last year, an important area of focus needs to be consistently and uniformly holding officers accountable for complying with PPB policy and procedure, as required by Paragraph 169.  The City still has not met Paragraph 121's required 180-day investigatory timeline owing in part to late training analyses and lack of

mediators for PRBs. On the positive side, the City followed its required procedures for involved officers in lethal force incidents, in compliance with Paragraphs 124, 125, 126, and 127. The City also recently enacted a protocol for Independent Police Review case closure decisions that will need to be implemented to comply with Paragraph 129. Lastly, in response to the Court's specific request to DOJ, we address the accountability investigations regarding the disclosed training materials from PPB's prior Rapid Response Team (RRT) in our discussion of Paragraph 169. As explained there, we have concerns that: (1) the City did not investigate a more serious charge in the "meme" slide investigation; (2) the City unnecessarily delayed the investigation of the obligation to report the slide; (3) the City asserted that it could not hold anyone accountable for the failure to review the RRT training material because it had not provided sufficient notice about the policy requirement to review specialized unit training; and (4) the City did not conduct an investigation of the failure to disclose the RRT materials to DOJ or the Compliance Officer.

**Community Engagement and PCCEP (Section IX) (Paragraphs 141–152)**: The City re-achieved substantial compliance with Paragraphs 143 and 144 by providing sufficient administrative support to the PCCEP and appointing four new active and engaged members. However, the City continues to struggle to ensure a full contingent of PCCEP members by timely filling vacancies, increasing burdens on PCCEP's volunteer members and unnecessarily impeding their ability to accomplish the objectives laid out in the Agreement and the PCCEP Plan. As a result, the City has not yet re-achieved substantial compliance with Paragraph 151. We are optimistic that the City will correct course by the end of the year.

**Addendum of Additional Remedies (Section XI) (Paragraphs 188–195)**: The City achieved substantial compliance with 4 of the 8 obligations entered by the Court in April 2022. The City is progressing with the two requirements most directly related to the City's 2020 protest

response—conducting an external assessment of the City's response (Paragraph 189) and investigating and holding accountable senior PPB managers for any misconduct committed during the response (Paragraph 192). The City also continues to work toward the remaining two requirements—implementing a BWC program (Paragraph 194) and a new oversight board (Paragraph 195) We will continue to assess the City's performance and report to the Court.

*    *    *

Finally, we remain mindful of the Court's direction to consider whether a Court-appointed monitor may be appropriate "at least to protect the progress that has been made and prevent further slippage." ECF 249, Hr'g Tr. at 196 (Aug. 24, 2021). The Parties have thoroughly discussed a monitor with the PPA, AMAC, and MHA over numerous mediation sessions with U.S. Magistrate Judge Stacie F. Beckerman and anticipate reporting back to the Court in the coming weeks.

DATED: August 8, 2023.

FOR THE UNITED STATES:

NATALIE K. WIGHT
United States Attorney
District of Oregon

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

STEVEN H. ROSENBAUM
Special Litigation Section Chief

*/s/ Laura L. Cowall*
LAURA L. COWALL
Deputy Chief

*/s/ R. Jonas Geissler*
R. JONAS GEISSLER
Trial Attorney

*/s/ Jared D. Hager*
JARED D. HAGER
Trial Attorney

*/s/ Amy Senier*
AMY SENIER
Trial Attorney