**United States v. City of Portland**

**DOJ's Seventh Periodic Compliance Assessment Report**

SECTION III – USE OF FORCE

| Obligation | Compliance Ratings by DOJ Report | | | | | | |
|---|---|---|---|---|---|---|---|
| | 1st Report ECF 105-1, 9/29/2015 | 2nd Report ECF 124-1, 10/18/2016 | 3rd Report ECF 158-1, 12/26/2017 | 4th Report ECF 195-1, 5/4/2019 | 5th Report ECF 236-1, 2/10/2021 | 6th Report ECF 292-1, 6/30/2022 | 7th Report ECF 369-1, 8/8/2023 |
| **A. Use of Force Policy** | | | | | | | |
| Para. 66: Use of force must be objectively reasonable | **Partial Compliance** | **Partial Compliance** | **Partial Compliance** | **Substantial Compliance** | **Partial Compliance** | **Partial Compliance** | **Substantial Compliance** |
| Para. 67: Require de-escalation, and impose discipline or corrective action for improper use of force | **Partial Compliance** | **Partial Compliance** | **Partial Compliance** | **Substantial Compliance** | **Partial Compliance** | **Partial Compliance** | **Substantial Compliance** |
| **1. Electronic Control Weapons (ECWs)** | | | | | | | |
| Para. 68: ECW policy prohibitions, limitations, and requirements | **Partial Compliance** | **Partial Compliance** | **Partial Compliance** | **Substantial Compliance** | **Substantial Compliance** | **Substantial Compliance** | **Substantial Compliance** |
| **2. Use of Force Reporting Policy and Use of Force Report** | | | | | | | |
| Para. 69: Force Data Collection Reports (FDCRs) | **Partial Compliance** | **Partial Compliance** | **Partial Compliance** | **Substantial Compliance** | **Partial Compliance** | **Partial Compliance** | **Partial Compliance** |

| Obligation | Compliance Ratings by DOJ Report | | | | | | |
|---|---|---|---|---|---|---|---|
| | 1st Report ECF 105-1, 9/29/2015 | 2nd Report ECF 124-1, 10/18/2016 | 3rd Report ECF 158-1, 12/26/2017 | 4th Report ECF 195-1, 5/4/2019 | 5th Report ECF 236-1, 2/10/2021 | 6th Report ECF 292-1, 6/30/2022 | 7th Report ECF 369-1, 8/8/2023 |
| **3. Use of Force Supervisory Investigations and Reports** | | | | | | | |
| Para. 70: After action reports (AARs) | Partial Compliance | Partial Compliance | Partial Compliance | Substantial Compliance | Partial Compliance | Partial Compliance | Partial Compliance |
| Para. 71: Sergeant staffing | Not Rated | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| Para. 72: Supervisory force investigation checklist | Partial Compliance | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Partial Compliance | Substantial Compliance |
| Para. 73: Command review of AARs | Partial Compliance | Partial Compliance | Partial Compliance | Substantial Compliance | Partial Compliance | Partial Compliance | Partial Compliance |
| **B. Compliance Audits Related to Use of Force** | | | | | | | |
| Para. 74: Force Inspector audit use-of-force and AARs | Partial Compliance | Partial Compliance | Partial Compliance | Substantial Compliance | Substantial Compliance | Partial Compliance | Partial Compliance |
| Para. 75: Force Inspector audit supervisory review of use-of-force | Partial Compliance | Partial Compliance | Partial Compliance | Substantial Compliance | Substantial Compliance | Partial Compliance | Partial Compliance |
| Para. 76: Force Inspector analyze force data and AARs | Partial Compliance | Partial Compliance | Partial Compliance | Substantial Compliance | Substantial Compliance | Partial Compliance | Partial Compliance |
| Para. 77: Force Inspector audit command review of AARs | Partial Compliance | Partial Compliance | Partial Compliance | Substantial Compliance | Substantial Compliance | Partial Compliance | Partial Compliance |

## III.    USE OF FORCE

PPB shall revise its existing use of force policy and force reporting requirements to ensure that all force, particularly force involving persons with actual or perceived mental illness: (a) is used only in accordance with the Constitution and laws of the United States; (b) is no greater than necessary to accomplish a lawful objective; (c) is properly documented, reported, and accounted for; and (d) is properly investigated, reviewed, evaluated, and, if necessary, remedied.  PPB shall attempt to avoid or minimize the use of force against individuals in perceived behavioral or mental health crisis, or those with mental illness and direct such individuals to the appropriate services where possible. In addition, PPB shall ensure that officers use non-force and verbal techniques to effect compliance with police orders whenever feasible, especially in the course of conducting welfare checks or effecting arrests for minor offenses or for persons whom officers have reason to believe are experiencing a mental health crisis; de-escalate the use of force at the earliest possible moment; only resort to those use of force weapons, including less-lethal weapons, as necessary; and refrain from the use of force against individuals who are already under control by officers, or who may express verbal discontent with officers but do not otherwise pose a threat to officers or others, or impede a valid law enforcement function.  To achieve these outcomes, PPB shall implement the requirements set out below.

| Status | Partial Compliance |
|--------|--------------------|

The City remains in partial compliance with Section III of the Amended Settlement Agreement (Agreement) because, as detailed below, PPB has not fully implemented all of the Section's requirements.

In February 2022, the Parties agreed to additional remedies in a new proposed Section XI to the Agreement, ECF 275-1, to resolve a notice of noncompliance based on our Fifth Periodic Compliance Assessment Report covering January 20, 2020, to January 10, 2021, ECF 236-1, and a letter critiquing Police Review Board (PRB) practices, ECF 286-3.  The Court entered the amended Agreement as a Court order in February 2023.  ECF 354.  All provisions of Section III are ongoing obligations that the City must continue to satisfy in addition to the new obligations of Section XI.

To assess compliance with Section III during this compliance assessment period, we reviewed PPB policies and PRB materials, observed PRB proceedings, and evaluated a random sample of 34 use of force incidents, representing approximately 15% of incidents involving serious force, ECW use, and/or force against people experiencing mental health crises during the compliance assessment period.  As a result of these reviews, we conclude that the City has maintained substantial compliance in two areas (Paragraphs 68 and 71) and returned to substantial compliance in three more areas (Paragraphs 66, 67, and 72).  The City remains in partial compliance in the reporting and review of force (Paragraphs 69, 70, and 73), though officers and supervisors demonstrated marked improvement in this compliance assessment period versus the last two periods, reflecting a renewed effort on PPB's part to implement these provisions.  The City has more to do, however, to ensure that PPB's Force Inspector sufficiently fulfills its duties to audit and analyze the use of force, particularly at the officer level (Paragraphs 74–77).

## A.    Use of Force Policy

66. PPB shall maintain the following principles in its existing use of force policies:

a. PPB shall use only the force reasonably necessary under the totality of circumstances to lawfully perform its duties and to resolve confrontations effectively and safely; and

b. PPB expects officers to develop and display, over the course of their practice of law enforcement, the skills and abilities that allow them to regularly resolve confrontations without resorting to force or the least amount of appropriate force.

67. PPB shall add to its use of force policy and procedures the following use of force principles:

a. Officers shall use disengagement and de-escalation techniques, when possible, and/or call in specialized units when practical, in order to reduce the need for force and increase officer and civilian safety;

b. In determining whether to use force, officers will take into account all information, when feasible, including behavior, reports, and known history as conveyed to or learned by the officer by any means, indicating that a person has, or is perceived to have, mental illness;

c. The use of force shall be de-escalated as resistance decreases and the amount of force used, including the number of officers who use force, shall de-escalate to a level reasonably calculated to maintain control with the least amount of appropriate force; and

d. Objectively unreasonable uses of force shall result in corrective action and/or discipline, up to and including termination.

| Status | Substantial Compliance |
|---|---|

We agree with the Compliance Officer that the City has returned to substantial compliance with Paragraphs 66 and 67 based upon our independent review of a random sample of 34 use of force incidents from this compliance assessment period, in which officers demonstrated using force consistent with Agreement-compliant directives.  *See* ECF 364-1, COCL Q4 2022 Report, at 33–35; COCL Q1 2023 Report (draft), at 34–35, available at https://perma.cc/JJ3G-VB7C.

Throughout this compliance assessment period, we worked with the City Attorney's Office, PPB, the Intervenor-Defendant Portland Police Association (PPA), the Portland Police Commanding Officers Association, and the Compliance Officer to review PPB's proposed revisions to its force policies.  This review process resulted in an updated revised PPB Directive 1010.00, Use of Force, available at https://perma.cc/8SE5-GZY9, and a separate directive governing the use of less lethal weapons specifically, PPB Directive 1015.00, Less Lethal Weapons and Tools, available at https://perma.cc/4FH2-D5YN.  The City also revised its policy governing the use and reporting of flash-bang grenades as we noted was necessary in our last report.  *See id.*, Procedure 6; PPB Directive 910.00, Use of Force Reporting, Review, and Investigation, Procedure 1.4, available at https://perma.cc/PE37-VSSB.

1.      **Electronic Control Weapons**

68. PPB shall revise PPB Directive 1051.00 regarding Taser, Less-Lethal Weapon System to include the following principles:

a. Prohibition against the use of ECWs for pain compliance against those suffering from mental illness or emotional crisis except in exigent circumstances, and then only to avoid the use of a higher level of force;

b. Unless it would present a danger to the officer or others, that officers shall issue a verbal warning, or attempt to utilize hand signals where there is a language barrier or the subject is hearing impaired, prior to deploying their ECW;

c. Officers shall follow protocols developed by PPB in conjunction with medical professionals on their responsibilities following ECW use;

d. Only one ECW at a time may be used on a subject, intentionally, except where lethal force would be permitted;

e. After one standard ECW cycle (5 seconds), the officer shall reevaluate the situation to determine if subsequent cycles are necessary, including waiting for a reasonable amount of time to allow the subject to comply with the warning. Officers shall describe and explain the reasonableness of each ECW cycle in their use of force reports;

f. Officers shall make every reasonable effort to attempt handcuffing during and between each ECW cycle. Officers should avoid deployments of more than three ECW cycles unless exigent circumstances warrant use;

g. ECWs shall not be used on handcuffed or otherwise restrained persons, unless doing so is necessary to prevent them from causing serious physical injury to themselves or others, or if lesser attempts of control have been ineffective and/or to avoid greater application of use of force; and

h. Officers receive annual ECW in service training including proficiency and policy changes, if any.

| Status | Substantial Compliance |
|---|---|

We have found the City in substantial compliance with Paragraph 68 since 2019. *See, e.g.*, ECF 195-1, DOJ 4th Report, at 8–9; ECF 292-1, DOJ 6th Report, at 10–11. For this report, we reviewed a random sample of 15 uses of ECWs, representing approximately 30% of all reported ECW use during the compliance assessment period. Officers appeared to use ECWs reasonably and reported issuing warnings prior to using the ECW or articulated sufficient reasons why issuing a warning was not feasible. Supervisors reported responding to the scene of ECW use. PPB also utilized its ambulance service, AMR, Portland Fire & Rescue members, or hospital staff to remove probes unless the probes appeared to have fallen out themselves.

PPB has implemented policies necessary to comply Paragraph 68. We previously reported that PPB's revised Directive 1010.00 incorporated all of Paragraph 68's mandates. ECF 158-1, DOJ 3rd Report, at 8. In November 2022, PPB revised Directive 1010.00, Use of Force, available at https://perma.cc/9WXB-WSBR, and issued Directive 1015.00, Less Lethal Weapons and Tools,

available at https://perma.cc/4FH2-D5YN, further restricting less lethal weapons.    Both directives comply with the terms of this Agreement.

PPB did not conduct the requisite annual ECW training during the compliance assessment period.    PPB intends to do so in September 2023.    We expect that PPB will provide the Compliance Officer and DOJ a complete set of training materials in advance of this training to allow timely review and comment.    Despite the temporary gap in training, we agree with the Compliance Officer that the City remains in substantial compliance with Paragraph 68.    *See* ECF 364-1, COCL Q4 2022 Report at 36; COCL Q1 2023 Report (draft), at 36, available at https://perma.cc/JJ3G-VB7C.

## 2.    Use of Force Reporting Policy and Use of Force Report

69. PPB shall revise its policies related to use of force reporting, as necessary, to require that:

a. All PPB officers that use force, including supervisory officers, draft timely use of force reports that include sufficient information to facilitate a thorough review of the incident in question by supervisory officers; and

b. All officers involved or witnesses to a use of force provide a full and candid account to supervisors.

c. In case of an officer involved shooting resulting in death, use of lethal force, or an in-custody death, PPB will fulfill its reporting and review requirements as specified in directive 1010.10, as revised. This will take place of Directive 940.00 reports for purposes of paragraphs 70, and 72-77 of this Agreement.

| Status | Partial Compliance |
|--------|--------------------|

We agree with the Compliance Officer that the City remains in partial compliance with Paragraph 69.    *See* ECF 364-1, COCL Q4 2022 Report at 37; COCL Q1 2023 Report (draft), at 37–38, available at https://perma.cc/JJ3G-VB7C.    We base our determination on PPB's failure to ensure that officers report all applications of force and sufficiently articulate their efforts to de-escalate encounters.

**Some FDCRs Lack Full and Candid Accounts:**  The majority of FDCRs we reviewed this compliance assessment period appeared to provide supervisors with full and candid accounts of force events. Indeed, in several of them, officers reported in great detail the various modalities and applications of force they used during a single encounter. There were several, however, where officers failed to report force; most commonly, control against resistance.  In auditing one such report, the Force Inspector identified an unreported control against resistance on surveillance video collected during the AAR and sent the reports back for correction, a reflection of a well-functioning review of this incident.  But in others, no one in the chain of command adequately identified the unreported force, meaning that these uses of force were not properly reported or reviewed.  For example, following one encounter, an officer reported in an incident report supplement that they had "grabbed" the wrist of a fleeing man and "put it in a San Kyo wrist lock and pinned it to the wall."  Unlike the officers who had restrained the fleeing man's other hand, arm, and legs on the opposite side of the fence he was scaling, this officer did not complete an FDCR reporting his use of force. The supervisor wrote in the AAR that this officer did not have to complete an FDCR because the hold did not meet resistance.  We understand

from PPB that for the Bureau to consider contact between an officer and individual to be a reportable control against resistance, an individual must be resisting the particular officer applying the force. We disagree with this position and believe that whenever an officer applies force to control an individual resisting any officer—as was the case here—that is reportable force under Directive 910.00. As a result, we recommend that PPB clarify in both its policy and training that control against resistance occurs whenever an officer applies weight or pressure to an individual who is displaying resistance towards *any* officer.

**De-Escalation:** In most of the FDCRs we reviewed, officers reported laudable efforts to de-escalate encounters prior to resorting to force, providing detail about their verbal communication, adaptations to a person's perceived mental health crisis, and particular use of distance, time, and cover. But too often the FDCRs we reviewed contained cursory references to phrases such as "numerical superiority," which—absent explanation—does not necessarily constitute de-escalation and could, in some instances, escalate encounters. In other FDCRs, officers reported engaging in "verbal techniques" or using a "calm voice" without elaborating on what messages they conveyed. And in some FDCRs, officers characterized the issuance of "commands" as de-escalation even though PPB policy does not recognize this as a de-escalation tactic. PPB Directive 1010.00, Use of Force, Procedure 1, available at https://perma.cc/8SE5-GZY9.

**Officer Incapacitation:** In our last report, we cited two investigations of officer-involved shootings in which PPB did not obtain timely interviews on the grounds that officers (one a witness, the other an involved) were incapacitated. We reported these failures resulted from misinterpretations of Directive 1010.10, and even if they did not, they still ran afoul of Paragraph 69(c). ECF 292-1, DOJ 6th Report, at 12–13. PPB, DOJ, and the Compliance Officer met to discuss this issue during the current compliance assessment period, and all agree that Directive 1010.10 needs revision. We look forward to reviewing those revisions pursuant to Paragraph 166 to ensure the Directive is applied in a manner that fully satisfies Paragraph 69(c) in the future.

To re-achieve substantial compliance, the City must ensure that PPB (1) obtains full and candid accounts of use-of-force events from involved and witness officers; (2) requires officers to adequately articulate their efforts to de-escalate encounters; and (3) revises Directive 1010.10.

### 3.    Use of Force Supervisory Investigations and Reports

70. PPB shall continue enforcement of Directive 940.00, which requires supervisors who receive notification of a force event to respond to the scene, conduct an administrative review and investigation of the use of force, document their findings in an After Action Report and forward their report through the chain of command. PPB shall revise Directive 940.00 to further require that supervisory officers:

a. Complete After Action Reports within 72 hours of the force event;

b. Immediately notify his or her shift supervisor and PSD regarding all officers['] Serious Use of Force, any Use of Force against persons who have actual or perceived mental illness, or any suspected misconduct. Where the supervisor suspects possible criminal conduct, the supervisor shall notify the PPB Detective Division. Where there is no misconduct, supervisors also shall determine whether additional training or counseling is warranted. PPB shall then provide such counseling or training consistent with this Agreement;

c. Where necessary, ensure that the subject receives medical attention from an appropriate medical provider; and

d. Interview officers individually and not in groups.

| Status | Partial Compliance |
|--------|--------------------|

We agree with the Compliance Officer that the City remains in partial compliance with Paragraph 70. *See* ECF 364-1, COCL Q4 2022 Report at 38–40; COCL Q1 2023 Report (draft), at 39–40, available at https://perma.cc/JJ3G-VB7C. Supervisors demonstrated improvement in the timeliness and thoroughness of their AARs,[1] but gaps remain in how they ensure that identified training or counseling is provided, particularly where de-escalation and warnings are not adequately reported.

Our review of a random sample of AARs from this compliance assessment period revealed a vast improvement in the timeliness of their initial submissions, and documentation thereof, demonstrating compliance with Paragraph 70(a). PPB also provided us with injury photographs and, where available, surveillance or bystander video that supervisors had saved to the Bureau's Digital Information Management System corresponding to nearly all of the AARs we reviewed. This evidence, combined with the written PPB reports we reviewed, indicate that PPB is continuing to secure medical care for individuals when they sustain and/or report injury arising from use of force encounters consistent with Paragraph 70(c).

We have concerns, however, that PPB may not be providing counseling or training consistent with Paragraph 70(b). For example, we reviewed an incident in which officers attempted to "box-in" a stolen vehicle occupied by two seemingly unconscious people. Once the first of two patrol cars approaching from the side made contact with the vehicle, its occupants woke, started the car, and escaped the attempted maneuver by driving down the sidewalk, striking two occupied tents within a half block of the scene. A 16-year-old girl sustained a broken pelvis as a result. In the AAR, supervisors and reviewers determined that it was "necessary" for the officers to use force in part because the vehicle's occupants appeared to be under the influence of drugs and might endanger the public. Reviewers further concluded that (1) it was "reasonable" for the on-scene sergeant to assume there was a curb line even though there was a puddle of water that obscured it and that (2) the injuries to a bystander were due to "the suspects [sic] independent actions while attempting to defeat a box-in maneuver." No one in the chain of command analyzed whether the officers could have considered less dangerous alternatives or, at a minimum, attempted to clear the sidewalk of uninvolved bystanders before engaging in the maneuver. This was particularly glaring given the time officers had to photograph and conduct a records check of the Vehicle Identification Number and place a stop stick in front of the vehicle. And our review of a particularly problematic September 2021 officer-involved shooting, discussed below in our assessment of compliance with Paragraph 169, where an officer fired over the head of a colleague but none of PPB's or the City's reviews found any policy violations, is another example of a lack of consideration of necessary training or counseling.

---

[1] We address revisions to the AAR forms required by Section XI in our discussion of Paragraph 188.

Additionally, we share the Compliance Officer's concern about whether AARs are identifying misunderstandings of when warnings are required before using force. *See* ECF 364-1, COCL Q4 2022 Report, at 39–40. PPB policy requires officers to issue a warning "before using any force" "when feasible" and to "describe" that warning in their use of force reports. PPB Directive 1010.00, Use of Force, Procedure 5, available at https://perma.cc/8SE5-GZY9. Where officers cannot feasibly provide a warning, they must provide a justification for the lack of warning in their FDCR, unless the force was a vehicle intervention or Category IV force. *See id.*, Procedure 5.1.3. We reviewed some FDCRs in which, in addition to checking the FDCR box indicating that they had issued a warning before applying force, officers described that warning consistent with the policy requirement. We also reviewed FDCRs in which officers explained their reasons for not issuing warnings (e.g., they did not have time given the speed with which they were threatened with serious injury). But we reviewed several FDCRs in which officers wrote (and reviewers endorsed, be it explicitly or implicitly) the view that warnings were not necessary because a general warning at the start of the encounter that force would be used if an individual did not comply with orders was sufficient or that warnings are not necessary before Category IV force. Neither interpretation is supported by Directive 1010.00. To be sure, there may be dynamic encounters in which warnings are not, as the Directive recognizes, "feasible." If and when that is the case, officers are required by policy to indicate that and articulate their rationale for not providing a warning, rather than reading exceptions into Directive 1010.00. Where officers fail to do this, supervisors should identify those failures and provide the necessary counseling and training.

Finally, as noted in our discussion of partial compliance with Paragraph 69, we reviewed some FDCRs in which officers reported the issuance of commands as constituting de-escalation, which is inconsistent with Directive 1010.00. While it is commendable that, in two instances, we saw reviewers note that commands are not de-escalation, the fact that in many reports these and other cursory references to de-escalation went unaddressed raises concerns that PPB is not investigating whether officers are engaging in adequate efforts to slow encounters down before resorting to force or officers are simply not documenting such efforts sufficiently. PPB's implementation of body-worn cameras should shed light on this issue in the coming compliance assessment period.

To re-achieve substantial compliance, the City must ensure that PPB provides additional training or counseling to officers who use force, when appropriate.

71. PPB shall maintain adequate patrol supervision staffing, which at a minimum, means that PPB and the City shall maintain its current sergeant staffing level, including the September 2012 addition of 15 sergeants.

| Status | Substantial Compliance |
| --- | --- |

We have found the City in substantial compliance with Paragraph 71 since 2016. *See, e.g.,* ECF 124-1, DOJ 2nd Report, at 21; ECF 292-1, DOJ 6th Report, at 15. Given the data produced by PPB demonstrating a continued staffing ratio of one sergeant to 6.6 officers, we agree with the Compliance Officer's assessment that PPB is maintaining adequate patrol supervision staffing. *See* ECF 364-1, COCL Q4 2022 Report, at 40–42; COCL Q1 2023 Report (draft), at 40–41, available at https://perma.cc/JJ3G-VB7C.

72. PPB shall develop a supervisor investigation checklist to ensure that supervisors carry out these force investigation responsibilities.  PPB shall review and revise the adequacy of this checklist regularly, at least annually.

| Status | Substantial Compliance |
|--------|------------------------|

We agree with the Compliance Officer that the City is now in compliance with Paragraph 72. *See* ECF 364-1, COCL Q4 2022 Report at 42; COCL Q1 2023 Report (draft), at 42, available at https://perma.cc/JJ3G-VB7C.  In November 2022, PPB revised its AAR form as part of its revisions to Directive 1010.00.  The revised AAR now serves as the requisite supervisory force investigation checklist.  We thus agree with the Compliance Officer that the City is in substantial compliance with Paragraph 72.

73. PPB shall revise its policies concerning chain of command reviews of After Action Reports, as necessary, to require that:

a. EIS tracks all Directive 940.00 comments, findings and corrections;

b. All supervisors in the chain of command are subject to and receive corrective action or discipline for the accuracy and completeness of After Action Reports completed by supervisors under their command;

c. All supervisors in the chain of command are accountable for inadequate reports and analysis;

d. A supervisor receives the appropriate corrective action, including training, demotion, and/or removal from a supervisory position when he or she repeatedly conducts deficient investigations.  Where a shift commander, or precinct commander, repeatedly permits deficient investigations, the shift commander, or precinct commander, receives the appropriate corrective action, including training, demotion, and/or removal from a supervisory position;

e. When, after investigation, a use of force is found to be out of policy, PPB shall take appropriate corrective action consistent with the Accountability provisions of this Agreement;

f. Where the use of force indicates policy, training, tactical, or equipment concerns, the immediate supervisor shall notify the Inspector and the Chief, who shall ensure that PPB timely conducts necessary training and that PPB timely resolves policy, tactical, or equipment concerns; and

g. The Chief or designee, as well as PSD, has discretion to re-assign a use of force investigation to the Detective Division or any PPB supervisor.

| Status | Partial Compliance |
|--------|--------------------|

Like the Compliance Officer, we continue to find that the City is in partial compliance with Paragraph 73.  ECF 364-1, COCL Q4 2022 Report at 43–44; COCL Q1 2023 Report (draft), at 42–43, available at https://perma.cc/JJ3G-VB7C.

Our review of a random sample of AARs from the compliance assessment period revealed some exemplary reviews, with sergeants canvassing for and interviewing civilian witnesses; photographing actual or potential injuries; canvassing for, obtaining, and analyzing surveillance video; and resolving discrepancies in officer accounts.  And we saw that PPB often documented

the results of its AAR reviews into its Employee Information System, consistent with Paragraph 73(a).

But as noted in our discussion of partial compliance with Paragraph 69, we reviewed several FDCRs that lacked full and candid accounts or failed to properly report de-escalation. These errors were, by and large, not corrected during the AAR process or by the chain of command.[2] We also reviewed an AAR of an incident in which an officer pursued a suspected stolen vehicle after it failed to yield for a traffic stop. In their FDCR, the officer described driving parallel to the vehicle as it "accelerated in an attempt to flee the traffic stop" and "accelerated with the vehicle matching its speed" at between 20 and 25 miles per hour. The officer then attempted a pursuit intervention technique (PIT), striking the vehicle's rear bumper, after which it crashed into a residential mailbox. The chain of command determined that "at no time is Officer ***'s actions a pursuit" because the officer had "move[d] up to match speed with the suspect and then conduct[ed] a PIT maneuver." PPB policy defines a pursuit as "[a]n active, deliberate attempt by one or more members to apprehend one or more occupants of another moving vehicle, when it is reasonably apparent that the driver of that vehicle is aware of that attempt and is resisting apprehension by increasing speed, disobeying traffic laws, or attempting to elude the officer through evasive maneuvers or tactics." PPB Directive 630.05, Vehicle Interventions and Pursuits, available at https://perma.cc/TTD3-RBSH. Given that the officer in their FDCR articulates their deliberate attempt to apprehend the moving vehicle, which the officer describes as "accelerat[ing] in an effort to evade capture," the officer had engaged in a vehicle pursuit as defined by PPB policy and it should have been reviewed to ensure it complied with pursuit policies. Finally, as noted below in our assessment of compliance with Paragraph 169, PPB did not always identify force justification reporting issues.

To re-achieve substantial compliance, the City must ensure that PPB supervisors are (1) held accountable for inaccurate or incomplete AARs, and (2) subject to appropriate corrective action or discipline for deficient AARs.

## B.    Compliance Audits Related to Use of Force

74. In consultation with the COCL, the Inspector, as part of PPB's quarterly review of force, will audit force reports and Directive 940.00 Investigation Reports to ensure that:

a. With respect to use of force generally:

i. reports describe the mental health information available to officers and the role of that information in their decision making;

ii. officers do not use force against people who engage in passive resistance that does not impede a lawful objective;

---

[2] The Force Inspector released updated guidance on what constitutes de-escalation at the end of March 2023, five days before the end of this compliance assessment period. While we are encouraged that the Inspector implemented the Compliance Officer's suggestion to release this guidance, given the timing of its release, it did not impact the results of our incident review. *See* COCL Q1 2023 Report (draft), at 4, 35, available at https://perma.cc/JJ3G-VB7C.

iii. when resistance decreases, officers de-escalate to a level reasonably calculated to maintain control with the least amount of appropriate force;

iv. officers call in specialty units in accordance with procedure;

v. officers routinely procure medical care at the earliest available opportunity when a subject is injured during a force event; and

vi. officers consistently choose options reasonably calculated to establish or maintain control with the least amount of appropriate force.

b. With respect to ECW usages:

i. ECW deployment data and Directive 940.00 reports are consistent, as determined by random and directed audits. Discrepancies within the audit should be appropriately investigated and addressed;

ii. officers evaluate the reasonableness and need for each ECW cycle and justify each cycle; when this standard is not met, this agreement requires supervisor correction;

iii. officers are universally diligent in attempting to use hands-on control when practical during ECW cycles rather than waiting for compliance; and

iv. officers do not attempt to use ECW to achieve pain compliance against subjects who are unable to respond rationally unless doing so is reasonably calculated to prevent the use of a higher level of force.

c. With respect to use of force reporting, the reports:

i. are completed as soon as possible after the force incident occurs, but no later than the timeframes required in policy;

ii. include a detailed description of the unique characteristics of the event, using common everyday language, sufficient to allow supervisors to accurately evaluate the quality of the officer's decision making and performance;

iii. include a decision point description of the force decision making;

iv. include a detailed description of the force used, to include descriptive information regarding the use of any weapon;

v. include a description of any apparent injury to the suspect, any complaint of injury, or the absence of injury (including information regarding any medical aid or on-scene medical evaluation provided);

vi. include the reason for the initial police presence;

vii. include a description of the level of resistance encountered by each officer that led to each separate use of force and, if applicable, injury;

viii. include a description of why de-escalation techniques were not used or whether they were effective;

ix. include whether the individual was known by the officer to be mentally ill or in mental health crisis;

x. include a general description of force an officer observes another officer apply; and

xi. demonstrate that officers consistently make diligent efforts to document witness observations and explain when circumstances prevent them from identifying witnesses or obtaining contact information. Reports will include all available identifying information for anyone who refuses to provide a statement.

