(Dan Handelman)

Portland Copwatch is pleased to be able to once again give you our analysis of the progress of the City in enacting the spirit of the USDOJ Settlement Agreement. The letter of the Agreement, I think we all learned, isn't enough, since three and a half years ago the DOJ and Compliance Officer thought there was substantial compliance with all the requirements. Yet here we still are.

Notably, both the DOJ and COCL find that the City is out of full compliance with 23 paragraphs. However, they only agree on twenty of those paragraphs, with the DOJ thinking that the 911 operators need to have a firm policy to dispatch Portland Street Response (115), that the IPR and Internal Affairs haven't adequately laid out plans to be sure investigations are finished in 180 days (123) and that PCCEP hasn't met with the Mayor and Chief or completed its quarterly reports as required (151).

The COCL, on the other hand, thinks the Bureau has to create a policy affirming that officers who witness deadly force can forego interviews if they are psychologically traumatized (126), that the PPB has to update its policy to match the discipline guide adopted in February 2022 (137) and that there were issues about suitably involving the community in hiring the Training "Dean" (191), though that's a remnant of the COCL looking at Q1 while the DOJ report goes through June/July. For the record, we agree with all six of these assessments.

On the subject of the Dean, Dr. Rodriguez (formerly introduced as Dr. Yazzie) was given the title of "Director of Education." However the PPB's draft Training policy presented in July refers to that position as "Director of Police Education." Some of us at Portland Copwatch take pains not to pronounce "COCL" and "PCCEP" like others do, so we're hoping people don't call Dr. Rodriguez the DOPE as that title spells out. The COCL told a story at the PCCEP town hall about being a civilian employee at a police department and not getting respect. We wonder if Dr. Rodriguez has been deliberately greeted with a pejorative title.

We also often comment to the court about how the City brings its "homework" in too close to these status conference deadlines. This time, the Independent Monitor LLC report on the 2020 protests, which was promised to be ready in January, was just published on August 10, four days before this hearing. That's about enough time to digest the report before it goes to Council on August 23, but not enough to give your honor a deep analysis. We will say that we're concerned about the consultants asking the City to get permission to violate state law by collecting information on people's First Amendment activities using video. The state's anti-spying law was hard-won in the 1980s and just survived an attempt by the City to gut it during this last legislative session.

The City's behavior, which is not captured in either report, also includes recent revelations that they lied to the public about the extent of their ability to enforce traffic laws as a ploy to get more funding.

News came out at the same time that the Chief had to write a memo to direct officers to stop telling community members they won't make arrests because they think the District Attorney won't prosecute. This kind of corrupt behavior is so overarching that it leads us to wonder why the US DOJ hasn't suggested scrapping the Portland Police Bureau and starting a new institution that will have more integrity.

Such dishonesty is also a hallmark of the Bureau's self-analysis of the many racial disparities in policing we've been calling to your honor's attention for many years. As noted by the COCL, a disproportionate number of traffic stops are made against Black drivers in Portland-- roughly 20% of stops in a City that's 6% Black. Similarly, use of force is doled out to Black people in over 25% of all uses of force, and roughly 18% of people subjected to deadly force are Black. That last number was on its way down until the PPB shot three Black men just between November and July, killing two of them. Yet analysis of deadly force incidents is not part of either the DOJ or COCL's reports.

They do note that very few deadly force cases have been through Police Review Board hearings, due to lack of professional facilitators willing to head up those mostly one-sided hearings. The DOJ calls out the case where officers shot 14 bullets at Andreas Boinay's moving car in 2021, then firing a fifteenth round after the car stopped. The DOJ says the Police Review Board didn't seek a rationale for each bullet fired, nor did the presenters include video of that last bullet shot. The COCL says that one deadly force case did not include the required review by the Training Division. There have been twenty deadly force incidents since January 2021. Only a handful have gone through the whole process.

We have now learned that the presentation to the behind-closed-doors Behavioral Health Unit Advisory Committee about deadly force incidents included summaries of all deadly force cases, because the Bureau allegedly doesn't identify which suspects were living with mental health issues. This is nonsense, and the entire reason PCW pushed the BHUAC to hear presentations on these cases is that lessons could be learned from those involving mental health to prevent future occurrences. If the meetings were open to the public, comments could have been made to direct the BHUAC's attention to certain cases.

