2023 WL 2983583
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

Tracy ALVES
v.
RIVERSIDE COUNTY, et al.

Case No. EDCV 19-2083 JGB (SHKx)
|
Filed March 13, 2023

**Attorneys and Law Firms**

John C. Burton, Matthew Sahak, Law Offices of John Burton, Pasadena, CA, Thomas Kennedy Helm, IV, Helm Law Office PC, Oakland, CA, Dale K. Galipo, Hang Dieu Le, Law Offices of Dale Galipo, Woodland Hills, CA, for Tracy Alves.

Anthony M. Sain, Tori Lyn Noelani Bakken, Lewis Brisbois Bisgaard and Smith LLP, Eugene P. Ramirez, Garros Chan, Manning and Kass Ellrod Ramirez Trester LLP, Los Angeles, CA, Abigail McLaughlin, Lewis Brisbois Bisgaard and Smith LLP, Phoenix, AZ, for Riverside County, et al.

**Proceedings: Order (1) DENYING Defendants' Motion in Limine #4 (Dkt. No. 92); (2) DENYING Defendants' Motion in Limine #5 (Dkt. No 93); (3) GRANTING Plaintiff's Motion in Limine #1 (Dkt. No. 94); (4) GRANTING Plaintiff's Motion in Limine #2 (Dkt. No. 95); and (5) Ruling on Bifurcation, Consideration of Monell Issues and Proposed Verdict Forms (IN CHAMBERS)**

JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

\*1 Before the Court are two motions in limine filed by Defendants ("Defendants' MIL #4," Dkt. No. 92; "Defendants' MIL #5," Dkt. No. 93) and two motions in limine filed by Plaintiff ("Plaintiff's MIL #1," Dkt. No. 94; "Plaintiff's MIL #2," Dkt. No. 95) (collectively, "the Motions"). The Court finds the matters appropriate for resolution without oral argument. See Fed. R. Civ. P. 78; L.R. 7-15. After considering the papers filed in support of and in opposition to the Motions, the Court DENIES Defendants' MIL #4, DENIES Defendants' MIL #5, GRANTS Plaintiff's MIL #1, and GRANTS Plaintiff's MIL #2. The Court also addresses related issues raised by the parties, namely Defendants' request to bifurcate the trial, the order in which the jury can consider the issues as they relate to potential Monell liability, and the parties' proposed verdict forms.

**I. BACKGROUND**

This is a Section 1983 case arising out of the death of Decedent Kevin R. Niedzialek brought by his successor in interest, Plaintiff Tracy Alves. On October 30, 2019, Plaintiff filed her complaint against Defendants Riverside County, Riverside Sheriff's Department, Sheriff-Coroner Chad Bianco, Deputy Sonia Gomez, Deputy Brian Keeney and Does 3-10, which she amended on July 17, 2020. ("Complaint," Dkt. No. 1; "FAC," Dkt. No. 34.)

On May 17, 2021, Defendants filed a motion for summary judgment. ("MSJ," Dkt. No. 59.) The same day, Defendants filed three motions in limine, seeking to exclude the opinions of Plaintiffs' experts Jeffrey Noble, Daniel Wohlgelterner, and Michael Freeman, respectively. ("Defendants' MIL #1," Dkt. No. 61; "Defendants' MIL #2," Dkt. No. 62; "Defendants' MIL #3," Dkt. No. 63.)

On July 26, 2021, Defendants filed their Motion in Limine #4. ("Defendants' MIL #4," Dkt. No. 92.) The same day, Defendants filed their Motion in Limine #5. ("Defendants' MIL #5," Dkt. No. 93.)

Also on July 26, 2021, Plaintiff filed her Motion in Limine #1. ("Plaintiff's MIL #1," Dkt. No. 94.) The same day, Plaintiff filed her Motion in Limine #2. ("Plaintiff's MIL #2," Dkt. No. 95.) Plaintiff also filed a declaration of T. Kennedy Helm, IV in support of Plaintiff's motions in limine. ("Helm Declaration," Dkt. No. 96.)

On August 2, 2021, Defendants opposed Plaintiff's MIL #1. ("Opposition to Plaintiff's MIL #1," Dkt. No. 99.) The same day, Defendants opposed Plaintiff's MIL #2. ("Opposition to Plaintiff's MIL #2," Dkt. No. 100.) Also on August 2, 2021, Plaintiff opposed Defendants' MIL #4. ("Opposition to Defendants' MIL #4," Dkt. No. 101.) Plaintiff also opposed Defendants' MIL #5. ("Opposition to Defendants' MIL #5," Dkt. No. 102.)

On August 2, 2021, Plaintiff filed a witness list. ("Plaintiff's Witness List," Dkt. No. 103.)

On August 5, 2021, the Court issued an order granting in part and denying in part the MSJ and denying Defendants' MIL #1, MIL #2 and MIL #3. ("MSJ and First MILs Order," Dkt. No. 109.) [1]

 *2  On August 20, 2021, Defendants filed a motion for reconsideration of the MSJ and First MILs Order. ("First Motion for Reconsideration," Dkt. No. 121.)

On September 2, 2021, Defendants filed a notice of appeal of the MSJ and First MILs Order. ("Notice of Appeal," Dkt. No. 128.) On September 8, 2021, Plaintiff filed an ex parte application for an order to certify Defendants' appeal as frivolous or waived and to drop or sever Defendants Sonia Gomez and Brian Kenney. ("Plaintiff's Ex Parte Application," Dkt. No. 134.) On September 16, 2021, the Court stayed the proceedings pending appeal. ("Stay Order," Dkt. No. 134.) On December 3, 2021, the Court granted Plaintiff's Ex Parte Application and dismissed Defendants Sonia Gomez and Brian Keeney from the action. ("Plaintiff's Ex Parte Application Order," Dkt. No. 138.) On May 26, 2022, the Ninth Circuit Court of Appeals dismissed Defendants' appeal for lack of jurisdiction. (Dkt. No. 141.) On June 10, 2022, Defendants withdrew the First Motion for Reconsideration. (Dkt. No. 144.) On June 17, 2022, the Ninth Circuit's mandate issued. (Dkt. No. 147.)

On July 18, 2022, Defendants filed an amended motion for reconsideration of the Court's MSJ and First MILs Order. ("Amended Motion for Reconsideration," Dkt. No. 148.) On August 18, 2022, the Court denied the Amended Motion for Reconsideration. ("Order Denying Amended Motion for Reconsideration," Dkt. No. 154.)

On January 4, 2023, the Court held a status conference, during which it set a pretrial conference for March 13, 2023 and a jury trial for March 28, 2023. (Dkt. No. 158.)

On February 24, 2023, Defendants filed a witness list. ("Defendants' Witness List," Dkt. No. 159.)

On March 6, 2023, Defendants filed an amended memorandum of contentions of fact and law. ("Defendants' Amended Memorandum of Contentions of Fact and Law," Dkt. No. 160.) Defendants also filed a proposed verdict form. ("Defendants' Proposed Verdict Form," Dkt. No. 161.) Defendants also filed their trial brief. ("Defendants' Trial Brief," Dkt. No. 162.)

