To: Compliance Officer/Community Liaison
    US Department of Justice
cc: Hon. Judge Michael Simon
    City of Portland
    Portland Committee on Community Engaged Policing
    AMA Coalition for Justice and Police Reform and other community organizations
    News media

COCL AND US DOJ: 25 OR MORE SETTLEMENT AGREEMENT PARAGRAPHS LACK COMPLIANCE
an analysis by Portland Copwatch, August 16, 2023

The Compliance Officer/Community Liaison (COCL) released its analysis of whether and how the City of Portland is fulfilling its promises to implement the 2012 Settlement Agreement with the US Department of Justice (DOJ), focusing on January-March 2023.*-1 The Agreement was struck in order to keep the DOJ from formally suing the City for its police violating people's rights by using too much force. The COCL's mid-July report was followed by an early August analysis from the DOJ that covers developments at least until May/June of 2023.*-2 While each entity found the City was not in full compliance with 23 paragraphs of the Agreement, they overlapped on only 20 of them. Adding the three others from each report, there are still at least 25 paragraphs for the City to complete to achieve full compliance.

To summarize the discrepancies, the DOJ thinks that 911 operators need to have a firm policy to dispatch Portland Street Response (paragraph 115), that the Independent Police Review (IPR) and Internal Affairs haven't adequately laid out plans to be sure misconduct investigations are finished in 180 days (paragraph 123) and that the Portland Committee on Community Engaged Policing (PCCEP) hasn't met with the Mayor and Chief or completed its quarterly reports as required (paragraph 151).

The COCL, on the other hand, thinks the Bureau has to create a policy affirming that officers who witness deadly force can forego interviews if they are psychologically traumatized (paragraph 126), that the PPB has to update its policy to match the discipline guide adopted in February 2022 (paragraph 137) and that there were issues about suitably involving the community in hiring the Training "Dean" (paragraph 191). It's likely the COCL would find paragraph 191 in compliance now that Dr. Rebecca Rodriguez (formerly Yazzie) has been hired as the civilian education director for the Portland Police Bureau (PPB).

It helps greatly that the COCL outlined changes in the ratings between Q4 2022 and Q1 2023, which involved three paragraphs each moving into and out of compliance.*-3 Both the COCL and DOJ included color-coded "report cards," making comparisons even easier for the public.

Notably, the failure of the PPB's internal Police Review Board (PRB), which holds its meetings in private and puts out heavily redacted reports twice a year, was not remedied in Q1 and seems to have gotten worse. The presentation for the Behavioral Health Unit Advisory Committee (BHUAC) on the use of force and deadly force against people in mental health crisis was begun in Q1 but was overly long (there wasn't time for discussion) and overly broad (the PPB included deadly force cases where no mental health nexus was known). Yet the COCL once again found the BHUAC in full compliance (95) [pp. 106-107].

The DOJ leans heavily into the inadequacy of the PPB investigation into biased training slides, which ended up with one Sergeant getting disciplined for being responsible (directly or indirectly) for the offensive material. The DOJ notes that there should also have been investigations into how this training went forward without the required approval from the Training Division.

The COCL indicates that Equity training seems to be on hold at the Bureau after the negative responses to the LGBTQIA2S+ training that was revealed in the Q3 and Q4 reports.

Neither the COCL nor the DOJ addresses the unilateral decision by Chief Lovell to extend the reporting time on naming officers involved in deadly force from 24 hours to 15 days. PCW pointed out that changes to Directives, in this case 1010.10 on post-shooting procedures, need to be posted for public comment before they are changed (paragraph 167). The Agreement makes no mention of Executive Orders, which the Chief used to make this change. At a public forum on the PPB Annual Report held in July, the Chief said the change was done at the request of the FBI. The Agreement clearly prioritizes community input, and nowhere does it say the FBI should tell the police how long they should wait to release officer names. Also, when officers from Portland and Clackamas County shot the same suspect to death in April, the Clackamas officer was named in 48 hours with no negative repercussions while the PPB waited 17 days to release two officers' names.*-4

Both the DOJ and COCL agree that the recent release of the report on the 2020 protests created by the Independent Monitor LLC (IMLLC) does not put the City in compliance with paragraph 189. That report was released on August 10, so was not able to be included in the analyses. The Agreement says that the City has to use the information to update its crowd control training and then IMLLC has to do a follow up report to satisfy the DOJ's requirements.

