# COMPLIANCE OFFICER AND COMMUNITY LIAISON

# *Quarterly Report: Quarter 1 Updates and Analysis*

**Prepared By:**

**ROSENBAUM & ASSOCIATES, LLP**

**For the City of Portland, Oregon**

**January 1, 2023 to March 31, 2023**

**August 31, 2023**



**Exhibit A**

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................ 1

INTRODUCTION .................................................................................................................... 2

EXECUTIVE SUMMARY ......................................................................................................... 3

REPORT CARD ..................................................................................................................... 15

III. USE OF FORCE ............................................................................................................... 34

IV: TRAINING ...................................................................................................................... 49

V. COMMUNITY-BASED MENTAL HEALTH SERVICES ............................................................ 97

VI. CRISIS INTERVENTION ................................................................................................... 101

VII. EMPLOYEE INFORMATION SYSTEM .............................................................................. 128

VIII. OFFICER ACCOUNTABILITY .......................................................................................... 135

IX. COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING ......................................................................................................... 167

XI. ADDITIONAL REMEDIES ................................................................................................. 194

LIST OF ACRONYMS ........................................................................................................... 214

LIST OF PERSONNEL .......................................................................................................... 216

**Exhibit A**

# INTRODUCTION

This is the Compliance Officer/Community Liaison's (COCL) first quarter report for 2023, as required by the Amended Settlement Agreement between the City of Portland (the City) and the United States Department of Justice (DOJ), Case No. 3:12-cv-02265-SI, entered April 29, 2022. This report covers the three-month period from January 1, 2023, to March 31, 2023.

The COCL continues to evaluate whether the systems required by the Settlement Agreement have been sustained or restored to ensure constitutional policing in Portland. There were several changes in compliance status between the fourth quarter of 2022 and the first quarter of 2023. The Executive Summary below is followed by a Report Card that lists the compliance rating for each paragraph reviewed by the COCL.

This will be the last report prepared by Rosenbaum & Associates, LLP. The Compliance Officer, Dr. Dennis Rosenbaum, has decided to retire from this position. He will be replaced by Dr. Thomas Christoff, who has worked with Dr. Rosenbaum from the start of this Settlement Agreement. Dr. Christoff, and his team at CNA, will continue the work of the COCL.

**Exhibit A**

# EXECUTIVE SUMMARY

In the first quarter of 2023, the Portland Police Bureau (PPB) and the City of Portland remained in Substantial Compliance for most of the paragraphs in the Settlement Agreement. Six changes occurred: The City/PPB was moved to Partial Compliance for paragraphs 69 (Use of Force), 121 (Accountability), and 137 (Accountability). The City/PPB was moved to Substantial Compliance for paragraphs 84 (Training), 134 (Accountability) and 142 (Community Engagement). Thus, they were found to be in Partial Compliance for 18 of the original paragraphs and five of the new remedies (a total of 23 paragraphs), as described in this report. The paragraph-by-paragraph ratings can be found in the Report Card that follows this narrative summary.

### III. USE OF FORCE

During the first quarter of 2023, one paragraph (Par. 69) was reduced from Substantial Compliance to Partial Compliance, leaving seven of the twelve paragraphs in Partial Compliance (Pars. 69, 70, 73, 74, 75, 76, and 77). In conducting our review of a random sample of 20 use of force events, we found that each reported application of force was reasonable and justified. However, we identified a consistent misconception about the types of actions which constitute Control Against Resistance, thereby leading to the reduction in rating for Par. 69. Additionally, we continued to find cases where the supervisors' After-Action Reviews were deficient in critical ways. In three of the AARs for this quarter, the AAR's investigation was lacking in both scope and depth. Furthermore, these deficiencies were not identified by the chain-of-command and therefore were never corrected. Taken together, this continues to raise concerns about the comprehensiveness of force reviews.

In this quarter, we also discuss missed opportunities by the Force Inspector to remedy failures and limitations in officers' force reporting and supervisors' evaluation of force. For instance, we discuss inconsistency in supervisors gathering a statement from the recipient of force in instances where the subject is either incapacitated or otherwise injured. We also discuss one instance wherein a vehicle intervention tactic was conducted with a ride-along participant in the vehicle. We consider both of these to represent missed opportunities to clarify Bureau expectations through refined policy and training. In addition, there remains uncertainty regarding exactly how officers are identified as being outliers for use of force and then discussed with the Precinct Commander. Late in the quarter, we were provided with an SOP discussing the identification process, although additional revisions are necessary.

**Exhibit A**

Finally, we continue to identify data reliability concerns for some fields on the Force Data Collection Report (FDCR) that are completed by officers after a force event, most commonly the use of the term "de-escalation." In evaluating de-escalation by PPB officers, we continue to focus on the definition provided in Directive 1010.00 which defines de-escalation as a "deliberate attempt" by the officer rather than happenstance. In this quarter, the Force Inspector re-issued guidance discussing what is and what is not de-escalation, although we will need to ensure, moving forward, that this guidance has resolved the issue.

## IV: TRAINING

The PPB was found to be in Substantial Compliance with eight of the 10 paragraphs in Section IV, leaving paragraphs 78 and 81 in Partial Compliance. Importantly, the PPB achieved Substantial Compliance with Paragraph 84. During the first quarter of 2023, the COCL observed and evaluated the two-day In-Service training for all PPB officers on crowd management and the role of the Mobile Field Force (MFF). This training was well planned and executed, offering a mixture of theoretical, practical, legal, and scenario-based instruction. This training was responsive to COCL's prior recommendations because it (1) incorporated changes to polices related to use of force (i.e., Directives 910.00, 1010.00, and 1015.00) and public order events (Directive 0635.10), (2) incorporated internal assessments of training needs, and (3) provided scenarios or exercises to practice appropriate crowd control skills. Thus, with the exception of Par. 81 (discussed later), the PPB has met the basic requirements of Section IV. However, the COCL will continue to provide a variety of recommendations to improve training within the PPB, as described here.

From the COCL's perspective, a single two-day training on crowd management for all officers, although well delivered, is insufficient in the bigger picture. The COCL recommends ongoing refresher training to ensure adequate preparedness for all officers. Looking ahead, the COCL also recommends that the PPB create a new specialty unit rather than continue to rely on MFF squads. This new unit should be provided with extensive specialty training and expert supervision to ensure a comprehensive, equitable, and effective approach to crowd management.

For in-person learning, the COCL continues to call for more training that follows the fundamental principles of adult learning and problem-based learning and allows officers to practice good decision-making. The PPB has made considerable progress in this area, and we expect even more progress under the leadership of the new Director of Police Education. The COCL continues to emphasize the importance of instructor development classes. Also, the

Training Division will need to hire more civilian trainers and analysts in light of budget constraints and staff shortages.

The COCL continued to examine the PPB's Online training program delivered through their Learning Management System (LMS), and this quarter, it was included in our Outcome Assessment (see below). The Training Division continues to provide a wide range of online training and educational materials via LMS. However, last quarter, the COCL expressed concern that the online training for directive 0650.00 ("Search, Seizures, and Inventories") gave insufficient attention to the distribution of consent search cards in six languages. Thus, we continue to recommend that the PPB provide supplemental training on consent searches and document the level of success with implementation.

The PPB has yet to integrate equity-focused material into in-person training. The COCL has recommended this adjustment over the last three quarters and we hope to see the PPB make a concerted effort to bring these sensitive, and sometimes difficult topics into an in-person format. Clearly, the PPB is facing limited resources and conflicting priorities for their in-person training hours, but we will continue to express the importance of equity and impartial policing, as required for constitutional policing.

Finally, the Training Division continues to use LMS to keep records of officer training (Par. 81). However, as we noted in our last report, not all training records are being kept in a central, accessible location and, according to PPB's recent audit, "Rosters identifying members with specialty certifications were not up-to-date." PPB is working to correct this problem but will remain in Partial Compliance for Par. 81 until the correction has been made.

*Outcome Assessments*: This quarter, the COCL conducted an Outcome Assessment of the Online training, the In-Service Supervisor training, and the Annual Performance Evaluation, with particular attention to the systems used to evaluate these trainings. For the Online trainings, the results from the PPB's surveys were generally positive, although the feedback from PPB members varied by topic. Unfortunately, the rate of participation in the post-class surveys is too low to draw any conclusions about how most officers feel about the training. Hence, the COCL will continue to recommend that these surveys be mandatory as part of all PPB training programs.

The COCL's Outcome Assessment of the one-day In-Service Supervisor training revealed positive reviews from most of the supervisors who were enrolled, with some exceptions. Of course, one day of training cannot possibly cover the full range of topics that need supervisory attention, so COCL provides examples of important topics that should be covered in future trainings.

Overall, we are satisfied with the PPB's efforts to evaluate Supervisor training and other training classes, but their end-of-the-day knowledge tests are not sufficient to assess what the PPB calls "In-class learning." COCL offers recommendations to improve these methods and produce valid findings. Student learning (<u>changes</u> in knowledge, attitudes, and behavior) is best evaluated by collecting data <u>before and after</u> training (not exclusively after training) and by comparing the results with a control group that does not receive the training. In addition, the COCL has recommended that PPB give more attention to the evaluation of performance by individual officers (instead of group performance) during skills training and role-playing scenarios.

As part of our Training Outcome Assessment, the COCL also examined the PPB's Annual Performance Evaluations used by supervisors to evaluate their officers. This process was reviewed because of the training implications for supervisors. The main problem with this evaluation system is not the content, but the way in which supervisors complete these evaluations. Similar to our earlier Outcome Assessment, we found that not a single officer in our sample received a "Needs Improvement" rating on any of the 64 dimensions. Thus, we encourage the PPB to rethink this system of evaluation and provide new supervisor training so that officers can receive meaningful and constructive feedback on their daily performance.

Finally, while the COCL is generally satisfied with the PPB's efforts to evaluate their training programs (Par. 80), there is room for improvement when it comes to measuring the impact of training on police work (after officers leave the training academy). The COCL has recommended new methods to evaluate the impact of training on the job, such as community contact surveys and body-worn camera videos. These types of data will not only help to evaluate the effectiveness of training but will lead to new insights about how to improve public trust and confidence in the police. The PPB's Training Division is beginning to think more about on-the-job outcome measures, so we encourage them to continue down this path.

The PPB remains in Substantial Compliance with Par. 86, as the Force Inspector continues to gather force data on a quarterly basis, examine it for patterns and trends, and present the findings at meetings of the Training Advisory Council (TAC). However, the Force Inspector is also required to identify and respond to "problematic use of force patterns." Here, the COCL and the TAC have called for a more thorough analysis of the underlying factors associated with racial disparities in police use of force. Also, the COCL has recommended that the Chief's office provide a more formal and transparent system of responding to TAC's recommendations.

## V. COMMUNITY-BASED MENTAL HEALTH SERVICES

In the first quarter of 2023, the PPB and the City remained in Substantial Compliance for all paragraphs in Section V, Community-Based Mental Health Services. These paragraphs refer to services that are part of a broader mental health response system. The PPB and the City are partners in this system but are not necessarily drivers of the system. The City and the PPB continued to participate through engagement in various committees and workgroups. These include the Behavioral Health Unit Advisory Committee (BHUAC), the Behavioral Health Coordination Team (BHCT), the Unity Transportation Work Group, and the Legacy ED Community Outreach Group. These groups have continued to address important issues in city, county, and state approaches to providing comprehensive mental health services.

During the first quarter, the Bureau of Emergency Communication (BOEC) maintained the Portland Street Response (PSR) dispatch protocols and training for telecommunicators, both of which were previously reviewed by BHUAC. Also, as part of Section V, the Unity Center continues to act as a drop-off center for first responders to transport persons in a mental health crisis. As noted in prior reports, the Unity Center conforms to the intent of the Settlement Agreement and of drop-off centers as outlined in the Memphis Model of mental health crisis response. Furthermore, the PPB has continued to participate in AMR (ambulance service) training for transporting persons in mental health crises.

## VI. CRISIS INTERVENTION

As we have done in the past, we evaluated the PPB and the City's system of mental health response in two ways: (1) Primary Response, including Enhanced Crisis Intervention Team (ECIT) officers and Portland Street Response (PSR); and (2) Secondary Response, including Behavioral Health Response Team (BHRT) and Service Coordination Team (SCT). We also evaluated the steps taken once a call involving a person in a mental health crisis is received by BOEC and PPB's response to such calls. Finally, we examined what follow-up steps occur when a person demonstrates behavior that may warrant additional contact by the PPB. We continue to find Substantial Compliance with all paragraphs within Section VI.

During the first quarter, BOEC maintained their policies and training for telecommunicators on dispatching officers to calls involving a mental health component. They continued to use seven call characteristics to determine whether a specialized ECIT officer should be dispatched. For their part, the PPB continued to maintain directives related to crisis response, including 850.20 (Police Response to Mental Health Crisis), 850.21 (Peace Officer Custody – Civil), 850.22 (Police Response to Mental Health Director Holds and Elopement), and 850.25 (Police Response to Mental Health Facilities). The PPB also continued to provide training to new officers as well as

**Exhibit A**

current officers through annual In-service training. In February of 2023, the PPB started a new Advanced Academy for new recruits. Additionally, the PPB maintained their specialized response approach through the use of ECIT officers. In the first quarter, PPB presented to the BHUAC on the updates to the language of SOP 3-3, which further clarifies the selection process for ECIT officers.

The PPB has maintained the use of BHRT to assist individuals who represent an escalating risk of harm. While the Settlement Agreement only requires three teams (one for each precinct), in the first quarter the PPB was able to return to five BHRTs, and all five clinicians became city employees. The PPB has also maintained the Service Coordination Team (SCT) to facilitate the provision of services to persons who are chronically houseless, suffer chronic addiction, and are chronically in and out of the criminal justice system. For both programs, we provide ongoing operational statistics, including statistics related to decision-making and outcomes.

Finally, BHUAC continued to meet during the first quarter of 2023, utilizing the expertise of individuals at the PPB, BOEC, and the City, as well as other agencies, stakeholders, advocates, and service providers. We found that in the first quarter, meetings were largely productive and met quorum. Furthermore, the Office of the Inspector General made their first annual force presentation to the committee, directly responding to recommendations from the COCL's prior Technical Assistance. For these reasons, we find the City has remained in Substantial Compliance with all paragraphs.


## VII. EMPLOYEE INFORMATION SYSTEM

Throughout the first quarter of 2023, the PPB remained in Substantial Compliance with three of the five paragraphs in Section VII (Pars. 118, 199, and 120), as the current Employee Information System (EIS) thresholds identify potentially problematic trends, and thus, meet the requirements of the Settlement Agreement. However, we maintain that the PPB is not currently using EIS to its full potential, and interventions based on the peer-comparison approach are rare.

The PPB remains in Partial Compliance for Pars. 116 and 117 as we continue to have concerns with how the PPB and the Force Inspector identify and respond to "at-risk employees, supervisors, and teams." During this quarter, we listened-in on conversations between the Force Inspector and Precinct commanders. In the meetings we observed, the Force Inspector and commanders discussed several individual officers who were identified by the Force Inspector as being force outliers. However, similar to prior quarters, we remain confused as to why certain officers were identified as problematic and why others were not. The PPB provided

a draft of SOP #5 to better clarify the process, although additional revisions to the SOP are necessary. We will continue to work with the PPB on finalizing the SOP.

## VIII. OFFICER ACCOUNTABILITY

During the first quarter of 2023, the City maintained Substantial Compliance for 13 paragraphs in Section VIII, Officer Accountability, and was elevated from Partial Compliance to Substantial Compliance for one paragraph (134), bringing the total to 14 paragraphs within Partial Compliance (66.7% of Section VIII). However, during this quarter, we lowered two paragraph ratings from Substantial Compliance to Partial Compliance (Pars. 121 and 137), resulting in a total of seven paragraphs in Partial Compliance (Pars. 121, 126, 128, 129, 131, 137, and 169). For the two paragraphs which were reduced to Partial Compliance, we found Par. 121 is no longer in Substantial Compliance due to reduced compliance rates with the 180-day timeline. For Par. 137, we found reduced compliance for failure to update Directive 338.00 as required by the DOJ's conditional approval of the new Corrective Action Guide.

For other paragraphs within this section, many of the barriers to Substantial Compliance remain from our prior reports, including for Pars. 126 (witness officer debriefings), 128 (enabling meaningful independent investigation by IPR), 129 (administrative closures of use of force allegations), and 131 (Police Review Board). Additionally, the COCL finds, based on aggregate findings, that the PPB remains in Partial Compliance with the requirements of Par. 169 paragraph to "apply policies uniformly and hold officers accountable for complying with PPB policy and procedure." For several of these paragraphs, the COCL's recommendations for Substantial Compliance are not difficult to achieve. For instance, our recommendations for Pars. 126 and 137 to reach Substantial Compliance hinge primarily (if not solely) on the need to update policies (Directives 1010.10 and 338.00, respectively). Similarly, for Par. 129, we have only recently been provided with an SOP from IPR that clarifies the administrative closure process when involving an allegation of excessive force. While other paragraphs may require additional discussion between COCL and DOJ, these paragraphs are well within the reach of PPB and the City and we will prioritize their completion in the coming months.

Finally, we conducted an Outcome assessment for the Accountability section during this quarter. The Outcome Assessment identifies some areas which warrant further review. For instance, the data clearly suggests that there are individual officers who are atypical in the number of citizen complaints against them and deserve additional attention from management. Additionally, the data indicate that approximately 4% of force allegations are sustained, although within the past four quarters, less than 2% were sustained (I.e. only a single allegation

of force was sustained across 52 allegations that received a full investigation). This finding is notable and deserves further inquiry.


## IX. COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING (PCCEP)

*PCCEP*: In the first quarter of 2023, PCCEP continued to function as a legitimate body for community engagement. They held three full committee meetings, six sub-committee meetings and hosted two town halls. The PCCEP submitted two formal recommendations and prepared a statement for the February Status Conference. The City continued to support PCCEP by maintaining competent staff to plan and manage meetings, recruiting and training new PCCEP members, and providing technical and legal assistance as needed. The COCL's remaining concerns are: (1) the need to fill youth vacancies on the PCCEP; and (2) the continued need for the City to respond to PCCEP's recommendations in a prompt and thorough manner.

*PPB*: Under the Settlement Agreement, the PPB is expected to introduce or expand its systems of community engagement, both with PCCEP and other resources. This includes maintaining or expanding its systems of measurement to better understand police-community relations and develop tailored responses to issues or concerns. During the first quarter of 2023, the PPB continued to implement its Community Engagement Plan. The PPB's diverse advisory groups (Community and Culturally Specific Councils), as well as the Coalition of Advisory Groups (CAG), continue to meet with the PPB leadership, City Commissioners, and the communities they represent in a transparent manner. Also, the PPB's Operational Councils -- the Behavioral Health Unit Advisory Committee (BHUAC), the Police Equity Advisory Council (PEAC), and the Training Advisory Council (TAC) - continue to meet regularly and provide the PPB with feedback on relevant issues.

The PPB's Office of Community Engagement and the PPB's Policy Director (with support from PPB's Strategic Services Division) have built a sound Language Justice Program that continues to expand to ensure equal access to police and city services. The new language access policy is nearly operational and should be followed by training in the near future.

The PPB continued to produce high-quality quarterly and annual reports on traffic stops and use of force with demographic breakdowns that allow for the analysis of racial disparities.

The PPB has made considerable strides in terms of community engagement and the PPB's Office of Community Engagement is doing some excellent, cutting-edge work to de-centralize community policing and build partnerships with the community. In fact, they are beginning to receive national attention for their work. Nevertheless, there are some areas of concern within the PPB. COCL offers the following recommendations, with some required to maintain

Substantial Compliance: (1) provide additional training and documentation regarding consent searches for individuals with limited English proficiency; (2) revisit the Equity training program and provide in-person training on issues of equity, bias, and procedural justice; (3) address persistent racial disparities in traffic stops and searches through operational and training strategies; (4) give the community a greater voice when evaluating police services, especially those who are the recipients of such services, (5) increase usage of the Community Events App by requiring police officers to document participation in community events; and (6) more fully engage PCCEP in PPB's Community Engagement Plan.

_Outcome Assessment_. This quarter, the COCL also conducted an Outcome assessment for the community engagement work done by both PCCEP and the PPB. For PCCEP, we sought to conduct online surveys or telephone interviews with current members to ask them how well PCCEP has been able to fulfill the five authorized PCCEP duties and responsibilities, as outlined in Par. 142, during the fourth quarter of 2022 and the first quarter of 2023. Those who responded to our invitation offered a mixed assessment of PCCEP's success in these areas, but they expressed optimism that PCCEP is on the right track, with renewed support from the City to achieve its mission. As one member noted, "I think we're on the right track, but we have a long way to go as far as engaging with the communities." Some PCCEP members expressed concern that the Mayor or Police Chief have not been directly involved in PCCEP, but the COCL acknowledges that they both have representatives who regularly attend PCCEP meetings and report back to them. The COCL would encourage the PCCEP to develop a more formal, in-depth relationship with the PPB so that the PCCEP members can learn more about the inner workings of the Bureau to make informed recommendations.

For the PPB, our community engagement Outcome Assessment focused on each component of their Community Engagement Plan – Public Involvement, Communications, Access, and Training. Overall, the PPB's Office of Community Engagement (OCE) has done an excellent job of implementing this plan, as summarized above, but community policing must be more de-centralized and moved into the Precincts and into special units to build partnerships with Portland's many diverse communities and document these activities. The OCE is working hard to achieve this goal. Also, the linkage between the PPB and PCCEP should be enhanced as described above.

Finally, the many advisory groups in Portland consistently talk about greater community engagement and feedback to improve the PPB's ability to provide equitable and respectful services. For many years, the COCL has pointed out that the voices <u>not</u> being heard are the thousands of community members who have lived experience with PPB officers (The vast majority of Portland residents do not have this experience). Thus, the COCL will continue to recommend the implementation of a continuous online contact survey, asking people about

**Exhibit A**

their recent experience after being stopped by the PPB or calling the PPB for help. A contact survey program can measure what matters to the community, namely, how they are treated (procedural justice), with breakdowns by precinct, beat, shift, officer, and community demographics.[1] Data generated from a contact survey program, along with data from the new body-worn camera program, will go a long way toward ensuring equitable treatment for all groups in Portland and should lead to important changes in training, coaching, and supervision of PPB officers. Adding new measures of police performance is the best way to change police culture and increase public trust in the police. In 2023, several of PPB's advisory groups – the CAG, PCCEP, and TAC – have all expressed interest in such a program and have provided useful feedback during meetings with the COCL. Also, the Community Safety Division, Office of Management and Finance, could serve as a possible home for this program. The ideas and recommendations from these groups and from COCL should be taken very seriously by the City Council.

## XI. ADDITIONAL REMEDIES

During the first half of 2022, the Parties, the Portland City Council, and the Federal court agreed to amend the Settlement Agreement to include eight new remedies to help reform the PPB. As a result, Section XI has been added, with eight new paragraphs (188 to 195). The COCL's compliance assessment for Section XI began in the second quarter of 2022.

Compliance ratings for these new remedies did not change in the first quarter of 2023. Specifically, the City has achieved Substantial Compliance for Par. 188, 190, and 193, but only Partial Compliance for Par. 189, 191, 192, 194, and 195. Here we briefly report on the requirements of each paragraph and the progress to date.

**Par. 188 Requirement**: "The City shall revise Force Data Collection Report (FDCR) and After Action Report forms to capture when the forms are edited and completed."

COCL's Assessment: Our review indicates that the updated FDCR and AAR forms continue to be used and continue to capture the data required by Par. 188. We therefore continue to find the City and the PPB in Substantial Compliance with the requirements of Par. 188.

**Par. 189 Requirement**: "The City shall provide funding for a qualified outside entity to critically assess the City's response to crowd control events in 2020."

---

[1] To learn more about the proposed Contact Survey Program, the reader is encouraged to read COCL's technical assistance report, Measuring what Matters to the Community: A New Performance Evaluation System, released during the first quarter of 2023. The report can be found at:
https://www.portlandcocl.com/reports/2023/02/contact-survey-program-technical-assistance-report

COCL's Assessment: The independent consultant continued to gather information in the first quarter of 2023, including observation of the PPB's In-Service MFF training. We expect that the consultant will prepare a report in the third quarter of 2023 and that the PPB will use these findings to modify its training needs assessment, training, and policies accordingly. In the meantime, the City will remain in Partial Compliance with Par. 189.

Par. 190 Requirement: "The City shall provide in the budget a separate line item for overtime costs to conduct necessary training for PPB officers."

COCL's Assessment: The City Council has included a separate line item for these overtime costs in the City's FY 22-23 budget. Hence, the City has achieved Substantial Compliance with Par. 190.

Par. 191 Requirement: "The City shall budget for a qualified civilian in PPB to direct all educational aspects of PPB's Training Division."

COCL's Assessment: The City conducted the first and second round of interviews for the civilian Director of Police Education position (formerly called the "Dean"). At the close of the first quarter, the City was close to deciding who would be offered the position. The COCL continues to recommend uncompromised authority for this individual within the PPB, and adequate staff support. Thus, the City will remain in Partial Compliance with Par. 191.

Par. 192 Requirement: (summarized): The City shall initiate an appropriate investigation through IPR to identify and hold accountable those within the PPB who trained or directed PPB officers to use force in violation of policy during the crowd control events of 2020, or failed to ensure that force reports were completed and reviewed properly.

COCL's Assessment: The IPR has four open investigations related to Par. 192 and the COCL will not be privy to all of the facts until they are completed. We expect to have some additional details in the third quarter of 2023. Thus, the City will remain in Partial Compliance with Par. 192.

Par. 193 Requirement: "PPB shall release its Annual Report and hold the required precinct meetings no later than September 20 of each year for the duration of this Agreement."

COCL's Assessment: The PPB achieved this requirement in the third quarter of 2022, as it presented its 2021 Annual report at three precinct meetings in July of 2022. The 2022 Annual Report is not expected until the second quarter of 2023, followed by appropriate meetings. In the meantime, the PPB will remain in Substantial Compliance for Par. 193.

Par. 194 Requirement: "The City shall implement body-worn cameras (BWCs) pursuant to a policy that is subject to the policy-review-and-approval provisions of this Agreement."

<u>COCL's Assessment</u>: During the first quarter of 2023, the City continued to negotiate with the Portland Police Association (PPA) and Portland Police Commanding Officers Association (PPCOA) regarding the introduction of a BWC program and policy. Although this bargaining process lasted much longer than expected, it concluded early in the second quarter when the PPA and the PPB reached an agreement on April 20, 2023. The drafted BWC policy will guide the training and pilot program in the Central Precinct, which will last for 60 days. Once the pilot is completed, there may be revisions to the policy, procedures, and training for all officers. Thus, the City will remain in Partial Compliance with Par. 194 until the BWC program is fully implemented by PPB. The COCL recommends strong training, supervision, and auditing to ensure that the BWC program is being implemented with integrity.

**Par. 195: Requirement** (summarized): As required by Portland voters and now by the Settlement Agreement, the City shall create a new Community Oversight Board to replace IPR for investigating certain complaints of police misconduct and replace the Chief of Police for imposing discipline.

<u>COCL's Assessment</u>: Progress has been made by the 20-member Police Accountability Commission (PAC), appointed by the City to develop a proposal for the Community Oversight Board. In the first quarter of 2023, the PAC completed its third phase of work – Powers and Duties Phase. In this phase, the PAC developed and adopted three documents ("Areas of Agreement") that outline the function of the new oversight board: Access to Information, Officer Accountability, and Structural Oversight.

The PAC has worked hard to provide a process and framework for this remedy, and the Commission is supported by competent and committed City staff. Despite 21 meetings in the first quarter, there is some concern about the slowness of this process. The PAC requested that the City Council extend the deadline for their work product from June 9, 2023 to October 29, 2023, but the Council only approved an extension to August 31, 2023. Any proposal for a Community Police Oversight Board must be reviewed by the City Council, PPA, and DOJ, which will extend the planning process. Thus, the City remains in Partial Compliance for Par. 195.

**Exhibit A**

# REPORT CARD

This report includes a "Report Card" that provides a separate assessment of each paragraph in the Agreement. Under "Recommendations," this format gives the City clarity about what is needed "*to achieve Substantial Compliance.*" We also give the City guidance on what is needed "*to maintain Substantial Compliance*." Finally, when this language is not used, the COCL is offering recommendations that are not required for compliance, but we feel would have a significant positive impact on the PPB if implemented. All paragraphs are reviewed and evaluated using the following standards:

- Substantial Compliance: The City/PPB has satisfied the requirement of the provision in a comprehensive fashion and with a high level of integrity.
- Partial Compliance: The City/PPB has made significant progress towards the satisfaction of the provision's requirements, though additional work is needed.
- Non-Compliance but Initial Steps Taken: The City/PPB has begun the necessary steps toward compliance, though significant progress is lacking.

In the first quarter of 2023, the City/PPB remained in Substantial Compliance for most of the paragraphs in the Settlement Agreement. Six changes occurred: The City/PPB was moved to Partial Compliance for paragraphs 69 (Use of Force), 121 (Accountability), and 137 (Accountability). The City/PPB was moved to Substantial Compliance for paragraphs 84 (Training), 134 (Accountability) and 142 (Community Engagement). Thus, at the conclusion of the first quarter of 2023, Partial Compliance ratings were given for the following paragraphs: Use of Force (Pars. 69, 70, 73, 74, 75, 76, 77), Training (Pars. 78, 81), Employee Information System (Pars. 116, 117), Officer Accountability (Pars. 121, 126, 128, 129, 131, 137, 169), and Additional Remedies (Pars. 189, 191, 192, 194, 195).

The table below summarizes the compliance status and recommendations for all paragraphs reviewed by the COCL.

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| **III. USE OF FORCE** | | |
| Par. 66 | Substantial Compliance | • To maintain Substantial Compliance, ensure officers are demonstrating tactical skills which will avoid force or result in the least amount of reasonable force |
| Par. 67 | Substantial Compliance | • To maintain Substantial Compliance, ensure officers are demonstrating tactical skills which will avoid force or result in the least amount of reasonable force |
| Par. 68 | Substantial Compliance | • No recommendations at this time |
| Par. 69 | Partial Compliance | • To return to Substantial Compliance, evaluate Directives 1010.00 and 910.00, evaluate current training, and identify opportunities to clarify when officers should be reporting Control Against Resistance.<br><br>• Upon issuing such clarification, take corrective action on members who fail to report Control Against Resistance and supervisors who fail to correct the issue |
| Par. 70 | Partial Compliance | • To achieve Substantial Compliance, review cases and take corrective action |
| Par. 71 | Substantial Compliance | • No recommendations at this time |

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| Par. 72 | Substantial Compliance | • Ensure supervisors reliably and consistently use the AAR for future force events |
| Par. 73 | Partial Compliance | • To achieve Substantial Compliance, ensure that chain-of-command supervisors are held accountable for inadequate reports and analysis<br><br>• To achieve Substantial Compliance, clearly distinguish conduct that requires formal review from that which can be corrected by informal counseling |
| Par. 74 | Partial Compliance | • To achieve Substantial Compliance, ensure significant deficiencies are identified and resolved<br><br>• To achieve Substantial Compliance, provide evidence of Inspector review documents and findings<br><br>• To achieve Substantial Compliance, clearly distinguish conduct that requires formal review from that which can be corrected by informal counseling |
| Par. 75 | Partial Compliance | • To achieve Substantial Compliance, ensure significant deficiencies are identified and resolved<br><br>• To achieve Substantial Compliance, provide evidence of Inspector review documents and findings<br><br>• To achieve Substantial Compliance, clearly distinguish conduct that requires formal |

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
|  |  | review from that which can be corrected by informal counseling |
| Par. 76 | Partial Compliance | • To achieve Substantial Compliance, comment on trends over time and make suggestions for correcting/duplicating elsewhere<br><br>• To achieve Substantial Compliance, work with the COCL to identify statistically significant members on both ends of the spectrum to better manage force |
| Par. 77 | Partial Compliance | • To achieve Substantial Compliance, ensure significant deficiencies are identified and resolved<br><br>• To achieve Substantial Compliance, provide evidence of Inspector review documents and findings<br><br>• To achieve Substantial Compliance, clearly distinguish conduct that requires formal review from that which can be corrected by informal counseling |
|  | **IV. TRAINING** |  |
| Par. 78 | Partial Compliance | • To achieve Substantial Compliance, PPB must substantially comply with all paragraphs within Section IV |
| Par. 79 | Substantial Compliance | • To maintain Substantial Compliance, the Training Division will need to update its own training needs assessment and training plan regarding crowd management |

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| | | based on the findings from the external critical assessment of the 2020 protests<br><br>• In future needs assessments and training plans, give more attention to interpersonal communication skills used for de-escalation and procedural justice, as requested by the public |
| Par. 80 | Substantial Compliance | • Work with City officials to develop a contact survey program that can measure officers' on-the-job performance around procedural justice<br><br>• Use data from contact surveys and body-worn cameras to improve the training needs assessment, training plan, and training evaluation metrics.<br><br>• Add role-play scenarios where officers can be evaluated individually rather than in groups<br><br>• Measure whether officers have reached an acceptable level of communication skills in de-escalation and procedural justice prior to leaving the training<br><br>• Return all Training Analysts to their original job duties and hire additional analysts to ensure the best training needs assessment, training plan, and scientific knowledge about the quality and effectiveness of training<br><br>• Improve the Training Division's evaluation surveys and evaluation methods as |

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| | | described in the Training Outcome Assessment |
| Par. 81 | Partial Compliance | • To return to Substantial Compliance, the Training Division must update certification rosters and develop a process to ensure that they are maintained and accurate. Additional attention is needed for specialty trainings |
| Par. 82 | Substantial Compliance | • No recommendations at this time |
| Par. 83 | Substantial Compliance | • No recommendations at this time |
| Par. 84 | Substantial Compliance | • Create a new specialty group for responding to Public Order Events and provide members with extensive specialty training<br><br>• Make Equity training a higher priority and include it routinely in PPB's in-person training schedule<br><br>• Introduce in-person training on procedural justice with enough dosage to make a difference<br><br>• Continue to support the development of sophisticated online training that allows for interactivity and is linked to subsequent in-person skills development<br><br>• Provide more Stops training with attention to the Consent Search cards<br><br>• Rethink this Annual Performance Evaluation system and retrain supervisors so that officers can receive meaningful and |

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| | | constructive feedback on their daily performance. |
| Par. 85 | Substantial Compliance | • The next audit of the Training Division should give special attention to civilianization, including the level of support for the Director of Police Education and instructor development classes<br><br>• A future audit should give attention to the content of in-person training for officers and supervisors, with particular attention to the quality of instruction on Equity, Procedural Justice, and De-escalation<br><br>• In terms of training needs assessment, the community should play a bigger role in setting training priorities because they are the recipients of police services<br><br>• Given the critical importance of training in police reform, the City and PPB should invest more in Training Division personnel so that more instruction can be delivered |
| Par. 86 | Substantial Compliance | • The Force Inspector is required to identify and respond to "problematic use of force patterns" and this should include a more thorough analysis of the underlying factors associated with racial disparities in police use of force, as recommended by TAC and COCL<br><br>• With input from TAC, the Chief's office should provide a more formal and transparent system of responding to TAC's recommendations |

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| Par. 87 | Substantial Compliance | • No recommendations at this time |
| **V. COMMUNITY-BASED MENTAL HEALTH SERVICES** | | |
| Par. 88 | Substantial Compliance | • No recommendations at this time |
| Par. 89 | Substantial Compliance | • No recommendations at this time |
| Par. 90 | Substantial Compliance | • No recommendations at this time |
| **VI. CRISIS INTERVENTION** | | |
| Par. 91 | Substantial Compliance | • Continue to update the COCL and DOJ on changes to personnel when applicable |
| Par. 92 | Substantial Compliance | • Continue to collect and review data on mental health services, and use this information to update services as needed |
| Par. 93 | Substantial Compliance | • Continue to collect and review data on mental health services, and use this information to update services as needed |
| Par. 94 | Substantial Compliance | • No recommendations at this time |
| Par. 95 | Substantial Compliance | • At the next annual force presentation to the BHUAC, make sure to allot time for questions and discussion<br><br>• At the next annual force presentation to the BHUAC, focus on lethal force involving persons in mental health crisis |

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| Par. 96 | Substantial Compliance | • No recommendations at this time |
| Par. 97 | Substantial Compliance | • Consider seeking BHUAC input during training development rather than after training has been developed |
| Par. 98 | Substantial Compliance | • Consider seeking BHUAC input during training development rather than after training has been developed |
| Par. 99 | Substantial Compliance | • If issue persists with BOEC calls being set up for ECIT when they don't meet criteria, PPB and BOEC should coordinate with each other to resolve the issues. |
| Par. 100 | Substantial Compliance | • Continue utilizing existing data to assess demand for ECIT services |
| Par. 101 | Substantial Compliance | • No recommendations at this time |
| Par. 102 | Substantial Compliance | • Continue to seek out recommendations from BHUAC on ECIT training |
| Par. 103 | Substantial Compliance | • Reconsider revisions to 850.20 |
| Par. 104 | Substantial Compliance | • No recommendations at this time |
| Par. 105 | Substantial Compliance | • No recommendations at this time |
| Par. 106 | Substantial Compliance | • No recommendations at this time |
| Par. 107 | Substantial Compliance | • No recommendations at this time |
| Par. 108 | Substantial Compliance | • No recommendations at this time |

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| Par. 109 | Substantial Compliance | • No recommendations at this time |
| Par. 110 | Substantial Compliance | • Continue to collect data and create reports on mental health services |
| Par. 111 | Substantial Compliance | • No recommendations at this time |
| Par. 112 | Substantial Compliance | • No recommendations at this time |
| Par. 113 | Substantial Compliance | • No recommendations at this time |
| Par. 114 | Substantial Compliance | • Develop focused training for PSR |
| Par. 115 | Substantial Compliance | • Continue to address PSR issues and determine their implications for policy and training |
| **VII. EMPLOYEE INFORMATION SYSTEM** | | |
| Par. 116 | Partial Compliance | • To achieve Substantial Compliance, require the Force Inspector to conduct the Type III alert process in accordance with Directive 345.00<br>• To achieve Substantial Compliance, implement corrective action for Precinct Commanders when significant review failures occur<br>• Determine with DOJ whether an assessment of EIS's effectiveness is required for compliance |
| Par. 117 | Partial Compliance | • To achieve Substantial Compliance, require the Force Inspector to conduct the Type III |

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| | | alert process in accordance with Directive 345.00 <br><br> • To achieve Substantial Compliance, implement corrective action for Precinct Commanders when significant review failures occur <br><br> • Determine with DOJ whether an assessment of EIS's effectiveness is required for compliance |
| Par. 118 | Substantial Compliance | • No recommendations at this time |
| Par. 119 | Substantial Compliance | • No recommendations at this time |
| Par. 120 | Substantial Compliance | • No recommendations at this time |
| **VIII. OFFICER ACCOUNTABILITY** | | |
| Par. 121 | Partial Compliance | • To return to Substantial Compliance, conduct case-study evaluation on OIS events, other high-visibility cases, cases that are returned for additional investigation, and cases involving legal representation to identify unique opportunities for reducing timelines |
| Par. 122 | Substantial Compliance | • No recommendations at this time |
| Par. 123 | Substantial Compliance | • Maintain self-improvement loop for stages that exceed their stage timeline even if the case does not exceed the 180-day timeline |
| Par. 124 | Substantial Compliance | • No recommendations at this time |

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| Par. 125 | Substantial Compliance | • No recommendations at this time |
| Par. 126 | Partial Compliance | • To achieve Substantial Compliance, revise Directive 1010.10 to allow for the potential for witness officers being incapacitated for mental health reasons<br><br>• Provide criteria to make such a determination |
| Par. 127 | Substantial Compliance | • No recommendations at this time |
| Par. 128 | Partial Compliance | • To achieve Substantial Compliance, address the identified gap in the size of the records backlog<br><br>• To achieve Substantial Compliance, limit future operational limitations by providing IPR the necessary support and collaboration |
| Par. 129 | Partial Compliance | • To return to Substantial Compliance, initiate accountability mechanisms for the supervisor who failed to forward the allegations for full investigation<br><br>• To return to Substantial Compliance, re-emphasize the responsibilities of on-scene supervisors and provide documentation of efforts to COCL |
| Par. 130 | Substantial Compliance | • No recommendations at this time |
| Par. 131 | Partial Compliance | • To return to Substantial Compliance, conduct PRBs in accordance with prior COCL and DOJ guidance |

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
|  | <span style="background:yellow"></span> | • To return to Substantial Compliance, increase the facilitator pool that the City relies on |
| Par. 132 | Substantial Compliance | • No recommendations at this time |
| Par. 133 | Substantial Compliance | • No recommendations at this time |
| Par. 134 | Substantial Compliance | • No recommendations at this time |
| Par. 135 | Substantial Compliance | • No recommendations at this time |
| Par. 136 | Substantial Compliance | • No recommendations at this time |
| Par. 137 | Partial Compliance | • To return to Substantial Compliance, update Directive 338.00, publicly post the directive, and provide link to the Corrective Action Guide. |
| Par. 138 | Substantial Compliance | • No recommendations at this time |
| Par. 139 | Substantial Compliance | • No recommendations at this time |
| Par. 140 | Substantial Compliance | • No recommendations at this time |
| Par. 169 | Partial Compliance | • To achieve Substantial Compliance, PPB should expand their approach to conducting objective investigations and hold officers accountable when policy violations are found<br>• To achieve Substantial Compliance, remedy barriers to ensure a fair and consistent accountability system |

| Paragraph | Compliance Label | COCL Recommendations |
|-----------|------------------|----------------------|
| **IX. COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING** | | |
| Par. 141 | Substantial Compliance | • No recommendations at this time |
| Par. 142 | Substantial Compliance | • To maintain Substantial Compliance with Par. 142, the City should continue to respond to PCCEP's recommendations in a prompt and thorough manner, and the Mayor/Police Commissioner should fulfill the requirement to meet with PCCEP "at least twice per year" |
| Par. 143 | Substantial Compliance | • To maintain Substantial Compliance with Par. 143, the City should continue to identify and recruit sufficient PCCEP members to maintain a full body<br><br>• The City, with guidance from PCCEP, should prioritize the recruitment and retention of youth members on PCCEP |
| Par. 144 | Substantial Compliance | • To maintain Substantial Compliance, continue adequate staffing dedicated to supporting PCCEP<br><br>• To maintain Substantial Compliance, post minutes of PCCEP meetings within 10 business days after a PCCEP meeting, including in the Documents section of PCCEP's website |
| Par. 145 | Substantial Compliance | • To maintain Substantial Compliance, make equity and procedural justice training a higher priority and engage additional |

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| | | community and police experts in these training initiatives<br><br>• Seek to improve access to police and City services for individuals with hearing impairments through updated policy, and training<br><br>• Officers' use of the Community Events App should be mandatory, not voluntary, and memorialized in a PPB directive and new training<br><br>• In the absence of the Alliance for Community Safety advisory group, the PPB should reach out to some active members of the LGBTQIA2S+ community and seek to restore a working partnership. |
| Par. 146 | Substantial Compliance | • Continue to explore new ways of measuring the quality of police-community interactions |
| Par. 147 | Substantial Compliance | • No recommendations at this time |
| Par. 148 | Substantial Compliance | • To maintain Substantial Compliance for Par. 148, PPB should provide additional training for officers regarding the distribution of consent cards in five languages<br><br>• Continue the dialogue with community members around racial disparities in traffic stops and searches |
| Par. 149 | Substantial Compliance | • As part of everyday policing, the City should introduce a contact survey to measure the level of procedural justice and |

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
|  |  | public satisfaction with police-public interactions, especially interactions with constitutionally-protected populations<br><br>• The PPB should Implement routine, anonymous internal surveys of PPB employees to measure police-community interactions, internal organizational justice, officer wellness, job satisfaction, and other aspects of police culture<br><br>• The City should acquire and use software to analyze body worn camera data<br><br>• As a learning organization, the PPB should introduce programs, polices, and training curricula that are directly responsive to these new databases |
| Par. 150 | Substantial Compliance | • No recommendations at this time |
| Par. 151 | Substantial Compliance | • No recommendations at this time |
| Par. 152 | Substantial Compliance | • Continue to maintain records of training for new PCCEP members; Ensure current and future PCCEP members participate in all required trainings<br><br>• To remain in Substantial Compliance, ensure that PCCEP members are offered a meaningful opportunity to participate in any optional training on the history of the Settlement Agreement by the AMAC and mental health advocates |
|  | **XI. ADDITIONAL REMEDIES** |  |

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| Par. 188 | Substantial Compliance | • No recommendations at this time |
| Par. 189 | Partial Compliance | • To achieve Substantial Compliance, the IMLLC must collect and analyze data consistent with the Scope of Work, and prepare a report that critically assesses the City's response to the 2020 demonstrations<br>• The City must respond to the IMLLC report<br>• PPB must use the IMLLC report to prepare a training needs assessment, training plan, and relevant crowd management training<br>• The IMLLC must prepare a follow-up report that reviews the City's response to their original report, including the PPB's training needs assessment<br>• The City should keep COCL informed of the work planned and completed by IMLLC<br>• The City should provide COCL with IMLLC's reports and the City's training needs assessment report |
| Par. 190 | Substantial Compliance | • To maintain Substantial Compliance, the City must continue to provide a separate line item for PPB training-related overtime expense<br>• Revisit the staffing and budget for the Training Division, keeping in mind the option of hiring more civilians |
| Par. 191 | Partial Compliance | • To achieve Substantial Compliance, the City and PPB must hire an individual who is |

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| | | • qualified to "direct all educational aspects of PPB's Training Division." <br><br> • The City should continue to create opportunities for community involvement in the process of hiring and orienting the new Director of Police Education. <br><br> • The City and PPB should select a candidate who understands both policing practices and best practices in teaching and the evaluation of training <br><br> • The Director of Police Education and the Captain of the Training Division should report to the same Assistant or Deputy Chief <br><br> • The Director of Police Education should explore professional development classes for PPB Training instructors |
| Par. 192 | Partial Compliance | • To achieve Substantial Compliance, complete a thorough, fair, and reasonable investigation of the command personnel associated with the 2020 crowd control and the training they provided <br><br> • To achieve Substantial Compliance, hold accountable the investigated command personnel members as appropriate who are found to have violated PPB policies (including this Agreement) as described in Par. 192 |
| Par. 193 | Substantial Compliance | • No recommendations at this time |

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| Par. 194 | Partial Compliance | • To achieve Substantial Compliance, the City "shall implement body-worn cameras (BWCs) pursuant to a policy that is subject to the policy-review-and-approval provisions of this Agreement" (Par. 194). This means that the City will need to:<br><br>　○ Develop and implement comprehensive BWC training<br><br>　○ Complete a successful pilot test in the field<br><br>　○ Achieve full-scale implementation of BWCs for PPB officers<br><br>• For any revisions that occur during or after the pilot process, we encourage the City to incorporate the recommendations from the community, the COCL and DOJ<br><br>• PPB should seek to acquire software for analyzing BWC data and identifying patterns in police-community interactions that can be used for training and coaching |
| Par. 195 | Partial Compliance | • To achieve Substantial Compliance, the PAC must submit to the City Council a clear and reasonable proposal for the implementation of a Community Police Oversight Board (CPOB) as defined in Par. 195<br><br>• To achieve Substantial Compliance, the City must implement a functional CPOB that is properly staffed, trained, operational, and able to effectively investigate and dispose of use of force and misconduct cases |

**Exhibit A**

# III. USE OF FORCE

## A. Use of Force Policy

| | |
|---|---|
| **Settlement Agreement Paragraph** | |

66. PPB shall maintain the following principles in its existing use of force policies: (a) PPB shall use only the force reasonably necessary under the totality of circumstances to lawfully perform its duties and to resolve confrontations effectively and safely; and (b) PPB expects officers to develop and display, over the course of their practice of law enforcement, the skills and abilities that allow them to regularly resolve confrontations without resorting to force or the least amount of appropriate force.

67. COCL Summary: Paragraph 67 establishes that PPB shall add several core use of force principles to its force policy: the use of disengagement and de-escalation techniques, calling in specialized units when practical, taking into account all available information about actual or perceived mental illness of the individual, and the appropriate de-escalation of force when no longer necessary. Par. 67 also indicates that the force policy should include mention that unreasonable uses of force shall result in corrective action and/or discipline. (For details and exact language, see the Settlement Agreement)

| **Compliance Label** | Par. 66 Substantial Compliance |
|---|---|
| | Par. 67 Substantial Compliance |
| **Methodology** | Review force case sample |

**Compliance Assessment**

As part of our regular review of PPB force events, we evaluated 20 cases which represent a randomly drawn cross-section of the PPB's use of force, including force from different categories, from different precincts, involving the use of a CEW, and against persons in a mental health crisis. For this quarter, we did not find any cases where we believed the force was unreasonable. However, we found five cases wherein we felt that officer actions were

not tactically sound and, while perhaps not the proximate cause of the use of force, would require correction by supervisors. To the PPB's credit, we found that supervisors were, in general, willing to identify these deficiencies and provide constructive criticism to officers (though we discuss broader concerns with supervisory review in our assessments of Par. 70, below). As we found these issues were largely identified by the chain of command, and this quarter represents the first quarter in recent memory with this degree of concerns, we continue to find the PPB and the City have substantially complied with the requirements of this paragraph. However, if subsequent quarters demonstrate tactical decisions which prevent achieving the "least amount of appropriate force" (66b), we may be required to change our compliance rating.

As a follow-up to prior concerns we have had with respect to the use of the term "de-escalation" in FDCRs, we note that during this quarter, the Force Inspector re-released a guiding document for what does and does not constitute de-escalation. We had previously approved such guidance and found that it resulted in improved descriptions of de-escalation. We therefore find that this suffices as a response to the COCL's recommendation to re-issue guidance though note that cases reviewed for this quarter did not have the benefit of the guide (since it came at the end of the quarter) and still suffered from many of the definitional issues we have commented on in the past (e.g., defining de-escalation so broadly that it would be nearly impossible for an interaction to <u>not</u> meet the definition). In reviewing PPB's definition of the term Directive 1010.00, de-escalation requires a "deliberate attempt" rather than happenstance. As the refresher training document came near the end of the quarter, we will need to review future FDCRs to determine the impact of the refresher.

| | |
|---|---|
| **COCL Recommendations** | • To maintain Substantial Compliance, ensure officers are demonstrating tactical skills which will avoid force or result in the least amount of reasonable force |
| **Assessment Based On** | COCL review of force sample |

## 1. Electronic Control Weapons

### Settlement Agreement Paragraph

68. COCL Summary: PPB shall revise PPB Directive 1051.00 regarding Taser, Less-Lethal Weapons System to include several core principles: ECWs will not be used for pain compliance against those suffering from mental illness or emotional crisis except in rare circumstances; officers shall issue verbal warnings or hand signals (if communication barriers exist); conventional standards for using ECW should be followed (e.g. one ECW at a time, re-evaluation; attempt hand-cuffing between cycles). Officers shall describe and justify their use of ECW in their Force Report, and receive annual training in ECW use. (For details and exact language, see the Settlement Agreement).

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review force case sample |

### Compliance Assessment

Based on our review of PPB force events, we find that the PPB officers continue to use CEWs in accordance with the Settlement Agreement (Par. 68). For this quarter, we reviewed a total of four force events involving an officer's use of a CEW which represented over half of CEW events in the quarter and included the sole event where a CEW was used on a person in a mental health crisis. In each case, we found the use of CEW to be reasonable and in neither of the cases were CEWs used for pain compliance or more than one CEW used at a time. For each of the CEW force events, officers were able to place the subject in custody without having to resort to a higher level of force. As a result, we continue to find the PPB in Substantial Compliance with the requirements of this paragraph.

| COCL Recommendations | • No recommendations at this time |
|---|---|
| Assessment Based On | COCL review of CEW cases |

## 2. Use of Force Reporting Policy and Use of Force Report

<div style="border">

### Settlement Agreement Paragraph

69. PPB shall revise its policies related to use of force reporting, as necessary, to require that: (a) All PPB officers that use force, including supervisory officers, draft timely use of force reports that include sufficient information to facilitate a thorough review of the incident in question by supervisory officers; (b) All officers involved or witnesses to a use of force provide a full and candid account to supervisors; (c) In case of an officer involved shooting resulting in death, use of lethal force, or an in-custody death, PPB will fulfill its reporting and review requirements as specified in directive 1010.10, as revised. This will take place of Directive 940.00 reports for the purposes of paragraphs 70, and 72-77 of this Agreement.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review force case sample |

### Compliance Assessment

In our review of cases for this quarter, the majority of FDCRs reviewed contained sufficient information to allow a supervisor to conduct a fulsome investigation of the event. However, we reviewed two cases where officers did not, at least originally, report all applications of force they used. In one case, a suspect was "kicking [their] legs and attempting to stand" during a struggle with officers. During this time, an officer "put [their] weight onto [the suspect]" upon which the suspect immediately stopped resisting. However, another FDCR stated that the suspect was "still actively attempting to get back up" while the officer was holding down the suspect's legs. In clarifying with the officers, the supervisor relayed that both officers indicated that once the one officer put his/her weight onto the suspect, the suspect immediately stopped resisting. As a result, the supervisor concluded that the action was not control against resistance and therefore did not constitute reportable force. However, we find this inconsistent with PPB policy as the use of physical coercion with a resisting suspect (even if immediately resulting in a cessation of resistance) should be categorized as Control Against Resistance.

In a second case, an officer originally did not report five applications of Control Against Resistance. To the credit of the sergeant in this case, they identified the five applications that

</div>

were missing and had the officer submit an amended FDCR.[2] However, the sergeant was only able to do so because security footage of the event existed and without the existence of such footage, it's likely that the applications of force would have remained un-reported. This example also re-emphasizes the importance of the PPB's forthcoming body-worn camera program in ensuring compliance with the Settlement Agreement.

We also consider these cases alongside a case from last quarter. In that case, both the officer and supervisor overlooked a Control Against Resistance application of force. In speaking with the Force Inspector for that report, he agreed that this should have been reported. As that had been a single missed application in the quarter and we had not identified issues in prior quarters, we did not consider it to impact compliance.[3] However, when coupled with the cases found in this quarter's sample, as well as with the fact that all violations are related to Control Against Resistance, we must now find that there is a consistent misconception about what actions do and do not constitute force with respect to this type of force. We therefore find the PPB to be in Partial Compliance with the requirements of Par. 69.

To return to Substantial Compliance, the PPB should evaluate Directives 1010.00 (Use of Force) and 910.00 (Use of Force Reporting, Review, and Investigation) and evaluate current training on what constitutes Control Against Resistance to identify opportunities for clarifying when officers should be reporting such applications. After clarifying, the PPB supervisors should then review FDCRs and GOs (and, when available, BWC video) to ensure compliance and take corrective action on members who fail to accurately report on these types of incidents and supervisors who fail to correct the issue.

| | |
|---|---|
| **COCL Recommendations** | • To return to Substantial Compliance, evaluate Directives 1010.00 and 910.00, evaluate current training, and identify opportunities to clarify when officers should be reporting Control Against Resistance.<br><br>• Upon issuing such clarification, take corrective action on members who fail to report Control Against Resistance and supervisors who fail to correct the issue |

---

[2] From the AAR: "I reviewed the surveillance footage and found it showed five additional level IV uses of force not reported by [OFFICER], all appeared to be control against resistances."

[3] See Par. 175(a): "Substantial compliance is achieved if any violations of the Agreement are minor or occasional and are not systemic."

**Exhibit A**

| **Assessment Based On** | COCL review of force cases |
| --- | --- |

### 3. Use of Force Supervisory Investigations and Reports

| **Settlement Agreement Paragraph** |
| --- |
| 70. COCL Summary: Paragraph 70 states, "PPB shall continue enforcement of Directive 940.00, which requires supervisors who receive notification of a force event to respond to the scene, conduct an administrative review and investigation of the use of force, document their findings in an After Action Report and forward their report through the chain of command." Paragraph 70 continues on to describe what is required of supervisory officers when a use of force event occurs, including timeframes for After Action Reports, notification requirements of serious use of force, force against individuals with mental illness, suspected misconduct, procuring medical attention, and officer interviews (For details and exact language, see the Settlement Agreement). |

| **Compliance Label** | Partial Compliance |
| --- | --- |
| **Methodology** | Review of force cases |

| **Compliance Assessment** |
| --- |
| In our review of 20 use of force cases, we saw a reduced number of AARs which had significant deficiencies in supervisor review when compared with prior quarters. In several cases, the depth of evaluation was appreciable. For instance, in one case, the sergeant identified four areas of improvement to an officer's tactics and decision-making. The areas of improvement were well-developed and relevant, and the officer no-doubt learned from the experience. We suggest these examples be forwarded to the Training Division for incorporation into future Sergeant Academies as they are informative and provide a positive example of a comprehensive AAR.

Despite these examples, we continue to find the PPB remains in Partial Compliance with the requirements of Par. 70. In addition to unresolved recommendations in prior quarters, we found three AARs in this quarter which are inconsistent with this paragraph in significant |

ways and in which the authoring supervisors were not corrected. As noted above, we found one case wherein a supervisor did not identify a Control Against Resistance and was not corrected in the chain of command review. In addition to this case, we identified one case where the supervisor and chain-of-command determination of reasonableness for a vehicle ramming incident does not appear to have considered the fact that the officer had a ride-along participant during the ramming. Finally, one case involved an officer who indicated they used profanity during the event, telling the subject to "sit the fuck down." The sergeant then reviewed footage of the force event and determined the officer had used profanity three times (though the AAR does not indicate what profanity was used the other two times). However, while the sergeant addressed whether or not the officer was attempting to be untruthful by not reporting the other two uses of profanity (we agree that the officer wasn't), the supervisor did not assess whether the use of profanity during the event was a violation of Directive 310.00 (Professional Conduct and Courtesy) based on the "totality of circumstances in which [the profanity] was used" (Directive 310.00).

As with prior reports, we maintain that corrective action be taken against supervisors throughout the chain of command for significantly deficient reporting and reviews (see also Par. 73).

| **COCL Recommendations** | • To achieve Substantial Compliance, review cases and take corrective action |
|---|---|
| **Assessment Based On** | COCL review of force cases |

| **Settlement Agreement Paragraph** | |
|---|---|
| 71. PPB shall maintain adequate patrol supervision staffing, which at a minimum, means that PPB and the City shall maintain its current sergeant staffing level, including the September 2012 addition of 15 sergeants. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review rate of officers to supervisors |

**Compliance Assessment**

The PPB has maintained an adequate patrol-supervision staffing level in accordance with Par. 71, thus remaining in Substantial Compliance. As noted in prior reports, the rate of officers to sergeants is a better metric than the raw number of sergeants. In the first quarter of 2023, the PPB reported a staffing ratio of 6.6 officers for every sergeant (including Acting Sergeants) across the three precincts. This is the same ratio as the fourth quarter of 2022. However, not reflected in this data is a promotion of 12 sergeants which has since recently happened. In conversations with PPB, we learned that they were at authorized sergeant levels based on these promotions. We therefore expect data from 2023 Q2 to reverse the trends that we have seen in our review of this paragraph in prior quarters.

**Figure 3.1**



| COCL Recommendations | • No recommendations at this time |
|---|---|
| **Assessment Based On** | COCL review of ratio of officers to sergeants |

| **Settlement Agreement Paragraph** | |
|---|---|
| 72. PPB shall develop a supervisor investigation checklist to ensure that supervisors carry out these force investigation responsibilities. PPB shall review and revise the adequacy of this checklist regularly, at least annually. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review current AAR form; Review upcoming web form |
| **Compliance Assessment** | |
| Presently, the After-Action Report (AAR) form contains the checklist, and therefore we find the PPB has remained in Substantial Compliance with the requirements of Par. 72. Although we assess the PPB's use of the AAR form as the "investigation checklist" to be in compliance with this paragraph, we refer the reader to our assessment of other paragraphs for critical deficiencies in how supervisors have completed the AAR. | |
| **COCL Recommendations** | • Ensure supervisors reliably and consistently use the AAR for future force events |
| **Assessment Based On** | COCL review of AAR form |

| **Settlement Agreement Paragraph** | |
|---|---|
| 73. COCL Summary: Paragraph 73 directs PPB to revise its policies concerning chain of command reviews of After Action Reports (940s) to ensure that the reviews are accurate and thorough; that all comments are recorded in the EIS tracking system; that supervisors in the chain are held accountable for inadequate reports and analysis through corrective action (including training, demotion and/or removable from their supervisory position); and that when use of force is found to be outside of policy, that it be reported and appropriate | |

corrective action be taken with the officer and the investigation itself (For details and exact language, see the Settlement Agreement).

| | |
|---|---|
| **Compliance Label** | Partial Compliance |
| **Methodology** | Review force case sample |

**Compliance Assessment**

Our assessment of force cases during this quarter revealed several cases where after-action reviews were not accurate or thorough, and supervisors were not held accountable for inadequate reports and analysis. We thoroughly discuss these issues in the different paragraphs above though, also note that no member in the chain-of-command commented on the deficiencies and, no member in the chain-of-command was held accountable for the deficient reporting. Therefore, the City remains in Partial Compliance for the requirements of this paragraph. To achieve Substantial Compliance, we maintain our recommendations from prior quarters.

| | |
|---|---|
| **COCL Recommendations** | • To achieve Substantial Compliance, ensure that chain-of-command supervisors are held accountable for inadequate reports and analysis<br><br>• To achieve Substantial Compliance, clearly distinguish conduct that requires formal review from that which can be corrected by informal counseling |
| **Assessment Based On** | COCL review of force cases, lack of clarity in conduct that requires formal review |

**B. Compliance Audits Related to Use of Force**

---

**Settlement Agreement Paragraph**

74. COCL Summary: Paragraph 74 states that "In consultation with the COCL, the Inspector, as part of PPB's quarterly review of force, will audit force reports and Directive 940.00 Investigation Reports" and will do this to ensure that the officer's force report is complete and accurate and that the officer's actions in the field are in line with PPB policy. The audit of force reports seeks to ensure that force is used in a way that is lawful and appropriate to the circumstances; that de-escalation is used appropriately; that ECW is used appropriately and within policy; and that specialty units and medical care are called in appropriately. In terms of force reporting, the audit seeks to ensure that reports are submitted in a timely manner; that they include detailed information about the event, the decision to use force, the type of force used, any subject resistance and any injuries to the parties; that the report includes the mental health status of the subject of force, documentation of witnesses and contact information, and other details as required by the Settlement. There should be sufficient information in the report to allow supervisors to evaluate the quality of the officer's decision making regarding the use of force. (For details and exact language, see the Settlement Agreement)

75. COCL Summary: Paragraph 75 states that, "In consultation with the COCL, the Inspector shall audit force reports and Directive 940.00 investigations" to determine whether supervisors consistently engage in a variety of behaviors when reviewing use of force reports and supervising their employees. Specifically, the Settlement requires that supervisors complete an After Action Report within 72 hours of being notified of the incident; To perform well at this task, supervisors would need to review all use of force reports for completeness, determine whether the officer's actions are consistent with PPB policy, the Settlement Agreement and best practices; and take all appropriate actions as a supervisor, including determining any training or counseling needs for the officer; taking corrective action on omissions or inaccuracies in the force report; notifying appropriate authorities when criminal conduct is suspected; and documenting all of the above-named actions. (For details and exact language, see the Settlement Agreement)

77. COCL Summary: "In consultation with the COCL, the Inspector shall audit the adequacy of chain of command reviews of After Action Reports." This type of audit by the Inspector will ensure that supervisors at all levels in the chain of command are conscientiously reviewing all After Action (940) Reports using the appropriate legal and administrative performance standards, and taking appropriate action. The reviewers of After Action reports should be

---

assessing the completeness of reports and evaluating the findings using a "preponderance of the evidence" standard. Where appropriate, reviewers should modify findings that do not seem justified, speak with the original investigator, order additional investigations, identify any deficiencies in training, policy or tactics, ensure that supervisors discuss poor tactics with the officer involved, and document the above in EIS. (For details and exact language, see the Settlement Agreement.)

| | |
|---|---|
| **Compliance Label** | Par. 74 Partial Compliance |
| | Par. 75 Partial Compliance |
| | Par. 77 Partial Compliance |
| **Methodology** | Review Quarterly Force Audit Report; Review Force Inspector Memos; Review Force Inspector Phase II Spreadsheet |

### Compliance Assessment

On a quarterly basis, the PPB conducts the audits of force events required by Pars. 74, 75, and 77. As with prior quarters, both PPB officers (through FDCRs) and PPB supervisors (through AARs) continue to demonstrate approximately 99% accuracy in their reporting based on the audits. However, as reflected in our assessments above, we continue to find that the audit conducted by the Force Inspector does not identify significant failures and limitations in officers' force reporting and supervisors' evaluation of force (even if they represent a small percentage of overall reporting data). We also note that the force audit allows the Force Inspector an opportunity to identify important policy and training implications not identified by the chain-of-command. In a review of supporting evidence, we found two instances where the Force Inspector forwarded concerns to the Training Division. However, other significant opportunities were missed and although we discuss many of these in our assessment of other paragraphs above, we highlight two such opportunities here.

The first opportunity relates to a series of use of force events across the prior two quarters. In these events, supervisors were unable to conduct an interview with the subject on-scene due to the subject either being chemically incapacitated by AMR or otherwise incapacitated at the

time. In these instances, no follow-up attempt is made by the supervisors to gather a statement later, either through a phone call to the subject or any other means. We also note that in one event, a supervisor appears to interview a chemically incapacitated individual (unsurprisingly, this interview was not successful). Therefore, there is an opportunity for the Inspector to clarify policy (which currently only requires "an attempt" by the sergeant to gather a subject statement) and/or training (e.g., Bureau expectations for what constitutes "an attempt"). However, in speaking with the Force Inspector on this trend, we were informed that any technical "attempt" (even if the subject is incapacitated at the time) would suffice and that no additional clarification was necessary.

The second opportunity relates to a case described above regarding the use of ramming as a force tactic when there is a ride-along participant in the vehicle. Aside from the question of reasonableness is the more basic question of whether the PPB wants its officers to engage in any vehicle intervention tactic with a ride-along at all. As indicated by Directive 630.05 (Vehicle Interventions and Pursuits), pursuits are "are dynamic and rapidly evolving in nature and, as a result, have inherent safety risks."[4] While the directive does state that an officer cannot be a primary pursuer with a ride-along, it provides no guidance on whether a PIT, ram, or box-in can or should be conducted with a ride-along. This event therefore brings to light something which may have never happened before but now represents an identified gap that needs to be resolved. However, in conversations with the Force Inspector, we were informed that this was considered a one-off event and therefore no recommendations were made with respect to policy or training.

For both of these, we consider them to represent a missed opportunity to clarify Bureau expectations through refined policy and training. As history is bound to repeat itself if left unchecked, it's not clear to us why the Force Inspector would not want to provide such clarification to officers and supervisors if faced with similar situations in the future. Due to failure to correct officer and supervisor deficiencies, the missed opportunities in the Force Inspector's review, and issues remaining from prior quarters, we continue to find the PPB to be in Partial Compliance with the requirements of Pars. 74, 75, and 77.

| **COCL Recommendations** | • To achieve Substantial Compliance, ensure significant deficiencies are identified and resolved. |
|---|---|

---

[4] While PPB did not consider this event a "pursuit" by definition, it contained similar circumstances as many pursuits and we therefore include it as illustrative of the point

|  | • To achieve Substantial Compliance, provide evidence of Inspector review documents and findings<br><br>• To achieve Substantial Compliance, clearly distinguish conduct that requires formal review from that which can be corrected by informal counseling |
|---|---|
| **Assessment Based On** | Review of Force Audit Report, review of Feedback forms |

| **Settlement Agreement Paragraph** |
|---|
| 76. In consultation with the COCL, the Inspector shall conduct a quarterly analysis of force data and supervisors' Directive 940.00 reports designed to: (a) Determine if significant trends exist; (b) Determine if there is variation in force practice away from PPB policy in any unit; (c) Determine if any officer, PPB unit, or group of officers is using force differently or at a different rate than others, determine the reason for any difference and correct or duplicate elsewhere, as appropriate; (d) Identify and correct deficiencies revealed by the analysis; and (e) Document the Inspector's findings in an annual public report. |

| **Compliance Label** | Partial Compliance |
|---|---|
| **Methodology** | Reviewed Quarterly Force Reports |

| **Compliance Assessment** |
|---|
| For each of the subsections of Par. 76, the PPB possesses a tool or process to achieve Substantial Compliance. For instance, in addressing subsection (a), the PPB continues to produce quarterly and annual force reports including several important data points and comparisons to prior quarters. Subsection (a) is also addressed, in part, through the Phase II review wherein the Force Inspector identifies organizational trends. For subsections (b) and (c), the Force Inspector reviews the findings of a comparative analysis of each officer, unit, and group (as defined by common days off), identifying differences and discussing the analysis with each patrol RU Manager. For subsection (d), the Force Inspector either provides |

a memo to the RU Manager or creates a manual EIS alert (see also Par. 117). Finally, for subsection (e), the Force Inspector memorializes findings of the reviews in annual reports, including the Annual Force Summary Report and Annual Force Audit Summary Report.

The PPB continues to have an overall low raw number of force; across the entirety of the city in 2023, an average of 1.8 force events occurred per day, with 45% of force events involving a Category IV use of force (i.e., resisted handcuffing, control against resistance, hobbles restraint, pointing of a firearm, firearm – hurt animal, or box-in) as the highest level of force. Additionally, the PPB saw an approximate 12% decrease in force events in 2022 compared to 2021 though only a 5% decrease in calls for service and a 3% increase in custodies between the two years.

However, despite these decreases, the complete role of the Force Inspector has not been fulfilled, for we still do not have reliable evidence that officers who use force at a "different rate than others" are being addressed, either through correction or duplication (see also our assessment of Pars. 116 and 117). Furthermore, we are without evidence that organizational trends in use of force are being addressed, as indicated in our assessment of several paragraphs within this section. We therefore maintain our recommendations from prior reports and request the Force Inspector re-engage with the COCL team to discuss how these paragraphs might be substantially complied with.

| | |
|---|---|
| **COCL Recommendations** | • To achieve Substantial Compliance, comment on trends over time and make suggestions for correcting/duplicating elsewhere<br><br>• To achieve Substantial Compliance, work with COCL to identify statistically significant members on both ends of the spectrum to better manage force |
| **Assessment Based On** | COCL review of quarterly Force Data Summary Reports, COCL review of PPB data |

# IV: TRAINING

**Overview of Training Systems**

The COCL's framework for assessing compliance with Section IV remains unchanged. Specifically, we assess the extent to which the PPB's training systems: (1) identify areas where officers require training; (2) develop and deliver appropriate and high-quality training; (3) develop and implement a valid and useful system of training evaluation both in the short and long term; (4) document and report training delivered and received; and (5) audit the overall training system to ensure that it is accountable to the administration and the public.

**Overview of Methods**

The COCL continues to review and critique training documents, including training needs assessment reports, training plans, lesson plans, PowerPoint presentations, evaluation instruments, and evaluation reports. The COCL also continues to observe training (either in-person or online), observe TAC meetings, and conduct interviews with the PPB members and others as needed. Our reviews, observations, and analyses allow us to assess the adequacy of the training systems and whether officers are being adequately prepared to protect the constitutional rights of all individuals, including those who have or are perceived to have a mental illness.

**Training Summit**

In our last report, we summarized the Training Summit that occurred last December with DOJ, the COCL, and City officials to assist the Training Division as it seeks to engage in best practices. Here we provide an update on the four primary recommendations to emerge from that meeting.

*Consistency in Training Academy Leadership:* A high rate of turnover in leadership is likely to persist within the Training Division because of the ripple effect caused by turnover in positions throughout the PPB. For example, Assistance Chiefs have left the PPB, thus requiring promotions to fill these positions, and further appointments to fill these vacancies created by these personnel changes. Hopefully, the appointment of a Director of Police Education and other civilians will create more stability with the Training Division.

*Instructor Development Course:* The PPB needs to shift from a reliance on lectures to more scenario-based approaches to training. The COCL has pushed for more adult learning techniques for many years, and the PPB has gradually moved in this direction. The COCL would like to see the PPB go a step further to offer more scenarios for individual officers where they can practice the skills involved in de-escalation and verbal communication (The PPB currently offers this type of training for physical control tactics and use of weapons). At a minimum, the PPB needs to give more attention to (1) selecting instructors (both sworn and civilian) with teaching skills and (2) give more attention to developing the teaching skills in current instructors, rather than assume that instructors who are knowledgeable about a particular topic in police work are also good instructors.

*Director of Police Education and Captain Equivalency:* The new Director of Police Education and the Captain in the Training Division should report to the same individual so that both retain the authority to effectively execute their responsibilities. The decision to ensure that the new civilian position (Director of Police Education) is not secondary to the Captain's position currently resides with the City Council. However, we encourage the Council to leave that decision to the Chief of Police, and that the Chief follows the recommendation from the Training Summit.

*Resource Constraints:* Budget constraints have hampered training opportunities. To offset this resource constraint, the PPB is exploring the idea of civilianizing certain aspects of the Training Division. This would include hiring more civilian trainers (including former officers) to address the demand for additional classes. A primary role of the new Director of Police Education is to address all aspects of the instructor program, including the training of new instructors. The COCL continues to recommend more civilian employees in the Training Division, including instructors with knowledge in urban police and/or organizational behavior, and knowledge of effective instructional techniques.

**Assessment of Compliance**

---

**Settlement Agreement Paragraph**

78. All aspects of PPB training shall reflect and instill agency expectations that officers are committed to the constitutional rights of the individuals who have or are perceived to have mental illness whom they encounter and employ strategies to build community partnerships to effectively increase public trust and safety. To achieve these outcomes, PPB shall implement the requirements below.

---

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | This is a summative judgment that is contingent upon satisfying all paragraphs in Section IV |

| | |
|---|---|
| **Compliance Assessment** | |

The PPB has achieved only Partial Compliance with Paragraph 78 because Substantial Compliance requires the PPB to "implement the requirements below." Because this is a summative paragraph, compliance will be assessed in terms of the achievement of all requirements of the Settlement Agreement pertaining to Section IV, Training.

We will continue to focus on the primary training for all officers and supervisors and special mental health training for Enhanced Crisis Intervention Team (ECIT), as these are the training courses most central to the Settlement Agreement. However, given the problems that occurred with the PPB's crowd management during the 2020 protests, the COCL added this subject to our training evaluation agenda beginning in 2021.

We will continue to evaluate training progress in terms of the fidelity of implementation and whether these trainings are likely to achieve the desired outcomes listed in Par. 78.

| COCL Recommendations | • To achieve Substantial Compliance, PPB must substantially comply with all paragraphs within Section IV |
|---|---|
| Assessment Based On | Summative and contingent upon satisfying all paragraphs of Section IV, based on the methods identified for each |

## Assess Training Needs

| |
|---|
| **Settlement Agreement Paragraph** |
| 79. The Training Division shall review and update PPB's training plan annually. To inform these revisions, the Training Division shall conduct a needs assessment and modify this assessment annually, taking into consideration: (a) trends in hazards officers are |

encountering in performing their duties; (b) analysis of officer safety issues; (c) misconduct complaints; (d) problematic uses of force; (e) input from members at all levels of PPB; (f) input from the community; (g) concerns reflected in court decisions; (h) research reflecting best practices; (i) the latest in law enforcement trends; (j) individual precinct needs; and (k) any changes to Oregon or federal law or PPB policy.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Interviewed PPB staff and reviewed internal training documents. |

**Compliance Assessment**

In the fourth quarter of 2022, the Training Division was able to complete their annual needs assessment and finalize their 2023 PPB Annual Training Plan. We summarized and evaluated this plan in our last report, so we will not repeat that information here. The needs assessment covers needs related to In-service training for all sworn members, In-service for Supervisors and Enhanced Crisis Intervention Team training, and Advanced Academy training for new recruits.

During the first quarter of 2023, the Training Division continued to update its 2023 needs assessment and training plan by gathering additional information from a variety of sources.[5] We remind the reader that the PPB also conducted a special needs assessment for crowd management training. Both the standard needs assessment and the crowd management needs assessment were used to plan the In-Service training that occurred in the first quarter of 2023 and described here under Par. 84 of this report. We note that their needs assessment is an ongoing process. In the first quarter, as part of this in-service training, the PPB collected additional information from all officers regarding crowd management training needs and their preparedness for such work.

---

[5] PPB gathers information from the following sources: Independent Police Review reports, use of force data, officer injury data from the Fire and Police Disability and Retirement, data from the Portland Police Bureau's officer injuries log, the DOJ Agreement, the Training Advisory Council, the Behavioral Health Unit and related community advisory committee, Oregon and federal court cases, the Portland Police Bureau's Force Audit Report, the Portland Police Bureau's Policy Analysts, learning assessment and other training evaluation findings, collision statistics, national conferences, Internal Affairs data, pursuit data, officer surveys, national literature on law enforcement training, and discussions with training leads, precinct commanders, City Attorneys, DOJ coordinators, Independent Police Review staff, Internal Affairs staff, Training Division management, and officer safety liaisons.

As described in Par. 84, this In-Service training for all officers focused on the role of the Mobile Field Force (MFF) in responding to crowd management/public order events. After the problems associated with the 2020 protests and the resignation of the PPB's Rapid Response Team (RRT), the PPB has been slow to assign another special unit to handle mass demonstrations. In the meantime, the PPB has decided to rely on its existing MFF as the primary strategic/unit response to such events, while tailoring its approach based on updated policy and best practices nationwide[6]. This crowd management training is detailed in the PPB's Annual Training Plan. Although the COCL was generally satisfied with this Training Plan (as reported previously), the PPB's training needs assessment and training plan will need to be updated when the Independent Monitor, LLC, has completed its assessment of PPB's response to the 2020 protests (see Par. 189). The PPB plans to do so.

We continue to encourage the Training Division to close the gap between their Needs Assessment and Training Plan (only about one quarter of the needs identified are being addressed in the training plan) and give more attention to training that can improve public trust and police legitimacy. This would include procedural justice and de-escalation skills that should be practiced during live, role-playing scenarios, followed by thoughtful debriefings.

The COCL continues to provide a rating of Substantial Compliance for Par. 79, but to maintain Substantial Compliance, the Training Division will need to supplement its own training needs assessment and training plan with the results from the external Critical Assessment of the 2020 protests (see Par. 189).

| | |
|---|---|
| **COCL Recommendations** | <ul><li>To maintain Substantial Compliance, the Training Division will need to update its own training needs assessment and training plan regarding crowd management based on the findings from the external critical assessment of the 2020 protests</li><li>In future needs assessments and training plans, give more attention to interpersonal communication skills used for de-escalation and procedural justice, as requested by the public</li></ul> |

---

[6] Some PPB Instructors have attended external trainings and seminars to learn more about best practices for responding to protest events.

| **Assessment Based On** | Review of PPB's internal training documents and interviews with PPB personnel |
|---|---|

**Evaluate Training**

| **Settlement Agreement Paragraph** |
|---|
| 80. Within 180 days of the Effective Date, PPB shall develop and implement a process that provides for the collection, analysis, and review of data regarding the effectiveness of training for the purpose of improving future instruction, course quality, and curriculum. These evaluations shall measure and document student satisfaction with the training received; student learning as a result of training; and the extent to which program graduates are applying the knowledge and skills acquired in training to their jobs. This audit shall be reported to the Training Division Manager and shall include student evaluations of the program and the instructor. |

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Interviewed PPB staff and reviewed internal training documents; Assessed the methods of evaluation, content, and the presence of a complete evaluation system with feedback loops |

| **Compliance Assessment** |
|---|
| The COCL's assessment of the PPB's training evaluation system did not change in the first quarter, although we will continue to recommend that the City support new methods for evaluating police performance on the job, which can also be used to evaluate the effectiveness of training. The PPB's training evaluations continue to employ multiple methods of data collection, analysis, and reporting that are being guided by the Kirkpatrick Model of training evaluation. Specifically, the Training Division administers in-class quizzes/surveys, anonymous post-class evaluation surveys, post-class knowledge tests, scenario skills tests, and classroom observations. The research team also provides preliminary results and debriefings for Training Division personnel so that adjustments in teaching can be made. |

Overall, the COCL continues to be satisfied with the use of these methods, although we have additional recommendations.

The Training Division used many of these methods during the first quarter to continue their ongoing evaluations of Advanced Academy training, on-line training, and ECIT training. In the second quarter of 2023, the Training Division completed two evaluation reports – one on the In-Service training for all officers (reviewed by COCL in our Q3 2022 report), and one on the Supervisor In-Service training (reviewed by COCL in Q4 of 2022). Because we have observed and reviewed these trainings previously, here we will focus our assessment on the methods employed for the evaluations relevant to Par. 80. (The Supervisor In-Service training is also reviewed as part of our Training Outcome Assessment later in this report).

These evaluation reports, like prior reports, rely heavily on the surveys administered after the completion of the classes. The authors conclude that most students continue to give positive reviews of these classes. Some students also provide useful feedback about the limitations of these trainings and make constructive recommendations. For example, some supervisors wanted more advanced supervisor training and more complex case studies. Some officers wanted additional skills training as part of their in-service training.[7]

Administering post-class surveys is useful for this type of feedback, but as the COCL has stressed over the years, it is a limited methodology for evaluating the effectiveness of training. Did officers learn anything from the training? The PPB's evaluation reports often make statements like, "Overall members demonstrated high amounts of knowledge and skill levels" (In-Service Evaluation report, p. 3). But how much knowledge did they have before the training started? Without a pretest, the PPB will never know if any learning occurred as a result of the training, even if officers in the class say they did.[8] Also, without a control group (i.e., a group that did not receive the training), even a pretest-post-test evaluation is very limited, because factors other than the training may have caused any observed changes in knowledge, attitudes, or perceptions in the group that received the training.

Finally, the focus on post-class surveys as the primary evaluation tool offers no evidence as to whether the training resulted in any changes in behavior on the job. The PPB is expected to use outcome metrics that capture "the extent to which program graduates are applying the knowledge and skills acquired in training to their jobs." (Par. 80). Along these lines, in Q3 of

---

[7] Since 2020, PPB members have been receiving only two days of In-Service training per year, although four days were planned. This is attributed to COVID and PPB staffing limitations.

[8] Research shows that self-reports can be very inaccurate ("I learned a lot") vs actual measures of knowledge or behavior.

**Exhibit A**

2022, the COCL recommended that the PPB "conduct more scientific evaluations of on-the-job outcomes and include contact surveys to measure the impact of training on police-community interactions and procedural justice."

We credit the PPB for beginning to work with Washington State University to conduct a more rigorous evaluation (pretest-posttest control group design) for one of the PPB's training classes – Officer Wellness. This is a good start, but this type of evaluation should be standard for the PPB. (For example, some community members would like to see this type of rigorous evaluation applied to Use of Force training). In their reports, the Training Division also talks about using various on-the-job outcome metrics, but we see little use of these metrics in their evaluation reports.

In terms of on-the-job outcome metrics, the next big step, as recommended by the COCL, is for the City to build a contact survey program that continuously collects survey data from community members who have had a recent contact with a PPB officer. Currently, the Training Division is working with the Training Advisory Council (TAC) to reanalyze citywide data collected by Davis, Hibbitts & Midghall, Inc. (DHM Research) in prior years. While this data has some utility, the COCL has several concerns about relying on citywide surveys of Portland residents to evaluate police performance. First, random samples of all city residents tend to focus on the two-thirds of the population who have had no police contact in the past year. This population tends to have little, if any, knowledge of how the PPB treats the public. Portland should survey the 1-in-3 residents who have voluntary contact with the police (e.g., reporting a crime) and the 13% of the population who have involuntary contact (e.g., stopped by the police).[9]

Second, even those residents with some police contact over the past year are unlikely to remember the details of an encounter that occurred 11 or 12 months ago. Research shows that human memory decays rapidly, and new information can interfere with the recall of older information (what psychologists call "retroactive interference").

Third, history shows that citywide surveys of random samples come and go as special projects, and rarely provide consistent information over time. These projects are also expensive and often don't ask the exact same questions when they are repeated several years later by different researchers.

Fourth, and perhaps most importantly, these general surveys will not provide the level of detail about police encounters that are needed to make changes to policy, training, and

---

[9] DHM Research (2016). *City of Portland Community Policing Survey.* Portland, Oregon. December. www.dhmresearch.com

**Exhibit A**

supervision. In contrast, a contact survey program will produce <u>continuous</u> data from community members with a police contact in the past week or two. Such a program will measure, with accuracy, what matters to the community, namely, how they are treated (procedural justice), with breakdowns by precinct, beat, shift, officer, and community demographics. Data generated from a contact survey program, along with data from the new body-worn camera program, will ensure equitable treatment for all groups and lead to important changes in training, coaching, and supervision.

We continue to offer a few other recommendations regarding training evaluations. When officers are practicing specific skills, we continue to advocate for scenarios where officers are evaluated individually rather than in groups. This happens for Firearms and Control Tactics training, but rarely for other skills. Specific skills, such as de-escalation and procedural justice, should be tested and used in training. Measurement and feedback should be built into the training process to ensure that communication skills have reached an acceptable level <u>prior to</u> leaving the training. Finally, we continue to recommend that the Training Division, despite staffing limitations, protect the time of the Training Analysts. The administration should return all Training Analysts to their original job duties and hire additional analysts to ensure that the best training needs assessment, training plan, and scientific knowledge about the quality and effectiveness of training are met.

| | |
|---|---|
| **COCL Recommendations** | <ul><li>Work with City officials to develop a contact survey program that can measure officers' on-the-job performance around procedural justice</li><li>Use data from contact surveys and body-worn cameras to improve the training needs assessment, training plan, and training evaluation metrics.</li><li>Add role-play scenarios where officers can be evaluated individually rather than in groups</li><li>Measure whether officers have reached an acceptable level of communication skills in de-escalation and procedural justice <u>prior to</u> leaving the training</li><li>Return all Training Analysts to their original job duties and hire additional analysts to ensure the best training needs assessment, training plan, and scientific knowledge about the quality and effectiveness of training</li></ul> |

| | • Improve the Training Division's evaluation surveys and evaluation methods as described in the Training Outcome Assessment |
| --- | --- |
| **Assessment Based On** | COCL review of training evaluation tools, quality of data, and systems of reporting and feedback |

**Document Training Delivered and Received**

<table>
<tr><td colspan="2" align="center"><strong>Settlement Agreement Paragraph</strong></td></tr>
<tr><td colspan="2">81. PPB shall ensure that the Training Division is electronically tracking, maintaining, and reporting complete and accurate records of current curricula, lesson plans, training delivered, attendance records, and other training material in a central, commonly accessible, and organized file system. Each officer's immediate supervisor shall review the database for the officers under his/her command at least semi-annually.</td></tr>
<tr><td><strong>Compliance Label</strong></td><td>Partial Compliance</td></tr>
<tr><td><strong>Methodology</strong></td><td>Requested and reviewed LMS records for the first quarter of 2023</td></tr>
<tr><td colspan="2" align="center"><strong>Compliance Assessment</strong></td></tr>
<tr><td colspan="2">The Training Division continues to use the Cornerstone Learning Management System (LMS) to record officer training and provide a range of online trainings. LMS attendance records are expected to include all in-person and online trainings completed by PPB members. In the first quarter of 2023, this included three Directives and 13 online trainings, as well as legal updates. (See Par. 84 for a list of classes offered).

For the first quarter, we selected several 2023 training courses to confirm that the Training Division had recorded attendance in LMS. We examined both in-person training (Mobile Field Force Training and Range Qualifications) and online training (CPR First Aid, Naloxone Administration, and Legal Updates). We also selected a random sample of PPB officers and</td></tr>
</table>

sergeants to confirm that the Training Division had recorded their attendance at all relevant classes in the first quarter. We did not observe any irregularities or missing data in the LMS records.

As the COCL reported last quarter, an audit conducted by the Office of the Inspector General (OIG) found that "Rosters identifying members with specialty certifications were not up-to-date" and that the "OIG review of records found gaps in the processes for ensuring record accuracy as evidenced by incomplete records." Also, certification records were being kept in two locations, not meeting the requirement of Par. 81. The COCL concurred with the OIG's recommendation that the Training Division needs to "update certification rosters and develop a process to ensure that they are maintained and accurate." During the first quarter of 2023, the LMS team worked to correct this problem and create a centralized database that contains the certification records for particular specialties. The Training Division is also working on an SOP "to ensure certification rosters for ECIT, AR15, 40 mm, Mountain Bike, Advanced Shotgun, and ATV are maintained and updated in the Learning Management System (LMS) on a semi-annual basis."[10] This work was still in progress at the end of the first quarter.

Thus, the PPB will remain in Partial Compliance for Par. 81 until this database has been created and is functional. Certification rosters are critically important training records that inform management and supervisors which of its members are properly trained to perform specialty functions, including CPR/First Aid, less lethal weapons (from CEW to 40 mm operators), air support, crisis negotiation (CNT), behavioral health response (BHRT, ECIT), and other functions. Certifications expire and need to be renewed, so records are easily outdated. For emergencies, a centralized process is needed, with a list of names indicating who are currently qualified for specialty functions. The PPB is working to create customized reports for supervisors so they can see who is certified for particular specialties.

At present, the Training Division and PPB supervisors review LMS training hours to ensure that the PPB members remain in compliance with Oregon state standards and have received the training required by the PPB. LMS is used to ensure that PPB employees who are not on leave are completing their required training and that these records are reviewed by supervisors. The review and compliance process has not changed: PPB employees are given 30 days to complete training and are sent email reminders 14 days, seven days, one day before the due date, and one day past the due date. Their RU manager sends emails regarding training delinquencies at one, five, and 21 days past the due date.

---

[10] Inter-Office memorandum from the Captain of the Training Division dated February 28, 2023

When PPB members fail to complete online training in this window, the Training Division sends non-compliance memos to the Chief's office, which the COCL has reviewed. Focusing on sworn PPB members, six such memos (covering six classes) were sent to the Chief's office for review during the first quarter of 2023. The COCL found that, in total, there were only 12 cases where an officer did not complete one or more classes.[11] We note that for four of the six trainings – all regarding PPB Directives (0640.30, 0640.70, 850.30, 850.39) -- all sworn members completed these classes on time. For any class, if the absence is justified (e.g., long-term medical leave), the Training Division is notified and the LMS records are updated. When the absence does not appear to be justified, the employee's supervisor or unit manager is notified, and the training must be completed immediately under supervision.

| **COCL Recommendations** | • To return to Substantial Compliance, the Training Division must update certification rosters and develop a process (as reflected in an SOP) to ensure that they are maintained and accurate. Additional attention is needed for specialty trainings |
| --- | --- |

| **Settlement Agreement Paragraph** |
| --- |
| 82. PPB shall report training delivered and received semi-annually to the Assistant Chief of Operations and, during the pendency of this Agreement, to DOJ. |

| **Compliance Label** | Substantial Compliance |
| --- | --- |
| **Methodology** | Review Semi-Annual Training Reports |

| **Compliance Assessment** |
| --- |
| As we noted last quarter, two Semi-Annual Training Reports were delivered to the Deputy and Assistant Chiefs on January 18, 2023. One report listed internal trainings and the other |

---

[11] The total number of officers who missed classes may be less than 12 if certain officers missed more than one class because of long-term medical leave. The total number of misses (not officers) in the fourth quarter is 12.

| | external trainings attended by PPB sworn members between July 1 and December 31, 2022. Thus, the PPB remains in Substantial Compliance for Par. 82. |
|---|---|
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Based On** | Delivery and content of Semi-Annual Training Reports |

**Trainer Qualifications**

| **Settlement Agreement Paragraph** |
|---|
| 83. PPB shall institute guidelines to govern its selection of officers that serve as trainers and shall ensure that those officers do not have a history of using excessive force. The trainer selection guidelines shall prohibit the selection of officers who have been subject to disciplinary action based upon the use of force or mistreatment of people with mental illness within the three (3) preceding years, or twice in the preceding five (5) years and will take into account if a civil judgment has been rendered against the City in the last five (5) years based on the officer's use of force. |

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Reviewed "Work History Review Sheet" for the third quarter hires and ensured that PPB is following S.O.P. #1-19 standards. |

| **Compliance Assessment** |
|---|
| During the first quarter of 2023, only one officer was assigned to the Training Division to work in the Patrol Procedures program. This assignment activated the review process pursuant to S.O.P. #1-19. The COCL reviewed the Work History Review Sheet for this individual and found |

| | |
|---|---|
| no evidence of civil judgments, discipline, or mistreatment of people with mental illness as defined in Par. 83. | |
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Based On** | COCL review of "Work History Review Sheet" and S.O.P. #1-19 standards |

**Deliver Appropriate and High-Quality Training**

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 84. (COCL Summary) Paragraph 84 describes the content and delivery of training that is expected for patrol officers and supervisors. PPB is expected to develop and implement a high-quality system of training that is consistent with PPB's policies as well as federal and state laws, and must cover specific topics, including use of force, de-escalation techniques, procuring medical care, proactive problem solving, civil and criminal liability, and positive communication skills. PPB training is also required to give particular attention to police responses to individuals who have, or are perceived to have, mental illness. PPB's training of officers must include "role playing scenarios and interactive exercises that illustrate proper use of force decision making" as well as peer intervention. In addition to all sworn personnel, paragraph 84 requires supervisor training, including conducting use of force investigations, evaluation of officer performance, and positive career development/disciplinary actions. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Observed In-Service Training. Also observed online trainings made available through the LMS; Interviewed PPB personnel |
| | |

**Compliance Assessment**

During the first quarter of 2023, the COCL focused attention on the In-Service training for all officers that was initiated during this period. In addition, we continue to provide an overview and assessment of the online training delivered by the PPB during the first quarter. Later in Section IV, we provide training Outcome Assessments for Online Training and In-Service Training for Supervisors.

To return to Substantial Compliance for Par. 84, the PPB needed to: provide crowd control training that: (1) incorporated changes to policies related to use of force (i.e., Directives 910.00, 1010.00, and 1015.00) and crowd control (Directive 635.10), (2) incorporated an internal assessment of training needs, and (3) provided scenarios or exercises to practice appropriate crowd control skills. By the end of the first quarter of 2023, the PPB was able to complete these requirements, and thus has returned to Substantial Compliance for Par. 84. Specifically, the PPB's directives on use of force and crowd control had been updated, and the PPB had introduced a high-quality crowd control training program (MFF In-Service) that incorporated these updated directives as well as PPB's internal crowd management training needs assessment.

Previously, the COCL required (for Par. 84) that the PPB provide additional crowd management training that is responsive to the training needs identified by the outside consultant hired to review the PPB's response to the 2020 protests. Instead, the City and COCL have agreed that supplemental training on crowd management is appropriately moved from Par. 84 to Par. 189, where the work of the LLC consultants is discussed. This way, the PPB can receive credit for the laudable training they have done under Par. 84, but without escaping the COCL's requirement that the PPB eventually convert the LLC's report into a new training needs assessment, training plan, and crowd management training.

**PPB In-Service Training: 2023 Mobile Field Force Training**

During the first quarter of 2023, the PPB offered a two-day In-Service training for all PPB officers focused on crowd management and the role of the Mobile Field Force (MFF). The MFF is comprised of patrol officers and sergeants who work in each precinct and are called up to serve on the MFF squads when there is a need to respond to some crowd events. Officers across the city will continue to serve in this role until the PPB has created a specialty unit for crowd management.

In past reports, the COCL has maintained that crowd management training is required for the PPB to return to Substantial Compliance for Par. 84. Here, we provide a summary and assessment of the first and second days of this In-Service training.

**Day One: MFF In-Service**

*Introduction/Updates.* The training began with Chief Lovell welcoming everyone to the training. The Chief candidly referred to the past challenges with crowd management during the 2020 protests and the importance of training. He expressed his hope that the training would make the officers feel comfortable with MFF and need to consider what is best for the City "in the long term." The Chief opened it up for questions and responded to one inquiry about body-worn cameras. Overall, this presentation of open and effective at setting the stage.

*Crowd Theory.* The purpose of the class was to establish a foundation of crowd theory and the different ways crowds are formed. The Commander who delivered this training was in Georgia, so the training was a replayed video. The Commander was passionate and engaging. The video showed how he openly called on officers in the training to check for comprehension and asked them to provide examples from their experience with different social settings. He emphasized that trauma is real and alluded to the trauma officers experienced during the 2020 protests. He encouraged officers to self-check and, if needed, seek help from the Employee Assistance Program. He used different analogies on his PowerPoint to make the material relatable to the content during the lecture.

The crowd theory portion of the lecture was dense, but the instructor used his time efficiently. He debunked Le Bon's original Crowd Theory and covered the current theory, the Enhanced Social Identity Model.[12] He defined organized and unorganized groups. If subgroups are offended by what some officers are doing (ex: "using too much force"), they may become cohesive and organized against the police. Police officers need to demonstrate situational awareness and consider their legal standing. If disorder and density are increasing, then different techniques can be used to diffuse the crowd.

---

[12] Gustave Le Bon, a French social psychologist in the 1800s, was famous of his study of crowds (The Crowd, 1895), and his theory suggested that the individual's personality becomes submerged in crowds, where the collective, emotional crowd mindset takes over. Losing their cognitive abilities, a violent mob mentality suddenly takes over without good cause. The Enhanced Social Identity model alludes to being an in-group with a common bond, despite coming from different identities and social classes, and may find negatives from the out-group. An example would be sports games.

The Commander emphasized that the Negotiated Management Model is best for responding to crowds. This involves active communication, de-escalation, and procedural justice to gain a positive response from the crowd—communication with the public needs to be used well in a graduated approach. Bicycles will be utilized again so officers can move between groups quickly and safely without "hard" gear. Regarding procedural justice, the Commander explained that the officers should strive to be neutral if the group is peaceful. The officers must build trust and institutional validity to gain compliance, cooperation, and support. This includes explaining to the protestors why certain actions are being taken.

*Crowd Management and Legal Updates:* The purpose of this training was to review the legal obligations and City policies relevant to crowd management events and use of force (Directives 1010.00, Use of Force, 635.10, PPB Response to Public Order Events; Directive 312.50, Identification). The instructor used PowerPoints to spell out the relevant directives and walk through different cases/scenarios. The PowerPoint had large text and images that were easy to follow for people from all tables in the classroom.

Directive 312.50 (and Oregon Revised Statute - ORS 181A.702) includes the requirement that officers identify themselves as police officer. One officer asked if they were required to give civilians their business cards. The instructor noted that if you are concerned about your privacy and refuse to provide your business card, that decision must be documented and justified. He encouraged officers to take advantage of City resources to clean up their social media, personal addresses, and the like. He also acknowledged that there is an aspect of publicity in policing, and officers are not entitled to the same level of anonymity as other public employees.

The class covered the PPB's authority to disperse a crowd. According to state law (ORS 131.675), the Mayor may command five or more persons who are unlawfully assembled to disperse. The instructor reviewed the different directives that PPB must follow (This coverage included City Code 14C.30.010 on restricting access to certain areas). Officers have the responsibility to be specific in directions and use the least restrictive means necessary to diffuse the crowd.

The instructor covered new changes to the crowd management policy (635.10). First, alternatives like verbal warnings must be considered. Also, kinetic impact projectiles (KIPS), chemical incapacitant, and handheld chemical incapacitant (HCI) cannot be used for crowd control. Officers may use physical force for self-defense, defending, making an arrest, or a person attempting to escape. Police must minimize the incidental impact on bystanders, medical personnel, journalists, and other unintended targets. As the PowerPoint slides state, officers shall "only use force necessary to accomplish a lawful objective, and the force must

be objectively reasonable under the totality of the circumstances." Furthermore, "The Bureau is committed to respecting lawful assembly and expression of speech while also maintaining public safety, peace, and order."

Law enforcement agencies may not use tear gas for crowd management unless the use is objectively reasonable (defend against a threat to life). Due to the indiscriminate nature of tear gas, the PPB must be very cautious about using it.

For LRAD (sound trucks), officers must provide a minimum of two announcements for purposes of crowd management, both audibly and visually. For example, they must communicate that there is an unlawful assembly, and the crowd must disperse. The announcements must also caution riotous acts will not be permitted. However, a sound truck does not replace the member's duty to warn regarding the use of force.

If force is used and permitted, Oregon Revised Statute (ORS 181A.702) requires that the PPB notify local hospitals in the vicinity of the type of weapons or tools to let doctors know what is being used and so they can prepare for any people needing medical assistance. The PPB shall attempt to take injured persons to safety or allow injured persons to seek medical help, and they cannot prevent EMS or protest medics from reaching injured persons.

In terms of seizures of property, Directive 650.10 is discretionary, but officers must conduct an analysis of the scene and remove weapons that are perceived to be deadly or dangerous or items that are used for an unlawful purpose.

The last section covered different cases that occurred in the Ninth Circuit. A Venn diagram was used to emphasize the three main things that the court considered -- case law, legislation, and best practice. He explained the background of each case and walked through the court's reason for siding with one party over the other.

Overall, this class was well organized and covered the legal issues and case law around crowd management and the use of force. However, a strictly legal perspective was applied with little attention to the importance of de-escalation and procedural justice to prevent or reduce the amount of force used during mass protests. These skills are also important for crowd communication, searches, seizures, and arrests.

*Wellness Course: Everyday Sleep Health.* The purpose of this class was to have officers think about their health and sleep well-being and the dangers of sleep deprivation for police work and healthy living. This portion of the training was also taught in a lecture-PowerPoint format.

The instructor discussed the sleep cycle and why sleep is essential to performing well throughout one's day. They used visuals and charts to show the adverse consequences of

sleep deprivation. Solutions were provided at the end of the lecture so that officers could think about specific habits that they hope to change. This class is important not only for safety reasons but because it shows that PPB is concerned about the health and welfare of its workforce, and sleep deprivation is a real possibility with overtime work or stressful events, such as mass demonstrations.

This was the third lecture class without any real interaction among the students. Officers might be more engaged with less technical, scientific information and more opportunity to discuss their real-life experiences with sleep deprivation and police work.

*Air Purifying Respirator (APR) Program.* The purpose of the class was to teach the officers how to use their Air Purifying Respirators and their limitations. Although the PPB is unlikely to use tear gas in future crowd management settings, other law enforcement agencies may be, and thus PPB personnel must be protected if that were to occur. The instructor used a PowerPoint with visuals, but the presentation itself was fast paced with a time crunch (due to a schedule conflict and lunch break). They covered the different pieces of an APR face mask and how officers can check for deficiencies. Safety was emphasized, and officers were told not to enter an area if they believed that their gas mask was not working properly. With the help of other trainers, the class tried on their APR gas masks to check for any fit adjustments. At the end of the lecture, the instructor asked the group questions to assess their level of understanding of the key concepts during his lecture.

*MFF Formation.* The purpose of this portion was to train officers in the various movement commands and formations for the MFF group that would be responsible for crowd management– specifically, movement commands and preparatory commands. The presenter identified the squad leader, the less lethal officer (the person authorized to use less lethal weapons), and the structure of different formations. Essentially, the squad needs to be proactive and repeat commands back to the leader to ensure that commands are being followed cohesively. They also showed how squads should be organized when they are in a police vehicle.

The PowerPoint covered different formations with squads of eight. Despite the different slides showing how movements should be done and, in some cases, showing the movements more than once, the presentation was fast paced. One new officer was trying to draw the different visuals for personal notes, but they eventually gave up because the slides were moving too quickly for anyone to process the demonstrations. Even though the instructor may not need to discuss the rational for each formation, there was little room for officers to ask questions or enough time to process all the different movements on each slide.

**Exhibit A**

*Formation/Movement Exercises (Driving Pad)*. Day 1 included some practice sessions on the Driving Pad and Scenario Village. Officers were separated into two groups to practice the movement formations that were covered in the classroom. There were obvious signs that the rushed classroom material was not fully comprehended (e.g., confusion in placements). The utilization of the driving pad and stimulated street also worked through any missteps (using the sidewalk, obstruction with a pole, or street sign). As the training continued, the officers worked hard to make sure they were doing the formations correctly, and there was greater consistency in formation after a few iterations. The second day was planned to be a better assessment of the officers' confidence and understanding.

**Day Two: MFF In-Service Scenarios**

For several years, the COCL has underscored the importance of role-playing scenarios for officers so they can practice different de-escalation skills and proper use of force decision-making (see Par. 84). Thus, we were pleased to see that the second half of Day 2 was dedicated to officers practicing crowd management and given a debriefing by the instructors on their performance. The officers used the driving pad and scenario village to play out each scenario. The instructors walked around the area to observe how each officer was responding to the event.

*Format & Location*: Before leaving the classroom adjacent to the driving pad, officers were assigned to a squad (A or B). They then received a call with limited information, exited the classroom, and jumped into their assigned cars. The officers were then driven to the scenario village, where a crowd was protesting, and the MFF officers must decide how to act. Sergeants and training officers took notes while the scenario played out, with other officers serving as protesters. In some cases, an instructor would serve as a role player in the crowd, but the majority of instructors served as evaluators and note takers. The squad leaders were officers participating in the In-Service training. After each scenario, the officers were instructed to "leave the scene" (drive away and repark the cars) and return to the classroom. In the classroom, the instructors debriefed the group on their performance and asked a series of questions. The trainers, one at a time, shared their feedback. The officers seemed appreciative and communicated with the trainers about how they responded to each scenario.

*Scenario 1- Peaceful Protest/EMT blocked*. Officers received a call that there was a protest downtown. The two squad leaders then engaged in private conversations with one protestor

and the protest leader to learn about the purpose of the protest and request that they do not block traffic. In this scenario, the protestors complied with the request.

Another version of this scenario played out on the west side of the driving pad. The crowd escalated and blocked the road, preventing an EMS vehicle from passing. When the MFF team arrived, they tried to get crowd members to cooperate by motioning them over to talk with them, but they refused by adamantly shaking their heads. Two other protestors sat down in front of the EMS vehicle as a form of passive resistance; they were later taken away with a two-person carry. The MFF spread themselves out in a line and, at the squad leader's command, used their hands and batons to move the crowd back.

*Debrief.* The biggest concern expressed by the trainers was the lack of communication between the squad leaders and the rest of the team. Squad leaders need to continuously communicate what movements are needed or how long officers are expected to remain in one location. Officers should not feel that they are standing around with little or no guidance when attempting to manage a crowd. However, the MFF Officers did a good job of spreading themselves out in the formation.

*Scenario 2/Crime Scene at the Club/Scenario Village*. Officers received a call about someone having a medical emergency at a club. When they arrived, civilians at the club surrounded a "deceased" person (a dummy), and the scene emotionally escalated. The MFF had to get the crowd away from the body, for it was now a crime scene, but the crowd was not compliant with directions given by the officers. Officers then used their line formations to create a wall to block the crime scene and to move the crowd backward.

*Debrief*. Compared to the first scenario, the officers were more synchronized in movement, and the squad leaders made sure to check in with MFF officers in formation by walking down the line and communicating with each officer. The trainers were satisfied with the improvements made in such a short time. They explained that if a baton were used, it would be a Category III use of force event, and officers needed to report the event as such. None of the officers used a baton in this scenario, but in a real-life situation where a baton may be needed, the instructors emphasized the different levels of force categories.

*Scenario 3/PPB Officer in Vehicle stuck in a crowd/Scenario Village*. Officers received a call about a police vehicle being stuck in the middle of a protest. When the MFF officers arrived on the scene, they saw an angry crowd surrounding the car, banging on the windows, and rocking the vehicle. The squad leader went up to the driver and asked if he was ok ("I feel safe.") Next, the squad leaders directed the MFF officers to move the crowd back from the vehicle. They used a line formation approach to walk the crowd backward. Once the crowd was moved away, the squad leaders then directed the driver on how to exit the perimeter.

The squad leaders then instructed the drivers of their own vehicles to station their cars so that officers standing in the line could exit quickly. The drivers turned around the cars and opened the doors to the PPB vehicles.

*Debrief:* The MFF officers were given positive feedback during the debrief and applauded for actions that would expedite the departure of officers from their formation.

### Conclusion: MFF In-Service Training

In reviewing the training, we ask two primary questions. The first question is whether the PPB delivered high-quality crowd management training to its members. The answer is a firm yes. The training was an appreciable mix of theoretical, practical, legal, and scenario-based instruction, and officers were actively engaged during each module. However, we expect that the PPB's crowd management training will eventually be updated to incorporate the findings of IMLLC's review of the PPB's response to the 2020 protests.

The second question is whether the training was sufficient to ensure MFF squads are prepared to handle the type and duration of protests experienced in 2020. For this question, we maintain that a single two-day training is insufficient and ongoing refresher training would be needed to ensure adequate preparedness. As the PPB no longer has an RRT specialty unit, the MFF squads have complete responsibility for responding to crowd management events. While the training represented a particularly good learning opportunity for officers, it was only an introduction, and we doubt officers are adequately prepared for complex and rapidly developing real-life events. While the PPB has indicated the intention to provide refresher MFF training in the future, it does not substitute for a dedicated team such as the RRT. A specialty unit for public order events would receive many more hours of training, with exposure to a variety of crowd events.

Finally, we noted an intentional effort to include elements of procedural justice throughout the training and commend the PPB for including this. This is a good start, but we suggest the PPB consider ways to expand procedural justice throughout other parts of the training. For instance, we believe the PPB could include more opportunities to practice building rapport with members of the crowd. We hope to see officers engaging with protestors in such ways as thanking them for their cooperation, explaining PPB's actions, and answering questions such as where the PPB is taking persons who are detained. Beyond procedural justice, the PPB could consider other ways of linking the theory discussed on Day 1 with the scenarios played out on Day 2, but these suggestions do not detract from the overall quality of the MFF training that was delivered.

We credit the Training Division with mentioning procedural justice principles at the start of many lesson plans and slide decks, but a stronger effort could be made to integrate these concepts into the substance of the training or provide stand-alone training to strengthen the underlying communication skills. In the second quarter of 2023, the COCL provided in-person technical assistance to the managers of the Training Division on this subject. The Compliance Officer highlighted examples of effective procedural justice training but stressed that it can take a full week of training, not a couple of hours.[13] The dosage of training is critical. In the second quarter, we observed significant improvements in the procedural justice training for new recruits (to be discussed in the COCL's second quarter report).

**In-service: Online Training**

In the first quarter of 2023, the PPB continued to provide online classes and educational material using their Learning Management System (LMS). A total of 25 items were delivered virtually to PPB members during the quarter. This included training videos, the City Attorney's Office legal updates from December 2022[14], and three Bureau directives.[15] Seven of the online trainings posted in Q1 2023 focused on teaching PPB members how to use the Microsoft suite of products in their work. These trainings were developed and delivered by Advisicon[16] and were conducted in a seminar format where PPB members were not able to ask questions to the instructors during the training or be on camera. If participants had a question, they were directed to submit them either via email or via Cherwell – a service management system.

When we reviewed the online training on directive 0650.00 ("Search, Seizures, and Inventories") in Q3 of 2022, we noted that it gave insufficient attention to the distribution of consent search cards in six languages – cards that would help persons with limited English proficiency. PPB has yet to update the online training on directive 0650.00. Hence, we will

---

[13] Weisburd et al. (2022). "Reforming the police through procedural justice training: A multicity randomized trial at crime hot spots." PNAS, Vol. 119, No. 14, e2118780119. https://doi.org/10.1073/pnas.2118780119

[14] The City Attorney's legal update advised officers to initiate investigations in situations where there is a reasonable suspicion that a vulnerable person has suffered abuse. This comes as a response to the Supreme Court finding that officers and the City can be held liable if there is a reasonable suspicion that someone has experienced abuse and the police did not initiate an investigation.

[15] The directives were: 0660.00 Management of Criminal Intelligence File; 1110.00, Personal Appearance Standards; and 0505.00 Employee Assistance Program (EAP).

[16] https://advisicon.com/about-advisicon-vancouver-washington/

continue to recommend supplemental training on consent searches that would give specific attention to the required distribution of consent cards in different languages.

**Online Equity Training and Beyond**

In the first quarter of 2023, there were no new online equity trainings and there were no requests for new online equity content, although some form of equity training is being considered for the PPB's 2024 In-Service. The priority given to Equity training remains a point of concern for the COCL and something we have been discussing since 2020. COCL continues to recommend that the PPB expand equity training and begin to offer this training in an in-person format to promote open dialogue on what can be difficult or sensitive topics.

Today, we see equity programs being devalued nationwide at a time when cities and organizations should be doing just the opposite – investing more time and resources in these initiatives. Hopefully, the PPB will find its own path to effective equity training that is collaborative and inclusive of all perspectives.

*Online Training Conclusion*

The PPB continues to offer online training to their members covering a wide range of topics. We credit PPB with efforts to improve the quality of online training by providing more interactive learning, including interactive decision-based scenarios, graphics, and timed questions embedded within training videos. The LMS system also provides some online videos that are linked to in-person classes. According to the PPB, this hybrid model, which draws on university teaching methods, allows for "pre-learning" and prompts more in-class discussion. Also, complaints about not having enough time to complete online training, as call volume increases, have been addressed by allowing officers time to complete some trainings during roll call.

**The RRT Training Investigation**

The investigation of the offensive training materials used in 2018 training of the Rapid Response Team (RRT) was completed in the first quarter of 2023. After a year-long investigation, a disciplinary letter was issued on February 21, 2023. The Chief of Police, with support from the Police Commissioner, suspended a PPB sergeant for 100 hours without pay for adding "The Prayer of the Alt-Knight" meme to the training slide deck.

**Exhibit A**

The Training Division is required to review and approve all training material used to train PPB personnel, per Directive 1500.00 and S.O.P #1-21.[17] In 2022, the Training Division notified all PPB personnel of these regulations and included all planned training for Specialty units in its revised 2022 Annual Training Plan. However, as the Training Audit last quarter has shown (see Par. 85), more work is needed to ensure that the records of external training kept in the LMS system are complete and accurate (Par. 81).

The RRT no longer exists to respond to public order events after all members resigned in 2021. In the absence of a specialty unit for this purpose, the PPB has moved ahead with plans to use the MFF to respond to public order events and accordingly, provided MFF training to all PPB members beginning in January of 2023 (See the COCL's review of MFF In-Service Training above). However, the COCL recommends that the PPB establish a new specialty unit with special skills and training in responding to protests and riots. Also, we have brought to PPB's attention the research and reports on mass demonstrations in other cities, as well as training opportunities.


**Training Outcome Assessments**

This quarter, the COCL provides Training Outcome Assessments in two areas: Online Training and Supervisor In-Service Training. As a supplement to Supervisor training, we also provide a narrower Outcome Assessment of the PPB's Annual Performance Evaluation system because it could be a powerful tool for improving police performance during police-public encounters if re-designed and incorporated into supervisor training.

In general, the COCL's Outcome Assessments look at the creation of sustainable systems (Par. 170), including both PPB's training evaluation program and the actual training programs that are designed to achieve specific outcomes. Here, our training assessment focuses primarily on class content, delivery, and impact from the students' perspective.


***Outcome Assessment: Online Training***

In the first quarter of 2023 the PPB published their evaluation report for online training that took place in March, April, and May of 2022. During that period, six online trainings were posted to the LMS on four unique topics. The trainings covered in the evaluation are as follows:

---

[17] https://www.portlandoregon.gov/police/article/680811

**Exhibit A**

- EAP Crisis Planning

- Interacting with members of the LGBTQIA2S+/Queer Community – Vocabulary

- Interacting with members of the LGBTQIA2S+/Queer Community – Pronouns

- Interacting with members of the LGBTQIA2S+/Queer Community – Policy Scenarios

- Police Vehicle Operations – PIT and Ramming

- Language & Culture – Informal Interpreters

The COCL has decided to include this evaluation work as part of our Training Outcome Assessment for this quarter. In this section, we review the data collected by PPB to evaluate these online training programs and comment on the systems in place.

*Online Training Survey Responses*

The surveys distributed to PPB members included a combination of questions that asked the respondent to rate the extent to which they agree or disagree with statements about the quality, usefulness, format, and effectiveness of the training. Additionally, the surveys included a series of open-ended questions that ask the respondent to share how the training could be improved, what did or did not work well in the online format, and allowed space for any other feedback the respondent chose to offer.

According to the survey feedback, PPB members rated the online trainings positively overall. Most respondents expressed appreciation for the trainings and the content covered. Some even shared appreciation for the instructors in the training videos. However, some survey responses indicated mixed reception of some trainings and negative feelings about others.

As part of their evaluations of the trainings, the PPB distributed surveys to all members who received each training to gain their feedback on the content and structure of the online trainings. We are pleased to see that the PPB continues to request feedback following their online training courses and that the Bureau continues to evaluate the results they receive from the surveys. Feedback from the individuals receiving the training can offer valuable insights into what is working well in the training, what can be improved, and can even indicate where additional training could be useful.

Unfortunately, the rate of participation in the post-class surveys was very low for the online trainings (see Figure 4.1 below). The survey response rates peaked at 24%, with three of the six surveys completed by only 13-14% of those enrolled. With these low response rates, the PPB will not be able to determine how widespread the perspectives expressed in the survey responses are within the Bureau. However, the responses can still offer insight on how a

portion of responders view the trainings, their relevance, and potential ways to improve. But to know how the vast majority of PPB members view these and other online trainings, the PPB should make the survey mandatory for all students, as COCL has previously recommended.

**Figure 4.1**



Survery Response Rate by Training Topic March-May 2022

_Survey Results_

For the trainings on EAP – crisis planning, PVO – PIT and Ramming, and Language & Culture – Informal Interpreters, the feedback was very positive in terms of the training being well organized, a good use of their training time, useful for their job, and educational. (See Table 4.1 below). However, respondents were noticeably less positive when asked the same questions about the three trainings focused on Interacting with members of the LGBTQIA2S+ community.

**Exhibit A**

**Table 4.1**

**Student Feedback for Online Trainings conducted March – May 2022[18]**
(Percent that Agree or Strongly Agree)

| Training | This training was organized and well prepared. | This training was a good use of my training time. | This training is useful for my job. | I learned new information from this training. |
|---|---|---|---|---|
| PVO – PIT and Ramming | 92% | 79% | 81% | 67% |
| EAP – Crisis Planning | 91% | 82% | 72% | 75% |
| Language & Culture – Informal Interpreters | 88% | 74% | 66% | 76% |
| LGBTQIA2S+ – Vocabulary | 75% | 49% | 45% | 46% |
| LGBTQIA2S+ – Policy Pronouns | 65% | 41% | 41% | 39% |
| LGBTQIA2S+ – Policy Scenarios | 72% | 42% | 41% | 34% |

Related to usefulness, there was a significant amount of feedback about the trainings focused on interacting with members of the LGBTQIA2S+ being "unnecessary" or "redundant" even though the training was related to a new policy on Interacting with members of the LGBTQIA2S+ Community[19] (put into effect in March of 2022) and this was the first series of

---

[18] Compiled by COCL using data found in PPB's Evaluation Report: 2022 Online Training Program Evaluation for Trainings Conducted March Through May 2022.

[19] https://www.portland.gov/policies/police-directives/field-operations-0600/064038-interacting-members-lgbtqia2s-queer

trainings on the policy. It should be noted that, according to the PPB report, this sentiment was not expressed for any other topic covered online in the same time period. The COCL discussed the Equity training issues, including implicit and explicit bias, with the City and the PPB personnel and reported these concerns in our Q3 and Q4 2022 reports. We also recommended that this training be revisited with additional input from equity experts within PPB, the City, and the community.

_Training Format_

Training format is one of the topics that offered a range of response from PPB members. On a positive note, the majority of survey respondents appreciated that the trainings were offered online as they were able to fit the training into their schedules. However, some respondents shared that they did not have dedicated time to complete the online trainings. Thus, the PPB should continue to assess whether members have enough downtime to complete the trainings or if time allotments should be built into their schedules to accommodate those trainings. We have learned that the PPB is now allowing members to complete online trainings during roll calls, but whether that is sufficient or implemented consistently throughout the PPB is unknown. Also, going forward, there will be a limit on how much training can be pushed into the online format.

Additionally, other responses indicated an interest in some of the training topics being covered in an in-person format to allow for open dialogue and the opportunity to ask questions related to the material. The COCL has previously recommended that the PPB assess whether some trainings would be better served by taking place in-person and the responses from a portion of the PPB members supports that assertion. The COCL hopes that the PPB will take our recommendations, as well as those offered by PPB members, and consider reviewing which training topics are well-suited to be covered online and which topics should be covered in-person. Also, some online and in-person classes should be linked. Apparently, the PPB is using this hybrid format for some legal updates, but they should consider using it more widely.

In sum, while skewing towards positive, the PPB received mixed feedback from PPB members about their experiences with online training in Q2 of 2022. There is much that the PPB can learn from the survey responses they receive following online trainings. Although it is not possible to determine how widespread the opinions expressed are within PPB (due to low response rates), they may offer some insights on ways to improve the online training program. We can already see evidence of the PPB is listening to the feedback from its

members and seeking to implement changes within the online program, and the COCL encourages the PPB to continue this practice.

While the PPB's online evaluation report does admit that they received both positive and negative feedback on the trainings focused on Interacting with members of the LGBTQIA2S+ community, they fail to acknowledge the expressed bias against the LGBTQIA2S+ community within the open-ended survey responses. We would like to reiterate that, due to low survey responses, the PPB cannot tell how widespread the anti-LGBTQIA2S+ sentiments are within the PPB. Additionally, the COCL's expectation is not that the PPB should punish officers responsible for those opinions, but rather, that high-ranking officials take a public stance against these expressions of bias against marginalized groups and underscore the importance of additional equity training.

### Outcome Assessment: Supervisor In-Service Training

During the fourth quarter, the 2022 Supervisor In-Service training was held over the course of one day at the PPB Training Division. The COCL team observed this training and decided to include it as part of our Training Outcome Assessment because of the importance of supervisors in all police organizations, but especially those seeking reform like Portland. Here we provide an overview of the post-class survey findings as presented in PPB's report, *2022 Supervisors In-Service Training: Evaluation of In-Service Training for Supervisors*. Overall, this training received positive reviews from the supervisors who were enrolled, with some exceptions. We credit the researchers in the PPB's Training Division with preparing a comprehensive and candid assessment of this training. The COCL will provide additional comments after providing a brief summary of the main survey findings.

This one-day training included the following lessons:

- Bureau of Human Resources (BHR) 2.02 Directive: Review of the City's policy to prohibit workplace harassment, discrimination, racism, and retaliation based on protected status.

- Critical Incident Management (CIM): The role of supervisors in responding to and managing critical incidents, including their role within the Critical Incident Command structure.

- Public Information Officer (PIO): Bureau's strategic communications and PIO notifications.

- SharePoint for After Action Reports (AAR): Using the new SharePoint system (instead of PDFs) to submit Use of Force AARs

- Use of force/complaint investigations: How to render findings for an investigation; update on Police Accountability Commission; and use of Discussion Tracker and the Employee Information System (EIS).

These five classes were completed in one day of training. At the end of the training, the supervisors provided feedback to the Training Division to assess the quality of the lesson and student learning and leave remarks for future training. A total of 66 supervisors completed the survey, yielding a satisfactory response rate of 50%.

*Overall Satisfaction*

In general, the 2022 In-Service Supervisor training was positively received by the students. Of the supervisors who completed the survey, 69% reported being "Generally Satisfied" or "Very Satisfied" with the training overall. Comparatively speaking, this rating is similar to the 2021 supervisor training (66%), but noticeably higher than the 2020 training (only 40% satisfaction), as the 2020 training was delivered online.

*Specific Feedback*

At the end of the day, supervisors were asked to rate the extent to which they agree or disagree with four statements on a six-point scale (ranging from strongly disagree to strongly agree). These results are summarized in Table 4.2.

- Statement 1: "The trainer(s) were organized and well-prepared." Many supervisors agreed or strongly agreed that the trainer(s) were organized and well-prepared. For three sessions -- PIO, SharePoint/AAR, and Use of Force/Complaint Investigations – the trainers received at least 95.0% approval ratings using this standard.

- Statement 2: "The trainer(s) were knowledgeable on the topic." This statement received the highest level of agreeableness ("Agree" or "Strongly Agree") across all five lessons, averaging 94.3%.

- Statement 3: "Overall, the interaction between the trainer(s) and the class was positive." All lessons received ratings over 95%, with the exception of the Bureau of Human Resources 20.02 Directive, which received only 70%.

- Statement 4: "This class was a good use of my time." On this dimension, the lessons received lower ratings (averaging 70.3%), with the Use of Force/Complaint

**Exhibit A**

investigation training receiving the highest remarks (79.4%), and the Bureau of Human Resources receiving the lowest score (48.5%).

The COCL is not surprised that, among the five lessons delivered, the BHR training on Directive 2.02 received the lowest ratings overall. As noted in the COCL's fourth quarter (2022) report, the instructor used only a fraction of the provided time to review class content.

_Preparedness_

Additional feedback was asked for specific lessons. For instance, the Critical Incident Management and Use of Force lessons asked supervisors to rate how prepared they felt to do this work based on the information they received in the training. Using a five-point scale (1=Not at all prepared, 5=Very prepared), respondents gave either a 4 or 5 rating 85.2% of the time for the Critical Incident Management lesson, but only 59.2% of the time for their preparedness to do findings for Use of Force and Compliant Investigations.

Overall, each lesson was well received. The COCL is pleased to see that the PPB supervisors provided largely positive feedback for their training (see Table 4.2). Supervisors were also given the opportunity to comment on the training. There was dense information delivered in the span of one day, which produced some concern among students. For example, some supervisors expressed concern about the challenges they faced when adapting to the new SharePoint/AAR technology. The COCL encourages the PPB to continuously support supervisors amidst updates in procedure or training, especially for supervisors who may express hesitation with such changes.

**Table 4.2**

**Student Feedback on the Quality of Instruction**

(Percent that Agree or Strong Agree)

| Class | Trainer(s) were organized and well-prepared. | Trainer(s) were knowledgeable in the topic. | The interaction b/w the trainer and the class was positive. | The class was a good use of my time. |
|---|---|---|---|---|
| BHR 2.02 Directive | 75.0% | 81.2% | 70.4% | 48.5% |
| Critical Incident Management | 88.5% | 95.0% | 96.8% | 77.0% |
| Public Information Officer | 98.5% | 100.0% | 95.3% | 70.8% |
| SharePoint/After Action Review Process | 95.1% | 96.8% | 96.8% | 75.8% |
| Use of Force/Complaint Investigations | 96.7% | 98.4% | 95.3% | 79.4% |
| AVERAGE (Across all Trainings) | 90.8% | 94.3% | 90.9% | 70.3% |

_Knowledge Test Results_

**Exhibit A**

The PPB Training Division asked supervisors to complete a knowledge test at the end of the day. The eleven test questions had three response formats: select all that apply, choose (select) the single correct answer, and true-false statements.

The Bureau of Human Resources only had one knowledge test question, but 98% of the supervisors received full credit for choosing the correct answer. The Critical Incident Management had two true-false questions, and nearly all of the respondents answered correctly (98% for both). The Public Information Officer had two questions, one "select all that apply" and one prompting the student to choose the correct answer. Less than half of the class (41%) received full credit for the first question, but everyone received full credit for the second PIO question. The SharePoint/AAR had three knowledge test questions, with the same problem of low scores associated with the "select all that apply" question (only 44% gave the correct answer). Finally, the students answered three knowledge test questions for the Use of Force/Complaint Investigations lesson. Unlike the PIO and SharePoint/AAR questions, the percentage of students who received full credit was relatively consistent -- approximately 80% of supervisors received full credit for all three questions (see Table 4.3).

Based on the analysis done by the COCL, supervisors performed best when being prompted to choose the correct/best answer or respond to true-false statements. The lowest percentage of supervisors who received full credit occurred within the four "select all that apply" questions. The COCL credits the PPB with a good faith effort to ensure that supervisors understand their responsibilities regarding this In-Service training through knowledge checks. Still, we continue to discourage the PPB from using the "Select all that apply" response option, as it does not provide a fair assessment of knowledge. Also, using a single test question, as done with the BHR 2.02 Directive class, is not an acceptable method of assessing knowledge of an entire lesson.

**Table 4.3**

**In-Service Supervisor Training Knowledge Test Results**

| Class Question | Received Full Credit | Question Format |
|---|---|---|
| BHR Q1 | 98% | Choose the correct/best answer |
| CIM Q1 | 98% | True-False |
| CIM Q2 | 98% | True-False |
| PIO Q1 | 41% | Select all that apply |
| PIO Q2 | 100% | Choose the correct/best answer |
| SharePoint/AAR Q1 | 71% | Select all that apply |
| SharePoint/AAR Q2 | 100% | True-False |
| SharePoint/AAR Q3 | 44% | Select all that apply |
| Use of Force/Complaint Invest. Q1 | 82% | Choose the correct/best answer |
| Use of Force/Complaint Invest. Q2 | 79% | True-False |
| Use of Force/Complaint Invest. Q3 | 80% | Select all that apply |

*Caution about Knowledge Tests and Learning*

The PPB refers to these end-of-the-day knowledge tests as an "In-class Learning Assessment." Administering post-class surveys can be useful for receiving feedback on the quality of instruction, but as the COCL has stressed over the years, it is a limited methodology for assessing whether PPB members learned anything from the training. As we pointed out under Par. 80, the PPB does not collect data on how much knowledge the students had <u>prior to</u> the start of training. Without a pretest, the PPB will never know if any learning occurred as a

result of the training, even if supervisors report that they did learn something. Furthermore, post-class surveys and knowledge tests do not offer any evidence that the training resulted in any changes in behavior on the job. The PPB is expected to use outcome metrics that capture "the extent to which program graduates are applying the knowledge and skills acquired in training to their jobs." (Par. 80).

*Future Trainings*

While the COCL is satisfied with the content of most lessons contained in this supervisor training, these topics barely scrape the surface of the full range of topics that need supervisory attention. For example, supervisors should be regularly trained in the methods needed to increase procedural justice within the PPB organization and improve the current morale problem. Also, they should be trained in ways to conduct more useful annual performance evaluations after the current system has been reconfigured and ways to increase public trust through coaching.

One of the benefits of post-class surveys is that students can offer recommendations for future training that contribute to the PPB's training needs assessment. Program managers and trainers can also contribute to this process. The current training was no exception. In their evaluation report, the PPB's lists the following recommendations for future training considerations:

> "*the importance and impacts of the Bureau's data collection processes, leading tactical debriefs, mission planning and Incident Action Plan development, developing employees, patrol investigations (including risk assessments), advanced leadership training (including how to improve morale, organizational wellness, and internal legitimacy), and the Vehicle Pursuit policy (including risk management).*"

### **Outcome Assessment: Annual Performance Evaluation**

As part of the COCL's Outcome Assessment for Training, we continue to examine the PPB's system for evaluating officer performance. Supervisors are required to complete an "Annual Performance Evaluation" for each PPB officer under their command and are trained in how to perform this function. The COCL has included this training in our Outcome Assessment because supervisors play such a critical role in maintaining or changing organizational culture and street-level behaviors of those they supervise.

The Annual Performance Evaluations by supervisors are expected to "give direction and reinforcement of how officers should work, behave, and conduct themselves," as well as

"draw attention to areas of concern." After completing the review, Sergeants are required to hold a debriefing with the officer being evaluated.

For this Outcome Assessment and technical assistance, we have conducted a brief analysis of the actual data collected in these annual evaluations, including training implications. The purpose of the COCL's analysis is (1) to encourage PPB to explore these data further to better understand how supervisors are reviewing PPB officers; (2) to suggest improvements in this system of review to improve its effectiveness; and (3) as a result, enhance the training of supervisors who conduct these reviews. With these actions, we would expect that the annual evaluation becomes an effective mechanism for enhancing both individual and organizational performance.

As we noted in our previous analysis, the PPB has a comprehensive evaluation system that covers a wide range of performance metrics. These metrics go far beyond traditional measures of police performance (e.g., arrests and citations) and give considerable attention to actions that reflect community policing and procedural justice, including the communication skills needed to de-escalate conflict, responses to individuals facing a mental health crisis, methods of collecting good evidence at crime scenes and whether they are respectful of community members. The evaluation system also gives attention to the officer's ability to get along with peers, be organized, produce good reports, and follow the law. The evaluation form has 11 sections and a total of 64 separate measures of performance.

The main problem with this evaluation system is not the content, but the way in which supervisors complete these evaluations and the wording of the evaluation scale. The rating system is relatively simple. Supervisors evaluate each officer on 62 dimensions using the following evaluation scale:

- Exceptional/Exceeds Standards: "Performance significantly exceeds the requirements of the assignment. Consistently achieves objectives at a superior level and demonstrates exceptional skills and innovation in work performance."

- Meets Standards: "Performance consistently met standards in all essential areas of responsibility and the quality of work overall was good."

- Needs Improvement: "Performance failed to meet expectations in one or more of the rated areas. Performance was consistently below expectations in most essential areas of responsibility. Significant improvement is needed in one or more areas."

- Not Observed: Supervisors were also given the option of checking "Not Observed" if they did not have sufficient data to evaluate the officer on a particular metric.

PPB supervisors are also required to make comments in some instances.

*Update on Performance Evaluation Data*

As part of our third quarter report in 2022, the COCL originally requested 40 randomly selected and de-identified files from the list of officers whose performance was reviewed in 2021. In the final analysis, our report was based on complete data from 36 patrol officers spread across all three precincts. For the present analysis, we requested more recent (2022) evaluations for these same individuals. Unfortunately, because of retirements and evaluations that were still under review by RU managers, only 14 cases were available to us. Thus, the COCL will offer a brief assessment of these cases to see if any changes have occurred in PPB's Annual Performance Evaluation system since our last report.

In the analysis, 890 ratings were made by supervisors across the many performance dimensions. As shown in the bar chart below (Figure 4.2), "Exceeds Standards" represented over half of the ratings (55.4%), while the remaining evaluations (41.7%) were "Meets Standards." However, not a single officer on any aspect of performance received a "Needs Improvement" rating. Thus, the evaluation system reported in our previous assessment remains unchanged.

**Figure 4.2**



### Thinking Differently about Performance Evaluations

Our conclusion about the PPB's Annual Performance Evaluation system remains the same: The PPB needs a culture change when it comes to evaluating its officers, along with new training, so that supervisors are prepared to give "Needs Improvement" ratings and officers will not view it as a punishment. "Needs Improvement" should be viewed as an opportunity to provide coaching and constructive feedback. We continue to recommend that the PPB: (1) modify the definition of "Needs Improvement" on the form so it doesn't appear so negative; (2) have senior administrators weigh in on the importance of meaningful and constructive feedback; and (3) change the supervisor training regarding Annual Performance Evaluations so that the "Needs Improvement" option is used more frequently. Also, supervisors should receive additional guidance on the written comments they provide in these evaluations. Some supervisors gave very few written comments, while others wrote lengthy comments, to justify their evaluations or provide constructive feedback that could be used to improve the performance of their officers.

As we noted previously, this performance evaluation system has 64 evaluation metrics, which may be excessive and overly burdensome on supervisors. Thus, we encourage PPB to return to the drawing board and have a team of managers review the metrics carefully to ensure

**Exhibit A**

that only valuable metrics are retained. Also, the PPB should consider expanding the rating system from three options to four or five options, including at least two levels of "needs improvement." Finally, when data from body-worn cameras and possibly contact surveys become available, they should be incorporated into the updated performance evaluation system.

In summary, the PPB has constructed a comprehensive set of performance metrics, but without good variance in the actual performance evaluations, both within and across officers, this annual process can do little to provide useful feedback to officers and shape behavior on the job. We encourage the PPB to explore this dataset and look for patterns that can improve the evaluation system. Also, under a revised system, we encourage the PPB to identify supervisors who provide exemplary evaluations, showing variation in ratings within and across individual officers, within and across categories, and who provide thoughtful and constructive written comments. These model supervisors should be rewarded for their performance, while other supervisors should receive constructive, non-punitive guidance. Importantly, these changes should result in new training on Annual Performance Evaluations for both officers and supervisors.


### _Training Summary and Conclusions_

During the first quarter of 2023, the COCL observed and evaluated the two-day In-Service training for all PPB officers on crowd management and the role of the Mobile Field Force (MFF). This training was well planned and executed, offering a mixture of theoretical, practical, legal, and scenario-based instruction. This training was responsive to COCL's prior recommendations in that it (1) incorporated changes to polices related to use of force (i.e., Directives 910.00, 1010.00, and 1015.00) and public order events (Directive 0635.10), (2) incorporated internal assessments of training needs, and (3) provided scenarios or exercises to practice appropriate crowd control skills. This training allowed the PPB to return to Substantial Compliance for Par. 84. Eventually, the findings from the external review of the 2020 protests will need to be built into the PPB's Training Needs Assessment, Training Plan, and actual training on PPB's response to public order events.

The COCL continued to examine the PPB's Online training program delivered through their Learning Management System (LMS), and this quarter, it was included in our Outcome Assessment. The PPB's online training continues to improve and become more engaging, although some videos are not interactive (e.g., 7 videos on how to use the Microsoft suite of products).

Last quarter, the COCL expressed concern that the online training for directive 0650.00 ("Search, Seizures, and Inventories") gave insufficient attention to the distribution of consent search cards in six languages. Thus, we continue to recommend that the PPB provide supplemental training on consent searches and document the level of success with implementation.

The online Equity training provided in 2022 was controversial and no additional equity training has been provided in 2023. Because of the complexity and sensitivity of this subject, the COCL has repeatedly recommended that it be moved to the in-person format. Clearly, the PPB is facing limited resources for their in-person training hours, but we will continue to express the importance of equity and impartial policing, as required by the United States Constitution.

*Outcome Assessments*: This quarter, the COCL conducted an Outcome Assessment of the Online training, the In-Service Supervisor training, and the Annual Performance Evaluation, with particular attention to the systems used to evaluate these trainings. For the Online trainings, the results were generally positive, although the feedback from PPB members varied by topic (e.g., more negative sentiments were expressed toward the LGBTQIA2S+ training). Although the PPB can learn a great deal from the survey responses they receive following online trainings, unfortunately, the rate of participation in the post-class surveys was very low (e.g., For 3 of the 6 classes evaluated, only 13-14% of the students completed the surveys). Hence, the COCL will continue to recommend that these surveys be mandatory (yet de-identified) at part of all PPB training programs.

The COCL's Outcome Assessment of the one-day In-Service Supervisor training revealed positive reviews from most of the supervisors who were enrolled, with some exceptions (e.g., lower ratings for the BHR training on Directive 2.02, which was poorly delivered). Of course, one day of training cannot possibly cover the full range of topics that need supervisory attention. Not surprisingly, the COCL argues that supervisors should be regularly trained in methods to increase procedural justice within the PPB organization (to improve morale and conduct), methods of supervising on mental health calls, and methods of conducting annual performance evaluations.

We credit the researchers in the PPB's Training Division with preparing a comprehensive and candid assessment of the Supervisor training. However, their end-of-the-day knowledge tests are not sufficient to assess what the PPB calls "In-class learning." COCL offers recommendations to improve these methods and produce valid findings.

Finally, the COCL examined the PPB's Annual Performance Evaluations, where supervisors evaluate PPB officers on 64 dimensions of performance. This process was reviewed because

of the training implications for supervisors. The main problem with this evaluation system is not the content (which is very comprehensive), but the way in which supervisors complete these evaluations and the wording of the evaluation scale. Like our earlier Outcome Assessment, we again found that, based on our sample, not a single officer received a "Needs Improvement" rating on any of the 64 dimensions. Thus, we encourage the PPB to rethink this system of evaluation and provide new supervisor training so that officers can receive meaningful and constructive feedback on their daily performance.

| | |
|---|---|
| **COCL Recommendations** | <ul><li>Create a new specialty group for responding to Public Order Events and provide members with extensive specialty training</li><li>Make Equity training a higher priority and include it routinely in PPB's in-person training schedule</li><li>Introduce in-person training on procedural justice with enough dosage to make a difference</li><li>Continue to support the development of sophisticated online training that allows for interactivity and is linked to subsequent in-person skills development</li><li>Provide more Stops training with attention to the Consent Search cards</li><li>Rethink this Annual Performance Evaluation system and retrain supervisors so that officers can receive meaningful and constructive feedback on their daily performance.</li></ul> |
| **Assessment Based On** | COCL's observation/assessment of training content, delivery, and consistency with adult-learning principles and best practices; Processes described by PPB personnel |

**Audit the Training Program**

| |
|---|
| **Settlement Agreement Paragraph** |

85. In consultation with the COCL, the Inspector shall audit the training program using the following performance standards to ensure that PPB does the following: (a) Conducts a comprehensive needs assessment annually; (b) Creates a Training Strategic Plan annually; (c) Within 180 days of the Effective Date, develops and implements a process for evaluation of the effectiveness of training; (d) Maintains accurate records of Training delivered, including substance and attendance; (e) Makes Training Records accessible to the Director of Services, Assistant Chief of Operations, and DOJ; (f) Trains Officers, Supervisors, and Commanders on areas specific to their responsibilities; and (g) Ensures that sworn PPB members are provided a copy of all PPB directives and policies issues pursuant to this Agreement, and sign a statement acknowledging that they have received, read, and had an opportunity to ask questions about the directives and/or policies, within 30 days of the release of the policy.

| Compliance Label | Substantial Compliance |
| --- | --- |
| Methodology | COCL will review the audit report for accuracy and completeness |

**Compliance Assessment**

Over the past two years, the COCL has recommended that the PPB undertake another audit because of current and planned changes in the Training Division since the last formal audit in 2018. The Office of the Inspector General (OIG) was responsive and completed such an Audit on December 30, 2022. By conducting this audit, the PPB has demonstrated that it has a system in place that complies with the basic requirements of Par. 85.

The COCL summarized the 2022 audit in our last quarterly report, so the details will not be repeated here. Overall, the audit findings were positive and found compliance with the requirements of Par. 85, but several problems were identified by the audit team that we feel should be highlighted.[20] First, regarding section 85(a) and 85(b), many of the needs identified in PPB's Training Needs Assessment (roughly 75%) "could not be incorporated into the Training Plan due to budget and staffing limitations." Second, regarding section 85(d) and 85(e), not all training records were being kept in a central, accessible location and "Rosters identifying members with specialty certifications were not up-to-date."

---

[20] Compliance includes 85(g), where 94% of the 1007 individuals completed one-DOJ related directive on time (0635.10 ("Portland Police Bureau Response to Public Order Events"), with only two past due.

On February 28, 2023, the Training Division responded to the recommendations provided in the Training Audit and committed to taking corrective action. For example, as we described in Par. 81 earlier, the LMS team is addressing the second problem regarding record keeping.

The first problem (i.e., the gap between training needs and actual training) is more serious and suggests that PPB needs to ensure that the training needs with the highest priority are incorporated into the training programs being offered. Over the years, COCL has been very clear about what types of training it considers a high priority, but the Training Division should also listen carefully to the voices of the community, including TAC, when deciding on training priorities in the context of scare resources.

Finally, regarding section 85(c), the audit team did not identify any problems with PPB's process for evaluating the effectiveness of training, but the COCL has reported some limitations in PPB's efforts to assess the impact of training on member's knowledge and on-the-job behavior. As we described earlier in this report (under Training Outcome Assessment), student learning is best evaluated by collecting data before and after training and by comparing the results with a control group. Also, new methods are needed to evaluate the impact of training on the job, such as community contact surveys and body-worn camera videos. Even existing data on use of force and official complaints could be studied more carefully over time to document changes. In addition, the COCL has recommended that PPB give more attention to the evaluation of performance by individual officers (instead of group performance) during skills training and role-playing scenarios. Finally, the COCL has recommended that the annual performance evaluation and associated training be reconfigured so that feedback to officers is meaningful and effective rather than simply a bureaucratic requirement.

| **COCL Recommendations** | • The next audit of the Training Division should give special attention to civilianization, including the level of support for the Director of Police Education and instructor development classes<br><br>• A future audit should give attention to the content of in-person training for officers and supervisors, with particular attention to the quality of instruction on Equity, Procedural Justice, and De-escalation |
|---|---|

| | |
|---|---|
| | • In terms of training needs assessment, the community should play a bigger role in setting training priorities because they are the recipients of police services |
| | • Given the critical importance of training in police reform, the City and PPB should invest more in Training Division personnel so that more instruction can be delivered |
| **Assessment Based On** | COCL's review of the audit report based on identified needs of the Training Division, auditing standards, and the timeline for completion of the audit |

**Analyze and Report Force Data**

| **Settlement Agreement Paragraph** | |
|---|---|
| 86. In consultation with the COCL, the Inspector shall gather and present data and analysis on a quarterly basis regarding patterns and trends in officers' uses of force to the Chief, the PPB Training Division, and to the Training Advisory Council. The Training Division and Training Advisory Council shall make recommendations to the Chief regarding proposed changes in policy, training, and/or evaluations based on the data presented. The Inspector shall also, in coordination with the COCL and PSD, identify problematic use of force patterns and training deficiencies. The Chief's Office shall assess all use of force patterns identified by the Training Division and/or Training Advisory Council and timely implement necessary remedial training to address deficiencies so identified. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Reviewed Training Advisory Council (TAC) meeting agenda and minutes; Reviewed TAC reports and recommendations |
| **Compliance Assessment** | |

The Force Inspector continues to gather force data on a quarterly basis and examine it for patterns and trends (See Section III on Use of Force). The Force Inspector continues to present the findings to the public at TAC meetings. Thus, the COCL continues to find the PPB in compliance with this part of Par. 86.

TAC held two public meetings in the first quarter of 2023 (January 11 and March 8). During the January meeting, the PPB and TAC heard a very informative presentation about a joint PPB-Portland State University (PSU) project that illustrates the benefits of procedural justice when interacting with crime victims (the type of procedural justice that COCL has been promoting for years in Portland). According to PSU researchers, the PPB 's online crime reporting program, where crime victims are required to answer dozens of questions without any police contact, accounts for 39% of all police reports and roughly half of all crime reports (about 29,000 crime victims), according to PSU researchers. This project demonstrated how low victim satisfaction and public trust can be significantly improved when officers follow up and talk with these victims in a procedurally just manner.

During the March 8 meeting of TAC, the Force Inspector presented the Force Application Reports for the third and fourth quarters of 2022. However, given TAC's bimonthly schedule and PPB's reporting schedule, the PPB's Force Application Report for the first quarter of 2023 will not be presented until the TAC's July 12 meeting.

Similar to the November meeting, TAC members asked about the overrepresentation of Black Portlanders in the force statistics, with one individual noting that the PPB was much more likely to use force against a Black males and females than whites with looking at population statistics. The Force Inspector noted the limits of population statistics, but TAC members wanted to dig deeper – why are people of color having disproportionate contact with the PPB in the first place and does the reason justify the use of force? The Force Inspector and his team were unable to explain the racial disparity in force applications, arguing it was beyond their unit's mission. However, they did provide population and force statistics from other cities to argue that Portland's numbers "are not drastically out of line with other places." Last quarter, the COCL noted that TAC wanted the PPB "to provide more context to these statistics, show greater sensitivity, and conduct more historical and statistical analysis of this complex problem." We consider this a preliminary attempt to be responsive, but clearly, more work is needed.

This periodic dialogue with the Force Inspector is healthy, and it has not distracted from the good working relationship between TAC and the Training Division. The Training Division continues to invite TAC members to provide feedback on planned and observed trainings. During the first quarter of 2023, the TAC should be credited with producing two substantial

reports on Training. On January 11, 2023, they submitted a report on the Supervisor In-Service Training that they observed in December, and on March 8, 2023, they submitted a report on the Mobile Field Force (MFF) Spring 2023 In-Service Training observed in January and February. These reports offer feedback that is generally positive, but also include some recommendations. The TAC would like to be engaged earlier in the planning process so that their feedback can contribute to curriculum revisions if needed.

During the first quarter of 2023, the TAC has remained active with its four Task Groups - Advanced Academy, Continuous Quality Improvement, Officer-Community Relationships and Perceptions, and Restorative Justice. The Training Division continues to post the TAC's reports and formal recommendations on its webpage,[21] including recommendations from these Tasks Groups. However, the COCL continues to recommend that the PPB provide a more formal and transparent system of responding to TAC's recommendations.

| | |
|---|---|
| **COCL Recommendations** | • The Force Inspector is required to identify and respond to "problematic use of force patterns" and this should include a more thorough analysis of the underlying factors associated with racial disparities in police use of force, as recommended by TAC and COCL<br><br>• With input from TAC, the Chief's office should provide a more formal and transparent system of responding to TAC's recommendations |
| **Assessment Based On** | PPB's presentation of quarterly force reports and inclusion of trends; The TAC's recommendations; PPB's responsiveness to the TAC's recommendations |

---

**Settlement Agreement Paragraph**

87. Training Advisory Council meetings will be open to the public unless the matter under discussion is confidential or raises public safety concerns, as determined by the Chief.

---

[21] TAC reports and recommendations can be found at: https://portland.gov/police/tac/ppbtacrecs)

| Compliance Label | Substantial Compliance |
| --- | --- |
| Methodology | Review of PPB website regarding TAC; Review TAC agendas and minutes; Observe TAC meetings |

| **Compliance Assessment** | |
| --- | --- |
| Two TAC meetings were held in the first quarter of 2023 (January 11 and March 8) and were open to the public as required by Paragraph 87. The COCL continues to observe these Zoom meetings, and the public has been allowed to listen and comment. The PPB continues to use a public email distribution list to send reminders of the meetings to the public. The PPB also continues to post TAC meeting agendas and minutes on the PPB's website.[22] | |

| COCL Recommendations | • No recommendations at this time |
| --- | --- |
| Assessment Based On | COCL review of information available on PPB website; COCL observation of TAC meetings and review of TAC minutes |

---

[22] https://www.portland.gov/police/tac/events/past

## V. COMMUNITY-BASED MENTAL HEALTH SERVICES

### Settlement Agreement Paragraph

88. The absence of a comprehensive community mental health infrastructure often shifts to law enforcement agencies throughout Oregon the burden of being first responders to individuals in mental health crisis. Under a separate agreement, the United States is working with State of Oregon officials in a constructive, collaborative manner to address the gaps in state mental health infrastructure. The state-wide implementation of an improved, effective community-based mental health infrastructure should benefit law enforcement agencies across the State, as well as people with mental illness. The United States acknowledges that this Agreement only legally binds the City to take action. Nonetheless, in addition to the City, the United States expects the City's partners to help remedy the lack of community-based addiction and mental health services to Medicaid clients and uninsured area residents. The City's partners in the provision of community-based addiction and mental health services include: the State of Oregon Health Authority, area Community Care Organizations ("CCOs"), Multnomah County, local hospitals, health insurance providers, commercial health providers, and existing Non-Governmental Organizations ("NGOs") such as community-based mental health providers, and other stakeholders.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Monitor the City and PPB continuing to work with community partners |

### Compliance Assessment

This paragraph is assessed based on the City and the PPB's continuing relationship with community partners. As this is a summative paragraph, compliance is dependent upon compliance with other paragraphs within this section. With all the other paragraphs within this section remaining in Substantial Compliance, so too does Par. 88.

| COCL Recommendations | • No recommendations at this time |
|---|---|

**Exhibit A**

| | |
|---|---|
| **Assessment Based On** | N/A – Summative paragraph |

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 89. The United States expects that the local CCOs will establish, by mid-2013, one or more drop-off center(s) for first responders and public walk-in centers for individuals with addictions and/or behavioral health service needs. All such drop off/walk in centers should focus care plans on appropriate discharge and community-based treatment options, including assertive community treatment teams, rather than unnecessary hospitalization. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review status of Unity Center; Interview with PPB Personnel |

**Compliance Assessment**

The COCL continues to acknowledge that the focus of Par. 89 is on the Community Care Organizations and the expectation that they establish one or more drop-off center(s). The Settlement Agreement does not hold any authority over these organizations, but our assessment remains focused on the City's activities and reasonable expectations regarding their involvement with the drop-off/walk-in center(s).

Related to the focus of Par. 89, the Unity Center remains the drop off center for individuals experiencing behavioral health needs. The facility has been operating in this capacity since it opened in May 2017. PPB has two policies related to this paragraph, including Directive 850.21 (Peace Officer Custody (Civil)) and 850.25 (Police Response to Mental Health Facilities). These directives provide the protocol for officers to contact AMR for ambulance transport to the Unity Center. Since the opening of the Unity Center, a Transportation Workgroup has met regularly in quarterly meetings to discuss the operation of the Center. This workgroup includes members of Unity, the PPB, AMR, Multnomah County, and Legacy ED Health. However, due to scheduling issues, the group has been unable to meet in the last six months, including the first quarter of 2023 though PPB reports meetings will resume in the second quarter. We will provide additional updates next quarter. Based on the PPB and the

City's ongoing participation in the process to date, we believe they have substantially complied with all reasonable expectations for them related to this paragraph.

| **COCL Recommendations** | • No recommendations at this time |
| --- | --- |
| **Assessment Based On** | Status of Unity Center and PPB policies |

---

**Settlement Agreement Paragraph**

90. The CCOs will immediately create addictions and mental health-focused subcommittee(s), which will include representatives from PPB's Addictions and Behavioral Health Unit ("ABHU") [Now called Behavioral Health Unit or "BHU"], the ABHU Advisory Board [Now called the BHU Advisory Committee or "BHUAC"], Portland Fire and Rescue, Bureau of Emergency Communications ("BOEC") and other City staff. These committees will pursue immediate and long-term improvements to the behavioral health care system. Initial improvements include: (COCL Summary) increased sharing of information (subject to lawful disclosure); creation of rapid access clinics; enhanced access to primary care providers; expanded options for BOEC operators to divert calls to civilian mental health services, addressing unmet needs identified by Safer PDX; expanding and strengthening networks of peer mediated services; and pursue tele-psychiatry.

| **Compliance Label** | Substantial Compliance |
| --- | --- |
| **Methodology** | Review Community Outreach Meeting minutes; Review PSU evaluation on PSR |

**Compliance Assessment**

As with the above paragraph, Par. 90 holds expectations of CCOs to create subcommittees for PPB to serve on, with a list of initial goals to be accomplished. However, CCO's are not under

the authority of the Settlement Agreement, and we therefore only evaluate the City on what can reasonably be expected of the agency given the lack of opportunity from CCOs.

During the first quarter of 2023, Legacy Community Outreach met twice (January 4 and February 1) and minutes and a resource list were provided for those meetings. At the January 2023 meeting, the first presentation was made by a representative from the Bybee Lakes Hope Center, a re-entry program that provides transitional housing and other resources like job sourcing, life skills and recovery support. The second presentation was given by a representative from the Ticket Home/Transition Projects. This program helps individuals experiencing homelessness to reunite with family by buying a transportation ticket for the individual. The February 2023 meeting hosted a presentation from the Mental Health & Addiction Association of Oregon (MHAAO), which provided an overview of what services they offer. The second presentation was delivered by a representative from Charlie Health. Charlie Health aims to provide adolescents and young adults (ages 11-33 year old) with mental health treatment that can be accessed virtually. We continue to find that PPB collaborating with community partners through participation with this group works toward the goal of long-term improvements to the behavioral health care system as outlined in paragraph 90.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | PPB involvement with Behavioral Health Collaborative Team; PPB involvement with Legacy ED Community Outreach |

# VI. CRISIS INTERVENTION

## A. Addictions and Behavioral Health Unit and Advisory Committee

---

**Settlement Agreement Paragraph**

91. In order to facilitate PPB's successful interactions with mental health consumers and improve public safety, within 60 days of the Effective Date, PPB shall develop an Addictions and Behavioral Health Unit ("ABHU") within PPB. PPB shall assign command-level personnel of at least the rank of Lieutenant to manage the ABHU. ABHU shall oversee and coordinate PPB's Crisis Intervention Team ("C-I Team"), Mobile Crisis Prevention Team ("MCPT"), and Service Coordination Team ("SCT"), as set forth in this Agreement.

*[As a point of clarification, since the writing of the Agreement, the ABHU is known as Behavioral Health Unit ("BHU"), the C-I Team is known as Enhanced Crisis Intervention Team ("ECIT"), and the MCPT is known as Behavioral Health Response Team ("BHRT"). Discussion of these entities, and their reference in subsequent Agreement paragraphs, will use their current nomenclatures].*

| | |
|---|---|
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review BHU Unit Structure |

**Compliance Assessment**

Regarding personnel and the BHU's general oversight, the BHU continues to conform to the requirements of Par. 91, as evidenced by the BHU unit structure, and our observations of the BHU coordinating ECIT, BHRT, and SCT operations. While the BHU provides oversight to the ECIT program (including ECIT training, dispatch criteria, ECIT data collection, etc.), ECIT officers directly report to their precinct level chain of command. This command structure conforms to the Memphis Model. There have been no major changes to the structure of the unit, and the PPB is expected to provide updates on personnel changes.

In the first quarter of 2023, PPB provided the COCL with the updated organization chart for the Specialized Resources Division, which houses the BHU. During the first quarter, the PPB

---

and the City completed the switch to having all BHRT clinicians being in-house as opposed to contracting with Cascadia. Based on the PPB's ongoing unit structure, as well as the regular updates provided to the COCL during the transition to in-house clinicians, we continue to find that the PPB remains in Substantial Compliance with this paragraph.

| **COCL Recommendations** | • Continue to update the COCL and DOJ on changes to personnel when applicable |
| --- | --- |
| **Assessment Based On** | COCL review of unit structures and personnel |

---

| **Settlement Agreement Paragraph** |
| --- |
| 92. [BHU] will manage the sharing and utilization of data that is subject to lawful disclosure between PPB and Multnomah County, or its successor. PPB will use such data to decrease law enforcement interactions or mitigate the potential uses of force in law enforcement interactions with consumers of mental health services.<br><br>93. [BHU] shall track outcome data generated through the [ECIT], [BHRT], and SCT, to: (a) develop new response strategies for repeat calls for service; (b) identify training needs; identify and propose solutions to systemic issues that impede PPB's ability to provide an appropriate response to a behavioral crisis event; and (c) identify officers' performance warranting commendation or correction. |

| **Compliance Label** | 92. Substantial Compliance |
| --- | --- |
| | 93. Substantial Compliance |
| **Methodology** | Review BHUCT, BHRT, and SCT coordination team meeting agendas and minutes; Review ECIT, BHRT, and SCT outcome measures |
| | |

**Compliance Assessment**

The PPB continues to utilize a number of work groups to collaborate on ways to "decrease law enforcement interactions [and] mitigate the potential uses of force in law enforcement interactions with consumers of mental health services" (Par. 92). During the first quarter of 2023, the BHU staff continued to meet weekly to discuss the BHRT caseload, and the Behavioral Health Unit Coordination Team (BHUCT) met on a bi-weekly basis to discuss current and potential BHRT clients. The BHUCT is composed of several community partners including representatives from Multnomah County, Cascadia, and Federal/State law enforcement. The PPB provided us with meeting minutes and agendas indicating that a core group of partners attends consistently, with other partners attending as needed.

The discussions during these meetings are designed to problem-solve and create strategies to reduce future criminal justice contacts for individuals that have frequent contact with the police but have been difficult to engage in ongoing services. BHU personnel indicate information on individuals discussed is shared only if it is subject to lawful disclosure. BHU personnel indicate the BHUCT has been a particularly valuable collaborative strategy.

The Service Coordination Team also conducts weekly meetings to discuss potential clients and make determinations about eligibility for SCT Services. The meetings include community partners and representatives from various entities in Multnomah County. The meetings also review current SCT clients to "facilitate continuation of care" for clients. We believe these meetings meet the spirit of Par. 92.

The PPB continues to provide the COCL with the documentation for all meetings occurring within the BHU, including minutes from each SCT, BHU, and BHUCT meeting. Additionally, the PPB provided the COCL with copies of the BHRT flyers that are used to communicate with partners about individuals who they are trying to connect with services. This information is also supplemented through data collected on the Mental Health Template (MHT) by identifying individuals and locations with repeat calls for service and developing response strategies.

Relevant outcome measures are collected for BHRT and SCT, and the PPB provides the COCL with quarterly reports summarizing these data. Altogether, the BHU system has multiple avenues for sharing and receiving information with such entities as the BHCT, BHCC (Behavioral Health Call Center), BOEC, and BHUAC. Thus, we find that the PPB remains in Substantial Compliance with the requirements of Pars. 92 and 93.

| COCL Recommendations | • Continue to collect and review data on mental health services, and use this information to update services as needed |
|---|---|
| Assessment Based On | BHCT, BHRT, and SCT coordination meeting agendas and minutes; ECIT, BHRT, and SCT outcome measures |

---

### Settlement Agreement Paragraph

94. Within 90 days of the Effective Date, PPB shall also establish a [BHU] Advisory Committee. The [BHU] Advisory Committee shall include representation from: PPB command leadership, [ECIT], [BHRT], and SCT; BOEC; civilian leadership of the City government; and shall seek to include representation from: the Multnomah County Sheriff's Office; Oregon State Department of Health and Human Services; advocacy groups for consumers of mental health services; mental health service providers; coordinated care organizations; and persons with lived experience with mental health services.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review BHUAC roster of members; Review BHUAC minutes; Observe BHUAC meetings |

### Compliance Assessment

In the first quarter of 2023, the Behavioral Health Unit Advisory Committee (BHUAC) continued to meet regularly, holding meetings on January 25, February 22, and March 22. The minutes of these meetings have been documented and shared with the COCL and can be found on the PPB's website (https://www.portland.gov/police/bhu-advisory/documents).

Membership requirements of BHUAC as outlined in Paragraph 94 continue to be met, with a current roster of 19 voting members, representing a variety of entities involved in the mental health response systems. Beyond the roster requirements, voting members are expected to attend, and there needs to be at least eight voting members present for quorum. For all of

the meetings held in the first quarter, a quorum was met. The membership represents a variety of community partners and recent additions in previous quarters ensure a quorum and a variety of perspectives. We continue to find the PPB to be in Substantial Compliance with this paragraph.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | BHUAC roster; BHUAC minutes; Observations of BHUAC meetings |

| **Settlement Agreement Paragraph** | |
|---|---|
| 95. The [BHU] Advisory Committee shall provide guidance to assist the City and PPB in the development and expansion of [ECIT], [BHRT], SCT, BOEC Crisis Triage, and utilization of community-based mental health services. The [BHU] Advisory Committee shall analyze and recommend appropriate changes to policies, procedures, and training methods regarding police contact with persons who may be mentally ill or experiencing a mental health crisis, with the goal of de-escalating the potential for violent encounters. The [BHU] Advisory Committee shall report its recommendations to the [BHU] Lieutenant, PPB Compliance Coordinator, COCL (as described herein), and the BOEC User Board. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review BHUAC minutes; Observe BHUAC meetings |
| **Compliance Assessment** | |
| Paragraph 95 envisions that BHUAC committee members will assist "the City and PPB in the development and expansion of [ECIT], [BHRT], SCT, BOEC Crisis Triage, and utilization of community-based mental health services." BHUAC continued to hold monthly meetings in the first quarter of 2022. The meeting agendas included a variety of topics. | |

The January meeting hosted a presentation by the PPB to discuss communication to patrol officers about BHRT caseload. At the moment, PPB officers do not have any way of knowing whether an individual is assigned to a BHRT officer. It was proposed that a simple communication request could be made to determine if an individual is assigned to a specific officer and to reach out to that officer if appropriate. The members brought up a lot of points of consideration for this proposal and engaged in thoughtful discussion. The members were mostly concerned with the right to privacy and accessibility of mental health information. While the members did put forth the idea that care coordination can be beneficial, they pointed out that it would be necessary to set up very specific rules and protections around what could be shared. The sergeant presenting this proposal concluded that they would gather more information and would report back to the committee at a later date.

At the February meeting, the PPB did respond and follow up the discussion about notifying ECIT patrol officers about BHRT caseload. They shared their plan to provide a document that will only be available to ECIT officers. The document, which would be updated weekly, will include a list of individuals and the corresponding BHRT. It would not be kept in the overall system, just as a document for ECIT officers to access. The BHUAC decided that this was a good approach that emphasized coordination of care and they suggested to move forward with the plan for 90 days and then re-evaluate based on how it goes. Additionally, at the February meeting, employees of the BHU presented on the Evaluation of the BHRT Outcomes. The presentation went over the background, mission and model of the BHRTs. The presenters shared data highlighting the long-term benefits of using the BHRT model.

At the March meeting, the Office of the Inspector General (OIG) provided their first annual presentation on force events involving those in perceived mental health crisis. This presentation was put together in response to the COCL request that the PPB share and seek input from the committee members regarding force events involving community members in actual or perceived mental health crisis. There were two main topic areas discussed during the presentation. First, OIG analysts provided BHUAC members with data on non-deadly force instances involving persons in mental health crisis. Members were provided with a PDF of the PowerPoint presentation before the meeting and were able to ask questions regarding the information. Next, the Detectives Division presented on selected Category 1 Force Investigations from 2021 and 2022. The presenter provided timeline and context information for these officer involved shootings (OIS).

Overall, the presentations were thorough and satisfied the COCL's underlying concerns. However, we identified two areas for improvement in future years, both of which relate to issues of time management. First, the presentation on OIS events included cases that did not

involve a person in crisis. While perhaps giving BHUAC a greater appreciation for PPB tactics, these cases are largely outside of the BHUAC's scope and we suggest that future iterations of the annual presentation cut out any events that clearly don't have a mental health component. Second, the BHUAC's ability to engage in robust discussion after the presentations was limited due to the length of the discussion, resulting in the BHUAC having to defer the time for questions until the next month's meeting. While we appreciate the PPB's willingness to join in the next month's meeting, the delay likely impacted the robustness of discussion that could have occurred had time been reserved at the end of the March meeting. However, these issues do not significantly impact our finding that the overall presentation was well-delivered and well-received. We therefore find ongoing Substantial Compliance with the requirements of this paragraph.

| | |
|---|---|
| **COCL Recommendations** | • At the next annual force presentation to the BHUAC, make sure to allot time for questions and discussion<br><br>• At the next annual force presentation to the BHUAC, focus on lethal force involving persons in mental health crisis |
| **Assessment Based On** | Review of BHUAC minutes and agendas; Observation of BHUAC meetings |

| **Settlement Agreement Paragraph** | |
|---|---|
| 96. Within 240 days of the Effective Date of this Agreement, the [BHU] Advisory Committee will provide status reports on the implementation of the [BHU] and BOEC Crisis Triage, and identify recommendations for improvement, if necessary. PPB will utilize the [BHU] Advisory Committee's recommendations in determining appropriate changes to systems, policies, and staffing. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review BHUAC recommendations found in BHUAC minutes |

**Compliance Assessment**

In accordance with Paragraph 96, BHUAC continues to provide the COCL with a report of their votes and recommendations for the implementation of the BHU and BOEC. In the first quarter of 2023, BHUAC made one formal recommendation, to pass SOP 3-3 as written. This SOP refers to the ECIT program and organizational structure. At the December 2022 meeting, the BHUAC suggested to the PPB that the language include a more detailed description of the criteria to be selected for ECIT certification. It was also suggested to include the consideration for ECIT selection accounts for specific day/shift availability. The PPB incorporated these suggestions and the committee approved SOP 3-3 as written at the February 2023 meeting. As this process follows what is envisioned by paragraph 96, we find the PPB to be in substantial compliance with the paragraph.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | BHUAC status reports and recommendations; PPB responses to BHUAC recommendations |

**B. Continuation of C-I Program**

**Settlement Agreement Paragraph**

97. PPB provides C-I Training to all its officers. C-I is a core competency skill for all sworn police officers in the City. PPB shall continue to train all officers on C-I.

98. PPB agrees to continue to require a minimum of 40 hours of C-I training to all officers before officers are permitted to assume any independent patrol or call-response duties. Additionally, PPB shall include C-I refresher training for all officers as an integral part of PPB's on-going annual officer training. PPB's Training Division, in consultation with [BHU] Advisory Committee, shall determine the subjects and scope of initial and refresher C-I training for all officers.

| **Compliance Label** | 97. Substantial Compliance |
|---|---|

**Exhibit A**

| | 98. Substantial Compliance |
|---|---|
| **Methodology** | Review of PPB in-service training |

<table>
<tr><td colspan="2" align="center"><strong>Compliance Assessment</strong></td></tr>
<tr><td colspan="2">The PPB continues to emphasize crisis response as a core competency in their training. For instance, all officers are required to receive a minimum of 40 hours of crisis intervention training prior to graduating from the Advanced Academy. In late February of 2023, the PPB started a new Advanced Academy and, by the end of the monitoring period, 13.5 hours of crisis intervention training had been delivered to 10 new recruits. The PPB plans to deliver additional crisis intervention training in the second quarter as well. This complements the 28 hours of C-I training that all recruits get in the statewide DPSST Basic Academy, which results in (and in-fact exceeds) the 40 hours of required C-I training.</td></tr>
</table>

| **COCL Recommendations** | • Consider seeking BHUAC input during training development rather than after training has been developed |
|---|---|
| **Assessment Based On** | PPB In-service training |

## C. Establishing "Memphis Model" Crisis Intervention Team

<table>
<tr><td colspan="2" align="center"><strong>Settlement Agreement Paragraph</strong></td></tr>
<tr><td colspan="2">99. Within 120 days of the Effective Date, PPB shall establish a Memphis Model Crisis Intervention team ("[ECIT]").</td></tr>
<tr><td><strong>Compliance Label</strong></td><td>Substantial Compliance</td></tr>
<tr><td><strong>Methodology</strong></td><td>Review BHU/ECIT data; Interview PPB Personnel; Review Mental Health Template data; Review BOEC data</td></tr>
</table>

**Compliance Assessment**

The PPB continues to operate under a modified "Memphis Model" of crisis intervention. In this specialized response system, a select group of officers receive an additional 40 hours of training to become Enhanced Crisis Intervention Team (ECIT) officers. As part of ECIT operations, the PPB has Directive 850.20 (Police Response to Mental Health Crisis) which was revised during the third quarter, then subsequently presented to officers during the third quarter In-service training. Along with discussing the revisions, the PPB provided a brief training that distinguished between the roles and responsibilities of ECIT, Portland Street Response, and Project Respond. We therefore continue to find that the PPB has sufficiently memorialized their crisis response model in both policy and training.

In the first quarter of 2023, the PPB reported 147 active members on the ECIT roster. Additionally, the BHU continued to hold ECIT advisory meetings. During the first quarter, ECIT members from all precincts discussed topics related to PSR, Project Respond, and patrol input. As a result, maintaining their model, we continue to find the PPB has substantially complied with the requirements of Par. 99.

| COCL Recommendations | • No recommendations at this time |
|---|---|
| **Assessment Based On** | ECIT roster; PPB's Semi-Annual Mental Health Crisis Response Report |

**Settlement Agreement Paragraph**

100. PPB's [ECIT] shall be comprised of officers who volunteer for assignment to the [ECIT]. The number of [ECIT] members will be driven by the demand for [ECIT] services, with an initial goal of 60-80 volunteer, qualified officers.

| Compliance Label | Substantial Compliance |
|---|---|
| **Methodology** | Review ECIT Roster; Interview PPB personnel |

**Compliance Assessment**

The PPB continues to follow the practice of accepting volunteer officers for ECIT certification. In the first quarter of 2023, no additional officers were ECIT-certified. The PPB provided us with a current ECIT roster that includes 147 active members. In the previous quarter, COCL's Outcome Assessment determined that the distribution of ECIT officers across precinct and shift is consistent with patterns of ECIT calls and we will continue to monitor this in future quarters. As there has been no major changes in the number of ECIT officers since the previous quarter and as ECIT officer distribution matches call volume patterns, we continue to find Substantial Compliance with the requirements of this paragraph.

| **COCL Recommendations** | • Continue utilizing existing data to assess demand for ECIT services |
|---|---|
| **Assessment Based On** | Mental Health Template data; ECIT roster; PPB's Semi-Annual Mental Health Crisis Response Report |

**Settlement Agreement Paragraph**

101. No officers may participate in [ECIT] if they have been subject to disciplinary action based upon use of force or mistreatment of people with mental illness within the three years preceding the start of [ECIT] service, or during [ECIT] service. PPB, with the advice of the [BHU] Advisory Committee, shall define criteria for qualification, selection, and ongoing participation of officers in the [ECIT].

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Review evaluation documents for potential ECIT officers |

**Compliance Assessment**

In the first quarter of 2023, the PPB did not add any new members to the ECIT roster. They are planning to hold a certification course in September 2023. As an update prior reports, we

note that at the December 2022 meeting, the PPB made a presentation to BHUAC about ECIT recruitment, qualifications, and eligibility requirements. The Committee suggested that the ECIT SOP (SOP #3-3) be revised to codify the practice of PPB recruiting ECIT officers based on shift-precinct needs. At the February 2023 BHUAC meeting, the PPB presented the updated version of SOP #3-3 to the committee. The language included the changes suggested by the BHUAC and the members voted to formally recommend SOP #3-3 as written. As a result of the current process as well as engaging with BHUAC for the future process, we continue to find the PPB in Substantial Compliance with the requirements of this paragraph.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | PPB ECIT evaluation documents |

| **Settlement Agreement Paragraph** |
|---|
| 102. PPB shall specially train each [ECIT] member before such member may be utilized for [ECIT] operations. PPB, with the advice of the [BHU] Advisory Committee, shall develop such training for [ECIT] members consistent with the Memphis Model. |

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Review PPB supplemental documents |

| **Compliance Assessment** |
|---|

In the first quarter of 2023, there was no ECIT certification training; the next one is being planned for September 2023. The PPB reports that they will be presenting to the BHUAC on the training contents and seeking input from members. We continue to appreciate the PPB's dedication to providing comprehensive ECIT training consistent with the Memphis Model. We recommend the PPB continue to analyze and update their materials for ECIT training on an

ongoing basis and continue to utilize outside perspectives, such as those from BHUAC to help inform training content.

| **COCL Recommendations** | • Continue to seek out recommendations from BHUAC on ECIT training |
|---|---|
| **Assessment Based On** | PPB supplemental documents; Observation of BHUAC meeting |

| **Settlement Agreement Paragraph** ||
|---|---|
| 103. [ECIT] members will retain their normal duties until dispatched for use as [ECIT]. BOEC or PPB may dispatch [ECIT] members to the scene of a crisis event. ||
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review PPB policy |
| **Compliance Assessment** ||
| In accordance with Par. 103 (and the Memphis Model of mental health crisis response), ECIT members retain their normal duties until dispatched for use as ECIT. BOEC personnel have received training on the criteria for dispatching an ECIT to a call. Additionally, the PPB's Directive 850.20 includes the requirement for officers to consider calling in specialized units (including ECIT) as necessary. We therefore continue to find the PPB has maintained Substantial Compliance with this paragraph. However, although not a condition for compliance, we also continue to suggest the PPB consider the language of Directive 850.20 which currently does not default to the ECIT officer being the primary officer on ECIT calls in accordance with the Memphis Model of crisis response. ||
| **COCL Recommendations** | • Reconsider revisions to 850.20 |

| | |
|---|---|
| **Assessment Based On** | PPB policy |

<br>

| **Settlement Agreement Paragraph** ||
|---|---|
| 104. PPB will highlight the work of the [ECIT] to increase awareness of the effectiveness of its work. ||
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review PPB public awareness efforts; Review BHU website; Review BHUAC minutes |

**Compliance Assessment**

The PPB continues to perform a wide variety of tasks designed to increase awareness of the work performed by the BHU, ECIT, BHRT, and SCT. This work includes flash alert emails, newsletters, conference presentations, conference attendance, community outreach training and presentations, social media, and other efforts. We believe that the PPB has made a strong effort to highlight the work of the BHU in its entirety, not only the ECIT.

For instance, in the first quarter of 2023, the BHU Newsletter shared positive news, such as The BHU being awarded the Pathfinder Award from the National Alliance on Mental Illness (NAMI). This award honors community organizations that "light a path to justice, dignity, and respect for all people affected by mental illness." The newsletter also highlighted the BHU's attendance of a behavioral threat assessment conference, data on BHRT referrals, and introduced the two new BHU clinicians and a new BHRT sergeant. Based on this and our previous review of the PPB outreach efforts, we believe the PPB has substantially complied with the requirements of Par. 104.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | Public awareness and education documents |

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 105. For each crisis event to which [ECIT] is dispatched, the [ECIT] member shall gather data that [BHU] shall utilize to track and report data on public safety system interactions with individuals with perceived or actual mental illness or who are in crisis. These data shall include: (COCL summary) the required tracking of details about the context and nature of incident, information about the subject, techniques used, injuries, disposition, presence of mental health professional on scene, and a narrative of the event. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review Mental Health Template data; Interview PPB personnel |

**Compliance Assessment**

In accordance with this paragraph, the PPB must collect data on mental health calls, and the BHU is required to report on the data collected. In the first quarter of 2023, PPB continued to use the Mental Health Template (MHT) as the method for collecting the data points required in Par. 105. The PPB's quality assurance plan for ECIT-related data and outcomes includes analysts auditing associated data on a monthly basis.

The BHU provided the COCL with a quarterly report describing MHT data for ECIT calls. In the first quarter of 2023, the PPB received 349 MHTs on 344 calls that reported an ECIT officer was on scene (a single call may result in more than one MHT being completed). ECIT officers authored 256 (73%) of the MHTs. For the 344 calls, the most common technique used was de-escalation (40%). A total of 15 calls (4% of the total) reported a use of force. For the disposition of the 344 calls, the most common clearance type was report completed (83% of calls), followed by about 8% of calls being cleared by arrest (physical). All these statistics are similar to prior quarters.

Due to the nature and extent of data collected and analyzed on ECIT dispatches, the PPB remains in Substantial Compliance with Par. 105.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|

| | |
|---|---|
| **<u>Assessment Based On</u>** | Mental Health Template data |

### D. Mobile Crisis Prevention Team

<table>
<tr><td colspan="2" align="center"><b><u>Settlement Agreement Paragraph</u></b></td></tr>
<tr><td colspan="2">106. PPB currently has a [BHRT] comprised of a two-person team, one sworn officer and one contractor who is a qualified mental health professional. Within 120 days of the Effective Date, City shall expand [BHRT] to provide one [BHRT] car per PPB precinct.</td></tr>
<tr><td colspan="2">107. Each [BHRT] car shall be staffed by one sworn PPB officer and one qualified mental health professional. [BHRT] shall be the fulltime assignment of each such officer.</td></tr>
<tr><td rowspan="2"><b>Compliance Label</b></td><td>106. Substantial Compliance</td></tr>
<tr><td>107. Substantial Compliance</td></tr>
<tr><td><b>Methodology</b></td><td>Review BHU Unit Structure; Review of BHUAC meeting, Interview PPB Personnel</td></tr>
<tr><td colspan="2" align="center"><b><u>Compliance Assessment</u></b></td></tr>
<tr><td colspan="2">The PPB continues to have a BHRT car in each precinct composed of one officer and one qualified mental health professional. For the officer, BHRT is considered their full-time assignment. As an update to prior reports, the PPB continued in their efforts to expand the number of BHRT teams back to five. In the first quarter of 2023, the PPB officially hired the final two clinicians for BHRTs, completing the roster of the five BHRTs. The PPB aims to maintain the five teams as the complete roster for BHRT. One BHRT is assigned to each of the precincts (East, Central and North), a fourth BHRT is assigned to Houseless Outreach, and a fifth BHRT is assigned to Proactive Follow-up. As a result of their current effort, we continue to find the PPB is in Substantial Compliance with the requirements of Pars. 106 and 107.</td></tr>
</table>

| COCL **Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | BHU Unit Structure |

---

| **Settlement Agreement Paragraph** | |
|---|---|

108. No officers may participate in [BHRT] if they have been subject to disciplinary action based upon use of force or mistreatment of people with mental illness within the three years preceding the start of [BHRT] service, or during [BHRT] service. PPB, with the advice of [BHU] Advisory Committee, shall define criteria for qualification, selection, and ongoing participation of officers in the [BHRT].

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Review evaluation documents for potential ECIT officers |

| **Compliance Assessment** | |
|---|---|

All BHRT officers are ECIT certified and are held to the same eligibility standards as ECIT officers. In addition, S.O.P. #43 covers the ongoing participation of officers involved with BHRT. The BHU Sergeants and the Lieutenant monitor all current BHRT members through the Employee Information System (EIS) and PSD to ensure qualifications are maintained. During this quarter, no new BHRT officers were assigned though we have seen this process play out in prior quarters. We therefore continue to find the PPB remains in Substantial Compliance with Paragraph 108.

| COCL **Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | PPB policy |

| **Settlement Agreement Paragraph** |
| --- |
| 109. PPB shall specially train each [BHRT] member before such member may be utilized for [BHRT] operations. PPB, with the advice of the [BHU] Advisory Committee, shall develop such training for [BHRT] members. |

| **Compliance Label** | Substantial Compliance |
| --- | --- |
| **Methodology** | Review reported trainings for BHRT members |

| **Compliance Assessment** |
| --- |
| The BHU continues to promote supplemental training for supervisors and BHRT members. In the first quarter of 2023, members took part in external supplemental training and conferences. For instance, trainings attended by members of the BHU covered a variety of topics, including threat assessment, mass attacks, EMD para practitioner and motivational interviewing. Members also attended a two-day conference on Behavioral Threat Assessment. It appears that the BHU has continued to forge a culture in which ongoing learning and training is promoted and encouraged. We therefore find the PPB has maintained Substantial Compliance with Paragraph 109. |

| **COCL Recommendations** | • No recommendations at this time |
| --- | --- |
| **Assessment Based On** | PPB quarterly report identifying supplemental BHRT training |

| **Settlement Agreement Paragraph** |
| --- |
| 110. [BHRT] shall utilize [ECIT] data to proactively address mental health service, in part, by connecting service recipients with service providers. |

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review Mental Health Template summary data; Review BERS summary data |

**Compliance Assessment**

The PPB has continued the practice of collecting data through the Mental Health Template (MHT). When an officer has an encounter with a mental health component, they will complete the MHT, and this information is used to address mental health service needs. If an individual is a subject of three Mental Health Templates (MHTs) in a 30-day period, then they will be referred to the Behavioral Health Unit Electronic Referral System (BERS) (if a referral had not already been made).

Once an individual is referred, a team will look at specific criteria including: a demonstration of escalating behavior, frequent contacts with the PPB, considered a risk to self or others, and whether case-specific information indicates a potential need for BHRT intervention. If the individual is deemed an appropriate candidate for additional intervention, then the Behavioral Health Unit Coordination Team (BHUCT) (which is composed of law enforcement, court, service provider, and hospital provider personnel, among other relevant stakeholders) will discuss a plan of action.

The PPB has continued to conduct analysis of BHRT operations on a quarterly basis to identify potential trends as well as ensure ongoing system function. In the first quarter of 2023, a total of 198 referrals were processed by the BHU. Of the 198 referrals, 117 (59%) were assigned to BHRT's caseload. This assignment rate represents an increase from the previous five quarters (47%, 50%, 52%, 55%, and 57% respectively).

In the first quarter of 2023, 117 individuals transitioned to inactive status with BHRT. Of those individuals, 39 (33%) had been previously assigned to BHRT's caseload in a different quarter and continued into the first quarter of 2023.

As shown in Figure 6.1 this quarter saw that the most common reason for a referral to be assigned was for Escalating Behavior (51%), followed by Frequent Contacts (16%) and Risk to Others (16%).

**Figure 6.1**
**Assigned Cases Reason for Referral (provided by PPB)**



Figure 1: Assigned Cases Reason for Referral, 2023 Q1
N=117

When looking at the outcomes of referrals for inactive cases in the first quarter of 2023 (Figure 6.2), the most common outcome was Concern Mitigated (22%), closely followed by Systems Coordination (16%) and Unable to Locate (14%).

**Figure 6.2:**
**Inactive Cases Outcome of Referral (provided by the PPB)**





Figure 2: Inactive Cases Outcome of Referral, 2023 Q1
N=117

The PPB's current practice of collecting data through the MHT, meeting weekly to share information and using data to inform service needs fulfills the requirements outlined in Par. 110, and we continue to find them in Substantial Compliance.

| **COCL Recommendations** | • Continue to collect data and create reports on mental health services |
|---|---|
| **Assessment Based On** | Mental Health Template data; BERS referral data |

| **Settlement Agreement Paragraph** |
| --- |
| 111. Within 180 days of the Effective Date, PPB, with the advice of [BHU] Advisory Committee, shall develop policies and procedures for the transfer of custody or voluntary referral of individuals between PPB, receiving facilities, and local mental health and social service agencies. These policies and procedures shall clearly describe the roles and responsibilities of these entities and of [BHRT] officers in the process. |

| Compliance Label | Substantial Compliance |
| --- | --- |
| **Methodology** | Review Directives 850.20, 850.21, 850.22, and 850.25; Interview PPB personnel |

| **Compliance Assessment** |
| --- |
| The PPB continues to operate under the Directives 850.20, 850.21, 850.22, and 850.25, which dictate the procedures for AMR to provide transportation for a person in a mental health crisis. These directives were also reviewed by BHUAC during the first quarter of 2022. In the third quarter of 2022, in-service training provided an overview of the updates made to Directive 850.20. Furthermore, the PPB continues to collaborate with AMR when issues arise in the transportation of an individual dealing with a mental health crisis (see our assessment of Par. 89). The PPB also has a designated liaison Sergeant at each precinct to respond, in real time, to any transportation issues. As the PPB continues to uphold these procedures, we find they have maintained Substantial Compliance with Paragraph 111. |

| **COCL Recommendations** | • No recommendations at this time |
| --- | --- |
| **Assessment Based On** | Directives 850.20, 850.21, 850.22, and 850.25; PPB interviews |

**E. Service Coordination Team**

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 112. The Service Coordination Team ("SCT"), or its successor, shall serve to facilitate the provision of services to individuals who interact with PPB that also have a criminal record, addiction, and highly acute mental or physical health service needs. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review SCT outcome measures; Review SCT Referrals Report |

**Compliance Assessment**

The PPB continues to facilitate the provision of services to individuals who experience drug-addiction, mental illness, and are chronically involved in criminal behavior. The SCT coordinates access to housing, medical, counseling, and addiction/mental health services. Members of the SCT are proactive in seeking out collaborations with other stakeholders in the State of Oregon.

The PPB also continues to provide data demonstrating that, over the years, SCT has consistently grown in the number of people referred to the program as well as the number of people served by the SCT. For the first quarter of 2023, the number of referrals was 249, as shown in Table 6.1 below. This is a decrease from the second and third quarter of 2022 (318 and 263 respectively), but an increase from the fourth quarter of 2022 (235). Overall trends in referrals remain largely consistent with pre-2020 data (when Covid caused a reduction in referrals). Of these referrals, the SCT accepted 67%, while the other 33% did not meet the assignment criteria. The primary reasons for not meeting criteria were the lack of recent crimes (28%) and lack of criminal history (23%).

**Table 6.1**
**SCT Referrals (provided by PPB)**

| SCT Referrals, 2023 Q1 | N | % of Total |
|---|---|---|
| Number of Referrals | 249 | - |
| Number of Individuals Referred* | 248 | - |
| Number of Referrals That Met Assignment Criteria | 166 | 67% |
| Number of Referrals That Did Not Meet Assignment Criteria | 83 | 33% |
| Reason for Not Meeting Assignment Criteria | N | % of Not Meeting Assignment Criteria |
| Lacks recent crimes | 23 | 28% |
| Lacks criminal history | 19 | 23% |
| Higher level of care | 12 | 14% |
| Aggression | 12 | 14% |
| Other | 7 | 8% |
| Sex Offender | 5 | 6% |
| Unable to Locate | 2 | 2% |
| Arson | 2 | 2% |
| Crimes outside Portland | 1 | 1% |

Additionally, the Supportive Transitions and Stabilization (STS) Program is an expansion of the SCT operation and is run by the Central City Concern's Housing Rapid Response. It is intended to address the needs of those with mental illness and co-occurring disorders who temporarily require a more extensive level of care by creating a direct housing resource. In the first quarter of 2023, 18 individuals were referred, 12 of the referrals were accepted, and a total of six new participants were served, as shown in Table 6.2 below. Furthermore, the PPB anticipates that restoring the fifth BHRT team will continue to raise referrals and we will continue to provide updates on these trends.

**Table 6.2**
**STS Referrals (provided by PPB)**

| STS Referrals, 2023 Q1 | |
|---|---|
| Number of Referrals* | 18 |
| Number of Individuals Referred | 18 |
| Average Age of Individuals Referred | 37.3 yrs |
| Number of Referrals Accepted (Met Criteria) | 12 |
| Number of Referrals Declined | 6 |
| Number of new participants served during Quarter | 6 |
| Number of participants who successfully completed | 0 |
| Participants terminated for cause/non-compliance | 3 |
| Participants who voluntarily withdrew from program | 0 |
| Average Length of Stay (days) of those who exited during Quarter | 59.3 |
| Bed utilization rate | 47% |

| | |
|---|---|
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Based On** | SCT process; SCT outcome measures |

**F. BOEC**

| **Settlement Agreement Paragraph** |
|---|
| 113. Within 120 days of the Effective Date, BOEC and PPB, with the advice of the [BHU] Advisory Committee, shall complete policies and procedures to triage calls related to mental health issues, including changes to protocols for assigning calls to [Behavioral Health Call Center - BHCC], and adding new or revised policies and protocols to assign calls to PPB [BHU] or directly to NGOs or community-based mental health professionals. |

| | |
|---|---|
| **Compliance Label** | Substantial Compliance |

| | |
|---|---|
| **Methodology** | Interview BOEC personnel; Review BOEC protocols |

| | |
|---|---|
| **Compliance Assessment** ||
| BOEC has completed and maintained the policies and procedures prescribed within Par. 113. BOEC's Mental Health and ECIT dispatch Protocol S.O.P. identifies seven call characteristics where an ECIT dispatch officer will be dispatched. These characteristics include when there is a mental health component and: (1) a weapon is present; (2) the person is violent; (3) the call is at a mental health facility; (4) the caller is threatening suicide and has the means to carry it out; (5) at the request of a community member; (6) at the request of another officer; or (7) when the person represents an escalating risk of harm to self or others. ||
| BOEC has maintained their policy criteria for ECIT dispatch, which partially satisfies the requirement for crisis triage. In addition, BOEC has updated criteria for forwarding calls to the Behavioral Health Call Center (BHCC). BOEC also has a triage protocol in place for PSR and has recently informed us that they have implemented a PSR policy. However, this occurred in the third quarter and we will therefore provide updates in our Q3 report. However, in the interim, the triage protocols for mental health calls continue to satisfy Par. 113 and BOEC remains in Substantial Compliance. ||

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | BOEC protocols for ECIT dispatch; BOEC protocols for BHCC referral; BOEC protocols for PSR dispatch |

| | |
|---|---|
| **Settlement Agreement Paragraph** ||
| 114. Within 180 days of the Effective Date, the City will complete training of all BOEC Dispatchers in Crisis Triage. The City, with the advice of the [BHU] Advisory Committee, shall develop ongoing training for BOEC Dispatchers. ||
| **Compliance Label** | Substantial Compliance |

| Methodology | Interview BOEC personnel |
|---|---|

| | **Compliance Assessment** |
|---|---|
| | BOEC staff continue to receive training in crisis triage both as new employees as well as ongoing refresher training, including on recognizing mental health crisis and available triage options (e.g., crisis line, PSR, and ECIT). In the first quarter of 2023, BOEC did not host any new trainings related to police dispatch, instead focusing on re-certifying members in fire and medical triage. BOEC has also been working on bringing up their staffing levels. They report that 50 trainees are in the pipeline to become employees. As of February 2023, 15 individuals moved to the floor for call taking training. We will continue to provide updates in future quarters with respect to training these new employees though we also continue to note that a training specifically related to PSR policies will need to be developed once official policies have been adopted. |

| **COCL Recommendations** | • Develop focused training for PSR |
|---|---|

| **Assessment Based On** | Prior observation of BOEC training; Interview with BOEC personnel |
|---|---|

| | **Settlement Agreement Paragraph** |
|---|---|
| | 115. Within 180 days of the Effective Date, the City shall ensure Crisis Triage is fully operational to include the implementation of the policies and procedures developed pursuant to the above paragraph and operation by trained staff. |

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Review of BOEC data; Interview with BOEC personnel |
| | |

**Compliance Assessment**

The COCL reviewed data related to the operation of BOEC, not only in the context of the PPB's crisis response, but also in the context of other triage options. This included transferring calls to the BHCC and dispatching PSR to calls that meet the necessary criteria. For instance, in the first quarter evaluation of mental health calls, the PPB identified 6,901 calls with a mental health component. BOEC audited a random sample of 347 of these calls to ensure that dispatchers are applying the criteria appropriately. In 18 of those calls (5%) BOEC's audit later found that sufficient information existed at the time of the call to warrant it being dispatched as ECIT. This rate is consistent with prior reporting periods. BOEC also assessed accuracy for calls transferred to the BHCC, with 13 out of 247 calls being kicked back to BOEC for ECIT dispatch (we note this may not indicate fault with the telecommunicators decision, for BHCC operators may learn additional information warranting emergency response).

We also reviewed the integral role that BOEC has played with respect to the citywide expansion of PSR. In the first quarter, BOEC set up 2,472 calls for PSR in the first quarter, which is a decrease of 3.7% from the fourth quarter of 2022. Moving forward, we will continue to monitor the progress of PSR, including the operation of BOEC as it relates to being able to dispatch them when the response criteria are met. However, for this quarter, we continue to find BOEC to be in Substantial Compliance with the requirements of this paragraph.

| | |
|---|---|
| **COCL Recommendations** | • Continue to address PSR issues and determine their implications for policy and training |
| **Assessment Based On** | Review of BOEC data; Interview with BOEC personnel; Interview with PSR personnel |

# VII. EMPLOYEE INFORMATION SYSTEM

### Settlement Agreement Paragraph

116. PPB has an existing Employee Information System ("EIS") to identify employees and design assistance strategies to address specific issues affecting the employee. *See* PPB Manual 345.00. PPB agrees to enhance its EIS to more effectively identify at-risk employees, supervisors and teams to address potentially problematic trends in a timely fashion. Accordingly, within 90 days of the Effective Date, PPB shall: (a) Require that commanders and supervisors conduct prompt reviews of EIS records of employees under their supervision and document the review has occurred in the EIS performance tracker; (b) Require that commanders and supervisors promptly conduct reviews of EIS for officers new to their command and document the review has occurred in the EIS performance tracker; and (c) Require that EIS staff regularly conduct data analysis of units and supervisors to identify and compare patterns of activity.

117. PPB agrees to use force audit data to conduct similar analyses at supervisor- and team-levels.

| Compliance Label | 116. Partial Compliance |
| | 117. Partial Compliance |
| **Methodology** | Interview EIS/PPB personnel; Review PPB EIS analysis |

### Compliance Assessment

The PPB continued to use the Employee Information System (EIS) as their primary system for identifying at-risk members and potentially problematic trends and "design[ing] assistance strategies to address specific issues affecting the employee" (Par. 116). As for the PPB's current procedure of evaluating subsections (a) and (b) of Par. 116, the PPB reports rates of compliance with supervisory reviews that are consistent with prior quarters. As shown in Figure 7.1 below, compliance for subsection (a) reviews (supervisors performing annual reviews) demonstrated that 99% of required reviews were completed on-time, whereas subsection (b) reviews ("new-to-command" reviews) were completed on-time for all cases

(100%). This led to 99% on-time reviews for subsection (c), which looks at all opportunities for Par. 116 compliance.

**Figure 7.1**

**Compliance with Reviews Directive 345.00 Reviews (provided by PPB)**



However, the COCL continues to have concerns with how the PPB and the Force Inspector identify "at-risk employees, supervisors, and teams." During this quarter, we again were able to listen-in on conversations between the Force Inspector and Precinct commanders regarding officers and supervisors whose data was considered by the Force Inspector as being force outliers or who represented some of other potential concern (i.e., comparatively low levels of calls for service or arrests). However, similar to past quarters, we are still uncertain as to what processes or considerations are being used to select these officers, and our requests for consultation with the Force Inspector prior to these meetings have continued to be declined. At the end of the first quarter, the PPB provided a draft of SOP #5 (Force Analysis for Supervisors and Teams) in order to better clarify the process that the Force Inspector will take to identify potentially problematic members. However, additional revisions to the SOP were necessary and we will provide updates in future reports.

In reviewing commanders' written responses for the individuals discussed during the meetings, we continue to find that the status of these members as statistical outliers is secondary to justifying the behavior. For instance, in one response, the commander states that the member "has a unique ability to locate subjects in stolen cars and felons actively engaged in crime. [Member] utilizes pursuit intervention techniques to mitigate risk to the public, bring resolve and quickly take subjects into custody. [Member's] proactive work ethic has elevated [their] force ratios compared to [their] peers who are responding to assist officers with calls for service." This response essentially boils down to the position that the member's elevated statistics are not concerning because the member is fighting crime and using force to do so, which justifies their elevated force ratios compared to their peers. However, this ignores the fact that statistical ratios already control for the fact that some officers will be more active than others.

While one commander indicated they were working with EAP for alternative interventions for an identified member and other commanders noted small denominators in calculating the ratio (calling into question why the members were identified in the first place), we continue to find that the goal of capturing outliers in order to "address potentially problematic trends in a timely fashion" is not being accomplished.

Finally, during this quarter, we held a meeting with the PPB to discuss the data necessary to conduct a comprehensive assessment of the PPB's EIS. Overall, there are data points that would contribute to a comprehensive assessment which the PPB either does not collect or would require significant resources to convert to a format that could be reliably used in a statistical model. Still, based on our meeting, we are confident that sufficient data exist that an assessment of the EIS's effectiveness could be conducted, particularly when paired with qualitative methods. However, the PPB and City hold to the position that such an assessment is not required by the Settlement Agreement. Thus, we will await a resolution of this issue by the Parties before beginning data collection, as this would dictate whether the assessment is considered technical assistance or a requirement of compliance.

| **COCL Recommendations** | • To achieve Substantial Compliance, require the Force Inspector to conduct the Type III alert process in accordance with Directive 345.00. |
| | • To achieve Substantial Compliance, implement corrective action for Precinct Commanders when significant review failures occur |

| | • Determine with DOJ whether an assessment of EIS's effectiveness is required for compliance |
|---|---|
| **Assessment Based On** | EIS and threshold review process |

---

**Settlement Agreement Paragraph**

118. PPB shall continue to use existing thresholds, and specifically continue to include the following thresholds to trigger case management reviews: (a) Any officer who has used force in 20% of his or her arrests in the past six months; and (b) Any officer who has used force three times more than the average number of uses of force compared with other officers on the same shift.

119. Within 90 days of the Effective Date, PPB shall add one additional threshold to trigger case management review of any officer who has three uses of force in a one-month period.

| **Compliance Label** | 118. Substantial Compliance |
|---|---|
| | 119. Substantial Compliance |
| **Methodology** | Interview EIS/PPB personnel; Reviewed EIS program data |

**Compliance Assessment**

The thresholds that the PPB are required to maintain for Par. 118 continue to be used to flag officers for supervisory reviews. The PPB continues to collate data from a variety of sources, including force events, traumatic incidents (captured in Regional Justice Information Network (RegJIN), complaints, and commendations (captured in Administrative Investigations Management (AIM)). These data are used to identify potentially problematic behavior with the predetermined thresholds identified by these paragraphs.

In the first quarter of 2023, EIS Administrators reviewed a total of 351 alerts and sent 225 (64.1%) on for RU Manager review (see Figure 7.2). When forwarded to the RU Manager, the

alert may be reviewed and closed by the RU Manager or sent on to the officer's supervisor for either closure or an intervention (i.e., coaching, commending, debriefing, monitoring, referring to the Employee Assistance Program (EAP), training, or temporary reassignment). For alerts closed in the first quarter of 2023 (which may also include cases opened in prior quarters), the RU closed 206 (62.6%) of those which is a 7.9% increase from the previous quarter. (see Table 7.1). There were 146 alerts sent to the RU Manager and for 146 (83.4%) of those instances, the alert was sent on for further supervisor review (the second highest percentage in the prior four quarters). Additionally, 71% of alerts sent to an officer's supervisor during the first quarter of 2023 resulted in some type of intervention. The information provided by PPB indicates that for all 145 alerts closed with an intervention, the intervention involved a debriefing or supervisors coaching.

As with Par. 116, we are continuing to work with the PPB to analyze the relative effectiveness of EIS interventions, both from empirical data analyses as well as through conversations with key stakeholders in the EIS process. However, the PPB continues to use the thresholds as outlined by Pars. 118 and 119, we continue to find they have substantially complied with these paragraphs.

**Figure 7.2**

**EIS Alerts and Alerts Sent to RU Manager (provided by PPB)**



| Table 7.1<br>EIS Alerts and Interventions | | | | | | |
|---|---|---|---|---|---|---|
| | **2021 Q4** | **2022 Q1** | **2022 Q2** | **2022 Q3** | **2022 Q4** | **2023 Q1** |
| Alerts Closed by RU | 215 | 170 | 174 | 174 | 140 | 206 |
| Alerts Sent to Supervisor (Percent of Alerts Sent to RU) | 181 (84.2%) | 112 (65.9%) | 126 (72.4%) | 103 (59.2%) | 100 (71.4%) | 166 (73%) |
| Interventions (Percent of Alerts Sent to RU) | 162 (75.3%) | 88 (51.8%) | 94 (54.0%) | 82 (47.1%) | 73 (52.1%) | 146 (70.9%) |
| Interventions (Percent of Alerts Sent to Supervisor) | 162 (89.5%) | 88 (78.6%) | 94 (74.6%) | 82 (79.6%) | 73 (73%) | 146 (88%) |

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | Current EIS thresholds and associated data |

| **Settlement Agreement Paragraph** | |
|---|---|
| 120. Within 90 days of the Effective Date, PPB shall identify and train a second EIS administrator. This individual may be assigned to other tasks within the Professional Standards Division or as otherwise needed. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Reviewed Directive 345.00; Reviewed EIS Program |

| | |
|---|---|
| **Compliance Assessment** ||
| Paragraph 120 requires that the PPB "identify and train a second EIS administrator." During the first quarter of 2023, PPB maintained the second EIS administrator that was trained and joined the team in the first quarter of 2022. We therefore find that the PPB has maintained compliance with Par. 120. ||
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Based On** | Maintenance of second EIS Administrator |

# VIII. OFFICER ACCOUNTABILITY

## A. Investigation Timeframe

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 121. PPB and the City shall complete all administrative investigations of officer misconduct within one-hundred eighty (180) days of a complaint of misconduct, or discovery of misconduct by other means. For the purposes of this provision, completion of administrative investigations includes all steps from intake of allegations through approval of recommended findings by the Chief, excluding appeals, if any, to CRC. Appeals to CRC should be resolved within 90 days. | |
| **Compliance Label** | Partial Compliance |
| **Methodology** | Review IPR Quarterly Data Analysis; Review Administrative Investigation Management (AIM) System data |

### Compliance Assessment

On a quarterly basis, IPR provides summary statistics for all full administrative investigations which are closed within 180 days of their initiation date. Using the quarter in which the cases were opened as reference, IPR statistics show that in the last two quarters for which 180 days could have passed (2022 Q2 and Q3), the percentage of administrative investigations which exceeded 180 days was 30% or more. This includes over 20% of all IA investigations as well as over 60% of all IPR investigations for the past two quarters. We discuss the reasons the PPB indicated cases have exceeded the 180-day timeline in our assessment of Par. 123, and we also spoke with IPR with respect to overdue cases. In our discussions with them, IPR cites several cases requiring them to wait until a member returns from protected leave (which is not currently allowed to be tolled) as well as the overall complexity of some cases they have investigated. For instance, IPR noted several "bad boss" complaints (e.g., complaints against the actions of higher-ranking members). In these cases, the subjects of the complaints have hired legal representation, causing delays in being able to schedule interviews. Scheduling interviews through legal representation has also delayed IPR's ability to swiftly conduct investigations opened as a result of tort complaints. Whereas intake investigations may

normally take five to six days, it may take five to six weeks when the complainant has legal representation.

For the most recent two quarters for which 180 days could have passed, the proportion of cases which have been completed within the Par. 121 timeline has significantly dropped when compared with prior quarters. For instance, in three of the four quarters prior, less than 15% of cases exceeded the 180-day timeline. The two most recent quarters have more than doubled this mark and based on the available evidence (see our assessment of Pars. 123, 128, and 131), we are not confident that the issue will soon be resolved. We therefore must find that the PPB and the City have fallen out of Substantial Compliance with the requirements of Par. 121.

To return to Substantial Compliance, we maintain our recommendation to evaluate lethal force events as case studies in order to identify opportunities to reduce timelines with these high-visibility events. In addition, we now recommend including in this evaluation cases that are returned for additional investigation (see our assessment of Par. 123) as well as complaints stemming from lawsuits and other such events where legal representation prevents the timely resolution of the complaint. For these events, creative solutions may be necessary such as determining an alternate path for collecting information when a person's legal representation is barring a timely interview. Additionally, the City may consider an amendment to the Settlement Agreement to allow for tolling in instances of protected leave as these are instances where investigators are reasonably required to delay their investigation. Regardless, as a neutral party "calling balls and strikes", we must find that two consecutive quarters of less than 70% compliance with the 180-day timeline requires remedial action on the part of the PPB and the City.

| | |
|---|---|
| **COCL Recommendations** | • To return to Substantial Compliance, conduct case-study evaluation on OIS events, other high-visibility cases, cases that are returned for additional investigation, and cases involving legal representation to identify unique opportunities for reducing timelines |
| **Assessment Based On** | IPR data indicating adherence to 180-day timeline |

**Exhibit A**

| Settlement Agreement Paragraph | |
|---|---|
| 122. PPB shall conduct administrative investigations concurrently with criminal investigations, if any, concerning the same incident. All administrative investigations shall be subject to appropriate tolling periods as necessary to conduct a concurrent criminal investigation, or as otherwise provided by law, or as necessary to meet the CRC or PRB recommendation to further investigate. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review Criminal-IA Concurrent Investigation Audit Reports; Review Directive 0330.00 |
| **Compliance Assessment** | |
| In Q1 of 2023, the PPB continued to provide documentation indicating when an Internal Affairs investigation began compared to when the criminal investigation began. In this quarter, there were two cases that required both a criminal and an Internal Affairs investigation. In both cases, the Internal Affairs investigation and criminal investigation were initiated on the same day and a review of the AIM data associated with one case indicates that investigation actions occurred during the pendency of the criminal investigation[23]. We therefore find that each case met the criteria for "concurrent" and, as a result, continue to find that the PPB has maintained Substantial Compliance with Par. 122. | |
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Based On** | Criminal-IA Concurrent Investigation Audit reports |

---

[23] AIM data provided to COCL did not contain any data for one case. We have inquired with IPR as to the reason for the omission.

| **Settlement Agreement Paragraph** |
| --- |
| 123. If PPB is unable to meet these timeframe targets, it shall undertake and provide to DOJ a written review of the IA process, to identify the source of the delays and implement an action plan for reducing them. |

| **Compliance Label** | Substantial Compliance |
| --- | --- |
| **Methodology** | Review Administrative Investigations Report |

**Compliance Assessment**

In the first quarter of 2023, the PPB closed 34 administrative investigations, six of which exceeded the 180-day timeline. The PPB provided the COCL with an Administrative Investigations Report for each of these six cases as well as a report for cases which did not exceed the 180-day total timeline, but exceeded the timeline for one or more individual investigative stages. For the six cases which exceeded the 180-day timeline, the PPB identified "three issues which were the substantial cause of delays" in the six cases, including cases being returned for additional investigation, delays in scheduling PRBs (see also our assessment of Par. 131), and missed case referrals to Internal Affairs. For these, the PPB also identified remedies, including greater supervisory oversight of investigations, increasing the number contracted PRB facilitators, and reminders to IA command to better monitor incoming referrals. Although we discuss the implications of some of these reasons in other paragraphs (for instance, see our assessment of Par. 131), we find that the process intended by Par. 123 was followed for these six cases.

Additionally, we continue to evaluate stage timelines to see whether consistent processes occurred at a micro-level. During this quarter, of the 28 cases that did not exceed the 180-day timeline overall, 25 had at least one investigation stage exceed the stage-timeline.[24] In some cases, the delays were caused by the case being sent back for additional investigation. In other cases, delays were due to PPB members being out on protected leave, multiple reviews in certain investigation stages, and interviews being delayed during the holidays. In none of

---

[24] Additionally, there were three cases that did not exceed the 180-day timeline and also did not exceed the stage timelines.

the cases which had stages exceed their individual timelines (but the case was resolved in 180 days) did we see recommendations for improving the stage timeline.

Because the PPB has continued to document clear explanations for cases that exceed their allotted timeline, as well as take remedial action to address reasons for delays, we continue to find them in Substantial Compliance with the requirements of Par. 123. However, we maintain our ongoing suggestion that supervisors identify remedies for delays in individual stages, even if the entire investigation timeline was under 180-days.

| | |
|---|---|
| **COCL Recommendations** | • Maintain self-improvement loop for stages that exceed their stage timeline even if the case does not exceed the 180-day timeline |
| **Assessment Based On** | Administrative Investigations Report |

## B. On Scene Public Safety Statements and Interviews

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 124. Within 90 days of the Effective Date, the City and PPB shall review its protocols for compelled statements to PSD and revise as appropriate so that it complies with applicable law and current professional standards, pursuant to *Garrity v. New Jersey*, 385 U.S. 493 (1967). The City will submit the revised protocol to DOJ for review and approval. Within 45 days of obtaining DOJ's approval, PPB shall ensure that all officers are advised on the revised protocol. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review Directive 1010.10 |

| **Compliance Assessment** | |
| --- | --- |
| During the first quarter of 2023, the PPB maintained their protocols for compelled statements to PSD and all officers have been advised on the protocol. As a result, we find the PPB has maintained compliance with Par. 124. | |
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Based On** | Current PPB policy |

| **Settlement Agreement Paragraph** | |
| --- | --- |
| 125. Separation of all witnesses and involved officers to lethal force events is necessary in order to safeguard the integrity of the investigation of that event. Immediately following any lethal force event, PPB shall continue to issue a communication restriction order ("CRO") to all witness and involved officers, prohibiting direct or indirect communications between those officers regarding the facts of the event. The CRO will continue, unless extended further, until conclusion of the Grand Jury or, if no Grand Jury is convened, until a disposition is determined by the District Attorney. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Reviewed CROs for 2022 Second Quarter OIS events |
| **Compliance Assessment** | |
| In the first quarter of 2023 there were no OIS incidents. In previous reporting periods, the PPB issued CROs when OIS incidents occurred, and therefore, we continue to find the PPB in Substantial Compliance with the requirements of Par. 125. | |

| COCL Recommendations | • No recommendations at this time |
|---|---|
| **Assessment Based On** | CROs for 2022 first quarter OIS events |

### Settlement Agreement Paragraph

126. PPB shall continue to require witness officers to lethal force events to give an on-scene briefing to any supervisor and/or member of the Detective Division to ensure that victims, suspects, and witnesses are identified, evidence is located, and provide any information that may be required for the safe resolution of the incident, or any other information as may be required.

| **Compliance Label** | Partial Compliance |
|---|---|
| **Methodology** | Review Officer-Involved Shooting case file excerpts |

### Compliance Assessment

During the first quarter of 2023, there were no OIS incidents and therefore no need for on-scene walkthroughs.

However, in our 2021 Q3 report, as well as our 2022 Q2, Q3 and Q4 reports, we noted that the PPB should review and revise Directive 1010.10 to include mental health in the definition of officer incapacitation as a reason not to complete an on-scene walkthrough, as well as establish criteria and training to evaluate and determine when someone meets the criteria. As of the writing of this report, Directive 1010.10 has not been revised and we therefore continue to find that the PPB has not returned to Substantial Compliance with the requirements of Par. 126.

| **COCL Recommendations** | • To achieve Substantial Compliance, revise Directive 1010.10 to allow for the potential for witness officers being incapacitated for mental health reasons<br><br>• Provide criteria to make such a determination |
|---|---|
| **Assessment Based On** | OIS case file excerpts; Review of Directive 1010.10 |

---

### Settlement Agreement Paragraph

127. In agreement and collaboration with the Multnomah County District Attorney, PPB shall request that involved officers in lethal force and in-custody death events provide a voluntary, on-scene walk-through and interview, unless the officer is incapacitated.

| **Compliance Label** | <span style="background-color:green">Substantial Compliance</span> |
|---|---|
| **Methodology** | Review Officer-Involved Shooting case file excerpts |

### Compliance Assessment

In the first quarter of 2023, there were no OIS incidents. Because there are no new OIS incidents, and the PPB had maintained Substantial Compliance in previous quarters, we continue to find that PPB has substantially complied with the requirements of Par. 127.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | OIS case file excerpts. |

**C. Conduct of IA Investigations**

---

**Settlement Agreement Paragraph**

128. Currently, both IPR and PPB's PSD have authority to conduct administrative investigations, provided that IPR interview of PPB Officers must only be conducted jointly with IA. Within 120 days of the Effective Date, the City will develop and implement a plan to reduce time and effort consumed in the redundant interview of witnesses by both IPR and IA, and enable meaningful independent investigation by IPR, when IPR determines such independent investigation is necessary.

| | |
|---|---|
| **Compliance Label** | Partial Compliance |
| **Methodology** | Interviews of PPB and City Staff |

**Compliance Assessment**

During the first quarter of 2023, both IPR and IA maintained their respective administrative investigations using the system we have previously found compliant with Par. 128. Aside from their own independent investigations, our review of cases this quarter also highlighted IPR's thorough effort in conducting intake investigations for follow-up by the PPB, particularly the range and depth of information collected during the intake process.

However, the City and the PPB continue to be in Partial Compliance for several reasons. First, we are still awaiting resolution with respect to the Records Division backlog of documents. As indicated in our last report, we will need to see evidence that trends are being reversed and the backlog is being reduced before finding Substantial Compliance.

Additionally, IPR has experienced operational limitations that has impacted their ability to conduct "meaningful independent investigations," either as a result of City failures or due to IPR's current existential situation. For instance, the separation from the Auditor's Office was not appropriately documented in City records, as IPR indicates they were delayed several months in hiring an individual because of the time it took to convince the City's payroll department that they were now independent from the Auditor's Office. Additionally, an investigation that went over the 180-day timeline was unnecessarily delayed when the City's litigation team failed to share critical information with IPR that would have allowed IPR to

---

close the investigation (though IPR indicates there is now improved communication with the City's litigation team). Finally, IPR's staff continue to experience the strain of not knowing the extent of their future work given the forthcoming new accountability system. At times, there is frustration in not knowing when a final resolution might occur.

| **COCL Recommendations** | • To achieve Substantial Compliance, address the identified gap in the size of the records backlog<br><br>• To achieve Substantial Compliance, limit future operational limitations by providing IPR the necessary support and collaboration |
| --- | --- |
| **Assessment Based On** | Ongoing Records Division Backlog |

---

### Settlement Agreement Paragraph

129. The City and PPB shall ensure that all allegations of use of excessive force are subject to full and completed IA investigations resulting in findings, unless there is clear and convincing evidence to IPR that the allegation has no basis in fact.

| **Compliance Label** | <mark>Partial Compliance</mark> |
| --- | --- |
| **Methodology** | Review administrative closure justifications for allegations of excessive force |

### Compliance Assessment

In the first quarter of 2023, data provided by IPR had two complaints containing allegations of excessive force that were administratively closed by IPR. In both cases, the complaints were administratively closed with the closure category of "no misconduct." (The remaining 11 cases that included allegations of force were investigated, with some of those investigations concluded by the close of the first quarter). In the first case, the complainant claimed that officers harmed them while arresting them. However, there was video evidence, reports from

the involved officers, and medical evidence that led IPR to administratively close the complaint. In the second case, the complaint was related to a previously submitted (and investigated) complaint. The two allegations in the first complaint -- one on control (during an arrest), and one for courtesy -- had been administratively closed and sent for Supervisory Investigation, respectively. In the subsequent filed case, the complainant added a force allegation stating that officers had harmed them when they responded to a call for service. IPR investigators reviewed the new information, including interview transcripts and audio recordings from the first investigation. It was determined, based on the available information, that the officers did not physically harm the complainant. We find that both of these cases fall within the exception allowed by Par. 129.

However, in our prior reports, we have noted trends and concerns which have prevented the PPB from achieving Substantial Compliance. First, we have previously identified instances wherein supervisors did not forward an on-scene allegation of excessive force for a full investigation as required by this paragraph. For these incidents, one does not appear to have been opened for an investigation[25] and we are unaware as to the status of the other event (which we had raised in our last report). As a result of these and other instances we have raised, we maintain our recommendations from prior reports that accountability mechanisms should be initiated for supervisors who fail to forward on-scene allegations for a full investigation.

In previous reports, we have also noted IPR's use of the "complainant unavailable" closure category, recommending that IPR codify its use within its SOPs. In the third quarter of 2023, the IPR provided an updated SOP and we will provide updates during our Q3 report. However, for this quarter, we continue to find Partial Compliance.

| | |
|---|---|
| **COCL Recommendations** | <ul><li>To return to Substantial Compliance, initiate accountability mechanisms for the supervisor who failed to forward the allegation for full investigation</li><li>To return to Substantial Compliance, re-emphasize the responsibilities of on-scene supervisors and provide documentation of efforts to COCL</li></ul> |

---

[25] For this case, we had originally been informed that an administrative investigation had been opened. However, we were recently told that IPR had been unsuccessful in contacting the subject of force and therefore the incident was categorized as a Community Contact.

| **Assessment Based On** | Administrative closure of allegations of excessive force |
| --- | --- |

| **Settlement Agreement Paragraph** | |
| --- | --- |
| 130. The City and PPB shall continue to expressly prohibit all forms of retaliation, including discouragement, intimidation, coercion, or adverse action, against any person who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review Directive 310.20 |
| **Compliance Assessment** | |
| During the first quarter of 2023, the PPB maintained Directive 310.20 (Discrimination, Harassment, and Retaliation Prohibited) which contains the requirements of Par. 130 (see Policy #2 within the Directive). During the first quarter of 2023, there was one complaint involving Directive 310.20 which was administratively closed by IPR for lack of investigative merit. As PPB continues to maintain Directive 310.20 and we continue to see instances where it is invoked, we continue to find Substantial Compliance with the requirements of Par. 130. | |
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Based On** | Directive 310.20 |

| **Settlement Agreement Paragraph** |
|---|
| 131. <u>COCL Summary</u>. Paragraph 131 states that "The City and PPB shall retain Police Review Board procedures currently utilized for purposes of investigation and making recommended findings on administrative complaints, except as outlined below." The subsections of Par. 131 refer to PRB membership, rotation of CRC members serving on the PRB, requirements and qualifications for PRB members, provisions for removing community members or CRC members serving on the PRB, term limits for CRC members serving on the PRB, the requirement for CRC members to recuse themselves from the CRC if part of the PRB hearing the case, and stipulated discipline. (For details and exact language, see the Settlement Agreement). |

| **Compliance Label** | <mark>Partial Compliance</mark> |
|---|---|
| **Methodology** | Review Directive 336.00; Review City Code 3.20.140 |

| **Compliance Assessment** |
|---|
| The PPB's Directive 336.00 and the City's Code 3.20.140 have been maintained, outlining the PRB operations. In the first quarter of 2023, we observed one PRB which did not follow PRB procedures with respect to a training review as required in lethal force events. In that case, the event was not initially categorized as lethal force but contained a fact pattern which both the COCL and DOJ have previously stated should result in being treated as a lethal force event (at least for the purposes of PRBs). This failure contributes to our finding that the City and the PPB remain in Partial Compliance for this paragraph. |
| Further contributing to our finding of Partial Compliance are limitations in the PRB's overall operational processes. As discussed as a cause for delay in Par. 123, the PPB has faced significant barriers recently in getting cases in front of a PRB due to the fact that they presently only have one contracted facilitator for PRBs. Therefore, PRB schedules (and the schedules of all participants) are tied to the availability of a single person. The City is currently working on a solution to add an additional facilitator, though this may require a change to City Code 3.20.140. This has also caused several cases to go over the 180-day timeline. |
| As a result of these issues, as well as the failure to address COCL's prior recommendations, we continue to find Partial Compliance with the requirements of Par. 131. |

**Exhibit A**

| | |
|---|---|
| **COCL Recommendations** | • To return to Substantial Compliance, conduct PRBs in accordance with prior COCL and DOJ guidance<br><br>• To return to Substantial Compliance, increase the facilitator pool that the City relies on |
| **Assessment Based On** | Observation of PRBs and PRB documents |

**Settlement Agreement Paragraph**

132. By majority vote, the PRB may request that investigations of misconduct be returned to its investigating entity, i.e., PSD or IPR, to complete the investigation as to factual matters necessary to reach a finding regarding the alleged misconduct. The investigating entity must make reasonable attempts to conduct the additional investigation or obtain the additional information within 10 business days or provide a written statement to the PRB explaining why additional time is needed.

| | |
|---|---|
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review PPB Directive 336.00 |

**Compliance Assessment**

During the first quarter of 2023, the PPB maintained Directive 336.00 (Police Review Board) which memorializes the authority of PRB to send a case back for additional investigation. There were no such instances during this quarter. As Par. 132 has been placed into policy and adequately covered, we find the PPB has maintained Substantial Compliance with the requirements of this paragraph.

| | |
|---|---|
| **COCL Recommendations** | • No recommendations at this time |

| **Assessment Based On** | PPB Directive 336.00 |
| --- | --- |

| **Settlement Agreement Paragraph** | |
| --- | --- |
| 133. <u>COCL Summary</u>: Paragraph 133 states that, "If an officer's use of force gives rise to a finding of liability in a civil trial," PPB shall be required to take various actions. The subsections of Par. 133 include requirements for findings of liability including EIS documentation, re-evaluation for specialized units, automatic IA investigations, review of previous IA investigation if one was already completed, and a published summary if IA investigation did not reach the same finding. (For details and exact language, see the Settlement Agreement). | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review S.O.P. #32 and #42 |
| **Compliance Assessment** | |
| During the first quarter of 2023, the PPB maintained S.O.P. #32 (Civil Liability and Tort Claims) and S.O.P. #42 (Evaluation of Members Fitness to Participate in All Current and Prospective Specialized Units when the Use of Force Results in a Finding of Liability in a Civil Trial). The combination of these two S.O.P.s contains the requirements of Par. 133. Given this and the fact that no new findings of liability occurred in the first quarter of 2023, we continue to find Substantial Compliance with the requirements of this paragraph. | |
| <u>**COCL Recommendations**</u> | ● No recommendations at this time |
| <u>**Assessment Based On**</u> | S.O.P. #32 and #42 |

**Exhibit A**

**D. CRC Appeals**

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 134. The City shall expand the membership of the CRC to 11 members, representative of the many and diverse communities in Portland, who are neutral, unbiased, and capable of making objective decisions. The quorum of CRC members necessary to act may remain at its existing level. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review City Code 3.21.080 Review CRC meeting; communication with City staff |
| **Compliance Assessment** | |

CRC continues to have 11 members, which includes community members who are representative of the community at large. During the first quarter of 2023, the CRC met three times – one meeting each month. The meeting recordings can be found on the Auditor's Office website[26] as well as the meeting minutes.[27] In observing the CRC meetings for this quarter, we find that the operation of CRC does not suffer from the dysfunction and infighting we saw in prior quarters. Additionally, while no appeals occurred during this quarter, the CRC continued discussing ways in which they could contribute to the transition to the new accountability system.

The CRC, and the volunteer members within it, find themselves in an uncertain position. At some point, they are likely to be disbanded as the new accountability system takes place and, as such, the committee appears to be operating in an overall state of limbo. While they are currently preparing some type of "lessons learned" document to assist in the transition to the new accountability system, they are otherwise waiting for the new system to begin. We recognize the impact this uncertainty may have on the CRC's volunteer members and express our gratitude for their dedication to the committee during this transition period. As the CRC

---

[26] https://efiles.portlandoregon.gov/Record/14957290/

[27] https://efiles.portlandoregon.gov/Record/15919064/

**Exhibit A**

| | |
|---|---|
| does not suffer from the operational concerns we have identified in the past, we find they have returned to Substantial Compliance. | |
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Based On** | City Code 3.21.080; Review of CRC Minutes and CRC related personnel |

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 135. The City and PPB agree that the CRC may find the outcome of an administrative investigation is unreasonable if the CRC finds the findings are not supported by the evidence. | |
| 136. In its review process for purposes of the appeal, the CRC may make one request for additional investigation or information to the investigating entity, i.e., PSD or IPR at any point during its review. The investigating entity must make reasonable attempts to conduct the additional investigation or obtain the additional information within 10 business days or provide a written statement to the CRC explaining why additional time is needed. The request for additional investigation or information may contain multiple points of inquiry, but no follow-up requests will be permitted. The additional request may be voted on by a quorum, the members voting must have read the Case File in order to vote, and any request with multiple points of inquiry must be prioritized. | |
| **Compliance Label** | 135. Substantial Compliance |
| | 136. Substantial Compliance |
| **Methodology** | Review PSF-5.03; Communications with City staff and CRC leadership |
| | |

| **Compliance Assessment** | |
|---|---|
| The City maintains PSF-5.03 which memorializes CRC's authority as related to Pars. 135 and 136. No appeals occurred during this quarter and therefore these paragraphs were not implicated. We continue to find the City has maintained Substantial Compliance with this paragraph. | |
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Based On** | Charter Code and Policy Code PSF-5.03; Meeting observations |

### E. Discipline

| **Settlement Agreement Paragraph** | |
|---|---|
| 137. Within 60 days of the Effective Date, PPB and the City shall develop and implement a discipline guide to ensure that discipline for sustained allegations of misconduct is based on the nature of the allegation and defined, consistent, mitigating and aggravating factors and to provide discipline that is reasonably predictable and consistent. | |
| **Compliance Label** | Partial Compliance |
| **Methodology** | Review Corrective Action Recommendation documents; Review of Department of Justice Letter |
| **Compliance Assessment** | |
| For the first quarter of 2023, we reviewed ten Corrective Action Recommendation (CAR) documents provided by the PPB. For the majority of the CARs, the Commander provided mitigating and aggravating factors, rationale for their discipline recommendation, and any corrective action history. However, the CARs from one Commander that were provided to us consistently did not and the Commander instead only provided the policies which were | |

violated, thereby limiting how informative the CARs were. We suggest the PPB refresh the individual Commander on the information that is necessary to put into the CARs.

As noted in our prior report, the PPB does not have an updated Directive 338.00 (currently titled Discipline Guide) to reflect the new Corrective Action Guide, which has replaced the Discipline Guide. Also in prior reports, we have stated that the PPB would need to update the directive and post it to the PPB website by the end of the first quarter of 2023 to maintain Substantial Compliance. As of the end of this quarter, as well as of the drafting of this report, the Directive has not been updated and posted to the City's website. The PPB indicates that they currently have an Executive Order which temporarily supersedes Directive 338.00 and therefore serves as policy. However, in providing their conditional approval of the Corrective Action Guide, DOJ stated the approval was "subject to the City timely revising Directive 338.00" (emphasis added). As the conditional approval was given in February of 2022, the PPB had had considerable time to bring the policy in-line with current operations though has not yet done so. As a result, we must find that the City has lost compliance with the requirements of Par. 137. To return to Substantial Compliance, the PPB should update Directive 338.00, publicly post the directive, and provide a link to the Corrective Active Guide.

| **COCL Recommendations** | • To return to Substantial Compliance, update Directive 338.00, publicly post the directive, and provide link to the Corrective Active Guide |
|---|---|
| **Assessment Based On** | Corrective Action Recommendations; Failure to update Directive 338.00 |

### F. Communication with Complainant and Transparency

| **Settlement Agreement Paragraph** |
|---|
| 138. Within 180 days of the Effective Date, the City shall enhance its existing website to ensure that a complainant can file and track his or her own complaint of officer misconduct.<br><br>139. Within 120 days of the Effective Date, the City shall review its protocols to ensure that the City shares with complainants requested documentation about his or her own complaint to the extent permitted by law. |

140. The City shall ensure that IPR provides each complainant a tracking number upon receipt of the complaint, informs each complainant of the complaint classification, assignment (precinct or IA) and outcome of the compliant (sustained, unproven, etc.) in writing (whether mail, email/text, or fax), including information regarding whether the City took any corrective action. The City Attorney's Office shall determine whether disclosures regarding corrective action are required on a case-by-case basis consistent with Oregon's Public Records Law.

| | |
|---|---|
| **Compliance Label** | 138. Substantial Compliance |
| | 139. Substantial Compliance |
| | 140. Substantial Compliance |
| **Methodology** | Review IPR website; Review IPR policy; Review findings letters |

### Compliance Assessment

We continue to see evidence of IPR conforming with Pars. 138, 139, and 140. IPR has maintained many different avenues for submitting a complaint. When an individual submits a complaint online, they receive a unique tracking number and can request a status update with that number. If they submit a complaint through another avenue, such as mail, telephone, or walk in, the IPR employee will submit the complaint through their online system to generate a tracking number which will be given to the complainant. IPR and the City will share requested documents with complainants in line with Oregon Public Records Request laws. From a protocol and operation standpoint, IPR has systems in place to ensure that they are complying with the requirements of Pars. 138, 139, and 140.

As with previous quarters, we reviewed a random sample of case files with the requirements of these paragraphs in mind. We were able to locate consistent documentation sent to complainants regarding the status of their cases, including when the cases were opened, when findings had been made, and when the cases were closed. As such, the COCL finds that the City is in Substantial Compliance with Pars. 138, 139, and 140.

| COCL Recommendations | • No recommendations at this time |
|---|---|
| **Assessment Based On** | IPR policy; Complaint tracking webpage; Finding and closure letters to complainant; Interview of IPR personnel |

| **Settlement Agreement Paragraph** |
|---|
| 169. PPB shall apply policies uniformly and hold officers accountable for complying with PPB policy and procedure. |

| **Compliance Label** | Partial Compliance |
|---|---|
| **Methodology** | Review sample of accountability cases; Review use of force events; Review EIS entries; Review force audit; Interviews with PPB and City personnel |

| **Compliance Assessment** |
|---|

As demonstrated in our assessment of other paragraphs, the accountability system operating within the PPB and the City continues to demonstrate both strengths and weaknesses. For instance, during this quarter, we continued to find that each administrative complaint we reviewed[28] had been handled appropriately (either as an administrative closure, SI, PR, or full investigation). Additionally, we found that each case we reviewed led to an investigation with findings, was conducted in accordance with best practices, and the findings were reasonable under a preponderance of evidence standard.

However, in our last report, we identified a number of barriers to the overall accountability system which led us to find that the PPB and the City had not been able to "apply policies uniformly and hold officers accountable for complying with PPB policy and procedure." These barriers included the chain-of-command, on-scene supervisors, the PRB process, and a lack of objective video evidence by way of BWCs. In various events reviewed for this quarter, we find that these barriers remain.

---

[28] On a quarterly basis, the COCL reviews 20 randomly selected cases which include all investigative pathways a complaint might take

Furthermore, during this quarter, we identified a different barrier present in the accountability system as it relates to reliable and consistent tracking of accountability system data. In reviewing the use of force cases for this quarter, we identified an incident where the AAR process found an officer had violated Directive 315.30 (Satisfactory Performance). However, in speaking with the PPB, we were informed that the policy violation was dealt with via supervisor counseling and therefore was not forwarded on to IA. We take no position on the appropriateness of this decision, though we also note that the PPB indicated this policy violation would not be captured in the Administrative Investigation Management (AIM) System and therefore, would not be reported with other complaints. Furthermore, this has implications for the Corrective Action Report. Specifically, should the officer be subjected to discipline in the future, supervisors will be unaware of that prior history based on the AIM data used to identify prior misconduct history. Therefore, data management serves as an additional barrier to the accountability system.

We continue to believe that the investigative abilities of the City and the PPB remain strong overall and when an investigation is conducted, it is conducted comprehensively. However, the accountability system is not reliable if barriers to entry are not addressed, and the system does not result in fair and consistent resolutions. We therefore continue to find that Par. 169 remains in Partial Compliance.

| | |
|---|---|
| **COCL Recommendations** | • To achieve Substantial Compliance, PPB should expand their approach to conducting objective investigations and hold officers accountable when policy violations are found<br><br>• To achieve Substantial Compliance, remedy barriers to ensure a fair and consistent accountability system |
| **Assessment Based On** | Sample of accountability cases; Sample of use of force events; Interviews with PPB and City personnel |

**Accountability Outcome Assessment**

For this Accountability Outcome Assessment, the COCL used IPR data from January 1, 2020 to March 31, 2023 to examine the system of measurement in place to document allegations of complaints against PPB officers and investigative findings.

_Allegations and Complaints_

Since January 1, 2020, a total of 937 complaints have been made against PPB members, including a total of 2,027 allegations. Since the second quarter of 2020, the overall number of complaints and allegations have decreased noticeable, and remained lower in 2021 and 2022 (see Figures 8.1 and 8.2). However, the trend reversed in the first quarter of 2023. For instance, compared with first quarter of 2022, the number of complaints in the first quarter of 2023 increased by 61%. Across all quarters in the data, there has been an average of 2.15 allegations per complaint with little variance across quarters (see Figure 8.3).

**Figure 8.1**



**Figure 8.2**



**Figure 8.3**



*Complaints by Precinct*

We also examined the data by Precinct. A total of 618 complaints were distributed across the PPB's three Precincts (See Table 8.1). The East Precinct received the most complaints (27.3%), while the North Precinct received the fewest (15.5%).

**Table 8.1**

| Complaints by Precinct[29] | |
|---|---|
| Precinct | Count of Complaints (%) |
| Central | 217 (23.2%) |
| East | 256 (27.3%) |
| North | 145 (15.5%) |

When we break out complaints by quarter for each precinct (see Figure 8.4), we see that the sizeable increase in the most recent quarter is driven largely by the East Precinct, which jumped from an average of less than 15 complaints per quarter to 37 complaints in the first quarter of 2023.

**Figure 8.4**



---

[29] Percentages do not equal 100% as members in other units or divisions (e.g., TOD) may also receive complaints.

*Allegation Type*

The most frequently reported allegations are related to Conduct (29.4%), Force (23.8%), and Procedure (28.8%), which make up nearly 90% of all allegations (See Table 8.2). These are the three most common allegations across the entire dataset, although we note that Procedure allegations have significantly increased in recent quarters. As shown in Figure 8.5, Procedure allegations have become the most common allegation in the last three quarters after being the third most common in the prior three quarters. For instance, the number of procedure allegations increased from 37 in the fourth quarter of 2022 to 88 in the first quarter of 2023, equating to a 137.8% increase. (The PPB received a total of 189 allegations during the first quarter of 2023). Force allegations also saw a 57.9% increase between the fourth quarter of 2022 and the first quarter of 2023. Finally, conduct allegations saw an increase of approximately 33.3% during this same period.

**Table 8.2**

| Allegations from Jan. 1, 2020, to March 31, 2023 | |
|---|---|
| **Allegation Type** | **Number of Allegations (%)** |
| Conduct | 596 (29.4%) |
| Control | 32 (1.6%) |
| Courtesy | 232 (11.4%) |
| Disparate Treatment | 58 (2.9%) |
| Force | 482 (23.8%) |
| Policy Issue | 12 (0.6%) |
| Procedure | 584 (28.8%) |
| Blank | 31 (1.5%) |
| **Total** | **2027** |

**Figure 8.5**



### Initiation

As shown in Table 8.3, the majority of complaints are initiated by citizens (averaging 80.4% of all complaints). However, the number of Bureau-initiated complaints substantially increased in the first quarter of 2023 to a total of 39, compared to an average of 8.5 per quarter in 2021 and 11.25 in 2022. This may be due to increased attention by supervisors to minimize misconduct under the Settlement Agreement, but other factors may be at play as well.

**Table 8 .3**

| Complaint Initiation | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **2020** | | | | **2021** | | | | **2022** | | | | **2023** |
| | **Q1** | **Q2** | **Q3** | **Q4** | **Q1** | **Q2** | **Q3** | **Q4** | **Q1** | **Q2** | **Q3** | **Q4** | **Q1** |
| Citizen Initiated | 67 | 116 | 98 | 55 | 52 | 57 | 46 | 38 | 50 | 39 | 44 | 44 | 50 |
| Bureau Initiated | 16 | 24 | 13 | 13 | 14 | 6 | 7 | 7 | 5 | 16 | 12 | 12 | 39 |

*Individual Officers*

Consistent with prior Outcome Assessments, we evaluated the complaint data to identify members who demonstrated significantly higher numbers of complaints compared with others (see Table 8.4). For this analysis, we only included members who had one or more complaints, which amounted to a total of 537 identifiable members[30] in a Bureau with 806 sworn members. In reviewing the data, there were 28 members who had six or more complaints against them since 2020. The remaining 509 members had five or fewer complaints in this timeframe. The 28 members with six or more complaints accounted for approximately 20% of the total number of complaints made since 2020, but only 3.5% of the total police force.

**Table 8.4**

| Number of Complaints | Total Officers with Number of Complaints |
|:---:|:---:|
| 12 | 2 |
| 11 | 1 |
| 10 | 4 |
| 9 | 4 |
| 8 | 3 |
| 7 | 3 |
| 6 | 11 |
| 5 | 14 |
| 4 | 29 |
| 3 | 75 |
| 2 | 124 |
| 1 | 267 |

[30] In the data, several complaints were made against unknown members. For this analysis, we excluded any complaint involving an unknown member.

**Exhibit A**

*Findings*

If an allegation proceeds to a full investigation (not closed), there are four possible results: sustained, not sustained, unfounded, and exonerated. A sustained finding occurs when the preponderance of evidence proves a violation of policy or procedure. Not sustained occurs when the evidence is insufficient to prove a violation of policy or procedure. Exonerated occurs when the preponderance of evidence proves the member's conduct was lawful and within policy. Finally, unfounded occurs when the preponderance of evidence proves the allegation was false or devoid of fact or there was no credible basis for a possible violation of policy or procedure.

For full investigations, the most common findings for an allegation are Not Sustained (32.4%) and Exonerated (31%) (see Figure 8.6). However, we note that the breakdown of findings varies by allegation type (see Figures 8.7 to 8.9). For example, when looking at full investigations involving an allegation of Force, the allegations are sustained only 4.3% of the time, while findings for allegations of Procedure are sustained 41.5% of the time. In fact, the proportion of sustained Force allegations is even smaller in recent quarters. Specifically, in the past four quarters (2022 Q2 to 2023 Q1), when considering the 52 Force allegations that received a full investigation, there has only been one sustained allegation of Force (1.9% of the cases).

**Figure 8.6**



**Exhibit A**

**Figure 8.7**



**Figure 8.8**



**Figure 8.9**



*Status*

When examining case status within the dataset, we found that the majority of cases appear to have been closed, particularly for those which were opened prior to the fourth quarter of 2022. However, some cases have remained open for significant periods of time, including six cases still open from 2020 and four cases still open from 2021. Table 8.5 below looks at <u>all</u> administrative complaints, including those which have been administratively closed. Therefore, this table should not be compared with our assessment of Par. 121, which discusses only those cases which are subject to full investigations.

**Table 8.5**

| Case Status | | | |
|---|---|---|---|
| **Quarter Opened** | | **Open** | **Closed** |
| 2020 | Q1 | 0 | 83 |
| | Q2 | 1 | 139 |
| | Q3 | 3 | 108 |
| | Q4 | 2 | 66 |
| 2021 | Q1 | 2 | 64 |
| | Q2 | 0 | 63 |
| | Q3 | 0 | 53 |
| | Q4 | 2 | 43 |
| 2022 | Q1 | 3 | 52 |
| | Q2 | 9 | 46 |
| | Q3 | 6 | 50 |
| | Q4 | 14 | 39 |
| 2023 | Q1 | 46 | 43 |

*Summary*

The COCL has conducted an Accountability Outcome Assessment looking at IPR data from January 1, 2020 to March 31, 2023. From this assessment, the COCL has concluded that IPR has maintained a sufficient system of data collection and analysis to keep the public informed about the extent and nature of police accountability. They have created a robust system to document allegations of complaints against PPB officers and investigative findings.

Clearly, the data in this system suggests that there are individual officers who are atypical in the number of citizen complaints against them and deserve additional attention from management. Furthermore, the number of fully investigated Force allegations that have resulted in a Sustained finding – about 4% overall and less than 2% in the last four quarters -- is notable and deserves further inquiry.

# IX. COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING

**Portland Committee on Community Engaged Policing (PCCEP)**

| Settlement Agreement Paragraph |
| --- |
| 141. To leverage the ideas, talent, experience, and expertise of the community, the City, in consultation with the DOJ, shall establish a Portland Committee on Community Engaged-Policing ("PCCEP"), within 90 days of the Effective Date of the relevant amendments to this Agreement. |
| 142. The PCCEP shall be authorized to: (a) solicit information from the community and PPB about PPB's performance, particularly with regard to constitutional policing; (b) make recommendations to the Chief, Police Commissioner, the Director of the Office of Equity and Human Rights, and community and, during the effective period of this Agreement, to the DOJ; (c) advise the Chief and the Police Commissioner on strategies to improve community relations; (d) contribute to the development and implementation of a PPB Community Engagement Plan; and (e) receive public comments and concerns. The composition, selection/replacement process and specific duties of the PCCEP shall be set forth in a separate Plan for Portland Committee on Community-Engaged Policing ("the PCCEP Plan") which shall be substantially similar to Exhibit 1 to this Agreement. Amicus AMAC and Intervenor PPA shall be consulted regarding and DOJ shall review and approve any amendments to the PCCEP Plan proposed to occur during the effective period of this Agreement. |
| 143. PCCEP's membership will come from a reasonably broad spectrum of the community. PCCEP members shall not have an actual or perceived conflict of interest with the City of Portland. |

| **Compliance Label** | 141. Substantial Compliance |
| --- | --- |
| | 142. Substantial Compliance |

| | 143. Substantial Compliance |
|---|---|
| **Methodology** | Observation of PCCEP meetings; Review of minutes, reports, and recommendations; Interviews with City staff and PCCEP |

**Compliance Assessment**

In the first quarter of 2023, PCCEP continued to function as a legitimate body for community engagement.

During the first quarter of 2023, the PCCEP held three full committee meetings (January 18, February 15, and March 15), as well as meetings of their Settlement Agreement and Policy Sub-Committee (January 4, February 1, and March 8), their Community Engagement Sub-Committee (January 11 and February 8), and their Racial Equity Sub-Committee (January 25). The community was able to participate in these meetings via Zoom.

The PCCEP also hosted a Town Hall with the COCL (February 1) to discuss the COCL's Q3 report and hosted a Town Hall on the Gunshot Detection Systems (March 1). Again, the community was able to participate via Zoom.

During the first quarter, the PCCEP approved a statement to the Court regarding the February 28 Status Conference. The PCCEP also prepared and submitted two recommendations in the first quarter. First, on February 28, they recommended that an Independent Monitor be hired to oversee the Settlement Agreement. Second, on March 15, they recommended that the City abandon its plans for a gunshot detection pilot program. The Mayor provided a written response to both recommendations.[31]

Three PCCEP recommendations dating back to the third quarter of 2021 had been pending a response from the City to PCCEP. The delays had been attributed to turnover and changes in staffing within the Mayor's Office; a staff member responsible for ensuring responses to PCCEP recommendations departed the Mayor's office in early 2021.

In the first quarter of 2022, the COCL lowered the compliance rating on Par. 142 to Partial Compliance, as PCCEP's ability to function effectively was compromised by the City's lack of responsiveness to PCCEP's recommendations. This issue was addressed by current City staff in the first quarter of 2023: Staff did a comprehensive search for records related to the PCCEP

---

[31] For a list of PCCEP recommendations and City responses, go to: https://www.portland.gov/pccep/pccep-recommendations

recommendations and sent a lengthy response to PCCEP members in mid-March regarding the recommendations. For example, staff shared a letter from the police chief to the Citizen Review Committee in response to their recommendations—which PCCEP voted to "support and amplify" in September 2021—that had not previously been sent to PCCEP. Thus, COCL has updated the compliance rating on Par. 142 to Substantial Compliance, now that this has been resolved.

The PCCEP Plan referenced in Par. 142 notes "the PCCEP shall meet at least twice per year with the Chief, the Police Commissioner, PPB Precinct Commanders, PPB Neighborhood Response Teams, and a representative of the Office of Neighborhood Involvement Crime Prevention to assess and solicit comment on PPB's activities in regards to community outreach, engagement, and problem-solving policing." The close of the first quarter of 2023 marks one year since the Mayor/Police Commissioner last attended a PCCEP meeting (March 30, 2022, to propose a PCCEP hiatus), and other than the Chief, the other parties noted in this section of the PCCEP Plan have not met with PCCEP to discuss community engagement and outreach. COCL recommends PCCEP specifically invite the Mayor to attend a meeting with a defined agenda, and the Mayor/Police Commissioner (in particular, as the official this body reports to directly) prioritize meeting with PCCEP, to maximize the group's effectiveness.

The City has made a good faith effort over the past three quarters to identify and recruit new PCCEP members. With some vacancies early in 2023, the City Council approved the appointment of two new members on February 15, thus allowing PCCEP to reach a full body of at-large adult members. However, the two youth positions were still vacant at the end of the first quarter. We encourage the City and PCCEP to make youth membership a priority because, historically, police nationwide have the most difficulty when interacting with youth.

As a full body, PCCEP comes from a reasonably broad spectrum of the community, with gender balance, and approximately half of the membership identifying as BIPOC. In this quarter, the COCL has not identified or been notified of an actual or perceived conflict of interest with a PCCEP member and the City of Portland.

| **COCL Recommendations** | • To maintain Substantial Compliance with Par. 142, the City should continue to respond to PCCEP's recommendations in a prompt and thorough manner, and the Mayor/Police Commissioner should fulfill the requirement to meet with PCCEP "at least twice per year" |
|---|---|

| | |
|---|---|
| | • To maintain Substantial Compliance with Par. 143, the City should continue to identify and recruit sufficient PCCEP members to maintain a full body<br><br>• The City, with guidance from PCCEP, should prioritize the recruitment and retention of youth members on PCCEP |
| **Assessment Based On** | Content of PCCEP meetings; Interview with City staff; Substance of reports and recommendations; Level of community engagement |

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 144. The City shall provide administrative support so that the PCCEP can perform the duties and responsibilities identified in this Agreement and in the PCCEP Plan. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Observation of PCCEP meetings; Review of minutes, reports, and recommendations; Interviews with City staff and PCCEP |

**Compliance Assessment**

PCCEP's staff support comes from the Community Safety Division (CSD) in the Office of Management and Finance. During the first quarter, PCCEP continued to be staffed by a full-time Project Manager, as well as part-time staff shared with other CSD advisory boards and commissions. This additional support includes a Unit Manager (0.25 FTE) and two Project Assistant (0.25 FTE x 2), bringing the total to 1.7 FTE. One Project Assistant left during the first quarter, thus lowering the total staff support to 1.5 FTE. The CSD has requested additional support for PCCEP as part of its FY2023-24 budget request.

Meeting notes are now being posted in a timely fashion on the meeting's event page. The COCL recommends PCCEP staff also consistently tag these records in the Documents section of PCCEP's website to allow PCCEP members and members of the public to use the filter function and easily find all past minutes, for example, in one place. Videos of meetings have

continued to be posted in a timely manner on YouTube, and the link to PCCEP's YouTube channel is accessible from PCCEP's home page.

We continue to recommend that the City maintain timely posting of information about PCCEP's work so that the public is kept informed about these community engagement opportunities and productions. In addition, we recommend the City continue to fully support the PCCEP staff in their roles.

| | |
|---|---|
| **COCL Recommendations** | • To maintain Substantial Compliance, continue adequate staffing dedicated to supporting PCCEP <br><br> • To maintain Substantial Compliance, continue posting minutes of PCCEP meetings within 10 business days after a PCCEP meeting, including in the Documents section of PCCEP's website |
| **Assessment Based On** | Review of PCCEP website and YouTube channel; Interviews with staff |

**Portland Police Bureau's Role in Public Engagement and Outreach**

*System Overview*

Under the Settlement Agreement, the PPB is expected to introduce or expand its systems of community engagement, both with PCCEP and other resources. This includes maintaining or expanding its systems of measurement to better understand police-community relations and develop tailored responses to issues or concerns.

*The Community Engagement Plan*

| |
|---|
| **Settlement Agreement Paragraph** |
| 145. To ensure constitutional policing, to closely interact with the community to resolve neighborhood problems, and to increase community confidence, PPB shall work with City resources knowledgeable about public outreach processes to develop and finalize a CEO Plan. |
| 146. Within 120 days of the effective date of the relevant Amendments to this Agreement, the City, in consultation with the PCCEP, will conduct another reliable, comprehensive and |

| | |
|---|---|
| | representative survey of members of the Portland community regarding their experiences with and perceptions of PPB's community outreach efforts and accountability efforts and where those efforts could be improved, to inform the work of the PCCEP and the development and implementation of the Community Engagement Plan. |
| **Compliance Label** | 145. Substantial Compliance |
| | 146. Substantial Compliance |
| **Methodology** | Monitor progress on the implementation of the Community Engagement Plan; Interview City personnel and advisory groups members about community engagement and support |

**Compliance Assessment**

The COCL continues to use PPB's Community Engagement Plan (CEP) to provide the framework for evaluating compliance with Par. 145 and 146. The Plan has four components: Public involvement, Communications, Access, and Training. The COCL's assessment of this Plan has been incorporated into the Community Engagement Outcome Assessment at the end of Section IX. At this point, COCL will simply say that the evidence is sufficient in the first quarter of 2023 to show that PPB should remain in Substantial Compliance for Paragraphs 145 and 146. The Office of Community Engagement, with the support of advisory groups, continues to explore innovative programs and training lessons to build new partnerships between the police and the community. Although PPB is still in compliance, we have several concerns that are expressed in the Community Engagement Outcome Assessment and reflected in our recommendations below.

For Par. 146, the City has not conducted a police-focused community survey for several years, and PPB's advisory groups are considering a similar survey in 2023. Certainly, another citywide survey would help Portland understand the level of community engagement by the PPB, especially their level of outreach for community crime prevention. However, this should not be confused with the contact survey proposed by COCL, which measure the quality of the community's actual encounters with PPB officers when seeking services (such as crime victims) and when being stopped for law enforcement purposes. This distinction is discussed in greater detail under Par. 149.

| | |
|---|---|
| **COCL Recommendations** | For Par. 145:<br><br>• To maintain Substantial Compliance, make equity and procedural justice training a higher priority and engage additional community and police experts in these training initiatives<br><br>• Seek to improve access to police and City services for individuals with hearing impairments through updated policy, and training<br><br>• Officers' use of the Community Events App should be mandatory, not voluntary, and memorialized in a PPB directive and new training<br><br>• In the absence of the Alliance for Community Safety advisory group, the PPB should reach out to some active members of the LGBTQIA2S+ community and seek to restore a working partnership. |
| **Assessment Based On** | Reviews of City and PPB reports; Feedback from the City, PPB, and advisory groups; Implementation of the Community Engagement Plan |

*Data Collection, Analysis, and Reporting*

The PPB is required to collect, analyze, and report demographic data about police interactions with the community to ensure constitutional policing and build community trust (Par. 147-150).

| **Settlement Agreement Paragraph** |
|---|
| 147. PPB shall continue to collect appropriate demographic data for each precinct so that the Precinct Commander, considering any input from the PCCEP, may develop outreach and policing programs specifically tailored to the residents of the precincts. The data shall also be provided to PCCEP to inform its work.<br><br>148. PPB shall continue to require that officers document appropriate demographic data regarding the subjects of police encounters, including the race, age, sex, and perceived mental health status of the subject, and shall provide such information to the PCCEP and |

make such information publicly available to contribute to the analysis of community concerns regarding discriminatory policing. PPB shall consider enhancements to its data collection efforts, and report on its efforts to enhance data collection to the DOJ by no later than December 31, 2013, and quarterly thereafter.

| **Compliance Label** | 147. Substantial Compliance |
| | 48. Substantial Compliance |

### Compliance Assessment

For Par. 147, the PPB compiled and reported demographic data in 2020 pertinent to each precinct and posted it on their website. Shortly after the end of the first quarter of 2023, the PPB shared with precincts the updated demographics based on the 2017–2021 American Community Survey Five-Year Estimates provided by the U.S. Census Bureau. In doing so, they remain in Substantial Compliance with Par. 147. Furthermore, they have kept the public informed of this data, as well as a wide array of other public safety data posted on the Bureau's Open Data portal.[32]

The PPB remains in Substantial Compliance with Par. 148 as they continue to collect, analyze, and report demographic data from individuals who are stopped by the PPB using its Stops Data Collection app. In terms of data analysis and reporting requirements, the PPB's Strategic Service Division continued to produce high-quality Stops Data Collection reports, both quarterly and annually, and share them with PCCEP and the public on the PPB's website. The Stops Data Collection Report for the fourth quarter of 2022 was posted on February 15, and the report for the first quarter of 2023 was posted on April 25 of this year. The PPB's 2022 Annual Stops Report has yet to be released (Last year it was released in September and discussed at a PCCEP meeting). For this COCL report, we provide an analysis of traffic stops data, comparing the first quarter of 2022 to the first quarter of 2023, to examine changes in racial disparities over time.

*Analysis of Racial Disparities in Traffic Stops*

Tables 9.1 and 9.2 below provide racial/ethnic breakdowns of traffic stops by precinct, division, and year. As shown in Table 9.1, the percentage of stops that involve Black/African

---

[32] https://www.portlandoregon.gov/police/71673

American drivers has increased roughly two percentage points from the first quarter of 2022 to the first quarter of 2023 (from 19.0% to 20.9%). Furthermore, the percentages have grown over the past year in all three precincts and for stops conducted by both Traffic and Non-Traffic officers. When compared to population statistics in each precinct, the Central Precinct recorded the largest disparities for Black/African American traffic stops (5 times higher than the Black/African population)), followed by the East Precinct (4.7 times higher)) and the North Precinct (3.2 times higher).

Table 9-2 shows the stop disparities for Hispanic/Latino drivers. the percentage of stops that involve Hispanic/Latino drivers has also increased two percentage points from the first quarter of 2022 to the first quarter of 2023 (from 11.7% to 13.7%). However, the disparities in stops is much smaller for Hispanic/Latino drivers than Black/African American drivers, i.e., only 3.4 percentage points higher than the population estimates compared to 14.5 percentage points for Black/African American drivers. The breakdown by precinct shows a similar pattern of widening disparities across all three precincts, with Central Precinct showing the largest discrepancy for traffic stops (1.6 times higher than the Hispanic/Latino population)), followed by North (1.3 times higher) and East (1.2 times higher). Unlike the Black/African American results, the special units responded differently over time. Compared to 2022 data, Traffic officers stopped a smaller percentage of Hispanic/Latino drivers in 2023, while Non-Traffic officers stopped a larger percentage.

**Table 9.1**

**Traffic Stops by Precinct and Division: Black/African American Drivers[33]**

| Precinct | Percentage of Population that is Black/ African American[1] | Percentage of Stops with Black/African American Drivers (2022 vs. 2023) | |
|---|---|---|---|
| | | Q1 2022 | Q1 2023 |
| Central | 3.0% | 13.9% | 15.1% |
| East | 5.0% | 20.9% | 23.4% |
| North | 9.0% | 24.3% | 28.8% |
| Traffic Officers | NA | 12.3% | 13.0% |
| Non-Traffic Officers | NA | 20.2% | 22.4% |
| Citywide | 5.6% | 19.0% | 20.9% |

---

[33] Source: Census data at https://www.census.gov/quickfacts/portlandcityoregon, and PPB reports at:
https://www.portland.gov/police/open-data/stops-data

**Exhibit A**

**Table 9.2**

**Traffic Stops by Precinct and Division: Hispanic/Latino Drivers[34]**

| Precinct | Percentage of Population that Hispanic/Latino[2] | Percentage of Stops with Hispanic/Latino Drivers (2022 vs. 2023) | |
| --- | --- | --- | --- |
| | | Q1 2022 | Q1 2023 |
| Central | 7.5% | 9.7% | 12.1% |
| East | 12.4% | 12.2% | 15.1% |
| North | 10.3% | 11.7% | 13.4% |
| Traffic Officers | NA | 12.1% | 10.7% |
| Non-Traffic Officers | NA | 11.6% | 14.3% |
| Citywide | 10.2% | 11.7% | 13.7% |

In sum, the PPB continues to collect and report traffic stops data, and the pattern over the past year suggests that racial disparities in stops have grown. We acknowledge that disparities in stops may or may not indicate racial bias, but they can be suggestive. The PPB's own research team has highlighted related trends in the recent past. As we noted in prior reports, the PPB's *2021 Stops Data Collection Annual* Report found that (1) Black/African American drivers were stopped at a higher rate for "Non-Moving Violations," which are often called "investigatory" or "pretext" stops that suggest racial bias; (2) Black/African American drivers were significantly more likely than other drivers to be asked to consent to a search and were less likely to refuse consent than White drivers; and (3) Hispanic/Latino drivers were significantly more likely to receive a citation than other drivers (rather than a warning), regardless of the reason for the stop.

---

[34] Source: Census data at https://www.census.gov/quickfacts/portlandcityoregon, and PPB reports at: https://www.portland.gov/police/open-data/stops-data

The COCL has recommended corrective action since 2020, and the PPB took action in 2022. Specifically, Directive 650.00 ("Search, Seizures, and Inventories") was finalized and became effective on August 1, 2022. Furthermore, the PPB provided officers with additional online training on this directive.

The PPB will remain in Substantial Compliance with Par. 148. However, the PPB must continue to collect good data on stops and searches, as required by Oregon law and PPB policy, that will "contribute to the analysis of community concerns regarding discriminatory policing," (Par. 148). The Directive requires officers to document the reason for the search on their Stops app, which will give the PPB analysts additional data regarding search disparities.

As noted earlier, we have some concerns that the documentation process is complex and will be difficult for some officers; that the role playing showed a lack of procedural justice in some places; and that the training did not mention that the consent cards for community members are available in five languages. Thus, we expect clarification regarding the consent cards via additional online training, as some incidents can quickly become problematic if communication is misunderstood by officers or persons with limited English proficiency.

Finally, the COCL has some concerns about the significant (35.7%) increase in the total number of stops, from 2,598 in the fourth quarter of 2022 to 3,527 in the first quarter of 2023. Hopefully, this increase is not due to recent public/media concern about violent crime, resulting in more aggressive "hot spots policing" by the PPB[35]. In reality, personal crime (primarily assaults) in Portland did not show any sustained increases in 2022. Also, the COCL researchers have underscored the dangers of hot spots policing for low-income families and people of color when not implemented properly.[36] Nearly half (49.5%) of all stops occurred in the East Precinct, where the household income is significantly lower than the other two Precincts. We look forward to an explanation of this trend.

| **COCL Recommendations** | • To maintain Substantial Compliance for Par. 148, PPB should provide additional training for officers regarding the distribution of consent cards in five languages |
| --- | --- |

---

[35] Hot spots policing typically involves placing more police officers for enforcement activity in geographic areas defined as "hot spots of crime," but typically, police departments define large areas as hot spots, when in fact, hot sports are usually very small areas.

[36] See Rosenbaum, D. P. (2019). "The Limits of Hot Spots Policing." In D. Weisburd & A. A. Braga (eds.), Police Innovation: Contrasting Perspectives. 2nd Edition. pp. 314-344. Cambridge: Cambridge University Press.

**Exhibit A**

| | |
|---|---|
| | • Continue the dialogue with community members around racial disparities in traffic stops and searches |
| **Assessment Based On** | COCL review of PPB precinct demographic reports; COCL review of PPB Stops Data Collection reports; COCL review of relevant PPB directives |

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 149. The COCL, PPB, and DOJ will jointly develop metrics to evaluate community engagement and outreach. PCCEP may review these metrics and may suggest additional metrics to DOJ and PPB. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review metrics requirement |

**Compliance Assessment**

The City has completed the requirement to develop a set of metrics to evaluate community engagement, and therefore remains in Substantial Compliance. Several of these metrics have been used by PPB to guide their Community Engagement Plan. Others have yet to be implemented.

The PPB, through its Office of Community Engagement, continues to explore innovative approaches to community engagement and community policing, as discussed in the COCL's Community Engagement Outcome Assessment below.

PCCEP has also expressed a stronger interest in community engagement around police performance, as exhibited in the creation of a Community Engagement Subcommittee, and as required by the Settlement Agreement.

The COCL continues to recommend that the City strengthen the PPB's ability to serve as a true "learning organization" that is rapidly responsive to internal and external information about its performance. Internally, PPB's ability to maintain a healthy relationship with the

community is currently hampered by morale problems and supervisory methods. Hence, we continue to recommend that the PPB implement routine, anonymous internal surveys of PPB employees to measure police-community interactions, internal procedural justice, wellness, police culture, and employee job satisfaction. Our national research in large American police departments shows that when procedural justice is lacking within the organization (what we call "organizational justice"), police officers experience lower morale, less commitment to organizational goals, and less compliance with agency rules.[37]

As technical assistance, the COCL has also encouraged the City and the PPB to gather more specific outcome data relevant to police-community interactions - data that will give voice to a larger number of community and can be used to track and enhance organizational performance. Also, such data was included in the set of metrics proposed under Par. 149. The first major indicator of community engagement and outreach, as agreed upon by the parties, was stated as follows:

> "*Interactions with the public and general service delivery. PPB is expected to engage with diverse community members in a manner that is fair (unbiased), respectful, and helpful. Public perceptions of the PPB and the performance of its officers are considered important metrics, as they affect public trust and confidence in the police. These can be measured through community and/or contact surveys." (Metrics report for Par. 149).*

Specifically, we continue to recommend that the City measure the quality of police-community interactions for all encounters using data from community contact surveys, body-worn cameras, and officer surveys. These datasets can provide a foundation for an evidence-based, data-driven police organization, including supervisor coaching and feedback to officers based on performance metrics. We encourage the PPB to incorporate these outcome measures as part of the remedies being pursued in Section XI.

In the first quarter of 2023, the COCL prepared a technical assistance report on contact surveys and encouraged the City to work in partnership with an external organization to establish and maintain these metrics. The COCL has taken the position that the City has achieved Substantial Compliance with Par. 149 based on two citywide surveys conducted several years ago and the metrics proposed by the COCL, the PPB, and DOJ. We are pleased to see that the City's Community Safety Division, along with CAG, PCCEP, TAC, and other advisory groups, are seriously considering the proposed metrics, especially the creation of a

---

[37] See Rosenbaum, D. P., & McCarty, W. P. (2017). "Organizational Justice and Officer 'Buy in' in American Policing." Policing: An International Journal of Police Strategies & Management, 40 (1), 11-25.

sustainable Contact Survey Program as defined in our 2023 technical assistance[38]   During the first and second quarters of 2023, the COCL has responded to inquiries from advisory groups about this proposed program and made itself available for meetings on this subject., and has received some excellent feedback.

Currently, the Training Division is working with the Training Advisory Council (TAC) to reanalyze citywide data collected by DHM in prior years. The COCL helped to design these surveys, so we believe they have utility for measuring public trust in general and capturing the level of community engagement by PPB members. However, we have some serious concerns about relying on citywide surveys of Portland residents to evaluate police performance.

First, random samples of all city residents tend to focus on the two-thirds of the population who have had no police contact in the past year. This population tends to have little, if any, knowledge of how the PPB treats the public. Portland should survey the 1-in-3 residents who have contacted the police (e.g., to report a crime) and the 13% of the population who are the recipients of police-initiated contact (e.g., police stops).

Second, even those residents with some police contact over the past year are unlikely to remember the details of an encounter that occurred 11 or 12 months ago. Research shows that human memory decays rapidly and new information can interfere with the recall of older information (what psychologists call "retroactive interference").

Third, history shows that citywide surveys of random samples come and go as special projects, and rarely provide consistent information over time. These projects are also expensive and often don't ask the exact same questions when they are repeated several years later by different researchers.

Fourth, and perhaps most importantly, these general surveys will not provide the level of detail about police encounters that are needed to make changes to policy, training, and supervision. In contrast, a contact survey program will produce continuous data from community members with a police contact in the past week or two. Such a program will measure, with accuracy, what matters to the community, namely, how they are treated (procedural justice), with breakdowns by precinct, beat, shift, officer, and community demographics. Data generated from a contact survey program, along with data from the new

---

[38] COCL's report on the Contact Survey Program can be found at:
https://www.portlandcocl/reports/2023/02/contact-survey-program-technical-assistance-report

| | |
|---|---|
| body-worn camera program, will ensure equitable treatment for all groups and lead to important changes in training, coaching, and supervision. | |
| **COCL Recommendations** | • As part of everyday policing, the City should introduce a contact survey to measure the level of procedural justice and public satisfaction with police-public interactions, especially interactions with constitutionally protected populations<br><br>• The PPB should Implement routine, anonymous internal surveys of PPB employees to measure police-community interactions, internal organizational justice, officer wellness, job satisfaction, and other aspects of police culture<br><br>• The City should acquire and use software to analyze body worn camera data<br><br>• As a learning organization, the PPB should introduce programs, polices, and training curricula that are directly responsive to these new databases |
| **Assessment Based On** | The development of metrics that capture multiple dimensions of community engagement |

---

**Settlement Agreement Paragraph**

150. Annually, PPB shall issue a publicly available PPB Annual Report, which shall include a summary of its problem-solving and community policing activities. A draft of the Annual Report shall be provided to the PCCEP for review and comment before the report is finalized and released to the public. Once released, PPB shall hold at least one meeting in each precinct area and at a City Council meeting, annually, to present its Annual Report and to educate the community about its efforts in community policing in regard to the use of force, and about PPB's policies and laws governing pedestrian stops, stops and detentions, and biased-free policing, including a civilian's responsibilities and freedoms in such encounters.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Reviewed PPB's Annual Report; Interviewed PPB and City staff involved with PCCEP |

| **Compliance Assessment** | |
|---|---|
| The PPB remained in Substantial Compliance with Par. 150 for the first quarter of 2023. The 2022 Annual Report is not expected until the second quarter of 2023. The PPB began working on the report after receiving input from various units and divisions with the Bureau. The COCL will assess compliance again after the draft 2022 annual report is posted on the PCCEP website, discussed with PCCEP, presented and discussed at all three precinct meetings, and presented before the City Council. | |

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | Review of progress on the content and presentation of PPB's Annual Report |

| **Settlement Agreement Paragraph** |
|---|
| 151. PCCEP shall meet as needed to accomplish their objectives as set forth in the PCCEP Plan. PCCEP shall hold regular Town Hall meetings which shall be open to the public. To the extent that PCCEP meetings are subject to the Oregon Public Meetings Law, or similar regulatory or statutory requirements, the City shall be responsible to give advice necessary to the PCCEP to ensure compliance with those laws and agrees to represent PCCEP in any challenges regarding compliance with those laws. |
| 152. The City shall provide PCCEP members with appropriate training necessary to comply with requirements of City and State law. |

| Compliance Label | 151. Substantial Compliance |
| | 152. Substantial Compliance |

**Compliance Assessment**

During the first quarter of 2023, the PCCEP was very active. It held three full committee meetings, two town halls, and six sub-committee meetings.

At least one representative of the City Attorney's Office attended PCCEP meetings and continued to advise PCCEP as necessary to ensure compliance with public meetings law.

The City continues to train new PCCEP appointees as needed based on the "*Guide for Volunteer Boards & Commissions*" materials prepared for all City advisory boards. These materials cover the Oregon Government Ethics Commission guide for public officials, the City's code of ethics, restrictions on political activity for public officials, and the Oregon Attorney General's Public Records and Public Meetings Manual. The two new members of PCCEP were provided with this training material, as well as training on the Settlement Agreement and PCCEP Roles/Responsibilities. In addition, the staff is working with new members to provide them with opportunities to learn more about the police work and the PPB through activities such as ride-alongs or participation in future Community Academies.

However, Section VII of the PCCEP Plan[39] requires that, as part of the PCCEP's training, "the Albina Ministerial Alliance Coalition for Justice and Police Reform (AMAC) and mental health advocates will be invited to provide information on the history of the Settlement Agreement." (p. 5). Thus, to remain in Substantial Compliance with Par. 152, the COCL expects that the City will make these invitations in 2023.

| **COCL Recommendations** | • Continue to maintain records of training for new PCCEP members; Ensure current and future PCCEP members participate in all required trainings |
| | • To remain in Substantial Compliance, ensure that PCCEP members are offered a meaningful opportunity to participate in any optional training on the history of the |

---

[39] Case No. 3:12-cv-02265-SI. Document 215 filed 02/18/20

| | Settlement Agreement by the AMAC and mental health advocates |
|---|---|
| **Assessment Based On** | Regularity and content of PCCEP meetings; Provision of City's legal advice and training for PCCEP |

**Community Engagement Outcome Assessment**

This is a two-part Outcome Assessment. The first part focuses on community engagement around PCCEP, and the second part focuses on PPB's community engagement efforts. These will include both qualitative and quantitative outcome measures to assess whether the City and PPB have created "robust systems of community engagement." (Par. 170).

*PCCEP Community Engagement Outcome Assessment*

In June 2023, the COCL team reached out to all current PCCEP members, requesting members fill out an online survey or schedule time for a phone interview regarding PCCEP and community engagement. Five members responded, and each completed a survey. Three of the participating PCCEP members have been on PCCEP since 2021 or earlier, and the other two respondents were appointed within the last year.

We asked how well PCCEP has been able to fulfill the five authorized PCCEP duties and responsibilities, as outlined in Par. 14228, during the fourth quarter of 2022 and the first quarter of 2023. A majority of PCCEP members interviewed felt PCCEP has not been effective at accomplishing many of its authorized duties and responsibilities during this time period.

- Three PCCEP members surveyed felt PCCEP has not been effective in soliciting information from the community about PPB's performance. Another felt PCCEP has been somewhat effective, and one wasn't sure. One member who felt PCCEP has not been effective in this area noted that members do get word out to individual contacts but could be more effective with a systematic approach to outreach, "if we used our outreach list and checked each off as they were contacted." Another who felt PCCEP has not been effective in this area noted that PCCEP "is engaged with connecting the community with what is going on with PPB, but the PPB is not connected to the information PCCEP is sharing. The reports and presentations feel superficial."

- Three of five PCCEP members surveyed felt PCCEP has been not effective at making recommendations to the Chief, Police Commissioner, the community, and DOJ; two

believe PCCEP has been somewhat effective in this area. One PCCEP member noted that a DOJ representative attends all PCCEP meetings, which means DOJ is "in the loop" regarding PCCEP's recommendations. Another noted "our most recent recommendation was met with a form letter from Mayor Wheeler," while a third member shared that "the Mayor's office continues to leave PCCEP out of the loop and is not reaching out to be collaborative in order to optimize community engagement."

- Three of five PCCEP members surveyed felt PCCEP has been not effective in advising the Chief and the Police Commissioner on strategies to improve community relations, with two saying PCCEP has not been effective; two believe PCCEP has been somewhat effective in this area. "We are trying," noted one of the members who felt PCCEP has been somewhat effective, and another shared their opinion that "the relationship with the Chief is not collaborative and feels obligatory."

- Four PCCEP members surveyed felt PCCEP has not been effective in contributing to the development and implementation of a PPB Community Engagement Plan, with the fifth saying they were not sure or didn't know. One noted there have been "no meetings between parties" relevant to this plan, and another noted they have not seen PCCEP engage in this area.

- Opinions on PCCEP's effectiveness regarding receiving public comments and concerns were mixed; Of the five PCCEP members surveyed, two felt PCCEP has been very effective. One of those members noted they have seen PCCEP improve in this area, and the other expressed a hope to engage an even wider population. Opinions of the other three respondents were mixed, with one saying PCCEP was somewhat effective, and another saying PCCEP was not effective. The fifth member wasn't sure.

- PCCEP members interviewed were also asked to provide feedback related to Par. 144, which requires the City to "provide administrative support so that the PCCEP can perform the duties and responsibilities identified in this Agreement and in the PCCEP Plan." Three of the PCCEP members surveyed felt the City had provided a lot of support to PCCEP, and another member felt the city has provided some support, noting it was "managed support." The newest member indicated the City had not provided enough support to PCCEP. One of the members who felt the City had provided a lot of support to PCCEP noted there is a need for even more support: "I feel that we do not know what other supports we can ask for. I know we could use all the support possible." Another member who said the City provided a lot of support said the PCCEP staff "are amazing and the reason why I stay on the committee."

- PCCEP members interviewed were asked whether PCCEP is fulfilling its mission[40]. Three said yes, with one noting "I just don't think we are there yet. We have a ways to go and there is no communication with the police commissioner." Another said "We have several examples of how PCCEP is gathering community together in an accessible and inclusive way to share information about PPB policy. That is our mission." The other two shared their opinion that PCCEP is not fulfilling its mission, but did not elaborate.

- PCCEP members were asked to characterize their working relationship with the Mayor/Police Commissioner with an open-ended response. Three were very critical of the working relationship: One called the working relationship "nonexistent," and a second concurred, saying "the Mayor hasn't been to a PCCEP meeting in over a year. Chief of PPB has attended a recent meeting. [There is] no real relationship with either party." A third member said "A check-list. A requirement. Not collaborative. Stiff. Fake. I think PCCEP makes the city look good in the settlement but doesn't actually collaborate with PCCEP." Of the other two respondents, one dubbed the working relationship "at par," while a newer member was not yet sure.

- Four PCCEP members felt PCCEP has been somewhat or very ineffective in working with Portland's diverse communities. In this survey and the one conducted six months ago, members expressed a strong desire amongst PCCEP members to do more robust outreach; in the prior survey, many members were looking to the then-new community engagement subcommittee to lead this work. In this survey, one member noted that PCCEP and the community has been asking the City to provide a community organizer for several years, to add capacity in this area. Another member noted PCCEP needs to build relationships to be effective. The fifth PCCEP member felt PCCEP is working somewhat effectively with diverse communities, and noted "we are continuously working on it."

- Members were asked if they personally have met with other community-based organizations, solicited community input on reports, policies, or other PCCEP agenda items, shared information about PCCEP meetings, or otherwise individually worked to engage other Portlanders in PCCEP's work. Four of the PCCEP members surveyed said they have shared information about PCCEP's meetings, and/or solicited community input on reports, policies, or other PCCEP agenda items. Two members also noted they

---

[40] "The mission of the Portland Committee on Community-Engaged Policing (PCCEP) is to work with the Mayor/Police Commissioner, Portland Police Bureau, and Portland's diverse constituencies to solicit and exchange information between the community and Portland Police Bureau (PPB) to achieve the desired outcomes of equitable policing which exceeds constitutional requirements, and meaningful community engagement with and trust in PPB."

have met with community-based organizations and individuals to share information about PCCEP and ask community members to join in. One member also represented PCCEP at a community event and was supported by PCCEP staff in preparation for this event (provided requested materials to share with the community).

Overall, while PCCEP's assessment of its work and role regarding community engagement continues to be mixed, there is continued optimism that PCCEP is on the right track, with renewed support from City staff to achieve its mission. "I think we're on the right track, but we have a long way to go as far as engaging with the communities," noted one member, while another said, "there is so much more to do," and added a hope that PCCEP would engage with schools and agencies to build partnerships.

Some PCCEP members expressed concern that the Mayor or Police Chief have not been directly involved in PCCEP—or that their involvement has been "not collaborative." The COCL acknowledges that they both have representatives who regularly attend PCCEP meetings and report back to them, but more collaboration and relationship building would serve all parties well.

*PPB Community Engagement Outcome Assessment*

PPB's Community Engagement Plan provides the framework for conducting this Outcome Assessment of PPB's work. The Plan has four components: Public involvement, Communications, Access, and Training. Each is summarized below. Overall, we give the PPB high marks for executing this plan in each of these areas, but we also want to encourage the PPB to make a concerted effort to engage the PCCEP in this process. As noted above, PCCEP members do not feel they have been involved in the development and implementation of PPB's Community Engagement Plan.

Public Involvement: The Community Engagement Plan specifies three PPB goals with respect to public involvement: (1) Maintain and expand upon current opportunities for meaningful community interactions, (2) Develop a shared understanding of what community engagement means, and (3) Enhance existing opportunities for community/PPB partnerships.

In the first quarter of 2023, the PPB's Office of Community Engagement (OCE) continued to work closely with community leaders to achieve these goals, especially through its advisory groups. Specifically, the OCE continued to work closely with its Community and Culturally Specific Councils: The Asian Pacific Islander American Advisory Council (APIA), Latino Advisory Council (LAC), and Muslim Advisory Council (MAC), and Slavic Advisory Council (SAC). The LAC members focused on developing an annual strategic plan for engaging with partnerships with PPB and developing a relationship with the Latino-based organization, "Hacienda." Several of PPB's advisory groups have given considerable attention to public education and operational

responses to prevent or respond to hate crime, including the APIA for anti-Asian hate, the MAC for anti-Islamic hate, and the SAC for anti-Slavic hate. With the help and support of the Office of Community Engagement, these groups have worked hard to build partnerships with various organizations, respond to specific proposals, and promote crime prevention.

The Alliance for Community Safety (ACS), which served as an advisory group to the PPB on LGBTQIA2S+ issues, disbanded in 2022. This is unfortunate considering the controversy over LGBTQIA2S+ training within the PPB in 2022. We recommend that PPB reach out to some active members of the LGBTQIA2S+ community and seek to restore a working partnership.

Representatives of the PPB's current advisory groups continue to meet as part of the Coalition of Advisory Groups (CAG) to enhance collaboration and mutual support. In addition to their monthly meetings with the Chief's office and City Council Commissioners, they held several meetings in the first quarter, including a meeting with COCL to discuss COCL's proposal to introduce a contact survey in Portland. The CAG members were receptive to this plan and provided some constructive feedback.

Finally, PPB's Operational Councils -- the Behavioral Health Unit Advisory Committee (BHUAC), the Police Equity Advisory Council (PEAC), and the Training Advisory Council (TAC) -- continue to meet regularly and provide PPB with feedback on relevant issues (as discussed elsewhere in this report).

_Communication:_ The CEP specifies two goals in communication: (1) Expand communication strategies to facilitate interface with underrepresented populations, and (2) Improve public awareness of the current communication strategies utilized. In the first quarter of 2023, the PPB continued to use social media to communicate with the public and used other mechanisms, including press releases, emails, brochures, and presentations to reach the public.

The PPB's Media team continues to give considerable attention to press releases and flash alerts for the media (e.g., homicides and car crashes), but they also cover community engagement events through Instagram, Twitter, and other platforms. In addition, the PPB is working to provide their advisory groups and CAG with a greater presence on the City's website.[41]

As part of the COCL's assessment of community engagement, we have given attention to the number of community events that officers have attended. We credit the PPB with using an app developed in-house to document such events and produce a monthly report, _Community Engagement Events_. However, as we began to report in our last Outcome Assessment, the total number of community events involving PPB officers that are recorded by the app has declined

---

[41] However, COCL is disappointed in the City's updated website, which makes it very difficult to find anything.

**Exhibit A**

dramatically over the past five years, from approximately 394 events per quarter in 2019 to only 45 events per quarter in 2022. Only 23 events were recorded in the first quarter of 2023 (See Figure 9.1).

**Figure 9.1**



Thus, we have encouraged the PPB to take note of this rapid decline and consider ways to correct this trend. Some of this decline may be due to staffing issues or the fact that recording these events in the app is optional for officers. We have recommended that officers' use of the App should be mandatory and should be memorialized in the PPB policy and an S.O.P. Also, community engagement at all levels (and not only the Chief's office) should be made a priority within the PPB. We see evidence of this happening in the new sergeants training (see below).

The COCL continues to maintain that PPB's Community Engagement App is a valuable tool with the potential to do more than simply count the number and type of events. It could be used to identify gaps in community engagement, as planned by OCE, and encourage de-centralized community policing. For PPB to expand or re-envision its community engagement strategy within Precincts, it must first ensure that the necessary data is being collected. Also, by collecting community engagement data at the officer level, PPB has a new set of metrics by which to evaluate officer performance.

_Access:_ The CEP specifies four goals for Access: (1) Develop a comprehensive language access plan, (2) Provide comprehensive training to all the PPB members on how to utilize this corps of officers and interpreters, (3) Inform/advise all communities of the existence of this

resource/service, and (4) Create/update appropriate directives for spoken language and deaf/hard of hearing.

Language access goals have taken considerable time to achieve, but the PPB continues to make significant progress as part of its Language Justice Program. We have documented that progress in previous reports, including creating a database of bilingual officers, creating and posting six LMS language awareness training videos for officers in 2022, and analyzing data from LanguageLine program to identify language needs and service gaps.

In the past, the COCL has credited the PPB with these accomplishments, but has pointed to the need for an updated policy and additional training. We can now report that the PPB has updated its language access policy (0640.37, "Communication with Persons who have Limited English Proficient Persons") and it has undergone two universal reviews. The PPB expects that policy will be adopted in the second quarter of 2023 and will be accompanied by additional trainings for all officers.

In sum, PPB's Office of Community Engagement and PPB's Policy Director (with support from PPB's Strategic Services Division) have built a sound Language Justice Program that continues to expand to ensure equal access to police and city services. Because of the many personnel changes since 2020, there are plans in 2023 to conduct another internal language survey to update the list of bilingual members, publish the list internally to help officers who need language assistance, provide additional training for certified PPB bilingual members, and build a Language Line Dashboard. Thus, PPB's Language Justice Program provides an innovative and evidence-based approach to policy development, training, and service delivery, and will likely serve as a national model when fully implemented. The COCL has only two remaining concerns regarding access to police services: (1) what is being done to address the access issues for the hearing impaired? and (2) to protect Fourth Amendment rights against unreasonable search and seizure, what are the PPB's plans to improve officer training regarding the distribution of consent search cards that were developed (with help from community members) for the six most commonly used languages in Portland?

_Training:_ The CEP specified three goals for Training: (1) To develop a variety of tools to help guide both police and ethnically and religiously diverse communities in efforts to address their unique concerns, (2) Create a workforce that is knowledgeable about the City and its history, and (3) Greater involvement of community members in the training of Bureau members.

In the past, we have credited the PPB with training related to these goals, including a series of equity trainings focused on interacting with historically marginalized groups and with the LGBTQIA2S+ community. Because of the importance of equity training, we have recommended that it be continued and moved from online to In-person training, with input from both

marginalized community members and PPB members. Interacting with community members in the classroom can help to create greater better understanding and empathy, and help to minimize the adverse effects of bias that can emerge during police-community interactions.

The one-day Community Police Academy held in the fourth quarter of 2022 (involving members of advisory groups and elected officials) was considered a success. Thus, we recommend that the PPB continue with its plan to offer such community classes three to four times per year. This will allow more community members to become familiar with police work and police training.

Now that the language access policy has been completed, we are awaiting new training on language interpretation for certified PPB bilingual members and general training for all officers on use of language services and distribution of the consent search cards.

Finally, we are pleased to learn that in the second quarter of 2023, the Director of the Office of Community Engagement (OCE) created and delivered "Community Engagement" training for new sergeants as part of the 2023 Sergeants Academy. The class highlights ways to create "sustainable and meaningful community-police partnerships." The learning objectives are to: "(1) apply the PPB Community Framework to their role as Sergeant; (2) utilize technology and strategies to support effective community policing, and (3) assess the role of community engagement in officer wellness and safety."

The COCL would like to note that the work of PPB's OCE has been visible on the national level. As a result, on June 5, 2023, the International Association of Chiefs of Police (and its partners) selected the PPB to serve as a demonstration site for their new "Community Trust Initiative" (CTI). The purpose of CTI is to "provide customized training and technical assistance to select law enforcement agencies and their community partners to build sustainable change that can further establish and maintain trust between police and the communities they serve." We hope that PPB and the Portland community will benefit from this initiative.


**Summary of Section IX: Community Engagement by PCCEP and PPB**

PCCEP: In the first quarter of 2023, PCCEP continued to function as a legitimate body for community engagement. They held three full committee meetings, six sub-committee meetings and hosted two town halls. The PCCEP submitted two formal recommendations and prepared a statement for the February Status Conference. The City continued to support PCCEP by maintaining competent staff to plan and manage meetings, recruiting and training new PCCEP members, and providing technical and legal assistance as needed. The COCL's remaining

concerns are: (1) the need to fill youth vacancies on the PCCEP; and (2) the continued need to respond to PCCEP's recommendations in a prompt and thorough manner.

PPB: During the first quarter of 2023, the PPB continued to implement its Community Engagement Plan. The PPB's diverse advisory groups (Community and Culturally Specific Councils), as well as the CAG, continue to meet with the PPB leadership, City Commissioners, and the communities they represent in a transparent manner. Also, the PPB's Operational Councils -- the Behavioral Health Unit Advisory Committee (BHUAC), the Police Equity Advisory Council (PEAC), and the Training Advisory Council (TAC) -- continue to meet regularly and provide the PPB with feedback on relevant issues.

The PPB's Office of Community Engagement and the PPB's Policy Director (with support from PPB's Strategic Services Division) have built a sound Language Justice Program that continues to expand to ensure equal access to police and city services. The new language access policy is nearly operational and should be followed by training in the near future.

The PPB continued to produce high-quality quarterly and annual reports on traffic stops and use of force with demographic breakdowns that allow for the analysis of racial disparities.

The PPB has made considerable strides in terms of community engagement and the PPB's Office of Community Engagement is doing some excellent, cutting-edge work to de-centralize community policing and build partnerships with the community. In fact, they are beginning to receive national attention for their work. The COCL's only remaining concerns involve: (1) the need to increase usage of the Community Events App by police officers to document participate in community events; (2) the need for additional training and documentation regarding consent searches and the distribution of consent search cards to persons with limited English proficiency; (3) the need to revisit the PPB's Equity training program and provide in-person training on issues of equity, bias, and procedural justice; (4) the need to address racial disparities in traffic stops and searches through operational and training strategies; (5) the need to give the community a greater voice when evaluating police services, especially those who are the recipients of such services,[42] and (6) then need to more fully engage PCCEP in PPB's Community Engagement Plan.

---

[42] The COCL's report on the Contact Survey Program can be found at:
https://www.portlandcocl.com/reports/2023/02/contact-survey-program-technical-assistance-report

# XI. ADDITIONAL REMEDIES

After five mediation meetings, the City and DOJ reached agreement on a set of remedies to achieve compliance with the terms of the Settlement Agreement[43]. On January 10, 2022, DOJ and the City filed their final "Joint Status Report" in the U.S. District Court (ECF 275), summarizing the mediation results and the specific remedies on which the parties agreed in principle. As such, the parties have agreed to add a new section to the Settlement Agreement— Section XI—that contains eight new paragraphs, 188 to 195. These remedies were approved by the Portland City Council on February 9, 2022, and by the federal judge at the Fairness Hearing on April 29, 2022.

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 188. The City shall revise Force Data Collection Report (FDCR) and After Action Report forms to capture when the forms are edited and completed as part of PPB's implementation of Office365, which is ongoing. In the interim, pursuant to a process approved by the United States, PPB shall capture in the existing FDCR and After Action Report forms the author's name and the time and date of initial submission and any subsequent edits, as well as the name, time, and date of each level of review. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review of AAR and FDCR forms |
| **Compliance Assessment** | |
| During the first quarter of 2023, our review demonstrated that the updated FDCR and AAR forms continue to be used and continue to capture the data required by Par. 188. We therefore continue to find that the City and the PPB have substantially complied with the requirements of Par. 188. | |
| **COCL Recommendations** | • No recommendations at this time |

---

[43] These meetings included the Intervenor-Defendant Portland Police Association (PPA), the Enhanced Amicus Curiae Albina Ministerial Alliance Coalition for Justice and Police Reform (AMAC), and Amicus Curiae Mental Health Alliance (MHA).

| Assessment Based On | Updated FDCR and AAR forms and use by officers and supervisors |
|---|---|

| **Settlement Agreement Paragraph** |
|---|
| 189. Before November 25, 2021, the City shall provide funding for a qualified outside entity to critically assess the City's response to crowd control events in 2020 in a public-facing report and prepare a follow-on review of the City's response to the report. The City will use the report to prepare a training needs assessment. The report, training needs assessment, and follow-on review will be completed consistent with a Scope of Work and deadlines agreed upon by the City and the United States, and such agreement shall not be unreasonably withheld by either Party. If the City demonstrates to the United States that significant progress is being made toward meeting the obligations under the agreed upon Scope of Work and deadlines, the City may request a reasonable modification of the Scope of Work or extension of deadlines, which the United States shall not unreasonably decline. |

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Interviews with PPB officials and review of documents |

| **Compliance Assessment** |
|---|
| The work of Independent Monitor, LLC (IMLLC, the group hired to conduct the critical assessment) continued in the first quarter of 2023. Specifically, the IMLCC observed the Portland Police Bureau's In-Service Mobile Field Force at the PPB's Training Division. Presently, we are awaiting a finalized report from IMLLC, which can then be used as the basis for the PPB's updated needs assessment and additional training. The City and COCL have agreed that supplemental training on crowd management that is responsive to the IMLLC's training needs assessment is appropriately moved from Par. 84 to Par. 189. |
| We anticipate a final report to be delivered sometime in the third quarter of 2023 and we will update our report then. Thus, the City will remain in Partial Compliance with Par. 189 until the following requirements have been achieved. |

| COCL Recommendations | To achieve Substantial Compliance: |
|---|---|

|  | • The IMLLC must collect and analyze data consistent with the Scope of Work, and prepare a report that critically assesses the City's response to the 2020 demonstrations |
|  | • The City must respond to the IMLLC report |
|  | • PPB must use the IMLLC report to prepare a training needs assessment, training plan, and relevant crowd management training |
|  | • The IMLLC must prepare a follow-up report that reviews the City's response to their original report, including the PPB's training needs assessment |
|  | • The City should keep COCL informed of the work planned and completed by the IMLLC |
|  | • The City should provide COCL with IMLLC's reports, the PPB's training needs assessment report, and training plans |
|  |  |
| **Assessment Based On** | Evaluation of the process employed by IMLLC, and the products planned and delivered by this group |

| **Settlement Agreement Paragraph** |
| 190. Before November 25, 2021, the City shall provide in the budget a separate line item for overtime costs to conduct necessary training for PPB officers. The City shall include a similar line item in subsequent budgets for the duration of this Agreement. |

| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review of budget documents |

| **Compliance Assessment** |

The COCL has reviewed the City's budget to ensure that sufficient overtime funds have been allocated for police training. As noted previously, the City Council has included a separate line

item for these overtime costs in the City's FY22-23 budget. Hence, the COCL finds that the City has achieved Substantial Compliance with the requirements of Par. 190. If the budget line item is removed in the FY23-24 budget, then the City will be assigned Partial Compliance. Also, the COCL recommends that the City and the PPB reconsider the total budget and staffing for the Training Division after the Director of Police Education is hired.

| | |
|---|---|
| **COCL Recommendations** | • To maintain Substantial Compliance, the City must continue to provide a separate line item for PPB training-related overtime expenses.<br><br>• Revisit the staffing and budget for the Training Division, keeping in mind the option of hiring more civilians. |
| **Assessment Based On** | Review of budget documents and amount of overtime funding included in the budget. |

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 191. Before November 25, 2021, the City shall budget for a qualified civilian in PPB to direct all educational aspects of PPB's Training Division alongside the Captain of the Training Division, who will direct administrative aspects of PPB's Training Division. The respective roles and responsibilities of the civilian and the Captain are outlined in Attachment 1 appended to this Agreement, provided that the Parties may agree to modify those roles and will not unreasonably withhold such agreement. Once funding is provided, the City shall post the position within 90 days. Once the position is posted, the City shall make a job offer to a suitable candidate and complete any required background screenings within 150 days. If the City demonstrates to the United States that no suitable candidate applied for or accepted the position, or that the City is otherwise making significant progress toward meeting the deadlines in this Paragraph, the City may request a reasonable extension of time to fill the position, which the United States shall not unreasonably withhold. | |
| **Compliance Label** | Partial Compliance |
| **Methodology** | Tracking the hiring process for the Director of Police Education |
| | |

**Compliance Assessment**

In the first quarter of 2023, the PPB continued the reinitiated process of filling the Director of Police Education position, who will lead all educational aspects of PPB's Training Division. As reported in our previous reports, the hiring process had to begin anew when the candidate selected for the position had the offer rescinded due to some information the Mayor received after the conditional offer had been made.

In October of 2022 the position was reposted, and the City received applications for the position. Sixteen (16) applicants met the minimum qualifications for the position and had their applications reviewed and scored by the Bureau of Human Resources. A second scoring panel, comprised of five individuals from PCCEP, the PPB's Training Division, City Council, the PPA, and the Mental Health Association, met and determined that five of the 16 applicants would move forward to interviews scheduled to take place in January. The Chief of Police was given the opportunity to review all the applications and include additional applicants if he so chose; he did not add any additional applicants to the list to be interviewed.

Each of the five candidates completed a panel interview in January of 2023. The panel consisted of City Hall staff, a representative from AMAC, and the PPB Equity Manager. After the panel interviews, three applicants were selected for the final interview with a Mayoral representative and the Chief of Police. The PPB made a contingent offer to the successful applicant on March 13, pending a background check. The background check was not completed until the second quarter (April 18).

At the request of the City, we offered suggestions on how to improve the hiring process for this position and highlighted some of our recommendations in our last report. The recommendations included more broadly soliciting community input for potential interview questions and a community forum with the finalists. During the first quarter, the PPB did take some steps to implement the recommendations from the COCL. As mentioned above, both the screening panel and the interview panel included representation from community groups and PPB advisory councils. However, the City did not take steps to more broadly include community in the hiring process, and as noted in our fourth quarter report, a representative of the Training Advisory Council (TAC) should have been included in the selection process.

Nevertheless, the PPB and the City continue to make strides in filling the position of Director of Police Education. Reinitiating the hiring process in Q3 of 2022 meant a significant delay in meeting the 150-day timeline. However, Paragraph 191 includes a provision to extend the deadline if needed. Thus far, the City has funded the position, posted the position, and made a contingent job offer. In the future, after the position has been filled, the COCL will assess

whether the individual hired is qualified to "direct all educational aspects of PPB's Training Division." (Par. 191). Until then, the PPB will remain in Partial Compliance for Par. 191.

There are a few points we would like to reiterate here:

- The Director of Police Education will need staff support (which the City has provided in the budget) and independence to develop and implement new training without interference. We acknowledge that the Director will function within the PPB bureaucracy and report to an Assistant or Deputy Chief but should have a significant role in determining the direction of training at the PPB. Also, we recommend that the Director of Police Education and the Captain report to the same individual to minimize power struggles within the Training Division. This recommendation resulted from the Training Summit held in December of 2022.

- We encourage the person hired to give priority to providing "professional development and continuing education to Training Division instructors to ensure that all personnel are highly qualified and well equipped to perform their duties in an equitable, lawful, impartial manner," as outlined in the job description. Along these lines, the COCL has on several occasions emphasized the need for instructor development classes and certification of teaching skills. This was also discussed at the Training Summit.

| | |
|---|---|
| **COCL Recommendations** | <ul><li>To achieve Substantial Compliance, the City and PPB must hire an individual who is qualified to "direct all educational aspects of PPB's Training Division."</li><li>The City should continue to create opportunities for community involvement in the process of hiring and orienting the new Director of Police Education.</li><li>The City and PPB should select a candidate who understands both policing practices and best practices in teaching and the evaluation of training</li><li>The Director of Police Education and the Captain of the Training Division should report to the same Assistant or Deputy Chief</li><li>The Director of Police Education should explore professional development classes for PPB Training instructors</li></ul> |

**Exhibit A**

| | |
|---|---|
| **Assessment Based On** | The City's ability to conduct a search and hire a qualified candidate within a reasonable time period. |

| |
|---|
| **Settlement Agreement Paragraph** |
| 192. Within 60 days of the date that this paragraph is entered as an order of the Court, the City shall initiate an appropriate investigation through IPR to identify: (a) the PPB Lieutenant(s) and above who trained Rapid Response Team members to believe that they could use force against individuals during crowd control events without meeting the requirements of PPB Directive 1010.00; (b) the PPB incident commander(s) and designee(s) with the rank of Lieutenant or above who directed or authorized any officer to use force in violation of PPB Directive 1010.00, or who failed to ensure that FDCRs and After Action Reports arising from the crowd control events starting on May 29, 2020, and ending on November 16, 2020, were completed as required by Section 13.1 of PPB Directive 635.10; and (c) the PPB Commanders and above who failed to timely and adequately clarify misunderstandings and misapplications of PPB policy (including this Agreement) governing the use, reporting, and review of force during the crowd control events starting on May 29, 2020, and ending on November 16, 2020. Once the IPR investigation is complete, the Police Commissioner and/or the Chief of Police, as required by this Agreement, shall hold accountable those investigated members of the rank of Lieutenant and above who are determined to have violated PPB policies (including this Agreement) as outlined in this paragraph. The Parties affirm the obligation in this Agreement and Directive 330 for IPR and PPB to investigate any sworn member if, during the investigations of Lieutenants and above required by this paragraph, information is discovered suggesting that any sworn member may have violated PPB policy or this Agreement. |

| | |
|---|---|
| **Compliance Label** | <mark>Partial Compliance</mark> |
| **Methodology** | Interviewed PPB, CAO, and IPR personnel |

| |
|---|
| **Compliance Assessment** |
| IPR is currently in the process of conducting the series of investigations required by Par. 192. Currently, IPR has four open investigations related to Par. 192 regarding PPB and City responses to the 2020 protests. Although each case is at a different step in their investigation, the COCL will not be privy to all the facts of these investigations until they are |

completed. A meeting with the City, DOJ, and COCL regarding an update to Par. 192 is currently set for July and we will therefore provide an update in our Q3 report. At this time, we continue to find the City in Partial Compliance with the requirements of Par. 192. Substantial Compliance will require IPR and the City to conduct investigations that are thorough, fair, and reasonable.

| | |
|---|---|
| **COCL Recommendations** | • To achieve Substantial Compliance, complete a thorough, fair, and reasonable investigation of the command personnel associated with the 2020 crowd control and the training they provided<br><br>• To achieve Substantial Compliance, hold accountable the investigated command personnel members as appropriate who are found to have violated PPB policies (including this Agreement) as described in Par. 192 |
| **Assessment Based On** | Discussions with City personnel |

| **Settlement Agreement Paragraph** |
|---|
| 193. In addition to the requirements of paragraph 150 of this Agreement, PPB shall release its Annual Report and hold the required precinct meetings no later than September 20 of each year for the duration of this Agreement. |

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Confirmed the dates of completion, dissemination, and discussion of PPB's 2021 Annual Report; Observed and reviewed Precinct Meetings; Engaged in methods reported under Par. 150 |

| **Compliance Assessment** |
|---|
| The PPB remained in Substantial Compliance with Par. 150 during the first quarter of 2023 and, without new information, must remain in Substantial Compliance with the added requirements of Par. 193. |

The 2022 Annual Report is not expected until the second quarter of 2023. As noted earlier, the PPB began working on the report after receiving input from various units and divisions with the Bureau. The COCL will assess compliance with Par. 193 again after the PPB has released its Annual Report and held the required precinct meetings. At that point, the COCL will determine whether the PPB has met the required deadline of September 20, 2023, to complete these tasks.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | Date the PPB's Annual Report was completed<br><br>Date the PPB Annual Report was presented at three precinct meetings |

**Settlement Agreement Paragraph**

194. Within 210 days of the date this paragraph is entered as an order of the Court, the City shall implement body-worn cameras (BWCs) pursuant to a policy that is subject to the policy-review-and-approval provisions of this Agreement; provided, however, if the City is making substantial progress this deadline may be extended by agreement of the United States, which shall not be unreasonably withheld.

a. The City will comply with any collective bargaining obligations it may have related to BWCs, which the City agrees to fulfill expeditiously and in compliance with its obligation to bargain in good faith.

b. Within 60 days of the date this paragraph is entered as an order of the Court, the Compliance Officer shall gather public input on the use of BWCs and provide this information and any technical assistance to the public and the Parties to inform the drafting of a policy. The United States reserves its policy review rights related to the BWC program under the terms of this Agreement.

c. If the City has not finally discharged its collective bargaining obligations as to BWCs within 120 days of the date this paragraph is entered as an order of the Court, the Parties stipulate that the Court may thereafter hold periodic status conferences every 60 days to receive an update on the procedural status of the collective bargaining process related to BWCs. The

City will provide a final procedural status update upon the completion of the collective bargaining process.

d. The United States reserves its enforcement rights related to the BWC program under the terms of this Agreement. If collective bargaining or any related arbitration or appeal results in a BWC program that the United States determines, in its sole and absolute discretion, will not adequately resolve the compliance concerns identified in the April 2, 2021 notice of noncompliance, the Parties agree that the United States can seek court enforcement pursuant to paragraph 183, without having to repeat the steps laid out in paragraphs 178 to 182.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review of BWC pilot policy; Review of the Letter of Agreement for BWC policy and pilot; Communication with PPB personnel |

### Compliance Assessment

The City has made major strides towards the full implementation of a body-worn camera (BWC) policy and program. In the first quarter of 2022, the PPB released a Request for Proposal (RFP) to solicit BWC vendors capable of supplying Portland with the equipment necessary for a BWC program. Additionally, the PPB started a process to gather subject-matter experts to assist in the scoring process, which continued into the fourth quarter. Negotiations with the Portland Police Association (PPA) and Portland Police Commanding Officers Association (PPCOA) regarding BWCs continued as well.

The City requested that DOJ set principles to govern a BWC policy, and in response, DOJ released a letter to the City on November 15, 2021, addressing key issues, including deployment, notice, activation/deactivation/buffering, authorized users, preview, control of videos, and accountability. DOJ additionally stated that public input should drive a BWC policy and be collected expeditiously before the PPB drafts and adopts such a policy. As discussed in the COCL's first quarter report for 2022, part of the public input process was a public forum and community survey, facilitated by the COCL, that brought together the PPB, City stakeholders, community groups, PCCEP members, and the public to discuss questions and concerns.

As reported in federal court on April 29, 2022, the COCL underscored two findings from the community forum and survey regarding access to the BWC recordings. First, the community wants open access to the recordings for the PPB supervisors, trainers, and auditors, as well as the general public. Second, when officers use force, most survey respondents felt that the

PPB officers should not review the camera footage until after they have written their force report (called the "prereview" issue). We continue to maintain that this viewpoint is supported by the Supreme Court's "Graham standard," which prohibits 20/20 hindsight, meaning that we should evaluate the use of force based on what the officer knew at the time, not what they learned later. We should capture the officer's unobstructed narrative as soon as possible after the incident so that we can understand what the officer was thinking at that time.

In the second quarter of 2022, the PPB underwent a series of next steps for the BWC program implementation including demonstrations from the top vendors; scoring of those vendors; vendor selection; grant application submission; and contract negotiations. The two remaining vendors demonstrated their products in May and were scored to determine which one will move on to the pilot program. This scoring process resulted in the selection of Axon, which is heavily utilized by police departments of many sizes throughout the US. During the third quarter of 2022, the PPB held a Zoom meeting with Axon to discuss the remaining issues in the contract. However, the contract with Axon to conduct the pilot program was not finalized until the first quarter of 2023. A contract for the full BWC program will not be executed until the pilot test has been completed and the City has decided whether they are satisfied with the performance of Axon.

In the second quarter of 2022, the PPB submitted a grant proposal to the Bureau of Justice Assistance for the Body-Worn Camera Policy and Implementation Program, but the proposal was not funded. In any event, the COCL has encouraged the PPB and the City to use the BWC program as an opportunity to begin to exploit the rich data that will be produced from BWCs. On several occasions, the COCL has recommended that, if the City partners with researchers who have the right software, then the BWC data can be used to identify specific types of interpersonal communication that lead to the escalation of conflict and the use of force, so that such encounters can be prevented or minimized in the future. Also, disparities in police treatment can be examined across various constitutionally protected classes. The COCL has also recommended that first-line supervisors be trained to use BWC data for coaching and feedback to individual officers under their supervision, but these initiatives are down the road. The PPB must first develop a sound BWC policy, basic training, and a pilot program.

As stated above, the fourth quarter of 2022 saw further discussions with the City Attorney's Office and the City Procurement department to work out the details of the pilot contract. In our previous report, we reported that the PPB hired 3 of 5 positions required in Records for redactions and 1 of 1 position required in IT for programmatic support. Furthermore, the PPB

began the process of preparing the Central Precinct with electrical capacity for BWC equipment to support the pilot test.

The PPB continued bargaining with PPA throughout the fourth quarter of 2022 and the first quarter of 2023, a process that extended beyond the initial timeframe that was expected. The bargaining process was concluded early in the second quarter when PPA and the PPB came to an agreement on April 20, 2023. Here we will provide a brief overview and analysis of the BWC policy (and implications for the pilot program) because of its importance to the future of policing in Portland. A Letter of Agreement (LOA) between the City and the PPA was released that states:

- Before interviewing an officer involved in a use of force event, a written instruction will be provided stating that BWC recordings may not capture the entire incident and should not be used as a substitute for a thorough investigation, which should emphasize reasonableness standard from the perspective of the officer on scene.

- Acknowledgement that there may be differences between an officer's perception and the video evidence due to human perception and memory. Video evidence should not automatically be prioritized over an officer's statement.

- The pilot program will start once the Central Precinct and FIT team have received proper training and equipment and will run for a total of 60 days.

The proposed BWC policy is subject to further revisions at the conclusion of the pilot if PPA, PPB, or the City believe additional instructional language is needed. As it stands, the policy outlines a number of areas designed to direct officers on the proper usage of the BWC and resulting footage. The policy is several pages and the COCL has summarized the main points of the policy:

*Purpose*
- The policy aims to use BWCs as a tool for enhancing transparency, accountability, and public trust in law enforcement interactions.

- BWCs can provide additional documentation of police-public encounters, collect evidence, and support investigations.

*Objectives of BWCs*
- Additional documentation of police-public contacts, encounters, arrests, and critical incidents.

- Supplementing or enhancing the accuracy of officer reports and testimony.

**Exhibit A**

- Gathering evidence for investigations and prosecutions.

- Providing information for officer evaluation, feedback, and training.

- Conducting fair and thorough professional standards reviews and investigations of complaints.

*Limitations of BWC Footage*

- BWC recordings may not capture the complete incident or the actual perspective of the officer.

- The footage may not fully represent the scene, circumstances, or perception of individuals present.

- BWC footage is only one piece of evidence and should not replace comprehensive reports or investigations.

*Procedures*

- BWCs will be individually issued to sworn members in specific assignments, as determined by the Chief or designee.

- Only Bureau-authorized and Bureau-issued BWCs should be used by members.

- Members are not required to wear or carry BWCs while off duty.

*Functionality Check and Device Placement*

- Members should test their BWCs at the beginning of their shift to ensure proper functioning.

- If a BWC is damaged, malfunctioning, or missing, members should promptly request a replacement from their supervisor.

- BWCs should be attached to the members' person at chest level or in a way that provides an unobstructed view of activities.

*Recording Notification*

- Members should announce to the person they are contacting at the beginning of the interaction that the interaction is being recorded, whenever feasible.

- If the person has difficulty hearing or limited English proficiency, reasonable efforts should be made to communicate the recording through gestures or other means.

- If immediate notification is not possible, members should inform the person as soon as feasible.

*Required Activation*

- BWCs should have automatic activation features that activate the device when emergency vehicle lights are activated or when the member draws their firearm or Conducted Electrical Weapon (CEW).

- Members should check for automatic activation and manually activate the BWC if it does not activate automatically.

- Manual activation is required during various situations, including responding to calls for service, public order events, traffic stops, searches, custodial interviews, and encounters involving reasonable suspicion or probable cause of a crime.

*Permissive Activation*

- Members are authorized to activate their BWCs in any other situation that serves a legitimate law enforcement purpose and does not conflict with the policy or state law.

*Recording Exceptions and Prohibitions*

- Exceptions are provided for personal privacy (e.g., using a bathroom) and confidential communications (e.g., with legal counsel).

- Prohibitions exist for recording certain sensitive situations, such as interviews with victims of sexual assault, medical or mental health treatment facilities (except for specific purposes), courthouses (except for specific purposes), conversations with undercover members or informants, and death notifications.

- Members may mute their BWCs during on-scene mission planning for safety concerns or release of sensitive tactical information.

- Members shall not activate or deactivate their BWCs during non-enforcement activities unless required to comply with mandatory activation.

*Recording Deactivation*

- Members should deactivate their BWCs at the termination.

The COCL would like to highlight a few concerns about the language and tone of the policy in its current state. First, language throughout the policy is vague and leaves considerable discretion to the operator of the BWC. The language is also vague and limited when describing how the pilot program will run, the exact steps that will be taken throughout the

pilot, and the metrics to be used to determine if it should be extended or fully implemented. How will PPB determine success? Second, the discussion of reviews completed by supervisors is scant and does not detail a process of regular reviews or secondary reviews to ensure supervisory reviews are taking place. Lastly, the community was clear in every conversation with the COCL, the City, and the PPB that they did not want officers to have the option for preview of BWC footage prior to writing reports but the policy allows for this practice under certain conditions. After extensive and protracted negotiations, this was a compromise, and it was later approved by the DOJ and the City Council. At this point, the COCL would simply request that the City explain to the Portland community why these decisions were made in the BWC policy. Transparency is key to the success of any PPB initiative.

The PPB has made a good faith effort with leaps and bounds towards a complete and implemented BWC program, but the work is not complete. As stated, once the pilot program is complete the PPB and PPA will decide if an extension is required, or revisions are needed to the policy before full and final implementation of the program. Additionally, those revisions should include the stated concerns and wishes of the community, as feasible. For these reasons, the PPB will remain in Partial Compliance with Par. 194.

The introduction of BWCs in the PPB is a big step and will place a significant responsibility on PPB officers to learn about this technology and use it according to policy. Inevitably, there will be oversights and mistakes, as we have seen with most law enforcement agencies. Therefore, the COCL underscores the importance of comprehensive training to ensure that officers understand the policy and procedures that guide the use of BWC and can practice using this technology. Second, the COCL recommends that the PPB or the City conduct an audit at some point to ensure that the BWC program is being implemented with integrity, and if not, to take corrective action.

| | |
|---|---|
| **COCL Recommendations** | • To achieve Substantial Compliance, the City "shall implement body-worn cameras (BWCs) pursuant to a policy that is subject to the policy-review-and-approval provisions of this Agreement" (Par. 194). This means that the City will need to: <br><br> ○ Develop and implement comprehensive BWC training <br><br> ○ Complete a successful pilot test in the field |

| | |
|---|---|
| | o   Achieve full-scale implementation of BWCs for PPB officer<br><br>• For any revisions that occur during or after the pilot process, we encourage the City to incorporate the recommendations from the community, the COCL and DOJ<br><br>• PPB should seek to acquire software for analyzing BWC data and identifying patterns in police-community interactions that can be used for training and coaching |
| **Assessment Based On** | Review of BWC pilot plans, BWC policy, hiring a qualified BWC vendor, hiring PPB personnel for BWC program, and preparing the identified precinct for pilot testing. Future assessment based on observations of training and review of data regarding implementation success. |

**Settlement Agreement Paragraph**

195. In 2020, the City referred to voters a ballot measure that would overhaul the police accountability system incorporated into this Agreement by establishing a new Community Police Oversight Board to replace IPR for investigations of certain complaints of police misconduct and to replace the Chief of Police for imposition of discipline. City voters approved the ballot measure. The City has since empowered a 20-member civilian Commission to define the duties and authority of the Oversight Board and submit a proposal to the City Council for final approval.

a. Before January 1, 2022, the City Council and Auditor shall each present a plan to the United States for an orderly transition to the Community Police Oversight Board by ensuring the continuity of IPR operations while the Commission develops the Oversight Board for City Council's approval. The United States shall determine whether either of these two plans is acceptable. City Council will then adopt a plan that the United States has determined is acceptable. The Parties agree that the adopted plan shall be appended to this Agreement and will become part of this Order, provided that the Parties may agree to modify the plan if warranted by the circumstances. Until the Oversight Board becomes operational, the City shall ensure that administrative investigations are completed as required by Section VIII –

Officer Accountability and that officers are held accountable for violating PPB policy and procedure as required by Paragraph 169.

b. Within 18 months of the date this paragraph is entered as an order of the Court, the Commission shall propose to City Council changes to City Code to create a new police oversight system as reflected in the City of Portland Charter amendment establishing a Community Police Oversight Board. Within 60 days of receiving the Commission's proposal, the City will propose amendments to City Code to address the Commission's proposal, and corresponding amendments to this Agreement, subject to the United States' and the Court's approval, to ensure full implementation of the Oversight Board and effective police accountability, consistent with the requirements of this Agreement. Within 21 days of the approval of the amendments to the Agreement by the United States and the Court, the City Council shall consider and vote on the conforming City Code provisions creating the Oversight Board. Within 12 months of the Council's adoption of the City Code provisions, the new Oversight Board shall be staffed and operational, and IPR shall then cease taking on new work and complete any pending work. For good cause shown, the deadlines imposed by this subparagraph (b) may be reasonably extended provided that the City is in substantial compliance with subparagraph (a).

c. The City will comply with any collective bargaining obligations it may have related to the Oversight Board, which the City agrees to fulfill expeditiously and in compliance with its obligation to bargain in good faith.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Observation of Police Accountability Commission (PAC) meetings; Communication with City support staff; Review of PAC's Quarterly Report, January-March 2023 |

### Compliance Assessment

The City is currently in Partial Compliance with the requirements of Par. 195 and work remains to be done in order to achieve Substantial Compliance. On November 3, 2020, Portland voters passed Ballot Measure 26-217 to create this Community Police Oversight Board (CPOB) that would provide an entirely new police accountability system. The CPOB will act as an independent body that has the authority to:

- Investigate all deaths in custody and uses of deadly force

- Investigate all complaints of force that result in injury, discrimination against a protected class, violations of federal or state constitutional rights

- Investigate other complaints or incidents of misconduct as they see fit or mandated by City Code

- Subpoena, gather, and compel documents and all evidence, including the ability to compel statements from witnesses and officers

- Compel sworn members of the PPB and supervisors to participate in investigations.

- Make policy recommendations to the PPB and City Council, and

- Impose discipline, including termination.[44]

To establish the community oversight board, in July of 2021, the City Council created a Police Accountability Commission (PAC), composed of 20 community members, with the directive of developing the new oversight board for the Portland Police Bureau. In furtherance of this mission, the PAC held 21 public meetings during the first quarter of 2023. Recordings of each meeting held during the fourth quarter are publicly available on PAC's city homepage.[45]

In January, the Police Accountability Commission (PAC) and its sub-committees held a total of eight public meetings, including two full commission meetings and six sub-committee meetings. The commission also organized two community engagement events. The Sub-Committee on Access to Information concluded its work on January 5, 2023, and referred a draft of the PAC's Areas of Agreement on Access to Information to the full commission for consideration. In February, the PAC and its sub-committees had five meetings. PAC members participated in a community event hosted by community-based organization partners to gather input for the PAC process. The Sub-Committee on Officer Accountability had its final meeting on February 2, 2023, finalizing a draft document called *Areas of Agreement on Officer Accountability* for consideration by the full commission. During public meetings on February 6th, 9th, and 13th, the full commission approved the Areas of Agreement on Structural Oversight and the Areas of Agreement on Officer Accountability, marking the completion of the PAC's third phase of work, Powers and Duties. In February, at the conclusion of the third phase of work, PAC adopted three documents created that outlined the function of the new oversight board: *PAC Areas of Agreement on Access to Information, PAC Areas of Agreement on Officer Accountability, and PAC Areas of Agreement on Structural Oversight.* In March, the PAC and its sub-committees held a total of eight public meetings. The PAC organized two community forums to directly hear community preferences for the

---

[44] https://www.portland.gov/sites/default/files/2021/portland-ballot-measure-26-217-11-03-2020.pdf

[45] https://www.portland.gov/police-accountability/events/meetings?f%5B0%5D=year%3A2022

new system. The community forums were held in March, one virtual forum on March 14th and one in-person forum on March 22nd, allowing the public to provide input on the design of the new accountability system, including the oversight board and investigatory and disciplinary structure.

In response to Par. 195(a), plans have been submitted to DOJ "for an orderly transition to the Community Police Oversight Board." Effective June 30, 2022, IPR was removed from the City Auditor's office by amending Portland City Code (PCC) 3.21. The plan to remove IPR was submitted in January of 2022. IPR is now recognized as an agency independent of the City Council and other city bureaus. Under this amendment to the PCC, IPR can request services, assistance, and advice from any City department, officer, administrative agency, or bureau in the performance of its duties. To ensure the continuity of resources to IPR, the City Council will fund IPR at the amount necessary to maintain operations until IPR transitions to the new Community Police Oversight Board. Similarly, non-represented IPR employees will be allowed to transfer to an equivalent (or suitable) position offered by the City Council, or to the Auditor's office if offered. For represented IPR employees, the City will negotiate with AFSCME to discuss the alternatives available to ensure the retention of represented employees.

The PAC has worked hard to provide a process and framework for this remedy, and the Committee is supported by competent and committed City staff. The City is seeking a Research and Policy Coordinator. This role is crucial in ensuring that the PAC has the necessary information and analysis to make well-informed recommendations. The Research and Policy Coordinator will be responsible for conducting research, compiling reports, and gathering relevant resources and documents to provide to PAC members. This information will help shape the commission's understanding of the issues at hand and enable them to make informed decisions. Additionally, the coordinator will assist in communicating the PACs findings and recommendations to the public and other parts of the City government. Clear and accessible communication is vital to ensure that interested parties can comprehend the PACs recommendations and understand the data and evidence used to support those recommendations.

To address concerns with the overall timeline, the PAC requested that the City Council extend the deadline for their work product from June 9, 2023, to October 29, 2023. In response to PAC's request for an extension, City Council voted on March 22, 2023, to extend their deadline to August 31, 2023. While this is only a partial extension, we remain concerned about the length of this process overall. However, we have empathy for a volunteer body that has met numerous times each quarter and faces a complex set of issues. The COCL is

impressed with the volume of topics addressed by the PAC and the competency of the supporting staff.

The work of the PAC should eventually lead them to submit a proposal to the City Council that will include "changes to City Code to create a new police oversight system as reflected in the City of Portland Charter amendment establishing a Community Police Oversight Board." (Par. 195 (b)). There is much work to be done before such a proposal is ready to be submitted and the City will need to ensure that the proposed changes to the City code "comply with any collective bargaining obligations" (Par. 195(c)). We also note that any proposal for a Community Police Oversight Board must be reviewed by the City Council, PPA, DOJ and the Compliance officer/Monitor. Until the work delineated in Par. 195 has been completed, the City will remain in Partial Compliance. The COCL will closely monitor the implementation of the amendment in the months ahead.

| | |
|---|---|
| **COCL Recommendations** | <ul><li>To achieve Substantial Compliance, the PAC must submit to the City Council a clear and reasonable proposal for the implementation of a Community Police Oversight Board (CPOB) as defined in Par. 195</li><li>To achieve Substantial Compliance, the City must implement a functional CPOB that is properly staffed, trained, operational, and able to effectively investigate and dispose of use of force and misconduct cases</li></ul> |
| **Assessment Based On** | Progress achieved by PAC toward developing the CPOB; Implementation and functioning of the CPOB. |

## LIST OF ACRONYMS

**AAR:** After Action Report (also referred to as 940)

**AMR/EMS:** American Medical Response/Emergency Medical Service

**BHR:** Bureau of Human Resources

**BHRT:** Behavioral Health Response Team

**BHCC:** Behavioral Health Call Center

**BHCT:** Behavioral Health Coordination Team

**BHU:** Behavioral Health Unit

**BHUAC:** Behavioral Health Unit Advisory Committee

**BOEC:** Bureau of Emergency Communications

**CAG:** Coalition of Advisory Groups

**CEW:** Conducted Electric Weapons

**CCO:** Coordinated Care Organization

**CI Training:** Crisis Intervention Training

**CIT:** Crisis Intervention Team

**COCL:** Compliance Officer and Community Liaison

**CRC:** Citizen Review Committee

**CRO:** Communication Restriction Order

DHM: Davis, Hibbitts & Midghall, Inc.

**DOJ:** Department of Justice

**ECIT:** Enhanced Crisis Intervention Team

**ECW:** Electronic Control Weapons

**EIS:** Employee Information System

**FED:** Forensic Evidence Division

**FMLA**: Family and Medical Leave Act

**FSD:** Family Services Division

**FTO:** Field Training Officer

**FDCR:** Force Data Collection Report

**HRC:** Human Rights Commission

**IA:** Internal Affairs

**IMLLC**: Independent Monitor, LLC

**IPR:** Independent Police Review

**LMS:** Learning Management System

**PAC**: Police Accountability Commission

**PCCEP:** Portland Committee on Community Engaged-Policing

**PED:** Property and Evidence Division

**PES:** Psychiatric Emergency Services

**POH:** Police Officer Hold

**PPB:** Portland Police Bureau

**PRB:** Police Review Board

**PSD:** Professional Standards Division

**PSR:** Portland Street Response

**PS3:** Public Safety Support Specialist

**RRT**: Rapid Response Team

**RU:** Responsibility Unit

**SCT:** Service Coordination Team

**S.O.P.:** Standard Operating Procedure

**SSD:** Strategic Services Division

**TA Statement:** Technical Assistance Statement

**TAC:** Training Advisory Council

**TOD:** Tactical Operations Division

**UDAR**: Uniform Daily Assignment Roster

**YSD:** Youth Services Division

## LIST OF PERSONNEL

Chief of Police: Chuck Lovell

Deputy Chief of Police: Michael Frome

Assistant Chief of Operations: Jeffrey Bell

Assistant Chief of Services: Michael Leasure

Assistant Chief of Investigations: Art Nakamura

Commander of Professional Standards Division/Compliance Coordinator: Kristina Jones

Inspector General/DOJ Compliance team: Mary Claire Buckley

Force Inspector Lieutenant: Peter Helzer

Behavioral Health Unit (BHU): Christopher Burley

EIS Supervisor: Matthew Engen

EIS/Accountability Lieutenant: Matt Engen

Training Captain: Franz Schoening

City of Portland Auditor: Simone Rede

IPR Director: Ross Caldwell

BOEC Director: Bob Cozzie

BOEC Training and Development Manager: Melanie Payne

**Exhibit A**