**KRISTEN CLARKE**
Assistant Attorney General
Civil Rights Division
**STEVEN H. ROSENBAUM**
Chief
**LAURA L. COWALL**
Deputy Chief
**R. JONAS GEISSLER**
**JARED D. HAGER**
**AMY SENIER**
Trial Attorneys
Special Litigation Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, D.C.  20530
Phone: 202.514.6255
Fax:    202.514.4883
    Attorneys for Plaintiff United States

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

|  |  |
|---|---|
| **UNITED STATES OF AMERICA,** | Case No. 3:12-cv-02265-SI |
| Plaintiff, | MEMORANDUM IN SUPPORT OF JOINT MOTION TO AMEND THE AMENDED SETTLEMENT AGREEMENT |
| v. | |
| **THE CITY OF PORTLAND,** | |
| Defendant. | |

Plaintiff United States of America (United States) submits this memorandum in support of the joint motion filed by the United States and Defendant City of Portland (City) (ECF 390) for the entry of an order amending the Amended Settlement (Agreement) (ECF 354).  The United States submits that the proposed amendments are fair, adequate, and reasonable.  They would:  (1) replace the current dual monitoring structure with an independent monitoring team with expertise in all areas of the Agreement; (2) terminate 40 paragraphs of the Agreement based upon sustained substantial compliance, thereby focusing compliance efforts on the remaining paragraphs; (3) establish a process for the City to self-monitor compliance with the  Agreement; and (4) provide enhanced opportunities for community involvement.

## I.    BACKGROUND

On June 6, 2011, the United States opened an investigation of the Portland Police Bureau (PPB) pursuant to 34 U.S.C. § 12601.  The United States released findings on September 13, 2012, concluding there was reasonable cause to believe that PPB engaged in a pattern or practice of excessive force against persons who have or are perceived to have mental illness.  ECF 5.  On December 17, 2012, the United States filed a complaint and, together with the City, a proposed settlement agreement.[1]  ECF 1, 3.  In litigation that ensued, the Court granted the Portland Police Association's (PPA) motion to intervene and enhanced *amicus curiae* status to the Albina Ministerial Alliance Coalition (AMAC), a group of representatives of community organizations and churches.  ECF 32.  Subsequently, the Court appointed the Mental Health Alliance (MHA) as *amicus curiae*, with the right to file briefs and present in any proceedings.  ECF 188.

---

[1] The Agreement provided for conditional dismissal pursuant to Federal Rule of Civil Procedure 41(a)(2).

On July 30, 2015, the Court entered the Agreement as an order.[2]  ECF 99.  The Agreement provides for comprehensive reform of PPB policies, procedures, and training in use of force, interactions with people with mental illness or in crisis, accountability, and oversight. The Agreement's eight substantive areas are:  (1) use of force; (2) training; (3) community-based mental health services; (4) crisis intervention; (5) employee information system; (6) officer accountability; (7) community engagement; and (8) additional remedies arising from the City's response to protests in 2020.  Rather than a more conventional court-appointed monitor model used in other institutional reform consent decrees, the Agreement included the use of a Compliance Officer and Community Liaison (COCL) appointed by the City to prepare public, quarterly reports assessing the City's compliance.  ECF 354-1, ¶ 162.  And the United States serves as Monitor of the Agreement.  *Id.*, ¶164.  In eight years since court approval of the Agreement, the United States has filed seven periodic compliance assessment reports.[3]

On November 21, 2019, the COCL released a quarterly report finding the City in substantial compliance with all of the Agreement's terms.  ECF 211-1.  On January 10, 2020, the United States likewise found the City in substantial compliance.  ECF 212.  Our finding triggered a one-year period after which, if the City maintained substantial compliance, the Agreement could have been terminated.  The City did not maintain compliance due to systemic

[2] The Agreement has been amended twice.  First, on May 15, 2018, the Court approved six of seven proposed changes after a fairness hearing, reserving judgment on changes to the community engagement structure pending further assessment of whether they were fair, adequate, and reasonable.  ECF 171.  On September 23, 2021, the Court approved those changes. ECF 262.  Second, on April 30, 2022, the Court approved eight new remedies the Parties added to resolve a notice of noncompliance related to the City's response to the 2020 protests.  ECF 290.

