# COMPLIANCE OFFICER AND COMMUNITY LIAISON

*QUARTERLY REPORT: QUARTER 2 UPDATES AND ANALYSIS*

**Prepared By:**
**CNA**

**For the City of Portland, Oregon**
**April 1, 2023 to June 30, 2023**

**October 9, 2023**





This document contains the best opinion of CNA at the time of issue.

**Distribution:**

Distribution unlimited.

**November, 2023**

**Exhibit A**

This page intentionally left blank.

Exhibit A

# Executive Summary

This is the Compliance Officer/Community Liaison's (COCL) second quarter report for 2023, as required by the Amended Settlement Agreement between the City of Portland (the City) and the United States Department of Justice (DOJ), Case No. 3:12-cv-02265-SI, entered April 29, 2022. This report covers the three-month period from April 1, 2023, to June 30, 2023.

### III. USE OF FORCE

During the second quarter of 2023, the Portland Police Bureau (PPB) and the City of Portland (the City) was found to be in Substantial Compliance in five of the 12 paragraphs in Section III, leaving Pars. 69, 70, 73, 74, 75, 76, and 77 in Partial Compliance.

For the present quarter, our review of a random sample of 20 use of force events revealed each use of force was reasonable, that the force was comprehensively described, investigated, and reviewed by the chain-of-command. Additionally, we found evidence of the Force Inspector identifying areas where policy and training could be enhanced, consistent with the force audit requirements. For instance, one critical issue that had been identified by PPB pertained to needing to better distinguish the difference between a modified box-in tactic and a ramming incident. This question was raised in the After Action Report (AAR) process and, as a result, the Force Inspector informs us that the Training Division has incorporated the issue in upcoming training.

Overall, our assessment of PPB's use of force events during the second quarter of 2023 found no significant concerns. However, as Par. 33 of the Settlement Agreement defines "implementation" as "consistent and verified performance of [policies and procedures]," we will need to see force events and force investigations continue being consistent with the requirements of the Settlement Agreement. Regardless, PPB officers and supervisors should be credited with the positive performances reviewed during this quarter.

### IV. TRAINING

During the second quarter of 2023, the PPB was found to be in Substantial Compliance with eight of the 10 paragraphs in Section IV, leaving Pars. 78 and 81 in Partial Compliance.

The COCL continued to examine the PPB's Online training program delivered through their Learning Management System (LMS). LMS attendance records are expected to include all in-person and online trainings completed by PPB members .The PPB has maintained its process for ensuring compliance with Oregon training standards, including through the use of

**Exhibit A**

reminder emails, noncompliance memos to the Chief's office, and supervised completion of training.  These training records are also required to be reviewed by supervisors as part of each members' annual performance evaluation.  We continue to await the final development of a centralized database that contains certification records for specialty assignments (e.g., ECIT or AR-15 certification).

During the second quarter of 2023, the COCL also observed select modules within the PPB's Advanced Academy training. These included courses on public order events, traffic stops, procedural justice, and crisis communication. Overall, we found the courses to be comprehensively developed and well delivered. In particular, we were impressed with how the concepts of respect, voice, neutrality, and fairness were incorporated throughout each of the courses we observed. We also found a high degree of engagement with the material from the instructors and the recruits.

Additionally, the COCL found that the PPB continued to produce training evaluation results for recently delivered training. The PPB's training evaluations continue to employ multiple methods of data collection, analysis, and reporting that are being guided by the Kirkpatrick Model of training evaluation.


### V. COMMUNITY BASED MENTAL HEALTH SERVICES

During the second quarter of 2023, the PPB and the City was found to be in Substantial Compliance for all paragraphs in Section V.

These paragraphs refer to services that are part of a broader mental health response system. The PPB and the City are partners in this system but are not necessarily drivers of the system. The City and the PPB continued to participate through engagement in various committees and workgroups. These include the Behavioral Health Unit Advisory Committee (BHUAC), the Behavioral Health Unit Coordination Team (BHUCT), the Unity Transportation Work Group, and the Legacy ED Community Outreach Group. These groups have continued to address important issues in city, county, and state approaches to providing comprehensive mental health services.

Also, as part of Section V, the Unity Center continues to act as a drop-off center for first responders to transport persons in a mental health crisis. As noted in prior reports, the Unity Center conforms to the intent of the Settlement Agreement and of drop-off centers as outlined in the Memphis Model of mental health crisis response. Furthermore, the PPB has continued to participate in AMR (ambulance service) training for transporting persons in mental health crises.

**Exhibit A**

## VI. CRISIS INTERVENTION

During the second quarter of 2023, the City and PPB was found to be in Substantial Compliance with all paragraphs in Section VI.

During the second quarter, Bureau of Emergency Communications (BOEC) maintained their policies and training for telecommunicators on triaging calls involving a mental health component, including Enhanced Crisis Intervention Team (ECIT), Portland Street Response (PSR), and the Behavioral Health Call Center (BHCC). BOEC continued to use seven call characteristics to determine whether a specialized ECIT officer should be dispatched. For their part, the PPB continued to maintain directives related to crisis response, including 850.20 (Police Response to Mental Health Crisis), 850.21 (Peace Officer Custody – Civil), 850.22 (Police Response to Mental Health Director Holds and Elopement), and 850.25 (Police Response to Mental Health Facilities). The PPB also continued to provide training to new officers as well as current officers through annual In-service training. In May of 2023, the PPB started a new Advanced Academy for new recruits. Additionally, the PPB maintained their specialized response approach through the use of ECIT officers. In the second quarter, PPB presented to the Behavioral Health Unit Advisory Committee (BHUAC) on the upcoming schedule for the ECIT certification training and invited members to a dry run of the training.

The PPB has maintained the use of Behavioral Health Response Team (BHRT) to assist individuals who represent an escalating risk of harm. While the Settlement Agreement only requires three teams for each precinct, in the second quarter the PPB maintained five BHRTs. The PPB has also maintained the Service Coordination Team (SCT) to facilitate the provision of services to persons who are chronically houseless, suffer chronic addiction, and are chronically in and out of the criminal justice system. For both programs, we provide ongoing operational statistics, including statistics related to decision-making and outcomes.

Finally, BHUAC continued to meet during the second quarter of 2023, utilizing the expertise of individuals at the PPB, BOEC, and the City, as well as other agencies, stakeholders, advocates, and service providers. We found that in the second quarter, meetings were largely productive and met quorum. For these reasons, we find the City has remained in Substantial Compliance with all paragraphs.

## VII. EMPLOYEE INFORMATION SYSTEM (EIS)

During the second quarter of 2023, the PPB was found to be in Substantial Compliance with three of the five paragraphs in Section VII, leaving Pars. 116 and 117 in Partial Compliance.

During the second quarter, we continued discussion with the PPB around our ongoing need for better clarity with how outlying officers, teams, and units are identified and evaluated in the context of early intervention.  To resolve these issues, we look forward to further

**Exhibit A**

discussion surrounding SOP #5 (Force Analysis for Supervisors and Teams).  Finally, we continue to await agreement from the Parties as to whether a comprehensive assessment of the EIS is necessary for compliance with the requirements of this paragraph.  For other paragraphs within this section, the PPB continues to maintain the thresholds required of the EIS and has maintained a second EIS administrator.

## VIII.  ACCOUNTABILITY

During the second quarter of 2023, the PPB was found to be in Substantial Compliance with 15 of the 21 paragraphs in Section VII, leaving Pars. 121, 126, 128, 131, 137 and 169 in Partial Compliance. During this quarter, we found one paragraph to have elevated from Partial Compliance to Substantial Compliance (Par. 129).  This is due to the fact that we have observed continuous quarters wherein all allegations of excessive force have been forwarded on for full and complete investigations or, in cases where there was an administrative closure, the allegation was deemed to have had no basis in fact by the Independent Police Review (IPR).

For other paragraphs within this section, barriers from prior quarters continue to remain, though we report progress towards Substantial Compliance in several of them, including Par. 126 (witness officer debriefings) and Par. 131 (PRBs and facilitators).  Alternatively, progress for some paragraphs remains relatively unchanged, including our assessment of Par. 169 ("PPB shall apply policies uniformly and hold officers accountable for complying with PPB policy and procedure").  Finally, we had previously provided a suggestion that the City should propose amendments to the Settlement Agreement which would allow IPR to toll for protected leave as IPR (as well as COCL) was under the impression that this had not previously been allowed.  However, we have recently been informed that the DOJ and City agreed that protected leave could be tolled, a development that IPR was unaware of and which ultimately led to differences between PPB's Internal Affairs Unit (IA) and IPR in how they calculated the 180-day timeline.  Moving forward, we will need to determine how this development impacts the timelines in Par. 121.

## IX.  COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING (PCCEP)

During the second quarter of 2023, the PPB was found to be in Substantial Compliance with all twelve paragraphs in Section IX.

PCCEP: In the second quarter of 2023, PCCEP continued to function as a legitimate body for community engagement.  They held one full committee meetings, six sub-committee meetings and hosted one town halls. The City continued to support PCCEP by maintaining competent staff to plan and manage meetings, recruiting and training new PCCEP members,

**Exhibit A**

and providing technical and legal assistance as needed. The COCL's remaining concerns are: (1) the need to fill youth vacancies on the PCCEP; and (2) the continued need for the City to respond to PCCEP's recommendations in a prompt and thorough manner.

PPB: Under the Settlement Agreement, the PPB is expected to introduce or expand its systems of community engagement, both with PCCEP and other resources. This includes maintaining or expanding its systems of measurement to better understand police-community relations and develop tailored responses to issues or concerns. During the second quarter of 2023, the PPB continued to implement its Community Engagement Plan. The PPB's diverse advisory groups (Community and Culturally Specific Councils), as well as the Coalition of Advisory Groups (CAG), continue to meet with the PPB leadership, City Commissioners, and the communities they represent in a transparent manner. Also, the PPB's Operational Councils – BHUAC, the Police Equity Advisory Council (PEAC), and the Training Advisory Council (TAC) – continue to meet regularly and provide the PPB with feedback on relevant issues.

The PPB's Office of Community Engagement and the PPB's Policy Director (with support from PPB's Strategic Services Division) have built a sound Language Justice Program that continues to expand to ensure equal access to police and city services. The new language access policy is nearly operational and should be followed by training in the near future.

The PPB continued to produce high-quality quarterly and annual reports on traffic stops and use of force with demographic breakdowns that allow for the analysis of racial disparities.

The PPB has made considerable strides in terms of community engagement and the PPB's Office of Community Engagement is doing some excellent, cutting-edge work to de-centralize community policing and build partnerships with the community. Nevertheless, there are some areas of concern within the PPB. COCL offers the following recommendations, with some required to maintain Substantial Compliance: (1) provide additional training and documentation regarding consent searches for individuals with limited English proficiency; (2) Continue the dialogue with community members around racial disparities in traffic stops and searches; (3) give the community a greater voice when evaluating police services, especially those who are the recipients of such services; and (4) more fully engage PCCEP in PPB's Community Engagement Plan.

## XI. ADDITIONAL REMEDIES

During the first half of 2022, the Parties, the Portland City Council, and the Federal court agreed to amend the Settlement Agreement to include eight new remedies to help reform the PPB. As a result, Section XI has been added, with eight new paragraphs (188 to 195). The COCL's compliance assessment for Section XI began in the second quarter of 2022.

**Exhibit A**

The City revised Force Data Collection Report (FDCR) and After Action Report forms to capture when the forms are edited and completed and continues to use these forms. The City also continues to list a separate line item for overtime costs to conduct necessary training for PPB officers. Additionally, the PPB released a draft of the 2022 Annual Report, soliciting comments and recommendations from the PCCEP and other community members. Finally, the PPB hired Dr. Rebecca Rodriguez as the Police Education Director. With these actions, the City has maintained Substantial Compliance for Par. 188, 190, 191, and 193.

The City and Independent Monitor, LLC (IMLLC) are undergoing an iterative review process for a report which assesses the City's response to crowd control events in 2020 as required by Par. 189. The IPR is continuing to complete investigations related to Par. 192 and the COCL expects to provide some additional details in the third quarter of 2023. Additionally, the PPB has begun a body-worn camera pilot program as an initial step to fulfil the requirements of Par. 194. Finally, the PAC submitted a set of recommendations to the City Council concerning the implementation of the Community Police Oversight Board required by Par. 195. With these actions, the City has maintained Partial Compliance for those paragraphs.

**Exhibit A**

# Contents

Introduction ............................................................................................................ 1

Report Card ............................................................................................................ 2

**Section III: Use of Force** ..................................................................................... **15**

    A.    Use of Force Policy ......................................................................................15
        1. Electronic Control Weapons ................................................................. 16
        2. Use of Force Reporting Policy and Use of Force Report ..................... 17
        3. Use of Force Supervisory Investigations and Reports ......................... 19
    B. Compliance Audits Related to Use of Force ...............................................23

**Section IV: Training** ........................................................................................... **33**

    A.    Assess Training Needs .................................................................................34
    B.    Evaluate Training ........................................................................................36
    C.    Document Training Delivered and Received ...............................................38
    D.    Trainer Qualifications ..................................................................................39
    E.    Deliver Appropriate and High-Quality Training ........................................40
    F.    Audit the Training Program .........................................................................41
    G.    Analyze and Report Force Data ..................................................................43

**Section V: Community-Based Mental Health Services** ..................................... **46**

**Section VI: Crisis Intervention** .......................................................................... **50**

    A. Addictions and Behavioral Health Unit and Advisory Committee ..............50
    B. Continuation of C-I Program ......................................................................58
    C. Establishing "Memphis Model" Crisis Intervention Team .........................59
    D. Mobile Crisis Prevention Team ..................................................................65
    E. Service Coordination Team .........................................................................71
    F. BOEC .........................................................................................................73

**Section VII: Employee Information System** ...................................................... **79**

**Section VIII: Officer Accountability** ................................................................. **89**

    A. Investigation Timeframe .............................................................................89
    B. On Scene Public Safety Statements and Interviews .....................................92
    C. Conduct of IA Investigations .......................................................................96
    D. CRC Appeals ...............................................................................................103
    E. Discipline ....................................................................................................105
    F. Communication with Complainant and Transparency .................................106

**Section IX: Community Engagement and Creation of Portland Committee on Community Engaged Policing** .............................................................................. **109**

    A.    Portland Committee on Community Engaged Policing ...............................109
    B.    PPB's Role in Public Engagement and Outreach .......................................113
        1.    System Overview ................................................................................113

**Exhibit A**

2.      The Community Engagement Plan ..................................................113

3.      Data Collection, Analysis, and Reporting .......................................115

**Section XI: Additional Remedies** ........................................................ **120**

**Appendix A: Acronyms** ........................................................................ **130**

**Appendix B: List of Personnel** ............................................................ **132**

**Exhibit A**

This page intentionally left blank.

**Exhibit A**

# Introduction

This is the Compliance Officer/Community Liaison's (COCL) second quarter report for 2023, as required by the Amended Settlement Agreement between the City of Portland (the City) and the United States Department of Justice (DOJ), Case No. 3:12-cv-02265-SI, entered April 29, 2022. This report covers the three-month period from April 1, 2023, to June 30, 2023.

The COCL continues to evaluate whether the systems required by the Settlement Agreement have been sustained or restored to ensure constitutional policing in Portland. The following Report Card lists the compliance rating for each paragraph reviewed by the COCL.

This is the first report prepared by CNA and Dr. Tom Christoff as the COCL since the resignation of Dr. Dennis Rosenbaum. The entire COCL Team would like to take the opportunity to express our sincerest gratitude for Dr. Rosenbaum's leadership since the start of the Settlement Agreement and his role in moving the City and PPB towards Substantial Compliance. Although there is work that needs to be done, the organizational reform that has occurred to-date could not have occurred without Dr. Rosenbaum.

**Exhibit A**

# Report Card

This report includes a "Report Card" that provides a separate assessment of each paragraph in the Agreement. Under "Recommendations," this format gives the City clarity about what is needed "*to achieve Substantial Compliance.*" We also give the City guidance on what is needed "*to maintain Substantial Compliance.*" Finally, when this language is not used, the COCL is offering recommendations that are not required for compliance, but we feel would have a significant positive impact on the PPB if implemented. All paragraphs are reviewed and evaluated using the following standards:

- Substantial Compliance: The City/PPB has satisfied the requirement of the provision in a comprehensive fashion and with a high level of integrity.
- Partial Compliance: The City/PPB has made significant progress towards the satisfaction of the provision's requirements, though additional work is needed.
- Non-Compliance but Initial Steps Taken: The City/PPB has begun the necessary steps toward compliance, though significant progress is lacking.

In the second quarter of 2023, the City/PPB remained in Substantial Compliance for most of the paragraphs in the Settlement Agreement. Two changes occurred: the City/PPB were moved to Substantial Compliance for Pars. 129 (Accountability) and 191 (Additional Remedies). Thus, at the conclusion of the second quarter of 2023, Partial Compliance ratings were given for the following 21 paragraphs: Use of Force (Pars. 69, 70, 73, 74, 75, 76, 77), Training (Pars. 78, 81), Employee Information System (Pars. 116, 117), Officer Accountability (Pars. 121, 126, 128, 131, 137, 169), and Additional Remedies (Pars. 189, 192, 194, 195).

**Exhibit A**

The table below summarizes the compliance status and recommendations for all paragraphs reviewed by the COCL.

| <u>Paragraph</u> | <u>Compliance Label</u> | <u>COCL Recommendations</u> |
|---|---|---|
| **III. USE OF FORCE** | | |
| Par. 66 | Substantial Compliance | • To maintain Substantial Compliance, maintain vigilance in reviewing how de-escalation is defined to ensure that the data surrounding de-escalation does not suffer from validity issues |
| Par. 67 | Substantial Compliance | • To maintain Substantial Compliance, maintain vigilance in reviewing how de-escalation is defined to ensure that the data surrounding de-escalation does not suffer from validity issues |
| Par. 68 | Substantial Compliance | • Use the upcoming CEW course during the fall in-service training to remind officers of their requirements to spark test their CEWs prior to going on shift. |
| Par. 69 | Partial Compliance | • To return to Substantial Compliance, evaluate Directives 1010.00 and 910.00, evaluate current training, and identify opportunities to clarify when officers should be reporting Control Against Resistance.<br><br>• Upon issuing such clarification, take corrective action on members who fail to report Control Against Resistance and supervisors who fail to correct the issue |
| Par. 70 | Partial Compliance | • To achieve Substantial Compliance, ensure consistent and verified performance as required by the Settlement Agreement |
| Par. 71 | Substantial Compliance | • No recommendations at this time |
| Par. 72 | Substantial Compliance | • Ensure supervisors reliably and consistently use the AAR for future force events |

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| Par. 73 | Partial Compliance | • To achieve Substantial Compliance, ensure consistent and verified performance as required by the Settlement Agreement |
| Par. 74 | Partial Compliance | • To achieve Substantial Compliance, ensure consistent and verified performance as required by the Settlement Agreement |
| Par. 75 | Partial Compliance | • To achieve Substantial Compliance, ensure consistent and verified performance as required by the Settlement Agreement |
| Par. 76 | Partial Compliance | • To achieve Substantial Compliance, resolve barriers to complying with Par. 76(c) by enhancing process for identifying statistically significant members on both ends of the spectrum to better manage force |
| Par. 77 | Partial Compliance | • To achieve Substantial Compliance, ensure consistent and verified performance as required by the Settlement Agreement |
| **IV. TRAINING** | | |
| Par. 78 | Partial Compliance | • To achieve Substantial Compliance, PPB must substantially comply with all paragraphs within Section IV |
| Par. 79 | Substantial Compliance | • To maintain Substantial Compliance, the Training Division will need to update its own training needs assessment and training plan regarding crowd management based on the findings from the external critical assessment of the 2020 protests<br><br>• In future needs assessments and training plans, give more attention to interpersonal communication skills used for de-escalation and procedural justice, as requested by the public |

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
|  | Substantial Compliance | • Reduce the gap between the needs assessment and training plan through other modes of training |
| Par. 80 | Substantial Compliance | • Enhance evaluation efforts to better capture on-the-street behavior through surveys and BWC review |
| Par. 81 | Partial Compliance | • To return to Substantial Compliance, the Training Division must update certification rosters and develop a process (as reflected in an SOP) to ensure that they are maintained and accurate. Additional attention is needed for specialty trainings |
| Par. 82 | Substantial Compliance | • No recommendations at this time |
| Par. 83 | Substantial Compliance | • No recommendations at this time |
| Par. 84 | Substantial Compliance | • Maintain and, where needed, expand efforts to further include concepts related to procedural justice and legitimacy. |
| Par. 85 | Substantial Compliance | • The next audit of the Training Division should give special attention to civilianization, including the level of support for the Director of Education and instructor development classes<br><br>• A future audit should give attention to the content of in-person training for officers and supervisors, with particular attention to the quality of instruction on Equity, Procedural Justice, and De-escalation<br><br>• In terms of training needs assessment, the community should play a bigger role in setting training priorities because they are the recipients of police services<br><br>• Given the critical importance of training in police reform, the City and PPB should invest |

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| | | more in Training Division personnel so that more instruction can be delivered |
| Par. 86 | Substantial Compliance | • Continue to work with TAC in the future to identify underlying factors associated with racial disparities in police use of force and determine potential solutions |
| Par. 87 | Substantial Compliance | • No recommendations at this time |

**V. COMMUNITY-BASED MENTAL HEALTH SERVICES**

| | | |
|---|---|---|
| Par. 88 | Substantial Compliance | • No recommendations at this time |
| Par. 89 | Substantial Compliance | • No recommendations at this time |
| Par. 90 | Substantial Compliance | • No recommendations at this time |

**VI. CRISIS INTERVENTION**

| | | |
|---|---|---|
| Par. 91 | Substantial Compliance | • Continue to update the COCL and DOJ on changes to personnel when applicable |
| Par. 92 | Substantial Compliance | • Continue to collect and review data on mental health services, and use this information to update services as needed |
| Par. 93 | Substantial Compliance | • Continue to collect and review data on mental health services, and use this information to update services as needed |
| Par. 94 | Substantial Compliance | • No recommendations at this time |
| Par. 95 | Substantial Compliance | • Ensure an ongoing quorum through increasing membership or substituting representatives who are able to attend more regularly for those who frequently cannot |
| Par. 96 | Substantial Compliance | • No recommendations at this time |

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| Par. 97 | Substantial Compliance | • Consider seeking BHUAC input during training development rather than after training has been developed |
| Par. 98 | Substantial Compliance | • Consider seeking BHUAC input during training development rather than after training has been developed |
| Par. 99 | Substantial Compliance | • No recommendations at this time |
| Par. 100 | Substantial Compliance | • Continue utilizing existing data to assess demand for ECIT services |
| Par. 101 | Substantial Compliance | • No recommendations at this time |
| Par. 102 | Substantial Compliance | • No recommendations at this time |
| Par. 103 | Substantial Compliance | • No recommendations at this time |
| Par. 104 | Substantial Compliance | • No recommendations at this time |
| Par. 105 | Substantial Compliance | • No recommendations at this time |
| Par. 106 | Substantial Compliance | • No recommendations at this time |
| Par. 107 | Substantial Compliance | • No recommendations at this time |
| Par. 108 | Substantial Compliance | • No recommendations at this time |
| Par. 109 | Substantial Compliance | • No recommendations at this time |
| Par. 110 | Substantial Compliance | • Continue to collect data and create reports on mental health services |
| Par. 111 | Substantial Compliance | • No recommendations at this time |
| Par. 112 | Substantial Compliance | • No recommendations at this time |
| Par. 113 | Substantial Compliance | • No recommendations at this time |
| Par. 114 | Substantial Compliance | • Develop focused training for PSR |

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| Par. 115 | Substantial Compliance | • Continue to address PSR issues and determine their implications for policy and training |
| **VII. EMPLOYEE INFORMATION SYSTEM** | | |
| Par. 116 | Partial Compliance | • To achieve Substantial Compliance, work with COCL to formalize the review, identification, and intervention process through SOP #5<br><br>• Determine with DOJ whether an assessment of EIS's effectiveness is required for compliance |
| Par. 117 | Partial Compliance | • To achieve Substantial Compliance, work with COCL to formalize the review, identification, and intervention process through SOP #5<br><br>• Determine with DOJ whether an assessment of EIS's effectiveness is required for compliance |
| Par. 118 | Substantial Compliance | • No recommendations at this time |
| Par. 119 | Substantial Compliance | • No recommendations at this time |
| Par. 120 | Substantial Compliance | • No recommendations at this time |
| **VIII. OFFICER ACCOUNTABILITY** | | |
| Par. 121 | Partial Compliance | • To return to Substantial Compliance, conduct a thematic review of oft overdue case types to identify common delays and take proactive measures when faced with future similar cases<br><br>• Consider the impact of system layers on timely resolution of complaints |

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
|  | | • The Parties, including IPR and IA, and COCL should discuss future data analysis, including who will perform the analysis and how the data will be retrieved |
| Par. 122 | Substantial Compliance | • No recommendations at this time |
| Par. 123 | Substantial Compliance | • Maintain self-improvement loop for stages that exceed their stage timeline even if the case does not exceed the 180-day timeline |
| Par. 124 | Substantial Compliance | • No recommendations at this time |
| Par. 125 | Substantial Compliance | • No recommendations at this time |
| Par. 126 | Partial Compliance | • To achieve Substantial Compliance, finalize the SOP related to mental incapacitation preventing a walk-through, including the criteria for making such a determination |
| Par. 127 | Substantial Compliance | • No recommendations at this time |
| Par. 128 | Partial Compliance | • To achieve Substantial Compliance, limit future operational limitations by providing IPR the necessary support and collaboration through the development of an SOP or other guiding document. |
| Par. 129 | Substantial Compliance | • No recommendations at this time |
| Par. 130 | Substantial Compliance | • No recommendations at this time |
| Par. 131 | Partial Compliance | • To return to Substantial Compliance, conduct PRBs in accordance with prior COCL and DOJ guidance |
| Par. 132 | Substantial Compliance | • No recommendations at this time |
| Par. 133 | Substantial Compliance | • No recommendations at this time |
| Par. 134 | Substantial Compliance | • No recommendations at this time |

