# COMPLIANCE OFFICER AND COMMUNITY LIAISON

*QUARTERLY REPORT: QUARTER 3 UPDATES AND ANALYSIS*

Prepared By:
CNA

For the City of Portland, Oregon
July 1, 2023 to September 30, 2023

March 9, 2024



Exhibit A



This document contains the best opinion of CNA at the time of issue.

**Distribution:**

Distribution unlimited.

**March 2024**

This page intentionally left blank.

**Exhibit A**

# Executive Summary

This is the Compliance Officer/Community Liaison's (COCL) third quarter report for 2023, as required by the Amended Settlement Agreement between the City of Portland (the City) and the United States Department of Justice (DOJ), Case No. 3:12-cv-02265-SI, entered April 29, 2022. This report covers the three-month period from July 1, 2023, to September 30, 2023.

**III. USE OF FORCE**

During the third quarter of 2023, the Portland Police Bureau (PPB) and the City of Portland (the City) was found to be in Substantial Compliance for 10 of the 12 paragraphs in Section III, leaving Pars. 69 and 76 in Partial Compliance.

For the present quarter, our review of a random sample of 20 use of force events revealed each use of force was reasonable, that the force was comprehensively described, investigated, and reviewed by the chain-of-command.  Additionally, we saw consistent instances of supervisors identifying opportunities for improvement during use of force events, documenting their findings, and providing correction to officers where appropriate. We also found the entire chain-of-command ensured accurate and complete after-action reviews, regularly identified policy, training, tactical, or equipment concerns, and raised these concerns to the Force Inspector for resolution. As a result of PPB's "consistent and verified performance" in these regards (Par. 33), we found the PPB had achieved renewed Substantial Compliance with the requirements of Pars. 70, 73, 74, 75, and 77.

To gain substantial compliance with the remaining paragraphs in the Use of Force section, we look forward to PPB rectifying the lack of clarity in the description of, and officers reporting of, Control Against Resistance. We also look forward to continued application of SOP #5 (Force Analysis for Supervisors and Teams) when identifying and addressing outlying officers though note recent progress regarding this process.

**IV. TRAINING**

During the third quarter of 2023, the PPB was found to be in Substantial Compliance with all paragraphs in Section IV.

The COCL continued to examine the PPB's Online training program delivered through their Learning Management System (LMS). LMS attendance records are expected to include all in-person and online trainings completed by PPB members . The PPB has maintained its process for ensuring compliance with Oregon training standards, including through the use of reminder emails, noncompliance memos to the Chief's office, and supervised completion of training.  The PPB also implemented SOP 10-10 (*Skills Certification Tracking With LMS*) which creates a centralized database that contains certification records for specialty assignments (e.g., ECIT or AR-15 certification).  This development addressed the final barrier to Par. 81, which we now find to be in Substantial Compliance.

**Exhibit A**

During this quarter, we also found that the Training Division continued to conduct Training Needs Assessments and use them to identify potential training needs, including areas related to use of force, trends in misconduct reports, crowd management, control tactics, patrol procedures, and COCL and DOJ recommendations for complying with the Settlement Agreement (among other topics). Additionally, the COCL found that the PPB continued to produce training evaluation results for recently delivered training. The PPB's training evaluations continue to employ multiple methods of data collection, analysis, and reporting that are being guided by the Kirkpatrick Model of training evaluation.

Several members of the COCL team were also provided the opportunity to observe training provided as part of the body-worn camera pilot. This training included modules on the BWC policy, wearing the cameras, operating the cameras, docking the cameras and downloading the videos, and modules for specific supervisor and detective responsibilities. In observing the training, we found each module to be informative and well received.

The COCL continues to suggest the incorporation of a contact survey to measure on-the-job performance of critical training objectives, such as procedurally just behaviors by officers. We maintain that data generated from a contact survey program, along with data from the new BWC program, would help ensure equitable treatment for all groups and lead to important changes in training, coaching, and supervision.

## V. COMMUNITY BASED MENTAL HEALTH SERVICES

During the third quarter of 2023, the PPB and the City was found to be in Substantial Compliance for all paragraphs in Section V.

These paragraphs refer to services that are part of a broader mental health response system. The PPB and the City are partners in this system but are not necessarily drivers of the system. The City and the PPB continued to participate through engagement in various committees and workgroups. These include the Behavioral Health Unit Advisory Committee (BHUAC), the Behavioral Health Unit Coordination Team (BHUCT), the Unity Transportation Work Group, and the Legacy ED Community Outreach Group. These groups have continued to address important issues in city, county, and state approaches to providing comprehensive mental health services.

Also, as part of Section V, the Unity Center continues to act as a drop-off center for first responders to transport persons in a mental health crisis. As noted in prior reports, the Unity Center conforms to the intent of the Settlement Agreement and of drop-off centers as outlined in the Memphis Model of mental health crisis response. Furthermore, the PPB has continued to participate in AMR (ambulance service) training for transporting persons in mental health crises.

## VI. CRISIS INTERVENTION

During the third quarter of 2023, the City and PPB was found to be in Substantial Compliance with all paragraphs in Section VI.

**Exhibit A**

During the third quarter, Bureau of Emergency Communications (BOEC) maintained their policies and training for telecommunicators on triaging calls involving a mental health component, including to Enhanced Crisis Intervention Team (ECIT), Portland Street Response (PSR), and the Behavioral Health Call Center (BHCC).  For instance, in this quarter, BOEC provided us with SOP 6.011 (Portland Street Response) which defines the function of PSR, defines a mental health crisis, and lists the specific criteria for dispatching PSR during a mental health crisis.  BOEC also continued to use seven call characteristics to determine whether a specialized ECIT officer should be dispatched.

For their part, the PPB continued to maintain directives related to crisis response, including 850.20 (Police Response to Mental Health Crisis), 850.21 (Peace Officer Custody – Civil), 850.22 (Police Response to Mental Health Director Holds and Elopement), and 850.25 (Police Response to Mental Health Facilities). The PPB also continued to provide training to new officers as well as current officers through annual In-service training. In August of 2023, the PPB completed a new Advanced Academy for new recruits, with 23 individuals graduating.  Additionally, the PPB maintained their specialized response approach through the use of ECIT officers. In the third quarter of 2023, there was an ECIT certification training with 20 graduates.  PPB also presented to the Behavioral Health Unit Advisory Committee (BHUAC) on the proposal of a dedicated ECIT Response car to help meet ECIT call demand.

The PPB has maintained the use of Behavioral Health Response Team (BHRT) to assist individuals who represent an escalating risk of harm. While the Settlement Agreement only requires three teams for each precinct, in the third quarter the PPB maintained five BHRTs. The PPB has also maintained the Service Coordination Team (SCT) to facilitate the provision of services to persons who are chronically houseless, suffer chronic addiction, and are chronically in and out of the criminal justice system. For both programs, we provide ongoing operational statistics, including statistics related to decision-making and outcomes.

Finally, BHUAC continued to meet during the third quarter of 2023, utilizing the expertise of individuals at the PPB, BOEC, and the City, as well as other agencies, stakeholders, advocates, and service providers. For the third quarter, the BHUAC met twice and one meeting was cancelled due to low availability.  The meetings we observed were largely productive though we will continue to monitor the ability of BHUAC to meet with a sufficient number of members in future quarters.  found that in the third quarter, meetings were largely productive and met quorum.


## VII. EMPLOYEE INFORMATION SYSTEM (EIS)

During the third quarter of 2023, the PPB was found to be in Substantial Compliance with three of the five paragraphs in Section VII, leaving Pars. 116 and 117 in Partial Compliance.

During the third quarter, we continued discussion with the PPB around our ongoing need for better clarity with how outlying officers, teams, and units are identified and evaluated in the context of early intervention.  To resolve these issues, we look forward to further discussion surrounding SOP #5 (Force Analysis for Supervisors and Teams).  Finally, we continue to await agreement from the Parties as to whether a comprehensive assessment of the EIS is necessary for compliance with the requirements of this paragraph, though we note this will likely not occur before the Monitor assumes

**Exhibit A**

their role.  For other paragraphs within this section, the PPB continues to maintain the thresholds required of the EIS and has maintained a third EIS administrator.

## VIII.  ACCOUNTABILITY

During the third quarter of 2023, the PPB was found to be in Substantial Compliance with 16 of the 21 paragraphs in Section VII, leaving Pars. 126, 128, 131, 137 and 169 in Partial Compliance.

For this quarter, the City achieved Substantial Compliance with Par. 121 based on a consistent upward trend of completing administrative investigations within 180-days per the requirements of the Settlement Agreement.  Over the past four quarter, IPR and IA went from a compliance rate of 67% for cases opened in 2022 Q2 to a compliance rate of 89% for cases opened in 2023 Q1 (the last quarter for which 180 days could have passed).

Additionally, while some barriers from prior quarters continue to remain, we report progress towards Substantial Compliance in several of them. For example, we were provided information from the City demonstrating that the transition to a new form of government will account for IPR's sunsetting (and the emergence of the new accountability system) by placing them all under the umbrella of the same City service area.  Thus, the City has a demonstrated plan for incorporating independent police review into the new system of government. Alternatively, progress for some paragraphs still remains before Substantial Compliance can be achieved and we will continue to provide updates on their development.

## IX. COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING (PCCEP)

During the third quarter of 2023, the PPB was found to be in Substantial Compliance with all twelve paragraphs in Section IX.

In the third quarter of 2023, PCCEP continued to function as a legitimate body for community engagement. They held three full committee meetings, as well as meetings of their Steering Committee, Settlement Agreement and Policy Sub-Committee, and their Community Engagement Sub-Committee. The City continued to support PCCEP by maintaining competent staff to plan and manage meetings, recruiting and training new PCCEP members, and providing technical and legal assistance as needed.

During the third quarter of 2023, the PPB continued to implement its Community Engagement Plan. The PPB's diverse advisory groups (Community and Culturally Specific Councils), as well as the Coalition of Advisory Groups (CAG), continue to meet with the PPB leadership, City Commissioners, and the communities they represent in a transparent manner. Also, the PPB's Operational Councils – BHUAC, the Police Equity Advisory Council (PEAC), and the Training Advisory Council (TAC) – continue to meet regularly and provide the PPB with feedback on relevant issues.   Additionally, the PPB's Office of Community Engagement and the PPB's Policy Director (with support from PPB's Strategic Services Division) have built a sound Language Justice Program that continues to expand to ensure equal access to police and city services. The new language access policy is nearly operational

**Exhibit A**

and should be followed by training in the near future. The PPB has also continued to produce high-quality quarterly and annual reports on traffic stops and use of force with demographic breakdowns that allow for the analysis of racial disparities. Finally, the PPB has made considerable strides in terms of community engagement and the PPB's Office of Community Engagement is doing some excellent, cutting-edge work to de-centralize community policing and build partnerships with the community.

## XI. ADDITIONAL REMEDIES

During the first half of 2022, the Parties, the Portland City Council, and the Federal court agreed to amend the Settlement Agreement to include eight new remedies to help reform the PPB. As a result, Section XI has been added, with eight new paragraphs (188 to 195). The COCL's compliance assessment for Section XI began in the second quarter of 2022.

The City continues to use the updated Force Data Collection Report (FDCR) and After Action Report forms to capture when the forms are edited and completed. The City also continues to list a separate line item for overtime costs to conduct necessary training for PPB officers. Additionally, the PPB finalized the 2022 Annual Report, after soliciting comments and recommendations from the PCCEP and other community members. Finally, the PPB has retained Dr. Rebecca Rodriguez as the Police Education Director. With these actions, the City has maintained Substantial Compliance for Par. 188, 190, 191, and 193.

For paragraphs which remained in Partial Compliance, continued progress was made. During this quarter, the Independent Monitor, LLC (IMLLC) released a report which assessed the City's response to crowd control events in 2020 as required by Par. 189. The IMLLC acknowledged the City's efforts even prior to completing their review, including hiring a civilian employee to direct educational efforts at PPB's Training Division, equipping PPB officers with body-worn cameras, and initiating investigations into actions of PPB personnel during the protests.  The IMLLC provided 12 recommendations for the City which PPB will now use as the basis for a training needs assessment. The IPR is continuing to complete investigations related to Par. 192 and will provide the COCL with additional details once the investigations are complete. Additionally, the PPB implemented a body-worn camera pilot program as an initial step to fulfil the requirements of Par. 194. Beginning on August 21, 2023, the pilot program equipped officers from PPB's Focused Intervention Team, Central Precinct Patrol, and Central Neighborhood Response Team/Bike Squad with body-worn cameras from Axon. Based on results from the pilot program, the PPB expects to implement the body-worn camera program in the Summer of 2024. Finally, the PAC submitted a final report and recommendations to the City concerning the implementation of the Community Police Oversight Board required by Par. 195. With these actions, the City has maintained Partial Compliance for those paragraphs.

**Exhibit A**

# Table of Contents

Introduction ................................................................................................................. 1

Report Card ................................................................................................................ 3

Community Engagement Team (CET) Report ..................................................... 13

Section III: Use of Force ......................................................................................... 15

    A.    Use of Force Policy.............................................................................................15
        1. Electronic Control Weapons ..................................................................... 16
        2. Use of Force Reporting Policy and Use of Force Report ................................ 17
        3. Use of Force Supervisory Investigations and Reports ................................ 19
    B. Compliance Audits Related to Use of Force ..................................................24

Section IV: Training ................................................................................................. 29

    A.    Assess Training Needs ...................................................................................30
    B.    Evaluate Training...........................................................................................31
    C.    Document Training Delivered and Received ..............................................33
    D.    Trainer Qualifications....................................................................................35
    E.    Deliver Appropriate and High-Quality Training........................................36
    F.    Audit the Training Program ..........................................................................37
    G.    Analyze and Report Force Data ...................................................................38

Section V: Community-Based Mental Health Services....................................... 42

Section VI: Crisis Intervention ............................................................................... 46

    A. Addictions and Behavioral Health Unit and Advisory Committee ..............46
    B. Continuation of C-I Program .......................................................................53
    C. Establishing "Memphis Model" Crisis Intervention Team ........................54
    D. Mobile Crisis Prevention Team.....................................................................61
    E. Service Coordination Team ...........................................................................67
    F. BOEC .............................................................................................................70

Section VII: Employee Information System ......................................................... 74

Section VIII: Officer Accountability ...................................................................... 80

    A. Investigation Timeframe ...............................................................................80
    B. On Scene Public Safety Statements and Interviews ......................................83
    C. Conduct of IA Investigations........................................................................87
    D. CRC Appeals.................................................................................................93
    E. Discipline .......................................................................................................95
    F. Communication with Complainant and Transparency ..................................96

Section IX: Community Engagement and Creation of Portland Committee on Community Engaged Policing......................................................................................................... 107

    A.    Portland Committee on Community Engaged Policing ..............................107
    B.    PPB's Role in Public Engagement and Outreach .....................................110

1.    System Overview ...................................................................110
2.    The Community Engagement Plan ......................................110
3.    Data Collection, Analysis, and Reporting ..........................112

**Section XI: Additional Remedies** ............................................. **121**

**Appendix A: Acronyms** ............................................................. **136**

**Appendix B: List of Personnel** .................................................. **138**

**Exhibit A**

This page intentionally left blank.

**Exhibit A**

# Introduction

This is the Compliance Officer/Community Liaison's (COCL) third quarter report for 2023, as required by the Amended Settlement Agreement between the City of Portland (the City) and the United States Department of Justice (DOJ), Case No. 3:12-cv-02265-SI, entered April 29, 2022.  Under the Portland Settlement Agreement, the Compliance Officer/Community Liaison (COCL) is responsible for collecting, reviewing, and reporting on data related to the Portland Police Bureau's (PPB) interactions with persons experiencing a mental health crisis, use of force, PPB supervision and management of use of force, accountability processes, and training. The COCL independently examines and synthesizes the data for the purposes of reporting to the City Council, the United States Department of Justice, and the public on the City's compliance with the Agreement.  The COCL team produces quarterly reports and presents the draft of each report to the public for comment.  This report covers the three-month period from July 1, 2023, to September 30, 2023.

This report includes a "Report Card" that provides a separate assessment of each paragraph in the Agreement. All paragraphs are reviewed and evaluated using the following standards:

- Substantial Compliance: The City/PPB has satisfied the requirement of the provision in a comprehensive fashion and with a high level of integrity.
- Partial Compliance: The City/PPB has made significant progress toward the satisfaction of the provision's requirements, though additional work is needed.
- Non-Compliance but Initial Steps Taken: The City/PPB has begun the necessary steps toward compliance, though significant progress is lacking.

For each paragraph assessed by the COCL team, we provide the Settlement Agreement paragraph language, our methodology for assessing compliance with that paragraph, a summary of our findings for the quarter, recommendations for achieving or maintaining compliance (where appropriate), and the documents, data, or observations that we relied on in completing our assessment.  When providing recommendations for reaching or maintaining compliance, we use the phrase "*to achieve [or maintain] Substantial Compliance.*" Where recommendations in our assessments are not preceded by this language, the COCL is offering recommendations that are not required for compliance, but that we feel would have a significant positive impact on the PPB if implemented.

In the third quarter of 2023, the City/PPB remained in Substantial Compliance for most of the paragraphs in the Settlement Agreement. The City/PPB achieved Substantial Compliance for five additional paragraphs within the Use of Force section (Pars. 70, 73, 74, 75, 77). The City/PPB also gained substantial for the two remaining Training paragraphs (Pars. 78, and 81), bringing the entire section into compliance.  This City also gained Substantial Compliance with Par. 121 in the

**Exhibit A**

Accountability Section.  Thus, at the conclusion of the third quarter of 2023, Partial Compliance ratings were given for the following 13 paragraphs: Use of Force (Pars. 69 and 76), Employee Information System (Pars. 116, 117), Officer Accountability (Pars. 126, 128, 131, 137, 169), and Additional Remedies (Pars. 189, 192, 194, 195).

**Exhibit A**

# Report Card

The table below summarizes the compliance status and recommendations for all paragraphs reviewed by the COCL.

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| **III. USE OF FORCE** | | |
| Par. 66 | Substantial Compliance | • Maintain vigilance in reviewing how de-escalation is defined to ensure that the data surrounding de-escalation does not suffer from validity issues |
| Par. 67 | Substantial Compliance | • Maintain vigilance in reviewing how de-escalation is defined to ensure that the data surrounding de-escalation does not suffer from validity issues |
| Par. 68 | Substantial Compliance | • No recommendations at this time |
| Par. 69 | Partial Compliance | • To return to Substantial Compliance, evaluate Directives 1010.00 and 910.00, evaluate current training, and identify opportunities to clarify when officers should be reporting Control Against Resistance<br><br>• Upon issuing such clarification, take corrective action on members who fail to report Control Against Resistance and supervisors who fail to correct the issue |
| Par. 70 | Substantial Compliance | • No recommendations at this time |
| Par. 71 | Substantial Compliance | • No recommendations at this time |
| Par. 72 | Substantial Compliance | • No recommendations at this time |
| Par. 73 | Substantial Compliance | • No recommendations at this time |
| Par. 74 | Substantial Compliance | • No recommendations at this time |

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| Par. 75 | Substantial Compliance | • No recommendations at this time |
| Par. 76 | Partial Compliance | • To achieve Substantial Compliance, maintain communication with COCL regarding the application of SOP #5 to ensure consistent and verified performance as required by the Settlement Agreement |
| Par. 77 | Substantial Compliance | • No recommendations at this time |
| **IV. TRAINING** | | |
| Par. 78 | Substantial Compliance | • No recommendations at this time |
| Par. 79 | Substantial Compliance | • Reduce the gap between the needs assessment and training plan through other modes of training |
| Par. 80 | Substantial Compliance | • Enhance evaluation efforts to better capture on-the-street behavior through surveys and body-worn camera (BWC) review |
| Par. 81 | Substantial Compliance | • No recommendations at this time |
| Par. 82 | Substantial Compliance | • No recommendations at this time |
| Par. 83 | Substantial Compliance | • No recommendations at this time |
| Par. 84 | Substantial Compliance | • Maintain and, where needed, expand efforts to further include concepts related to procedural justice and legitimacy |
| Par. 85 | Substantial Compliance | • The next audit of the Training Division should give special attention to civilianization, including the level of support for the Director of Education and instructor development classes<br><br>• A future audit should give attention to the content of in-person training for officers and supervisors, with particular attention to the |

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| | | quality of instruction on Equity, Procedural Justice, and De-escalation <br><br> • In terms of training needs assessment, the community should play a bigger role in setting training priorities because they are the recipients of police services <br><br> • Given the critical importance of training in police reform, the City and PPB should invest more in Training Division personnel so that more instruction can be delivered |
| Par. 86 | Substantial Compliance | • Work with the TAC to identify analyses that will be most useful to the TAC's mission |
| Par. 87 | Substantial Compliance | • No recommendations at this time |
| **V. COMMUNITY-BASED MENTAL HEALTH SERVICES** | | |
| Par. 88 | Substantial Compliance | • No recommendations at this time |
| Par. 89 | Substantial Compliance | • No recommendations at this time |
| Par. 90 | Substantial Compliance | • No recommendations at this time |
| **VI. CRISIS INTERVENTION** | | |
| Par. 91 | Substantial Compliance | • Continue to update the COCL and DOJ on changes to personnel when applicable |
| Par. 92 | Substantial Compliance | • Continue to collect and review data on mental health services, and use this information to update services as needed |
| Par. 93 | Substantial Compliance | • Continue to collect and review data on mental health services, and use this information to update services as needed |
| Par. 94 | Substantial Compliance | • No recommendations at this time |

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| Par. 95 | Substantial Compliance | • Ensure an ongoing quorum through increasing membership or substituting representatives who are able to attend more regularly for those who frequently cannot |
| Par. 96 | Substantial Compliance | • No recommendations at this time |
| Par. 97 | Substantial Compliance | • Consider seeking BHUAC input during training development rather than after training has been developed |
| Par. 98 | Substantial Compliance | • Consider seeking BHUAC input during training development rather than after training has been developed |
| Par. 99 | Substantial Compliance | • No recommendations at this time |
| Par. 100 | Substantial Compliance | • Continue utilizing existing data to assess demand for ECIT services |
| Par. 101 | Substantial Compliance | • No recommendations at this time |
| Par. 102 | Substantial Compliance | • No recommendations at this time |
| Par. 103 | Substantial Compliance | • No recommendations at this time |
| Par. 104 | Substantial Compliance | • No recommendations at this time |
| Par. 105 | Substantial Compliance | • No recommendations at this time |
| Par. 106 | Substantial Compliance | • No recommendations at this time |
| Par. 107 | Substantial Compliance | • No recommendations at this time |
| Par. 108 | Substantial Compliance | • No recommendations at this time |
| Par. 109 | Substantial Compliance | • No recommendations at this time |

**Exhibit A**

| __Paragraph__ | __Compliance Label__ | __COCL Recommendations__ |
|---|---|---|
| Par. 110 | Substantial Compliance | • Continue to collect data and create reports on mental health services |
| Par. 111 | Substantial Compliance | • No recommendations at this time |
| Par. 112 | Substantial Compliance | • No recommendations at this time |
| Par. 113 | Substantial Compliance | • No recommendations at this time |
| Par. 114 | Substantial Compliance | • No recommendations at this time |
| Par. 115 | Substantial Compliance | • No recommendations at this time |
| **VII. EMPLOYEE INFORMATION SYSTEM** | | |
| Par. 116 | Partial Compliance | • To achieve Substantial Compliance, work with COCL to formalize the review, identification, and intervention process through SOP #5<br><br>• Determine with DOJ whether an assessment of EIS's effectiveness is required for compliance |
| Par. 117 | Partial Compliance | • To achieve Substantial Compliance, work with COCL to formalize the review, identification, and intervention process through SOP #5<br><br>• Determine with DOJ whether an assessment of EIS's effectiveness is required for compliance |
| Par. 118 | Substantial Compliance | • No recommendations at this time |
| Par. 119 | Substantial Compliance | • No recommendations at this time |
| Par. 120 | Substantial Compliance | • No recommendations at this time |
| **VIII. OFFICER ACCOUNTABILITY** | | |

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| Par. 121 | Substantial Compliance | <ul><li>Conduct a thematic review of oft overdue case types to identify common delays and take proactive measures when faced with future similar cases</li><li>Consider the impact of system layers on timely resolution of complaints</li></ul> |
| Par. 122 | Substantial Compliance | <ul><li>No recommendations at this time</li></ul> |
| Par. 123 | Substantial Compliance | <ul><li>Maintain self-improvement loop for stages that exceed their stage timeline even if the case does not exceed the 180-day timeline</li></ul> |
| Par. 124 | Substantial Compliance | <ul><li>No recommendations at this time</li></ul> |
| Par. 125 | Substantial Compliance | <ul><li>No recommendations at this time</li></ul> |
| Par. 126 | Partial Compliance | <ul><li>To achieve Substantial Compliance, finalize the SOP related to mental incapacitation preventing a walk-through, including the criteria for making such a determination</li></ul> |
| Par. 127 | Substantial Compliance | <ul><li>No recommendations at this time</li></ul> |
| Par. 128 | Partial Compliance | <ul><li>To achieve Substantial Compliance, implement plan to house IPR (and the future accountability system) under the Community Safety service area.</li></ul> |
| Par. 129 | Substantial Compliance | <ul><li>No recommendations at this time</li></ul> |
| Par. 130 | Substantial Compliance | <ul><li>No recommendations at this time</li></ul> |
| Par. 131 | Partial Compliance | <ul><li>To return to Substantial Compliance, conduct PRBs in accordance with prior COCL and DOJ guidance</li></ul> |
| Par. 132 | Substantial Compliance | <ul><li>No recommendations at this time</li></ul> |
| Par. 133 | Substantial Compliance | <ul><li>No recommendations at this time</li></ul> |

**Exhibit A**

| **Paragraph** | **Compliance Label** | **COCL Recommendations** |
|---|---|---|
| Par. 134 | Substantial Compliance | • No recommendations at this time |
| Par. 135 | Substantial Compliance | • No recommendations at this time |
| Par. 136 | Substantial Compliance | • No recommendations at this time |
| Par. 137 | Partial Compliance | • To return to Substantial Compliance, update Directive 338.00, publicly post the directive, and provide link to the Corrective Action Guide |
| Par. 138 | Substantial Compliance | • No recommendations at this time |
| Par. 139 | Substantial Compliance | • No recommendations at this time |
| Par. 140 | Substantial Compliance | • No recommendations at this time |
| Par. 169 | Partial Compliance | • To achieve Substantial Compliance, PPB should expand their approach to conducting objective investigations and hold officers accountable when policy violations are found<br>• To achieve Substantial Compliance, remedy barriers to ensure a fair and consistent accountability system |
| **IX. COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING** | | |
| Par. 141 | Substantial Compliance | • No recommendations at this time |
| Par. 142 | Substantial Compliance | • To maintain Substantial Compliance with Par. 142, the City should continue to promptly respond to PCCEP's recommendations and the Mayor/Police Commissioner should fulfill the requirement to meet with Portland Committee On Community Engaged Policing (PCCEP) "at least twice per year" |

**Exhibit A**

| **Paragraph** | **Compliance Label** | **COCL Recommendations** |
|---|---|---|
| Par. 143 | Substantial Compliance | • To maintain Substantial Compliance with Par. 143, the City should continue to identify and recruit sufficient Portland Committee On Community Engaged Policing (PCCEP) members to maintain a full body<br><br>• The City, with guidance from PCCEP, should prioritize the recruitment and retention of youth members on PCCEP |
| Par. 144 | Substantial Compliance | • To maintain Substantial Compliance, continue adequate staffing dedicated to supporting PCCEP<br><br>• To maintain Substantial Compliance, post minutes of PCCEP meetings within 10 business days after a PCCEP meeting, including in the Documents section of PCCEP's website |
| Par. 145 | Substantial Compliance | • Conduct a police-focused community survey and, where possible, incorporate measures of the quality of actual encounters with PPB officers |
| Par. 146 | Substantial Compliance | • Conduct a police-focused community survey and, where possible, incorporate measures of the quality of actual encounters with PPB officers |
| Par. 147 | Substantial Compliance | • No recommendations at this time |
| Par. 148 | Substantial Compliance | • Continue the dialogue with community members around racial disparities in traffic stops and searches |
| Par. 149 | Substantial Compliance | • As part of everyday policing, the City should introduce a contact survey to measure the level of procedural justice and public satisfaction with police-public interactions, |

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| | | especially interactions with constitutionally-protected populations |
| Par. 150 | Substantial Compliance | • No recommendations at this time |
| Par. 151 | Substantial Compliance | • Continue to maintain records of training for new PCCEP members; ensure current and future PCCEP members participate in all required trainings and are offered a meaningful opportunity to participate in any optional training |
| Par. 152 | Substantial Compliance | • Continue to maintain records of training for new PCCEP members; ensure current and future PCCEP members participate in all required trainings and are offered a meaningful opportunity to participate in any optional training |
| **XI. ADDITIONAL REMEDIES** | | |
| Par. 188 | Substantial Compliance | • No recommendations at this time |
| Par. 189 | Partial Compliance | To achieve Substantial Compliance:<br>• The City must respond to the IMLLC report<br>• The PPB must use the IMLLC report to prepare a training needs assessment, training plan, and relevant crowd management training<br>• IMLLC must prepare a follow-up report that reviews the City's response to their original report, including the PPB's training needs assessment<br>• The City should prepare a detailed roadmap for responding to IMLLC's findings and recommendations. |

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| | | • The City should provide COCL with IMLLC's reports, the PPB's training needs assessment report, and training plans |
| Par. 190 | Substantial Compliance | • No recommendations at this time |
| Par. 191 | Substantial Compliance | • No recommendations at this time |
| Par. 192 | Partial Compliance | • To achieve Substantial Compliance, complete a thorough, fair, and reasonable investigation of the command personnel associated with the 2020 crowd control and the training they provided<br><br>• To achieve Substantial Compliance, hold accountable the investigated command personnel members as appropriate who are found to have violated PPB policies (including this Agreement) as described in Par. 192 |
| Par. 193 | Substantial Compliance | • No recommendations at this time |
| Par. 194 | Partial Compliance | • To achieve Substantial Compliance, the City should achieve full-scale implementation of the BWC program |
| Par. 195 | Partial Compliance | • To achieve Substantial Compliance, the City must implement a functional oversight board that is properly staffed, trained, operational, and able to effectively investigate and dispose of use of force and misconduct cases |

**Exhibit A**

# Community Engagement Team (CET) Report

*Who are the Community Engagement Team (CET)?*

The COCL Community Engagement Team (CET) is new to the COCL and is led by Dr. Steven Holt and Janie Gullickson, who are connected to, and members of, the Portland community. We recognize that the City of Portland is a multiplex of nuanced communities that are each impacted by policing in different ways and we have worked to facilitate interviews, focus groups, and listening sessions across this range of communities. Our primary goal is to foster open communication, build trust, and listen to authentic and transparent feedback about the Settlement Agreement. We engage community members from diverse cultural backgrounds, a broad range of socioeconomic status, and a variety of lived experiences. We recognize the importance of gathering community voices that represent all facets of the people who live and work in Portland, and where appropriate, highlight intersectionality.

