ORIGINAL

# Independent Monitor Proposal for the Settlement Agreement on Policing

MARK P. SMITH & ASSOCIATES

JANUARY 19, 2024

Exhibit B

# Executive Summary

Thank you for your consideration of this proposal as you reach your selection of an Independent Monitor for the Settlement Agreement (Agreement) on policing between the City of Portland (City) and the United States Department of Justice (DOJ). In submitting this proposal, our team recognizes both the call for continuous improvement and reform that initially gave rise to the Agreement as well as the approximately decade-long history of efforts to fully implement the Agreement's provisions, up to the present time. With sensitivity to the needs of the diverse Portland community to have a police force that conducts itself professionally and constitutionally, as well as sensitivity to the needs of the Portland Police Bureau (PPB) to be afforded the necessary tools and guidance to consistently uphold that standard, our team is ideally equipped to accelerate full and final implementation of the remaining sections of the Agreement and to help earn their successful termination as efficiently as possible.

Our team is composed of professionals who have dedicated much or all of their careers to the pursuit of effective, accountable, and constitutional policing. As described further in this proposal, each member of our team exhibits a deep commitment to the principles of sound policing, including, but not limited to, the highest ethical standards, transparency, authentic and lasting partnerships and collaboration with the community, de-escalation, diversity, inclusivity, and officer wellness. We also highly value constructive efforts to find alternatives to policing that will help divert individuals away from unnecessary encounters with law enforcement as well as repeated cycles through the criminal justice system.

Importantly, our team brings a wealth of experience that demonstrates a comprehensive understanding of, and ability to adhere to, the stringent standards of compliance and accountability that exist under a federal Consent Decree. Specifically, our team includes law enforcement and oversight professionals who contributed significant and substantial work toward the Los Angeles Police Department's (LAPD's) successful emergence from its longstanding Consent Decree. This pivotal transition marked a constructive shift from relying on an Independent Monitor's assessments of the LAPD to entrusting that agency and its civilian oversight structure with the responsibility of ensuring sustained compliance with the tenets of the decree. We will undoubtedly call on our aggregated knowledge and skill in this regard to expedite the full implementation of the Agreement in Portland, ensuring that its critical requirements are having a positive impact on policing, as intended.

It is, quite simply, the dedication to healthy and effective law enforcement that drives our team's pursuit of this monitorship. To that end, you will see that our proposal anticipates the monitoring of the Agreement in Portland to be the primary professional task for our lead Monitor, Mark Smith. Mr. Smith intends to focus squarely on the implementation of the Agreement and to devote every bit of time and effort that is called for in order to reach the goal of the Agreement's successful termination. Of course, our lead Monitor will be supported by an accomplished group of experts

with knowledge and experience in the areas of law enforcement operations, police use of force, behavioral and mental health, community engagement, comprehensive data analysis, and more, all of whom believe deeply in the importance of the reform measures that are outlined in the paragraphs of the Agreement. Should our team be selected, we will all collectively commit to achieving full implementation as efficiently and effectively as possible.

In contrast with larger and more extended monitoring teams, where the focus of the team's leadership may potentially be diluted to some degree, we feel that the City of Portland will be best served by having a Monitor whose primary professional focus will be the Agreement, and whose focus will remain as such until full compliance has been achieved. Our team, and especially its lead Monitor, will be readily accessible and consistently present throughout this monitorship if we are selected for the role. We believe that the pursuit of constitutional, accountable, and effective policing that appropriately serves all of the people of Portland is too critical for the Monitor of this Agreement to operate in any other way.

