# COMPLIANCE OFFICER AND COMMUNITY LIAISON

*QUARTERLY REPORT: 2023 QUARTER 4 UPDATES AND ANALYSIS*

**Prepared By:**
**CNA**

**For the City of Portland, Oregon**
**October 1, 2023 to December 31, 2023**

**June 11, 2024**



**Exhibit A**



This document contains the best opinion of CNA at the time of issue.

**Distribution:**

Distribution unlimited.

**June, 2024**

This page intentionally left blank.

# Executive Summary

This is the Compliance Officer/Community Liaison's (COCL) fourth quarter report for 2023, as required by the Amended Settlement Agreement between the City of Portland (the City) and the United States Department of Justice (DOJ), Case No. 3:12-cv-02265-SI, entered January 26, 2024. This report covers the three-month period from October 1, 2023, to December 31, 2023.

## III. USE OF FORCE

During the fourth quarter of 2023, the PPB and City were found to be in Substantial Compliance for nine of the ten remaining monitorable paragraphs within Section III.  For this quarter, the PPB achieved Substantial Compliance with Par. 76 as a result of consistent and verified performance of each element of the paragraph, leaving only Par. 69 in Partial Compliance.

For the present quarter, our review of a random sample of 20 use of force events revealed each use of force was reasonable, that the force was comprehensively described, investigated, and reviewed by the chain-of-command.  Additionally, we saw consistent instances of supervisors identifying opportunities for improvement during use of force events, documenting their findings, and providing correction to officers where appropriate. We also found the entire chain-of-command, as well as the Force Inspector and analysts, ensured accurate and complete after-action reviews, regularly identified policy, training, tactical, or equipment concerns, and appropriately forwarded concerns through the proper channels for resolution.

At present, the only remaining paragraph in Partial Compliance in Section III is Par. 69.  To gain substantial compliance with this paragraph, PPB will need to rectify the lack of clarity in the description of, and officers reporting of, Control Against Resistance. Although not occurring in the fourth quarter, this process has already begun.

## IV. TRAINING

During the fourth quarter of 2023, the PPB and City were found to be in Substantial Compliance with all six remaining monitorable paragraphs in Section IV.

During this quarter, the Training Division used their 2023 Training Needs Assessments to develop a 2024 Training Plan, addressing identified needs related to use of force, trends in misconduct reports, crowd management, control tactics, patrol procedures, and COCL and DOJ recommendations for complying with the Settlement Agreement (among other topics). Additionally, the COCL found that the PPB's Learning Management System (LMS) continues to maintain and track training records for training delivered to PPB members.  PPB also continued to produce high-quality training to recruits, officers, supervisors, and specialized units in accordance with each group's specific responsibilities. Finally, we discuss our suggestion that PPB begin planning their next audit of the Training Division

**Exhibit A**

to be conducted sometime in 2025 and give special attention to civilianization of the Training Division, and instruction on equity, procedural justice, and de-escalation.

## V. COMMUNITY BASED MENTAL HEALTH SERVICES

During the fourth quarter of 2023, the PPB and the City was found to be in Substantial Compliance for all three monitorable paragraphs in Section V.

These paragraphs refer to services that are part of a broader mental health response system. The PPB and the City are partners in this system but are not necessarily drivers of the system. The City and the PPB continued to participate through engagement in various committees and workgroups. These include the Behavioral Health Unit Advisory Committee (BHUAC), the Behavioral Health Unit Coordination Team (BHUCT), the Unity Transportation Work Group, and the Legacy ED Community Outreach Group. These groups have continued to address important issues in city, county, and state approaches to providing comprehensive mental health services.  Also, as part of Section V, the Unity Center continues to act as a drop-off center for first responders to transport persons in a mental health crisis. As noted in prior reports, the Unity Center conforms to the intent of the Settlement Agreement and of drop-off centers as outlined in the Memphis Model of mental health crisis response. Furthermore, the PPB has continued to participate in AMR (ambulance service) training for transporting persons in mental health crises.

## VI. CRISIS INTERVENTION

During the fourth quarter of 2023, the City and PPB was found to be in Substantial Compliance with all four remaining monitorable paragraphs in Section VI.

During the fourth quarter of 2023, the BHUAC continued to meet, utilizing the expertise of individuals at the PPB, BOEC, and the City, as well as other agencies, stakeholders, advocates, and service providers. During the quarter, the BHUAC met twice, discussing topics such as BHU data related to crisis calls, a BHU data dashboard, ECIT in-service training, and updates to the Settlement Agreement. We found these meetings to be very productive and reflective of the BHUAC's purpose under the Settlement Agreement.  Additionally, during the fourth quarter, the Bureau of Emergency Communications (BOEC) continued to provide data related to their operation.  For instance, BOEC audited a random sample of 351 calls out of 5,782 calls identified by PPB as having a mental health component.  Of these, BOEC found that 8 of those calls (2.3 percent) contained sufficient information at the time of the call to warrant it being dispatched as ECIT, consistent with low error rates found for prior reporting periods.

## VII. EMPLOYEE INFORMATION SYSTEM (EIS)

During the fourth quarter of 2023, the PPB was found to be in Substantial Compliance with one of the three remaining monitorable paragraphs in Section VII, leaving Pars. 116 and 117 in Partial Compliance.

**Exhibit A**

During the fourth quarter, PPB maintained the thresholds required by Par. 118.  For Pars. 116 and 117, PPB and the Force Inspector maintained utilization of SOP #5 (Force Analysis for Supervisors and Teams), which outlines guidelines for identifying outlying "at-risk employees, supervisors, and teams." We continue to find that the SOP contains a wide range of reference points for the Force Inspector to consider when conducting the review and provides standardization to the selection process while still allowing the force inspector's experience to guide the process.  Although we have seen consistent and verified performance of this particular process, we continue to find Partial Compliance for Pars. 116 and 117 because we have yet to receive any agreement from the Parties as to whether a comprehensive assessment of the EIS is necessary for compliance with the requirements of these paragraphs.

### VIII.  ACCOUNTABILITY

During the fourth quarter of 2023, the PPB was found to be in Substantial Compliance with 10 out of the 14 remaining monitorable paragraphs in Section VII.  During this quarter, the PPB achieved Substantial Compliance for Pars. 126 and 128, and lost Substantial Compliance for Par. 122, leaving Pars. 122, 131, 137 and 169 in Partial Compliance.

For this quarter, the City and PPB achieved Substantial Compliance with Par. 126 by providing an updated SOP that includes guidance on situations where mental incapacitation prevents a witness officer from providing a walk-through during an OIS event, thereby addressing a long-standing COCL recommendation.  Additionally, the City gained compliance with Par. 128 by demonstrating the range of supports that have been provided to IPR as an independent entity.  However, the City lost Substantial Compliance with Par. 122, as we were informed that, for OIS events, PPB tolls for the criminal case of both the officer <u>and</u> the subject of force, a practice that is inconsistent with Par. 122 and PPB's own policies.   Should PPB maintain this practice, we note that it would also have compliance implications for Pars. 121 and 123.   We also report maintenance of Substantial Compliance in other areas, including IA and IPR investigation capabilities, protocols for investigating lethal force events, PRB authority, and processes occurring after a findings of liability.  However, in other areas, progress still needs to be seen to achieve Substantial Compliance, such as in the operation of the PRB, finalization of Directive 338.00, and uniform application of policies and accountability efforts.

### IX. COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING (PCCEP)

During the fourth quarter of 2023, the PPB was found to be in Substantial Compliance with all eight of the remaining monitorable paragraphs in Section IX.

In the fourth quarter of 2023, PCCEP continued to function as a legitimate body for community engagement. They held two full committee meetings, as well as meetings of their Settlement Agreement and Policy Sub-Committee, and their Community Engagement Sub-Committee. The City continued to support PCCEP by maintaining competent staff to plan and manage meetings, recruiting and training new PCCEP members, and providing technical and legal assistance as needed. During

the fourth quarter, the PCCEP submitted a recommendation to implement contact surveys that would allow any Portlander who has contact with police to submit feedback about the "content and quality of their interaction." this recommendation was subsequently accepted by Mayor Wheeler in the first quarter of 2024. Finally, the PPB has continued to produce high-quality quarterly and annual reports on traffic stops and use of force with demographic breakdowns that allow for the analysis of racial disparities.

## XI. ADDITIONAL REMEDIES

During the fourth quarter, the PPB and City were found to be in Substantial Compliance with four of the eight monitorable paragraphs in Section XI, leaving Pars. 189, 192, 194, and 195 in Partial Compliance.

The City continues to use the updated Force Data Collection Report (FDCR) and After Action Report forms to capture when the forms are edited and completed. The City also continues to list a separate line item for overtime costs to conduct necessary training for PPB officers. Additionally, while we await the 2023 Annual Report in the second quarter of 2024, the PPB's 2022 Annual Report was completed in a timely manner, posted on the PCCEP website, discussed with the PCCEP, and presented at all precinct meetings and before the city council. Finally, the PPB has retained Dr. Rebecca Rodriguez as the Police Education Director. With these actions, the City has maintained Substantial Compliance for Pars. 188, 190, 191, and 193.

For paragraphs which remained in Partial Compliance, continued progress was made.  During the fourth quarter of 2023, the City and PPB continued to make progress in implementing recommendations from IMLLC's assessment of the City's response to crowd control events in 2020. PPB released a training plan that identified several training components that were the result of IMLLC's report and that were scheduled for both spring and fall in-service, providing a roadmap for responding to IMLLC's recommendations. This is in addition to several other steps taken by the City and PPB to respond to the recommendations, as demonstrated by a 180-day self-assessment conducted by the City.  Related to Par. 192, IPR is continuing to conduct investigations related to Par. 192.  Additionally, the PPB took additional steps to fulfill the requirements of Par. 194. During this quarter, PPB ended its BWC pilot program and began evaluating its results, including through interviews with PPB members who had worn the BWCs. In addition, the City authorized PPB to enter into a procurement contract with Axon, a major BWC developer and distributor. Furthermore, PPB began developing a random review generator for supervisor review of BWC videos and continued revisions to the BWC policy. Finally, concerning the implementation of the Community Police Oversight Board required by Par. 195, the city council approved changes to City code that will lead to a new oversight system.  With these actions, the City has maintained Partial Compliance for those paragraphs.

# Table of Contents

Introduction ........................................................................................................................... 1

Report Card ........................................................................................................................... 3

Section III: Use of Force ...................................................................................................... 10

Section IV: Training ............................................................................................................. 22

Section V: Community-Based Mental Health Services ........................................................ 36

Section VI: Crisis Intervention ............................................................................................ 40

Section VII: Employee Information System ......................................................................... 48

Section VIII: Officer Accountability .................................................................................... 57

Section IX: Community Engagement and Creation of Portland Committee on Community-Engaged Policing .................................................................................................................. 73

Section XI: Additional Remedies ......................................................................................... 80

Appendix A: Acronyms ........................................................................................................ 90

Appendix B: List of Personnel ............................................................................................. 92

This page intentionally left blank.

# Introduction

This is the Compliance Officer/Community Liaison's (COCL) fourth quarter report for 2023, as required by the Amended Settlement Agreement between the City of Portland (the City) and the United States Department of Justice (DOJ), Case No. 3:12-cv-02265-SI, entered January 26, 2024.  Under the Agreement, the Compliance Officer/Community Liaison (COCL) is responsible for collecting, reviewing, and reporting on data related to the Portland Police Bureau's (PPB) interactions with persons experiencing a mental health crisis, use of force, PPB supervision and management of use of force, training, employee information system, accountability processes, community engagement, and remedies to prior non-compliance.. The COCL independently examines and synthesizes the data for the purposes of reporting to the City Council, the DOJ, and the public on the City's compliance with the Agreement.  The COCL team produces quarterly reports and presents the draft of each report to the public for comment.  This report covers the three-month period from October 1, 2023, to December 31, 2023.

During the fourth quarter, the Court granted a motion to amend the Agreement that terminated 40 paragraphs from being monitored.  This includes two paragraphs in Section III (Pars. 68 and 71), four paragraphs in Section IV (Pars. 80, 82-83, and 87), twenty-one paragraphs in Section VI (Pars. 91-93, 97-98, 99-105, 106-111, 112, and 113-114), two paragraphs in Section VII (Pars. 119-120), seven paragraphs in Section VIII (Pars. 130, 134-136, and 138-140), and four paragraphs in Section IX (Pars. 145-147, and 149).  This report therefore includes a "Report Card" that provides a separate assessment of each remaining monitorable paragraph in the Agreement. All paragraphs are reviewed and evaluated using the following standards:17

- Substantial Compliance: The City/PPB has satisfied the requirement of the provision in a comprehensive fashion and with a high level of integrity.
- Partial Compliance: The City/PPB has made significant progress toward the satisfaction of the provision's requirements, though additional work is needed.
- Non-Compliance but Initial Steps Taken: The City/PPB has begun the necessary steps toward compliance, though significant progress is lacking.

For each paragraph assessed by the COCL team, we provide the Settlement Agreement paragraph language, our methodology for assessing compliance with that paragraph, a summary of our findings for the quarter, recommendations for achieving or maintaining compliance (where appropriate), and the documents, data, or observations that we relied on in completing our assessment.   When providing recommendations for reaching or maintaining compliance, we use the phrase "*to achieve [or maintain] Substantial Compliance.*" Where recommendations in our assessments are not preceded by this

**Exhibit A**

language, the COCL is offering recommendations that are not required for compliance, but that we feel would have a significant positive impact if implemented.

In the fourth quarter of 2023, the City/PPB remained in Substantial Compliance for most of the paragraphs in the Settlement Agreement. The City/PPB achieved Substantial Compliance for one additional paragraph within the Use of Force section (Par. 76) and two paragraphs within the Accountability section (Pars. 126 and 128). However, the City lost Substantial Compliance with Par. 122 in the Accountability Section.  Thus, at the conclusion of the fourth quarter of 2023, Partial Compliance ratings were given for the following 11 paragraphs: Use of Force (Par. 69), Employee Information System (Pars. 116, 117), Officer Accountability (Pars. 122, 131, 137, 169), and Additional Remedies (Pars. 189, 192, 194, 195).

**Exhibit A**

# Report Card

The table below summarizes the compliance status and recommendations for all paragraphs reviewed by the COCL.

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| **III. USE OF FORCE** | | |
| Par. 66 | Substantial Compliance | • Maintain vigilance in reviewing how de-escalation is defined to ensure that the data surrounding de-escalation does not suffer from validity issues |
| Par. 67 | Substantial Compliance | • Maintain vigilance in reviewing how de-escalation is defined to ensure that the data surrounding de-escalation does not suffer from validity issues |
| Par. 69 | Partial Compliance | • To return to Substantial Compliance, evaluate Directives 1010.00 and 910.00, evaluate current training, and identify opportunities to clarify when officers should be reporting Control Against Resistance<br><br>• Upon issuing such clarification, take corrective action on members who fail to report Control Against Resistance and supervisors who fail to correct the issue |
| Par. 70 | Substantial Compliance | • No recommendations at this time |
| Par. 72 | Substantial Compliance | • No recommendations at this time |
| Par. 73 | Substantial Compliance | • No recommendations at this time |
| Par. 74 | Substantial Compliance | • No recommendations at this time |
| Par. 75 | Substantial Compliance | • No recommendations at this time |

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| Par. 76 | Substantial Compliance | • No recommendations at this time |
| Par. 77 | Substantial Compliance | • No recommendations at this time |
| **IV. TRAINING** | | |
| Par. 78 | Substantial Compliance | • No recommendations at this time |
| Par. 79 | Substantial Compliance | • No recommendations at this time |
| Par. 81 | Substantial Compliance | • No recommendations at this time |
| Par. 84 | Substantial Compliance | • Maintain and, where needed, expand efforts to further include concepts related to procedural justice and legitimacy |
| Par. 85 | Substantial Compliance | • The next audit of the Training Division should give special attention to civilianization, including the level of support for the Director of Education and instructor development classes<br><br>• The next audit should give attention to the content of in-person training for officers and supervisors, with particular attention to the quality of instruction on equity, procedural justice, and de-escalation<br><br>• In terms of a training needs assessment, the community should play a bigger role in setting training priorities because it is the recipient of police services<br><br>• Given the critical importance of training in police reform, the City and PPB should invest more in Training Division personnel so that more instruction can be delivered |

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|-----------|------------------|----------------------|
| Par. 86 | Substantial Compliance | • Continue to work with the TAC to identify analyses that will be most useful to the TAC's mission |
| **V. COMMUNITY-BASED MENTAL HEALTH SERVICES** | | |
| Par. 88 | Substantial Compliance | • No recommendations at this time |
| Par. 89 | Substantial Compliance | • No recommendations at this time |
| Par. 90 | Substantial Compliance | • No recommendations at this time |
| **VI. CRISIS INTERVENTION** | | |
| Par. 94 | Substantial Compliance | • No recommendations at this time |
| Par. 95 | Substantial Compliance | • Ensure an ongoing quorum through increasing membership or substituting representatives who are able to attend more regularly for those who frequently cannot |
| Par. 96 | Substantial Compliance | • No recommendations at this time |
| Par. 115 | Substantial Compliance | • No recommendations at this time |
| **VII. EMPLOYEE INFORMATION SYSTEM** | | |
| Par. 116 | Partial Compliance | • To achieve Substantial Compliance, determine with DOJ whether an assessment of EIS's effectiveness is required for compliance |
| Par. 117 | Partial Compliance | • To achieve Substantial Compliance, determine with DOJ whether an assessment of EIS's effectiveness is required for compliance |

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| Par. 118 | Substantial Compliance | • No recommendations at this time |
| **VIII. OFFICER ACCOUNTABILITY** | | |
| Par. 121 | Substantial Compliance | • To maintain Substantial Compliance, PPB should discontinue the practice of tolling for the subject's criminal case in OIS events |
| Par. 122 | Partial Compliance | • To return to Substantial Compliance, PPB should discontinue the practice of tolling for the subject's criminal case in OIS events |
| Par. 123 | Substantial Compliance | • Maintain self-improvement loop for stages that exceed the stage timeline, even if the case does not exceed the 180-day timeline<br><br>• To maintain Substantial Compliance, PPB should discontinue the practice of tolling for the subject's criminal case in OIS events |
| Par. 124 | Substantial Compliance | • No recommendations at this time |
| Par. 125 | Substantial Compliance | • No recommendations at this time |
| Par. 126 | Substantial Compliance | • No recommendations at this time |
| Par. 127 | Substantial Compliance | • No recommendations at this time |
| Par. 128 | Substantial Compliance | • No recommendations at this time |
| Par. 129 | Substantial Compliance | • No recommendations at this time |
| Par. 131 | Partial Compliance | • To return to Substantial Compliance, conduct PRBs in accordance with prior COCL and DOJ guidance |
| Par. 132 | Substantial Compliance | • No recommendations at this time |
| Par. 133 | Substantial Compliance | • No recommendations at this time |