75. In consultation with the COCL, the Inspector shall audit force reports and Directive 940.00 investigations to determine whether supervisors consistently:

a. Complete a Supervisor's After Action Report within 72 hours of notification;

b. Review all use of force reports to ensure they include the information required by this Agreement and PPB policy;

c. Evaluate the weight of the evidence;

d. Use a "decision-point" approach to analyze each use of force;

e. Determine whether the officer's actions appear consistent with PPB policy, this Agreement, and best practices;

f. Determine whether there was legal justification for the original stop and/or detention;

g. Assess the incident for tactical and training implications, including whether the use of force may have been avoided through the use of de-escalation techniques or lesser force options;

h. Determine whether additional training or counseling is warranted;

i. Implement corrective action whenever there are material omissions or inaccuracies in the officers' use of force report, and for failing to report a use of force, whether applied or observed;

j. Document any non-disciplinary corrective action to remedy training deficiencies, policy deficiencies, or poor tactical decisions in EIS;

k. Notify PSD and the shift supervisor of every incident involving an officer's Serious Use of Force, and any Use of Force that could appear to a reasonable supervisor to constitute misconduct; and

l. Notify the Detective Division and shift supervisor of every force incident in which it could reasonably appear to a supervisor that an officer engaged in criminal conduct.

76. In consultation with the COCL, the Inspector shall conduct a quarterly analysis of force data and supervisors' Directive 940.00 reports designed to:

a. Determine if significant trends exist;

b. Determine if there is variation in force practice away from PPB policy in any unit;

c. Determine if any officer, PPB unit, or group of officers is using force differently or at a different rate than others, determine the reason for any difference and correct or duplicate elsewhere, as appropriate;

d. Identify and correct deficiencies revealed by the analysis; and

e. Document the Inspector's findings in an annual public report.

77. In consultation with the COCL, the Inspector shall audit the adequacy of chain of command reviews of After Action Reports using the following performance standards to ensure that all supervisors in the chain of command:

a. Review Directive 940.00 findings using a preponderance of the evidence standard;

b. Review Directive 940.00 reports to ensure completeness and order additional investigation, when necessary;

c. Modify findings as appropriate and document modifications;

d. Order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improve the reliability or credibility of the findings and counsel the investigator;

e. Document any training deficiencies, policy deficiencies, or poor tactical decisions, ensure a supervisor discusses poor tactical decisions with the officer and ensure the discussion is documented in EIS;

f. Suspend an investigation immediately and notify the branch Assistant Chief, the Director of PSD, and the Detectives Division whenever the investigating supervisor, shift commander or Division commander finds evidence of apparent criminal conduct by a PPB officer; and

g. Reports a matter to PSD for review and investigation whenever an investigating supervisor, shift commander or precinct commander finds evidence of apparent misconduct by a PPB officer or employee.

| Status | **Partial Compliance** |
|--------|------------------------|

In our last report, we found that the City did not maintain substantial compliance with Paragraphs 74 to 77.  ECF 292-1, DOJ 6th Report, at 21–23.  We agree with the Compliance Officer that the City remains in partial compliance for these paragraphs.  *See* ECF 364-1, COCL Q4 2022 Report at 44–48; COCL Q1 2023 Report (draft), at 44–48, available at https://perma.cc/JJ3G-VB7C.

The Force Inspector continues to conduct and post annual and quarterly force audit reports on PPB's website.  *See* Force Data Summary Reports, available at https://perma.cc/2PH9-J8JP. The Force Inspector also reviews analyses of force use by officer, unit, and group, which they then discuss with the relevant responsible unit managers.

But, like the Compliance Officer, we find that the Force Inspector has not fulfilled many of the requirements of Paragraphs 74, 75, 76, and 77.  *See* ECF 364-1, COCL Q4 2022 Report at 44–48; COCL Q1 2023 Report (draft), at 44–48, available at https://perma.cc/JJ3G-VB7C.  For example, even though PPB audits its FDCRs and AARs for accuracy, as noted above in our discussions about compliance with Paragraphs 66, 69, 70 and 73, we identified substantively deficient FDCRs and AARs that went unaddressed throughout the chain of the command and up to the Force Inspector, reflecting a failure to conduct the analyses necessary to identify significant or repeated deficiencies in the use, reporting, and review of force.  And we share the Compliance Officer's concern that PPB is not utilizing its force data to assess why some officers use force differently or at a different rate than others, determine the reason for any difference, and correct or duplicate such behavior elsewhere as required by Paragraph 76(c).  *See* COCL Q1 2023 Report (draft), at 44–48, available at https://perma.cc/JJ3G-VB7C.  Pursuant to the

Compliance Officer's suggestion, the Force Inspector drafted a standard operating procedure outlining the Force Inspector's process for identifying the members, shifts or details that will be the subject of discussion with Precinct command on a quarterly basis and the actions that should result from such meetings. The Compliance Officer provided technical assistance to PPB on the standard operating procedure. But PPB has yet to address it. PPB collects very useful data on its use of force. But it should re-engage with the Compliance Officer to ensure that it is conducting the analyses on individual and organizational trends required by Paragraphs 74, 75, 76, and 77.

To re-achieve substantial compliance, the City must ensure that PPB's Force Inspector fulfills all of the material requirements of Paragraphs 74, 75, 76, and 77.

**United States v. City of Portland**

**DOJ's Seventh Periodic Compliance Assessment Report**

SECTION IV – TRAINING

| Obligation | Compliance Ratings by DOJ Report | | | | | | |
|---|---|---|---|---|---|---|---|
| | 1st Report<br>ECF 105-1,<br>9/29/2015 | 2nd Report<br>ECF 124-1,<br>10/18/2016 | 3rd Report<br>ECF 158-1,<br>12/26/2017 | 4th Report<br>ECF 195-1,<br>5/4/2019 | 5th Report<br>ECF 236-1,<br>2/10/2021 | 6th Report<br>ECF 292-1,<br>6/30/2022 | 7th Report<br>ECF 369-1,<br>8/8/2023 |
| Para. 78: Implement all PPB training requirements | Partial Compliance | Partial Compliance | Partial Compliance | Substantial Compliance | Partial Compliance | Partial Compliance | Partial Compliance |
| Para. 79: Annual training plan and needs assessment | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Partial Compliance | Substantial Compliance |
| Para. 80: Training evaluations | Partial Compliance | Partial Compliance | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| Para. 81: Training records | Partial Compliance | Partial Compliance | Partial Compliance | Substantial Compliance | Substantial Compliance | Partial Compliance | Partial Compliance |
| Para. 82: Semi-annual reports on training | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| Para. 83: Training officer qualifications | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |

| Obligation | Compliance Ratings by DOJ Report | | | | | | |
|---|---|---|---|---|---|---|---|
| | 1st Report ECF 105-1, 9/29/2015 | 2nd Report ECF 124-1, 10/18/2016 | 3rd Report ECF 158-1, 12/26/2017 | 4th Report ECF 195-1, 5/4/2019 | 5th Report ECF 236-1, 2/10/2021 | 6th Report ECF 292-1, 6/30/2022 | 7th Report ECF 369-1, 8/8/2023 |
| Para. 84: Conform training to policy | Partial Compliance | Substantial Compliance | Partial Compliance | Substantial Compliance | Partial Compliance | Partial Compliance | Partial Compliance |
| Para. 85: Force Inspector audit of Training Division | Partial Compliance | Partial Compliance | Partial Compliance | Substantial Compliance | Substantial Compliance | Partial Compliance | Substantial Compliance |
| Para. 86: Training recommendations via force data and trends | Partial Compliance | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Partial Compliance | Substantial Compliance |
| Para. 87: Training Advisory Council (TAC) meetings | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |

## IV.   TRAINING

78. All aspects of PPB training shall reflect and instill agency expectations that officers are committed to the constitutional rights of the individuals who have or are perceived to have mental illness whom they encounter, and employ strategies to build community partnerships to effectively increase public trust and safety.  To achieve these outcomes, PPB shall implement the requirements below.

| Status | Partial Compliance |
|--------|--------------------|

For the third consecutive year, the City remains in partial compliance with Paragraph 78 because PPB has not fully implemented the requirements of Section IV.  *See* ECF 236-1, DOJ 5th Report, at 18–19; ECF 292-1, DOJ 6th Report, at 23–27.  We agree with the Compliance Officer that this is a summative paragraph that requires PPB to implement Paragraphs 79 to 87.

The City sustained substantial compliance with Paragraphs 80, 82, 83, and 87.  The City has re-achieved substantial compliance with Paragraphs 79, 85, and 86, but not Paragraphs 81 and 84 because PPB has not implemented the requirements to ensure that (1) training records are accurate, and (2) training conforms to policy.  Accordingly, we share the Compliance Officer's assessment that PPB has not yet re-achieved substantial compliance with this paragraph.  *See* ECF 364-1, COCL Q4 2022 Report, at 57–58; COCL Q1 2023 Report (draft), at 50–51, available at https://perma.cc/JJ3G-VB7C.

79. The Training Division shall review and update PPB's training plan annually.  To inform these revisions, the Training Division shall conduct a needs assessment and modify this assessment annually, taking into consideration:  (a) trends in hazards officers are encountering in performing their duties; (b) analysis of officer safety issues; (c) misconduct complaints; (d) problematic uses of force; (e) input from members at all levels of PPB; (f) input from the community; (g) concerns reflected in court decisions; (h) research reflecting best practices; (i) the latest in law enforcement trends; (j) individual precinct needs; and (k) any changes to Oregon or federal law or PPB policy.

| Status | Substantial Compliance |
|--------|------------------------|

The City re-achieved substantial compliance with Paragraph 79 by preparing a 2022 needs assessment and a 2023 training plan, and by separately agreeing in Paragraph 189 to hire a qualified outside entity to prepare a critical assessment of the City's response to protests in 2020 and to use that assessment to prepare a training needs assessment.  *See* ECF 354-1, Am. Settlement Agreement, ¶ 189.  We agree with the Compliance Officer that PPB's 2023 annual training plan is sufficiently comprehensive in scope, reaching all levels of PPB members, and in substance, covering a range of important topics, including training on Active Bystandership in Law Enforcement (ABLE), crowd management, and procedural justice, among other topics.  *See* ECF 364-1, COCL Q4 2022 Report, at 58–61; COCL Q1 2023 Report (draft), at 51–54, available at https://perma.cc/JJ3G-VB7C; *see also* PPB Training Division, *2023 Annual Training Plan* (December 2022), available at https://perma.cc/LQ32-SSGT.

Between January and May 2023, PPB delivered in-service training on crowd management to all PPB members.  We observed sessions of this training with two subject matter experts, separately from sessions observed by the Compliance Officer and Independent Monitor, LLC (IM LLC), the outside entity the City hired pursuant to Paragraph 189.  This training was generally prepared

and delivered well, in accord with PPB's needs and the considerations outlined in Paragraph 79. *See* COCL Q1 2023 Report (draft), at 63–71, available at https://perma.cc/JJ3G-VB7C.

During this reporting period, PPB did not incorporate IM LLC's recommendations into their needs assessment or training plan because IM LLC has not yet issued any recommendations; however, PPB has committed to incorporating the recommendations when they are available. *See* PPB Training Division, *Evaluation Report – 2022 Needs Assessment: Law Enforcement Response to Mass Demonstrations*, at 5 (Oct. 2022), available at https://perma.cc/XF6Q-LVK5; *see also* ECF 354-1, Am. Settlement Agreement, ¶ 189 (requiring the City to use IM LLC's report and recommendations to prepare a training needs assessment). We will evaluate the City's compliance with its specific obligations related to IM LLC's review of the 2020 protests pursuant to Paragraph 189.

80. Within 180 days of the Effective Date, PPB shall develop and implement a process that provides for the collection, analysis, and review of data regarding the effectiveness of training for the purpose of improving future instruction, course quality, and curriculum. These evaluations shall measure and document student satisfaction with the training received; student learning as a result of training; and the extent to which program graduates are applying the knowledge and skills acquired in training to their jobs. This audit shall be reported to the Training Division Manager and shall include student evaluations of the program and the instructor.

| Status | Substantial Compliance |
|--------|------------------------|

We have found the City to be in substantial compliance with Paragraph 80 since 2019. *See* ECF 195-1, DOJ 4th Report, at 23–24. We agree with the Compliance Officer that the City continued to sustain substantial compliance in 2022 because PPB continued to collect, analyze, and review data regarding training effectiveness, using the data to improve future training. *See* ECF 364-1, COCL Q4 2022 Report, at 61–63.

81. PPB shall ensure that the Training Division is electronically tracking, maintaining, and reporting complete and accurate records of current curricula, lesson plans, training delivered, attendance records, and other training materials in a central, commonly-accessible, and organized file system. Each officer's immediate supervisor shall review the database for the officers under his/her command at least semi-annually.

| Status | Partial Compliance |
|--------|--------------------|

For a second straight year, the City is not in substantial compliance with Paragraph 81. PPB remedied the cause for falling out of substantial compliance last year, which was based on supervisors reviewing the training records database only annually, not semi-annually. *See* ECF 292-1, DOJ 6th Report, at 29. PPB produced documentation demonstrating that supervisors reviewed the training database at least semi-annually for each officer under their command.

However, we agree with the Compliance Officer and PPB's Office of Inspector General (OIG), which both found that the Training Division needs to "update certification rosters and develop a process to ensure that they are maintained and accurate." *See* ECF 364-1, COCL Q4 2022 Report, at 65. As the Compliance Officer notes, such certifications are regularly changing yet always critical to effective operational management. *See id.* In addition, the Compliance Officer

found that PPB's certification records were kept in two locations, rather than in a central, commonly accessible, and organized file system, as required.  *See* COCL Q1 2023 Report (draft), at 59, available at https://perma.cc/JJ3G-VB7C.

To re-achieve substantial compliance, the City must ensure that PPB addresses its OIG's training audit by updating specialty certification rosters and filling process gaps to ensure complete and accurate records.  *See id.* at 59 (quoting PPB's OIG audit of the Training Division).  We share the Compliance Officer's optimism that these deficiencies can be fixed expeditiously.  *See* ECF 364-1, COCL Q4 2022 Report, at 65.

82. PPB shall report training delivered and received semi-annually to the Assistant Chief of Operations and, during the pendency of this Agreement, to DOJ.

| Status | Substantial Compliance |
| --- | --- |

We have found the City to be in substantial compliance with Paragraph 82 since 2016.  *See* ECF 124-1, DOJ 2nd Report, at 55.  We agree with the Compliance Officer that the City maintained substantial compliance in 2022 by providing semi-annual training reports to the Assistant Chief and DOJ.  *See* ECF 364-1, COCL Q4 2022 Report, at 66.

83. PPB shall institute guidelines to govern its selection of officers that serve as trainers and shall ensure that those officers do not have a history of using excessive force.  The trainer selection guidelines shall prohibit the selection of officers who have been subject to disciplinary action based upon the use of force or mistreatment of people with mental illness within the three (3) preceding years, or twice in the preceding five (5) years, and will take into account if a civil judgment has been rendered against the City in the last five (5) years based on the officer's use of force.

| Status | Substantial Compliance |
| --- | --- |

We have found the City to be in substantial compliance with Paragraph 83 since 2016.  *See* ECF 124-1, DOJ 2nd Report, at 56.  We agree with the Compliance Officer that the City maintained substantial compliance in 2022 by continuing to apply the guidelines for selecting officers to serve as trainers.  *See* ECF 364-1, COCL Q4 2022 Report, at 67.

84. All training that PPB provides shall conform to PPB's current policies at the time of training. PPB shall train all officers on the Agreement's requirements during the next in-service training scheduled.

a. With respect to patrol officers, PPB shall:

i. increase the use of role-playing scenarios and interactive exercises that illustrate proper use of force decision making, specifically including interactions with people who have or are perceived to have mental illness, including training officers on the importance and impact of ethical decision making and peer intervention;

ii. emphasize the use of integrated de-escalation techniques, when appropriate, that encourage officers to make arrests without using force;

iii. continue to provide training regarding an officer's duty to procure medical care whenever a subject is injured during a force event, and enhance and revise training as necessary to ensure that PPB's training in this regard is proactive and responsive to deficiencies identified by the Inspector, if any;

iv. continue to train on proactive problem solving and to utilize, when appropriate, disengagement, area containment, surveillance, waiting out a subject, summoning reinforcements, requesting specialized units, including CIT officers and mental health professionals, or delaying arrest;

v. describe situations in which a force event could lead to potential civil or criminal liability; and

vi. continue to train officers to avoid using profanity, prohibit using derogatory/demeaning labels, and also avoiding terms not currently appropriate for person-center communication, such as the term "mentals," in all work-related settings and communications, as well as when interacting with the public.

b. With respect to supervisors, provide additional training on how to:

i. conduct use of force investigations, including the supervisory investigatory responsibilities identified in Section III.A.3;

ii. evaluate officer performance as part of PPB's annual performance evaluation system; and

iii. foster positive career development and impose appropriate disciplinary sanctions and non-disciplinary corrective action.

| Status | **Partial Compliance** |
|--------|------------------------|

For the third straight year, the City is not in substantial compliance with Paragraph 84 because PPB has not demonstrated that all training PPB provides conforms to PPB's policies at the time of training. *See* ECF 292-1, DOJ 6th Report, at 30–32; ECF 236-1, DOJ 5th Report, at 23–25.

For example, we reviewed PPB's 40mm less-lethal launcher qualification training and found that the materials contained incorrect instruction on firing at groups without individual justification in violation of PPB policy and a federal court order. *See* Stipulated Additional TRO at 2, *Don't Shoot Portland v. City of Portland*, 533 F. Supp. 3d 1022 (D. Or., Nov. 27, 2020) (No. 3:20-cv-00917-HZ). Similarly, PPB's AR-15 rifle training materials did not instruct officers on the need to justify every single round that they fire or instruct on PPB Directive 1010.00, Section 8.5.7 requirements regarding shooting from moving vehicles. It is unclear if PPB made the appropriate changes to their lesson plans as the City did not provide all finalized training materials to evidence compliance with this Agreement.

In addition, our review of the City's compliance with Paragraphs 68 and 70 revealed training concerns relevant here. In particular, PPB did not provide officers with required ECW training during the last in-service, and PPB must ensure that supervisors conduct proper use of force reviews, which includes whether and to what extent supervisors should provide counseling or training to an officer who is involved in a use-of-force event. *See* ECF 354-1, Am. Settlement Agreement, ¶¶ 68, 70.

> To re-achieve substantial compliance, the City must ensure that PPB training conforms to policy at the time of training, which will require PPB to provide us with lesson plans before delivering training, revise lesson plans as necessary to ensure conformance to policy, and provide us with any revised lesson plans to demonstrate compliance.

85. In consultation with the COCL, the Inspector shall audit the training program using the following performance standards to ensure that PPB does the following:

a. Conducts a comprehensive needs assessment annually;

b. Creates a Training Strategic Plan annually;

c. Within 180 days of the Effective Date, develops and implements a process for evaluation of the effectiveness of training;

d. Maintains accurate records of Training delivered, including substance and attendance;

e. Makes Training Records accessible to the Director of Services, Assistant Chief of Operations, and DOJ;

f. Trains Officers, Supervisors, and Commanders on areas specific to their responsibilities; and

g. Ensures that sworn PPB members are provided a copy of all PPB directives and policies issued pursuant to this Agreement, and sign a statement acknowledging that they have received, read, and had an opportunity to ask questions about the directives and/or policies, within 30 days of the release of the policy.

| Status | Substantial Compliance |
|--------|------------------------|
| The City re-achieved substantial compliance with Paragraph 85 because PPB conducted another audit of its training program in 2022, releasing a report prepared by PPB's OIG on December 30, 2022.  The Compliance Officer provided a detailed summary of the 2022 audit report.  *See* ECF 364-1, COCL Q4 2022 Report, at 83–85; COCL Q1 2023 Report (draft), at 91–92, available at https://perma.cc/JJ3G-VB7C. | |

PPB previously audited the training program more than five years ago.  *See* PPB Training Division, *Audit Report* (Oct. 2017), available at https://perma.cc/AQZ8-QGUV.  Due to that 25-page audit report and a follow-up report in November 2018, which PPB completed with the Compliance Officer's input, we found that the City had achieved substantial compliance with Paragraph 85.  *See* ECF 195-1, DOJ 4th Report, at 28.  We indicated then that "PPB's next training audit should address the status of the three recommendations that the November 2018 Follow-Up Audit Report states are in progress:  reallocating analysts; quality assurance of training records; and tracking expiring certifications."  *Id.*

The 2022 audit report identifies two similar issues – a need for quality assurance to ensure the accuracy of training records and a need to track expiring certifications.  *See* PPB OIG, *Training Division Assessment*, at 18 (Dec. 2022), on file with DOJ.[3]  The 2022 audit also found that

---

[3] We could not find the 2022 training audit report on the City or PPB's website.  The Agreement requires the City to post online all audits and reports related to implementing the Agreement's

budgetary and staffing restrictions severely impact the Training Division's ability to provide needed training for PPB members. *Id.* at 8–10. The City and the Training Advisory Council (TAC) can ensure that PPB adequately implements the commonsense recommendations of the last two audits.

The Compliance Officer recommended that the Training Division respond to the recommendations made in the 2022 audit. *See* ECF 364-1, COCL Q4 2022 Report, at 86. On February 28, 2023, the Training Division accepted the audit recommendations and committed to taking corrective action. COCL Q1 2023 Report (draft), at 91, available at https://perma.cc/JJ3G-VB7C. We agree with the Compliance Officer that PPB's 2022 training audit is sufficiently comprehensive in scope and content to demonstrate the City's substantial compliance with the specific obligations set forth in Paragraph 85. *See* ECF 364-1, COCL Q4 2022 Report, at 82–86.

86. In consultation with the COCL, the Inspector shall gather and present data and analysis on a quarterly basis regarding patterns and trends in officers' uses of force to the Chief, the PPB Training Division, and to the Training Advisory Council. The Training Division and Training Advisory Council shall make written recommendations to the Chief regarding proposed changes in policy, training, and/or evaluations based on the data presented. The Inspector shall also, in coordination with the COCL and PSD, identify problematic use of force patterns and training deficiencies. The Chief's Office shall assess all use of force patterns identified by the Training Division and/or Training Advisory Council and timely implement necessary remedial training to address deficiencies so identified.

| Status | Substantial Compliance |
|--------|------------------------|

The City re-achieved substantial compliance with Paragraph 86 because, in consultation with the Compliance Officer, the Force Inspector adequately presented quarterly force reports, enabling the Training Division and the TAC to make recommendations to the Chief, as required. The quarterly and annual force data reports are available on the City's website. *See* PPB, Force Data Summary Reports, available at https://perma.cc/A3DF-C52H. During the reporting period, the City reports that the Force Inspector did not make any recommendations to the Chief's Office and identified no problematic force patterns. However, the Force Inspector did identify a training gap involving new recruits and vehicle interventions, which was referred to the Training Division and resulted in PPB offering remedial training with additional information and instruction.

We agree with the Compliance Officer's consistent findings that the Force Inspector, Training Division, TAC, and the Chief's Office are appropriately implementing the requirements of this paragraph. *See* COCL Q1 2023 Report (draft), at 93–94, available at https://perma.cc/JJ3G-VB7C; ECF 364-1, COCL Q4 2022 Report, at 87–89; ECF 358-1, COCL Q3 2022 Report, at 85–87; ECF 328-1, COCL Q2 2022 Report, at 96–98; ECF 306-1, COCL Q1 2022 Report, at 84–86.

provisions. ECF 354-1, Am. Settlement Agreement, ¶ 155 ("All PPB audits and reports related to the implementation of this Agreement shall be made publicly available via website and at PPB, IPR, City Hall, and other public locations. Audits and reports shall be posted on PPB's website.").

87. Training Advisory Council meetings will be open to the public unless the matter under discussion is confidential or raises public safety concerns, as determined by the Chief.

| Status | Substantial Compliance |
|---|---|
| We have found the City to be in substantial compliance with Paragraph 87 since 2016.  *See* ECF 124-1, DOJ 2nd Report, at 59.  For years, PPB has supported the TAC, including by facilitating a space for the TAC to hold regularly scheduled meetings that are open to the public.  We agree with the Compliance Officer that the City maintained substantial compliance in 2022 because the TAC held meetings open to the public throughout the year.  *See* ECF 364-1, COCL Q4 2022 Report, at 89–90; *see also* PPB Training Advisory Council, Events, available at https://perma.cc/2PA5-7SA4.  The TAC's recommendations, agendas, minutes, and comments can be found on the City's website.  *See* PPB Training Advisory Council, Documents, available at https://perma.cc/QGV3-W8BE. | |

**United States v. City of Portland**

**DOJ's Seventh Periodic Compliance Assessment Report**

SECTION V – COMMUNITY-BASED MENTAL HEALTH SERVICES

| | Compliance Ratings by DOJ Report | | | | | | |
|---|---|---|---|---|---|---|---|
| **Obligation** | 1st Report ECF 105-1, 9/29/2015 | 2nd Report ECF 124-1, 10/18/2016 | 3rd Report ECF 158-1, 12/26/2017 | 4th Report ECF 195-1, 5/4/2019 | 5th Report ECF 236-1, 2/10/2021 | 6th Report ECF 292-1, 6/30/2022 | 7th Report ECF 369-1, 8/8/2023 |
| Para. 88: Collaborate with mental health service provider partners | **Not Rated** | **Not Rated** | **Not Rated** | **Substantial Compliance** | **Substantial Compliance** | **Substantial Compliance** | **Substantial Compliance** |
| Para. 89: Divert people in crisis to a walk in / drop off center | **Partial Compliance** | **Partial Compliance** | **Substantial Compliance** | **Substantial Compliance** | **Substantial Compliance** | **Substantial Compliance** | **Substantial Compliance** |
| Para. 90: Expand BOEC options and capacity to divert calls to qualified civilian first responders | **Partial Compliance** | **Substantial Compliance** | **Substantial Compliance** | **Substantial Compliance** | **Substantial Compliance** | **Substantial Compliance** | **Substantial Compliance** |

## V.    COMMUNITY-BASED MENTAL HEALTH SERVICES

88. The absence of a comprehensive community mental health infrastructure often shifts to law enforcement agencies throughout Oregon the burden of being first responders to individuals in mental health crisis.  Under a separate agreement, the United States is working with State of Oregon officials in a constructive, collaborative manner to address the gaps in state mental health infrastructure.  The state-wide implementation of an improved, effective community-based mental health infrastructure should benefit law enforcement agencies across the State, as well as people with mental illness.  The United States acknowledges that this Agreement only legally binds the City to take action.  Nonetheless, in addition to the City, the United States expects the City's partners to help remedy the lack of community-based addiction and mental health services to Medicaid clients and uninsured area residents.  The City's partners in the provision of community-based addiction and mental health services include:  the State of Oregon Health Authority, area Community Care Organizations (CCOs), Multnomah County, local hospitals, health insurance providers, commercial health providers, and existing Non-Governmental Organizations (NGOs) such as community-based mental health providers, and other stakeholders.

| Status | Substantial Compliance |
|---|---|

The City remains in substantial compliance with Section V, Paragraphs 88–90.  We found that the City achieved substantial compliance with Paragraphs 88–90 in 2019 and has since maintained substantial compliance.  *See* ECF 195-1, DOJ 4th Report, at 31–33; ECF 236-1, DOJ 5th Report, at 28–32; ECF 292-1, DOJ 6th Report, at 35–38.  The Compliance Officer also has found that the City maintained substantial compliance.  *See* ECF 364-1, COCL Report Q4 2022, at 8, 91–94; COCL Q1 2023 Report (draft), at 97–100, available at https://perma.cc/JJ3G-VB7C.