The COCL says that one reason for long delays in deadly force cases is that people are hiring lawyers who don't respond to interview requests in a timely manner. At first we thought these were the community members or their surviving family members. But the report states that it is police officers' lawyers who are delaying the cases. Yes, officers have the same rights as anyone not to self-incriminate, but this is unacceptable when it comes to the administrative investigations.

(Marc Poris)

The Court heard brief discussion about the City's requirement to follow paragraph 195, implementing the new police oversight board. PCW member Dan Handelman sits on the Police Accountability Commission, which has met for 20 months and is combing through its draft City Code to hand over to Council for adoption. I have been to several of the PAC meetings, read their reports, and took a close look at the proposed code. Nothing surprises me based on the tasks given to the PAC to build out the Charter's basic framework. It was discouraging to hear members of City Council ask questions at the PAC's May quarterly report presentation showing they did not fundamentally understand the City Charter that created the new Board. They asked about powers embedded in the city's "constitution" that, for instance, give the board subpoena power -- and power to compel officer testimony. They questioned that the Charter assures the new board a budget equivalent to 5% of the Police Bureau's, and they questioned that current or former police officers may not sit on the Board, despite these items being in the Charter.

In the months since that time, despite hearing from the good Rev. Dr. LeRoy Haynes Jr. about the history of the community struggle for an independent oversight system during a Work Session, Council members have been hinting to the media that they are dubious about the PAC's work.

While I may not agree with everything I read in their proposal, I do think the City should adopt the code as it is written and let the experiment play out. The system is envisioned to be self-correcting, but more importantly it is set up to be run by community members and not the police.

There are plenty of other issues that show the City is not making enough progress. The COCL randomly picked 20 force cases to review and found that 25% of them were not "tactically sound"-- and that's just a random sample! The police claimed that because a person stopped struggling once officers put their weight on them, it was not a use of force against resistance because there was no resistance. Our supposed transparent Bureau told officers they don't have to give out business cards if they have privacy concerns. These are public employees.

Similarly, as we noted at the last hearing, the PPB unilaterally changed part of their deadly force policy to withhold officer names in deadly force cases for 15 days instead of the 24 hours written in the Bureau's current policy. When officers from Portland and Clackamas County shot the same suspect to death in April, the Clackamas officer was named in 48 hours with no negative repercussions, whereas it took 17 days for PPB to name their officers.

The Chief says the FBI told the Bureau to change the policy. As we noted before, the Agreement requires all policies to be subject to public comment, but this policy has not been posted for review as it was changed by executive order. The Agreement does not make provisions for executive orders. Moreover, the people of Portland should have more say in our policies than the FBI.

However, when it comes to privacy for the community, since the last hearing the PPB bought $80,000 worth of surveillance drones. They are only supposed to be used for a small number of incident types by a small unit, yet 16 officers were trained on the devices. The Body Worn Camera pilot program has conveniently not begun yet, so we can't ask that the City compare how often they use footage to hold officers accountable versus how often footage is used to prosecute community members. We appreciate that your honor is a fan of these cameras, but we hope such data will be part of the reports back to the court to illustrate what may be the real reason the Police Association claims to support the technology. We also note that the new policy is better than we expected, though weaker than we would have liked, as it requires officers to make statements before viewing their footage after force events. However, that restriction only applies to levels "I" and "II" of force. The supervisor is supposed to record the statements in those cases, but not in levels "III" or "IV." Strangely,  if they realize a low-level case is more serious, they then have to record the statement. By then it is too late.


Portland Copwatch hopes to have a more in-depth analysis of the COCL's Q1 report out by mid-week and with the court's permission we will share that with you to add to these comments.


To summarize, we hope the City and Police will stop their tactics of delaying, minimizing serious issues, and trying to thwart efforts at accountability. And as always we thank your honor for reminding everyone how important it is for the community to be able to trust those hired to enforce the law.


Thank you