Also on March 6, 2023, Plaintiff filed an amended memorandum of contentions of fact and law. ("Plaintiff's Amended Memorandum of Contentions of Fact and Law," Dkt. No. 163.) Plaintiff also filed a proposed verdict form. ("Plaintiff's Proposed Verdict Form," Dkt. No. 164.) On behalf of the parties, Plaintiff also filed a set of disputed and undisputed jury instructions. ("Jointly Proposed Undisputed Jury Instructions," Dkt. No. 165; "Jointly Proposed Disputed Jury Instructions," Dkt. No. 166.) Plaintiff finally filed a notice of lodging of a proposed pretrial conference order. ("Plaintiff's Proposed Pretrial Conference Order," Dkt. No. 167.)

On March 8, 2023, Plaintiff filed a trial brief with supplemental authority regarding Riverside Sheriff's Department's capacity to be sued. ("Plaintiff's Supplemental," Dkt. No. 169.) On March 10, 2023, Defendants filed a response to Plaintiff's Supplemental. ("Response to Plaintiff's Supplemental," Dkt. No. 169.) Also on March 10, 2023, Defendants filed a trial brief regarding objections to Plaintiff's proposed verdict form. ("Objections to Plaintiff's Proposed Verdict Form," Dkt. No. 170.)

## II. LEGAL STANDARD

**A. Motions in Limine**

 *3  Motions in limine are a well-recognized judicial practice based in "the court's inherent power to manage the course of trials." Luce v. United States, 469 U.S. 38, 41 n.4 (1984). Regardless of its initial decision on a motion in limine, a court may revisit the issue at trial. See Fed. R. Evid. 103, advisory committee's note to 2000 Amendment ("Even where the court's ruling is definitive, nothing in the amendment prohibits the court from revisiting its decision when the evidence is to be offered."); Luce, 469 U.S. at 41–42 ("[E]ven if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous in limine ruling."). "[A] ruling on a motion in limine is essentially a preliminary opinion that falls entirely within the discretion of the district court." United States v. Bensimon, 172 F.3d 1121, 1127 (9th Cir. 1999) (citing Luce, 469 U.S. at 41–42).

**B. Federal Rule of Evidence 702**
Federal Rule of Evidence 702 ("FRE 702") allows admission of "scientific, technical, or other specialized knowledge" by a qualified expert if four conditions are met: (a) the testimony

will "assist the trier of fact to understand the evidence or to determine a fact in issue"; (b) "the testimony is based on sufficient facts or data"; (c) "the testimony is the product of reliable principles and methods"; and (d) "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(a)-(d).

The trial court is accorded wide discretion to act as gatekeepers for the admissibility of expert testimony. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 151–52 (1999). A court may consider several factors to determine the reliability of an expert's opinion, including whether a theory or technique has been tested, has been subjected to peer review and publication, has a high known or potential rate of error, and "enjoys 'general acceptance' within a 'relevant scientific community.' " Id. at 149–50 (quoting Daubert v. Merrell Dow Pharm., 509 U.S. 579, 592–94 (1993)). "The party offering the expert bears the burden of establishing that Rule 702 is satisfied." Sundance Image Tech., Inc. v. Cone Editions Press, Ltd., 2007 WL 935703, *4 (S.D. Cal. Mar. 7, 2007). FRE 702 should be applied consistent with the "liberal thrust" of the Federal Rules and their "general approach of relaxing the traditional barriers to 'opinion testimony.' " Daubert, 509 U.S. at 588.

### III. DISCUSSION

**A. Defendants' MIL #4**
Defendants' MIL #4 seeks to exclude "facts unknown to Defendant Deputies," "including but not limited to so-called 'recovery position 'training.' " (See Defendants' MIL #4.) Specifically, Defendants ask the Court to exclude all "recovery" position training or related risks taught by law enforcement agencies other than the Riverside County Sheriff's Department (RCSD), and/or alleged positional asphyxia 'risks' that were not provided in training to the Defendant Deputies. (See id. at 1.) The primary legal basis for that request is that the reasonableness of an officer's use of force can only be based on the "facts and circumstances confronting them, without regard to their underlying intent or motivation." (Id.) (quoting Graham v. Connor, 490 U.S. 386, 396-97 (1989)). According to Defendants, the deputies were unaware "of any practice or training requirements that *all* secured prone-restrained subjects are supposed to be moved into an on-the-side 'recovery' position in every case and in every circumstance." (Id. at 3.) Defendants' secondary argument is that evidence of "recovery" position training is irrelevant and prejudicial, in part because Plaintiff's expert Jeffrey Noble cannot identify studies finding that prone positioning causes or contributes to asphyxia. (Id. at 4-5.) They also assert that evidence of alternate training procedures would "confuse" the jury because it could "obscure the focus of the analysis on the Defendant Deputies' *actual* knowledge and training." (Id. at 6.)

**\*4** Plaintiff responds that her theory of the case is that "generally accepted police practices dictate that law-enforcement officials, immediately after handcuffing Mr. Niedzialek prone, would have rolled him into a recovery position, either on his side or sitting up, to facilitate breathing and prevent asphyxiation." (Opposition to Defendants' MIL #4 at 1.) According to Mr. Noble, Plaintiff's police practices expert, the RCSD's failure to have any such training or policy runs contrary to generally accepted police practices. (Id.) Mr. Noble supports his opinions by citing publications of the United States Department of Justice (DOJ), California Peace Officer Standards and Training (POST), multiple other law enforcement agencies, the International Association of Chiefs of Police (IACP), of which Defendant Chad Bianco is a member, and *Police Magazine.* (Id.)

As Plaintiff observes, Defendants do not argue, nor can the Court discern how they could, that evidence of widespread training on the recovery position is irrelevant to Plaintiff's Monell and supervisory liability claims. (Id. at 2.) The Court agrees with Plaintiff that evidence of what Plaintiff claims to be a generally accepted law enforcement training standard concerning the recovery position is "relevant to show that the County of Riverside's and its Sheriff's Department practice or custom of leaving people on their chest is dangerous and increased the likelihood of Mr. Niedzialek's death." (Id. at 2-3.) In other words, policies and practices of other agencies are relevant to show that Defendants are "outliers in policing." (Id. at 3.) To the extent Defendants claim Plaintiff's opinion evidence in support of its theory is unreliable, Defendants' MIL #4 covers the same ground as Defendants' MIL #1, seeking the exclusion of Mr. Noble's opinions, which the Court already denied. (See MSJ and First MILs Order.) As such, the Court finds Plaintiff's recovery position evidence relevant and sufficiently reliable.