The two compliance reports note that few deadly force cases have been through Police Review Board hearings, due to lack of professional facilitators willing to head up those mostly one-sided hearings. The DOJ calls out the case where officers shot 14 bullets at Andreas Boinay's moving car in 2021, then fired a fifteenth round after the car stopped. They say the PRB didn't seek a rationale for each bullet fired, nor did the presenters include video of that last bullet shot [DOJ p. 74]. The COCL says that one deadly force case did not include the required review by the Training Division (paragraph 131, p. 147). It's not clear if that was the same incident since everyone seems to be afraid to name names in these reports, while the OIR Group includes both officer and community member names in their deadly force reports on a regular basis. There have been twenty deadly force incidents since January 2021. Only a handful have gone through the whole process. Just a few weeks ago, the Portland Police shot and killed PoniaX Calles, a young Black man. This was the third time they shot a Black man since November and the second time the shooting was deadly. Do Black Lives Still Matter?

With a total of at least 20 deadly force incidents from 2021 to the present, the COCL has ample data to run an analysis on these most serious cases. Yet their only suggestion to the PPB about analyzing the cases is to find out why they take so much longer than the mandated 180 days to investigate (paragraph 121, COCL pp. 25 & 136).

While PCW sounds cynical about the omissions in the two reports, we want to be clear that the amount of information that _is_ included is crucial for a window into what's going on behind closed doors. The problem is that it's like having a window that's deeply tinted with just a tiny hole to peek through. In our analysis, paragraph numbers generally appear in (parentheses) with Report page numbers in [brackets], with "DOJ" added where appropriate. Some information is from analysis by the COCL regarding outcomes so no specific paragraph is referenced.

CROWD CONTROL

Much of the section in the COCL's report on Training has to do with Crowd Control ("Public Order"? No thanks, Mr. Orwell). Here are some of the key points:

--The PPB used internal assessments of what happened in 2020 to design a new crowd control training. The COCL says a new unit should be created that ensures it is a "comprehensive, equitable and effective approach to crowd management." However, at the town hall on the COCL report, the consultants were not sure whether any community members were involved in the training other than Training Advisory Council (TAC) members who observed it (84) [p. 4]. On p. 68, the report explicitly says officers played the role of protestors, which seems to prove they did not involve the public.

--An instructor said officers can refuse to give out their business card if they are concerned about privacy as long as they document and justify the decision, which seems to fly in the face of the Bureau's stated transparency value. The instructor noted that officers are not entitled to the same level of anonymity as "[other] public employees" (84) [p. 65]. PCW agrees that people who can put their hands on members of the public, beat them and shoot them should not have the ability to hide their names from the community.

--PPB now has to let hospitals know what type of weapons or "tools" they're using so doctors can prepare a response (84) [p. 66].

--It's not 100% clear whether or not there was "procedural justice" included in the crowd training as the COCL says they paid "little attention" to the concept on p. 66 but on p. 69 say they did include that issue. The idea is to build rapport with crowd. The COCL wants the police to also thank people for cooperation (which can lead to dubious consequences in crowds which frown on police collaborators), explain their actions and answer questions like where people are being detained (84).

--The police were told to be clear on the difference between "significant government interest" and "legitimate government interest" but the report doesn't explain that difference (84) [p. 65].