[3] A color-coded chart taken from the United States' last compliance assessment report (ECF 369-1) and noting the compliance ratings for each paragraph in each report is attached as Exhibit 2.

**Page 3      Memorandum in Support of Joint Motion to Amend the Amended Settlement Agreement**

failures to report, review, and hold PPB officers accountable for more than 6,600 uses of force during near nightly protests for racial justice and police accountability between May 29 and November 15, 2020.

After 2020, the City experienced backsliding in its rate of compliance.  In the United States' fifth report, filed in February 2021, we found the City was no longer in substantial compliance with 11 of 88 paragraphs.  ECF 236.  At a hearing that summer, the Court directed the Parties to consider whether a Monitor may now be appropriate "at least to protect the progress that has been made and prevent further slippage."  ECF 249.  In our sixth report, we found the City was no longer in substantial compliance with 30 of 88 paragraphs.  ECF 292.  We also filed a status report noting minor corrections.  ECF 307.  We then filed our seventh report in July 2023, evaluating implementation of the Agreement as then modified with eight new paragraphs for the first time, and found progress with the City in substantial compliance with 71 of 96 paragraphs.  ECF 369.

In October 2022, the City initiated mediation before U.S. Magistrate Judge Stacie Beckerman, in part to explore the possibility of shifting to a court-appointed Monitor.  *See* ECF 308, 330, 334, 350, 359, 361, 366.  The Parties included PPA, AMAC, and MHA at different points in the mediation.  Judge Beckerman also made herself available for individual conversations to help the Parties reach agreement.  Now, the Parties have agreed to add to the Agreement a new Section XII—containing Subsections A to H, with 80 paragraphs, numbered 196 to 275—establishing an independent, court-appointed monitor (Monitor) to assess the City's compliance with the remaining provisions of the Agreement (ECF 390-1).[4]  Section XII's

---

[4] In addition to definitions, access, monitoring, and enforcement provisions, the remaining operative sections of the Agreement would include 55 paragraphs, identified among the discrete subsubsections listed in the Motion.  ECF 390 at 23-26 (listing the following discrete sections

independent monitor structure would replace the current system under which the COCL issues

quarterly reports and the United States produces periodic compliance assessments.  Through

proposed Section XII, the Parties also seek immediate termination of 40 paragraphs that have

been in sustained compliance for at least the three prior United States assessment reports and a

structure for partial termination of the Agreement going forward based on the Monitor's

assessments and the City demonstrating its ability to sustain compliance through self-monitoring.

ECF 390-1, ¶¶ 250-259.

On November 8, 2023, the City Council held public hearings to consider an ordinance

that would approve the proposed amendments.  After receiving written and oral public

comment, the City Council voted unanimously to adopt Ordinance 191519, which approved

the proposed amendments, as required by Paragraph 184.   *See* City of Portland, City Council

Documents, *available at*

https://www.portland.gov/council/documents/ordinance/passed/191519 (last visited Nov. 9,

2023).

---

remaining in the Agreement:  Paragraphs 66-67 (force principles); Paragraphs 69, 70, 72-73, 188
(force reports and reviews); Paragraphs 74-77 (force audits); Paragraphs 78-79, 81, 84, and 190
(training principles); Paragraphs 85-86 (training audits, analyses, and recommendations);
Paragraphs 88-90 (community-based mental health services); Paragraphs 94-96 (behavioral
health unit advisory committee); Paragraphs 116-118 (EIS operation); Paragraphs 121-123
(investigation timelines); Paragraphs 124-127 (on-scene public safety statements and
interviews); Paragraphs 128-129, 131-133 (conduct of IA investigations); Paragraphs 137 and
245 (discipline and accountability); Paragraphs 141-144, 151-152 (PCCEP); Paragraphs 148,
150, 193 (PPB Stops Data and Annual Reports); Paragraph 189 (outside review of 2020 protest
response); Paragraph 191 (training dean); Paragraph 192 (investigating 2020 protest response);
Paragraph 194 (body-worn cameras); and Paragraph 195 (new accountability structure)).  An
additional discrete section, Paragraph 115 (crisis triage), would be subject to mediation pursuant
to subject to Paragraph 252(a).  *Id.*