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| Par. 135 | Substantial Compliance | • No recommendations at this time |
| Par. 136 | Substantial Compliance | • No recommendations at this time |
| Par. 137 | Partial Compliance | • To return to Substantial Compliance, update Directive 338.00, publicly post the directive, and provide link to the Corrective Action Guide. |
| Par. 138 | Substantial Compliance | • No recommendations at this time |
| Par. 139 | Substantial Compliance | • No recommendations at this time |
| Par. 140 | Substantial Compliance | • No recommendations at this time |
| Par. 169 | Partial Compliance | • To achieve Substantial Compliance, PPB should expand their approach to conducting objective investigations and hold officers accountable when policy violations are found<br><br>• To achieve Substantial Compliance, remedy barriers to ensure a fair and consistent accountability system |

**IX. COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| Par. 141 | Substantial Compliance | • No recommendations at this time |
| Par. 142 | Substantial Compliance | • To maintain Substantial Compliance with Par. 142, the City should continue to promptly respond to PCCEP's recommendations and the Mayor/Police Commissioner should fulfill the requirement to meet with PCCEP "at least twice per year" |
| Par. 143 | Substantial Compliance | • To maintain Substantial Compliance with Par. 143, the City should continue to identify and recruit sufficient PCCEP members to maintain a full body |

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| | | • The City, with guidance from PCCEP, should prioritize the recruitment and retention of youth members on PCCEP |
| Par. 144 | Substantial Compliance | • To maintain Substantial Compliance, continue adequate staffing dedicated to supporting PCCEP<br><br>• To maintain Substantial Compliance, post minutes of PCCEP meetings within 10 business days after a PCCEP meeting, including in the Documents section of PCCEP's website |
| Par. 145 | Substantial Compliance | • Conduct a police-focused community survey and, where possible, incorporate measures of the quality of actual encounters with PPB officers. |
| Par. 146 | Substantial Compliance | • Conduct a police-focused community survey and, where possible, incorporate measures of the quality of actual encounters with PPB officers. |
| Par. 147 | Substantial Compliance | • No recommendations at this time |
| Par. 148 | Substantial Compliance | • To maintain Substantial Compliance for Par. 148, PPB should provide additional training for officers regarding the distribution of consent cards in five languages<br><br>• Continue the dialogue with community members around racial disparities in traffic stops and searches |
| Par. 149 | Substantial Compliance | • As part of everyday policing, the City should introduce a contact survey to measure the level of procedural justice and public satisfaction with police-public interactions, especially interactions with constitutionally-protected populations |

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| Par. 150 | Substantial Compliance | • No recommendations at this time |
| Par. 151 | Substantial Compliance | • Continue to maintain records of training for new PCCEP members; Ensure current and future PCCEP members participate in all required trainings and are offered a meaningful opportunity to participate in any optional training. |
| Par. 152 | Substantial Compliance | • Continue to maintain records of training for new PCCEP members; Ensure current and future PCCEP members participate in all required trainings and are offered a meaningful opportunity to participate in any optional training. |
| **XI. ADDITIONAL REMEDIES** | | |
| Par. 188 | Substantial Compliance | • No recommendations at this time |
| Par. 189 | Partial Compliance | To achieve Substantial Compliance:<br><br>• , The City must respond to the IMLLC report<br><br>• The PPB must use the IMLLC report to prepare a training needs assessment, training plan, and relevant crowd management training<br><br>• IMLLC must prepare a follow-up report that reviews the City's response to their original report, including the PPB's training needs assessment<br><br>• The City should keep COCL informed of the work planned and completed by IMLLC<br><br>• The City should provide COCL with IMLLC's reports, the PPB's training needs assessment report, and training plans |
| Par. 190 | Substantial Compliance | • No recommendations at this time |

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| Par. 191 | Substantial Compliance | • No recommendations at this time |
| Par. 192 | Partial Compliance | • To achieve Substantial Compliance, complete a thorough, fair, and reasonable investigation of the command personnel associated with the 2020 crowd control and the training they provided<br><br>• To achieve Substantial Compliance, hold accountable the investigated command personnel members as appropriate who are found to have violated PPB policies (including this Agreement) as described in Par. 192 |
| Par. 193 | Substantial Compliance | • No recommendations at this time |
| Par. 194 | Partial Compliance | • To achieve Substantial Compliance, the City "shall implement body-worn cameras (BWCs) pursuant to a policy that is subject to the policy-review-and-approval provisions of this Agreement" (Par. 194). This means that the City will need to:<br>   o Develop and implement comprehensive BWC training<br>   o Complete a successful pilot test in the field<br>   o Achieve full-scale implementation of BWCs for PPB officers |
| Par. 195 | Partial Compliance | • To achieve Substantial Compliance, the PAC must submit to the City Council a clear and reasonable proposal for the implementation of a Community Police Oversight Board (CPOB) as defined in Par. 195<br><br>• To achieve Substantial Compliance, the City must implement a functional CPOB that is properly staffed, trained, operational, and |

**Exhibit A**

| **Paragraph** | **Compliance Label** | **COCL Recommendations** |
|---|---|---|
|  |  | able to effectively investigate and dispose of use of force and misconduct cases |

**Exhibit A**

# Section III: Use of Force

## A. Use of Force Policy

**Settlement Agreement Paragraph**

66. PPB shall maintain the following principles in its existing use of force policies: (a) PPB shall use only the force reasonably necessary under the totality of circumstances to lawfully perform its duties and to resolve confrontations effectively and safely; and (b) PPB expects officers to develop and display, over the course of their practice of law enforcement, the skills and abilities that allow them to regularly resolve confrontations without resorting to force or the least amount of appropriate force.

67. COCL Summary: Paragraph 67 establishes that PPB shall add several core use of force principles to its force policy: the use of disengagement and de-escalation techniques, calling in specialized units when practical, taking into account all available information about actual or perceived mental illness of the individual, and the appropriate de-escalation of force when no longer necessary. Par. 67 also indicates that the force policy should include mention that unreasonable uses of force shall result in corrective action and/or discipline. (For details and exact language, see the Settlement Agreement)

| Compliance Label | Par. 66 Substantial Compliance |
|---|---|
| | Par. 67 Substantial Compliance |
| Methodology | Review force case sample |

**Compliance Assessment**

As part of our regular review of PPB force events, we evaluated 20 cases that represent a randomly drawn cross section of the PPB's use of force. This includes force from different categories and different precincts involving the use of a Conducted Electric Weapon (CEW) and against persons in a mental health crisis. For this quarter, we did not find any cases in which we believed the force was unreasonable or where members did not demonstrate

**Exhibit A**

appropriate force avoidance skills. We therefore continue to find that the PPB and the City have substantially complied with the requirements.

In our last report, we noted recent guidance from the Force Inspector regarding the use of the term "de-escalation" in FDCRs. In our review of cases for this quarter, we identified fewer concerns on descriptions of de-escalation, though the concerns we did see mirrored our prior comments on not constituting a "deliberate attempt" (as defined in Directive 1010.00). For instance, in one FDCR, the officer described their de-escalation as follows: "2 on 1 handcuffing. Explained to [SUBJECT] that he was under arrest." We continue to suggest that officers, supervisors, and the Force Inspector maintain vigilance in reviewing how de-escalation is defined, to ensure that the data surrounding de-escalation does not suffer from validity issues.

| **COCL Recommendations** | • Maintain vigilance in reviewing how de-escalation is defined to ensure that the data surrounding de-escalation does not suffer from validity issues |
|---|---|
| **Assessment Based On** | COCL review of force sample |

## 1. Electronic Control Weapons

| **Settlement Agreement Paragraph** | |
|---|---|
| 68. COCL Summary: PPB shall revise PPB Directive 1051.00 regarding Taser, Less-Lethal Weapons System to include several core principles: ECWs will not be used for pain compliance against those suffering from mental illness or emotional crisis except in rare circumstances; officers shall issue verbal warnings or hand signals (if communication barriers exist); conventional standards for using ECW should be followed (e.g. one ECW at a time, re-evaluation; attempt hand-cuffing between cycles). Officers shall describe and justify their use of ECW in their Force Report, and receive annual training in ECW use. (For details and exact language, see the Settlement Agreement). | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review force case sample |

**Exhibit A**

**Compliance Assessment**

Based on our review of four PPB force events involving CEWs, we found that the PPB officers continue to use CEWs in accordance with the Settlement Agreement (Paragraph 68). Though we did identify one case that raises questions about the CEWs that PPB uses and the tactical communication of two officers. In this case, three officers attempted to deploy their taser. For one officer, the cartridge failed to deploy. For the other two officers, both deployed their tasers at the same time unintentionally, due to a lack of communication (i.e., neither announced to other officers that they had drawn their taser), which is inconsistent with training provided by the PPB. Should similar incidents occur in the future, there would be implications for compliance with this paragraph. However, as this represents only a single incident across several quarters of review, we do not find it to be an ongoing or systemic issue.

Regarding the taser that failed to deploy, we note that this is the second case in the past two quarters in which there was a taser malfunction due to a failure to test the taser during roll call (as required by policy). We also note that the internal clocks of all three CEWs were inconsistent with each other, as determined by the investigating supervisor, meaning that time stamps on the CEW download report are not reliable. The chain of command thoroughly discussed this issue. However, combined with the failure to test CEW tasers, there are repeated training implications involved with force cases from this quarter and last quarter. We discuss these further in our assessment of Paragraphs 74, 75, and 77. For this paragraph, we suggest the PPB use the upcoming CEW course at their fall in-service training to remind officers of their requirement to spark test their CEWs prior to going on shift.

| **COCL Recommendations** | • Use the upcoming CEW course during the fall in-service training to remind officers of their requirements to spark test their CEWs prior to going on shift. |
|---|---|
| **Assessment Based On** | COCL review of CEW cases |

## 2. Use of Force Reporting Policy and Use of Force Report

**Settlement Agreement Paragraph**

69. PPB shall revise its policies related to use of force reporting, as necessary, to require that: (a) All PPB officers that use force, including supervisory officers, draft timely use of

**Exhibit A**

force reports that include sufficient information to facilitate a thorough review of the incident in question by supervisory officers; (b) All officers involved or witnesses to a use of force provide a full and candid account to supervisors; (c) In case of an officer involved shooting resulting in death, use of lethal force, or an in-custody death, PPB will fulfill its reporting and review requirements as specified in directive 1010.10, as revised. This will take place of Directive 940.00 reports for the purposes of paragraphs 70, and 72-77 of this Agreement.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review force case sample |

**Compliance Assessment**

In our review of cases for this quarter, we found that all FDCRs reviewed contained sufficient information to allow a supervisor to conduct a full investigation of the event. Overall, we continue to be impressed with the level of detail officers provide in their reports, which allow supervisors to gain a clear picture of an event (although we await Bureau-wide implementation of BWCs that will provide additional information to supervisors).

We continue to find Partial Compliance with this paragraph as a result of prior quarters' findings, primarily the need to evaluate policy and in training to clarify when a Control Against Resistance has occurred as we had found inconsistency with this force type across multiple cases and multiple quarters. Therefore, to return to Substantial Compliance, the PPB should evaluate Directives 1010.00 (Use of Force) and 910.00 (Use of Force Reporting, Review, and Investigation), evaluate the current training on what constitutes Control Against Resistance, and identify opportunities to clarify when officers should be reporting such applications. After clarifying, the PPB supervisors should review FDCRs and general offense reports (and, when available, BWC video) to ensure compliance and take corrective action on members who fail to accurately report on these types of incidents and on supervisors who fail to correct the issue.

| **COCL Recommendations** | • To return to Substantial Compliance, evaluate Directives 1010.00 and 910.00, evaluate current training, and identify opportunities to clarify when officers should be reporting Control Against Resistance |
|---|---|

**Exhibit A**

| | |
|---|---|
| | • Upon issuing such clarification, take corrective action on members who fail to report Control Against Resistance and supervisors who fail to correct the issue |
| **Assessment Based On** | COCL review of force cases |

## 3. Use of Force Supervisory Investigations and Reports

| **Settlement Agreement Paragraph** |
|---|
| 70. COCL Summary: Paragraph 70 states, "PPB shall continue enforcement of Directive 940.00, which requires supervisors who receive notification of a force event to respond to the scene, conduct an administrative review and investigation of the use of force, document their findings in an After Action Report and forward their report through the chain of command." Paragraph 70 continues on to describe what is required of supervisory officers when a use of force event occurs, including timeframes for After Action Reports, notification requirements of serious use of force, force against individuals with mental illness, suspected misconduct, procuring medical attention, and officer interviews (For details and exact language, see the Settlement Agreement). |

| **Compliance Label** | Partial Compliance |
|---|---|
| **Methodology** | Review of force cases |

| **Compliance Assessment** |
|---|
| In our review of 20 use of force cases, we found that all supervisory investigations were thorough and addressed areas identified for improvement during the force event. Overall, the AAR sample we reviewed for this quarter demonstrated supervisors' ability to review force events using a critical eye. Although we identified no concerns for this quarter, the PPB has not yet demonstrated "consistent and verified performance" (see Paragraph 33), particularly as it relates to subsection (b) of Par. 73.  Moving forward, we will evaluate whether the next quarter's force sample demonstrates that supervisors have continued to conduct thorough investigations and, where not, that corrective action has been taken. Should we see verified performance continue for more than one quarter, we will update our compliance label. |

**Exhibit A**

| | |
|---|---|
| **COCL Recommendations** | • To achieve Substantial Compliance, ensure consistent and verified performance as required by the Settlement Agreement |
| **Assessment Based On** | COCL review of force cases |

| **Settlement Agreement Paragraph** | |
|---|---|
| 71. PPB shall maintain adequate patrol supervision staffing, which at a minimum, means that PPB and the City shall maintain its current sergeant staffing level, including the September 2012 addition of 15 sergeants. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review rate of officers to supervisors |

**Compliance Assessment**

The PPB has maintained an adequate patrol supervision staffing level in accordance with Paragraph 71, thus remaining in Substantial Compliance. As noted in prior reports, the rate of officers to sergeants is a better metric than the raw number of sergeants. In the first quarter of 2023, the PPB reported a staffing ratio of 6.6 officers for every sergeant (including acting sergeants) across the three precincts, which was the same ratio as the fourth quarter of 2022. However, after the promotion of 12 sergeants during the second quarter of 2023, the staffing ratio lowered to 4.9 officers for every sergeant (Figure 1). We continue to find this a reasonable ratio and therefore continue to find Substantial Compliance.

**Exhibit A**

**Figure 1**



| COCL Recommendations | • No recommendations at this time |
|---|---|
| **Assessment Based On** | COCL review of ratio of officers to sergeants |

| **Settlement Agreement Paragraph** | |
|---|---|
| 72. PPB shall develop a supervisor investigation checklist to ensure that supervisors carry out these force investigation responsibilities. PPB shall review and revise the adequacy of this checklist regularly, at least annually. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review current AAR form; Review upcoming web form |
| **Compliance Assessment** | |
| Presently, the AAR form contains the checklist. Therefore, we find that the PPB has remained in Substantial Compliance with the requirements of Paragraph 72 since we | |

**Exhibit A**

continue to find that the PPB's use of the AAR form serves as the "investigation checklist.". However, we refer the reader to other paragraphs for our assessment of how well supervisors are utilizing the AAR.

| **COCL Recommendations** | • Ensure supervisors reliably and consistently use the AAR for future force events |
|---|---|
| **Assessment Based On** | COCL review of AAR form |

<br>

| **Settlement Agreement Paragraph** |
|---|
| 73. COCL Summary: Paragraph 73 directs PPB to revise its policies concerning chain of command reviews of After Action Reports (940s) to ensure that the reviews are accurate and thorough; that all comments are recorded in the EIS tracking system; that supervisors in the chain are held accountable for inadequate reports and analysis through corrective action (including training, demotion and/or removable from their supervisory position); and that when use of force is found to be outside of policy, that it be reported and appropriate corrective action be taken with the officer and the investigation itself (For details and exact language, see the Settlement Agreement). |

| **Compliance Label** | <mark>Partial Compliance</mark> |
|---|---|
| **Methodology** | Review force case sample |

| **Compliance Assessment** |
|---|
| Consistent with our assessment of Paragraph 70, we found that all use of force events for this quarter were thoroughly investigated and reviewed by the entire chain of command. Although we identified no concerns for this quarter, the PPB has not yet demonstrated "consistent and verified performance" (see Paragraph 33), particularly as it relates to subsections (b), (c), and (f) of Par. 73.  Moving forward, we will evaluate whether the next quarter's force sample demonstrates that chain-of-command supervisors have continued to conduct thorough reviews of AARs and, where not, that corrective action has been taken. |

**Exhibit A**

| Should we see verified performance continue for more than one quarter, we will update our compliance label. | |
|---|---|
| **COCL Recommendations** | • To achieve Substantial Compliance, ensure consistent and verified performance as required by the Settlement Agreement |
| **Assessment Based On** | COCL review of force cases, lack of clarity in conduct that requires formal review |

## B. Compliance Audits Related to Use of Force

**Settlement Agreement Paragraph**

74. COCL Summary: Paragraph 74 states that "In consultation with the COCL, the Inspector, as part of PPB's quarterly review of force, will audit force reports and Directive 940.00 Investigation Reports" and will do this to ensure that the officer's force report is complete and accurate and that the officer's actions in the field are in line with PPB policy. The audit of force reports seeks to ensure that force is used in a way that is lawful and appropriate to the circumstances; that de-escalation is used appropriately; that ECW is used appropriately and within policy; and that specialty units and medical care are called in appropriately. In terms of force reporting, the audit seeks to ensure that reports are submitted in a timely manner; that they include detailed information about the event, the decision to use force, the type of force used, any subject resistance and any injuries to the parties; that the report includes the mental health status of the subject of force, documentation of witnesses and contact information, and other details as required by the Settlement. There should be sufficient information in the report to allow supervisors to evaluate the quality of the officer's decision making regarding the use of force. (For details and exact language, see the Settlement Agreement)

75. COCL Summary: Paragraph 75 states that, "In consultation with the COCL, the Inspector shall audit force reports and Directive 940.00 investigations" to determine whether supervisors consistently engage in a variety of behaviors when reviewing use of force reports and supervising their employees. Specifically, the Settlement requires that supervisors complete an After Action Report within 72 hours of being notified of the incident; To perform well at this task, supervisors would need to review all use of force reports for completeness, determine whether the officer's actions are consistent with PPB policy, the Settlement Agreement and best practices; and take all appropriate actions as a

**Exhibit A**

supervisor, including determining any training or counseling needs for the officer; taking corrective action on omissions or inaccuracies in the force report; notifying appropriate authorities when criminal conduct is suspected; and documenting all of the above-named actions. (For details and exact language, see the Settlement Agreement)

77. COCL Summary: "In consultation with the COCL, the Inspector shall audit the adequacy of chain of command reviews of After Action Reports." This type of audit by the Inspector will ensure that supervisors at all levels in the chain of command are conscientiously reviewing all After Action (940) Reports using the appropriate legal and administrative performance standards, and taking appropriate action. The reviewers of After Action reports should be assessing the completeness of reports and evaluating the findings using a "preponderance of the evidence" standard. Where appropriate, reviewers should modify findings that do not seem justified, speak with the original investigator, order additional investigations, identify any deficiencies in training, policy or tactics, ensure that supervisors discuss poor tactics with the officer involved, and document the above in EIS. (For details and exact language, see the Settlement Agreement.)

| | |
|---|---|
| **Compliance Label** | Par. 74 Partial Compliance |
| | Par. 75 Partial Compliance |
| | Par. 77 Partial Compliance |
| **Methodology** | Review quarterly Force Audit Report; Review Force Inspector memos; Review Force Inspector Phase II spreadsheet |

### Compliance Assessment

On a quarterly basis, the PPB conducts the audits of force events required by Paragraphs 74, 75, and 77. As with prior quarters, PPB officers (through FDCRs) and PPB supervisors (through AARs) continue to demonstrate approximately 99% accuracy in their reporting, based on the audits. However, as noted in past reports, our primary concern with respect to this paragraph relates not to the prevalence of inaccuracies in force reporting but rather to the magnitude of a select few inaccuracies which were not identified through the chain-of-command review and, subsequently, not by the Force Inspector. Therefore, barriers to compliance with these paragraphs have largely been related to the Force Inspector's

**Exhibit A**

achievement of Par. 77 ("audit the adequacy of chain-of-command reviews"), and, in particular, subsections (b), (e), and (g).

However, consistent with our assessments above, we did not identify any cases this quarter where significant deficiencies in force report writing, investigation, or chain-of-command review occurred. Instead, we reviewed evidence indicating that important policy and training implications were identified by the chain-of-command as well as by the Force Inspector. For instance, one critical issue that had been identified by PPB pertained to needing to better distinguish the difference between a modified box-in tactic and a ramming incident. This question was raised in the AAR process and, as a result, the Force Inspector informs us that the Training Division has incorporated the issue in upcoming training. From start to finish, the chain-of-command and Force Inspector engaged in the type of critical and collaborative thinking that the audit process was designed to facilitate. Additionally, in response to the taser timestamp issue discussed in Par. 68, the Force Inspector coordinated with the Training Division to determine that the cause of the issue was due to the age of the CEWs being used. As officers receive updated equipment, the issue will be resolved and the Force Inspector is developing protocols for what to do in similar future events.

Similar to other paragraphs, we continue to find Partial Compliance for this paragraph though this is only due to the need to observe consistent and verified performance over more than a single quarter. However, for the present quarter, we find that the system designed by the Settlement Agreement operated as intended.

| **COCL Recommendations** | • To achieve Substantial Compliance, ensure consistent and verified performance as required by the Settlement Agreement |
|---|---|
| **Assessment Based On** | Review of Force Audit Report; Review of feedback forms |

| **Settlement Agreement Paragraph** |
|---|
| 76. In consultation with the COCL, the Inspector shall conduct a quarterly analysis of force data and supervisors' Directive 940.00 reports designed to: (a) Determine if significant trends exist; (b) Determine if there is variation in force practice away from PPB policy in any unit; (c) Determine if any officer, PPB unit, or group of officers is using force differently or at a different rate than others, determine the reason for any difference and correct or |

**Exhibit A**

duplicate elsewhere, as appropriate; (d) Identify and correct deficiencies revealed by the analysis; and (e) Document the Inspector's findings in an annual public report.

| Compliance Label | Partial Compliance |
| --- | --- |
| Methodology | Reviewed quarterly Force Reports |

### Compliance Assessment

For each of the subsections of Paragraph 76, the PPB possesses a tool or process to achieve Substantial Compliance. For instance, in addressing subsection (a), the PPB continues to produce quarterly and annual force reports including several important data points and comparisons to prior quarters. Subsection (a) is also addressed, in part, through the Phase II review wherein the Force Inspector identifies organizational trends. For subsections (b) and (c), the Force Inspector reviews the findings of a comparative analysis of each officer, unit, and group (as defined by common days off), identifying differences and discussing the analysis with each patrol Responsibility Unit (RU) Manager. For subsection (d), the Force Inspector either provides a memo to the RU Manager or creates a manual EIS alert (see also Paragraph 117). Finally, for subsection (e), the Force Inspector memorializes the findings of the reviews in annual reports, including the Annual Force Summary Report and Annual Force Audit Summary Report.

As noted in the past, the PPB continues to have a low overall raw number of force, with the plurality of them being Category IV uses of force (e.g., resisted handcuffing, control against resistance, hobble restraint, pointing of a firearm, firearm–hurt animal, or box-in). For context, we highlight one event we reviewed as part of our sample of force events for this quarter. In that event, a resistant subject refused to put his head up for the arrest booking photograph. The officer lifted the subject's head for the front-angle photo and repeated the process for the side-angle photo. No other force was used. Although only a single case, we include it here to demonstrate the low-level nature of some PPB force events and to provide additional context to the PPB's overall use of force numbers.

For this quarter, we continue to find that the PPB is in Partial Compliance with the requirements of Paragraph 76, though note that our concerns are primarily related to subsection (c) ("determine if any officer, PPB unit, or group of officers is using force differently or at a different rate than others, determine the reason for any difference and correct or duplicate elsewhere, as appropriate"). For all other subsections, we continue to find the efforts of the Force Inspector to be substantially compliant with the requirements of this paragraph. For subsection (c), we still need to discuss SOP #5 (Force Analysis for

**Exhibit A**

| | |
|---|---|
| | Supervisors and Teams) as this should begin to resolve our concerns with identifying outlying officers.  Once SOP #5 is finalized and implemented, we will then update our assessment of this paragraph. |
| **COCL Recommendations** | • To achieve Substantial Compliance, resolve barriers to complying with Par. 76(c) by enhancing process for identifying statistically significant members on both ends of the spectrum to better manage force |
| **Assessment Based On** | COCL review of quarterly Force Data Summary Reports; COCL review of PPB data |

### Use of Force Outcome Assessment

As part of our outcome assessment, we used the data provided by PPB on their publicly available website to identify trends in use of force overall, by Precinct, by demographics, and by whether the subject was in actual or perceived mental health crisis as determined by the officer using force.  As seen in Table 1, the PPB used force on a total of 625 subjects over the past four quarters.  During this time period, the majority of force used was against male subjects (79.8%, N=499) compared to females/unknown sex and White subjects (56.6%, N=354) compared to all other races.  The next highest racial category was Black subjects who accounted for 26.9% of all subjects of force.  Within the category of gender, 25% of males on whom force was used were Black, compared to 57.7% of males on whom force was used being White.  Comparatively, 32.8% of females who force was used on were Black while 53.3% of females were White.  All other demographic intersections were less than 15%.