> "Our primary goal is to foster open communication, build trust, and listen to authentic and transparent feedback about the Settlement Agreement."

*What has the CET done?*

The CET employs a snowball sampling approach to identify communities, gather feedback, solicit referrals, and continue engagement. We have an established list of over 80 community groups to engage with and, over the last several months, we have reached out to and met with individual community members from community-based organizations (CBOs), faith-based organizations, professional organizations, neighborhood associations, and individuals who have a connection to, or may have personally utilized, Portland's mental/behavioral health (crisis) response services or shelter settings. We have met with 25 representatives of the 80 organizations we identified, conducted three in-person community conversations that brought together over 100 people, and completed several one-on-one meetings with community members to begin planning listening sessions regarding the City of Portland's mental health/behavioral health response system (planned for 2024). We have also worked as part of the COCL team to participate



- Established community groups
- Met with organizations
- Conducted in-person community conversations
- Began planning for listening sessions (2024)
- Participated in two PCCEP town hall meetings

in two PCCEP town hall meetings, presenting quarterly statuses on the Settlement Agreement and COCL work. During these town halls, we have worked to clarify and explain the role of the COCL, as established by the Settlement Agreement.

**Exhibit A**

*What has the CET heard?*

During our conversations with the community, we are noticing several themes. Primarily, there is widespread interest among the community in expressing feedback on issues such as community safety, use of force, and alternative response. For example, many community members have consistently shared a desire for the City to better integrate mental health and law enforcement responses, and to identify more effective community policing approaches. Many community members expressed concern about the current police-community relationship and skepticism about the likelihood that policing would change, despite external forces. Very few individuals we spoke with had prior understanding of the Settlement Agreement in Portland or where to find resources about the status of the Settlement Agreement.

*What does the CET want to do in the future?*

The work of the CET has only just begun, and as we are able to get on more and more community groups' agendas, the information we receive will only become greater and greater.  It will take time to establish the necessary relationships with community members and we will continue on that journey.  Based on the engagement we have conducted to-date, the CET is working to review what we have heard from the community and identify how we can continue to incorporate that feedback into our approach. The community is eager to share their perspectives, learn about the Settlement Agreement progress, and improve policing in Portland. We are taking time to continue establishing authentic relationships with community members and working to establish feedback loops that can keep communities informed and connected to this work in ways that are simple and with a low barrier of access.  We will continue to serve as dedicated liaisons for community stakeholders, sending information to the stakeholders, engaging with them regularly, and sharing community input with the entire COCL team.  As part of this, we will continue to attend town halls and help interested community members better understand the reforms under the Settlement Agreement, the progress to-date, and areas where more progress is necessary.  Finally, we will continue assess what we're learning, how we can use that information, and, as necessary, adjust our approach to ensure we are capturing the full landscape of community needs.

> **Next Steps:**
> - Continue to assess what we have heard.
> - Continue to establish relationships.
> - Continue to establish feedback loops.
> - Continue to serve as dedicated liaisons.

**Exhibit A**

# Section III: Use of Force

## A. Use of Force Policy

**Settlement Agreement Paragraph**

66. PPB shall maintain the following principles in its existing use of force policies: (a) PPB shall use only the force reasonably necessary under the totality of circumstances to lawfully perform its duties and to resolve confrontations effectively and safely; and (b) PPB expects officers to develop and display, over the course of their practice of law enforcement, the skills and abilities that allow them to regularly resolve confrontations without resorting to force or the least amount of appropriate force.

67. <u>COCL Summary</u>: Paragraph 67 establishes that PPB shall add several core use of force principles to its force policy: the use of disengagement and de-escalation techniques, calling in specialized units when practical, taking into account all available information about actual or perceived mental illness of the individual, and the appropriate de-escalation of force when no longer necessary. Par. 67 also indicates that the force policy should include mention that unreasonable uses of force shall result in corrective action and/or discipline. (For details and exact language, see the Settlement Agreement)

| Compliance Label | Par. 66 Substantial Compliance |
|---|---|
|  | Par. 67 Substantial Compliance |
| **Methodology** | Review force case sample |

**Compliance Assessment**

As part of our regular review of PPB force events, we evaluated 20 cases that represent a randomly drawn cross section of the PPB's use of force. This includes force from different categories, different precincts, and includes (but was not limited to) force involving the use of a CEW and/or against persons in a mental health crisis. For this quarter, we did not find any cases in which we believed the force was unreasonable or where members did not demonstrate appropriate force avoidance skills. We therefore continue to find that the PPB

**Exhibit A**

and the City have substantially complied with the requirements though maintain our prior suggestion regarding the definition of de-escalation and ensuring data validity with respect to de-escalation reporting.

| | |
|---|---|
| **COCL Recommendations** | • Maintain vigilance in reviewing how de-escalation is defined to ensure that the data surrounding de-escalation does not suffer from validity issues |
| **Assessment Based On** | COCL review of force sample |

## 1. Electronic Control Weapons

| **Settlement Agreement Paragraph** |
|---|
| 68. COCL Summary: PPB shall revise PPB Directive 1051.00 regarding Taser, Less-Lethal Weapons System to include several core principles: Electronic Control Weapons (ECWs) will not be used for pain compliance against those suffering from mental illness or emotional crisis except in rare circumstances; officers shall issue verbal warnings or hand signals (if communication barriers exist); conventional standards for using ECW should be followed (e.g., one ECW at a time, re-evaluation; attempt hand-cuffing between cycles). Officers shall describe and justify their use of ECW in their Force Report and receive annual training in ECW use. (For details and exact language, see the Settlement Agreement.) |

| | |
|---|---|
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review force case sample |

| **Compliance Assessment** |
|---|
| Based on our review of four PPB force events involving CEWs, we find that PPB officers continue to use CEWs in accordance with Par. 68. For this quarter, we reviewed a total of four force events involving an officer's use of a CEW, which represented one-third of the CW events in the quarter and included two of the three events where a CEW was used on a person in mental health crisis. In each case, we found the use of CEW to be reasonable, and no cases involved the use of CEW for pain compliance or involved more than one CEW |

**Exhibit A**

used at a time. For each of the CEW force events, officers were able to place the subject in custody without having to resort to a higher level of force. As a result, we continue to find Substantial Compliance with the requirements of this paragraph.

In our last compliance assessment, we reported two instances in recent quarters in which members had failed to spark test their CEW prior to going on shift, as required by PPB policy. As part of conducting their 2023 weapons qualifications, PPB included a module on CEWs, ensuring that members could demonstrate familiarity with spark testing and informing them of their responsibilities. This is consistent with our prior suggestion and we therefore consider the matter resolved at this time.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | COCL review of CEW cases |

## 2. Use of Force Reporting Policy and Use of Force Report

| **Settlement Agreement Paragraph** |
|---|
| 69. PPB shall revise its policies related to use of force reporting, as necessary, to require that: (a) All PPB officers that use force, including supervisory officers, draft timely use of force reports that include sufficient information to facilitate a thorough review of the incident in question by supervisory officers; (b) All officers involved or witnesses to a use of force provide a full and candid account to supervisors; (c) In case of an officer involved shooting resulting in death, use of lethal force, or an in-custody death, PPB will fulfill its reporting and review requirements as specified in directive 1010.10, as revised. This will take place of Directive 940.00 reports for the purposes of paragraphs 70, and 72-77 of this Agreement. |

| **Compliance Label** | Partial Compliance |
|---|---|
| **Methodology** | Review force case sample |

| **Compliance Assessment** |
|---|

**Exhibit A**

In our review of cases for this quarter, we found that all Force Data Collection and Review (FDCRs) reviewed contained sufficient information to allow a supervisor to conduct a full investigation of the event. Overall, we continue to be impressed with the level of detail officers provide in their reports, which allows supervisors to gain a clear picture of an event (although we await Bureau-wide implementation of BWCs that will provide additional information to supervisors).

However, we continue to find Partial Compliance with this paragraph as a result of a lack of clarity in PPB's description of Control Against Resistance, which impacts how force is reported, investigated, and analyzed. For instance, in this quarter, we identified one case wherein a Control Against Resistance was not reported initially by the officer, and the reviewing sergeant did not identify the oversight. Although PPB's system of force review (see Pars. 70, 73, and 77) led to the oversight being identified during the chain-of-command review, the event continues a trend of inconsistent understanding of when a Control Against Resistance occurs.

Although the cases we have reviewed in this and prior quarters have largely indicated inconsistencies in Control Against Resistance, we note that underlying causes apply to other Category IV force types such as Resisted Handcuffing. We also note from the beginning that there is no evidence that such inconsistency is an attempt to avoid reporting force by PPB members. Rather, the inconsistency appears to lead to both under-reporting as well as over-reporting (for instance, we reviewed one case this quarter where an officer reported a Resisted Handcuffing that was later deemed not to meet the criteria for force).

Instead, the inconsistent reporting appears largely the result of two elements, the first of which is how force types such as Control Against Resistance and Resisted Handcuffing are defined within PPB's current policies or, more accurately, how they are not defined. PPB Directives 1010.00 and 910.00 state "control holds and handcuffing without resistance do not constitute force," though this does not actually define the force types and instead defines what force is not. This does not provide affirmative guidance to officers and may lead to different interpretations.

This leads us to the second contributing factor for inconsistent reporting, which is the unique approach to how force is defined within PPB. As a result of the Settlement Agreement, the PPB defines force in a manner that goes above and beyond the large majority of police departments across the country, which do not include force types like Control Against Resistance and Resisted Handcuffing as reportable force types at all. PPB is therefore in a position of attempting to define something without the benefit of sufficient reference policies to inform the process. Thus, although we maintain that PPB's lack of definition is problematic, we recognize there are few "best practices" in defining these types of events to draw from.

**Exhibit A**

Although we recognize PPB's position in attempting to define these force types, we also recognize that the City and DOJ have agreed that these types of activities do constitute reportable force. Consistent with the COCL's history of "calling balls and strikes," our statements of compliance and associated recommendations merely reflect these agreements, without commentary on their commonality in the broader criminal justice field. Consequently, the inconsistent reporting of these force events must be resolved and we continue to recommend that the PPB review their policies and training to identify opportunities for providing greater clarity with respect to these force types. To their credit, we note that PPB has already taken some steps toward doing so. For instance, the Force Inspector spoke with several agencies at national training, including several agencies from Florida that include similar force types and which may provide definitional guidance. In addition, the PPB included this issue in their 2023 Training Needs Assessment report as a training to be determined. However, in keeping with recommendations we have made since our 2023 Q1 report, we will need to actually see PPB evaluate policy and training to identify opportunities for clarifying Control Against Resistance in order to return to Substantial Compliance.

| | |
|---|---|
| **COCL Recommendations** | • To return to Substantial Compliance, evaluate Directives 1010.00 and 910.00, evaluate current training, and identify opportunities to clarify when officers should be reporting Control Against Resistance<br><br>• Upon issuing such clarification, take corrective action on members who fail to report Control Against Resistance and supervisors who fail to correct the issue |
| **Assessment Based On** | COCL review of force cases |

## 3. Use of Force Supervisory Investigations and Reports

| |
|---|
| **Settlement Agreement Paragraph** |
| 70. COCL Summary: Paragraph 70 states, "PPB shall continue enforcement of Directive 940.00, which requires supervisors who receive notification of a force event to respond to the scene, conduct an administrative review and investigation of the use of force, document their findings in an After Action Report and forward their report through the chain of |

**Exhibit A**

command." Paragraph 70 continues on to describe what is required of supervisory officers when a use of force event occurs, including timeframes for After Action Reports, notification requirements of serious use of force, force against individuals with mental illness, suspected misconduct, procuring medical attention, and officer interviews (For details and exact language, see the Settlement Agreement.).

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review of force cases |

| **Compliance Assessment** ||
|---|---|

In our review of 20 use of force cases, we found for the second straight quarter that all supervisory investigations were thorough and addressed areas identified for improvement during the force event. Overall, the AAR sample we reviewed for this quarter demonstrated supervisors' ability to review force events using a critical eye. In particular, we reviewed cases to ensure that supervisors "determined[d] whether additional training or counseling [was] warranted [and]...provide[d] such counseling or training consistent with this Agreement" (Par. 70(b)) as our prior concerns have mainly pertained to this subsection. For the past two quarters, we have seen consistent instances of supervisors identifying opportunities for improvement during use of force events, documenting their findings, and providing correction to officers where appropriate. Additionally, for the past two quarters, we have not identified any instances where significant opportunities for correction were missed by supervisors in the chain-of-command. As a result of PPB's "consistent and verified performance" in this regard (Par. 33), we now find the PPB has achieved Substantial Compliance with the requirements of Par. 70.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | COCL review of force cases |

**Exhibit A**

| **Settlement Agreement Paragraph** |
|---|
| 71. PPB shall maintain adequate patrol supervision staffing, which at a minimum, means that PPB and the City shall maintain its current sergeant staffing level, including the September 2012 addition of 15 sergeants. |

| | |
|---|---|
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review rate of officers to supervisors |

### Compliance Assessment

The PPB has maintained an adequate patrol supervision staffing level in accordance with Paragraph 71, thus remaining in Substantial Compliance. As noted in prior reports, the rate of officers to sergeants is a better metric than the raw number of sergeants. In the third quarter of 2023, the PPB reported a staffing ratio of 4.9 officers for every sergeant (including acting sergeants) across the three precincts, which remains consistent with the ratio from the second quarter. We continue to find this a reasonable ratio and therefore continue to find Substantial Compliance.

Figure 1. Officers to Sergeant Ratio Q2 2021 - Q3 2023



**Exhibit A**

| **COCL Recommendations** | • No recommendations at this time |
| --- | --- |
| **Assessment Based On** | COCL review of ratio of officers to sergeants |

| **Settlement Agreement Paragraph** |
| --- |
| 72. PPB shall develop a supervisor investigation checklist to ensure that supervisors carry out these force investigation responsibilities. PPB shall review and revise the adequacy of this checklist regularly, at least annually. |

| **Compliance Label** | Substantial Compliance |
| --- | --- |
| **Methodology** | Review current AAR form |

| **Compliance Assessment** |
| --- |
| Presently, the AAR form serves as the checklist of supervisor responsibilities during use of force investigations.  Additionally, with respect to Par. 72's requirement to review and revise the form regularly, this requirement continues to be memorialized in Directive 910 (*Use of Force Reporting, Review, and Investigation*) under Section 5.2, identifying the Force Inspector (or Chief's designee) as the individual responsible for conducting the review.  As part of the Force Inspector's ongoing audit responsibilities, the "adequacy and relevance" (Directive 910.00) of the form is constantly being appraised, meeting Par. 72's requirement.   Therefore, we find that the PPB has remained in Substantial Compliance with the requirements of Paragraph 72. |

| **COCL Recommendations** | • No recommendations at this time |
| --- | --- |
| **Assessment Based On** | COCL review of AAR form |

**Exhibit A**

| Settlement Agreement Paragraph |
|---|
| 73. COCL Summary: Paragraph 73 directs PPB to revise its policies concerning chain of command reviews of After Action Reports (940s) to ensure that the reviews are accurate and thorough; that all comments are recorded in the EIS tracking system; that supervisors in the chain are held accountable for inadequate reports and analysis through corrective action (including training, demotion and/or removable from their supervisory position); and that when use of force is found to be outside of policy, that it be reported and appropriate corrective action be taken with the officer and the investigation itself (For details and exact language, see the Settlement Agreement). |

| Compliance Label | Substantial Compliance |
|---|---|
| **Methodology** | Review force case sample |

| Compliance Assessment |
|---|
| Consistent with our assessment of Paragraph 70, we found that all use of force events for this quarter were thoroughly investigated and reviewed by the entire chain of command. In particular, we reviewed cases with an eye towards subsections (b)[1], (c)[2], and (f)[3] of Par. 73 as our prior compliance concerns mainly pertained to these subsections. For the second straight quarter, we found the entire chain-of-command ensured accurate and complete AARs, regularly identified policy, training, tactical, or equipment concerns, and raised these concerns to the Force Inspector for resolution. As a result of PPB's "consistent and verified performance" in this regard (see Paragraph 33), we now find the PPB has achieved Substantial Compliance with the requirements of Par. 73. |

| **COCL Recommendations** | • No recommendations at this time |
|---|---|

[1] Paragraph 73 (b): "All supervisors in the chain of command are subject to and receive corrective action or discipline for the accuracy and completeness of After Action Reports completed by supervisors under their command."

[2] Paragraph 73 (c): "All supervisors in the chain of command are accountable for inadequate reports and analysis."

[3] Paragraph 73 (f): "Where the use of force indicates policy, training, tactical, or equipment concerns, the immediate supervisor shall notify the Inspector and the Chief, who shall ensure that PPB timely conducts necessary training and that PPB timely resolves policy, tactical, or equipment concerns."

**Exhibit A**

| **Assessment Based On** | COCL review of force cases |
|---|---|

## B. Compliance Audits Related to Use of Force

**Settlement Agreement Paragraph**

74. COCL Summary: Paragraph 74 states that "In consultation with the COCL, the Inspector, as part of PPB's quarterly review of force, will audit force reports and Directive 940.00 Investigation Reports" and will do this to ensure that the officer's force report is complete and accurate and that the officer's actions in the field are in line with PPB policy. The audit of force reports seeks to ensure that force is used in a way that is lawful and appropriate to the circumstances; that de-escalation is used appropriately; that ECW is used appropriately and within policy; and that specialty units and medical care are called in appropriately. In terms of force reporting, the audit seeks to ensure that reports are submitted in a timely manner; that they include detailed information about the event, the decision to use force, the type of force used, any subject resistance and any injuries to the parties; that the report includes the mental health status of the subject of force, documentation of witnesses and contact information, and other details as required by the Settlement. There should be sufficient information in the report to allow supervisors to evaluate the quality of the officer's decision-making regarding the use of force. (For details and exact language, see the Settlement Agreement.)

75. COCL Summary: Paragraph 75 states that, "In consultation with the COCL, the Inspector shall audit force reports and Directive 940.00 investigations" to determine whether supervisors consistently engage in a variety of behaviors when reviewing use of force reports and supervising their employees. Specifically, the Settlement requires that supervisors complete an After Action Report within 72 hours of being notified of the incident; To perform well at this task, supervisors would need to review all use of force reports for completeness, determine whether the officer's actions are consistent with PPB policy, the Settlement Agreement and best practices; and take all appropriate actions as a supervisor, including determining any training or counseling needs for the officer; taking corrective action on omissions or inaccuracies in the force report; notifying appropriate authorities when criminal conduct is suspected; and documenting all of the above-named actions. (For details and exact language, see the Settlement Agreement.)

77. COCL Summary: "In consultation with the COCL, the Inspector shall audit the adequacy of chain of command reviews of After Action Reports." This type of audit by the Inspector will ensure that supervisors at all levels in the chain of command are conscientiously

reviewing all AARs (940s) using the appropriate legal and administrative performance standards, and taking appropriate action. The reviewers of AARs should be assessing the completeness of reports and evaluating the findings using a "preponderance of the evidence" standard. Where appropriate, reviewers should modify findings that do not seem justified, speak with the original investigator, order additional investigations, identify any deficiencies in training, policy or tactics, ensure that supervisors discuss poor tactics with the officer involved, and document the above in EIS. (For details and exact language, see the Settlement Agreement.)

| Compliance Label | Par. 74 Substantial Compliance |
|---|---|
| | Par. 75 Substantial Compliance |
| | Par. 77 Substantial Compliance |
| **Methodology** | Review quarterly Force Audit Report; Review Force Inspector memos; Review Force Inspector Phase II spreadsheet |

<u>**Compliance Assessment**</u>

On a quarterly basis, the PPB conducts the audits of force events required by Paragraphs 74, 75, and 77. As with prior quarters, PPB officers (through FDCRs) and PPB supervisors (through AARs) continue to demonstrate approximately 99 percent accuracy in their reporting, based on the audits. Additionally, combined with our assessments of Pars. 70 and 73, we have now seen consistent efforts by supervisors, chain-of-command reviewers, and (as required by Par. 77) the Force Inspector to conduct thorough and critical evaluations of use of force events, and where issues are identified, take corrective action.

Particularly as it relates to the Force Inspector's responsibility to identify policy, training, and tactical concerns, we continued to see evidence that such concerns are being identified and resolved through formal feedback channels. For instance, during this quarter, the Force Inspector identified provided feedback on several topics, including CEWs, box-ins and rams, member use of profanity, supervisor investigations, and more.  The feedback was sent to those most appropriate to address the feedback, including PPB's policy teams, Training Division, and Precinct commanders.

**Exhibit A**

Consistent with Pars. 74, 75, and 77, the PPB conducts extremely thorough reviews of force events. The audits conducted by PPB routinely find that FDCRs and AARs are accurately completed, that force investigations are systematically performed, and that opportunities for member development and improving force reduction strategies are taken advantage of. In addition, we have now seen successive quarters where all criteria of these paragraphs have been met, including Par. 77(b)[4], (e)[5], and (g)[6] which we identified in our last report as the remaining subsections to be achieved. This now satisfies the COCL's need to observe consistent and verified performance of Pars. 74, 75, and 77 and, accordingly, we now find Substantial Compliance with these paragraphs.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | Review of Force Audit Report; Review of feedback forms |

| **Settlement Agreement Paragraph** |
|---|
| 76. In consultation with the COCL, the Inspector shall conduct a quarterly analysis of force data and supervisors' Directive 940.00 reports designed to: (a) Determine if significant trends exist; (b) Determine if there is variation in force practice away from PPB policy in any unit; (c) Determine if any officer, PPB unit, or group of officers is using force differently or at a different rate than others, determine the reason for any difference and correct or duplicate elsewhere, as appropriate; (d) Identify and correct deficiencies revealed by the analysis; and (e) Document the Inspector's findings in an annual public report. |

| **Compliance Label** | Partial Compliance |
|---|---|

---

[4] Paragraph 77 (b): "Review Directive 940.00 reports to ensure completeness and order additional investigation, when necessary."

[5] Paragraph 77 (e): "Document any training deficiencies, policy deficiencies, or poor tactical decisions, ensure a supervisor discusses poor tactical decisions with the officer and ensure the discussion is documented in EIS."

[6] Paragraph 77 (g): Reports a matter to PSD for review and investigation whenever an investigating supervisor, shift commander or precinct commander finds evidence of apparent misconduct by a PPB officer or employee."

**Exhibit A**

| **Methodology** | Reviewed quarterly Force Reports;  Reviewed SOP #5; Meetings with Force Inspector and other PPB personnel |
|---|---|

### **Compliance Assessment**

For each of the subsections of Paragraph 76, the PPB possesses a tool or process to achieve Substantial Compliance. For instance, in addressing subsection (a), the PPB continues to produce quarterly and annual force reports including several important data points and comparisons to prior quarters. Subsection (a) is also addressed, in part, through the Phase II review wherein the Force Inspector identifies organizational trends. For subsections (b) and (c), the Force Inspector reviews the findings of a comparative analysis of each officer, unit, and group (as defined by common days off), identifying differences and discussing the analysis with each patrol Responsibility Unit (RU) Manager. For subsection (d), the Force Inspector either provides a memo to the RU Manager or creates a manual EIS alert (see also Paragraph 117). Finally, for subsection (e), the Force Inspector memorializes the findings of the reviews in annual reports, including the Annual Force Summary Report and Annual Force Audit Summary Report.

Although we find PPB continues to possess the tools and processes for achieving Substantial Compliance with Par. 76, we continue to find for this quarter that the PPB is in Partial Compliance with this paragraph. This is primarily related past concerns related to subsection (c) ("determine if any officer, PPB unit, or group of officers is using force differently or at a different rate than others, determine the reason for any difference and correct or duplicate elsewhere, as appropriate"). However, during the third quarter (as well as into the fourth quarter), we were able to review more thoroughly PPB SOP #5 (Force Analysis for Supervisors and Teams) and subsequently held meetings with the Force Inspector to gain greater clarity as to how outlying officers are being identified and addressed prior to his meeting with precinct commanders. We will therefore provide additional updates in our next report.  Going forward, we will need to see "consistent and verified performance" (Par. 33) in executing the methodology found in SOP #5, though we find PPB's recent efforts to be responsive to long-standing recommendations for achieving substantial compliance with this paragraph.