[THIS SPACE INTENTIONALLY LEFT BLANK]

# Qualifications

Our team possesses the combined knowledge, skill, and experience that will be needed to accelerate the City's compliance with the remaining sections of the Agreement, and to do so expeditiously. The members of our team have expertise in: monitoring compliance with court-approved settlement agreements and consent decrees; conducting civilian oversight of law enforcement agencies of varied sizes and in diverse jurisdictions; a broad spectrum of police operations, as well as police executive leadership; community engagement that is inclusive of multiple and often opposing points of view; in-depth review of police use of force incidents (including lethal and non-lethal force); evaluation of officers' adherence to de-escalation principles and policies; gathering, analyzing, and publicly presenting large and complex sets of law enforcement data; investigating a wide variety of citizen complaints; overseeing internal affairs investigations; evaluating the quality of law enforcement training; crafting new law enforcement policies and refining existing ones; conducting highly-detailed reviews and analyses of body-worn camera video evidence; developing and implementing alternatives to policing when addressing persons in mental health crisis; and much more. It is these attributes that will allow us to conduct accurate and reliable assessments of the Agreement's provisions, to effectively communicate with the public, elected officials, police executives, the parties to the Agreement, the federal court, and all other stakeholders regarding the City's progress toward implementation, and, ultimately, to oversee sustained substantial compliance with the Agreement.

In addition to the directly applicable experience in police reform and accountability that our team offers, we also maintain a commitment to diversity in terms of our backgrounds, our perspectives, and our approaches to assessing law enforcement agencies and identifying areas for improvement. We feel that, without these diverse points of view informing our work and our recommendations, monitoring of a complex organization such a police department will necessarily suffer from blind spots and will therefore be less effective in serving all of the involved and interested stakeholders. Our team's unwavering commitment to diversity will be maintained throughout the monitorship, should we be selected for it.

We also fully appreciate the importance of maintaining a local presence during the course of this monitorship. A genuine understanding of Portland's history and culture, the PPB and its own history and culture, the events that gave rise to the Agreement and the successful reforms that been achieved thus far, and the widely diverse and varied communities who are all stakeholders in the pursuit of good policing that serves everyone's needs is an invaluable component of an effective team for this monitoring role. Our team does include a subject matter expert with deep connections to, and familiarity with, all of the above. Furthermore, as indicated previously, we intend for our lead Monitor to be present physically in Portland, as well as readily available remotely, on a regular and consistent basis throughout this monitorship.

*Personnel*

Following are introductions to the team that will conduct this monitorship, if we are selected. Full résumés for each team member can be found in the Appendix.

**Mark P. Smith** is the Inspector General of the Los Angeles Police Department. Along with the staff of the Office of the Inspector General (OIG), Mr. Smith is responsible for conducting robust and effective civilian oversight of the LAPD. His responsibilities include analyzing uses of force as well as use of force investigations, monitoring the LAPD's internal affairs system, continuously engaging in community outreach, and producing public reports—with substantive recommendations for improvement—on a wide range of topics (officers' employment of de-escalation principles, the operations of the Mental Evaluation Unit, adherence to national best practices in policing, demographic disparities in law enforcement detentions, the use of data-driven policing strategies, etc.).

Mr. Smith's work requires the utmost objectivity, allowing him to determine compliance or non-compliance with a particular policy or law without regard to external influences. He must constantly maintain legitimacy and credibility for himself and his staff by identifying the LAPD's successes as well as its shortcomings, based on whatever the relevant facts or evidence show. He must also produce meaningful recommendations and results that ultimately have a positive impact on the diverse communities that are policed by the LAPD, as well as on the LAPD itself.

Mr. Smith has spent his entire professional career overseeing law enforcement agencies and ensuring their accountability to the public whom they serve. Starting as a special investigator in the same office he is now the head of, he has held increasingly influential leadership positions at the various agencies he has worked for. Such positions include the second-in-command of the office charged with overseeing the Chicago Police Department (known at the time as the Chicago Independent Police Review Authority), the first-ever Independent Police Auditor of the San Francisco Bay Area Rapid Transit System, and now the Inspector General of the LAPD. Additionally, and immediately prior to his current position, Mr. Smith worked within one of the largest law enforcement agencies in the country as a Constitutional Policing Advisor in the Los Angeles Sheriff's Department. He sought to complement his growing knowledge of civilian oversight with first-hand experience inside a complex police department, and he did so as a direct report to the Sheriff, advising on matters including discipline, policy development, and compliance with the multiple settlement agreements that the department was subject to at that time as the result of litigation.