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| Par. 137 | Partial Compliance | • To return to Substantial Compliance, update Directive 338.00, publicly post the directive, and provide link to the Corrective Action Guide |
| Par. 169 | Partial Compliance | • To achieve Substantial Compliance, remedy barriers related to Pars. 122, 131, 137, and 195 to ensure a fair and consistent accountability system |

**IX. COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| Par. 141 | Substantial Compliance | • No recommendations at this time |
| Par. 142 | Substantial Compliance | • To maintain Substantial Compliance with Paragraph 142, the City should continue to promptly respond to PCCEP's recommendations, and the mayor and police commissioner should continue to fulfill the requirement to meet with the PCCEP "at least twice per year |
| Par. 143 | Substantial Compliance | • To maintain Substantial Compliance with Par. 143, the City should continue to identify and recruit sufficient Portland Committee On Community Engaged Policing (PCCEP) members to maintain a full body<br><br>• The City, with guidance from PCCEP, should prioritize the recruitment and retention of youth members on PCCEP |
| Par. 144 | Substantial Compliance | • To maintain Substantial Compliance, continue adequate staffing dedicated to supporting PCCEP<br><br>• To maintain Substantial Compliance, post minutes of PCCEP meetings within 10 business days after a PCCEP meeting, |

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| | Substantial Compliance | including in the Documents section of PCCEP's website |
| Par. 148 | Substantial Compliance | • Continue the dialogue with community members around racial disparities in traffic stops and searches |
| Par. 150 | Substantial Compliance | • No recommendations at this time |
| Par. 151 | Substantial Compliance | • Continue to maintain records of training for new PCCEP members; ensure current and future PCCEP members participate in all required trainings and are offered a meaningful opportunity to participate in any optional training |
| Par. 152 | Substantial Compliance | • Continue to maintain records of training for new PCCEP members; ensure current and future PCCEP members participate in all required trainings and are offered a meaningful opportunity to participate in any optional training |
| **XI. ADDITIONAL REMEDIES** | | |
| Par. 188 | Substantial Compliance | • No recommendations at this time |
| Par. 189 | Partial Compliance | To achieve Substantial Compliance:<br>• The PPB must use the IMLLC report to prepare a training needs assessment, training plan, and relevant crowd management training<br>• IMLLC must prepare a follow-up report that reviews the City's response to their original report, including the PPB's training needs assessment |
| Par. 190 | Substantial Compliance | • No recommendations at this time |
| Par. 191 | Substantial Compliance | • No recommendations at this time |

**Exhibit A**

| Paragraph | Compliance Label | COCL Recommendations |
|---|---|---|
| Par. 192 | Partial Compliance | • To achieve Substantial Compliance, complete a thorough, fair, and reasonable investigation of the command personnel associated with the 2020 crowd control and the training they provided<br><br>• To achieve Substantial Compliance, hold accountable the investigated command personnel members as appropriate who are found to have violated PPB policies (including this Agreement) as described in Par. 192 |
| Par. 193 | Substantial Compliance | • No recommendations at this time |
| Par. 194 | Partial Compliance | • To achieve Substantial Compliance, the City should achieve full-scale implementation of the BWC program |
| Par. 195 | Partial Compliance | • To achieve Substantial Compliance, the City must implement a functional oversight board that is properly staffed, trained, operational, and able to effectively investigate and dispose of use of force and misconduct cases |

**Exhibit A**

# Section III: Use of Force

| | |
|---|---|
| **Settlement Agreement Paragraph** | |

66. PPB shall maintain the following principles in its existing use of force policies: (a) PPB shall use only the force reasonably necessary under the totality of circumstances to lawfully perform its duties and resolve confrontations effectively and safely, and (b) PPB expects officers to develop and display, over the course of their practice of law enforcement, the skills and abilities that allow them to regularly resolve confrontations without resorting to force or using the least amount of appropriate force.

67. <u>COCL Summary</u>: Paragraph 67 establishes that PPB shall add several core use of force principles to its force policy: the use of disengagement and de-escalation techniques, calling in specialized units when practical, taking into account all available information about actual or perceived mental illness of the individual, and the appropriate de-escalation when force is no longer necessary. Par. 67 also indicates that the force policy should include mention that unreasonable uses of force shall result in corrective action or discipline. (For details and exact language, see the Settlement Agreement.)

| | |
|---|---|
| **Compliance Label** | Par. 66 Substantial Compliance |
| | Par. 67 Substantial Compliance |
| **Methodology** | Review force case sample |

| |
|---|
| **Compliance Assessment** |

As part of our regular review of PPB force events, we evaluated 20 cases that represent a randomly drawn cross section of PPB's use of force. These cases include force from different categories and different precincts and force involving the use of a conducted electric weapon (CEW) and against persons in a mental health crisis. For this quarter, we did not find any cases in which we believed that the force used was unreasonable or in which members did not demonstrate appropriate force avoidance skills. We therefore continue to find that PPB and the City have substantially complied with the requirements

**Exhibit A**

and maintain our prior suggestion regarding the definition of de-escalation and ensuring data validity with respect to de-escalation reporting.

| **COCL Recommendations** | • Maintain vigilance in reviewing how de-escalation is defined to ensure that the data surrounding de-escalation do not suffer from validity issues |
|---|---|
| **Assessment Based On** | COCL review of force sample |

| **Settlement Agreement Paragraph** |
|---|
| 69. PPB shall revise its policies related to use of force reporting as necessary to require that (a) all PPB officers who use force, including supervisory officers, draft timely use of force reports that include sufficient information to facilitate a thorough review of the incident in question by supervisory officers, (b) all officers who are involved in or witnesses to a use of force event provide a full and candid account to supervisors, and (c) in case of an officer-involved shooting resulting in death, use of lethal force, or an in-custody death, PPB will fulfill its reporting and review requirements as specified in Directive 1010.10, as revised. This will take the place of Directive 940.00 reports for the purposes of paragraphs 70 and 72 through 77 of this Agreement. |

| **Compliance Label** | Partial Compliance |
|---|---|
| **Methodology** | Review force case sample |

| **Compliance Assessment** |
|---|
| In our review of cases for this quarter, we found that all Force Data Collection Reports (FDCRs) reviewed contained sufficient information to allow a supervisor to conduct a full investigation of the event. Overall, we continue to be impressed with the level of detail officers provide in their reports, which gives supervisors a clear picture of an event (although we await Bureau-wide implementation of BWCs that will provide additional information to supervisors). |

However, consistent with prior quarters, we continue to find Partial Compliance with this paragraph because of a lack of clarity in PPB's definition of Category IV force types,

**Exhibit A**

particularly for force involving Control Against Resistance and Resisted Handcuffing. During this quarter, we identified one case in which this issue occurred again. In that case, three officers completed FDCRs based on perceiving resistance from the subject. A fourth officer, who was engaging in the same type of physical restraint as the other three, did not perceive resistance and therefore did not complete an FDCR. Although no changes in policy or training for these force types occurred during the fourth quarter of 2023, PPB, the City, DOJ, and COCL have recently engaged in more directed conversation surrounding these force types. This conversation was informed by a thorough review conducted by PPB of its policies, training, and the operational effect of Category IV uses of force. We look forward to further discussion around this issue going forward and maintain our criteria for returning to Substantial Compliance because a final resolution has not yet been reached.

| | |
|---|---|
| **COCL Recommendations** | <ul><li>To return to Substantial Compliance, update policy and training to clarify when officers should be reporting Control Against Resistance</li><li>Upon issuing such clarification, take corrective action on members who fail to report Control Against Resistance and supervisors who fail to correct the issue</li></ul> |
| **Assessment Based On** | COCL review of force cases |

| **Settlement Agreement Paragraph** |
|---|
| 70. COCL Summary: Paragraph 70 states, "PPB shall continue enforcement of Directive 940.00, which requires supervisors who receive notification of a force event to respond to the scene, conduct an administrative review and investigation of the use of force, document their findings in an After Action Report and forward their report through the chain of command." Paragraph 70 also describes what is required of supervisory officers when a use of force event occurs, including timeframes for AARs and notification requirements for serious uses of force, force against individuals with mental illness, suspected misconduct, procuring medical attention, and officer interviews (for details and exact language, see the Settlement Agreement). |

| | |
|---|---|
| **Compliance Label** | Substantial Compliance |

**Exhibit A**

| **Methodology** | Review of force cases |
|---|---|

| **Compliance Assessment** | |
|---|---|

In our review of 20 use of force cases, we continue to find that all supervisory investigations were thorough and addressed areas identified for improvement during the force event. Overall, the AAR sample we reviewed for this quarter demonstrated supervisors' ability to review force events using a critical eye, and we did not identify any instances in which supervisors in the chain of command missed significant opportunities for correction. As a result, we continue to find PPB to be in Substantial Compliance with the requirements of Par. 70.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | COCL review of force cases |

| **Settlement Agreement Paragraph** | |
|---|---|

72. PPB shall develop a supervisor investigation checklist to ensure that supervisors carry out these force investigation responsibilities. PPB shall review and revise the adequacy of this checklist regularly, at least annually.

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Review current AAR form |

| **Compliance Assessment** | |
|---|---|

Presently, the AAR form serves as the checklist of supervisor responsibilities during use of force investigations. In addition, with respect to Par. 72's requirement to review and revise the form regularly, this requirement continues to be memorialized in Directive 910 (*Use of Force Reporting, Review, and Investigation*) under Section 5.2, identifying the force inspector (or chief's designee) as the individual responsible for conducting the review. As

**Exhibit A**

part of the force inspector's ongoing audit responsibilities, the "adequacy and relevance" (Directive 910.00) of the form is constantly being appraised, meeting Par. 72's requirement. Therefore, we find that PPB remains in Substantial Compliance with the requirements of Paragraph 72.

| | |
|---|---|
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Based On** | COCL review of AAR form |

| **Settlement Agreement Paragraph** | |
|---|---|
| 73. COCL Summary: Paragraph 73 directs PPB to revise its policies concerning chain of command reviews of AARs (also called 940s) to ensure that the reviews are accurate and thorough, that all comments are recorded in the EIS, that supervisors in the chain are held accountable for inadequate reports and analysis through corrective action (including training, demotion, or removal from their supervisory position), and that when use of force is found to be outside of policy, it is reported and appropriate corrective action is taken with the officer and the investigation itself (for details and exact language, see the Settlement Agreement). | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review force case sample |
| **Compliance Assessment** | |
| Consistent with our assessment of Paragraph 70, we found that all use of force events for this quarter were thoroughly investigated and reviewed by the entire chain of command. In reviewing the cases, we found that the entire chain of command ensured accurate and complete AARs; regularly identified policy, training, tactical, or equipment concerns; and raised concerns to the force inspector for resolution as necessary. As a result, we continue to find PPB to be in Substantial Compliance with the requirements of Par. 73. | |

**Exhibit A**

| **COCL Recommendations** | • No recommendations at this time |
| --- | --- |
| **Assessment Based On** | COCL review of force cases |

---

**Settlement Agreement Paragraph**

74. COCL Summary: Paragraph 74 states, "In consultation with the COCL, the Inspector, as part of PPB's quarterly review of force, will audit force reports and Directive 940.00 Investigation Reports" to ensure that the officer's force report is complete and accurate and that the officer's actions in the field are in line with PPB policy. The audit of force reports seeks to ensure that force is used in a way that is lawful and appropriate to the circumstances, that de-escalation is used appropriately, that ECW is used appropriately and within policy, and that specialty units and medical care are called in appropriately. In terms of force reporting, the audit seeks to ensure that reports are submitted in a timely manner; that they include detailed information about the event, the decision to use force, the type of force used, any subject resistance, and any injuries to the parties; and that they include the mental health status of the subject of force, documentation of witnesses and contact information, and other details as required by the Settlement. The report should have sufficient information to allow supervisors to evaluate the quality of the officer's decision-making regarding the use of force. (For details and exact language, see the Settlement Agreement.)

75. COCL Summary: Paragraph 75 states, "In consultation with the COCL, the Inspector shall audit force reports and Directive 940.00 investigations" to determine whether supervisors consistently engage in a variety of behaviors when reviewing use of force reports and supervising their employees. Specifically, the Settlement requires that supervisors complete an AAR within 72 hours of being notified of the incident. To perform well at this task, supervisors would need to review all use of force reports for completeness; determine whether the officer's actions are consistent with PPB policy, the Settlement Agreement, and best practices; and take all appropriate actions as a supervisor, including determining any training or counseling needs for the officer, taking corrective action on omissions or inaccuracies in the force report, notifying appropriate authorities when criminal conduct is suspected, and documenting all of these actions. (For details and exact language, see the Settlement Agreement.)

**Exhibit A**

77. COCL Summary: "In consultation with the COCL, the Inspector shall audit the adequacy of chain of command reviews of After-Action Reports." This type of audit by the Inspector will ensure that supervisors at all levels in the chain of command are conscientiously reviewing all AARs using the appropriate legal and administrative performance standards and taking appropriate action. Those who review AARs should be assessing the completeness of reports and evaluating the findings using a "preponderance of the evidence" standard. When appropriate, reviewers should modify findings that do not seem justified; speak with the original investigator; order additional investigations; identify any deficiencies in training, policy, or tactics; ensure that supervisors discuss poor tactics with the officer involved; and document these actions in EIS. (For details and exact language, see the Settlement Agreement.)

| | |
|---|---|
| **Compliance Label** | Par. 74 Substantial Compliance |
| | Par. 75 Substantial Compliance |
| | Par. 77 Substantial Compliance |
| **Methodology** | Review quarterly Force Audit Report; review force inspector memos; review force inspector Phase II spreadsheet |

**Compliance Assessment**

On a quarterly basis, PPB conducts the audits of force events required by Paragraphs 74, 75, and 77. As with prior quarters, PPB officers (through FDCRs) and PPB supervisors (through AARs) continue to demonstrate approximately 99 percent accuracy in their reporting, based on the audits. In addition, supervisors, chain-of-command reviewers, and the force inspector continue to conduct thorough and critical evaluations of use of force events and take corrective action when issues are identified.

Particularly as related to the force inspector's responsibility to identify policy, training, and tactical concerns, we continue to see evidence that such concerns are being identified and resolved through formal feedback channels. For instance, during this quarter, we reviewed feedback for supervisors regarding missing or incomplete information, requests for policy clarification after a unique force event, and training referrals for clarification of box-ins and rams. The feedback was sent to those most appropriate to address the feedback, including PPB's policy teams, Training Division, and precinct commanders. In addition, the

**Exhibit A**

force inspector maintains a comprehensive spreadsheet of identified issues, allowing those who review the spreadsheet to clearly see the issues, steps taken, and response. Because we continue to see the force audits adhere to the requirements of Pars. 74, 75, and 77, we continue to find that PPB has maintained Substantial Compliance with these paragraphs.

| **COCL Recommendations** | • No recommendations at this time |
| --- | --- |
| **Assessment Based On** | Review of Force Audit Report; review of feedback forms |

| **Settlement Agreement Paragraph** |
| --- |
| 76. In consultation with the COCL, the Inspector shall conduct a quarterly analysis of force data and supervisors' Directive 940.00 reports designed to: (a) Determine if significant trends exist; (b) Determine if there is variation in force practice away from PPB policy in any unit; (c) Determine if any officer, PPB unit, or group of officers is using force differently or at a different rate than others, determine the reason for any difference and correct or duplicate elsewhere, as appropriate; (d) Identify and correct deficiencies revealed by the analysis; and (e) Document the Inspector's findings in an annual public report. |

| **Compliance Label** | Substantial Compliance |
| --- | --- |
| **Methodology** | Reviewed quarterly Force Reports; reviewed SOP #5; meetings with force inspector and other PPB personnel |

| **Compliance Assessment** |
| --- |
| For each of the subsections of Paragraph 76, PPB possesses a tool or process to achieve Substantial Compliance. For instance, in addressing subsection (a), PPB continues to produce quarterly and annual force reports including several important data points and comparisons to prior quarters. Subsection (a) is also addressed, in part, through the Phase II review wherein the force inspector identifies organizational trends. For subsections (b) and (c), the force inspector reviews the findings of a comparative analysis of each officer, unit, and group (as defined by common days off), identifying differences and discussing the analysis with each patrol Responsibility Unit (RU) manager. For subsection (d), the |

**Exhibit A**

force inspector either provides a memo to the RU manager or creates a manual EIS alert (see also Paragraph 117). Finally, for subsection (e), the force inspector memorializes the findings of the reviews in annual reports, including the Annual Force Summary Report and Annual Force Audit Summary Report.

In addition, during the fourth quarter, we observed sustained and consistent use of PPB SOP #5 (Force Analysis for Supervisors and Teams), which outlines guidelines for identifying outlying officers who use more force than others. In discussions with the force inspector, we clearly followed the reasoning for selecting certain officers while using the SOP to dismiss other officers as non-concerning statistical noise. These discussions led to robust and engaging meetings between the force inspector and Precinct Commanders, consistent with the intentions of Par. 76(c).

Overall, we find that the tools PPB has in place conform to each of the requirements of Par. 76. Furthermore, the current process for identifying outlying officers is responsive to long-standing recommendations for achieving substantial compliance with this paragraph. Given the consistent and verified performance that we have observed across multiple quarters for Par. 76(c), we find that PPB has returned to Substantial Compliance with the requirements of this paragraph.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | COCL review of quarterly Force Data Summary Reports; COCL review of PPB data; meetings with Force Inspector and other PPB personnel |

## USE OF FORCE OUTCOME ASSESSMENT

We also evaluated the elements of a use of force call involving a person with actual or perceived mental illness as identified by the responding officers.  For these analyses, we used data from 2019 to 2023 and compared it to data from only the last year (2023) to determine whether last year's data was substantially different from the larger timeline.  For this evaluation, we considered an individual to be in actual or perceived mental illness if at least one officer on-scene indicated the individual was, even if other members did not.  We conducted a similar process with analyzing whether a person was armed and, if so, with what.  If one officer indicated the person was armed, the event was coded as such even if other officers did not indicate the person was armed.

**Exhibit A**

Overall, we find that the data within the past four quarters is consistent with the larger dataset. For instance, between 16% and 18% of the PPB's force events involve a person with actual or perceived mental illness. Additionally, when using force against a person in actual or perceived mental illness, the PPB overwhelmingly uses Category IV force types, including Control Against Resistance (approximately 55-56% in both timeframes) and Resisted Handcuffing (between 24-28% in both timeframes). In both timeframes, the call types Behavioral Health, Disturbance, Unwanted Person, and Welfare Check have been the leading call types to involve force against a person with actual or perceived mental illness. Assist had been the fifth most common historically, but Suspicious has replaced it in the last four quarters. Finally, with respect to the threat posed by the community member, approximately 56% of persons with actual or perceived mental illness were not reported to be armed. When subjects were armed, there was significant variety with respect to how they were armed, with Blunt Object, Knife Edged Weapon/Stabbing Instrument, Needle, Spit, and Other Bodily Fluid all comprising approximately 10% to 11%. Additionally, between 28% and 40% of subjects who were reported to have a weapon did not use or threaten to use the weapon.