The City maintained substantial compliance with Paragraph 88 by engaging governmental and non-governmental partners who provide mental health services, in particular through PPB's Behavioral Health Unit (BHU), the BHU Advisory Committee (BHUAC), the Service Coordination Team (SCT), and the Behavioral Health Response Team (BHRT).  *See generally* BHU, Portland Police Bureau Divisions and Units, available at https://perma.cc/8KFQ-LYDU.  In December 2022, the BHU updated its 14-page guide of local mental health-related service providers.  PPB BHU, *Community Mental Health Resources Guide* (Dec. 2022), available at https://perma.cc/9A8P-2KNC.  In March 2023, the BHU received the Pathfinder Award from the local chapter of the National Alliance on Mental Illness (NAMI).  *See* PPB, BHU Newsletter, at 1 (Quarter 1 2023), available at https://perma.cc/8XYN-VQHV.  The award honors organizations that "light a path to justice, dignity, and respect for all people affected by mental illness."  NAMI Multnomah, *Annual Membership Meeting*, available at https://perma.cc/GJD2-P56Q.

The BHU publicizes its efforts by sending alerts to an email list anyone can join, *see* PPB Flash Alerts, available at https://perma.cc/6TS4-LRJ3, through social media, *see, e.g.*, Behavioral Health Unit: Ride Along with a Behavioral Health Response Team, PPB (Mar. 5, 2023, 7:07 pm), available at https://perma.cc/TAJ6-LCEY, and by publishing quarterly newsletters that are available on the City's external website, *see* PPB BHU, Newsletters, available at https://perma.cc/ZFH7-RBMJ.

89. The United States expects that the local CCOs will establish, by mid-2013, one or more drop-off center(s) for first responders and public walk-in centers for individuals with addictions and/or behavioral health service needs.  All such drop off/walk in centers should focus care plans on appropriate discharge and community-based treatment options, including assertive community treatment teams, rather than unnecessary hospitalization.

| Status | Substantial Compliance |
|--------|------------------------|

We agree with the Compliance Officer that the City has maintained substantial compliance with Paragraph 89 due to the Community Care Organizations (CCOs) establishing the Unity Center (Unity) in 2017, with material support from the City.  *See* ECF 364-1, COCL Q4 2022 Report, at 92–93.  PPB has worked with Unity's Transportation Subcommittee since its inception to ensure that first responders can transfer people with behavioral health needs to an ambulance for transport to Unity or local hospitals.  PPB policy provides for such transfer and transport. *See* PPB Directive 630.45, Emergency Medical Custody Transports (2007), available at https://perma.cc/GM6K-J5WL; PPB Directive 850.20, Police Response to Mental Health Crisis (2022), available at https://perma.cc/VP7M-SYDK.  Unity meets the expectation that local CCOs establish one or more walk-in/drop-off centers for individuals with addiction and/or behavioral health service needs.

In response to community concerns and the Court's questions, we have reported the number of people arrested at Unity since it began operating on January 31, 2017.  ECF 191, DOJ Status Report, at 3–4.  We continue to find that Unity is not merely a way station for later arrest.  The most recent data covers 17 months, from December 1, 2021, to May 1, 2023.  During this time, there were just 12 arrests at Unity among the 16,995 patients that Unity treated.  The low arrest rate is consistent with prior data.  In the first 58 months that Unity operated, from January 31, 2017, to November 30, 2021, 70 current or former patients were arrested at Unity.  Over that period, Unity provided care to people across 53,509 encounters.[4]

90. The CCOs will immediately create addictions and mental health-focused subcommittee(s), which will include representatives from PPB's Addictions and Behavioral Health Unit (ABHU), the ABHU Advisory Board, Portland Fire and Rescue, Bureau of Emergency Communications (BOEC) and other City staff.  These committees will pursue immediate and long-term improvements to the behavioral health care system. Initial improvements include:

a. Increased sharing of information, subject to lawful disclosure, between agencies and organizations including BOEC, Multnomah County, and health care providers to create an information exchange among first responders and providers to better serve those suffering from mental illness;

b. Creation of rapid-access clinics so those in crisis have access to timely medication management appointments;

---

[4] Unity voluntarily provided statistical information for DOJ to respond to the Court's inquiry and report updates in periodic compliance assessments.  Unity is not a party to this litigation, however, and DOJ has not rigorously evaluated and does not opine on the quality of Unity's services.

c. Enhancing access to primary care providers to shift low-to moderate acuity patients to primary care programs creating more capacity for acute patients in existing outpatient crisis mental health systems;

d. Expanding the options and available capacity for BOEC Operators to appropriately divert calls to qualified civilian mental health providers as first responders;

e. Addressing issues of unmet needs identified by Safer PDX and its community partners;

f. Expanding and strengthening networks of Peer-Mediated services to:

i. develop a referral guide delineating these services and locations and assist with accessing information;

ii. better educate the community of the viability of these services as alternative first engagement sites/programs for those having difficulty engaging with "professional driven" services;

iii. expand peer services connected to peer supports in the community for inpatient psychiatric units (including Emergency Departments) and in the community;

iv. add peer guides to work alongside Emergency Department guides for those patients with behavioral health issues entering the Emergency Department; and

v. evaluate opportunities to expand use of peers to coordinate with PPB ABHU (as described herein) and function as a link with impacted individuals; and

g. pursue tele-psychiatry (a provision of mental health care by video conferencing) as a way for first responders to take advantage of existing IT infrastructure to provide direct care or provider evaluation supporting the provision of appropriate services to an individual in crisis.

| Status | Substantial Compliance |
|---|---|

We agree with the Compliance Officer that the City has maintained substantial compliance with Paragraph 90 due to expanding Portland Street Response (PSR) and BOEC's ability to divert 911 calls to qualified civilian mental health providers as first responders. *See* ECF 358-1, COCL Q3 2022 Report, at 97–98. PSR responds to certain calls about a person experiencing homelessness, a mental health crisis, or intoxication. *See generally* City of Portland, PSR, available at https://perma.cc/9UBZ-P8TA (last visited July 25, 2023).

BOEC currently dispatches PSR as a first responder if two conditions are met:

1. The call is about a person who (a) is possibly experiencing a mental health crisis, intoxicated, and/or drug affected if the person is either outside or inside a publicly accessible space, such as a business, store, or public lobby; (b) is outside and down on the ground for an unknown reason; (c) is outside and yelling; or (d) needs a referral for services but lacks access to a phone; and

2. The person (a) has no known access to weapons; (b) is not displaying physically combative or threatening behavior; (c) is not suicidal; and (d) is not in a private home.

PSR, Frequently Asked Questions, available at https://perma.cc/LCX2-EMVF (last visited July 25, 2023).

In 2022, the City expanded PSR, which launched in February 2021 as a one-team, one-shift pilot program in one southeast Portland neighborhood.  *See* City of Portland, Portland Street Response Expands Service Citywide (Mar. 27, 2022), available at https://perma.cc/M9WU-WWA7. PSR's geographic scope expanded three times at four-month intervals over the course of a year: in April 2021 (from 4 to 13 square miles); in November 2021 (to 36 square miles); and, in March 2022 (to all 145 square miles of Portland).  *Id.*  The City also increased PSR's hours (8:00 a.m. to 10:00 p.m. daily) and staff (51 of 58 approved positions are filled).  *Id.*; Nicole Hayden, *Portland Street Response's Future Hangs in the Balance: 'I Feel Like it's About to Implode'*, Oregonian, June 26, 2023, available at https://perma.cc/TJS8-NXAQ.

In the first six months following the citywide expansion of PSR (April 1 to September 30, 2022), PSR responded to 3,228 calls for service, a 717% increase from the same period in 2021 (395 calls for service).  *See* Greg Townley & Emily Leickly, *Portland Street Response Year Two Mid-Point Evaluation* 7 (Dec. 2022), available at https://perma.cc/F8VY-DU6Y.  BOEC dispatched more than 3,000 of the calls (94%), and 3,158 (97.8%) were calls traditionally responded to by PPB.  *See id.*  Indeed, data has consistently shown that PSR is successfully diverting calls for service from police response to qualified healthcare providers.  *See* Greg Townley & Emily Leickly, *Portland Street Response: Year One Evaluation* 23–24 (Apr. 2022), available at https://perma.cc/K9CR-QAFF; Greg Townley & Emily Leickly, *Portland Street Response: Six-Month Evaluation* 19 (Oct. 2021), available at https://perma.cc/Y4CT-532C; *see generally* Portland State University Homeless Research & Action Collaborative, *Portland Street Response Program Evaluation*, available at https://perma.cc/J2D5-MV4M.

Portland State University released its most recent PSR evaluation in June 2023.  Greg Townley & Emily Leickly, *Portland Street Response: Year Two Program Evaluation* (June 2023), available at https://perma.cc/HWK6-D8PD.  In its second year (April 1, 2022, to March 31, 2023), PSR responded to 7,418 incidents, a 509% increase from the same period its first year. BOEC dispatched 94% of the calls (73% from 911 calls and 21% from calls to the non-emergency number), and PSR self-dispatched to 6%.  *Id.* at 7.  Of the 7,418 calls for service, 7,238 (97.6%) were calls traditionally responded to by PPB.  *Id.*

PSR is demonstrably achieving three primary goals: (1) PSR reduced by 3.5% the total calls that police would have responded to during PSR's operating hours; (2) PSR reduced by 19% the calls for non-emergency welfare checks and unwanted persons that PPB would have responded to during PSR's operating hours; and (3) PSR resolved the vast majority of its calls in the field, and resolved only 187 individual's cases (2.5% of all calls) by transport to the hospital for additional care.  *Id.* at 7-8.  The City posted Portland State University's first three six-month evaluations to the PSR website but not the most recent one, which some perceived as critical of City and Fire Bureau leadership for both expanding PSR's scope to assist in sweeping encampments and limiting the resources PSR may provide to those in crisis, and the Fire Bureau's response, which are posted only to PSU's website.  *See id.* at 136–139; *see also* PSR, *Inside Portland State University's Evaluation of Portland Street Response*, available at https://perma.cc/9QTZ-7CC9 (last visited July 26, 2023); Hayden, *Portland Street Response's Future Hangs in the Balance: 'I Feel Like it's About to Implode'*, *supra*.

When asked to describe how BOEC complied in this reporting period with the obligation to expand "the options and available capacity for BOEC Operators to appropriately divert calls to qualified civilian mental health providers as first responders," the City replied:

> As of March 28, 2022, Portland Street Response (PSR) expanded their service area city wide and increased their availability to 0800 to 2200 seven (7) days per week. Prior to March 28, 2022, they only had service available Monday through Thursday, 0800 to 1700 and Thursday to Sunday, 1730 to 0330. By hiring additional teams to provide service, this expansion increased the City's ability to divert calls to qualified civilian mental health providers as first responders.
>
> From April 1, 2022 to May 1, 2023, PSR responded to 10,585 calls compared to 1,373 calls from February 16, 2021 to March 31, 2022.

In short, reliable data continues to show that PSR is effectively lightening the load of PPB officers. *See* Townley & Leickly, *PSR Year Two Program Evaluation* 7–12, *supra*; *see also* PSR, Data Dashboard, available at https://perma.cc/GY6A-WDHS (last visited July 26, 2023). The City deserves to be commended for its effort to launch PSR and expand it based on a data-driven assessment of its performance in the field.

However, despite PSR's consistent and demonstrable success, we are concerned that the City's crisis triage approach may lack durability. Recent reporting suggests the City may be seeking to reduce, eliminate, or move PSR's important, effective services. *See, e.g.*, Hayden, *Portland Street Response's Future*, *supra*; Alex Zielinski, *Portland Street Response, Despite Successes, Faces an Uncertain Future*, Oregon Pub. Broad. (June 27, 2023), available at https://perma.cc/TJS8-NXAQ; Nigel Jaquiss, *Robyn Burek Steps Down from Leadership of Portland Street Response*, Willamette Wk. (June 28, 2023), available at https://perma.cc/X8PU-YDCK. While this Agreement does not dictate all programs the City must include in its crisis triage approach, it does require the City to expand the options and capacity to appropriately divert calls to qualified civilian mental health providers as first responders. *See* ECF 354-1, Am. Settlement Agreement, ¶¶ 90(d), 113. In addition, where the City has expanded its crisis triage approach, such as by creating PSR, BOEC must implement policies and training, in consultation with the BHUAC, to ensure crisis triage is fully operational. *See* ECF 354-1, Am. Settlement Agreement, ¶¶ 113–115. BOEC did not adopt final policies for PSR during the compliance assessment period. The Compliance Officer reported that this essential aspect of operational crisis triage was waiting on the PPA, which represents BOEC employees, and the City to negotiate pursuant to state law collective bargaining rules.[5] *See* ECF 364-1, COCL Q4 2022 Report, at 119 & n.19. We have raised these concerns with the City and will continue to monitor the situation and report to the Court, as appropriate.

---

[5] The City did not advise us that BOEC's crisis triage policies, which are obligations under Paragraphs 113 and 115, had become subject to collective bargaining, as the City is required to do. ECF 354-1, Am. Settlement Agreement, ¶ 186 ("The PPB and the City agree to promptly notify DOJ if any term of this Agreement becomes subject to collective bargaining. The City agrees to keep DOJ apprised of the status of the resulting negotiations."). On July 11, 2023, BOEC adopted a PSR policy.

**United States v. City of Portland**

**DOJ's Seventh Periodic Compliance Assessment Report**

SECTION VI – CRISIS INTERVENTION

| Obligation | Compliance Ratings by DOJ Report | | | | | | |
|---|---|---|---|---|---|---|---|
| | 1st Report ECF 105-1, 9/29/2015 | 2nd Report ECF 124-1, 10/18/2016 | 3rd Report ECF 158-1, 12/26/2017 | 4th Report ECF 195-1, 5/4/2019 | 5th Report ECF 236-1, 2/10/2021 | 6th Report ECF 292-1, 6/30/2022 | 7th Report ECF 369-1, 8/8/2023 |
| **A.  Behavioral Health Unit (BHU) and BHU Advisory Committee (BHUAC)** | | | | | | | |
| Para. 91: Develop a BHU | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| Para. 92: Use and share BHU data | Partial Compliance | Partial Compliance | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| Para. 93: Track BHU data | Partial Compliance | Not Rated | Not Rated | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| Para. 94: Establish the BHUAC | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| Para. 95: BHUAC duties | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Partial Compliance | Substantial Compliance |
| Para. 96: BHUAC reports and recommendations | Partial Compliance | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |

| Obligation | 1st Report<br>ECF 105-1,<br>9/29/2015 | 2nd Report<br>ECF 124-1,<br>10/18/2016 | 3rd Report<br>ECF 158-1,<br>12/26/2017 | 4th Report<br>ECF 195-1,<br>5/4/2019 | 5th Report<br>ECF 236-1,<br>2/10/2021 | 6th Report<br>ECF 292-1,<br>6/30/2022 | 7th Report<br>ECF 369-1,<br>8/8/2023 |
|---|---|---|---|---|---|---|---|
| **B. Continuing the Crisis Intervention Program** | | | | | | | |
| Para. 97: Initial crisis intervention training | Substantial Compliance | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| Para. 98: Annual crisis intervention training | Partial Compliance | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| **C. Establishing a "Memphis Model" Crisis Intervention Team (ECIT)** | | | | | | | |
| Para. 99: Establish ECIT program | Partial Compliance | Not Rated | Not Rated | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| Para. 100: ECIT staffing | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| Para 101: ECIT officer qualifications | Not Rated | Not Rated | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| Para. 102: ECIT officer training | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| Para. 103: ECIT duties and dispatch | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| Para. 104: Highlight the ECIT program | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| Para. 105: ECIT data | Partial Compliance | Not Rated | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |

| Obligation | Compliance Ratings by DOJ Report | | | | | | |
|---|---|---|---|---|---|---|---|
| | 1st Report ECF 105-1, 9/29/2015 | 2nd Report ECF 124-1, 10/18/2016 | 3rd Report ECF 158-1, 12/26/2017 | 4th Report ECF 195-1, 5/4/2019 | 5th Report ECF 236-1, 2/10/2021 | 6th Report ECF 292-1, 6/30/2022 | 7th Report ECF 369-1, 8/8/2023 |
| **D.  Behavioral Health Response Team (BHRT)** | | | | | | | |
| Para. 106: Establish BHRTs | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| Para. 107: BHRT staffing | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| Para. 108: BHRT officer qualifications | Not Rated | Not Rated | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| Para. 109: BHRT training | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| Para. 110: BHRT duties | Partial Compliance | Partial Compliance | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| Para. 111: BHRT policies to transfer or refer people in crisis | Non Compliance | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |

| Obligation | Compliance Ratings by DOJ Report | | | | | | |
|---|---|---|---|---|---|---|---|
| | 1st Report ECF 105-1, 9/29/2015 | 2nd Report ECF 124-1, 10/18/2016 | 3rd Report ECF 158-1, 12/26/2017 | 4th Report ECF 195-1, 5/4/2019 | 5th Report ECF 236-1, 2/10/2021 | 6th Report ECF 292-1, 6/30/2022 | 7th Report ECF 369-1, 8/8/2023 |
| **E.  Service Coordination Team (SCT)** | | | | | | | |
| Para. 112: Establish the SCT | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| **F.  Bureau of Emergency Communications (BOEC)** | | | | | | | |
| Para. 113: BOEC and PPB policies for crisis triage | Non Compliance | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| Para. 114: BOEC training on crisis triage | Partial Compliance | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| Para. 115: Crisis triage fully operational with implemented policies and procedures | Non Compliance | Partial Compliance | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Partial Compliance |

## VI.    CRISIS INTERVENTION

The City acknowledges that the community of consumers of mental health services, and their families and advocates, have an interest in interactions between PPB and people experiencing mental health symptoms or crises. The PPB will add new capacity and expertise to deal with persons perceived or actually suffering from mental illness, or experiencing a mental health crisis as required by this Agreement. Despite the critical gaps in the state and local mental health system, the City and PPB must be equipped to interact with people in mental health crisis without resorting to unnecessary or excessive force.

### A.    Addictions and Behavioral Health Unit and Advisory Committee

91. In order to facilitate PPB's successful interactions with mental health consumers and improve public safety, within 60 days of the Effective Date, PPB shall develop an Addictions and Behavioral Health Unit (ABHU) within the PPB. PPB shall assign command-level personnel of at least the rank of Lieutenant to manage the ABHU. ABHU shall oversee and coordinate PPB's Crisis Intervention Team (C-I Team), Mobile Crisis Prevention Team (MCPT), and Service Coordination Team (SCT), as set forth in this Agreement.

| Status | Substantial Compliance |
|---|---|

We have found the City to be in substantial compliance with Paragraph 91 since 2016. *See* ECF 124-1, DOJ 2nd Report, at 64–65. For years, PPB has maintained the units, staffing, and command structure required by this paragraph. PPB uses different names for most of the units, however. The entities referenced in this Agreement equate with the following PPB entities:

- Addictions and Behavioral Health Unit = Behavioral Health Unit (BHU).

The BHU coordinates the City's law enforcement response to people experiencing behavioral health crises and works with partners in the behavioral health system to aid people in crisis. *See* PPB Police Divisions and Units, BHU, available at https://perma.cc/ZFH7-RBMJ.

- Crisis Intervention Team = Enhanced Crisis Intervention Team (ECIT).

ECIT officers volunteer to receive specialized training and respond to calls with both a mental health nexus and a heightened risk of harm. *See* PPB Training Division, *2018 ECIT Evaluation Report* 4–5 (Feb. 2019), available at https://perma.cc/5CUM-6A94.

- Mobile Crisis Prevention Team = Behavioral Health Response Team (BHRT).

The BHRT has five units. Each unit pairs a PPB patrol officer with a qualified mental health professional. BHRT Units follow-up with people who have had frequent contacts with police while in crisis with a goal to reduce the frequency and risk of harm of future contacts. *See* PPB, BHRT, available at https://perma.cc/75K9-6QVZ; PPB, *BHU: Ride along with a Behavioral Health Response Team*, YouTube (Mar. 5, 2023), available at https://perma.cc/N74R-AVDS.

- Service Coordination Team = Service Coordination Team (SCT).

The SCT coordinates the provision of treatment and services to individuals frequently charged with low-level offenses to reduce the risk of recidivism and harm during future encounters. *See* PPB Police Divisions and Units, SCT, available at https://perma.cc/ZFH7-RBMJ.

92. ABHU will manage the sharing and utilization of data that is subject to lawful disclosure between PPB and Multnomah County, or its successor.  PPB will use such data to decrease law enforcement interactions or mitigate the potential uses of force in law enforcement interactions with consumers of mental health services.

| Status | Substantial Compliance |
|--------|------------------------|

We have found the City to be in substantial compliance with Paragraph 92 since 2019.  *See* ECF 195-1, DOJ 4th Report, at 34.  We agree with the Compliance Officer that the City maintained substantial compliance in 2022 based on the BHU continuing to use and share data in three ways: (1) weekly reports to the Multnomah County Behavioral Health Call Center from the BHU Electronic Referral System (BERS), which monitors individuals referred for BHRT follow-up; (2) meetings with the Behavioral Health Coordination Team to identify and reach people who frequently encounter the police; and (3) meetings between SCT and behavioral health system partners to coordinate services.  *See* ECF 364-1, COCL Q4 2022 Report, at 96–98.

In addition, the BHU shares data collected by ECIT officers, BHRT units, and the SCT with the BHUAC.  Importantly, the City is also decreasing police contacts and mitigating potential force with PSR.  Multiple analyses have shown that PSR obtains good results for consumers and the City's first responder system by providing a non-police response to low-acuity calls involving behavioral health needs and homelessness.  *See, e.g.*, Greg Townley & Emily Leickly, *Portland Street Response: Year Two Program Evaluation* (June 2023), available at https://perma.cc/HWK6-D8PD; Greg Townley & Emily Leickly, *Portland Street Response Year Two Mid-Point Evaluation* (Dec. 2022), available at https://perma.cc/F8VY-DU6Y; Greg Townley & Emily Leickly, *Portland Street Response: Year One Evaluation* (Apr. 2022), available at https://perma.cc/K9CR-QAFF; Greg Townley & Emily Leickly, *Portland Street Response: Six-Month Evaluation* (Oct. 2021), available at https://perma.cc/Y4CT-532C.

We continue to agree with the Compliance Officer that these efforts demonstrate sustained substantial compliance.  *See* ECF 292-1, DOJ 6th Report, at 39–40; *see also* COCL Q1 2023 Report (draft), at 102–103, available at https://perma.cc/JJ3G-VB7C; ECF 364-1, COCL Q4 2022 Report, at 97; ECF 358-1, COCL Q3 2022 Report, at 100–102; ECF 328-1, COCL Q2 2022 Report, at 106–107; ECF 306-1, COCL Q1 2022 Report, at 94–96.

93. ABHU shall track outcome data generated through the C-I Team, MCPT, and SCT, to: (a) develop new response strategies for repeat calls for service; (b) identify training needs; identify and propose solutions to systemic issues that impede PPB's ability to provide an appropriate response to a behavioral crisis event; and (c) identify officers' performance warranting commendation or correction.

| Status | Substantial Compliance |
|--------|------------------------|

We found the City to be in substantial compliance with Paragraph 93 since 2019.  *See* ECF 195-1, DOJ 4th Report, at 34–35.  We have no reason to disagree with the Compliance Officer's finding that the City sustained substantial compliance in 2022 by collecting and analyzing data from ECIT officers, BHRT units, and the SCT.  *See* ECF 306-1, COCL Q1 2022 Report, at 95; ECF 328-1, COCL Q2 2022 Report, at 108; ECF 358-1, COCL Q3 2022 Report, at 101; ECF 364-1, COCL Q4 2022 Report, at 97.

> The Compliance Officer's assessments turn on the data itself and various meetings involving the BHU Lieutenant. *See id.* However, it is not apparent how the BHU used these data and analyses to (a) develop new response strategies for repeat calls for service; (b) identify training needs; (c) identify and propose solutions to systemic issues that impede PPB's ability to provide an appropriate response to a behavioral health crisis event; and (d) identify officer performance warranting commendation or correction.
>
> Whether PPB is capitalizing as much as it can on the immense amount of data the BHU collects to improve operations is a question for the BHUAC to consider. We share the Compliance Officer's assessment that the BHU's prior efforts combined with the continued availability of data is sufficient for the City to maintain substantial compliance. *See id.*

94. Within 90 days of the Effective Date, PPB shall also establish an ABHU Advisory Committee. The ABHU Advisory Committee shall include representation from: PPB command leadership, CIT, MCPT, and SCT; BOEC; civilian leadership of the City government; and shall seek to include representation from: the Multnomah County's Sheriff's Office; Oregon State Department of Health and Human Services; advocacy groups for consumers of mental health services; mental health service providers; coordinated care organizations; and persons with lived experience with mental health services.

| Status | Substantial Compliance |
|---|---|

We have found the City to be in substantial compliance with Paragraph 94 since 2015. *See* ECF 105-1, DOJ 1st Report, at 41. For more than a decade, PPB has maintained and supported the BHUAC. *See* PPB, BHUAC, available at https://perma.cc/77D9-MKE7. The BHUAC's membership continues to include representatives from the required groups. *See* BHUAC, BHU Advisory Committee Members, available at https://perma.cc/RB9F-UZJ5.

The BHUAC met remotely via Zoom for the first two-plus years of the COVID-19 pandemic. Recently, the BHUAC has held hybrid meetings with some members attending in person and others on Zoom. The BHUAC publishes meeting minutes, which are posted on PPB's website along with BHUAC reports. *See* BHUAC, Documents, available at https://perma.cc/AQ8K-AMAC. We observe meetings periodically, as does the Compliance Officer.

The BHUAC has repeatedly declined to open any part of its regular monthly meetings to the public but has taken other steps to inform the public of its work, including by formally adopting a community engagement plan. *See* BHUAC, Community Engagement Plan, available at https://perma.cc/9CPW-2TMH; Email from J. Gullickson, Chair, BHUAC, to C. Hettman, Acting Lieutenant, PPB BHU, May 27, 2020, available at https://perma.cc/8587-TRXV. The BHUAC also holds quarterly public meetings to engage with the community. *See* BHUAC, Past Events, available at https://perma.cc/2PCH-DBJY. BHUAC members and BHU officers have regularly attended PCCEP meetings. BHUAC members are willing to speak with individual community members upon request and they do so often.

This Agreement does not expressly require or prohibit the BHUAC from holding open or partially open meetings. *Compare* Paragraph 87 (requiring that Training Advisory Council meetings be open to the public). Accordingly, the City's compliance does not turn on how the BHUAC exercises its discretion to allow the public to observe all or part of its meetings.

95. The ABHU Advisory Committee shall provide guidance to assist the City and PPB in the development and expansion of C-I Team, MCPT, SCT, BOEC Crisis Triage, and utilization of community-based mental health services.  The ABHU Advisory Committee shall analyze and recommend appropriate changes to policies, procedures, and training methods regarding police contact with persons who may be mentally ill or experiencing a mental health crisis, with the goal of de-escalating the potential for violent encounters.  The ABHU Advisory Committee shall report its recommendations to the ABHU Lieutenant, PPB Compliance Coordinator, COCL (as described herein), and the BOEC User Board.

| Status | Substantial Compliance |
|--------|------------------------|

The City has re-achieved substantial compliance with Paragraph 95 by providing the BHUAC with information about recent violent encounters between PPB officers and people experiencing a mental health crisis.  We share the Compliance Officer's assessment that PPB's presentation to the BHUAC could be improved by better focusing on cases relevant to the BHUAC's mission and preserving time for BHUAC members to ask questions and discuss thoughts.  However, the presentation adequately provided members with relevant information for recommending changes to decrease the potential for violent encounters between PPB and persons who may be mentally ill or experiencing a mental health crisis.  *See* COCL Q1 2023 Report (draft), at 105–107, available at https://perma.cc/JJ3G-VB7C.  Moreover, the BHUAC set aside part of its April meeting to follow-up on the use of force presentations.