The Court also rejects Defendants' argument that Graham's familiar principle that use of force analysis is evaluated by the facts known to the officers at the time they acted somehow precludes evidence of national standards or training. Graham makes clear that judges and juries should evaluate an officer's use of force based on the incident-specific facts known to

her at the time. The canonical example is that an object later determined *not* to be a gun in the hands of a suspect does not render an officer's use of force unlawful if it was reasonable for the officer to believe it was a gun, just as a gun in the suspect's possession that no officer knew about could not provide (post-hoc) justification for the use of deadly force. Defendants' argument conflates two distinct rules and legal inquiries: facts unknown to the officers at the time they used force are not relevant to assessing the lawfulness of the force used, but objective reasonableness standards apply regardless of an officer's subjective state of mind. Defendants cite no authority, and the Court is not aware of any, that requires a court to accept (1) Defendants' representation of what their training consisted of and (2) exclude any relevant evidence simply because they claim not have been trained on it. As Plaintiff explains, "the deputies' claimed ignorance of the recovery position should carry no more weight than an officer's professed ignorance of Tennessee v. Garner, 471 U.S. 1 (1985), accused of excessive force after shooting a non-violent, feeling felon." (Opposition to Defendants' MIL #4 at 4.) Or put another way, "the deputies' purported ignorance does not make their deadly conduct 'objectively reasonable,' any more than a driver unaware of the effect of extreme cold on road surfaces would be exonerated from an accident caused by driving as if the weather were normal." (Id. at 5.) Moreover, as Plaintiff explains, a reasonable jury could find that the deputies *were* aware of the risks of prone restraint and the benefits of the recovery position because (1) it is undisputed that Deputies Keeney and Gomez completed POST-certified training and (2) POST training warns officers about the risk of positional asphyxia and instructs officers to place individuals in the recovery position when appropriate. (Id. at 6.)

**\*5** As to supervisory liability, Plaintiff intends to argue at trial that Sheriff-Coroner Chad Bianco (1) was a member of IACP, which endorsed the recovery position to mitigate positional asphyxia; (2) ignored the IACP's recommendations; and thus (3) disregarded the known or obvious consequences that not training his deputies to use the recovery position would cause Deputies Keeney and Gomez to violate Mr. Niedzialek's rights by causing him to die of asphyxia. (Id. at 4.) There are disputed factual issues underlying this theory and others, but those are the questions the jury must decide.

Finally, Plaintiff's evidence is not unduly prejudicial. A reasonable jury will be capable of placing the evidence in context and separating out the use of force inquiries from other issues such as Monell and supervisory liability. The evidence is also not substantially more prejudicial than probative.

The Court **DENIES** Defendants' MIL #4.

**B. Defendants' MIL #5**

Defendants' MIL #5 seeks to exclude any and all references to the George Floyd case and "similar non-party incidents" as irrelevant, unduly prejudicial, an undue consumption of time and a risk of confusing the issues. (Defendants' MIL #4 at 1.) Defendants assert that the facts of the instant case "have almost no similarity to those of the Floyd case," because Floyd was a black man restrained by a white officer and here Niedzialek was white, as was one of the deputies; the autopsy result in the Floyd case "clearly showed his cause of death was asphyxiation" due to neck compression from a knee to the neck, whereas here "Niedzialek never had any knee on his neck" and his autopsy excluded asphyxia as a cause of death; and Floyd had a minimal amount of meth in his system, whereas Niedzialek had five times the minimum toxic amount of meth in his system. (Id. at 4.) Defendants argue that "comparing these apples and oranges cases" is unduly prejudicial and "unreasonably and dangerously inflammatory" and "would allow Plaintiff and Plaintiff's counsel to exploit Floyd's memory in an improper, bad faith manner." (Id.)

Plaintiff asks the Court to deny Defendants' MIL #5 as "overbroad and vague." (Opposition to Defendants' MIL #5 at 1.) In her view, "[t]o answer Defendants' contention that restraint-induced asphyxiation is a myth requires Plaintiff to reference other sudden in-custody deaths such as the murder of George Floyd, to support her argument that the risk of positional asphyxia is real and caused the death of Kevin Niedzialek." (Id.) Defendants have claimed that "the weight of the current scientific information does not support the contention that being restrained in the prone cuffed position, or having pressure applied to the back during the typical course of forcible restraint, leads to clinically significant respiratory or cardiovascular compromise and/or death" and are likely to make this argument at trial. (Id. at 1.) Plaintiff summarizes this position as (1) prone restraint does not impair breathing and (2) positional asphyxia is a myth. (Id. at 2.) Plaintiff argues that, "to balance this claim, Plaintiff's experts should be allowed to refer to the death of George Floyd and other instances of cardiac arrest and death due to prone restraint asphyxia." (Id. at 2.) She argues that "reference to George Floyd's death and other prone-restraint-asphyxia

deaths cannot prejudice Defendants, who will be telling the jury that prone-restraint asphyxia is a myth." (Id.)

The Court understands both parties' positions. The Court agrees with Defendants that reference to George Floyd's death (or the deaths of David Smith or Eric Garner or any other related incidents) may pose some risk of prejudice and confusion of the issues. The Court does not want this case to devolve into a mini-trial of how it is, or is not, like the George Floyd case. The Court agrees that fact-specific comparisons between the two cases would be inappropriate from either party, e.g., seeking to admit the specific amount of drugs in George Floyd's system to contrast that in Mr. Niedzialek's. It also will not allow Plaintiff to make the improper argument that Defendants identify, namely "to make the deduction that this matter is similar and, thus, should be given similar results." (Defendants' MIL #5 at 3.) (Notwithstanding the obvious distinction that the George Floyd case was criminal, and this one is civil, so any "results" are inherently dissimilar.) Nonetheless, the Court accepts Plaintiff's argument that the evidence of non-party incidents (including the Floyd incident) is relevant to the parties' respective expert opinions as to whether or not positional asphyxia is real. The Court also accepts Plaintiff's representation that she will seek to admit this testimony only through the direct and cross-examination of the experts to "educate the jury that the risk of prone-restraint asphyxia is real, and that Defendants' claim to the contrary is fiction." (Opposition to Defendants' MIL #5 at 2.)

*6 Limiting the introduction of this evidence to the basis of the experts' respective opinions will also limit the potential prejudice of the evidence to both sides. The parties have some leeway to ask the experts, at a fairly high level of generality, their awareness of (alleged or purported) prone-restraint deaths involving officers in preceding years, and how that affects their opinions as to cause of death, the proper training of officers, the reasonableness of force, etc. But the Court warns the parties, especially Plaintiff, that they will be on a short leash when referring to other incidents. The parties should not delve into the facts of other cases. The parties should not raise improper hypotheticals or lines of questioning, e.g., "was the use of force in the Floyd case reasonable?" or "is it your opinion that George Floyd died of positional asphyxia or drug toxicity"? The parties are certainly precluded from making any arguments that invoke the Floyd case in service of the contention that it compels (or does not compel) a result in *this* case, i.e., "justice for George Floyd means justice for Kevin Niedzialek" or "Derek Chauvin killed George Floyd with a knee on his neck; Kevin Niedzialek tragically died of a methamphetamine overdose—don't confuse the two." The Court does not want to hear the words "justice" and "George Floyd" uttered in the same sentence, or the words "this case is/is not like the Floyd case," or anything of the sort. The parties are also precluded, until further order of this Court, from making specific reference to George Floyd in their opening statements; the Court may take the issue up again when it comes to closing arguments. Plaintiff (and Defendants, should they wish) may, however, make a brief and general reference to deaths caused by positional asphyxia, e.g., "you will hear from experts in this case who will explain to you that positional asphyxia is real, and that the national law enforcement community has responded to incidents of deaths in police custody by changing their training and use of force standards—but not Defendants, who are outliers in policing."