--Apparently officers are now being trained to be specific in directions to disperse a crowd and use "the least restrictive means necessary." This is important as PCW has observed conflicting and unclear orders for years. They're also instructed to use verbal warnings, but not projectiles or chemicals, and physical force can only be for defense of self or others, when making an arrest or preventing escape. They are told to minimize the impact on bystanders, medical personnel, journalists and other "unintended targets" (84) [p. 65].

--Part of the training is that a warning from the Bureau's sound truck that violence might be used doesn't relieve officers of the need to give individual warnings before using force (84) [p. 66].

--In a vaguely worded statement about seizure of property, the COCL reveals that officers are told they can remove weapons that are perceived to be deadly or dangerous, or items that are used for an unlawful purpose (84) [p. 66]. In the past, the police have confiscated items such as a sign reading "register to vote here." Maybe they need better training on what's a threat.

--A commander dubunked the "Le Bon theory" on crowds, but the COCL doesn't say what that was or why. Instead they used the "Enhanced Social Identity Model" which says that if some people are "offended by what some officers are doing" like using too much force "they may become cohesive and organized against the police" (84) [p. 64].

NEW CIVILIAN TRAINING "DEAN"

On the subject of the "Dean," Dr. Rodriguez was given the title of "Director of Education." However the PPB's draft Training policy presented in July refers to that position as "Director of Police Education." Portland Copwatch takes pains not to pronounce "COCL" and "PCCEP" like others do, so we're hoping people don't call Dr. Rodriguez the DOPE as that title spells out. The COCL told a story at the PCCEP town hall about being a civilian employee at a police department and not getting respect. We wonder if Dr. Rodriguez has been deliberately greeted with a pejorative title.

Also:

--For some reason, the COCL says City Council should let the Chief decide whether the Director of Education and the Commander of Training report to the same person. That makes no sense if the Chief ignores COCL's wise proposal [p. 50].

--The COCL also suggests using civilian trainers including former officers, who of course will then be double-dipping as retirees and employees [p. 51]. Nice work if you can get it!

--P. 198 says the TAC was involved in interviewing the Civilian Dean, but in the previous report the COCL revealed that nobody from TAC showed up for the interview because the email invitation went to a spam folder and the Bureau failed to follow up.

OTHER TRAINING ISSUES

Other items about training include:

--The list of sources for input into the Bureau's training needs does not include the general public (79) [p. 52]. That's unfortunate as the new draft of the Training Directive explicitly lists the public separately from the Training Advisory Council. That said, the COCL urges the Training Division to listen to "voices of the community, including TAC," to make decisions on what subjects to teach each year (85) [p. 91].

--The COCL calls for evaluations of training to be done by professionals, but starting with Officer Wellness (80) [p. 56]. PCW would encourage the Bureau instead to start with a policy that directly impacts the community, such as the use of deadly force.

--Officers' response to trainings saw the lowest satisfaction rates of 39%-65% for LGBTQIA+ pronoun trainings, and LGBTQIA+ policy scenarios at 34%-72% [p. 76].

--The TAC wisely asked the Bureau to engage them earlier when drawing up new training (86) [p. 91].

USE OF FORCE

Portland Copwatch has addressed deadly force in its introduction and touches on it elsewhere. Other issues around the use of force and the Employee Information System (EIS), include:

--The COCL randomly picked 20 force cases to review and found that 25% of them were not "tactically sound." (66/67) [p. 34]. That's just a random sample!

---In one incident, the police claimed that because a person stopped struggling once officers put their weight on them, it was not a use of force against resistance because there was no resistance. In another case, they only knew an officer used force because of surveillance footage of the incident. The COCL calls for corrective action for the officers who aren't filing accurate reports (66/67) [pp. 37-38].

---In another case, an officer rammed a suspect's car while a ride-along was in the patrol vehicle. The PPB shrugged this off as a "one-off event" (74/75/77) [p. 46].

--The police continue to mark down any tactic they employ as a form of de-escalation even when that's an unsupported assertion. The COCL notes the policy says de-escalation has to be a "deliberate attempt," not randomly assigned after-the-fact They hope this may improve after a new reminder went out from the Force Inspector (66/67) [p. 35].