## II.    LEGAL STANDARD

This Court has previously approved the Agreement and subsequent amendments to the Agreement after fairness hearings applying a fair-adequate-and-reasonable standard. *See, e.g.*, ECF 354 (listing prior fairness hearings and orders amending the Agreement). This same standard applies to the proposed Section XII.[5] *Officers for Justice v. Civil Service Comm'n, et al.*, 688 F.2d 615, 625 (9th Cir. 1982), *cert. denied*, 459 U.S. 1217 (1983); *United States v. Oregon*, 913 F.2d 576, 586 (9th Cir. 1990); *Cemex Inc. v. L.A. County*, 166 Fed. Appx. 306, 307 (9th Cir. 2006) (finding that consent decree was negotiated in good faith and at "arm's length"). Though this Agreement is not a consent decree, it is a settlement agreement the terms of which are ordered by the Court and that the Parties agree should be subject to judicial oversight. In other contexts, the courts have used consent decree analysis to approve and retain judicial enforcement of court-enforceable agreements that were not consent decrees. *See Oregon*, 913 F.2d at 580 (discussing approval and retained jurisdiction over the "Salmon Plan").

The fair-adequate-and-reasonable analysis does not require "the achievement of the optimal outcome for all parties," but rather, "[t]he court need only be satisfied that the decree represents a reasonable factual and legal determination." *Id.* at 580-81. Further, public policy favors settlement, particularly in complex litigation such as the pattern-or-practice claims brought by the United States. *Officers for Justice*, 688 F.2d at 625 ("[I]t must not be overlooked that voluntary conciliation and settlement are the preferred means of dispute resolution.");

---

[5] As the parties noted in the joint motion (ECF 390), the amendments would become self-executing after 45 days by operation of Paragraph 184 of the Agreement. This Paragraph enables the Parties to "jointly stipulate to make changes, modifications, and amendments to this Agreement, which shall be effective, absent further action by the Court, 45 days after a joint motion has been filed with the Court." ECF 354-1.

*United States v. McInnes*, 556 F.2d 436, 441 (9th Cir.1977) ("We are committed to the rule that the law favors and encourages compromise settlements.").

In an executive agency's enforcement action, the Ninth Circuit states that "courts should pay deference to the judgment of the government agency which has negotiated and submitted the proposed judgment," and "[u]nless a consent decree is unfair, inadequate, or unreasonable, it ought to be approved." *SEC v. Randolph*, 736 F.2d 525, 529 (9th Cir. 1984).

In this case, the Agreement as amended by Section XII demonstrably reaches and surpasses the legal standard for court approval.

## III.    ANALYSIS

The Court should approve the proposed amendments because they are fair, adequate, and reasonable, and resulted from arm's-length negotiations by sophisticated parties, consistent with the purpose of Section 12601.  That these amendments meet this standard is evident in that the proposed amendments:  (1) replace the current dual monitoring structure with an independent monitoring team with expertise in all areas of the Agreement; (2) terminate 40 paragraphs of the Agreement based upon sustained substantial compliance, thereby focusing compliance efforts on the remaining paragraphs; (3) establish a process for the City to self-monitor compliance with the Agreement; and (4) provide enhanced opportunities for community involvement.

### A.    The Amendments Would Shift Monitoring to a Single Independent Monitor Selected with Broad Community Input.

The proposed Court appointment of an independent monitor is a substantial change from the current dual system of the United States monitoring compliance with the Agreement while the Parties are informed by the quarterly outcome and assessment reports of the COCL.  ECF 354-2, ¶ 159.