**Table 1. Demographic Information of Subjects of Uses of Force by PPB (2022 Q3 - 2023 Q2)**

| | Total | | Female | | Male | | Unknown Sex | |
|---|---|---|---|---|---|---|---|---|
| | n | % | n | % | n | % | n | % |
| Subjects of Uses of Force | 625 | 100 | 122 | 19.5% | 499 | 79.8% | 4 | 0.6% |
| | | | | | | | | |
| Asian | 19 | 3.0% | 1 | 0.8% | 18 | 3.6% | 0 | 0.0% |
| Black | 168 | 26.9% | 40 | 32.8% | 128 | 25.7% | 0 | 0.0% |
| Hispanic | 71 | 11.4% | 12 | 9.8% | 59 | 11.8% | 0 | 0.0% |
| Native American | 7 | 1.1% | 3 | 2.5% | 4 | 0.8% | 0 | 0.0% |
| Unknown Race/Ethnicity | 6 | 1.0% | 1 | 0.8% | 2 | 0.4% | 3 | 75.0% |
| White | 354 | 56.6% | 65 | 53.3% | 288 | 57.7% | 1 | 25.0% |

**Exhibit A**

We also evaluated the specific force types used by PPB members within the past four quarters. As discussed elsewhere, the PPB's use of force is largely driven by Category IV force types, primarily Control Against Resistance (36.5% of the force applications used) and Resisted Handcuffing (24.5% of the force applications used), which combine for 61.0% of all force applications used. Other than these, only Takedowns (Category II and III) represent more than 10% of the force applications used in the last year. Across Precincts, we note that there is relative parity between Central Precinct and North Precinct though some areas of difference for East Precinct compared with the other two. For instance, East Precinct uses Control Against Resistance at a substantially lower rate (25.8%) compared to Central and North (46.5% and 40.8%, respectively). Alternatively, East Precinct uses Vehicle Intervention Strategies (VIS) more than Central and North, including box-ins, PIT maneuvers, and ramming.

**Exhibit A**

Table 2. Applications of Force used by PPB (2022 Q3 – 2023 Q2)

| Applications of Force | All PPB | | Central Precinct | | East Precinct | | North Precinct | |
|---|---|---|---|---|---|---|---|---|
| | N | % | n | % | n | % | n | % |
| | 2,304 | 100% | 863 | 37.5% | 900 | 39.1% | 409 | 17.8% |
| Force Implement Used | | | | | | | | |
| Baton Jab | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Baton Push | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Baton Nonstrike | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Baton Strike | 3 | 0.1% | 0 | 0.0% | 3 | 0.3% | 0 | 0.0% |
| Box-In VIS | 114 | 4.9% | 29 | 3.4% | 74 | 8.2% | 5 | 1.2% |
| CEW | 64 | 2.8% | 12 | 1.4% | 35 | 3.9% | 10 | 2.4% |
| Chemical Incapacitant - handheld | 44 | 1.9% | 3 | 0.3% | 35 | 3.9% | 4 | 1.0% |
| Chemical Incapacitant - launched | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Control Against Resistance | 842 | 36.5% | 401 | 46.5% | 232 | 25.8% | 167 | 40.8% |
| Firearm - Animal (aggressive) | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Firearm - Animal (suffering) | 4 | 0.2% | 0 | 0.0% | 1 | 0.1% | 3 | 0.7% |
| Flash Sound Dist. Dev. (FSDD) | 4 | 0.2% | 0 | 0.0% | 0 | 0.0% | 1 | 0.2% |
| Holds with Injury | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Hobble Restraint | 15 | 0.7% | 6 | 0.7% | 5 | 0.6% | 3 | 0.7% |
| K-9 Bite | 10 | 0.4% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Kinetic Impact Projectile (KIP) | 12 | 0.5% | 4 | 0.5% | 4 | 0.4% | 2 | 0.5% |
| Less Lethal - Aggressive Animal | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| PIT - VIS | 87 | 3.8% | 10 | 1.2% | 63 | 7.0% | 12 | 2.9% |
| Pointing of a Firearm | 69 | 3.0% | 23 | 2.7% | 25 | 2.8% | 10 | 2.4% |
| Resisted Handcuffing | 564 | 24.5% | 213 | 24.7% | 229 | 25.4% | 108 | 26.4% |
| Strikes/Kicks | 116 | 5.0% | 27 | 3.1% | 75 | 8.3% | 12 | 2.9% |
| Takedown (II and III) | 267 | 11.6% | 102 | 11.8% | 103 | 11.4% | 42 | 10.3% |
| Takedown (IV) | 79 | 3.4% | 31 | 3.6% | 11 | 1.2% | 29 | 7.1% |
| Tear Gas | 2 | 0.1% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Vehicle Ram - VIS | 8 | 0.3% | 2 | 0.2% | 5 | 0.6% | 1 | 0.2% |

We also evaluated the elements of a use of force call involving a person with actual or perceived mental illness as identified by the responding officers.  For these analyses, we compared data from 2019 to the 2023 Q2 and then compared it to data from the prior four quarters (2022 Q3 – 2023 Q2) to determine whether the last year's data was substantially different from the larger timeline.  For this evaluation, we considered an individual to be in actual or perceived mental illness if they at least one officer on-scene indicated they were, even if other members did not.  We conducted a similar process with analyzing whether a

**Exhibit A**

person was armed and, if so, with what.  If one officer indicated the person was armed, the event was coded as such even if other officers did not indicate the subject was armed.

Overall, we find that the data within the past four quarters is consistent with the larger dataset.  For instance, between 14% and 18% of the PPB's force events involve a person with actual or perceived mental illness.  Additionally, when using force against a person in actual or perceived mental illness, the PPB overwhelmingly uses Category IV force types, including Control Against Resistance (approximately 46% in both timeframes) and Resisted Handcuffing (approximately 30% in both timeframes).  In both timeframes, the call types Behavioral Health, Disturbance, Unwanted Person, and Welfare Check have been in the top 5 call types to involve force against a person with actual or perceived mental illness, with the call type Assist being the fifth most common historically but with Assault being a the fifth most common in the last four quarters.  Finally, with respect to the threat posed by the community member, approximately 60% of persons with actual or perceived mental illness were not reported to be armed and, when they were armed, there is significant variety with respect to how they were armed, with Blunt Object, Knife Edged Weapon/Stabbing Instrument, Needle, Spit, and Other Bodily Fluid all having approximately 20% to 30%.  Additionally, between 30% and 40% of subjects who were reported to have a weapon did not use or threaten to use the weapon.  Also related to the community members threat, we looked at the initial resistance offered by the person with actual or perceived mental illness (i.e., the resistance described prior to the officers first application of force).  Within the past four quarters, the initial level of resistance has been coded as Active in over 90% of FDCRs, an increase over the past five years' average of 78.1%.

**Table 3. Police Use of Force on Persons with Actual or Perceived Mental Illness**

|  | 2022 Q3 – 2023 Q2 | 2019 – 2023 (Q2) |
|---|---|---|
| Force Used on Person with Actual or Perceived Mental Illness | | |
| Yes | 14.7% (N=90) | 18.1% (N=566) |
| No | 85.3% (N=522) | 81.9% (N-2,555) |
| Type of force (Actual or Perceived Mental Illness)* | | |
| CEW | 3.6% (N=14) | 2.9% (N=71) |
| Control Against Resistance | 46.9% (N=183) | 46.6% (N=1,154) |
| Resisted Handcuffing | 31.5% (N=123) | 28.6% (N=707) |
| Strikes/kicks | 2.6% (N=10) | 1.2% (N=30) |

**Exhibit A**

| | | |
|---|---|---|
| Takedown (II and III) | 8.7% (N=34) | 7.4% (N=182) |
| Takedown (IV) | 3.6% (N=14) | 5.5% (N=136) |
| Other | 3.1% (N=12) | 7.8% (N=193) |
| Initial Call Type (Top 5 most common) (Actual or Perceived Mental Illness) | | |
| Assault | 6.7% (N=16) | |
| Assist | | 6.6% (N=96) |
| Behavioral Health | 23.8% (N=57) | 32.6% (N=476) |
| Disturbance | 22.2% (N=53) | 13.8% (N=201) |
| Unwanted Person | 8.4% (N=20) | 6.9% (N=100) |
| Welfare Check | 10.0% (N=24) | 15.6% (N=227) |
| Subject Armed with Weapon (Actual or Perceived Mental Illness) | | |
| Yes | 40% (N=36) | 42.9% (N=243) |
| No | 60% (N=54) | 57.1% (N=323) |
| Subject Weapon Type (If Armed) (Actual or Perceived Mental Illness)** | | |
| Blunt object | 22.2% (N=8) | 17.3% (N=42) |
| Firearm | 2.8% (N=1) | 2.1% (N=5) |
| Firearm - implied | 0% (N=0) | 0.8% (N=2) |
| Firearm replica | 0% (N=0) | 0.4% (N=1) |
| Knife edged weapon/stabbing instrument | 22.2% (N=8) | 27.6% (N=67) |
| Needle, spit, or other bodily fluid | 27.8% (N=10) | 18.5% (N=45) |
| Other weapon | 16.7% (N=6) | 11.1% (N=27) |
| Weapon present, but not used or threatened | 30.6% (N=11) | 41.2% (N=100) |
| Resistance Offered by Subject (Actual or Perceived Mental Illness) | | |
| Active | 91.2% (N=218) | 78.1% (N=1,139) |
| Aggressive | 7.9% (N=19) | 21.3% (N=311) |
| Passive | 0% (N=0) | .5% (N=7) |

*Force events may contain more than one application of force.  Therefore, the number of force applications are naturally higher than the number of persons on whom force was used.

**A subject may be armed with more than one type of weapon.  Therefore, the number of identified weapon types are naturally higher than the number of subjects who were armed with a weapon.

**Exhibit A**

We also sought to examine how the relative rate of CEW use compares with other use of force types.  As seen in Figure 2, CEW usage has remained relatively steady over the past five years, reaching 4% in 2020, 3% in 2021 and 2022, and 2% in 2023 (YTD).

Figure 2. ECW usage compared to all other force implements (2019 – 2023)



**Exhibit A**

# Section IV: Training

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 78. All aspects of PPB training shall reflect and instill agency expectations that officers are committed to the constitutional rights of the individuals who have or are perceived to have mental illness whom they encounter and employ strategies to build community partnerships to effectively increase public trust and safety. To achieve these outcomes, PPB shall implement the requirements below. | |
| **Compliance Label** | Partial Compliance |
| **Methodology** | This is a summative judgment that is contingent upon satisfying all paragraphs in Section IV |

| | |
|---|---|
| **Compliance Assessment** | |
| The PPB has achieved only Partial Compliance with Paragraph 78 because Substantial Compliance requires the PPB to "implement the requirements below." Because this is a summative paragraph, compliance will be assessed in terms of the achievement of all requirements of the Settlement Agreement pertaining to Section IV, Training. | |
| We will continue to focus on the primary training for all officers and supervisors and specialized mental health training for ECIT, as these are the training courses most central to the Settlement Agreement. However, given the problems that occurred with the PPB's crowd management during the 2020 protests, the COCL added training on response to public order events to our evaluation agenda beginning in 2021. | |
| We will continue to evaluate training progress in terms of the fidelity of implementation and whether these trainings are likely to achieve the desired outcomes listed in Paragraph 78. | |
| **COCL Recommendations** | • To achieve Substantial Compliance, the PPB must substantially comply with all paragraphs within Section IV |

**Exhibit A**

| Assessment Based On | Summative and contingent upon satisfying all paragraphs of Section IV, based on the methods identified for each |
|---|---|

## A. Assess Training Needs

**Settlement Agreement Paragraph**

79. The Training Division shall review and update PPB's training plan annually. To inform these revisions, the Training Division shall conduct a needs assessment and modify this assessment annually, taking into consideration: (a) trends in hazards officers are encountering in performing their duties; (b) analysis of officer safety issues; (c) misconduct complaints; (d) problematic uses of force; (e) input from members at all levels of PPB; (f) input from the community; (g) concerns reflected in court decisions; (h) research reflecting best practices; (i) the latest in law enforcement trends; (j) individual precinct needs; and (k) any changes to Oregon or federal law or PPB policy.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Interviewed PPB staff and reviewed internal training documents |

**Compliance Assessment**

In the second quarter of 2023, the Training Division continued to work on the needs assessments for annual in-service training and for training related to public order events. In reviewing the description of sources cited by the PPB, we identified each of the areas of review required by Paragraph 79.

During the second quarter of 2023, the Training Division continued to update its 2023 needs assessment and training plan by gathering additional information from a variety of sources, including:

- Independent Police Review reports

- Use of force data

- Officer injury data from the Fire and Police Disability and Retirement

- Data from the PPB's officer injuries log

**Exhibit A**

- DOJ Settlement Agreement

- Training Advisory Council

- Behavioral Health Unit and related community advisory committees

- Oregon and federal court cases

- PPB's Force Audit Report

- PPB's policy analysts

- Learning assessment and other training evaluation findings

- Collision statistics

- National conferences

- Internal Affairs data

- Pursuit data

- Officer surveys

- National literature on law enforcement training

- Discussions with training leads, precinct commanders, city attorneys, DOJ coordinators, Independent Police Review staff, Internal Affairs staff, Training Division management, and officer safety liaisons

We note that the development of the PPB's needs assessment is an ongoing process, and we will continue to evaluate how the process contributes to an overall strategic training program.

We continue to find the PPB to be in Substantial Compliance with the requirements of this paragraph. As with prior reports, maintenance of Substantial Compliance will be dependent on the City and PPB's incorporation of findings from the report by IMLLC. The report was publicly released in the third quarter of 2023, and we will therefore provide updates in future reports on the progress of the City and PPB in incorporating IMLLC's findings. In addition, we continue to suggest greater incorporation of intercommunication skills into training. We have seen some evidence of this in the upcoming fall in-service lesson plans and presentation material, though we will need to observe the training before we can comment on how well intercommunication skills were incorporated.

Finally, we continue to encourage the Training Division to identify opportunities to close the gap between their Needs Assessment and Training Plan (only about one quarter of the needs identified are addressed in the training plan). For instance, we continue to suggest

**Exhibit A**

| | narrowing the gap through a variety of approaches, including roll-call training, Tips and Techniques documents, video or virtual training, or direct supervisor discussions. |
|---|---|
| **COCL Recommendations** | • To maintain Substantial Compliance, the Training Division will need to update its own training needs assessment and training plan regarding crowd management based on the findings from the external critical assessment of the 2020 protests<br><br>• In future needs assessments and training plans, give more attention to interpersonal communication skills used for de-escalation and procedural justice, as requested by the public<br><br>• Reduce the gap between the needs assessment and training plan through other modes of training |
| **Assessment Based On** | Review of the PPB's internal training documents and interviews with PPB personnel |

## B. Evaluate Training

| **Settlement Agreement Paragraph** |
|---|
| 80. Within 180 days of the Effective Date, PPB shall develop and implement a process that provides for the collection, analysis, and review of data regarding the effectiveness of training for the purpose of improving future instruction, course quality, and curriculum. These evaluations shall measure and document student satisfaction with the training received; student learning as a result of training; and the extent to which program graduates are applying the knowledge and skills acquired in training to their jobs. This audit shall be reported to the Training Division Manager and shall include student evaluations of the program and the instructor. |

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Interviewed PPB staff and reviewed internal training documents; Assessed the methods of evaluation, content, and |

**Exhibit A**

| | the presence of a complete evaluation system with feedback loops |
|---|---|
| **Compliance Assessment** ||

The COCL's assessment of the PPB's training evaluation system did not change in the second quarter of 2023. It continued to produce training evaluation results for recently delivered training. The PPB's training evaluations continue to employ multiple methods of data collection, analysis, and reporting that are being guided by the Kirkpatrick Model of training evaluation. Specifically, the Training Division administers in-class quizzes/surveys, anonymous post-class evaluation surveys, post-class knowledge tests, scenario skills tests, and classroom observations. As part of the productions for this quarter, the PPB provided interim evaluation results for Advanced Academy, ECIT certification, and online trainings. As these results were preliminary and data collection and evaluation is ongoing, we will reserve commentary on the findings until a formal report is provided by the PPB. Overall, the PPB continues to operate a robust training evaluation program.

The COCL continues to suggest the incorporation of a contact survey to measure on-the-job performance of critical training objectives, such as procedurally just behaviors by officers. We maintain that data generated from a contact survey program, along with data from the new BWC program, would ensure equitable treatment for all groups and lead to important changes in training, coaching, and supervision. At present, officer interactions are measured through a random-sample, citywide survey that asks respondents about interactions within the last year and therefore may not reach those who have had recent contact with police (i.e., when memory is freshest). This limitation aside, we note that the findings were primarily positive based on the most recent survey in 2019. Absent a contact survey (which remains a more reliable way to gather perceptions of police interactions), we suggest that the PPB and City, at the least, complete an updated citywide survey to determine whether these findings have held steady, particularly in light of the events of the past 3 years.

| **COCL Recommendations** | • Enhance evaluation efforts to better capture on-the-street behavior through surveys and BWC review |
|---|---|
| **Assessment Based On** | COCL review of training evaluation tools, quality of data, and systems of reporting and feedback |

**Exhibit A**

## C. Document Training Delivered and Received

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 81. PPB shall ensure that the Training Division is electronically tracking, maintaining, and reporting complete and accurate records of current curricula, lesson plans, training delivered, attendance records, and other training material in a central, commonly accessible, and organized file system. Each officer's immediate supervisor shall review the database for the officers under his/her command at least semi-annually. | |
| **Compliance Label** | Partial Compliance |
| **Methodology** | Reviewed LMS records for the second quarter of 2023 |

| | |
|---|---|
| **Compliance Assessment** | |

The Training Division continues to use the Cornerstone LMS to record officer training and provide a range of online trainings. LMS attendance records are expected to include all in-person and online trainings completed by PPB members. In the second quarter of 2023, this included three directives and 11 online trainings. In addition, the PPB has maintained its process for ensuring compliance with Oregon training standards, including through the use of reminder emails, noncompliance memos to the Chief's office, and supervised completion of training.  These training records are also required to be reviewed by supervisors as part of each members' annual performance evaluation.

We continue to await the final development of a centralized database that contains certification records for specialty assignments (e.g., ECIT or AR-15 certification). A Training Division SOP will accompany this database. The PPB has indicated significant advances in this process during the third quarter. Therefore, we will provide an update in our next report. As for this quarter, we continue to find Partial Compliance and maintain our recommendations from our last report.

| | |
|---|---|
| **COCL Recommendations** | <ul><li>To return to Substantial Compliance, the Training Division must update certification rosters and develop a process (as reflected in an SOP) to ensure that they are maintained and accurate. Additional attention is needed for specialty trainings</li></ul> |

**Exhibit A**

| **Settlement Agreement Paragraph** | |
|---|---|
| 82. PPB shall report training delivered and received semi-annually to the Assistant Chief of Operations and, during the pendency of this Agreement, to DOJ. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review Semi-Annual Training Reports |
| **Compliance Assessment** | |
| As we noted last quarter, two Semi-Annual Training Reports were delivered to the Deputy and Assistant Chiefs on July 25, 2023. One report listed internal trainings and the other listed external trainings attended by PPB sworn members between January 1 and June 30, 2023. Thus, the PPB remains in Substantial Compliance for Paragraph 82. | |
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Based On** | Delivery and content of Semi-Annual Training Reports |

## D. Trainer Qualifications

| **Settlement Agreement Paragraph** | |
|---|---|
| 83. PPB shall institute guidelines to govern its selection of officers that serve as trainers and shall ensure that those officers do not have a history of using excessive force. The trainer selection guidelines shall prohibit the selection of officers who have been subject to disciplinary action based upon the use of force or mistreatment of people with mental illness within the three (3) preceding years, or twice in the preceding five (5) years and | |

**Exhibit A**

will take into account if a civil judgment has been rendered against the City in the last five (5) years based on the officer's use of force.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Reviewed "Work History Review Sheet" for third-quarter hires and ensured that the PPB is following SOP #1-19 standards |

| **Compliance Assessment** |
|---|
| During the second quarter of 2023, we reviewed the Work History Review Sheet for eight officers who were assigned to the Training Division pursuant to the process found in SOP #1-19. For the officers, the PPB found no evidence of civil judgments, discipline, or mistreatment of people with mental illness as defined in Paragraph 83. |

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | COCL review of "Work History Review Sheet" and SOP. #1-19 standards |

# E. Deliver Appropriate and High-Quality Training

| **Settlement Agreement Paragraph** |
|---|
| 84. (<u>COCL Summary</u>) Paragraph 84 describes the content and delivery of training that is expected for patrol officers and supervisors. PPB is expected to develop and implement a high-quality system of training that is consistent with PPB's policies as well as federal and state laws, and must cover specific topics, including use of force, de-escalation techniques, procuring medical care, proactive problem solving, civil and criminal liability, and positive communication skills. PPB training is also required to give particular attention to police responses to individuals who have, or are perceived to have, mental illness. PPB's training of officers must include "role playing scenarios and interactive exercises that illustrate proper use of force decision making" as well as peer intervention. In addition to all sworn personnel, paragraph 84 requires supervisor training, including conducting use of force |

**Exhibit A**

investigations, evaluation of officer performance, and positive career development/disciplinary actions.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Observed Advanced Academy training; Observed online trainings made available through the LMS; Interviewed PPB personnel |

| **Compliance Assessment** ||
|---|---|
| During the second quarter of 2023, the COCL observed select modules within the PPB's Advanced Academy training. These included courses on public order events, traffic stops, procedural justice, and crisis communication. Overall, we found the courses to be comprehensively developed and well delivered. In particular, we were impressed with how the concepts of respect, voice, neutrality, and fairness were incorporated throughout each of the courses we observed. We also found a high degree of engagement with the material from the instructors and the recruits. As a result, we continue to find the PPB to be in Substantial Compliance with the requirements of this paragraph. We also maintain our prior suggestions for overall improvement of the PPB's training efforts. However, we have combined them into an overall suggestion for maintaining and expanding efforts to further include concepts related to procedural justice and legitimacy. ||

| **COCL Recommendations** | • Maintain and, where needed, expand efforts to further include concepts related to procedural justice and legitimacy |
|---|---|
| **Assessment Based On** | COCL's observation/assessment of training content, delivery, and consistency with adult-learning principles and best practices; Processes described by PPB personnel |

## F. Audit the Training Program

| **Settlement Agreement Paragraph** |
|---|

**Exhibit A**

85. In consultation with the COCL, the Inspector shall audit the training program using the following performance standards to ensure that PPB does the following: (a) Conducts a comprehensive needs assessment annually; (b) Creates a Training Strategic Plan annually; (c) Within 180 days of the Effective Date, develops and implements a process for evaluation of the effectiveness of training; (d) Maintains accurate records of Training delivered, including substance and attendance; (e) Makes Training Records accessible to the Director of Services, Assistant Chief of Operations, and DOJ; (f) Trains Officers, Supervisors, and Commanders on areas specific to their responsibilities; and (g) Ensures that sworn PPB members are provided a copy of all PPB directives and policies issues pursuant to this Agreement, and sign a statement acknowledging that they have received, read, and had an opportunity to ask questions about the directives and/or policies, within 30 days of the release of the policy.

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Review of audit report for accuracy and completeness |

**Compliance Assessment**

As noted in our last report, the Office of the Inspector General (OIG) completed a comprehensive audit of PPB's training program on December 30, 2022, thereby demonstrating that the Bureau has a system in place that complies with the basic requirements of Paragraph 85. We therefore continue to find Substantial Compliance with the requirements of this paragraph. However, we maintain our suggestions for future audits and overall Training Division operations.

| **COCL Recommendations** | <ul><li>The next audit of the Training Division should give special attention to civilianization, including the level of support for the Director of Education and instructor development classes</li><li>A future audit should give attention to the <u>content</u> of in-person training for officers and supervisors, with particular attention to the quality of instruction on equity, procedural justice, and de-escalation</li></ul> |
|---|---|

**Exhibit A**

| | |
|---|---|
| | • In terms of a training needs assessment, the community should play a bigger role in setting training priorities because it is the recipient of police services<br><br>• Given the critical importance of training in police reform, the City and PPB should invest more in Training Division personnel so more instruction can be delivered |
| **Assessment Based On** | COCL's review of the audit report based on identified needs of the Training Division, auditing standards, and the timeline for completion of the audit |

# G. Analyze and Report Force Data

| **Settlement Agreement Paragraph** |
|---|
| 86. In consultation with the COCL, the Inspector shall gather and present data and analysis on a quarterly basis regarding patterns and trends in officers' uses of force to the Chief, the PPB Training Division, and to the Training Advisory Council. The Training Division and Training Advisory Council shall make recommendations to the Chief regarding proposed changes in policy, training, and/or evaluations based on the data presented. The Inspector shall also, in coordination with the COCL and PSD, identify problematic use of force patterns and training deficiencies. The Chief's Office shall assess all use of force patterns identified by the Training Division and/or Training Advisory Council and timely implement necessary remedial training to address deficiencies so identified. |

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Reviewed TAC meeting agenda and minutes; Reviewed TAC reports and recommendations |

| **Compliance Assessment** |
|---|
| The Force Inspector continues to gather force data on a quarterly basis and examine it for patterns and trends (See Section III on Use of Force). During this quarter, the Force Inspector was unable to provide the quarterly update due to the bimonthly meeting |

**Exhibit A**

schedule. The TAC met on May 10, though the Force Inspector's analysis was not released until May 15. Therefore, the Force Inspector presented the first quarter data at the TAC's July meeting, and we will provide updates in our next report.

The TAC held one public meeting in the second quarter of 2023 (May 10). During this meeting, the TAC heard a presentation from the Equity and Inclusion Office and from the City Attorney's Office. In addition, the TAC discussed and voted on a recommendation related to the PPB's ECIT program. Finally, the TAC heard from its four Task Groups: Advanced Academy, Continuous Quality Improvement, Officer-Community Relationships and Perceptions, and Restorative Justice.  From this meeting, the TAC made several recommendations that the PPB provided publicly-posted responses to (see Police Training Recommendations | Portland.gov).