Finally, similar to prior reports, we maintain our desire to provide context for PPB's use of force events. PPB continued to use an overall low raw number of force, with the plurality of force events involving Category IV uses of force[7] as the highest category of force within the event. Therefore, when hearing the term "use of force," it would be a mistake for

---

[7] Category IV force includes resisted handcuffing, control against resistance, hobble restraint, pointing of a firearm, firearm–hurt animal, or box-in

**Exhibit A**

community members to automatically picture PPB members using tasers, striking individuals, or otherwise taking physical measures likely to result in injury, rather than reduce the potential for injury. For instance, during this quarter, we reviewed two FDCRs for an event wherein a community member was involved in a serious car accident, resulting in head trauma. In responding to the scene, the community member was confused and disoriented and was resisting AMR personnel's efforts to strap him onto a gurney in order to get him medical attention. PPB officers, recognizing the need to get the man to the hospital, assisted AMR personnel in holding the disoriented man down so AMR could get him strapped in. This individual, who by all accounts was subjected to force for their own benefit, accounted for 1.4 percent of individuals who had Category IV force used against them during the third quarter. We report this not to detract from other, more serious use of force events but rather to provide greater insights into the universe of PPB's force numbers and how the Bureau operationalizes the concept of "force" overall.

| | |
|---|---|
| **COCL Recommendations** | • To achieve Substantial Compliance, maintain communication with COCL regarding the application of SOP #5 to ensure consistent and verified performance as required by the Settlement Agreement |
| **Assessment Based On** | COCL review of quarterly Force Data Summary Reports; COCL review of PPB data; meetings with Force Inspector and other PPB personnel |

**Exhibit A**

# Section IV: Training

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 78. All aspects of PPB training shall reflect and instill agency expectations that officers are committed to the constitutional rights of the individuals who have or are perceived to have mental illness whom they encounter and employ strategies to build community partnerships to effectively increase public trust and safety. To achieve these outcomes, PPB shall implement the requirements below. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | This is a summative judgment that is contingent upon satisfying all paragraphs in Section IV |

| | |
|---|---|
| **Compliance Assessment** | |
| Substantial Compliance with Par. 78 requires the PPB to "implement the requirements below." Because this is a summative paragraph, compliance is assessed in terms of the achievement of all requirements of the Settlement Agreement pertaining to Section IV, Training. During the third quarter of 2023, the PPB achieved Substantial Compliance with all paragraphs in Section IV and we therefore similarly now find Substantial Compliance with Par. 78. | |
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Based On** | Summative and contingent upon satisfying all paragraphs of Section IV, based on the methods identified for each |

**Exhibit A**

## A. Assess Training Needs

**Settlement Agreement Paragraph**

79. The Training Division shall review and update PPB's training plan annually. To inform these revisions, the Training Division shall conduct a needs assessment and modify this assessment annually, taking into consideration: (a) trends in hazards officers are encountering in performing their duties; (b) analysis of officer safety issues; (c) misconduct complaints; (d) problematic uses of force; (e) input from members at all levels of PPB; (f) input from the community; (g) concerns reflected in court decisions; (h) research reflecting best practices; (i) the latest in law enforcement trends; (j) individual precinct needs; and (k) any changes to Oregon or federal law or PPB policy.

| | |
|---|---|
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Interviewed PPB staff; Reviewed 2023 Annual Training Needs Assessment; Reviewed 2023 Training Needs Assessment: Law Enforcement Response to Mass Demonstrations |

**Compliance Assessment**

In the third quarter of 2023, the Training Division provided two reports: (1) 2023 Annual Training Needs Assessment and (2) 2023 Training Needs Assessment: Law Enforcement Repose to Mass Demonstrations. We find that these two documents collectively continue to be responsive to the requirements of the Settlement Agreement and build upon the minimum requirements of Par. 79. For instance, in reviewing the 2023 Annual Training Needs Assessment, the PPB continued to rely on a wide range of sources to inform the needs assessment, including:

*"Independent Police Review reports, use of force data, officer injury data, DOJ and COCL recommendations, the Training Advisory Council, the Behavioral Health Unit and related community advisory committee, Oregon and federal court cases, Portland Police Bureau's (PPB) Force Analysis Summary Reports, training evaluation and learning assessment findings, information from national conferences, Internal Affairs data, pursuit data, police and community survey data, national literature on law enforcement training; and discussions with Bureau managers, City Attorneys, DOJ coordinators, Injury Liaison Program management, Independent Police Review staff, Policy*

**Exhibit A**

> *Analysts, Internal Affairs staff, and Training Division management and lead instructors."*

The PPB then used these sources to identify potential training needs in 19 areas, including areas related to use of force, trends in misconduct reports, crowd management, control tactics, patrol procedures, and COCL and DOJ recommendations for complying with the Settlement Agreement (among other topics).  Some trends identified by the needs assessment included sustained reductions in community complaints, greater community desire for proactive policing and more follow-up to calls and reports by officers, shooting at moving vehicles, distinguishing box-ins and ramming, and extracting uncooperative drivers/passengers from vehicles.  Several of these trends reflect findings of the COCL and DOJ as well and we look forward to observing how the needs are incorporated into future training through the variety of approaches PPB uses, including roll-call training, Tips and Techniques documents, video or virtual training, or direct supervisor discussions.  Given PPB's efforts in identifying training needs in accordance with Par. 79, we continue to find they have maintained Substantial Compliance with this paragraph though maintain our suggestion for closing the gap between identified needs and training plans by using the range of training delivery options available to PPB.

| **COCL Recommendations** | • Reduce the gap between the needs assessment and training plan through other modes of training |
|---|---|
| **Assessment Based On** | Review of the PPB's internal training documents and interviews with PPB personnel |

## B. Evaluate Training

> ### Settlement Agreement Paragraph
>
> 80. Within 180 days of the Effective Date, PPB shall develop and implement a process that provides for the collection, analysis, and review of data regarding the effectiveness of training for the purpose of improving future instruction, course quality, and curriculum. These evaluations shall measure and document student satisfaction with the training received; student learning as a result of training; and the extent to which program graduates are applying the knowledge and skills acquired in training to their jobs. This audit shall be reported to the Training Division Manager and shall include student evaluations of the program and the instructor.

**Exhibit A**

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Interviewed PPB staff and reviewed internal training documents; Assessed the methods of evaluation, content, and the presence of a complete evaluation system with feedback loops |

**Compliance Assessment**

During the third quarter of 2023, the Training Division provided an evaluation report on their 2022 Enhanced Crisis Intervention Training, The report gathers feedback from 20 PPB members who received ECIT training in 2022, including immediate feedback (i.e., upon completion of training modules) as well as a follow-up survey conducted four (4) months post-training. The report continues to depict positive reaction to the PPB's ECIT training, finding modules to be informative and relevant to members' ECIT job responsibilities. In addition, the report notes improvements in some areas compared with prior reports. For instance, the authors noted that 70 percent of respondents agreed or strongly agreed with the statement that most officers understand the role of ECIT officers and what services they provide, compared with 51 percent agreement with this item in 2020 (though the report continues to find that there is room for further clarification in this regard). Furthermore, the report evaluates on-the-street outcome measures to determine operational impacts, finding that the ECIT program overall is accomplishing its intended objectives. Overall, the report demonstrates and ongoing dedication to evaluating the impact of ECIT training and identifying potential areas for improvement.

Aside from the ECIT training evaluation, the documents and evidence provided by PPB continue to demonstrate a comprehensive evaluation process for training overall. For this quarter, we were provided evaluation material pertaining to Advanced Academy, in-service, supervisor's in-service, an ABLE scenario, BWCs, and online training. We therefore find that the PPB continues to operate a robust training evaluation program.

The COCL continues to suggest the incorporation of a contact survey to measure on-the-job performance of critical training objectives, such as procedurally just behaviors by officers. We maintain that data generated from a contact survey program, along with data from the new BWC program, would help ensure equitable treatment for all groups and lead to important changes in training, coaching, and supervision. Absent a contact survey (which remains a more reliable way to gather perceptions of police interactions), we suggest that the PPB and City, at the least, complete an updated citywide survey to

**Exhibit A**

| | |
|---|---|
| determine whether findings from prior citywide surveys have held steady and whether the data indicate areas for improvement. ||
| **COCL Recommendations** | • Enhance evaluation efforts to better capture on-the-street behavior through surveys and BWC review |
| **Assessment Based On** | COCL review of training evaluation tools, quality of data, and systems of reporting and feedback |

# C. Document Training Delivered and Received

| | |
|---|---|
| **Settlement Agreement Paragraph** ||
| 81. PPB shall ensure that the Training Division is electronically tracking, maintaining, and reporting complete and accurate records of current curricula, lesson plans, training delivered, attendance records, and other training material in a central, commonly accessible, and organized file system. Each officer's immediate supervisor shall review the database for the officers under his/her command at least semi-annually. ||
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Reviewed LMS records for the third quarter of 2023 |
| **Compliance Assessment** ||
| The Training Division continues to use the Cornerstone LMS to record officer training and provide a range of online trainings. LMS attendance records include all in-person (such as in-service training) and online trainings completed by PPB members. In the third quarter of 2023, online trainings included training on eight directives, four City Attorney's Office Legal Update modules, one Tips and Techniques training related to BWCs, a training related to Portland Community Justice Partnership and Restorative Justice Referrals, and a training related to the use of video evidence when investigating force. In addition, the PPB has maintained its process for ensuring compliance with Oregon training standards, including through the use of reminder emails, noncompliance memos to the Chief's office, ||

**Exhibit A**

and supervised completion of training. Supervisors also review the database during officers' annual performance review as well as when any transfer occurs (e.g., when an officer transfers to a new supervisor or a supervisor transfers to a new unit or precinct).

Additionally during Q3, the PPB implemented SOP 10-10 (*Skills Certification Tracking With LMS*) which creates a centralized database that contains certification records for specialty assignments (e.g., ECIT or AR-15 certification). The need for such a database was discovered during an audit of the Training Division conducted by the Office of Inspector General (OIG) and the Training Division's responsiveness to the identified deficiency demonstrates the type of self-evaluation and remediation process that the Settlement Agreement intended to foster within PPB. As a result, we find that the PPB has returned to Substantial Compliance with the requirements of this paragraph.

| **COCL Recommendations** | • No recommendations at this time |
| --- | --- |

| **Settlement Agreement Paragraph** |
| --- |
| 82. PPB shall report training delivered and received semi-annually to the Assistant Chief of Operations and, during the pendency of this Agreement, to DOJ. |

| **Compliance Label** | Substantial Compliance |
| --- | --- |
| **Methodology** | Review Semi-Annual Training Reports |

| **Compliance Assessment** |
| --- |
| In July, the PPB provided two reports on training received during the first and second quarters of 2023, including internal trainings and external trainings attended by PPB members. These reports were provided to the Deputy Chief and Assistant Chief of Operations in accordance with the requirements of this paragraph. We therefore continue to find Substantial Compliance with the requirements of Par. 82. |

**Exhibit A**

| | |
|---|---|
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Based On** | Delivery and content of Semi-Annual Training Reports |

## D. Trainer Qualifications

| **Settlement Agreement Paragraph** |
|---|
| 83. PPB shall institute guidelines to govern its selection of officers that serve as trainers and shall ensure that those officers do not have a history of using excessive force. The trainer selection guidelines shall prohibit the selection of officers who have been subject to disciplinary action based upon the use of force or mistreatment of people with mental illness within the three (3) preceding years, or twice in the preceding five (5) years and will take into account if a civil judgment has been rendered against the City in the last five (5) years based on the officer's use of force. |

| | |
|---|---|
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Reviewed "Work History Review Sheet" for Q3 hires and ensured that the PPB is following SOP #1-19 standards |

| **Compliance Assessment** |
|---|
| During the third quarter of 2023, we reviewed the Work History Review Sheet for one officer who was assigned to the Training Division pursuant to the process found in SOP #1-19. For the officer, the PPB found no evidence of civil judgments, discipline, or mistreatment of people with mental illness as defined in Paragraph 83. We therefore continue to find Substantial Compliance with the requirements of this paragraph. |

| | |
|---|---|
| **COCL Recommendations** | • No recommendations at this time |

**Exhibit A**

| **Assessment Based On** | COCL review of "Work History Review Sheet" and SOP. #1-19 standards |
|---|---|

# E. Deliver Appropriate and High-Quality Training

**Settlement Agreement Paragraph**

84. (<u>COCL Summary</u>) Paragraph 84 describes the content and delivery of training that is expected for patrol officers and supervisors. PPB is expected to develop and implement a high-quality system of training that is consistent with PPB's policies as well as federal and state laws, and must cover specific topics, including use of force, de-escalation techniques, procuring medical care, proactive problem solving, civil and criminal liability, and positive communication skills. PPB training is also required to give particular attention to police responses to individuals who have, or are perceived to have, mental illness. PPB's training of officers must include "role playing scenarios and interactive exercises that illustrate proper use of force decision making" as well as peer intervention. In addition to all sworn personnel, paragraph 84 requires supervisor training, including conducting use of force investigations, evaluation of officer performance, and positive career development/disciplinary actions.

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Reviewed lesson plans and training materials; Observed training in-person |

**Compliance Assessment**

During the third quarter of 2023, the PPB began delivering their Fall in-service courses which included modules on equity, mental health, crime scene management, active bystander for law enforcement (ABLE), body-worn camera policy, legal updates and firearms/use of force.  Prior to PPB delivering the training, the COCL team had the opportunity to review course curriculums and provide comments, though we found the training to be overall consistent with the requirements of Par. 84.  Additionally, during the third quarter, several members of the COCL team observed training provided as part of the body-worn camera pilot (see our assessment of Par. 194).  Finally, during the third quarter,

**Exhibit A**

the COCL team provided comments and feedback on a supervisor's in-service training, though this training was not delivered until the fourth quarter.  Overall, the COCL team continues to believe that training is developed in accordance with the need to provide members refresher information on their specific responsibilities.  As such, we continue to find Substantial Compliance with the requirements of this paragraph though maintain our ongoing suggestions for maintaining and expanding efforts to further include concepts related procedural justice and legitimacy.

| **COCL Recommendations** | • Maintain and, where needed, expand efforts to further include concepts related to procedural justice and legitimacy |
|---|---|
| **Assessment Based On** | COCL's observation/assessment of training content, delivery, and consistency with adult-learning principles and best practices; processes described by PPB personnel |

## F. Audit the Training Program

| **Settlement Agreement Paragraph** |
|---|
| 85. In consultation with the COCL, the Inspector shall audit the training program using the following performance standards to ensure that PPB does the following: (a) Conducts a comprehensive needs assessment annually; (b) Creates a Training Strategic Plan annually; (c) Within 180 days of the Effective Date, develops and implements a process for evaluation of the effectiveness of training; (d) Maintains accurate records of Training delivered, including substance and attendance; (e) Makes Training Records accessible to the Director of Services, Assistant Chief of Operations, and DOJ; (f) Trains Officers, Supervisors, and Commanders on areas specific to their responsibilities; and (g) Ensures that sworn PPB members are provided a copy of all PPB directives and policies issues pursuant to this Agreement, and sign a statement acknowledging that they have received, read, and had an opportunity to ask questions about the directives and/or policies, within 30 days of the release of the policy. |

| **Compliance Label** | Substantial Compliance |
|---|---|

**Exhibit A**

| Methodology | Review of audit report for accuracy and completeness |
|---|---|

| | **Compliance Assessment**<br><br>The OIG completed a comprehensive audit of PPB's training program on December 30, 2022, thereby demonstrating that the Bureau has a system in place that complies with the basic requirements of Paragraph 85. We therefore continue to find Substantial Compliance with the requirements of this paragraph. However, we maintain our suggestions for future audits and overall Training Division operations. |
|---|---|

| **COCL Recommendations** | • The next audit of the Training Division should give special attention to civilianization, including the level of support for the Director of Education and instructor development classes<br><br>• A future audit should give attention to the content of in-person training for officers and supervisors, with particular attention to the quality of instruction on equity, procedural justice, and de-escalation<br><br>• In terms of a training needs assessment, the community should play a bigger role in setting training priorities because it is the recipient of police services<br><br>• Given the critical importance of training in police reform, the City and PPB should invest more in Training Division personnel so more instruction can be delivered |
|---|---|
| **Assessment Based On** | COCL's review of the audit report based on identified needs of the Training Division, auditing standards, and the timeline for completion of the audit |

# G. Analyze and Report Force Data

| **Settlement Agreement Paragraph** |
|---|

**Exhibit A**

86. In consultation with the COCL, the Inspector shall gather and present data and analysis on a quarterly basis regarding patterns and trends in officers' uses of force to the Chief, the PPB Training Division, and to the Training Advisory Council. The Training Division and Training Advisory Council shall make recommendations to the Chief regarding proposed changes in policy, training, and/or evaluations based on the data presented. The Inspector shall also, in coordination with the COCL and PSD, identify problematic use of force patterns and training deficiencies. The Chief's Office shall assess all use of force patterns identified by the Training Division and/or Training Advisory Council and timely implement necessary remedial training to address deficiencies so identified.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Reviewed TAC meeting agenda and minutes; Reviewed TAC reports and recommendations |

**Compliance Assessment**

The Force Inspector continues to gather force data on a quarterly basis and examine it for patterns and trends (See Section III on Use of Force). During this quarter, there were two TAC meetings; the first involved a presentation by the outgoing Force Inspector, and the second involved an introduction to the incoming Force Inspector as well as a Q/A session. To inform this Q/A session, TAC members provided comments and questions prior to the meeting, allowing the Force Inspector to provide responses during the meeting rather than requiring follow-up at a later date and leading to a more engaged meeting. We therefore continue to find the PPB has substantially complied with the requirements of this paragraph.

Although we continue to find Substantial Compliance with Par. 86, we take a moment to respond to a point raised by several TAC members during the September meeting about the format of the presentations to the TAC. In several places, the Force Inspector appears to state that the format of the presentations is fixed based on prior agreements between the PPB, DOJ, and COCL. We note that the current format was merely determined to meet the minimum criteria for compliance with the Settlement Agreement and, where TAC members have expressed a desire for other analyses, the COCL has never been of the position that the Settlement Agreement would preclude. Rather, Par. 86 requires a presentation of "patterns and trends" that will allow the TAC "make recommendations to the Chief regarding proposed changes in policy, training, and/or evaluations based on the data presented." Although we continue to find presentations on PPB's quarterly use of

**Exhibit A**

force summary reports satisfy this criterion, this is only one way that Substantial Compliance can be achieved and maintained. Moving forward, the PPB should work with the TAC to identify analyses that will be most useful to the TAC's mission. Should the TAC consider the quarterly use of force summary reports to achieve this, we would continue to find Substantial Compliance. However, should the TAC desire supplemental analyses and provide PPB with notice of what those analyses might reasonably look like, we do not hold the position that Substantial Compliance would be automatically lost by doing so.

| **COCL Recommendations** | • Work with the TAC to identify analyses that will be most useful to the TAC's mission |
|---|---|
| **Assessment Based On** | The PPB's presentation of quarterly force reports and inclusion of trends; The TAC's recommendations; The PPB's responsiveness to the TAC's recommendations |

| **Settlement Agreement Paragraph** | |
|---|---|
| 87. Training Advisory Council meetings will be open to the public unless the matter under discussion is confidential or raises public safety concerns, as determined by the Chief. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review of the PPB website regarding the TAC; Review TAC agendas and minutes; Observe TAC meetings |
| **Compliance Assessment** | |
| The two TAC meetings held in the third quarter of 2023 were open to the public as required by Paragraph 87. The COCL continues to observe these meetings virtually and/or review transcripts of the meetings we continue to public comment and participation on the meetings. The PPB continues to use a public email distribution list to send reminders of | |

| | |
|---|---|
| the meetings to the public. The PPB also continues to post TAC meeting agendas and minutes on the PPB's website.[8] | |
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Based On** | COCL review of information available on the PPB website; COCL observation of TAC meetings and review of TAC transcripts |

---

[8] https://www.portland.gov/police/tac/events/past

**Exhibit A**

# Section V: Community-Based Mental Health Services

---

**Settlement Agreement Paragraph**

88. The absence of a comprehensive community mental health infrastructure often shifts to law enforcement agencies throughout Oregon the burden of being first responders to individuals in mental health crisis. Under a separate agreement, the United States is working with State of Oregon officials in a constructive, collaborative manner to address the gaps in state mental health infrastructure. The state-wide implementation of an improved, effective community-based mental health infrastructure should benefit law enforcement agencies across the State, as well as people with mental illness. The United States acknowledges that this Agreement only legally binds the City to take action. Nonetheless, in addition to the City, the United States expects the City's partners to help remedy the lack of community-based addiction and mental health services to Medicaid clients and uninsured area residents. The City's partners in the provision of community-based addiction and mental health services include: the State of Oregon Health Authority, area Community Care Organizations ("CCOs"), Multnomah County, local hospitals, health insurance providers, commercial health providers, and existing Non-Governmental Organizations ("NGOs") such as community-based mental health providers, and other stakeholders.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Monitor the City and PPB's continuing work with community partners |

**Compliance Assessment**

This paragraph is assessed based on the City and the PPB's continuing relationships with community partners. As this is a summative paragraph, compliance is dependent upon compliance with other paragraphs within this section. With all other paragraphs within this section remaining in Substantial Compliance, so too does Par. 88.

---

**Exhibit A**

| COCL Recommendations | • No recommendations at this time |
|---|---|
| Assessment Based On | N/A – Summative paragraph |

| | |
|---|---|
| **Settlement Agreement Paragraph** | |

89. The United States expects that the local CCOs will establish, by mid-2013, one or more drop-off center(s) for first responders and public walk-in centers for individuals with addictions and/or behavioral health service needs. All such drop off/walk in centers should focus care plans on appropriate discharge and community-based treatment options, including assertive community treatment teams, rather than unnecessary hospitalization.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review status of Unity Center; Interview with PPB personnel |

**Compliance Assessment**

The COCL continues to acknowledge that the focus of Paragraph 89 is on the Community Care Organizations and the expectation that they establish one or more drop-off center(s). The Settlement Agreement does not hold any authority over these organizations, but our assessment remains focused on the City's activities and reasonable expectations regarding their involvement with the drop-off/walk-in center(s).

Related to the focus of Paragraph 89, the Unity Center remains the drop-off center for individuals experiencing behavioral health needs. The facility has been operating in this capacity since it opened in May 2017. The PPB has two policies related to this paragraph, including Directive 850.21 (Peace Officer Custody [Civil]) and 850.25 (Police Response to Mental Health Facilities). These directives provide the protocol for officers to contact AMR for ambulance transport to the Unity Center. Since the opening of the Unity Center, a Transportation Workgroup has met as necessary to discuss the operation of the Center. This workgroup includes members of Unity, the PPB, AMR, Multnomah County, and Legacy

**Exhibit A**

ED Health. No issues related to transportation or interactions with PPB members have been identified for several quarters, though PPB remains prepared to meet as issues arise. Based on the PPB and the City's efforts to-date, we believe they have substantially complied with all reasonable expectations for them related to this paragraph.

| **COCL Recommendations** | • No recommendations at this time |
| --- | --- |
| **Assessment Based On** | Status of Unity Center and PPB policies |

| **Settlement Agreement Paragraph** |
| --- |
| 90. The CCOs will immediately create addictions and mental health-focused subcommittee(s), which will include representatives from PPB's Addictions and Behavioral Health Unit ("ABHU") [Now called Behavioral Health Unit or "BHU"], the ABHU Advisory Board [Now called the BHU Advisory Committee or "BHUAC"], Portland Fire and Rescue, Bureau of Emergency Communications ("BOEC") and other City staff. These committees will pursue immediate and long-term improvements to the behavioral health care system. Initial improvements include: (COCL Summary) increased sharing of information (subject to lawful disclosure); creation of rapid access clinics; enhanced access to primary care providers; expanded options for BOEC operators to divert calls to civilian mental health services, addressing unmet needs identified by Safer PDX; expanding and strengthening networks of peer mediated services; and pursue tele-psychiatry. |

| **Compliance Label** | Substantial Compliance |
| --- | --- |
| **Methodology** | Review Community Outreach Meeting minutes; Review Portland State University evaluation on PSR |

| **Compliance Assessment** |
| --- |
| As with the above paragraph, Paragraph 90 contains expectations for CCOs to create subcommittees for the PPB to serve on and include a list of initial goals to be accomplished. |

**Exhibit A**

However, CCOs are not under the authority of the Settlement Agreement, and we therefore evaluate the City only on what can reasonably be expected of the agency given the lack of opportunity from CCOs.

During the third quarter of 2023, the Service Coordination Team (SCT) manager continued to attend the Legacy Community Outreach meeting with community partners. The program met two times (August 22 and September 6) and minutes and a resource list were provided for those meetings. At the August meeting, two community groups presented, the Everly Project and Help Me Grow (Swindells Resource Center at Providence). The Everly Project is a harm reduction program and shared information about what they offer as well as provided contact information. Help Me Grow focuses on providing assistance to young children and families. In their presentation, the group shared how to refer families to the services. At the September meeting, presentations were made by Harmony Academy and Tri-County 911. Harmony Academy is a high school for students in recovery; at the meeting they provided information about enrollment and contact information. Tri-County 911 is a program that tries to connect individuals with sustainable care as a means to reduce the demand on EMS. The program shared their contact information and how they receive referrals. The SCT continued attendance at these meetings since 2015 has been a great way to stay up to date on programs and community resources. Staying involved in such outreach helps the BHU maintain a proactive and preventative approach to criminal justice involvement.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | PPB involvement with Behavioral Health Collaborative Team; PPB involvement with Legacy ED Community Outreach |

**Exhibit A**

# Section VI: Crisis Intervention

## A. Addictions and Behavioral Health Unit and Advisory Committee

**Settlement Agreement Paragraph**

91. In order to facilitate PPB's successful interactions with mental health consumers and improve public safety, within 60 days of the Effective Date, PPB shall develop an Addictions and Behavioral Health Unit ("ABHU") within PPB. PPB shall assign command-level personnel of at least the rank of Lieutenant to manage the ABHU. ABHU shall oversee and coordinate PPB's Crisis Intervention Team ("C-I Team"), Mobile Crisis Prevention Team ("MCPT"), and Service Coordination Team ("SCT"), as set forth in this Agreement.

*[As a point of clarification, since the writing of the Agreement, the ABHU is known as Behavioral Health Unit ("BHU"), the C-I Team is known as Enhanced Crisis Intervention Team ("ECIT"), and the MCPT is known as Behavioral Health Response Team ("BHRT"). Discussion of these entities, and their reference in subsequent Agreement paragraphs, will use their current nomenclatures].*

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review Behavioral Health Unit (BHU) structure |

**Compliance Assessment**

Regarding personnel and the BHU's general oversight, the BHU continues to conform to the requirements of Paragraph 91, as evidenced by the BHU structure and our observations of the BHU coordinating ECIT, BHRT, and SCT operations. Although the BHU provides oversight to the ECIT program (including ECIT training, dispatch criteria, data collection, etc.), ECIT officers report directly to their precinct level chain of command. This command structure conforms to the Memphis Model. There have been no major changes to the structure of the unit, and the PPB is expected to provide updates on personnel changes.