This career path has allowed Mr. Smith to hone his expertise in the area of police accountability based on the widely varying perspectives of different geographies, political climates, and policing-related challenges. Of note with respect to the Agreement in Portland, Mr. Smith spent the early portion of his career helping to ensure the LAPD's compliance with its Consent Decree, which placed the department under federal oversight for more than a decade. He has spent the last six years overseeing the post-consent-decree LAPD, giving him a valuable perspective on how to

successfully navigate the challenges that inevitably arise during the course of such structured arrangements.

Additionally relevant to this monitorship proposal are Mr. Smith's service on the Board of Directors of the National Association for Civilian Oversight of Law Enforcement, his founding membership of the Western States Chapter of the Association of Inspectors General, and his co-authorship of written testimony submitted to the President's Task Force on 21st Century Policing. Mr. Smith is a graduate of the University of California at Berkeley as well as the University of California at Los Angeles School of Law.

If this proposal is selected, Mr. Smith would maintain this monitorship as his primary professional responsibility, as is indicated further in the proposed budget below.

**Brian Buchner** is an Assistant Inspector General with the Los Angeles Police Commission's OIG where he leads the office's Audit Section. Brian has held several roles within the OIG, including as a Police Special Investigator in the Use of Force, Complaints, and the former Special Investigations and Compliance sections.

Prior to rejoining the OIG as an Assistant Inspector General, Brian served as the City Homelessness Coordinator for the City of Los Angeles where he oversaw more than $1 billion in funding and led the implementation of the city's major homelessness initiatives. He was selected to serve as a member of the Council on State Government and National Policing Institute's Law Enforcement and Homelessness Community of Practice to explore police-mental health collaboration strategies for addressing the needs of people experiencing homelessness and to guide data collection and analysis efforts, with the ultimate goals of improving housing and mental health outcomes and reducing the number of people coming into contact with the justice system.

Brian has also directed city-wide policing and homelessness policy for the Mayor of Los Angeles. While at the Mayor's office, Brian led the creation and launch of the City's unarmed alternative 911 response initiative for non-emergency situations involving individuals experiencing homelessness – the Crisis and Incident Response through Community-Led Engagement program, or CIRCLE. The pioneering CIRCLE program was first introduced in the Venice and Hollywood communities, which have some of the highest concentrations of unsheltered homelessness in Los Angeles and generate many calls to 911 involving the unhoused population. This innovative program has since expanded to encompass almost every corner of the city. At its core, the CIRCLE program unites street outreach workers and mental health clinicians as cohesive teams, stationed within targeted areas, actively engaging with homeless communities every day of the week. The CIRCLE program has emerged as a successful example of a program that offers vital support to those facing homelessness, steering them away from unnecessary encounters with law enforcement and repeated cycles through the criminal justice system. This not only reduces barriers to addressing their housing challenges, like a criminal record or costly fines, but also allows the police to focus on other

law enforcement priorities. Brian has also spoken on academic and practitioner panels about other models and approaches to alternative 911 response programs.

Brian is also an expert in police oversight and policy, having worked for several oversight agencies, including the OIG, and he has advised local, state, national, and international government entities regarding police accountability.

He has been invited to testify before numerous task forces and blue-ribbon commissions, including President Barack Obama's Task Force on 21st Century Policing. Brian has helped to establish civilian oversight agencies across the U.S. and has published numerous articles and reports on police accountability, including an assessment of policing across the University of California system. He also co-led and co-authored the nation's most comprehensive national survey of police oversight agencies.