**Table 1. Police Use of Force on Persons with Actual or Perceived Mental Illness**

|  | 2023 Q1 – 2023 Q4 | 2019 – 2023 |
|---|---|---|
| Force Used on Person with Actual or Perceived Mental Illness | | |
| Yes | 16.2% (N=104) | 18.1% (N=623) |
| No | 83.8% (N=538) | 82.4% (N=2,817) |
| Type of force (Actual or Perceived Mental Illness)* | | |
| CEW | 2.6% (N=12) | 2.7% (N=73) |
| Control Against Resistance | 46.7% (N=214) | 47.0% (N=1,257) |
| Resisted Handcuffing | 32.5% (N= 149) | 29.1% (N=780) |
| Strikes/kicks | 2.8% (N=13) | 1.1% (N=30) |
| Takedown (II and III) | 7.4% (N=34) | 7.3% (N=196) |
| Takedown (IV) | 2.8% (N=13) | 5.3% (N=143) |
| Other | 5.0% (N=23) | 7.4% (N=198) |
| Initial Call Type (Top 5 most common) (Actual or Perceived Mental Illness) | | |
| Assist | | 6.5% (N=104) |
| Behavioral Health | 21.6% (N=60) | 31.4 (N=505) |

**Exhibit A**

| | | |
|---|---|---|
| Disturbance | 20.1% (N=56) | 3.4% (N=216) |
| Suspicious | 6.8% (N=19) | |
| Unwanted Person | 6.8% (N=19) | 6.9% (N=111) |
| Welfare Check | 15.8% (N=44) | 16.3% (N=261) |
| **Subject Armed with Weapon (Actual or Perceived Mental Illness)** | | |
| Yes | 44.2% (N=46) | 43.2% (N=269) |
| No | 55.8% (N=58) | 56.8% (N=354) |
| **Subject Weapon Type (If Armed) (Actual or Perceived Mental Illness)\*\*** | | |
| Blunt object | 15.2% (N=7) | 16.7% (N=45) |
| Firearm | 4.3% (N=2) | 2.2% (N=6) |
| Firearm - implied | 0% (N=0) | 0.7% (N=2) |
| Firearm replica | 4.3% (N=2) | 1.1% (N=3) |
| Knife edged weapon/stabbing instrument | 28.3% (N=13) | 28.6% (N=77) |
| Needle, spit, or other bodily fluid | 19.6% (N=9) | 17.5% (N=47) |
| Other weapon | 19.6% (N=9) | 11.5% (N=31) |
| Weapon present, but not used or threatened | 28.3% (N=13) | 40.5% (N=109) |

*Force events may contain more than one application of force.  Therefore, the number of force applications are naturally higher than the number of persons on whom force was used.

**A subject may be armed with more than one type of weapon.  Therefore, the number of identified weapon types are naturally higher than the number of subjects who were armed with a weapon.

**Exhibit A**

We also sought to examine how the relative rate of CEW use compares with other use of force types.  As seen in Figure 1, CEW usage has remained relatively steady over the past five years, reaching 4% in 2020 and 3% in 2021, 2022, and 2023.

**Figure 1. CEW usage compared to all other force implements (2019 – 2023)**



**Exhibit A**

# Section IV: Training

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 78. All aspects of PPB training shall reflect and instill agency expectations that officers are committed to the constitutional rights of the individuals who have or are perceived to have mental illness whom they encounter and employ strategies to build community partnerships to effectively increase public trust and safety. To achieve these outcomes, PPB shall implement the requirements below. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | This is a summative judgment that is contingent upon satisfying all paragraphs in Section IV |
| **Compliance Assessment** | |
| Substantial Compliance with Par. 78 requires PPB to "implement the requirements below." Because this is a summative paragraph, compliance is assessed in terms of the achievement of all requirements of the Settlement Agreement pertaining to Section IV, Training. During the fourth quarter of 2023, PPB maintained Substantial Compliance with all paragraphs in Section IV, and we therefore similarly find Substantial Compliance with Par. 78. | |
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Based On** | Summative and contingent upon satisfying all paragraphs of Section IV, based on the methods identified for each |

**Exhibit A**

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 79. The Training Division shall review and update PPB's training plan annually. To inform these revisions, the Training Division shall conduct a needs assessment and modify this assessment annually, taking into consideration: (a) trends in hazards officers are encountering in performing their duties; (b) analysis of officer safety issues; (c) misconduct complaints; (d) problematic uses of force; (e) input from members at all levels of PPB; (f) input from the community; (g) concerns reflected in court decisions; (h) research reflecting best practices; (i) the latest in law enforcement trends; (j) individual precinct needs; and (k) any changes to Oregon or federal law or PPB policy. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Reviewed 2023 Annual Training Needs Assessment; reviewed 2023 Training Needs Assessment: Law Enforcement Response to Mass Demonstrations; reviewed 2024 Training Plan |

**Compliance Assessment**

In the fourth quarter of 2023, the Training Division provided its 2024 Training Plan, incorporating the findings of the two needs assessments we discussed in our last report, the 2023 Annual Training Needs Assessment and the 2023 Training Needs Assessment: Law Enforcement Respnose to Mass Demonstrations. The Training Plan covers all refresher training planned for 2024, including in-service trainings (for both fall and spring), online training, precinct and unit-specific training, planned external trainings, and other required qualifications and specialty certifications. The Training Plan incorporates several needs that have previously been identified by DOJ, COCL, and Independent Monitor, LLC (IMLLC) (see Par. 189) and that were reflected in PPB's 2023 Annual Training Needs Assessment. Consistent with prior years, the Training Plan was developed from needs identified through a wide range of sources, including

> *Independent Police Review reports, use of force data, officer injury data, DOJ and COCL recommendations, the Training Advisory Council, the Behavioral Health Unit and related community advisory committee, Oregon and federal court cases, Portland Police Bureau's (PPB) Force Analysis Summary Reports, training evaluation and learning assessment findings, information from*

**Exhibit A**

> *national conferences, Internal Affairs data, pursuit data, police and community survey data, national literature on law enforcement training; and discussions with Bureau managers, City Attorneys, DOJ coordinators, Injury Liaison Program management, Independent Police Review staff, Policy Analysts, Internal Affairs staff, and Training Division management and lead instructors.*

As a result of PPB's efforts in conducting its 2023 needs assessments and its incorporation of the needs assessments into the 2024 Training Plan, we continue to find that it has maintained Substantial Compliance with this paragraph.

We also take the opportunity to follow up on our prior suggestions that PPB reduce the gap between identified needs and training plans by using the range of training delivery options available to PPB. PPB has identified several steps toward achieving this goal, including conducting training at the precincts, addressing needs through Command and Detective in-service trainings, and recently purchasing a curriculum development software to develop more interactive online training. We commend PPB for these efforts and believe that they will allow PPB to continue to provide a wide range of training to members.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | Review of the 2024 Training Plan and 2023 needs assessments; review of PPB quarterly updates |

| **Settlement Agreement Paragraph** |
|---|
| 81. PPB shall ensure that the Training Division is electronically tracking, maintaining, and reporting complete and accurate records of current curricula, lesson plans, training delivered, attendance records, and other training material in a central, commonly accessible, and organized file system. Each officer's immediate supervisor shall review the database for the officers under his/her command at least semi-annually. |

| **Compliance Label** | Substantial Compliance |
|---|---|

**Exhibit A**

| **Methodology** | Reviewed learning management system (LMS) records for the fourth quarter of 2023 |
|---|---|

| **Compliance Assessment** |
|---|
| The Training Division continues to use the Cornerstone LMS to record officer training (including specialty certifications) and provide a range of online trainings. LMS attendance records include all in-person (such as in-service training) and online trainings completed by PPB members. In the fourth quarter of 2023, PPB provided LMS records for members attending in-service, supervisor in-service, command staff in-service, and ECIT training. In addition, PPB provided LMS records for members completing seven online trainings, including four trainings related to directives or executive orders and three other trainings related to stolen vehicles, BHU referrals, and the amended Settlement Agreement. In addition, PPB (through the Training Division) has maintained its process for ensuring compliance with Oregon training standards, including through the use of reminder emails, noncompliance memos to the chief's office, and supervised completion of training. Supervisors also review the database during officers' annual performance review as well as when any transfer occurs (e.g., when an officer transfers to a new supervisor or a supervisor transfers to a new unit or precinct). Through the combination of Training Division reviews as well as supervisors' annual review, each PPB member has their training records reviewed on at least a semi-annual basis (and, for some members, more). As a result, we find that PPB has maintained Substantial Compliance with the requirements of this paragraph. |

| **COCL Recommendations** | • No recommendations at this time |
|---|---|

| **Settlement Agreement Paragraph** |
|---|
| 84. (<u>COCL Summary</u>) Paragraph 84 describes the content and delivery of training that is expected for patrol officers and supervisors. PPB is expected to develop and implement a high-quality system of training that is consistent with PPB's policies as well as federal and state laws, and this training must cover specific topics, including use of force, de-escalation techniques, procuring medical care, proactive problem-solving, civil and criminal liability, and positive communication skills. PPB training is also required to give particular attention |

to police responses to individuals who have, or are perceived to have, mental illness. PPB's training of officers must include "role playing scenarios and interactive exercises that illustrate proper use of force decision making" as well as peer intervention. In addition to training for all sworn personnel, Paragraph 84 requires supervisor training, including conducting use of force investigations, evaluation of officer performance, and positive career development and disciplinary actions.

| Compliance Label | Substantial Compliance |
|---|---|
| Methodology | Reviewed lesson plans and training materials; observed training in person |

### Compliance Assessment

During the fourth quarter of 2023, PPB continued its fall in-service, which included modules on equity, mental health, crime scene management, BWC policy, legal updates, firearms/use of force, and a box-scenario.  As reported in our Q3 report, the COCL team reviewed these trainings before delivery and found the curriculum to be consistent with the requirements of Par. 84. PPB also conducted supervisors' in-service in the fourth quarter, for which the COCL team similarly provided comments and feedback. In addition, during the fourth quarter, PPB provided ECIT training (which the COCL team has previously reviewed), command in-service training, and several online trainings. Given the range of topics covered in these trainings and our review of trainings, we continue to find that training has been developed in accordance with the need to provide members refresher information on their specific responsibilities. As such, we continue to find Substantial Compliance with the requirements of this paragraph and maintain our ongoing suggestions for maintaining and expanding efforts to further include concepts related to procedural justice and legitimacy.

| **COCL Recommendations** | • Maintain and, where needed, expand efforts to further include concepts related to procedural justice and legitimacy |
|---|---|
| **Assessment Based On** | COCL's assessment of training content, delivery, and consistency with adult-learning principles and best practices |

**Exhibit A**

| **Settlement Agreement Paragraph** |
|---|
| 85. In consultation with the COCL, the Inspector shall audit the training program using the following performance standards to ensure that PPB does the following: (a) Conducts a comprehensive needs assessment annually; (b) Creates a Training Strategic Plan annually; (c) Within 180 days of the Effective Date, develops and implements a process for evaluation of the effectiveness of training; (d) Maintains accurate records of Training delivered, including substance and attendance; (e) Makes Training Records accessible to the Director of Services, Assistant Chief of Operations, and DOJ; (f) Trains Officers, Supervisors, and Commanders on areas specific to their responsibilities; and (g) Ensures that sworn PPB members are provided a copy of all PPB directives and policies issues pursuant to this Agreement, and sign a statement acknowledging that they have received, read, and had an opportunity to ask questions about the directives and/or policies, within 30 days of the release of the policy. |

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Review of audit report for accuracy and completeness |

| **Compliance Assessment** |
|---|
| The Office of the Inspector General (OIG) completed a comprehensive audit of PPB's training program on December 30, 2022, thereby demonstrating that the Bureau has a system in place that complies with the basic requirements of Paragraph 85. We therefore continue to find Substantial Compliance with the requirements of this paragraph. However, while the Settlement Agreement does not provide a set interval for conducting follow-up audits, we suggest PPB begin planning their next audit of the Training Division to be conducted sometime in 2025, which would be approximately 3 years after the most recent audit. In performing this next audit, we maintain our suggestions for future audits and overall Training Division operations with regards to special attention to civilianization of the Training Division, as well as greater attention to instruction on equity, procedural justice, and de-escalation. While PPB already performs this in some degree with their annual Needs Assessment and Training Plan, we continue to suggest a broader audit of these topics. |

**Exhibit A**

| | |
|---|---|
| **COCL Recommendations** | • The next audit of the Training Division should give special attention to civilianization, including the level of support for the Director of Education and instructor development classes<br><br>• The next audit should give attention to the <u>content</u> of in-person training for officers and supervisors, with particular attention to the quality of instruction on equity, procedural justice, and de-escalation<br><br>• In terms of a training needs assessment, the community should play a bigger role in setting training priorities because it is the recipient of police services<br><br>• Given the critical importance of training in police reform, the City and PPB should invest more in Training Division personnel so that more instruction can be delivered |
| **Assessment Based On** | COCL's review of the audit report based on identified needs of the Training Division, auditing standards, and the timeline for completion of the audit |

| |
|---|
| **Settlement Agreement Paragraph** |
| 86. In consultation with the COCL, the Inspector shall gather and present data and analysis on a quarterly basis regarding patterns and trends in officers' uses of force to the Chief, the PPB Training Division, and to the Training Advisory Council (TAC). The Training Division and Training Advisory Council shall make recommendations to the Chief regarding proposed changes in policy, training, and/or evaluations based on the data presented. The Inspector shall also, in coordination with the COCL and Professional Standards Division (PSD), identify problematic use of force patterns and training deficiencies. The Chief's Office shall assess all use of force patterns identified by the Training Division and/or Training Advisory Council and timely implement necessary remedial training to address deficiencies so identified. |

| **Compliance Label** | Substantial Compliance |
|---|---|

**Exhibit A**

| Methodology | Reviewed TAC meeting agenda and minutes |
|---|---|

| | **Compliance Assessment** |
|---|---|
| | The Force Inspector continues to gather force data on a quarterly basis and examine them for patterns and trends (See Section III on Use of Force). One TAC meeting was held during the fourth quarter of 2023, although the meeting did not contain a presentation by the force inspector because of a decision to delay the force inspector's presentation to allow more time for the Data Analysis Regarding Use of Force Project Group (a task group within the TAC) to meet with the force inspector to better understand the use of force data and inform future force presentations. A presentation of force data was then provided in the first quarter of 2024. Because the delay in providing a force presentation was reasonable (and was at the request of the TAC), we do not find this delay to be a significant deviation from the requirements of this paragraph and continue to find PPB in Substantial Compliance with the requirements of Par. 86. |

| **COCL Recommendations** | • Continue to work with the TAC to identify analyses that will be most useful to the TAC's mission |
|---|---|
| **Assessment Based On** | Prior PPB presentations of quarterly force reports and inclusion of trends; prior TAC recommendations; PPB responsiveness to the TAC's recommendations |

## TRAINING OUTCOME ASSESSMENT

In conducting the outcome assessment for this report, the COCL examined PPB's training evaluation data for 2023. The PPB's Training Division conducts evaluations in each of their trainings, though for this evaluation, we focus on the available data for the Advanced Academy trainings, online trainings, and ECIT training.

The first part of this assessment reviews PPB officers' evaluation of the adequacy of training they receive as part of Advanced Academy and online training. As shown in Figure 2, responses from evaluation surveys indicate that most PPB officers see value in the trainings they receive, with the majority agreeing or strongly agreeing that that the trainings were a good use of their time.

Figure 2 Responses to "This was a good use of my training time."



We then dove deeper into the data from the Advanced Academy courses, which were categorized as CEW, Crisis Intervention Team (CIT), Community Engagement, Control Tactics, Firearms, Law, Patrol Procedures, Police Legitimacy/Procedural Justice, Public Order, Patrol Vehicle Operations (PVO), Wellness, and Other. Courses aggregated into Other had less than 15 responses. As shown in Table 2, many respondents believed these courses were a good use of their training time. However, the Community Engagement and Wellness courses received the highest number of 'Slightly Disagree', 'Disagree', and particularly, 'Strongly Disagree' responses. When interpreting the data, we note that these are overarching categories of training and that not all courses under the "Community Engagement" or "Wellness" categories are the same.  For instance, for the Community Engagement category, PPB has delivered a total of 27 courses, each being developed by different persons or groups.  Similarly for the Wellness category, course topics varied, with some courses focused on topics such as proper sleep practices and others related to financial wellness.  Therefore, while many courses within a certain category may have been well received, other individual courses within the broader categories may have not been, thus explaining more disagreement with the question.  However, the concerns expressed by members for individual courses should not be read as an overall aversion to Community Engagement or Wellness training topics.

Table 2. Advanced Academy Responses to "This was a good use of my training time."

|  | Strongly Disagree | Disagree | Slightly Disagree | Slightly Agree | Agree | Strongly Agree |
|---|---|---|---|---|---|---|
| CEW | 0.0% (N=0) | 0.0% (N=0) | 0% (N=0) | 13.3% (N=2) | 13.3% (N=2) | 73.3% (N=11) |

**Exhibit A**

| | | | | | | |
|---|---|---|---|---|---|---|
| CIT | 1.5% (N=2) | 1.5% (N=2) | 0% (N=0) | 9.0% (N=12) | 37.3% (N=50) | 50.7% (N=68) |
| Community Engagement | 15.9% (N=25) | 7.0% (N=11) | 10.2% (N=16) | 24.8% (N=39) | 29.9% (N=47) | 12.1% (N=19) |
| Control Tactics | 0.0% (N=0) | 0.0% (N=0) | 0.5% (N=2) | 1.0% (N=4) | 12.1% (N=47) | 86.4% (N=336) |
| Firearms | 0.0% (N=0) | 0.3% (N=1) | 0.3% (N=1) | 0.9% (N=3) | 18.5% (N=63) | 80.1% (N=273) |
| Law | 0.0% (N=0) | 0.0% (N=0) | 0.0% (N=0) | 4.3% (N=5) | 13.9% (N=16) | 81.7% (N=94) |
| Patrol Procedures | 0.3% (N=1) | 0.3% (N=1) | 0.0% (N=0) | 1.9% (N=7) | 15.3% (N=57) | 82.3% (N=306) |
| Police Legitimacy/ Procedural Justice | 0.0% (N=0) | 0.0% (N=0) | 5.3% (N=1) | 5.3% (N=1) | 47.4% (N=9) | 42.1% (N=8) |
| Public Order | 0.0% (N=0) | 2.4% (N=1) | 0.0% (N=0) | 7.3% (N=3) | 39.0% (N=16) | 51.2% (N=21) |
| PVO | 0.6% (N=1) | 0.0% (N=0) | 0.0% (N=0) | 0.0% (N=0) | 14.9% (N=26) | 84.5% (N=147) |
| Wellness | 4.6% (N=5) | 5.6% (N=6) | 4.6% (N=5) | 18.5% (N=20) | 25.9% (N=28) | 40.7% (N=44) |
| Other | 0.0% (N=0) | 1.4% (N=1) | 0.0% (N=0) | 4.3% (N=3) | 18.6% (N=13) | 75.7% (N=53) |

Figure 3 reports how respondents evaluated their training courses by their perceived level of importance for future Advanced Academies. An overwhelming majority of respondents recommended the current courses for future Advanced Academies or reported that the current courses were critical for future Advanced Academy students. However, similar to responses in Table 2, the Community Engagement and Wellness courses received the most disapproving responses from respondents. Over 20% of respondents for the Community Engagement courses and nearly 10% of respondents for the Wellness courses indicated that some portion of the courses were unimportant for including in future academies. Again though, this should not be interpreted as respondents believing that Community Engagement or Wellness (as broader topics) were unimportant for future academies, just that some individual courses were less well-received.