Between November 2021 and September 2022, we joined the Compliance Officer in meeting several times with City and PPB representatives and BHUAC leadership to discuss whether the BHUAC could and should inform its recommendations to reduce violent encounters by reviewing actual encounters.  The Compliance Officer formally recommended this course of action in a technical assistance letter that provided additional guidance about the importance of looking at past encounters if the BHUAC is to achieve its goal of decreasing the potential for future violent encounters.  ECF 291-1, COCL Q4 2021 Report, at 81–82, 164–67.  We agreed.  ECF 292-1, DOJ 6th Report, at 41–43.

PPB explored solutions and proposed alternatives.  On October 17, 2022, the City agreed to present serious use of force cases to the BHUAC, to include Categories I, II, and III force that result in injury to an officer or a person who may be mentally ill or experiencing a mental health crisis.  On December 7, 2022, the BHUAC recommended that PPB present annually at its March meeting on (a) PPB use of force against people in actual or perceived mental health crisis, and (b) PPB officer-involved shootings and in-custody deaths.  *See* BHUAC, Meeting Minutes, at 2 (Dec. 7, 2022), available at https://perma.cc/WA6E-MXDF.  The BHUAC also decided to "review the usefulness and any data gaps for future BHUAC use."  *Id.*

On March 22, 2023, the BHUAC received use of force presentations. PPB analysts surveyed data on non-deadly force events and the Detectives Division recounted the facts and circumstances of Category I deadly force investigations from 2021 and 2022.  Most questions and discussions were set over for the BHUAC's April meeting due to the length of the presentations.  However, the presentations were well received by the BHUAC and provided a vast amount of data, including on both general statistics and trends and specific encounters involving the use of deadly force.  As the Compliance Officer has explained, this information is directly relevant to the BHUAC's mission, and it is necessary and appropriate for PPB to provide

it to BHUAC members to inform their recommendations to policies, procedures, and training methods.  *See* ECF 291-1, COCL Q4 2021 Report, at 153–159, 164–67.

96. Within 240 days of the Effective Date of this Agreement, the ABHU Advisory Committee will provide status reports on the implementation of the ABHU and BOEC Crisis Triage, and identify recommendations for improvement, if necessary.  PPB will utilize the ABHU Advisory Committee's recommendations in determining appropriate changes to systems, policies, and staffing.

| Status | Substantial Compliance |
|---|---|

We have found the City to be in substantial compliance with Paragraph 96 since 2017.  *See* ECF 158-1, DOJ 3rd Report, at 43.  We agree with the Compliance Officer that the City continued to sustain substantial compliance in 2022 because the BHUAC reported on the implementation of the BHU and BOEC crisis triage and made recommendations for improvement.  *See* ECF 364-1, COCL Q4 2022 Report, at 101.

The City recently created a new first responder dispatch option for BOEC crisis triage, in the form of PSR.  To provide status reports on the implementation of BOEC crisis triage, the BHUAC should keep open lines of communication and interface with every one of the City's first responder options.  In addition, the BHUAC should be informed about how each option fits within the City's broader approach to crisis triage.  Being appropriately informed requires, at a minimum, a basic understanding of how each option operates and impacts the outcomes for people with actual or perceived mental illness.  The BHUAC's members have relevant professional expertise across the spectrum of the criminal justice and mental health service systems, and many have relevant personal experience, including some with lived experience at the intersection of behavioral health crisis and police encounters.  To sustain compliance with this paragraph, the City and PPB should draw on that expertise to improve the BHU and BOEC crisis triage.  We will continue to monitor the BHUAC's efforts to improve the City's approach to crisis triage.

## B.    Continuation of C-I Program

97. PPB provides C-I Training to all its officers. C-I is a core competency skill for all sworn police officers in the City.  PPB shall continue to train all officers on C-I.

| Status | Substantial Compliance |
|---|---|

We have found the City to be in substantial compliance with Paragraph 97 since 2017.  *See* ECF 158-1, DOJ 3rd Report, at 43.  We agree with the Compliance Officer that the City continued to sustain substantial compliance in 2022 because PPB continued to provide crisis intervention training to all sworn officers.  *See* ECF 364-1, COCL Q4 2022 Report, at 102.

98. PPB agrees to continue to require a minimum of 40 hours of C-I training to all officers before officers are permitted to assume any independent patrol or call response duties.  Additionally, PPB shall include C-I refresher training for all officers as an integral part of PPB's on-going annual

officer training. PPB's Training Division, in consultation with ABHU Advisory Committee, shall determine the subjects and scope of initial and refresher C-I training for all officers.

| Status | Substantial Compliance |
|--------|------------------------|

We have found the City to be in substantial compliance with Paragraph 98 since 2017. *See* ECF 158-1, DOJ 3rd Report, at 44. We agree with the Compliance Officer that the City continued to sustain substantial compliance in 2022 because PPB continued to provide more than 40 hours of crisis intervention training to all recruits before they become patrol officers. *See* ECF 364-1, COCL Q4 2022 Report, at 102; *see also* PPB Training Division, *Advanced Academy 2020-2021 Program Modifications Evaluation Report*, at 10, available at https://perma.cc/HTD7-NG3Y. In addition, PPB continued to provide refresher crisis intervention training to all officers during this year's in-service training. *See* ECF 308-1, COCL Q1 2022 Report, at 101. Finally, with little variance, the Training Division continues to determine the subjects and scope of PPB's crisis intervention training in consultation with the BHUAC. *See* ECF 358-1, COCL Q3 2022 Report, at 107–108.

## C. Establishing "Memphis Model" Crisis Intervention Team

99. Within 120 days of the Effective Date, PPB shall establish a Memphis Model Crisis Intervention team ("C-I Team").

| Status | Substantial Compliance |
|--------|------------------------|

We have found the City to be in substantial compliance with Paragraph 99 since 2019. *See* ECF 195-1, DOJ 4th Report, at 38–40. We agree with the Compliance Officer that the City continued to sustain substantial compliance in 2022 because PPB continued to maintain its version of a Memphis Model Crisis Intervention team. *See* ECF 364-1, COCL Q4 2022 Report, at 103–104.

The core features of the Memphis Model are law enforcement partnerships with advocacy groups and mental health service providers; local ownership of the program; a volunteer group of specially trained officers comprising around 25% of the patrol division; and protocols and training for 911 call dispatchers; policies and protocols that maximize officer discretion and allow for specially trained officers to act as primary responding officers to certain pre-identified calls involving a mental health crisis. Randolph Dupont, Sam Cochran, & Sarah Pillsbury, *Crisis Intervention Team Core Elements*, at 4 (Sept. 2007), available at https://perma.cc/Z333-UNP3.

PPB has adopted core features of the Memphis Model, including a volunteer group of ECIT officers who receive an additional 40 hours of crisis intervention training on top of the 40 hours all officers receive. By the end of 2022, PPB had 148 certified ECIT officers, 125 assigned to patrol. The BHU oversees the ECIT program, though ECIT officers retain their normal patrol duties and chain of command. The BHU maintains meaningful partnerships with advocacy groups and mental health service providers. These features of the BHU are consistent with the Memphis Model.

The City diverges from the Memphis Model by triaging mental health-related calls and directly dispatching ECIT officers only to calls that pose a relatively greater risk of harm. BOEC will dispatch ECIT officers to a call that has a nexus to mental health and one of seven other factors:

1. The subject is violent toward others (physically combative, threatening violence, assaulting);

2. The subject has a weapon;

3. The subject is threatening or attempting suicide;

4. The call is at a mental health facility;

5. Upon request of the caller;

6. Upon request of a responding officer; or

7. The subject's behavior indicates an escalating risk of harm of self or others.

For mental health-related calls that lack one of these seven factors, BOEC may dispatch either any nearby available patrol officer or PSR. We have found this approach compliant with Paragraph 99. *See* ECF 292-1, DOJ 6th Report, at 45.

PPB's directives relating to mental health crisis intervention, including Directive 850.20, codify the City's Memphis Model approach. PPB, Directive 850.20, Police Response to Mental Health Crisis (2022), available at https://perma.cc/VP7M-SYDK. PPB policy emphasizes de-escalation and disengagement, when appropriate, and transporting people by ambulance to a hospital rather than by police cruiser to jail. *See id.*, Procedures 3, 4, and 5.

The City has demonstrated the effectiveness of the current ECIT dispatch criteria. Since April 2018, the City has produced 10 reports, each covering six-month datasets. Outcomes remain generally positive and reflect a crisis intervention approach that complies substantially with this Agreement. The data show that both ECIT and non-ECIT officers are getting people to the hospital by ambulance rather than taking them to jail. Force remains low as an overall percentage of calls. The two most recent data sets cover from April 1, 2022, to April 1, 2023. During this period, PPB reported 109 uses of force over 22,754 service encounters involving a mental health component, which is about half of one percent, or about 1 in every 209 encounters. Most of this was Category IV force (60 cases), the lowest level of force, defined as not reasonably likely to result in physical injury. Category II force (10 cases) and Category III force (39 cases), which includes the use of ECWs, collectively was used in less than one-quarter of one percent of encounters.

In sum, though the City's triage approach varies slightly from the Memphis Model, we continue to find the variance justified by local needs with input from community partners and appropriate outcome assessments. *See, e.g.*, ECF 195-1, DOJ 4th Report, at 38–40; ECF 236-1, DOJ 5th Report, at 37–39; ECF 292-1, DOJ 6th Report, at 44–46.

100. PPB's C-I Team shall be comprised of officers who volunteer for assignment to the C-I Team. The number of C-I Team members will be driven by the demand for C-I Team services, with an initial goal of 60-80 volunteer, qualified officers.

| Status | Substantial Compliance |
|--------|------------------------|

We have found the City to be in substantial compliance with Paragraph 100 since 2016. *See* ECF 124-1, DOJ 2nd Report, at 74–75. We agree with the Compliance Officer that the City continued to sustain substantial compliance in 2022 because PPB continues to staff ECIT teams with volunteer members sufficient to meet demand. *See* ECF 364-1, COCL Q4 2022 Report, at 104–105.

PPB has exceeded the initial goal of 60–80 ECIT members for many years. As of January 2023, 148 members had active ECIT certification, of which 125 were operational patrol officers divided among precincts and shifts proportionate to ECIT calls for service. *See* ECF 364-1, COCL Q4 2022 Report, at 125–128. Across precincts over the last two years, ECIT officers are arriving at between 60% (North in Q2/Q3 2022) and 77% (East in Q2/Q3 2021) of calls for service that BOEC codes as ECIT. *See id.* at 127. Although the response rates in North Precinct are lower, the predominant reason that an ECIT officer is not on scene is because another officer arrived first and called off the ECIT officer after resolving the situation. *See id.* at 128.

101. No officers may participate in C-I Team if they have been subject to disciplinary action based upon use of force or mistreatment of people with mental illness within the three years preceding the start of C-I Team service, or during C-I Team service. PPB, with the advice of the ABHU Advisory Committee, shall define criteria for qualification, selection, and ongoing participation of officers in the C-I Team.

| Status | Substantial Compliance |
|--------|------------------------|

We have found the City to be in substantial compliance with Paragraph 101 since 2019. *See* ECF 195-1, DOJ 4th Report, at 41. We agree with the Compliance Officer that the City continued to sustain substantial compliance in 2022 because the BHU Lieutenant implemented the required criteria for qualification, selection, and ongoing participation as an ECIT officer. *See* ECF 364-1, COCL Q4 2022 Report, at 105–106.

In November 2022, PPB certified 18 new ECIT officers. *Id.* at 105. Significantly, in December 2022, the BHUAC recommended that the BHU modify the standard operating procedure governing ECIT participation to make clear PPB's goal to recruit and distribute new ECIT officers based on shift and precinct needs. *See* BHUAC, Meeting Minutes, at 3 (Dec. 7, 2022), available at https://perma.cc/WA6E-MXDF. The BHU agreed to incorporate the BHUAC's feedback and present a modified standard operating procedure to the Committee. *See id.*

102. PPB shall specially train each C-I Team member before such member may be utilized for C-I Team operations.  PPB, with the advice of the ABHU Advisory Committee, shall develop such training for C-I Team members consistent with the Memphis Model.

| Status | Substantial Compliance |
|---|---|

We have found the City to be in substantial compliance with Paragraph 102 since 2016.  *See* ECF 124-1, DOJ 2nd Report, at 76–77.  We agree with the Compliance Officer that the City continued to sustain substantial compliance in 2022 because PPB's ECIT training is consistent with the Memphis Model and regularly updated in collaboration with the Training Division and the BHUAC.  *See* ECF 364-1, COCL Q4 2022 Report, at 106–107.

ECIT officers receive specialized training, consisting of 40 hours of enhanced crisis intervention training beyond the 40 hours of introductory crisis training that all officers receive.  The BHUAC reviewed the ECIT training in 2022 and made recommendations, which PPB adopted.  The training emphasizes de-escalation and communication skills and recognizing the signs and symptoms of a mental health crisis.  Older ECIT training and additional details are available online.  *See, e.g.*, PPB Training Division, *ECIT Evaluation Report: Mental Health Partnership Effectiveness* (Feb. 2018), available at https://perma.cc/3545-Z6SX; PPB Training Division, *2018 ECIT Evaluation Report* (Feb. 2019), available at https://perma.cc/U8EB-HM42.

103. C-I Team members will retain their normal duties until dispatched for use as a C-I Team.  BOEC or PPB may dispatch C-I Team members to the scene of a crisis event.

| Status | Substantial Compliance |
|---|---|

We have found the City to be in substantial compliance with Paragraph 102 since 2016.  *See* ECF 124-1, DOJ 2nd Report, at 77.  We agree with the Compliance Officer that the City continued to sustain substantial compliance in 2022 because (a) ECIT officers retain their normal duties until BOEC dispatches them to a call that meets ECIT-dispatch criteria, and (b) BOEC will dispatch an ECIT officer whenever either the 911 caller or a PPB officer asks for an ECIT officer.  *See* ECF 364-1, COCL Q4 2022 Report, at 107–108.  PPB policy encourages officers to ask for an ECIT officer to be dispatched to the scene of a call involving a person experiencing a mental health crisis.  *See* PPB Directive 850.20, Police Response to Mental Health Crisis, Procedure 3.1.1, available at https://perma.cc/VP7M-SYDK.

104. PPB will highlight the work of the C-I Team to increase awareness of the effectiveness of its work.

| Status | Substantial Compliance |
|---|---|

We have found the City to be in substantial compliance with Paragraph 104 since 2016.  *See* ECF 124-1, DOJ 2nd Report, at 77–78.  We agree with the Compliance Officer that the City continued to sustain substantial compliance in 2022 because PPB and the BHU highlighted the work of ECIT officers through various channels, including presentations at national conferences.  *See* ECF 364-1, COCL Q4 2022 Report, at 108–109; ECF 358-1, COCL Q3 2022 Report, at 116.

The Compliance Officer notes that PPB gave a particularly well-received presentation regarding its semi-annual outcome assessment and the value of data-driven approaches to crisis response at the annual CIT International Conference, which brings together experts in the field from across the country. *See* BHU Newsletter (Quarter 3, 2022), available at https://perma.cc/Y47T-USNQ; *see generally* CIT International, available at https://perma.cc/F7JB-XGW5. PPB continues to increase awareness of ECIT and BHU operations in newsletters, minutes, flash alert emails, and on social media. *See* BHU, Newsletters, available at https://perma.cc/ZFH7-RBMJ; BHUAC, Documents, available at https://perma.cc/WA6E-MXDF (where meeting minutes are posted); PPB Flash Alerts, available at https://perma.cc/P9GL-6GM6; PPB Blog, available at https://perma.cc/Y6V5-SH4F. PPB also posts useful information about the BHU components and links to mental health resources on its website. *See* BHU, available at https://perma.cc/YU9A-PZED.

105. For each crisis event to which a C-I Team is dispatched, the C-I Team member shall gather data that ABHU shall utilize to track and report data on public safety system interactions with individuals with perceived or actual mental illness or who are in crisis. These data shall include:

    a. Date, time, and location of the incident;

    b. Subject's name, age, gender, and address;

    c. Whether the subject was armed, and the type of weapon;

    d. Whether the subject is a U.S. military veteran;

    e. Complainant's name and address;

    f. Name and DPSST number of the officer on the scene;

    g. Whether a supervisor responded to the scene;

    h. Techniques or equipment used;

    i. Any injuries to officers, subject, or others;

    j. Disposition;

    k. Whether a mental health professional responded to the scene;

    l. Whether a mental health professional contacted the subject as a result of the call; and

    m. A brief narrative of the event (if not included in any other document).

| Status | Substantial Compliance |
| --- | --- |

We have found the City to be in substantial compliance with Paragraph 105 since 2019. *See* ECF 195-1, DOJ 4th Report, at 44. The City maintained substantial compliance in 2022 because PPB continued to ensure that officers collect the required data through policy and practice. *See* PPB Directive 850.20, Police Response to Mental Health Crisis, Procedure 1.2, available at https://perma.cc/VP7M-SYDK (directing officers to collect the required data). Additionally, PPB continues to audit the data to ensure its reliability, analyze the data, and report out as authorized by law. We share the Compliance Officer's assessment that PPB's Mental Health Template reliably collects data that can facilitate organizational improvement and suffices to sustain substantial compliance. *See* ECF 364-1, COCL Q4 2022 Report, at 110.

### D. Mobile Crisis Prevention Team

106. PPB currently has an MCPT comprised of a two-person team, one sworn officer and one contractor who is a qualified mental health professional. Within 120 days of the Effective Date, City shall expand MCPT to provide one MCPT car per PPB precinct.

| Status | Substantial Compliance |
|---|---|
| We have found the City to be in substantial compliance with Paragraph 106 since 2015. *See* ECF 105-1, DOJ 1st Report, at 54. The City maintained substantial compliance in 2022 because PPB had at least three BHRT units, one per precinct, all year. In fact, PPB now has five BHRT units, with the fourth assigned to the houseless community and the fifth assigned to proactive follow-up. *See* ECF 364-1, COCL Q4 2022 Report, at 111. More information about the BHRT is on PPB's website. *See* PPB BHU, Behavioral Health Response Team, available at https://perma.cc/L8QK-4S7D. | |

107. Each MCPT car shall be staffed by one sworn PPB officer and one qualified mental health professional. MCPT shall be the fulltime assignment of each such officer.

| Status | Substantial Compliance |
|---|---|
| We have found the City to be in substantial compliance with Paragraph 107 since 2015. *See* ECF 105-1, DOJ 1st Report, at 54. The City maintained substantial compliance in 2022 because PPB continued to staff BHRT units with one sworn officer and one qualified mental health professional, as required. *See* ECF 364-1, COCL Q4 2022 Report, at 111. | |

108. No officers may participate in MCPT if they have been subject to disciplinary action based upon use of force or mistreatment of people with mental illness within the three years preceding the start of MCPT service, or during MCPT service. PPB, with the advice of the ABHU Advisory Committee, shall define criteria for qualification, selection, and ongoing participation of officers in the MCPT.

| Status | Substantial Compliance |
|---|---|
| We have found the City to be in substantial compliance with Paragraph 108 since 2019. *See* ECF 195-1, DOJ 4th Report, at 45. We agree with the Compliance Officer that the City continued to maintain substantial compliance in 2022 because the BHU Lieutenant and Sergeants applied the required criteria for qualification, selection, and ongoing participation to be a BHRT officer. *See* ECF 364-1, COCL Q4 2022 Report, at 112. | |

109. PPB shall specially train each MCPT member before such member may be utilized for MCPT operations. PPB, with the advice of the ABHU Advisory Committee, shall develop such training for MCPT members.

| Status | Substantial Compliance |
|---|---|
| We have found the City to be in substantial compliance with Paragraph 109 since 2016. *See* ECF 124-1, DOJ 2nd Report, at 80. We agree with the Compliance Officer that the City | |

> continued to maintain substantial compliance in 2022 because PPB requires that BHRT officers receive enhanced crisis intervention training in order to work on a BHRT unit. The BHU further provides BHRT officers with specialized training opportunities. *See* ECF 364-1, COCL Q4 2022 Report, at 113.

110. MCPT shall utilize C-I Team data to proactively address mental health service, in part, by connecting service recipients with service providers.

| Status | Substantial Compliance |
|--------|------------------------|

> We have found the City to be in substantial compliance with Paragraph 110 since 2019. *See* ECF 195-1, DOJ 4th Report, at 46. We agree with the Compliance Officer that the City continued to maintain substantial compliance in 2022 because the BHU continued to collect reliable data, which the BHRT used to connect people who have frequent police contacts involving a nexus to mental health with mental health service providers. *See* ECF 364-1, COCL Q4 2022 Report, at 113–115.
>
> PPB's Mental Health Template has now captured more than five years of reliable data, covering tens of thousands of calls for service with a mental health component. BHU analysts use the data to evaluate trends, identify repeat contacts, and track referrals. BHRT units use the data to connect frequent police contacts to service providers, as required. The BHRT has achieved demonstrable successes for service recipients. *See, e.g.*, BHU, Newsletter (Quarter 1, 2023), available at https://perma.cc/8XYN-VQHV.

111. Within 180 days of the Effective Date, PPB, with the advice of the ABHU Advisory Committee, shall develop policies and procedures for the transfer of custody or voluntary referral of individuals between PPB, receiving facilities, and local mental health and social service agencies. These policies and procedures shall clearly describe the roles and responsibilities of these entities and of MCPT officers in the process.

| Status | Substantial Compliance |
|--------|------------------------|

> We have found the City to be in substantial compliance with Paragraph 111 since 2017 when PPB enacted three policies, with the advice of the BHUAC, which establish protocols for transferring custody or referring individuals to receiving facilities, and local mental health and social service agencies. *See* ECF 158-1, DOJ 3rd Report, at 51; *see also* PPB Directive 850.21, Peace Officer Custody (Civil), available at https://perma.cc/BKG8-4XGN; PPB Directive 850.22, Police Response to Mental Health Director Holds and Elopement, available at https://perma.cc/K87M-WHEX; PPB Directive 850.25, Police Response to Mental Health Facilities, available at https://perma.cc/GWX9-5DJ9.
>
> In 2019, PPB enacted Directive 850.20, which directs officers to seek a non-criminal resolution for a person with a mental illness or in a mental health crisis, including by referral to a community-based mental health service provider or by requesting an ambulance to transport the person to an appropriate facility for voluntary care. *See* PPB Directive 850.20, Police Response to Mental Health Crisis, Procedure 5, available at https://perma.cc/VP7M-SYDK.

> We agree with the Compliance Officer that the City continued to maintain substantial compliance in 2022 because PPB continues to implement the relevant Directives with fidelity. *See* ECF 364-1, COCL Q4 2022 Report, at 116.

### E.    Service Coordination Team

112. The Service Coordination Team (SCT), or its successor, shall serve to facilitate the provision of services to individuals who interact with PPB that also have a criminal record, addictions, and highly acute mental or physical health service needs.

| Status | Substantial Compliance |
| --- | --- |

We have found the City to be in substantial compliance with Paragraph 112 since 2016. *See* ECF 124-1, DOJ 2nd Report, at 82. We agree with the Compliance Officer that the City sustained substantial compliance in 2022 because the SCT served its designated population of people who both interact with PPB and have a criminal record, addictions, or highly acute mental or physical health service needs, by connecting them to providers of supportive housing, addiction and mental health treatment services, and medical care. *See* ECF 364-1, COCL Q4 2022 Report, at 117–118.

The Compliance Officer has previously determined that the SCT reduces arrests and increases employment and housing. *See* ECF 182-2, COCL Q1 2018 Report, at 26, 45–50. In addition, between 2009 and 2018, Portland State University (PSU) released 10 annual reports detailing the SCT's effectiveness. *See, e.g.*, Greg Boler et al., *Study of the Service Coordination Team and its Influence on Chronic Offenders* (2018), available at https://perma.cc/EAK2-H6XE. In 2019, PSU found that the SCT program reduces police contacts with enormous value for the community. *See* PSU Capstone Class, *Study of the Service Coordination Team and its influence on chronic offenders*, at 24 (2018) (on file with DOJ) (concluding that every "dollar the program spends has a corresponding $20.61 in avoided cost for the community"). The 2020 and 2021 classes were canceled due to COVID-19; however, the SCT has advised that a 2022 report will be released.

### F.    BOEC

113. Within 120 days of the Effective Date, BOEC and PPB, with the advice of the ABHU Advisory Committee, shall complete policies and procedures to triage calls related to mental health issues, including changes to protocols for assigning calls to Multnomah County Crisis Call Center, and adding new or revised policies and protocols to assign calls to the PPB ABHU or directly to NGOs or community-based mental health professionals.

| Status | Substantial Compliance |
| --- | --- |

The City remains in substantial compliance with Paragraph 113 because BOEC completed adequate new or revised policies to triage calls related to mental health issues consistent with the City's current approach to crisis triage. Although BOEC did not adopt a final policy for dispatching PSR teams of mental health professionals during the compliance assessment period (March 31, 2022, to March 31, 2023), it adopted a final policy on July 11, 2023. BOEC's PSR-

related policy can now be implemented, as required by the crisis triage provisions of this Agreement.  *See* Paragraph 115 assessment below.

As background, BOEC is responsible for 911 emergency call operations. Portland Emergency Communications, available at https://perma.cc/YA3L-8LYS.  In early 2014, with the advice of the BHUAC, BOEC enacted protocols to triage calls with a mental health nexus.  At that time, the options available to BOEC included dispatching an ECIT officer or assigning the call to the Behavioral Health Call Center (BHCC).[6]

In February 2021, the City expanded its approach to crisis triage by adding PSR, which consists of teams that include a licensed mental health professional typically paired with an emergency medical technician.  PSR is housed within the Portland Fire & Rescue Bureau.  *See generally* PSR, available at https://perma.cc/9QTZ-7CC9.  The City established pilot program criteria that BOEC would use to dispatch PSR as a first responder to low acuity calls with a nexus to homelessness or behavioral health issues.  The pilot program has since expanded City wide. Currently, BOEC will dispatch PSR if:

1. The call is about (a) a person who is possibly experiencing a mental health crisis, intoxicated, and/or drug affected if the person is either outside or inside a publicly accessible space, such as a business, store, or public lobby; (b) a person who is outside and down, not checked; (c) a person who is outside and yelling; or (d) a person who needs a referral for services but lacks access to a phone; and

2. The person (a) has no known access to weapons; (b) is not displaying physically combative or threatening behavior; (c) is not suicidal; and (d) is not inside a private residence.

PSR, Frequently Asked Questions, available at https://perma.cc/LCX2-EMVF.  In addition, a caller can also simply ask 911 to dispatch a PSR team, even anonymously.  *See* PSR, *Downloadable Portland Street Response Information Flyer in Multiple Languages*, available at https://perma.cc/2EMB-8PPS.

Despite having the standard operating procedures in place for two years, BOEC did not adopt a final policy to assign calls directly to PSR's mental health professionals until July 2023.  The Compliance Officer has regularly advised the City of the need for both PPB and BOEC to adopt consistent policies regarding PSR.  *See, e.g.*, ECF 274-1, COCL Q2 2021 Report, at 7, 39; ECF 291-1, COCL Q4 2021 Report, at 101; ECF 306-1, COCL Q1 2022 Report, at 123–124; ECF 328-1, COCL Q2 2022 Report, at 8.  Clear policy guidance is necessary and appropriate to ensure coordinated and predictable actions by City employees.  For example, when there is actual or potential co-response to a call for service, resulting in both PPB and PSR responding to a call with a nexus to mental health, or when a PPB officer is on-scene at a call more appropriate for PSR.

---

[6] Before 2021, the BHCC was called the Multnomah County Crisis Line.  The BHCC operates 24/7 and, for more than 20 years, has been a reliable resource for community members.  *See* Multnomah County Health Department, *Behavioral Health Crisis Intervention*, available at https://perma.cc/N5M8-FJ65; Multnomah County, *Honoring 20 Years of Behavioral Health Call Center Services*, Jan. 19, 2022, available at https://perma.cc/M5F8-GD2W.  The system for transferring calls to the BHCC is functioning as intended.

> To sustain substantial compliance, the City must ensure that all aspects of its crisis triage approach are implemented pursuant to final policies that are consistent and enforceable.