The Court is also confident that the jury can separate out the dynamics from the George Floyd incident (or related deaths) that are not relevant here without further order or instruction from the Court. The jury can clearly see for itself that Mr. Niedzialek was white and that the racial justice aspects of the Floyd case are not at play here. However, if the parties wish, they can meet and confer regarding a potential stipulation or instruction that will limit what the jury is and is not allowed to consider non-party incidents for.

Because Defendants' MIL #4 seeks to exclude any and all reference to other incidents, it is **DENIED**. However, the parties are to limit any such references to the constraints imposed here. They are forewarned that the Court may revisit this issue if either party makes improper references or arguments. The Court warns Plaintiff in particular that any improper or excessive reference to the George Floyd incident or related ones may lead the Court to preclude any further references for the rest of the trial. Finally, if the parties need further clarification of what questions are proper, they are encouraged to raise the issue ahead of time outside the presence of the jury—the Court is not going to make line edits to every proposed question, but it is willing to tell the parties ahead of time whether a particular line of questioning is valid or not. To the extent the parties have any remaining doubt about whether a George Floyd reference is acceptable or not, they should exercise caution and avoid it wherever possible.

**C. Plaintiff's MIL #1**

Plaintiff's two motions in limine seek to the exclude the opinions of two of Defendants' experts. The Court assesses each individually under the Daubert, 509 U.S. 579 standard.

Fed. R. Evid. Rule 702 allows admission of "scientific, technical, or other specialized knowledge" by a qualified expert if it will "assist the trier of fact to understand the evidence or to determine a fact in issue." In assessing whether a particular expert theory or technique is admissible, courts assess "[w]hether the theory or technique enjoys 'general acceptance' within a 'relevant scientific community.' " Kumho Tire, 526 U.S. at 150 (1999) (quoting Daubert, 509 U.S. at 592-94). Additionally, the party offering expert opinion must show by a preponderance of the evidence that: (1) the expert is qualified to render their opinions; and (2) the opinions are adequately factually and scientifically supported. Daubert, 509 U.S. at 592-93.

Plaintiff's MIL #1 seeks to exclude the testimony of Defendants' expert James Borden, whom Defendants have noticed as a "force science expert." (Plaintiff's MIL #1; Defendants' Witness List.) Plaintiff argues that (1) Mr. Borden lacks the requisite knowledge, skill, experience, training or education regarding "human factors" and related behavioral science topics and California and national law enforcement standards; (2) Mr. Borden's proposed testimony will tell the jury what inferences to draw from the video evidence and will not assist it; (3) Mr. Borden fails to base his testimony on sufficient facts or data and does not apply reliable principles and methods to the facts of the case; and (4) Mr. Borden's proposed testimony about creating the Incident Reconstruction Timeline and Composite Video and police practices-related testimony would be cumulative because Plaintiff would stipulate to the authenticity of the Composite Video and Defendants have already noticed Robert Fonzi as their police practices expert. (See id.) The Court agrees with each of these arguments.

**\*7** Defendants have proffered Mr. Borden as an expert in "force science" as shorthand. In slightly more detail, they offer his testimony to explain his "review and analysis regarding the incident related to the use-of-force in subduing and controlling the subject of the contact, Kevin R. Niedzialek, from a police performance dynamics perspective." ("Borden Expert Report," Helm Declaration Ex. 1.) He offers six specific opinions which the Court need not recount in detail here, but they can be summarized as follows: the Deputies followed their training, their "stated perceptions were accurate," the Deputies had to act quickly, their decision-making was consistent with a reasonable officer's perception of events, and the Deputies' continued restraint was appropriate in that they were "cautiously restricting Niedzialek's movements." (See Borden Expert Report.) It is his "overarching opinion that decisions made by the deputies to use force in this incident were dictated by the actions of Niedzialek, and were not subjective decisions made by the deputies." (Id.) The Court excludes Mr. Borden's testimony for the specific reasons below, but this nonsensical "overarching opinion" certainly encapsulates the problems with those that follow: couched in language that appears facially technical or scientific, it amounts to no more than relaying the underlying evidence he reviewed and asserting that it justifies the deputies' actions. See Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc., 709 F.3d 872, 883 (9th Cir. 2013) (explaining that, under Daubert, "[b]asically, the judge is supposed to screen the jury from unreliable nonsense opinions"). What does it mean that the deputies' actions were "not subjective?" All decisions are based on the information actually received and processed by the human mind. Mr. Borden follows up this "overarching opinion" with the following: "The deputies [sic] reactions to the behavior of Niedzialek were not only based on a *reasonable belief* that Niedzialek's actions required lawful intervention, rather, the decisions were based on the *actual* behavior and condition of Niedzialek and an *actual* need to de-escalate Niedzialek's actions." (Id.) (emphasis in the original). This, too, is nonscientific gobbledygook. No one claims that Mr. Niedzialek's behavior was not "actual"—the jury will have ample opportunity to watch it for themselves. The Deputies will surely testify that they actually perceived that behavior; that is why they are the first individuals listed on Defendants' Witness List. (See Defendants' Witness List.) And Defendants' police practices expert, Robert Fonzi, can opine that based on Mr. Niedzialek's behavior and the Deputies' perception of it, their actions were consistent with their training and appropriate under the circumstances. Mr. Borden's testimony offers nothing that these other witnesses cannot testify to. To the extent his testimony is offered to add a (pseudo)scientific gloss to the notion that the Deputies' conduct was reasonable, he is unqualified to offer that opinion. To the extent he simply points out what every layperson can see from a video, his testimony is unhelpful to the jury. And to the extent he opines that the Deputies' conduct was reasonable in light of their training or other standards, his testimony is duplicative of that offered by Defendants' police practices expert. Mr. Borden's views are trapped in a kind of legal purgatory, halfway in between any theory of admissibility: they are not expert opinions or useful lay testimony.