--Supervisors didn't follow up after being unable to interview a community member who had been "chemically incapacitated" by medical responders, a concept which in itself is alarming. This is an example of how supervisors aren't conducting thorough investigations on force (74/75/77) [p. 45].

--The COCL says there's a low raw number of uses of force amounting to 1.8 per day (76) [p. 48]. No other city workers use force on people, so twice a day is still too much!

--The report finds that commanders are more concerned with justifying officer behavior than examining why they are "statistical outliers." Example: an officer who uses more vehicle intervention techniques (ie hitting moving cars) more than others was praised for their "unique ability to locate subjects in stolen cars." The officer's commander claims this aggressiveness mitigates risks to the public. The COCL points out that the system accounts for the fact that some officers are more active than others but this one was still flagged for this anomaly. Thus, the PPB is not addressing the problematic trends that is the point of the EIS (116/117) [p. 130].

---The COCL met with people in the city to ask for an assessment of the Employee Information System, but the City pushed back, saying the Agreement doesn't require it (116/117) [p. 130].

RACE, STOPS, FORCE AND DEADLY FORCE

The Bureau's self-analysis of the many racial disparities in policing PCW has been pointing out for many years shows a lack of intellectual honesty. As noted by the COCL, a disproportionate number of traffic stops are made for Black drivers in Portland-- roughly 20% of stops in a City that's 6% Black (148) [pp. 174-175]. Similarly, use of force is doled out to Black people in over 25% of all uses of force [PPB quarterly force data], and the people subjected to deadly force are roughly 18% Black [OIR Group Report and PCW data]. That last number was on its way down until the PPB shot three Black men just between November and July, killing two of them. Yet analysis of deadly force incidents is not part of either the DOJ or COCL's reports. More specifically:

--The Force Inspector and team could not explain to the Training Advisory Council the racial disparity in force applications, but provided population and force data from other cities to show Portland's force use is "not drastically out of line with other places "(86) [p. 91]. Just because other people are as racist as Portland doesn't mean the numbers are acceptable.

--The COCL narrative says the most disparity is in North Precinct where the stop rate for Black drivers is 20% higher than the population, then East is 18% higher and Central is 12% higher (148) [pp. 174-175]. However, the table on p. 176 shows that North Precinct has a 9% Black population and Black people made up 29% of stops, which is 320% higher. In East Precinct, a 5% Black population made up 23% of stops-- 460% higher. In Central Precinct, their 3% Black population were subjected to 15% of stops, or 500% higher. So really the greatest disparity is in Central precinct, and they are all far out of line with demographics.

--The Compliance Officer reminds the Bureau that paragraph 148 says the data need to "contribute to the analysis of community concerns regarding discriminatory policing," which isn't happening (148) [p. 178].

--The PPB's 2021 stop data report showed Black drivers had more non-moving violations, suggesting racial bias through "pretext stops" says the COCL. They add that Black drivers are more likely to be asked to consent to searches and less likely to refuse than white drivers (148) [p 177].

--The COCL expresses concern that the PPB may be turning to "hotspot" policing, which usually targets too broad of a target area. For instance, 50% of all stops occurred in East Precinct where more low income people live. The COCL is also concerned of the impact on people of color (148) [p. 178].

--For many years before the DOJ Agreement, the Community/Police Relations Committee (part of the Human Rights Commission) reviewed stop data on an ongoing basis. The presumption was that the PCCEP (or really, its predecessor) would pick up where they left off. Yet the PCCEP's Racial Equity subcommittee, which began an in-depth look at stop data in early 2022, only met once in 2023 on January 28 (141/142) [pp. 168-169]. They later disbanded to focus on policy issues.