This Court has asked whether a Monitor may be appropriate "at least to protect the progress that has been made and prevent further slippage." ECF 249. AMAC has long sought the appointment of a court monitor. ECF 220 at 11. Similarly, the prior Community Oversight Advisory Board (COAB) recommended replacing the COCL with a court-appointed monitor years ago. *See* COAB recommendation 071416-2, available at

https://www.mentalhealthportland.org/wp-content/uploads/2016/10/Overview-of-Approved-COAB-Recommendations_0_0.pdf. COAB's replacement, the current Portland Committee on Community-engaged Policing (PCCEP) also recommended appointment of a monitor. *See* "PCCEP Recommendation to Appoint an Independent Monitor in the Settlement Agreement," Feb. 28, 2023, available at https://www.portland.gov/pccep/documents/pccep-recommendation-appoint-independent-monitor-united-states-v-city-portland/download. In response to that recommendation, Portland Mayor Ted Wheeler said:

> I agree that the current system in place, in which a COCL and DOJ both provide compliance reports is confusing and breeds a perception of competition and lack of objectivity. Additionally, having the DOJ involved as both a party to the Settlement Agreement and the monitor creates another layer of confusion that can be avoided with an Independent Monitor.

*See* "Mayor Wheeler's Response to PCCEP Independent Monitor Recommendation," May 9, 2023, available at https://www.portland.gov/pccep/documents/mayor-wheelers-response-pccep-independent-monitor-recommendation/download. Accordingly, the appointment of a monitor brings to fruition a frequent and long-standing call for an independent court monitor to assess the City's compliance with the Agreement.

**B.    The Amendments Focus Compliance Efforts on Needed Areas of Improvement while Narrowing Areas with a Sustained Record of Substantial Compliance.**

The City has established a record of sustained compliance with 40 paragraphs of the Agreement for at least three assessment periods. *Id.,* ¶ 250.  Considering the need to dedicate resources toward achieving compliance with more difficult Agreement provisions and acknowledging the City's success implementing other provisions, the Parties reached the reasonable conclusion:  termination of discrete sections of the Agreement where the City has shown sustained substantial compliance.  ECF 390-1, Sec G.  Accordingly, the decision to focus efforts on where the City must still demonstrate sustained substantial compliance is a reasonable step to ensure implementation of the not-yet-achieved remedies.  Provisions proposed for termination cover electronic control weapons (ECWs); Behavioral Health Unit; Training Advisory Committee; Enhanced Crisis Intervention Team; Behavioral Health Response Team; Service Coordination Team; Bureau of Emergency Communications; and Citizen Review Committee.

C.    **The Amendments Establish Self-Monitoring Intended to Ensure Sustainable Reform.**

In the same vein as partial termination, the amendments afford an opportunity for self-monitoring—against the backstop of independent monitor review—for provisions of the Agreement with which the City has demonstrated substantial compliance, but must still show capacity to sustain that compliance. ECF 390-1, Sec G. Among other things, self-monitoring also sets up the systems for a durable remedy's continuation after the dismissal of this entire lawsuit upon sustained substantial compliance with all remaining terms. Self-monitoring will require the City to demonstrate it can self-detect and self-correct issues. And the City will necessarily have to work closely with the Monitor and learn from the Monitor's review of its self-assessments.

Paragraphs would move into self-monitoring through one of three ways: (1) if the Monitor's first report and DOJ's Seventh Periodic Compliance Assessment Report (ECF 369) found the City in substantial compliance with the discrete section; (2) if the Monitor's first report and COCL's final two quarterly assessment reports found the City in substantial compliance with the discrete section; or (3) if the Monitor finds substantial compliance in two consecutive reports (i.e., after the City evidences one more year of compliance). ECF 390-1, ¶ 254. If the Court approves Section XII, provisions covering community-based mental health services, the behavioral health advisory committee, portions of community oversight, and PPB's stops data and annual reports would immediately shift to self-monitoring. *Id.*, ¶ 253. All paragraphs that the City self-monitors and demonstrates to the Court successful implementation for two consecutive semi-annual reports would be subject to a joint motion for partial termination. *Id.*, ¶ 257. This is a reasonable process through which the Parties can be assured of an independent assessment of compliance followed by a testing period during which the City demonstrates its

**Page 10    Memorandum in Support of Joint Motion to Amend the Amended Settlement Agreement**

ability to sustain compliance and self-detect/self-correct under the tutelage of the Monitor. Only then would additional provisions be subject to termination.