Overall, we continue to find Substantial Compliance with the requirements of this paragraph, though we maintain our suggestions from past reports.

| | |
|---|---|
| **COCL Recommendations** | • Continue to work with TAC in the future to identify underlying factors associated with racial disparities in police use of force and determine potential solutions |
| **Assessment Based On** | The PPB's presentation of quarterly force reports and inclusion of trends; The TAC's recommendations; The PPB's responsiveness to the TAC's recommendations |

| **Settlement Agreement Paragraph** | |
|---|---|
| 87. Training Advisory Council meetings will be open to the public unless the matter under discussion is confidential or raises public safety concerns, as determined by the Chief. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review of the PPB website regarding the TAC; Review TAC agendas and minutes; Observe TAC meetings |

| **Compliance Assessment** |
|---|
| The TAC meeting held in the second quarter of 2023 was open to the public as required by Paragraph 87. The COCL continues to observe these meetings virtually, and the public has been allowed to listen and comment. The PPB continues to use a public email distribution list to send reminders of the meetings to the public. The PPB also continues to post TAC meeting agendas and minutes on the PPB's website.[1] |

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | COCL review of information available on the PPB website; COCL observation of TAC meetings and review of TAC minutes |

---

[1] https://www.portland.gov/police/tac/events/past

**Exhibit A**

# Section V: Community-Based Mental Health Services

| | |
|---|---|
| **Settlement Agreement Paragraph** | |

88. The absence of a comprehensive community mental health infrastructure often shifts to law enforcement agencies throughout Oregon the burden of being first responders to individuals in mental health crisis. Under a separate agreement, the United States is working with State of Oregon officials in a constructive, collaborative manner to address the gaps in state mental health infrastructure. The state-wide implementation of an improved, effective community-based mental health infrastructure should benefit law enforcement agencies across the State, as well as people with mental illness. The United States acknowledges that this Agreement only legally binds the City to take action. Nonetheless, in addition to the City, the United States expects the City's partners to help remedy the lack of community-based addiction and mental health services to Medicaid clients and uninsured area residents. The City's partners in the provision of community-based addiction and mental health services include: the State of Oregon Health Authority, area Community Care Organizations ("CCOs"), Multnomah County, local hospitals, health insurance providers, commercial health providers, and existing Non-Governmental Organizations ("NGOs") such as community-based mental health providers, and other stakeholders.

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Monitor the City and PPB's continuing work with community partners |

| | |
|---|---|
| **Compliance Assessment** | |

This paragraph is assessed based on the City and the PPB's continuing relationships with community partners. As this is a summative paragraph, compliance is dependent upon compliance with other paragraphs within this section. With all other paragraphs within this section remaining in Substantial Compliance, so too does Paragraph 88.

**Exhibit A**

| COCL Recommendations | • No recommendations at this time |
|---|---|
| **Assessment Based On** | N/A – Summative paragraph |

| **Settlement Agreement Paragraph** |
|---|
| 89. The United States expects that the local CCOs will establish, by mid-2013, one or more drop-off center(s) for first responders and public walk-in centers for individuals with addictions and/or behavioral health service needs. All such drop off/walk in centers should focus care plans on appropriate discharge and community-based treatment options, including assertive community treatment teams, rather than unnecessary hospitalization. |

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Review status of Unity Center; Interview with PPB personnel |

| **Compliance Assessment** |
|---|

The COCL continues to acknowledge that the focus of Paragraph 89 is on the Community Care Organizations and the expectation that they establish one or more drop-off center(s). The Settlement Agreement does not hold any authority over these organizations, but our assessment remains focused on the City's activities and reasonable expectations regarding their involvement with the drop-off/walk-in center(s).

Related to the focus of Paragraph 89, the Unity Center remains the drop-off center for individuals experiencing behavioral health needs. The facility has been operating in this capacity since it opened in May 2017. The PPB has two policies related to this paragraph, including Directive 850.21 (Peace Officer Custody [Civil]) and 850.25 (Police Response to Mental Health Facilities). These directives provide the protocol for officers to contact AMR for ambulance transport to the Unity Center. Since the opening of the Unity Center, a Transportation Workgroup has historically met regularly in quarterly meetings to discuss the operation of the Center. This workgroup includes members of Unity, the PPB, AMR,

**Exhibit A**

Multnomah County, and Legacy ED Health. However, due to scheduling issues, the group has not been able to meet for three consecutive quarters. At the moment there are no pressing issues, so the groups have not found it imperative to meet. We will provide additional updates on this workgroup next quarter. Based on the PPB and the City's ongoing participation in the process to date, we believe they have substantially complied with all reasonable expectations for them related to this paragraph.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | Status of Unity Center and PPB policies |

| **Settlement Agreement Paragraph** |
|---|
| 90. The CCOs will immediately create addictions and mental health-focused subcommittee(s), which will include representatives from PPB's Addictions and Behavioral Health Unit ("ABHU") [Now called Behavioral Health Unit or "BHU"], the ABHU Advisory Board [Now called the BHU Advisory Committee or "BHUAC"], Portland Fire and Rescue, Bureau of Emergency Communications ("BOEC") and other City staff. These committees will pursue immediate and long-term improvements to the behavioral health care system. Initial improvements include: (COCL Summary) increased sharing of information (subject to lawful disclosure); creation of rapid access clinics; enhanced access to primary care providers; expanded options for BOEC operators to divert calls to civilian mental health services, addressing unmet needs identified by Safer PDX; expanding and strengthening networks of peer mediated services; and pursue tele-psychiatry. |

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Review Community Outreach Meeting minutes; Review Portland State University evaluation on PSR |
| **Compliance Assessment** | |

**Exhibit A**

As with the above paragraph, Paragraph 90 contains expectations for Coordinated Care Organizations (CCOs) to create subcommittees for the PPB to serve on and include a list of initial goals to be accomplished. However, CCOs are not under the authority of the Settlement Agreement, and we therefore only evaluate the City on what can reasonably be expected of the agency given the lack of opportunity from CCOs.

During the second quarter of 2023, Legacy Community Outreach met three times (April 5, May 3, and June 7), and minutes and a resource list were provided for those meetings. At the April meeting, presentations were given by WeShine and SARA (Stabilization and Recovery Area) at Providence Portland Medical Center. These organizations help those struggling with homelessness and substance use. At the May meeting, the group heard from Oregon Lifeline service, which provides free and discounted cell phone services. The group also heard about a rental inspection program in Gresham, housing openings at Shared Recovery Housing, job openings at community groups, and a board member position at Homeless Solutions Coalition of Clackamas County (HSCCC). At the June meeting, a presentation was given by LoveOne and Karibu Stabilization Program. LoveOne provides community outreach, helping with laundry, water need, and connecting individuals with work picking up trash. Karibu focuses on culturally specific treatment for African American individuals by combining clinical services with housing support. We continue to find that the PPB collaborating with community partners through participation with this group works toward the goal of long-term improvements to the behavioral health care system, as outlined in paragraph 90.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | PPB involvement with Behavioral Health Collaborative Team; PPB involvement with Legacy ED Community Outreach |

**Exhibit A**

# Section VI: Crisis Intervention

## A. Addictions and Behavioral Health Unit and Advisory Committee

---

### Settlement Agreement Paragraph

91. In order to facilitate PPB's successful interactions with mental health consumers and improve public safety, within 60 days of the Effective Date, PPB shall develop an Addictions and Behavioral Health Unit ("ABHU") within PPB. PPB shall assign command-level personnel of at least the rank of Lieutenant to manage the ABHU. ABHU shall oversee and coordinate PPB's Crisis Intervention Team ("C-I Team"), Mobile Crisis Prevention Team ("MCPT"), and Service Coordination Team ("SCT"), as set forth in this Agreement.

*[As a point of clarification, since the writing of the Agreement, the ABHU is known as Behavioral Health Unit ("BHU"), the C-I Team is known as Enhanced Crisis Intervention Team ("ECIT"), and the MCPT is known as Behavioral Health Response Team ("BHRT"). Discussion of these entities, and their reference in subsequent Agreement paragraphs, will use their current nomenclatures].*

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review Behavioral Health Unit (BHU) structure |

### Compliance Assessment

Regarding personnel and the BHU's general oversight, the BHU continues to conform to the requirements of Paragraph 91, as evidenced by the BHU structure and our observations of the BHU coordinating ECIT, BHRT, and SCT operations. While the BHU provides oversight to the ECIT program (including ECIT training, dispatch criteria, data collection, etc.), ECIT officers directly report to their precinct level chain of command. This command structure conforms to the Memphis Model. There have been no major changes to the structure of the unit, and the PPB is expected to provide updates on personnel changes.

---

**Exhibit A**

In the second quarter of 2023, the PPB provided the COCL with the updated organization chart for the Specialized Resources Division, which houses the BHU. Based on the PPB's ongoing unit structure, we continue to find that the PPB remains in Substantial Compliance with this paragraph.

| COCL Recommendations | • Continue to update the COCL and DOJ on changes to personnel when applicable |
|---|---|
| Assessment Based On | COCL review of unit structures and personnel |

**Settlement Agreement Paragraph**

92. [BHU] will manage the sharing and utilization of data that is subject to lawful disclosure between PPB and Multnomah County, or its successor. PPB will use such data to decrease law enforcement interactions or mitigate the potential uses of force in law enforcement interactions with consumers of mental health services.

93. [BHU] shall track outcome data generated through the [ECIT], [BHRT], and SCT, to: (a) develop new response strategies for repeat calls for service; (b) identify training needs; identify and propose solutions to systemic issues that impede PPB's ability to provide an appropriate response to a behavioral crisis event; and (c) identify officers' performance warranting commendation or correction.

| Compliance Label | 92. Substantial Compliance |
|---|---|
| | 93. Substantial Compliance |
| Methodology | Review Behavioral Health Unit Coordination Team (BHUCT), BHRT, and SCT coordination team meeting agendas and minutes; Review ECIT, BHRT, and SCT outcome measures |
| **Compliance Assessment** | |

**Exhibit A**

The PPB continues to utilize a number of work groups to collaborate on ways to "decrease law enforcement interactions [and] mitigate the potential uses of force in law enforcement interactions with consumers of mental health services" (Paragraph 92). During the second quarter of 2023, the BHU staff continued to meet weekly to discuss the BHRT caseload, and the BHUCT met on a biweekly basis to discuss current and potential BHRT clients. The BHUCT is composed of several community partners, including representatives from Multnomah County, Cascadia, and federal/state law enforcement. The PPB provided us with meeting minutes and agendas indicating that a core group of partners attends consistently, with other partners attending as needed.

The discussions during these meetings are designed to problem solve and create strategies to reduce future criminal justice contacts for individuals who have frequent contact with the police but have been difficult to engage in ongoing services. BHU personnel indicate that information about the individuals discussed is shared only if it is subject to lawful disclosure. BHU personnel indicate that the creation of the BHUCT has been a particularly valuable collaborative strategy.

The SCT also conducts weekly meetings to discuss potential clients and make determinations about eligibility for SCT services. The meetings include community partners and representatives from various entities in Multnomah County. The meetings also review current SCT clients to "facilitate continuation of care" for clients. We believe these meetings meet the spirit of Paragraph 92.

The PPB continues to provide the COCL with the documentation for all meetings occurring within the BHU, including minutes from each SCT, BHU, and BHUCT meeting. In addition, the PPB provided the COCL with copies of the BHRT flyers used to communicate with partners about individuals they are trying to connect with services. This information is supplemented by data collected on the Mental Health Template (MHT) that identifies individuals and locations with repeat calls for service and develops response strategies.

Relevant outcome measures are collected for BHRT and SCT, and the PPB provides the COCL with quarterly reports summarizing these data. The BHU system has multiple avenues for sharing and receiving information with such entities as the BHUCT, Behavioral Health Call Center (BHCC), BOEC, and BHUAC. Thus, we find that the PPB remains in Substantial Compliance with the requirements of Paragraphs 92 and 93.

| **COCL Recommendations** | • Continue to collect and review data on mental health services, and use this information to update services as needed |
|---|---|

**Exhibit A**

| **Assessment Based On** | BHUCT, BHRT, and SCT coordination meeting agendas and minutes; ECIT, BHRT, and SCT outcome measures |
|---|---|

| **Settlement Agreement Paragraph** |
|---|
| 94. Within 90 days of the Effective Date, PPB shall also establish a [BHU] Advisory Committee. The [BHU] Advisory Committee shall include representation from: PPB command leadership, [ECIT], [BHRT], and SCT; BOEC; civilian leadership of the City government; and shall seek to include representation from: the Multnomah County Sheriff's Office; Oregon State Department of Health and Human Services; advocacy groups for consumers of mental health services; mental health service providers; coordinated care organizations; and persons with lived experience with mental health services. |

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Review BHUAC roster of members; Review BHUAC minutes; Observe BHUAC meetings |

| **Compliance Assessment** |
|---|
| In the second quarter of 2023, the BHUAC continued to meet regularly, holding meetings on April 26 , May 24, and June 28. The minutes of these meetings have been documented and shared with the COCL and can be found on the PPB's website (https://www.portland.gov/police/bhu-advisory/documents). |
| Membership requirements of BHUAC, as outlined in Paragraph 94, continue to be met, with a current roster of 18 voting members representing a variety of entities involved in the mental health response systems. Beyond the roster requirements, voting members are expected to attend meetings, and there must be at least eight voting members present for a quorum. For all meetings held in the second quarter, a quorum was met. The membership represents a variety of community partners. Recent additions in previous quarters ensure a quorum and a variety of perspectives. We continue to find the PPB to be in Substantial Compliance with this paragraph. |

**Exhibit A**

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | BHUAC roster; BHUAC minutes; Observations of BHUAC meetings |

---

| **Settlement Agreement Paragraph** ||
|---|
| 95. The [BHU] Advisory Committee shall provide guidance to assist the City and PPB in the development and expansion of [ECIT], [BHRT], SCT, BOEC Crisis Triage, and utilization of community-based mental health services. The [BHU] Advisory Committee shall analyze and recommend appropriate changes to policies, procedures, and training methods regarding police contact with persons who may be mentally ill or experiencing a mental health crisis, with the goal of de-escalating the potential for violent encounters. The [BHU] Advisory Committee shall report its recommendations to the [BHU] Lieutenant, PPB Compliance Coordinator, COCL (as described herein), and the BOEC User Board. |

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Review BHUAC minutes; Observe BHUAC meetings |

| **Compliance Assessment** |
|---|

Paragraph 95 envisions that BHUAC committee members will assist "the City and PPB in the development and expansion of [ECIT], [BHRT], SCT, BOEC Crisis Triage, and utilization of community-based mental health services." BHUAC continued to hold monthly meetings in the second quarter of 2022. The meeting agendas included a variety of topics.

The April meeting covered many different topics but began with a follow-up discussion regarding the OIG's presentation on force in March. Overall, the members thought the presentation was useful and informative but wondered about the level of detail necessary to understand the bigger picture. They brought up that there is a lot of sensitive material packed into a small chunk of time. They recommended that the PPB provide recurrent trigger warnings on the material throughout the presentation. They also suggested that more time be given to each presentation and that the presentations take place over two

separate meetings. Another topic of discussion involved a PPB representative asking the committee for recommendations for community programs that could present at the next meeting. The committee compiled a list of 18 different suggestions. In addition, a PPB member did a presentation about the upcoming Crisis Intervention Team (CIT) refresher training at which the Bureau plans to show a video of a police encounter provided by Police Executive Resource Form (PERF). The purpose of the video is to review and identify better practices for working with persons in crisis. After reviewing the video, a committee member asked about how the Bureau helps officers deal with trauma responses. The PPB member informed the committee that the PPB has trained officers using the Active Bystandership for Law Enforcement (ABLE) project, which aims to help officers intervene and accept intervention from their peers. The last item for discussion at the April meeting was about the BHUAC community engagement meeting. Members brought up that they wanted to make sure it was known that they were attending these meetings as members of the BHUAC and not as representatives of their professional organizations.

At the May meeting, the PPB followed up with the committee on the recommendations for facilities presentations and presented the selected facilities. The committee was also provided with Directive 0850.10 (Custody, Civil Holds), a directive that the committee had not previously reviewed. The goal of the directive's language is to make it very clear that a custody is taking place. A member requested the language be clarified to make it very clear that there is a custody taking place. Another member suggested that the PPB should consider adding language that encourages the officer to inquire what course of action would work best for the affected individual. The next agenda item was a discussion around an inquiry from the community engagement meeting to include a faith-based service provider representative on BHUAC. The committee agreed to schedule a meet and greet with the organization to learn more about their interest.

The June meeting began with an officer presenting to the committee on the topic of Ukrainian Mental Health Support. The officer shared resources and the sensitive issues they run into when interacting with the Ukrainian community and probed the committee for ideas on how to tackle these issues and for available resources. Next, an officer with the BHU and a member of the training division presented the course plan for the ECIT certification course scheduled for September of this year. The committee was provided with an excel sheet outlining the schedule for the week and the topics that will be covered. Details of the content were not provided, but the committee was told that most of the classes, skill builders, and scenarios would be similar to those from last year. Members were invited to attend dry runs of the scenarios, to see them in action and provide feedback. The committee voted to formally approve the ECIT training schedule, with the understanding that some members of the BHUAC will attend the dry runs of the scenarios.

**Exhibit A**

The final topic was BHRT coordination with patrol officers. Members of the PPB discussed the issue of patrol officers, namely ECIT officers, working with individuals but not knowing they are on a BHRT caseload. An idea has been brought forth to share information with ECIT patrol officers regarding individuals who are working with BHRTs. This information would be protected and only available to ECIT officers who wish to access it. Some members of the committee had concerns about putting individuals on a list and how that might impact them. The PPB responded that this information would only be made available to ECIT officers as a resource to improve communication between ECIT officers and the BHRTs. Further, if an individual is on the BHRT caseload, this information is already stored and discoverable. A new list would not be created; the list would just be made accessible to ECIT officers. The BHUAC lost the quorum during this presentation and was not able to vote on any recommendations concerning this proposal. The PPB will bring up this topic for a vote at a future meeting.

Overall, the presentations and discussions were thorough and satisfied the COCL's understanding of the BHUAC purpose. The quorum was lost toward the end of the last two meetings, which delayed a presentation and a vote. We understand that participation in the committee is voluntary for the members, and we acknowledge the efforts that have been made to bolster the roster. We therefore continue to encourage attempts to ensure an ongoing quorum by increasing membership or substituting representatives who are able to attend more regularly for those who frequently cannot. However, for the present quarter, we continue to find Substantial Compliance with the requirements of this paragraph.

| **COCL Recommendations** | • Ensure an ongoing quorum through increasing membership or substituting representatives who are able to attend more regularly for those who frequently cannot |
|---|---|
| **Assessment Based On** | Review of BHUAC minutes and agendas; Observation of BHUAC meetings |

| **Settlement Agreement Paragraph** |
|---|
| 96. Within 240 days of the Effective Date of this Agreement, the [BHU] Advisory Committee will provide status reports on the implementation of the [BHU] and BOEC Crisis Triage, and identify recommendations for improvement, if necessary. PPB will utilize the [BHU] |

**Exhibit A**

Advisory Committee's recommendations in determining appropriate changes to systems, policies, and staffing.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review BHUAC recommendations found in BHUAC minutes |

**Compliance Assessment**

In accordance with Paragraph 96, BHUAC continues to provide the COCL with a report of their votes and recommendations for the implementation of the BHU and BOEC. In the second quarter of 2023, the BHUAC made two formal recommendations. The first recommendation concerned the annual OIG presentation created for the BHUAC. Members requested the following:

- Timelines and roles of officers who were involved on the calls, especially ECIT officers
- Follow-up trigger warnings throughout the presentations
- More time should be given for each presentation and the presentations should take place over two separate meetings
- The OIG's presentation should be recorded and posted to the BHUAC web page with the power point to capture the entirety of the presentation

The PPB responded that they concur with and will implement these recommendations in the 2024 presentation. The second recommendation was for the PPB to reassess the proposed updates to Directive 0850.10, as it interprets Oregon Revised Statute (ORS) 430.399-.401, ORS 430.306, and any relevant case law, to focus on utilizing the least restrictive limitations as possible on an intoxicated person's liberty. We have not yet been provided with a response by the PPB on this recommendation. As this process follows what is envisioned by paragraph 96, we find the PPB to be in substantial compliance with the paragraph.

| **COCL Recommendations** | - No recommendations at this time |
|---|---|
| **Assessment Based On** | BHUAC status reports and recommendations; PPB responses to BHUAC recommendations |

**Exhibit A**

## B. Continuation of C-I Program

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 97. PPB provides C-I Training to all its officers. C-I is a core competency skill for all sworn police officers in the City. PPB shall continue to train all officers on C-I. | |
| 98. PPB agrees to continue to require a minimum of 40 hours of C-I training to all officers before officers are permitted to assume any independent patrol or call-response duties. Additionally, PPB shall include C-I refresher training for all officers as an integral part of PPB's on-going annual officer training. PPB's Training Division, in consultation with [BHU] Advisory Committee, shall determine the subjects and scope of initial and refresher C-I training for all officers. | |

| **Compliance Label** | 97. Substantial Compliance |
|---|---|
| | 98. Substantial Compliance |
| **Methodology** | Review of PPB in-service training |

| | |
|---|---|
| **Compliance Assessment** | |
| The PPB continues to emphasize crisis response as a core competency in its training. For instance, all officers are required to receive a minimum of 40 hours of crisis intervention training prior to graduating from the Advanced Academy. In May of 2023, the PPB started a new Advanced Academy. By the end of Q2, 4.5 hours of crisis intervention training had been delivered to 10 new recruits. The PPB plans to deliver additional crisis intervention training in future quarters. This will complement the 28 hours of crisis intervention training that all recruits get in the statewide Department of Public Safety Standards & Training (DPSST) Basic Academy, resulting in, and in fact exceeding, the 40 hours of required crisis intervention training. Regarding refresher training, the PPB plans to include crisis intervention as part of the second half of in-service training, which is scheduled to begin in the fourth quarter. We therefore continue to find Substantial Compliance with the requirements of this paragraph, though we maintain our suggestion from prior reports. | |

**Exhibit A**

| COCL Recommendations | • Consider seeking BHUAC input during training development rather than after training has been developed |
|---|---|
| **Assessment Based On** | PPB in-service training |

## C. Establishing "Memphis Model" Crisis Intervention Team

| **Settlement Agreement Paragraph** | |
|---|---|
| 99. Within 120 days of the Effective Date, PPB shall establish a Memphis Model Crisis Intervention team ("[ECIT]"). | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review BHU/ECIT data; Interview PPB personnel; Review MHT data; Review BOEC data |

| **Compliance Assessment** |
|---|
| The PPB continues to operate under a modified Memphis Model of crisis intervention. In this specialized response system, a select group of officers receive an additional 40 hours of training to become ECIT officers. As part of ECIT operations, the PPB has Directive 850.20 (Police Response to Mental Health Crisis), which was revised during the third quarter and presented to officers during the third-quarter in-service training. Along with discussing the revisions, the PPB provided a brief training that distinguished differences between the roles and responsibilities of ECIT, PSR, and Project Respond. We therefore continue to find that the PPB has sufficiently memorialized their crisis response model in both policy and training. |

In the second quarter of 2023, the PPB reported 147 active members on the ECIT roster. In addition, the BHU continued to hold ECIT advisory meetings. During the second quarter, ECIT members from all precincts discussed topics related to the ECIT certification course, sharing BHRT caseload, and the possibility of an ECIT detail car. For instance, the minutes from the meeting included conversation on how many officers had signed up for the ECIT

**Exhibit A**

training (27 had applied so far) and conversation about the ECIT detail car. Officers were open to the idea but were concerned that they might be pulled all over the city all night. They discussed the possibility of having two ECIT cars rather than a two-person car. As a result, maintaining their model, we continue to find the PPB has substantially complied with the requirements of Paragraph 99.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | ECIT roster; PPB's Semi-Annual Mental Health Crisis Response Report |

| **Settlement Agreement Paragraph** | |
|---|---|
| 100. PPB's [ECIT] shall be comprised of officers who volunteer for assignment to the [ECIT]. The number of [ECIT] members will be driven by the demand for [ECIT] services, with an initial goal of 60-80 volunteer, qualified officers. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review ECIT Roster; Interview PPB personnel |
| **Compliance Assessment** | |
| The PPB continues to follow the practice of accepting volunteer officers for ECIT certification. In the second quarter of 2023, no additional officers were ECIT certified. The PPB provided us with a current ECIT roster that includes 147 active members. The PPB plans to run another ECIT certification training in September of 2023. As there have been no major changes in the number of ECIT officers since the previous quarter and we previously found that ECIT officer distribution matches call volume patterns, we continue to find Substantial Compliance with the requirements of this paragraph. | |
| **COCL Recommendations** | • Continue utilizing existing data to assess demand for ECIT services |

**Exhibit A**

| Assessment Based On | MHT data; ECIT roster; The PPB's Semi-Annual Mental Health Crisis Response Report |
|---|---|

### Settlement Agreement Paragraph

101. No officers may participate in [ECIT] if they have been subject to disciplinary action based upon use of force or mistreatment of people with mental illness within the three years preceding the start of [ECIT] service, or during [ECIT] service. PPB, with the advice of the [BHU] Advisory Committee, shall define criteria for qualification, selection, and ongoing participation of officers in the [ECIT].

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review evaluation documents for potential ECIT officers |

### Compliance Assessment

In the second quarter of 2023, the PPB did not add any new members to the ECIT roster. The Bureau is planning to hold a certification course in September 2023, a curriculum previously approved by DOJ and COCL. As a result of ongoing PPB practice, we continue to find the PPB in Substantial Compliance with the requirements of this paragraph.

| COCL Recommendations | • No recommendations at this time |
|---|---|
| Assessment Based On | PPB ECIT evaluation documents |

### Settlement Agreement Paragraph

102. PPB shall specially train each [ECIT] member before such member may be utilized for [ECIT] operations. PPB, with the advice of the [BHU] Advisory Committee, shall develop such training for [ECIT] members consistent with the Memphis Model.