**Exhibit A**

In the third quarter of 2023, PPB provided the COCL with the organization chart for the Specialized Resources Division, which houses the BHU. PPB shared that one of the two sergeants within BHU will be taking sabbatical for a year to further their education and their plan is to cover this position in house. In addition, in the third quarter, the BHU relocated to a new building that expands accessibility for the community by offering a more centralized location and providing free parking. Based on the PPB's ongoing unit structure, we continue to find that the PPB remains in Substantial Compliance with this paragraph.

| **COCL Recommendations** | • Continue to update the COCL and DOJ on changes to personnel when applicable |
|---|---|
| **Assessment Based On** | COCL review of unit structures and personnel |

| **Settlement Agreement Paragraph** |
|---|
| 92. [BHU] will manage the sharing and utilization of data that is subject to lawful disclosure between PPB and Multnomah County, or its successor. PPB will use such data to decrease law enforcement interactions or mitigate the potential uses of force in law enforcement interactions with consumers of mental health services. |
| 93. [BHU] shall track outcome data generated through the [ECIT], [BHRT], and SCT, to: (a) develop new response strategies for repeat calls for service; (b) identify training needs; identify and propose solutions to systemic issues that impede PPB's ability to provide an appropriate response to a behavioral crisis event; and (c) identify officers' performance warranting commendation or correction. |

| **Compliance Label** | 92. Substantial Compliance |
|---|---|
| | 93. Substantial Compliance |

| **Methodology** | Review Behavioral Health Unit Coordination Team (BHUCT), BHRT, and SCT coordination team meeting agendas and minutes; Review ECIT, BHRT, and SCT outcome measures |
|---|---|

## Compliance Assessment

The PPB continues to utilize a number of work groups to collaborate on ways to "decrease law enforcement interactions [and] mitigate the potential uses of force in law enforcement interactions with consumers of mental health services" (Paragraph 92). During the third quarter of 2023, the BHU staff continued to meet weekly to discuss the BHRT caseload, and the BHUCT met on a biweekly basis to discuss current and potential BHRT clients. The BHUCT is composed of several community partners, including representatives from Multnomah County, Cascadia, and federal/state law enforcement. The PPB provided us with meeting minutes and agendas indicating that a core group of partners attends consistently, with other partners attending as needed.

The discussions during these meetings are designed to problem solve and create strategies to reduce future criminal justice contacts for individuals who have frequent contact with the police but have been difficult to engage in ongoing services. BHU personnel indicate that information about the individuals discussed is shared only if it is subject to lawful disclosure. BHU personnel indicate that the creation of the BHUCT has been a particularly valuable collaborative strategy.

The SCT also conducts weekly meetings to discuss potential clients and make determinations about eligibility for SCT services. The meetings include community partners and representatives from various entities in Multnomah County. The meetings also review current SCT clients to "facilitate continuation of care" for clients. We believe these meetings meet the spirit of Paragraph 92.

The PPB continues to provide the COCL with the documentation for all meetings occurring within the BHU, including minutes from each SCT, BHU, and BHUCT meeting. In addition, the PPB provided the COCL with copies of the BHRT flyers used to communicate with partners about individuals they are trying to connect with services. This information is supplemented by data collected on the Mental Health Template (MHT) that identifies individuals and locations with repeat calls for service and develops response strategies.

Relevant outcome measures are collected for BHRT and SCT, and the PPB provides the COCL with quarterly reports summarizing these data. The BHU system has multiple avenues for sharing and receiving information with such entities as the BHUCT, Behavioral

**Exhibit A**

Health Call Center (BHCC), BOEC, and BHUAC. Thus, we find that the PPB remains in Substantial Compliance with the requirements of Paragraphs 92 and 93.

| **COCL Recommendations** | • Continue to collect and review data on mental health services, and use this information to update services as needed |
|---|---|
| **Assessment Based On** | BHUCT, BHRT, and SCT coordination meeting agendas and minutes; ECIT, BHRT, and SCT outcome measures |

### Settlement Agreement Paragraph

94. Within 90 days of the Effective Date, PPB shall also establish a [BHU] Advisory Committee. The [BHU] Advisory Committee shall include representation from: PPB command leadership, [ECIT], [BHRT], and SCT; BOEC; civilian leadership of the City government; and shall seek to include representation from: the Multnomah County Sheriff's Office; Oregon State Department of Health and Human Services; advocacy groups for consumers of mental health services; mental health service providers; coordinated care organizations; and persons with lived experience with mental health services.

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Review BHUAC roster of members; Review BHUAC minutes; Observe BHUAC meetings |

### Compliance Assessment

In the third quarter of 2023, the BHUAC continued to meet regularly, holding meetings on August 23 and September 27. The minutes of these meetings have been documented and shared with the COCL and can be found on the PPB's website (https://www.portland.gov/police/bhu-advisory/documents).

Membership requirements of BHUAC as outlined in Paragraph 94 continue to be met, with a current roster of 17 voting members, representing a variety of entities involved in the mental health response systems. The membership of BHUAC continues to represent a

**Exhibit A**

variety of community partners. For the two meetings held in the third quarter, a quorum was met for one meeting (August 23) and the July meetings was cancelled due to low availability. We will continue to monitor the ability of BHUAC to meet with a sufficient number of members in future quarters and, as necessary, suggest PPB identify ways to encourage members should future quarters have similar low attendance. However, for this quarter, we continue to find the PPB to be in Substantial Compliance with this paragraph.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | BHUAC roster; BHUAC minutes; Observations of BHUAC meetings |

| **Settlement Agreement Paragraph** | |
|---|---|
| 95. The [BHU] Advisory Committee shall provide guidance to assist the City and PPB in the development and expansion of [ECIT], [BHRT], SCT, BOEC Crisis Triage, and utilization of community-based mental health services. The [BHU] Advisory Committee shall analyze and recommend appropriate changes to policies, procedures, and training methods regarding police contact with persons who may be mentally ill or experiencing a mental health crisis, with the goal of de-escalating the potential for violent encounters. The [BHU] Advisory Committee shall report its recommendations to the [BHU] Lieutenant, PPB Compliance Coordinator, COCL (as described herein), and the BOEC User Board. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review BHUAC minutes; Observe BHUAC meetings |
| **Compliance Assessment** | |
| Paragraph 95 envisions that BHUAC committee members will assist "the City and PPB in the development and expansion of [ECIT], [BHRT], SCT, BOEC Crisis Triage, and utilization of community-based mental health services." BHUAC continued to meet in the third quarter of 2023 and meeting agendas included a variety of topics. | |

**Exhibit A**

The August meeting had a presentation by PPB on the proposal of a dedicated ECIT Response car. To help meet ECIT call demand, there would be a car with ECIT officers on overtime specifically during times with a high volume of ECIT calls. The BHU plans to implement a 30-day pilot program to evaluate this initiative. The members of the committee discussed ECIT typical operation and how best to utilize this additional ECIT response car. In addition, members pointed out that since it would use officers on overtime, that it is important to be mindful of burnout and compassion fatigue and this should be tracked and monitored. The committee formally approved and recommended this 30-day pilot period and PPB plans on providing a follow up presentation to update the committee with results.

Another presentation by PPB addressed updates to  SOP 1-3 (CIT Coordinator) and Directive 850.20 (Police Response to Mental Health Crisis). For SOP 1-3, the committee had no recommended revisions. For Directive 850.20,the committee brought up many concerns, including the lack of mention of PSR and 988. There are difficulties with including PSR specifically as they operate under another entity. BHUAC members proposed that there should be inclusion of other diversion options as a part of the policy. Another member pointed out the directive are supposed to guide officers, but do not include all options, rather training helps officers put the directive into action and understand the range of responses to various situations. During the conversation many questions were raised about how PSR, PPB, Project Respond are coordinating and a BOEC representative said they would plan on making a presentation to the committee to highlight this coordination. The final agenda item was a discussion on recruiting new BHUAC membership.

At the September meeting, the first presentation was a follow-up report on the ECIT Certification Course. After the 2023 ECIT certification course, all 20 new graduates reported having confidence in communicating with and de-escalating individuals in crisis. The training implemented a lot more of a hands-on learning approach and at times it was difficult to fit the course in the allotted time. Future training will try to correct this. A member of the BHUAC was able to attend the dry run and found it beneficial. Another presentation served as a follow up to the previous meeting, as it provided a general introduction into PPB Directives. This included the purpose of the directives and how they are formed and reviewed. The committee can help guide this process by making recommendations based off their expertise, and in the past their input has been very helpful. The final presentation was by a BHRT team (clinician and officer) on a specific case study of an individual they are trying to help. The BHRT sought suggestions for how to better help the individual and the members were able to provide input. Overall, it was agreed that being presented case studies of complex cases would be a beneficial use of the

**Exhibit A**

members' expertise, and they welcome future case to help with problem solving. The September meeting ended with discussing possible individuals who could be brought on as members for the BHUAC.

Overall, the presentations and discussions were thorough and satisfied the COCL's understanding of the BHUAC purpose and we therefore continue find Substantial Compliance with the requirements of this paragraph.

| **COCL Recommendations** | • Ensure an ongoing quorum through increasing membership or substituting representatives who are able to attend more regularly for those who frequently cannot |
|---|---|
| **Assessment Based On** | Review of BHUAC minutes and agendas; Observation of BHUAC meetings |

| **Settlement Agreement Paragraph** | |
|---|---|
| 96. Within 240 days of the Effective Date of this Agreement, the [BHU] Advisory Committee will provide status reports on the implementation of the [BHU] and BOEC Crisis Triage, and identify recommendations for improvement, if necessary. PPB will utilize the [BHU] Advisory Committee's recommendations in determining appropriate changes to systems, policies, and staffing. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review BHUAC recommendations found in BHUAC minutes |
| **Compliance Assessment** | |

In accordance with Paragraph 96, BHUAC continues to provide the COCL with a report of their votes and recommendations for the implementation of the BHU and BOEC. In the third quarter of 2023, the BHUAC made one formal recommendation. The committee formally recommended the proposed 30-day pilot period for the ECIT response car. The recommendation also stated that there should be a follow-up presentation with the results

**Exhibit A**

after this period. The BHU responded that although they appreciated this recommendation, the new budget forecast might prohibit this program. The BHU noted that 20 new ECIT officers were added to the roster and they will re-assess the need for a specific ECIT response car after evaluating the impact of these additional ECIT officers. As this process follows what is envisioned by paragraph 96, we find the PPB to be in substantial compliance with the paragraph.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | BHUAC status reports and recommendations; PPB responses to BHUAC recommendations |

## B. Continuation of C-I Program

| **Settlement Agreement Paragraph** |
|---|
| 97. PPB provides C-I Training to all its officers. C-I is a core competency skill for all sworn police officers in the City. PPB shall continue to train all officers on C-I. |
| 98. PPB agrees to continue to require a minimum of 40 hours of C-I training to all officers before officers are permitted to assume any independent patrol or call-response duties. Additionally, PPB shall include C-I refresher training for all officers as an integral part of PPB's on-going annual officer training. PPB's Training Division, in consultation with [BHU] Advisory Committee, shall determine the subjects and scope of initial and refresher C-I training for all officers. |

| **Compliance Label** | 97. Substantial Compliance |
|---|---|
| | 98. Substantial Compliance |
| **Methodology** | Review of PPB in-service training |

**Exhibit A**

**Compliance Assessment**

The PPB continues to emphasize crisis response as a core competency in its training. For instance, all officers are required to receive a minimum of 40 hours of crisis intervention training prior to graduating from the Advanced Academy. The Advanced Academy that began in May of 2023 ended in August 2023, with 23 individuals graduating. The 23 new recruits received nine hours of Crisis Intervention training in the third quarter. Altogether, the recruits received 13.5 hours of Crisis Intervention training in the Advanced Academy, complementing the 28 hours of crisis intervention training that all recruits get in the statewide Department of Public Safety Standards & Training Basic Academy, resulting in, and in fact exceeding, the 40 hours of required crisis intervention training.

In addition, the PPB Training Division started another Advanced Academy for new recruits in the third quarter. The 23 individuals in the new training group has so far received six hours of Crisis Intervention training.

Regarding refresher training, the PPB provided 2.5 hours of mental health training during the second half of in-service training, which started in the third quarter and will continue throughout the fourth quarter. We therefore continue to find Substantial Compliance with the requirements of this paragraph, though we maintain our suggestion from prior reports.

| | |
|---|---|
| **COCL Recommendations** | • Consider seeking BHUAC input during training development rather than after training has been developed |
| **Assessment Based On** | PPB in-service training |

## C. Establishing "Memphis Model" Crisis Intervention Team

**Settlement Agreement Paragraph**

99. Within 120 days of the Effective Date, PPB shall establish a Memphis Model Crisis Intervention team ("[ECIT]").

**Exhibit A**

| Compliance Label | Substantial Compliance |
| --- | --- |
| Methodology | Review BHU/ECIT data; Interview PPB personnel; Review MHT data; Review BOEC data |

| **Compliance Assessment** |
| --- |
| The PPB continues to operate under a modified Memphis Model of crisis intervention. In this specialized response system, a select group of officers receive an additional 40 hours of training to become ECIT officers. As part of ECIT operations, the PPB has Directive 850.20 (Police Response to Mental Health Crisis), which was revised during the third quarter and presented to officers during the third-quarter in-service training. Along with discussing the revisions, the PPB provided a brief training that distinguished differences between the roles and responsibilities of ECIT, PSR, and Project Respond. We therefore continue to find that the PPB has sufficiently memorialized their crisis response model in both policy and training. |
| In the third quarter of 2023, the PPB reported 167 active members on the ECIT roster. In addition, the BHU continued to hold ECIT advisory meetings. During the third quarter, ECIT members from all precincts discussed topics related to the ECIT certification course, sharing BHRT caseload, and the possibility of an ECIT detail car. For instance, the minutes from the meeting included an update on the ECIT training that was just completed. Officers also talked about shelter beds and available resources on the website. As a result, maintaining their model, we continue to find the PPB has substantially complied with the requirements of Paragraph 99. |

| **COCL Recommendations** | • No recommendations at this time |
| --- | --- |
| **Assessment Based On** | ECIT roster; PPB's Semi-Annual Mental Health Crisis Response Report |

| **Settlement Agreement Paragraph** |
| --- |

**Exhibit A**

100. PPB's [ECIT] shall be comprised of officers who volunteer for assignment to the [ECIT]. The number of [ECIT] members will be driven by the demand for [ECIT] services, with an initial goal of 60-80 volunteer, qualified officers.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review ECIT Roster; Interview PPB personnel |

**Compliance Assessment**

The PPB continues to follow the practice of accepting volunteer officers for ECIT certification. In the third quarter of 2023, 20 additional officers were ECIT certified. The PPB provided us with a current ECIT roster that includes 167 active members. As there have been no decrease in the number of ECIT officers since the previous quarters and we previously found that ECIT officer distribution matches call volume patterns, we continue to find Substantial Compliance with the requirements of this paragraph.

| COCL Recommendations | • Continue utilizing existing data to assess demand for ECIT services |
|---|---|
| Assessment Based On | MHT data; ECIT roster; The PPB's Semi-Annual Mental Health Crisis Response Report |

**Settlement Agreement Paragraph**

101. No officers may participate in [ECIT] if they have been subject to disciplinary action based upon use of force or mistreatment of people with mental illness within the three years preceding the start of [ECIT] service, or during [ECIT] service. PPB, with the advice of the [BHU] Advisory Committee, shall define criteria for qualification, selection, and ongoing participation of officers in the [ECIT].

| Compliance Label | Substantial Compliance |
|---|---|

**Exhibit A**

| **Methodology** | Review evaluation documents for potential ECIT officers |
|---|---|

| **Compliance Assessment** | |
|---|---|
| In the third quarter of 2023, the PPB added 20 new members to the ECIT roster. The Bureau held the certification course in September 2023, using a curriculum previously approved by DOJ and COCL. Before the training, the BHU Sergeants engaged in the typical screening process of the applicants to determine their eligibility for ECIT certification. The PPB provided the COCL with a work history review sheet to show all applicants were eligible. Further, the BHU Sergeants used relevant ECIT data (e.g., geography of dispatched calls, ECIT templates, and officer rosters) to guide decision-making in the selection of potential ECIT officers. As a result of ongoing PPB practice, we continue to find the PPB in Substantial Compliance with the requirements of this paragraph. | |

| **COCL Recommendations** | • No recommendations at this time |
|---|---|

| **Assessment Based On** | PPB ECIT evaluation documents |
|---|---|

| **Settlement Agreement Paragraph** | |
|---|---|
| 102. PPB shall specially train each [ECIT] member before such member may be utilized for [ECIT] operations. PPB, with the advice of the [BHU] Advisory Committee, shall develop such training for [ECIT] members consistent with the Memphis Model. | |

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Review PPB supplemental documents |

| **Compliance Assessment** | |
|---|---|

**Exhibit A**

In the third quarter of 2023, there was an ECIT certification training with 20 graduates. The PPB presented the schedule for the next certification training to the BHUAC at the June meeting. The committee voted to approve the schedule with the understanding that it will provide additional feedback during the dry runs of the scenarios scheduled for August. A member of the BHUAC was able to attend the dry run in August and found it to be an insightful experience. We appreciate the PPB taking the steps to gather feedback on the ECIT course topics and provide the BHUAC with the opportunity to participate in dry runs and suggest changes. Additionally, an ECIT officer attended a 10-hour motivational interviewing training in August. We therefore continue to find Substantial Compliance with the requirements of this paragraph.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | PPB supplemental documents; Observation of BHUAC meeting |

| **Settlement Agreement Paragraph** |
|---|
| 103. [ECIT] members will retain their normal duties until dispatched for use as [ECIT]. BOEC or PPB may dispatch [ECIT] members to the scene of a crisis event. |

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review PPB policy |

| **Compliance Assessment** |
|---|
| In accordance with Paragraph 103 (and the Memphis Model of mental health crisis response), ECIT members retain their normal duties until dispatched for use as ECIT. BOEC personnel have received training on the criteria for dispatching an ECIT to a call. In addition, the PPB's Directive 850.20 includes the requirement for officers to consider calling in specialized units (including ECIT) as necessary. We therefore continue to find that the PPB has maintained Substantial Compliance with this paragraph. |

**Exhibit A**

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | PPB policy |

| **Settlement Agreement Paragraph** | |
|---|---|
| 104. PPB will highlight the work of the [ECIT] to increase awareness of the effectiveness of its work. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review PPB public awareness efforts; Review BHU website; Review BHUAC minutes |

### Compliance Assessment

The PPB continues to perform a wide variety of tasks designed to increase awareness of the work performed by the BHU, ECIT, BHRT, and SCT. This work includes flash alert emails, newsletters, conference presentations, conference attendance, community outreach training and presentations, social media, and other efforts. We believe the PPB has made a strong effort to highlight the work of not only the ECIT but the BHU in its entirety.

For instance, in the third quarter of 2023, the BHU newsletter shared positive news, such as the graduation of 20 officers from the ECIT certification course and BHU members involvement with the community program "Shop-With-A-Cop" that helps children get back school clothing and supplies. The newsletter also highlighted BHU members attendance of conferences: the CIT International Conference and the Association of Threat Assessment Professional conferences. In addition, the newsletter shared data on the SCT. Based on this and our previous review of PPB outreach efforts, we believe the PPB has substantially complied with the requirements of Paragraph 104.

**Exhibit A**

| | |
|---|---|
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Based On** | Public awareness and education documents |

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 105. For each crisis event to which [ECIT] is dispatched, the [ECIT] member shall gather data that [BHU] shall utilize to track and report data on public safety system interactions with individuals with perceived or actual mental illness or who are in crisis. These data shall include: (COCL summary) the required tracking of details about the context and nature of incident, information about the subject, techniques used, injuries, disposition, presence of mental health professional on scene, and a narrative of the event. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review MHT data; Interview PPB personnel |

**Compliance Assessment**

In accordance with this paragraph, the PPB must collect data on mental health calls, and the BHU is required to report on the data collected. In the third quarter of 2023, the PPB continued to use the MHT as the method for collecting the data points required in Paragraph 105. The PPB's quality assurance plan for ECIT-related data and outcomes includes analysts auditing associated data on a monthly basis.

The BHU provided the COCL with a quarterly report describing MHT data for ECIT calls. In the third quarter of 2023, the PPB received 399 MHTs on 389 calls that reported an ECIT officer was on scene (a single call may result in more than one MHT being completed). ECIT officers authored 264 (66 percent) of the MHTs. For the 389 calls, the most common technique used was de-escalation (44 percent). A total of 25 calls (6 percent of the total) reported a use of force. For the disposition of the 389 calls, the most common clearance

**Exhibit A**

type was report written (78 percent of calls), followed by about 10 percent of calls being cleared by arrest (physical). All these statistics are similar to prior quarters.

Due to the nature and extent of data collected and analyzed on ECIT dispatches, the PPB remains in Substantial Compliance with Paragraph 105.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | MHT data |

## D. Mobile Crisis Prevention Team

| **Settlement Agreement Paragraph** | |
|---|---|
| 106. PPB currently has a [BHRT] comprised of a two-person team, one sworn officer and one contractor who is a qualified mental health professional. Within 120 days of the Effective Date, City shall expand [BHRT] to provide one [BHRT] car per PPB precinct. 107. Each [BHRT] car shall be staffed by one sworn PPB officer and one qualified mental health professional. [BHRT] shall be the fulltime assignment of each such officer. | |

| **Compliance Label** | 106. Substantial Compliance |
|---|---|
| | 107. Substantial Compliance |
| **Methodology** | Review BHU structure; Review of BHUAC meeting; Interview PPB personnel |

| **Compliance Assessment** | |
|---|---|

The PPB continues to have a BHRT car in each precinct composed of one officer and one qualified mental health professional. For the officer, BHRT is considered their full-time assignment. In the third quarter of 2023, the PPB made no changes to their roster of the

five BHRTs. The PPB aims to maintain the five teams as the complete roster for BHRT. One BHRT is assigned to each precinct (East, Central, and North), a fourth BHRT is assigned to Houseless Outreach, and a fifth BHRT is assigned to Proactive Follow-up. As a result of their current effort, we continue to find the PPB is in Substantial Compliance with the requirements of Paragraphs 106 and 107.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | BHU structure |

| **Settlement Agreement Paragraph** | |
|---|---|
| 108. No officers may participate in [BHRT] if they have been subject to disciplinary action based upon use of force or mistreatment of people with mental illness within the three years preceding the start of [BHRT] service, or during [BHRT] service. PPB, with the advice of [BHU] Advisory Committee, shall define criteria for qualification, selection, and ongoing participation of officers in the [BHRT]. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review evaluation documents for potential ECIT officers |
| **Compliance Assessment** | |
| All BHRT officers are ECIT certified and are held to the same eligibility standards as ECIT officers. In addition, SOP #43 covers the ongoing participation of officers involved with BHRT. The BHU Sergeants and the Lieutenant monitor all current BHRT members through the EIS and Professional Standards Division (PSD) to ensure qualifications are maintained. During this quarter, no new BHRT officers were assigned. However, we have seen this process play out in prior quarters and therefore continue to find that the PPB remains in Substantial Compliance with Paragraph 108. | |

**Exhibit A**

| COCL Recommendations | • No recommendations at this time |
|---|---|
| **Assessment Based On** | PPB policy |

| **Settlement Agreement Paragraph** ||
|---|---|
| 109. PPB shall specially train each [BHRT] member before such member may be utilized for [BHRT] operations. PPB, with the advice of the [BHU] Advisory Committee, shall develop such training for [BHRT] members. ||
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review reported trainings for BHRT members |
| **Compliance Assessment** ||
| The BHU continues to promote supplemental training for supervisors and BHRT members. In the third quarter of 2023, members took part in external supplemental training and conferences. For instance, trainings and presentations attended by members of the BHU covered a variety of topics, including threat assessment, methods of instruction, guardianship and conservatorships. Members attended multiple conferences relating to threat assessment, crisis intervention, and addiction studies It appears that the BHU has continued to forge a culture in which ongoing learning and training is promoted and encouraged. We therefore find that the PPB has maintained Substantial Compliance with Paragraph 109. ||
| **COCL Recommendations** | • No recommendations at this time |

**Exhibit A**

| **Assessment Based On** | The PPB quarterly report identifying supplemental BHRT training |
| --- | --- |

### Settlement Agreement Paragraph

110. [BHRT] shall utilize [ECIT] data to proactively address mental health service, in part by connecting service recipients with service providers.

| **Compliance Label** | Substantial Compliance |
| --- | --- |
| **Methodology** | Review MHT summary data; Review Behavioral Health Unit Electronic Referral System (BERS) summary data |

### Compliance Assessment

The PPB has continued the practice of collecting data through the MHT. When an officer has an encounter with a mental health component, they will complete the MHT. This information will be used to address mental health service needs. If an individual is the subject of three MHTs in a 30-day period, they will be referred to the BERS (if a referral has not already been made).

Once an individual is referred, a team will look at specific criteria, including a demonstration of escalating behavior, frequent contacts with the PPB, considered a risk to self or others, and whether case-specific information indicates a potential need for BHRT intervention. If the individual is deemed an appropriate candidate for additional intervention, the BHUCT (which is composed of law enforcement, court, service provider, hospital provider personnel, and other relevant stakeholders) will discuss a plan of action.

The PPB has continued to conduct analysis of BHRT operations on a quarterly basis to identify potential trends and ensure ongoing system function. In the third quarter of 2023, a total of 170 referrals were processed by the BHU. Of the 170 referrals, 102 (60 percent) were assigned to BHRT's caseload. This assignment rate is the highest assignment rate in the last seven quarters and is a bounce back from the previous quarter (46 percent).

**Exhibit A**

In the third quarter of 2023, 93 individuals transitioned to inactive status with BHRT. Of those individuals, 30 (32 percent) had been assigned previously to BHRT's caseload in a different quarter and continued into the third quarter of 2023.

As shown in Figure 2, this quarter saw that the most common reason for a referral to be assigned was for Escalating Behavior (43 percent), followed by Risk to Others (35 percent) and Frequent Contacts (13 percent).



**Figure 2 Assigned Cases Reason for Referral (provided by the PPB)**

N=102

When looking at the outcomes of referrals for inactive cases in the third quarter of 2023 (Figure 3), the most common outcome was Systems Coordination (27%), closely followed by Concern Mitigated (23%) and Unable to Locate (13%).

**Figure 3 Inactive Cases Outcome of Referral (provided by the PPB)**

N=93

The PPB's current practice of collecting data through the MHT, meeting weekly to share information, and using data to inform service needs fulfills the requirements outlined in Paragraph 110. In fact, PPB has shown that not only do they have systems in place to monitor data trends but they also use this information to inform practice. In the second

quarter, the BHU noticed that the BERS referrals were down about 12 percent compared to the previous 12 months. To help remedy this in the third quarter, they worked with the Training Division to create an informational video to help remind officers when and how they should fill out a BERS referral. This video will be released in the fourth quarter. We continue to find the PPB in Substantial Compliance.

| COCL **Recommendations** | • Continue to collect data and create reports on mental health services |
|---|---|
| **Assessment Based On** | MHT data; BERS referral data |

| **Settlement Agreement Paragraph** | |
|---|---|
| 111. Within 180 days of the Effective Date, PPB, with the advice of [BHU] Advisory Committee, shall develop policies and procedures for the transfer of custody or voluntary referral of individuals between PPB, receiving facilities, and local mental health and social service agencies. These policies and procedures shall clearly describe the roles and responsibilities of these entities and of [BHRT] officers in the process. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review Directives 850.20, 850.21, 850.22, and 850.25; Interview PPB personnel |

**Compliance Assessment**

The PPB continues to operate under the Directives 850.20, 850.21, 850.22, and 850.25, which dictate the procedures for AMR to provide transportation for a person in a mental health crisis. Directive 850.20: Police Response to Mental Health Crisis was reviewed by BHUAC during the third quarter of 2023. The PPB continues to collaborate with AMR when issues arise during the transportation of an individual dealing with a mental health crisis (see our assessment of Paragraph 89). The PPB also has a designated liaison Sergeant at each precinct to respond, in real time, to any transportation issues. As the PPB continues

to uphold these procedures, we find that they have maintained Substantial Compliance with Paragraph 111.

| | |
|---|---|
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Based On** | Directives 850.20, 850.21, 850.22, and 850.25; PPB interviews |

## E. Service Coordination Team

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 112. The Service Coordination Team ("SCT"), or its successor, shall serve to facilitate the provision of services to individuals who interact with PPB that also have a criminal record, addiction, and highly acute mental or physical health service needs. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review SCT outcome measures; Review SCT Referrals Report |

### Compliance Assessment

The PPB continues to facilitate the provision of services to individuals experiencing drug addiction and mental illness and who are chronically involved in criminal behavior. The SCT coordinates access to housing, medical, counseling, and addiction/mental health services. Members of the SCT are proactive in seeking out collaborations with other stakeholders in the State of Oregon.