Brian teaches graduate-level criminal justice courses at the University of Southern California and previously taught at the undergraduate level at California State University, Los Angeles, including developing and teaching the nation's first undergraduate course focused specifically on the oversight of policing. He previously served as a senior fellow with the NYU School of Law's Policing Project, a senior fellow with the UCLA Luskin School of Public Affairs, and as an advisor to the American Law Institute's Policing Project. He is a past president of NACOLE, the nation's largest civilian oversight organization. During that time, Brian connected with communities and advanced police reform initiatives in the wake of police-involved deaths in places like Baltimore, Chicago, and Ferguson.

Brian serves on the board of Ride On, a nonprofit organization that provides equine-related therapeutic services for children and adults with disabilities. He served as a commissioner on the Santa Monica Social Services Commission, from 2005 to 2015.

Brian earned a BS in criminal justice from Bowling Green State University and an MA in criminology and criminal justice from the University of Missouri-St. Louis. He also earned a certificate from the USC Safe Communities Institute's Public Safety Leadership program.

His current employment requires a commitment of Monday to Friday, 8AM-4PM PT. In addition, he dedicates roughly 5 hours per week to teaching and a maximum of 5 hours per month to his board membership responsibilities.

**Antoinette Edwards** has spent most of her lifetime engaged in community activism. She is a tireless, passionate activist who has spent over 40 years reaching out to the most vulnerable populations in our community, providing leadership, policy development, service provisions and advocacy for children and families of North and Northeast Portland. She is also a beloved ally of the LGBTQ community. She founded PFLAG Portland Black Chapter, the nation's first PFLAG group created by and for African Americans. Antoinette previously served as the Director of the

Office of Youth Violence Prevention for the City of Portland with Mayors Sam Adams, Charlie Hales, and Ted Wheeler.

**John Thomas**, a native of South-Central Los Angeles, has spent close to four decades in law enforcement including twenty-one years as a member of the Los Angeles Police Department (LAPD) where he retired at the rank of Lieutenant in 2005 and took a position as Deputy Chief of Police for the University of the District of Columbia Department of Public Safety & Emergency Management in Washington D.C.  In 2006, he returned to Southern California where he spent 15 years in command level positions with the University of Southern California Department of Public Safety, one of the nation's largest campus departments with over 300 officers and an annual budget of $52 million.  In 2013 he was appointed to the department's Executive Director/Chief position before retiring in January 2022 to accept a Senior Advisor position with the university.  He served in that position until December 2022.

In December 2022 he accepted a position as the Interim Chief of Police for the University of California, Los Angeles (UCLA) Police Department.  He served as the Interim Chief of Police until after a national search he was selected and appointed Chief of Police in January 2024.

As a member of the Los Angeles Police Department, Chief Thomas worked patrol assignments primarily in South Los Angeles in Wilshire, 77th Street, Southwest, Newton Street and Pacific Divisions.  He was also assigned to the Department's Gang Enforcement Detail in South Los Angeles and worked undercover narcotic enforcement as a member of the Department's FALCON (Focused Attack Linking Community Organizations and Neighborhoods) Unit.  While assigned to FALCON he was awarded the City of Los Angeles' City Angel Award for outstanding community enhancement and the Department's Meritorious Unit Citation.  Perhaps most notably, he served as Adjutant to four LAPD Chiefs of Police including two interim chiefs and Chief Bernard Parks and Chief Bill Bratton.  He is featured in Bill Bratton's Best-selling book, "The Profession-A Memoir of Community, Race, and The Arc of Policing in America" published in 2021.

He has also assisted in the executive search and selection processes for both municipal and campus police chief and command level positions.

Up until his appointment as the Interim Chief of Police for UCLA, he also continued to serve the people of Los Angeles as an LAPD Reserve Officer.  His last assignment was to the newly formed Office of Constitutional Policing & Policy's Diversity, Equity and Inclusion (DEI) Group.