**Exhibit A**

Figure 3. Advanced Academy Responses to "How would you classify this class in regards to its importance for future Advances Academies?"



We also summarize the evaluation of the 2022 Enhanced Crisis Intervention Training as provided in the PPB's Training Division's 2023 Assessment Report. ECIT training consists of four 10-hour days of training comprised of in-class lectures, site visit presentations, and role-playing scenarios. The training curriculum focuses on equipping officers with de-escalation techniques such as being able to communicate from a safe distance, use active listening to build rapport, avoid physical confrontation by placing barriers between the person and the officers, and to use time and patience whenever possible. ECIT officers are also trained to recognize the signs and symptoms of mental illness, evaluate various situational risk factors, and to utilize resources and techniques to resolve the call in the safest way possible. Figure 4 shows ECIT officers' perception of adequacy of training over time (2015 – 2022) for the ECIT Overview course[1].  As seen in the figure, the number of Strongly Agree responses has increased over the past several years.  For the last year, there were a total of two individuals

---

[1] Some years did not have ECIT trainings

**Exhibit A**

who indicated they strongly disagreed with the statement, though PPB reports that one of these individuals rated all other courses within the training positively.

Figure 4. ECIT Overview Responses to 'This was a good use of my training time."



Four months post-training, ECIT officers were given a follow-up survey to assess the usefulness of the training, challenges they have faced on the job, and their confidence to engage with individuals during behavioral crisis incidents. As shown in Table 3, a majority of respondents either Agree and Strongly Agree that the ECIT training proved to be useful by expanding their knowledge, increasing their confidence, and improving their ECIT engagements. Comparatively, responses to supervisor and peer support questions indicated that some respondents disagree that they are supported from their supervisors (8%) and peers (17%). Further, ECIT officers appear to face some challenges when responding to calls that may impact their perception of supervisor and peer support. For example, 16% of respondents Agree or Strongly Agree that 'When I attend a call as an ECIT officer, there is confusion as to whether I or the primary officer should lead the call,' and 25% Agree or Strongly Agree with 'I am reluctant to respond to a call as an ECIT officer without being requested.' However, in terms of raw numbers and given that this reflects a single cadre of new ECIT officers, these do not represent a concern. We have also seen the question of roles and responsibilities for ECIT calls addressed in broader in-service training in the past and PPB reports that the evaluation results pertaining to non-ECIT officers' and supervisors' understanding of ECIT roles and responsibilities have been improving over time. Additionally, as part of their ECIT in-service, PPB surveyed ECIT officers on additional metrics for whether non-ECIT and supervisors understand ECIT roles, similarly seeing improvement in these metrics as well. While not a concern within this report, PPB should continue to assess these issues going forward.

**Exhibit A**

Table 3. Four Month Follow Up of ECIT Training

| | Strongly Disagree | Disagree | Slightly Disagree | Neither Agree nor Disagree | Slightly Agree | Agree | Strongly Agree |
|---|---|---|---|---|---|---|---|
| **Usefulness** | | | | | | | |
| The ECIT training expanded upon my previous knowledge base regarding individuals experiencing a behavioral health crisis. | 0% (N=0) | 0% (N=0) | 0% (N=0) | 0% (N=0) | 17% (N=2) | 50% (N=6) | 33% (N=4) |
| Since the ECIT training, I feel more confident in my ability to handle situations involving people in a behavioral health crisis. | 0% (N=0) | 0% (N=0) | 0% (N=0) | 0% (N=0) | 0% (N=0) | 67% (N=8) | 33% (N=4) |
| The ECIT training has improved my ability to effectively engage with family members and/or care providers during a mental health crisis. | 0% (N=0) | 0% (N=0) | 0% (N=0) | 0% (N=0) | 0% (N=0) | 58% (N=7) | 42% (N=5) |
| **Supervisor and Peer Support** | | | | | | | |
| My supervisor(s) are very supportive of the ECIT program. | 0% (N=0) | 0% (N=0) | 8% (N=1) | 0% (N=0) | 8% (N=1) | 42% (N=5) | 42% (N=5) |
| My supervisor(s) allow me the needed time and resources to respond to ECIT calls. | 0% (N=0) | 0% (N=0) | 0% (N=0) | 0% (N=0) | 8% (N=1) | 50% (N=6) | 42% (N=5) |
| My supervisor(s) allow me the needed time and resources for training pertaining to ECIT. | 0% (N=0) | 0% (N=0) | 0% (N=0) | 17% (N=2) | 17% (N=2) | 33% (N=4) | 33% (N=4) |
| My peers are very supportive of the ECIT program. | 0% (N=0) | 0% (N=0) | 17% (N=2) | 0% (N=0) | 17% (N=2) | 33% (N=4) | 33% (N=4) |
| Most officers understand the role of the ECIT officers and what services they provide. | 0% (N=0) | 8% (N=1) | 17% (N=2) | 0% (N=0) | 17% (N=2) | 33% (N=4) | 25% (N=3) |
| Most sergeants understand how to utilize ECIT officers in a "coach role" on calls involving a behavioral health crisis. | 0% (N=0) | 8% (N=1) | 8% (N=1) | 0% (N=0) | 25% (N=3) | 25% (N=3) | 33% (N=4) |

**Exhibit A**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| When I attend a call as an ECIT officer, there is confusion as to whether I or the primary officer should lead the call. | 0% (N=0) | 42% (N=5) | 25% (N=3) | 17% (N=2) | 0% (N=0) | 8% (N=1) | 8% (N=1) |
| I am reluctant to respond to a call as an ECIT officer without being requested. | 8% (N=1) | 50% (N=6) | 0% (N=0) | 17% (N=2) | 0% (N=0) | 25% (N=3) | 0% (N=0) |

**Exhibit A**

# Section V: Community-Based Mental Health Services

---

**Settlement Agreement Paragraph**

88. The absence of a comprehensive community mental health infrastructure often shifts to law enforcement agencies throughout Oregon the burden of being first responders to individuals in mental health crisis. Under a separate agreement, the United States is working with State of Oregon officials in a constructive, collaborative manner to address the gaps in state mental health infrastructure. The state-wide implementation of an improved, effective community-based mental health infrastructure should benefit law enforcement agencies across the State, as well as people with mental illness. The United States acknowledges that this Agreement only legally binds the City to take action. Nonetheless, in addition to the City, the United States expects the City's partners to help remedy the lack of community-based addiction and mental health services to Medicaid clients and uninsured area residents. The City's partners in the provision of community-based addiction and mental health services include: the State of Oregon Health Authority, area Community Care Organizations ("CCOs"), Multnomah County, local hospitals, health insurance providers, commercial health providers, and existing Non-Governmental Organizations ("NGOs") such as community-based mental health providers, and other stakeholders.

| | |
|---|---|
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Monitor the City and PPB's continuing work with community partners |

**Compliance Assessment**

This paragraph is assessed based on the City's and PPB's continuing relationships with community partners. Because this is a summative paragraph, compliance is dependent upon compliance with other paragraphs within this section. With all other paragraphs within this section remaining in Substantial Compliance, so too does Par. 88.

---

**Exhibit A**

| COCL Recommendations | • No recommendations at this time |
|---|---|
| Assessment Based On | N/A – Summative paragraph |

| **Settlement Agreement Paragraph** ||
|---|---|
| 89. The United States expects that the local CCOs will establish, by mid-2013, one or more drop-off center(s) for first responders and public walk-in centers for individuals with addictions and/or behavioral health service needs. All such drop off/walk in centers should focus care plans on appropriate discharge and community-based treatment options, including assertive community treatment teams, rather than unnecessary hospitalization. ||
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review status of Unity Center; interviews with PPB personnel |

**Compliance Assessment**

The COCL continues to acknowledge that the focus of Paragraph 89 is the CCOs and the expectation that they establish one or more drop-off centers. The Settlement Agreement does not hold any authority over these organizations, but our assessment remains focused on the City's activities and reasonable expectations regarding its involvement with the drop-off and walk-in center(s).

Related to the focus of Paragraph 89, the Unity Center remains the drop-off center for individuals experiencing behavioral health needs. The facility has been operating in this capacity since it opened in May 2017. PPB has two policies related to this paragraph, Directive 850.21 (Peace Officer Custody [Civil]) and 850.25 (Police Response to Mental Health Facilities). These directives provide the protocol for officers to contact AMR for ambulance transport to the Unity Center. Since the opening of the Unity Center, a Transportation Workgroup has met as necessary to discuss the operation of the center. This workgroup includes members of Unity, PPB, AMR, Multnomah County, and Legacy ED

**Exhibit A**

Health. No issues related to transportation or interactions with PPB members have been identified for several quarters, although PPB remains prepared to meet as issues arise. Based on PPB's and the City's efforts to date, we believe that they have substantially complied with all reasonable expectations for them related to this paragraph.

| **COCL Recommendations** | • No recommendations at this time |
| --- | --- |
| **Assessment Based On** | Status of Unity Center and PPB policies |

| **Settlement Agreement Paragraph** |
| --- |
| 90. The CCOs will immediately create addictions and mental health-focused subcommittee(s), which will include representatives from PPB's Addictions and Behavioral Health Unit ("ABHU") [Now called Behavioral Health Unit or "BHU"], the ABHU Advisory Board [Now called the BHU Advisory Committee or "BHUAC"], Portland Fire and Rescue, Bureau of Emergency Communications ("BOEC") and other City staff. These committees will pursue immediate and long-term improvements to the behavioral health care system. Initial improvements include: (COCL Summary) increased sharing of information (subject to lawful disclosure); creation of rapid access clinics; enhanced access to primary care providers; expanded options for BOEC operators to divert calls to civilian mental health services, addressing unmet needs identified by Safer PDX; expanding and strengthening networks of peer mediated services; and pursue tele-psychiatry. |

| **Compliance Label** | Substantial Compliance |
| --- | --- |
| **Methodology** | Review Community Outreach Meeting minutes; |

| **Compliance Assessment** |
| --- |
| As with Paragraph 89, Paragraph 90 contains expectations for CCOs to create subcommittees for PPB to serve on and include a list of initial goals to be accomplished. However, CCOs are not under the authority of the Settlement Agreement, and we therefore |

**Exhibit A**

evaluate the City only on what can reasonably be expected of the agency given the lack of opportunity from CCOs.

During the fourth quarter of 2023, the Service Coordination Team (SCT) manager continued to attend the Legacy Community Outreach meeting with community partners. The program met twice (November 1 and December 6), and minutes and a resource list were provided for those meetings. At the November meeting, three community groups presented: CODA, PRISM Health, and the Sunshine Division. CODA, a not-for-profit substance use treatment program, spoke about the services that it offers. PRISM Health provides primary care, behavioral health supports, substance use disorder treatment, peer supports, and medication-assisted treatment for the LGBTQ+ community. The Sunshine Division provides food and clothing relief to Portland families and individuals in need. They spoke about their locations, requirements for their services, and the referral process. ASSIST and Equi Institute presented at the December meeting. ASSIST aids individuals experiencing homelessness and poverty with accessing their Social Security benefits. The organization discussed its referral and case management processes. Equi Institute, an organization that works with the LGBTQAI2S+ community to addresses social determinants of health, shared information about its services. The SCT manager's continued attendance at these meetings since 2015 has been a great way to stay up to date on programs and community resources. Staying involved in such outreach helps the BHU maintain a proactive and preventive approach to criminal justice involvement.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | PPB involvement with Behavioral Health Collaborative Team; PPB involvement with Legacy ED Community Outreach |

**Exhibit A**

# Section VI: Crisis Intervention

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 94. Within 90 days of the Effective Date, PPB shall also establish a [BHU] Advisory Committee. The [BHU] Advisory Committee shall include representation from: PPB command leadership, [ECIT], [BHRT], and SCT; BOEC; civilian leadership of the City government; and shall seek to include representation from: the Multnomah County Sheriff's Office; Oregon State Department of Health and Human Services; advocacy groups for consumers of mental health services; mental health service providers; coordinated care organizations; and persons with lived experience with mental health services. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review BHUAC roster of members; review BHUAC minutes; observe BHUAC meetings |

| | |
|---|---|
| **Compliance Assessment** | |

In the fourth quarter of 2023, the BHUAC held two meetings, one in October and one in December. The minutes of these meetings have been documented and shared with the COCL and can be found on PPB's website (https://www.portland.gov/police/bhu-advisory/documents).

Membership requirements of BHUAC as outlined in Paragraph 94 continue to be met, with a current roster of 18 voting members representing a variety of entities involved in the mental health response systems. A quorum was met for one of the meetings, although both meetings contained meaningful discussion around topics related to PPB's system of crisis response. As such, we continue to find PPB to be in Substantial Compliance with this paragraph.

| | |
|---|---|
| **COCL Recommendations** | - No recommendations at this time |

**Exhibit A**

| | |
|---|---|
| **Assessment Based On** | BHUAC roster; BHUAC minutes; observations of BHUAC meetings |

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 95. The [BHU] Advisory Committee shall provide guidance to assist the City and PPB in the development and expansion of [ECIT], [BHRT], SCT, BOEC Crisis Triage, and utilization of community-based mental health services. The [BHU] Advisory Committee shall analyze and recommend appropriate changes to policies, procedures, and training methods regarding police contact with persons who may be mentally ill or experiencing a mental health crisis, with the goal of de-escalating the potential for violent encounters. The [BHU] Advisory Committee shall report its recommendations to the [BHU] Lieutenant, PPB Compliance Coordinator, COCL (as described herein), and the BOEC User Board. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review BHUAC minutes; observe BHUAC meetings |
| **Compliance Assessment** | |

Paragraph 95 envisions that BHUAC committee members will assist "the City and PPB in the development and expansion of ECIT, BHRT, SCT, and BOEC Crisis Triage, as well as the use of community-based mental health services." BHUAC continued to meet in the fourth quarter of 2023, and meeting agendas included a variety of topics.

During the October meeting, BHUAC received a presentation on BHU data regarding responses by PPB members to crisis calls[2] as well as a proposed BHU data dashboard. During the December meeting, BHUAC received a presentation on ECIT in-service training planned for early 2024. In addition, BHUAC received a presentation regarding changes to the Settlement Agreement as well as a presentation from the project manager at Mission Critical Partners, a consulting firm specializing in public safety and justice. Overall, we found that the presentations and discussions were thorough and satisfied BHUAC's

---

[2] A similar presentation was also provided to the community as part of the Q4 open meeting held by BHUAC. Because this meeting occurred in early January 2024, we do not discuss it for this quarter.

**Exhibit A**

purpose under the Settlement Agreement. We therefore continue to find Substantial Compliance with the requirements of this paragraph.

| **COCL Recommendations** | • Ensure an ongoing quorum through increasing membership or substituting representatives who can attend more regularly for those who frequently cannot |
|---|---|
| **Assessment Based On** | Review of BHUAC minutes and agendas; observation of BHUAC meetings |

| **Settlement Agreement Paragraph** | |
|---|---|
| 96. Within 240 days of the Effective Date of this Agreement, the [BHU] Advisory Committee will provide status reports on the implementation of the [BHU] and BOEC Crisis Triage, and identify recommendations for improvement, if necessary. PPB will utilize the [BHU] Advisory Committee's recommendations in determining appropriate changes to systems, policies, and staffing. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Observe BHUAC meetings; review BHUAC minutes and associated recommendations |
| **Compliance Assessment** | |
| In accordance with Paragraph 96, BHUAC continues to provide the COCL with a report of its votes and recommendations for the implementation of the BHU and BOEC. In the fourth quarter of 2023, BHUAC did not make any formal recommendations. However, because it retains the ability to make formal recommendations and has consistently done so when appropriate, we continue to find Substantial Compliance with the requirements of this paragraph. | |
| **COCL Recommendations** | • No recommendations at this time |

**Exhibit A**

| | |
|---|---|
| **Assessment Based On** | BHUAC status reports and recommendations; PPB responses to BHUAC recommendations |

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 115. Within 180 days of the Effective Date, the City shall ensure Crisis Triage is fully operational to include the implementation of the policies and procedures developed pursuant to the above paragraph and operation by trained staff. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review of BOEC data; interviews with BOEC personnel |

**Compliance Assessment**

The COCL reviewed data related to the operation of BOEC in the context of not only PPB's crisis response but also other triage options, including transferring calls to the BHCC and dispatching PSR to calls that meet the necessary criteria. For instance, in the fourth quarter evaluation of mental health calls, PPB identified 5,782 calls with a mental health component. BOEC audited a random sample of 351 of these calls to ensure that dispatchers were applying the criteria appropriately. In 8 of those calls (2.3 percent), BOEC's audit found that sufficient information existed at the time of the call to warrant it being dispatched as ECIT. This rate is consistent with that of prior reporting periods. BOEC also assessed accuracy for calls transferred to the BHCC, with 12 of 200 calls being kicked back to BOEC for ECIT dispatch (we note that this finding may not indicate fault with the telecommunicators decision, because BHCC operators may learn additional information warranting emergency response). Finally, we reviewed BOEC's data for PSR during the fourth quarter, which included 2,858 calls dispatched to the response team. This is a decrease of 1,252 calls from the third quarter though an analysis from BOEC indicated this is likely due to a seasonal decline in calls.  In addition to tracking PSR calls, BOEC holds monthly meetings with PSR representatives to discuss any emerging issues and ensure that BOEC's practices align with its policy and training. Moving forward, we will continue to monitor how BOEC assesses its use of different crisis dispatch options to ensure ongoing

**Exhibit A**

| | |
|---|---|
| compliance with its policies and protocols, and we continue to find Substantial Compliance for this quarter. | |
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Based On** | Review of BOEC data; Interviews with BOEC personnel; Interviews with PSR personnel |

**COMMUNITY-BASED MENTAL HEALTH SERVICES AND CRISIS INTERVENTION OUTCOME ASSESSMENT**

The COCL examined data regarding PPB's response to Mental Health calls over the last two years. Using data from the fourth quarter of 2021 through the third quarter of 2023, we looked into possible trends and how that can inform PPB mental health response.