114. Within 180 days of the Effective Date, the City will complete training of all BOEC Dispatchers in Crisis Triage. The City, with the advice of the ABHU Advisory Committee, shall develop ongoing training for BOEC Dispatchers.

| Status | Substantial Compliance |
|--------|------------------------|

We have found the City to be in substantial compliance with Paragraph 114 since 2017. *See* ECF 158-1, DOJ 3rd Report, at 53. We agree with the Compliance Officer that the City continued to sustain substantial compliance in 2022 because BOEC has developed and delivered training to dispatchers on the City's crisis triage approach, including PSR. *See* ECF 364-1, COCL Q4 2022 Report, at 120.

As the Compliance Officer reported, BOEC provided in-service training in the fourth quarter of 2022, which included updates on the definition of mental health crisis, ECIT response, PSR, calls from people discussing suicide, and callers requesting an ambulance. *See id.* This training remedied a lack of similar training in 2021. *See* ECF 273-1, COCL Q1 2021 Report, at 38–39; ECF 274-1, COCL Q2 2021 Report, at 41–42; ECF 278-2, COCL Q3 2021 Report, at 41; ECF 291-1, COCL Q4 2021 Report, at 102.

115. Within 180 days of the Effective Date, the City shall ensure Crisis Triage is fully operational to include the implementation of the policies and procedures developed pursuant to the above paragraph and operation by trained staff.

| Status | Partial Compliance |
|--------|--------------------|

The City is no longer in substantial compliance with Paragraph 115 because the City has not ensured that its approach to crisis triage is fully operational by implementing BOEC and PPB policies related to PSR.

The City's crisis triage approach became fully operational in 2019, when it was codified in policy, governed by established protocols, and implemented by appropriately trained staff. *See* ECF 195-1, DOJ 4th Report, at 49. However, in February 2021, the City created PSR, expanding the options available to BOEC to dispatch qualified mental health professionals as first responders instead of armed police officers. The expanded first responder options were consistent with the requirements of this Agreement. *See* ECF 354-1, Am. Settlement Agreement, ¶¶ 90(d), 113. The City developed a PSR pilot program, rolled it out, evaluated its impact, and incrementally expanded its operations over time based on reliable data of its positive outcome. *See generally* PSR, News Coverage about PSR, available at https://perma.cc/L62W-QDUQ; PSR, Data Dashboard, available at https://perma.cc/GY6A-WDHS.

To date, BOEC has appropriately transferred calls to the BHCC, sent ECIT officers to calls meeting ECIT dispatch criteria, sent PSR to calls meeting PSR dispatch criteria, and audited calls to ensure proper dispatch decisions are being made or, alternatively, that corrective action can be taken. However, in the first 28 months after PSR launched, the City did not finalize or implement policies regarding PSR. As a result, it has not been clear how PSR fits into the City's broader approach to crisis triage. First, BOEC created a draft policy for PSR dispatch in 2022.

But it was finalized only recently because the PPA, which represents BOEC call takers and dispatchers, asserted bargaining rights over the policy. The City and PPA have not yet resolved the asserted rights but agreed to allow BOEC to finalize its draft PSR-related policy. The City was unable to give a date by which it expected to resolve the underlying matter that is subject to bargaining. Second, although there is now a BOEC policy regarding PSR, PPB has no policy to guide its officers on how to interact with PSR. That leaves open important questions about potential co-response, whether and when an officer can call for PSR dispatch, and how the City's various first responder options for crisis triage relate to one another. The City endeavored to finalize integrated policies for first responders by June 2022. *See* Letter of Agreement for Portland Street Response, at 95, available at https://perma.cc/ZS4Z-78MF (establishing a committee to create "integrated public safety response protocols that will include at a minimum: (a) the type of calls for service that may be appropriately handled by PSR or handled with the assistance of PSR, and (b) protocols on appropriate response actions at the scene of the incident and thereafter, including but not limited to initial contacts, initial entry, standby, joint responses, and related actions," with an expected policy draft to be ready for approval by June 30, 2022, "with the final rules to be adopted as City policy"). However, that has not happened yet, and the committee continues its work to create integrated public safety response protocols to be adopted as City policy. Third, despite existing for two years and achieving high-profile positive outcomes, City officials assert that PSR lacks sufficient policies to operate on a 24/7 basis. Some of those policies are related to human resources and ministerial, but it is not clear the full extent of what needs to be done and when it will be done. The BHUAC should consider the impact of these issues pursuant to its authority to provide guidance to the City on, *inter alia*, BOEC's crisis triage, utilization of community-based mental health services, and policies and procedures to triage calls related to mental health issues. *See* ECF 354-1, Am. Settlement Agreement, ¶¶ 95, 113.

To re-achieve substantial compliance with Paragraph 115, the City must fully operationalize its approach to crisis triage by ensuring that PSR-related policies are adopted and implemented, in coordination with the BHUAC.

**United States v. City of Portland**

**DOJ's Seventh Periodic Compliance Assessment Report**

SECTION VII – EMPLOYEE INFORMATION SYSTEM (EIS)

| Obligation | Compliance Ratings by DOJ Report | | | | | | |
|---|---|---|---|---|---|---|---|
| | 1st Report ECF 105-1, 9/29/2015 | 2nd Report ECF 124-1, 10/18/2016 | 3rd Report ECF 158-1, 12/26/2017 | 4th Report ECF 195-1, 5/4/2019 | 5th Report ECF 236-1, 2/10/2021 | 6th Report ECF 292-1, 6/30/2022 | 7th Report ECF 369-1, 8/8/2023 |
| Para. 116: Enhance EIS to identify employees at risk and address trends | Partial Compliance | Partial Compliance | Partial Compliance | Substantial Compliance | Substantial Compliance | Partial Compliance | Partial Compliance |
| Para. 117: Use force audit data as EIS for supervisors and teams | Partial Compliance | Partial Compliance | Not Rated | Substantial Compliance | Substantial Compliance | Partial Compliance | Partial Compliance |
| Para. 118: Thresholds for case management reviews | Not Rated | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| Para. 119: Add threshold for three uses of force in one month | Not Rated | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| Para. 120: EIS staffing | Not Rated | Substantial Compliance | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |

## VII.    EMPLOYEE INFORMATION SYSTEM

116. PPB has an existing Employee Information System ("EIS") to identify employees and design assistance strategies to address specific issues affecting the employee.  *See* PPB Manual 345.00. PPB agrees to enhance its EIS to more effectively identify at-risk employees, supervisors and teams to address potentially problematic trends in a timely fashion.  Accordingly, within 90 days of the Effective Date, PPB shall:

a. Require that commanders and supervisors conduct prompt reviews of EIS records of employees under their supervision and document the review has occurred in the EIS performance tracker;

b. Require that commanders and supervisors promptly conduct reviews of EIS for officers new to their command and document the review has occurred in the EIS performance tracker; and

c. Require that EIS staff regularly conduct data analysis of units and supervisors to identify and compare patterns of activity.

117. PPB agrees to use force audit data to conduct similar analyses at supervisor- and team-levels.

| Status | Partial Compliance |
|---|---|

We continue to find the City in partial compliance with Paragraphs 116 and 117, as has the Compliance Officer, since our last report.  *See* ECF 292-1, DOJ 6th Report, at 53–55; *see also* ECF 364-1, COCL Q4 2022 Report at 128–131; COCL Q1 2023 Report (draft), at 128–131, available at https://perma.cc/JJ3G-VB7C.

**Overall performance data:**  The City reports high rates of supervisors performing required, timely assessments of their subordinates' Performance Data Tracker (PDT) entries for annual performance evaluations.  PPB reports achieving 99.3% in the second quarter of 2022, 98.9% in the third quarter of 2022, 99.1% in the fourth quarter of 2022, and 99.5% in the first quarter of 2023.    PPB Quarterly Update Report, May 15, 2023, at 319–320, available at https://perma.cc/M5E9-PSH6.  Similarly, PPB reports increased rates of supervisors having reviewed the PDT entries for subordinates new to their command because of supervisors' or officers' transfers: PPB reports achieving 89.1%, 92.5%, and 100% in the last three quarters of 2022, and 97.1% in the first quarter of 2023.  *Id.*

We attempted to verify the City's self-reported data by using our own assessment of a small sample.  We identified two consequential groups:  (1) PPB executives and (2) officers who had used Category I force, i.e., deadly force.  We asked the City to produce to us all PDT entries since April 1, 2022, for certain PPB executives.  A review of the PDT entries made for these executives shows many commendable actions, including giving of their off-duty time, taking on additional tasks, and fundraising for charity.

Several PDT entries since April 1, 2022 for PPB members involved in Category I uses of force included notes of thanks from community members regarding other interactions.  Many of the PDT entries described force events and noted that the force was within or outside of policy and any coaching corrections to reporting or tactics.  Four members' PDT entries indicated a use of force event and a related PPB case number, but no explanation about the event, unlike the lesser categories of force events recorded in other PDT entries with details of the event.  *See* entries

for 23-60721; 22-204636; 23-109203; and 22-264683.  PPB's directive requires that when a supervisor makes a PDT entry for an AAR where no prior entry has been made:

> 3.1.3. The entry shall include, *at a minimum*:
>
> 3.1.3.1. The case number of the incident,
>
> 3.1.3.2. The nature of the incident and, if applicable, the type of force used,
>
> 3.1.3.3. Whether the incident was within policy,
>
> 3.1.3.4. Any positive performance, and
>
> 3.1.3.5. Any training deficiencies, policy deficiencies, or poor tactical decisions identified as well as any non-disciplinary corrective action taken to remedy them.

PPB Directive 345.00, Employee Information System, available at https://perma.cc/KNN7-2NH4 (emphasis added).

**Performance Data Tracker as an Officer's "Jacket":**  The PDT entries for many PPB members show that many supervisors are using the PDT effectively to record critiques, traumatic events, feedback from community members and other City employees, and force events other than the Category I uses of force.  Thus, over time, the PDT is becoming the "jacket" for PPB members that follows them to new assignments or for newly assigned supervisors to review.  Except for omitting a description of the force used in the PDT entries discussed above, the PDT is serving a valuable purpose.  In an organization with frequently shifting supervisors, the PDT is an easily accessible record for new supervisors to understand an officer's recent experiences.

**Effective Identification of At-Risk Employees:**  In our last report we stated:  "We agree with the Compliance Officer's well-formed analysis of the City's partial compliance with these paragraphs.  ECF 291-1, COCL Q4 2021 Report, at 104–06."  ECF 292-1, DOJ 6th Report, at 54.  The Compliance Officer's assessment included a critique that the City did not conduct an analysis to "seek to ensure that the EIS is 'more effectively identify[ing] at-risk employees, supervisors and teams to address potentially problematic trends in a timely fashion.'"  ECF 291-1, COCL Q4 2021 Report, at 105 (quoting Paragraph 116).

The City continues to hold the position that it need not assess the efficacy of its existing EIS system to comply with Paragraph 116.  *See* COCL Q1 2023 Report (draft), at 130, available at https://perma.cc/JJ3G-VB7C ("However, the PPB and City hold to the position that such an assessment is not required by the Settlement Agreement").  Thus, the Compliance Officer continues to find only partial compliance with Paragraph 116 and, consequently, the City can only partially comply with Paragraph 117, which requires similar analysis for supervisor and team levels that Paragraph 116 requires for individuals.  We agree.  PPB has not changed its EIS system since we last found that the system was ineffective to intervene in problematic behavior:

> A review of a sample of EIS records for officers who ultimately became subject to criticism for poor outcomes shows that PPB repeatedly declined any interventions.  The EIS also shows no interventions following the City's settlement of significant civil claims based on PPB uses of force.

ECF 292-1, DOJ 6th Report, at 55.

The City invests substantially in the personnel required to run the EIS system and the supervisory hours required to respond to EIS alerts.  Although this time is useful and constructive if it

captures risky behavior, it fails to meet the objective of the remedy for Section VII if the use of EIS is merely a "check the box."  We have encouraged the City to meet this Agreement's mandates, but also to meet PPB's own business purposes by effectively using EIS to prevent poor outcomes to the public and officer—and to prevent potentially career-ending outcomes from occurring where possible.  Accordingly, the same critique that we made in our prior report still stands:

> We believe the inefficacy of the current EIS system requires the PPB to explore enhancements, as required by Paragraph 116.  We agree with the Compliance Officer, who made a similar assessment on May 11, 2022, and offered the City assistance.

*Id.*

118. PPB shall continue to use existing thresholds, and specifically continue to include the following thresholds to trigger case management reviews:

a. Any officer who has used force in 20% of his or her arrests in the past six months; and

b. Any officer who has used force three times more than the average number of uses of force compared with other officers on the same shift.

119. Within 90 days of the Effective Date, PPB shall add one additional threshold to trigger case management review any officer who has three uses of force in a one-month period.

| Status | Substantial Compliance |
|--------|------------------------|

The City remains in substantial compliance with Paragraphs 118 and 119.

The Compliance Officer's most recent report notes that PPB's EIS unit sent over 60% of the alerts generated by EIS to responsible unit (RU) managers.  *See* COCL Q1 2023 Report (draft), at 131, available at https://perma.cc/JJ3G-VB7C.  The specific thresholds required by this Agreement remain in place.  PPB policy creates the following thresholds for review:

- Shift Force Ratio:  a sworn member's force ratio is greater than or equal to three (3) times their shift's average ratio in the preceding six (6) months;

- Force Ratio:  a sworn member's force ratio is greater than or equal to 20% of their arrests in the preceding six (6) months;

- Force Count:  a sworn member uses force three (3) or more times in the preceding thirty (30) days;

- Criminal Complaint:  a member receives a complaint with an allegation of criminal misconduct;

- Complaint in Same Category:  a member receives two (2) or more complaints with at least one (1) allegation in each complaint being in the same category (such as two (2) complaints that both have conduct allegations) for events in the preceding six months;

- Complaint Count:  a member receives three (3) or more complaints for events in the preceding six (6) months;

- Traumatic Incidents: a member experiences three (3) or more traumatic incidents in the preceding thirty (30) days; and

- Commendations: a member receives two (2) or more commendations for events in the preceding six (6) months.

PPB Directive 345.00, Employee Information System, available at  https://perma.cc/KNN7-2NH4.  However, this directive is past due for review.  *See id.* (noting a review date of May 15, 2020).

PPB data indicate a consistent use of the threshold that Paragraph 119 requires:  three (3) uses of force in a one-month period.  PPB reports 11% of force-related alerts in the third quarter of 2022 resulted from this threshold; 8.7% in the fourth quarter of 2022; and 8% in the first quarter of 2023.    *See* PPB Quarterly Update Report, May 15, 2023, at 335–336, available at https://perma.cc/M5E9-PSH6.

120. Within 90 days of the Effective Date, PPB shall identify and train a second EIS administrator. This individual may be assigned to other tasks within the Professional Standards Division or as otherwise needed.

| Status | Substantial Compliance |
|---|---|

We agree with the Compliance Officer that the City remains in compliance with Paragraph 120. *See* ECF 364-1, COCL Q4 2022 Report, at 134; COCL Q1 2023 Report (draft), at 133–134, https://perma.cc/JJ3G-VB7C.  Since February 3, 2022, PPB placed a second EIS administrator with the EIS team, replacing the Force Inspector who had served in an interim capacity as the second EIS administrator.  PPB Quarterly Update Report, May 15, 2023, at 339–340, available at https://perma.cc/M5E9-PSH6.

**United States v. City of Portland**

**DOJ's Seventh Periodic Compliance Assessment Report**

SECTION VIII – ACCOUNTABILITY

| Obligation | Compliance Ratings by DOJ Report | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 1st Report ECF 105-1, 9/29/2015 | 2nd Report ECF 124-1, 10/18/2016 | 3rd Report ECF 158-1, 12/26/2017 | 4th Report ECF 195-1, 5/4/2019 | Supp. Report ECF 212, 1/24/2020 | 5th Report ECF 236-1, 2/10/2021 | 6th Report ECF 292-1, 6/30/2022 | 7th Report ECF 369-1, 8/8/2023 |
| Para. 169: Uniformly apply policies and hold officers accountable[7] | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Substantial Compliance | Partial Compliance | Partial Compliance | Partial Compliance |
| **A. Investigation Timeframe** | | | | | | | | |
| Para. 121: Complete investigations within 180 days | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Substantial Compliance | Partial Compliance | Partial Compliance | Partial Compliance |
| Para. 122: Concurrent administrative and criminal investigations | Not Rated | Substantial Compliance | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| Para. 123: Manage investigation timeframes | Partial Compliance | Partial Compliance | Partial Compliance | Partial Compliance | Substantial Compliance | Partial Compliance | Partial Compliance | Partial Compliance |

[7] Paragraph 169 was enumerated Paragraph 172 in our 1st, 2nd, and 3rd Reports.

| | Compliance Ratings by DOJ Report | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Obligation** | 1st Report<br>ECF 105-1,<br>9/29/2015 | 2nd Report<br>ECF 124-1,<br>10/18/2016 | 3rd Report<br>ECF 158-1,<br>12/26/2017 | 4th Report<br>ECF 195-1,<br>5/4/2019 | Supp. Report<br>ECF 212,<br>1/24/2020 | 5th Report<br>ECF 236-1,<br>2/10/2021 | 6th Report<br>ECF 292-1,<br>6/30/2022 | 7th Report<br>ECF 369-1,<br>8/8/2023 |
| **B.  On-Scene Public Safety Statements and Interviews** | | | | | | | | |
| Para. 124: Revise *Garrity* protocol | Non-compliance | Partial Compliance | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| Para. 125: Separate officer interviews following lethal force | Partial Compliance | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Partial Compliance | Substantial Compliance |
| Para. 126: Witness officer briefings after lethal force | Not Rated | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Partial Compliance | Substantial Compliance |
| Para. 127: Officer walk-throughs and interviews after lethal force and in-custody deaths | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| **C.  Conduct of Internal Affairs Investigations** | | | | | | | | |
| Para. 128: Reduce redundancy and ensure IPR independence | Non-Compliance | Partial Compliance | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Partial Compliance | Partial Compliance |
| Para. 129: Conduct full force investigations | Partial Compliance | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Partial Compliance | Partial Compliance |

| Obligation | Compliance Ratings by DOJ Report | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 1st Report ECF 105-1, 9/29/2015 | 2nd Report ECF 124-1, 10/18/2016 | 3rd Report ECF 158-1, 12/26/2017 | 4th Report ECF 195-1, 5/4/2019 | Supp. Report ECF 212, 1/24/2020 | 5th Report ECF 236-1, 2/10/2021 | 6th Report ECF 292-1, 6/30/2022 | 7th Report ECF 369-1, 8/8/2023 |
| Para. 130: Prohibit retaliation | Non-Compliance | Non-Compliance | Partial Compliance | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| Para. 131: PRB procedures | Partial Compliance | Substantial Compliance | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Partial Compliance | Partial Compliance |
| Para. 132: PRB may request additional investigation | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| Para. 133: Civil liability for force | Partial Compliance | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| **D. Citizen Review Committee (CRC) Appeals** | | | | | | | | |
| Para. 134: Expand CRC | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| Para. 135: CRC may find administrative investigation outcomes unreasonable | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| Para. 136: CRC may request additional investigation | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |

| Obligation | Compliance Ratings by DOJ Report | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 1st Report ECF 105-1, 9/29/2015 | 2nd Report ECF 124-1, 10/18/2016 | 3rd Report ECF 158-1, 12/26/2017 | 4th Report ECF 195-1, 5/4/2019 | Supp. Report ECF 212, 1/24/2020 | 5th Report ECF 236-1, 2/10/2021 | 6th Report ECF 292-1, 6/30/2022 | 7th Report ECF 369-1, 8/8/2023 |
| **E.  Discipline** | | | | | | | | |
| Para. 137: Develop and implement a Discipline Guide | Partial Compliance | Partial Compliance | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Partial Compliance | Substantial Compliance |
| **F.  Communication with Complainant and Transparency** | | | | | | | | |
| Para. 138: Enhance complaint website | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| Para. 139: Provide complainants with documentation | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| Para. 140: Update complainants | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |

## VIII.   OFFICER ACCOUNTABILITY

PPB and the City shall ensure that all complaints regarding officer conduct are fairly addressed; that all investigative findings are supported by a preponderance of the evidence and documented in writing; that officers and complainants receive a fair and expeditious resolution of complaints; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair and consistent.  The City and PPB seek to retain and strengthen the citizen and civilian employee input mechanisms that already exist in the PPB's misconduct investigations by retaining and enhancing IPR and CRC as provided in this Agreement.

169. PPB shall apply policies uniformly and hold officers accountable for complying with PPB policy and procedure.

| Status | **Partial Compliance** |
|--------|------------------------|

We agree with the Compliance Officer that the City remains in partial compliance with Section VIII and Paragraph 169.  *See* ECF 364-1, COCL Q4 2022 Report, at 154 (discussing Paragraph 169); COCL Q1 2023 Report (draft), at 155–156, available at https://perma.cc/JJ3G-VB7C.  We base our assessment on our review of provided accountability materials and observations of Police Review Board (PRB) hearings as well as our review of a sample of supervisory and chain of command force reviews, detailed in our assessment of the City's partial compliance with Paragraphs 70 and 73.

During this compliance assessment period, PPB has resolved many outstanding complaints that stemmed from 2020's crowd control interactions.  Some of the same issues that we cited in our last report—collateral misconduct (2020-C-0156), incomplete investigation of force directive allegations, double jeopardy, and interference (2012-B-0041) with officer interviews—continue to affect compliance in this period.  In response to our concerns, the City recently opened an investigation of a collateral misconduct issue identified in 2020-C-0156 and has addressed interference with officer interviews.

**Accountability for Previously Reported Rapid Response Team (RRT) Training Materials**: Following our last compliance assessment report, the Court asked DOJ to respond to the problematic RRT training materials discussed preliminarily at the July 2022 status conference. We told the Court that we would await the outcome of PPB's administrative investigations. Now, PPB reports having completed the investigations it plans to undertake on those materials. We respond to the Court's inquiry under the framework of Paragraph 169, which sets forth the overall requirement that PPB apply policies uniformly and hold officers accountable for complying with them.

As to our review of PPB's investigations of the RRT training materials, we have four concerns: (1) a preponderance of evidence supported investigating a more serious charge in the "meme" slide investigation; (2) the City unnecessarily delayed the investigation of the obligation to report the slide; (3) the City asserted that it could not hold anyone accountable for the failure to review the RRT training material because the City had not provided sufficient notice about the policy requirement to review specialized unit training; and (4) the City did not conduct an investigation of the failure to disclose the RRT training materials to DOJ or the Compliance Officer.

### 1. The Meme Slide Investigative Scope

In this compliance period, the City completed an administrative investigation of the PPB member accused of having inserted the meme slide into the RRT training presentation. The City released the imposed discipline memorandum. *See* Imposed Discipline Memorandum, IA Case #2021-B-0034 (Feb. 21, 2023), available at https://perma.cc/H3PL-VQYJ. The Chief reduced the proposed discipline that had been recommended in a separate memorandum, which the City also released. *See* Proposed Discipline Memorandum for IA Case #2021-B-0034 (Jan. 6, 2023), available at https://perma.cc/7972-G6VG.

In reaching the ultimate finding, the Chief found "You said you did not put the meme in the slide deck." Imposed Discipline Memorandum, IA Case #2021-B-0034, at 11. And the Chief found, "[I]t is more likely than not that you added the meme to the slide deck." *Id.* Yet the City did not give notice of an investigation and did not reach a finding on the honesty issue.

### 2. Delays in Investigating the Reporting of the Meme Slide

PPB must act on known allegations of misconduct. In the investigation of the involved member who allegedly added the meme slide there was only one other member who recalled seeing the slide. That person was the supervisor who spotted and removed the meme slide from the RRT presentation—others reported not even seeing it in the presentation—and then rebuked the member who had added it. Still, PPB policy required that the supervisor report the misconduct. *See* PPB Directive 310.00, Professional Conduct and Courtesy, available at https://perma.cc/K5UW-HR92. In a January 20, 2022 meeting, we asked the City if it investigated the supervisor's duty to report the misconduct. After several follow up conversations, the City reported initiating the investigation on November 8, 2022. This delay also affected the City's ability to meet the timeline requirements of Paragraph 121 of the Agreement, i.e., the 180-day deadline was supposed to have begun from "receipt of a complaint of misconduct, or discovery of misconduct by other means." ECF 354-1, Am. Settlement Agreement, ¶ 121. The City did not meet the deadline in that case.

### 3. Enforcing Directive Requiring Training Review for Approval

Last year, we reported the City's representation that it had "initiated a broader investigation into the approval of the training, a potential violation of PPB Directive 1500.00 – Training." *See* ECF 307, Plaintiff's Status Report, at 2–3. Now, that appears not to be the case. The City's attorneys asserted that the City could not hold officers accountable for failure to submit specialized unit training for review because, among other reasons, PPB had not previously implemented the requirement of Directive 1500.00 that officers do so for specialized unit training, so no one was on notice of the requirement. Although PPB's Training Captain later reminded members that training review does apply to specialized unit training, the City asserted that it was too late to hold anyone accountable for not having the RRT training materials reviewed as required by PPB Directive 1500.00.

### 4. Disclosure of Training Materials

PPB had a court-ordered obligation to provide the RRT training materials to DOJ. *See* ECF 354-1, Am. Settlement Agreement, ¶ 166. Neither the City nor PPB can credibly excuse the non-production by asserting they were unaware of these materials. PPB policy requires that all members comply with laws, rules, and orders, such as this Agreement, a federal court order that binds all City employees. *See* PPB Directive 315.00, Laws, Rules, and Orders, available at

https://perma.cc/W544-M83F; *see also* ECF 354-1, Am. Settlement Agreement, ¶ 4.    The Agreement explicitly requires PPB to "send new or revised policies, procedures, protocols, and training curricula regarding use of force, interactions with persons in mental health crisis and systems of accountability to DOJ as they are promulgated, with a copy to the COCL." ECF 354-1, Am. Settlement Agreement, ¶ 166.  In this compliance assessment period, we also provided the City with a record of correspondence showing our multiple specific requests for RRT training materials prior to 2020, pursuant to our access provisions.  *See id.*, ¶¶ 162(b), 164.  Despite these requirements, PPB did not disclose the training materials.  We highlighted that nondisclosure in our last compliance assessment report, yet neither PPB—nor the City—has conducted an investigation of the failure to disclose the training materials to the Compliance Officer and DOJ.  *See* ECF 292-1, DOJ 6th Report, at 24–25.

**Lack of Accountability regarding Shooting at Moving Vehicles:**  As we have before, we assessed force incidents that went through the PRB process during this compliance assessment period.  A significant issue we identified was PPB's management not appropriately addressing a repeated issue of officers firing at moving vehicles without applying PPB policy restrictions.

The issue arose in this compliance assessment period in the City's response to two officers firing 15 rounds at a moving truck.  In this September 12, 2021 officer-involved shooting, for which PPB conducted a PRB on October 5, 2022, PPB followed a stolen truck to a residential neighborhood and barricaded the street with their vehicles.  *See* 2021-B-0032.  The truck backed up in an arc movement across the front of the PPB vehicles and crashed into a stone wall in front of another home.  As the pickup truck was backing up, two officers fired 14 rounds at the moving vehicle, one officer firing *over the head and of another officer "down range."*  After the truck crashed into the wall and stopped, the officers radioed "shots fired."  After that, one officer fired a fifteenth round *at the stopped truck*.  A residential home's security camera captured both video images and audio recordings of the uses of force.  [Redacted resident's name] Driveway Video 3.MP4 at 0:00-0:19. The image shows smoke arising from the discharge of the last round fired at the stopped truck.

PPB showed only a portion of the video and no audio at the PRB; PPB stopped the video before showing the last round fired.  Shooting multiple rounds at a moving vehicle, some over the head of another officer, and shooting at a stopped vehicle that posed no apparent threat raised questions to us that PPB did not address.  We addressed the use of force with our expert consultant and the Compliance Officer.  They expressed four concerns:    (1) the lack of justification for each round fired; (2) that the video did not show the pickup truck moving toward the officers though the truck's movement was the only justification provided for firing; (3) that PPB did not evaluate, let alone justify the last round fired; and (4) that PPB did not adequately assess "crossfire" that conflicted with PPB training and could have killed the down-range officer.  We conveyed our concerns to the City, but the City did not conduct any further investigation of the incident or reassessment of the findings.