Mr. Borden's opinions are purportedly based in concepts that at least bear a superficial resemblance to behavioral

science. He explains terms like "consequentialism," "time compression," "focus of attention," and "threat cues." (Borden Expert Report.) He claims that his opinions "are made to a reasonable degree of scientific or technical probability or certainty based on this expert's review of the available known forensic and witness evidence and this expert's background, training and experience." (Id.) But Mr. Borden lacks the background to opine about behavioral science topics. His resume lacks an "education" section. (See Helm Declaration Ex. 1.) Plaintiff asserts, and Defendants do not deny, that Mr. Borden is not a kinesiologist, biomechanical engineer, psychologist, or doctor. (Plaintiff's MIL #1 at 4.) He has never taken a psychology class. (Id.) He has some college credits, but no college degree. (Id.) He has "30 credits in criminal justice" and "15 credits with a focus on human behavior and psychology" at a community college, College of Southern Nevada. (Id.) The primary basis for Mr. Borden's purported expertise in "force science" is that he is an instructor at the Force Science Institute. (See id.) Mr. Borden says that he has helped gather data for studies conducted by the Force Science Institute, which he also claims to have been published in peer reviewed publications, though his expert report does not cite a single peer-reviewed study for which he gathered data. (See Borden Expert Report.) Moreover, the Force Science Institute is widely regarded as a purveyor of unreliable pseudoscientific analysis engineered to justify officers' use of force, and its studies, virtually all of which are non-peer reviewed and none of which have been published in reliable scientific journals, enjoy little or no acceptance within the relevant scientific community. See Kumho Tire, 526 U.S. at 150. The Court has reviewed relevant materials concerning the Force Science Institute's acceptance within the scientific community, including the 2015 article published by the *New York Times* submitted by Plaintiff. (See Helm Declaration Ex. 3, Matt Apuzzo, *Training Officers to Shoot First, and He Will Answer Questions Later*, N.Y. TIMES, Aug. 1, 2015). Founded by psychology professor William Lewinski, who consistently testifies on behalf of law enforcement officers alleged to have used excessive force, the Force Science Institute's research "has been roundly criticized by experts." (Id.) Lisa Fournier, a Washington State University professor, and an American Journal of Psychology editor, has called Mr. Lewinski's work "pseudoscience" and "invalid and unreliable." (Id.) Because Mr. Lewinski's work was not published in scientific journals (but rather in police magazines), it was not subjected to the peer review process; Dr. Fournier determined that it "lacked basic elements of legitimate research, such as control groups, and drew conclusions that were unsupported by the data." (Id.) The United States Department of Justice has denounced his findings as "lacking in both foundation and reliability." The Court might not allow Mr. Lewinski himself to testify under Rule 702 because his opinions are not reliable. But unlike Mr. Lewinski, Mr. Borden has no scientific training, so his role espousing Mr. Lewinski's unreliable ideas as an instructor for the Force Science Institute provides an additional reason to exclude his testimony: he provides no independent scientific basis to concur in the opinions advocated by the Force Science Institute.

**\*8** Based on the above, it is little wonder that district courts asked to pass on Mr. Borden's qualifications as an expert have consistently excluded all or some of his opinions. The Court adopts the positions of those courts. Defendants argue that Mr. Borden is qualified as an expert because he has extensive experience as a law enforcement officer. (See Opposition to Plaintiff's MIL #1 at 2-4.) The Court agrees that Mr. Borden's long career in law enforcement might qualify him as an expert in some subjects, but not in the subjects for which he is offered here, namely disciplines of behavioral science. In Cole v. Perry, 2019 WL 4165304, at \*6 (S.D. Ind. Apr. 30, 2019), on reconsideration, 2019 WL 2210809 (S.D. Ind. May 22, 2019), the court explained that Mr. Borden's " 'twenty years of experience in law enforcement with five years observing human interactions as a patrol officer and one year as an undercover detective,' does not make Mr. Borden an expert in the academic field of behavioral science. See Chapman v. Maytag Corp., 297 F.3d 662, 688 (7th Cir. 2002) ('Personal observation is not a substitute for scientific methodology, and is insufficient to satisfy Daubert's most significant guidepost.')." Defendants also argue that Mr. Borden has considerable education and training. (Opposition to Plaintiff's MIL #1 at 3.) The Cole court rejected this argument as well, reasoning, "the fact that Mr. Borden has been a student of these topics does not make him an expert. Simply put, Defendants have failed to establish that Mr. Borden is an expert in the field of behavioral science." Cole, 2019 WL 4165304, at \*7. Another district court excluded Mr. Borden's opinion testimony on "human factors," "human movement" and "human performance" (the core of what he seeks to testify regarding in this case) because he lacks the "requisite training or education to provide expert testimony about matters of human behavior and psychology." Bao Xuyen Le v. Reverend Dr. Martin Luther King, Jr. Cnty., 2019 WL 8273355, at \*1 (W.D. Wash. May 9, 2019). The same court later precluded Mr. Borden from testifying about whether an officer, Deputy Molina, used reasonable or justifiable force when he shot a civilian, Tommy Le, finding

that "the issue of whether or not the force used by Deputy Molina was excessive is properly within the province of the jury, and that expert testimony will not assist the jury in making this determination." Bao Xuyen Le v. Reverend Dr. Martin Luther King, Jr. Cnty., 2019 WL 2289681, at *1 (W.D. Wash. May 29, 2019). It also precluded Mr. Borden from opining "about which version of events is more credible or which facts actually occurred," and instructed him not to "speculate about the intent, motive, or state of mind of anyone involved, including Tommy Le and Deputy Molina"; it also precluded him from testifying regarding "the law concerning the use of force." Id. The Court agrees with the Bao court that Mr. Borden's opinions bolstering the credibility of the Deputies' accounts or speculating as to any individual's state of mind are inadmissible. The sole issue the Bao court allowed Mr. Borden to testify about was "law enforcement practices, tactics, techniques and training." Id. As noted below, the Court might have allowed Mr. Borden to testify to those issues, too, but that testimony would be entirely duplicative of that offered by Defendants' other experts and witnesses.

Facing a motion in limine to exclude Mr. Borden's testimony in its entirety, the defendant-officer in Farmer v. Las Vegas Metro. Police Dep't, 2020 WL 5763607 (D. Nev. Sept. 28, 2020), aff'd sub nom. Farmer v. Lopera, 860 F. App'x 469 (9th Cir. 2021) conceded that Mr. Borden "will not mention human factors and behavior, purport to be an expert on them, or offer any opinions on human factors and behavior." Id. at *3. Rather, he sought only to have Mr. Borden testify about law enforcement policies, customs and training and that his actions were consistent with them. Id. at *4. Farmer illustrates that Mr. Borden has been far more readily received as an expert in police practices than an expert in behavioral science, the latter subject for which he is offered as an expert here.