ACCOUNTABILITY

While the City awaits implementation of the new oversight board (195), the IPR continues to process complaints along with the Bureau's Internal Affairs division (IA). Here are some issues highlighted in the COCL report:

--Paragraph 121 was moved to partial status because 20% of IA and 60% IPR cases were not completed in the required 180 day timeline. One reason has to do with "protected leave" which can't be tolled. Other issues include complaints against ranking officers and officers who get legal representation who then delay interview from what would be 5-6 days to 5-6 weeks [pp. 135-136]. At first we thought the legal delays were coming from community members or their surviving family. But the report states that it is police officers' lawyers who are delaying the cases. While officers have the same rights as anyone not to self-incriminate, this is unacceptable when it comes to the administrative investigations. The COCL also notes that returning cases for more investigation causes delays, but that is probably something that should be tolled since it improves the outcome.

---Despite the analysis of paragraph 121, the COCL finds paragraph 123 in compliance, even though that requires the PPB and IPR to identify ways to stop cases from running over 180 days [p. 138]. The DOJ appropriately called this paragraph out of compliance. Three issues identified by the PPB are return for investigation, delay in getting the PRB scheduled and cases that were not sent to Internal Affairs.

---One case went over 180 days because the City's litigation team didn't share info with IPR that would have allowed them to close the case (128) [p . 143].

--The IPR recategorized one case from use of force to "community contact" because they could not contact the community member. This is another example that IPR is still dismissing force cases outside the Agreement's protocols (129) [p. 145].

--The COCL did a deep dive into data regarding complaint allegations and outcomes. Here are some of their findings:

---Procedure allegations went from 37 in Q4 to 88 in Q1, which is a 138% increase. Also there's a category of "blank" allegations which has 31, making up almost 2% of the 2027 allegations [p. 160].

---Bureau initiated complaints were up from about 10 per quarter in 2021-2022 to 29 in Q1. The COCL says this may have to do with "increased attention by supervisors to minimize misconduct under the settlement agreement." It's not clear what this means [p. 161].

---Of 537 officers who had complaints against them, two had 12 complaints, four each had nine and 10, three each had seven and eight, with only one who had 11. Eleven officers had six complaints, 14 had five,, 29 had four, 75 had three, 124 had two and just 267 had one (50%) [p. 162]. The COCL asks that officers who get more complaints than others get special attention [pp. 9 and 166].

---The percentage of Force allegations that were sustained (found out of policy) is 4.3% since 2020, but was only 2% in 2022 [p. 9]. The percentage of Procedure allegations that were sustained was 41.5%. Other findings are Unfounded (incident did not happen as described), Exonerated (in policy), and Not Sustained (insufficient evidence). From the pie charts in the report [pp. 163-165]:

|                   | Sustained | Unfounded | Exonerated | Not Sustained |
|-------------------|-----------|-----------|------------|---------------|
| All allegations:  | 18.3%     | 18.4%     | 31%        | 32.4%         |
| Conduct:          | 29.2%     | 21.6%     | 18%        | 31.2%         |
| Procedure         | 41.5%     | 11.5%     | 25.4%      | 21.5%         |
| Force             | 4.3%      | 18.4%     | 46.6%      | 30.7%.        |

A few more accountability tidbits:

--The overwhelming records backlog still hasn't been fixed after well over a year (128) [p. 143] This raises the question again of what the records personnel who were hired in Q4 2022 to manage the Body Camera program are getting paid to do (194) [p. 204].

--IPR is experiencing an existential crisis due to the incoming new system. On top of that, the City didn't file the right paperwork when IPR went independent of the Auditor and so payroll people didn't believe they were their own Bureau (128) [p. 143].

--A complaint about retaliation was dismissed for having "no merit" (130) [p. 146]. Again, there are no details offered in the report.

--The IPR's Citizen Review Committee, which had fallen out of compliance for sporadic and unproductive meetings, received a Substantial Compliance rating again. They met every month in Q1 (and Q2) and their minutes and recordings of meetings were posted online (134) [p. 150].