### D. The Amendments Provide Enhanced Opportunities for Community Involvement.

As noted above, proposed Section XII is the product of over a year of mediation that included the United States, the City, and PPA, AMAC, and MHA at different points in time. The United States and the City carefully considered the input of the intervenor, enhanced *amicus curiae*, and *amicus curiae* in the formulation and editing of the amendments we now present to the Court. Proposed Section XII enhances opportunities for community involvement in the implementation of the Agreement in significant ways. In selecting a Monitor to propose to the Court, the United States and City will consider "commitment to establish a local presence; demonstrated experience, willingness, and ability to solicit and obtain meaningful community participation; ability to seek out varied stakeholder interests and perspectives, including law enforcement, the Black community, communities of color, mental health communities, and LGBTQIA+ communities; demonstrated knowledge about Portland's history of policing, mental health needs and services, and institutional racism, and willingness to expand upon that knowledge." *Id.*, ¶ 204.

The United States and the City will choose finalists only after considering input from the PPA, AMAC, and MHA. *Id.*, ¶ 204. The Parties will publicly announce the three finalists through various media intended to reach diverse populations, will post their resumes and proposed team members' profiles on the City website, and will provide and advertise a 32-day public comment period. *Id.*, ¶ 205. Finalists will participate in a public town hall to answer community questions before the Parties select a Monitor for the Court to appoint. *Id.* In selecting the final candidate, the Parties will consider public input and any input from the PPA, AMAC, MHA, and PCCEP. *Id.*, ¶ 206.

**Page 11    Memorandum in Support of Joint Motion to Amend the Amended Settlement Agreement**

During the remaining implementation of the Agreement, the intervenor, enhanced *amicus curiae*, and *amicus curiae* also will have an amplified role.  In deciding whether the Monitor's two-year term should be renewed, the Parties will consider the input of the PPA, AMAC, MHA, and PCCEP.  *Id.*, ¶ 209.  The same is true for any replacement Monitor.  *Id.*, ¶ 215.  Before issuing any monitoring report, the Monitor will post the draft report publicly for 32 days to receive any community input, during which the Monitor shall hold a public town hall to address the community and receive comments.  *Id.*, ¶ 227.  If there are any disputes requiring mediation, the PPA, AMAC, and MHA also would have a new role:  Whereas the current Agreement only requires participation of the Parties for potential mediation of compliance issues, future mediation would, at the mediator's discretion, include the PPA, AMAC, and MHA.  *Id.*, ¶ 271.

## IV.    CONCLUSION

For the foregoing reasons, the proposed amendments in Section XII are fair, reasonable, and adequate.  If the Court approves the amendments, the Parties will move forward expeditiously to request proposals for a Monitor and to implement the community-inclusive vetting process proposed in Section XII.

DATED: November 16, 2023.

Respectfully submitted,

FOR THE UNITED STATES:

NATALIE K. WIGHT
United States Attorney
District of Oregon

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

STEVEN H. ROSENBAUM
Special Litigation Section Chief

*/s/ Laura L. Cowall*
LAURA L. COWALL
Deputy Chief

*/s/ Amy Senier*
R. JONAS GEISSLER
JARED D. HAGER
AMY SENIER
Trial Attorneys

## **Certificate of Service**

I hereby certify that on November 16, 2023, I filed the foregoing through the Court's CM/ECF system, which will serve a true and correct copy of the filing on all counsel of record in this matter.

*/s/ Amy Senier*