**Exhibit A**

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review PPB supplemental documents |

**Compliance Assessment**

In the second quarter of 2023, there was no ECIT certification training; the next one is planned for September 2023. The PPB presented the schedule for the next certification training to the BHUAC at the June meeting. The committee voted to approve the schedule with the understanding that it will provide additional feedback during the dry runs of the scenarios scheduled for August. We appreciate the PPB taking the steps to gather feedback on the ECIT course topics and provide the BHUAC with the opportunity to participate in dry runs and suggest changes. We therefore continue to find Substantial Compliance with the requirements of this paragraph.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | PPB supplemental documents; Observation of BHUAC meeting |

---

**Settlement Agreement Paragraph**

103. [ECIT] members will retain their normal duties until dispatched for use as [ECIT]. BOEC or PPB may dispatch [ECIT] members to the scene of a crisis event.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review PPB policy |

**Compliance Assessment**

**Exhibit A**

In accordance with Paragraph 103 (and the Memphis Model of mental health crisis response), ECIT members retain their normal duties until dispatched for use as ECIT. BOEC personnel have received training on the criteria for dispatching an ECIT to a call. In addition, the PPB's Directive 850.20 includes the requirement for officers to consider calling in specialized units (including ECIT) as necessary. We therefore continue to find that the PPB has maintained Substantial Compliance with this paragraph.

| **COCL Recommendations** | • No recommendations at this time |
| --- | --- |
| **Assessment Based On** | PPB policy |

| **Settlement Agreement Paragraph** |
| --- |
| 104. PPB will highlight the work of the [ECIT] to increase awareness of the effectiveness of its work. |

| **Compliance Label** | Substantial Compliance |
| --- | --- |
| **Methodology** | Review PPB public awareness efforts; Review BHU website; Review BHUAC minutes |

**Compliance Assessment**

The PPB continues to perform a wide variety of tasks designed to increase awareness of the work performed by the BHU, ECIT, BHRT, and SCT. This work includes flash alert emails, newsletters, conference presentations, conference attendance, community outreach training and presentations, social media, and other efforts. We believe the PPB has made a strong effort to highlight the work of the BHU in its entirety, not only the ECIT.

For instance, in the second quarter of 2023, the BHU newsletter shared positive news, such as members of the BHU presenting at the NW Regional CIT Conference and BHU members attending a walk for the National Alliance on Mental Illness, which helped raise money for the organization. The newsletter also shared a story in which BHRT and SCT coordinated

to help an individual get treatment, housing, and employment. In addition, the PPB provided data and information on the ECIT for the year. Based on this and our previous review of PPB outreach efforts, we believe the PPB has substantially complied with the requirements of Paragraph 104.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | Public awareness and education documents |

| **Settlement Agreement Paragraph** |
|---|
| 105. For each crisis event to which [ECIT] is dispatched, the [ECIT] member shall gather data that [BHU] shall utilize to track and report data on public safety system interactions with individuals with perceived or actual mental illness or who are in crisis. These data shall include: (COCL summary) the required tracking of details about the context and nature of incident, information about the subject, techniques used, injuries, disposition, presence of mental health professional on scene, and a narrative of the event. |

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Review MHT data; Interview PPB personnel |

| **Compliance Assessment** |
|---|

In accordance with this paragraph, the PPB must collect data on mental health calls, and the BHU is required to report on the data collected. In the second quarter of 2023, the PPB continued to use the MHT as the method for collecting the data points required in Paragraph 105. The PPB's quality assurance plan for ECIT-related data and outcomes includes analysts auditing associated data on a monthly basis.

The BHU provided the COCL with a quarterly report describing MHT data for ECIT calls. In the second quarter of 2023, the PPB received 338 MHTs on 333 calls that reported an ECIT officer was on scene (a single call may result in more than one MHT being completed). ECIT

**Exhibit A**

officers authored 217 (64%) of the MHTs. For the 333 calls, the most common technique used was de-escalation (46%). A total of 14 calls (4% of the total) reported a use of force. For the disposition of the 333 calls, the most common clearance type was report written (79% of calls), followed by about 10% of calls being cleared by arrest (physical). All these statistics are similar to prior quarters.

Due to the nature and extent of data collected and analyzed on ECIT dispatches, the PPB remains in Substantial Compliance with Paragraph 105.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | MHT data |

## D. Mobile Crisis Prevention Team

| **Settlement Agreement Paragraph** | |
|---|---|
| 106. PPB currently has a [BHRT] comprised of a two-person team, one sworn officer and one contractor who is a qualified mental health professional. Within 120 days of the Effective Date, City shall expand [BHRT] to provide one [BHRT] car per PPB precinct.<br><br>107. Each [BHRT] car shall be staffed by one sworn PPB officer and one qualified mental health professional. [BHRT] shall be the fulltime assignment of each such officer. | |
| **Compliance Label** | 106. Substantial Compliance |
| | 107. Substantial Compliance |
| **Methodology** | Review BHU structure; Review of BHUAC meeting; Interview PPB personnel |
| **Compliance Assessment** | |

**Exhibit A**

The PPB continues to have a BHRT car in each precinct composed of one officer and one qualified mental health professional. For the officer, BHRT is considered their full-time assignment. In the second quarter of 2023, the PPB made no changes to their roster of the five BHRTs. The PPB aims to maintain the five teams as the complete roster for BHRT. One BHRT is assigned to each precinct (East, Central, and North), a fourth BHRT is assigned to Houseless Outreach, and a fifth BHRT is assigned to Proactive Follow-up. As a result of their current effort, we continue to find the PPB is in Substantial Compliance with the requirements of Paragraphs 106 and 107.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | BHU  structure |

| **Settlement Agreement Paragraph** |
|---|
| 108. No officers may participate in [BHRT] if they have been subject to disciplinary action based upon use of force or mistreatment of people with mental illness within the three years preceding the start of [BHRT] service, or during [BHRT] service. PPB, with the advice of [BHU] Advisory Committee, shall define criteria for qualification, selection, and ongoing participation of officers in the [BHRT]. |

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Review evaluation documents for potential ECIT officers |

| **Compliance Assessment** |
|---|
| All BHRT officers are ECIT certified and are held to the same eligibility standards as ECIT officers. In addition, SOP #43 covers the ongoing participation of officers involved with BHRT. The BHU Sergeants and the Lieutenant monitor all current BHRT members through the EIS and Professional Standards Division (PSD) to ensure qualifications are maintained. During this quarter, no new BHRT officers were assigned. However, we have seen this |

**Exhibit A**

process play out in prior quarters and therefore continue to find that the PPB remains in Substantial Compliance with Paragraph 108.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | PPB policy |

| **Settlement Agreement Paragraph** | |
|---|---|
| 109. PPB shall specially train each [BHRT] member before such member may be utilized for [BHRT] operations. PPB, with the advice of the [BHU] Advisory Committee, shall develop such training for [BHRT] members. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review reported trainings for BHRT members |

| **Compliance Assessment** |
|---|
| The BHU continues to promote supplemental training for supervisors and BHRT members. In the second quarter of 2023, members took part in external supplemental training and conferences. For instance, trainings attended by members of the BHU covered a variety of topics, including personality disorders, suicidality and resources for veterans, applied suicidal intervention training, and HIPAA for Law Enforcement Training. Members attended the two-day NW Regional CIT conference, where two members also presented. It appears that the BHU has continued to forge a culture in which ongoing learning and training is promoted and encouraged. We therefore find that the PPB has maintained Substantial Compliance with Paragraph 109. |

| **COCL Recommendations** | • No recommendations at this time |
|---|---|

**Exhibit A**

| **Assessment Based On** | The PPB quarterly report identifying supplemental BHRT training |
|---|---|

---

### **Settlement Agreement Paragraph**

110. [BHRT] shall utilize [ECIT] data to proactively address mental health service, in part, by connecting service recipients with service providers.

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Review MHT summary data; Review Behavioral Health Unit Electronic Referral System (BERS) summary data |

### **Compliance Assessment**

The PPB has continued the practice of collecting data through the MHT. When an officer has an encounter with a mental health component, they will complete the MHT. This information will be used to address mental health service needs. If an individual is the subject of three MHTs in a 30-day period, they will be referred to the BERS (if a referral has not already been made).

Once an individual is referred, a team will look at specific criteria, including a demonstration of escalating behavior, frequent contacts with the PPB, considered a risk to self or others, and whether case-specific information indicates a potential need for BHRT intervention. If the individual is deemed an appropriate candidate for additional intervention, the BHUCT (which is composed of law enforcement, court, service provider, hospital provider personnel, and other relevant stakeholders) will discuss a plan of action.

The PPB has continued to conduct analysis of BHRT operations on a quarterly basis to identify potential trends and ensure ongoing system function. In the second quarter of 2023, a total of 110 referrals was processed by the BHU. Of the 110 referrals, 51 (46%) were assigned to BHRT's caseload. This assignment rate represents a decrease from the previous quarter (59%) and the lowest assignment rate across the last six quarters (47%, 50%, 52%, 55%, and 57%, respectively).

**Exhibit A**

In the second quarter of 2023, 101 individuals transitioned to inactive status with BHRT. Of those individuals, 36 (36%) had been previously assigned to BHRT's caseload in a different quarter and continued into the second quarter of 2023.

As shown in Figure 3, this quarter saw that the most common reason for a referral to be assigned was for Escalating Behavior (39%), followed by Risk to Others (32%) and Frequent Contacts (20%).

**Figure 3 Assigned Cases Reason for Referral (provided by the PPB)**

N=97



When looking at the outcomes of referrals for inactive cases in the second quarter of 2023 (Figure 4), the most common outcome was Systems Coordination (27%), closely followed by Concern Mitigated (23%) and Unable to Locate (15%).

**Figure 4 Inactive Cases Outcome of Referral (provided by the PPB)**

N=101



The PPB's current practice of collecting data through the MHT, meeting weekly to share information, and using data to inform service needs fulfills the requirements outlined in Paragraph 110. We continue to find the PPB in Substantial Compliance.

| **COCL Recommendations** | • Continue to collect data and create reports on mental health services |
| --- | --- |

**Exhibit A**

| **Assessment Based On** | MHT data; BERS referral data |
| --- | --- |

---

| **Settlement Agreement Paragraph** |
| --- |
| 111. Within 180 days of the Effective Date, PPB, with the advice of [BHU] Advisory Committee, shall develop policies and procedures for the transfer of custody or voluntary referral of individuals between PPB, receiving facilities, and local mental health and social service agencies. These policies and procedures shall clearly describe the roles and responsibilities of these entities and of [BHRT] officers in the process. |

| **Compliance Label** | Substantial Compliance |
| --- | --- |
| **Methodology** | Review Directives 850.20, 850.21, 850.22, and 850.25; Interview PPB personnel |

| **Compliance Assessment** |
| --- |
| The PPB continues to operate under the Directives 850.20, 850.21, 850.22, and 850.25, which dictate the procedures for AMR to provide transportation for a person in a mental health crisis. These directives were reviewed by BHUAC during the first and third quarters of 2022; in-service training provided an overview of the updates made to Directive 850.20. The PPB continues to collaborate with AMR when issues arise during the transportation of an individual dealing with a mental health crisis (see our assessment of Paragraph 89). The PPB also has a designated liaison Sergeant at each precinct to respond, in real time, to any transportation issues. As the PPB continues to uphold these procedures, we find that they have maintained Substantial Compliance with Paragraph 111. |

| **COCL Recommendations** | • No recommendations at this time |
| --- | --- |
| **Assessment Based On** | Directives 850.20, 850.21, 850.22, and 850.25; PPB interviews |

**Exhibit A**

## E. Service Coordination Team

| **Settlement Agreement Paragraph** |
| --- |
| 112. The Service Coordination Team ("SCT"), or its successor, shall serve to facilitate the provision of services to individuals who interact with PPB that also have a criminal record, addiction, and highly acute mental or physical health service needs. |

| **Compliance Label** | Substantial Compliance |
| --- | --- |
| **Methodology** | Review SCT outcome measures; Review SCT Referrals Report |

| **Compliance Assessment** |
| --- |
| The PPB continues to facilitate the provision of services to individuals experiencing drug addiction and mental illness and who are chronically involved in criminal behavior. The SCT coordinates access to housing, medical, counseling, and addiction/mental health services. Members of the SCT are proactive in seeking out collaborations with other stakeholders in the State of Oregon. |
| The PPB continues to provide data demonstrating that, over the years, SCT has consistently grown in the number of people referred to the program and the number of people it serves. For the second quarter of 2023, the number of referrals was 212, as shown in Table 4. This is a decrease from the previous four quarters (318, 263, 235, and 249, respectively). Overall trends in referrals remain largely consistent with pre-2020 data (when COVID-19 caused a reduction in referrals). Of these referrals, the SCT accepted 67%; the other 33% did not meet the assignment criteria. The primary reasons for not meeting criteria were lack of criminal history (26%) and lack of recent crimes (22%). |

**Exhibit A**

**Table 4. SCT Referrals (provided by the PPB)**

| SCT Referrals, 2023 Q2 | N | % of Total |
|---|---|---|
| Number of Referrals | 212 | - |
| Number of Individuals Referred* | 209 | - |
| Number of Referrals That Met Assignment Criteria | 143 | 67% |
| Number of Referrals That Did Not Meet Assignment Criteria | 69 | 33% |

| Reason for Not Meeting Assignment Criteria | N | % of Not Meeting Assignment Criteria |
|---|---|---|
| Lacks criminal history | 18 | 26% |
| Lacks recent crimes | 15 | 22% |
| Unable to Locate | 8 | 12% |
| Other | 6 | 9% |
| Higher level of care | 6 | 9% |
| Aggression | 6 | 9% |
| Sex Offender | 5 | 7% |
| Arson | 4 | 6% |
| Crimes outside Portland | 1 | 1% |

In addition, the Supportive Transitions and Stabilization (STS) Program is an expansion of the SCT operation that is run by the Central City Concern's Housing Rapid Response. By creating a direct housing resource, the STS addresses the needs of those experiencing mental illness and co-occurring disorders who temporarily require a more extensive level of care. In the second quarter of 2023, 19 individuals were referred, 17 of the referrals were accepted and a total of 8 new participants were served, as shown in Table 5.

**Table 5. STS Referrals (provided by the PPB)**

| STS Referrals, 2023 Q2 | |
|---|---|
| Number of Referrals* | **19** |
| Number of Individuals Referred | **19** |
| Average Age of Individuals Referred | **37.3 yrs** |
| Number of Referrals Accepted (Met Criteria) | **89%** |
| Number of Referrals Declined | **2** |
| Number of new participants served during Quarter | **8** |
| Number of participants who successfully completed | **1** |
| Participants terminated for cause/non-compliance | **4** |
| Participants who voluntarily withdrew from program | **0** |
| Average Length of Stay (days) of those who exited during Quarter | 153.6 |
| Bed utilization rate | 62% |

*Three individuals did not have a unique ID number; however, they are included in the analysis.*

| **COCL Recommendations** | • No recommendations at this time |
|---|---|

**Exhibit A**

| Assessment Based On | SCT process; SCT outcome measures |
|---|---|

## F. BOEC

| **Settlement Agreement Paragraph** |
|---|
| 113. Within 120 days of the Effective Date, BOEC and PPB, with the advice of the [BHU] Advisory Committee, shall complete policies and procedures to triage calls related to mental health issues, including changes to protocols for assigning calls to [Behavioral Health Call Center - BHCC], and adding new or revised policies and protocols to assign calls to PPB [BHU] or directly to NGOs or community-based mental health professionals. |

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Interview BOEC personnel; Review BOEC protocols |

| **Compliance Assessment** |
|---|
| BOEC has completed and maintained the policies and procedures prescribed within Paragraph 113. BOEC's mental health and ECIT dispatch protocol SOP identifies seven call characteristics for which an ECIT dispatch officer will be dispatched. These characteristics include when there is a mental health component and (1) a weapon is present, (2) a person is violent, (3) the call is at a mental health facility, (4) the caller is threatening suicide and has the means to carry it out, (5) request of a community member, (6) request of another officer; or (7) a person represents an escalating risk of harm to self or others.

BOEC has maintained its policy criteria for ECIT dispatch, which partially satisfies the requirement for crisis triage. In addition, BOEC has updated criteria for forwarding calls to BHCC. BOEC also has a triage protocol in place for PSR and has recently informed us that they have implemented a PSR policy. Since this occurred in the third quarter, we will provide updates in our third-quarter report. However, in the interim, the triage protocols for mental health calls continue to satisfy Paragraph 113 and BOEC remains in Substantial Compliance. |

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | BOEC protocols for ECIT dispatch; BOEC protocols for BHCC referral; BOEC protocols for PSR dispatch |

<br>

| **Settlement Agreement Paragraph** | |
|---|---|
| 114. Within 180 days of the Effective Date, the City will complete training of all BOEC Dispatchers in Crisis Triage. The City, with the advice of the [BHU] Advisory Committee, shall develop ongoing training for BOEC Dispatchers. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Interview BOEC personnel |
| **Compliance Assessment** | |
| BOEC staff continue to receive training in crisis triage both as new employees as well as ongoing refresher training, including on recognizing mental health crisis and available triage options (e.g., crisis line, PSR, and ECIT). In the second quarter of 2023, BOEC did not host any new trainings and the planned in-service was cancelled. We will continue to provide updates in future quarters with respect to training these new employees though we also continue to note that a training specifically related to PSR policies will need to be developed once official policies have been adopted. | |
| **COCL Recommendations** | • Develop focused training for PSR |
| **Assessment Based On** | Prior observation of BOEC training; Interview with BOEC personnel |

**Exhibit A**

### Settlement Agreement Paragraph

115. Within 180 days of the Effective Date, the City shall ensure Crisis Triage is fully operational to include the implementation of the policies and procedures developed pursuant to the above paragraph and operation by trained staff.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review of BOEC data; Interviews with BOEC personnel |

### Compliance Assessment

The COCL reviewed data related to the operation of BOEC, not only in the context of the PPB's crisis response, but also in the context of other triage options. This included transferring calls to the BHCC and dispatching PSR to calls that meet the necessary criteria. For instance, in the second quarter evaluation of mental health calls, the PPB identified 6,855 calls with a mental health component. BOEC audited a random sample of 341 of these calls to ensure that dispatchers are applying the criteria appropriately. In 23 of those calls (6.7%) BOEC's audit later found that sufficient information existed at the time of the call to warrant it being dispatched as ECIT. This rate is consistent with prior reporting periods. BOEC also assessed accuracy for calls transferred to the BHCC, with 11 out of 217 calls being kicked back to BOEC for ECIT dispatch (we note this may not indicate fault with the telecommunicators decision, for BHCC operators may learn additional information warranting emergency response).

We also reviewed the integral role that BOEC has played with respect to the citywide expansion of PSR. In the second quarter, BOEC set up 3,309 calls for PSR. Moving forward, we will continue to monitor the progress of PSR, including the operation of BOEC as it relates to being able to dispatch them when the response criteria are met. However, for this quarter, we continue to find BOEC to be in Substantial Compliance with the requirements of this paragraph.

In their report, the DOJ found Paragraph 115 to be in Partial Compliance due to a lack of formal policies between BOEC, the PPB, and PSR regarding PSR's operations. We have interviewed representatives from each of these entities, as well as other City representatives, to discuss the current issues with PSR operations and agree with the DOJ that greater formalization is important to memorialize the mission and scope of PSR. However, we find these issues are broader than BOEC and, with respect to the

**Exhibit A**

| requirements of this paragraph, BOEC ensures PSR triage operations through a protocol and training approved by COCL and DOJ as well as through a long-standing audit process. We therefore continue to find Substantial Compliance with the requirements of Paragraph 115. | |
|---|---|
| **COCL Recommendations** | • Continue to address PSR issues and determine their implications for policy and training |
| **Assessment Based On** | Review of BOEC data; Interviews with BOEC personnel; Interviews with PSR personnel |

**Mental Health Outcome Assessment**

The COCL examined data regarding PPB's response to Mental Health calls over the last two years. Using data from the second quarter of 2021 through the first quarter of 2023, we looked into possible trends and how that can inform PPB mental health response.

Table 6. Quarterly ECIT calls by precinct

| | 2021 Q2 | 2021 Q3 | 2021 Q4 | 2022 Q1 | 2022 Q2 | 2022 Q3 | 2022 Q4 | 2023 Q1 | Average |
|---|---|---|---|---|---|---|---|---|---|
| **Central** | 333 | 289 | 302 | 296 | 258 | 315 | 346 | 290 | **304** |
| **East** | 261 | 237 | 232 | 188 | 191 | 225 | 248 | 220 | **225** |
| **North** | 280 | 204 | 218 | 190 | 145 | 168 | 210 | 206 | **203** |
| **Total** | 874 | 730 | 752 | 674 | 594 | 708 | 804 | 716 | **732** |

Table 6 highlights the distribution of ECIT calls by precinct during the past two years. On average Central precinct receives the highest number of ECIT calls (Mean=304), followed by East (Mean=225) and North (Mean=203). During the first two quarters of 2022, there was a dip in the number of ECIT calls (both in total as well as within each precinct) but over the next three quarters the numbers increased.  As such, we can conclude that, at least at the call volume-level, the need for ECIT staff has remained relatively stable.

We also sought to evaluate whether the distribution of ECIT officers across precincts was in-line with the distribution of ECIT calls across precincts.  Taking the averages of ECIT call distribution by precinct over the last two years, we used this information to compare against the current make-up of the ECIT roster. In the second quarter of 2023, PPB reported that they had 126 operational ECIT officers. Distributed among the precincts, Central had 37

**Exhibit A**

active ECIT members, East had 27 and North had 27. The remaining 35 operational ECIT officers were housed in the SRD (n=23), Detective (n=4), Personnel (n=2), Training (n=2) and Chief's Office (n=2); as they are not assigned to a Precinct, will not be included in this analysis.  In reviewing the distribution of ECIT officers across the three Precincts and the distribution of ECIT calls, we continue to see a high degree of parity.

Table 7. Distribution of ECIT Officers

|  | Proportion of ECIT Calls | Proportion of ECIT Officers |
|---|---|---|
| Central | 42% | 40.7% |
| East | 31% | 29.7% |
| North | 27% | 29.7% |

After a call has been coded for ECIT response, another important metric to analyze is the response rate, or how often and ECIT officer was able to response to an ECIT call. The average response rate over the last two years has been 68%, which is in line with the historical average, although it's beginning to show a pattern of decrease. Table 8 looks at the average response rate by precinct over the last five reporting periods.

Table 8. Average response rate by Precinct

|  | 2020 Q4 & 2021 Q1 | 2021 Q2 & 2021 Q3 | 2021 Q4 & 2022 Q1 | 2022 Q2 & 2022 Q3 | 2022 Q4 & 2023 Q1 | Average |
|---|---|---|---|---|---|---|
| Central | 72% | 73% | 74% | 74% | 71% | **73%** |
| East | 73% | 77% | 70% | 67% | 65% | **70%** |
| North | 63% | 63% | 65% | 60% | 53% | **61%** |

North Precinct has a consistently lower response rate each reporting period, with the most recent reporting period indicating the lowest response rate (53%), which is a notable decrease across the last two and a half years. Although our comparison of the average number of calls by precinct with the current roster of active ECIT officers by precinct suggests adequate staffing levels, the response rates may indicate that something else is at-play.  We will need to discuss North Precinct's lower response rates with PPB and determine potential solutions as well as discuss the overall trend that, at the most recent reporting period, all precincts have reported their lowest response rate in the past 2.5 years.

PPB provided data on the reasons why an ECIT officer was not on scene of an ECIT call. Table 9 provides a breakdown of these reasons across four reporting periods over the last two years. The reason of "not available" would suggest there was not adequate staffing of ECIT

**Exhibit A**

officers. Over the last two years, this reason accounted for 6% to 10% of the total reasons for not having an ECIT officer on the scene, indicating that availability of ECIT officers has remained pretty stable over the last two years. We also note that "Not Dispatched" increased from 20% to 25% of the reasons why an ECIT was not on-scene. This clearance code, however, does not indicate <u>why</u> a call was not dispatched and therefore could be analyzed further to identify potential resolutions.

**Table 9. Instances of ECIT Calls Without ECIT Officer Response**

|  | 2020 Q4 & 2021 Q1 | 2021 Q2 & 2021 Q3 | 2021 Q4 & 2022 Q1 | 2022 Q2 & 2022 Q3 | 2022 Q4 & 2023 Q1 |
|---|---|---|---|---|---|
| Dispatched and Cleared | 61% | 66% | 63% | 54% | 47% |
| Not Dispatched | 11% | 9% | 13% | 19% | 25% |
| Other | 16% | 11% | 9% | 12% | 14% |
| Not Available | 6% | 8% | 6% | 9% | 10% |
| Related/duplicate call | 4% | 5% | 8% | 7% | 4% |
| On Scene per reporting other than CAD | 1% | 1% | 1% | 1% | 1% |
|  | n=553 | n=466 | n=423 | n=413 | n=542 |

**Exhibit A**

# Section VII: Employee Information System

<table>
<tr>
<td colspan="2">

**Settlement Agreement Paragraph**

116. PPB has an existing Employee Information System ("EIS") to identify employees and design assistance strategies to address specific issues affecting the employee. *See* PPB Manual 345.00. PPB agrees to enhance its EIS to more effectively identify at-risk employees, supervisors and teams to address potentially problematic trends in a timely fashion. Accordingly, within 90 days of the Effective Date, PPB shall: (a) Require that commanders and supervisors conduct prompt reviews of EIS records of employees under their supervision and document the review has occurred in the EIS performance tracker; (b) Require that commanders and supervisors promptly conduct reviews of EIS for officers new to their command and document the review has occurred in the EIS performance tracker; and (c) Require that EIS staff regularly conduct data analysis of units and supervisors to identify and compare patterns of activity.

117. PPB agrees to use force audit data to conduct similar analyses at supervisor- and team-levels.

</td>
</tr>
<tr>
<td rowspan="2"><strong>Compliance Label</strong></td>
<td>116. Partial Compliance</td>
</tr>
<tr>
<td>117. Partial Compliance</td>
</tr>
<tr>
<td><strong>Methodology</strong></td>
<td>Interviews with EIS/PPB personnel; Review of PPB EIS analysis</td>
</tr>
<tr>
<td colspan="2">

**Compliance Assessment**

The PPB continued to use the EIS as its primary system for identifying at-risk members and potentially problematic trends and "design[ing] assistance strategies to address specific issues affecting the employee" (Paragraph 116). As for the PPB's current procedure of evaluating subsections (a) and (b) of Paragraph 116, the PPB reports rates of compliance with supervisory reviews that are consistent with prior quarters. As shown in Figure 5 below, compliance for subsection (a) reviews (supervisors performing annual reviews) demonstrated that 98.6% of required reviews were completed on time, whereas subsection (b) reviews ("new-to-command" reviews) were completed on time for all cases

</td>
</tr>
</table>

**Exhibit A**

(97.1%). This led to 97.8% on-time reviews for subsection (c), which looks at all opportunities for Paragraph 116 compliance.