The PPB continues to provide data demonstrating that, over the years, SCT has consistently grown in the number of people referred to the program and the number of people it serves. For the third quarter of 2023, the number of referrals was 261, as shown in Table 1. This is an increase from the previous quarter (212). Of these referrals, the SCT accepted 59 percent; the other 41 percent did not meet the assignment criteria. The

**Exhibit A**

primary reasons for not meeting criteria were lack of criminal history (29 percent) and lack of recent crimes (26 percent).

### Table 1 SCT Referrals (provided by the PPB)

| SCT Referrals, 2023 Q3 | N | % of Total |
|---|---|---|
| Number of Referrals | 261 | - |
| Number of Individuals Referred* | 258 | - |
| Number of Referrals That Met Assignment Criteria | 153 | 59% |
| Number of Referrals That Did Not Meet Assignment Criteria | 108 | 41% |
| Reason for Not Meeting Assignment Criteria | N | % of Not Meeting Assignment Criteria |
| Lacks criminal history | 31 | 29% |
| Lacks recent crimes | 28 | 26% |
| Higher level of care | 14 | 13% |
| Unable to Locate | 12 | 11% |
| Other | 8 | 7% |
| Sex Offender | 5 | 5% |
| Aggression | 4 | 4% |
| Arson | 3 | 3% |
| Crimes outside Portland | 3 | 3% |

The Supportive Transitions and Stabilization (STS) Program is an expansion of the SCT operation that is run by the Central City Concern's Housing Rapid Response. By creating a direct housing resource, the STS addresses the needs of those experiencing mental illness and co-occurring disorders who temporarily require a more extensive level of care. In the third quarter of 2023, 14 individuals were referred, 10 of the referrals were accepted and a total of four new participants were served, as shown in Table 2.

**Table 2. STS Referrals (provided by the PPB)**

| STS Referrals, 2023 Q3 | |
|---|---|
| Number of Referrals* | 14 |
| Number of Individuals Referred | 14 |
| Average Age of Individuals Referred | 44.0 yrs |
| Number of Referrals Accepted (Met Criteria) | 10 |
| Number of Referrals Declined | 4 |
| Number of new participants served during Quarter | 4 |
| Number of participants who successfully completed | 2 |
| Participants terminated for cause/non-compliance | 0 |
| Participants who voluntarily withdrew from program | 1 |
| Average Length of Stay (days) of those who exited during Quarter | 82.3 |
| Bed utilization rate | 79% |

In addition to the quarterly data, PPB provided an analysis of SCT and STS trends utilizing quarterly data from Q2 2015 to Q3 2023. As the graph below displays there was a significant dip post pandemic but have since returned to pre-pandemic averages.



Figure 4 SCT Individuals Referred



| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | SCT process; SCT outcome measures |

**Exhibit A**

## F. BOEC

### Settlement Agreement Paragraph

113. Within 120 days of the Effective Date, BOEC and PPB, with the advice of the [BHU] Advisory Committee, shall complete policies and procedures to triage calls related to mental health issues, including changes to protocols for assigning calls to [Behavioral Health Call Center - BHCC], and adding new or revised policies and protocols to assign calls to PPB [BHU] or directly to NGOs or community-based mental health professionals.

| **Compliance Label** | Substantial Compliance |
| --- | --- |
| **Methodology** | Interview BOEC personnel; Review BOEC protocols |

### Compliance Assessment

BOEC has completed and maintained the policies and procedures prescribed within Paragraph 113. BOEC's mental health and ECIT dispatch protocol SOP identifies seven call characteristics for which an ECIT dispatch officer will be dispatched. These characteristics include when there is a mental health component and (1) a weapon is present, (2) a person is violent, (3) the call is at a mental health facility, (4) the caller is threatening suicide and has the means to carry it out, (5) request of a community member, (6) request of another officer; or (7) a person represents an escalating risk of harm to self or others.

BOEC has maintained its policy criteria for ECIT dispatch, which partially satisfies the requirement for crisis triage. In addition, BOEC has updated criteria for forwarding calls to BHCC. Additionally, during the third quarter, BOEC provided us with SOP 6.011 (Portland Street Response) which "describes the Portland Street Response program, defines the duties of the Portland Street Response team and the procedures Operations Staff will follow when dispatching them." In doing so, the SOP describes the function of PSR, defines a mental health crisis, and lists the specific criteria for dispatching PSR during a mental health crisis. It then describes the required steps to be taken by call-takers, dispatchers, and supervisors when a call is to be dispatched to PSR. We therefore continue to find Substantial Compliance with the requirements of this paragraph.

**Exhibit A**

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | BOEC protocols for ECIT dispatch; BOEC protocols for BHCC referral; BOEC protocols for PSR dispatch |

| **Settlement Agreement Paragraph** | |
|---|---|
| 114. Within 180 days of the Effective Date, the City will complete training of all BOEC Dispatchers in Crisis Triage. The City, with the advice of the [BHU] Advisory Committee, shall develop ongoing training for BOEC Dispatchers. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Interview BOEC personnel |

**Compliance Assessment**

BOEC staff continue to receive training in crisis triage both as new employees as well as ongoing refresher training, including on recognizing mental health crisis and available triage options (e.g., crisis line, PSR, and ECIT). In the third quarter of 2023, BOEC carried out their fall in-service training which included a presentation on all triage options available to dispatchers for calls involving a mental health crisis, including ECIT, BHCC, and PSR. As part of the presentation, BOEC discussed the criteria for each option as well as tips and techniques for determining the most appropriate response option. In addition, BOEC provided real-world examples of calls that should have received ECIT dispatch but did not (see also Par. 115). Furthermore, upon issuing SOP 6.001 (Portland Street Response), BOEC provided a roll-call training discussing the PSR criteria, including a discussion of changes to the criteria compared to the prior protocol. Taken together we continue to find that BOEC has trained dispatchers and call-takers in the available crisis triage options and therefore continue to be in Substantial Compliance with the requirements of Par. 114.

**Exhibit A**

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | Prior observation of BOEC training; Interview with BOEC personnel |

| **Settlement Agreement Paragraph** | |
|---|---|
| 115. Within 180 days of the Effective Date, the City shall ensure Crisis Triage is fully operational to include the implementation of the policies and procedures developed pursuant to the above paragraph and operation by trained staff. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review of BOEC data; Interviews with BOEC personnel |

### Compliance Assessment

The COCL reviewed data related to the operation of BOEC, not only in the context of the PPB's crisis response, but also in the context of other triage options. This included transferring calls to the BHCC and dispatching PSR to calls that meet the necessary criteria. For instance, in the third quarter evaluation of mental health calls, the PPB identified 6,395 calls with a mental health component. BOEC audited a random sample of 334 of these calls to ensure that dispatchers are applying the criteria appropriately. In 14 of those calls (4.2%) BOEC's audit later found that sufficient information existed at the time of the call to warrant it being dispatched as ECIT. This rate is consistent with prior reporting periods. BOEC also assessed accuracy for calls transferred to the BHCC, with 22 out of 287 calls being kicked back to BOEC for ECIT dispatch (we note this may not indicate fault with the telecommunicators decision, for BHCC operators may learn additional information warranting emergency response). Finally, we reviewed BOEC's data for PSR during the third quarter, which included 4,110 calls dispatched to the response team. This is an increase of 301 calls from the second quarter, demonstrating BOEC's continued use of the program when triaging calls.  In addition to tracking PSR calls, BOEC holds monthly

**Exhibit A**

meetings with PSR representatives, discussing any emerging issues and helping to ensure that BOEC's practices align with their policy and training.  Moving forward, we will continue to monitor how BOEC assesses their use of different crisis dispatch options to ensure ongoing compliance with their policies and protocols though continue to find Substantial Compliance for this quarter.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | Review of BOEC data; Interviews with BOEC personnel; Interviews with PSR personnel |

# Section VII: Employee Information System

**Settlement Agreement Paragraph**

116. PPB has an existing Employee Information System ("EIS") to identify employees and design assistance strategies to address specific issues affecting the employee. *See* PPB Manual 345.00. PPB agrees to enhance its EIS to more effectively identify at-risk employees, supervisors, and teams to address potentially problematic trends in a timely fashion. Accordingly, within 90 days of the Effective Date, PPB shall: (a) Require that commanders and supervisors conduct prompt reviews of EIS records of employees under their supervision and document the review has occurred in the EIS performance tracker; (b) Require that commanders and supervisors promptly conduct reviews of EIS for officers new to their command and document the review has occurred in the EIS performance tracker; and (c) Require that EIS staff regularly conduct data analysis of units and supervisors to identify and compare patterns of activity.

117. PPB agrees to use force audit data to conduct similar analyses at supervisor- and team-levels.

| **Compliance Label** | 116. Partial Compliance |
| | 117. Partial Compliance |
| **Methodology** | Interviews with EIS/PPB personnel; Review of PPB EIS analysis |

**Compliance Assessment**

The PPB continued to use the EIS as their primary system for identifying at-risk members and potentially problematic trends and "design[ing] assistance strategies to address specific issues affecting the employee" (Paragraph 116). As for the PPB's current procedure of evaluating subsections (a) and (b) of Paragraph 116, the PPB reports rates of compliance with supervisory reviews that are consistent with prior quarters. As shown in Figure 5 below, compliance for subsection (a) reviews (supervisors performing annual reviews) demonstrated that 99 percent of required reviews were completed on time,

**Exhibit A**

whereas subsection (b) reviews ("new-to-command" reviews) were completed on time for nearly all cases (90.2 percent). This led to 96.8 percent on-time reviews for subsection (c), which looks at all opportunities for Paragraph 116 compliance.

**Figure 5 Compliance with Reviews Directive 345.00 Reviews (provided by the PPB)**



During the third quarter of 2023, the COCL team reviewed PPB's SOP #5 (*Force Analysis for Supervisors and Teams*), which memorializes the process used by the Force Inspector to consistently identify "at-risk employees, supervisors, and teams." We found that the SOP contains a wide range of reference points for the Force Inspector to consider when conducting the review and provides standardization to the selection process while also still allowing for the Force Inspector's experience to guide the process. During the fourth quarter of 2023, we were able to meet with the Force Inspector to discuss their application of the SOP, ask questions, and better understand the Force Inspector's decisions. We will therefore provide additional updates in our next report.

Finally, we have long noted the need for a comprehensive assessment of PPB's EIS though have awaited a joint-determination from both Parties as to whether such an assessment is required for compliance (and therefore has implications for the Settlement Agreement if the system is determined to be ineffective) or instead is a matter of technical assistance without such implications. To date, the Parties have not come to agreement on the matter and, as the City and DOJ have agreed on implementing a Monitor in the coming months, it

**Exhibit A**

is unlikely that such an assessment can occur prior to the Monitor assuming their role. We therefore continue to recommend the Parties confer as to the requirement of Par. 116 with respect to a comprehensive assessment and, where appropriate, recommend the Monitor incorporate the evaluation methodology previously provided by COCL. As the COCL is required to debrief the Monitor on barriers to implementation (see amended Par. 208), we look forward to discussing this paragraph in particular.

| **COCL Recommendations** | • To achieve Substantial Compliance, work with COCL to formalize the review, identification, and intervention process through SOP #5<br><br>• Determine with DOJ whether an assessment of EIS's effectiveness is required for compliance |
|---|---|
| **Assessment Based On** | EIS and threshold review process |

| **Settlement Agreement Paragraph** |
|---|
| 118. PPB shall continue to use existing thresholds, and specifically continue to include the following thresholds to trigger case management reviews: (a) Any officer who has used force in 20% of his or her arrests in the past six months; and (b) Any officer who has used force three times more than the average number of uses of force compared with other officers on the same shift.<br><br>119. Within 90 days of the Effective Date, PPB shall add one additional threshold to trigger case management review of any officer who has three uses of force in a one-month period. |

| **Compliance Label** | 118. Substantial Compliance |
|---|---|
| | 119. Substantial Compliance |
| **Methodology** | Interviews with EIS/PPB personnel; Review of EIS program data |

**Compliance Assessment**

The thresholds the PPB are required to maintain for Paragraph 118 continue to be used to flag officers for supervisory reviews. The PPB continues to collate data from a variety of sources, including force events, traumatic incidents (captured in the Regional Justice Information Network, complaints, and commendations (captured in Administrative Investigations Management (AIM) system). These data are used to identify potentially problematic behavior with the predetermined thresholds identified by these paragraphs.

In the third quarter of 2023, EIS administrators reviewed 316 alerts and sent 242 (76.6 percent) on for RU Manager review (see Figure 6). When forwarded to the RU Manager, the alert may be reviewed and closed by the RU Manager or sent to the officer's supervisor for either closure or intervention (i.e., coaching, commending, debriefing, monitoring, referring to the Employee Assistance Program, training, or temporary reassignment). For alerts closed in the third quarter of 2023, which may also include cases opened in prior quarters, 292 were closed at the RU level (see Table 3). Of these 292 alerts, 238 (81.5 percent) were sent on for further supervisor review (the highest percentage in the past seven quarters). Additionally, 69.2 percent of alerts sent to an officer's supervisor during the third quarter of 2023 resulted in some type of intervention. The information provided by the PPB indicates that for the 202 alerts closed with an intervention, one was closed with a referral to the Employee Assistance Program, and the remaining 201 involved a debriefing or supervisor coaching.

As with Paragraph 116, we are continuing to work with the PPB to analyze the relative effectiveness of EIS interventions, both from empirical data analyses as well as through conversations with key stakeholders in the EIS process. However, the PPB continues to use the thresholds as outlined by Paragraphs 118 and 119, and we continue to find they have complied substantially with these paragraphs.



Figure 6 EIS Alerts and Alerts Sent to RU Manager (provided by the PPB)

Table 3 EIS Alerts and Interventions

|  | 2022 Q2 | 2022 Q3 | 2022 Q4 | 2023 Q1 | 2023 Q2 | 2023 Q3 |
|---|---|---|---|---|---|---|
| Alerts Closed by RU | 174 | 174 | 140 | 206 | 217 | 292 |
| Alerts Sent to Supervisor (Percent of Alerts Sent to RU) | 126 (72.4%) | 103 (59.2%) | 100 (71.4%) | 166 (73%) | 166 (76.5%) | 238 (81.5%) |
| Interventions (Percent of Alerts Sent to RU) | 94 (54.0%) | 82 (47.1%) | 73 (52.1%) | 146 (70.9%) | 150 (69.1%) | 202 (69.2%) |
| Interventions (Percent of Alerts Sent to Supervisor) | 94 (74.6%) | 82 (79.6%) | 73 (73%) | 146 (88%) | 150 (90.4%) | 202 (84.9%) |

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | Current EIS thresholds and associated data |

**Exhibit A**

| | |
|---|---|
| **Settlement Agreement Paragraph** | |

120. Within 90 days of the Effective Date, PPB shall identify and train a second EIS administrator. This individual may be assigned to other tasks within the Professional Standards Division or as otherwise needed.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review of Directive 345.00; Review of EIS Program |

**Compliance Assessment**

Paragraph 120 requires that the PPB "identify and train a second EIS administrator." During the third quarter of 2023, the PPB maintained the second EIS administrator, who was trained and joined the team in the first quarter of 2022. We therefore find that the PPB has maintained compliance with Paragraph 120.

| COCL Recommendations | • No recommendations at this time |
|---|---|
| Assessment Based On | Maintenance of second EIS administrator |

**Exhibit A**

# Section VIII: Officer Accountability

## A. Investigation Timeframe

| | |
|---|---|
| **Settlement Agreement Paragraph** ||
| 121. PPB and the City shall complete all administrative investigations of officer misconduct within one-hundred eighty (180) days of a complaint of misconduct, or discovery of misconduct by other means. For the purposes of this provision, completion of administrative investigations includes all steps from intake of allegations through approval of recommended findings by the Chief, excluding appeals, if any, to CRC. Appeals to CRC should be resolved within 90 days. ||
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review of IPR quarterly data analysis; Review of AIM system data |
| **Compliance Assessment** ||

As noted in our last report, IPR now includes tolling for protected leave in its data analysis of administrative complaints that exceed the 180-day timeline required by Par. 121. For this quarter, IPR provided us with eleven (11) quarters of data using the updated methodology. The reported data indicate that greater than 90 percent of administrative complaints were closed within the 180-day period for the last three quarters. These data include cases that were administratively closed, were conducted as Supervisory Investigations, and received a full administrative investigation. However, consistent with prior COCL reviews, we focus on full administrative investigations for the purposes of evaluating compliance with this paragraph. When evaluating full investigations that have been closed, there have been steady and consistent increases in compliance quarter-over-quarter, particularly over the past four quarters.  For instance, 67% of cases opened in 2022 Q2 were closed within 180 days, 71% of cases opened in 2022 Q3 were closed within 180 days, and 80% of cases opened in 2022 Q4 were closed within 180 days.  For cases opened in 2023 Q1 (the last quarter for which 180 days could have passed), 89% were

**Exhibit A**

closed within 180 days. A similar pattern of improvement was also noted in our 2019 Q3 report[9] when we had first found Substantial Compliance with this paragraph.

As the City and PPB have made commendable progress in conducting administrative investigations within 180 days, we find they have returned to Substantial Compliance with the requirements of this paragraph. However, while PPB and the City have been able to show demonstrated increases in compliance in recent quarters, we continue to suggest they perform a thematic review of case types that typically exceed 180-days to identify potential future time-saving steps that could be taken. Additionally, we maintain our suggestion that the City continue to assess the development of the CBPA to ensure that processes within the Office will facilitate compliance with the 180-day timeline going forward.

| | |
|---|---|
| **COCL Recommendations** | • Conduct a thematic review of oft overdue case types to identify common delays and take proactive measures when faced with future similar cases<br><br>• Consider the impact of system layers on timely resolution of complaints |
| **Assessment Based On** | IPR data indicating adherence to 180-day timeline; IA data indicating adherence to 180-day timeline |

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 122. PPB shall conduct administrative investigations concurrently with criminal investigations, if any, concerning the same incident. All administrative investigations shall be subject to appropriate tolling periods as necessary to conduct a concurrent criminal investigation, or as otherwise provided by law, or as necessary to meet the CRC or PRB recommendation to further investigate. | |
| **Compliance Label** | Substantial Compliance |

---

[9] https://static1.squarespace.com/static/5a319f76a9db0901e16c6433/t/5dd78954e8d3bc5dd45f9d15/1574406486218/Q3+2019+COCL+Compliance+and+Outcome+Assessment+Quarterly+Report+FINAL+11212019.pdf

**Exhibit A**

| Methodology | Review of Criminal-IA Concurrent Investigation Audit reports; Review of Directive 0330.00 |
|---|---|

| **Compliance Assessment** |
|---|
| In the third quarter of 2023, the PPB continued to provide documentation indicating when an IA investigation began compared to when the criminal investigation began. In this quarter, there were seven cases that required both a criminal and an IA investigation. In all but three cases, the IA investigation and criminal investigation were initiated on the same day. In the remaining cases, the criminal investigation was initiated after the IA investigation for two, and the IA investigation was initiated after the criminal investigation for one. Further, a review of the AIM data associated with the cases indicates that investigations were not unreasonably delayed. We therefore continue to find that case investigations meet the criteria for "concurrent" and, as a result, find that the PPB has maintained Substantial Compliance with Paragraph 122. |

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | Criminal-IA Concurrent Investigation Audit reports |

| **Settlement Agreement Paragraph** |
|---|
| 123. If PPB is unable to meet these timeframe targets, it shall undertake and provide to DOJ a written review of the IA process, to identify the source of the delays and implement an action plan for reducing them. |

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review of Administrative Investigations Report |

**Compliance Assessment**

In the third quarter of 2023, the PPB closed 35 administrative investigations, three of which exceeded the 180-day timeline. The PPB provided the COCL with an Administrative Investigations Report for each of these three cases as well as a report for cases that did not exceed the 180-day total timeline but exceeded the timeline for one or more individual investigative stages. For the three cases that exceeded the 180-day timeline, reasons were largely similar to what we have seen in the past, including being impacted by the time period when PPB was unable to schedule Police Review Boards (PRBs) as a result of not having enough PRB facilitators. This problem has largely been addressed during the third quarter, allowing for a greater number of PRBs to be scheduled. As we continue to see the process intended by Paragraph 123 is being followed, we therefore continue to find Substantial Compliance, though we maintain our suggestion that supervisors identify remedies for delays in individual stages, even if the entire investigation timeline was under 180 days.

| **COCL Recommendations** | • Maintain self-improvement loop for stages that exceed their stage timeline, even if the case does not exceed the 180-day timeline |
|---|---|
| **Assessment Based On** | Administrative Investigations Report |

## B. On Scene Public Safety Statements and Interviews

**Settlement Agreement Paragraph**

124. Within 90 days of the Effective Date, the City and PPB shall review its protocols for compelled statements to PSD and revise as appropriate so that it complies with applicable law and current professional standards, pursuant to *Garrity v. New Jersey*, 385 U.S. 493 (1967). The City will submit the revised protocol to DOJ for review and approval. Within 45 days of obtaining DOJ's approval, PPB shall ensure that all officers are advised on the revised protocol.

| **Compliance Label** | Substantial Compliance |
|---|---|

**Exhibit A**

| Methodology | Review of Directive 1010.10 |
|---|---|

### Compliance Assessment

During the third quarter of 2023, the PPB maintained their protocols for compelled statements to PSD, and all officers have been advised on the protocol. As a result, we find the PPB has maintained compliance with Paragraph 124.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | Current PPB policy |

### Settlement Agreement Paragraph

125. Separation of all witnesses and involved officers to lethal force events is necessary in order to safeguard the integrity of the investigation of that event. Immediately following any lethal force event, PPB shall continue to issue a communication restriction order ("CRO") to all witness and involved officers, prohibiting direct or indirect communications between those officers regarding the facts of the event. The CRO will continue, unless extended further, until conclusion of the Grand Jury or, if no Grand Jury is convened, until a disposition is determined by the District Attorney.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Reviewed CROs for 2023 second quarter OIS events |

### Compliance Assessment

In the third quarter of 2023, one OIS incident involving PPB officers occurred in Gresham. Traditionally, the PPB demonstrates compliance with this paragraph through excerpts from the criminal investigation file (as opposed to administrative investigations). In the

**Exhibit A**

OIS for this quarter, the criminal investigation is not being conducted by the PPB; instead, it is being conducted by the Gresham Police Department. This is similar to the OIS which occurred in the second quarter of 2023 in that evidence of the CROs was not immediately available during the pendency of the criminal investigation. However, as a follow-up to our last report, we have now received and reviewed the CROs and rescindments for the OIS in the second quarter. We anticipate a similar process will occur for the OIS in this quarter and will therefore provide updates in our Q4 report. For this quarter, we continue to find the PPB in Substantial Compliance with the requirements of this paragraph.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | CROs for 2023 Q2 OIS |

| **Settlement Agreement Paragraph** |
|---|
| 126. PPB shall continue to require witness officers to lethal force events to give an on-scene briefing to any supervisor and/or member of the Detective Division to ensure that victims, suspects, and witnesses are identified, evidence is located, and provide any information that may be required for the safe resolution of the incident, or any other information as may be required. |

| **Compliance Label** | Partial Compliance |
|---|---|
| **Methodology** | Review of OIS case file excerpts |

| **Compliance Assessment** |
|---|
| In the third quarter of 2023, one OIS incident involving PPB officers occurred in Gresham. Traditionally, the PPB demonstrates compliance with this paragraph through excerpts from the criminal investigation file (as opposed to administrative investigations). In the OIS for this quarter, the criminal investigation is not being conducted by the PPB; instead, |

**Exhibit A**

it is being conducted by the Gresham Police Department. Therefore, the on-scene walk-through would not have been conducted by the PPB but by the GPD.

Recently, the PPB has developed a draft SOP to resolve our prior recommendations related to witness officers being mentally incapacitated with respect to this paragraph. We will therefore provide an update once the SOP has been finalized.

| **COCL Recommendations** | • To achieve Substantial Compliance, finalize the SOP related to mental incapacitation preventing a walk-through, including the criteria for making such a determination |
|---|---|
| **Assessment Based On** | OIS case file excerpts |

| **Settlement Agreement Paragraph** | |
|---|---|
| 127. In agreement and collaboration with the Multnomah County District Attorney, PPB shall request that involved officers in lethal force and in-custody death events provide a voluntary, on-scene walk-through and interview, unless the officer is incapacitated. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review of OIS case file excerpts |
| **Compliance Assessment** | |
| In the third quarter of 2023, one OIS incident involving PPB officers occurred in Gresham. Traditionally, the PPB demonstrates compliance with this paragraph through excerpts from the criminal investigation file (as opposed to administrative investigations). In the OIS for this quarter, the criminal investigation was not being conducted by the PPB; instead, it is being conducted by the Gresham Police Department. Therefore, the on-scene walk-through would not have been conducted by the PPB but by the GPD. | |

**Exhibit A**

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | OIS case file excerpts |

## C. Conduct of IA Investigations

| **Settlement Agreement Paragraph** |
|---|
| 128. Currently, both IPR and PPB's PSD have authority to conduct administrative investigations, provided that IPR interview of PPB Officers must only be conducted jointly with IA. Within 120 days of the Effective Date, the City will develop and implement a plan to reduce time and effort consumed in the redundant interview of witnesses by both IPR and IA, and enable meaningful independent investigation by IPR, when IPR determines such independent investigation is necessary. |

| **Compliance Label** | Partial Compliance |
|---|---|
| **Methodology** | Review of City transition plan; Interviews of PPB and City staff |

| **Compliance Assessment** |
|---|
| During the third quarter of 2023, both IPR and IA maintained their respective administrative investigations, using the system we have previously found compliant with Paragraph 128. Aside from their own independent investigations, our review of cases this quarter also highlighted IPR's thorough work in conducting intake investigations for follow-up by the PPB, particularly the range and depth of information collected during the intake process. |
| In our last report, we noted that the position of IPR outside the authority of any Bureau was unique to the City and that IPR was receiving City support as needed through the City Attorney's Office. Recently, we were provided information from the City demonstrating that the transition to a new form of government will account for IPR's sunsetting (and the emergence of the new accountability system) by placing them all under the umbrella of the |

Community Safety service area.[10]  Thus, the City has a demonstrated plan for incorporating independent police review into the new system of government, which will resolve the issue going forward.  However, the fact remains that the current structure of City support for IPR is inconsistent with the support that was present when we first found Substantial Compliance with this paragraph.  While we acknowledge this will resolve the issue going forward, we would need to await actual implementation.

| | |
|---|---|
| **COCL Recommendations** | • To achieve Substantial Compliance, implement plan to house IPR (and the future accountability system) under the Community Safety service area. |
| **Assessment Based On** | Review of transition documents; Interviews of City staff |

| **Settlement Agreement Paragraph** | |
|---|---|
| 129. The City and PPB shall ensure that all allegations of use of excessive force are subject to full and completed IA investigations resulting in findings, unless there is clear and convincing evidence to IPR that the allegation has no basis in fact. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review of administrative closure justifications for allegations of excessive force |
| **Compliance Assessment** | |

In the third quarter of 2023, data provided by IPR had three complaints containing four allegations of excessive force that were administratively closed by IPR. However, in following up with IPR, we were informed that one of these cases was administratively closed because the complainant wouldn't agree to interview and nothing in the general offense indicated force was used; notably, the complainant was made aware IPR can re-

---

[10] The placement in the Community Safety service area is subject to change.