He has served on the Board of Directors for The Challenger's Boys & Girls Club in South LA and has been on the Board of Directors for Los Angeles Police Museum since 1999.  He has been published and has researched and written extensively on the Early Black History of LAPD and Los Angeles.  He is also on the Board of Directors for the Police Officers' Association of Los Angeles County (POALAC) and serves on the Board of Advisors for the USC Price School's Safe Communities Institute.  He is a member of the International Association of Campus Law Enforcement Administrators (IACLEA), the Police Executive Research Forum (PERF), the International Association of Chiefs of Police (IACP), the National Organization of Black Law Enforcement Executives (NOBLE), Pac 12 Campus Chiefs' Association, Campus Safety Magazine

Advisory Board, California College & University Police Chiefs Association, and the FBI National Academy Associates.

He attended UCLA and Mount St. Mary's University where he graduated with a Bachelor's Degree in Liberal Arts and earned a Master's Degree in Executive Leadership from the USC Sol Price School of Public Policy.

Chief Thomas commits approximately 40-50 hours per week in his current role at UCLA. He also serves on the Independent Consent Decree Monitoring Team for the City of Aurora, working approximately 5-10 hours per week. Additionally, Chief Thomas spends 2-3 hours per month as an Executive Coach for the University of Washington Chief of Police.

**Russell Bloom** is the current Independent Police Auditor for the San Francisco Bay Area Rapid Transit District (BART), a civilian oversight agency. In this role, Mr. Bloom worked to implement 50 recommendations for improvements to the BART Citizen Oversight Model, including an expansion of authority and responsibility to investigate any allegation of potential misconduct received from any source and to review all use of force incidents. Mr. Bloom is currently working as part of a consulting team under contract with Community Police Review Board in the City of Albany, NY and has in recent years provided input and guidance related to the creation of an oversight system for the Alameda County (CA) Sheriff's Office and the City of Santa Barbara (CA). He has provided similar input toward the development and improvement of oversight in Austin, TX, Sonoma County (CA), Vallejo (CA), Oakland (CA), and Berkeley (CA). Mr. Bloom was also invited to address the San Jose (CA) City Council at their January 18, 2018 study session to consider strengthening the city's civilian oversight structure, and he subsequently co-authored a report for that city in which the feasibility of enhancing the role of the San Jose Independent Police Auditor was analyzed based on the team's research and community input. Prior to working for BART, Mr. Bloom served as a Police Review Commissioner and Commission chairperson for the City of Berkeley.

Mr. Bloom received his undergraduate degree in English Literature from the University of California, Berkeley, and a JD from the New College of California School of Law. He also completed an externship with US District Court Judge (ret.) Thelton Henderson during the creation of the Oakland, CA Negotiated Settlement Agreement in 2004.

Mr. Bloom's position as the BART Independent Police Auditor requires a commitment of 40 hours per week and the consulting contract with the city of Albany requires a varying weekly commitment, typically ranging from 5-15 hours.

**Susruta Sudula** is a Senior Forensic Auditor in the Police Integrity Division at the Office of Inspector General for the Port Authority of New York and New Jersey (PANYNJ) where she performs a variety of investigative, data and policy support functions. Susruta reviews investigative reports, collects and analyzes data on new and closed civilian complaints, assists with investigations, conducts discipline checks and Giglio redactions, and helps create policies for the agency. Susruta is

also an Advisory Board Member at Essential Personnel, where she provides academic guidance in the development of a safety/wellness software designed for public safety professionals.

Prior to her role at PANYNJ, Susruta worked as a Police Special Investigator with the Los Angeles Police Commission's OIG, where she collected data and conducted analyses on LAPD policies and practices, including civilian-police interactions during traffic stops, Board of Rights procedures, and uses of force. She also identified areas for improvement and provided recommendations to the Department. Susruta also worked as a Senior Performance Analyst for the Chicago Police Department, where she conducted performance audits to assess reform compliance related to the consent decree and the Chicago Police Department strategic plan in key areas such as training, mental health, and community policing. Additional roles she has held include Assessor for the Division of Criminal Justice Services in New York State, Research Associate for the Police Foundation embedded within the NYPD Office of Collaborative Policing, and Investigator with the New York City Civilian Complaint Review Board.