**Table 4. Quarterly ECIT calls by precinct**

| | 2021 Q4 | 2022 Q1 | 2022 Q2 | 2022 Q3 | 2022 Q4 | 2023 Q1 | 2023 Q2 | 2023 Q3 | Average |
|---|---|---|---|---|---|---|---|---|---|
| **Central** | 302 | 296 | 258 | 315 | 346 | 290 | 284 | 279 | **296** |
| **East** | 232 | 188 | 191 | 225 | 248 | 220 | 196 | 208 | **214** |
| **North** | 218 | 190 | 145 | 168 | 210 | 206 | 193 | 210 | **193** |
| **Total** | 752 | 674 | 594 | 708 | 804 | 716 | 673 | 697 | **702** |

Table 4 highlights the distribution of ECIT calls by precinct during the past two years. On average Central precinct receives the highest number of ECIT calls (Mean=296), followed by East (Mean=214) and North (Mean=193). Over the past eight quarters, the number of ECIT calls has remained relatively stable around ~700 calls per quarter, with the highest quarter being 2022 Q4 (804) and the lowest quarter being 2022 Q2 (594).

After a call has been coded for ECIT response, another important metric to analyze is the response rate, or how often an ECIT officer was able to respond to an ECIT call. For the most recent two quarters, the overall ECIT response rate for the Bureau was 67.1%, consistent with prior averages.  The average response rate over the last two years has been 68%, which is in line with the historical average.  In reviewing individual Precincts (Table 5), North Precinct has had consistently lower response rates compared with other Precincts though, in the most recent reporting period, response rates increased from 53% to 61% (the likely

**Exhibit A**

result of recent targeted ECIT recruitment in North). Additional recruitment efforts may still be needed in North (as it continues to be the Precinct with the lowest ECIT response rate) as well as in East Precinct which has continued a negative trend in ECIT response rates. Whereas North Precinct has historically had a low response rate, East Precinct enjoyed the highest rate two and a half years ago and the negative trend should be addressed concurrent with North Precinct.

**Table 5. Average response rate by Precinct**

|  | 2021 Q2 & 2021 Q3 | 2021 Q4 & 2022 Q1 | 2022 Q2 & 2022 Q3 | 2022 Q4 & 2023 Q1 | 2023 Q2 & 2023 Q3 | **Quarterly Average** |
|---|---|---|---|---|---|---|
| Central | 73% | 74% | 74% | 71% | 74% | **73%** |
| East | 77% | 70% | 67% | 65% | 63% | **68%** |
| North | 63% | 65% | 60% | 53% | 61% | **60%** |

We also reviewed data on the reasons why an ECIT officer was not on scene of an ECIT call. Table 6 provides a breakdown of these reasons across four reporting periods over the last two years. Over the last two years, the reason "not available" accounted for 6% to 10% of the total reasons for not having an ECIT officer on the scene, indicating that availability of ECIT officers has remained fairly stable over the last two years. We also note that "Not Dispatched" has accounted for nearly a quarter of the reasons why an ECIT was not on-scene over the past year. This clearance code, however, does not indicate <u>why</u> a call was not dispatched and therefore could be analyzed further to identify potential resolutions. Finally, the coding category "Other" now accounts for nearly one-fifth of the reasons why an ECIT officer did not respond to the scene of an ECIT call. This similarly could be broken down further in order for more exact analysis to be conducted.

**Table 6. Instances of ECIT Calls Without ECIT Officer Response**

|  | 2021 Q2 & 2021 Q3 | 2021 Q4 & 2022 Q1 | 2022 Q2 & 2022 Q3 | 2022 Q4 & 2023 Q1 | 2023 Q2 & 2023 Q3 |
|---|---|---|---|---|---|
| Dispatched and Cleared | 66% | 63% | 54% | 47% | 49% |
| Not Dispatched | 9% | 13% | 19% | 25% | 23% |
| Other | 11% | 9% | 12% | 14% | 19% |
| Not Available | 8% | 6% | 9% | 10% | 8% |
| Related/duplicate call | 5% | 8% | 7% | 4% | 2% |
| On Scene per reporting other than CAD | 1% | 1% | 1% | 1% | 0% |
|  | n=466 | n=423 | n=413 | n=542 | n=451 |

**Exhibit A**

Finally, the PPB conducts analysis on non-ECIT call outcomes, performing a logistic regression to determine whether the presence of an ECIT on-scene impacts: (1) the likelihood of the call resulting in a transport to jail, and (2) the likelihood of the call resulting in a transport to a hospital or Unity Center for a mental health evaluation. As shown in Table 7, for their two most recent analyses, the PPB has found no difference with respect to the call resulting in a transport for a mental health evaluation, though this is primarily due to increases in transport rates for calls not involving an ECIT trained officer. However, also for the past two analyses, when an ECIT officer is on-scene, it's more than twice as likely for the call to result in a transport to jail compared to when an ECIT officer is not on-scene. For both outcomes, the past year's findings have been the opposite of the year before, indicating a potential need to further explore the data to explain the switch. PPB indicates that such a review is already underway.

**Exhibit A**

**Table 7. Odds Ratios from Logistic Regression (*provided by PPB*)**

**Odds Ratios from Logistic Regression**
**Presence of ECIT-Trained Officer On Scene of Non-ECIT Calls on Call Outcome**

|  | Transportation to Jail | Transportation to Hospital (Mental Health)/Unity Center | Use of Force |
|---|---|---|---|
| 04/01/18 - 09/30/18 N=2,703 | No Difference | More Likely*** (1.924) | Not enough cases (35) |
| 10/01/18 - 03/31/19 N=2,108 | No Difference | More Likely*** (1.898) | Not enough cases (24) |
| 04/01/19 - 09/30/19 N=2,178 | No Difference | More Likely** (1.433) | Not enough cases (47) |
| 10/01/19 – 03/31/20 N=1,780 | No Difference | More Likely** (1.464) | Not enough cases (30) |
| 04/01/20 - 09/30/20 N=1,603 | More Likely** (1.715) | More Likely** (1.401) | Not enough cases (39) |
| 10/01/20 – 03/31/21 N=1,497 | No Difference | No Difference | Not enough cases (31) |
| 04/01/21 - 09/30/21 N=1,762 | More Likely* (1.503) | More Likely** (1.384) | Not enough cases (66) |
| 10/01/21 – 03/31/22 N=1,422 | No Difference | More Likely*** (1.503) | Not enough cases (37) |
| 04/01/22 - 09/30/22 N=1,487 | No Difference | More Likely* (1.242) | Not enough cases (28) |
| 10/01/22 - 03/31/23 N=1,352 | More Likely*** (2.066) | No Difference | Not enough cases (15) |
| 04/01/23 - 09/30/23 N=1,445 | More Likely*** (2.320) | No Difference | Not enough cases (20) |

Notes: Logistic Regression Models controlled for the following: (1) Precinct - Central, (2) Priority Level - High 1-3, (3) Presence of Weapon, (4) Subject Injury, (5) Mental Health Professional Involvement, (6) Warrant or PV Detainer, and (7) Directors Hold. Directors Hold with high standard error is excluded from the models.

$*p<.05$    $**p < .01$    $***p < .001$

**Exhibit A**

# Section VII: Employee Information System

---

**Settlement Agreement Paragraph**

116. PPB has an existing Employee Information System ("EIS") to identify employees and design assistance strategies to address specific issues affecting the employee. *See* PPB Manual 345.00. PPB agrees to enhance its EIS to more effectively identify at-risk employees, supervisors, and teams to address potentially problematic trends in a timely fashion. Accordingly, within 90 days of the Effective Date, PPB shall: (a) Require that commanders and supervisors conduct prompt reviews of EIS records of employees under their supervision and document the review has occurred in the EIS performance tracker; (b) Require that commanders and supervisors promptly conduct reviews of EIS for officers new to their command and document the review has occurred in the EIS performance tracker; and (c) Require that EIS staff regularly conduct data analysis of units and supervisors to identify and compare patterns of activity.

117. PPB agrees to use force audit data to conduct similar analyses at supervisor- and team-levels.

| | |
|---|---|
| **Compliance Label** | 116. Partial Compliance |
| | 117. Partial Compliance |
| **Methodology** | Interviews with EIS/PPB personnel; Review of PPB EIS analysis |

---

**Compliance Assessment**

PPB continued to use the EIS as its primary system for identifying at-risk members and potentially problematic trends and "design[ing] assistance strategies to address specific issues affecting the employee" (Paragraph 116). As for PPB's current procedure of evaluating subsections (a) and (b) of Paragraph 116, PPB reports rates of compliance with supervisory reviews that are consistent with those of prior quarters. As shown in Figure 5, 100 percent of required subsection (a) reviews (supervisors performing annual reviews) were completed on time, whereas 83.6 percent of subsection (b) reviews ("new-

**Exhibit A**

to-command" reviews) were completed on time. This led to 93.4 percent on-time reviews for subsection (c), which looks at all opportunities for Paragraph 116 compliance.

Figure 5 Compliance with Reviews Directive 345.00 Reviews (provided by PPB)



In addition, during the fourth quarter, PPB and the force inspector maintained utilization of SOP #5 (Force Analysis for Supervisors and Teams), which outlines guidelines for identifying outlying "at-risk employees, supervisors, and teams." We continue to find that the SOP contains a wide range of reference points for the force inspector to consider when conducting the review and provides standardization to the selection process while still allowing the force inspector's experience to guide the process. Similar to our assessment of Par. 76, we have now seen consistent and verified application of this SOP with respect to Par. 117.

However, we have long noted the need for a comprehensive assessment of PPB's EIS but have awaited a joint determination from both Parties as to whether such an assessment is required for compliance (and therefore has implications for the Settlement Agreement if the system is determined to be ineffective) or instead is a matter of technical assistance without such implications. To date, the Parties have not come to agreement on the matter. We therefore continue to recommend that the Parties confer as to the requirement of Par.

**Exhibit A**

116 with respect to a comprehensive assessment and, where appropriate, recommend that the monitor incorporate the evaluation methodology previously provided by COCL.

| **COCL Recommendations** | • To achieve Substantial Compliance, determine with DOJ whether an assessment of EIS's effectiveness is required for compliance |
|---|---|
| **Assessment Based On** | EIS and threshold review process |

| **Settlement Agreement Paragraph** |
|---|
| 118. PPB shall continue to use existing thresholds, and specifically continue to include the following thresholds to trigger case management reviews: (a) Any officer who has used force in 20% of his or her arrests in the past six months; and (b) Any officer who has used force three times more than the average number of uses of force compared with other officers on the same shift. |

| **Compliance Label** | 118. Substantial Compliance |
|---|---|
| **Methodology** | Interviews with EIS/PPB personnel; review of EIS program data |

**Compliance Assessment**

The thresholds that PPB is required to maintain for Paragraph 118 continue to be used to flag officers for supervisory reviews. PPB continues to collate data from a variety of sources, including force events, traumatic incidents (captured in the Regional Justice Information Network), complaints, and commendations (captured in the Administrative Investigations Management (AIM) system). These data are used to identify potentially problematic behavior with the predetermined thresholds identified by these paragraphs.

In the fourth quarter of 2023, EIS administrators reviewed 339 alerts and sent 134 (39.5 percent) on for RU manager review (see Figure 6). This is a significant decrease compared with prior quarters though is the result of technical complications rather than any change in PPB practice. During the fourth quarter, the PPB's EIS was impacted by "outside system

**Exhibit A**

changes, server connections, and downloading errors." However, the PPB has identified these data inconsistencies, have resolved some issues, and, for issues still being resolved, have implemented short-term resolutions such as manual reviews of data.

When forwarded to the RU manager, the alert may be reviewed and closed by the RU manager or sent to the officer's supervisor for either closure or intervention (i.e., coaching, commending, debriefing, monitoring, referring to the Employee Assistance Program, training, or temporary reassignment). For alerts closed in the fourth quarter of 2023, which may also include cases opened in prior quarters, 138 were closed at the RU level (see Table 8). Of these 138 alerts, 111 (80.4 percent) were sent on for further supervisor review. In addition, 57.2 percent of alerts sent to an officer's supervisor during the fourth quarter of 2023 resulted in some type of intervention. The information provided by PPB indicates that for the 79 alerts that were closed with an intervention, one was closed with a referral to the Employee Assistance Program and the remaining 78 involved a debriefing or supervisor coaching.

As with Paragraph 116, we are continuing to work with PPB to analyze the relative effectiveness of EIS interventions from both empirical data analyses as well as conversations with key stakeholders in the EIS process. However, PPB continues to use the thresholds outlined by Paragraph 118, and we continue to find that they have complied substantially with this paragraph.

**Figure 6 EIS Alerts and Alerts Sent to RU Manager (provided by PPB)**



**Exhibit A**

| Table 8. EIS Alerts and Interventions | 2022 Q3 | 2022 Q4 | 2023 Q1 | 2023 Q2 | 2023 Q3 | 2023 Q4 |
|---|---|---|---|---|---|---|
| Alerts Closed by RU | 174 | 140 | 206 | 217 | 292 | 138 |
| Alerts Sent to Supervisor (Percent of Alerts Sent to RU) | 103 (59.2%) | 100 (71.4%) | 166 (73%) | 166 (76.5%) | 238 (81.5%) | 111 (80.4%) |
| Interventions (Percent of Alerts Sent to RU) | 82 (47.1%) | 73 (52.1%) | 146 (70.9%) | 150 (69.1%) | 202 (69.2%) | 79 (57.2%) |
| Interventions (Percent of Alerts Sent to Supervisor) | 82 (79.6%) | 73 (73%) | 146 (88%) | 150 (90.4%) | 202 (84.9%) | 79 (71.2%) |

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | Current EIS thresholds and associated data |

#### EMPLOYEE INFORMATION SYSTEM OUTCOME ASSESSMENT

In addition to the outcomes discussed in our assessments of Pars. 116, 117, and 118, we provide data related to "complaints sustained and not sustained" as it relates to Par. 170 (d) (Performance Data).  Like uses of force, analysis of the Administrative Investigation Management (AIM) system shows that complaints are not distributed evenly across all PPB members.  In conducting our analysis, we used data between January 2020 and December 2023 (a total of four years) to identify trends across the data.

As seen in Table 9, 27.2% of PPB members did not receive any complaints over the four-year span[3] and 91.6% of PPB members were the subject of four or fewer complaints across the dataset, with 75.7% being the subject of two or fewer.  This is commendable, particularly given that these cases reflect only the fact that they were the subject of a complaint,

---

[3] The AIM database naturally does not contain cases on members who did <u>not</u> receive a complaint.  Therefore, raw numbers and percentages have been calculated by subtracting the number of members who had a complaint in the dataset (591) from the current number of PPB members at the writing of this report (812).

**Exhibit A**

regardless of whether allegations within the complaint were administratively closed, unfounded, or the member was exonerated.[4]

Table 9. Number of Complaints PPB Members Were Subject To (January 2020 to December 2023)

| Number of Complaints | Number of Members | Percent of Members |
|---|---|---|
| 0 | 221 | 27.2% |
| 1 | 265 | 32.6% |
| 2 | 129 | 15.9% |
| 3 | 89 | 11.0% |
| 4 | 40 | 4.9% |
| 5 | 27 | 3.3% |
| 6 | 17 | 2.1% |
| 7 | 7 | 0.9% |
| 8 | 3 | 0.4% |
| 9 | 5 | 0.6% |
| 10 | 1 | 0.1% |
| 11 | 4 | 0.5% |
| 12 | 2 | 0.2% |
| 15 | 1 | 0.1% |
| 17 | 1 | 0.1% |
| **TOTAL** | **812** | **100%** |

However, as also seen in Table 9, approximately 2% of members had eight or more complaints, demonstrating a pattern across all four years in the data. We provide further breakdown of these members in Table 10 though note that for all members in this table, each had a relatively high number of complaints in more than just a single year. The fact that higher numbers of complaints for these members spanned multiple years is significant given that most members did not receive more than two across the entire four-year span. For instance, Member #4[5] in the table below twice had four complaints within a single year (2021 and 2023) and had three complaints in 2022. Similarly, Member #8 had three years (2020-2022) with three complaints each year and had two complaints in 2023. Although not being the subject of a complaint in 2021, Member #2 had three years of four or more complaints. Likewise, Member #6 had two years of four or more complaints. Furthermore, some members had individual years with extremely high numbers of complaints, including

---

[4] Between 2022 Q4 and 2023 Q3, more than 40% of allegations were administratively closed. When subjected to a full investigation, allegations were unfounded nearly 30% of the time and the officer was exonerated in an additional 20% of allegations – see COCL's 2023 Q3 report

[5] To maintain confidentiality of the data, we refrain from listing the members' actual employee ID number

**Exhibit A**

Member #1 (10 complaints in 2023), Member #2 (6 complaints in 2023), and Member #5 (6 complaints in 2021).[6]

These same members also represented the members with the highest number of complaints with at least one sustained allegation.  Although not reflected in the table below, over 95% of members had two or fewer complaints with sustained allegations across the four-year dataset.  Of the six members with three or more complaints with a sustained allegation, five were in the top 2% of members who received a complaint.[7]

Table 10. PPB Members Subject To the Most Complaints (January 2020 to December 2023)

| Member Number | Total Complaints | Sustained Complaints[8] | 2020 Complaints | 2021 Complaints | 2022 Complaints | 2023 Complaints |
|---|---|---|---|---|---|---|
| 1 | 17 | 0 | 6 | 1 | 0 | 10 |
| 2 | 15 | 2 | 5 | 0 | 4 | 6 |
| 3 | 12 | 2 | 9 | 1 | 2 | 0 |
| 4 | 12 | 1 | 1 | 4 | 3 | 4 |
| 5 | 11 | 6 | 1 | 6 | 2 | 2 |
| 6 | 11 | 3 | 6 | 1 | 4 | 0 |
| 7 | 11 | 0 | 3 | 1 | 5 | 2 |
| 8 | 11 | 1 | 3 | 3 | 3 | 2 |
| 9 | 10 | 0 | 1 | 4 | 0 | 5 |
| 10 | 9 | 3 | 0 | 2 | 2 | 5 |
| 11 | 9 | 0 | 7 | 1 | 1 | 0 |
| 12 | 9 | 1 | 5 | 2 | 2 | 0 |
| 13 | 9 | 0 | 5 | 2 | 1 | 1 |
| 14 | 9 | 3 | 3 | 3 | 2 | 1 |
| 15 | 8 | 1 | 7 | 0 | 1 | 0 |
| 16 | 8 | 1 | 3 | 0 | 4 | 1 |
| 17 | 8 | 3 | 2 | 2 | 1 | 3 |

Additionally, we sought to determine whether the officers identified here were the subject of EIS alerts related to complaint-threshold breaks.  For each of these members, we requested the following information from the PPB:

- The total number of EIS alerts the officer received for any alert category
- The total number of EIS alerts related to complaints

---

[6] Many others had a high number of complaints in 2020, though we recognize that 2020 as a whole is an outlier with respect to the number of complaints filed.  While we report the members and their total number of complaints here, we caution the reader when interpreting this data, particularly when members then had zero or one complaints in years other than 2020.

[7] One member with three complaints with a sustained allegation had six total complaints.

[8] Cases may still be open

**Exhibit A**

- The total number of EIS alerts related to complaints that were forwarded for supervisory review
- The total number of EIS alerts related to complaints that led to any type of intervention
- The outcome associated with each EIS alert

In response, the PPB provided us with EIS alert data for each of the identified officers. In looking at the 17 officers, all had one or more EIS alerts and all had at least one EIS alert related to complaints. Therefore, we conclude that the EIS thresholds used by the PPB are capable of identifying officers who present as outliers in the administrative investigation data.