Not assessing each round fired—and validating that approach up through the chain of command (as of the City's July 5, 2023 reporting to us)—also contradicts the Chief's public commitment to assess every round fired in officer involved shooting cases.  On February 28, 2023, PPB agreed with two OIR Group recommendations.  First, PPB agreed to assess the actions of officers leading up to shootings.  Second, PPB agreed to conduct an independent analysis of multiple

rounds fired by officers.  Below are the two operative OIR Group recommendations and the Chief's responses:

**9: The Bureau should change its protocols to ensure that tactical decision making that precedes a use of force is a formal area of review in each officer-involved shooting or in-custody death.**

PPB agrees with this recommendation and will ensure the Internal Affairs Division makes the review of pre-deadly force tactical decision-making a standard part of deadly force reviews.

\* \* \*

**12: During its investigation and review of any deadly force incident, the firing of multiple rounds should be overtly and independently analyzed as an issue for both the underlying investigation and the Training Division review.**

PPB agrees that all uses of deadly force should be analyzed in light of current firearms training policy. PPB will assign this recommendation to the Training Division for them to present an overview of the firearms program to the Internal Affairs investigators so the investigators are familiar with current training. This will allow the investigators to know if actions taken in the field deviate greatly from current training.

*See* Letter from Chief C. Lovell to IPR Director R. Caldwell, Feb. 28, 2023, at 102–103, available at https://perma.cc/45EF-4LFY.

Additionally, the City did not apply its force policy restrictions on shooting at moving vehicles. Instead, after our further inquiry, the City asserted that the prohibition on shooting at vehicles applies only to vehicles "fleeing from police."  PPB's policy on use of force, in effect when the incident occurred, did not contain any such limitation.  It provided:

8.5. Moving Vehicles.

8.5.1. A moving vehicle does not presumptively constitute a deadly force threat.

8.5.2. Members *shall not shoot at a moving* or fleeing *vehicle* unless an immediate risk of death or serious physical injury to the member or others exists.

8.5.3. Members are prohibited from intentionally positioning themselves in the path of a moving vehicle or in a location that is clearly vulnerable to vehicular attack.

8.5.4. When feasible, members shall move out of the path of a vehicle rather than discharging a firearm at the vehicle or its occupants.

8.5.5. Members shall consider whether the threat to the member or other persons (including all vehicle occupants) is increased by incapacitating the vehicle operator. If the operator is incapacitated, the unguided vehicle may remain a threat to anyone in its path. Members shall weigh the threat of incapacitating the driver against the threat posed by allowing the driver to maintain control of the vehicle.

8.5.6. *Members must be aware that shooting at a moving vehicle presents unique challenges of target and backstop.*

8.5.7. Members must be aware that shooting from a moving vehicle creates additional challenges of stability and aiming that must be considered in the decision to employ deadly force.

8.5.8. Members shall not use poor tactics or positioning as justification for shooting at or from a moving vehicle.

8.5.9. Members are prohibited from entering an occupied vehicle that is readily capable of being driven (i.e., engine running or keys in the ignition) without substantial justification.

PPB Directive 1010.00, Use of Force, effective Jan. 19, 2020 (emphases added).  PPB's current policy more succinctly states the prohibition:

9.4.3.  Moving Vehicles.

9.4.3.1.  A moving vehicle may not always constitute a deadly threat. However, if a member reasonably believes the vehicle operator is targeting a pedestrian(s) or group of people, thereby creating an immediate risk of death or serious injury, the vehicle does constitute a deadly threat.

9.4.3.2.  Members *shall not* shoot at or from a moving vehicle unless they reasonably believe an immediate threat of death or serious physical injury exists.

9.4.3.3.  Members shall consider whether the threat to the member or other persons (including all vehicle occupants) is increased by incapacitating the vehicle operator.  If the operator is incapacitated, the unguided vehicle may remain a threat to anyone in its path.  Members shall weigh the threat of incapacitating the driver against the threat posed by allowing the driver to maintain control of the vehicle.

9.4.3.3.1.  *Members shall also consider the challenges of target, backstop, stability, and aiming when deciding whether to use deadly force in this circumstance.*

PPB Directive 1010.00, Use of Force, effective Nov. 15, 2022, available at https://perma.cc/8SE5-GZY9 (emphases added).

In addition to the above concerns, we did not receive any documentation that PPB addressed the conduct of the involved officer who fired over the head of another officer down range.  It was not addressed by the involved officer's supervisor in the EIS PDT entries.

**Force Directive's De-escalation Requirement:**  In response to our request for investigations of failure to de-escalate force, PPB referenced an investigation of an officer "inappropriately escalat[ing] a confrontation . . . without sufficient justification" and an investigation of an officer who "escalated the need to use force during his confrontation with [an individual]."  *See* IPR 40 – De-Escalation Allegations (undated) (stating "Officer **** inappropriately escalated a confrontation with **** without sufficient justification," and "Officer **** escalated the need to use force during his confrontation with ****.").  However, instead of investigating any

violations of PPB policy that requires de-escalation (Directive 1010.00),[8] the investigations applied PPB's satisfactory performance policy (Directive 315.30). PPB's response acknowledged that the allegation in these cases involved failure to de-escalate. PPB's framing of the allegation as only "satisfactory performance" could, if the conduct were sustained, implicate Paragraph 83's remedy to exclude an officer sustained for excessive force from serving as a trainer for three years. *See* ECF 354-1, Am. Settlement Agreement, ¶ 83.

**Failing to hold supervisors accountable for previously identified policy breaches:** In our Sixth Compliance Assessment Report, we noted that the City had settled for substantial sums three civil claims based on prior force incidents. We recommended that "for substantial or high-profile settlements, the City should consider whether to apply their systems for holding supervisors responsible for properly reviewing these uses of force, consistent with Section VIII, tracking deficiencies from the Force Inspector, consistent with Section III, and informing the training needs assessment, consistent with Section IV." *See* ECF 292-1, DOJ 6th Report, at 71. There is no evidence that the City initiated administrative investigations of supervisors' reviews of those uses of force.

## A.    Investigation Timeframe

121. PPB and the City shall complete all administrative investigations of officer misconduct within one-hundred eighty (180) days of receipt of a complaint of misconduct, or discovery of misconduct by other means. For the purposes of this provision, completion of administrative investigations includes all steps from intake of allegations through approval of recommended findings by the Chief, excluding appeals, if any, to CRC. Appeals to CRC shall be resolved within 90 days.

123. If PPB is unable to meet these timeframe targets, it shall undertake and provide to DOJ a written review of the IA process, to identify the source of the delays and implement an action plan for reducing them.

| Status | Partial Compliance |
|--------|--------------------|

The City remains in partial compliance with Paragraphs 121 and 123 because it is still failing to meet the required timelines. Our assessment is consistent with the Compliance Officer's public draft report for the first quarter of 2023, which also finds that the City is not in substantial compliance with timeframes for administrative investigations required by Paragraph 121. *See* COCL Q1 2023 Report (draft), at 135–136, available at https://perma.cc/JJ3G-VB7C.

**PPB Self-Reporting:** PPB issues a quarterly self-report of compliance with the Agreement, the latest of which concludes that the City complies with these paragraphs. *See* PPB 2023 Quarterly Update Report, May 15, 2023, at 350, 360, available at https://perma.cc/M5E9-PSH6. In the last four quarters, PPB reported the below levels of compliance with the 180-day timeline, excluding days tolled pursuant to Paragraph 122. PPB's self-reported statistics count only cases

---

[8] PPB's force policy, Directive 1010.00, includes a section on the de-escalation requirements mandated by this Agreement, which provide that PPB add to its use of force policy: "Officers shall use disengagement and de-escalation techniques, when possible . . . ." ECF 354-1, Am. Settlement Agreement, ¶ 67(a); *see also* PPB Directive 1010.00, Use of Force, Procedure 1, available at https://perma.cc/8SE5-GZY9.

that are closed each quarter, so an overdue case will count against only the quarter in which it is closed.

2022 Q2:  2 of 22 administrative investigations closed in this quarter exceeded 180 days.

2022 Q3:  1 of 30 administrative investigations closed in this quarter exceeded 180 days.

2022 Q4:  1 of 22 administrative investigations closed in this quarter exceeded 180 days.

2023 Q1:  6 of 34 administrative investigations closed in this quarter exceeded 180 days.

According to PPB, 10 of 108 cases, or 9.3% are late.  PPB's reporting, as it has in the past, does not account for cases that exceed 180 days, but have not reached completion.  Thus, PPB's above-reported data does not account for all the open cases that are non-compliant with the 180-day deadline.  Nor does PPB's reporting account for administrative investigations that began after the City became aware of the allegations, as has occurred during this compliance assessment period.  An untimely start date skews the timeliness data for the length of the investigation, which the Agreement defines as starting from the receipt of the allegation.  *See* ECF 354-1, Am. Settlement Agreement, ¶ 121.

Also, PPB excludes IPR independent administrative investigations of alleged policy violations. Accordingly, PPB's self-assessment does not reflect all administrative investigations.

**IPR Self-Reporting**:  IPR reported on-time completion for its independent investigations dropped to 25% in the first quarter of 2022, climbed to 67% in the second quarter of 2022, and fell back to 60% in the third quarter of 2022:



IPR Quarterly Update Report, May 30, 2023, available at https://perma.cc/X8FE-T64B.  This rate of timeliness falls short of substantial compliance.  In addition, four IPR investigations of potential misconduct by Lieutenants and above during the 2020 protests are still ongoing and have now each exceeded 180 days.  See Paragraph 192 assessment below.  We appreciate the involved nature of those investigations and expect updates from the City on the progress in the next compliance assessment period.

**The City Did Not Timely Identify and Address Timeline Delays**:  The City's responses to our inquiries about timeline delays revealed that the City has known about sources of delays but did not meet Paragraph 123's requirements to "provide to DOJ a written review of the IA process, to identify the source of the delays and implement an action plan for reducing them." ECF 354-1, Am. Settlement Agreement, ¶ 123.  All 10 officer-involved shooting investigations since April 1, 2022 remain open.  *See* Item 46.pdf, Memo from PPB dated May 16, 2023.  The

City has said that eight of these consequential cases remain open because the City has not completed its own steps in the process, e.g., PRBs, training analyses, and responsible unit manager findings. *Id.* Separately, the City's responses indicate that it knew as early as December 28, 2022, that it did not have enough PRB facilitators. However, the City did not affirmatively raise the issue with DOJ until June 7, 2023. By then, the lack of facilitators had already caused monthslong delays and a backlog of accountability cases that could not be completed.

As of July 20, 2023, the City reports a code change that will allow the PPB discipline coordinator to serve as the PRB facilitator. We will assess this change in operation, specifically how the PPB employee effectively facilitates in an unbiased manner, as required by policy.

122. PPB shall conduct administrative investigations concurrently with criminal investigations, if any, concerning the same incident. All administrative investigations shall be subject to appropriate tolling periods as necessary to conduct a concurrent criminal investigation, or as otherwise provided by law, or as necessary to meet the CRC or PRB recommendation to further investigate.

| Status | Substantial Compliance |
|---|---|

As we said in our last report, the City remains in substantial compliance with Paragraph 122 because the City continues to allow appropriate tolling and apply approved procedures for concurrent criminal and administrative investigations, subject to tolling. *See* ECF 292-1, DOJ 6th Report, at 63. The Compliance Officer agrees. *See* ECF 364-1, COCL Q4 2022 Report, at 136; COCL Q1 2023 Report (draft), at 137, available at https://perma.cc/JJ3G-VB7C.

And, as we said in our October 2022 status report, "appropriate tolling," should include periodic contact with the prosecutor to ensure that any tolling is appropriate and that accused officers receive reasonably expedient processing of complaints. ECF 307, Pl.'s Status Report, at 8. During this compliance assessment period, we asked the City about the length of time to review some of the most consequential uses of force—lethal force. The City's responses indicate lengthy periods of review by outside prosecutors followed by delays in training analysis that are within PPB's control. To justify and potentially expedite lengthy tolling periods, we reiterate our prior recommendation that the City document communications with prosecutors in writing, including when the information was sought, who sought it, and what information was received in response. *Id.*

## B.    On Scene Public Safety Statements and Interviews

124. Within 90 days of the Effective Date, the City and PPB shall review its protocols for compelled statements to PSD and revise as appropriate so that it complies with applicable law and current professional standards, pursuant to *Garrity* v. *New Jersey*, 385 U.S. 493 (1967). The City will submit the revised protocol to DOJ for review and approval. Within 45 days of obtaining DOJ's approval, PPB shall ensure that all officers are advised on the revised protocol.

| Status | Substantial Compliance |
|---|---|

The City remains in substantial compliance with Paragraph 124.

> We continue to agree with the Compliance Officer that PPB's protocol for compelled statements complies with the requirements of this paragraph. *See* ECF 364-1, COCL Q4 2022 Report, at 138–139; COCL Q1 2023 Report (draft), at 139–140, available at https://perma.cc/JJ3G-VB7C. We have credited as evidence of compliance PPB's enactment and application of Directive 1010.10, Deadly Force and In-Custody Death Reporting and Investigation Procedures; SOP 7 – Deadly Force; In-Custody Death Investigations; and SOP 30 – Concurrent Administrative / Criminal Investigations. *See, e.g.*, ECF 212, DOJ Supplemental Report, at 10–11. PPB continues to implement these policies and procedures; however, Directive 1010.10 is out of date. *See* PPB Directive 1010.10, Deadly Force and In-Custody Death Reporting and Investigation Procedures, available at https://perma.cc/7CRN-S5CX (noting a review date of March 27, 2018). We expect the Parties to further discuss changes to Directive 1010.10 in the next compliance assessment period.

125. Separation of all witness and involved officers to lethal force events is necessary in order to safeguard the integrity of the investigation of that event. Immediately following any lethal force event, PPB shall continue to issue a communication restriction order ("CRO") to all witnesses and involved officers, prohibiting direct or indirect communications between those officers regarding the facts of the event. The CRO will continue, unless extended further, until the conclusion of the Grand Jury or, if no Grand Jury is convened, until a disposition is determined by the District Attorney.

| Status | Substantial Compliance |
|--------|------------------------|

> We agree with the Compliance Officer and find that the City has re-achieved substantial compliance with Paragraph 125 based on PPB providing the required CROs. *See* ECF 364-1, COCL Q4 2022 Report, at 139–140; COCL Q1 2023 Report (draft), at 140, available at https://perma.cc/JJ3G-VB7C.
>
> PPB self-reported 59 CROs issued during this compliance assessment period. *See* PPB Quarterly Update Report, May 15, 2023, at 370, available at https://perma.cc/M5E9-PSH6. There is usually a lag in the ability to assess the efficacy of CROs. We review the Category I force files as they reach the PRB process, which is substantially delayed. For the PRBs that occurred in this compliance assessment period, we reviewed the CROs. Where a question arose about three members who were listed as "witnesses" or "reviewed" members, the City did not issue CROs. However, the City's response to our inquiry was sufficient, i.e., those members did not personally witness or have firsthand knowledge of the use of force, so they are not "witnesses" under the applicable PPB policy. *See* PPB Directive 1010.10, Deadly Force and In-Custody Death Reporting and Investigation Procedures, available at https://perma.cc/7CRN-S5CX; *see also* DOJ Data Request #(7) #(55) at 4, provided July 5, 2023.
>
> As the City begins its body-worn camera (BWC) pilot program, the City must maintain controls on viewing recordings so as not to undermine the Agreement's prohibition on direct or indirect communication between officers in Category I use of force events. In future compliance assessment reports, we will assess the "audit trails" of BWC recordings, which will show who accessed the recordings and when the recordings were accessed.

126. PPB shall continue to require witness officers to lethal force events to give an on-scene briefing to any supervisor and/or a member of the Detective Division to ensure that victims,

suspects, and witnesses are identified, evidence is located, and provide any information that may be required for the safe resolution of the incident, or any other information as may be required.

| Status | Substantial Compliance |
|--------|------------------------|

PPB policy requires that witness officers to lethal force events give an on-scene briefing to any supervisor and/or a member of the Detective Division. *See* PPB Directive 1010.10, Deadly Force and In-Custody Death Reporting and Investigation Procedures, Procedure 2.1.2, available at https://perma.cc/7CRN-S5CX. When the City applied the process of asking witness officers for walk throughs and statements, the City reports that all those asked agreed to do so in the compliance assessment period. *See* PPB Quarterly Update Report, May 15, 2023, at 372–373, available at https://perma.cc/M5E9-PSH6.

127. In agreement and collaboration with the Multnomah County District Attorney, PPB shall request that involved officers in lethal force and in-custody death events provide a voluntary, on-scene walkthrough and interview, unless the officer is incapacitated.

| Status | Substantial Compliance |
|--------|------------------------|

The City remains in substantial compliance with Paragraph 127.

We continue to agree with the Compliance Officer that PPB is adhering to the requirements of this paragraph at lethal force and in-custody death events. *See* ECF 364-1, COCL Q4 2022 Report, at 141; COCL Q1 2023 Report (draft), at 142, available at https://perma.cc/JJ3G-VB7C. Uniformly, involved officers have declined voluntary, on-scene walkthroughs and interviews in each Category I use of force in the compliance assessment period. *See* PPB Quarterly Update Report, May 15, 2023, at 376–377, available at https://perma.cc/M5E9-PSH6.

## C.    Conduct of IA Investigations

128. Currently, both IPR and PPB's PSD have authority to conduct administrative investigations, provided that IPR interview of PPB Officers must only be conducted jointly with IA. Within 120 days of the Effective Date, the City will develop and implement a plan to reduce time and effort consumed in the redundant interview of witnesses by both IPR and IA, and enable meaningful independent investigation by IPR, when IPR determines such independent investigation is necessary.

| Status | Partial Compliance |
|--------|--------------------|

We agree with the Compliance Officer that the City remains in partial compliance with Paragraph 128. *See* ECF 364-1, COCL Q4 2022 Report, at 142–143; COCL Q1 2023 Report (draft), at 143–144, available at https://perma.cc/JJ3G-VB7C. As the Compliance Officer reports, the City has not yet overcome its capacity issues to deal with a records backlog that inhibited IPR's ability to meaningfully investigate allegations. COCL Q1 2023 Report (draft), at 143, available at https://perma.cc/JJ3G-VB7C.

Also, as the Compliance Officer reported in the second quarter of 2022, IPR had only 11 of 16 positions filled and was unable to hire additional personnel. *See* ECF 328-1, COCL Q2 2022 Report, at 157. We agree with the Compliance Officer that IPR's current work is inhibited by

> the strain facing staff who still do not know the extent of their future work given the forthcoming new accountability system.    COCL Q1 2023 Report (draft), at 144, available at https://perma.cc/JJ3G-VB7C.

129. The City and PPB shall ensure that all allegations of use of excessive force are subject to full and completed IA investigations resulting in findings, unless there is clear and convincing evidence to IPR that the allegation has no basis in fact.

| Status | **Partial Compliance** |
|--------|------------------------|

We agree with the Compliance Officer that the City remains in partial compliance with Paragraph 129.  *See* ECF 364-1, COCL Q4 2022 Report, at 143–144; COCL Q1 2023 Report (draft), at 144–146, available at https://perma.cc/JJ3G-VB7C.

PPB reports that in this compliance assessment period IPR closed five cases in the second quarter of 2022 for lack of merit or no misconduct; four cases in the third quarter of 2022 for lack of merit or no misconduct; two cases in the fourth quarter of 2022 for lack of complainant availability; and two cases in the first quarter of 2023 for no misconduct.  PPB Quarterly Update Report, May 15, 2023, at 383, available at https://perma.cc/M5E9-PSH6.

The Compliance Officer points to an allegation of excessive force that a supervisor did not report to the Professional Standards Division.  *See* ECF 364-1, COCL Q4 2022 Report, at 144.  We agree that this does not evidence compliance with Paragraph 129.

The Compliance Officer also points to a need for clear guidance if IPR determines to close a case for lack of complainant availability.  On July 7, 2023, IPR promulgated such guidance in a revised IPR Standard Operating Procedures (SOP), Chapter 2.3:

III. Use of Force

A. IPR investigators will identify and document all complaints alleging improper or excessive use of force by Portland Police Bureau officers.

B. IPR will not administratively close an allegation of inappropriate use of force unless there is clear and convincing evidence that the allegation has no basis in fact. In other words, there must be substantial evidence that the alleged force did not occur and by extension no need for a full administrative investigation. Such circumstances may include:

i. A record or piece of evidence that substantially shows the alleged force did not occur or that the officer was not a member of the Portland Police Bureau;

ii. Witness statements that substantially show the alleged force did not occur; and/or

iii. Complainant unavailability preventing facts of the allegation to be established.

C. Inability to identify an officer or contact the complainant shall not be used as the sole reason for closing a force allegation.

D. If, after due diligence, the complainant is nonresponsive to requests from IPR for an interview and IPR does not have enough information to identify an officer so it may take further investigative steps then a force allegation may be closed.

E. If an allegation of inappropriate use of force is closed because IPR is unable to interview the complainant and identify an officer:

    i. IPR will provide the following information to the complainant in the closure letter:

        1. Appropriate information regarding the reason(s) the allegation was closed,

        2. That the case will be reviewed if IPR is able to interview the complainant.

    ii. The purpose of the review is to determine if the investigation can be reopened and proceed to full administrative investigation after the complainant is interviewed;

    iii. If upon obtaining an interview with complainant, IPR is able to proceed with the investigation, IPR will reopen and IPR or IA will conduct a full administrative investigation;

    iv. If upon obtaining an interview with complainant, no information or evidence emerges that allows IPR to take further investigative steps, IPR will not reopen, and the investigation will remain closed; and

    v. If a full administrative investigation is conducted, the time during which the investigation was closed will not be counted for purposes of timeline reporting

We find the changed protocol a reasonable means of IPR determining when there is no basis to proceed because it also requires the re-opening of the investigation when evidence becomes available. However, as has been the case with assessing compliance with other provisions in past reports, merely having a policy or procedure does not equate to substantial compliance. Accordingly, the new IPR SOP is a helpful step toward compliance, but the City must evidence implementation of the SOP to re-achieve substantial compliance with Paragraph 129. *See* ECF 354-1, Am. Settlement Agreement, ¶ 33 (defining "implementation").

130. The City and PPB shall continue to expressly prohibit all forms of retaliation, including discouragement, intimidation, coercion, or adverse action, against any person who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct.

| Status | Substantial Compliance |
|--------|------------------------|

The City remains in substantial compliance with Paragraph 130.

We agree with the Compliance Officer's assessment that the City continues to adequately prohibit all forms of retaliation, including discouragement, intimidation, coercion, or adverse action, against any person who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct. ECF 364-1, COCL Q4 2022 Report, at 145; COCL Q1 2023 Report (draft), at 146, available at https://perma.cc/JJ3G-VB7C.

PPB has a previously DOJ-approved policy concerning a prohibition on retaliation. *See* PPB Directive 310.20, Discrimination, Harassment, and Retaliation Prohibited, available at https://perma.cc/9D29-VWVP.  That policy was due for review on May 15, 2021. *Id*.  PPB has listed that policy as in "Executive Reconciliation" since the third quarter of 2021. *See* PPB Quarterly Update Report, May 15, 2023, at 385, available at https://perma.cc/M5E9-PSH6.  PPB should complete revision of this policy.

131. The City and PPB shall retain Police Review Board procedures currently utilized for purposes of investigation and making recommended findings on administrative complaints, except as outlined below:

a. Currently, seven voting members of the PRB review use of force incidents, including two citizen members. When PRB reviews uses of force case, one of the two citizen member slots shall be drawn from the Citizen Review Committee members.

b. The CRC slot on the PRB in use of force cases will rotate among the CRC membership so that different CRC members participate on the PRB. Within 60 days of the Effective Date, the Auditor shall develop a membership rotation protocol.

c. All members participating in the PRB must maintain confidentiality and be able to make thoughtful, unbiased, objective recommendations to the Chief of Police and Police Commissioner that are based on facts, consistent with PRB city code provisions and "just cause" requirements set forth in Portland City Charter, City rules, and labor agreements.

d. Cases in which the member elects, with the concurrence of the Chief and the Police Commissioner, to accept the investigative findings and recommended discipline. This option will only be available to a member following implementation of code language which shall require at a minimum a full investigation of the alleged misconduct, issuance of the investigative findings, and concurrence with the findings by the Independent Police Review, the Professional Standards Division and the member's Branch Chief.  The scope of cases eligible for stipulated discipline shall be identified in the authorizing code, and cases involving alleged used of excessive force, cases involving alleged discrimination, disparate treatment or retaliation, reviews of officer involved shootings and in-custody deaths, and cases in which the Chief or the Police Commissioner does not agree to accept the member's proposed stipulation to findings and recommended discipline shall not be eligible for stipulated findings and recommended discipline.

e. All community members and CRC members must meet the following qualifications to participate on the PRB:

i. Pass a background check performed by the Bureau.

ii. Participate in Bureau training to become familiar with police training and policies, including the PRB process.

iii. Sign a confidentiality agreement.

iv. Participate in ride-alongs to maintain sufficient knowledge of police patrol procedures.

f. Current city code provides that the City Auditor and the Chief have authority to recommend to City Council the removal of citizen members from the PRB pool.  Likewise, the City Auditor or Chief shall have authority to recommend to City Council removal of a CRC member from

serving on the PRB.  The Chief or the City Auditor may recommend that City Council remove a community member or member of the CRC from the pool for the following reasons:

    i. Failure to attend training;

    ii. Failure to read Case Files;

    iii. Objective demonstration of disrespectful or unprofessional conduct;

    iv. Repeated unavailability for service when requested;

    v. Breach of confidentiality;

    vi. Objective demonstration of bias for or against the police; or

    vii. Objective demonstration of conflict of interest.

g. Removal from participation in the PRB shall not affect CRC membership.

h. Like current PRB citizen members, CRC members serving on the PRB may serve in that capacity for no more than three (3) years.

i. A CRC member who participates in a PRB review shall recuse himself/herself during any later appeal of the same allegation(s) to the CRC.

| Status | **Partial Compliance** |
|---|---|

The City is still partially compliant with Paragraph 131 because PPB continued to improperly implement the required PRB procedures during this compliance assessment period.

We agree with the Compliance Officer's assessment that PPB's use of the PRB process has been inadequate to meet the requirements of the Agreement.  ECF 364-1, COCL Q4 2022 Report, at 146–147; COCL Q1 2023 Report (draft), at 147–148, available at https://perma.cc/JJ3G-VB7C. PPB has simply not completed PRBs for numerous cases, as described above in the discussion of PRB delays for lack of facilitators.  *See* Paragraph 123 assessment above.

Paragraph 131 meaningfully retains the PRB requirements that existed when the Parties signed the initial version of the Agreement in this case.  *See* ECF 4-1, Settlement Agreement, ¶ 131. Accordingly, the City's obligations under Paragraph 131 include the implementation of processes contained in PPB's policy for PRBs.  *See* PPB Directive 336.00, Police Review Board, available at https://perma.cc/LV98-EXXU.[9]

PRBs are PPB's means of reviewing certain administrative investigations that could result in discipline as well as the most consequential uses of force and injuries, including:

    1.1.3.1. Officer involved shooting;

    1.1.3.2. In-Custody Death;

---

[9] The PRB policy should have been reviewed by April 25, 2021.  *See* PPB Directive 336.00, Police Review Board, available at https://perma.cc/LV98-EXXU.

1.1.3.3. Proposed sustained finding for out-of-policy deployment of less-lethal weapons; or

1.1.3.4. Physical injury caused by a member that requires hospital admission.

*Id.*, Procedure 1.1.3. Accordingly, PRBs are not just a step in the disciplinary process, but part of PPB's force analysis and assessment of potentially low frequency but high-impact events.

**PRB Observations:** During this compliance assessment period we observed several PRBs. With one exception, PPB provided us with an extensive case file before each PRB. We meticulously reviewed the case files and silently observed the deliberations. Although we do not disclose the PRB deliberations to the public, we discuss the deliberations with counsel for the City to understand what occurred and offer constructive criticism about the City's attempted implementation of processes mandated by the Agreement.

To help the City re-achieve substantial compliance, we convened two separate "accountability summits," provided several written questions during the compliance assessment period, and consolidated unanswered questions into an omnibus request for information to address unresolved accountability issues. These issues included: justification for each round fired in a critical force event; the RRT slide investigations; unfulfilled document requests; potential collateral misconduct; untimely investigations; interference with officer interviews by representatives; holding supervisors accountable for their force reviews; separate officer interviews; arbitration submissions; training recommendations; CROs; and explanations for delays in force reviews. Some of these issues are still unresolved.