The lengthiest discussion of Mr. Borden's purported areas of expertise is in Finch v. City of Wichita, Kansas, 2020 WL 3403121 (D. Kan. June 19, 2020), aff'd sub nom. Finch v. Rapp, 38 F.4th 1234 (10th Cir. 2022). Finch, too, is bad news for Mr. Borden. The Finch court first declined to "pass upon the reliability of 'Force Science' generally," observing that the "term appears to be more of a trademark than the name of a field of scientific study." Id. at *22. The court "gather[ed] that the concept generally involves examining how scientific principles governing human behavior apply to police work." Id. Applying Daubert standards, Finch found it "clear that a number of Borden's opinions turn on scientific concepts that are outside of his area of expertise as a police officer." Id. Virtually all of those "scientific concepts" are the same

as those in Mr. Borden's expert report in the instant case, such as the "limits and characteristics of human attention" and its "relation to memory," and the "human limitations of focus of attention and time compression." Id. (See Borden Expert Report.) The court excluded these opinions, which were "clearly outside the scope of Borden's training and experience as a law enforcement officer," reasoning, "Borden may have read studies or attended courses relating to attention and memory, but no showing is made that he has the training, experience, or learning necessary to make informed judgments about issues within specialized fields of the behavioral sciences such as psychology and cognitive science." Finch, 2020 WL 3403121, at *22. The court next found that "other opinions appear to merely advocate on behalf of Officer Rapp based on Borden's personal views, without any showing these opinions are tethered to a reliable method of analysis." Id. at *23. Those "personal views" included ones virtually identical to those asserted here, e.g., "Officers in a rapidly evolving critical incident like this one, do not have the luxury of analyzing a static representation of the incident, an object, or a particular action for the benefit of optimal decision making." Id. The court excluded those opinions because they would not be helpful to the jury and the defendants did not meet their burden to show that the opinions were the product of reliable principles and methods. Id. Finch then excluded Borden's opinions as to whether the officer complied with departmental policies because they would not be helpful to the jury, reasoning that officers "who were present at the scene are able to testify to and explain [departmental] policies to the extent they have any relevance." Id. "Moreover, whether Rapp's actions were consistent with departmental policies is not an issue the jury must decide, and having an expert focus on and render opinions about policy compliance runs the risk of confusing the jury about the standards by which they must decide whether Rapp's actions violated the Fourth Amendment." It found that the "vast majority of Borden's opinions" would also not be helpful because they "consist largely of Borden offering justifications and making factual and legal arguments that Defendant Rapp – or his attorneys – can provide the jury without the need for expert opinion." Id.

**\*9** This Court follows Cole, Bao, Farmer and Finch in finding that Mr. Borden is not qualified to testify on the subjects for which he is offered as an expert and that Defendants have not met their burden to demonstrate that his methodology is reliable. In his expert report, Mr. Borden also fails to cite to the relevant "applicable policies" or any relevant peer-reviewed studies, law enforcement

training and policy documents, or anything else to support the overwhelming majority of his opinions, which also undermines any finding of reliability. See Farmer, 2020 WL 5763607, at *5 (faulting Mr. Borden's expert reports for "numerous conclusory statements" that do not "directly cite the applicable police standards used to reach such conclusions" and explaining that what citations he did offer were "broad, general and somewhat removed from the specific actions" of the relevant officer). The Court excludes every opinion in Mr. Borden's report that purports to be rooted in behavioral science on those bases. The rest of his proposed testimony is mere ideology or legal advocacy masquerading as science. The Court excludes those opinions on the grounds that it is unhelpful to the jury, for the jury can just as easily determine the facts Mr. Borden cites in support of his opinions and Defendants' lawyers can just as easily argue what inferences and conclusions they wish the jury to draw from them, i.e. that the Deputies acted reasonably.

For these same reasons, the Court excludes Mr. Borden's proposed narration of video evidence. Mr. Borden seeks to opine that Mr. Niedzialek "continued to aggressively struggle" against the Deputies and offered "aggressive resistance" at various points on the video. (See Borden Expert Report.) The jury can see and decide for itself whether or not Mr. Niedzialek was "aggressive" or resisted or struggled. The same is true of Mr. Borden's opinion as to the validity of the Deputies' use of "continued restraint," which Plaintiff is correct to observe merely "sounds like a defense attorney's closing argument." (Plaintiff's MIL #1 at 9.) The same is also true of Mr. Borden's belief that what the deputies observed was "accurate," which is either speculation as to their state of mind or unhelpful opinion evidence that a jury can decide for itself.

Plaintiff does not object to the authenticity of the Composite Video that Mr. Borden created and will stipulate to its admissibility, which renders Mr. Borden's proposed testimony regarding "Demonstrative Processes re Video and Stills" cumulative and unnecessary. (See Plaintiff's MIL #1 at 13.) As such, because Plaintiff will stipulate to the introduction of the Composite Video, the jury may watch it without hearing from Mr. Borden as to how he produced it. Mr. Borden also appears to have played some role in creating the Incident Reconstruction Timeline. (See Plaintiff's MIL #1 at 2.) As explained below in its discussion of Plaintiff's MIL #2, the Court excludes the Incident Reconstruction Timeline. The Court thus excludes Mr. Borden's proposed testimony on that subject.

Finally, any opinions by Mr. Borden about the appropriateness of the Deputies' use of force, their compliance with their training or "nationally accepted training and practices" is duplicative of the testimony of Defendants' police practices' expert, Robert Fonzi, who will offer his "opinions with respect to the police procedures; specifically, the issues related to reasonable suspicion, probable cause, use of force, involving deputies with the County of Riverside Sheriff's Department." (Id. at 14.) To the extent Mr. Borden is also offered as an expert in police practices, the Court excludes his opinions under Rule 403 as cumulative and a waste of time.

For these reasons, the Court **GRANTS** Plaintiff's MIL #1. Mr. Borden's testimony is excluded in its entirety. Plaintiff has stipulated to the Composite Video; the Court will allow its use at trial but will exclude any testimony by Mr. Borden regarding its creation or use. [2]

**D. Plaintiff's MIL #2**

*10 In her MIL #2, Plaintiff moves to exclude the testimony of Defendants' incident reconstruction expert Rod Englert and the "Incident Reconstruction Timeline" he created. (Plaintiff's MIL #2 at 1.) Plaintiff argues that (1) Mr. Englert lacks the qualification to opine on Mr. Niedzialek's cause of death and the reasonableness of the use of force applied by the deputies; (2) Mr. Englert's proposed testimony and the Incident Reconstruction Timeline will not help the jury (and invade the province of the jury) by telling them what they are supposed to see in the video; (3) Mr. Englert's "Review of Scene Photographs" evidence is irrelevant and should be excluded under Federal Rule of Evidence 403; and (4) the Incident Reconstruction Timeline is not based on reliable principles, but defense counsel's theory of the case, and should be excluded. (See Plaintiff's MIL #2.) The Court agrees with each of these arguments.