--Although a new discipline guide was approved in February 2022, there is still no new Directive covering the new plan (137) [p. 153]. The DOJ was more forgiving than the COCL and is satisfied that an Executive Order will soon become a real policy [DOJ p. 77].

--Another problem at the Police Review Board in addition to the Boinay case cited above: one case wasn't handled as lethal force even though DOJ and COCL laid out criteria for doing so (131) [p. 147]. Unfortunately, the COCL does not give details about the incident in question.

BEHAVIORAL HEALTH UNIT ADVISORY COMMITTEE AND PPB FORCE PRESENTATION

PCW and others continue to be concerned that the Behavioral Health Unit Advisory Committee continues to meet behind closed doors. Their compromise to hold quarterly community engagement events is thoroughly undercut by their using 45 minutes of the hour meetings to report back with only vague details about what they have done in the previous three months. As noted above, the COCL points out that the BHUAC needed more time at their March meeting to respond to the Bureau's presentation of force and deadly force information [p. 22], which matches up with the tactic BHUAC uses in these public meetings.

The reason the presentation about deadly force incidents included summaries of all deadly force cases is that the Bureau allegedly doesn't identify which suspects were living with mental health issues. This is nonsense. The entire reason PCW pushed the BHUAC to hear presentations on these cases is that lessons could be learned from those involving mental health to prevent future occurrences. If the meetings were open to the public, comments could have been made to direct the BHUAC's attention to certain cases.

MENTAL HEALTH AND ASSOCIATED SERVICES

The major finding from the DOJ that led to the Agreement was that Portland Police used too much force on people in mental health crisis. Related to the remedies specific to this issue:

--A Standard Operating Procedure was revised with input from the BHUAC regarding recruiting Enhanced Crisis Intervention Team (ECIT) officers based on what shifts they work (101) [p. 112]. However there has still been no clarity from BHUAC, PPB, DOJ or COCL about the criteria that exclude officers from being part of the ECIT where the text says they can't have findings against them for use of force or mistreatment of people with mental illness (101). PCW believes this is for any use of force and any mistreatment (including use of force), some seem to think it only applies to use of force against people living with mental illness.

--The COCL makes a good recommendation that when there's a mental health call, Directive 850.20 should state that the ECIT officer should be considered the primary on-scene officer (103) [p. 113].

--Although part of the point of having police trained on mental health is to end the stigma that people with mental illness are inherently violent, ECIT members attended a "threat assessment" conference (104) [p. 114] as well as trainings on mass attacks, EMD Parapractitioner (whatever that means) and motivational interviewing (109) [p. 118].

--The most common ways ECIT calls were "cleared" was by filing "report completed" (83%) or arresting people (8%), which is a bit troubling even if the percentage of arrests is relatively low (105) [p. 115].

--Once again, the largest reasons people can't get into the Service Coordination Team program are that they didn't commit any crimes (28%) or didn't do so recently enough (23%). Perhaps the Bureau should consider lowering the thresholds? One person was disqualified for committing their crimes outside Portland. These data are particularly disturbing as a related housing program shows that 47% of their beds went unused in Q1 (112) [pp. 122-123].

--While the City keeps getting high scores on the entire Section V on Mental Health, a committee that's supposed to discuss how to safely transport people to mental health facilities was unable to meet for six months (89) [p. 98].

--Neither the DOJ nor COCL specifically address the sixteen-person committee working on the rules for Portland Street Response (PSR), which began meeting shortly after the Police Association contract was ratified in February 2022.*-5 This group is deciding whether PSR personnel can enter buildings or go into the street to address people in crisis. The City Attorney's office informed PCW during the July 19 PCCEP meeting that the committee is "regrouping" and trying to find agreement... 17 months later.

COMMUNITY ENGAGEMENT

There's an entire section of the Agreement on Community Engagement. While the Bureau generally gets high scores in this area, here are items in the COCL report on that topic:

--The Bureau was given substantial compliance for its community engagement plan, even though some metrics have not been implemented yet (149) [p. 179].