**Figure 5 Compliance with Reviews Directive 345.00 Reviews (provided by the PPB)**



However, the COCL continues to have concerns with how the PPB and the Force Inspector consistently identify "at-risk employees, supervisors, and teams." While we no longer see examples indicating a complete lack of analysis (see, for example, our 2022 Q2 report), we maintain our overall concerns with the identification and intervention process.  To resolve this, the COCL, PPB, and DOJ are planning to discuss SOP #5 (Force Analysis for Supervisors and Teams), which should begin to address these concerns.

Finally, we continue to await agreement from the parties as to whether a comprehensive assessment of the EIS is necessary for compliance with the requirements of this paragraph. In their most recent report, the DOJ indicated their position that such an assessment is a requirement[2] though, as reported in our last report, the City does not agree with this position. Thus, we continue to await an agreed-upon resolution of this issue by the parties before beginning data collection.

---

[2] "Thus, the Compliance Officer continues to find only Partial Compliance with Paragraph 116 and, consequently, the City can only partially comply with Paragraph 117, which requires similar analysis for supervisor and team levels that Paragraph 116 requires for individuals. We agree."

**Exhibit A**

| **COCL Recommendations** | • To achieve Substantial Compliance, work with COCL to formalize the review, identification, and intervention process through SOP #5 <br><br> • Determine with DOJ whether an assessment of EIS's effectiveness is required for compliance |
|---|---|
| **Assessment Based On** | EIS and threshold review process |

---

### Settlement Agreement Paragraph

118. PPB shall continue to use existing thresholds, and specifically continue to include the following thresholds to trigger case management reviews: (a) Any officer who has used force in 20% of his or her arrests in the past six months; and (b) Any officer who has used force three times more than the average number of uses of force compared with other officers on the same shift.

119. Within 90 days of the Effective Date, PPB shall add one additional threshold to trigger case management review of any officer who has three uses of force in a one-month period.

| **Compliance Label** | 118. Substantial Compliance |
| | 119. Substantial Compliance |
| **Methodology** | Interviews with EIS/PPB personnel; Review of EIS program data |

### Compliance Assessment

The thresholds the PPB are required to maintain for Paragraph 118 continue to be used to flag officers for supervisory reviews. The PPB continues to collate data from a variety of sources, including force events, traumatic incidents (captured in the Regional Justice Information Network, complaints, and commendations (captured in Administrative Investigations Management (AIM) system). These data are used to identify potentially problematic behavior with the predetermined thresholds identified by these paragraphs.

**Exhibit A**

In the second quarter of 2023, EIS administrators reviewed 367 alerts and sent 252 (68.7%) on for RU Manager review (see Figure 6). When forwarded to the RU Manager, the alert may be reviewed and closed by the RU Manager or sent to the officer's supervisor for either closure or intervention (i.e., coaching, commending, debriefing, monitoring, referring to the Employee Assistance Program, training, or temporary reassignment). For alerts closed in the second quarter of 2023, which may also include cases opened in prior quarters, 217 were closed at the RU level (see Table 10). Of these 217 alerts, 166 (76.5%) were sent on for further supervisor review (the highest percentage in the past six quarters). Additionally, 69.1% of alerts sent to an officer's supervisor during the second quarter of 2023 resulted in some type of intervention. The information provided by the PPB indicates that for the 150 alerts closed with an intervention, 2 were closed with a referral to the Employee Assistance Program, 2 were closed with a monitoring plan, and the remaining 146 involved a debriefing or supervisor coaching.

As with Paragraph 116, we are continuing to work with the PPB to analyze the relative effectiveness of EIS interventions, both from empirical data analyses as well as through conversations with key stakeholders in the EIS process. However, the PPB continues to use the thresholds as outlined by Paragraphs 118 and 119, and we continue to find they have substantially complied with these paragraphs.

**Figure 6 EIS Alerts and Alerts Sent to RU Manager (provided by the PPB)**

**Exhibit A**

Table 10 EIS Alerts and Interventions

|  | 2022 Q1 | 2022 Q2 | 2022 Q3 | 2022 Q4 | 2023 Q1 | 2023 Q2 |
|---|---|---|---|---|---|---|
| Alerts Closed by RU | 170 | 174 | 174 | 140 | 206 | 217 |
| Alerts Sent to Supervisor (Percent of Alerts Sent to RU) | 112 (65.9%) | 126 (72.4%) | 103 (59.2%) | 100 (71.4%) | 166 (73%) | 166 (76.5%) |
| Interventions (Percent of Alerts Sent to RU) | 88 (51.8%) | 94 (54.0%) | 82 (47.1%) | 73 (52.1%) | 146 (70.9%) | 150 (69.1%) |
| Interventions (Percent of Alerts Sent to Supervisor) | 88 (78.6%) | 94 (74.6%) | 82 (79.6%) | 73 (73%) | 146 (88%) | 150 (90.4%) |

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | Current EIS thresholds and associated data |

| **Settlement Agreement Paragraph** | |
|---|---|
| 120. Within 90 days of the Effective Date, PPB shall identify and train a second EIS administrator. This individual may be assigned to other tasks within the Professional Standards Division or as otherwise needed. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review of Directive 345.00; Review of EIS Program |
| **Compliance Assessment** | |

**Exhibit A**

> Paragraph 120 requires that the PPB "identify and train a second EIS administrator." During the second quarter of 2023, the PPB maintained the second EIS administrator, who was trained and joined the team in the first quarter of 2022. We therefore find that the PPB has maintained compliance with Paragraph 120.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | Maintenance of second EIS administrator |

### Outcome Assessment

In conducting the outcome assessment for this report, we sought to validate parts of the current EIS alert process as well as evaluate the interventions provided to PPB officers. Using the last four quarters of PPB use of force data (2022 Q3 through 2023 Q2), we compared PPB officers on the number of force events over that one-year timeframe. We then conducted descriptive analysis to identify outliers in the data (e.g., officers who were 2+ standard deviations above the mean compared with other officers). From the data, we identified 18 officers who were 2+ standard deviations above the means and for each of these officers, we requested the following information from the PPB:

- The total number of EIS alerts the officer received for any alert category
- The total number of EIS alerts related to use of force
- The total number of EIS alerts related to force that were forwarded for supervisory review
- The total number of EIS alerts related to force that led to any type of intervention
- The total number of EIS alerts related to force in which the intervention was something other than Coaching Conducted
- The outcome associated with each EIS alert

In response, the PPB provided us with EIS alert data for each of the identified officers. In looking at the 18 officers, all but one of them had one or more EIS alerts, including alerts on uses of force as well as alerts related to complaints, traumatic events, and other alerts. For the one officer who had zero total EIS alerts, this does not mean that the system failed to identify them for a Force Alert. That officer had nine use of force events within the four quarters and those events could have been spaced out enough to not break the threshold of "a sworn member uses force three (3) or more times in the preceding thirty (30) days" (see

**Exhibit A**

Directive 345.00). Therefore, we conclude that in nearly all cases, the EIS thresholds used by the PPB are capable of identifying officers who present as outliers in the use of force data.

We then looked at whether EIS alerts related to force events are forwarded to Responsibility Units (RUs) for further review. Within the data, there were a total of 83 Force Alerts for the 18 officers we identified. Of those 83 alerts, a total of 39 were sent on for RU review (47.0%). We note here that an alert may not be forwarded for several legitimate reasons, including when an alert was created despite no new uses of force. For example, PPB has a threshold related to the ratio of force events and arrests – should an arrest fall out of the threshold timeline (i.e., it is now more than 6 months ago) but no use of force falls out, then the force to arrest ratio will naturally increase. Therefore, we encourage caution in drawing strong conclusions based on the strict proportion of cases that were forwarded for RU review. In looking at the individual officers, we found only one who did not have any force alerts reviewed by RUs. That officer, was the subject of four EIS alerts, all related to force. From this, we can conclude that nearly all officers who receive an EIS Force Alert have at least one of those alerts reviewed by their respective RUs.

From the alerts that were forwarded to RUs, we then looked at how many of those alerts received some type of intervention. Termed "Supervisory Actions" in Directive 345.00, interventions "may include coaching, commending, debriefing, monitoring, referring to the Employee Assistance Program (EAP), requiring training, temporarily re-assigning, or some other form of non-disciplinary action." In looking at the data related to the 39 alerts forwarded to the RUs, there were a total of 13 (33.3%) alerts that received some type of intervention. Of the 16 officers who had an alert forwarded to their RU, seven (43.8%) did not have any of their alerts result in an intervention. We also note the absence of interventions for officers who represented higher standard deviations in force events. For instance, there were two officers with 15 force events each, which represents the third-most number of force events by an officer across the four quarters. One of these officers had a total of 5 alerts related to force though none of them received an intervention. The other officer had a total of 3 force alerts, one of which resulted in an intervention. Thus, for these two officers, one out of eight Force Alerts resulted in an intervention. We also note that for interventions with officers, all were supervisory coaching. This includes the two officers with the most force events who had 5 and 7 (respectively) Force Alerts and who each had three total force alerts lead to three total Coaching Conduct interventions. From these data, we can conclude that, for the most frequent users of force, approximately 1/3 of Force Alerts receive some type of intervention, less than half of the individual officers receive an intervention, and no alerts result in an intervention other than Coaching Conduct.

We also evaluated the category of force associated with the sample as a whole compared with the category of force associated with outlying officers to determine how categories

**Exhibit A**

differ between the two groups, regardless of force frequency.   For the whole sample, Category III represented the most frequent category during force events (50.3%) with Category IV making up an additional 42.5% and Category II representing the remaining 7.2%.  For many of the outlying officers, the uses of force they were associated with had a similar distribution as the broader sample.  However, for others, they were associated with a higher proportion of Category III events compared with the broader sample.  For instance, one officer was involved in 11 use of force events (making them 2.8 standard deviations above the mean), all of which were investigated as a Category III.   Another member was involved in 14 use of force events (making them 3.89 standard deviations above the mean), of which 71.4% (N=10) were investigated as a Category III.   From these data, we can conclude that not only can differences across officers be identified, but differences in the types of force they are associated with can also be determined and evaluated.

**Exhibit A**

Table 11. EIS Alerts

| Officer | Force Events (Last Four Quarters) | Type IV | Type III | Type II | SD | Total EIS Alerts | Total Force Alerts | Total Force Alerts to RU | Total Force Alerts with Intervention | Description of each Intervention |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 18 | 9 (50.0%) | 7 (38.9%) | 2 (11.1%) | 5.35 | 10 | 5 | 3 | 3 | 3 force alerts w/ Coaching Conduct |
| 2 | 17 | 9 (52.9%) | 7 (41.2%) | 1 (5.9%) | 4.99 | 11 | 7 | 3 | 3 | 3 force alerts w/ Coaching Conduct |
| 3 | 15 | 5 (33.3%) | 9 (60.0%) | 1 (6.7%) | 4.26 | 7 | 3 | 3 | 1 | 1 force alert w/ Coaching Conduct |
| 4 | 15 | 6 (40%) | 8 (53.3%) | 1 (6.7%) | 4.26 | 9 | 5 | 2 | 0 | No Interventions |
| 5 | 14 | 8 (57.1%) | 5 (35.7%) | 1 (7.1%) | 3.89 | 9 | 6 | 3 | 1 | 1 force alert w/ Coaching Conduct |
| 6 | 14 | 4 (28.6%) | 10 (71.4%) | 0 (0%) | 3.89 | 10 | 7 | 2 | 1 | 1 force alert w/ Coaching Conduct |
| 7 | 12 | 6 (50%) | 5 (41.7%) | 1 (8.3%) | 3.17 | 4 | 3 | 2 | 0 | No Interventions |
| 8 | 12 | 3 (25.0%) | 8 (66.7%) | 1 (8.3%) | 3.17 | 8 | 1 | 1 | 0 | No Interventions |
| 9 | 11 | 0 (0%) | 11 (100%) | 0 (0%) | 2.80 | 2 | 1 | 1 | 0 | No Interventions |

**Exhibit A**

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **10** | 11 | 3 (27.3%) | 7 (63.6%) | 1 (9.1%) | 2.80 | 9 | 4 | 2 | 0 | No Interventions |
| **11** | 9 | 2 (22.2%) | 5 (55.6%) | 2 (22.2%) | 2.07 | 0 | 0 | 0 | 0 | No Interventions |
| **12** | 9 | 2 (22.2%) | 7 (77.7%) | 0 (0%) | 2.07 | 8 | 7 | 3 | 1 | 1 force alert w/ Coaching Conduct |
| **13** | 9 | 3 (33.3%) | 5 (55.6%) | 1 (11.1%) | 2.07 | 9 | 7 | 2 | 1 | 1 force alert w/ Coaching Conduct |
| **14** | 9 | 3 (33.3%) | 6 (66.7%) | 0 (0%) | 2.07 | 4 | 4 | 0 | 0 | No Interventions |
| **15** | 9 | 3 (33.3%) | 5 (55.6%) | 1 (11.1%) | 2.07 | 8 | 6 | 2 | 1 | 1 force alert w/ Coaching Conduct |
| **16** | 9 | 2 (22.2%) | 6 (66.7%) | 1 (11.1%) | 2.07 | 9 | 7 | 3 | 1 | 1 force alert w/ Coaching Conduct |
| **17** | 9 | 5 (55.6%) | 4 (44.4%) | 0 (0%) | 2.07 | 8 | 6 | 3 | 0 | No Interventions |
| **18** | 9 | 2 (22.2%) | 5 (55.6%) | 2 (22.2%) | 2.07 | 5 | 4 | 4 | 0 | No Interventions |

**Exhibit A**

# Section VIII: Officer Accountability

## A. Investigation Timeframe

**Settlement Agreement Paragraph**

121. PPB and the City shall complete all administrative investigations of officer misconduct within one-hundred eighty (180) days of a complaint of misconduct, or discovery of misconduct by other means. For the purposes of this provision, completion of administrative investigations includes all steps from intake of allegations through approval of recommended findings by the Chief, excluding appeals, if any, to CRC. Appeals to CRC should be resolved within 90 days.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review of IPR quarterly data analysis; Review of AIM system data |

**Compliance Assessment**

In our past report, we provided a suggestion that the City should propose amendments to the Settlement Agreement which would allow IPR to toll for protected leave as IPR (as well as COCL) was under the impression that this had not previously been allowed. However, we have only recently been informed that the DOJ and City agreed that protected leave could be tolled, a development that IPR was unaware of and which ultimately led to differences between IA and IPR in how they calculated the 180-day timeline. For instance, IPR's most recent analysis indicated a 35% overdue rate within IA for 2022 Q4 (the last quarter for which 180-days could have passed). PPB then provided an analysis using IPR's methodology but tolling for protected leave – in it, their overdue case rate for 2022 Q4 showed 21% of IA cases being overdue (representing a total of 3 cases out of 14) rather than 35%.

In interviewing IPR for this report, we were informed that this development was welcome though they would require additional data from PPB in order to conduct their analysis for future quarters. IPR has therefore requested a meeting between the Parties (including IPR and IA) and COCL to discuss who will perform the analyses in the future and, if IPR

**Exhibit A**

continues to provide outcomes, how they will receive the data. We look forward to such a meeting so that this issue can be resolved moving forward.

As such, we do not have sufficient evidence across quarters to assess compliance with Par. 121 given the agreement between the City and DOJ. Until such a time, we maintain a Partial Compliance finding for this paragraph due to previously reported delays in lethal force events, cases which require interviews to be scheduled through legal representation, and other complex investigations. During our interviews of IA and IPR personnel in the third quarter, we heard that these issues have continued. We therefore maintain our recommendation that IPR and IA take a thematic review of these types of cases to identify common delays across them in order to take proactive measures when faced with future similar cases.

In addition, the City may consider how the future accountability system can be designed to defend against similar barriers to compliance with this paragraph. For instance, the current accountability process contains, qualitatively, the same number of layers that existed at the time of the DOJ's Findings Letter and, while each may serve a legitimate purpose, the aggregate of each layer may in itself serve as a barrier to meeting the 180-day timelines. In designing the new accountability system, the City should consider the impact of such layers on timely resolution of complaints.

| | |
|---|---|
| **COCL Recommendations** | <ul><li>To return to Substantial Compliance, conduct a thematic review of oft overdue case types to identify common delays and take proactive measures when faced with future similar cases</li><li>Consider the impact of system layers on timely resolution of complaints</li><li>The Parties, including IPR and IA, and COCL should discuss future data analysis, including who will perform the analysis and how the data will be retrieved</li></ul> |
| **Assessment Based On** | IPR data indicating adherence to 180-day timeline; IA data indicating adherence to 180-day timeline |

| |
|---|
| **Settlement Agreement Paragraph** |

**Exhibit A**

122. PPB shall conduct administrative investigations concurrently with criminal investigations, if any, concerning the same incident. All administrative investigations shall be subject to appropriate tolling periods as necessary to conduct a concurrent criminal investigation, or as otherwise provided by law, or as necessary to meet the CRC or PRB recommendation to further investigate.

| Compliance Label | Substantial Compliance |
| --- | --- |
| Methodology | Review of Criminal-IA Concurrent Investigation Audit reports; Review of Directive 0330.00 |

**Compliance Assessment**

In the second quarter of 2023, the PPB continued to provide documentation indicating when an IA investigation began compared to when the criminal investigation began. In this quarter, there were two cases that required both a criminal and an IA investigation. In both cases, the IA investigation and criminal investigation were initiated on the same day, and a review of the AIM data associated with the cases indicates that investigations were not unreasonably delayed. We therefore continue to find that case investigations meet the criteria for "concurrent" and, as a result, find that the PPB has maintained Substantial Compliance with Paragraph 122.

| COCL Recommendations | • No recommendations at this time |
| --- | --- |
| Assessment Based On | Criminal-IA Concurrent Investigation Audit reports |

**Settlement Agreement Paragraph**

123. If PPB is unable to meet these timeframe targets, it shall undertake and provide to DOJ a written review of the IA process, to identify the source of the delays and implement an action plan for reducing them.

**Exhibit A**

| Compliance Label | Substantial Compliance |
| --- | --- |
| Methodology | Review of Administrative Investigations Report |

**Compliance Assessment**

In the second quarter of 2023, the PPB closed 59 administrative investigations, six of which exceeded the 180-day timeline. The PPB provided the COCL with an Administrative Investigations Report for each of these six cases as well as a report for cases that did not exceed the 180-day total timeline but exceeded the timeline for one or more individual investigative stages. For the six cases that exceeded the 180-day timeline, reasons were largely similar to what we have seen in the past, including a majority which were impacted by the PPB's inability to schedule Police Review Boards (PRBs) as a result of not having enough PRB facilitators. This problem has largely been addressed during the third quarter, allowing for a greater number of PRBs to be scheduled. As we continue to see the process intended by Paragraph 123 is being followed, we therefore continue to find Substantial Compliance, though we maintain our suggestion that supervisors identify remedies for delays in individual stages, even if the entire investigation timeline was under 180 days.

| **COCL Recommendations** | • Maintain self-improvement loop for stages that exceed their stage timeline, even if the case does not exceed the 180-day timeline |
| --- | --- |
| **Assessment Based On** | Administrative Investigations Report |

## B. On Scene Public Safety Statements and Interviews

**Settlement Agreement Paragraph**

124. Within 90 days of the Effective Date, the City and PPB shall review its protocols for compelled statements to PSD and revise as appropriate so that it complies with applicable law and current professional standards, pursuant to *Garrity v. New Jersey*, 385 U.S. 493 (1967). The City will submit the revised protocol to DOJ for review and approval. Within

**Exhibit A**

45 days of obtaining DOJ's approval, PPB shall ensure that all officers are advised on the revised protocol.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review of Directive 1010.10 |

### Compliance Assessment

During the second quarter of 2023, the PPB maintained their protocols for compelled statements to PSD, and all officers have been advised on the protocol. As a result, we find the PPB has maintained compliance with Paragraph 124.

| COCL Recommendations | • No recommendations at this time |
|---|---|
| Assessment Based On | Current PPB policy |

### Settlement Agreement Paragraph

125. Separation of all witnesses and involved officers to lethal force events is necessary in order to safeguard the integrity of the investigation of that event. Immediately following any lethal force event, PPB shall continue to issue a communication restriction order ("CRO") to all witness and involved officers, prohibiting direct or indirect communications between those officers regarding the facts of the event. The CRO will continue, unless extended further, until conclusion of the Grand Jury or, if no Grand Jury is convened, until a disposition is determined by the District Attorney.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Reviewed CROs for 2022 second quarter OIS events |

**Exhibit A**

### Compliance Assessment

In the second quarter of 2023, one OIS incident involving PPB officers occurred in Clackamas County. Traditionally, the PPB demonstrates compliance with this paragraph through excerpts from the criminal investigation file (as opposed to administrative investigations). In the OIS for this quarter, the criminal investigation is not being conducted by the PPB; instead, it is being conducted by the Clackamas County Sheriff's Office. Citing the need to keep administrative investigations confidential, the PPB provided us instead with a written affirmation that the casefile contains information demonstrating witness and involved officers were separated and that CROs were provided to all witness and involved officers.  Although we will need to review the actual casefile once the administrative investigation is complete to verify the information, we continue to find the PPB in Substantial Compliance with the requirements of this paragraph.

| COCL Recommendations | • No recommendations at this time |
|---|---|
| Assessment Based On | PPB written affirmation |

### Settlement Agreement Paragraph

126. PPB shall continue to require witness officers to lethal force events to give an on-scene briefing to any supervisor and/or member of the Detective Division to ensure that victims, suspects, and witnesses are identified, evidence is located, and provide any information that may be required for the safe resolution of the incident, or any other information as may be required.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review of OIS case file excerpts |

### Compliance Assessment

**Exhibit A**

In the second quarter of 2023, one OIS incident involving PPB officers occurred in Clackamas County. Traditionally, the PPB demonstrates compliance with this paragraph through excerpts from the criminal investigation file (as opposed to administrative investigations). In the OIS for this quarter, the criminal investigation is not being conducted by the PPB; instead, it is being conducted by the Clackamas County Sheriff's Office. Therefore, the on-scene walk-through would not have been conducted by the PPB but by the Sheriff's Office.

Recently, the PPB has developed a draft SOP to resolve our prior recommendations related to witness officers being mentally incapacitated with respect to this paragraph. We will therefore provide an update once the SOP has been finalized.

| **COCL Recommendations** | • To achieve Substantial Compliance, finalize the SOP related to mental incapacitation preventing a walk-through, including the criteria for making such a determination |
|---|---|
| **Assessment Based On** | OIS case file excerpts |

| **Settlement Agreement Paragraph** |
|---|
| 127. In agreement and collaboration with the Multnomah County District Attorney, PPB shall request that involved officers in lethal force and in-custody death events provide a voluntary, on-scene walk-through and interview, unless the officer is incapacitated. |

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Review of OIS case file excerpts |

| **Compliance Assessment** |
|---|
| In the second quarter of 2023, one OIS incident involving PPB officers occurred in Clackamas County. Traditionally, the PPB demonstrates compliance with this paragraph |

**Exhibit A**

through excerpts from the criminal investigation file (as opposed to administrative investigations). In the OIS for this quarter, the criminal investigation was not being conducted by the PPB; instead, it is being conducted by the Clackamas County Sheriff's Office. Therefore, the on-scene walk-through would not have been conducted by the PPB but by the Sheriff's Office.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | OIS case file excerpts |

## C. Conduct of IA Investigations

| **Settlement Agreement Paragraph** |
|---|
| 128. Currently, both IPR and PPB's PSD have authority to conduct administrative investigations, provided that IPR interview of PPB Officers must only be conducted jointly with IA. Within 120 days of the Effective Date, the City will develop and implement a plan to reduce time and effort consumed in the redundant interview of witnesses by both IPR and IA, and enable meaningful independent investigation by IPR, when IPR determines such independent investigation is necessary. |

| **Compliance Label** | Partial Compliance |
|---|---|
| **Methodology** | Interviews of PPB and City staff |

| **Compliance Assessment** |
|---|
| During the second quarter of 2023, both IPR and IA maintained their respective administrative investigations, using the system we have previously found compliant with Paragraph 128. Aside from their own independent investigations, our review of cases this quarter also highlighted IPR's thorough work in conducting intake investigations for |

follow-up by the PPB, particularly the range and depth of information collected during the intake process.

However, the City and the PPB continue to be in Partial Compliance with the requirements of this paragraph. Primarily, this is due to ongoing limitations with the support that IPR has received from the City since becoming an independent agency. In recent discussions with IPR personnel, we were informed that a Deputy City Attorney is providing assistance to IPR since IPR's independent nature is inconsistent with other City agencies (who are typically housed under a City Bureau). Due to the confusion as to how to handle this situation within the City's structure, IPR makes request for assistance directly through the Deputy City Attorney though this has been time-consuming and unsustainable. Although PAC has recently made their recommendations to the City Council (occurring at the end of Q3), we note the timeline still contemplates IPR operating in some type of manner until 2025. Therefore, we maintain our prior recommendation that the City should provide IPR the necessary support and collaboration to serve as an independent agency. In particular, this could be accomplished by developing an SOP or other guiding document for dealing with any future instance where a City entity does not fall under the authority of a specific Bureau. While we recognize that the City (as well as the overall accountability system) will be undergoing significant reconstruction in the near future, a more formalized process would be beneficial until that point.