**Exhibit A**

open the case if they return. This decision by IPR preserves the complainant's allegation whereas a non-sustained finding would have prevented future investigation. The second case contained two allegations of excessive force that were both refuted by footage from security cameras and an Officer's recording. The third case was closed due to Mobile Audio Video and Project Respond witnesses refuting the allegations.

In follow-up to prior reports, IPR now has an updated SOP, which memorializes their criteria for administratively closing force cases when a complainant does not make themselves available to investigators and no other information to draw on is available. Additionally, we found no instances of supervisors not forwarding allegations. We therefore find that the City and PPB have to maintain Substantial Compliance for Par. 129 though will continue to review FDCRs and AARs to ensure similar problems do not re-surface in the future.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | Administrative closure of allegations of excessive force |

| **Settlement Agreement Paragraph** | |
|---|---|
| 130. The City and PPB shall continue to expressly prohibit all forms of retaliation, including discouragement, intimidation, coercion, or adverse action, against any person who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review of Directive 310.20 |
| **Compliance Assessment** | |
| During the third quarter of 2023, the PPB maintained Directive 310.20 (Discrimination, Harassment, and Retaliation Prohibited), which contains the requirements of Paragraph | |

**Exhibit A**

130 (see Policy #2 within the directive). During the third quarter of 2023, there were four complaints involving Directive 310.20. At the time of this report, two of the complaints are still open—one with sustained findings and the other still being investigated. The other two complaints are closed - one due to no misconduct identified and the other was forwarded on for precinct review for further discussion with members. However, as the PPB continues to maintain Directive 310.20 and we continue to see instances where it is invoked, we continue to find Substantial Compliance with the requirements of Paragraph 130.

| | |
|---|---|
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Based On** | Directive 310.20 |

| **Settlement Agreement Paragraph** |
|---|
| 131. <u>COCL Summary</u>. Paragraph 131 states that "The City and PPB shall retain Police Review Board procedures currently utilized for purposes of investigation and making recommended findings on administrative complaints, except as outlined below." The subsections of Par. 131 refer to PRB membership, rotation of CRC members serving on the PRB, requirements and qualifications for PRB members, provisions for removing community members or CRC members serving on the PRB, term limits for CRC members serving on the PRB, the requirement for CRC members to recuse themselves from the CRC if part of the PRB hearing the case, and stipulated discipline. (For details and exact language, see the Settlement Agreement). |

| | |
|---|---|
| **Compliance Label** | Partial Compliance |
| **Methodology** | Review of Directive 336.00; Review of City Code 3.20.140 |
| **Compliance Assessment** | |

**Exhibit A**

During the third quarter, the City updated City Code 3.20.140 the pool of potential PRB facilitators to now include the PPB Discipline Coordinator.  This revision addresses prior barriers to ensuring timely PRB's due to a lack of available facilitators.  However, in observing PRBs during the third quarter, we continued to find challenges faced by the review board in conducting their reviews.  For instance, in this quarter, we observed two different PRBs wherein the board recommended officers be cleared of violations related to Directive 1010.00 (Use of Force).  Yet in both cases, the officers' actions and tactics were found to be tactically deficient, contributing to the need to use force.  While this may hold implications for Directive 315.30 (Satisfactory Performance), Directive 1010.00 holds more specific language about force avoidance and it's therefore unclear why the tactical deficiencies were not tied to 1010.00 rather than 315.30.  We therefore continue to find the City and PPB to be in Partial Compliance with the requirements of this paragraph.

| **COCL Recommendations** | • To return to Substantial Compliance, conduct PRBs in accordance with prior COCL and DOJ guidance |
|---|---|
| **Assessment Based On** | Observation of PRBs and PRB documents |

| **Settlement Agreement Paragraph** |
|---|
| 132. By majority vote, the PRB may request that investigations of misconduct be returned to its investigating entity, i.e., PSD or IPR, to complete the investigation as to factual matters necessary to reach a finding regarding the alleged misconduct. The investigating entity must make reasonable attempts to conduct the additional investigation or obtain the additional information within 10 business days or provide a written statement to the PRB explaining why additional time is needed. |

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Review of PPB Directive 336.00 |
| **Compliance Assessment** | |

**Exhibit A**

During the third quarter of 2023, the PPB maintained Directive 336.00 (Police Review Board), which memorializes the authority of PRB to send a case back for additional investigation. There were no such instances during this quarter. As Paragraph 132 has been placed into policy and adequately covered, we find the PPB has maintained Substantial Compliance with the requirements of this paragraph.

| COCL Recommendations | • No recommendations at this time |
|---|---|
| **Assessment Based On** | PPB Directive 336.00 |

---

| **Settlement Agreement Paragraph** |
|---|

133. COCL Summary: Paragraph 133 states that, "If an officer's use of force gives rise to a finding of liability in a civil trial," PPB shall be required to take various actions. The subsections of Par. 133 include requirements for findings of liability including EIS documentation, re-evaluation for specialized units, automatic IA investigations, review of previous IA investigation if one was already completed, and a published summary if IA investigation did not reach the same finding. (For details and exact language, see the Settlement Agreement).

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Review of SOP #32 and #42 |

| **Compliance Assessment** |
|---|

During the third quarter of 2023, the PPB maintained SOP #32 (Civil Liability and Tort Claims) and SOP #42 (Evaluation of Members' Fitness to Participate in All Current and Prospective Specialized Units When the Use of Force Results in a Finding of Liability in a Civil Trial). The combination of these two SOPs contains the requirements of Paragraph 133. Given this and the fact that no new findings of liability occurred in the third quarter

**Exhibit A**

of 2023, we continue to find Substantial Compliance with the requirements of this paragraph.

| COCL Recommendations | • No recommendations at this time |
|---|---|
| Assessment Based On | SOP #32 and #42 |

## D. CRC Appeals

| **Settlement Agreement Paragraph** |
|---|
| 134. The City shall expand the membership of the CRC to 11 members, representative of the many and diverse communities in Portland, who are neutral, unbiased, and capable of making objective decisions. The quorum of CRC members necessary to act may remain at its existing level. |

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Review of City Code 3.21.080; Review of Citizen Review Committee (CRC) meeting minutes; Communication with City staff |

| **Compliance Assessment** |
|---|
| CRC continues to have 11 members, which includes community members who represent the community at large. During the fourth quarter, several CRC members resigned for differing personal reasons and we will update our Q4 report with additional information. |
| There were no appeals during the third quarter of 2023 for the CRC to hear. During the third quarter of 2023, the CRC met once (September 6), during they received an update from the IPR Director as well as an update of the PAC recommendations that were to be presented to City Council. The meeting recordings can be found on IPR's Office website as |

**Exhibit A**

well as in the meeting minutes.[11]  As a result, we continue to find the City in Substantial Compliance with Paragraph 134.

| | |
|---|---|
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Based On** | City Code 3.21.080; Review of CRC minutes and CRC-related personnel |

| **Settlement Agreement Paragraph** |
|---|
| 135. The City and PPB agree that the CRC may find the outcome of an administrative investigation is unreasonable if the CRC finds the findings are not supported by the evidence. |
| 136. In its review process for purposes of the appeal, the CRC may make one request for additional investigation or information to the investigating entity, i.e., PSD or IPR at any point during its review. The investigating entity must make reasonable attempts to conduct the additional investigation or obtain the additional information within 10 business days or provide a written statement to the CRC explaining why additional time is needed. The request for additional investigation or information may contain multiple points of inquiry, but no follow-up requests will be permitted. The additional request may be voted on by a quorum, the members voting must have read the Case File in order to vote, and any request with multiple points of inquiry must be prioritized. |

| | |
|---|---|
| **Compliance Label** | 135. Substantial Compliance |
| | 136. Substantial Compliance |
| **Methodology** | Review of PSF-5.03; Communications with City staff and CRC leadership |

---

| **Compliance Assessment** |
| --- |
| The City maintains PSF-5.03, which memorializes CRC's authority as related to Paragraphs 135 and 136. No appeals occurred during this quarter; therefore, these paragraphs were not implicated. We continue to find the City has maintained Substantial Compliance with this paragraph. |

| **COCL Recommendations** | • No recommendations at this time |
| --- | --- |
| **Assessment Based On** | Charter Code and Policy Code PSF-5.03; Meeting observations |

## E. Discipline

| **Settlement Agreement Paragraph** | |
| --- | --- |
| 137. Within 60 days of the Effective Date, PPB and the City shall develop and implement a discipline guide to ensure that discipline for sustained allegations of misconduct is based on the nature of the allegation and defined, consistent, mitigating and aggravating factors and to provide discipline that is reasonably predictable and consistent. | |
| **Compliance Label** | Partial Compliance |
| **Methodology** | Review of Corrective Action Recommendation (CAR) documents; Review of Department of Justice letter |
| **Compliance Assessment** | |
| For the third quarter of 2023, we reviewed one CAR document provided by the PPB. For this CAR, the Commander provided their rationale for the discipline recommendations and the corrective action history for the officer. The Commander did not identify any mitigating or aggravating factors. However, while PPB uses an Executive Order to guide the use of the Corrective Action Guide, there is currently no updated Directive 338.00 (currently titled Discipline Guide) to reflect the new CAG, which has replaced the Discipline Guide. Near the | |

end of the third quarter, the DOJ provided the PPB comments on Directive 338.00 and PPB provided responses in the fourth quarter. However, the policy remains unchanged and we therefore maintain our recommendations to update Directive 338.00, publicly post the directive, and provide a link to the Corrective Active Guide.

| **COCL Recommendations** | • To return to Substantial Compliance, update Directive 338.00, publicly post the directive, and provide link to the Corrective Active Guide |
| --- | --- |
| **Assessment Based On** | CARs; Failure to update Directive 338.00 |

# F. Communication with Complainant and Transparency

| **Settlement Agreement Paragraph** |
| --- |
| 138. Within 180 days of the Effective Date, the City shall enhance its existing website to ensure that a complainant can file and track his or her own complaint of officer misconduct. |
| 139. Within 120 days of the Effective Date, the City shall review its protocols to ensure that the City shares with complainants requested documentation about his or her own complaint to the extent permitted by law. |
| 140. The City shall ensure that IPR provides each complainant a tracking number upon receipt of the complaint, informs each complainant of the complaint classification, assignment (precinct or IA) and outcome of the compliant (sustained, unproven, etc.) in writing (whether mail, email/text, or fax), including information regarding whether the City took any corrective action. The City Attorney's Office shall determine whether disclosures regarding corrective action are required on a case-by-case basis consistent with Oregon's Public Records Law. |

| **Compliance Label** | 138. Substantial Compliance |
| --- | --- |
| | 139. Substantial Compliance |

**Exhibit A**

| | 140. Substantial Compliance |
|---|---|
| **Methodology** | Review of IPR website; Review of IPR policy; Review of findings letters |

**Compliance Assessment**

We continue to see evidence of IPR conforming with Paragraphs 138, 139, and 140. IPR has maintained many different avenues for submitting a complaint. When an individual submits a complaint online, they receive a unique tracking number and can request a status update with that number. If they submit a complaint through another avenue, such as mail, telephone, or walk-in, the IPR employee will submit the complaint through their online system to generate a tracking number, which will be given to the complainant. IPR and the City will share requested documents with complainants in line with Oregon Public Records Request laws. From a protocol and operation standpoint, IPR has systems in place to ensure they are complying with the requirements of Paragraphs 138, 139, and 140.

As with previous quarters, we reviewed a random sample of case files with the requirements of these paragraphs in mind. We were able to locate consistent documentation sent to complainants regarding the status of their cases, including when the cases were opened, when findings had been made, and when the cases were closed. As such, the COCL finds that the City is in Substantial Compliance with Paragraphs 138, 139, and 140.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | IPR policy; Complaint tracking webpage; Finding and closure letters to complainant; Interview of IPR personnel |

**Settlement Agreement Paragraph**

169. PPB shall apply policies uniformly and hold officers accountable for complying with PPB policy and procedure.

**Exhibit A**

| Compliance Label | Partial Compliance |
| --- | --- |
| Methodology | Review of sample of accountability cases; Review of use of force events; Review of EIS entries; Review of force audit; Interviews with PPB and City personnel |

### Compliance Assessment

We continue to evaluate Par. 169 in a summative fashion, reflecting the accountability system (and the systems inputs) as a whole. As demonstrated in our assessment of other paragraphs, the accountability system operating within the PPB and the City continues to demonstrate both strengths and weaknesses. For instance, during this quarter, we continued to find that each administrative complaint we reviewed[12] had been handled appropriately (either as an administrative closure, Supervisory Investigations (SI), Precinct Referrals (PR), or full investigation). In addition, we found that all cases we reviewed led to an investigation with findings, was conducted in accordance with best practices, and the findings were reasonable under a preponderance of evidence standard.

We also note that some of the shortcomings in holding officers have accountable that we have reported on in our past two reports have recently been resolved or at least have not surfaced over the past two quarters. For instance, as noted in our assessment of Pars. 70, 73, and 77, there have been improvements in the force reviews by the chain-of-command and supervisors. The PPB has also progressed in their rollout of BWCs which will provide objective video evidence of PPB officer interactions and activities. Additionally, the PPB has indicated they will be providing greater guidance to supervisors as to making findings of policy violation within AARs. All of these are positive steps though some concerns still remain, including with the PRB process. Furthermore, the change in accountability systems and processes planned by the City will need to be closely monitored going forward to ensure Substantial Compliance with this paragraph. As the implementation is still in its beginning phases, we cannot yet say that all of COCL's prior concerns have been resolved. We continue to believe that the investigative abilities of the City and the PPB remain strong overall and, when an investigation is conducted, it is conducted comprehensively. However, the accountability system is not reliable if the system does not result in fair and consistent resolutions and until all concerns have been address, we will continue to find that Paragraph 169 remains in Partial Compliance.

[12] On a quarterly basis, the COCL reviews 20 randomly selected cases that include all investigative pathways a complaint might take.

**Exhibit A**

| **COCL Recommendations** | • To achieve Substantial Compliance, the PPB should expand their approach to conducting objective investigations and hold officers accountable when policy violations are found<br><br>• To achieve Substantial Compliance, remedy barriers to ensure a fair and consistent accountability system |
|---|---|
| **Assessment Based On** | Sample of accountability cases; Sample of use of force events; Interviews with PPB and City personnel |

**Accountability Outcome Assessment**

As part of our outcome assessment, we used data provided by the City to identify trends over the past four quarters (2022 Q4 – 2023 Q3) in complaints reported against PPB members. These trends include topics such as allegation type[13], directive name, member's rank, and complaint outcomes (i.e., sustained, not sustained, or exonerated). As seen in Table 4, the number of reported complaints over the past four quarters amounted to 250 with nearly 34% stemming from East Precinct, 26% stemming from Central Precinct, 18.4% stemming from North Precinct, and the remaining complaints filed against officers in some other Unit or Division (e.g., Traffic, Detectives, etc.) or was coded as a "Mass Event – Multiple Precincts" (.8% of the total sample). We also note that the number of complaints filed by quarter has generally remained around the mid-50s, representing an overall reduction compared to 2021 Q2 and prior. Finally, although not represented in the below tables, the data show that the PPB initiated approximately 20% of complaints, with the remaining 80% of the reported complaints being initiated by a community member.

---

[13] PPB defines the allegation types as follows: **Conduct** is unjustified, unprofessional, or inappropriate actions, unsatisfactory performance. **Control** is inappropriate use of a hold or other technique to control a person's movement. **Courtesy** is discourteous or rude statements or conduct. **Disparate Treatment** is inappropriate action or statement based on a characteristic of a person such as race, sex, or age or disability. **Force** is inappropriate use of physical force or pointing a firearm at a person. **Procedure** is failure to follow an administrative or procedural requirement.

**Exhibit A**

Table 4. Complaints by Precinct (2022 Q4 – 2023 Q3)

|  | Number of Complaints | Proportion of Complaints |
|---|---|---|
| Central Precinct | 65 | 26.0% |
| East Precinct | 85 | 34.0% |
| North Precinct | 46 | 18.4% |
| Other | 54 | 21.6% |
| **TOTAL** | **250** | **100%** |



Figure 7. Complaints by Quarter (Q1 2020- Q3 2023)

We then assessed the data based on the allegation type. For this analysis, we included both open and closed cases for the past four quarters. We then looked at the breakdown of allegation type[14] overall as well by Precinct. Across the sample, there were a total of 547 allegations made in the past four quarters,[15] the most common of which was allegations of Procedure (41.3% of the sample), followed by allegations of Conduct (21.8%) and Force (20.7%). Allegations of Courtesy (9.0%), Disparate Treatment (4.9%), and Control (2.4%)

---

[15] A single complaint may have more than one allegation.

**Exhibit A**

were less common, comparatively.  These trends generally remained the same across Precincts, though there are some differences of note.  For instance, while allegations of Procedure made up approximately 40% of the entire sample, they made up approximately 60% of allegations within East Precinct.  Additionally, rates of Conduct were much higher in Central Precinct (25%) and North Precinct (27.0%) compared with their rates in East Precinct (9.7%).  Finally, the data indicate that that 26.3% of allegations made in Central Precinct related to Use of Force compared with 17.6% in East Precinct and 11% in North Precinct.

**Table 5. Reported Allegations against PPB members by Allegation Type (2022 Q4 - 2023 Q3)**

|  | All PPB | | Central Precinct | | East Precinct | | North Precinct | | Other | |
|---|---|---|---|---|---|---|---|---|---|---|
|  | N | % | n | % | n | % | N | % | N | % |
|  | 547 | 100% | 156 | 28.5% | 176 | 32.2% | 100 | 18.3% | 115 | 21.0% |
| **Allegation Type** | | | | | | | | | | |
| Conduct | 119 | 21.8% | 39 | 25.0% | 17 | 9.7% | 27 | 27.0% | 36 | 30.3% |
| Control | 13 | 2.4% | 5 | 3.2% | 5 | 2.8% | 2 | 2.0% | 1 | 0.9% |
| Courtesy | 49 | 9.0% | 16 | 10.3% | 18 | 10.2% | 10 | 10.0% | 5 | 4.3% |
| Disparate Treatment | 27 | 4.9% | 0 | 0.0% | 6 | 3.4% | 11 | 11.0% | 10 | 8.7% |
| Force | 113 | 20.7% | 41 | 26.3% | 31 | 17.6% | 11 | 11.0% | 30 | 26.1% |
| Procedure | 226 | 41.3% | 55 | 35.3% | 99 | 56.3% | 39 | 39.0% | 33 | 28.7% |

Complaints within the sample involved specific allegations against 50 different PPB directives. In Table 5, we examined PPB policy violations by reviewing the top five most common violations over the past four quarters (2022 Q4 – 2023 Q3).  Across the entire Police Bureau, the most commonly alleged violation of policy related to Directive 1010.00 (Use of Force) which accounted for 21.3% of allegations, and Directive 315.30 (Satisfactory Performance) which accounted for 19.1% of the allegations.  These were followed by allegations against Directive 310.00 (Professional Conduct and Courtesy) and Directive 650.00 (Search, Seizures and Inventories) which made up 11.6% of allegations.  All other directives found in the data made up less than 5% of allegations.  When focusing on these five allegation types, we see some differences across Precincts.  For instance, Central Precinct had a higher proportion of allegations related to Use of Force (29%) compared with East Precinct (17.6%) and North Precinct (10.2%).  Alternatively, East Precinct was over-represented with respect to allegations of Search, Seizures, and Inventories (17%) compared to Central Precinct (8.4%) and North Precinct (11.2%).  Finally, we note that nearly half the allegations related to Laws, Rules, and Orders came from Central Precinct whereas North Precinct did not have any allegations of violations for this directive.

**Exhibit A**

**Table 6. Allegations Against PPB Members by Specific Directive (Top 5) (2022 Q4 - 2023 Q3)**

| | All PPB | | Central Precinct | | East Precinct | | North Precinct | | Other | |
|---|---|---|---|---|---|---|---|---|---|---|
| | N | % | N | % | n | % | n | % | n | % |
| | 544 | 100% | 155 | 28.5% | 176 | 32.4% | 98 | 18.0% | 115 | 21.1% |
| Violation Type (Policy #) | | | | | | | | | | |
| Use of Force (1010.00) | 116 | 21.3% | 45 | 29.0% | 31 | 17.6% | 10 | 10.2% | 30 | 26.1% |
| Satisfactory Performance (315.30) | 104 | 19.1% | 34 | 21.9% | 38 | 21.6% | 19 | 19.4% | 13 | 11.3% |
| Professional Conduct and Courtesy (310.00) | 71 | 13.1% | 21 | 13.5% | 18 | 10.2% | 10 | 10.2% | 22 | 19.1% |
| Search, Seizures and Inventories (650.00) | 63 | 11.6% | 13 | 8.4% | 30 | 17.0% | 11 | 11.2% | 9 | 7.8% |
| Laws, Rules and Orders (315.00) | 25 | 4.6% | 17 | 11.0% | 4 | 2.3% | 0 | 0.0% | 4 | 3.5% |

In Table 6, we provide the investigative path that each allegation took (i.e., administratively closed, supervisory investigation, precinct referral, or full investigation). Overall, a 41.4% of allegations were administratively closed though we note that in interpreting the data, the reader should recall that a single complaint may have more than a single allegation. Therefore, while a single allegation may be administratively closed, other allegations within the same compliant may go through a full investigation. Indeed, 26.4% of allegations were subjected to a full administrative investigation with findings.  Furthermore, 21.7% of allegations were forwarded on for a supervisory investigation, with the remaining 9.4% of allegations resolved through mediation and 1.2% of allegations being forwarded as a precinct referral. In looking at differences across Precincts, the starkest difference in the past four quarters relates to North Precinct's rate of Administrative Closures and Full Investigations compared to all others.  Whereas other Precincts had allegations administratively closed approximately one-third of the time, North Precinct had nearly 70% of allegations administratively closed.  Conversely, allegations only received a full investigation 6.3% of the time whereas all other Precincts were again near 33% of allegations received a full investigation. If not done so already, the City and PPB should further explore this difference.

**Exhibit A**

Table 7.  Investigative Path by Allegation (2022 Q4 - 2023 Q3)

|  | All PPB | | Central Precinct | | East Precinct | | North Precinct | | Other | |
|---|---|---|---|---|---|---|---|---|---|---|
|  | N | % | N | % | n | % | n | % | n | % |
|  | 406 | 100% | 155 | 28.5% | 176 | 32.4% | 98 | 18.0% | 115 | 21.1% |
| Allegation Path |  |  |  |  |  |  |  |  |  |  |
| Administrative Closure (IA or IPR) | 168 | 41.4% | 38 | 34.2% | 47 | 32.6% | 55 | 69.6% | 28 | 38.9% |
| Full Investigation (IA or IPR) | 107 | 26.4% | 38 | 34.2% | 38 | 34.2% | 5 | 6.3% | 26 | 36.1% |
| Supervisory Investigation | 88 | 21.7% | 20 | 18.0% | 45 | 31.3% | 15 | 19.0% | 8 | 11.1% |
| Mediation | 38 | 9.4% | 14 | 12.6% | 11 | 7.6% | 4 | 5.1% | 9 | 12.5% |
| Precinct Referral | 5 | 1.2% | 1 | .9% | 3 | 2.1% | 0 | 0.0% | 1 | 1.4% |

We then focused on allegations which received a full and complete administrative investigation with findings.  In reviewing these data, we also refer the reader to our assessment of Par. 169 which states that the COCL's review of administrative complaints for this quarter found that all complaints were reasonably investigated and adjudicated, regardless of their outcome.  As seen in Table 7, the most common finding for an allegation receiving a full investigation was Not Sustained (including Not Sustained with a Debrief), making up 43% of such allegations.  Next most common were findings of Unfounded (including Unfounded with a Debrief) (28.9%) followed by Exonerate (including Exonerate with a Debrief) (19.6%).  Finally, the least most common finding was Sustained, which was the finding for 8.4% of allegations which received a full investigation.  For this analysis, no meaningful differences were found across Precincts.

Table 8. Reported Complaints against PPB Members by Findings (2022 Q4 - 2023 Q3)

|  | All PPB | | Central Precinct | | East Precinct | | North Precinct | | Other | |
|---|---|---|---|---|---|---|---|---|---|---|
|  | n | % | n | % | n | % | n | % | n | % |
|  | 107 | 100% | 38 | 35.5% | 38 | 35.5% | 5 | 4.7% | 26 | 24.3% |
| Finding |  |  |  |  |  |  |  |  |  |  |
| Exonerated | 21 | 19.6% | 3 | 7.9% | 9 | 23.7% | 0 | 0.0% | 9 | 34.6% |
| Not Sustained | 46 | 43.0% | 18 | 47.3% | 16 | 42.1% | 3 | 60.0% | 9 | 34.6% |
| Sustained | 9 | 8.4% | 5 | 13.2% | 2 | 5.3% | 1 | 20.0% | 1 | 3.8% |
| Unfounded | 31 | 28.9% | 12 | 31.6% | 11 | 28.9% | 1 | 20.0% | 7 | 26.9% |

We further broke down findings across Allegation Types (i.e., Use of Force, Control, Procedure, etc.) to identify differences within the groups in the rate by which they are Sustained.  In order to have a large enough sample size for this analysis, we expanded our timeframe to include all closed allegations from 2020 to the end of 2023 Q3.  Of the different

**Exhibit A**

allegation types, the data show that allegations of Procedure are the most likely to be found Sustained (40.8% of allegations Sustained), followed by Conduct (24.2%). All other allegation types were Sustained less than 7% of the time[16].

Table 9. Allegation Type by Sustained Rate. (2020 Q1 – 2023 Q3)

|  | Total Number of Allegations | Total Number of Allegations Sustained | Rate of Allegations Sustained |
|---|---|---|---|
| **Conduct** | 269 | 65 | 24.2% |
| **Control** | 8 | 0 | 0.0% |
| **Courtesy** | 16 | 1 | 6.3% |
| **Disparate Treatment** | 25 | 1 | 4.0% |
| **Force** | 388 | 12 | 3.1% |
| **Procedure** | 125 | 51 | 40.8% |

Finally, as part of this outcome assessment, we also examined information on the PPB members who received the reported complaints. Over the past four quarters, there were 246 identifiable PPB members that were the subjects of one or more complaints. Most of the complaints were against Officers (84.6%) and Sergeants (8.5%), while Detectives and Lieutenants were the subjects of less than 4% of the reported complaints combined. Similarly, Police Captains, Police Chief Assistants, and Police Commanders, accounted for 1.2% of the reported complaints for all PPB members combined. Civilians (i.e., Analyst III, Criminalist, etc.) were subjects of less than 1% of the reported complaints. Additionally, of the 246 PPB members that were subjects of reported complaints over the past four quarters, 83 PPB members were the subject of more than 1 complaints while 23 members were the subject of 3 or more complaints. The data identified only three individuals who were the subject of 4 or more complaints, with two of these members having 4 complaints and one member having 7 complaints in the four quarters.

Using data provided by the City, we also analyzed judgements and settlements from civil suits against PPB officers over the past two years.[17] The dataset contained a total of 64

---

[16] The difference in sustained rates for use of force incidents may be attributed to the fact that allegations of excessive force receive a full and complete investigation.

[17] For this analysis, we included civil suits that were <u>adjudicated</u> in the past two years, though the suits were filed as far back as 2016.