Susruta holds a Ph.D. from The Graduate Center / John Jay College of Criminal Justice, M.Phil. from The Graduate Center, M.A. from John Jay College of Criminal Justice, and B.A. from Temple University. For her dissertation, she utilized SPSS—a statistical software—to examine the use of a structured decision-making tool/matrix by NYC probation officers and judges when selecting dispositions for youth. Susruta looked at how often they adhered to that matrix, whether adherence varied by demographic and legal factors, and whether better adherence improved re-arrest outcomes among youth.

Her time commitment for her current employment is Monday to Friday from 8AM-4PM EST, and for her advisory board membership is, at most, five hours monthly.

[THIS SPACE INTENTIONALLY LEFT BLANK]

## Locality and Costs

Our team's approach to this monitorship strongly emphasizes local connections, notably through the inclusion of member Antoinette Edwards, who embodies the spirit and understanding of the Portland community.  We feel strongly that her inclusion on our team will allow us to leverage her dynamic presence, deep local connections, and extensive experience in the City.  Antoinette's local insights will be instrumental in managing tasks ranging from document collection to representation at community meetings and events, significantly reducing the overall costs associated with these types of activities.

Furthermore, while there will be many instances when the lead Monitor and other team members will travel to Portland for community engagements, on-scene assessments, reports to the federal court, etc., a substantial portion of our work also lends itself to being conducted remotely.  This approach aligns with our team members' proven expertise during the COVID-19 pandemic, during which we demonstrated that many oversight and monitoring tasks can be effectively managed from a distance.  Our experience working remotely, encompassing the management of local government responses to the pandemic as well as the continuation of civilian oversight over law enforcement agencies under pandemic conditions, has demonstrated that remote work can reliably contribute to effectively sustaining the necessary levels of accountability and scrutiny in police oversight.

Incorporating remote work strategies as appropriate, coupled with the local and impactful presence that Antoinette Edwards brings to our team, will not only serve to keep costs down but also to ensure a seamless integration of our efforts with the unique nuances and needs of the Portland community.  This hybrid model of local engagement and remote operation will allow us to maintain the highest standards of accountability and efficiency, ensuring that our monitoring work remains both cost-effective and deeply connected to the local context of Portland.

[THIS SPACE INTENTIONALLY LEFT BLANK]

**Proposed Budget** - Following is our team's proposed budget for Year One of the monitorship of the Settlement Agreement:

| Labor Costs | | | | | |
|---|---|---|---|---|---|
| **Core Duty** | **Team Members** | **Rate** | **Anticipated Hours** | **Rate Subtotal** | **Cost Subtotal** |
| Development of Monitoring Plan | Lead Monitor | $375 | 160 | $60,000 | $80,000 |
| | Experts | $250 | 80 | $20,000 | |
| Conduct Semi-annual Compliance Assessments | Lead Monitor | $375 | 310 | $116,250 | $158,750 |
| | Experts | $250 | 170 | $42,500 | |
| Conduct Qualitative and Quantitative Outcome Assessments | Lead Monitor | $375 | 310 | $116,250 | $158,750 |
| | Experts | $250 | 170 | $42,500 | |
| Provide Recommendations and Advice on Timely Substantial Compliance | Lead Monitor | $375 | 160 | $60,000 | $80,000 |
| | Experts | $250 | 80 | $20,000 | |
| File Semi-annual Monitor Reports | Lead Monitor | $375 | 400 | $150,000 | $200,000 |
| | Experts | $250 | 200 | $50,000 | |
| Court Appearances | Lead Monitor | $375 | 100 | $37,500 | $42,500 |
| | | $250 | 20 | $5,000 | |
| Community Outreach (including Town Hall Meetings) | Lead Monitor | $375 | 60 | $22,500 | $67,500 |
| | Experts | $250 | 180 | $45,000 | |
| | | **Total Labor Hours** | **2,400** | **Total Labor Costs** | **$787,500** |