We then looked at whether EIS alerts related to complaints are forwarded to Responsibility Units (RUs) for further review. Within the data, there were a total of 58 Complaint Alerts for the 17 officers we identified. Of those 58 alerts, nearly all (57) were sent on for RU review (98.3%), with one member (member #16) having a single complaint alert that was not forwarded for RU review. From this, we can conclude that members who receive an EIS alert related to complaints nearly universally have those alerts reviewed by their respective RUs.

From the complaint alerts that were forwarded to RUs, we then looked at how many of those complaint alerts received some type of intervention. Termed "Supervisory Actions" in Directive 345.00, interventions "may include coaching, commending, debriefing, monitoring, referring to the Employee Assistance Program (EAP), requiring training, temporarily re-assigning, or some other form of non-disciplinary action." In looking at the data related to the 57 complaint alerts forwarded to the RUs, there were a total of 7 (12.5%) complaint alerts that received some type of intervention. Of the 17 members representing the top 2% of members receiving a complaint in the past four years who had an alert forwarded to their RU, 11 (64.7%) did not have any interventions based on complaint thresholds. This includes the member with the highest number of complaints as well four of the top eight members with the greatest number of complaints. Of the 6 members who did receive an intervention based on complaint thresholds, none received more than one intervention.[9] Of these, one was placed on a 90-day monitoring plan while the five others received a Coaching Conducted intervention. From these data, we can conclude that, for the members with the most complaints over the past four years, approximately 1/3 received some type of intervention based on the complaint alert, with Coaching Conducted being a large majority of the interventions received.

---

[9] Our analysis only looks at interventions as a result of complaint alerts. However, we note that many members receive some type of EIS intervention outside of the complaint alerts (i.e., through EIS alerts related to force, traumatic events, or commendations). Therefore, the reader should interpret these results only as they relate to complaint thresholds.

**Exhibit A**

Table 11. EIS Alerts for Select PPB Members

| Member Number | Total Complaints | Sustained Complaints | Total # EIS Alerts | Total # Complaint Alerts | Total # Complaint Alerts Sent to RU | Total # Complaint Alerts with Intervention | Description of Intervention |
|---|---|---|---|---|---|---|---|
| 1 | 17 | 0 | 30 | 5 | 5 | 0 | N/A |
| 2 | 15 | 2 | 26 | 8 | 8 | 1 | 90-Day Monitoring |
| 3 | 12 | 2 | 8 | 2 | 2 | 0 | N/A |
| 4 | 12 | 1 | 33 | 3 | 3 | 1 | Coaching Conducted |
| 5 | 11 | 6 | 2 | 2 | 2 | 0 | N/A |
| 6 | 11 | 3 | 21 | 5 | 5 | 1 | Coaching Conducted |
| 7 | 11 | 0 | 16 | 3 | 3 | 0 | N/A |
| 8 | 11 | 1 | 22 | 5 | 5 | 1 | Coaching Conducted |
| 9 | 10 | 0 | 2 | 2 | 2 | 1 | Coaching Conducted |
| 10 | 9 | 3 | 12 | 1 | 1 | 0 | N/A |
| 11 | 9 | 0 | 14 | 5 | 5 | 0 | N/A |
| 12 | 9 | 1 | 19 | 2 | 2 | 1 | Coaching Conducted |
| 13 | 9 | 0 | 20 | 2 | 2 | 0 | N/A |
| 14 | 9 | 3 | 27 | 3 | 3 | 0 | N/A |
| 15 | 8 | 1 | 10 | 3 | 3 | 1 | N/A |
| 16 | 8 | 1 | 23 | 4 | 3 | 0 | N/A |
| 17 | 8 | 3 | 23 | 3 | 3 | 0 | N/A |

**Exhibit A**

# Section VIII: Officer Accountability

<table>
<tr><td colspan="2"><strong>Settlement Agreement Paragraph</strong></td></tr>
<tr><td colspan="2">121. PPB and the City shall complete all administrative investigations of officer misconduct within one-hundred eighty (180) days of a complaint of misconduct, or discovery of misconduct by other means. For the purposes of this provision, completion of administrative investigations includes all steps from intake of allegations through approval of recommended findings by the Chief, excluding appeals, if any, to CRC. Appeals to CRC should be resolved within 90 days.</td></tr>
<tr><td><strong>Compliance Label</strong></td><td>Substantial Compliance</td></tr>
<tr><td><strong>Methodology</strong></td><td>Review of IPR quarterly data analysis; review of AIM system data</td></tr>
<tr><td colspan="2"><strong>Compliance Assessment</strong></td></tr>
<tr><td colspan="2">IPR continues to provide quarterly data analyses of administrative complaints that exceed the 180-day timeline required by Par. 121. The reported data for this quarter continue to demonstrate that more than 90 percent of administrative complaints were closed within the 180-day period, although these data include cases that were administratively closed, cases that were conducted as Supervisory Investigations, and cases that received full administrative investigations. For full administrative investigations, we continue to see appreciable compliance rates with Par. 121. For instance, of cases opened in Q2 of 2023 (the last quarter for which 180 days could have passed), 88 percent were closed within 180 days.

While we continue to see high rates of compliance with the 180-day timeline required by Par. 121, we were recently informed that, for officer-involved shooting (OIS) events, PPB tolls for the criminal case of both the officer <u>and</u> the subject of force (see our assessment of Par. 122 for further discussion). This tolling issue affects a small number of investigations (only OIS events) and is unlikely to impact the proportion of cases which go over 180 days, since OIS events routinely do anyways. We therefore continue to find Substantial Compliance with this paragraph as the tolling concern only minimally impacts the overall 180-day timeline data that we have relied upon for assessment. However, the</td></tr>
</table>

**Exhibit A**

practice nevertheless holds the potential to impact the validity of data that can be relied upon in the future with respect to Par. 121. Although we maintain PPB has maintained compliance for this quarter, should PPB not adhere to the recommendations to return to Substantial Compliance for Par. 122, compliance with this paragraph would be implicated because PPB would then be knowingly creating a situation where future data could be invalid for analyzing Par. 121. We therefore recommend that PPB discontinue the practice of tolling for the subject's criminal case in OIS events as a condition for maintaining Substantial Compliance.

| **COCL Recommendations** | • To maintain Substantial Compliance, PPB should discontinue the practice of tolling for the subject's criminal case in OIS events |
|---|---|
| **Assessment Based On** | IPR data indicating adherence to 180-day timeline; internal affairs (IA) data indicating adherence to 180-day timeline |

| **Settlement Agreement Paragraph** |
|---|
| 122. PPB shall conduct administrative investigations concurrently with criminal investigations, if any, concerning the same incident. All administrative investigations shall be subject to appropriate tolling periods as necessary to conduct a concurrent criminal investigation, or as otherwise provided by law, or as necessary to meet the CRC or PRB recommendation to further investigate. |

| **Compliance Label** | Partial Compliance |
|---|---|
| **Methodology** | Review of Criminal-IA Concurrent Investigation Audit reports; review of Directive 0330.00 |

| **Compliance Assessment** |
|---|
| In the fourth quarter of 2023, PPB continued to provide documentation indicating when an IA investigation began and when the criminal investigation began. In this quarter, all administrative investigations began at or near the same time as the criminal investigation. |

**Exhibit A**

However, we were recently informed that, for OIS events, PPB tolls for the criminal case of both the officer <u>and</u> the subject of force, a practice that is inconsistent with Par. 122 and PPB's own policies.

The requirements of Par. 122 recognize the need to toll for concurrent criminal cases concerning the same incident for the involved officer, which allows evidence gathered as part of the officer's criminal proceedings to be included in the administrative review. Yet applying this same logic to the criminal case of the subject is neither "appropriate" nor "necessary" (Par. 122) because those cases focus on the culpability of the subject, not the officer.  New facts regarding the culpability of the officer being legitimately raised during the subject's criminal case could potentially result in new allegations, including allegations related to truthfulness. However, extending the subject's case does not justify delaying the administrative investigation of the officer to adjudicate the subject's actions. Indeed, given the pace of the legal system, such an approach could mean that an officer has an open administrative investigation for years before a subject's case is adjudicated.

In addition, PPB policy does not allow tolling time to complete the subject's criminal case and does not provide for a distinction between OIS and non-OIS events. PPB SOP #6 (Concurrent Administrative/Criminal Investigations) discusses the 180-day timeline and tolling, with reference to PPB Directive 333.00 (Criminal Investigations of Police Bureau Employees and Other Law Enforcement Agency Sworn Members). In that directive, Section 6 discusses concurrent administrative and criminal investigations, but the term *criminal investigations* is defined as pertaining to the <u>officer</u>. In our review, no other PPB policy or SOP appears to reference the subject's criminal case in any way with respect to tolling or timelines.

Because PPB's current tolling practices are neither appropriate nor necessary as required by Par. 122, and because PPB's current tolling practices are inconsistent with its own SOPs and directives, we find that the requirements of Par. 122 are no longer being met. To return to Substantial Compliance, PPB should discontinue the practice of tolling for the subject's criminal case in OIS events and toll only for the officer's criminal case in accordance with PPB policy and best practices.

| **COCL Recommendations** | • To return to Substantial Compliance, PPB should discontinue the practice of tolling for the subject's criminal case in OIS events |
|---|---|
| **Assessment Based On** | Criminal-IA Concurrent Investigation Audit reports |

**Exhibit A**

| **Settlement Agreement Paragraph** |
| --- |
| 123. If PPB is unable to meet these timeframe targets, it shall undertake and provide to DOJ a written review of the IA process, to identify the source of the delays and implement an action plan for reducing them. |

| **Compliance Label** | Substantial Compliance |
| --- | --- |
| **Methodology** | Review of Administrative Investigations Report |

| **Compliance Assessment** |
| --- |
| In the fourth quarter of 2023, the PPB closed 32 administrative investigations, eight of which exceeded the 180-day timeline. The PPB provided the COCL with an Administrative Investigations Report for each of these eight cases as well as a report for cases that did not exceed the 180-day total timeline but exceeded the timeline for one or more individual investigative stages. For the eight cases that exceeded the 180-day timeline, reasons included being impacted by the time period when PPB was unable to schedule Police Review Boards (PRBs) as a result of not having enough PRB facilitators, as well as discrepancies missed in the investigation report, training analysis, and the inability to contact an involved member. However, nearly all the delays referenced the lack of PRB facilitators. This problem has largely been addressed during the third and fourth quarters of 2023, allowing for a greater number of PRBs to be scheduled. Recommended action plans for the other sources of delay include reminders for investigators to carefully review reports and improved communication with the Training Division.

Although we find that PPB has not appropriately tolled OIS events as required by Par. 122, the process within this paragraph remains valid and does not require revision. Because we find the crux of the issue to relate more to Par. 122 and we continue to find that the process related to this paragraph is working, we maintain a finding of Substantial Compliance for Par. 123. However, should PPB not adhere to the recommendations to return to Substantial Compliance for Par. 122, compliance with this paragraph would be implicated because PPB would then be willfully performing incomplete reviews. We therefore recommend that PPB discontinue the practice of tolling for the subject's criminal case in OIS events as a condition for maintaining Substantial Compliance. In addition, we maintain our ongoing |

suggestion that supervisors identify remedies for delays in individual stages, even if the entire investigation timeline took less than 180 days.

| | |
|---|---|
| **COCL Recommendations** | • Maintain self-improvement loop for stages that exceed the stage timeline, even if the case does not exceed the 180-day timeline<br><br>• To maintain Substantial Compliance, PPB should discontinue the practice of tolling for the subject's criminal case in OIS events |
| **Assessment Based On** | Administrative Investigations Report |

| **Settlement Agreement Paragraph** |
|---|
| 124. Within 90 days of the Effective Date, the City and PPB shall review its protocols for compelled statements to PSD and revise as appropriate so that it complies with applicable law and current professional standards, pursuant to *Garrity v. New Jersey*, 385 U.S. 493 (1967). The City will submit the revised protocol to DOJ for review and approval. Within 45 days of obtaining DOJ's approval, PPB shall ensure that all officers are advised on the revised protocol. |

| | |
|---|---|
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review of Directive 1010.10 |

| **Compliance Assessment** |
|---|
| During the fourth quarter of 2023, PPB maintained its protocol for compelled statements to PSD, and all officers have been advised on the protocol. As a result, we find that PPB has maintained compliance with Paragraph 124. |

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | Current PPB policy |

| **Settlement Agreement Paragraph** |
|---|
| 125. Separation of all witnesses and involved officers to lethal force events is necessary in order to safeguard the integrity of the investigation of that event. Immediately following any lethal force event, PPB shall continue to issue a communication restriction order ("CRO") to all witness and involved officers, prohibiting direct or indirect communications between those officers regarding the facts of the event. The CRO will continue, unless extended further, until conclusion of the Grand Jury or, if no Grand Jury is convened, until a disposition is determined by the District Attorney. |

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Reviewed CROs for 2023 third and fourth quarter OIS events |

| **Compliance Assessment** |
|---|
| Two OIS incidents involving PPB officers occurred in the fourth quarter of 2023. For both events, PPB provided us with the CROs for members. In addition, PPB provided us rescinding notifications from an OIS event that occurred in 2022. Finally, as follow-up to our last report, we have now reviewed the CROs for the lethal force event from 2023 Q3 that was investigated by the Gresham Police Department. As a result of ongoing documentation, we continue to find PPB in Substantial Compliance with the requirements of this paragraph. |

| **COCL Recommendations** | • No recommendations at this time |
|---|---|

**Exhibit A**

| **Assessment Based On** | CROs for 2023 Q2 and Q3 OIS events |
|---|---|

| **Settlement Agreement Paragraph** |
|---|
| 126. PPB shall continue to require witness officers to lethal force events to give an on-scene briefing to any supervisor and/or member of the Detective Division to ensure that victims, suspects, and witnesses are identified, evidence is located, and provide any information that may be required for the safe resolution of the incident, or any other information as may be required. |

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Review of OIS case file excerpts; Review of SOP #39 |

| **Compliance Assessment** |
|---|
| Two OIS incidents involving PPB officers occurred in the fourth quarter of 2023. We reviewed documentation of the walk-throughs that were conducted with witness members for both incidents. |
| For this quarter, the PPB provided an updated version of SOP #39 (*Detective Division and Homicide Detail Response to Officer Involved Shootings, Officer Use of Deadly Physical Force, and In-Custody Deaths*).  This SOP addresses our long-standing recommendation to address situations where mental incapacitation prevents a walk-through, including criteria for making such a determination.  As such, we now find the PPB to be in Substantial Compliance with the requirements of Par. 126. |

| **COCL Recommendations** | • No recommendations at this time. |
|---|---|
| **Assessment Based On** | OIS case file excerpts; Finalized version of SOP #39 |

**Exhibit A**

| **Settlement Agreement Paragraph** | |
| --- | --- |
| 127. In agreement and collaboration with the Multnomah County District Attorney, PPB shall request that involved officers in lethal force and in-custody death events provide a voluntary, on-scene walk-through and interview, unless the officer is incapacitated. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review of OIS case file excerpts |
| **Compliance Assessment** | |
| During the fourth quarter of 2023, PPB provided us with documents indicating that all officers involved in two lethal force events this quarter were requested to provide voluntary on-scene walkthroughs and interviews. As in prior lethal force events, each officer declined, citing constitutional protections. As a result of the PPB requests, we continue to find that PPB has substantially complied with the requirements of Par. 127. | |
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Based On** | OIS case file excerpts |

| **Settlement Agreement Paragraph** | |
| --- | --- |
| 128. Currently, both IPR and PPB's PSD have authority to conduct administrative investigations, provided that IPR interview of PPB Officers must only be conducted jointly with IA. Within 120 days of the Effective Date, the City will develop and implement a plan to reduce time and effort consumed in the redundant interview of witnesses by both IPR and IA, and enable meaningful independent investigation by IPR, when IPR determines such independent investigation is necessary. | |

**Exhibit A**

| | |
|---|---|
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review of City transition plan; interviews of PPB and City staff |

| **Compliance Assessment** |
|---|
| During the fourth quarter of 2023, both IPR and IA maintained their respective administrative investigations, using the system that we have previously found compliant with Paragraph 128. Aside from their own independent investigations, our review of cases this quarter also highlighted IPR's thorough work in conducting intake investigations for follow-up by PPB, particularly the range and depth of information collected during the intake process.

Additionally for this quarter, the City provided specific evidence as to the broader structural support that IPR receives.  In their independent operation, IPR receives has specific points of contact within City departments and receives support on topics including human resources, legal support, timekeeping, employee benefits, budgeting, collective bargaining, getting on the City Council agenda, and volunteer recruitment.  As the evidence provided for this report is overall responsive to prior concerns, we now find that the City has achieved Substantial Compliance with the requirements of this paragraph. |

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | Review of transition documents; interviews of City staff |

| **Settlement Agreement Paragraph** |
|---|
| 129. The City and PPB shall ensure that all allegations of use of excessive force are subject to full and completed IA investigations resulting in findings, unless there is clear and convincing evidence to IPR that the allegation has no basis in fact. |

**Exhibit A**

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Review of administrative closure justifications for allegations of excessive force |

| **Compliance Assessment** |
|---|

In the fourth quarter of 2023, data provided by IPR included two complaints containing six allegations of excessive force that were administratively closed by IPR. However, in following up with IPR, we were informed that one of these cases was administratively closed because the complainant would not agree to an interview and nothing in the general offense indicated that force was used; notably, the complainant was made aware that IPR can reopen the case if they return. This decision by IPR preserves the complainant's allegation, whereas a non-sustained finding would have prevented future investigation. The second case contained one allegation of excessive force that was refuted by an officer's BWC footage.