As we described in the discussion of Section VIII and Paragraph 169, above, the PRB for 2021-B-0032 did not address the justification for each of the 15 rounds fired, including the round fired at the stopped vehicle, and the PRB did not adequately assess the policy restrictions on firing at moving vehicles or the backdrop of rounds—namely the downrange officer. We also noted in PRBs that supervisors were not held accountable for assessing each use of force in an incident (2021-C-0032; 2020-B-0027). We observed force investigations that are subject to PRBs be undercut by interference during officer interviews. For example, officer representatives changed questions, coached answers, and argued with interviewers (2020-C-0041). And we observed a supervisor not held accountable after failing to separately interview officers, as required by PPB policy (2020-B-0027). Accordingly, the PRBs we observed and the City's responses to issues we raised do not evidence substantial compliance with Paragraph 131.

**PRB Membership:** We worked cooperatively with the City to help address its need for civilian members for PRBs. The City asked whether DOJ would object to assigning two Citizen Review Committee (CRC) members to conduct PRBs rather than one CRC and one other civilian who is not a member of CRC. We read Paragraph 131(a) to modify the prior PRB process and to set a floor of at least one civilian member who is a CRC member, but not limit whether the other member is also a CRC member. Accordingly, we did not object to two CRC members participating in PRBs where there are no other civilians available. The City also presented adequate data showing effective recruiting for PPB peer members to serve on PRBs. *See* response to request 50, "PRB Peer Volunteer Additions Since 4/1/22 (undated).

**PRB Recommendations:** In addition to discipline considerations, PPB uses PRBs to make recommendations on policy, training, and tactics. Because PPB did not convene many PRBs that should have occurred in this compliance period, PPB did not fulfill its obligation to use

PRBs for systemic assessments. Also, PPB did not act on a consequential PRB recommendation in this compliance assessment period. The PRB recommended training on criteria to determine who should be an incident commander at a quickly evolving incident. This recommendation was in line with DOJ's prior written critique of a consequential officer-involved shooting and DOJ's written comment and in-person meeting regarding a training about supervisors' incident management, called "Beyond the 4 C's". We asked about this recommendation because the issue has been outstanding for a number of years. The City's response did not evidence that PPB implemented the PRB policy requirement to document actions taken in response to the recommendations. *See* PPB Directive 336.00, Police Review Board, Procedure 6.1.9, available at https://perma.cc/LV98-EXXU. This is an important recommendation that PPB should consider implementing. *See id.*

**PRB Policy Implementation:** We also reach the same finding as our prior report with respect to PPB's PRB policy.

> We previously concluded that PPB properly incorporated Paragraph 131's requirements in Directive 336.00 – Police Review Board, and Directive 337.00 – Police Review Board Personnel Selection. ECF 236-1, DOJ 5th Periodic Compliance Assessment Report, at 58. The policies establish partial compliance, but the City must fully implement the policies to re-achieve substantial compliance.

ECF 292-1, DOJ 6th Report, at 70.

132. By majority vote, the PRB may request that investigations of misconduct be returned to its investigating entity, i.e. PSD or IPR, to complete the investigation as to factual matters necessary to reach a finding regarding the alleged misconduct. The investigating entity must make reasonable attempts to conduct the additional investigation or obtain the additional information within 10 business days or provide a written statement to the PRB explaining why additional time is needed.

| Status | Substantial Compliance |
|---|---|

The City remains in substantial compliance with Paragraph 132. We continue to agree with the Compliance Officer that the City has empowered the PRB to send back an issue for further factual development. *See* ECF 292-1, DOJ 6th Report, at 70; ECF 364-1, COCL Q4 2022 Report, at 147; COCL Q1 2023 Report (draft), at 148–149, available at https://perma.cc/JJ3G-VB7C.

PPB has incorporated Paragraph 132's requirements in Directive 336.00. We did not observe a PRB exercise this authority during this compliance period. PPB reports that no PRBs have returned a reviewed matter for additional investigation in this compliance assessment period. *See* PPB Quarterly Update Report, May 15, 2023, at 389, available at https://perma.cc/M5E9-PSH6.

133. If an officer's use of force gives rise to a finding of liability in a civil trial, PPB shall: (1) enter that civil liability finding in the EIS; (2) reevaluate the officer's fitness to participate in all current and prospective specialized units; (3) if no IA investigation has previously been conducted based upon the same allegation of misconduct and reached an administrative finding, conduct a full IA investigation with the civil trial finding creating a rebuttable presumption that the force used also

violated PPB policy, which presumption can only be overcome by specific, credible evidence by a preponderance of evidence; (4) if an IA investigation has already concluded based upon the same allegation of misconduct and failed to reach a sustained finding, identify whether any new evidence exists in the record of the civil trial to justify the reopening of the IA investigation, and if so, reinitiate an IA investigation; and (5) if an IA investigation has already concluded based upon the same allegation of misconduct and failed to reach a sustained finding, and no new evidence from the civil trial justifies reopening the IA investigation, work with IPR to identify the reason why the administrative finding was contrary to the civil trial finding and publish a summary of the results of the inquiry.

| Status | Substantial Compliance |
|---|---|

The City remains in substantial compliance with Paragraph 133.  We continue to agree with the Compliance Officer that PPB is properly implementing SOP 32 and SOP 42, which incorporate the requirements this paragraph.  *See* ECF 364-1, COCL Q4 2022 Report, at 148–149; COCL Q1 2023 Report (draft), at 149, available at https://perma.cc/JJ3G-VB7C.

As the Compliance Officer correctly points out, PPB had a finding of liability in the fourth quarter of 2022.  ECF 364-1, COCL Q4 2022 Report, at 148–149.  Thus, Paragraph 133's provisions applied to the judicial finding.  On October 4, 2022, a jury found in favor of a plaintiff who allegedly suffered a broken arm after being pushed by PPB during 2020 protests.  *See Wenzel v. Portland*, Oregon Circuit Court, Multnomah County, 20-CV-37166, Complaint, available at https://perma.cc/DV4Y-F45P.  On the day of the verdict, we inquired with the City about its application of Paragraph 133.  IPR responded that it had previously opened an investigation based on the plaintiff's tort claim notice to the City, but administratively closed the investigation when IPR could not identify an officer and the plaintiff's attorney declined an interview.  Based on the verdict, however, IPR reopened the investigation (citing 2020-C-0312).  As the Compliance Officer correctly points out, the City did not identify the officer that used force.  *See* ECF 364-1, COCL Q4 2022 Report, at 148.  Nonetheless, absent a subject officer, the City completed an investigation, though the City could not evaluate the unknown officer's fitness to participate in all current and prospective specialized units as Paragraph 133 part (2) would require.

## D.    CRC Appeals

134. The City shall expand the membership of the CRC to 11 members, representative of the many and diverse communities in Portland, who are neutral, unbiased, and capable of making objective decisions. The quorum of CRC members necessary to act may remain at its existing level.

| Status | Substantial Compliance |
|---|---|

We continue to find that the CRC's membership is properly composed and the CRC operates pursuant to allowable rules.  ECF 292-1, DOJ 6th Report, at 71; *see also* CRC, Meeting Minutes and Meeting Recordings, available at https://perma.cc/J9WL-M7H5.

135. The City and PPB agree that the CRC may find the outcome of an administrative investigation is unreasonable if the CRC finds the findings are not supported by the evidence.

136. In its review process for purposes of the appeal, the CRC may make one request for additional investigation or information to the investigating entity, i.e. PSD or IPR at any point during its review. The investigating entity must make reasonable attempts to conduct the additional investigation or obtain the additional information within 10 business days or provide a written statement to the CRC explaining why additional time is needed. The request for additional investigation or information may contain multiple points of inquiry, but no follow-up requests will be permitted. The additional request be voted on by a quorum, the members voting must have read the Case File in order to vote, and any request with multiple points of inquiry must be prioritized.

| Status | Substantial Compliance |
|--------|------------------------|

The City remains in substantial compliance with Paragraphs 135 and 136. We agree with the Compliance Officer's assessment that the City has memorialized the CRC's authority to conduct appeals in city code. *See* ECF 364-1, COCL Q4 2022 Report, at 151; COCL Q1 2023 Report (draft), at 151–152, available at https://perma.cc/JJ3G-VB7C. We previously reported that the CRC's governing regulations incorporate the requirements of these paragraphs. ECF 236-1, DOJ 5th Report, at 59–60; ECF 292-1, DOJ 6th Report, at 72–73. There were no appeals in this compliance assessment period.

## E.    Discipline

137. Within 60 days of the Effective Date, PPB and the City shall develop and implement a discipline guide to ensure that discipline for sustained allegations of misconduct is based on the nature of the allegation and defined, consistent, mitigating and aggravating factors and to provide discipline that is reasonably predictable and consistent.

| Status | Substantial Compliance |
|--------|------------------------|

In our last compliance assessment report, we stated: "To re-achieve substantial compliance the City must implement the applicable discipline guide with fidelity to its requirements." ECF 292-1, DOJ 6th Report, at 74. In this compliance assessment period, we have seen positive efforts to understand and apply the new guide in the PRB process. The Compliance Officer's most recent assessment included a review of corrective action recommendations. Nine of ten recommendations reviewed contained appropriate application of mitigating and aggravative factors and consideration of disciplinary history, all as required by PPB's current corrective action guide. Based on this and our assessments of PRBs, we find that the City has achieved substantial compliance with Paragraph 137. And, we agree with the Compliance Officer's recommendation that PPB still needs to revise Directive 338.00, publicly post the directive, and provide a link to the Corrective Active Guide, rather than rely on PPB's current interim Executive Order. Though we expect the City should timely fulfill this recommendation, we do not find the City in partial compliance for the delay.

## F.    Communication with Complainant and Transparency

138. Within 180 days of the Effective Date, the City shall enhance its existing website to ensure that a complainant can file and track his or her own complaint of officer misconduct.

139. Within 120 days of the Effective Date, the City shall review its protocols to ensure that the City shares with complainants requested documentation about his or her own complaint to the extent permitted by law.

140. The City shall ensure that IPR provides each complainant a tracking number upon receipt of the complaint, informs each complainant of the complaint classification, assignment (precinct or IA) and outcome of the complaint (sustained, unproven, etc.) in writing (whether mail, email/text, or fax), including information regarding whether the City took any corrective action.  The City Attorney's Office shall determine whether disclosures regarding corrective action are required on a case-by-case basis consistent with Oregon's Public Records Law.

| Status | Substantial Compliance |
|--------|------------------------|

The City remains in substantial compliance with Paragraphs 138, 139, and 140.  We continue to share the Compliance Officer's assessment that the City is ensuring the required communication and transparency for complainants.  *See* ECF 364-1, COCL Q4 2022 Report, at 153–154; COCL Q1 2023 Report (draft), at 153–155, available at https://perma.cc/JJ3G-VB7C.

IPR's website continues to allow complainants to check the status of their complaints by entering their complaint number or the complainant's identifying information.  IPR, Complaint Status Request Form, available at https://perma.cc/P3A2-FM3P.  IPR's website has a highly visible link titled "IPR Complaint Status Request" to reach the form.  *See* City of Portland, IPR, available at https://www.portland.gov/ipr.

**United States v. City of Portland**

**DOJ's Seventh Periodic Compliance Assessment Report**

SECTION IX – COMMUNITY ENGAGEMENT AND CREATION OF
PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING (PCCEP)

| Obligation | Compliance Ratings by DOJ Report | | | | |
| --- | --- | --- | --- | --- | --- |
| | 4th Report[10] ECF 195-1, 5/4/2019 | Supp. Report ECF 212, 1/24/2020 | 5th Report ECF 236-1, 2/10/2021 | 6th Report ECF 292-1, 6/30/2022 | 7th Report ECF 369-1, 8/8/2023 |
| Para. 141: Create PCCEP | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| Para. 142: PCCEP authority and PCCEP Plan | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| Para. 143: PCCEP membership | Substantial Compliance | Substantial Compliance | Substantial Compliance | Partial Compliance | Substantial Compliance |
| Para. 144: PCCEP administrative support | Substantial Compliance | Substantial Compliance | Substantial Compliance | Partial Compliance | Substantial Compliance |
| Para. 145: PPB work with PCCEP | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| Para. 146: Representative community survey | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |

---

[10] The Parties agreed to substantial revisions of Section IX in 2017, which the Court conditionally approved in 2018 and we initially evaluated in our Fourth Periodic Compliance Assessment Report, filed on May 4, 2019.

| Obligation | Compliance Ratings by DOJ Report | | | | |
| --- | --- | --- | --- | --- | --- |
| | 4th Report ECF 195-1, 5/4/2019 | Supp. Report ECF 212, 1/24/2020 | 5th Report ECF 236-1, 2/10/2021 | 6th Report ECF 292-1, 6/30/2022 | 7th Report ECF 369-1, 8/8/2023 |
| Para. 147: Base precinct outreach strategies on demographic data | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| Para. 148: Collect and report on PPB stops data | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| Para. 149: Metrics to evaluate PPB community engagement | Partial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| Para. 150: PPB Annual Report and precinct meetings | Partial Compliance | Substantial Compliance | Partial Compliance | Substantial Compliance | Substantial Compliance |
| Para. 151: PCCEP to meet as necessary to accomplish the PCCEP Plan objectives | Substantial Compliance | Substantial Compliance | Substantial Compliance | Partial Compliance | Partial Compliance |
| Para. 152: PCCEP training | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance | Substantial Compliance |

## IX.    COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED-POLICING

There is significant community and City interest in improving PPB's community relationships. The community is a critical resource. Soliciting community input regarding PPB's performance, while also enhancing PPB's current community outreach efforts, will promote community confidence in PPB and facilitate police/community relationships necessary to promote public safety.

141. To leverage the ideas, talent, experience, and expertise of the community, the City, in consultation with DOJ, shall establish a Portland Committee on Community Engaged-Policing (PCCEP), within 90 days of the Effective Date of the relevant amendments to this Agreement.

| Status | Substantial Compliance |
|---|---|

We have found the City to be in substantial compliance with Paragraph 141 since 2019.  *See* ECF 195-1, DOJ 4th Report, at 68–69.

The City created the PCCEP and PCCEP Plan on August 24, 2017.  ECF 169-4, Council Ordinance No. 188570; ECF 169-9, PCCEP Plan.  On September 26, 2018, the City appointed PCCEP's inaugural membership.  *See* ECF 200, Decl. of Nicole Grant, ¶¶ 3–7 & Exs. 1–3.  The PCCEP has operated since then.  *See* PCCEP, available at https://perma.cc/W2MJ-DG7E.

142. The PCCEP shall be authorized to: (a) solicit information from the community and the PPB about PPB's performance, particularly with regard to constitutional policing; (b) make recommendations to the Chief, Police Commissioner, the Director of the Office of Equity and Human Rights, and community and, during the effective period of this Agreement, to the DOJ; (c) advise the Chief and the Police Commissioner on strategies to improve community relations; (d) contribute to the development and implementation of a PPB Community Engagement Plan; and (e) receive public comments and concerns.  The composition, selection/replacement process and specific duties of the PCCEP shall be set forth in a separate Plan for Portland Committee on Community-Engaged Policing ("the PCCEP Plan") which shall be substantially similar to Exhibit 1 to this Agreement.  Amicus AMAC and Intervenor PPA shall be consulted regarding and DOJ shall review and approve any amendments to the PCCEP Plan proposed to occur during the effective period of this Agreement.

| Status | Substantial Compliance |
|---|---|

We have found the City to be in substantial compliance with Paragraph 142 since 2019.  *See* ECF 195-1, DOJ 4th Report, at 69.

The City has twice amended the PCCEP Plan.  *See* Council Resolution 37470, Dec. 18, 2019, available at https://perma.cc/W8AH-TVMJ; Council Ordinance 27284, Sept. 5, 2018, https://perma.cc/XDJ4-N4DG.  The PCCEP Plan now in effect is Exhibit 1 to the Agreement.[11]

---

[11] The current version of the PCCEP Plan is also accessible on the PCCEP's website.  *See* PCCEP, *Exhibit 1: City of Portland Plan for PCCEP*, available at https://perma.cc/J99W-59Q9.

> ECF 354-1, Am. Settlement Agreement, at 66–75. The Plan sufficiently authorizes the PCCEP to perform the required functions. *See id.* at 67, 71-75.

143. PCCEP's membership will come from a reasonably broad spectrum of the community. PCCEP members shall not have an actual or perceived conflict of interest with the City of Portland.

| Status | Substantial Compliance |
|---|---|

The City re-achieved substantial compliance with Paragraph 143 by filling four longstanding vacancies on the PCCEP. *See* ECF 292-1, DOJ 6th Report, at 77. The PCCEP Plan provides that the PCCEP will have 13 members, two of whom will be youth, defined as people between 16 and 23 years old. *See* ECF 354-1, Am. Settlement Agreement, at 68. The Mayor's Office has exclusive authority to appoint new members and City Council has confirmation authority. *See id.* at 68-69. No one else can perform those essential functions.

The City has had difficulty ensuring adequate membership for the PCCEP. For most of the past 18 months, the PCCEP had between two and six vacancies. The City has often deprioritized its obligation fill PCCEP vacancies, and, at times, the City has acknowledged that it was failing to discharge its responsibilities under the PCCEP Plan. *See, e.g.*, PCCEP, Full Committee Meeting, YouTube (Mar. 30, 2022), available at https://perma.cc/PK62-GAKB (1:26:00 to 1:44:00, remarks of City officials regarding recurring and persistent issues with PCCEP staffing and membership vacancies).

The City took steps to reverse course during this reporting period. Between June and September 2022, the City appointed four new members who have been actively engaged with the mission and contributing to the work. The City appointed other members, including two youth members, who were removed after not speaking with staff or attending meetings. As of May 2023, the PCCEP had 11 members. *See* PCCEP, Members, available at https://perma.cc/2MYH-VXAQ. The two designated seats for youth members were filled in September 2022, but vacant again by November 2022. The PCCEP has not had an active youth member since January 2021. The City reports that it expects to fill the two remaining PCCEP vacancies in the coming months.

To sustain substantial compliance, the City must fill PCCEP's open seats on a timely basis.

144. The City shall provide administrative support so that the PCCEP can perform the duties and responsibilities identified in this Agreement and in the PCCEP Plan.

| Status | Substantial Compliance |
|---|---|

The City has re-achieved substantial compliance with Paragraph 144 by hiring, retaining, and adequately supervising sufficient qualified staff to administratively support the PCCEP.

Turnover among PCCEP staff and within the Mayor's Officer had negatively impacted the City's compliance with Section IX of the Agreement. *See, e.g.*, ECF 292-1, DOJ 6th Report, at 75, 77–78. The City took steps to resolve the issue during this compliance assessment period, including by centralizing administrative staff. The City moved PCCEP support staff from the Office of Equity and Human Rights to the Community Safety Division, which staffs, supervises, and administratively supports other volunteer groups that make public safety-related recommendations, including the Police Accountability Commission (PAC) and Focused

Intervention Team Community Oversight Group (FITCOG). *See generally* Community Safety Division, available at https://perma.cc/B3YR-C9WA; PAC, available at https://perma.cc/ENF5-A9FF; FITCOG, available at https://perma.cc/TGG7-4N44. However, as of June 2023, the Community Safety Division's website does not list PCCEP among its related offices, programs, advisory groups, and projects.

The PCCEP benefited from having a consistent Project Director who had a consistent supervisor, both of whom provided effective support in this compliance assessment period. The PCCEP also had a stable Mayor's Office liaison. The City continues to host a dedicated website for PCCEP, which contains links to information, events, and documents that memorialize the PCCEP's work. *See* PCCEP, available at https://perma.cc/89ZA-QXNU. PCCEP staff have been generally responsive to community ideas about the content of the PCCEP website; they can be contacted at PCCEPInfo@portlandoregon.gov. The City also continues to provide a Zoom account to enable community members to attend PCCEP meetings remotely. Meetings have been recorded and are posted online. *See* PCCEP YouTube Channel, available at https://perma.cc/BL7J-NJJ9. The PCCEP recently held hybrid meetings, gathering in person for the first time since the onset of the COVID-19 pandemic (with a Zoom option to attend remotely). *See* PCCEP, In-Person Viewing Event for COCL Selection Town Hall, May 17, 2023, available at https://perma.cc/WU7F-GZH9; PCCEP, Settlement and Policy Subcommittee Meeting / Review of PPB Annual Report, June 14, 2023, available at https://perma.cc/3H6Z-QRSU. In-person meetings should help to build group cohesion and strengthen PCCEP member ties to community attendees, PPB, and the City.

Over the past year, PCCEP staff and staff supervision have significantly improved the City's administrative support for the PCCEP. The PCCEP, in turn, has been able to discharge more of its duties and responsibilities. We agree with the Compliance Officer that the City has re-achieved substantial compliance with the requirements of Paragraph 144, but to maintain substantial compliance, the City must continue to provide adequate staffing and supervision to enable the PCCEP to perform its mission. *See* ECF 364-1, COCL Q4 2022 Report, at 160–161.

145. To ensure constitutional policing, to closely interact with the community to resolve neighborhood problems, and to increase community confidence, PPB shall work with City resources knowledgeable about public outreach processes and the PCCEP to improve its engagement with the community.

| Status | Substantial Compliance |
|--------|------------------------|

We have found the City in substantial compliance with Paragraph 145 since 2019. *See* ECF 195-1, DOJ 4th Report, at 70–71.

For years, PPB has consistently worked with City resources knowledgeable about public outreach processes, community partners, and the PCCEP to improve its community engagement efforts. PPB regularly engages the public through faith-based groups, training and educational workshops, advisory councils and boards, cultural events, sporting activities, and neighborhood meetings. *See, e.g.*, PPB, Police Community Outreach, available at https://perma.cc/VUT4-TKY8; PPB, Advisory Groups, available at https://perma.cc/9KY5-WN4L. Members of PPB's command staff, including PPB's Inspector General and Compliance Coordinator, routinely attend PCCEP monthly meetings and subcommittee meetings.

> We agree with the Compliance Officer that PPB's continued community engagement efforts have maintained the City's substantial compliance with this paragraph. *See* ECF 364-1, COCL Q4 2022 Report, at 161–166.

146. Within 120 days of the effective date of the relevant Amendments to this Agreement, the City, in consultation with the PCCEP, will conduct another reliable, comprehensive and representative survey of members of the Portland community regarding their experiences with and perceptions of PPB's community outreach efforts and accountability efforts and where those efforts could be improved, to inform the work of the PCCEP and the development and implementation of the Community Engagement Plan.

| Status | Substantial Compliance |
|--------|------------------------|

> We have found the City in substantial compliance with Paragraph 146 since 2020. *See* ECF 212, DOJ Supplemental Compliance Report, at 24.
>
> In 2019, DHM Research conducted the required survey, prepared a report, and presented its analysis to the PCCEP. *See* DHM Research, *City of Portland Community Policing – Mail Survey*, February 2019, available at https://perma.cc/YCK3-HJKG. DHM presented its findings at the PCCEP's July 2019 monthly meeting. *See* PCCEP, Full Committee Meeting, YouTube, July 23, 2019, available at https://perma.cc/B2DT-RS9K. With the PCCEP's input, the City then adopted PPB's five-year Community Engagement Plan, which identifies goals in the areas of public involvement, communication, access, and training. *See* PPB, *Community Engagement Plan,* available at https://perma.cc/J5DR-RYJF. The Plan is designed to evolve over time, with continued input from the PCCEP.
>
> PCCEP has not recently engaged with PPB to understand how the Community Engagement Plan is being implemented and whether it should be modified or supplemented. As PPB enters the fourth year of the five-year Plan, it should affirmatively seek input from its City and community partners, including the PCCEP, to evaluate and improve on the Community Engagement Plan.

147. PPB shall continue to collect appropriate demographic data for each precinct so that the Precinct Commander, considering any input from the PCCEP, may develop outreach and policing programs specifically tailored to the residents of the precincts. The data shall also be provided to PCCEP to inform its work.

| Status | Substantial Compliance |
|--------|------------------------|

> We have found the City in substantial compliance with Paragraph 147 since 2019. *See* ECF 195-1, DOJ 4th Report, at 71.
>
> PPB routinely posts on its website the required demographic data from the U.S. Census Bureau's American Community Survey. *See, e.g.*, PPB, Open Data, *Precinct Demographics*, available at https://perma.cc/V6QW-ZXWD; *see generally* U.S. Census Bureau, available at https://perma.cc/6RBU-BZ42. The data is available to the PCCEP.
>
> In 2019, the Compliance Officer detailed how PPB precinct commanders use demographic data to tailor outreach and policing programs. ECF 196-1, COCL Q4 2019 Report, at 45. We have

not seen more recent evidence showing whether and how today's different precinct commanders use demographic data. We also have not seen evidence of the PCCEP providing input to commanders on how to develop or tailor outreach programs based on precinct demographic data. However, the City has authorized the PCCEP to review, evaluate, and recommend improvements to PPB's Community Engagement Plan and to advise on strategies to improve community relations.

Despite our continuing concern that precinct demographic data is not being used as intended, we share the Compliance Officer's assessment that the City has maintained substantial compliance with this paragraph because PPB is collecting and publicly posting the data on its website. *See* ECF 364-1, COCL Q4 2024 Report, at 166–168.

148. PPB shall continue to require that officers document appropriate demographic data regarding the subjects of police encounters, including the race, age, sex and perceived mental health status of the subject, and shall provide such information to the PCCEP and make such information publicly available to contribute to the analysis of community concerns regarding discriminatory policing. PPB shall consider enhancements to its data collection efforts, and report on its efforts to enhance data collection to the DOJ by no later than December 31, 2013, and quarterly thereafter.

| Status | Substantial Compliance |
|--------|------------------------|

We have found the City in substantial compliance with Paragraph 148 since 2019. *See* ECF 195-1, DOJ 4th Report, at 72.

PPB requires officers to document appropriate demographic data, which PPB reports quarterly. Data through the first quarter of 2023 is publicly available on PPB's website. PPB, Open Data, *Stops Data Collection Reports*, available at https://perma.cc/6YL9-BWJ9. PPB publishes a yearly report with greater analyses of the stops data. The 2021 Annual Report continues to show significant disparities in stops and searches of racial minorities. *See* PPB Strategic Services Division, *Stops Data Collection 2021 Annual Report* (July 1, 2022), available at https://perma.cc/333A-3NGL. The PCCEP has received this data and devoted several meetings to the issue of discriminatory policing. In September 2022, the PCCEP hosted a presentation and discussion about the stops data, attended by PPB personnel knowledgeable about the Stops Data reports and representatives from the Chief's Office. *See* PCCEP, PCCEP September 2022 Public Meeting, available at https://perma.cc/WG2R-E7AC.

PPB's Open Data program is a significant ongoing effort to enhance data collection and public reporting. *See generally* PPB, Open Data, available at https://perma.cc/WK59-LUJN. The Open Data webpage has links to numerous reports and interactive dashboards that allow the public access to a broad range of statistics related to PPB operations, including use of force by officers, officer-involved shootings, dispatched calls for service, staffing and overtime, reports of bias-related crimes, and general crime statistics.

We agree with the Compliance Officer that PPB's efforts are sufficient to maintain substantial compliance with Paragraph 148. *See* ECF 364-1, COCL Q4 2024 Report, at 166–168.

149. The COCL, PPB, and DOJ will jointly develop metrics to evaluate community engagement and outreach. PCCEP may review these metrics and may suggest additional metrics to DOJ and PPB.

| Status | Substantial Compliance |
|--------|------------------------|

We have found the City in substantial compliance with Paragraph 149 since 2020. *See* ECF 212, DOJ Supplemental Compliance Report, at 26.

In 2019, PCCEP recommended changes to the jointly developed metrics for evaluating community engagement and outreach, which were adopted. The five current metrics are:

**1. Survey data detailing public trust and confidence in PPB.** PPB is expected to continue to engage with diverse community members in a manner that is fair (unbiased), respectful, and helpful. Public perceptions of the PPB and the performance of its officers are considered important metrics, as they affect public trust and confidence in the police. These can be measured through community and/or contact surveys.

**2. Communication with the public**. The PPB is expected to maintain and continue to establish conduits of information to encourage the bi-directional flow of information between the community and the PPB. These can be measured through the presence, quality, and quantity of information available on PPB's website and social media outlets.

**3. Collective engagement with the community through boards, commissions, committees, and other stakeholder forums/groups/meetings**. PPB is expected to continue to participate in a wide range of public events and groups for purposes of accountability, transparency, and public education. This participation could be measured through the presence, quality, and quantity of PPB participation in these collective events. PPB is expected to report on strategies used to engage with communities that have historically been difficult to reach, including but not limited to, people with mental illness and houseless individuals.