First, though offered as an expert in incident reconstruction, Mr. Englert's report opines on matters that significantly exceed his purported area of expertise, including Mr. Niedzialek's cause of death and the appropriateness of the Deputies' actions. The Court's review of Mr. Englert's resume and expert report indicates that he has no education or experience in determining cause of death. He is not a pathologist or medical examiner, and has no medical expertise of any kind. Nonetheless, his report declares that he consulted with *other* experts retained by Defendants, such as "ER

Doctor and Asphyxia Studies Expert Dr. Chan," and "based upon their medical expertise and opinion, I agree with the assessment that this death was due to acute methamphetamine toxicity. Furthermore, it is consistent with my opinion that the deputies applied minimal and appropriate restraint in this incident." ("Englert Expert Report," Helm Declaration Ex. 5.) Mr. Englert continues to opine about what various autopsy photos show with regard to injuries, but his commentary mostly seems to rehash (or, as Plaintiff puts it, "parrot") the opinions of another one of Defendant's witnesses, Dr. Mark Fajardo, the medical examiner who performed the autopsy. To the extent Mr. Englert evaluates what those photographs depict in terms of injuries, he is not qualified to render that opinion, and to the extent he simply points out what a layperson can see in the photographs, his opinion is not helpful to the jury. He further opines that "restraint applied by the deputies was necessary and appropriate for this type of incident and was carried out to protect themselves, protect others, and protect Kevin from himself until has was able to receive medical attention." (Englert Expert Report.) But Mr. Englert is not offered as an expert in police practices either—that is, again, Robert Fonzi, Defendants' police practices expert. Nor can the Court discern the basis of Mr. Englert's opinions as to the reasonableness of the force used, other than the opinions of other experts or any general deductions that can be drawn from his career in law enforcement. Mr. Englert's area of expertise, according to his resume, is in "managing criminal investigations, solving unresolved homicides, blood spatter interpretation and crime scene construction." (Englert Resume, Helm Declaration Ex. 5.) Mr. Englert puts that skillset to good use in his report, but as noted below, his interpretation of evidence such as blood spatter in Mr. Niedzialek's apartment is not relevant to this case. The Court therefore finds that Mr. Englert is not qualified to render his opinions concerning cause of death or the appropriateness of the Deputies' use of force under Rule 702. To the extent he is forced to rely upon the opinions of others, there is no independent basis why he is qualified to render an opinion agreeing or disagreeing with those opinions. Moreover, such evidence would be cumulative, for Defendants have noticed *eight* experts, not including Dr. Fajardo, and the Court will not allow Defendants to put on expert testimony simply to repeat and reinforce the conclusions they would like the jury to draw from other expert testimony.

*11 Second, Mr. Englert's proposed testimony and his use of the Incident Reconstruction Timeline is not helpful to the jury and invades its province. "Expert testimony is admissible under Fed. R. Evid. 702 if it addresses an issue 'beyond the common knowledge of the average layperson.' " United States v. Hanna, 293 F.3d 1080, 1086 (9th Cir. 2002) (quoting United States v. Morales, 108 F.3d 1031, 1039 (9th Cir. 1997) (en banc). The Ninth Circuit instructs district courts to "guard ... from expert elucidation[ ] areas believed to be within the jurors' common understanding," United States v. Rahm, 993 F.2d 1405, 1413 (9th Cir. 1993), and exercise their discretion to exclude an opinion that "concerns a subject improper for expert testimony, for example, one that invades the province of the jury." United States v. Lukashov, 694 F.3d 1107, 1116 (9th Cir. 2012) (citation omitted). District courts frequently exclude proposed expert testimony about what a photograph or video shows, for "[w]hat a photograph depicts is readily visible to a lay person and is not a proper subject of expert testimony." Barnes v. City of Pasadena, 2011 WL 13143536, at *3 (C.D. Cal. May 5, 2011), aff'd, 508 F. App'x 663 (9th Cir. 2013). Generally speaking, it "would be unhelpful for the jury for [an expert] simply to take the witness stand and recount his observations from the video evidence, since the jury is no less capable of viewing the evidence and drawing their own conclusions." A.B. v. Cnty. of San Diego, 2020 WL 4431982, at *2 (S.D. Cal. July 31, 2020). However, there are many situations in which an expert can recount what she observed in video or photographic evidence in order to explain the basis for her opinion, provided she is, of course, qualified to render an opinion on the subject. In A.B., for example, the court allowed the defendants' police practices expert to testify to what he observed in the videos because those formed the basis for his opinions as to whether officers acted appropriately. See id. at 2-3. Here, however, Mr. Englert's testimony is more or less offered to highlight video evidence for its own sake. Once again, Defendants have noticed a different police practices expert, Mr. Fonzi, who might be entitled to watch body-worn camera footage of an officer using force and opine as to whether the force he saw in the video was consistent with certain standards or training. But Mr. Englert's proposed testimony, and the Incident Reconstruction Timeline, consistently just points out what Defendants' Counsel wants the jury to see in the video, which is something that the jury can do by itself, or a lawyer can do at closing argument. In other words, it is not the proper subject of expert testimony. For example, the Incident Reconstruction Timeline tells the jury that, at a given moment, Deputy Keeney has "no knees" on Mr. Niedzialek. (Plaintiff's MIL #2 at 6.) If the video shows "no knees," the jury can see that for itself. And if "no knees" is a fact that forms the basis of Defendants' police practices expert's opinion that the use of force was consistent with training standards, then he is welcome to say that. Moreover, Mr. Englert's proposed

testimony does not just consist of unhelpful recitation of facts viewable on the video. He frequently veers into spinning those facts, e.g., claiming that "Kevin was out-of-control, kicking the concrete and bucking while resisting restraint." (Englert Report.) Telling the jury that the decedent was "out of control" is something attorneys for law enforcement agencies say at closing argument. It is not the proper subject of expert testimony.

Third, Mr. Englert's extensive "review of scene photographs" in his report, much of which consists of depicting and analyzing the bloodstains found in the apartment where Mr. Niedzialek was staying, is irrelevant and prejudicial. "Expert testimony which does not relate to any issue in the case is not relevant and ergo, non-helpful." Daubert, 509 U.S. at 591. Defendants have repeatedly insisted that facts unknown to the deputies at the time of the use of force is irrelevant. They now claim the evidence from the apartment is relevant because "the apartment contained various, extensive bloodstains that were likely caused by the external injuries observed on Mr. Niedzialek by reporting parties and witnesses" and residents had reported, prior to the Deputies' arrival, that a male individual was "having a meltdown." (Opposition to Plaintiff's MIL #2 at 8.) But it is undisputed that the deputies did not view or analyze this evidence before contacting Mr. Niedzialek. They could see, and everybody could see, that he was bleeding and needed medical attention; this, too, is undisputed. They could see, and everybody could see, that he was in distress. The parties might use different words to describe his conduct, but "meltdown" is not inaccurate. The point is that the blood pattern evidence obtained later from the apartment does not make any disputed fact more or less likely; it is clear that he was injured and needed help, and it is also clear that he was in that situation when the deputies arrived. It also does not go to Defendants' defense, for they argue that Mr. Niedzialek died of acute methamphetamine toxicity, not of whatever injuries he may have sustained prior to the contact with the Deputies. The extensive evidence of the apartment, including numerous gory photographs, is thus not probative of the issues in the action (either a claim or defense) and is prejudicial to Plaintiff's case. It will also confuse the issues and cause undue consumption of time. Mr. Englert is an expert in solving homicides, and his opinion evidence as to where bloodstains were located in the apartment demonstrates why he is a useful asset to any criminal investigation. But it is not helpful to this case, which has nothing to do with the state of the physical evidence in the apartment.