--The Training Advisory Council is looking at data from Citywide surveys done in the past. The COCL dismisses the idea of conducting another survey because 2/3 of the people had no contact with police in any year, and 1/3 report crimes while 13% have involuntary contact (80) [p. 56] These contractors, who have been pushing hard for "contact surveys," also put down the idea of re-issuing the old survey on pp. 180-181 (149). PCW disagrees and thinks the same survey going out will still yield results showing whether the public's perceptions have changed.

--In our analysis of the Q4 2022 report, PCW noted that the COCL praised the work of the Alliance for Community Safety (ACS), which advised the PPB on LGBTQIA+ issues, despite that group disbanding in January 2022. The new report doesn't mention the ACS at all in its list of advisory groups [p. 188].

--While both DOJ and the COCL say the Bureau is in compliance with paragraph 150 for presenting its reports to the public at "precinct meetings" and City Council, those presentations leave a lot to be desired. The precinct meetings are held over Zoom, and the public information officer selectively asks and/or censors questions that are meant for the Chief or Commander to answer. The presentation on people's rights and racial profiling issues included a statement from the Chief that people should obey an officer's commands. However, once PCW noted that a person can ask "am I free to go" and end the interaction, the Chief seemed to agree that was the case.

PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING

The PCCEP has had its ups and downs in the last two years. Some recent developments point to the ongoing promise and disappointment of the Committee's activity.

--Paragraph 142, which describes PCCEP's duties, was put back into Substantial Compliance because the Mayor and Chief responded to the three recommendations from September 2021. One was the PCCEP's support for the Citizen Review Committee crowd control recommendations. Apparently the Chief responded to CRC (PCW is not sure this has been released to the public or CRC) but didn't share it with PCCEP until March 2023 [pp. 168-169].

--On that note, PCCEP members told the COCL that they think the Bureau is not listening to them [p. 185].

--For some reason, the COCL continues to find PCCEP membership in substantial compliance even though, as they point out (as PCW did in our Q4 analysis), both youth seats were not filled at the end of Q1 (143) [pp. 168-169].

--Portland Copwatch very much appreciates that the COCL tells the staff for PCCEP that while the minutes are timely, they should be included in the "documents" area of the website (149) [p. 170]. The team rightfully takes a swipe at how hard it is to find anything on the City's website in a footnote on p. 189.

--The report states that the PCCEP training is based on Board guidance from the City, ignoring that the PCCEP plan requires teaching of the history of Portland and the Settlement Agreement to be taught by the Albina Ministerial Alliance Coalition for Justice and Police Reform and the Mental Health Alliance (152) [p. 184].

BODY CAMERAS

Although the City and the Portland Police Association came to an agreement about Body Cameras in April, or Q2, and the COCL is usually very insistent on covering items only during the time period in question, they summarize the new policy and their concerns in this Q1 report.

--PCW concerns about facts posted by the COCL: The policy talks about perception and video not being the same, so video isn't a priority for investigators. The list of purposes for the BWCs has gathering evidence for investigations and prosecutions as #3, but professional standards investigations as #5, reinforcing our concerns about how the cameras will be used (194) [p. 205].

--The COCL finds the guidelines too vague and that they leave too much discretion to officers. They point out there are no criteria listed to decide if the pilot program works, and no process for supervisors to review officers' footage, or to have someone else be sure they did so. The finalized policy isn't completely consistent with community concerns such as zero pre-review, so the COCL asks the City to explain why they made those decisions, reminding them that transparency is key (194) [pp. 207-208].