Finally, with respect to the Records Division backlog we have discussed in the past, we continue to urge the PPB to reduce the backlog as a matter of organizational practice. However, in discussing the issue with IPR, it appears the backlog is no longer a significant concern and has not recently impacted IPR's ability to conduct independent investigations. Additionally, the PPB has prioritized uploading FDCRs, AARs, and other critical reports within PPB's records management systems. Therefore, we no longer hold resolution of the backlog as a condition of Substantial Compliance though will continue to discuss the issue with IPR to determine whether future investigations are impacted by the backlog.

| | |
|---|---|
| **COCL Recommendations** | • To achieve Substantial Compliance, limit future operational limitations by providing IPR the necessary support and collaboration through the development of an SOP or other guiding document. |
| **Assessment Based On** | Ongoing Records Division backlog |

**Exhibit A**

| **Settlement Agreement Paragraph** |
| --- |
| 129. The City and PPB shall ensure that all allegations of use of excessive force are subject to full and completed IA investigations resulting in findings, unless there is clear and convincing evidence to IPR that the allegation has no basis in fact. |

| **Compliance Label** | Substantial Compliance |
| --- | --- |
| **Methodology** | Review of administrative closure justifications for allegations of excessive force |

| **Compliance Assessment** |
| --- |

In the second quarter of 2023, data provided by IPR had two complaints containing allegations of excessive force that were administratively closed by IPR. However, in following up with IPR, we were informed that one of these cases was administratively closed because IA had opened an investigation into the same incident; therefore, IPR's case was closed (the IA case was provided a full and complete investigation). For the other case, the underlying incident had been investigated previously. Although the complainant now alleged excessive force, the complainant did not provide any new evidence and the previous investigation did not find any evidence of force. In our random review of force cases for this quarter, we also identified one case wherein a direct complaint of excessive force was made on-scene. In that case, the AAR chain of command forwarded the matter to IA, which conducted a full and complete investigation.

In follow-up to prior reports, IPR now has an updated SOP, which memorializes their criteria for administratively closing force cases when a complainant does not make themselves available to investigators and no other information to draw on is available. Therefore, we find that this issue has been resolved. Additionally, we have previously discussed failures in holding supervisors accountable for not forwarding allegations for investigation when made on-scene. It does not appear the PPB is intending to do so for cases we have pointed out in the past; therefore, we include this in our summary of identified issues for Paragraph 169 as part of our discussion of barriers related to chain-of-command supervisors.  Over the past several quarters, we have seen instances of on-scene allegations of excessive force being forwarded for full investigation and have not identified any cases where supervisors have failed to do so.  We therefore find that the City

**Exhibit A**

and PPB have returned to Substantial Compliance for Par. 129 though will continue to review FDCRs and AARs to ensure similar problems do not re-surface in the future.

| **COCL Recommendations** | • No recommendations at this time |
| --- | --- |
| **Assessment Based On** | Administrative closure of allegations of excessive force |

| **Settlement Agreement Paragraph** | |
| --- | --- |
| 130. The City and PPB shall continue to expressly prohibit all forms of retaliation, including discouragement, intimidation, coercion, or adverse action, against any person who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review of Directive 310.20 |
| **Compliance Assessment** | |
| During the second quarter of 2023, the PPB maintained Directive 310.20 (Discrimination, Harassment, and Retaliation Prohibited), which contains the requirements of Paragraph 130 (see Policy #2 within the directive). During the second quarter of 2023, there were no complaints involving Directive 310.20. However, as the PPB continues to maintain Directive 310.20 and we continue to see instances where it is invoked, we continue to find Substantial Compliance with the requirements of Paragraph 130. | |
| **COCL Recommendations** | • No recommendations at this time |

**Exhibit A**

| | |
|---|---|
| **Assessment Based On** | Directive 310.20 |

| | |
|---|---|
| **Settlement Agreement Paragraph** ||
| 131. <u>COCL Summary</u>. Paragraph 131 states that "The City and PPB shall retain Police Review Board procedures currently utilized for purposes of investigation and making recommended findings on administrative complaints, except as outlined below." The subsections of Par. 131 refer to PRB membership, rotation of CRC members serving on the PRB, requirements and qualifications for PRB members, provisions for removing community members or CRC members serving on the PRB, term limits for CRC members serving on the PRB, the requirement for CRC members to recuse themselves from the CRC if part of the PRB hearing the case, and stipulated discipline. (For details and exact language, see the Settlement Agreement). ||
| **Compliance Label** | Partial Compliance |
| **Methodology** | Review of Directive 336.00; Review of City Code 3.20.140 |
| **Compliance Assessment** ||
| PPB Directive 336.00 and City Code 3.20.140 have been maintained, outlining PRB operations. During the second quarter, the COCL team observed two PRBs. In their most recent report, the DOJ provided an excellent summary of the concerns and issues regarding PRBs, including identified concerns regarding cases we observed during this quarter. We agree with the DOJ's summation and discussed these issues as part of the broader accountability summits referenced in the DOJ's report.

We maintain our recommendations from prior quarters regarding deficiencies in PRB reviews, including the need to evaluate each application of force (for instance, in OIS events), the failure to conduct training reviews in non-conventional lethal force events, and identifying and addressing collateral misconduct. We therefore continue to find the ||

**Exhibit A**

City and PPB to be in Partial Compliance with the requirements of this paragraph. However, in the third quarter of 2023, there was progress regarding the PRB's ability to ensure enough facilitators to consistently and reliably conduct their proceedings. Therefore, we will provide an update regarding this update in our next report.

| **COCL Recommendations** | • To return to Substantial Compliance, conduct PRBs in accordance with prior COCL and DOJ guidance |
| --- | --- |
| **Assessment Based On** | Observation of PRBs and PRB documents |

| **Settlement Agreement Paragraph** | |
| --- | --- |
| 132. By majority vote, the PRB may request that investigations of misconduct be returned to its investigating entity, i.e., PSD or IPR, to complete the investigation as to factual matters necessary to reach a finding regarding the alleged misconduct. The investigating entity must make reasonable attempts to conduct the additional investigation or obtain the additional information within 10 business days or provide a written statement to the PRB explaining why additional time is needed. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review of PPB Directive 336.00 |
| **Compliance Assessment** | |
| During the second quarter of 2023, the PPB maintained Directive 336.00 (Police Review Board), which memorializes the authority of PRB to send a case back for additional investigation. There were no such instances during this quarter. As Paragraph 132 has been placed into policy and adequately covered, we find the PPB has maintained Substantial Compliance with the requirements of this paragraph. | |

**Exhibit A**

| COCL Recommendations | • No recommendations at this time |
|---|---|
| **Assessment Based On** | PPB Directive 336.00 |

| **Settlement Agreement Paragraph** |
|---|
| 133. <u>COCL Summary</u>: Paragraph 133 states that, "If an officer's use of force gives rise to a finding of liability in a civil trial," PPB shall be required to take various actions. The subsections of Par. 133 include requirements for findings of liability including EIS documentation, re-evaluation for specialized units, automatic IA investigations, review of previous IA investigation if one was already completed, and a published summary if IA investigation did not reach the same finding. (For details and exact language, see the Settlement Agreement). |

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Review of SOP #32 and #42 |

| **Compliance Assessment** |
|---|
| During the second quarter of 2023, the PPB maintained SOP #32 (Civil Liability and Tort Claims) and SOP #42 (Evaluation of Members' Fitness to Participate in All Current and Prospective Specialized Units When the Use of Force Results in a Finding of Liability in a Civil Trial). The combination of these two SOPs contains the requirements of Paragraph 133. Given this and the fact that no new findings of liability occurred in the second quarter of 2023, we continue to find Substantial Compliance with the requirements of this paragraph. |

| COCL Recommendations | • No recommendations at this time |
|---|---|

**Exhibit A**

| **Assessment Based On** | SOP #32 and #42 |
|---|---|

## D. CRC Appeals

| **Settlement Agreement Paragraph** |
|---|
| 134. The City shall expand the membership of the CRC to 11 members, representative of the many and diverse communities in Portland, who are neutral, unbiased, and capable of making objective decisions. The quorum of CRC members necessary to act may remain at its existing level. |

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Review of City Code 3.21.080; Review of Citizen Review Committee (CRC) meeting; Communication with City staff |

| **Compliance Assessment** |
|---|
| CRC continues to have 11 members, which includes community members who represent the community at large. There were no appeals during the second quarter of 2023 for the CRC to hear. During the second quarter of 2023, the CRC met three times—once in April 2023, once in June 2023, and once in May 2023 to hear from the OIR Group regarding their review of recent PPB OIS events. The meeting recordings can be found on the Auditor's Office website as well as in the meeting minutes.[3]

In observing the CRC meetings for this quarter, we continue to find that the operation of CRC is consistent with the letter and intent of this paragraph. Therefore, we continue to find the City in Substantial Compliance with Paragraph 134. |

| **COCL Recommendations** | • No recommendations at this time |
|---|---|

---

[3] CRC Meeting Minutes | Portland.gov

**Exhibit A**

| Assessment Based On | City Code 3.21.080; Review of CRC minutes and CRC-related personnel |
|---|---|

### **Settlement Agreement Paragraph**

135. The City and PPB agree that the CRC may find the outcome of an administrative investigation is unreasonable if the CRC finds the findings are not supported by the evidence.

136. In its review process for purposes of the appeal, the CRC may make one request for additional investigation or information to the investigating entity, i.e., PSD or IPR at any point during its review. The investigating entity must make reasonable attempts to conduct the additional investigation or obtain the additional information within 10 business days or provide a written statement to the CRC explaining why additional time is needed. The request for additional investigation or information may contain multiple points of inquiry, but no follow-up requests will be permitted. The additional request may be voted on by a quorum, the members voting must have read the Case File in order to vote, and any request with multiple points of inquiry must be prioritized.

| Compliance Label | 135. Substantial Compliance |
|---|---|
| | 136. Substantial Compliance |
| Methodology | Review of PSF-5.03; Communications with City staff and CRC leadership |

### **Compliance Assessment**

The City maintains PSF-5.03, which memorializes CRC's authority as related to Paragraphs 135 and 136. No appeals occurred during this quarter; therefore, these paragraphs were not implicated. We continue to find the City has maintained Substantial Compliance with this paragraph.

**Exhibit A**

| COCL Recommendations | • No recommendations at this time |
|---|---|
| **Assessment Based On** | Charter Code and Policy Code PSF-5.03; Meeting observations |

## E. Discipline

| **Settlement Agreement Paragraph** |
|---|
| 137. Within 60 days of the Effective Date, PPB and the City shall develop and implement a discipline guide to ensure that discipline for sustained allegations of misconduct is based on the nature of the allegation and defined, consistent, mitigating and aggravating factors and to provide discipline that is reasonably predictable and consistent. |

| Compliance Label | Partial Compliance |
|---|---|
| **Methodology** | Review of Corrective Action Recommendation (CAR) documents; Review of Department of Justice letter |

| **Compliance Assessment** |
|---|
| For the second quarter of 2023, we reviewed eight CAR documents provided by the PPB. For each CAR, the Commander provided mitigating and aggravating factors, rationale for the discipline recommendations, and any corrective action history. However, as noted in our prior reports, there is currently no updated Directive 338.00 (currently titled Discipline Guide) to reflect the new Corrective Action Guide, which has replaced the Discipline Guide. Therefore, we maintain our recommendations to update Directive 338.00, publicly post the directive, and provide a link to the Corrective Active Guide. This directive is one of several that will be discussed between the PPB, City, DOJ, and COCL, and we will provide updates once those conversations have occurred. |

| **COCL Recommendations** | • To return to Substantial Compliance, update Directive 338.00, publicly post the directive, and provide link to the Corrective Active Guide |
|---|---|

**Exhibit A**

| **Assessment Based On** | CARs; Failure to update Directive 338.00 |
|---|---|

## F. Communication with Complainant and Transparency

| **Settlement Agreement Paragraph** |
|---|
| 138. Within 180 days of the Effective Date, the City shall enhance its existing website to ensure that a complainant can file and track his or her own complaint of officer misconduct. |
| 139. Within 120 days of the Effective Date, the City shall review its protocols to ensure that the City shares with complainants requested documentation about his or her own complaint to the extent permitted by law. |
| 140. The City shall ensure that IPR provides each complainant a tracking number upon receipt of the complaint, informs each complainant of the complaint classification, assignment (precinct or IA) and outcome of the compliant (sustained, unproven, etc.) in writing (whether mail, email/text, or fax), including information regarding whether the City took any corrective action. The City Attorney's Office shall determine whether disclosures regarding corrective action are required on a case-by-case basis consistent with Oregon's Public Records Law. |

| | |
|---|---|
| **Compliance Label** | 138. Substantial Compliance |
| | 139. Substantial Compliance |
| | 140. Substantial Compliance |
| **Methodology** | Review of IPR website; Review of IPR policy; Review of findings letters |

| **Compliance Assessment** |
|---|
| We continue to see evidence of IPR conforming with Paragraphs 138, 139, and 140. IPR has maintained many different avenues for submitting a complaint. When an individual |

submits a complaint online, they receive a unique tracking number and can request a status update with that number. If they submit a complaint through another avenue, such as mail, telephone, or walk-in, the IPR employee will submit the complaint through their online system to generate a tracking number, which will be given to the complainant. IPR and the City will share requested documents with complainants in line with Oregon Public Records Request laws. From a protocol and operation standpoint, IPR has systems in place to ensure they are complying with the requirements of Paragraphs 138, 139, and 140.

As with previous quarters, we reviewed a random sample of case files with the requirements of these paragraphs in mind. We were able to locate consistent documentation sent to complainants regarding the status of their cases, including when the cases were opened, when findings had been made, and when the cases were closed. As such, the COCL finds that the City is in Substantial Compliance with Paragraphs 138, 139, and 140.

| | |
|---|---|
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Based On** | IPR policy; Complaint tracking webpage; Finding and closure letters to complainant; Interview of IPR personnel |

| **Settlement Agreement Paragraph** | |
|---|---|
| 169. PPB shall apply policies uniformly and hold officers accountable for complying with PPB policy and procedure. | |
| **Compliance Label** | <mark>Partial Compliance</mark> |
| **Methodology** | Review of sample of accountability cases; Review of use of force events; Review of EIS entries; Review of force audit; Interviews with PPB and City personnel |
| **Compliance Assessment** | |

As demonstrated in our assessment of other paragraphs, the accountability system operating within the PPB and the City continues to demonstrate both strengths and weaknesses. For instance, during this quarter, we continued to find that each

**Exhibit A**

administrative complaint we reviewed[4] had been handled appropriately (either as an administrative closure, Supervisory Investigations (SI), Precinct Referrals (PR), or full investigation). Additionally, we found that all but one case we reviewed led to an investigation with findings, was conducted in accordance with best practices, and the findings were reasonable under a preponderance of evidence standard. In that single case, our primary concerns stemmed from the fact that the investigating supervisor stated that the "[subject's] complaint is really one of customer service, which [accused member] could have done a much better job of on this call" though there was no allegation added related to this finding and the case was ultimately closed as Not Substantiated.  As this case represents only a single instance across several quarters, we do not find a pattern of deficient investigations for the purposes of this paragraph.

However, we maintain that a number of barriers to the overall accountability system lead us to find that the PPB and City had not been able to "apply policies uniformly and hold officers accountable for complying with PPB policy and procedure." These barriers included the chain of command, on-scene supervisors, the PRB process, a lack of objective video evidence by way of BWCs, and AIM data reliability[5]. Although we found improved practices for some of these areas (see, for example, in our assessment of Section III), this does not mean that the systemic barrier has been resolved.

We continue to believe that the investigative abilities of the City and the PPB remain strong overall and, when an investigation is conducted, it is conducted comprehensively. However, the accountability system is not reliable if barriers to entry are not addressed and the system does not result in fair and consistent resolutions. We therefore continue to find that Paragraph 169 remains in Partial Compliance.

| | |
|---|---|
| **COCL Recommendations** | <ul><li>To achieve Substantial Compliance, the PPB should expand their approach to conducting objective investigations and hold officers accountable when policy violations are found</li><li>To achieve Substantial Compliance, remedy barriers to ensure a fair and consistent accountability system</li></ul> |
| **Assessment Based On** | Sample of accountability cases; Sample of use of force events; Interviews with PPB and City personnel |

---

[4] On a quarterly basis, the COCL reviews 20 randomly selected cases that include all investigative pathways a complaint might take.

[5] Similar to last quarter, an AAR for this quarter made a finding of misconduct (for this quarter, it was a violation of 1020.00) though we continue to find that this data is not reflected in the AIM data system.

**Exhibit A**

# Section IX: Community Engagement and Creation of Portland Committee on Community Engaged Policing

## A. Portland Committee on Community Engaged Policing

| **Settlement Agreement Paragraph** | | |
| --- | --- | --- |
| 141. To leverage the ideas, talent, experience, and expertise of the community, the City, in consultation with the DOJ, shall establish a Portland Committee on Community Engaged-Policing ("PCCEP"), within 90 days of the Effective Date of the relevant amendments to this Agreement. | | |
| 142. The PCCEP shall be authorized to: (a) solicit information from the community and PPB about PPB's performance, particularly with regard to constitutional policing; (b) make recommendations to the Chief, Police Commissioner, the Director of the Office of Equity and Human Rights, and community and, during the effective period of this Agreement, to the DOJ; (c) advise the Chief and the Police Commissioner on strategies to improve community relations; (d) contribute to the development and implementation of a PPB Community Engagement Plan; and (e) receive public comments and concerns. The composition, selection/replacement process and specific duties of the PCCEP shall be set forth in a separate Plan for Portland Committee on Community-Engaged Policing ("the PCCEP Plan") which shall be substantially similar to Exhibit 1 to this Agreement. Amicus AMAC and Intervenor PPA shall be consulted regarding and DOJ shall review and approve any amendments to the PCCEP Plan proposed to occur during the effective period of this Agreement. | | |
| 143. PCCEP's membership will come from a reasonably broad spectrum of the community. PCCEP members shall not have an actual or perceived conflict of interest with the City of Portland. | | |
| **Compliance Label** | 141. Substantial Compliance | |
| | 142. Substantial Compliance | |

**Exhibit A**

|  | 143. Substantial Compliance |
|---|---|
| **Methodology** | Observation of PCCEP meetings; Review of minutes, reports, and recommendations; Interviews with City staff and PCCEP |

### Compliance Assessment

In the second quarter of 2023, PCCEP continued to function as a legitimate body for community engagement.

The PCCEP held one full committee meeting (April 19), as well as meetings of their Settlement Agreement and Policy Sub-Committee (May 3, and June 14), and their Community Engagement Sub-Committee (April 12, May 10, and June 7). The community was able to participate in these meetings via Zoom.

The PCCEP also hosted a Town Hall for the selection of the new COCL (May 17) and hosted a steering committee meeting to gather public input on police oversight (June 28). Again, the community was able to participate via Zoom.

During the second quarter of 2023, the PCCEP did not develop or submit any new recommendations to the City. On May 9, the Mayor responded to two first quarter PCCEP recommendations: one to abandon plans to adopt gunshot detection technology, and the other to appoint an independent monitor for the Settlement Agreement. The Mayor noted there are "productive discussions about an Independent Monitor, and [PCCEP's] recommendations will help inform those conversations," and that the City will work to incorporate PCCEP's feedback on candidate recruitment and selection.

Regarding gunshot detection technology, the Mayor's response highlighted other components of the public input on this issue, and noted another advisory body "endured despicable harassment including racial slurs and personal insults" as they gathered input. The Mayor didn't respond directly to PCCEP's recommendation to not adopt this technology, though noted he greatly appreciated their input, and it would inform Council's direction, alongside all other input. PCCEP members had a lengthy discussion of this response during the June 7 community engagement subcommittee meeting, further discussing "questions and concerns" some PCCEP members had also discussed at a closed member retreat held two weeks prior. Those concerns included whether it was confusing to the public to fold responses to two PCCEP recommendations into one communication from the Mayor, and whether this particular response constituted a "thorough response," as required in the Settlement Agreement (since it did not directly accept or reject PCCEP's recommendation regarding gunshot detection technology). Others felt the response's

**Exhibit A**

wording around harassment, slurs, and insults could be misread as having occurred at PCCEP's town hall on this topic. The subcommittee discussed ways to improve collaboration with the Mayor's office around recommendations and responses, including sharing these concerns with the Mayor the next time he joined a PCCEP meeting or through a written communication response from PCCEP.

The PCCEP Plan referenced in Paragraph 142 notes "the PCCEP shall meet at least twice per year with the Chief, the Police Commissioner, PPB Precinct Commanders, PPB Neighborhood Response Teams, and a representative of the Office of Neighborhood Involvement Crime Prevention to assess and solicit comment on the PPB's activities in regards to community outreach, engagement, and problem-solving policing."  For this quarter, we continue to find that the Mayor/Police Commissioner last attended a PCCEP meeting on March 30, 2022, and the other parties noted in this section of the PCCEP Plan have not met with PCCEP to discuss community engagement and outreach. We therefore continue to recommend PCCEP specifically invites the Mayor to attend a meeting with a defined agenda, and the Mayor and Police Commissioner (in particular, as the official this body reports to directly) prioritize meeting with PCCEP to maximize the group's effectiveness.

The City has made a good faith effort over the past several quarters to identify and recruit new PCCEP members, and Council appointed a new youth member in May. PCCEP closed this quarter with 12 members, and one youth seat vacant. We continue to encourage the City and PCCEP to make youth membership a priority because, historically, police nationwide have the most difficulty when interacting with youth.

As a full body, PCCEP comes from a reasonably broad spectrum of the community, with gender balance and approximately half the membership identifying as BIPOC. In this quarter, the COCL has not identified or been notified of an actual or perceived conflict of interest with a PCCEP member and the City of Portland.

| | |
|---|---|
| **COCL<br>Recommendations** | • To maintain Substantial Compliance with Paragraph 142, the City should continue to promptly respond to PCCEP's recommendations and the Mayor and Police Commissioner should fulfill the requirement to meet with PCCEP "at least twice per year"<br><br>• To maintain Substantial Compliance with Paragraph 143, the City should continue to identify and recruit sufficient PCCEP members to maintain a full body |

**Exhibit A**

| | |
|---|---|
| | • The City, with guidance from PCCEP, should prioritize the recruitment and retention of youth members on PCCEP |
| **Assessment Based On** | Content of PCCEP meetings; Interview with City staff; Substance of reports and recommendations; Level of community engagement |

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 144. The City shall provide administrative support so that the PCCEP can perform the duties and responsibilities identified in this Agreement and in the PCCEP Plan. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Observation of PCCEP meetings; Review of minutes, reports, and recommendations; Interviews with City staff and PCCEP |

**Compliance Assessment**

PCCEP's staff support comes from the Community Safety Division (CSD) in the Office of Management and Finance. During the second quarter, PCCEP continued to be staffed by a full-time Project Manager as well as part-time staff shared with other CSD advisory boards and commissions. This additional support includes a Unit Manager (0.25 full-time equivalent [FTE]) and two Project Assistants (0.25 FTE x 2), bringing the total to 1.75 FTE. One Project Assistant left during the first quarter, thus lowering the total staff support to 1.5 FTE. The CSD has requested additional support for PCCEP as part of its FY 2023–24 budget request.

Meeting notes continue to be posted in a timely fashion on the meeting's event page. In June, PCCEP staff started so consistently tagging minutes and agendas in the Documents section of PCCEP's website to allow PCCEP members and members of the public to use the filter function and easily find all documents in one place. Videos of meetings have continued to be posted in a timely manner on YouTube, and the link to PCCEP's YouTube channel is accessible from PCCEP's home page.

**Exhibit A**

We continue to recommend that the City maintain timely posting of information about PCCEP's work so that the public is kept informed about these community engagement opportunities and productions. In addition, we recommend the City continue to fully support the PCCEP staff in their roles.

| | |
|---|---|
| **COCL Recommendations** | • To maintain Substantial Compliance, continue adequate staffing dedicated to supporting PCCEP<br><br>• To maintain Substantial Compliance, continue posting minutes of PCCEP meetings within 10 business days after a PCCEP meeting, including in the Documents section of the PCCEP website |
| **Assessment Based On** | Review of PCCEP website and YouTube channel; Interviews with staff |

## B. PPB's Role in Public Engagement and Outreach

### 1. System Overview

Under the Settlement Agreement, the PPB is expected to introduce or expand its systems of community engagement, both with PCCEP and other resources. This includes maintaining or expanding its systems of measurement to better understand police-community relations and develop tailored responses to issues or concerns.

### 2. The Community Engagement Plan

**Settlement Agreement Paragraph**

145. To ensure constitutional policing, to closely interact with the community to resolve neighborhood problems, and to increase community confidence, PPB shall work with City resources knowledgeable about public outreach processes to develop and finalize a CEO Plan.

146. Within 120 days of the effective date of the relevant Amendments to this Agreement, the City, in consultation with the PCCEP, will conduct another reliable, comprehensive and representative survey of members of the Portland community regarding their experiences with and perceptions of PPB's community outreach efforts and accountability efforts and

**Exhibit A**

where those efforts could be improved, to inform the work of the PCCEP and the development and implementation of the Community Engagement Plan.

| Compliance Label | 145. Substantial Compliance |
| | 146. Substantial Compliance |
| Methodology | Monitor progress on the implementation of the Community Engagement Plan; Interview City personnel and advisory group members about community engagement and support |

### Compliance Assessment

The COCL continues to use the PPB's Community Engagement Plan to provide the framework for evaluating compliance with Paragraphs 145 and 146. The plan has four components: public involvement, communications, access, and training. The COCL's assessment of this plan has been incorporated into the Community Engagement Outcome Assessment at the end of Section IX. At this point, COCL will simply say that the evidence is sufficient in the second quarter of 2023 to show that the PPB should remain in Substantial Compliance for Paragraphs 145 and 146. The Office of Community Engagement, with the support of advisory groups, continues to explore innovative programs and training lessons to build new partnerships between the police and the community.