**Exhibit A**

different claims involving 70 payees.[18]  In analyzing distributions, most judgements and settlements were based on claims of "Bodily Injury (GL)" which accounted for 82.8% (N=53) of the claim numbers.  Claims of "Property Damage (GL)" accounted for 3.1% (N=2) of the claim numbers found in the dataset, with the remaining claims involving cases of "Property Damage/Bodily Injury," which accounted for 14.1% (N=9) of the claim numbers.   The settlements and judgements were in the dataset were categorized by their "Transaction Type" including Full Settlement (55.4%, N=36)[19], Agreed Judgement (40%, N=26), Judgement-Court Award – Economic Damages (1.5%, N=1), Judgement-Jury Award – Non-Economic Damages (1.5%, N=1), and Partial Settlement (1.5%, N=1).  Across all payees, the total amount of monetary compensation was $2,012,120.61, resulting in average payment of $28,744.58 per payee.  When examining Claim Type, claims involving "Bodily Injury (GL)" resulted in an average claim payment of $34,261.63, claims involving "Property Damage (GL)" resulted in an average claim payout of $15,049.25, and claims involving "Property Damage/Bodily Injury" resulted in an average claim payment of $18,461.75.   When examining Transaction Types and associated payments, claims that were resolved through a Full Settlement received an average payment of $40,333.33, claims that were resolved through an Agreed Judgement received an average payment of $19,853.05.  All other Transaction Types only had one associated claim number and we list the payment amount in Table 11.

---

[18] One settlement or judgement may include more than one payee.

[19] One claim number involved two payees, one with a Full Settlement and one with a Partial Settlement.  Numbers for this analysis therefore add up to 65.

**Exhibit A**

**Table 10. PPB Settlements**

|  |  | n | % |
|---|---|---|---|
| Total Payees |  | 70 | 100 |
| Total Claims |  | 64 |  |
|  |  |  |  |
| **Claim Type** |  |  |  |
|  | Bodily Injury (GL) | 53 | 82.8% |
|  | Property Damage (GL) | 2 | 3.1% |
|  | Property Damage/Bodily Injury | 9 | 14.1% |
|  |  |  |  |
| **Transaction Type** |  |  |  |
|  | Full Settlement | 36 | 55.4% |
|  | Agreed Judgement | 26 | 40.0% |
|  | Judgment-Jury Award- Non-Economic Damages | 1 | 1.5% |
|  | Judgment-Court Award- Economic Damages | 1 | 1.5% |
|  | Partial Settlement | 1 | 1.5% |
|  |  |  |  |
| **Settlement Amounts** |  |  |  |
|  | Total | $ 2,012,120.61 |  |
|  | Average | $ 28,744.58 |  |
|  | Minimum | $ 1.00 |  |
|  | Maximum | $ 400,000.00 |  |

**Table 11. Average Amount by Claim Type and Transaction Type**

| **Claim Type** |  |  |
|---|---|---|
| Bodily Injury (GL) | $ | 34,261.63 |
| Property Damage (GL) | $ | 15,049.25 |
| Property Damage/Bodily Injury | $ | 18,461.75 |
| **Transaction Type** |  |  |
| Full Settlement | $ | 40,333.33 |
| Agreed Judgement | $ | 19,853.05 |
| Judgment-Jury Award- Non-Economic Damages | $ | 41,036.62 |
| Judgment-Court Award- Economic Damages | $ | 904.73 |
| Partial Settlement | $ | 2,000.00 |

**Exhibit A**

# Section IX: Community Engagement and Creation of Portland Committee on Community Engaged Policing

## A. Portland Committee on Community Engaged Policing

| **Settlement Agreement Paragraph** |
|---|
| 141. To leverage the ideas, talent, experience, and expertise of the community, the City, in consultation with the DOJ, shall establish a Portland Committee on Community Engaged-Policing ("PCCEP"), within 90 days of the Effective Date of the relevant amendments to this Agreement. |
| 142. The PCCEP shall be authorized to: (a) solicit information from the community and PPB about PPB's performance, particularly with regard to constitutional policing; (b) make recommendations to the Chief, Police Commissioner, the Director of the Office of Equity and Human Rights, and community and, during the effective period of this Agreement, to the DOJ; (c) advise the Chief and the Police Commissioner on strategies to improve community relations; (d) contribute to the development and implementation of a PPB Community Engagement Plan; and (e) receive public comments and concerns. The composition, selection/replacement process and specific duties of the PCCEP shall be set forth in a separate Plan for Portland Committee on Community-Engaged Policing ("the PCCEP Plan") which shall be substantially similar to Exhibit 1 to this Agreement. Amicus AMAC and Intervenor PPA shall be consulted regarding and DOJ shall review and approve any amendments to the PCCEP Plan proposed to occur during the effective period of this Agreement. |
| 143. PCCEP's membership will come from a reasonably broad spectrum of the community. PCCEP members shall not have an actual or perceived conflict of interest with the City of Portland. |

| **Compliance Label** | 141. Substantial Compliance |
|---|---|
| | 142. Substantial Compliance |

**Exhibit A**

| | 143. Substantial Compliance |
|---|---|
| **Methodology** | Observation of PCCEP meetings; Review of minutes, reports, and recommendations; Interviews with City staff and PCCEP |

**Compliance Assessment**

In the third quarter of 2023, PCCEP continued to function as a legitimate body for community engagement.

The PCCEP held three full committee meeting (July 26, August 16, and September 20), as well as meetings of their Steering Committee (July 12), Settlement Agreement and Policy Sub-Committee (August 2 and September 6), and their Community Engagement Sub-Committee (July 19 and September 13). The community was able to participate in these meetings via Zoom.

During the third quarter of 2023, the PCCEP did not develop or submit any new recommendations to the City.

The PCCEP Plan referenced in Paragraph 142 notes "the PCCEP shall meet at least twice per year with the Chief, the Police Commissioner, PPB Precinct Commanders, PPB Neighborhood Response Teams, and a representative of the Office of Neighborhood Involvement Crime Prevention to assess and solicit comment on the PPB's activities in regards to community outreach, engagement, and problem-solving policing."  In the third quarter, the Mayor attended PCCEP's August 16 meeting, and discussed PCCEP's role, and the process related to PCCEP recommendations. The other parties noted in this section of the PCCEP Plan have not met with PCCEP to discuss community engagement and outreach. We therefore continue to recommend PCCEP specifically invites the Mayor to attend a meeting with a defined agenda, and the Mayor/Police Commissioner (in particular, as the official this body reports to directly) prioritize meeting with PCCEP to maximize the group's effectiveness.

The City has made a good faith effort over the past several quarters to identify and recruit new PCCEP members, and Council appointed several new members in Q3. PCCEP closed this quarter with 12 members – leaving one non-youth seat vacant.

As a full body, PCCEP comes from a reasonably broad spectrum of the community, with gender balance and approximately half the membership identifying as BIPOC. In this quarter, the COCL has not identified or been notified of an actual or perceived conflict of interest with a PCCEP member and the City of Portland.

**Exhibit A**

| | |
|---|---|
| **COCL Recommendations** | • To maintain Substantial Compliance with Paragraph 142, the City should continue to promptly respond to PCCEP's recommendations and the Mayor and Police Commissioner should fulfill the requirement to meet with PCCEP "at least twice per year"<br><br>• To maintain Substantial Compliance with Paragraph 143, the City should continue to identify and recruit sufficient PCCEP members to maintain a full body<br><br>• The City, with guidance from PCCEP, should prioritize the recruitment and retention of youth members on PCCEP |
| **Assessment Based On** | Content of PCCEP meetings; Interview with City staff; Substance of reports and recommendations; Level of community engagement |

| **Settlement Agreement Paragraph** | |
|---|---|
| 144. The City shall provide administrative support so that the PCCEP can perform the duties and responsibilities identified in this Agreement and in the PCCEP Plan. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Observation of PCCEP meetings; Review of minutes, reports, and recommendations; Interviews with City staff and PCCEP |
| **Compliance Assessment** | |
| PCCEP's staff support comes from the Community Safety Division (CSD) in the Office of Management and Finance. During the third quarter, PCCEP continued to be staffed by a full-time Project Manager as well as part-time staff shared with other CSD advisory boards and commissions. This additional support includes a Unit Manager (0.25 full-time equivalent [FTE]), one Project Assistant (0.25 FTE), and one Community Service Aide (.33 FTE), bringing the total to 1.83 FTE. | |

**Exhibit A**

Meeting notes continue to be posted in a timely fashion on the meeting's event page. PCCEP staff continued to consistently tag minutes and agendas in the Documents section of PCCEP's website to allow PCCEP members and members of the public to use the filter function and easily find all documents in one place. Videos of meetings have also continued to be posted in a timely manner on YouTube, and the link to PCCEP's YouTube channel is accessible from PCCEP's home page.

We continue to recommend that the City maintain timely posting of information about PCCEP's work so that the public is kept informed about these community engagement opportunities and productions. In addition, we recommend the City continue to fully support the PCCEP staff in their roles.

| | |
|---|---|
| **COCL Recommendations** | • To maintain Substantial Compliance, continue adequate staffing dedicated to supporting PCCEP<br><br>• To maintain Substantial Compliance, continue posting minutes of PCCEP meetings within 10 business days after a PCCEP meeting, including in the Documents section of the PCCEP website |
| **Assessment Based On** | Review of PCCEP website and YouTube channel; Interviews with staff |

## B. PPB's Role in Public Engagement and Outreach

### 1. System Overview

Under the Settlement Agreement, the PPB is expected to introduce or expand its systems of community engagement, both with PCCEP and other resources. This includes maintaining or expanding its systems of measurement to better understand police-community relations and develop tailored responses to issues or concerns.

### 2. The Community Engagement Plan

| **Settlement Agreement Paragraph** |
|---|
| 145. To ensure constitutional policing, to closely interact with the community to resolve neighborhood problems, and to increase community confidence, PPB shall work with City |

**Exhibit A**

resources knowledgeable about public outreach processes to develop and finalize a CEO Plan.

146. Within 120 days of the effective date of the relevant Amendments to this Agreement, the City, in consultation with the PCCEP, will conduct another reliable, comprehensive and representative survey of members of the Portland community regarding their experiences with and perceptions of PPB's community outreach efforts and accountability efforts and where those efforts could be improved, to inform the work of the PCCEP and the development and implementation of the Community Engagement Plan.

| | |
|---|---|
| **Compliance Label** | 145. Substantial Compliance |
| | 146. Substantial Compliance |
| **Methodology** | Monitor progress on the implementation of the Community Engagement Plan; Interview City personnel and advisory group members about community engagement and support |

### Compliance Assessment

The COCL continues to use the PPB's Community Engagement Plan to provide the framework for evaluating compliance with Paragraphs 145 and 146. The plan has four components: public involvement, communications, access, and training. Overall, we continue to find Substantial Compliance with the requirements of these paragraphs. For instance, for Q3, the City and PPB provided documents related to meetings of the Latino Advisory Council, the Coalition of Advisory Groups, and the Asian and Pacific Islander Advisory Council. Additionally, the evidence provided shows high-ranking officials and key personnel with PPB attending a variety of advisory group meetings, community events, and neighborhood meetings. We therefore continue to find Substantial Compliance for Paragraphs 145 and 146.

For Paragraph 146, we continue to suggest the City and PPB implement a new survey to evaluate community members' perceptions of PPB service, including through the use of a contact survey for specific interactions. This was also echoed by the PCCEP (albeit in the fourth quarter), who recommended the City "implement a contact survey program that would give any Portlander who has contact with police an opportunity to submit feedback

**Exhibit A**

about the content and quality of their interaction."   We will report on the City's response to this recommendation in future reports.

| COCL Recommendations | • Conduct a police-focused community survey and, where possible, incorporate measures of the quality of actual encounters with PPB officers. |
|---|---|
| Assessment Based On | Reviews of City and PPB reports; Feedback from the City, PPB, and advisory groups; Implementation of the Community Engagement Plan |

## 3. Data Collection, Analysis, and Reporting

The PPB is required to collect, analyze, and report demographic data about police interactions with the community to ensure constitutional policing and build community trust (Paragraph 147–150).

| **Settlement Agreement Paragraph** |
|---|
| 147. PPB shall continue to collect appropriate demographic data for each precinct so that the Precinct Commander, considering any input from the PCCEP, may develop outreach and policing programs specifically tailored to the residents of the precincts. The data shall also be provided to PCCEP to inform its work. |
| 148. PPB shall continue to require that officers document appropriate demographic data regarding the subjects of police encounters, including the race, age, sex, and perceived mental health status of the subject, and shall provide such information to the PCCEP and make such information publicly available to contribute to the analysis of community concerns regarding discriminatory policing. PPB shall consider enhancements to its data collection efforts, and report on its efforts to enhance data collection to the DOJ by no later than December 31, 2013, and quarterly thereafter. |

| Compliance Label | Compliance Label |
|---|---|
|  | 148. Substantial Compliance |

**Exhibit A**

**Compliance Assessment**

For Paragraph 147, the PPB compiled and reported demographic data in 2020 pertinent to each precinct and posted it on their website. As noted in our last report, the PPB previously shared with precincts the updated demographics based on the 2017–2021 American Community Survey Five-Year Estimates provided by the U.S. Census Bureau. As such, they remain in Substantial Compliance with Paragraph 147 for this quarter. Furthermore, they continue to keep the public informed of this data, as well as a wide array of other public safety data posted on the Bureau's Open Data portal.[20]

The PPB remains in Substantial Compliance with Paragraph 148 as they continue to collect, analyze, and report demographic data from individuals who are stopped by the PPB using its Stops Data Collection app. In terms of data analysis and reporting requirements, the PPB's Strategic Service Division continued to produce high-quality Stops Data Collection reports, both quarterly and annually, and share them with PCCEP and the public on the PPB's website. The Stops Data Collection Report for the second quarter of 2023 was posted on July 25 of this year, and the report for the third quarter was posted on October 31 of this year. In the second quarter, stops increased from 3,527 stops to 4,401.  White subjects accounted for 61% of all stops citywide, followed by Black or African American (17%), Hispanic or Latino (14%), Asian (5%), Middle Eastern (2%), Native Hawaiian or Other Pacific Islander (1%) and American Indian or Alaskan Native (less than 1%). Less than 1% of the stops involved an individual with a perceived mental health issue.

The PPB's 2022 Annual Stops Report was also released in July of this year. The report highlighted that stops across the city decreased in 2022 by 3%, though an increase in staffing of the Traffic Division would likely increase stops moving forward. The report also highlighted some key findings. Of particular note, the report found that "Native Hawaiian and other Pacific Islander was the only group stopped at a disparate rate compared to the 2022 Injury Collision Benchmark." Additionally, this was the first report where are request for consent searchers did not differ amongst racial and ethnic groups of drivers. However, the report indicated that drivers perceived to be Black/African American "were significantly more likely to be stopped for a Non-Moving Violation than other perceived racial / ethnic groups". This trend is problematic, particularly in light of PPB's reference to Senate Bill 1510 that limits the ability of officers to conduct stops for non-moving offenses. We agree with the report's recommendation to ensure traffic stop activity aligns with Oregon state law. However, as PPB continues to put together high quality traffic stops analysis, we continue to find them in Substantial Compliance with Par. 148 and maintain

---

[20] https://www.portlandoregon.gov/police/71673

**Exhibit A**

our suggestions that the City and PPB continue to evaluate the implications of the reports and work with the community to address any potential disparities.

| | |
|---|---|
| **COCL Recommendations** | • Continue the dialogue with community members around racial disparities in traffic stops and searches |
| **Assessment Based On** | COCL review of PPB precinct demographic reports; COCL review of PPB Stops Data Collection reports; COCL review of relevant PPB directives |

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 149. The COCL, PPB, and DOJ will jointly develop metrics to evaluate community engagement and outreach. PCCEP may review these metrics and may suggest additional metrics to DOJ and PPB. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review of metrics requirement |

**Compliance Assessment**

The City has completed the requirement to develop a set of metrics to evaluate community engagement, and therefore remains in Substantial Compliance. As noted in prior reports, several of these metrics have been used by the PPB to guide their Community Engagement Plan though others have yet to be implemented. Additionally, we agree with the DOJ that the PCCEP should take the opportunity in the near future to review the metrics to ensure that they continue to align with community expectations. Consistent with this suggestion, we maintain our position that the City and PPB should explore a contact-survey so as to be confident that the direct interactions that PPB members have with the community is characterized by fairness and respect (in addition to suggestions for organizational

**Exhibit A**

improvement discussed in prior reports). This recommendation was also echoed by PCCEP in the fourth quarter of 2023.

| | |
|---|---|
| **COCL Recommendations** | • As part of everyday policing, the City should introduce a contact survey to measure the level of procedural justice and public satisfaction with police-public interactions, especially interactions with constitutionally protected populations |
| **Assessment Based On** | The development of metrics that capture multiple dimensions of community engagement |

| |
|---|
| **Settlement Agreement Paragraph** |
| 150. Annually, PPB shall issue a publicly available PPB Annual Report, which shall include a summary of its problem-solving and community policing activities. A draft of the Annual Report shall be provided to the PCCEP for review and comment before the report is finalized and released to the public. Once released, PPB shall hold at least one meeting in each precinct area and at a City Council meeting, annually, to present its Annual Report and to educate the community about its efforts in community policing in regard to the use of force, and about PPB's policies and laws governing pedestrian stops, stops and detentions, and biased-free policing, including a civilian's responsibilities and freedoms in such encounters. |

| | |
|---|---|
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review of the PPB's Annual Report; Interviews with PPB and City staff involved with PCCEP |
| **Compliance Assessment** | |

The PPB remained in Substantial Compliance with Paragraph 150 for the third quarter of 2023. In June, PPB shared the draft of the 2022 Annual Report with PCCEP at the Settlement and Policy Subcommittee Meeting. PPB held precinct meetings for each of the

**Exhibit A**

three precincts on July 20, 25, and 27 at North, East and Central, respectively. They were held on Zoom and two to three dozen community members attended each one. The Chief then presented the report to City Council on August 23, 2023and it was unanimously accepted.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | Review of progress on the content and presentation of the PPB's Annual Report |

### Settlement Agreement Paragraph

151. PCCEP shall meet as needed to accomplish their objectives as set forth in the PCCEP Plan. PCCEP shall hold regular Town Hall meetings which shall be open to the public. To the extent that PCCEP meetings are subject to the Oregon Public Meetings Law, or similar regulatory or statutory requirements, the City shall be responsible to give advice necessary to the PCCEP to ensure compliance with those laws and agrees to represent PCCEP in any challenges regarding compliance with those laws.

152. The City shall provide PCCEP members with appropriate training necessary to comply with requirements of City and State law.

| **Compliance Label** | 151. Substantial Compliance |
|---|---|
| | 152. Substantial Compliance |

### Compliance Assessment

During the third quarter of 2023, the PCCEP remained active by holding three full committee meetings, a Steering Committee meeting, a Settlement Agreement and Policy Sub-Committee meeting, and their Community Engagement Sub-Committee meeting. Additionally, at least one representative of the City Attorney's Office attended PCCEP meetings and continued to advise PCCEP as necessary to ensure compliance with public meetings laws. Furthermore, the City continues to train new PCCEP appointees as needed

**Exhibit A**

based on the *Guide for Volunteer Boards & Commissions* materials prepared for all City advisory boards. These materials cover the Oregon Government Ethics Commission guide for public officials, the City's code of ethics, restrictions on political activity for public officials, and the Oregon Attorney General's *Public Records and Public Meetings Manual.* In the third quarter, the PPB provided the PCCEP Settlement and Policy subcommittee with a PowerPoint on Stops Data for their review, consideration and preparation of questions at their September meeting in anticipation of a live presentation by PPB and the Stops Data analyst and supervisor at the October meeting. As a result, we continue to find Substantial Compliance with the requirements of this paragraph.

| | |
|---|---|
| **COCL Recommendations** | • Continue to maintain records of training for new PCCEP members; ensure current and future PCCEP members participate in all required trainings and are offered a meaningful opportunity to participate in any optional training |
| **Assessment Based On** | Regularity and content of PCCEP meetings; Provision of City's legal advice and training for PCCEP |

## PCCEP Community Engagement Outcome Assessment

The COCL recognizes the importance of PCCEP and has worked to identify opportunities to engage members more frequently and authentically. In October 2023, the COCL team met with the two co-Chairs of PCCEP to hear their insights about the COCL and the Settlement agreement, share recommendations, and discuss opportunities for further collaboration. In December 2023, the COCL team reached out to all current PCCEP members, requesting members fill out an online survey or schedule time for a phone interview regarding PCCEP and community engagement during the period between April and October of 2023. Of the current PCCEP members, only eight were active during that period. Four of those eight members—and one newer member—completed a survey. Those four members have all been on PCCEP for at least one year. The last survey, conducted six months ago, received responses from five PCCEP members.

### *PCCEP Duties*

We asked about the ability of PCCEP to fulfill its' five authorized duties and responsibilities, as outlined in Par. 142, during the fourth quarter of 2022 and the first quarter of 2023. In our last survey, a majority of PCCEP members felt PCCEP had not been effective at accomplishing many of its

**Exhibit A**

authorized duties and responsibilities during this time period. In this survey, PCCEP members noted considerable improvement in their ability to fulfill three of those five authorized duties.

1. **Solicit information from the community and the PPB about PPB's performance, particularly with regard to constitutional policing;**

   Four PCCEP members surveyed felt PCCEP has been somewhat effective in soliciting information from the community about PPB's performance; the fifth felt PCCEP has been very effective. This is in contrast to the previous survey, when most PCCEP members surveyed felt they had not been effective in soliciting information from the public about PPB's performance. More recently, while still noting room for improvement, one PCCEP member said, "the Community Engagement subcommittee is trying really hard to get into the community to hear from these groups, we are bringing the community to us."

2. **Make recommendations to the Chief, Police Commissioner, the Director of the Office of Equity and Human Rights, and community and, during the effective period of this Agreement, to the DOJ**

   In the last survey, three of five PCCEP members surveyed felt PCCEP has been not effective at making recommendations; two believed PCCEP has been somewhat effective in this area. Now, three of those surveyed feel PCCEP is very effective in this area, and the other two feel PCCEP was somewhat effective. "I'm impressed with PCCEP's ongoing recommendation system," one member noted, and another cited PCCEP's direct involvement in writing recommendations. Both PCCEP members who added comments did raise questions about what happens to recommendations after PCCEP makes them, with one noting "it can take years" for the recommendations to gain approval or be implemented, and the other saying they are "just not sure how effective" the recommendations are.

3. **Advise the Chief and the Police Commissioner on strategies to improve community relations**

   PCCEP members remain mixed in their opinion of how effective the body has been on advising the Chief and the Police Commissioner with three saying PCCEP is very or somewhat effective, and two saying PCCEP has not been effective. One member expressed, "I am not seeing this done in our meetings, but I am not sure if others with PCCEP, like the co-chairs are doing this. I would like to do this and I have ideas, but I would like to see [the Chief and Police Commissioner] at our meetings."

4. **Contribute to the development and implementation of a PPB Community Engagement Plan**

   There was some improvement in PCCEP members' evaluation of how effective the group has been in their contributions to the PPB Community Engagement Plan; previously, the majority of those surveyed felt PCCEP was not effective. Now, two of five respondents feel PCCEP

**Exhibit A**

remains ineffective in this area, but a third felt PCCEP has been somewhat effective, and a fourth very effective (the fifth wasn't sure or didn't know).

5. **Receive public comments and concerns**

Previously, opinions on PCCEP's effectiveness regarding receiving public comments and concerns were mixed; Of the five PCCEP members surveyed six months ago, two felt PCCEP has been very effective. Today, four of the five respondents marked PCCEP as very effective in this area, and the fifth felt PCCEP is somewhat effective. "More can be done but the meetings held (that had audio input / were open) were good channels for public comments and concerns."

PCCEP members interviewed were also asked whether PCCEP is fulfilling its mission[21]. In the previous survey, three of five said yes. In this survey, all five respondents said yes. "every PCCEP project is a step closer to the goal," noted one member, while another noted that while they chose yes, they "don't feel like we are doing as much as we could be doing."

### PCCEP Relationship with and Support from the City

PCCEP members interviewed were asked to provide feedback related to Par. 144, which requires the City to "provide administrative support so that the PCCEP can perform the duties and responsibilities identified in this Agreement and in the PCCEP Plan." Consistent with the last survey, three of the PCCEP members surveyed felt the City had provided a lot of support to PCCEP, and another member felt the city has provided some support, noting it was "managed support." The fifth member indicated the City had not provided enough support to PCCEP, but did not add any comments. "[The City's team] provide terrific support," one noted, and another who felt the City provided some support added "I always would like to see things done in a faster manner and wish we had an office where we could meet to work on projects."

PCCEP members were asked to characterize their working relationship with the Mayor/Police Commissioner with an open-ended response. As with the previous survey, one member called the working relationship "nonexistent." A second said the relationship "NEEDS WORK... A lot of work." The other three made comments indicating the working relationship has improved, noting it's "good, can be better," it's "honest and open," and it "seemed open, in terms of access to staff and meetings."

---

[21] "The mission of the Portland Committee on Community-Engaged Policing (PCCEP) is to work with the Mayor/Police Commissioner, Portland Police Bureau, and Portland's diverse constituencies to solicit and exchange information between the community and Portland Police Bureau (PPB) to achieve the desired outcomes of equitable policing which exceeds constitutional requirements, and meaningful community engagement with and trust in PPB."

**Exhibit A**

### PCCEP Relationship with Portlanders

Consistent with the previous survey, four PCCEP members felt PCCEP has been somewhat or very ineffective in working with Portland's diverse communities. "For a group of volunteers especially, the outreach efforts are very effective," one of those four noted. The fifth felt PCCEP has been somewhat ineffective, noting room for improvement "I am personally trying to do outreach, but I do not see us partnering with communities I had hoped we would be working with. I do not see the staff doing outreach, but they also do not share that information if they are. I think we are each engaging with our own contacts and not making an overall effort on this."

Members were asked if they personally have met with other community-based organizations, solicited community input on reports, policies, or other PCCEP agenda items, shared information about PCCEP meetings, or otherwise individually worked to engage other Portlanders in PCCEP's work. All five of the PCCEP members surveyed said they have shared information about PCCEP's meetings, solicited community input on reports, policies, or other PCCEP agenda items, and met with community-based organizations and individuals to share information about PCCEP and ask community members to join in. One member noted they had also contacted people after they have attended a PCCEP meeting to see if they would like to become more involved. Two members noted they could use "materials" to support their engagement and outreach. "I definitely feel comfortable engaging. We need more materials. I attended and tabled a youth outreach event and was able to get the office to make me copies of what they had, but I had to make my own posters to hang up at my table."

### Conclusion

Overall, PCCEP's assessment of its work and role regarding community engagement has improved is most areas, with the notable exception of the relationship with the Mayor/Police Commissioner and Police Chief, where opinions remain mixed. As with the previous survey, the COCL acknowledges that they both have representatives who regularly attend PCCEP meetings and report back to them—and the Mayor did attend a PCCEP meeting during this period—but even more collaboration and relationship building would serve all parties well.

There is continued optimism that PCCEP is on the right track, though several feel the group could be doing more. Several members offered suggestions in that spirit, such as "recruit more people of color," develop a PCCEP "script" or talking points to help members talk about their work consistently; another suggested social media support "to help reach the general public" and share more about PCCEP's work and how the public can engage.