| Non-Labor Costs | |
|---|---|
| Travel and Lodging | $35,000 |
| Miscellaneous: Supplies, Production of Materials, Website Management, etc. | $15,000 |
| **Total Non-Labor Costs** | **$50,000** |

| **Total Costs** | **$837,500** |
|---|---|

**Second Year Price Proposal** - Our team anticipates that some of the Monitor's responsibilities will require a heavier time commitment during the first year of the monitorship, as community connections are solidified, compliance and outcome measures are developed, and reporting protocols are established.  Therefore, we estimate that the second-year costs of the monitorship would be 10% lower than the first year, or $753,750.

**Travel Expenses** - Our team will bill its lodging, meals, and incidental travel expenses in accordance with applicable per diem rates established by the U.S. General Services Administration. We will not bill separately for any travel time (though monitoring work conducted while traveling will be billed in accordance with the above estimated budget).

Should any extensions of the monitorship occur beyond an initial two-year period, as is contemplated by the Agreement, our team will submit revised budget estimates that cover such extensions.

[THIS SPACE INTENTIONALLY LEFT BLANK]

13

**Exhibit B**

# Scope of Work

***Approach to Monitoring***
Our team's overall approach to the monitorship of the Agreement recognizes the tremendous amount of work toward reform and improvement that has been completed over the past decade. Building on those successes and the momentum gained thus far, we are confident in our capability to focus intently on the remaining sections of the Agreement. This includes sections that necessitate assessment by the Monitor as well as those requiring self-assessment by the City. Leveraging our expertise, we are poised to bring these sections into full compliance with efficiency and precision.

As our team believes is illustrated by the descriptions of our members, we are well-equipped to meet all of the responsibilities set out for the Monitor. We have substantial and proven experience conducting evidence-based compliance assessments of law enforcement agencies, which will allow us to clearly identify and communicate the requirements that must be met in order for the City to achieve full implementation of the Agreement. Our team's collective familiarity with Consent Decrees and other similar settlement agreements in multiple jurisdictions, across multiple areas of focus, will allow us to develop meaningful outcome measures to ensure that progress made by the City and by PPB is verifiable, impactful, and sustainable. The expertise our team has in gathering, analyzing, and presenting data will ensure that such measures are accurate, reliable, and relatable to all stakeholders.

We will also call on our collective experience in police oversight and accountability to provide actionable and productive recommendations to the City whenever unforeseen challenges or obstacles to compliance with the Agreement arise. It is notable to our team that Section XII of the Agreement explicitly acknowledges room for such recommendations from the Monitor. We strongly feel there is great value in a monitorship which, while maintaining its unflinching independence and objectivity, also includes guidance that is focused on facilitating substantial compliance with the Agreement as efficiently as possible, when warranted. Our team is ideally positioned to provide such guidance as part of a monitoring role.

Our proposed monitoring approach places a strong emphasis on robust community engagement throughout the monitorship. While the Agreement mandates town hall meetings twice a year for community input, we view this as just the beginning. If selected, our team will ensure continuous efforts to give a voice to all interested stakeholders and to make certain that their concerns are appropriately addressed in matters related to the monitorship and the Agreement's requirements.