As we have shared in prior reports, IPR has an updated SOP (*Independent Police Review Standard Operating Procedures*) that memorializes its criteria for administratively closing force cases when a complainant does not make themselves available to investigators and no other information is available. In addition, we found no instances of supervisors who did not forward allegations of excessive use of force when confronted with one in the FDCR or AAR process. In fact, we heard anecdotally from IPR staff that there has been an increase in the cases that they receive from AARs. We therefore find that the City and PPB maintain Substantial Compliance with Par. 129.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | Administrative closure of allegations of excessive force |

| **Settlement Agreement Paragraph** |
|---|

**Exhibit A**

131. <u>COCL Summary</u>. Paragraph 131 states that "The City and PPB shall retain Police Review Board procedures currently utilized for purposes of investigation and making recommended findings on administrative complaints, except as outlined below." The subsections of Par. 131 refer to PRB membership, rotation of CRC members serving on the PRB, requirements and qualifications for PRB members, provisions for removing community members or CRC members serving on the PRB, term limits for CRC members serving on the PRB, the requirement for CRC members to recuse themselves from the CRC if part of the PRB hearing the case, and stipulated discipline. (For details and exact language, see the Settlement Agreement).

| | |
|---|---|
| **Compliance Label** | Partial Compliance |
| **Methodology** | Review of Directive 336.00; review of City Code 3.20.140 |

| **Compliance Assessment** | |
|---|---|
| During the fourth quarter of 2023, the COCL team observed one PRB, although we found the PRB to be neither useful nor objective. The event that led to the PRB was a civil lawsuit that found PPB liable for excessive force but for which no particular officer was ever identified. Therefore, PRB members' findings were made on no one.  In addition, with no identified officer or other reports to provide specific, credible evidence to overcome the presumption of misconduct (see Par. 133), PRB members were required to rely only on the finding of the court and were unable to vote in any way other than to sustain the findings, even if they disagreed with the court. Overall, we found this PRB to completely procedural with little utility for the organization. Because we maintain our prior concerns with PRB operations and did not find those concerns resolved by the PRB during this quarter, we continue to find the City and PPB to be in Partial Compliance with the requirements of this paragraph. | |

| **COCL Recommendations** | • To return to Substantial Compliance, conduct PRBs in accordance with prior COCL and DOJ guidance |
|---|---|
| **Assessment Based On** | Observation of PRBs and PRB documents |

**Exhibit A**

| **Settlement Agreement Paragraph** | |
|---|---|
| 132. By majority vote, the PRB may request that investigations of misconduct be returned to its investigating entity, i.e., PSD or IPR, to complete the investigation as to factual matters necessary to reach a finding regarding the alleged misconduct. The investigating entity must make reasonable attempts to conduct the additional investigation or obtain the additional information within 10 business days or provide a written statement to the PRB explaining why additional time is needed. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review of PPB Directive 336.00 |
| **Compliance Assessment** | |
| During the fourth quarter of 2023, PPB maintained Directive 336.00 (Police Review Board), which memorializes the authority of the PRB to send a case back for additional investigation. No such instances occurred during this quarter. Because Paragraph 132 has been placed into policy and adequately covered, we find that PPB has maintained Substantial Compliance with the requirements of this paragraph. | |
| **COCL Recommendations** | • No recommendations at this time |
| **Assessment Based On** | PPB Directive 336.00 |

| **Settlement Agreement Paragraph** | |
|---|---|
| 133. COCL Summary: Paragraph 133 states, "If an officer's use of force gives rise to a finding of liability in a civil trial," PPB shall be required to take various actions. The subsections of Par. 133 include requirements for findings of liability, including EIS documentation, reevaluation for specialized units, automatic IA investigations, review of a previous IA investigation if one was already completed, and a published summary if an IA investigation | |

**Exhibit A**

did not reach the same finding. (For details and exact language, see the Settlement Agreement).

| **Compliance Label** | Substantial Compliance |
|---|---|
| **Methodology** | Review of SOP #32 and #42 |

| | |
|---|---|
| | **Compliance Assessment** |

During the fourth quarter of 2023, PPB maintained SOP #32 (Civil Liability and Tort Claims) and SOP #42 (Evaluation of Members' Fitness to Participate in All Current and Prospective Specialized Units When the Use of Force Results in a Finding of Liability in a Civil Trial). The combination of these two SOPs contains the requirements of Paragraph 133. Given the SOPs and the fact that no new findings of liability occurred in the fourth quarter of 2023, we continue to find Substantial Compliance with the requirements of this paragraph.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | SOP #32 and #42 |

| | |
|---|---|
| | **Settlement Agreement Paragraph** |

137. Within 60 days of the Effective Date, PPB and the City shall develop and implement a discipline guide to ensure that discipline for sustained allegations of misconduct is based on the nature of the allegation and defined, consistent, mitigating and aggravating factors and to provide discipline that is reasonably predictable and consistent.

| **Compliance Label** | Partial Compliance |
|---|---|

**Exhibit A**

| **Methodology** | Review of Corrective Action Recommendation (CAR) documents; review of DOJ letter |
| --- | --- |

### Compliance Assessment

For the fourth quarter of 2023, we reviewed eight CAR documents provided by PPB. For each CAR, commanders provided their rationale for the discipline recommendations and the officer's history of corrective action. In addition, commanders discussed both mitigating and aggravating factors in making their discipline recommendations.  We also reviewed the final discipline imposed by PPB for three of these events, which we found to be consistent with the Corrective Action Guide (CAG) used by PPB to determine fair and consistent discipline.  Four of the remaining members resigned before they could be disciplined and one member was still awaiting a final disciplinary decision.

However, although PPB uses an executive order to guide the use of the CAG, Directive 338.00 (currently titled Discipline Guide) has not been updated to reflect the new CAG, which has replaced the Discipline Guide.  As we have noted in prior reports, the DOJ's February 22nd, 2022 letter to the City approving the CAG stated "Accordingly, we now conditionally approve the CAG, subject to the City timely revising Directive 338.00."  While PPB, the City, DOJ, and the COCL team engaged in policy reviews during the first quarter of 2024, no updates have been made in the more than two years since DOJ's conditional approval. Accordingly, because the policy remains unchanged, we continue to find Partial Compliance and maintain our recommendations to update Directive 338.00, publicly post the directive, and provide a link to the CAG.

| **COCL Recommendations** | • To return to Substantial Compliance, update Directive 338.00, publicly post the directive, and provide a link to the CAG |
| --- | --- |
| **Assessment Based On** | CARs; failure to update Directive 338.00 |

### Settlement Agreement Paragraph

169. PPB shall apply policies uniformly and hold officers accountable for complying with PPB policy and procedure.

**Exhibit A**

| | |
|---|---|
| **Compliance Label** | Partial Compliance |
| **Methodology** | Review of sample of accountability cases; review of use of force events; review of EIS entries; review of force audit; interviews with PPB and City personnel |

**Compliance Assessment**

We continue to evaluate Par. 169 in a summative fashion, reflecting the accountability system and the system's inputs as a whole. As demonstrated in our assessment of other paragraphs, the accountability system operating within PPB and the City continues to demonstrate both strengths and weaknesses. For instance, during this quarter, we continued to find that each administrative complaint that we reviewed[10] had been handled appropriately (either as an administrative closure, Supervisory Investigation (SI), Precinct Referral (PR), or full investigation). In addition, we found that all but one case that we reviewed which led to an investigation with findings were conducted in accordance with best practices, and resulted in the findings that were reasonable under a preponderance of evidence standard. In one case that was investigated as an SI, we disagreed with the findings of the supervisor that the officer used appropriate confrontation management skills given the information from both the complainant and involved officer. However, this single case does not represent a major or systemic concern (see Par. 249(c) of the amended Settlement Agreement).

As reflected in our assessments above, however, recent revelations about PPB's tolling processes as well as ongoing issues with the operation of the PRB (among other concerns) continue to affect PPB's overall ability to "apply policies uniformly and hold officers accountable." Furthermore, the change in accountability systems and processes planned by the City (See Par. 195) will need to be closely monitored going forward to ensure Substantial Compliance with this paragraph. As a result, we continue to find Partial Compliance with the requirements of Par. 169.

| | |
|---|---|
| **COCL Recommendations** | • To achieve Substantial Compliance, remedy barriers related to Pars. 122, 131, 137, and 195 to ensure a fair and consistent accountability system |
| **Assessment Based On** | Sample of accountability cases; sample of use of force events; interviews with PPB and City personnel |

[10] On a quarterly basis, the COCL reviews 20 randomly selected cases that include all investigative pathways a complaint might take.

**Exhibit A**

**Exhibit A**

# Section IX: Community Engagement and Creation of Portland Committee on Community-Engaged Policing

### **Settlement Agreement Paragraph**

141. To leverage the ideas, talent, experience, and expertise of the community, the City, in consultation with the DOJ, shall establish a Portland Committee on Community Engaged-Policing ("PCCEP"), within 90 days of the Effective Date of the relevant amendments to this Agreement.

142. The PCCEP shall be authorized to: (a) solicit information from the community and PPB about PPB's performance, particularly with regard to constitutional policing; (b) make recommendations to the Chief, Police Commissioner, the Director of the Office of Equity and Human Rights, and community and, during the effective period of this Agreement, to the DOJ; (c) advise the Chief and the Police Commissioner on strategies to improve community relations; (d) contribute to the development and implementation of a PPB Community Engagement Plan; and (e) receive public comments and concerns. The composition, selection/replacement process and specific duties of the PCCEP shall be set forth in a separate Plan for Portland Committee on Community-Engaged Policing ("the PCCEP Plan") which shall be substantially similar to Exhibit 1 to this Agreement. Amicus AMAC and Intervenor PPA shall be consulted regarding and DOJ shall review and approve any amendments to the PCCEP Plan proposed to occur during the effective period of this Agreement.

143. PCCEP's membership will come from a reasonably broad spectrum of the community. PCCEP members shall not have an actual or perceived conflict of interest with the City of Portland.

| **Compliance Label** | 141. Substantial Compliance |
| | 142. Substantial Compliance |
| | 143. Substantial Compliance |

**Exhibit A**

| Methodology | Observation of PCCEP meetings; review of minutes, reports, and recommendations; interviews with City staff and the PCCEP |
| --- | --- |

**Compliance Assessment**

In the fourth quarter of 2023, the PCCEP continued to function as a legitimate body for community engagement.

The PCCEP held two full committee meetings (October 18 and December 13) as well as meetings of its Settlement Agreement and Policy Subcommittee (November 8) and its Community Engagement Subcommittee (October 11 and December 6). The community was able to participate in these meetings via Zoom. In addition, the PCCEP held a closed "community-building session" for PCCEP members and staff on November 29, 2023.

During the fourth quarter of 2023, the PCCEP submitted a recommendation to implement contact surveys. These surveys would allow any Portlander who has contact with police to submit feedback about the "content and quality of their interaction." The results of the survey could then be evaluated for opportunities to improve policies and training. The PCCEP also strongly recommended that the administrative activities of the survey program be conducted by an entity other than PPB. The TAC and COCL[11] have also previously suggested the implementation of a contact survey program.

Although not in the fourth quarter, Mayor Wheeler reviewed and accepted the recommendation for a contact survey program on January 2, 2024. A workgroup will be assembled to identify a vendor for the survey. This group will be composed of representatives from the PCCEP, the TAC, PPB, Community Safety Division (CSD), the PPA, Portland Police Command Officers Association, and a labor and employment attorney from the City Attorney's office.

The PCCEP closed this quarter with 12 members, leaving one non-youth seat vacant. As a full body, the PCCEP comes from a reasonably broad spectrum of the community, with gender, ethnicity, and background balance. In this quarter, the COCL has not identified or been notified of an actual or perceived conflict of interest between a PCCEP member and the City of Portland.

| COCL Recommendations | • To maintain Substantial Compliance with Paragraph 142, the City should continue to promptly respond to PCCEP's |
| --- | --- |

---

[11] https://static1.squarespace.com/static/5a319f76a9db0901e16c6433/t/63db4b38ec537f751df77c99/1675316025917/COCL+TECHNICAL+ASSISTANCE+REPORT+Proposed+Contact+Survey+Program+02012023.pdf

**Exhibit A**

| | |
|---|---|
| | recommendations, and the mayor and police commissioner should continue to fulfill the requirement to meet with the PCCEP "at least twice per year" |
| | • To maintain Substantial Compliance with Paragraph 143, the City should continue to identify and recruit sufficient PCCEP members to maintain a full body |
| | • The City, with guidance from the PCCEP, should prioritize the retention of youth members on the PCCEP |
| **Assessment Based On** | Content of PCCEP meetings; interviews with City staff; substance of reports and recommendations; level of community engagement |

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 144. The City shall provide administrative support so that the PCCEP can perform the duties and responsibilities identified in this Agreement and in the PCCEP Plan. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Observation of PCCEP meetings; review of minutes, reports, and recommendations; interviews with City staff and the PCCEP |

### Compliance Assessment

PCCEP's staff support comes from the CSD in the Office of Management and Finance. During the fourth quarter of 2023, the PCCEP had staff support from a full-time PCCEP project manager (1.0 full-time equivalent (FTE) dedicated to PCCEP) and shared support from the CSD Advisory Boards and Commissions unit manager (0.25 FTE dedicated to PCCEP), project assistant (0.25 FTE), and a (temporary, part-time) community services aide II, for a total of 1.75 FTE.

Meeting notes continue to be posted in a timely fashion on the meeting's event page. PCCEP staff continued to consistently tag minutes and agendas in the Documents section of PCCEP's website to allow PCCEP members and members of the public to use the filter

**Exhibit A**

function and easily find all documents in one place. Videos of meetings have also continued to be posted in a timely manner on YouTube, and the link to PCCEP's YouTube channel is accessible from PCCEP's home page.

We continue to recommend that the City maintain timely posting of information about PCCEP's work so that the public is kept informed about these community engagement opportunities and productions. In addition, we recommend that the City continue to fully support the PCCEP staff in their roles.

| | |
|---|---|
| **COCL Recommendations** | • To maintain Substantial Compliance, continue adequate staffing dedicated to supporting the PCCEP<br><br>• To maintain Substantial Compliance, continue posting minutes of PCCEP meetings within 10 business days after a PCCEP meeting, including in the Documents section of the PCCEP website |
| **Assessment Based On** | Review of PCCEP website and YouTube channel; interviews with staff |

| |
|---|
| **Settlement Agreement Paragraph** |
| 148. PPB shall continue to require that officers document appropriate demographic data regarding the subjects of police encounters, including the race, age, sex, and perceived mental health status of the subject, and shall provide such information to the PCCEP and make such information publicly available to contribute to the analysis of community concerns regarding discriminatory policing. PPB shall consider enhancements to its data collection efforts, and report on its efforts to enhance data collection to the DOJ by no later than December 31, 2013, and quarterly thereafter. |

| | |
|---|---|
| **Compliance Label** | 148. Substantial Compliance |

| |
|---|
| **Compliance Assessment** |
| PPB remains in Substantial Compliance with Paragraph 148. PPB continues to collect, analyze, and report demographic data from individuals who are stopped by PPB using its |

**Exhibit A**

Stops Data Collection app. In terms of data analysis and reporting requirements, PPB's Strategic Service Division continued to produce high-quality Stops Data Collection reports, both quarterly and annually, and share them with the PCCEP and the public on PPB's website. The Stops Data Collection report for the fourth quarter was posted on January 25, 2024. In the fourth quarter, stops decreased from 5,195 to 4,699. White subjects accounted for 58 percent of all stops citywide, followed by Black or African American (19 percent), Hispanic or Latino (14 percent), Asian (6 percent), Middle Eastern (2 percent), Native Hawaiian or Other Pacific Islander (1 percent), and American Indian or Alaskan Native (less than 1 percent). Less than 1 percent of the stops involved an individual with a perceived mental health issue.

| **COCL Recommendations** | • Continue the dialogue with community members around racial disparities in traffic stops and searches |
| --- | --- |
| **Assessment Based On** | COCL review of PPB precinct demographic reports; COCL review of PPB Stops Data Collection reports; COCL review of relevant PPB directives |

| **Settlement Agreement Paragraph** |
| --- |
| 150. Annually, PPB shall issue a publicly available PPB Annual Report, which shall include a summary of its problem-solving and community policing activities. A draft of the Annual Report shall be provided to the PCCEP for review and comment before the report is finalized and released to the public. Once released, PPB shall hold at least one meeting in each precinct area and at a City Council meeting, annually, to present its Annual Report and to educate the community about its efforts in community policing in regard to the use of force, and about PPB's policies and laws governing pedestrian stops, stops and detentions, and biased-free policing, including a civilian's responsibilities and freedoms in such encounters. |

| **Compliance Label** | Substantial Compliance |
| --- | --- |

**Exhibit A**

| Methodology | Review of PPB's Annual Report; interviews with PPB and City staff involved with the PCCEP |
|---|---|

| **Compliance Assessment** | |
|---|---|
| PPB remained in Substantial Compliance with Paragraph 150 for the fourth quarter of 2023. As we reported in our third quarter report, a draft of PPB's 2022 Annual Report was completed in a timely manner, posted on the PCCEP website, discussed with the PCCEP, presented and discussed at all precinct meetings, and presented before the city council. The 2023 Annual Report is not expected until the second quarter of 2024. Compliance will be assessed again after the draft of the 2023 Annual Report is posted on the PCCEP website, discussed with the PCCEP, presented and discussed at all three precinct meetings, and presented before the city council. | |

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | Review of progress on the content and presentation of PPB's Annual Report |

| **Settlement Agreement Paragraph** |
|---|
| 151. PCCEP shall meet as needed to accomplish their objectives as set forth in the PCCEP Plan. PCCEP shall hold regular Town Hall meetings which shall be open to the public. To the extent that PCCEP meetings are subject to the Oregon Public Meetings Law, or similar regulatory or statutory requirements, the City shall be responsible to give advice necessary to the PCCEP to ensure compliance with those laws and agrees to represent PCCEP in any challenges regarding compliance with those laws. |
| 152. The City shall provide PCCEP members with appropriate training necessary to comply with requirements of City and State law. |

| **Compliance Label** | 151. Substantial Compliance |
|---|---|

**Exhibit A**

| | 152. Substantial Compliance |
|---|---|

### Compliance Assessment

During the fourth quarter of 2023, the PCCEP remained active by holding two full committee meetings, a Settlement Agreement and Policy Subcommittee meeting, and two Community Engagement Subcommittee meetings. In addition, at least one representative of the City Attorney's office attended PCCEP meetings and continued to advise the PCCEP as necessary to ensure compliance with public meetings laws.

Furthermore, the City continues to train new PCCEP appointees as needed based on the Guide for Volunteer Boards & Commissions materials prepared for all City advisory boards. These materials cover the Oregon Government Ethics Commission guide for public officials, the City's code of ethics, restrictions on political activity for public officials, and the Oregon Attorney General's Public Records and Public Meetings Manual. An all-day training for new members was held on October 14, 2023.

As a result, we continue to find Substantial Compliance with the requirements of this paragraph.

| **COCL Recommendations** | • Continue to maintain records of training for new PCCEP members; ensure that current and future PCCEP members participate in all required trainings and are offered a meaningful opportunity to participate in any optional training |
|---|---|
| **Assessment Based On** | Regularity and content of PCCEP meetings; provision of City's legal advice and training for PCCEP |

**Exhibit A**

# Section XI: Additional Remedies

After five mediation meetings, the City and DOJ agreed on a set of remedies to achieve compliance with the terms of the Settlement Agreement.[12] On January 10, 2022, DOJ and the City filed their final Joint Status Report in US District Court (ECF 275), summarizing the mediation results and the specific remedies on which the parties agreed in principle. As such, the parties have agreed to add a new section to the Settlement Agreement: Section XI, which contains eight new paragraphs, 188 to 195. These remedies were approved by the Portland City Council on February 9, 2022, and by the federal judge at the Fairness Hearing on April 29, 2022.

| Settlement Agreement Paragraph | |
|---|---|
| 188. The City shall revise Force Data Collection Report (FDCR) and After Action Report forms to capture when the forms are edited and completed as part of PPB's implementation of Office365, which is ongoing. In the interim, pursuant to a process approved by the United States, PPB shall capture in the existing FDCR and After Action Report forms the author's name and the time and date of initial submission and any subsequent edits, as well as the name, time, and date of each level of review. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review of AAR and FDCR forms |
| **Compliance Assessment** | |
| During the fourth quarter of 2023, our review demonstrated that the updated FDCR and AAR forms continue to be used and continue to capture the data required by Paragraph 188. We therefore continue to find that the City and PPB have substantially complied with the requirements of Paragraph 188. | |
| **COCL Recommendations** | • No recommendations at this time |

---

[12] These meetings included the Intervenor-Defendant PPA, the enhanced Amicus Curiae AMAC, and Amicus Curiae Mental Health Alliance.