**4. Regular reporting to the community on PPB activities**. In the interest of transparency and public education, PPB is expected to continue to report regularly to the community regarding its activities and events in the realm of community engagement (including #3 above). These can be measured through the presence, quality, and quantity of information contained in PPB's reports, website and social media outlets. PPB reports should note situations in which Bureau members engage with the community in an official capacity, but out of their patrol uniform. In addition, reports should note significant changes year over year, including number and type of contacts, to allow for historical comparison.

**5. Integrating best practices from police departments across the country and around the world**. PPB is expected to report on efforts made to identify learnings from other departments and integrate those learnings into the Bureau's community engagement work. This metric includes, but is not limited to, attendance at conferences outside of Portland, training by personnel from outside of Portland, and changes to policies and practices inspired by learnings from other jurisdictions.

PPB's Community Engagement Plan addresses these metrics. *See* PPB, *Community Engagement Plan,* available at https://perma.cc/J5DR-RYJF. But the Plan is not readily

discoverable on PPB's website or highlighted on any City webpage. And there is no evidence that PPB has applied the agreed upon metrics or otherwise evaluated its implementation of the Plan. The PCCEP is tasked with holding PPB accountable to its community engagement strategies, and PPB has pledged to work with the PCCEP to evaluate and modify the Plan as needed. *See* ECF 354-1, Am. Settlement Agreement, at 67, 71–74. However, the PCCEP has not recently reviewed the metrics or applied them to the implementation of PPB's five-year Community Engagement Plan.

We continue to support the Compliance Officer's recommendation, endorsed by the TAC and the PCCEP, that the City introduce a permanent contact survey program to solicit feedback from those who are subject to police encounters, to measure PPB's efforts to incorporate procedural justice into policy and practice, and to evaluate and improve performance. *See* ECF 364-1, COCL Q4 2022 Report, at 169; *see also* COCL, *Measuring What Matters to the Community: A New Performance Evaluation System for the Portland Police Bureau Technical Assistance Report* (Feb. 1, 2023), available at https://perma.cc/384M-FMAU. However, we agree with the Compliance Officer that the City remains in substantial compliance with Paragraph 149. *See* ECF 364-1, COCL Q4 2022 Report, at 168–170.

150. Annually, PPB shall issue a publicly available PPB Annual Report, which shall include a summary of its problem-solving and community policing activities. A draft of the Annual Report shall be provided to the PCCEP for review and comment before the report is finalized and released to the public. Once released, PPB shall hold at least one meeting in each precinct area and at a City Council meeting, annually, to present its Annual Report and to educate the community about its efforts in community policing, in regard to the use of force, and about PPB's policies and laws governing pedestrian stops, stops and detentions, and biased-free policing, including a civilian's responsibilities and freedoms in such encounters.

| Status | Substantial Compliance |
|--------|------------------------|

The City maintained substantial compliance with Paragraph 150 for the first time, after twice achieving but then failing to sustain substantial compliance. *See* ECF 292-1, DOJ 6th Report, at 82 (substantial compliance); ECF 236-1, DOJ 5th Report, at 69–70 (partial compliance); ECF 212, DOJ Supplemental Compliance Report, at 27–28 (substantial compliance); ECF 195-1, DOJ 4th Report, at 72–73 (partial compliance).

In June 2022, PPB provided a draft 2021 Annual Report to the PCCEP. *See* PCCEP, PCCEP June 2022 Public Meeting, available at https://perma.cc/U39M-EZRF. After considering the PCCEP's feedback, PPB published the final version. *See* PPB, *2021 Annual Report*, available at https://perma.cc/9528-2L5Y.

The timely release of the 2021 Annual Report allowed PPB to present it to the public and City Council. Chief Lovell and the respective commanders from Central, North, and East precincts held recorded meetings on Zoom with interested community members. *See*, PPB, Annual Report Presentations, YouTube, available at https://perma.cc/5LFY-PPTM. The meetings broached challenges and successes and were generally well received. On August 31, 2022, Chief Lovell presented the 2021 Annual Report to City Council. *See* City Council, August 31, 2022 Council Agenda, available at https://perma.cc/3WQW-CA2N; eGov PDX, City Council 2022-08-31 AM Session, YouTube (Aug. 31, 2022), available at https://perma.cc/X7CV-N68F

(remarks run from 1:03:00 to 2:10:00); City Council Documents, Report 737-2022, available at https://perma.cc/X87X-4WHA. Unlike prior years, the City allowed public testimony after Chief's Lovell's presentation. *See* eGov PDX, City Council 2022-08-31 AM Session (public testimony at 1:58:00 to 2:07:00).

PPB is on track to sustain compliance as to the 2022 Annual Report. In June 2023, PPB provided a draft to the PCCEP for review and comment, with Chief Lovell present to respond to comments. *See* PCCEP, PCCEP Settlement and Policy Subcommittee Meeting / Review of PPB Annual Report, available at https://perma.cc/GBG5-2D6X; PPB, *2022 Annual Report (draft)*, available at https://perma.cc/GAD9-4MUL.

151. PCCEP shall meet as needed to accomplish their objectives as set forth in the PCCEP Plan. PCCEP shall hold regular Town Hall meetings which shall be open to the public. To the extent that PCCEP meetings are subject to the Oregon Public Meetings Law, or similar regulatory or statutory requirements, the City shall be responsible to give advice necessary to the PCCEP to ensure compliance with those laws and agrees to represent PCCEP in any challenges regarding compliance with those laws.

| Status | **Partial Compliance** |
| --- | --- |

For the second straight year, the City is not in substantial compliance with Paragraph 151 due to the City hindering the PCCEP's ability to accomplish the objectives set forth in the PCCEP Plan. *See* ECF 292-1, DOJ 6th Report, at 83–84.

The PCCEP Plan lays out various duties for the PCCEP, including some quarterly and annual tasks. *See* ECF 354-1, Am. Settlement Agreement, at 71–75. Many of the tasks were not completed in 2021 or 2022. For example, the PCCEP did not meet twice with the Police Commission and other relevant City leaders. *See id.* at 75. Staff turnover and vacant seats plainly impacted the PCCEP's ability to issue quarterly summary reports, timely post meeting minutes and agendas, and discharge other responsibilities. *See id.* at 72–74.

For three years beginning in November 2018, the PCCEP consistently held monthly public meetings and five subcommittee meetings even as a seat became vacant now and then. From November 2021 to June 2022, the number of vacancies increased to six of thirteen seats. The lack of permanent PCCEP staff during that time compounded the impact of the Mayor's Office not appointing new members. The City canceled PCCEP subcommittee meetings between April and November 2022, which had a tremendous impact on the PCCEP's ability to meet as needed to perform the duties that the City codified in the original PCCEP Plan and reaffirmed in the amended PCCEP Plan. Instead of resuming existing subcommittees, the City proposed new subcommittee structures, one of which the PCCEP adopted. *See* PCCEP, PCCEP Special Meeting on Bylaws and Subcommittees (Oct. 5, 2022), available at https://perma.cc/87NL-ZRB5.

Despite the challenges, PCCEP members and staff worked hard to advance the mission, as detailed in the Compliance Officer's quarterly reports. *See* ECF 364-1, COCL Q4 2022 Report, at 10, 158–161; ECF 358-1, COCL Q3 2022 Report, at 9–10, 166–170, 182–186; ECF 328-1, COCL Q2 2022 Report, at 11, 174–179; ECF 306-1, COCL Q1 2022 Report, at 10–11, 158–163; ECF 291-1, COCL Q4 2021 Report, at 126–128; ECF 278-1, COCL Q3 2021 Report, at

11–12, 63–65; ECF 274-1, COCL Q2 2021 Report, at 11–12, 60–62; ECF 273-1, COCL Q1 2021 Report, at 12–13, 56–57.

In this reporting period, the PCCEP made recommendations on a proposed measure to reduce gun violence and an Independent Court Monitor to evaluate the City's compliance with this Agreement. *See* PCCEP, *Recommendation to Appoint an Independent Monitor in the Settlement Agreement*, Feb. 28, 2023, available at https://perma.cc/DJ85-XZT3; PCCEP, *Recommendation to Mayor Wheeler and Chief Lovell to Abandon Plans for a Gunshot Detection Technology Pilot Program*, Mar. 15, 2023, available at https://perma.cc/S7GF-BYWQ. The PCCEP also hosted town hall events with the Compliance Officer to provide feedback on its quarterly reports, as referenced in Paragraph 160, and with Independent Monitor LLC to assist its work regarding the City's response to protests in 2020, as required by Paragraph 189. See PCCEP, Full Committee Meeting, Apr. 19, 2023, available at https://perma.cc/28E6-44BK; PCCEP, Town Hall with Independent Monitor, Oct. 12, 2022, available at https://perma.cc/DJC4-BBGJ. The PCCEP also hosted presentations and gave feedback on PPB's stops data and PPB's 2021 Annual Report. *See, e.g.*, PCCEP, September 2022 Public Meeting, Sept. 21, 2022, available at https://perma.cc/393E-9MYG; PCCEP, June 2022 Public Meeting, June 22, 2022, available at https://perma.cc/XR4T-RSJ7. Importantly, the PCCEP prepared, discussed, and approved statements to the Court regarding the implementation of the Amended Settlement Agreement. *See, e.g.*, PCCEP, Special Meeting on Status Conference Hearing Statement, Nov. 2, 2022, available at https://perma.cc/N2CC-HZNZ.

The PCCEP's substantial efforts to accomplish its objectives are commendable. But many important tasks in the PCCEP Plan have not been completed for two years running. While the City made considerable progress toward re-achieving substantial compliance during the second half of this reporting cycle, the City must sustain its recent improvements to enable the PCCEP to accomplish the objectives set forth in the PCCEP Plan.

152. The City shall provide PCCEP members with appropriate training necessary to comply with requirements of City and State law.

| Status | Substantial Compliance |
| --- | --- |

We have found the City in substantial compliance with Paragraph 152 since 2019. *See* ECF 195-1, DOJ 4th Report, at 73.

The City Attorney's Office provides new and existing PCCEP members with live training, access to recorded training sessions, and written materials on the requirements of local law. On September 28, 2022, the City hosted a training for PCCEP members and the public. *See* PCCEP, Training Session on History of United States v. City of Portland Settlement Agreement, Sept. 28, 2022, available at https://perma.cc/VH9P-2872. However, the City also reported that several new members have not yet received the full array of training contemplated by the PCCEP Plan. *See* ECF 354-1, Am. Settlement Agreement, at 71–72.

PCCEP staff are preparing a formalized set of training materials and curricula to roll out later in 2023. Consistently implementing this new training regimen for new and existing PCCEP members will allow the City to maintain substantial compliance.

**United States v. City of Portland**

**DOJ's Seventh Periodic Compliance Assessment Report**

SECTION XI – ADDENDUM OF ADDITIONAL REMEDIES

| Obligation | Compliance Ratings by DOJ Report | |
|---|---|---|
| | 6th Report[12]<br>ECF 292-1<br>6/30/2022 | 7th Report<br>ECF 369-1<br>8/8/2023 |
| Para. 188: Revise FDCR and AAR forms | Not Rated | Substantial Compliance |
| Para. 189: Outside review of 2020 protest response | Not Rated | Partial Compliance |
| Para. 190: Budget for training costs | Not Rated | Substantial Compliance |
| Para. 191: Hire civilian to lead the Training Division | Not Rated | Substantial Compliance |
| Para. 192: IPR investigate 2020 protest misconduct by Lieutenants and above | Not Rated | Partial Compliance |
| Para. 193: Release PPB's Annual Report by September 20 | Not Rated | Substantial Compliance |
| Para. 194: Implement BWCs | Not Rated | Partial Compliance |
| Para. 195: Implement new civilian oversight board | Not Rated | Partial Compliance |

---

[12] On April 29, 2022, the Court granted the Parties' motion to add the new remedies in Section XI. *See* ECF 290, Order.

## XI.  ADDENDUM OF ADDITIONAL REMEDIES

On April 2, 2021, the United States issued a notice of noncompliance pursuant to Paragraph 178. The purpose of this Addendum is to ensure that the City, by and through its officials, agents, employees, and bureaus, takes actions to resolve the concerns expressed by the United States in the noncompliance notice.  Specifically, the United States found that the City failed to implement the following provisions of this Agreement:  Section III – Use of Force, Paragraphs 66, 67, 69, 70, and 73; Section IV – Training, Paragraphs 78 and 84; Section VIII – Officer Accountability, Paragraphs 121, 123, and 169; and Section IX – Community Engagement and Creation of Portland Committee on Community Engaged Policing, Paragraph 150.  The City does not admit that the allegations of noncompliance are true.

188. The City shall revise Force Data Collection Report (FDCR) and After Action Report forms to capture when the forms are edited and completed as part of PPB's implementation of Office365, which is ongoing.  In the interim, pursuant to a process approved by the United States, PPB shall capture in the existing FDCR and After Action Report forms the author's name and the time and date of initial submission and any subsequent edits, as well as the name, time, and date of each level of review.

| Status | Substantial Compliance |
|--------|------------------------|

We agree with the Compliance Officer that the City has achieved substantial compliance with Paragraph 188.  *See* ECF 364-1, COCL Q4 2022 Report, at 174; COCL Q1 2023 Report (draft), at 194, available at https://perma.cc/JJ3G-VB7C.  In our review of a random sample of FDCRs and AARs to assess compliance with Section III, nearly all AARs were dated as were most FDCRs.  Though our sample did not reveal any dated revisions to FDCRs, we did see dated revisions on AARs.  For these reasons, we recommend that the Compliance Officer continue to review FDCRs and AARs for compliance with this paragraph in the coming quarter.

189. Before November 25, 2021, the City shall provide funding for a qualified outside entity to critically assess the City's response to crowd control events in 2020 in a public-facing report and prepare a follow-on review of the City's response to the report.  The City will use the report to prepare a training needs assessment.  The report, training needs assessment, and follow-on review will be completed consistent with a Scope of Work and deadlines agreed upon by the City and the United States, and such agreement shall not be unreasonably withheld by either Party.  If the City demonstrates to the United States that significant progress is being made toward meeting the obligations under the agreed upon Scope of Work and deadlines, the City may request a reasonable modification of the Scope of Work or extension of deadlines, which the United States shall not unreasonably decline.

| Status | Partial Compliance |
|--------|--------------------|

The City contracted with Independent Monitor, LLC (IM LLC) in the spring of 2022.  IM LLC is operating pursuant to a scope of work and deadlines agreed on by the Parties.  The scope of work is divided into two phases.  Phase 1 consists of the critical assessment report and recommendations, the City's response to the report, and PPB's responsive training needs assessment.  Phase 2 consists of a follow-on assessment of the City's response to and implementation of the recommendations.

IM LLC circulated a draft of its initial Phase 1 report to the Parties and the Compliance Officer on April 12, 2023. The scope of work provides the City with 60 days from receiving the draft (or until June 12, 2023) to respond to IM LLC and simultaneously release a needs assessment based on the Phase 1 report. IM LLC then has an additional 60 days to finalize and release the Phase 1 report (or until August 11, 2023).

The scope of work also provides for a Phase 2 report, which must begin within 180 days of the Phase 1 report being finalized, or by February 7, 2024. IM LLC must produce the Phase 2 report to the Parties and the Compliance Officer no later than 365 days from the issuance of the final Phase 1 report (or by August 12, 2024).

During the reporting period, the City complied with its obligations to fund and otherwise support IM LLC's inquiry. We will continue to monitor the Phase 1 work as it concludes and the Phase 2 work as it begins.

190. Before November 25, 2021, the City shall provide in the budget a separate line item for overtime costs to conduct necessary training for PPB officers. The City shall include a similar line item in subsequent budgets for the duration of this Agreement.

| Status | Substantial Compliance |
|---|---|

We agree with the Compliance Officer that the City has achieved substantial compliance with Paragraph 190 by including a separate line item in its 2022-2023 fiscal year budget for overtime costs to provide PPB officers with required training. *See* ECF 364-1, COCL Q4 2022 Report, at 176–177; COCL Q1 2023 Report (draft), at 196–197, available at https://perma.cc/JJ3G-VB7C. Budgeting in advance for this predictable and necessary expense ensures against the City being unable to comply with the training-related requirements of this Agreement. *See* ECF 286-1, DOJ Notice of Noncompliance; ECF 236-1, DOJ 5th Report, at 18–19, 24–25 (finding that the City was no longer in substantial compliance with Paragraphs 78 and 84 because PPB relied on overtime budgets that were cut in 2020, causing PPB to be unable to provide more than half of its required annual in-service training).

191. Before November 25, 2021, the City shall budget for a qualified civilian in PPB to direct all educational aspects of PPB's Training Division alongside the Captain of the Training Division, who will direct administrative aspects of PPB's Training Division. The respective roles and responsibilities of the civilian and the Captain are outlined in Attachment 1 appended to this Agreement, provided that the Parties may agree to modify those roles and will not unreasonably withhold such agreement. Once funding is provided, the City shall post the position within 90 days. Once the position is posted, the City shall make a job offer to a suitable candidate and complete any required background screenings within 150 days. If the City demonstrates to the United States that no suitable candidate applied for or accepted the position, or that the City is otherwise making significant progress toward meeting the deadlines in this Paragraph, the City

may request a reasonable extension of time to fill the position, which the United States shall not unreasonably withhold.

| Status | Substantial Compliance |
|--------|------------------------|

The City has achieved substantial compliance with Paragraph 191 because of its efforts to create, fund, and fill with a qualified candidate a civilian position to direct all educational aspects of PPB's Training Division.

On April 19, 2023, the City and PPB announced the hiring of a Training Dean to lead the educational aspects of PPB's Training Division, including the design, development, and delivery of training programs.  *See* PPB, News, available at https://perma.cc/78Q6-2LHR.  On May 15, 2023, the City hosted an online forum to introduce the Dean to interested community members. *See* PPB, Events,  https://perma.cc/3K2S-MFZ8.  The Dean began working in the Training Division in June 2023.

To maintain substantial compliance, the City and PPB must ensure that the Dean has sufficient support and authority to perform the responsibilities outlined in Attachment 1.  *See* ECF 354-1, Am. Settlement Agreement, at 75.

192. Within 60 days of the date this paragraph is entered as an order of the Court, the City shall initiate an appropriate investigation through IPR to identify: (a) the PPB Lieutenant(s) and above who trained Rapid Response Team members to believe that they could use force against individuals during crowd control events without meeting the requirements of PPB Directive 1010.00; (b) the PPB incident commander(s) and designee(s) with the rank of Lieutenant or above who directed or authorized any officer to use force in violation of PPB Directive 1010.00, or who failed to ensure that FDCRs and After Action Reports arising from the crowd control events starting on May 29, 2020, and ending on November 16, 2020, were completed as required by Section 13.1 of PPB Directive 635.10; and (c) the PPB Commanders and above who failed to timely and adequately clarify misunderstandings and misapplications of PPB policy (including this Agreement) governing the use, reporting, and review of force during the crowd control events starting on May 29, 2020, and ending on November 16, 2020.  Once the IPR investigation is complete, the Police Commissioner and/or the Chief of Police, as required by this Agreement, shall hold accountable those investigated members of the rank of Lieutenant and above who are determined to have violated PPB policies (including this Agreement) as outlined in this paragraph. The Parties affirm the obligation in this Agreement and Directive 330 for IPR and PPB to investigate any sworn member if, during the investigations of Lieutenants and above required by this paragraph, information is discovered suggesting that any sworn member may have violated PPB policy or this Agreement.

| Status | Partial Compliance |
|--------|--------------------|

We agree with the Compliance Officer that the City is in partial compliance with Paragraph 192. *See* ECF 364-1, COCL Q4 2022 Report, at 180–181; COCL Q1 2023 Report (draft), at 200–201, available at https://perma.cc/JJ3G-VB7C.  Independent Police Review (IPR) broke down the tasks identified in subsections (a)-(c) into four investigations, parsing subsection (b) into two separate investigations.

IPR's investigations are ongoing. Like the Compliance Officer, we will not know the facts of these investigations until IPR completes them and they proceed through the City's accountability process. It would be inappropriate for us to comment on or otherwise disclose the content of the ongoing investigations, which could jeopardize their fairness and enforceability. IPR's work is ongoing and must be completed—including imposition of discipline, if any—for the City to achieve substantial compliance.

193. In addition to the requirements of paragraph 150 of this Agreement, PPB shall release its Annual Report and hold the required precinct meetings no later than September 20 of each year for the duration of this Agreement.

| Status | Substantial Compliance |
|---|---|

We agree with the Compliance Officer that the City achieved substantial compliance with Paragraph 193 because PPB met the requirements for releasing its Annual Report and holding the required precinct meetings. *See* ECF 364-1, COCL Q4 2022 Report, at 181–182; COCL Q1 2023 Report (draft), at 201–202, available at https://perma.cc/JJ3G-VB7C.

PPB's last two annual reports (2022 and 2021) were provided to PCCEP the following year in June. *See* PCCEP, June 2022 Public Meeting, available at https://perma.cc/5WVC-7798; PPB, *2021 Annual Report (draft)*, available at https://perma.cc/HC6L-7HA2; PCCEP, Past Events, available at PCCEP Settlement and Policy Subcommittee Meeting / Review of PPB Annual Report | Portland.gov; PPB, *2022 Annual Report (draft)*, available at https://perma.cc/Z3JY-2PFU.

PPB issued the final 2021 Annual Report in July 2022 and held the required meetings in July and August 2022. *See* YouTube, PPB Annual Report Presentations, available at https://perma.cc/9V48-6SNB; City of Portland, Council Agenda and Video, available at https://perma.cc/Q3BU-MZ5V (remarks run from 1:03:00 to 2:10:00); City of Portland, Council Report 737-2022, available at https://perma.cc/93JL-HHG9.

194. Within 210 days of the date this paragraph is entered as an order of the Court, the City shall implement body-worn cameras (BWCs) pursuant to a policy that is subject to the policy-review-and-approval provisions of this Agreement; provided, however, if the City is making substantial progress this deadline may be extended by agreement of the United States, which shall not be unreasonably withheld.

a. The City will comply with any collective bargaining obligations it may have related to BWCs, which the City agrees to fulfill expeditiously and in compliance with its obligation to bargain in good faith.

b. Within 60 days of the date this paragraph is entered as an order of the Court, the Compliance Officer shall gather public input on the use of BWCs and provide this information and any technical assistance to the public and the Parties to inform the drafting of a policy. The United States reserves its policy review rights related to the BWC program under the terms of this Agreement.

c. If the City has not finally discharged its collective bargaining obligations as to BWCs within 120 days of the date this paragraph is entered as an order of the Court, the Parties stipulate that the Court may thereafter hold periodic status conferences every 60 days to receive

an update on the procedural status of the collective bargaining process related to BWCs. The City will provide a final procedural status update upon the completion of the collective bargaining process.

d.   The United States reserves its enforcement rights related to the BWC program under the terms of this Agreement. If collective bargaining or any related arbitration or appeal results in a BWC program that the United States determines, in its sole and absolute discretion, will not adequately resolve the compliance concerns identified in the April 2, 2021 notice of noncompliance, the Parties agree that the United States can seek court enforcement pursuant to paragraph 183, without having to repeat the steps laid out in paragraphs 178 to 182.

| Status | Partial Compliance |
|---|---|

We agree with the Compliance Officer that the City is in partial compliance with Paragraph 194. *See* ECF 364-1, COCL Q4 2022 Report, at 182–186; COCL Q1 2023 Report (draft), at 202-209, available at https://perma.cc/JJ3G-VB7C. In a separate filing, we jointly reported to the Court the status of the City's compliance with its collective bargaining obligations, which resulted in an approved PPB directive to govern a BWC pilot program. *See* ECF 368, Joint Status Report.

The City has provided regular updates on the implementation of BWCs.[13] The City has decided with the PPA to roll out BWCs first in Central Precinct and with the Focused Intervention Team tasked with addressing gun violence during a 60-day pilot period. However, the City did not timely produce training materials for the pilot program, and what the City first produced was incomplete. The materials initially omitted supervisory training, and the means of assessing skills and effectiveness of the City's BWC contractor's instruction is still unclear. We will observe PPB's training for the BWC pilot program in August 2023, along with our expert consultant and the Compliance Officer, provide feedback to PPB, and report to the Court in due course.

To achieve substantial compliance with this paragraph, the City must complete the BWC pilot program it created, and then:  propose any necessary changes to the BWC policy for DOJ's consideration; contract with a vendor to ensure that all required PPB members receive BWC equipment and training; show consistent and verified performance of BWCs in accord with policy, and specifically for force reporting and review; and perform an audit of BWC use and access as contemplated in the conditionally approved BWC pilot project policy.

195. In 2020, the City referred to voters a ballot measure that would overhaul the police accountability system incorporated into this Agreement by establishing a new Community Police Oversight Board to replace IPR for investigations of certain complaints of police misconduct and to replace the Chief of Police for imposition of discipline. City voters approved the ballot measure.

---

[13] Under the Agreement, "implementation" means "the development or putting into place of a policy or procedure, including the appropriate training of all relevant personnel, and the consistent and verified performance of that policy or procedure in actual practice through the regular use of audit tools." ECF 354-1, Am. Settlement Agreement, ¶ 33.

The City has since empowered a 20-member civilian Commission to define the duties and authority of the Oversight Board and submit a proposal to City Council for final approval.

a.  Before January 1, 2022, the City Council and Auditor shall each present a plan to the United States for an orderly transition to the Community Police Oversight Board by ensuring the continuity of IPR operations while the Commission develops the Oversight Board for City Council's approval.  The United States shall determine whether either of these two plans is acceptable.  City Council will then adopt a plan that the United States has determined is acceptable.  The Parties agree that the adopted plan shall be appended to this Agreement and will become part of this Order, provided that the Parties may agree to modify the plan if warranted by the circumstances.  Until the Oversight Board becomes operational, the City shall ensure that administrative investigations are completed as required by Section VIII – Officer Accountability and that officers are held accountable for violating PPB policy and procedure as required by Paragraph 169.

b.  Within 18 months of the date this paragraph is entered as an order of the Court, the Commission shall propose to City Council changes to City Code to create a new police oversight system as reflected in the City of Portland Charter amendment establishing a Community Police Oversight Board.  Within 60 days of receiving the Commission's proposal, the City will propose amendments to City Code to address the Commission's proposal, and corresponding amendments to this Agreement, subject to the United States' and the Court's approval, to ensure full implementation of the Oversight Board and effective police accountability, consistent with the requirements of this Agreement.  Within 21 days of the approval of the amendments to the Agreement by the United States and the Court, the City Council shall consider and vote on the conforming City Code provisions creating the Oversight Board.  Within 12 months of the Council's adoption of the City Code provisions, the new Oversight Board shall be staffed and operational, and IPR shall then cease taking on new work and complete any pending work.  For good cause shown, the deadlines imposed by this subparagraph (b) may be reasonably extended provided that the City is in substantial compliance with subparagraph (a).

c.  The City will comply with any collective bargaining obligations it may have related to the Oversight Board, which the City agrees to fulfill expeditiously and in compliance with its obligation to bargain in good faith.

| Status | Partial Compliance |
|--------|--------------------|

We agree with the Compliance Officer that the City is in partial compliance with Paragraph 195.  *See* ECF 364-1, COCL Q4 2022 Report, at 186–190; COCL Q1 2023 Report (draft), at 209–213, available at https://perma.cc/JJ3G-VB7C.  The City successfully spun off IPR from the City Auditor's Office to a standalone City agency with adequate independence to fulfill its function.  *See generally* IPR, available at https://perma.cc/4YBN-AQSZ.  Over the last several months, the City has also provided substantial administrative support to the 20-member civilian Police Accountability Commission (PAC), enabling it to begin preparing a proposal to City Council that defines the duties and authority of the Oversight Board.  *See generally* PAC, available at https://perma.cc/H53Q-7WN7.  The PAC's work is catalogued on the City's website.  *See* PAC, Key Documents, available at https://perma.cc/5NEP-EQM4.

The PAC is scheduled to complete its work in the coming weeks, which will trigger the 60-day period for the City to propose amendments to City Code to address the Commission's proposal. At the same time, the City must also propose corresponding amendments to this Agreement, subject to the approval of the United States and the Court, to ensure full implementation of the Oversight Board and effective police accountability.

To achieve substantial compliance with this paragraph, the City must staff and operationalize the new Oversight Board within 12 months and 21 days of the Court approving the relevant amendments to this Agreement.