Fourth, the Court is concerned that the Incident Reconstruction Timeline is not based on sufficient facts or data or the products of reliable principles and methods. See Fed. R. Evid. 702(b)-(d). As Plaintiff explains, and Defendants mostly concede, the Incident Reconstruction Timeline is not an objective and comprehensive characterization of all the available evidence; it exists to curate the particular moments relevant to Defendants' theory of the case. Plaintiff asserts that this cherry-picks the evidence. (Plaintiff's MIL #2 at 8.) For example, the Timeline asserts that Deputy Keeney observed that Mr. Niedzialek is non-responsive at 11:59.033, but leaves out the moment, minutes earlier, when Deputy Keeney announces that he is "falling asleep." (Id.) Defendants argue that any errors or omissions in the Timeline would go to the weight of its admissibility and Plaintiff would be able to cross-examine Mr. Englert about the methodology he used in creating it. (Opposition to Plaintiff's MIL #2 at 9.) All other things being equal, the Court would likely agree with that argument. But the reasons set forth above convince the Court that allowing Mr. Englert to testify at all, including walking the jury through his Incident Reconstruction Timeline, would be improper. The Court expects that both parties will play video evidence for the jury and use it during witness examination. Defendants are welcome to examine the Deputies, play them body-worn camera to elicit what transpired, and ask them what they may have thought at any given moment. Defendants can present video and photographic evidence to their police practices expert, who can use them to opine about the Deputies' conduct at a given time. But Mr. Englert's testimony, and his presentation of the Incident Reconstruction Timeline, is not the proper subject of an expert testimony. It is also cumulative and prejudicial.

*12 The Court **GRANTS** Plaintiff's MIL #2. The Court excludes Mr. Englert's testimony and the Incident Reconstruction Timeline in their entirety.

**E. Bifurcation, Consideration of Monell Issues and Verdict Form**

In their Trial Brief, Defendants argue that Plaintiff's Monell claims cannot survive without an underlying constitutional violation by one of the former defendant deputies. (Defendants' Trial Brief at 3.) Defendants ask the Court to properly instruct the jury that they should first consider whether the deputies committed a constitutional violation before moving on to Monell liability. (Id.) They ask that the Court adopt their proposed verdict form, which they assert presents the issues in the correct order. (See id.)

The Court agrees with Defendants that Monell liability must be predicated on an underlying constitutional violation. It does not appear that Plaintiff contends otherwise. Further, the Court agrees with Defendants that the proper order for the jury to consider the issues is to turn to Monell liability if and only if it finds an underlying constitutional violation. Again, Plaintiff does not appear to suggest otherwise.

The key problem with Defendants' Proposed Verdict Form is that it completely omits Plaintiff's negligence cause of action, which is still live, and for which the legal standards differ in some respects from Fourth Amendment claims. (See Defendants' Proposed Verdict Form.) The Court observes that Plaintiff's Proposed Verdict Form retains the negligence cause of action but presents the issues in essentially the same order as Defendants request. (See Plaintiff's Proposed Verdict Form.) As such, the Court's tentative view would be to adopt Plaintiff's Proposed Verdict Form over Defendants' Proposed Verdict Form, although there may be some issues with the former as well. However, it would be preferable for the parties to stipulate to a mutually agreeable verdict form. As such, the Court **ORDERS** the parties to meet and confer as soon as possible to attempt to reach a stipulation regarding the verdict form. If the parties are unable to reach a stipulation, they shall file a joint status report indicating as such and explaining which issues remain disputed.

Defendants have sought bifurcation of the issues of liability, causation, compensatory damages, and the factual predicate for an award of punitive damages (trial phase one) from the issues of calculation of punitive damages against any individual defendant (if any) (trial phase two). (Defendants' Amended Memorandum of Contentions of Law and Fact at 20.) "Plaintiff does not oppose bifurcation of the amount of punitive damages as to Defendant Chad Bianco should the jury find the predicate for punitive damages in the first phase of the trial. Plaintiff opposes any additional bifurcation." (Plaintiff's Amended Memorandum of Contentions of Fact and Law at 12.) It is not clear to the Court to what extent the parties actually disagree about bifurcation. Defendants reference punitive damages against "any individual defendant" but the Court understands that the sole individual against whom Plaintiff seeks punitive damages is Defendant Chad Bianco. Nonetheless, for the sake of clarity, the Court orders as follows: the first phase of the trial will consist of every issue except for the amount of punitive damages, if any. The jury will decide whether Defendant Chad Bianco acted with the requisite factual predicate (malice, oppression or reckless disregard) for punitive damages. If so, the jury will consider the amount of punitive damages in a short second phase of the trial.

### IV. CONCLUSION

**\*13** For the reasons above, the Court **DENIES** Defendants' MIL #4, **DENIES** Defendants' MIL #5, **GRANTS** Plaintiff's MIL #1, and **GRANTS** Plaintiff's MIL #2. The Court rules on the issues of bifurcation, consideration of Monell liability and proposed verdict forms as set forth above.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2023 WL 2983583

### Footnotes

1   In their Amended Memorandum of Contentions of Fact and Law, Defendants suggest that their MIL #1, MIL #2, and MIL #3 are "pending." (Defendants' Amended Memorandum of Contentions of Fact and Law at 16.) That is inaccurate; the Court already denied them. It does not reconsider Defendants' MIL #1, MIL #2 and MIL #3 in this order because they have already been denied.

2   Defendants note that Mr. Borden has testified before this Court on three occasions in 2015-2016: Smith v. County of Riverside, Case No. 5:16-CV-00227-JGB (KKx); Young v. County of San Bernardino, et al., Case No. 5:15-CV-1102-JGB (SPx); and Tucker, et al. v. County of Riverside, et al., Case No. 5:16—CV-02275-JGB (DTBx). The Court has reviewed those dockets and the materials submitted by Defendants in conjunction with them. They do not change the analysis here. From the Court's review of the dockets, it appears that no

motion to exclude Mr. Borden's testimony was filed in those cases, so the Court never had an opportunity to rule on whether he met the Daubert standard. It also appears that Mr. Borden's testimony in those actions concerned materially different subjects than those he is asked to opine on here, and for which he is not qualified to so opine. In sum, Mr. Borden has previously testified before this Court as a police practices expert, opining on matters within that field and based on his lengthy career as a law enforcement officer; he has not been qualified as a "force science" or "human factors" expert entitled to opine on the matters for which he is offered here. Moreover, in the seven years since Mr. Borden testified in this Court, the unreliability of his methodology and his lack of qualifications have also come to light, as evidenced by the district court orders excluding his testimony, all of which were issued after Mr. Borden testified in front of this Court. And finally, even if Mr. Borden has testified before in front of this Court seven or eight years ago, that is not a sufficient reason to let him testify again. If Mr. Borden's opinions are unreliable and he lacks the qualifications to testify *in this case*, it makes no difference that he has testified in the past.

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.