PCW adds here that the Body Worn Camera pilot program has not begun yet, so we can't ask that the City compare how often they use footage to hold officers accountable against how often they're used to prosecute community members. We hope such data will be part of the reports back to the court to illustrate the real reason the Police Association claims to support them, which is more about law and order than police accountability. We also note that the new policy is better than we expected, requiring officers to make statements before viewing their footage after force events, but that restriction only applies to levels "I" and "II" of force. The supervisor is supposed to record the statements in those cases, but not in levels "III" or "IV." But if they realize a low-level case is more serious they then have to record the statement. By then it is too late.

Also, the PPB recently bought $80,000 worth of surveillance drones, which are only supposed to be used for a small number of incident types. The Sergeant in charge told City Council they would be used by a small unit, yet 16 officers were trained on the devices, which have many of the same privacy implications as Body Cams.

NEW OVERSIGHT SYSTEM

As the primary author of this analysis, PCW member Dan Handelman has to be cautious about what is said here about the Police Accountability Commission's plan for the new oversight system, which needs to be finalized by August 31. Here are some thoughts, one from the COCL report and the others based on comments made by PCW member Marc Poris in court on August 14.

--The COCL expressed concerns about the length of the PAC process, but was impressed with the topics addressed by PAC (195) [p. 212].

--[Marc Poris:] "I have been to several of the PAC meetings, read their reports, and took a close look at the proposed code. It's very discouraging to have heard the City Council ask questions at the May quarterly report presentation showing they did not fundamentally understand the City Charter that created the new Board. They asked about powers embedded in the city's 'constitution' that give the board subpoena power -- and power to compel officer testimony, assures them a budget equivalent to 5% of the Police Bureau's, and doesn't allow for current or former officers to sit on the Board.

"In the months since that time, despite hearing from the good Rev. Dr. LeRoy Haynes Jr. about the history of the community struggle for an independent oversight system, Council members have been hinting to the media that they are dubious about the PAC's work. I may not agree with everything I read in their proposal, but I think the City should adopt the code as it is written and let the experiment play out. The system is envisioned to be self-correcting, but more importantly it is set up to be run by community members and not the police."

----------

CONCLUSION

It's with a little wistfulness that PCW produces this analysis of the last report co-authored by Dr. Dennis Rosenbaum. However, our analysis is deliberately focused on institutions and not personalities, and the role of the COCL in the future (in the person of Dr. Tom Christoff) remains the same. The COCL continues to provide important information that we can't get anywhere else, and has made progress in recognizing issues such as racial bias. However, there is still a long way to go at both the PPB and in the COCL's work to truly incorporate community input and make a police bureau that is responsive to concerns. It feels as though the City and Police continue to delay implementing important changes, minimize serious issues, and try to thwart efforts at accountability. It sounds as if a Court Appointed Monitor is in the future of this Agreement. We hope they will be able to push the Bureau and pull from the community in a more substantial way.

---------

Footnotes

*1- Find the Report at https://www.portland.gov/pccep/documents/cocl-draft-quarterly-report-2023-quarter-1-updates-analysis/download

*2- https://pjw.info/copwatch/DOJcompliance_report0823.pdf

*3- What went up: Training delivery paragraph 84 because of the new crowd training, accountability paragraph 134 because of CRC meeting regularly, and community engagement paragraph 142 because PCCEP received responses to its recommendations. What went down: Use of Force paragraph 69 because officers don't understand how force and de-escalation are defined, and Accountability paragraphs 121 due to lengthy investigations and 137 due to lack of policy around the new Corrective Action Guide.

*4- On or after August 7, the Portland Mercury released the Chief's memo, which is dated April 25, 2023. It was not issued in December as promised, but rather the day after the Portland Police shot Jack Watson. https://www.portlandmercury.com/news/2023/08/07/46648620/portland-police-bureau-identifies-cops-who-killed-legacy-hospital-gunman

*5- The committee is made up of two members of each of: management of PPB, management of Fire and Rescue, management of PSR and management of 911, along with workers for PSR, the firefighters Association and the collective bargaining unit representing Portland Police and the 911 operators. The Portland Police Association represents both of those last two groups, so has four seats at the table.