For Paragraph 146, the City has not conducted a police-focused community survey for several years, and the PPB's advisory groups are considering a similar survey in 2023. We continue to agree that a new survey should be conducted to evaluate the level of community engagement by the PPB, especially their level of outreach for community crime prevention.  Additionally, where possible, we continue to recommend the PPB implement a contact survey to measure the quality of the community's (e.g., crime victims) actual encounters with PPB officers when seeking services and when being stopped for law enforcement purposes.

| **COCL Recommendations** | • Conduct a police-focused community survey and, where possible, incorporate measures of the quality of actual encounters with PPB officers. |

**Exhibit A**

| | |
|---|---|
| **Assessment Based On** | Reviews of City and PPB reports; Feedback from the City, PPB, and advisory groups; Implementation of the Community Engagement Plan |

## 3. Data Collection, Analysis, and Reporting

The PPB is required to collect, analyze, and report demographic data about police interactions with the community to ensure constitutional policing and build community trust (Paragraph 147–150).

| **Settlement Agreement Paragraph** |
|---|
| 147. PPB shall continue to collect appropriate demographic data for each precinct so that the Precinct Commander, considering any input from the PCCEP, may develop outreach and policing programs specifically tailored to the residents of the precincts. The data shall also be provided to PCCEP to inform its work. |
| 148. PPB shall continue to require that officers document appropriate demographic data regarding the subjects of police encounters, including the race, age, sex, and perceived mental health status of the subject, and shall provide such information to the PCCEP and make such information publicly available to contribute to the analysis of community concerns regarding discriminatory policing. PPB shall consider enhancements to its data collection efforts, and report on its efforts to enhance data collection to the DOJ by no later than December 31, 2013, and quarterly thereafter. |

| **Compliance Label** | 147. Substantial Compliance |
|---|---|
| | 48. Substantial Compliance |

| **Compliance Assessment** |
|---|
| For Paragraph 147, the PPB compiled and reported demographic data in 2020 pertinent to each precinct and posted it on their website. In the second quarter of 2023, the PPB shared with precincts the updated demographics based on the 2017–2021 American Community Survey Five-Year Estimates provided by the U.S. Census Bureau. In doing so, they remain in Substantial Compliance with Paragraph 147. Furthermore, they have kept |

the public informed of this data, as well as a wide array of other public safety data posted on the Bureau's Open Data portal.[6]

The PPB remains in Substantial Compliance with Paragraph 148 as they continue to collect, analyze, and report demographic data from individuals who are stopped by the PPB using its Stops Data Collection app. In terms of data analysis and reporting requirements, the PPB's Strategic Service Division continued to produce high-quality Stops Data Collection reports, both quarterly and annually, and share them with PCCEP and the public on the PPB's website. The Stops Data Collection Report for the first quarter of 2023 was posted on April 25 of this year, and the report for the second quarter of 2023 was posted on July 25 of this year. The PPB's 2022 Annual Stops Report was also released in July of this year and we will discuss both reports released in July in our next report. For this quarter, we maintain our suggestions that the City and PPB continue to evaluate the implications of the reports and work with the community to address any potential disparities.

| **COCL Recommendations** | • To maintain Substantial Compliance for Paragraph 148, the PPB should provide additional training for officers regarding the distribution of consent cards in five languages<br><br>• Continue the dialogue with community members around racial disparities in traffic stops and searches |
|---|---|
| **Assessment Based On** | COCL review of PPB precinct demographic reports; COCL review of PPB Stops Data Collection reports; COCL review of relevant PPB directives |

| **Settlement Agreement Paragraph** |
|---|
| 149. The COCL, PPB, and DOJ will jointly develop metrics to evaluate community engagement and outreach. PCCEP may review these metrics and may suggest additional metrics to DOJ and PPB. |

| **Compliance Label** | Substantial Compliance |
|---|---|

---

[6] https://www.portlandoregon.gov/police/71673

**Exhibit A**

| Methodology | Review of metrics requirement |
|---|---|

**Compliance Assessment**

The City has completed the requirement to develop a set of metrics to evaluate community engagement, and therefore remains in Substantial Compliance. As noted in prior reports, several of these metrics have been used by the PPB to guide their Community Engagement Plan though others have yet to be implemented. Additionally, we agree with the DOJ that the PCCEP should take the opportunity in the near future to review the metrics to ensure that they continue to align with community expectations. Consistent with this suggestion, we maintain our position that the City and PPB should explore a contact-survey so as to be confident that the direct interactions that PPB members have with the community is characterized by fairness and respect (in addition to suggestions for organizational improvement discussed in prior reports).

| **COCL Recommendations** | • As part of everyday policing, the City should introduce a contact survey to measure the level of procedural justice and public satisfaction with police-public interactions, especially interactions with constitutionally protected populations |
|---|---|
| **Assessment Based On** | The development of metrics that capture multiple dimensions of community engagement |

**Settlement Agreement Paragraph**

150. Annually, PPB shall issue a publicly available PPB Annual Report, which shall include a summary of its problem-solving and community policing activities. A draft of the Annual Report shall be provided to the PCCEP for review and comment before the report is finalized and released to the public. Once released, PPB shall hold at least one meeting in each precinct area and at a City Council meeting, annually, to present its Annual Report and to educate the community about its efforts in community policing in regard to the use of force, and about PPB's policies and laws governing pedestrian stops, stops and

**Exhibit A**

detentions, and biased-free policing, including a civilian's responsibilities and freedoms in such encounters.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review of the PPB's Annual Report; Interviews with PPB and City staff involved with PCCEP |

**Compliance Assessment**

The PPB remained in Substantial Compliance with Paragraph 150 for the second quarter of 2023. In June, PPB shared the draft of the 2022 Annual Report with PCCEP at the Settlement and Policy Subcommittee Meeting, and PPB advised PCCEP members and the public of precinct presentations scheduled for the third quarter. The COCL will assess compliance again in the third quarter, after the draft 2022 annual report is presented and discussed at all three precinct meetings, and presented before the City Council.

| COCL Recommendations | • No recommendations at this time |
|---|---|
| Assessment Based On | Review of progress on the content and presentation of the PPB's Annual Report |

**Settlement Agreement Paragraph**

151. PCCEP shall meet as needed to accomplish their objectives as set forth in the PCCEP Plan. PCCEP shall hold regular Town Hall meetings which shall be open to the public. To the extent that PCCEP meetings are subject to the Oregon Public Meetings Law, or similar regulatory or statutory requirements, the City shall be responsible to give advice necessary to the PCCEP to ensure compliance with those laws and agrees to represent PCCEP in any challenges regarding compliance with those laws.

152. The City shall provide PCCEP members with appropriate training necessary to comply with requirements of City and State law.

**Exhibit A**

| Compliance Label | 151. Substantial Compliance |
| --- | --- |
| | 152. Substantial Compliance |

**Compliance Assessment**

During the second quarter of 2023, the PCCEP remained active by holding a full committee meeting, two town halls, and six subcommittee meetings. Additionally, at least one representative of the City Attorney's Office attended PCCEP meetings and continued to advise PCCEP as necessary to ensure compliance with public meetings laws. Furthermore, the City continues to train new PCCEP appointees as needed based on the *Guide for Volunteer Boards & Commissions* materials prepared for all City advisory boards. These materials cover the Oregon Government Ethics Commission guide for public officials, the City's code of ethics, restrictions on political activity for public officials, and the Oregon Attorney General's *Public Records and Public Meetings Manual.* As a result, we continue to find Substantial Compliance with the requirements of this paragraph.

| COCL Recommendations | • Continue to maintain records of training for new PCCEP members; ensure current and future PCCEP members participate in all required trainings and are offered a meaningful opportunity to participate in any optional training |
| --- | --- |
| Assessment Based On | Regularity and content of PCCEP meetings; Provision of City's legal advice and training for PCCEP |

**Exhibit A**

# Section XI: Additional Remedies

After five mediation meetings, the City and DOJ reached agreement on a set of remedies to achieve compliance with the terms of the Settlement Agreement.[7] On January 10, 2022, DOJ and the City filed their final Joint Status Report in U.S. District Court (ECF 275), summarizing the mediation results and the specific remedies on which the parties agreed in principle. As such, the parties have agreed to add a new section to the Settlement Agreement: Section XI, which contains eight new paragraphs, 188 to 195. These remedies were approved by the Portland City Council on February 9, 2022, and by the federal judge at the Fairness Hearing on April 29, 2022.

| **Settlement Agreement Paragraph** | |
|---|---|
| 188. The City shall revise Force Data Collection Report (FDCR) and After Action Report forms to capture when the forms are edited and completed as part of PPB's implementation of Office365, which is ongoing. In the interim, pursuant to a process approved by the United States, PPB shall capture in the existing FDCR and After Action Report forms the author's name and the time and date of initial submission and any subsequent edits, as well as the name, time, and date of each level of review. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review of AAR and FDCR forms |
| **Compliance Assessment** | |
| During the second quarter of 2023, our review demonstrated that the updated FDCR and AAR forms continue to be used and continue to capture the data required by Paragraph 188. We therefore continue to find that the City and the PPB have substantially complied with the requirements of Paragraph 188. | |
| **COCL Recommendations** | • No recommendations at this time |

---

[7] These meetings included the Intervenor-Defendant PPA, the enhanced Amicus Curiae Albina Ministerial Alliance Coalition for Justice and Police Reform (AMAC), and Amicus Curiae Mental Health Alliance.

**Exhibit A**

| | |
|---|---|
| **Assessment Based On** | Updated FDCR and AAR forms and use by officers and supervisors |

---

**Settlement Agreement Paragraph**

189. Before November 25, 2021, the City shall provide funding for a qualified outside entity to critically assess the City's response to crowd control events in 2020 in a public-facing report and prepare a follow-on review of the City's response to the report. The City will use the report to prepare a training needs assessment. The report, training needs assessment, and follow-on review will be completed consistent with a Scope of Work and deadlines agreed upon by the City and the United States, and such agreement shall not be unreasonably withheld by either Party. If the City demonstrates to the United States that significant progress is being made toward meeting the obligations under the agreed upon Scope of Work and deadlines, the City may request a reasonable modification of the Scope of Work or extension of deadlines, which the United States shall not unreasonably decline.

| | |
|---|---|
| **Compliance Label** | Partial Compliance |
| **Methodology** | Interviews with PPB officials and review of documents |

**Compliance Assessment**

The work of IMLLC, the group hired to conduct the critical assessment, continued in the second quarter of 2023. In this, IMLLC provided a draft report to the City, which then provided comments and feedback to IMLLC. In the third quarter of 2023, IMLLC publicly released their report and participated in a public forum wherein they took questions and comments from community members. We will provide an update in our 2023 third quarter report. Thus, we continue to find the City in Partial Compliance with Paragraph 189 and maintain our prior recommendations.

| | |
|---|---|
| **COCL Recommendations** | To achieve Substantial Compliance:<br><br>• The City must respond to the IMLLC report<br><br>• The PPB must use the IMLLC report to prepare a training needs assessment, training plan, and relevant crowd management training |

**Exhibit A**

| | |
|---|---|
| | • IMLLC must prepare a follow-up report that reviews the City's response to their original report, including the PPB's training needs assessment<br><br>• The City should keep COCL informed of the work planned and completed by IMLLC<br><br>• The City should provide COCL with IMLLC's reports, the PPB's training needs assessment report, and training plans |
| **Assessment Based On** | Evaluation of the process employed by IMLLC and the products planned and delivered by this group |

| **Settlement Agreement Paragraph** | |
|---|---|
| 190. Before November 25, 2021, the City shall provide in the budget a separate line item for overtime costs to conduct necessary training for PPB officers. The City shall include a similar line item in subsequent budgets for the duration of this Agreement. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review of budget documents |
| **Compliance Assessment** | |
| The City has continued to include a separate line item for these overtime costs in the City's budget. Hence, the COCL finds that the City has achieved Substantial Compliance with the requirements of Paragraph 190. | |
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Based On** | Review of budget documents and amount of overtime funding included in the budget |

| **Settlement Agreement Paragraph** |
|---|
| |

**Exhibit A**

191. Before November 25, 2021, the City shall budget for a qualified civilian in PPB to direct all educational aspects of PPB's Training Division alongside the Captain of the Training Division, who will direct administrative aspects of PPB's Training Division. The respective roles and responsibilities of the civilian and the Captain are outlined in Attachment 1 appended to this Agreement, provided that the Parties may agree to modify those roles and will not unreasonably withhold such agreement. Once funding is provided, the City shall post the position within 90 days. Once the position is posted, the City shall make a job offer to a suitable candidate and complete any required background screenings within 150 days. If the City demonstrates to the United States that no suitable candidate applied for or accepted the position, or that the City is otherwise making significant progress toward meeting the deadlines in this Paragraph, the City may request a reasonable extension of time to fill the position, which the United States shall not unreasonably withhold.

| | |
|---|---|
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Tracking the hiring process for the Police Education Director |

**Compliance Assessment**

In the second quarter of 2023, the PPB announced the hiring of Dr. Rebecca Rodriguez as the Police Education Director, fulfilling the requirements of this paragraph. We have met with Dr. Rodriguez and are confident in her skills and abilities to "direct all educational aspects of PPB's Training Division." In particular, we were impressed by her approach to training formation and evaluation. Although we will evaluate the work of the director as it relates to paragraphs within Section IV (Training), we find that this paragraph is now in Substantial Compliance. Moving forward, we will only evaluate this paragraph if the PPB transitions to another director, at which point we will refer the City to the suggestions we made for improving the hiring process in our 2023 first quarter report.

| | |
|---|---|
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Based On** | The City's ability to search for and hire a qualified candidate within a reasonable time period |

**Exhibit A**

| Settlement Agreement Paragraph |
|---|
| 192. Within 60 days of the date that this paragraph is entered as an order of the Court, the City shall initiate an appropriate investigation through IPR to identify: (a) the PPB Lieutenant(s) and above who trained Rapid Response Team members to believe that they could use force against individuals during crowd control events without meeting the requirements of PPB Directive 1010.00; (b) the PPB incident commander(s) and designee(s) with the rank of Lieutenant or above who directed or authorized any officer to use force in violation of PPB Directive 1010.00, or who failed to ensure that FDCRs and After Action Reports arising from the crowd control events starting on May 29, 2020, and ending on November 16, 2020, were completed as required by Section 13.1 of PPB Directive 635.10; and (c) the PPB Commanders and above who failed to timely and adequately clarify misunderstandings and misapplications of PPB policy (including this Agreement) governing the use, reporting, and review of force during the crowd control events starting on May 29, 2020, and ending on November 16, 2020. Once the IPR investigation is complete, the Police Commissioner and/or the Chief of Police, as required by this Agreement, shall hold accountable those investigated members of the rank of Lieutenant and above who are determined to have violated PPB policies (including this Agreement) as outlined in this paragraph. The Parties affirm the obligation in this Agreement and Directive 330 for IPR and PPB to investigate any sworn member if, during the investigations of Lieutenants and above required by this paragraph, information is discovered suggesting that any sworn member may have violated PPB policy or this Agreement. |

| Compliance Label | Partial Compliance |
|---|---|
| **Methodology** | Interviewed PPB, CAO, and IPR personnel |

| Compliance Assessment |
|---|
| IPR is currently conducting the series of investigations required by Paragraph 192. Currently, IPR has four open investigations related to Paragraph 192 regarding the PPB and City responses to the 2020 protests. Although each case is at a different stage in its investigation, the COCL will not be privy to all the facts of these investigations until they are completed. In July 2023, a meeting between the City, DOJ, and COCL provided an update to Paragraph 192, though we cannot comment on any open administrative investigation. At this time, we continue to find the City in Partial Compliance with the requirements of Paragraph 192. Substantial Compliance will require IPR and the City to conduct |

**Exhibit A**

investigations that are thorough, fair, and reasonable, which we will assess upon the completion of the investigations.

| | |
|---|---|
| **COCL Recommendations** | • To achieve Substantial Compliance, complete a thorough, fair, and reasonable investigation of the command personnel associated with the 2020 crowd control and the training they provided<br><br>• To achieve Substantial Compliance, hold accountable, as appropriate, the investigated command personnel members who are found to have violated PPB policies (including this Agreement) as described in Paragraph 192 |
| **Assessment Based On** | Discussions with City personnel |

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 193. In addition to the requirements of paragraph 150 of this Agreement, PPB shall release its Annual Report and hold the required precinct meetings no later than September 20 of each year for the duration of this Agreement. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Confirmed the dates of completion, dissemination, and discussion of the PPB's 2021 Annual Report; Observed and reviewed precinct meetings; Engaged in methods reported under Paragraph 150 |
| **Compliance Assessment** | |
| During the second quarter of 2023, the PPB released a draft of the 2022 Annual Report, soliciting comments and recommendations from the PCCEP and other community members. Since the final report was issued in the third quarter and the required precinct meeting similarly occurred in that quarter, we will provide updates in our next report. | |
| **COCL Recommendations** | • No recommendations at this time |

**Exhibit A**

| Assessment Based On | Date the PPB's Annual Report was completed; Date the PPB Annual Report was presented at three precinct meetings |
|---|---|

| **Settlement Agreement Paragraph** |
|---|
| 194. Within 210 days of the date this paragraph is entered as an order of the Court, the City shall implement body-worn cameras (BWCs) pursuant to a policy that is subject to the policy-review-and-approval provisions of this Agreement; provided, however, if the City is making substantial progress this deadline may be extended by agreement of the United States, which shall not be unreasonably withheld.<br><br>a. The City will comply with any collective bargaining obligations it may have related to BWCs, which the City agrees to fulfill expeditiously and in compliance with its obligation to bargain in good faith.<br><br>b. Within 60 days of the date this paragraph is entered as an order of the Court, the Compliance Officer shall gather public input on the use of BWCs and provide this information and any technical assistance to the public and the Parties to inform the drafting of a policy. The United States reserves its policy review rights related to the BWC program under the terms of this Agreement.<br><br>c. If the City has not finally discharged its collective bargaining obligations as to BWCs within 120 days of the date this paragraph is entered as an order of the Court, the Parties stipulate that the Court may thereafter hold periodic status conferences every 60 days to receive an update on the procedural status of the collective bargaining process related to BWCs. The City will provide a final procedural status update upon the completion of the collective bargaining process.<br><br>d. The United States reserves its enforcement rights related to the BWC program under the terms of this Agreement. If collective bargaining or any related arbitration or appeal results in a BWC program that the United States determines, in its sole and absolute discretion, will not adequately resolve the compliance concerns identified in the April 2, 2021 notice of noncompliance, the Parties agree that the United States can seek court enforcement pursuant to paragraph 183, without having to repeat the steps laid out in paragraphs 178 to 182. |

| **Compliance Label** | Partial Compliance |
|---|---|

**Exhibit A**

| Methodology | Review of BWC pilot policy; Review of the Letter of Agreement for BWC policy and pilot; Communication with PPB personnel |
|---|---|

### Compliance Assessment

The City continues to make strides toward the full implementation of a BWC policy and program. In the second quarter of 2022, the PPB finalized the BWC policy that will guide officers' and supervisors' use of the cameras. However, the COCL was not provided an opportunity to review the draft prior to finalization. Therefore, we cannot say that the policy was "subject[ed] to the policy-review-and-approval provisions of this Agreement" (see also Paragraph 166). We await such an opportunity after the pilot is complete and before the cameras are deployed department-wide. Furthermore, while we were provided an opportunity to review training prior to the PPB delivering it, the review timeframe was often limited and impacted the depth of technical assistance we could provide.

Overall, the BWC rollout has been inconsistent. In our last report, we identified several policy concerns that will need to be addressed. Additionally, there are still topics that we hope to see more training on, including a greater scope of supervisory training. Finally, we have only recently (2023 Q3) been provided with any tool for evaluating the success of the program, and the tools provided by the PPB do not cover the range of topics that would be necessary to evaluate the program. As the PPB is presently in a BWC pilot program, we believe there is still time to make the necessary adjustments prior to deploying the cameras bureau-wide, and we look forward to discussing matters further with the parties before this point.

| **COCL Recommendations** | • To achieve Substantial Compliance, the City "shall implement body-worn cameras (BWCs) pursuant to a policy that is subject to the policy-review-and-approval provisions of this Agreement" (Paragraph 194). This means that the City will need to:<br><br>  ○ Develop and implement comprehensive BWC training<br><br>  ○ Complete a successful pilot test in the field<br><br>  ○ Achieve full-scale implementation of BWCs for PPB officers |
|---|---|
| **Assessment Based On** | Review of BWC pilot plans, BWC policy, hiring a qualified BWC vendor, hiring PPB personnel for the BWC program, and preparing the identified precinct for pilot testing; Future |

**Exhibit A**

| | assessment based on observations of training and review of data regarding implementation success |
|---|---|

**Settlement Agreement Paragraph**

195. In 2020, the City referred to voters a ballot measure that would overhaul the police accountability system incorporated into this Agreement by establishing a new Community Police Oversight Board to replace IPR for investigations of certain complaints of police misconduct and to replace the Chief of Police for imposition of discipline. City voters approved the ballot measure. The City has since empowered a 20-member civilian Commission to define the duties and authority of the Oversight Board and submit a proposal to the City Council for final approval.

a. Before January 1, 2022, the City Council and Auditor shall each present a plan to the United States for an orderly transition to the Community Police Oversight Board by ensuring the continuity of IPR operations while the Commission develops the Oversight Board for City Council's approval. The United States shall determine whether either of these two plans is acceptable. City Council will then adopt a plan that the United States has determined is acceptable. The Parties agree that the adopted plan shall be appended to this Agreement and will become part of this Order, provided that the Parties may agree to modify the plan if warranted by the circumstances. Until the Oversight Board becomes operational, the City shall ensure that administrative investigations are completed as required by Section VIII – Officer Accountability and that officers are held accountable for violating PPB policy and procedure as required by Paragraph 169.

b. Within 18 months of the date this paragraph is entered as an order of the Court, the Commission shall propose to City Council changes to City Code to create a new police oversight system as reflected in the City of Portland Charter amendment establishing a Community Police Oversight Board. Within 60 days of receiving the Commission's proposal, the City will propose amendments to City Code to address the Commission's proposal, and corresponding amendments to this Agreement, subject to the United States' and the Court's approval, to ensure full implementation of the Oversight Board and effective police accountability, consistent with the requirements of this Agreement. Within 21 days of the approval of the amendments to the Agreement by the United States and the Court, the City Council shall consider and vote on the conforming City Code provisions creating the Oversight Board. Within 12 months of the Council's adoption of the City Code provisions, the new Oversight Board shall be staffed and operational, and IPR shall then cease taking on new work and complete any pending work. For good cause shown, the

**Exhibit A**

deadlines imposed by this subparagraph (b) may be reasonably extended provided that the City is in substantial compliance with subparagraph (a).

c. The City will comply with any collective bargaining obligations it may have related to the Oversight Board, which the City agrees to fulfill expeditiously and in compliance with its obligation to bargain in good faith.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Observation of PAC meetings; Communication with City support staff; Review of PAC's Quarterly Report, January–March 2023 |

**Compliance Assessment**

For the second quarter of 2023, the City remained in Partial Compliance with the requirements of Paragraph 195. In the second quarter, both IA and IPR continued to operate; therefore, we continue to find that subsection (a) is being achieved. Also in the second quarter of 2023, the PAC began wrapping up their work. In the third quarter of 2023, the PAC submitted a set of recommendations to the City Council, thereby triggering the Council's responsibilities under subsection (b) of this paragraph. Therefore, we will provide an update in our next report regarding the Council's response to the PAC's recommendations. For the moment, we maintain our recommendations from our prior report.

| COCL Recommendations | • To achieve Substantial Compliance, the PAC must submit to the City Council a clear and reasonable proposal for the implementation of a CPOB as defined in Paragraph 195<br><br>• To achieve Substantial Compliance, the City must implement a functional CPOB that is properly staffed, trained, operational, and able to effectively investigate and dispose of use of force and misconduct cases |
|---|---|
| Assessment Based On | Progress achieved by PAC toward developing the CPOB; Implementation and functioning of the CPOB |

**Exhibit A**

# Appendix A: Acronyms

| Acronym | Definition |
| --- | --- |
| AAR | After Action Report (also referred to as 940) |
| AIM | Administrative Investigations Management |
| AMAC | Albina Ministerial Alliance Coalition for Justic and Police Reform |
| AMR/EMS | American Medical Response/Emergency Medical Service |
| BERS | Behavioral Health Unit Electronic Referral System |
| BHCC | Behavioral Health Call Center |
| BHRT | Behavioral Health Response Team |
| BHU | Behavioral Health Unit |
| BHUAC | Behavioral Health Unit Advisory Committee |
| BHUCT | Behavioral Health Unit Coordination Team |
| BOEC | Bureau of Emergency Communications |
| BWC | Body-Worn Camera |
| CAG | Coalition of Advisory Groups |
| CAR | Corrective Action Recommendation |
| CCO | Coordinated Care Organization |
| CEW | Conducted Electric Weapon |
| CIT | Crisis Intervention Team |
| COCL | Compliance Officer and Community Liaison |
| CPOB | Community Police Oversight Board |
| CRC | Citizen Review Committee |
| CRO | Communication Restriction Order |
| CSD | Community Safety Division |
| DOJ | Department of Justice |
| ECIT | Enhanced Crisis Intervention Team |
| ECW | Electronic Control Weapon |
| EIS | Employee Information System |
| FDCR | Force Data Collection Report |
| FTE | Full-Time Equivalent |
| IA | Internal Affairs |
| IMLLC | Independent Monitor, LLC |
| IPR | Independent Police Review |
| LMS | Learning Management System |

**Exhibit A**

| | |
|---|---|
| MFF | Mobile Field Force |
| MHT | Mental Health Template |
| OIG | Office of the Inspector General |
| OIS | Officer-Involved Shooting |
| PAC | Police Accountability Commission |
| PCCEP | Portland Committee on Community-Engaged-Policing |
| PPA | Portland Police Association |
| PPB | Portland Police Bureau |
| PRB | Police Review Board |
| PSD | Professional Standards Division |
| PSR | Portland Street Response |
| RU | Responsibility Unit |
| SCT | Service Coordination Team |
| SOP | Standard Operating Procedure |
| STS | Supportive Transitions and Stabilization |
| TAC | Training Advisory Council |

**Exhibit A**

# Appendix B: List of Personnel

- Chief of Police: Chuck Lovell
- Deputy Chief of Police: Michael Frome
- Assistant Chief of Operations: Jeffrey Bell
- Assistant Chief of Services: Michael Leasure
- Assistant Chief of Investigations: Art Nakamura
- Commander of Professional Standards Division/Compliance Coordinator: Kristina Jones
- Inspector General/DOJ Compliance team: Mary Claire Buckley
- Force Inspector Lieutenant: Peter Helzer
- Behavioral Health Unit (BHU): Christopher Burley
- EIS Supervisor: Matthew Engen
- Training Captain: Franz Schoening
- City of Portland Auditor: Simone Rede
- IPR Director: Ross Caldwell
- BOEC Director: Bob Cozzie
- BOEC Training and Development Manager: Melanie Payne

**Exhibit A**

This page intentionally left blank

**Exhibit A**

Exhibit A