**Exhibit A**

# Section XI: Additional Remedies

After five mediation meetings, the City and DOJ reached agreement on a set of remedies to achieve compliance with the terms of the Settlement Agreement.[22] On January 10, 2022, DOJ and the City filed their final Joint Status Report in U.S. District Court (ECF 275), summarizing the mediation results and the specific remedies on which the parties agreed in principle. As such, the parties have agreed to add a new section to the Settlement Agreement: Section XI, which contains eight new paragraphs, 188 to 195. These remedies were approved by the Portland City Council on February 9, 2022, and by the federal judge at the Fairness Hearing on April 29, 2022.

| **Settlement Agreement Paragraph** | |
| --- | --- |
| 188. The City shall revise Force Data Collection Report (FDCR) and After Action Report forms to capture when the forms are edited and completed as part of PPB's implementation of Office365, which is ongoing. In the interim, pursuant to a process approved by the United States, PPB shall capture in the existing FDCR and After Action Report forms the author's name and the time and date of initial submission and any subsequent edits, as well as the name, time, and date of each level of review. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review of AAR and FDCR forms |
| **Compliance Assessment** | |
| During the third quarter of 2023, our review demonstrated that the updated FDCR and AAR forms continue to be used and continue to capture the data required by Paragraph 188. We therefore continue to find that the City and the PPB have substantially complied with the requirements of Paragraph 188. | |
| **COCL Recommendations** | • No recommendations at this time |

---

[22] These meetings included the Intervenor-Defendant PPA, the enhanced Amicus Curiae Albina Ministerial Alliance Coalition for Justice and Police Reform (AMAC), and Amicus Curiae Mental Health Alliance.

| | |
|---|---|
| **Assessment Based On** | Updated FDCR and AAR forms and use by officers and supervisors |

---

### Settlement Agreement Paragraph

189. Before November 25, 2021, the City shall provide funding for a qualified outside entity to critically assess the City's response to crowd control events in 2020 in a public-facing report and prepare a follow-on review of the City's response to the report. The City will use the report to prepare a training needs assessment. The report, training needs assessment, and follow-on review will be completed consistent with a Scope of Work and deadlines agreed upon by the City and the United States, and such agreement shall not be unreasonably withheld by either Party. If the City demonstrates to the United States that significant progress is being made toward meeting the obligations under the agreed upon Scope of Work and deadlines, the City may request a reasonable modification of the Scope of Work or extension of deadlines, which the United States shall not unreasonably decline.

| | |
|---|---|
| **Compliance Label** | Partial Compliance |
| **Methodology** | Interviews with PPB officials and review of documents |

### Compliance Assessment

In the third quarter of 2023, IMLLC publicly released their report and participated in a public forum wherein they took questions and comments from community members.  In reviewing the report, we found IMLLC's work to be thorough in that it contained a review of PPB directives, trainings, operational plans, after-action reports, administrative investigations, videos, and interviews of PPB members, community members, and other City employees (among other methodologies).  The IMLLC's report made findings regarding key characteristics of the 2020 protests, and the impact on the protests from members of the community, PPB, federal law enforcement, and the City.  The IMLLC's report also discussed the effect of the protests on police-community relations, property damage, and PPB operations.  Overall, the IMLLC's findings found a need for greater coordination in response to protests, improved force management systems, more effective public order training, and clearer policies and expectations for officers' response to protest events.  For these findings, the IMLLC made corresponding recommendations.  Many of these findings and recommendations also mirrored those of COCL and DOJ in finding the PPB and City had fallen out of Substantial Compliance in 2020.

**Exhibit A**

With respect to Par. 189, the City has achieved the first component in that it "provide[d] funding for a qualified outside entity to critically assess the City's response to crowd control events in 2020 in a public-facing report." The City and PPB must now take the report and develop a needs assessment based on its findings, the second component of Par. 189 and one that PPB has taken initial steps towards achieving. For instance, both Needs Assessments prepared by PPB this quarter (see Par. 79) reference IMLLC's report and noted where the report's findings and recommendations are being addressed through recent and future training. However, most of the recent training referenced came in 2021 or earlier in 2023 (prior to the release of the report) and the Needs Assessment merely says that additional training is being considered for 2024 without further detail. Without additional information regarding future training, we are unable to say that this component has been fully achieved.

We recognize that some prior training has addressed critical shortcomings in PPB's protest response. However, we cannot say that all recommendations from IMLLC are being addressed because PPB and the City have not provided a detailed roadmap for addressing all of the recommendations. We were informed that the City and PPB are prioritizing reforms based on the order of importance as stated by IMLLC, though this doesn't reflect a planned, holistic approach to the remedies. We suggest the City and PPB develop such a roadmap that contains how the City plans to address each finding and recommendation, resulting in a more efficient and effective reform process.

Finally, in accordance with Par. 189, the IMLLC will return six months after the release of their report to conduct a follow-up assessment. That report is slated to be issued in the Fall of 2024. This will satisfy the third component of this paragraph. As a result, the City and PPB continue to remain in Partial Compliance.

| | |
|---|---|
| **COCL Recommendations** | To achieve Substantial Compliance:<br><br>• The City must respond to the IMLLC report<br><br>• The PPB must use the IMLLC report to prepare a training needs assessment, training plan, and relevant crowd management training<br><br>• IMLLC must prepare a follow-up report that reviews the City's response to their original report, including the PPB's training needs assessment<br><br>• The City should prepare a detailed roadmap for responding to IMLLC's findings and recommendations. |

**Exhibit A**

| | |
|---|---|
| | • The City should provide COCL with IMLLC's reports, the PPB's training needs assessment report, and training plans |
| **Assessment Based On** | Evaluation of the process employed by IMLLC and the products planned and delivered by this group |

| **Settlement Agreement Paragraph** | |
|---|---|
| 190. Before November 25, 2021, the City shall provide in the budget a separate line item for overtime costs to conduct necessary training for PPB officers. The City shall include a similar line item in subsequent budgets for the duration of this Agreement. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review of budget documents |
| **Compliance Assessment** | |
| The City has continued to include a separate line item for these overtime costs in the City's budget. Hence, the COCL finds that the City has achieved Substantial Compliance with the requirements of Paragraph 190. | |
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Based On** | Review of budget documents and amount of overtime funding included in the budget |

| **Settlement Agreement Paragraph** | |
|---|---|
| 191. Before November 25, 2021, the City shall budget for a qualified civilian in PPB to direct all educational aspects of PPB's Training Division alongside the Captain of the Training Division, who will direct administrative aspects of PPB's Training Division. The respective roles and responsibilities of the civilian and the Captain are outlined in Attachment 1 appended to this Agreement, provided that the Parties may agree to modify those roles and will not unreasonably withhold such agreement. Once funding is provided, | |

**Exhibit A**

the City shall post the position within 90 days. Once the position is posted, the City shall make a job offer to a suitable candidate and complete any required background screenings within 150 days. If the City demonstrates to the United States that no suitable candidate applied for or accepted the position, or that the City is otherwise making significant progress toward meeting the deadlines in this Paragraph, the City may request a reasonable extension of time to fill the position, which the United States shall not unreasonably withhold.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Tracking the hiring process for the Police Education Director |

| | |
|---|---|
| **Compliance Assessment** | |
| This paragraph was found in Substantial Compliance in the second quarter of 2023 and relates to the process of hiring a civilian training director. As the PPB has retained the same civilian training director since then, we continue to find Substantial Compliance with the requirements of this paragraph. Should PPB transition to another director in the future, we will refer the City to the suggestions we made for improving the hiring process in our 2023 first quarter report. | |

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | The City's ability to search for and hire a qualified candidate within a reasonable time period |

| |
|---|
| **Settlement Agreement Paragraph** |
| 192. Within 60 days of the date that this paragraph is entered as an order of the Court, the City shall initiate an appropriate investigation through IPR to identify: (a) the PPB Lieutenant(s) and above who trained Rapid Response Team members to believe that they could use force against individuals during crowd control events without meeting the requirements of PPB Directive 1010.00; (b) the PPB incident commander(s) and designee(s) with the rank of Lieutenant or above who directed or authorized any officer to use force in violation of PPB Directive 1010.00, or who failed to ensure that FDCRs and After Action Reports arising from the crowd control events starting on May 29, 2020, and |

ending on November 16, 2020, were completed as required by Section 13.1 of PPB Directive 635.10; and (c) the PPB Commanders and above who failed to timely and adequately clarify misunderstandings and misapplications of PPB policy (including this Agreement) governing the use, reporting, and review of force during the crowd control events starting on May 29, 2020, and ending on November 16, 2020. Once the IPR investigation is complete, the Police Commissioner and/or the Chief of Police, as required by this Agreement, shall hold accountable those investigated members of the rank of Lieutenant and above who are determined to have violated PPB policies (including this Agreement) as outlined in this paragraph. The Parties affirm the obligation in this Agreement and Directive 330 for IPR and PPB to investigate any sworn member if, during the investigations of Lieutenants and above required by this paragraph, information is discovered suggesting that any sworn member may have violated PPB policy or this Agreement.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Interviewed PPB, CAO, and IPR personnel |

**Compliance Assessment**

IPR is currently conducting the series of investigations required by Paragraph 192. Currently, IPR has four open investigations related to Paragraph 192 regarding the PPB and City responses to the 2020 protests. Although each case is at a different stage in its investigation, the COCL will not be privy to all the facts of these investigations until they are completed. Additionally for any information we learn, we would be unable to comment on any open administrative investigation. At this time, we continue to find the City in Partial Compliance with the requirements of Paragraph 192. Substantial Compliance will require IPR and the City to conduct investigations that are thorough, fair, and reasonable, which we will assess upon the completion of the investigations.

| COCL Recommendations | • To achieve Substantial Compliance, complete a thorough, fair, and reasonable investigation of the command personnel associated with the 2020 crowd control and the training they provided |
|---|---|
| | • To achieve Substantial Compliance, hold accountable, as appropriate, the investigated command personnel members who are found to have violated PPB policies |

**Exhibit A**

| | |
|---|---|
| | (including this Agreement) as described in Paragraph 192 |
| **Assessment Based On** | Discussions with City personnel |

| **Settlement Agreement Paragraph** ||
|---|---|
| 193. In addition to the requirements of paragraph 150 of this Agreement, PPB shall release its Annual Report and hold the required precinct meetings no later than September 20 of each year for the duration of this Agreement. ||
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Confirmed the dates of completion, dissemination, and discussion of the PPB's 2023 Annual Report; Observed and reviewed precinct meetings; Engaged in methods reported under Paragraph 150 |
| **Compliance Assessment** ||
| The PPB remained in Substantial Compliance with Paragraph 150 for the third quarter of 2023. In June, PPB shared the draft of the 2022 Annual Report with PCCEP at the Settlement and Policy Subcommittee Meeting, soliciting comments and recommendations from the PCCEP and other community members. PPB held precinct meetings for each of the three precincts on July 20, 25, and 27 at North, East and Central, respectively. The Chief then presented the report to City Council on August 23, 2023, and it was unanimously accepted, fulfilling the requirements of this paragraph. ||
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Based On** | Date the PPB's Annual Report was completed; Date the PPB Annual Report was presented at three precinct meetings |

| **Settlement Agreement Paragraph** |
|---|

**Exhibit A**

194. Within 210 days of the date this paragraph is entered as an order of the Court, the City shall implement body-worn cameras (BWCs) pursuant to a policy that is subject to the policy-review-and-approval provisions of this Agreement; provided, however, if the City is making substantial progress this deadline may be extended by agreement of the United States, which shall not be unreasonably withheld.

a. The City will comply with any collective bargaining obligations it may have related to BWCs, which the City agrees to fulfill expeditiously and in compliance with its obligation to bargain in good faith.

b. Within 60 days of the date this paragraph is entered as an order of the Court, the Compliance Officer shall gather public input on the use of BWCs and provide this information and any technical assistance to the public and the Parties to inform the drafting of a policy. The United States reserves its policy review rights related to the BWC program under the terms of this Agreement.

c. If the City has not finally discharged its collective bargaining obligations as to BWCs within 120 days of the date this paragraph is entered as an order of the Court, the Parties stipulate that the Court may thereafter hold periodic status conferences every 60 days to receive an update on the procedural status of the collective bargaining process related to BWCs. The City will provide a final procedural status update upon the completion of the collective bargaining process.

d. The United States reserves its enforcement rights related to the BWC program under the terms of this Agreement. If collective bargaining or any related arbitration or appeal results in a BWC program that the United States determines, in its sole and absolute discretion, will not adequately resolve the compliance concerns identified in the April 2, 2021 notice of noncompliance, the Parties agree that the United States can seek court enforcement pursuant to paragraph 183, without having to repeat the steps laid out in paragraphs 178 to 182.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Review of BWC pilot policy; Observation of BWC training; Communication with PPB personnel |

**Compliance Assessment**

During the third quarter of 2023, the PPB took several steps toward full implementation of the BWC program. For instance, in August, several members of the COCL team were able to observe BWC training provided by PPB to Central Precinct members, members of the FIT team, and detectives. This training included modules on the BWC policy, wearing the

cameras, operating the cameras, docking the cameras and downloading the videos, and modules for specific supervisor and detective responsibilities. In observing the training, we found each module to be informative and well received.

However, we still have questions about the BWC program rollout broadly and cannot yet determine whether the program implementation is being optimized and will ultimately be successful. As the pilot policy was the result of negotiations between the PPB and PPA, and ultimately the City and DOJ, the COCL team and our subject matter experts have not been provided an opportunity to weigh in on the policy. As the PPB has recently ended the pilot period (Q4), it is our understanding that an additional round of revisions to the policy will be occurring and we recommend our team be afforded an opportunity to provide input prior to finalization. In addition, although our evaluation of training that we observed is overall positive, we maintain that additional modules will be important for the success of the program, including a greater scope of supervisory training. Finally, we continue to seek greater clarification on evaluation metrics, both in terms of successful rollout of the cameras as well as auditing, evaluation frameworks, and ongoing training plans for looking at the success and sustainability of the program overall.

As a matter of technical assistance, the COCL team understands that a comprehensive and well-developed BWC program is built upon several factors, not merely having a policy and training.  To their credit PPB and the City have taken several positive steps to implement their BWC program, including engaging the community and PPA in developing their policy and recently conducting a BWC pilot to inform how the program will be implemented department-wide. However, moving forward, we would expect to see more specific plans regarding the future rollout of BWCs in Portland.  Proper planning, and preparation are critical for success as BWCs can impact an entire department's operation, including staffing, officer safety and well-being, training opportunities, evidence collection, community trust, and accountability (among others). Particularly during the implementation phase, agencies should have a detailed plan, developed in coordination with partners and stakeholders (including community members and prosecutor's offices), that describes the phased approach that will be taken. Finally, many agencies fail to consider the amount of work (and resources) that it takes to manage a BWC program operationally, especially with regards to stored digital evidence. Such factors should be included in a comprehensive plan from the beginning, as well as a long-term sustainability plan (including auditing and evaluation frameworks) that accounts for how an expanding amount of digital evidence will impact policing capabilities, capacities, and resources. Research and resources for each of these elements (and others) can be found in the BWC

**Exhibit A**

National Toolkit[23] as well as through the BWC Policy Implementation Program.[24]   In addition, the COCL team stands ready to provide training and technical assistance to PPB on any issue regarding their developing BWC program based on our experience in this area.

| **COCL Recommendations** | • To achieve Substantial Compliance, the City should achieve full-scale implementation of the BWC program. |
|---|---|
| **Assessment Based On** | Review of BWC pilot plans, BWC policy, hiring a qualified BWC vendor, hiring PPB personnel for the BWC program, and preparing the identified precinct for pilot testing; observation of training |

---

**Settlement Agreement Paragraph**

195. In 2020, the City referred to voters a ballot measure that would overhaul the police accountability system incorporated into this Agreement by establishing a new Community Police Oversight Board to replace IPR for investigations of certain complaints of police misconduct and to replace the Chief of Police for imposition of discipline. City voters approved the ballot measure. The City has since empowered a 20-member civilian Commission to define the duties and authority of the Oversight Board and submit a proposal to the City Council for final approval.

a. Before January 1, 2022, the City Council and Auditor shall each present a plan to the United States for an orderly transition to the Community Police Oversight Board by ensuring the continuity of IPR operations while the Commission develops the Oversight Board for City Council's approval. The United States shall determine whether either of these two plans is acceptable. City Council will then adopt a plan that the United States has determined is acceptable. The Parties agree that the adopted plan shall be appended to this Agreement and will become part of this Order, provided that the Parties may agree to modify the plan if warranted by the circumstances. Until the Oversight Board becomes operational, the City shall ensure that administrative investigations are completed as required by Section VIII – Officer Accountability and that officers are held accountable for violating PPB policy and procedure as required by Paragraph 169.

---

[23] https://bja.ojp.gov/program/bwc

[24] https://bwctta.com/

**Exhibit A**

b. Within 18 months of the date this paragraph is entered as an order of the Court, the Commission shall propose to City Council changes to City Code to create a new police oversight system as reflected in the City of Portland Charter amendment establishing a Community Police Oversight Board. Within 60 days of receiving the Commission's proposal, the City will propose amendments to City Code to address the Commission's proposal, and corresponding amendments to this Agreement, subject to the United States' and the Court's approval, to ensure full implementation of the Oversight Board and effective police accountability, consistent with the requirements of this Agreement. Within 21 days of the approval of the amendments to the Agreement by the United States and the Court, the City Council shall consider and vote on the conforming City Code provisions creating the Oversight Board. Within 12 months of the Council's adoption of the City Code provisions, the new Oversight Board shall be staffed and operational, and IPR shall then cease taking on new work and complete any pending work. For good cause shown, the deadlines imposed by this subparagraph (b) may be reasonably extended provided that the City is in substantial compliance with subparagraph (a).

c. The City will comply with any collective bargaining obligations it may have related to the Oversight Board, which the City agrees to fulfill expeditiously and in compliance with its obligation to bargain in good faith.

| Compliance Label | Partial Compliance |
|---|---|
| Methodology | Observation of PAC meetings; Communication with City support staff; Review of PAC's Quarterly Report, January–March 2023; Review of PAC's final recommendations to the City |

**Compliance Assessment**

For the third quarter of 2023, the City remained in Partial Compliance with the requirements of Paragraph 195. During this quarter, the PAC completed their work, submitting its final report and recommendations to the City. As noted in our Technical Assistance Statement,[25] the PAC conducted a substantial number of public hearings, community engagement events, interviews, and public engagements as part of their recommendation development process. For many of these engagements, the COCL team was present and observed PAC members allot their time in a purposeful and effective

---

[25]
https://static1.squarespace.com/static/5a319f76a9db0901e16c6433/t/6542dfb881721e1542c0a39b/1698881464546/COCL+TA+Statement+-+PAC+Recommendations.pdf

**Exhibit A**

fashion.  We commend the efforts of the PAC in developing their recommendations and believe their efforts meet the requirements of Par. 195.

In developing their report, the PAC focused on several issues, including identifying barriers to accountability under the current oversight system, identifying best practices from the current system, and defining independent judgment.  For instance, in identifying current barriers, the PAC noted the system suffers from include a lack of transparency, complexity, lack of accessibility and equity, public perception, lack of trust in the system, current laws and policies, lack of proven effectiveness, conflicts of interest and bias, vulture, and inadequate resources.  For best practices within the current system, the PAC identified the CRC, IPR transparency and regular reporting with language accessibility, civilian staff involvement, qualifications of investigators, review and rigor, and the outcome possibilities that go beyond discipline or correction action (i.e., mediation and supervisory investigation).  Finally, the PAC defined independent judgement as "a demonstrable absence of real or perceived influence from law enforcement, political actors, and other special interests looking to affect the operations of the civilian oversight agency."

Overall, the PAC proposed a package of recommendations that included 97 pages of proposed City Code language, which we summarize here.  The system proposed by PAC has a multi-level staffing structure including board members and oversight staff. Using Charter 2-10, the PAC listed parameters for board membership including that they must be appointed by approval of council and must represent diverse communities, including those with lived experiences. Charter 2-10 also includes parameters that would make potential candidates ineligible to serve on the board:

*"People currently employed by a law enforcement agency and their immediate family members are not eligible for service on the board. People who were formerly employed by a law enforcement agency are not eligible for service on the board."*

Other board characteristics (i.e., size, selection method, term length, quorum, method to ensure representation, and compensation level) were similarly recommended by the PAC. One new aspect of the Oversight Board would be the full board vs. smaller group. The full board would include all 33 members serving staggered three-year terms. The full board's responsibilities include making decisions on all internal processes, reviewing sub-committee proposals, and attending public town halls and events. Smaller groups refer to the rotating panel of five to seven members that would decide on individual cases and to the sub-committees that develop proposals for full board consideration. Board members would receive support through monetary compensation (estimated mid-point is $5,400/year) and mental health services such as an employee assistance program. Further, the oversight staff include the director, who is to be hired and managed by the oversight board, and the professional staff, who are to be hired and managed by the

**Exhibit A**

director. The staff are responsible for processing cases as well as policy and community outreach.

The proposed system's duties and authorities are categorized into their access to information and administrative investigations. Access to information refers to the ability of the oversight system to obtain the information that is needed to do the work of handling specific cases of potential misconduct and conducting overall review. The new system would first request information from PPB/Officers and have the authority to compel officer testimony, subpoena witnesses, access police records and data, and access body camera footage. Administrative investigations have 5-steps for all cases that fit in the oversight board's jurisdiction. Step 1 is intake, in which any person who witnesses an alleged misconduct can file a complaint, who will then be assigned a complaint navigator to keep them informed throughout the process and is their primary point of contact. At this point, complaints would be categorized. For example, the complaints may be categorized as allegations of misconduct of discourtesy, dishonesty, or neglect of duty (among others). The cases would then be assigned for dismissal, full investigations, or determined if eligible for mediation or listed as an informal complaint for less serious allegations. Step 2 is the investigation would include interviews, collecting evidence, and empowerments. During this step updates would be shared regularly with officers and complainants. Step 3 is the findings, in which the completed investigation would be presented to the panel of board members previously mentioned. Panels would typically be made up of 5 board members, unless the cases is complex and/or high-profile, in which case two additional members would be on the panel. During step 3, the panel would select one of four findings (e.g., in policy, out of policy, unfounded, insufficient evidence) about the alleged officer's actions for each case. The panel could also select any additional findings (e.g., policy issues, training issues, supervisory issues, communication issues, equipment issues) about how the system can improve, if relevant. Step 4 of the submitted proposal is corrective action and discipline. This step was designed to be consistent with due process and just cause considerations to ensure Officer's rights are upheld. Not all responses require a disciplinary response and may include more training or command counseling to promote better performance in the future, however, disciplinary response can go up to termination. Step 5 is appeals, in which both the complainants and officers would have the right to appeal to the board's decision. Officers will also have two additional options for appeal through civil service files or a grievance for arbitration. Lastly, as advised in Step 1, there are different processes for lower-level cases that can be handled through mediation or the officer's supervisor. It is intended that this would take the burden off the investigative team, while allowing these lower-level cases to achieve closure faster. However, lower-level cases can be escalated to full investigations as needed.

**Exhibit A**

The PAC identified four primary differences between the current system and the proposed system: (1) the complaint navigator provided to the complainant from the beginning, (2) one entity reviews each case allowing the process to be more straightforward, (3) deadly force cases go through administrative investigations and there is ability to appeal, and (4) community members make the final decisions on findings. Conversely, three key similarities between the current system and proposed system were identified by the PAC: (1) the use of a discipline guide, (2) the use of panels and sizes like PRB structure, and (3) upholding due process, just cause, and 5th amendment rights. Moreover, the proposal includes structural oversight of the oversight board as written in Charter 2-10. The oversight board can also make policy recommendations to PPB. The recommendations can be initiated through six processes and rejected recommendations may be sent to city council. These policy recommendations also include collective bargaining negotiations.

The proposed report by the PAC further goes into their methods of maintaining public transparency and implementation as outlined by the settlement agreement between DOJ and the City of Portland, and the transition plan. The transition plan includes three proposals: 1) transfer cases from IPR six months after full implementation to new oversight board in order to minimize the length of time the systems overlap, 2) allow transferred cases to use the new systems administrative investigative process, and 3) create a transition team during the DOJ/Court review in order to give relief during the 1-year implementation period in which the board members, director, and staff must all be hired and trained.

Other notable components of the final report proposed by PAC are that they wish for the new oversight system to be a model for other jurisdictions, making Portland a leader in police accountability. Further, reporting and transparency will be conducted through open public meetings, comprehensive annual reports, data available online including downloadable public data, and making case decisions and hearings open to the public when in compliance with state law and only if the officer requests it or the board determines the case is high enough profile that public interest requires it.

Although occurring in Q4, the City Council ultimately approved a pared-down version of the PAC's recommendations when passing changes to City Code, noting that many of the PAC's recommendations were better suited for SOPs or other documents rather than City Code. At present, proposed amendments to the Settlement Agreement based on the code change are being bargained by the City and PPA, after which DOJ will review them. Upon approval, the Settlement Agreement will be amended to reflect the CBPA and we will therefore provide updates as they become available to us.

| **COCL Recommendations** | • To achieve Substantial Compliance, the City must implement a functional oversight board that is properly |
| --- | --- |

**Exhibit A**

|  | staffed, trained, operational, and able to effectively investigate and dispose of use of force and misconduct cases |
|---|---|
| **Assessment Based On** | Progress achieved by PAC toward developing the new oversight board; Implementation and functioning of the new oversight board |

**Exhibit A**

# Appendix A: Acronyms

| Acronym | Definition |
|---|---|
| AAR | After Action Report (also referred to as 940) |
| AIM | Administrative Investigations Management |
| AMAC | Albina Ministerial Alliance Coalition for Justice and Police Reform |
| AMR/EMS | American Medical Response/Emergency Medical Service |
| BERS | Behavioral Health Unit Electronic Referral System |
| BHCC | Behavioral Health Call Center |
| BHRT | Behavioral Health Response Team |
| BHU | Behavioral Health Unit |
| BHUAC | Behavioral Health Unit Advisory Committee |
| BHUCT | Behavioral Health Unit Coordination Team |
| BOEC | Bureau of Emergency Communications |
| BWC | Body-Worn Camera |
| CAR | Corrective Action Recommendation |
| CBPA | Community Board for Police Accountability |
| CCO | Coordinated Care Organization |
| CEW | Conducted Electric Weapon |
| CIT | Crisis Intervention Team |
| COCL | Compliance Officer and Community Liaison |
| CRC | Citizen Review Committee |
| CRO | Communication Restriction Order |
| CSD | Community Safety Division |
| DOJ | Department of Justice |
| ECIT | Enhanced Crisis Intervention Team |
| ECW | Electronic Control Weapon |
| EIS | Employee Information System |
| FDCR | Force Data Collection Report |
| FTE | Full-Time Equivalent |
| IA | Internal Affairs |
| IMLLC | Independent Monitor, LLC |
| IPR | Independent Police Review |
| LMS | Learning Management System |
| MHT | Mental Health Template |

**Exhibit A**

| | |
|---|---|
| OIG | Office of the Inspector General |
| OIS | Officer-Involved Shooting |
| PAC | Police Accountability Commission |
| PCCEP | Portland Committee on Community-Engaged-Policing |
| PPA | Portland Police Association |
| PPB | Portland Police Bureau |
| PRB | Police Review Board |
| PSD | Professional Standards Division |
| PSR | Portland Street Response |
| RU | Responsibility Unit |
| SCT | Service Coordination Team |
| SOP | Standard Operating Procedure |
| STS | Supportive Transitions and Stabilization |
| TAC | Training Advisory Council |

**Exhibit A**

# Appendix B: List of Personnel

- Chief of Police: Bob Day
- Deputy Chief of Police: Michael Frome
- Assistant Chief of Operations: Jeffrey Bell
- Assistant Chief of Services: Michael Leasure
- Assistant Chief of Investigations: Art Nakamura
- Assistant Chief of Services: Mike Leasure
- Assistant Chief of Community Services: Chuck Lovell
- Commander of Professional Standards Division: Amanda McMillan
- Inspector General/DOJ Compliance team: Mary Claire Buckley
- Force Inspector Lieutenant: Michael Roberts
- BHU: Christopher Burley
- EIS Supervisor: Matthew Engen
- Training Captain: Franz Schoening
- City of Portland Auditor: Simone Rede
- IPR Director: Ross Caldwell
- BOEC Director: Bob Cozzie
- BOEC Training and Development Manager: Melanie Payne

**Exhibit A**

This page intentionally left blank

**Exhibit A**