Similarly, our monitoring team will operate with an emphasis on clear and consistent communication throughout the monitorship. We will commit to being readily-accessible and responsive to questions, comments, or concerns about any aspect of the ongoing efforts toward substantial compliance with the Agreement. This will be the case with respect to the Parties to the Agreement, the Court (at its discretion), PPB, community stakeholders, etc. Clarity will also be a principle of our

periodic monitoring reports, to be released as designated by the terms of the Agreement. We feel it is important for these benchmarks of progress, the data that underlies them, and the descriptions of the work remaining to be done need to be accessible and unambiguous for all audiences, including the Parties, the Court, PPB, and the public. Our team has a tremendous amount of combined experience in producing and presenting clear public reports on a variety of law enforcement topics, including analyses of statistical data as well as actionable recommendations for improvement, where appropriate. We will uphold the value of clear and concise communication across all facets of this monitorship, should we be selected for it.

*Methodology*

Should we be selected for the monitorship, our team will swiftly engage with the PPB, City Attorney, and other key stakeholders, including DOJ attorneys, the Portland Committee on Community-Engaged Policing (PCCEP), the Portland Police Association (PPA), and the broader Portland community to gain diverse insights and shape our review strategy. We anticipate proposing the appointment of a City project manager to streamline document and interview requests, focusing on PPB's compliance with the Agreement as well as best practices. Our comprehensive review will encompass all relevant PPB policies, training materials, early intervention systems, complaint and disciplinary records, pedestrian and traffic stop data, use-of-force reports, and audiovisual recordings, including body-worn and dash camera footage. We also anticipate analyzing Incident Action Plans, After-Action Reports, internal audits, risk management reports, and non-privileged emails that are relevant to the remaining provisions of the Agreement.

Our methodology will integrate community input through public listening sessions and stakeholder outreach, making full use of online and digital platforms for widespread engagement, such as social media, a dedicated email address to collect feedback, and an integrated website, as outlined in the City's Request for Applications. Our community input process and evidentiary and document review will be complemented by discussions and interviews with members of the PPB and appropriate City officials and staff, along with regular onsite visits to Portland throughout the monitorship. Additionally, our team is confident that our collective experience and knowledge base will allow us to adapt and hone our methodology based on all that we are learning during the course of the monitorship. All of these efforts will be made in furtherance of a thorough, balanced, and efficient monitoring process as the City continues to make progress toward full compliance with the mandates of the Agreement.

[THIS SPACE INTENTIONALLY LEFT BLANK]

*Team Member Areas of Responsibility*

|  | Mark P. Smith | Brian Buchner | Antoinette Edwards | John Thomas | Russell Bloom | Susruta Sudula |
|---|---|---|---|---|---|---|
| Force Principles | ● | ● |  | ● | ● |  |
| Force Reports and Reviews | ● | ● |  | ● | ● | ● |
| Force Audits | ● | ● |  | ● | ● | ● |
| Training Principles | ● | ● | ● | ● | ● |  |
| Training Audits, Analyses, and Recommendations | ● | ● | ● | ● | ● | ● |
| Community-based Mental Health Services | ● | ● | ● |  | ● |  |
| Behavioral Health Unit Advisory Committee | ● | ● | ● |  | ● |  |
| Crisis Triage | ● | ● | ● | ● | ● |  |
| EIS Operation | ● | ● |  | ● | ● | ● |
| Investigation Timelines | ● | ● |  | ● | ● |  |
| On-scene Public Safety Statements and Interviews | ● | ● |  | ● | ● |  |
| Conduct of IA Investigations | ● | ● |  | ● | ● |  |
| Discipline and Accountability | ● | ● |  | ● | ● |  |
| PCCEP | ● | ● | ● |  | ● |  |
| PPB Stops Data and Annual Reports | ● | ● |  | ● | ● | ● |
| Outside Review of 2020 Protest Response | ● | ● |  | ● | ● |  |
| Training Dean | ● | ● |  | ● | ● |  |
| Investigating 2020 Protest Response | ● | ● |  | ● | ● |  |
| Body-worn Cameras | ● | ● |  | ● | ● | ● |
| New Accountability Structure | ● | ● | ● |  | ● | ● |