**Exhibit A**

| | |
|---|---|
| **Assessment Based On** | Updated FDCR and AAR forms and use by officers and supervisors |

| | |
|---|---|
| **Settlement Agreement Paragraph** | |

189. Before November 25, 2021, the City shall provide funding for a qualified outside entity to critically assess the City's response to crowd control events in 2020 in a public-facing report and prepare a follow-on review of the City's response to the report. The City will use the report to prepare a training needs assessment. The report, training needs assessment, and follow-on review will be completed consistent with a Scope of Work and deadlines agreed upon by the City and the United States, and such agreement shall not be unreasonably withheld by either Party. If the City demonstrates to the United States that significant progress is being made toward meeting the obligations under the agreed upon Scope of Work and deadlines, the City may request a reasonable modification of the Scope of Work or extension of deadlines, which the United States shall not unreasonably decline.

| | |
|---|---|
| **Compliance Label** | Partial Compliance |
| **Methodology** | Review IMLLC report;  Review City 180-day self-assessment |

**Compliance Assessment**

The City had previously achieved the first component of Par. 189 during the third quarter of 2023, in that it "provide[d] funding for a qualified outside entity to critically assess the City's response to crowd control events in 2020 in a public-facing report." During the fourth quarter of 2023, the City and PPB continued to make progress in achieving the second component of Par. 189 by developing a needs assessment based on IMLLC's findings. As discussed in Par. 79, PPB released a training plan that identified several training components that were the result of IMLLC's report and that were scheduled for both spring and fall in-service, providing a roadmap for responding to IMLLC's recommendations.  Additionally, as evidenced by the City's 180-day self-assessment[13], the City and PPB have taken other actions consistent with IMLLC's recommendations, including revising policies related to crowd control and use of force, enhancing documentation and supervisory processes during crowd control events, rebuilding mutual

---

[13] Although the 180-day self-assessment was released after the 4th quarter, it reflects efforts occurring in this and prior quarters.

**Exhibit A**

aid networks (specifically with Multnomah County Sheriff's Office and with the Gresham Police Department), increasing the cadre of individuals qualified to serve as a Crowd Management Incident Commander, and improving communication before and after public order events (among other efforts). While some reforms are still underway (such as the establishment of the Public Order Team), we continue to believe that progress toward complying with this paragraph is being made. Moving forward, the PPB must deliver the training planned for 2024 and IMLLC must conduct a follow-up review for Substantial Compliance to be met. As a result, we continue to find Partial Compliance for Par. 189 and maintain our recommendations from prior quarters that have not yet been accomplished.

| | |
|---|---|
| **COCL Recommendations** | To achieve Substantial Compliance:<br><br>• PPB must use the IMLLC report to prepare a training needs assessment, training plan, and relevant crowd management training<br><br>• IMLLC must prepare a follow-up report that reviews the City's response to its original report, including PPB's training needs assessment |
| **Assessment Based On** | IMLLC report; PPB 180-day self-assessment. |

| | |
|---|---|
| **Settlement Agreement Paragraph** | |
| 190. Before November 25, 2021, the City shall provide in the budget a separate line item for overtime costs to conduct necessary training for PPB officers. The City shall include a similar line item in subsequent budgets for the duration of this Agreement. | |
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Review of budget documents |
| **Compliance Assessment** | |
| The City has continued to include a separate line item for these overtime costs in the City's budget. Therefore, the COCL finds that the City has achieved Substantial Compliance with the requirements of Paragraph 190. | |

**Exhibit A**

| **COCL Recommendations** | • No recommendations at this time |
| --- | --- |
| **Assessment Based On** | Review of budget documents and amount of overtime funding included in the budget |

---

| **Settlement Agreement Paragraph** |
| --- |
| 191. Before November 25, 2021, the City shall budget for a qualified civilian in PPB to direct all educational aspects of PPB's Training Division alongside the Captain of the Training Division, who will direct administrative aspects of PPB's Training Division. The respective roles and responsibilities of the civilian and the Captain are outlined in Attachment 1 appended to this Agreement, provided that the Parties may agree to modify those roles and will not unreasonably withhold such agreement. Once funding is provided, the City shall post the position within 90 days. Once the position is posted, the City shall make a job offer to a suitable candidate and complete any required background screenings within 150 days. If the City demonstrates to the United States that no suitable candidate applied for or accepted the position, or that the City is otherwise making significant progress toward meeting the deadlines in this Paragraph, the City may request a reasonable extension of time to fill the position, which the United States shall not unreasonably withhold. |

| **Compliance Label** | Substantial Compliance |
| --- | --- |
| **Methodology** | Discussions with the Police Education Director, Review of Training Division organizational chart |

| **Compliance Assessment** |
| --- |
| Because PPB has retained the same civilian training director through the fourth quarter of 2023, we continue to find Substantial Compliance with the requirements of this paragraph. Should PPB transition to another director in the future, we will refer the City to the suggestions that we made for improving the hiring process in our 2023 first quarter report. |

| **COCL Recommendations** | • No recommendations at this time |
| --- | --- |

| | |
|---|---|
| **Assessment Based On** | Maintaining the Director of Police Education |

| |
|---|
| **Settlement Agreement Paragraph** |
| 192. Within 60 days of the date that this paragraph is entered as an order of the Court, the City shall initiate an appropriate investigation through IPR to identify: (a) the PPB Lieutenant(s) and above who trained Rapid Response Team members to believe that they could use force against individuals during crowd control events without meeting the requirements of PPB Directive 1010.00; (b) the PPB incident commander(s) and designee(s) with the rank of Lieutenant or above who directed or authorized any officer to use force in violation of PPB Directive 1010.00, or who failed to ensure that FDCRs and After Action Reports arising from the crowd control events starting on May 29, 2020, and ending on November 16, 2020, were completed as required by Section 13.1 of PPB Directive 635.10; and (c) the PPB Commanders and above who failed to timely and adequately clarify misunderstandings and misapplications of PPB policy (including this Agreement) governing the use, reporting, and review of force during the crowd control events starting on May 29, 2020, and ending on November 16, 2020. Once the IPR investigation is complete, the Police Commissioner and/or the Chief of Police, as required by this Agreement, shall hold accountable those investigated members of the rank of Lieutenant and above who are determined to have violated PPB policies (including this Agreement) as outlined in this paragraph. The Parties affirm the obligation in this Agreement and Directive 330 for IPR and PPB to investigate any sworn member if, during the investigations of Lieutenants and above required by this paragraph, information is discovered suggesting that any sworn member may have violated PPB policy or this Agreement. |

| | |
|---|---|
| **Compliance Label** | Partial Compliance |

| | |
|---|---|
| **Methodology** | Interviewed PPB, CAO, and IPR personnel |

| |
|---|
| **Compliance Assessment** |
| IPR is currently conducting the series of investigations required by Paragraph 192. Currently, IPR has four open investigations related to Paragraph 192 regarding the PPB and City responses to the 2020 protests. Although each case is at a different stage in its investigation, the COCL will not be privy to all the facts of these investigations until they |

**Exhibit A**

are completed. In addition, for any information we learn, we would be unable to comment on any open administrative investigation. At this time, we continue to find the City in Partial Compliance with the requirements of Paragraph 192. Substantial Compliance will require IPR and the City to conduct investigations that are thorough, fair, and reasonable, which we will assess upon the completion of the investigations.

| | |
|---|---|
| **COCL Recommendations** | • To achieve Substantial Compliance, complete a thorough, fair, and reasonable investigation of the command personnel associated with the 2020 crowd control and the training that they provided<br><br>• To achieve Substantial Compliance, hold accountable, as appropriate, the investigated command personnel members who are found to have violated PPB policies (including this Agreement) as described in Paragraph 192 |
| **Assessment Based On** | Discussions with City personnel |

| | |
|---|---|
| **Settlement Agreement Paragraph** | |

193. In addition to the requirements of paragraph 150 of this Agreement, PPB shall release its Annual Report and hold the required precinct meetings no later than September 20 of each year for the duration of this Agreement.

| | |
|---|---|
| **Compliance Label** | Substantial Compliance |
| **Methodology** | Confirmed the dates of completion, dissemination, and discussion of PPB's 2023 Annual Report; observed and reviewed precinct meetings; engaged in methods reported under Paragraph 150 |

| |
|---|
| **Compliance Assessment** |

PPB remained in Substantial Compliance with Paragraph 150 for the fourth quarter of 2023. As we reported in our third quarter report, a draft of PPB's 2022 Annual Report was completed in a timely manner, posted on the PCCEP website, discussed with the PCCEP,

**Exhibit A**

presented and discussed at all precinct meetings, and presented before the city council. The 2023 Annual Report is not expected until the second quarter of 2024.

| **COCL Recommendations** | • No recommendations at this time |
|---|---|
| **Assessment Based On** | Date PPB's Annual Report was completed; date the PPB Annual Report was presented at three precinct meetings |

---

**Settlement Agreement Paragraph**

194. Within 210 days of the date this paragraph is entered as an order of the Court, the City shall implement body-worn cameras (BWCs) pursuant to a policy that is subject to the policy-review-and-approval provisions of this Agreement; provided, however, if the City is making substantial progress this deadline may be extended by agreement of the United States, which shall not be unreasonably withheld.

a. The City will comply with any collective bargaining obligations it may have related to BWCs, which the City agrees to fulfill expeditiously and in compliance with its obligation to bargain in good faith.

b. Within 60 days of the date this paragraph is entered as an order of the Court, the Compliance Officer shall gather public input on the use of BWCs and provide this information and any technical assistance to the public and the Parties to inform the drafting of a policy. The United States reserves its policy review rights related to the BWC program under the terms of this Agreement.

c. If the City has not finally discharged its collective bargaining obligations as to BWCs within 120 days of the date this paragraph is entered as an order of the Court, the Parties stipulate that the Court may thereafter hold periodic status conferences every 60 days to receive an update on the procedural status of the collective bargaining process related to BWCs. The City will provide a final procedural status update upon the completion of the collective bargaining process.

d. The United States reserves its enforcement rights related to the BWC program under the terms of this Agreement. If collective bargaining or any related arbitration or appeal results in a BWC program that the United States determines, in its sole and absolute

**Exhibit A**

discretion, will not adequately resolve the compliance concerns identified in the April 2, 2021 notice of noncompliance, the Parties agree that the United States can seek court enforcement pursuant to paragraph 183, without having to repeat the steps laid out in paragraphs 178 to 182.

| **Compliance Label** | Partial Compliance |
|---|---|
| **Methodology** | Review of BWC pilot policy; observation of BWC training; communication with PPB personnel; review of PPB quarterly BWC status reports |

| **Compliance Assessment** |
|---|

During the fourth quarter of 2023, PPB continued to take steps toward implementing the BWC program. During this quarter, PPB ended its BWC pilot program and began evaluating its results, including through interviews with PPB members who had worn the BWCs. In addition, the City authorized PPB to enter into a procurement contract with Axon, a major BWC developer and distributor. Furthermore, PPB began developing a random review generator for supervisor review of BWC videos and continued revisions to the BWC policy.

Consistent with prior quarters, we cannot yet determine whether the program implementation will ultimately be successful. Full implementation of BWCs is planned to begin in the summer of 2024, although we have still not been provided with an evaluation framework for the successful rollout of the cameras or auditing frameworks to ensure the ongoing success and sustainability of the program. In our last report, we provided a summary of the technical assistance that is available to PPB either through the COCL team or through national toolkits that provide best practices for each step in the BWC implementation process. Because Substantial Compliance will require full implementation of the program, we remain ready to provide PPB and the City with technical assistance along the way.

| **COCL Recommendations** | • To achieve Substantial Compliance, the City should achieve full-scale implementation of the BWC program |
|---|---|
| **Assessment Based On** | Review of BWC pilot plans, BWC policy, hiring a qualified BWC vendor, hiring PPB personnel for the BWC program, and preparing the identified precinct for pilot testing; observation of training |

**Exhibit A**

**Settlement Agreement Paragraph**

195. In 2020, the City referred to voters a ballot measure that would overhaul the police accountability system incorporated into this Agreement by establishing a new Community Police Oversight Board to replace IPR for investigations of certain complaints of police misconduct and to replace the Chief of Police for imposition of discipline. City voters approved the ballot measure. The City has since empowered a 20-member civilian Commission to define the duties and authority of the Oversight Board and submit a proposal to the City Council for final approval.

a. Before January 1, 2022, the City Council and Auditor shall each present a plan to the United States for an orderly transition to the Community Police Oversight Board by ensuring the continuity of IPR operations while the Commission develops the Oversight Board for City Council's approval. The United States shall determine whether either of these two plans is acceptable. City Council will then adopt a plan that the United States has determined is acceptable. The Parties agree that the adopted plan shall be appended to this Agreement and will become part of this Order, provided that the Parties may agree to modify the plan if warranted by the circumstances. Until the Oversight Board becomes operational, the City shall ensure that administrative investigations are completed as required by Section VIII – Officer Accountability and that officers are held accountable for violating PPB policy and procedure as required by Paragraph 169.

b. Within 18 months of the date this paragraph is entered as an order of the Court, the Commission shall propose to City Council changes to City Code to create a new police oversight system as reflected in the City of Portland Charter amendment establishing a Community Police Oversight Board. Within 60 days of receiving the Commission's proposal, the City will propose amendments to City Code to address the Commission's proposal, and corresponding amendments to this Agreement, subject to the United States' and the Court's approval, to ensure full implementation of the Oversight Board and effective police accountability, consistent with the requirements of this Agreement. Within 21 days of the approval of the amendments to the Agreement by the United States and the Court, the City Council shall consider and vote on the conforming City Code provisions creating the Oversight Board. Within 12 months of the Council's adoption of the City Code provisions, the new Oversight Board shall be staffed and operational, and IPR shall then cease taking on new work and complete any pending work. For good cause shown, the deadlines imposed by this subparagraph (b) may be reasonably extended provided that the City is in substantial compliance with subparagraph (a).

**Exhibit A**

c. The City will comply with any collective bargaining obligations it may have related to the Oversight Board, which the City agrees to fulfill expeditiously and in compliance with its obligation to bargain in good faith.

| **Compliance Label** | Partial Compliance |
| --- | --- |
| **Methodology** | Observation of Police Accountability Commission (PAC) meetings; communication with City support staff; review of PAC's Quarterly Report, January–March 2023; review of PAC's final recommendations to the City |

| **Compliance Assessment** |
| --- |
| During the fourth quarter of 2023, the city council approved changes to City code that used elements of PAC's recommendations, finding that many of the PAC's other recommendations were better suited for SOPs or other documents rather than City code. At present, the City and PPA are still bargaining proposed amendments to the Settlement Agreement based on the code change, after which DOJ will review them. Upon approval, the Settlement Agreement will be amended to reflect the Community Board for Police Accountability (CBPA), although the timeline for these amendments is unclear. Because significant steps toward compliance with this paragraph remain, we continue to find Partial Compliance. |

| **COCL Recommendations** | • To achieve Substantial Compliance, the City must implement a functional oversight board that is properly staffed, properly trained, operational, and able to effectively investigate and dispose of use of force and misconduct cases |
| --- | --- |
| **Assessment Based On** | Progress achieved by PAC toward developing the new oversight board; implementation and functioning of the new oversight board |

**Exhibit A**

# Appendix A: Acronyms

| Acronym | Definition |
|---------|------------|
| AAR | After-Action Report (also referred to as 940) |
| AIM | Administrative Investigations Management |
| AMAC | Albina Ministerial Alliance Coalition for Justice and Police Reform |
| AMR/EMS | American Medical Response/Emergency Medical Service |
| BERS | Behavioral Health Unit Electronic Referral System |
| BHCC | Behavioral Health Call Center |
| BHRT | Behavioral Health Response Team |
| BHU | Behavioral Health Unit |
| BHUAC | Behavioral Health Unit Advisory Committee |
| BHUCT | Behavioral Health Unit Coordination Team |
| BOEC | Bureau of Emergency Communications |
| BWC | Body-Worn Camera |
| CAR | Corrective Action Recommendation |
| CBPA | Community Board for Police Accountability |
| CCO | Community Care Organizations |
| CEW | Conducted Electric Weapon |
| CIT | Crisis Intervention Team |
| COCL | Compliance Officer and Community Liaison |
| CRC | Citizen Review Committee |
| CRO | Communication Restriction Order |
| CSD | Community Safety Division |
| DOJ | United States Department of Justice |
| ECIT | Enhanced Crisis Intervention Team |
| EIS | Employee Information System |
| FDCR | Force Data Collection Report |
| FTE | Full-Time Equivalent |
| IA | Internal Affairs |
| IMLLC | Independent Monitor, LLC |
| IPR | Independent Police Review |
| LMS | Learning Management System |
| MHA | Mental Health Alliance |
| MHT | Mental Health Template |

**Exhibit A**

| OIG | Office of the Inspector General |
|-----|-------------------------------|
| OIS | Officer-Involved Shooting |
| PAC | Police Accountability Commission |
| PCCEP | Portland Committee on Community-Engaged Policing |
| PPA | Portland Police Association |
| PPB | Portland Police Bureau |
| PRB | Police Review Board |
| PSD | Professional Standards Division |
| PSR | Portland Street Response |
| RU | Responsibility Unit |
| SCT | Service Coordination Team |
| SOP | Standard Operating Procedure |
| STS | Supportive Transitions and Stabilization |
| TAC | Training Advisory Council |

**Exhibit A**

# Appendix B: List of Personnel

- Chief of Police: Bob Day
- Deputy Chief of Police: Michael Frome
- Assistant Chief of Operations: Jeffrey Bell
- Assistant Chief of Services: Michael Leasure
- Assistant Chief of Investigations: Art Nakamura
- Assistant Chief of Services: Mike Leasure
- Assistant Chief of Community Services: Chuck Lovell
- Commander of Professional Standards Division: Amanda McMillan
- Inspector General/DOJ Compliance team: Mary Claire Buckley
- Force Inspector Lieutenant: Michael Roberts
- BHU Lieutenant: Christopher Burley
- EIS Supervisor: Matthew Engen
- Training Captain: Franz Schoening
- City of Portland Auditor: Simone Rede
- IPR Director: Ross Caldwell
- BOEC Director: Bob Cozzie
- BOEC Training and Development Manager: Melanie Payne

**Exhibit A**

This page intentionally left blank