1            IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF OREGON

3                  PORTLAND DIVISION

4

5

   UNITED STATES OF AMERICA,            )
6                                        )
                          Plaintiff,     )  No. 3:12-cv-02265-SI
7                                        )
              v.                         )  August 29, 2024
8                                        )
   THE CITY OF PORTLAND,                 )  Portland, Oregon
9                                        )
                          Defendant.     )
10

11

12

13

14

15              **TRANSCRIPT OF PROCEEDINGS**

16                 (Status Conference)

17

18        BEFORE THE HONORABLE MICHAEL H. SIMON

19        UNITED STATES DISTRICT COURT JUDGE

20

21

22

23  **COURT REPORTER:**
24  Kellie M. Humiston, RMR, CRR
    (503) 326-8186
25  Kellie_Humiston@ord.uscourts.gov

```
 1                    A P P E A R A N C E S

 2   FOR THE PLAINTIFF:            Jared Hager
                                   U.S. Attorney's Office
 3                                 1000 SW Third Avenue
                                   Suite 600
 4                                 Portland, OR 97204

 5                                 R. Jonas Alexander Geissler
                                   U.S. Dept. Of Justice Civil Rights
 6                                 Division
                                   950 Pennsylvania Avenue, N.W.
 7                                 Washington, DC 20530

 8   FOR THE CITY:                 Heidi Brown
                                   Sarah Ames
 9                                 Lisa Rogers
                                   Jackson Paul
10                                 City Attorney's Office
                                   1221 SW Fourth Avenue
11                                 Room 430
                                   Portland, OR 97204

12

13   FOR PORTLAND POLICE ASSOCIATION:   Anil Karia
                                        Public Safety Labor Group
14                                      3021 NE Broadway
                                        Portland, OR 97232

15

16   FOR AMICUS AMAC:              J. Ashlee Albies
                                   Rian Peck
17                                 Albies & Stark, LLC
                                   One SW Columbia Street, Suite 1850
18                                 Portland, OR 97204

19   FOR AMICUS MHA:               Juan Chavez
                                   Oregon Justice Resource Center
20                                 P.O. Box 5248
                                   Portland, OR 97208

21

22

23

24

25
```

```
 1                    (August 29, 2024, 9:06 a.m.)

 2                    P R O C E E D I N G S

 3

 4          THE COURT:  Good morning, everyone.

 5          MR. GEISSLER:  Good morning, Your Honor.

 6          THE COURT:  Good to see you all.  We are here in the

 7   case of the United States of America vs. City of Portland, Case

 8   Number 3:12-cv-2265.  And I'll invite counsel for plaintiff to

 9   enter an appearance.

10          MR. GEISSLER:  Good morning, Your Honor.  Jonas

11   Geissler from the Civil Rights Division of DOJ for the United

12   States.  On line is Jared Hager as well.

13          THE COURT:  Good morning.  I'll invite counsel for

14   Defendant City of Portland to make an appearance.

15          MS. BROWN:  Good morning, Your Honor.  Heidi Brown with

16   the City of Portland, City Attorney's Office.  And on the line,

17   we have Sarah Ames, also from our office.  And I'll let

18   Ms. Rogers introduce herself.

19          MS. ROGERS:  Lisa Rogers, Deputy City Attorney.

20          THE COURT:  Welcome.  Good morning.

21          I'll invite Intervenor Defendant Portland Police

22   Association's counsel to enter an appearance.

23          MR. KARIA:  Good morning, Your Honor.  Anil Karia for

24   PPA.

25          THE COURT:  Good morning.
```

1          I'll invite the amicus curiae for the Albina

2    Ministerial Alliance Coalition for Justice and Police Reform

3    enter an appearance.

4          MS. ALBIES:  Good morning, Your Honor.  Ashley Albies,

5    counsel for the AMAC.  And with me is Rian Peck, who is also new

6    counsel for the AMAC, so we have some new blood in the room.

7          THE COURT:  Welcome.  Good morning to both of you.

8          And I'll invite counsel for amicus curiae Mental Health

9    Alliance to enter an appearance.

10         MR. CHAVEZ:  Good morning, Your Honor.  Juan Chavez

11   with the Mental Health Alliance.

12         THE COURT:  Good morning.

13         I also recognize our independent monitor.  I'll invite

14   Mr. Smith to enter an appearance and introduce any colleagues who

15   may be with you.

16         MR. SMITH:  Good morning, Your Honor.  Mark Smith, I'm

17   the lead monitor for the monitoring team.  I'm here with Deputy

18   Monitor Brian Buchner today.

19         THE COURT:  Welcome to both of you.  It's a pleasure to

20   see both of you.

21         And I recognize that we have our Portland Police Chief

22   Day, Bob Day.  Welcome to you, sir.  Good to see you.

23         CHIEF DAY:  Thank you.  Good morning, Your Honor.

24         THE COURT:  All right.  I continue to believe that we

25   have made substantial progress in implementing the settlement

1   agreement, and I commend all of you for your hard work, your good
2   faith, and your diligence.
3          Before the Court today is the joint motion filed by the
4   Plaintiff United States and the Defendant City of Portland to
5   further amend the settlement agreement.  That joint stipulated
6   motion is Docket 431.  Specifically, the proposed amendment
7   proposes changes to Section VIII regarding officer
8   accountability.  The plaintiff and the defendant jointly propose
9   a new Community Police Oversight Board to replace the current
10  Independent Police Review and Citizen Review Committee.
11         The proposed amendments will be the primary focus of
12  today's hearing, and I'll turn to that in a few moments, but I
13  would like to also add I would appreciate an update on four other
14  issues.
15         Number one, I'd like to know the status of the rollout
16  of the body-worn cameras and the status of the protocol for
17  viewing videos.
18         Number two, I'd like to know the status of the Portland
19  Street Response, including funding, hours of operation,
20  management, and oversight.
21         Number three, I look forward to hearing about the
22  progress of the newly appointed independent monitor.
23         And number four, and this may call for more speculation
24  than fact, and if you're limited in how you can do it, that's
25  fine, but I would like a little bit of guidance on how we should

1    anticipate the upcoming changes to Portland city government and

2    how they are likely to affect, if at all, the implementation of

3    the settlement agreement.  We're going to have a city manager for

4    the first time in Portland's history, I think, I think it's for

5    the first time, it's certainly for the first time in my lifetime,

6    and that will affect the management of the bureaus or changing

7    city council, the city commission, from five members to 12

8    members.  If anybody has any insights on how, if at all, that may

9    affect the implementation of the settlement agreement going

10   forward and what I should be keeping an eye on, I'd like to know.

11           I will also disclose right now what I have read in

12   preparation for this hearing and then I'll offer some specific

13   comments.  In addition to reading quite closely -- and I'll tell

14   you where my areas of concern are.  In addition to reading quite

15   closely the joint stipulated motion, Docket 431, and of course

16   the proposed order, 433, I've read the City's memorandum in

17   support, Docket 434; the joint motion for the setting of the

18   agenda, which I've already adopted, 435; the United States' brief

19   in support of a motion to amend, that's Docket 436.  I've read

20   the comments and report from the Albina Ministerial Alliance

21   Coalition for Justice and Police Reform, Docket 441.  I have read

22   the comments submitted by the Mental Health Alliance and their

23   brief, Docket 450, and I've received a number of very interesting

24   and also helpful written comments from folks.  I've read --

25   received written comments from Gretchen Kolderup, Docket 438;

1    written comments from Cameron Browne, Docket 439; written

2    comments from Annie Capestany, Docket 440; comments from Casey

3    Kolderup, Docket 442; comments from Portland Copwatch for

4    fairness -- excuse me, Portland Copwatch related to the fairness

5    hearing, and that was signed by Mr. Handelman and other members

6    of Portland Copwatch, that's Docket 443; comments from

7    Dr. William Harris, Docket 444; comments from Natalie Gilbert,

8    Docket 445; comments from Beth Wilson, 446; comments from Matthew

9    LaVine, Docket 447; comments from Celeste Noche, N-O-C-H-E,

10   Docket 448; comments from the League of Women Voters of Portland,

11   specifically Carolyn Buppert and Debbie Aiona, that's Docket 449;

12   comments from Tara Hershberger, Docket 451; comments from

13   Katherine McDowell, a former member of the Police Accountability

14   Commission, and that's Docket 452; comments from Jenna Knobloch,

15   453; comments from Chris Olson, 454.

16          And then, finally, I note that Mr. Sebastian Bishop was

17   originally signed up to give us video testimony.  A matter has

18   arisen that prevents him from being with us.  He's asked for

19   permission to file late written comments, and I've granted that.

20          If you have filed written comments and I've not read

21   off your name, that means I've not seen them or received them,

22   but during a break, please make sure you give them to our

23   courtroom deputy, Ms. Austad.

24          Also, I have received requests for public speaking

25   during the public comment portion of our hearing, and the order

1    in which I have those written down now are from Je Amaechi by

2    video, Matt Cleinman by video, Dan Handelman by video, Barbara

3    Bochinski by video, Seemab Hussaini in person, Debbie Aiona by

4    video, Tia Carpenter in person, Teressa Raiford in person, Faythe

5    Aiken in person, Cameron Browne by video, Char Michelle-Westley

6    in person, and Ann Brayfield by video, and Jo-Ann Hardesty.  And

7    we'll probably go in that order.

8              If I've not read your name and you want to provide

9    public testimony, again, during our mid-morning recess, just come

10   let our courtroom deputy, Ms. Austad, know that.

11             I do want to share two other observations with you

12   before turning to comments by the independent monitor, followed

13   by the United States, followed by the City, followed by Portland

14   Police Association, followed by the Albina Ministerial Alliance,

15   followed by the Mental Health Association, and followed by

16   presentations from PCCEP, and alternative public comments.  I

17   want to share some comments, first general and then more specific

18   concerns.

19             A number of the comments that I've received both

20   write-in from the public and also from the parties talk about

21   whether or not the City is adequately reflecting the will of the

22   voters as expressed in Measure 26-217, and I want to make a

23   fairly nuanced distinction.  I think it is my responsibility

24   under the settlement agreement to monitor the settlement, and

25   when proposed amendments come in, to decide whether the

1    amendments are fair, reasonable, and adequate.  That's my legal

2    responsibility, that's my legal authority, and I take that very

3    seriously.  Just because the parties may jointly submit proposed

4    amendments doesn't mean there's no Court.  The law specifically

5    says I have to look at those proposals even when they're jointly

6    submitted to decide whether they are fair, reasonable, and

7    adequate.

8              On the other hand, it's not my responsibility, I

9    believe, to ensure that the decisions of the city council and

10   other elected officials, primarily the mayor, I guess, the mayor

11   and the rest of the city council adequately and correctly

12   reflects the will of the voters as expressed in various

13   initiatives that may be passed from time to time.

14             This is a nuanced distinction, though.  The will of the

15   voters is best expressed through the ballot.  And I do note, as

16   I've said, we're going to have an election soon.  It'll be a very

17   new form of government.  We'll be electing a new mayor.  We'll be

18   electing a new set of members of the city council, commission,

19   many more of them.  And if people don't believe that the current

20   city government or elected officials are being adequately

21   responsive to what the voters have already expressed in previous

22   initiatives, the ballot box is the right place to make that

23   expression rather than expecting a court to enforce what some

24   contend are the will of the voters.

25             That said, the criteria for deciding whether a

1    particular amendment is fair, reasonable, and adequate is a

2    fairly undefined, or broad, category and criteria that is vested

3    in the sound discretion of the Court, and how do these two

4    features interact is a little bit unclear.

5            I just want to let you know I'm focusing on my legal

6    authority and responsibility to decide whether proposed

7    amendments are fair, reasonable, and adequate as opposed to a

8    more general question of are the city's elected officials

9    adequately reflecting the city's general will as reflected in

10   prior votes on earlier initiatives.

11           Now, that said, also, I do have three concerns about

12   the joint stipulated motion, and I really would appreciate the

13   parties, when they have their opportunity to speak, to address my

14   three concerns.

15           The first concern relates to -- and I'll give you the

16   specific paragraph -- relates to the proposed amendments to

17   paragraph 131.  And my first concern relating to paragraph 131

18   concerns the new or proposed paragraph A and then Romanette iii,

19   I-I-I, Romanette iii, which is the requirement that in order to

20   be a member of the Community Board for Public Accountability,

21   that, among other things, a member must participate in a ride --

22   a ride-along with the Portland police and participate in the

23   Portland Police Bureau's Community Academy.  I get that the

24   purpose there is, as stated, to maintain sufficient knowledge of

25   police patrol procedures.  I recognize that under Romanette i in

1    that same subsection, in order to remain on and -- to be on and

2    to remain on the CBPA, a member must receive training about the

3    bureau's history, procedures, policy development, process, and

4    the PPB's training on de-escalation, equity, bias-based policing,

5    and crisis intervention, as well as training on the oversight

6    systems history, structure, and processes.  That's really

7    important.  I get that.  And I also get that it's very important

8    that a member of this review board have sufficient knowledge of

9    police patrol procedures and understand what is happening on the

10    streets.

11          I also recognize that we've previously had in this

12    agreement a requirement that the CRC members participate in a

13    ride-along, but based upon some of the public comments I've been

14    receiving as well as some of the comments from the amici, that

15    has created problems, that there are some people whose

16    contributions might be very valuable on this committee who have

17    had certain experiences and trigger points that make it very

18    burdensome, difficult, perhaps even impossible for them to

19    comfortably participate in a police ride-along.  And so I want to

20    be understanding of that point and understand why is it really

21    necessary as a requirement that they participate in a ride-along.

22    I definitely see the benefits of doing so, and, frankly, other

23    things being equal, I encourage people to participate in the

24    ride-along program.  I get that.  It's a good idea.  It fosters

25    relationships with officers, it helps people see what's really

1  going on on the streets, but if someone, because of their unique

2  circumstances, really does not feel comfortable doing that,

3  should that be a disqualifying factor in their ability to serve

4  on our new Community Board for Public Accountability.

5         And I'll tell you, I'm skeptical of that.  I don't

6  think it should be a disqualifying factor.  If the parties

7  disagree, talk to me about it, tell me why this is necessary.  I

8  get that we've previously had it, but now I'm basing this on some

9  experiences that the public and the amici have been reporting to

10  us.  So is that really necessary.

11        The second point also relates to Romanette iii, and

12  that is another one of the required qualifications to serve on

13  the Community Board for Public Accountability is that the member

14  participate in the Portland Police Bureau's Community Academy.

15  Again, some people have said that that will be a hardship for

16  some of them in the sense of creating traumatic or triggering

17  memories.  There was a little bit of talk about the participation

18  in the video firearm training.

19        I'd like to know a little bit more about what

20  specifically is going to be the benefit of participating in the

21  Portland Police Bureau Community Academy and whether there are

22  alternatives to provide those benefits, that education, that

23  background, that understanding, to our CBPA members without

24  bringing about some of the triggering or traumatic aspects that

25  might otherwise prevent people who should be participating, if

1  they want to, on the CBPA, but otherwise feel that they won't be

2  able to meet this qualification.

3          And I do note that this is a new addition.

4  Participating in the PPB Community Academy is new to the

5  proposals.  So I'd like to hear more about that and why that is

6  really necessary.

7          By the way, related to those two points, I know that

8  there are similar, to some extent similar, citizen review boards

9  going on with -- in other cities around the nation.  Do any of

10  them require ride-alongs or attendance and participation in a

11  police community academy in order to serve on this community

12  board?  I'm not aware of any.  If you are, please inform me.  I

13  think it's a good idea.  I'm fine with it being encouraged.  I'm

14  skeptical whether it should be required.

15          I mentioned that there were three concerns I have.  The

16  third concern relates to the next subsection, subsection B, and

17  Romanette vi, you know, little V-I.  And I know this has been in

18  there for a little while, but I understand there have been some

19  recent experiences in Boulder, Colorado, that caused some

20  concern.  That is the statement that the city council shall have

21  the authority to remove a member of the newly created, if we

22  approve this, CBPA, for cause, including but not limited to the

23  following reasons, and then in Romanette vi, the reason is

24  objective demonstration of bias for or against the police.

25          There has been some expression of the vagueness of that

 1    criteria.  I do see that it is to some extent vague, and I'm

 2    curious as to, one, whether that's ever been implemented in the

 3    history of this settlement, two, how it has been implemented or

 4    how it will be implemented if there's a disagreement.  If we have

 5    someone who is being removed because of what the City contends is

 6    an objective demonstration of bias against the police and that

 7    person disagrees, how does that get handled?  Who handles that?

 8    Who adjudicates that dispute?  The answer to that question may

 9    very well influence how I feel about the reasonableness of

10    providing that criteria without further definition or explanation

11    of really what would be a disqualifying bias.  So I'm curious

12    about how that procedure's going to work.

13            Anyway, those are the issues that I'm looking forward

14    to hearing about from you all, the four related to the matters

15    other than the joint motion and then these three concerns I have

16    in the joint motion.

17            Also, I assume that all the parties have read and the

18    amici have read all of the public comments that have been

19    submitted, I assume that the parties have read the comments from

20    the Albina Ministerial Coalition and the Mental Health Alliance.

21    And so there are other concerns and questions that have been

22    raised about the joint motion.  If you want to address all of

23    those, I'm very interested, but I did want to specifically

24    highlight the three that I find most troubling so far.

25            All right.  And with that, I'm looking forward to our

1  very first presentation from the independent monitor.  Mr. Smith.

2          And by the way, you're welcome to comment on any of the

3  issues I just identified, but if that's not part of really where

4  you feel your presentation is going to lie, I understand that,

5  too.

6          MR. SMITH:  Thank you, Your Honor.  Good morning, Your

7  Honor, once again.  And good morning to everyone in the courtroom

8  today and everyone who is observing remotely.  On behalf of

9  Deputy Monitor Brian Buchner and myself, I want to thank you for

10  an opportunity to provide just a brief update on some of the

11  activities of the independent monitor during our first couple of

12  months.

13          As you have just laid out the issues of the day, I

14  fully recognize that this fairness hearing is really focused on

15  other matters the Court needs to ensure it handles its business

16  of the day, and so I'll endeavor to be brief in my remarks.

17          I just want to mention that we really did appreciate

18  the opportunity to introduce our team the last time that we

19  appeared before this Court.  In doing so, I wanted to mention

20  that there is one new team member we did not have a chance to

21  introduce.  I thought I'd just give a short, short introduction.

22  Her name is Valencia, or Val, Thomas.  She was actually here in

23  Portland observing multiple training sessions, meeting with city

24  officials and Portland Police Bureau.  Unfortunately, could not

25  be here today.  She left on a flight this morning.  But just to

 1    mention a couple facts about her, she retired approximately a
 2    year and a half ago as a senior captain for the Los Angeles
 3    Police Department.  She worked many different assignments in her
 4    career, which included community relations, the Office of the
 5    Inspector General, which is the civilian oversight agency for
 6    Los Angeles Police Department, and in that role as the sole sworn
 7    member assigned to that office, took direction only from the
 8    oversight office and worked in support of civilian oversight
 9    exclusively during that time.  And her career at LAP ended as the
10    commanding officer of the Internal Affairs Division, which from
11    my experience, an agency I can confidently say is a high
12    pressure, high volume job that requires a lot of thought
13    complexity and analysis in focusing on police accountability.
14    She has a bachelor's in behavioral science and a master's in
15    public administration.  I mention that just to say that during
16    her studies for her graduate degree, she focused on the study of
17    women in command and executive positions with the LAPD and
18    Los Angeles Sheriff's Department.  And as our team really strives
19    to maintain a multi-disciplinary composition, I feel confident
20    that Val's knowledge and experience is serving the monitorship
21    well.
22            With regard to our activities, our team has had
23    multiple meetings over the course of these couple of months, and
24    we anticipate having many more of them.  The ones -- just a brief
25    listing of what we've done so far, who we've spoke with so far.

1   We spent a lot of time, multiple meetings, with the COCL, trying

2   to ensure a smooth handoff as best as possible.  We spent time

3   with Independent Monitor LLC to discuss their findings and

4   recommendations and experiences with their tasks; spent time with

5   the PCCEP, or Portland Committee on Community-Engaged Policing,

6   including specifically with their settlement and policy

7   subcommittee and their community engagement subcommittee, as well

8   as their staff directly; members of the Albina Ministerial

9   Alliance; the Interfaith Peace Action Collaborative; Independent

10  Police Review; Bureau of Emergency Communications, including a

11  tour of their facility, which was, I'd say, highly informative

12  for our team; multiple units within PPB responsible for

13  compliance with various sections of the settlement agreement,

14  that includes training, accountability, focusing on -- pardon me,

15  use of force, the employee information system, behavioral health,

16  policy, and their community engagement efforts.

17          I had a very, I'd say, helpful meeting with Assistant

18  Chief Chuck Lovell of their services branch, spent a lot of time

19  with us and was very thoughtful in his comments; the president of

20  the Portland Police Association.

21          Some team members have had the chance to complete a

22  ride-along.  I understand that will be more further discussed

23  today in a different forum, but some members have had a chance to

24  do so.  I anticipate more of those to come with either a PPB

25  officer or sergeant.  We have done both.

1          We have had -- we attended a Police Review Board that

2     was focused on an officer-involved shooting.  We made -- reviewed

3     and made comments on various policies and training for PPB,

4     including a corrective action guide and a potential revision to

5     it; a suite of directives related to mental health which were up

6     for revision; and curricula from approximately 12 different

7     training courses, where we have extensively reviewed all of the

8     materials for the training courses, made comments back to the

9     department.

10          We, of course, had quite a number of meetings with both

11     parties, and that will certainly continue, and have scheduled

12     meetings with the Mental Health Alliance, the Citizen Review

13     Committee, and members of the Training Advisory Council.

14          I think the main other activity I wanted to just

15     mention in my brief comments are we did complete a first draft of

16     our monitoring plan and have received comments on it back from

17     both parties.  At present, we are working with the parties to

18     ensure that we fully understand their comments.  We don't want

19     this process to go back and forth forever, but the document and

20     what it will lay out for the term of the monitorship is highly

21     important, and we really want to take the time to get it right,

22     and so we'll have a few more discussions, we think, to make sure

23     we understand what the comments are and how we want to react to

24     them and consider them and incorporate them into our final plan.

25     So we're in that process now.

1          We have contacted a website developer to discuss

2    building a monitoring web -- monitoring team website.  We hope to

3    make that publicly available soon.  We have a little more work to

4    do on that, but I'd like to get that up and running, because we

5    want to maintain our accessibility to the public.

6          Talking about accessibility, I would like to just put

7    on the record briefly the monitoring team's e-mail address, which

8    anyone can use to reach us.  When we do have the website, of

9    course this will be up there, but just to say it out loud, it is

10    info@portlandpolicemonitor.com.  That's

11    info@portlandpolicemonitor.com.  And everyone is certainly

12    welcome to contact us there, and I commit to being responsive to

13    those who do.

14          Lastly, this fairness hearing comes amidst our second

15    site visit since we started our work.  The first site visit was

16    spending a lot of time doing interviews with PPB and also

17    community members.  And as I mentioned, a couple of team members

18    who are no longer here today have spent the last few days here

19    observing trainings and meeting with city officials, and we are

20    already beginning to plan, we don't have a specific date just

21    yet, beginning to plan for our third site visit.  And so those

22    will certainly continue.

23          It's been a busy couple of months, and I can speak on

24    behalf of the team in saying that we are excited to continue

25    digging into all of the work of the monitorship.  And I'll

1    conclude my remarks there.

2         THE COURT:  I do have a follow-up question for you,

3    Mr. Smith.  And thank you.  I appreciate your thoroughness of

4    what you've just been describing.

5         Here's my follow-up question.  I appreciate the work

6    that you're -- and the care that you're putting into finalizing

7    the plan, the monitoring plan.  I get that it needs a lot of --

8    it will benefit from a lot of input and a lot of care and,

9    therefore, it will take some time, and you have that time.  At

10    least from the Court's perspective, I give you that time.

11         I heard in your description that you're meeting with a

12    number of organizations and groups to get further input, but I'm

13    not sure I heard -- if I did, I missed it -- is there a general

14    plan to solicit public input generally?  And here's specifically

15    what I'm thinking about.  You've described the public website

16    that's not yet up.

17         I think it would be a good idea -- tell me if you

18    disagree.  I think it would be a good idea before you finalize

19    the plan, get that public website up, get the draft plan on the

20    public website, and then let everyone know that even if they have

21    not yet submitted comments either through a group or otherwise,

22    there's still an opportunity to submit additional comments

23    through the publicly available website and the plan that's

24    available on that website before you finalize it.  I just want to

25    make sure both that everyone in the community has an opportunity

1    to comment and that you've had enough time, maybe leaving that up

2    for about 30 days at least, that you've had enough opportunity to

3    receive any final remaining comments that folks wish to provide

4    even if it's through some form other than the groups you've met

5    with.

6          Does that make sense and is that consistent with what

7    you see happening?

8          MR. SMITH:  Yes and yes.  We discussed that, so far

9    only internally as a team to say is that a good rollout strategy,

10   and we believe that it is.  We did want to go in order and be

11   careful to receive the comments from the parties first, have

12   those under consideration, and make sure we understood them;

13   however, we felt like a next step then would be to include

14   further public comment and make sure everyone had an opportunity

15   to do so before things get sort of set in stone, so to speak.

16         THE COURT:  Perfect.  Sounds good.  Thank you.

17         MR. SMITH:  Thank you, Your Honor.

18         THE COURT:  Very much appreciate you joining this team,

19   Mr. Smith --

20         MR. SMITH:  Thank you.

21         THE COURT:  -- and your team being part of this team.

22         MR. SMITH:  Thank you very much.

23         THE COURT:  Thank you.  And welcome, Mr. Buchner.

24         All right.  Let me turn it over to the United States as

25   plaintiff.

 1            MR. GEISSLER:  Thank you, Your Honor.  Your Honor, I

 2    thank the Court for taking time today to consider the motion to

 3    amend a section of the settlement agreement.  If Your Honor

 4    please, I'll address the four issues first.  Of those issues,

 5    rollout of the body-worn camera program.  As Your Honor may

 6    recall, Portland Police Bureau promulgated a policy as Directive

 7    620.  And Your Honor's specific question was a protocol for

 8    viewing and direct --

 9            THE COURT:  And how the rollout is coming.

10            MR. GEISSLER:  Yes, indeed.  And, Your Honor, I imagine

11    that many of Your Honor's questions will need to go to the City.

12            THE COURT:  Fair enough.

13            MR. GEISSLER:  As the owner of facts, the City needs to

14    make representations as to what they are doing.

15            THE COURT:  Fair enough.

16            MR. GEISSLER:  Your Honor, from our perspective, Your

17    Honor, it's a question of what has DOJ done.  DOJ has approved a

18    body-worn camera policy and we said that that policy met many of,

19    but not all, of our concerns as we expressed in the body-worn

20    camera letter filed with this Court.

21            Specifically with respect to viewing, Your Honor,

22    Section 11.2 of that directive applies to viewing, and in that

23    section is broken down by the levels of force.  Portland Police

24    Bureau has four levels under the existing Directive 1010, Level 1

25    being the highest, lethal uses of force or death in custody.  And

1    in that respect, Your Honor, the directive requires that officers

2    provide an on-scene public safety statement and required by the

3    supervisor.  Great.  That's a practice that we wanted to see.

4    And also must provide an interview with Internal Affairs within

5    48 hours, then can watch the video, then supplement.  That's the

6    correct sequence to us, because that preserves the subjective

7    impression of the officer.

8           For Levels 2, 3, and 4, likewise the officer must

9    provide the initial statement to their supervisor, which helps

10    the supervisor correctly categorize the force, and then the

11    officer may view the video.  And I'll withstand correction if the

12    City has any different impressions of that.

13           THE COURT:  And one more time, what exactly is Level 1?

14           MR. GEISSLER:  Level 1 is lethal use of force or

15    in-custody death.

16           THE COURT:  Okay.

17           MR. GEISSLER:  Thank you, Your Honor.  For the PSR,

18    Your Honor, the parties, of course, have previously subjected

19    paragraph 115 to mediation, and we believe that is not resolved.

20    I believe the City, Your Honor, can speak to the PSR.

21           THE COURT:  Okay.

22           MR. GEISSLER:  For the monitor's progress, Your Honor,

23    I'm pleased to report, as Mr. Smith did, that the monitor met the

24    deadline for providing the draft monitoring report to the

25    parties.

1          Based on experience in other cases, as we have seen,

2   monitoring reports are both a living document, it will need to be

3   revised to go along, and may also be iterative.  Specifically

4   what we saw in our comments that we returned to the monitor was

5   that there will need to be audit mechanisms for each of the grand

6   areas of the settlement agreement:  force, EIS, accountability,

7   what have you, training as well.

8          Those auditing tools may be separate documents.  I

9   believe we need to engage in a conversation with the monitor and

10  then collaboratively with the City after that.  And I expect,

11  Your Honor, that the ultimate filed document may not have all the

12  tools with it, but could be filed later.  I think that is the

13  subject of further discussions.

14         The fourth subject, Your Honor, was the City -- changes

15  to city government.  Again, Your Honor, I believe the City owns

16  this topic and needs to speak to how it plans to act.  I will

17  note for sake of the settlement agreement, Your Honor, paragraph

18  4 of the settlement agreement requires that any successors in the

19  city, so all of their officials, the city government writ large,

20  are also bound by this Court's order, and this Court's order must

21  be abided by by the new government, Your Honor.

22         For the sake of the amendments, Your Honor, I'd like to

23  briefly address the three points that we made in our brief just

24  in a nutshell format, Your Honor.

25         THE COURT:  Absolutely.

 1          MR. GEISSLER:  I know we have a lot of people from the

 2   public here today who may not have read our docket entry number

 3   436.  And then as Your Honor suggested --

 4          THE COURT:  Summarize it however you wish.  That's

 5   totally fine.

 6          MR. GEISSLER:  Thank you, Your Honor.

 7          THE COURT:  I just wanted to call your attention and

 8   the City's attention specifically to the three areas of concern

 9   that I had.

10          MR. GEISSLER:  Indeed.

11          MS. ALBIES:  Sorry to interrupt, but we want to make

12   sure that folks can hear from the podium.  I don't know if the

13   mic is picking up.

14          MR. GEISSLER:  Can you hear me?

15          THE COURT:  Mary, is the --

16          THE COURTROOM DEPUTY:  Yeah.  I think the mics are

17   working.  No one said anything to me.

18          THE COURT:  Have you heard any reports that people

19   cannot hear?

20          MS. ALBIES:  Yes.

21          MS. BROWN:  Yes, we are.  I'm also getting similar --

22   just crackling.

23          MR. GEISSLER:  I will endeavor to speak down toward the

24   microphone, Your Honor.

25          THE COURT:  Okay.  Also, from my experience with our

1    microphones, if people speak slowly, it tends to work better,

2    also from our court reporter's interpreting.  If people tend to

3    speak quickly, sometimes the electronics can't keep up with the

4    speed of light.

5         MR. GEISSLER:  I believe I'm batting a thousand, Your

6    Honor, with respect to coming to these hearings and being

7    reminded to speak slowly.

8         THE COURT:  Consistency's a good thing.

9         MR. GEISSLER:  It is, Your Honor.

10        THE COURT:  Also, let me say, too, for everyone who is

11   listening remotely either by telephone or by video, you will have

12   a better reception if you mute your microphones, because if

13   someone is watching remotely by video or by -- listening by

14   telephone and you have not muted your microphone, any sounds that

15   you -- that come from where you are may override or take

16   precedence over what our speaker is saying and interfere with

17   your ability and everybody else's ability remotely to hear what

18   our speaker's saying.  So please mute your telephones, mute your

19   microphones.  And when it comes time for you to speak, if all we

20   see is your mouth moving, don't worry.  I will remind you that

21   you need to unmute, but for now let's mute.

22        Back to you, Mr. Geissler.

23        MR. GEISSLER:  Thank you, Your Honor.  Your Honor makes

24   three simple points in our brief.  First thing, Your Honor, the

25   Section VIII amendments are a step toward implementing the

1    settlement agreement paragraph 195, which requires that the City

2    fulfill the charter amendment by creating a civilian oversight

3    system for police accountability.  And because the amendments are

4    consistent with this settlement agreement and its accountability

5    goals, the amendments themselves are fair, adequate, reasonable.

6            Second, Your Honor, the Section VIII amendments are not

7    the product of fraud or collusion, one of the inquiries I'm sure

8    Your Honor will make with respect to fairness, because during the

9    implementation of this portion of the settlement agreement under

10   paragraph 195, the City engaged the Police Accountability

11   Commission and 18 months worth of work to recommend changes for

12   the City Code to implement the new charter change.

13           In part, it is not a product of fraud or collusion,

14   because within 60 days of the PAC's initial report, the city

15   council undertook and considered and voted on the changes to the

16   settlement agreement and City Code exactly as required by

17   paragraph 195 of the current settlement agreement.

18           And it in part is not fraud or collusion, Your Honor,

19   because the defendant intervenor, Portland Police Association and

20   the other union for the Portland Police Bureau, the PPCOA,

21   Portland Police Commanding Officers Association, negotiated the

22   agreement's changes precisely as required by paragraph 195.

23           And third and last in our brief, Your Honor, we said

24   that we pointed to the proposed Section VIII amendments that

25   advanced the interests of all parties.  And in fairness and

1    effectively addressing the compliance concerns with the

2    settlement agreement, the accountability remedies ultimately need

3    to come into compliance to create a durable remedy before this

4    case can be resolved.

5           So based on those three reasons, Your Honor, we

6    submitted that Section VIII, and we submit again today,

7    Section VIII is fair, adequate, and reasonable and merits the

8    Court's approval today.

9           But we know that since the filing, Your Honor, as Your

10   Honor has laid out, there have been several submissions from the

11   public.  We read through all the submissions, save Ms. Raiford's

12   that was entered in Docket 455 just moments ago, although I'm

13   sure that we will hear similar statements today.  For each of

14   those documents, we assessed them and categorized them into

15   certain themes, as Your Honor's done.

16          First thing we'd like to note, an evidentiary issue, as

17   we have in past hearings, we've pointed out that in prior

18   processes before this Court, it would be error to consider of

19   record before the Court hearsay statements outside the court or

20   statements from individuals taken as, quote, testimony before the

21   Court.  They're not subject to cross-examination or evidentiary

22   rules, such as hearsay and relevance.  And simply for the sake of

23   the record, Your Honor, we'd like to preserve, as before, our

24   ongoing objection on the evidentiary basis.

25          THE COURT:  That's fine.

1          MR. GEISSLER:  Thank you, Your Honor.  That set aside,

2   let us fairly address each of those themes, and I believe that we

3   will hit each of Your Honor's three themes as well during this

4   time.

5          For the Code, Your Honor, the City Code is the City's

6   and not DOJ's.  Provided the City Code does not obstruct the

7   orderly implementation of the settlement agreement, the issue

8   before the Court today is merely the appropriateness of the

9   implementation, paragraph 195.  That does not foreclose us from

10  coming back to this Court later should there be a problem with

11  implementation.

12         The jurisdiction issue has been wrought up, and

13  specifically this is the jurisdiction of the CBPA to hear cases

14  from the community and others.  The City, and not DOJ, should

15  make representations to the Court on the planned operation of the

16  civilian oversight entity.  And any interaction with the City

17  Code, any potential expansion of CBPA jurisdiction, to our

18  understanding, is up to CBPA.  It can put forward its change to

19  city council, and city council, to our understanding, must act

20  upon that.  I would prefer, Your Honor, to leave to the City the

21  representations of how the City Charter must act to give CBPA the

22  authority to expand its jurisdiction.

23         THE COURT:  That's fine.  And I'll just state, I agree

24  with you on that point that the CBPA does appear to be the

25  primary entity that will initially recommend the expansion of its

1    jurisdiction.

2                MR. GEISSLER:  Agreed, Your Honor.  Thank you.

3                For bias, some commentators have objected to the

4    necessity that CBPA members demonstrate that they are not biased

5    for or against law enforcement.  Your Honor, this speaks to the

6    removal provision to which Your Honor pointed at 131.b.vi, and a

7    plan that, as Your Honor read, there must be an objective

8    demonstration.

9                THE COURT:  Yeah.  And, frankly, and I think that's a

10   really fair point, but what I want to know is how is that going

11   to be implemented?  First of all, I guess historically, has that

12   ever been an issue?  Has anybody been removed from one of our

13   earlier citizen panels for that basis?  But also, how is it

14   envisioned that if there's a disagreement, if someone is removed

15   and they say, "There is no objective basis that I am biased

16   against," how is that going to be resolved?

17               MR. GEISSLER:  Your Honor, directly past behavior

18   perhaps serves as the best record of future behavior.

19               To my understanding, Your Honor, and I welcome the

20   City's correction on this, no members of the CRC or the community

21   volunteers that have served on police review boards, PRBs have

22   been removed during the tenure of this case.

23               To my understanding, Your Honor, the CRC had some

24   conflicts among members of its own, but did not ultimately result

25   in the removal of any CRC members.

1          In that respect, Your Honor, the record shows that in

2    the past behavior, there's not been a removal, likely giving a

3    nod to the basis for removal going forward.

4          THE COURT:  All right.  That's helpful and that's

5    valuable, but let me ask you this:  As one of the parties to this

6    agreement, the agreement does provide, has provided, that if

7    there is an objective basis for removal, that's a legitimate

8    reason for removing.  How does the plaintiff envision that any

9    disputes would be resolved?  Would it be resolved strictly within

10    the City?  Would it be resolved by the party?  Would the Court

11    have a role in that?  What's the City's -- excuse me, the

12    plaintiff's understanding of how that specific provision would be

13    implemented?

14          MR. GEISSLER:  Your Honor, I believe there are three

15    tracks that we could follow there.  Paragraph 131, as proposed

16    right now, says the city council will make the determination.  So

17    track one is the individual member who may be removed would have

18    their hearing before city council.

19          Track two is the court monitor can observe that entire

20    process, and should do so.  That should bring sunlight and the

21    greatest disinfectant to the process to make sure that it is

22    aboveboard.

23          And track three is the plaintiff has the ability under

24    the current settlement agreement to move to enforce the

25    settlement agreement.  In that respect, there could be a notice

1    provision, followed by the opportunity to confer, and then

2    ultimately a motion to enforce.

3              THE COURT:  Understood.  Thank you.

4              MR. GEISSLER:  Your Honor, with respect to bias as

5    well, let me point out that the language of the current

6    settlement agreement also includes this same provision with

7    police review boards, as Your Honor pointed out.  And because

8    this Court has already found that language fair, adequate, and

9    reasonable, so too is the similar provision for CBPA.

10             And even if that were not the case, the "bias" language

11   is appropriate for CPBA members, because they are adjudicative.

12   They make determinations, sustained or not sustained, for

13   allegations of misconduct.

14             And the federal judges such as Your Honor are bound by

15   Judicial Canon 3 that contains similar language.  If the Canon's

16   requirements are fairly applied to judges such as Your Honor, we

17   submit, Your Honor, that similar language can be applied to these

18   adjudicative entities, such as CBPA in this case, and therefore,

19   it's fair, adequate, and reasonable.

20             As Your Honor pointed out, there was some discussion as

21   to whether or not the City was obliged to adopt a full panoply of

22   PAC recommendations, and some commenters wanted this full PAC

23   recommendation to be codified as City Code.

24             This settlement agreement envisions that the process

25   that played out here is precisely the process that was supposed

1    to take place.  The PAC would make recommendations and the city

2    council would exercise its discretion as publicly elected

3    officials, but act within the City Charter.  So long as they did

4    not conflict with the City Charter, their choice of what to pass

5    the City Code should stand.

6         From DOJ's perspective, the question is whether the

7    proposed amendments and the City Code are consistent with this

8    settlement agreement and its purposes.  And if so, if it's

9    consistent with the settlement agreement, then whether it's the

10   full panoply or some abbreviated form of it, it's rather beyond

11   our scope.

12        At this point, the Section VIII amendments establish

13   really a framework.  They are a framework for an accountability

14   system that the CBPA themselves, the civilians themselves, will

15   be able to enact their own rules and procedures to implement

16   their system.

17        Now, if those conflict with the settlement agreement in

18   this case, that's a problem.  And, again, we'd have to come back

19   to the approval process that's mentioned in Section VIII and

20   heading, which brings me to one of the other comments from the

21   public was a concern about the monitor and DOJ review of

22   policies, rules, and procedures for the CBPA.  Two commenters

23   brought that up.

24        In the past, Your Honor, again, past is prologue, COCL

25   and DOJ did review the IPR protocols and the PPB directives, and

1    where there were a conflict, and sometimes there were, and we

2    tried to reconcile those, but most importantly we needed to make

3    sure that those protocols and rules did not conflict with the

4    settlement agreement and we couldn't obstruct the operation of

5    this Court's order.

6           So that -- so far, that role has been fair, adequate,

7    and reasonable.  And so, too, must the current role mentioned in

8    Section VIII for approval of CBPA policies be also fair,

9    adequate, and reasonable.

10          And principally, Your Honor, you were concerned -- Your

11   Honor was concerned with --

12          THE COURT:  The ride-along and the Community Academy

13   requirements.  They're terrific ideas.  They should be

14   encouraged.  Should they be required?

15          MR. GEISSLER:  Should they be required.  131.a.iii is

16   the ride-alongs.  From DOJ's perspective, this requirement does

17   not conflict with the settlement agreement and, therefore, is

18   consistent.  We note that in DOJ's experience, we frequently go

19   on ride-alongs during the course of our investigations and during

20   the course of implementation, whether as monitor in this case or

21   merely as plaintiff, and that helps us gain perspective.

22          THE COURT:  Right.  I think it's a terrific idea.  I

23   encourage everyone to do it.  I just don't see why it should be a

24   requirement to be on the CBPA.

25          MR. GEISSLER:  Understood, Your Honor.  There may be

1    dispute as to that.  And, really, the City must own that

2    requirement.

3         THE COURT:  Okay.  Fair enough.

4         MR. GEISSLER:  Your Honor pointed out -- or asked are

5    there other cities that do similar things.  Albuquerque requires

6    two ride-alongs and 24 hours of training.  Cleveland recently had

7    a volunteer civilian academy that some of the members of the CBC,

8    which is their equivalent, attended.  I am not familiar --

9         THE COURT:  Required to attend or voluntarily?

10        MR. GEISSLER:  Voluntary.

11        THE COURT:  Yeah.  Not -- okay.  Not interested in

12   voluntary.  I think all of the voluntary opportunities are

13   terrific ideas.  I just want to know who else requires this to be

14   on a citizen review panel.

15        MR. GEISSLER:  Albuquerque is the short answer, but

16   more importantly, this group is different than other community

17   boards.  This group is adjudicative.  This group has, if you

18   will, skin in the game, whereas the other boards, not to say they

19   don't have skin in the game, but they don't decide the outcome of

20   internal affairs investigations.

21        The nominations, Your Honor, was one other issue

22   brought up, including by AMAC.  We agree with AMAC's proposed

23   remedy.

24        THE COURT:  Say that again.

25        MR. GEISSLER:  We agree with AMAC --

```
 1                THE COURT:  What specifically?

 2                MR. GEISSLER:  Oh.  The nominations of members to the

 3   CBPA.  AMAC suggested that the monitor observe the nomination

 4   process so that it is aboveboard and that there is not a bias in

 5   the nomination members to CBPA.

 6                The monitor has access.  There's already provision in

 7   the settlement agreement for access.  Yes, the monitor should

 8   observe that, and the monitor can report out.

 9                THE COURT:  And does that require any modifications to

10   the pending joint motion?

11                MR. GEISSLER:  It does not, Your Honor.

12                THE COURT:  Okay.

13                MR. GEISSLER:  There is not an approved monitoring plan

14   right now.

15                If I can get back to one of the very first points.

16   Even though there's not an approved monitoring plan right now, we

17   commend the City that they have given the monitor access.  The

18   monitor has been in training already, the monitor has been part

19   of the discussions on how to implement the monitoring plan, and

20   we understand going forward, the monitor will be part of the

21   policy discussions.  That's great.  The monitor already reviewed

22   a great deal of training.

23                Let me say, Your Honor, that that -- past is prologue

24   again.  If the monitor has been given access even absent a

25   monitoring plan, we expect also the monitor will have access to
```

1    the nomination process now.

2             And, Your Honor, in wrapping up, I believe that also

3    applies -- the points I've made also apply to the civilian

4    academy.  This is 131.a.iii.  You had similar concerns, Your

5    Honor.  The same argument stands.

6             Just to wrap up, Your Honor, and I appreciate Your

7    Honor's gracious giving of time here, we share a goal of trying

8    to implement an accountability system.  Accountability has been a

9    lagging indicator in compliance in this agreement.  It has been

10   an ongoing problem.  We need to implement a system.

11            This can be a great leap forward to implement a new

12   accountability system.  It will require a tremendous amount of

13   work from the civilians and the City.  Even so, that's an effort

14   that needs to be undertaken in order to reach a durable remedy in

15   this case.

16            THE COURT:  Let me ask you one more follow-up.  It

17   wasn't listed as one of my concerns, but it was listed by some of

18   the public comments:  the inability of the CBPA to appeal any

19   decisions that they don't agree with.  What's plaintiff's

20   position on that or view on that?

21            MR. GEISSLER:  To my understanding, Your Honor, one of

22   the commenters said there should be a CRC appeal preserved.  One

23   other said merely an appeal.  It didn't say to whom.

24            Your Honor, the CBPA is the adjudicative entity here.

25   They are not a civilian entity to be second-guessed by another

1    civilian entity.  They are the body to provide the option to

2    sustain or not sustain.  If an officer has a right to arbitrate

3    under their collective bargaining agreement, that is quite a sign

4    from the process to ultimately reach a finding sustained or not

5    sustained.  Let's not lose sight of the value of that, really

6    because we don't have a second CRC appeal.  That's already

7    embodied in having a civilian oversight entity.  The civilians

8    already make the determination.

9              THE COURT:  And I also think, too, that if there were

10    any people who contend that they are injured by inappropriate

11    actions by police, one avenue is through this complaint

12    procedure, but another avenue is litigation.  Am I right?

13             MR. GEISSLER:  Indeed, Your Honor.  Paragraph 133

14    requires that should such litigation end in a judgment, that the

15    judgment will then result in a new administrative investigation

16    if one has not already been initiated.

17             So our settlement agreement contemplates precisely that

18    scenario and also returns to the necessity to implement policies

19    under the administrative investigations.

20             THE COURT:  Very helpful.  Thank you.

21             MR. GEISSLER:  Thank you, Your Honor.

22             THE COURT:  Anything further from anyone for plaintiff

23    at this time?

24             MR. GEISSLER:  Nothing, Your Honor.  Thank you.

25             THE COURT:  Okay.  Thank you.

1          Look forward to comments from the City.  Ms. Brown.

2          MS. BROWN:  Good morning, Your Honor.  If it's okay,

3   I'll stay seated.

4          THE COURT:  Please.  And speak directly into the

5   microphone so the folks remotely can hear you.

6          MS. BROWN:  I will do that, and I will endeavor to

7   speak slowly.  And I'm happy to take cues from anyone if I start

8   talking fast.

9          So good morning, Your Honor, and counsel, and all the

10  members of the public, and the amici, and the monitor, and

11  everyone who's here today.  Very glad to be here today.

12         I want to start with your questions that you asked as

13  precursor before I get into Section VIII.  So on the status of

14  the rollout of body-worn cameras and protocol for viewing video,

15  body-worn cameras are predominantly rolled out at this point.

16  There are still a few specialty groups that are awaiting their

17  rollout, but all the precincts now have body cameras, and were, I

18  think, very happy to see that moving forward.  The pilot program

19  showed us some kinks that we need to work out.  I think we spoke

20  with you about that a little bit at the last -- the last time we

21  were here, and we worked those out.  And so now we're just kind

22  of in the beginning of rolling it back out.  We started in June

23  with Central Precinct, which had already been through the pilot

24  program, and then went through the other two precincts.  And as I

25  said, we'll get them out to the rest of the folks, I think, by

1    the end of September at the latest is the plan.

2            And the protocol for viewing video, that remains the

3    same as when we spoke to the Court about it.  So just briefly to

4    go over again the review by members of video is that when there

5    is force for a Category 1, which is use of deadly force or an

6    in-custody death, that the officer is interviewed, as the DOJ

7    noted, within 48 hours.  And the initial interview, there's a

8    requirement that the officer give a narrative perceptual

9    statement.  And we have a number of things, basically a who,

10    what, when, where, how, why that they address, giving an overview

11    of what happened.  Then the -- the investigator and the involved

12    officer go into separate rooms and watch the video.  They can

13    have -- we agree that this will occur within a reasonable time,

14    not hours and days, so that we can complete the interview.  And

15    then they come back together, and at that point the officer can

16    make any clarifications or comments that may have been raised by

17    watching the video.  And then at that point, the investigator has

18    a much broader range of questions that they go into, sort of more

19    in depth follow-up, if you will.

20            For the Category 2, which is serious physical injury

21    and also some other types of force, such as use of a taser on

22    somebody with a mental illness and similar types of categories of

23    incidents, for those, the officer will make an initial full and

24    candid account that will be recorded on the body camera by the

25    sergeant who's doing the after-action process.  And that's unseen

 1    that that occurs.  After that, similar to the Category 1, the

 2    officer goes and reviews their footage.  They then write their

 3    report.  And in their report, they can explain if there's any

 4    corrections or further memory that they have from having watched

 5    the body camera footage.

 6              For Categories 3 and 4, they give the initial

 7    statement, which is not recorded, and then they watch their body

 8    camera.

 9              I will note that the City of Portland's member review

10    process has been nationally discussed by PERF on a couple of

11    occasions, and sort of as a forerunner in that approach to member

12    review.  So it's a -- it's a more limited approach than most

13    jurisdictions use by requiring a statement prior to reviewing the

14    footage.

15              Did I address everything that you want to know about

16    body cameras and should -- okay.

17              For the status of Portland Street Response, the funding

18    has continued into this year at the same rate as last year, so

19    that was great.  The City was able to put that funding directly

20    for that.  The hours of operation at this point still remain the

21    same, but the City did move from -- the Portland Street Response

22    was in the fire bureau, and it has now moved over to Community

23    Safety Division.  Community Safety Division works with all of our

24    public safety bureaus, so the 911 bureau, our emergency

25    management bureau, and police and fire.  So Portland Street

1    Response is off in this separate division, and that division

2    works directly also with our new deputy city administrator, who

3    oversees all public safety.  So those are the big steps right

4    now, though the City continues to seek external funding for

5    Portland Street Response and looking at -- and standing up

6    policies and procedures and training, and also looking at

7    expansion, but we have been filling positions and keep -- keep

8    moving that forward.

9         As you noted, our newly appointed monitors have been

10   hard at work.  We gave them quite the task of having to give us a

11   draft plan within 30 days and get responses quickly.  I think

12   everybody's interested in moving forward with a plan.  And we

13   continue, though -- during that time, the monitor is continuing

14   the monitoring process, and I say "continuing" as in taking over

15   from COCL, who could -- who did their work through the end of

16   their service, which was June 30th.  Excuse me, July 31st.  They

17   went through the end of July to overlap with the monitor.  And I

18   know they met several times with the monitor and their team to

19   share information, and I'm sure knowing Tom Christoff, he's

20   available for questions to Mr. Smith and his folks at any time.

21        So the monitors review policies and training and come

22   to watch training and, as he said, engaged -- their teams engaged

23   with community members and with police and the City doing a lot

24   of great work, and we're real excited to have them along.

25             And then the guidance on how to anticipate the upcoming

1    changes to city government.  As far as how it will affect the

2    settlement agreement, I agree with the United States.  The terms

3    are terms that we agreed to and that the City is bound by.

4    Procedurally, though, it will be a different process, Your Honor.

5         THE COURT:  That's okay.  I'll ask you more about that

6    next spring.

7         MS. BROWN:  Okay.  Thank you, because we are -- yeah,

8    we're figuring it out.  Right now we are in --

9         THE COURT:  That's fine.

10        MS. BROWN:  -- a test period of trying to understand

11   how -- so the mayor had to call the bureaus under him and

12   appointed an interim city manager.  We're just trying to get used

13   to that, because it's very different.

14        THE COURT:  We'll talk about that next spring.

15        MS. BROWN:  That sounds great.

16        Now on to Section VIII, Your Honor.  I think in looking

17   over Section VIII, the -- I feel like for the City and in working

18   with the DOJ on this, that we really worked to maintain the

19   fundamental principles and core standards that we'd established

20   in the settlement agreement.

21        So kind of walking through how we got here, and if

22   you'll remember in November of 2020, of course, the voters

23   approved an amendment to our City Charter that established the

24   Community Police Oversight Board.

25        And just for folks -- I know Your Honor understands

1   this, but just for other folks, the charter of the city is its

2   constitution, and so it's usually very broad language that is

3   overarching and doesn't have a lot of detail, and so it just says

4   high level what are we doing.  And so this created in this

5   instance the oversight board and required certain things of the

6   oversight board that folks, I think, are pretty familiar with.

7           On July 19th of 2021, city council adopted a resolution

8   that created a commission to write rules, definitions,

9   procedures, and other necessary details for recommendation to

10  council for the new police oversight system, and thereafter, the

11  council appointed a 20-member commission that was tasked with

12  making those recommendations.

13          Thereafter, in April of 2022, we came to Your Honor

14  with amendments to the settlement agreement, and those were the

15  section 10 amendments that -- wherein we adopted paragraph 195

16  that you're familiar with.  And we sort of incorporated some work

17  the City had already done, because we already had the amendments

18  to charter, we had already -- the City had already, you know,

19  tasked the Police Accountability Commission with coming up with

20  rules, et cetera.  And then we started the process of appointing

21  those members, and they started their work in December of 2022.

22          They then worked for 20 months.  In the settlement

23  agreement, we had allowed for 18 months.  Excuse me.  I'm sorry.

24  They were seated prior to our hearing, and so because the

25  settlement agreement said they had 18 months, but because we had

1    seated them prior to that time, we were able to give them

2    20 months, but we were interested in getting their

3    recommendations early enough so that council could consider those

4    and vote on a package prior to the end of the year and people

5    going on vacation.

6              So in August, the Police Accountability Commission came

7    forward with recommendations.  They were about 96 pages.  It was

8    quite voluminous and with a lot of good information.  And the

9    City took those and put together a package of approximately

10   27 pages.  It's kind of increased and decreased over the months,

11   because we've had a lot of feedback from the DOJ, from bargaining

12   with the unions, from meeting with community members, and we've

13   had a number of those meetings, two town halls, and several other

14   engagements with folks to hear their questions, concerns.

15             We each -- as we made changes, we posted those so that

16   folks can provide feedback to us on them, and then -- and tried

17   to hold town halls thereafter.

18             So sort of -- you know, for the -- for implementing the

19   City's new charter language, we in our -- in paragraph 195, we

20   said we would come to you with changes to be consistent with the

21   requirements of this agreement.

22             So I kind of wanted to, if its okay with you, if I go

23   through just briefly for anybody who's not familiar just

24   paragraph by paragraph, it's very quick, to have an understanding

25   of what did we do.

1              THE COURT:  Briefly.

2              MS. BROWN:  Thank you.  The lead-in paragraph basically

3    retains the current provision, but -- the premise of the

4    provision, but it strengthens the community input into our

5    accountability process.  It provides for this oversight system

6    that, as the -- as the United States commented on, not only are

7    they now a recommendation -- a board that -- or a commission that

8    recommends what a finding should be based on the facts, but also

9    then they -- they actually decide what -- what occurred, what are

10   the facts, they apply the PPB directives to those facts, the law,

11   in other words, and then they decide whether or not there's a

12   violation of policy.

13             If they find a violation of policy, they use a

14   corrective action guide, just like we always do, and determine

15   what's the appropriate level of discipline, and they impose that

16   discipline.

17             So in that lead-in paragraph, as I noted, we describe

18   the oversight system.  We did maintain our -- we did say we would

19   maintain our current system of IA and the Independent Police

20   Review and the Citizen Review Committee to finish out cases that

21   they had started.  So we'll have this swapping of cases as they

22   go along.

23             THE COURT:  There will be a transition period.

24             MS. BROWN:  Yes.  Thank you.

25             And then lastly, we added in, as was noted, the monitor

1    and DOJ review of oversight systems, new or revised rules,

2    policies and procedures regarding systems of officer

3    accountability.

4            Paragraph 121, we maintain the 180-day timeline.

5            Paragraph 122, we basically name the existing

6    structure, which talks about concurrently having -- if there's a

7    criminal investigation going on against a police officer, we will

8    also have the administrative investigation.  In there, there's

9    also discussion about tolling of the 180-day timeline, which is

10    required.  And we -- we sort of gave a little more specification

11    to when tolling occurs just based on our experiences.

12            123, 124, no change except just add the old system to

13    the process.

14            125, 126, 127, no change at all.

15            128 maintains no redundancies between the community-led

16    system and Internal Affairs.  And we reflected now it's an

17    oversight system.

18            Paragraph 129 does have a change from Internal Affairs

19    investigating force investigations, because this is now in the

20    hands of the oversight system.  So force investigations will go

21    to the oversight system, but it maintains a requirement for full

22    and complete investigations.  And we talked a little bit about

23    administrative closure, again, just giving a little more detail

24    for that so everybody's clear on when that occurs.

25            Paragraph 130 is terminated.

```
 1              Paragraph 131 --
 2         THE COURT:  And that's the key.  131's the key.
 3         MS. BROWN:  131.  Yes.
 4              Just so you know, 132, 133, the rest of those really
 5    are minor changes just to put the oversight system in.  Many of
 6    them are terminated.
 7              So I want to address ride-along and bias.  For
 8    ride-alongs, as you noted, these are an existing requirement for
 9    community members on the Citizen Review Committee.  And as the
10    United States noticed, this is a committee that provides
11    recommendations only to the chief of police.  They are not
12    decision-makers.  And we've had that requirement for them.  And I
13    think that's an important distinction between the CRC that exists
14    today and the oversight system that will be coming on.
15              I would note that ride-alongs are a recommendation by
16    NACOLE as a best practice.
17         THE COURT:  I agree it's a best practice.  What I'm
18    struggling to understand is why it is a requirement of
19    membership.
20         MS. BROWN:  Your Honor, I will note we heard from some
21    people that they will find this ride-along traumatic and that
22    there are community members that will not apply to the board
23    because of this.
24              And we really considered our interest in having board
25    members with some exposure to the work of police and the
```

1    circumstances that police encounter, and we considered that

2    against that trauma for some people in making this decision.

3          We -- part of what we thought about in this was the

4    fact that board members will need to be able to watch hundreds of

5    hours, over the course of their service, of body-worn camera

6    footage, and there is going to be some disturbing and upsetting

7    content within that, and folks need to be able to watch that body

8    camera footage in order to perform this work.

9          Additionally, we thought about the fact that board

10   members will be meeting with police officers.  Part of what this

11   board is doing, because they're decision-makers, police officers

12   are entitled to a due process meeting, and we included that in

13   that -- in this process.

14         So the way that discipline works, there is a proposed

15   discipline that occurs.  If there's a finding that the conduct is

16   sustained violation of policy, then the proposed discipline comes

17   out.  And after that discipline is proposed, the board, the

18   decision-makers, must meet with the police officer.  This is a

19   due process requirement.  And it is going to be a meeting with --

20   almost always it's with the union and -- and the officer.  And

21   this is required that -- under Weingarten that the union member

22   has a right to be there with their member and the member has a

23   right to be there with their union.  And so they are going to sit

24   with police officers and they need to be able to do that.

25         This job of sitting on this board will expose members

 1    to a lot of police officers.  And after a really great deal of

 2    consideration and discussion back and forth on this, we

 3    ultimately decided to retain it, because we need board members

 4    who really understand the work that they're going to evaluate,

 5    and they're going to hold people accountable to that -- to that

 6    work, fitting the standards that we require.

 7         So I think, you know, at the end of the day with all

 8    those, we -- that -- that's why we landed on we felt this was

 9    important for people to have that understanding given -- given

10    the responsibility that they're taking on of decision-makers in

11    discipline.

12         THE COURT:  Let me ask you a follow-up question.  And

13    really I've got two follow-up questions, and the second may also

14    involve Chief Day --

15         MS. BROWN:  Okay.

16         THE COURT:  -- at least his input.

17         On the first one, have there been -- because we've had

18    this requirement for a while.  Have there been any instances

19    where folks have said, "I would like to be on this committee" --

20    the previous committee, previous iteration -- "but I simply --

21    it's too traumatic for me to do a ride-along, therefore, I'm not

22    applying"?  Is the City aware of any of those folks?

23         MS. BROWN:  I'm not aware, Your Honor.  We will -- we

24    will message some folks right now and we'll try to get an answer

25    back from people who maybe would know more, but off the top --

```
 1                THE COURT:  Okay.

 2                MS. BROWN:  I am not aware of anybody who's come to the

 3    City and said, "Hey, would you give us -- I'd like to be on the

 4    Citizen Review Committee, but you require a ride-along.  If you

 5    would waive that for me, then I would like to be on it."  I don't

 6    know of anybody.

 7                THE COURT:  Fair enough.  Now let me ask you a question

 8    that I'm just thinking about.  I don't know where to go with

 9    this.  I really understand the concerns that have been expressed

10    that it's important to have some people on that committee even if

11    they would be uncomfortable in a ride-along.  I totally

12    understand why it's a good idea to be on a ride-along.  I'm

13    beginning to understand why you're requiring it.

14                And the compromise that I'm thinking about, assuming it

15    doesn't get to be too great of a number, is if there are members

16    of our community who want to be on this committee who are

17    otherwise qualified to be on this committee and otherwise willing

18    to undertake its obligations and responsibilities but just don't

19    feel comfortable in a ride-along, I think a reasonable compromise

20    is for me to offer myself to accompany them on the ride-along.

21    Now, as long -- I don't want -- this is not going to turn into

22    hundreds, but if there's a few people that really want to be on

23    the committee, are otherwise qualified, as I said, but just have

24    some concerns based on previous experiences and don't want to

25    just be by themselves with sworn officers in a car, I think I
```

1    will offer myself to accompany them so that the ride-along

2    participant would have two people riding along, me and that

3    prospective committee member.

4              I'd like both your response to that idea.  I'm not

5    committing to that yet, I'm thinking about it, and I'd like the

6    expertise of Chief Day, what he thinks of that idea.  I think

7    it's a good idea.  I've done ride-alongs before in other

8    jurisdictions.  I think this might be a fair compromise.  What do

9    you think?

10             MS. BROWN:  Your Honor, if I could, because the chief

11   will know more about our requirements --

12             THE COURT:  Fine.  He can go first.

13             MS. BROWN:  -- of our ride-alongs and, you know, just

14   how many people are normally in the car, so if I could defer to

15   the chief.

16             THE COURT:  Yeah.

17             MS. BROWN:  Thank you.  And he's going to address the

18   Court, too, but --

19             CHIEF DAY:  Good morning, Your Honor.

20             THE COURT:  Good morning, Chief.  Good to see you.

21             CHIEF DAY:  As I was sitting there and hearing your

22   original concern about the requirement, I was actually trying to

23   think through how could we add a person, a comfort, you know,

24   perspective, whether that be one of our, you know, BHU members,

25   maybe one of our service providers particularly we have a lot of

 1   relations with or, you know, even bring a buddy, right, even if
 2   the person is not necessarily --
 3            THE COURT:  Bring a judge.
 4            CHIEF DAY:  Right.  Bring a judge.  So that's
 5   absolutely achievable.
 6            THE COURT:  Okay.
 7            CHIEF DAY:  You know, we would obviously, you know, be
 8   specific on the type of vehicle, because we're not going to have
 9   you ride in the back there with a cage or whatever it might be,
10   but that's absolutely reasonable.  We've done that before.  I
11   welcome it.  I'm encouraged by your offer and I think it would be
12   a tremendous opportunity, not only for the prospective member,
13   but also for the police bureau member to be able to have an
14   opportunity to be exposed to, you know, this conversation and
15   experience and feedback.
16            We welcome that as -- you know, ride-alongs, we promote
17   them, we encourage them, and have found that police work is such
18   a dynamic, complex work.  The vast majority of complaints that
19   this board is going to see and hear are going to come from patrol
20   and, therefore, really the only way to fully understand that
21   experience is to spend a little bit of time in that seat to be
22   able to see and hear that perspective.  So I'm a big proponent of
23   it, but certainly we could make it work.
24            THE COURT:  Very good.  And, yeah, I think this may be
25   the right solution to this problem.

1          By the way, as long as you're here, what about the

2    Community Academy is traumatic, and are there ways that might --

3    potentially traumatic, and are there ways to deal with that?  For

4    example, I know that in some academies, community academies, the

5    participants are invited to engage in a weapon video experience.

6    I assume that wouldn't have to be required if someone didn't want

7    to handle a weapon.  Am I correct?

8          CHIEF DAY:  Yeah.  We can certainly make adjustments.

9    The primary goal of the Community Academy is to provide some

10   scenario-based training.  This is a model that's -- you know,

11   it's a system with adult learning.  It's a model that we've

12   adopted organizationally now for a number of years.  And that's

13   where I see the benefit of the Community Academy.

14          I don't see the need to, you know, require the firing

15   of a firearm, other issues that may be traumatic, but to be able

16   to create scenarios and opportunities for the members to be able

17   to interact and then debrief and discuss, you know, what came up

18   for them.

19          Having participated and led numerous of these community

20   academies with a variety of diversity of folks, I have always

21   found at the end of the day, learning and awareness occurs on all

22   parties.  So I really believe that, you know, we can be sensitive

23   to the needs, and we can look and structure something that would

24   meet the goals and intentions of the police bureau, but also try

25   to find a way to manage those concerns and expectations.

1          THE COURT:  Thank you.  By the way, as long as you have

2    the floor and the microphone, anything else you'd like to add

3    this morning?

4          CHIEF DAY:  I always have a couple things.  I have a

5    note here if you want me to --

6          THE COURT:  Sure.  Do you want me to go after

7    Ms. Brown?

8          MS. BROWN:  If we could have the chief go after, and

9    then it'll --

10          THE COURT:  Fine.

11          MS. BROWN:  I was just going to finish on bias.

12          THE COURT:  That's fine.  I'll call on you next, Chief,

13    but thank you.  And thank you for the other comments.  I think

14    that may be the path to the solution.  Before making a final

15    decision, I want to hear both from our amici and also from the

16    public, but I think that may be a path to the solution.  With

17    that said, I'm not going to volunteer myself for a thousand

18    ride-alongs.

19          Ms. Brown.

20          MS. BROWN:  Thank you, Your Honor.  And I appreciate

21    your creative solution, thinking -- we were sort of trying to

22    brainstorm other ways, too, and if somebody might feel more

23    comfortable with going on a ride-along with, say, a BHU officer,

24    a Behavioral Health Unit officer, you know, that's another

25    option.

1          THE COURT:  That's fine, too, because I'm intimidating,

2     too, at times.

3          MS. BROWN:  Appreciate that.  It's a big deal.

4          So I do want to also address the other question you had

5     about bias.  And I would note that currently we have two

6     references to bias in paragraph 131.  We have the reference on

7     the Police Review Board.  The Police Review Board is made up, and

8     I do want folks to really understand this, current makeup is

9     police members and one community member for most cases.

10          When there's a force case, an allegation of force or

11    deadly force or in-custody death, it requires two community

12    members, and one of those two is from the Citizen Review

13    Committee.  And we recently also made a change to Code, after

14    talking to the United States, that because we had some issues

15    with filling the community member seat for the Police Review

16    Board for a short period of time, we now allow two community

17    Citizen Review Committee members if there's not a Police Review

18    Board community member available.  So we have had one or two

19    force cases where we had two CRC members rather than one CRC and

20    one Police Review Board.

21          For those Police Review Board members, they are

22    required to make thoughtful, unbiased, objective recommendations,

23    current language, as you noted.  And then as you noted, we also

24    have the removal for Citizen Review Committee for objective

25    demonstration of bias for or against the police.

1          THE COURT:  And has that occurred yet in the last

2    12 years?

3          MS. BROWN:  I did -- well, I did ask your first

4    question whether -- whether anyone's asked to waive the

5    ride-along.  And our independent police review director, Ross

6    Caldwell, messaged us back that in the five years he's been

7    serving in that role, there has never been that request.

8          THE COURT:  Okay.

9          MS. BROWN:  As for bias -- as for bias, I'm not aware

10   of that ever occurring, but I will say this.  We have had members

11   of boards and commissions of the city, not necessarily the

12   Citizen Review Commission and not necessarily on Police Review

13   Board, but just generally speaking where they've engaged in

14   conduct that's raised concerns for us.  Generally the way that

15   we've -- in my tenure with the City and those situations when

16   I've been involved in these, sometimes there's a concern about

17   harassment or discrimination by a board member.  Generally we've

18   been able to sit down with a board member, let them know these

19   concerns have been raised, let them know what we've learned in

20   our process of investigating it, and they have historically

21   recused themselves from the board.

22          And so while we have not had, you know, a removal for

23   the bias that we're talking about, I did want you to know that

24   there have been times where we've requested people to -- or at

25   least let them know that we would move to remove them if

1    necessary.

2         THE COURT:  Sure.  Let me ask you this, because I think

3    Mr. Geissler's comments went a long way towards resolving my

4    concerns, so let me just ask you to confirm.  First of all, if

5    there is -- if there ever does arise in the future an issue where

6    the City is thinking about or wants to remove someone for what

7    the City contends is an objective demonstration of bias, any

8    objection to the independent monitor fully reviewing or at least

9    observing that entire process?

10        MS. BROWN:  No, Your Honor.  I think if it's -- if it's

11   in the settlement agreement that the CRC -- or excuse me,

12   oversight system, it was CRC, that the oversight system members

13   can be removed for an objective demonstration of bias for or

14   against police, I really -- I do want to touch on that.

15        THE COURT:  I know.

16        MS. BROWN:  We need people who are not only unbiased

17   against police, we need people who are also unbiased for police.

18   You know, I have seen people who have a hard time with

19   accountability.  We have managers and supervisors who don't want

20   to hold their staff responsible for policy violations.  That is

21   to the detriment of the city, it is to the detriment of their

22   co-workers who have to continue to work with them.  And I have

23   never seen the chief or prior chiefs -- certainly they don't

24   enjoy having to hold people accountable, but they find that

25   extremely important.  It's critical.

```
 1              THE COURT:  It's part of the responsibility.  It's part
 2    of the job.
 3              MS. BROWN:  It is.  And so we're not saying an
 4    objective demonstration just against police --
 5              THE COURT:  No, I get it.
 6              MS. BROWN:  -- by any means.  And I don't want either
 7    side on our board.
 8              THE COURT:  Fair point.  If there's any process that
 9    begins where the City is looking to remove someone for an
10    objective demonstration of bias for or against, so the City has
11    no objection to the independent monitor observing all of that
12    and, as appropriate, reporting to the Court?
13              MS. BROWN:  Not at all, Your Honor.  I mean, under the
14    settlement agreement, the monitor has direct access to the City
15    and City employees, but also I think having them observe that and
16    provide their feedback, we appreciate that.  They've given good
17    feedback so far, and I'm sure they'll continue to do that.
18              THE COURT:  Let me follow up with Mr. Smith.  I have
19    one more question for you on this topic.  So this might be
20    something you want to build into your plan.
21              MR. SMITH:  Understood.
22              THE COURT:  Then with respect to Mr. Geissler's third
23    point, does the City agree -- I want to get this on the record,
24    because I think he's right.  Does the City agree that if the City
25    were to remove someone without an objective demonstration of bias
```

1    for or against, assuming I approve these proposed amendments,

2    that would appear to be at least a prima facie or putative

3    violation of the agreement for which the United States as

4    plaintiff could move to enforce the agreement through the

5    appropriate enforcement mechanisms?  That sounds right to me.

6    Does the City agree?

7              MS. BROWN:  Judge, I want to clarify.  There are a

8    number of reasons people can be removed from the oversight

9    system.  So assuming our sole basis was the objective

10   demonstration of bias for or against police and that's why we

11   were doing it, then I agree, it's in the settlement agreement.

12   And if they felt that we violated the settlement agreement, there

13   is a whole process for the United States to bring the City

14   through the breach process.

15             Just one more thing, Your Honor, that I think would be

16   helpful for you to know and for community members to know is

17   there has been reference to the case in Colorado where they had

18   "bias" language, but I want you to understand that the -- or just

19   starting -- not understand, but be aware of the differences

20   between their language and our language.  Their language was, "an

21   absence of any real or perceived bias, prejudice, or conflict of

22   interest."

23             THE COURT:  Yeah.  I saw that.

24             MS. BROWN:  We do not have that.  We have, "an

25   objective demonstration of bias."  So I just -- I do want to say

1   those are quite different.

2          THE COURT:  I agree.  The requirement of an objective

3   demonstration of bias, I think, gives adequate review, including

4   if the plaintiff were to contend that there's a violation because

5   there's no objective demonstration of bias and there's a motion

6   the Court could review that after taking appropriate evidence.

7   It's a very different problem when one of the criteria for

8   removal is a perceived demonstration of bias.

9          MS. BROWN:  I agree, Your Honor.

10         THE COURT:  Okay.

11         MS. BROWN:  Yeah.  Your Honor, with that, if I could

12   turn it over --

13         THE COURT:  Excellent.

14         MS. BROWN:  -- to Chief Day for his comments and give

15   you a little overview of how the bureau's doing, along with his

16   comments at this time.

17         THE COURT:  Thank you, Ms. Brown.

18         MS. BROWN:  Thank you so much.

19         THE COURT:  And good morning again, Chief Day, and I

20   look forward to your comments.

21         CHIEF DAY:  Thank you.  Good morning, Your Honor.  So

22   just a quick update on a few things with the police bureau.

23   It'll be a year next month and about three weeks that I was

24   appointed.  So grateful for the opportunity.

25             I've established three primary goals:  the first goal

1   being that we transform the dynamic between the police and the

2   people we serve; the second one being that we reduce crime and

3   the fear of crime; and the third one that we focus on

4   organizational growth and development.

5        I just want to give you a quick overview on how I see

6   those progressing, and areas of learning.  You know, primarily

7   transforming the dynamic between the police and the people we

8   serve, I emphasize to the organization almost daily that we are

9   one bureau, one city, that we are the community.  I do not adhere

10  to the belief that it's the police in the community.  I believe

11  we are the community and our actions have impact, our actions

12  have influence to the direction of the community.

13       So I'm pleased to say that for the first half of 2024

14  compared to the first half of 2023, community engagement is

15  significantly increased.  Numbers don't always tell the whole

16  story accurate, so I want to be totally transparent.  If I did

17  percentages, I can tell you we've seen a 500 percent increase in

18  recorded community engagement events since the spring of last

19  year.  In reality, that translates to about two a day.  We're

20  doing a better job of tracking, we're doing a better job of

21  recognizing that work, and we're still far below, almost

22  70 percent below, where we were in 2019.

23       So we have a lot of work to do, but I'm encouraged at

24  the numbers that I'm seeing.  I'm seeing more officers and more

25  members of the organization engaging with the community.  For

1    example, I participated in the Soul Stroll on Saturday.  Various

2    ways to get out and do outreach.  So it's an emphasis of mine.

3    Long ways to go, but we are responding, and our numbers represent

4    that and involvement in the community, I believe, represents

5    that.

6            You mentioned about the body-worn camera rollout.  I do

7    believe that has to do with community trust building and

8    relationships.  And it has been very well received by the

9    membership.  And as Ms. Brown noted, we have all the precincts

10   currently up and running.  I know it's on my calendar the next

11   couple weeks, I'm probably last one to get one, but I know that

12   the organization's grateful to have that.

13           And I'm grateful for the fact that we have several

14   agencies around the country to look at and learn from.  And as

15   Ms. Brown noted, our policy has been requested by numerous

16   agencies and has been recognized by the Police Executive Research

17   Forum, particularly in the area of lethal force review, as a

18   national example of good policing.

19           Regarding crime and reducing the fear of crime, we

20   continue to see a decrease in reported crime.  Violent crime is

21   down in many areas.  We still see too many loss of lives.  Our

22   homicide numbers are slightly below where they were this time

23   last year, but our injury shootings are down significantly.  We

24   see a reduction in, you know, many areas of reported crime, and

25   I'm encouraged by that.

1          But going back to goal number one, really my passion is

2     around reducing the fear of crime.  And just to use the Soul

3     Stroll event from Saturday at Dawson Park, you know, not lost on

4     me a month ago, 60, 70 rounds fired at Dawson Park, a real scary

5     event.  Unfortunately, some of our community members were struck

6     in that event, but to be there on Saturday with several hundred

7     community members participating in a 5K through the Boise-Eliot

8     neighborhood and to come back and be part of that celebration

9     really contributes to my desire and our desire to see a reduction

10    in the fear of crime and our ability to be in a community in safe

11    places and enjoy one another in those experiences.

12          And finally in the area of organizational growth and

13    development, I continue to be encouraged by our recruitment.  Our

14    applications are up, our hiring is up.  We're seeing an increased

15    amount of interest in those wanting to come back to the Portland

16    Police Bureau.  In 2023, we hired 61 folks.  As of today, we've

17    hired 51, and I know we have a couple hiring ceremonies

18    scheduled, so I believe we'll exceed that number this year.

19    Still looking at some retirements in the month of November

20    anticipated, but we're seeing people stick around longer, we're

21    seeing officers that may want to return, and we're also seeing

22    lateral transfers, all of which I believe are an indication of

23    increased confidence in the organization and a desire to be a

24    part of it.

25          So in regards to today's proposal, I'm obviously in

1    favor of it here on behalf of the City and on behalf of the
2    police bureau.  I think we've touched on several of my comments
3    and it's already been affirmed, but I will tell you, as chief of
4    police, this move towards the removal of the participation of the
5    chief of police in some of the discipline process is very
6    significant.
7            I take great pride in my role in trying to look and
8    make sure that I'm being consistent and fair and equitable in all
9    of my decisions around the discipline process.  It certainly
10   causes a great deal of angst within the organization, discipline
11   in any situation, whether it be law enforcement or otherwise.  So
12   I really know that the membership looks closely for how the final
13   decisions are made.  And to ensure that there's a level of
14   transparency and legitimacy, it is paramount, because I know as
15   the chief I'm not going to be able to change the organization
16   just by disciplining people.  That's not going to be effective.
17   And neither is an outside agency going to be able to make that
18   change.  Change that I believe the community and all of us are
19   striving for has to be done in concert with one another.
20           And this is why I'm also a proponent of the ride-alongs
21   and the Community Academy, because it really is some of the only
22   ways to get that holistic view.  And to be reviewing these cases
23   based upon what you read on a piece of paper around the policy or
24   an allegation without having that experience, I think, is a
25   missing link, so I will continue to be an advocate for that.

1              As well as, you know, one of my concerns that I read,

2     and I have seen several of the comments that were sent forward to

3     you as well and have had conversations with the community, the

4     desire or maybe the intent, I don't know what it might be, to

5     really keep sort of police out of this process in terms of

6     recommendations for board member positions or to have influence,

7     to have -- to try and create a board that's going to be in charge

8     of police accountability without having a greater involvement of

9     the police bureau, I think, is a -- is a missed opportunity for

10    that.

11             THE COURT:  I agree with you on that.  I really think

12    it's important to have input really from all affected

13    stakeholders.  So I support having a few members -- a few sworn

14    officers have the opportunity to make selections and

15    recommendations, but that's why I also want to make sure we don't

16    exclude some people who might otherwise from their past

17    experiences have reluctance to participate in a ride-along.  I

18    think we need input from everyone in this community.  So I agree

19    with you, we are one community.

20             CHIEF DAY:  Yeah.  Absolutely.  You know, and I was

21    reminded of this just this past month.  I had an opportunity to

22    get away for a couple of weeks.  I'm an avid reader, I love to

23    read about history, and I finished, "King:  A Life" by Jonathan

24    Eig, and then that led me also --

25             THE COURT:  That's a big, thick book.

 1          CHIEF DAY:  It is a big, thick book, Your Honor, but I

 2     had a lot of time to read there on vacation.  And then I also

 3     read Dr. King's book written in 1967, "Where do we go from here:

 4     Chaos or Community?", which was cited in Eig's book, and that's

 5     what drew me to that.

 6          And I was struck by something that I think is

 7     applicable to this conversation as a whole as we're trying to

 8     find a way to bring these many competing views to bear into one

 9     example.  And I'll be brief, and then finish with this story that

10     struck me, but you may be aware, Your Honor, of James Meredith,

11     and he was the first African-American to be admitted to the

12     University of Mississippi.  Several years later, he decided to do

13     what he called the Walk of Fear, where he was going to leave

14     Memphis and walk to Jackson.  And on the second day, he was shot

15     by a white person there just outside Memphis.

16          And so King and several others went to the area to sort

17     of revive the march, and yet there was, you know, many competing

18     views at this point around King's approach to non-violence and to

19     participation with white Americans that wanted to be part of the

20     civil rights movement.  And as they're walking, King is listening

21     to this, and one of his comments that struck me is he says,

22     "Their comments fell on my ears like music from a foreign land."

23     He was wrestling with this dissonance among his peers and

24     colleagues who were equally as committed to the civil rights

25     movement as his.

1       And I feel a little bit of that when I hear, you know,

2  folks saying, "Hey, you know, we can't go on a ride-along,"

3  things to me, I can't fathom that.  I've been in thousands of

4  police cars.  But I want to understand that, I want to be

5  sensitive to that.  I want to -- you know, and I just admire how

6  King wrestled with all of this.

7       The final quote, though, that really sort of gave me

8  pause, that has given me time to reflect, that I think is

9  relevant is he said as he's listening, he says, "You know, I

10  should have been reminded that disappointment produces despair

11  and despair produces bitterness, and that the one thing that's

12  certain about bitterness is its blindness, and bitterness has not

13  the capacity to make the distinction between some and all.  And

14  when some members of the dominant group, particularly those in

15  power, are racist in attitude and practice, bitterness accuses

16  the whole group."

17       And I realize that, you know, there's not a necessarily

18  an apples-to-apples comparison to that time and the conversation

19  today, but I just want us to really emphasize, and I think, Your

20  Honor, you've done this every time I've been in your courtroom,

21  which is why it resonates with me, that, you know, we cannot

22  accuse the whole group.  We cannot be dismissive of any one

23  particular point of view, because it may be what is represented

24  in some aspects of that group.

25       And so I believe that we can find a way to bring this

1     accountability commission to fruition, but it will require a

2     robust participation by PPB in the process.  And I welcome

3     solutions like you've already offered today, and I believe there

4     are others available, despite the history of policing, both in

5     this city and in this country, which certainly has room for

6     criticism.  And I heard Mr. Geissler's comments around

7     accountability and the frustration of the DOJ around that and its

8     time with us, and I'm committed to continuing to move us forward

9     in that area, but I deeply desire to continue to do it together.

10    Thank you, Your Honor.

11              THE COURT:  Thank you for those very wise and

12    compassionate words, Chief Day.  I agree with everything you've

13    just said.

14              CHIEF DAY:  Thank you.

15              THE COURT:  Thank you for your continued service, and

16    it's great seeing you again.

17              CHIEF DAY:  Good to see you.  Thank you, sir.

18              THE COURT:  Anything further, Ms. Brown?

19              MS. BROWN:  No, Your Honor.  Thank you.

20              THE COURT:  All right.  I invite comments from counsel

21    for the Portland Police Association.

22              MR. KARIA:  Thank you, Your Honor.  I apologize, if I

23    speak too quickly, to the court reporter.

24              THE COURT:  So far you're perfect.

25              MR. KARIA:  I'm trying very hard.  I'm leaning in to

1    slow talking.

2              No objection from the Portland Police Association with

3    regard to the entry of the settlement agreements that are before

4    you today.  I wanted to get that on the record.

5              Nothing to add to the four broader issues that

6    Ms. Brown did a nice job comprehensively updating and Chief Day

7    did a nice job comprehensively updating the Court on.

8              With respect to the three specific issues that Your

9    Honor brought up with regard to paragraph 131, two words came to

10   my mind through the course of the discussion this morning:

11   context and fairness.

12             With respect to context, I was reminded of the Ninth

13   Circuit's overall instruction to courts when reviewing settlement

14   agreements for fairness, adequacy, and reasonableness, which is

15   we don't peel apart provisions, we look at the agreement as a

16   whole.  And I can't remember if it was this Court or perhaps

17   another court that I am borrowing this line from, but we don't

18   take a red pen to the settlement agreement, but we look at the

19   overall four corners of the agreement.

20             And with respect to fairness, I think no better example

21   of the importance of fairness in all of the systems, at least in

22   this context, comes at the preface or the lead-in to

23   Section VIII, where the settlement agreement itself mentions no

24   fewer than three times in one sentence the importance of a fair

25   accountability system.  And the reason why those words, I think,

1    are important is when we look at the requirements of the
2    ride-along and the Community Academy, those come in a list of
3    requirements.  And Chief Day mentioned this concept of one
4    community, one bureau.  Those requirements require two sides of a
5    proverbial coin, they be addressed, right, the experiences of the
6    community in police interactions and the experiences of the
7    officers in those same interactions.

8            And so, you know, the exercise of taking what is
9    currently a requirement and making them a discretionary option,
10   if you will, right, so instead of requiring a ride-along, I think
11   invites a dangerous slippery slope, because just as much as the
12   parties would want to prohibit somebody serving on the board who
13   is unwilling or unable to see through the community lens, right,
14   questions of being unwilling to learn about mental illness, being
15   unwilling to learn about excessive force from the consumption of
16   the community, I think we'd find that all problematic.  And
17   similarly, the exercise, I think, invites a slippery slope if we
18   allow for that, right.

19           And so I think the exercise that the parties engaged in
20   in coming up with these settlement provisions was to ensure that
21   there are two sides of a proverbial coin as a baseline
22   requirement, that individuals who are going to be part of this
23   adjudicative body are experiencing and have the requirement to
24   understand both sides of that proverbial coin that I'm outlining.

25           But brass tacks, I'm not in the business of seeing

1    opportunities to have the Court do something at my behest.

2    Usually it's Your Honor gets to tell us to do something.  So I'd

3    love the option of taking you up on your offer to accompany

4    individuals who may be reluctant.  It is a very artful solution,

5    an artful compromise.

6          And similarly to the chief's comments that adjustments,

7    I think, are routinely made in individual's participation in

8    Community Academy, so if they would rather observe a role-playing

9    scenario rather than fully themselves inject themselves in

10   participating in a role-playing scenario only makes sense.

11         THE COURT:  And I'm even thinking, too, that if someone

12   also just feels uncomfortable but is otherwise willing to go to

13   the Community Academy with me, I'd be willing to join them on

14   that, too, as long as this doesn't get too out of hand.

15         MR. KARIA:  Fair enough.  With respect to the question

16   of bias, I think this Court has indicated a growing comfort, no

17   thanks to Mr. Geissler's merited comment.

18         One thing I would add in this, again, along the vein of

19   fairness is within the draft Code provisions, the enabling

20   provisions of the city's constitution in the form of its charter

21   are provisions that provide for some due process for the members

22   of the board themselves, right?  And so it's not just allegations

23   are going to be thrown out there and then, you know, an

24   individual behind closed doors makes a decision about whether

25   there was objective demonstration -- a demonstrable bias for or

1    against the police.   In the draft Code provisions, there is a

2    provision in there that at the very least, the Bureau of Human

3    Resources will conduct an investigation and provide an

4    investigation to city council for its consideration.   So there is

5    due process.   There is at least an element of that.   And then --

6            THE COURT:   Let me ask, and I think you've already

7    implied, I want to make that explicit, is there anything that

8    Mr. Geissler said regarding this provision for removal for an

9    objective demonstration of bias for or against with which the

10   Portland Police Association disagrees?   Do you disagree with

11   anything Mr. Geissler said this morning on that topic?

12           MR. KARIA:   No.

13           THE COURT:   Thank you.

14           MR. KARIA:   And then to the Court's indication of the

15   monitor observing any processes surrounding the implementation of

16   that provision if it ever came to bear, sure, that makes absolute

17   sense.   That's the monitor's job.

18           THE COURT:   Okay.   Thank you.

19           MR. KARIA:   Thank you.

20           THE COURT:   Thank you very much, Mr. Karia.

21           Let me invite comments from the Albina Ministerial

22   Alliance Coalition for Justice and Police Reform.

23           MS. ALBIES:   Thank you, Your Honor.   Dr. Haynes is

24   present and will give the --

25           THE COURT:   Wonderful.

1          MS. ALBIES:  -- AMAC presentation, as well as the
2     Reverend, Dr. Knutsen, who also will have some comments.
3          THE COURT:  Of course.
4          MS. ALBIES:  I just want to note as an initial matter,
5     we appreciate that the Court noted the AMAC's recommendation that
6     the monitor can observe the selection process potentially if
7     there's a bias issue, but the monitor is not going to be here for
8     the next 50 years, right.  There's a limited duration that
9     they're observing the implementation of this agreement.  And so
10    to the extent this oversight body extends past this agreement,
11    which it should do, once the monitor is no longer in charge of
12    monitoring compliance with the agreement, there still needs to be
13    something in place to ensure that that objective aspect
14    continues.
15         THE COURT:  Sure.  Well, in theory, this agreement's
16    not going to be in place forever, either.
17         MS. ALBIES:  That's what we said I think 14 years ago.
18         THE COURT:  And we're not quite ready to wrap it up,
19    either, but at the appropriate time when we transition,
20    post-monitor -- and the monitor's going to be with us through the
21    duration of this agreement.  I don't anticipate changing that.
22    And so when we're ready to talk about the transition from a
23    settlement agreement world to a post-settlement agreement world,
24    I think our political branches and our voters are going to need
25    to resolve a lot of those questions.

 1          MS. ALBIES:  And I do appreciate the Court's
 2   willingness to engage in a ride-along and the Community Academy,
 3   and your attention to that.  It might exclude people.  I think
 4   that's a critical point that community members and certainly MHA
 5   and AMAC have been raising throughout this whole process, and
 6   that's why we specifically proposed alternative educational
 7   opportunities, which is something that would have codified the
 8   ability for flexibility and accounting for that.
 9          And while I appreciate the idea of you participating in
10   the Community Academy, I do wonder if that will impact the
11   delivery of that information in any way, shape, or form.
12          THE COURT:  We'll find out.  And by the way, I will ask
13   the AMA and the MHA to assist in sort of facilitating and
14   coordinating any requests along these lines when they come up.
15          Dr. Haynes, it is a pleasure to see you again, sir.
16          DR. HAYNES:  Thank you, sir.
17          THE COURT:  If you could move the microphone right in
18   front of you so everyone listening remotely can hear you.
19   Welcome.
20          DR. HAYNES:  To the Honorable Judge Michael H. Simon
21   and to the United States Attorney, Office of Oregon, the City of
22   Portland Attorney Office, the attorney for the Portland Police
23   Association, to the amici's attorney, Mental Health Association,
24   I am Dr. LeRoy Haynes, the chairperson of the AMA Coalition for
25   Justice and Police Reform.

1           Since 2023, the AMA Coalition has led the effort for

2     police reform in the Portland Police Bureau.  The AMA Coalition

3     led the effort, along with many other stakeholders in police

4     reform, in bringing the department of the United States

5     Department of Justice to Portland to do an audit of the Portland

6     Police Bureau, and later, the filing of the federal suit that

7     produced this settlement agreement.

8           Since 2010, we have seen and participated in the many

9     changes, the ups and downs of the settlement agreement, as well

10    as the backward and forward movement.  Now we stand at a pivotal

11    moment with the establishment of the new monitor system and the

12    radical modification of the police accountability system, yet the

13    hope of building a 21st century community policing bureau still

14    remains our major goal, for we fully understand that public

15    safety and community trust go hand in hand with accountability.

16          The AMA Coalition has several concerns about the

17    modification and process of the new oversight system passed by

18    the city council.  On the issue of biases for the police or

19    against the police, many stakeholders as well as community police

20    advocates question whether the City has a clear legal definition

21    of what "biases" is in contrast to the legal definition of

22    "racism."  In fact, under Chief Sizer, we spent a whole year

23    trying to decide what is racial profiling and what is racial

24    bias, but there's nowhere in the brief of the City a definition,

25    a legal definition, of "racial bias" to go by, when we have found

 1   out historically, without a legal definition, as we have found in

 2   the issue of bringing cases of racism to the court, that without

 3   a legal definition, that we get into many different opinions.

 4           THE COURT:  Well, Dr. Haynes, let me ask you this.

 5           DR. HAYNES:  Yes.

 6           THE COURT:  Because we're talking about an objective

 7   demonstration of bias for or against the police, does the AMA

 8   have a proposed definition of "bias for or against the police" in

 9   in context to offer?

10           DR. HAYNES:  Well, there are some sociological

11   definitions of "racial bias."

12           THE COURT:  Not "racial."  I think, aren't we talking

13   about bias for or against the police as being a criterion for

14   removal from the committee, right?  I'm sorry to interrupt, but

15   go ahead.

16           DR. HAYNES:  Yes.  Certainly correct, sir.  What I am

17   basically saying, just like in terms of spending a year on the

18   issue of what is racial profiling, that because there is not a

19   legal definition, that there needs to be something in place in

20   the proposal to help guide and direct the decision-making

21   process.

22           It's just like a jury, and we know that juries deal

23   with police issues on a regular basis, how do we determine what

24   is a bias and what is an unbias?

25           THE COURT:  And you make a really, really good point,

1   but let me share with you this perspective, because I preside

2   over jury trials all the time.  The objective of our trial system

3   is to get a jury that is not unreasonably or unfairly biased for

4   or against any party in a trial.  If one side or the other makes

5   an argument when we're picking jurors that this particular juror

6   looks like or based upon their answers appears to be unreasonably

7   biased for or against a particular party, I have to make a

8   decision whether to excuse that prospective juror.  It's called,

9   you know, a challenge for cause.

10          I've got to tell you, that's one of the most difficult

11  things that I do, because there are no objective definitions of

12  what is bias.  I just have to use my experience and judgment in

13  listening to what that juror has said to decide whether I believe

14  that juror can and will give both sides an unbiased, fair trial.

15  It's difficult.  There are no definitions.

16          I'm not sure there are definitions that will really --

17  can be applied here, but I'm taking a little bit of comfort in

18  two things.  One is the fact that it has to be an objective

19  demonstration of bias in order to remove them.  If somebody -- if

20  the City can't objectively show a demonstration of bias, they

21  can't remove them.  It's not just, "We have a feeling."

22          Secondly, as Mr. Geissler points out, we have

23  procedures and processes that will protect against an

24  unreasonable removal of someone under this condition.  Not only

25  does it go before a vote of the city council, that's one; two,

1    the independent monitor will review and monitor all of this

2    entire process and report back to me their independent judgment;

3    and three, if the United States believes that someone has been

4    inappropriately removed under that category, they can present the

5    motion to me, I will hear evidence, we'll have sworn testimony,

6    including from the decision-makers, "What was your objective

7    determination?"

8            And those are all procedural protections that I think

9    helps solve this problem.  But I think you correctly identify the

10   problem, but I'm not sure there's any better solution.  I

11   apologize for interrupting, but I wanted to share that with you.

12           DR. HAYNES:  Thank you, Your Honor.  And I fully

13   understand, sir.  At one time, we did not have a legal definition

14   of what "racism" was in the judicial system, but eventually there

15   being -- there was developed over the years a definition of

16   "racism," that even the DOJ has a definition of "racism" that

17   is -- what I'm just pointing out is that we're still -- and I

18   will trust your decision and your arbitration in a

19   decision-making, but I'm just bringing up there's no legal

20   definition.

21           THE COURT:  I agree with you.

22           DR. HAYNES:  Okay.  Okay.  So the other thing in

23   reference to the ride-along, just because a citizen candidate for

24   the independent police accountability does not choose to do a

25   ride-along, it should not automatically cancel them out from

1    serving on the board.  There should be other educational options

2    that are made available.

3           THE COURT:  Like what?  Like what would be the other

4    educational options?  Because I was struggling with that, too.  I

5    agree that if someone really because of their prior life

6    experiences, their earlier life experiences doesn't feel

7    comfortable doing a ride-along, we should make alternative

8    educational experiences available to them, because they do need

9    to know what does an officer experience on a patrol.  And I was

10   having trouble thinking what that would be.

11          So I came up with this idea, which may be a crazy idea,

12   I'd like your opinion on it, well, maybe we can offer to the

13   person who is otherwise fearful, based upon previous experiences,

14   of sitting by themselves in a police car for a couple of hours,

15   that I'd accompany them.  And maybe that might be enough to make

16   that person feel more comfortable, and then they could see things

17   that an officer experiences on patrol without having the

18   underlying triggering trauma.  What do you think of that

19   solution?

20          DR. HAYNES:  I think that is certainly, Judge Simon,

21   that would be an option for some people and I think it would be a

22   very helpful option, but my stress and point is on the issue of

23   mandatory -- the issue of making it be a mandatory requirement.

24          Now, we mentioned that on CRC and other committees that

25   this has taken place, but the feedback that I get, some people

1      did not necessarily apply for these committees because of that.

2              THE COURT:  Yeah.  And I might need more information.

3      I might need to talk to them and get a better understanding of

4      why are you not applying to be on this committee and why is a

5      ride-along with me not sufficient, for me to really understand

6      the full dynamic of what's happening.  I may not fully understand

7      that.

8              DR. HAYNES:  Yeah.

9              THE COURT:  Okay.

10             DR. HAYNES:  Okay.  Thank you.  And we also are

11     concerned about the rising increase in stops of black people in

12     our community by the Focused Intervention Team, that there's a

13     rising number of increase of stops of male and female community

14     people.  We've had this problem before.  We've made adjustments

15     over the years to correct this problem, and we just want to make

16     sure that it doesn't become a major problem in the future.

17             I do believe, as a former instructor in the Dallas

18     Police Academy, that there's a need for education of anyone

19     that's on this board in police work and activities.  I think that

20     there can be models and educational projects, even mentoring,

21     that will take place as an option, but I do believe that anyone

22     that's sitting needs to be educated in police procedure.  Just

23     like I believe in the academy, that the police need to be

24     educated on cultural differences and biases in the community, and

25     then we don't have enough hours of that.

 1          THE COURT:  I agree.  I'd like to see both sides of --

 2     and really it's more than just a binary issue, but I'd like to

 3     see different perspectives have a better understanding of what

 4     the other side's challenges are.  I'd like to see sworn officers

 5     really understand what is it like to be in the community when

 6     you're seeing some crime -- including racial minorities, when

 7     you're seeing some crime but you're concerned about calling the

 8     police, when you're seeing some crime and you have mental health

 9     issues and you're afraid of calling the police.  I think sworn

10     officers need to understand that perspective, but similarly, some

11     members of our community, especially those who are going to sit

12     in judgment of police actions, need also to understand what the

13     police are experiencing and seeing when they do their patrols and

14     their official sworn activities.

15          DR. HAYNES:  Certainly, sir.  Certainly.

16          In conclusion, although the recent murder of a black

17     mother named Sonya Massey did not happen in Portland, but in

18     Illinois, it shows the importance of having a strong independent

19     citizen accountability system to hold police officers accountable

20     for the actions that violate the constitution and policies and

21     practice.  This black helpless mother should have never been

22     murdered by a law enforcement officer, who went from department

23     to department and never was held accountable by any police

24     department.

25          This is why we need real police accountability.  We

1   need accountability from citizens when they break the law, but we

2   need accountability from the police when they break policies and

3   practice and the law.  Thank you very much, sir.

4           THE COURT:  Completely agree with you, Dr. Haynes, as I

5   generally always do.

6           DR. HAYNES:  Yes, sir.

7           THE COURT:  Thank you for your comments.  Excellent to

8   see you, sir.

9           DR. HAYNES:  Bless you.

10          THE COURT:  And Reverend Knutsen, I look forward to

11  your comments.  Good to see you, sir.

12          MR. KNUTSEN:  I think I'm going to stand.

13          THE COURT:  Whatever you wish.  If you're going to

14  stand, go up by the microphone so the folks that are here

15  remotely can hear you.

16          MR. KNUTSEN:  Judge Simon, thank you again for being

17  the judge for this long process we've been in here.  We highly

18  appreciate your work, your integrity, your wisdom in this

19  process.

20          And to all our colleagues at the tables from the City,

21  Department of Justice, and Mental Health Alliance, Police

22  Association, so many others here to speak, I encourage us to

23  listen clearly to the community input when the time comes,

24  because that's been our primary role, is working -- to work in

25  the communities.

1          As you know, there's a famous Hebrew prophet who was

2     having a conversation with God about wanting to come speak to the

3     nation around reform during comfortable times, and God said God

4     was going to let a plumbline go down into that nation to measure

5     was it plumb.  And as we know so well, it wasn't.

6          And being a plumbline in this country today, especially

7     given the remarks Dr. Haynes just made, concluding with what is

8     taking place, we are still far out of whack when it comes to

9     community peacekeeping and that 21st century vision.

10          We appreciate the words of the chief earlier.  I was

11     hoping he would stay, because I wanted to ask a couple questions

12     myself.

13          We've been at this for many, many years, several

14     decades, so this is not new.  And we're in it for the marathon,

15     as Dr. Bethel always reminded us, but in a meeting with Mayor

16     Hales a number of years ago, the police chief, and members of

17     their staff, Commissioner Hardesty were part of this team at that

18     time, we were all in that room, and we asked the question about

19     cultural change of policing in Portland, because that's where we

20     get frustrated sometimes.  These smaller pieces have to be done

21     well and done in ways that will work and carry on, but that

22     bigger vision of change, we're still far from.

23          And I wanted to ask the chief, and maybe the city

24     lawyers can pass that for us before we're done today, a question

25     we asked Mayor Hales back then and the police chief, I can't even

1    remember which one that would have been, what were the breakdown

2    of the officers in the city.  At that time, 75 percent lived

3    outside the city of Portland, often came from other places.  So

4    Northeast Portland was like this land they were going to in some

5    ways.  So education, experiential education was so critical if

6    you're going to take on that kind of a job.  And we asked how

7    many were BIPOC officers at that time.  39.  I think 35 were

8    African-American.  And that hadn't changed for 20 years.

9            So I'd like to know of this class of 61 and 51, what is

10   the breakdown of those classes.  How many BIPOC community

11   members, LGBTQ members, women and men.  How does that class --

12   how do they match up with who we are in the city today, because

13   we should be staffing and building for Portland for 30 years from

14   now, not next year.

15           THE COURT:  Let me interrupt you for a second and ask

16   Ms. Brown two things:  one, will you please get that information

17   to Reverend Knutsen, but also be prepared in your comments at our

18   next status conference to let us all know the answers.

19           MS. BROWN:  Yes.  Thank you.

20           MR. KNUTSEN:  And the overall number for the city of

21   Portland now.

22           MS. BROWN:  Yes.

23           MR. KNUTSEN:  What's the breakdown overall.  And don't

24   double count numbers.  That's been done.  Sometimes if you're a

25   woman and a person of color, you're counted twice, and it raises

1   the category.  So that's an old way of counting that used to be

2   done.

3           So let me get right to the point, because a culture

4   change of 21st century community policing is so important, and

5   that's what we're in the long-term for, but for today on the

6   pieces that have been brought forward, Dr. Haynes spoke to them

7   very clearly, but let me remind ourselves 82 percent of the city

8   of Portland voted for this new oversight board.  Commission was

9   put in place for 20 people, that Dan Handelman was on that

10  commission.  I know.  I didn't go to that meeting, but I heard

11  how often they had to meet, all the work they did, very

12  conscientious.

13          Part of the breakdown was when it got to the City of

14  Portland and the commission.  They disregarded in many ways and

15  created this new model.  So there was angst at the beginning of

16  this process, as you know so well, but here we are.

17          So speaking to the three specific points that were

18  raised, the ride-alongs, I still think there has to be a point

19  for a person to say, "I would like to learn differently than that

20  ride-along."  I'm a proponent of experiential education, and I

21  appreciate your offer to go along, because there's nothing like

22  going and seeing and touching and feeling, but we need to be

23  equally demanding for how we train our police officers to know

24  Portland, 132nd, Northeast, to know why Jefferson High School is

25  so critical to the city and other schools, but they need to know

1   that experiential, but --

2              THE COURT:  And Rosemary Anderson, by the way.

3              MR. KNUTSEN:  What's that?

4              THE COURT:  And the Rosemary Anderson School.

5              MR. KNUTSEN:  You got it.  Yes, sir.

6              I'm not sure what kind of car is being used.  I

7   probably should check this out myself, because I've been in

8   police cars before, and I know if you have any aversion to

9   weapons, that alone could throw you into a state of crisis,

10  because those cars are heavily armed, as you know.  I've done

11  trainings with the Keizer Police Department.  They had to leave

12  their weapons in the cars to come into the church, because we

13  don't allow weapons.  That was a cultural moment of change that

14  they went along with, the chief did.

15             So I am very concerned that a person can be excellent

16  on this committee because of life experience, but be denied the

17  opportunity.  So I want to speak clearly on that one.

18             The second one is -- well, the community school is

19  important as well.

20             THE COURT:  Community Academy.

21             MR. KNUTSEN:  Academy.  I'm sorry.

22             THE COURT:  Yeah.  And then --

23             MR. KNUTSEN:  Demonstration of bias:  As preachers and

24  community activists, you often have to critique what is.  And as

25  we know from -- historically, as a preacher, you can be quoted

1   out of context pretty quickly.

2              THE COURT:  So can judges.

3              MR. KNUTSEN:  I know you can.  And, in fact, there's a

4   famous case of a great preacher, a friend of mine, actually, in

5   Chicago who had to step back from a presidential election because

6   of a comment taken from a sermon.

7              So what I'm saying here is bias is not always objective

8   in how we measure it or try to measure it.

9              When I had a funeral for a police officer, the same day

10  we began a press conference --

11             THE COURT:  Can I ask folks who are here remotely

12  please mute yourself?  We are hearing you, and it's a little

13  distracting.  Please mute yourselves if you're remote.  Did you

14  hear me?  Please -- I think you did.  Thank you very much.

15             Back to you, Reverend Knutsen.

16             MR. KNUTSEN:  So for an officer, we had a funeral, and

17  we asked -- we heard they had a military -- the police escorting

18  the casket.  I said, "Do you have guns?"

19             "Yes."

20             "You can't bring them in."

21             We went back and forth with sergeants all weekend.  The

22  sergeant came that day, very good person, and he had no gun.  He

23  said, "Reverend, I feel naked."

24             I said, "Sergeant, you look great."

25             The point is, is that bias towards the police to say

1    you cannot bring weapons into a church?  Is it bias when we

2    critique the system as it is at a rally or in our sermons?  Those

3    can easily be misconstrued.  So that's a very careful word if we

4    use it.  So I'd ask us to really look closely and maybe even pull

5    back on that one.

6          So I think those will close my comments for now.  In

7    terms of the number on the nominating committee, I think three is

8    far too many for the police department.  Yes.  I'll stop there.

9          Judge Simon, again, thank you for all you do.  And for

10   our colleagues at these tables, we'll keep working together, but

11   we'll keep being a voice saying we have to look forward and make

12   those truly cultural changes that are needed not just in

13   Portland, but across this country.

14         THE COURT:  Thank you, Reverend Knutsen, for all that

15   you do as well.  By the way, your comment in the beginning about

16   the story about the plumb device -- plumbing device reminded me,

17   and I think it's part of the sitting passage or group of passages

18   of the story where when there was a dispute over what was

19   required of someone had invoked the bending of the tree and the

20   reversal of the stream of the river.  You remember that story as

21   well?  Yeah.  Excellent point.

22         Now is not the right time for me to give any Talmudic

23   stories, but your comment reminded me of the rest of those

24   passages.  Thank you, sir.

25         MR. KNUTSEN:  Thank you, Judge.

```
 1                THE COURT:  Thank you.
 2                MS. ALBIES:  Your Honor, may I make one final comment?
 3                THE COURT:  Of course.
 4                MS. ALBIES:  Just as we were sitting here discussing
 5      the ride-along issue in the community, Academy issue, the
 6      Americans with Disabilities Act applies to police services, to
 7      volunteers, to --
 8                THE COURT:  Absolutely.
 9                MS. ALBIES:  -- city workers.  So as part of the
10      accommodations process, that's something that maybe the City can
11      consider some of these disability accommodations in this process.
12                THE COURT:  Absolutely.  And I really do want -- and I
13      know I'm imposing a burden on the AMA and the MHA, but if there
14      are folks that need accommodations either for mental health
15      reasons, other bases, certainly ADA-related accommodations, if
16      you can coordinate that, work with the City and the police, and
17      if this is where someone's going to want me to join them, you
18      know, work through my courtroom deputy to get me involved, and
19      I'll speak with you.  We'll make this happen.
20                MS. ALBIES:  Understood.  Thank you, Your Honor.
21                MR. KNUTSEN:  Judge, if I may.  We've always said we
22      want everybody participating, those on the police force, those in
23      our community, because we are one community, and that's why we're
24      all doing this together, and that is so critical.
25                I cannot underscore enough how important Portland
```

1    Street Response is.  And I like your last question about how's

2    the election coming up going to change the governance, because so

3    often the collective memory disappears and we start over again.

4    And the community remembers things, but often not the leadership

5    that's come in.

6              So Portland Street Response, Commissioner Hardesty, I

7    can't thank you enough for championing that.  That's such a great

8    thing, especially with the crackdown on camping in Portland and

9    people who are houseless who are going through tremendous

10   struggles, that's one more incredible pressure on a big part of

11   our population.  Portland Street Response is the most humane way

12   to respond.  And I pray that one of the greatest things our

13   officers will learn will be compassion, which I think -- I know

14   many do.  And this is not about the whole police department, it's

15   about individuals as well as practices.  So critical in the

16   society we're in right now.  Thank you, sir.

17             THE COURT:  No.  I agree.  And, frankly, people who

18   have attended these hearings before may have detected a subtle

19   hint of support from me that I'm a big fan of the Portland Street

20   Response and body-worn cameras, and I think that we're moving in

21   a very positive direction in both.

22             MR. KNUTSEN:  Thank you.

23             THE COURT:  If we can hear now from the Mental Health

24   Alliance.  We'll take -- I do want -- we do have a number of

25   people from the public.  I do have to give our court reporter a

1    break, but let me invite comments from the Mental Health

2    Alliance.

3              MR. CHAVEZ:  And, yes, Your Honor.  We've actually

4    heard from some of the public commenters that they have to leave

5    by 11:30, so we're happy to defer MHA's comments until after

6    the --

7              THE COURT:  If there's someone that has to leave by

8    11:30, I'm fine to take them right now.

9              MR. CHAVEZ:  Okay.  Fair.

10             THE COURT:  Who has to leave by 11:30, Mr. Chavez?

11             MR. CHAVEZ:  I see one person on the screen.

12             THE COURT:  Is it Ms. Aiken?  All right.  Let me call

13   you.  Ms. Aiken.

14             MS. AIKEN:  Hi.  Good morning.  Can you hear me?

15             THE COURT:  Yes, just fine.

16             MS. AIKEN:  Thank you so much for accommodating my

17   schedule.  I have a job interview in eight minutes, so I'm

18   prepping by giving public comment, and I have condensed my

19   comments accordingly.

20             THE COURT:  Good luck.  You have seven minutes.

21             MS. AIKEN:  Thank you.  Good morning, Your Honor.  My

22   name is Faythe Aiken.  I'm a research analyst by day, and I'm

23   here in my capacity as a former member of the Police

24   Accountability Commission.  I joined the commission having the

25   unique experience of representing my disabled brothers, sisters,

1    and siblings, who are often left out of conversations on police

2    accountability.

3            I was born with cerebral palsy, a neurological

4    disability that impacts the way I move throughout the world.

5    Many physical spaces are inaccessible to me.  When they are, it

6    requires a great amount of physical stress for my participation.

7            While no one loves being on video all day, one of the

8    unintended consequences of the pandemic has meant that I can now

9    access many more spaces that I previously couldn't.  I share this

10   experience because it's important context to my testimony today.

11           I will offer one specific example that would impact

12   someone like me participating in the new board.  You brought up

13   the very issue I want to discuss, the requirement for police

14   ride-alongs.  I can read between the lines and understand that

15   the desired outcome of this would be for board members to

16   experience a relational, humanized element or day in the life,

17   but for someone with a disability, I can't get in and out of a

18   car quickly.  Folks with migraines or chronic pain or anxiety

19   would all face a hurdle for this requirement.

20           Judge Simon, your proposed solution is very generous,

21   but it doesn't get to the fact that this requirement still

22   excludes people, people who are very often over-policed.

23           ADA accommodations are possible, but why do we require

24   people to provide medical documentation to meet this requirement?

25   Surely there is a creative enough solution here that doesn't

```
1   create a bigger barrier to participation for people with
2   disabilities.  If the desired outcome is relational or a day in
3   the life, why are we proscribing something that isn't accessible
4   for everyone?  Thank you.
5              THE COURT:  And before you leave, let me just say,
6   first of all, you don't need to provide any medical documentation
7   on this issue.  Your word is fine with me.
8              Will you please work with both Mr. Chavez and/or
9   Ms. Albies, figure out and make sure they understand what
10  accommodations you really need.  And if you want me to accompany
11  you, and then we'll work that out if you want to be on the
12  commission, if you want to apply for the commission.  And if you
13  want to do a ride-along under those circumstances, we'll get you
14  the accommodations that you need.  And if you want me to
15  accompany you, I will.
16             And good luck with your interview.
17             MS. AIKEN:  Thank you all.
18             THE COURT:  Thank you.
19             Maybe we should take a -- will ten minutes be
20  sufficient, Kellie --
21             THE REPORTER:  Yes.
22             THE COURT:  -- or do you want more?
23             Okay.  Let's take a 10-minute recess now.  When we come
24  back, we'll hear from MHA, PCCEP, and from the remainder of our
25  public commenters.  Ten minutes.
```

```
 1              (Recess:  11:26 - 11:39)

 2              THE COURT:  Welcome back, and good morning again.

 3              I look forward to hearing comments from the Mental

 4    Health Alliance.  Mr. Chavez.

 5              MR. CHAVEZ:  Good morning, Your Honor.  If it's okay,

 6    I've been informed by another community member that they also

 7    have to leave.  And she's in the --

 8              THE COURT:  Who's that?

 9              MR. CHAVEZ:  Ms. Carpenter.

10              THE COURT:  All right.  Ms. Carpenter, Tia Carpenter,

11    welcome.  Come on up.

12              MS. CARPENTER:  Can I stand there?

13              THE COURT:  What's more comfortable to you?  I want you

14    to be at a microphone.  So you can either sit where Mr. Chavez is

15    or stand at that microphone, whichever is more comfortable,

16    seated or standing.

17              MS. CARPENTER:  Thank you so much.

18              THE COURT:  Thank you.  And welcome, Ms. Carpenter.

19              MS. CARPENTER:  Hello, everyone.  I'm very glad that I

20    could be here today to add my voice to the public record.  Thank

21    you all for being here as well.

22              My name is Tishana Carpenter, and I am an artist, an

23    archivist, and a fifth generation Oregonian who is proud to love

24    and live in this city.

25              The reason we are together in this courtroom and the
```

1    reason that we continue to vote is because we want to believe in

2    the court's ability to bring forth justice and fairness.  As the

3    word around us continues to show resilience in the face of

4    violent systems, we must continue to protect the pathways of

5    justice that we have available to us.

6            I will now read the final slide of a training

7    presentation created for officers by the Portland Police Bureau.

8    I cannot share the image that accompanies what I am about to

9    read, which is from the tactical defense arm of the Proud Boys,

10   known as Fraternal Order of Alt Knights, the Alt Right Knight

11   Prayer:  And the Lord said, whoa be unto you, dirty hippy, for

12   thou speakest of patchouli and BO; for thou talk of Marx, yet

13   know him not; for thou hast bills, yet have not paid; for thou

14   hast dreadlocks and white skin.  And so I shall send among you my

15   humble servants with hat and with bat, that they may Christian

16   your heads with hickory and anoint your faces with pepper spray.

17   And once thou hast been cuffed and stuffed, once thou hast been

18   stitched and bandaged, perhaps thou shall learn I'm tired of your

19   shit.  Amen.

20           Reading something like this from Portland Police Bureau

21   makes it clear to me that this violence against the public is

22   expected and celebrated as a sick form of comedy.  Training

23   materials are resources designed to align with the training

24   objectives made to define best practices.  If you were at work

25   and added a violent meme celebrating brutality in a position that

 1    is set to protect and serve into a training manual, do you think

 2    you'd continue to keep that job?

 3            I heard the police chief say earlier that we are a

 4    community of one, but I know I am not alone when I say I wish

 5    that could be a reality.  This document is an example of why we

 6    need true accountability for our police bureau.  These are the

 7    biases that threaten the citizens' right to feel safe in this

 8    city.

 9            If this accountability system is to be successful, we

10    must make sure it has the best chance to do so.  I share the same

11    concerns as put forth by Judge Simon and others today, such as

12    the vagueness of "objective demonstrated bias," forced

13    ride-alongs, which can result in a manufactured experience, and

14    the requirements to serve in the Community Academy.

15            How can we believe in justice, when we use our voices

16    for them to be dismissed just a few short years later?  Please

17    prove that our most impacted communities' voices actually matter

18    and please help bring accountability to those who have sworn to

19    protect and serve.

20            We all deserve to feel safe in the City of Portland,

21    and this doesn't happen when those needing to be held accountable

22    continue to avoid the consequences.

23            These proposed amendments are dangerous, unfair and

24    unreasonable.  Thank you so much.

25            THE COURT:  Thank you, Ms. Carpenter.  I appreciate

 1    those comments.

 2              Mr. Chavez.

 3              MR. CHAVEZ:  Good morning, Your Honor.  Juan Chavez for

 4    the Mental Health Alliance.  Presenting for us today will be K.C.

 5    LeDell, but I'd just like to comment on a few of the comments

 6    made today and maybe address some of the questions that the Court

 7    has posed today.

 8              I just want to start by highlighting that at the start

 9    of our submission to the Court for this hearing, we noted how

10    much improvement and how grateful we are to see that improvement

11    of the PCCEP.  And as the Court would remember, six odd years

12    ago, the Court only conditionally approved that amendment to

13    allow PCCEP to get its feet, see if that was fair, adequate, and

14    reasonable, and see how that process worked out.

15              That still took a lot of time for both the Court and

16    for the amici to feel comfortable, to feel like that was an

17    appropriate amendment to the settlement agreement to allow for

18    community engagement.

19              Here, I don't believe that conditional approval would

20    even address the threshold problem that we see with the

21    amendments as proposed.  And it's, as the Court already

22    identified, ride-alongs and the "bias" language.

23              To the Court's very gracious offer to participate with

24    and go along with persons who had concerns about being in a

25    police car with a police officer, fundamentally for MHA,

```
1    boundaries set by people with trauma and with trauma disorders
2    just need to be respected, they need to be responded to.  And if
3    the issue then is for members of the oversight board to have
4    garnered some empathy, garnered some understanding about the
5    day-to-day jobs of police officers, there are other ways to
6    accomplish that.  I don't believe that there are actual
7    applicable lessons that could be learned from ride-alongs,
8    perhaps outside of empathy.  If we are trying to garner empathy,
9    there are better ways of accomplishing that:  getting coffee with
10   an officer, having a roundtable with officers who show body cam
11   footage of some interactions, some difficult interactions that
12   they handled well and other ones where they didn't handle well to
13   gain some sort of perspective there.
14           Our fear is that it's that common kind of logical
15   fallacy of the survivor bias, the one where we only inspect
16   planes that come back from war, not the ones that never return.
17           And here, I think by asking did anybody ever ask for an
18   accommodation, did anybody ever ask or highlight a problem with
19   ride-alongs, is somewhat asking the wrong question.  The right
20   question is, who didn't even bother to apply, who didn't even
21   bother -- or believe that they were going to be accepted by this
22   board, believe that their concerns would be heard.  And by
23   leaving in the language as is, we think that's what's going to
24   happen:  there will be people who won't apply.
25           THE COURT:  I understand.  And I think the solution I
```

 1   wanted to move towards, rather than simply reject the proposed

 2   amendment wholesale, is to try to deal with individual problems

 3   on a case-by-case basis.  So if you or Ms. Albies or any one of

 4   the parties or if the amici or the intervenor learns of someone

 5   who wants to be part of this board but doesn't want to

 6   participate in either a ride-along or attend the Community

 7   Academy, step one, tell them about my offer to accompany them to

 8   either the ride-along or the Community Academy or both; step two,

 9   if they still don't want to accept that but want to be on the

10   board, tell them, working through you or you and Ms. Albies,

11   contact my courtroom deputy, and we will try to come up with an

12   alternative proposal, working with the City, working with the

13   police, to come up with some alternative way to get them that

14   experience like you've described and then asking for a waiver of

15   that requirement, and we'll see where that goes.

16           MR. CHAVEZ:  I take the Court's suggestion very --

17   we'll certainly think on that.  And I think, from my perspective,

18   if the Court were to approve today's amendments, I would just

19   hope that there's an additional amendment that lays out precisely

20   what you just suggested, Your Honor, either read into the record

21   or in a written document.

22           I'll now turn it over --

23           THE COURT:  Well, I did just say it into the record and

24   it's on the record.  It's going to be in the transcript.  And if

25   that's the direction we go in, because I really -- I'm reluctant

1    now -- I had concerns yesterday, last night, and even this

2    morning, I had concerns about this mandatory ride-along, but I

3    think we're striving towards a solution.  And I'm reluctant also

4    to reject an otherwise valuable and important amendment based

5    upon, and I don't want to say hypothetical problem, because it's

6    probably real to many people, but we don't know of anybody who's

7    applied who's been rejected, but I take your point that there may

8    be people that have never done that, but that is causing me to

9    have reluctance to reject the amendment on that basis.  So I want

10   to see how things go.

11        So step one, if they want to be on the board but don't

12   want to do a mandatory ride-along, as I said, step one, extend my

13   offer; step two, if they still want to be on the board but my

14   offer's not good enough, with your assistance, with Ms. Albies'

15   assistance, let's find out what type of accommodations would be

16   acceptable to them that would also satisfy the City and the

17   police need to make sure that they have an adequate background

18   understanding, and then we'll craft something, ask for a waiver,

19   see if any of the parties oppose the waiver.  If no one opposes a

20   waiver, problem solved.  If someone does oppose a waiver, we'll

21   come back and talk about that and see where we go.

22        MR. CHAVEZ:  Very good, Your Honor.  Thank you.

23        At this time, I'll just turn it over to Mr. K.C.

24   LeDell.

25        THE COURT:  Thank you.  And will you please spell your

 1   last name, sir.

 2              MR. LEDELL:  Absolutely, Your Honor.  K.C. LeDell.

 3   That is L-E-D-E-L-L.

 4              THE COURT:  Welcome, Mr. LeDell.

 5              MR. LEDELL:  Thank you very much, Your Honor.  I am

 6   here today as a representative of the Mental Health Association.

 7   I was also a member of the Police Accountability Commission.  I'm

 8   not here today in that context.  I am here today as a person who

 9   has extensive experience in the criminal justice system both as a

10   prosecutor, as a currently public defender, and previously I've

11   worked in policy as well.  I'm also here as a person who has

12   lived with mental illness for my entire life, including the time

13   that I've been working as an attorney and working within that

14   system.

15              I have some prepared remarks.  I did want to first

16   address sort of some of the issues that Your Honor has brought

17   up, from our perspective.  Going to the issue of the ride-along,

18   like I said, I worked as a deputy district attorney when I was

19   first starting out as an attorney.  I did a ride-along at that

20   time.  I think that there is a reason that -- I mean, and it's

21   well taken that Mr. Geissler has also done probably many more

22   ride-alongs that I have.  I think there's a reason that people

23   who look like Mr. Geissler and myself are not necessarily as

24   nervous about the experience of getting into the car with a

25   police officer as some other people might be.

1          THE COURT:  I totally get that.

2          MR. LEDELL:  I can speak to the fact that when you are

3    getting into the car with a police officer for a ride-along,

4    you're really putting your life into their hands in a lot of

5    ways, you're potentially going into dangerous situations with

6    them, you're sitting next to somebody who's got a gun, pepper

7    spray, a taser on their hip.  You can only get in and out of the

8    car if they say so.

9          That's a very nerve-racking experience even in the best

10   of times.  And if you have a situation like this where, as we

11   just heard from a community member, you don't know if the person

12   who you're getting into the car with is one of the people who

13   chuckled at that slide when they got to the end of that training,

14   you have a lot of reason to potentially be doubtful of the fact

15   that any individual Portland police officer is actually going to

16   take your safety seriously while they're out there.

17         And, frankly, there is a long and well-documented

18   history of the Portland Police Bureau and the Portland Police

19   Association attempting to intimidate civilians whose political

20   opinions they disagree with, including a sitting city

21   commissioner.

22         So if that is not a situation where you can feel like

23   the police are going to keep you safe, I don't know how anybody

24   could.

25         THE COURT:  Well, and that's why I understand what

1    you're saying, and that's why I'm hopeful that for people in that

2    position, they might feel safer if the person sitting next to

3    them in the backseat is the federal judge who's been supervising

4    the settlement from the outset.  I will not be armed, I will not

5    have any pepper spray or mace.  I will meet with them beforehand

6    if they wish.  And this might be a good solution for everybody.

7    Let's give it a try.

8              MR. LEDELL:  I think that it would be a good solution

9    for some people.  I think others might have more deeply ingrained

10   reactions to that.

11             And I think that the other concern I have, I previously

12   worked for Disability Rights Oregon before my current job, when

13   we're talking about the ADA, it's certainly great to be able to

14   provide someone an accommodation upon request, but, say, a person

15   in a wheelchair rolls up to city hall wanting to go to a public

16   hearing and there's no ramp, and they say, "I want an

17   accommodation," and City Hall says, "Okay.  We'll build a ramp in

18   a year, then you'll be able to come in."

19             THE COURT:  I get that.  I can't solve all problems at

20   once --

21             MR. LEDELL:  Absolutely.

22             THE COURT:  -- but I get that.

23             MR. LEDELL:  I do think that what Mr. Chavez

24   recommended of just trying to have some full alternatives to the

25   ride-along available to people, that would be preferable from our

1   opinion.

2            THE COURT:  I understand.  And that's why I think this

3   two-step approach of will it make them feel sufficiently

4   comfortable if I accompany them; secondly, if the answer is no,

5   then let's meet, let's talk, let's find out what they need to

6   find -- to be sufficiently comfortable, if anything; and if

7   they -- nothing will satisfy that need, then maybe what's a

8   reasonable alternative to help them get an experience of what do

9   police officers experience on the street.  And we'll just have to

10  craft this almost as we go as opposed to trying to write an

11  advanced set of rules to deal with these issues.

12           MR. LEDELL:  Certainly, Your Honor.  And I think that

13  sort of gets to my next point, which really ties into, I think,

14  the larger concerns of the Mental Health Alliance is this issue

15  of bias.  And I'm completely in agreement with Your Honor in

16  terms of the sort of on-paper requirement.  I think that it is --

17  entirely makes sense for there to have the -- to have this

18  requirement that people not demonstrate bias in one direction or

19  the other when they're going to be adjudicating these cases.

20           My concern is who's going to be making that decision.

21  And I think that, as Your Honor and Mr. Geissler have sort of

22  articulated, the process for removing someone based on alleged

23  bias, I think it is the best process that we could come up with.

24  It's certainly not perfect, but what is?

25           THE COURT:  Yeah.

1          MR. LEDELL:  My concern really is how people are going

2    to be appointed to this committee in the first place, and that's

3    going to be going through this sort of appointments body.  This

4    is something that was created sort of from whole cloth against

5    the recommendations of the PAC.  And it's going to have not just

6    a member from police, it's going to have three members from

7    police.  It's not going to have any members from any

8    organizations that advocate for police accountability.  It's not

9    going to have any members from the amici here, who can

10   potentially speak to the lived experience of people of color or

11   the lived experience of people with mental health problems.

12          You're going to have this committee sitting down and

13   deciding who and who doesn't have bias with police officers

14   sitting there at the table putting sort of their hand on the

15   scale.

16          You spoke about the issue of trying to find an unbiased

17   jury, and that's something I deal with regularly as well.  This

18   is like having a situation in which you're trying to seat an

19   unbiased jury and only one side gets to do voir dire.

20          You're going to have people who are there who have

21   their own biases in favor of the police.  I mean, I know that

22   there are many police officers who would consider having said the

23   words "black lives matter" to be an indication of anti-police

24   bias.

25          We don't know who's going to actually be on that group.

1    They're going to be selected not just from the Portland Police

2    Bureau, but also from the PPA and the PPCOA.  So, again, these

3    are organizations whose explicit interest is in protecting their

4    membership, not necessarily in creating an unbiased panel.  That

5    causes us pretty serious concerns.

6            THE COURT:  I understand that.  I am a little comforted

7    by knowing that the independent monitor will be monitoring all of

8    this, observing all of this.  And if somebody says, "No.  We

9    can't have that person on this committee because they've put up a

10   sign in their window or their home that says 'Black Lives

11   Matter'," I expect I'll be hearing about that, and I will handle

12   that appropriately after giving everybody an opportunity to be

13   heard.

14           I don't think that's going to be a problem, but it

15   could be.  And I get what you're saying, but I'm comforted by the

16   fact that we now have an independent monitor to monitor a lot of

17   these things.

18           MR. LEDELL:  Certainly, Your Honor.  And I think that

19   one of our concerns really is just it feels like we are creating

20   sort of filter after filter and obstacle after obstacle for

21   people who are concerned about police accountability, for people

22   who have lived experience, for people who are concerned about

23   this ride-along.  There's just going to be so many points at

24   which they can get caught up and weeded out in this process, that

25   we're going to be creating a board that is sort of by its very

1    nature biased just due to all of the hoops that those people have

2    had to jump through versus the people who perhaps have a

3    pro-police bias that the police members on this committee are not

4    necessarily going to be looking for very diligently.

5         THE COURT:  Understood.  You know, a little bit later,

6    not now, a little bit later I'm going to ask Mr. Geissler to give

7    me the Government's perspective on these issues.  To some extent

8    you've already said it this morning, but I'm going to ask for it

9    again in order to be more responsive to our public comments to

10   explain why the plaintiff is satisfied at least with this

11   approach.  We'll hear from him later, but I understand what

12   you're saying.

13        MR. LEDELL:  Certainly, Your Honor.  And I would just

14   wrap up by saying something that Dr. Haynes said that really

15   resonated with me is that this feels like an incredibly pivotal

16   moment.  And I think that there is an extent to which some of the

17   changes that are proposed seem sort of more -- don't strike us as

18   sort of this heaven opening up and the choir coming down moment,

19   but this is a moment that I think a lot of people are here

20   because they feel like this is our last chance to really say we

21   don't think this is going to be successful.  We think that not

22   only sort of the actual mechanics of this, but also the

23   perception of sort of how hard the PPA and the City and the

24   police bureau are going to be putting their finger down on the

25   scale to make this thing go the way they want it to is going to

1    basically give us the same system that we had before, the system

2    that the people of Portland came out and voted overwhelmingly to

3    say we don't have faith in the system.

4            And if the community doesn't have faith in the system,

5    if they don't believe that police are going to be disciplined for

6    not following the training that we've imposed on them in the

7    settlement agreement, for not properly using their body cameras,

8    for the behavior that is seen on those body cameras, then all of

9    those other remedies, which are very important, we've worked so

10   hard on, sort of become a paper tiger, because the -- if the

11   police don't believe that they have to follow any of that, then

12   we're going to have people who don't.

13           THE COURT:  Understood.  Thank you, Mr. LeDell.

14           Back to you, Mr. Chavez.

15           MR. CHAVEZ:  Nothing further, Your Honor.

16           THE COURT:  All right.  Thank you.

17           Who will be speaking on behalf of PCCEP?  Come on up.

18   Please state your names.  And I look forward to your comments.

19   Good to see you again.

20           MS. ZUCKERMAN:  Hi, Your Honor.  My name is Odelia

21   Zuckerman.  I've been a PCCEP youth member for about a year now.

22           THE COURT:  Can you spell your last name, please?

23           MS. ZUCKERMAN:  Yeah.  Z-U-C-K-E-R-M-A-N.

24           THE COURT:  Go ahead.

25           MS. ZUCKERMAN:  And I've been a PCCEP youth member for

1    one year and I'm also co-chair of the Community Engagement

2    Subcommittee.  And I'll pass it over.

3              MR. BAUTISTA:  Good morning, Your Honor.  My name is

4    Jorge Sanchez Bautista.  I will spell the Bautista part, because

5    a lot of people miss it.  B-A-U-T-I-S-T-A.  And I'm also one of

6    the two youth members, with the other being Ms. Zuckerman behind

7    me.  I was recently appointed a few months ago, and I am on both

8    the Community Engagement and Settlement and Policy Subcommittees.

9              Your Honor, on behalf of the Portland Committee on

10   Community-Engaged Policy, formally known as PCCEP, thank you for

11   the opportunity to present today.

12             Every step the City takes towards adopting the

13   Community Board for Police Accountability, CBPA, is a step

14   towards affording the values ingrained in the settlement -- in

15   this settlement agreement.

16             PCCEP was born out of the settlement agreement, works

17   to support the goals of the settlement agreement, and we are

18   excited by the promise that the CBPA will provide independent

19   systems supporting transparency as well as the platform for the

20   voices of impacted communities.

21             We would first like to recognize the work of the former

22   Police Accountability Commission, or PAC, in developing the Code

23   package proposed last fall.  As a fellow community board working

24   on policing issues, PCCEP knows better than most how tremendous

25   of an undertaking this project was for the PAC.  PCCEP also

1   understands the City has an obligation to create an oversight

2   system that is functional and legally defensible.  We appreciate

3   and applaud everyone's commitment to creating the best

4   accountability system possible.  We are optimistic that a CBPA is

5   a step in the right direction, and are honored to be able to

6   contribute feedback during this preparation phase.

7           In the spirit of community leadership that has guided

8   this process along, we hope that the judge, City, and amici will

9   consider addressing the following four concerns PCCEP has about

10  the proposed changes to the settlement agreement and/or CBPA

11  Code.  Number one, we have an issue with the membership criteria

12  that measures bias; number two, we are concerned about the impact

13  these proposed criteria will have on recruitment and the ability

14  of members to work without threat of dismissal; we feel that

15  police participant organizations are overly represented on the

16  proposed CBPA nominating committee members; and we don't

17  understand why the chief of police should be allowed exemption

18  from CBPA reviews or conduct decisions.

19          First I'll talk about our concerns regarding the

20  consideration of bias as part of the membership evaluation.  In

21  the revisions of Section VIII of the settlement agreement being

22  considered today, it is outlined that, quote, city council shall

23  have authority to remove a member of the CBPA for cause,

24  including, quote, objective demonstration of bias for or against

25  the police.

1          This is a sharpening of the previous criterion of

2     Section VIII for Citizen Review Committee members, which stated

3     that members must be, quote, representative of the many and

4     diverse communities in Portland who are neutral, unbiased, and

5     capable of making objective decisions.

6          The previous version allowed for a board compromised of

7     people with diverse perspectives, and stressed that board members

8     should -- could still make objective decisions.  PCCEP is not

9     alone in our concern that the Code states members should be

10    evaluated based on whether or not they've demonstrated pro or

11    anti bias towards police.  It has also come up in the form of

12    spoken testimony at many PCCEP meetings and most of the written

13    testimony submissions sent to the Department of Justice.

14         As fellow community board members, this rewrite strikes

15    us as significant and problematic.  While we also fear that the

16    former language refers to general capabilities of objective

17    decision-making and encompasses any form of bias, the new

18    language does not mention neutrality or objectivity, and limits

19    displays of bias only for or against police.  The new language

20    also suggests that bias can be objectively identified, yet does

21    not provide any guidance as how to -- it will be assessed.

22         The fact that this same problematic language also

23    appears in the CBPA Code is an issue for us, too.  PCCEP wants to

24    be clear that we wholeheartedly support a board that is neutral

25    and capable of objective decision-making.  And we feel that

1  provisions already exist in the CBPA Code to ensure neutrality

2  without using phrases related to objective demonstration of bias.

3          Thank you, Your Honor.  I will pass it back to

4  Ms. Zuckerman.

5          THE COURT:  Thank you.  I appreciate your comments,

6  Mr. Bautista.  I do think, though, it does talk about neutrality,

7  although not expressly, but instead by the use of the word

8  "objective."  There has to be -- for there to be removal, there

9  has to be an objective demonstration of bias for or against.

10          That word "objective" is very, very significant.  You

11  know, under the law, simply having a subjective belief that

12  someone is biased is not good enough.  They have to convince a

13  neutral, reasonable person that there's been a demonstration of

14  bias.

15          And so to that extent, I think this concept of

16  neutrality that you correctly point out is so important, is

17  reflected in the requirement of an objective demonstration, but I

18  appreciate your comments.

19          MR. BAUTISTA:  Thank you, Your Honor.

20          THE COURT:  Thank you.

21          And Ms. Zuckerman.

22          MS. ZUCKERMAN:  Thank you.  And I think more of this

23  might answer that.  So now I'll move on to our second concern.

24          Because the language is so vague, it will be easy for

25  evaluators to label a candidate's behavior as either pro or

1  anti-police bias based on their own bias, even though the same

2  behavior might be judged as neutral or the opposite by someone

3  else.  This means that the evaluator's assessment is inherently

4  subjective as opposed to fact based.  This will lead to

5  difficulty recruiting members, because people can be easily and

6  incorrectly disqualified as being biased, and to retaining board

7  members, because people will feel restricted from sharing

8  thoughts during CBPA meetings.

9        On top of this, there is room for people to be

10  wrongfully removed from the board if their opinions and decisions

11  appear to be skewed in either direction regardless of if they

12  make these decisions objectively and fairly.

13        Once again, speaking from our experience as a community

14  board that works on policing, we know that there is no such thing

15  as an objective demonstration of bias for or against police, and

16  we'd hate to see the CBPA being set up for failure before it even

17  begins.

18        In our recent public forum about the CBPA Code, a PCCEP

19  member asked how bias would be identified in discipline police

20  cases heard by the CBPA.  The city attorney at the meeting

21  responded to community attendees by saying, "How do we know when

22  someone's doing that?  It's not an easy thing to determine.  If

23  there's bias for police, you all," speaking to community members,

24  "I imagine are going to tell us.  And if there's bias against

25  police, then the union's going to bring it up," end quote.

1           This response illustrates that different stakeholders

2     will view objectivity differently based on their personal

3     circumstances and perspectives.  It also illustrates how

4     difficult it would be for CBPA members to work towards their goal

5     if they're always concerned that statements may demonstrate bias.

6     As an example, consider the Colorado District Court case of Lisa

7     Sweeney-Miran vs. Boulder, Colorado.

8           THE COURT:  Although doesn't the Colorado case, as

9     Ms. Brown pointed out, include not just an objective

10    demonstration of bias, but an appearance of bias, which is a much

11    more mushy concept?  Isn't that -- do you agree with Ms. Brown

12    that that's part of the problem with the Boulder, Colorado,

13    criterion?

14          MS. ZUCKERMAN:  I would need more time to answer that

15    question, but I think that there is still a lesson to be learned

16    from the Colorado case even if they're not the same.  And I

17    think, like, that -- the Colorado case seems to be phrased as

18    more like a subjective opinion, but I guess what PCCEP is trying

19    to say is we don't -- we're unclear how it can even be objective

20    in the first place.  So hopefully that answers the question.

21          THE COURT:  Okay.

22          MS. ZUCKERMAN:  Okay.  The City claims that the written

23    "anti bias" language is necessary in order for the CBPA's

24    discipline decisions to be upheld in court; however, PCCEP

25    believes the standard inadvertently creates a huge liability for

1    the City both in terms of CBPA recruitment and potential

2    lawsuits.

3              Let's move on to our third concern, which is the makeup

4    of the nominating committee for the CBPA has too much police and

5    police-adjacent representation.  While we know this gets into the

6    details of the Code, we think it's crucial to bring up today.

7              Under Section 35B.020, the proposed Code for CBPA, it

8    is stated that the nominating committee should be comprised of

9    two CBPA representatives, one community member from each council

10   district as designated by the council members of that district,

11   one representative from the Office of Equity and Human Rights,

12   one representative designated by the chief of police, one

13   representative from Portland Police Association, and one

14   representative from Portland Police Commanding Officers

15   Association.

16             Given the desire for objectivity and fairness in

17   decision-making, the operations of the nominating committee must

18   be set up to ensure this.  As it currently stands, in speaking

19   from experience as a community board, this committee cannot

20   nominate members successfully given that three of the ten

21   nominating positions are filled by police-related

22   representatives.

23             We understand that the goal of this board is ultimately

24   a fair and objective decision regarding potential misconduct.

25   While the nominating committee is not directly tied to such

 1    outcomes, there is an indirect connection that necessarily will

 2    affect decision-making.

 3            Pro-police bias will exist in representatives from the

 4    PPA, PPCOA, and the chief of police's representative.  The city

 5    attorney's statement about how bias will be judged differently by

 6    different people illustrates exactly this.  In order to produce

 7    fair and objective decisions as a board, diverse perspectives

 8    must be represented, and we believe that such heavy police

 9    representation on the nominating committee could result in

10    potential candidates being unfairly barred from joining the board

11    or unfairly removed from the board.

12            We're glad the City added one position from the Office

13    of Equity and Human Rights, and we'd like to see them further

14    seek diversity by recognizing that the current membership roster

15    gives too much power to the police-adjacent nominating committee

16    members.

17            This brings us to our fourth and final concern

18    pertaining to the chief's involvement in CBPA investigations.

19    PCCEP has heard numerous concerns about the lack of

20    accountability for the chief of police.  Such an aid exists to

21    hold police accountable, and we fear that the chief's possible

22    exemption from this process undermines the very nature of police

23    accountability in Portland.  The CBPA Code states that when there

24    is an allegation of misconduct against the chief of police, the

25    OCPA shall investigate the allegation and report its findings to

1   the mayor unless the mayor opts for another entity to perform the

2   investigation.

3           It's unclear why the chief of police may be exempt from

4   the CBPA process of accountability, as the chief's position holds

5   the most power and authority in the bureau.  Any investigation

6   into the chief should be at the discretion of the CBPA.  We were

7   told that this decision was tied to the organizational chart of

8   the new charter system, specifically as it relates to hiring and

9   firing of the chief; however, we feel there is room to explore

10  how CBPA can be the default investigator of all misconduct

11  charges against the chief of police.

12          We suggest that the board have the ability to recommend

13  and impose discipline, except if it were to recommend in firing,

14  the mayor could ultimately make this decision.

15          In conclusion, we as a committee believe in the purpose

16  and mission of this board and want it to be as successful as

17  possible in its duty of accountability.  We think the above

18  references to bias, nominating committee, the chief's potential

19  lack of accountability are essential to overcome before this

20  board can operate effectively.

21          Thank you so much for allowing us to share and inform

22  this process.  PCCEP appreciates the space to voice our concerns

23  and be heard.  We hope that you consider the points we shared on

24  behalf of committee and many community members.  And we look

25  forward to working with a future CBPA that can authentically

 1   represent an accountability board and uphold the promises of the

 2   settlement agreement.  Thank you.

 3          THE COURT:  Thank you, Ms. Zuckerman.  And thank you

 4   and thank Mr. LeDell -- I'm sorry -- Mr. Bautista for all the

 5   work you do for PCCEP.  I appreciate that.

 6          Although, I want to follow up on one of the things you

 7   said, Ms. Brown, and ask this question.  Could you remind me what

 8   is the role of the council members in providing folks on the

 9   nominating committee?

10          MS. BROWN:  Your Honor, so each -- for the very first

11   nominating committee, assuming it's done by the existing council,

12   then each council member will appoint one member.

13          THE COURT:  So you have five.

14          MS. BROWN:  And it's a community member, just to be

15   clear.

16          THE COURT:  Right.  What's going to happen when we get

17   a 12-person council?

18          MS. BROWN:  Then each council district, so we'll have

19   three council members who will need to jointly agree on one

20   community member from their district to put onto the board.  So

21   we will have -- instead of five -- so our first nominating

22   committee, assuming it's this council, which I hope so, then

23   there would be 11 nominating committee members, but going

24   forward, there would be 10.  So each district -- the four

25   districts would appoint one community member from their district.

1    So the three council members would need to get together on

2    finding a community member who would serve on the committee.

3              THE COURT:  And does the mayor appoint someone?

4              MS. BROWN:  No.

5              THE COURT:  Afterwards, in the new version.

6              MS. BROWN:  No, Your Honor.  That's not provided for in

7    the Code language.  And then the Citizen Review Committee on this

8    first nominating committee, assuming it -- well, no matter what,

9    they will appoint two members.  And actually, they already met

10   and selected the two members who would serve on the nominating

11   committee.  So we have those two community members.  And then at

12   the request of somebody at the town hall, I can't even remember

13   if it was Odelia or not, but we added -- somebody had suggested

14   we add somebody from the City's Office of Equity and Human

15   Rights, and so it's going to be expanded from 9 to 10 right now,

16   10 to 11.

17             THE COURT:  Thank you.  Anything further from PCCEP?

18             MS. ZUCKERMAN:  If I could just speak, not on behalf of

19   PCCEP, but myself just --

20             THE COURT:  Yes, of course.

21             MS. ZUCKERMAN:  -- as a member, because we haven't

22   discussed this enough, but to address the concerns about a

23   ride-along and Community Academy, I think that enough exists in

24   the requirements for what people have to watch and be trained on,

25   that I don't see how this must be necessary.  I think if folks

1    want to do it on a voluntary basis, there's so much -- so many

2    other ways to learn and gather police perspectives, that I think

3    this doesn't have to be the one kind of solution to that.

4            And, like, speaking for myself, I personally have a

5    discomfort in the thought of doing a ride-along as a PCCEP

6    member.  And I interact with -- and I still feel like I'm able

7    to, like, show up and do my duty as a PCCEP member, although

8    these are very different boards.  Yeah.  That's all I want to

9    share.

10           THE COURT:  Let me ask you this.  And I don't want to

11   pry, so if you don't want to answer any of these questions,

12   don't.  Just say you'd rather not.  That's totally fine.

13           Can you share with -- so you've never done a

14   ride-along.  Is that correct?

15           MS. ZUCKERMAN:  Yeah.

16           THE COURT:  Can you share with me a little bit more

17   about what your discomfort is about that?

18           MS. ZUCKERMAN:  Yeah.  I can.  A lot of it has to do

19   with prior experiences with police and the feeling of, like,

20   unsafety in those situations --

21           THE COURT:  Okay.

22           MS. ZUCKERMAN:  -- and not wanting to feel those things

23   again.

24           THE COURT:  I totally get that.  And let me ask you

25   this.  And, first of all, I won't be insulted if you don't

1    answer, I won't be insulted by any answer you give, but would my

2    volunteering to accompany you on a ride-along help in making you

3    feel more safe and more comfortable?

4         MS. ZUCKERMAN:  You're really putting me on the spot.

5         THE COURT:  Okay.  You don't have to answer.  You don't

6    have to answer, but I want to understand.  If the answer to that

7    from somebody is no, I would like to understand why not.  And you

8    don't -- I don't want to put you on the spot, so you don't have

9    to answer anything.

10         MS. ZUCKERMAN:  Yeah.

11         THE COURT:  But that's what I'm struggling with, is

12    trying to understand why it wouldn't make someone feel more

13    comfortable.

14         MS. ZUCKERMAN:  I think there's definitely possibility

15    for it to make some people feel more comfortable.  I think it

16    just still doesn't translate to the experience being necessary.

17    I think there's still other, like, avenues for this.  Or even I

18    just thought of this and it might not make any sense, but doing a

19    ride-along virtually on, like, watching a video of a ride-along

20    and still having that, quote unquote, perspective.  I think

21    there's potential other avenues for this.

22         THE COURT:  And the trouble I'm still having, I'm

23    struggling with since I have done ride-alongs in my life, is I

24    think they really are valuable for understanding what goes on

25    during a patrol.  Much like we occasionally take a jury to the

1    scene of some incident or event, because you can hear about it,

2    you maybe could even see photographs, but there's something extra

3    to be learned by actually being there and seeing that.

4         And I guess I would like to hear from someone who's

5    done a ride-along who said, "No.  That was totally useless.  I

6    didn't learn anything meaningful from it," because I'm

7    tentatively of the opinion it is a valuable experience especially

8    for someone judging the conduct of the police officers, while I

9    also totally get for some people, based upon their experiences,

10   it could be traumatic.  And that's why I want to try to find a

11   way to accommodate both:  get them that experience, but reduce

12   the trauma.  That's what I'm struggling with.

13             MS. ZUCKERMAN:  Yeah.  That's a hard thing.

14             THE COURT:  Okay.

15             MS. ZUCKERMAN:  Yeah.  I'm not sure what to -- what a

16   solution looks like, but I do think, again speaking for myself,

17   that it isn't necessary to be a part of the board, or it

18   shouldn't be necessary.

19             THE COURT:  Understand.

20             MS. ZUCKERMAN:  Thank you.

21             THE COURT:  Thank you.

22             MR. BAUTISTA:  Your Honor, if I may.

23             THE COURT:  You may.

24             MR. BAUTISTA:  With your question about if you -- if

25   you coming to the ride-along would be helpful, I would -- in some

1   way, I would lean towards no.

2          THE COURT:  Tell me why, if you're willing to.

3          MR. BAUTISTA:  Yeah.  Of course.  I would say no

4   just -- so, I haven't done a ride-along yet.  I joined PCCEP when

5   I was a minor, so I was 17, and then, you know, it was a bit

6   complicated with the situation of me doing a ride-along.  So now

7   that I'm of age, 18, in the eyes of the government, you know, I

8   can -- I can finally do it, and I feel comfortable, you know.

9          As still a high school student, you know, I've seen and

10  heard a lot of experiences that my friends have, some that are --

11  like, identify as BIPOC, some that don't, so, you know, it's a

12  mix.  And I live in a diverse, you know, community where it's a

13  lot -- I would, say, probably see, like, a cop every once in a

14  while, because it's a lot of things happening there.  And, you

15  know, if I was doing a ride-along with them, I would be open to

16  it, because like you said, it's, you know, a very good experience

17  and you get to learn a lot.

18         And I don't -- I have never dealt with, I would say,

19  like, a very difficult police experience.  You know, I've gotten

20  stickers from them, I've said hi, I've gotten to know them and

21  such, they've told me about what they do and such, but, like,

22  when it comes to, like, actual work, you know, like, how they

23  interact with folks or how they, like -- you know, all that type

24  of information, I don't know.

25         So, like, that experience of me doing a ride-along, I

1    would, you know, be open to, but having someone with, you know,

2    the ability -- with great influence like yourself, because

3    you're -- you oversee this, you're overseeing this right now, you

4    know, like, I feel like that would -- that would distract them

5    from, you know, doing their part as a -- you know, because it

6    will be them right there driving whoever the candidate or, you

7    know, me, and then in the back, there's the federal judge who,

8    you know, has the power for really anything, with, of course,

9    like, you know, with the parties and evidence, but, you know,

10   like, you have the final say in that, so, like, that would, you

11   know, in some way impact how they, like, are, you know, being

12   honest or -- you know, they want to put a good picture in, so

13   that's --

14          THE COURT:  I get that.  And so, therefore, if

15   you're -- and I hear you're saying you're willing to do a

16   ride-along by yourself, right?  Okay.  And I think you'd learn an

17   awful lot and get a good experience, and I think it's valuable.

18          I'm just worried about the person who, because of their

19   prior experiences, is worried about being by themselves with

20   police officers.  And if I was there, maybe you're right, maybe

21   the officers would be on their very best behavior.  I get that,

22   but I also -- what I'd be trying to do is make the person who's

23   otherwise reluctant to do a ride-along feel more comfortable,

24   feel safer, because I think it's pretty clearly obvious nothing

25   bad's going to happen to that person during that ride-along when

1   they're sitting next to a federal judge.  And that's really what

2   I was looking for, a way to make them feel more comfortable.

3           Now, if your point is, well, then they might not get

4   the full experience, okay, I agree with that, but all we can do

5   is what we can do.  But I agree with what you're saying on that

6   point, too.

7           But I still think even if the officers are on their

8   best behavior, and I think they typically are on ride-alongs, but

9   I can understand some people being skeptical, just simply seeing

10  what officers go through on a regular patrol is valuable, and

11  that's not going to change, just seeing what they're confronting.

12  That's not going to change if somebody else like me is sitting

13  along right next to them in the car.

14          That's my tentative view on that right now, but I

15  really appreciate both of your inputs.

16          MR. BAUTISTA:  Yeah, Your Honor.  Yeah.  Like you said,

17  it's -- it's definitely, like, you know, a lot of situations, you

18  can't really find a solution.  You can only try, and, you know, I

19  admire that.

20          You know, and there's, you know, definitely a lot of

21  other situation -- or a lot of, like, different scenarios that

22  could happen, you know, and that could be, you know, something

23  they might have to reach out to the public for, you know, to the

24  community, like, probably most of the time in my life, okay, in

25  this type of situation, like, what would make you comfortable,

1    because, you know, the people that have been up here talking

2    about this whole issue have done work related to the police or

3    serve as a, you know, representative to a police-related, you

4    know, board such as ourselves.  So, you know, like, asking a

5    general person who's not, you know, involved or someone that

6    doesn't care about -- like, about police or someone that probably

7    does care about police, you know, asking them that might find you

8    a solution that you haven't thought of.

9            THE COURT:  I agree.  You're right.  And by the way, I

10   do encourage you to do the ride-along now that you're 18.  I do

11   think it's an eye-opening, educational experience.

12           MR. BAUTISTA:  Yeah.  I am planning on doing it, too.

13           THE COURT:  Thank you both so much.  I appreciate all

14   the work you're doing.

15           MR. BAUTISTA:  Thank you, Your Honor.

16           MS. ZUCKERMAN:  Thank you, Your Honor.

17           THE COURT:  All right.  The list that I have -- by the

18   way, I forgot, there were two names added that I didn't read off

19   earlier, Deian Salazar and Patrick Nolen, so I've added you to

20   the end of the list.

21           Do we have, and I apologize if I'm mispronouncing this,

22   Je or He Amaechi or Amaechi on video?  Do we still have you?

23           THE COURTROOM DEPUTY:  I don't (pause) --

24           THE COURT:  All right.  If you come back on, let us

25   know.

1           Do we have Matt Cleinman on video?

2           MR. CLEINMAN:  Yes, Your Honor.

3           THE COURT:  And we can hear you just fine.  So good

4    afternoon.  Thank you for being here and thank you for your

5    patience.  The floor is yours.

6           MR. CLEINMAN:  Of course.  Thank you.  So, Your Honor,

7    I'm a concerned community member.  I just want to thank you for

8    your guidance earlier this morning on the folks sitting in on the

9    settlement and not the City's modifications to their 2020

10   measure.  Also, I want to thank you for your reminder to speak

11   slowly.  Though I moved to Portland almost 20 years ago, I feel

12   like I'm -- one of the things from my northeast roots I retain

13   the most is speeding up in moments like this, so please feel free

14   to ask me to slow down if I start going too fast.

15          I'm generally supportive of the changes to the

16   oversight board, but I'm seriously concerned about a couple

17   pieces that have come up throughout this morning, and I think

18   some of what I was going to say has changed a bit after hearing

19   your thoughts and other people's thoughts throughout this

20   morning.

21          You know, I really appreciate the need for all sides to

22   understand all perspectives better, the entire community that's

23   going to be part the board, but I'm concerned that some of the

24   current plans are going to result in a board that better

25   understands the perspective of the police and may not equally

1    well understand the perspective of the community members who have

2    had poor interactions with police.

3              There's two cases I'm going to talk about.  The first

4    piece is -- both are pieces that have come up already.  One is

5    that selection process and the nomination process.  I agree with

6    you fully, Your Honor, that this first entity of the board is

7    going to be key, as well as future versions will be key for

8    suggesting changes that align.

9              There are tweaks that we need to make in how the board

10   operates in City Code, but I guess to me that underscores the

11   importance of getting this first board right, because if we don't

12   have a board that fully reflects the community in this first

13   board, we're going to be in a feedback loop where they -- that

14   board is not set up to make the changes that future iterations of

15   the board will need to operate without bias.

16             Like several people have said, I think I'm concerned

17   with the police influence on the board.  We are here because the

18   police need this outside influence, the full community influence

19   on discipline, right.  Over the years, Portland police have

20   proven unable to hold themselves in check.  And so with that in

21   mind, I'm not sure that having a nomination process that has

22   several members from the police and associated police unions is

23   going to be helpful to getting this unbiased board.  I think a

24   police-weighted nominating committee will undoubtedly affect who

25   is selected to serve, which in turn will affect how the oversight

1  board operates and will affect potentially who speaks and might

2  not -- and needs might not being met based on a police-heavy

3  nominating process.

4          The second piece I want to talk about, Your Honor, is

5  the piece that we've talked about a lot this morning so far, so

6  I'll try to summarize my thoughts, and that being the ride-alongs

7  and the PPE Community Academy.

8          I think I appreciate all of the ideas on how to try to

9  make it as comforting as possible for people who might not -- who

10  might not be comfortable with it, but I think at its core, my

11  concern is that it's going to scare away potential applicants who

12  otherwise might be willing to apply, and thus change the makeup

13  of the board.

14          I think a lot about colleges now.  And I was fortunate

15  to go to college with some incredible financial aid.  The sticker

16  price is now an absurd amount of money.  And while I still meet

17  all of the demonstrated need for people to apply, it has a

18  filtering effect of who applies, because some people just see the

19  price, don't go deeper and realize, "Hey, there might be

20  scholarships if I apply and get it."

21          I think similarly here, we'd likely be scaring away

22  potential applicants who aren't going to read far enough to see

23  that there are potential accommodations, or might be worried

24  about the accommodations not being -- the accommodations that

25  they would require not being accepted, right.  If it ends up

1    being a conference to accept potential accommodations, some

2    people might say, "Hey, I'm not sure I want to take the time off

3    work, the time to think about applying and then fight for

4    accommodations" if there's a chance that these accommodations may

5    not come through.

6             I'm also concerned about how these ride-alongs bias

7    members of the board, as there's no similar requirements to spend

8    time with communities highly affected by the police.  You know, I

9    think I agree that prep time with the police would be helpful for

10   understanding their perspectives, but I'm not sure, you know,

11   without a similar requirement to spend time with communities who

12   have been highly affected by the police, you end up with a board

13   who's spent a lot of time looking out the windshield and spending

14   time talking to officers and might not understand that full

15   community perspective that is helpful to be part of that board.

16   And so with the asymmetric time with police, I'm not sure this

17   requirement is helpful today.

18             Those are my thoughts on those two pieces.  I'd ask if

19   you'd indulge me the time to talk about Portland Street Response

20   once or twice today as well?

21             THE COURT:  Sure.  By the way, on the last point,

22   before we lose track of it --

23             MR. CLEINMAN:  Yeah.

24             THE COURT:  -- I'm assuming that as part of the general

25   background education of the committee members, if MHA and the

1   Albina Coalition want to put together some meetings with

2   community members or others or some other way to make sure that

3   the committee is appropriately educated on all aspects of their

4   job, I'm sure that will be well received.

5              MR. CLEINMAN:  Thank you, Your Honor.

6              THE COURT:  Hold on.  Ms. Brown has risen.  And maybe

7   I'm wrong.

8              MS. BROWN:  Well, I'm trying to find the exact

9   language, but this was a suggestion made at a town hall on

10  July 15th, and we did make amendments to the Code language to

11  allow -- because somebody suggested to us if people have to learn

12  about police, they should also learn about people that have been

13  over-policed.  And we put some language in.  I'm going to find

14  it, and then I will let anybody know what it is, but we did

15  include that because it was recommended.  It's in the Code.

16             THE COURT:  Excellent.  So when you find it, let us

17  know later.

18             MS. BROWN:  Thank you.

19             THE COURT:  Thank you.

20             All right.  Back to you, Mr. Cleinman.  And you want to

21  talk about Portland Street Response.  You may.

22             MR. CLEINMAN:  Yes.  I think I agree with you, Your

23  Honor, that it is a wonderful solution to some of the issues

24  we're talking about here.  And I think that the city's attorney

25  noted this morning that they're looking for external funding to

1    continue the expansion of Portland Street Response.  And as a

2    community who has seen firsthand the importance of Portland

3    Street Response in helping out some of our most vulnerable

4    neighbors, I find it to be an inadequate and embarrassing

5    response as a resident of the city of Portland.

6              We don't look for external funding when we want to

7    expand the fire bureau or the police bureau.

8              THE COURT:  Hold on one second.

9              MR. CLEINMAN:  I apologize if you can hear those dogs.

10             THE COURT:  Okay.  If those are your dogs,

11   Mr. Cleinman, asking you to mute won't do us any good at all.

12   All right.  Go ahead.

13             MR. CLEINMAN:  I believe the truck has gone by.  I

14   apologize for that, Your Honor.

15             You know, if we're having issues, if we want to expand

16   the fire bureau or the police bureau, we don't go looking for

17   external funding, we make it a priority with our city budget.

18   And especially given the impact that Portland Street Response has

19   in our overall city budget, a decision not to prioritize its

20   expansion on our existing resources speaks volumes.

21             Mentioning looking to external funding to expand the

22   program feels like a dodge to redirect attention away from the

23   fact that the City is not seriously supporting the expansion of

24   Portland Street Response today.  I just wanted to bring up that

25   point.

 1          THE COURT:  And I really want to stay away from
 2    electoral issues and political issues, but I'll just state the
 3    obvious.  Anyone who thinks that an expanded Portland Street
 4    Response is an important public policy issue should be asking the
 5    candidates for the upcoming election, "How do you feel about it
 6    and what are you planning on doing?"  I'm trying to stay out of
 7    any political issues, but that's just an obvious statement.
 8          MR. CLEINMAN:  Definitely.  I agree with that, Your
 9    Honor.  Those are all my thoughts.  I appreciate your time, Your
10    Honor, and I appreciate your consideration of my and a lot of the
11    community's concerns.
12          THE COURT:  Thank you so much for your participation,
13    Mr. Cleinman.
14          And let's turn it back to Ms. Brown.
15          MS. BROWN:  I have the answer.  And then, Your Honor,
16    there's also somebody in the courtroom, a Deian Salazar, who has
17    to leave by 1 o'clock, and asked if we could take --
18          THE COURT:  All right.  We'll turn to Deian Salazar in
19    a moment, but (pause) --
20          MS. BROWN:  The answer is, so the language that we
21    added at the recommendation of a community member was
22    "participate in an educational opportunity to learn about the
23    perspectives of people who have been negatively impacted by
24    police interactions."
25          THE COURT:  And am I correct in assuming that if our

```
1    amicus curiae, Mental Health Alliance and Albina Coalition, want
2    to contribute to preparing that appropriate educational
3    opportunity, which may include, you know, interactions with and
4    meeting with people in the community, that would be well
5    received?
6              MS. BROWN:  I'm sure it will, Your Honor.
7              THE COURT:  Thank you.
8              Deian Salazar, I understand you have to leave, so
9    you're welcome to come on up.
10             MR. SALAZAR:  Yes.  Thank you.
11             MS. ALBIES:  And, Your Honor, excuse me.  I also have a
12   prior commitment, so Rian Peck will be here to continue to
13   represent the AMAC.
14             THE COURT:  All right.  Is there anything you would
15   like to say before you leave, Ms. Albies?
16             MS. ALBIES:  No, Your Honor.  I appreciate the
17   opportunity.
18             THE COURT:  Okay.  Thank you for your continued
19   contributions always, Ms. Albies.
20             MS. ALBIES:  Thank you.
21             THE COURT:  Mr. Salazar, if you could spell your last
22   name, please, and state your --
23             MR. SALAZAR:  Yes.  So actually my first name is
24   spelled D-E-I-A-N and then my last name is spelled S-A-L-A-Z-A-R.
25             THE COURT:  Welcome.
```

 1            MR. SALAZAR:  Yes.  So I have some prepared remarks,

 2    but I also want to contribute after hearing lots of things that

 3    I've been hearing in this courtroom today.  So I will start with

 4    those and then transition, hopefully seamlessly, into the

 5    pre-prepared remarks.

 6            So first off, I want to give a little bit of context

 7    regarding my background.  So I serve on the Oregon Commission of

 8    Autism as a social services co-chair.  I am autistic myself.  I

 9    am 24 years old.  I'm Latino.  I serve on the Portland Children's

10    Levy Community Council and the Governor's Child Foster Care

11    Advisory Commission.  And I'm the only one of my family who,

12    dating back to at least my great-uncle, who has never been

13    arrested.  So that is quite a unique experience.

14            I have had when I was an adolescent, a minor, a

15    teenager, I believe, or pre-teen a suicidal experience where I

16    actually drank some sort of harmful substance, and then that

17    resulted in an armed police coming with actually an ambulance to

18    the house, which was quite shocking and surprising to me, and it

19    did make me feel unsafe at the time, so I do believe I have at

20    least more experience than the average person.

21            And so I want to talk about what I'm hearing from my --

22    you know, several of the people that have already testified.  So

23    one thing that I'm hearing that is concerning me is it's a

24    concerning amount of linguistic version of rules lawyering

25    regarding all the potential interpretations of the language or

1    the potential use of the language, and this is something that

2    dates back thousands of years.  It's something that is deeply

3    frustrating to me, because we've seen this happen with Rome, and

4    it continues to be used in America.  People in bad faith tend to

5    argue against proposed changes due to issues with language.  And

6    the simple fact of the matter is as a country, we've always had

7    to use language and to grow the specifics later on.  This was

8    true with the vice-presidency, so this is no less true here.

9           So to argue that the language inherently leads to a

10   less desirable result is simply based on, like, hypotheticals and

11   taking it to the extreme in bad faith or assuming the assumptions

12   of bad faith of all parties here, which I do not believe is

13   particularly useful if we really want to establish true

14   collaboration and true accountability, because that leads to it

15   being by the book.  And anyone who does stuff only by the book

16   knows that does not really result in the relationships necessary.

17   So I think a certain amount of trust is needed here.

18          Second, people talking about ride-alongs and how

19   traumatic that -- you know, how traumatic that can be, I can get

20   that.  I also, of course, as someone who works -- you know, who

21   really does work toward people with disabilities, I'm also aware

22   of something of the mobility issues, but barring those issues, I

23   do believe that you, Your Honor, have already provided reasonable

24   alternatives and solutions to the best of your capabilities.

25   That should encompass, maybe not even a single person who may

1    ever apply, but the vast majority.

2            And I think that we should have an abundance mind-set

3    here rather than a scarcity mind-set, because that's what it

4    feels like those objections are coming from.  And I, frankly,

5    think it would lead to an abundance of people willing to serve,

6    and so there will be ample time to get all those perspectives.

7            So that is something that we should really think

8    that -- would know we're not really limiting -- we're not going

9    to, like, not have every perspective, because eventually every

10   perspective will want to be there.  And those people who simply

11   do not fulfill that, who are simply -- you know, who are

12   unwilling to have that alternative or whatever or cannot for

13   whatever reason, they are not the only people in life with those

14   experiences.

15           And so we need to have an abundance mind-set of what

16   we're talking about when -- about who's applying, who can apply,

17   who will apply, et cetera, et cetera.  I think that is a first

18   step in ensuring that we actually establish trust, because if we

19   go into this in a scarcity mindset, we're going to go into this

20   feeling caged, and that's going to result in a lot of mutual

21   distrust and suspicion, I feel.

22           Third, someone mentioned Portland Street Response.  It

23   actually is a great program.  I hope to expand it.  One thing I

24   do just want to note for the record is that it does not have

25   authority to transport people who are experiencing mental health

1    crises.  And as someone who works on the Oregon Commission on

2    Autism and, you know, suffers mental health care and stuff like

3    that, that is a huge problem.  That's something similar to what

4    we experienced with the Sackler Units (phonetic), which is

5    stabilization and crisis units for people who have either severe

6    autism and/or are experiencing severe crises.  This is actually

7    dating back to institutionalization for that community, by the

8    way.  So that is a serious issue.

9           And so that's why -- but that's -- you know, the actual

10   policy solution is for another day, because this is about legal

11   stuff, not the, you know, policy stuff.  So those are some of my

12   concerns.

13          And now I will actually move on to my pre-prepared

14   statement.  So in this case, the United States vs. Portland, this

15   entire case, we are at a defining moment in Portland and American

16   history.  We are at a crossroads.  So do we choose us versus them

17   and allow false narratives to permeate the political discourse

18   and dictate policy or do we embrace equal justice, collaboration,

19   and holistic perspectives on policing?

20          For too long we have been given a binary -- a false

21   binary story as the result of a tug-o-war between two opposing

22   forces:  those who would abolish police and those who would let

23   them run amok.

24          The cause of police reform for Latino and black

25   communities has been highjacked, mutilated, and twisted into a

1    form of political patronage for those who seek to use the issue

2    for their own gain.  That must end now.

3            We the people of East Portland District 1 embrace

4    accountability, but we also reject that people who intrinsically

5    are useful for giving the view of one side of the equation should

6    speak for the entire city and make that critical judgment that

7    will forever shape the future of the relationships between police

8    and the community going forward.

9            We need a true well-rounded commission full of diverse

10   perspectives that are committed to working together and

11   pursuing -- and pushing a single -- let's see.  Not pushing a

12   single experiential narrative as it is representative of the

13   absolute truth in every situation.

14           Truth is revealed through a rainbow tapestry of

15   narratives full of people of many colors who all deserve equal

16   application of justice.

17           I have some reservations about the changes;

18   nevertheless, this only showcases the need to include all of

19   Portland community and communities of color, not self-appointed

20   spokespersons, when writing such an important, necessary, and

21   impactful piece of legislation.

22           Police cannot police themselves, that much is true, but

23   nor can people who have every reason to suspect cops police law

24   enforcement alone.  We need a more complete perspective that

25   ensures every community is able to speak for themselves and shape

1    accountability in a truly just way that empowers all of that

2    community, not just those who use them to push their narrative at

3    expense of their own community's diverse narratives, because that

4    is not accountability.  That is abuse of power and the trust of

5    their own communities to ensure they are all safe from police and

6    through police.

7            That is why, with serious reservation about the current

8    state, I nonetheless urge the United States of America to --

9    sorry, yeah, the judge and the court here to support these

10   revisions and recognize the cause of true police accountability

11   is growing up into a mature adult.  It's time they treat it like

12   one.  Thank you.

13           THE COURT:  Thank you very much, Mr. Salazar.  I

14   appreciate your comments and your being here.

15           MR. SALAZAR:  Yes.

16           THE COURT:  All right.  Thank you, sir.  Thank you.

17           Let me go back and invite Dan Handelman from Portland

18   Copwatch to turn back on your video, unmute yourself.  And I look

19   forward to your comments.  And we do have your written comments

20   in Docket 443.  Mr. Handelman, are you with us?  All right.

21   There you are.  Dan, we can see your name, but we don't see your

22   face yet and we don't hear you yet, so make sure you're unmuted.

23           (Pause in proceedings)

24           THE COURT:  Do we have Barbara Bochinski from Portland

25   Copwatch?  There you are, Barbara.  I see you.  Can you hear me?

 1    Make sure you unmute yourself.

 2               (Pause in proceedings)

 3         MS. HARDESTY:  Thank you, Judge Simon.  It's always a

 4    pleasure to stand in front of you.  This may probably be my last

 5    time, because my assumption is that you will probably approve

 6    this change, and if this change is approved, then there's nothing

 7    else I can offer you.

 8         Let me explain why I think approving this change at

 9    this time is not in the best interests of the people in the city

10    of Portland.  You may know this, Judge, but in 1988, there was a

11    police accountability system put in place called PIIAC.  And you

12    may also remember that that entire board resigned in

13    frustration --

14         THE COURT:  No.

15         MS. HARDESTY:  -- because they, in fact, did not

16    believe that they had the ability to hold police accountable.

17         So then came 2001, under Mayor Vera Katz, IPR, an

18    Independent Police Review was developed.  It was supposed to be a

19    one-year experiment.  It took 13 years to get an audit of whether

20    that system worked as the public had hoped it would.  I will tell

21    you that it's been consistently said that IPR doesn't actually

22    independently investigate police.  They really review police

23    reports of police investigations.

24         And so as a community member who's worked on police

25    accountability for over 30 years both as a grassroots community

1    member and as a member of the city council, we had to go to the

2    voters, because it was clear that neither the city council nor

3    the Portland Police Bureau had any interest in accountability to

4    the people they were sworn to protect and serve.

5             And so after fighting with -- or not fighting and

6    working with over 20 police chiefs, 10 police commissioners, the

7    only thing left to the people in the city of Portland was to go

8    to voters, so we did.  And voters overwhelmingly, by an

9    82 percent margin, voted for a truly independent police oversight

10   board that would have members who had been harmed by policing in

11   the city of Portland, and would not have either police officers,

12   their family members, or police influence on who served on the

13   board.

14            Now, no one who imagined this new system didn't think

15   that police would be involved, but they don't need to be on the

16   board, nor do they need to be deciding who serves on the board.

17            What you are now -- what is now being presented to you

18   is a proposal that says five city council members who never say

19   no to the police are going to appoint people, three police

20   personnel are going to appoint people, and we're supposed to

21   believe that there will be no bias for or against police.

22            Well, my life has been about accountability.  Would I

23   qualify to serve on this board?  I have sued the Portland Police

24   Association for misconduct.  I have won.  Would I automatically

25   be disqualified from serving on this board?

1          THE COURT:  The answer is no.

2          MS. HARDESTY:  Well, to you, Judge Simon.  But in this

3     little room where people are going to be deciding who's worthy or

4     who isn't, do you think what they're going to do, they're going

5     to do just like what happened when I got my jury summons?  I was

6     supposed to go to jury duty next week on Thursday, and then a

7     week after I did the call, I get an e-mail saying, "Don't report.

8     We don't need you.  You have served your jury duty."

9          All right?  Silly me.  I'm thinking, yes.  I am

10    66 years old.  I have time.  I can serve on jury duty, but

11    somebody in the DA's office looked at my name coming up and went,

12    "Oh, hell no," right?  And so I have served my jury duty by just

13    having my name there.

14         I have no confidence, and I want to be really clear

15    about this, no confidence that the current city council members

16    are the right people to pick people to serve on an oversight

17    board that will be the very first board for this new oversight

18    system.

19         The community depended on us.  That's why we got 20

20    community members to volunteer for almost two years for a

21    thoughtful process that engaged thousands of people in the

22    community on a recommendation to the city council.  It gets to

23    the city council.  The city council says, thank you very much,

24    and then they gut it.

25         What we know about volunteer boards at the City of

1   Portland is people have lives when they're trying to volunteer,

2   so the thought was we would have more community members on the

3   board to share the work, to make sure that the work didn't stop,

4   because if you had to have a quorum, we're at ten people now, so

5   five people.  If five people don't show up, you can't do

6   anything.  Right?

7          And so I am here today to say I wish that we would

8   actually be implementing what the voters intended.  The voters

9   were really clear.  And there were only two organized groups

10  opposed to this ballot measure.  That was the current City

11  Auditor and that was the Portland Police Association.

12          And so the fact that we have now put the police in the

13  middle of negotiating what oversight looks like and concerns this

14  new board, why have the ability to have community members walk in

15  with any complaint and feel they've been heard and respected and

16  that their complaint will be looked into.  Right?

17          I'm unclear today, what will IAB do, because when

18  Internal Affairs investigated the wrongdoing that happened to me,

19  they found no wrongdoing until I filed a lawsuit against the

20  Portland Police Association.  Then, lo and behold, all of a

21  sudden they found out, well, there were three police officers

22  that should have been held accountable for what they did to me.

23          I am very concerned that if you give this a green

24  light, we will be here 20 freaking years from now begging for

25  another real accountability system that will hold police

1    accountable to the community's expectations, not to policing's

2    expectations.

3          Your questions earlier today, why wouldn't somebody

4    want to go on a ride-along.  If you had been on the street

5    brutalized by the people who are sworn to protect and serve,

6    would you really want to be in an enclosed vehicle with them and

7    trust that what you're going to see is going to be really real?

8          As someone who actually films police all the time, I

9    can tell you filming police tells you a lot more about how police

10   engage with the public than doing a ride-along with a police

11   officer.  As someone who's done that for decades, right, very

12   respectfully, but when you film the police, the police actually

13   act better than they do when you don't film them.  Right?  And

14   I've had that experience over the last 30 years in this

15   community.

16         And so if I sound frustrated, it's because I am,

17   because the things that you're most proud of that we've done,

18   Judge Simon, Portland Street Response, body cams, and this police

19   oversight board, none of these were ideas that came from the City

20   of Portland or from the Portland Police Association.  All of

21   these came from the community pushing back over and over and over

22   again.

23         I was the conduit when I was on council.  Right?

24   Dr. Haynes, Dr. Reverend Knutsen, I mean, we've been doing this

25   for over 25 years.  Right?  This is -- it takes so long to undo a

 1    broken police accountability system.

 2            I tell you, from '88 to 2001, and now finally when

 3    we're at the threshold of getting a truly independent police

 4    oversight board, the City elected officials have gutted it in

 5    favor of something more appealing to police.

 6            Well, if we had a good system, 82 percent of voters

 7    would not have voted for a new system.  Clearly the community

 8    does not believe that when the police investigate themselves,

 9    that they find themselves doing anything wrong.

10            And so this is why I believe this will be my last time

11    in front of you, because this feels like -- I've been doing this

12    for 12 years, did it for two years before we even came in front

13    of you, and then at the end of the day, all of the great ideas,

14    none of them came from the City of Portland or the Police

15    Association.  They all came from the community and they all

16    required the community to push as hard as they possibly could to

17    get some results.  And so I'm giving up.  I'm accepting the fact

18    that we will not have an accountable police force in the city of

19    Portland any time soon, because of what I'm seeing and hearing

20    here today.

21            THE COURT:  Okay.  Can I ask you a question, and that

22    is, will the -- in your opinion, will the accountability board

23    and system be better received by the community if we wait until

24    the results of the new election of city council and then have the

25    new city council, which I think takes --

1          MS. HARDESTY:  Absolutely.  Absolutely.  I have more

2    trust in people I don't even know will be elected yet than I do

3    with the current people who already hold those seats.  Yes.

4          THE COURT:  All right.  And then let me ask, and I

5    don't know if Ms. Brown or Mr. Geissler want to answer now or

6    later, but why can't we -- given that we're only 70 days away

7    from the election, and as soon as the new city council gets

8    elected they'll be starting their office I believe in January,

9    why don't we wait until then to appoint the nominating committee?

10          I know that we're delaying things a little bit, but,

11    you know, for all practical purposes, we're not delaying it more

12    than five or six months in the course of this 13-year settlement.

13    And if that will make the oversight board have greater public

14    acceptance, it sure seems five months worth waiting for.

15          MS. HARDESTY:  I will say --

16          THE COURT:  Go ahead, Ms. Hardesty.

17          MS. HARDESTY:  Sorry, Judge.  I was just going to say,

18    this is on the city council agenda for next week, because they

19    want to fast track it so that they can do it before the new

20    council actually take its seat, which in my opinion just really

21    undermines the brand-new council.  They will be the ones we will

22    hold accountable for this system, and they won't actually have an

23    opportunity to appoint the people that are going to be on this

24    first board.  This first board is absolutely critical --

25          THE COURT:  Right.

1           MS. HARDESTY:  -- that we do the first one right,

2     because we're going to have to live with it for at least the next

3     decade or two.

4           THE COURT:  I agree with that.  And I'm also thinking

5     that once someone gets on the board, assuming they show up and

6     they act reasonably responsible, they're not going to be removed

7     from the board just because some new -- a new nominating

8     committee takes place.  And so it's making sense to me to let the

9     new city council that will be politically accountable for how

10    this is working appoint the nominating committee, because they

11    don't appoint the board directly, but they appoint the nominating

12    committee.

13          And so let me ask Mr. Geissler and Ms. Brown, why isn't

14    that a good idea?

15          MS. BROWN:  Your Honor, if I could go first.  I think

16    for the City -- from the City's perspective, you asked me earlier

17    about how things are going with moving to a new form of

18    government.  And Commissioner Hardesty and I talked about this

19    before the hearing that it's a huge change for the city.  And I

20    can't tell you how much work is going on in the background to try

21    to prepare for this and how much work it's going to be for the

22    new councilors to figure out what their work is.

23          So part of what we had hoped for and looked for is that

24    the current council, who already understands how everything

25    works, doesn't have to learn a new system.  We only have one

1    current member of council running to be a council member rather

2    than a mayor.  And it just is a very, very different form, and

3    it's going to be a lot of work for people to get up to speed on

4    how the new council works.

5         THE COURT:  I get that.

6         MS. BROWN:  So our -- and I would also -- one other

7    thing I would say, our current council is made up of our elected

8    officials.  These are all people that the voters chose to put

9    into these positions and are representative -- are the people

10   that the community voted to put into those positions.  So I guess

11   I would -- I just -- to suggest that they aren't speaking on the

12   wishes of the voters, I don't know that that is a fair

13   characterization of the current council, because they --

14        THE COURT:  Well, I don't mean to get too theoretical

15   on you, but, yes, I do.  One of the benefits of a representative

16   democratic system where people stand for reelection is if the

17   voters don't like what they're doing, they don't vote them --

18   they don't vote to reelect them.

19        We have a very different dynamic here.  Except other

20   than one, these folks are not standing for reelection.  They

21   don't have that much of a stake in the future, because they're

22   not putting their electoral reputation on the line, whereas the

23   new city council and the new mayor will have more at stake in

24   making sure that this system works, because if it doesn't, that's

25   going to be something that will affect their re-electability.

1    Isn't that right?

2            And if we were talking about waiting a few years, I

3    would say, no, we've got to move forward.  If we're talking about

4    waiting a few months, it's making some sense, because one of the

5    things that will make this settlement and these amendments work

6    is community buy-in.  So why aren't we better off waiting?  And

7    if it takes a little bit more time because the new council

8    members and the new mayor will need to get up to speed on a lot

9    of things, including this, that's not so bad, is it?

10           MS. BROWN:  Your Honor --

11           THE COURT:  What do we lose?

12           MS. BROWN:  Well, I would say what do we lose is that

13   we're in the settlement agreement and we're looking at standing

14   up this oversight board that we've been doing for -- you know,

15   working on hard for four years, but I would also note that of our

16   five council members, the only one who's not seeking reelection

17   is the mayor.  All four other council members are seeking

18   reelection.

19           THE COURT:  Okay.

20           MS. BROWN:  So three of them that are seeking election

21   have put their names in for the mayor position.  So what I meant

22   was the only -- only one commissioner is seeking to become a

23   council member again, but three others are seeking to be mayor.

24   So --

25           THE COURT:  I know that.

 1              MS. BROWN:  -- four of five are up for reelection.

 2              THE COURT:  The mayor doesn't have that much power in

 3     the new system.

 4              MS. BROWN:  Well, they have -- they hire and fire the

 5     city administrator, the police chief.

 6              THE COURT:  But I'm thinking about the appointment of

 7     the nominating committee.  If that's going to come from our four

 8     districts, I want the nominating committee to have the -- really

 9     I want the ultimate oversight committee to have confidence from

10     the community.

11              I'm hearing some complaints about the composition of

12     the nominating committee.  I don't really think yet that those

13     complaints are sufficient for me to turn down the structure,

14     although there are serious concerns, but maybe the right

15     compromise is let the new commissioners appoint four of the

16     members of the 10 or 11, 10-person nominating committee,

17     including keeping the three that come from the police.

18              It's a compromise, nobody's fully satisfied with

19     anything, but if we can get more acceptance by the community by

20     letting the new commissioners appoint the nominating committee,

21     knowing that if this doesn't work, there's going to be some

22     complaints about the new commissioners, the new mayor, and that's

23     going to be one of the things they have to factor in when they

24     stand for reelection, that's making sense to me.

25              MR. GEISSLER:  May I speak in response to your

1    question, Your Honor?

2                THE COURT:  Please.

3                MR. GEISSLER:  Do you mind if I sit?

4                THE COURT:  Please do.

5                MR. GEISSLER:  Thank you, Your Honor.  Your Honor's

6    question was why not wait.  And there are a few bases, but most

7    importantly, justice delayed.  Right now we have an

8    accountability system that is not delivering.  In paragraph 192,

9    investigations have been outstanding for 800 days.  That's not

10   acceptable.  It's not a remedy.

11                The goal of the settlement agreement is to remedy the

12   unconstitutional uses of force, particularly against individuals

13   with actual perceived mental health crises.  We need the system

14   in place and not to wait another four or six months.

15                Secondly, Your Honor, the Department of Justice makes a

16   determination based on what is appropriate to remedy the civil

17   rights violation and not upon a political question of who may or

18   may not be elected.  So it's very uneasy ground for us to agree

19   to the outcome of an election.

20                Third, there's an assumption that there will be a

21   difference in the predisposition of the electeds in the future

22   that is different than today.  The people have already spoken as

23   a consequence to the election, there's already a city council in

24   place that's already voted on these City Code and amendments.  It

25   is appropriate to deliver the remedy called for under the

1    settlement agreement, already approved under paragraph 195 in a

2    timely fashion.

3              I can speak, Your Honor, to the question that our

4    colleagues and friends at Mental Health Alliance raised earlier

5    about whether or not the entity will be *void ab initio* by the

6    nomination process and by the disincentive of the ride-along, but

7    I'd like to preserve that for later if Your Honor wouldn't mind.

8              THE COURT:  Yes.

9              MS. BROWN:  Your Honor, just one more thing for you to

10   consider is that what you're saying is that we won't even get to

11   appoint the nominating committee.  So we would have the new

12   council members seated, then they're going to have to -- three of

13   them will have to agree while they're learning a whole new

14   system, while we all learn a whole new system, to which community

15   member they want to appoint to this nominating committee.

16             And I understand the Court's interest.  I also just --

17   you know, I think -- I think we've been trying hard to get this

18   moving forward for quite a long time.  And, you know, the vote

19   next week is for the council to adopt the Code, because we are

20   supposed to do that within 21 days.  Once Your Honor adopts

21   amendments to the settlement agreement, we then -- under

22   paragraph 195, the City has one year to have them start taking

23   cases.  And that won't be unreasonably denied by DOJ if we need a

24   little additional time, but just --

25             THE COURT:  One of the things I'm thinking about is

1     taking all of this under advisement, letting the parties

2     negotiate a little bit further if they want to make any changes

3     to any of these issues based upon what we've talked about today.

4     You can let me know within maybe 30 days whether or not the

5     parties want to propose any changes to the joint motion.  If the

6     answer to that is no, that's okay.  And then I will give a

7     decision, let's say, within 60 days from today.  That's what I'm

8     currently thinking about.

9               MS. BROWN:  Your Honor, whatever the Court decides

10    best.  I guess personally, if you'd rather have us wait, then we

11    have the time certain set next week, I would love to if -- rather

12    than us waiting 90 days, which puts us into the holidays, and

13    then I need to get something before council within 21 days, that

14    will be challenging for me during that time.  If Your Honor wants

15    us to wait till the new council is seated, then I'd rather you

16    just tell us that that's what you want us to do.

17              THE COURT:  So I have the authority now -- if I were

18    to -- as another one of my options, if I were to approve the

19    joint motion now on the agreement of the parties that the

20    nominating committee will be appointed by the next city council,

21    that's something that I have authority to do, you think, with the

22    agreement of the parties?

23              MR. GEISSLER:  I don't believe that the United States

24    has the authority at this point in time to agree to that, Your

25    Honor.  That would take a new authorization.

 1          THE COURT:  Sure.  So what I might have to do, then, is
 2    take this under advisement and give you some period of time.
 3    Tell me how long you think you would need to get that
 4    authorization, and tell me whether you would oppose that or
 5    support that and then the reasons why.  And if you can do that
 6    within a week or two or something like that, that'll be fine.
 7          MR. GEISSLER:  I hear Your Honor and I deeply respect
 8    Your Honor's judgment.  I know that our authority right now
 9    delegated from the Assistant Attorney General is to seek approval
10    right now of this amendment.  And from where we stand right now,
11    the City has delayed effective implementation of the
12    accountability remedies.
13          THE COURT:  Sure.
14          MR. GEISSLER:  And I hesitate to agree to take back to
15    the United States another decision rather than to pursue the
16    implementation of the current amendments, Your Honor.
17          THE COURT:  I understand.  And maybe here's another
18    alternative.  Let me get your input on this.  These are tough
19    issues.  What if I were to take this under advisement and promise
20    you a decision within 60 days?  What would happen if I approve it
21    60 days from now?  What would happen?
22          MR. GEISSLER:  I understand, Your Honor.  And it is not
23    unfamiliar territory for the implementation of a consent decree
24    to be impacted by the electeds.  The four corners of this consent
25    decree and the four corners of the amendments to the consent

1   decree are, in our view, what governs what is fair, adequate, and

2   reasonable.

3          MS. BROWN:  And, Your Honor, I also don't have

4   authority.  You know, I would have to talk to my clients about

5   this.  So I guess, you know, whatever Your Honor decides, I do --

6   you know, I do think that we've worked hard to get this going and

7   we're -- we are interested in moving it forward.

8          THE COURT:  I totally agree that everybody's worked

9   hard, people have acted in good faith.  I'm really pleased at the

10  direction that everything is going subject to a few concerns, and

11  I'm not going to micromanage it, but I do hear some very serious

12  concerns.  And there's nothing, in my opinion, that's

13  unreasonable, let alone inappropriate, for me to take these

14  serious concerns under advisement.  Right?  I mean, I don't have

15  to decide the issue today.  Okay.

16         MR. CHAVEZ:  If it's all right, Your Honor, would I be

17  able to --

18         THE COURT:  Yes.

19         MR. CHAVEZ:  -- respond briefly?

20         So I heard back from some MHA members that they would

21  be supportive of a delay here.  And actually going to an earlier

22  question -- or point that Your Honor made about polling and

23  asking questions of the new potential candidates for the city

24  council, MHA did actually do that, and we did get a significant

25  amount of responses, over half of the present 102 candidates.

1    Sixty-six responded, and 59 supported the --

2              THE COURT:  I don't want to get involved in any --

3              MR. CHAVEZ:  Understand, Your Honor.

4              THE COURT:  -- political issues more than I've already

5    put myself into.

6              MR. CHAVEZ:  Understood, Your Honor.  But the point is

7    just the new council will undoubtedly have a lot of opinions and

8    hopefully a lot of input on the future implementation of the

9    accountability board.

10             THE COURT:  All right.  Let me let Ms. Hardesty have

11   her closing remarks so she can get out of here if she needs to.

12             MS. HARDESTY:  Thank you, sir.  I really appreciate

13   that, Judge Simon.

14             There's just a couple of other things I want to say,

15   but to just close off this part, giving the public the

16   opportunity to engage candidates for the Portland City Council on

17   their vision around this new oversight board is really vital for

18   the public.

19             It is hard getting information out of the City of

20   Portland.  I mean, I don't spend all day on the City of

21   Portland's website, and so because I don't spend all day there, I

22   don't know when these meetings are happening.  The only way I

23   know when your meetings are happening is that I have friends that

24   let me know that, you know, we're in the process of coming back

25   for this meeting.

1           THE COURT:  Well, the docket for this case, as well as

2     all of our dockets, are on the courts's public website, and

3     anybody that wants to know what's scheduled in this case should

4     go onto the court's public website and look up the docket for

5     this case.

6           MS. HARDESTY:  You know, it's not normal behavior for

7     people to wake up in the morning and go, let me get my coffee and

8     then I'm going to go see what the federal government's doing, let

9     me go see what the City's doing, let me go see what the State's

10    doing.  That's not normal behavior, right?  Most people don't do

11    that.

12          But anyway, having said that, I wanted to also talk

13    about the mandatory training, the fact that there's no mandatory

14    training on the history of police accountability in the city of

15    Portland, the fact that there's no mandatory training on the role

16    that race and gender and all those issues play in how policing

17    has played out in the city of Portland is really frustrating when

18    you look at the mandatory part and it's all about conditioning

19    people to believe that the way police see the world is the world

20    that we live in, right?  The Citizen Academy is built for that

21    purpose, right?  And it doesn't -- it doesn't help the community

22    understand what constitutional policing is.

23          There are actually national experts that know what

24    constitutional policing looks like, and since -- and in the city

25    of Portland, the police develop their own training for

1    themselves.  It's really ludicrous to think that we should not

2    have outside people coming in explaining what constitutional

3    policing looks like, right?  If we had constitutional policing,

4    we wouldn't be in this room today, right?  We're trying to get to

5    constitutional policing.

6              So let's not have the police train us on what

7    constitutional -- let's not have Portland police train us on what

8    constitutional policing looks like.  Let's have national experts

9    on constitutional policing training this new committee on what to

10   look for when they're looking for a constitutionally viable

11   police department.

12             THE COURT:  If you're suggesting that our independent

13   monitor play a role in the training and/or supervision of the

14   training, no objection from me.

15             MS. HARDESTY:  Well, they don't live here, so I'm

16   really curious as to how they're going to find out how

17   thoroughly --

18             THE COURT:  I thought you just said you wanted national

19   expertise.

20             MS. HARDESTY:  I do want national expertise, but if

21   they're going to play that role, they need to be in the city of

22   Portland a lot more than they are.

23             THE COURT:  We do have one member on the commission.

24             MS. HARDESTY:  Well, yes, but they're -- they don't

25   have the expertise on national policing.

 1                THE COURT:  Okay.

 2                MS. HARDESTY:  And one last thing.  If you want to make

 3     sure that people -- one way to make people more comfortable if

 4     they have to do a ride-along or if they want to do a ride-along,

 5     allow them to bring someone with them.

 6                THE COURT:  Right.  I agree.

 7                MS. HARDESTY:  There's nothing worse than --

 8                THE COURT:  That's another alternative that they can

 9     propose, and I doubt that that would not be well received.

10                MS. HARDESTY:  And it should be automatic, right?  Who

11     are you going to partner with?  They could partner with someone

12     else on the committee so that they're actually building a team

13     among themselves.  They could partner with a community member who

14     has some anxiety about policing.

15                I mean, it's, like, we don't have to do this the way

16     it's always been done, because we're creating a new system.  And

17     what we want are people who have my experience -- I want people

18     on that committee that's had the same experience I've had with

19     Portland police.

20                And one last thing.  I will end on this, Judge.  I have

21     been told that I am biased because I ask a lot of questions, and

22     I don't think asking questions makes me biased.  It makes me

23     intellectually curious and it makes me wanting to have the right

24     facts so that I can hold people accountable for what they say

25     they do.  And so I am very concerned that somebody is going to

```
 1   decide whether I'm objective because I ask a lot of questions.
 2   Thank you.
 3            THE COURT:  I ask a lot of questions, too, and I'm not
 4   biased.
 5            MS. HARDESTY:  Neither am I, Judge.  Thank you.
 6            THE COURT:  Thank you.  Good seeing you.
 7            MS. BROWN:  Your Honor, might I raise one more?
 8            THE COURT:  Of course.
 9            MS. BROWN:  I do need to just raise that I am concerned
10   that in delaying a decision on this, that it doesn't allow our
11   currently elected officials -- it's making a decision to take
12   away the ability to act from our current elected officials.  And
13   I just do have concerns with -- that the people that were elected
14   by the voters to be in today are now being pushed out of this
15   process, and I'm concerned about that as well.
16            THE COURT:  I am concerned about that, too, and I hear
17   it.  I'm trying to factor in the fact that part of the objections
18   to the reasonableness, fairness of this proposal is that it
19   doesn't adequately reflect what the electorate previously has
20   voted on.
21            I don't think that's my criteria, but I also want to
22   take in all of the relevant input and I want to make sure that
23   whatever comes from the movement forward of the settlement is
24   accepted by all members of the community.
25            MS. BROWN:  I understand.  I do think that if you look
```

1    at when these council members were elected, it's all either at

2    the same time that the voters voted on the change to the charter

3    or subsequent to that.  In fact, most of them have been

4    subsequent to that.  I think the mayor was the only one who was

5    re-elected at that time, if I remember correctly.  Maybe

6    Commissioner Rubio.  I'm not sure.  But I think everybody else

7    has been subsequently elected to that position.

8            So with an understanding that the charter amendment was

9    there and that the police accountability was something that folks

10   wanted to inform the community oversight board, voters then also

11   decided on our current elected officials.

12           THE COURT:  When does the new city council take office?

13           MS. BROWN:  January 1.

14           THE COURT:  That's what I thought.  Okay.  Thanks.

15           All right.  Continuing with our public testimony.

16   Mr. Handelman?

17           MR. HANDELMAN:  Yes, Your Honor.

18           THE COURT:  Oh, we can hear you.  Very good.  Thank you

19   for your patience, sir.  The floor is yours.

20           MR. HANDELMAN:  Wonderful.  Thank you, Judge Simon.

21           Hon. Judge Michael Simon.

22           Portland Copwatch unequivocally believes that the

23   proposed amendments to Section VIII of the U.S. vs. City of

24   Portland settlement agreement as a whole are not fair, adequate,

25   or reasonable.  The City and DOJ have chosen to retain language

1    about bias, which you likely have or will hear from other people,

2    is not fair because is too vague and prone to misuse.  It is not

3    adequate, because the parties call for Internal Affairs and the

4    oversight system to decide who has jurisdiction over cases, when

5    the current system with both the Independent Police Review and IA

6    is widely seen as confusing.

7        Another topic you will hear a lot about is that it is

8    not reasonable to exclude otherwise well-qualified candidates who

9    may not be willing to go on a ride-along with police or attend

10   Community Academy.  While it is frustrating for community members

11   that the oversight system voted into place in 2020 is still not

12   implemented nearly four years later, implementing a poor

13   imitation of what was promised will ultimately end everyone back

14   in a courtroom.

15       We believe that getting it right is more important than

16   trying to meet artificial deadlines.  The City has missed

17   deadline after deadline.  For instance, hiring the civilian dean

18   of training took almost a year longer than mandated, yet the City

19   seems obsessed with pushing forward on the oversight system.

20   This speediness resulted in negative reaction from nearly every

21   member of the Police Accountability Commission.

22       City Code was put forward in November, which led to a

23   special meeting in December, and a few reasonable changes were

24   made thanks to the City taking some extra time to listen, but not

25   enough.

1       Regarding the November Council meeting, the City has
2   stated that a version of the amendments before you today were
3   presented to the public at that meeting.  They were not.  If Your
4   Honor checks the transcript and/or recording of that hearing, the
5   amendments are not discussed in any detail, nor were they
6   featured in the city attorney's slideshow explaining what was
7   being voted on that day.  Few, if any, members of the public
8   testified about the amendments, though they were included in the
9   paperwork for the council agenda item.
10      In addition to the three items listed above, Portland
11  Copwatch is deeply concerned with the opening paragraph of the
12  new Section VIII, which requires the new oversight board to turn
13  over to the monitor and the DOJ every "rule, policy, or
14  procedure" before they are enacted for review of compatibility
15  with the agreement.
16      The City Charter states explicitly that no city
17  employee should interfere with the independent judgment of the
18  board.  Unfortunately, it doesn't cover the federal government or
19  the court monitor.  Take, for instance, the idea of compensating
20  the board members for their work, which is severely limited by
21  various laws.  Research for PAC found it would likely be a
22  maximum of $7,000 or so per year.  The PAC proposed that this
23  compensation be offered.  The City requires the board to ask city
24  council to approve the idea of compensation.  What interest do
25  the monitor or the DOJ have in that policy?  This will simply

1   further slow down implementation.

2          Another example that the City and the DOJ are ignoring

3   the public is their recent change to how force is tracked by

4   creating a new "de minimis" category that does not require a

5   force form to be filled out.  Not only will this affect the

6   board's jurisdiction, but it will throw off statistical data

7   gathered since 2017.

8          The board is supposed to take all complaints about

9   excessive force.  Moreover, one of the main arguments the bureau

10  has made for the change is how long officers have to spend doing

11  paperwork and investigating these lower level uses of force, but

12  the new oversight system will have a $14 million budget,

13  potentially enough to send investigators out to the scene of some

14  or all of these incidents.  The way the change was made, there

15  was no time to discuss this possibility, and it will be

16  implemented before the board is even seated.

17         We recognize Your Honor has no jurisdiction over the

18  Code, but we want to make sure the settlement agreement will not

19  override the Code, and the City's implementation should not

20  undermine the agreement or the will of the voters.

21         One other topic you will probably hear about is the

22  size of the panels.  The existing system has an advisory body,

23  the Police Review Board, which is currently in Section VIII.

24  Five PRB members vote on regular cases and seven vote on deadly

25  force and other serious incidents.  The PAC proposed retaining

1    these numbers, as the numerical size of the boards, though not
2    the makeup of them, are one instance in which the current system
3    is adequate.
4          Though Section VIII says that the panels shall be of
5    "three or more people," the Code is requiring the panels to be of
6    only three people for regular cases and somewhere between 11 and
7    21 for full cases.  That is unreasonable, particularly in light
8    of the City's promise to value anti-racism and equity.
9          Another area where we disagree with the City's
10   interpretation of the charter is the jurisdiction over the chief
11   of police.  The charter says the board will investigate all sworn
12   officers and their supervisors.  It's hard to argue that the
13   chief is not a supervisor of the officers; however, the City
14   asserts that voters who supported a subsequent ballot measure
15   which reorganized city council and the mayor's duties wanted the
16   mayor to decide whether to let the board investigate the chief.
17         We reject the notion that people made the connection
18   that the mayor hiring and firing the chief would have anything to
19   do with the board's authority to investigate and discipline all
20   sworn PPB members.
21         PCW has suggested that the board should investigate the
22   chief for misconduct and if their proposed discipline is
23   termination, then the mayor can get involved, but the City has
24   chosen their own interpretation.  This is important, as the IPR
25   was initially not informed when former Chief Larry O'Dea shot a

1    friend while squirrel hunting and ended up investigating not only

2    the chief's behavior, but the actions of other high ranking staff

3    who helped cover it up.

4           Your Honor may also hear from one or more other

5    community members how the current system, and many others in the

6    United States, uses four findings in misconduct investigations;

7    however, the City cut it down to just two — in or out of policy —

8    not based on research, the experience of being a complainant or

9    officer, or months of public discussions, but rather on it being

10   a "pet peeve" of one of the deputy city attorneys as stated at a

11   July 15 meeting about the oversight system.

12          This is an example of why the settlement agreement

13   should not be approved at this time without further guarantees

14   that the City will honor the intent of the voters.  There also

15   needs to be written assurance that the DOJ and monitor will not

16   interfere with the board's activities unless they somehow violate

17   some aspect of the agreement.

18          Finally, the amended agreement needs to be sharpened to

19   make sure the new system does what it is intended to do, which is

20   to have a community-run oversight system that can fairly,

21   adequately, and reasonably hold officers accountable for

22   misconduct.

23          So I have some other comments based on things that were

24   said in court today.  I think that when we talk about the fact

25   that there's no appeal for community members anymore, that they

1    can still file a lawsuit, the lawsuit doesn't hold officers

2    accountable.  The lawsuit only makes the City pay money out, and

3    it has paid out like the other for 2020, believe me.

4            Juries, when they are trained, you said, Your Honor,

5    that sometimes they go out to a scene so they can see it

6    physically sometimes.  They don't get training, the equivalent of

7    a police academy or to a ride-along with a police officer, even

8    when there is a law enforcement officer who's the defendant.

9            So this is -- you know, I've said this many times

10   before, and forgive me if you've heard it already, but I'm not a

11   doctor, but I know that if you do surgery and you leave an

12   implement in somebody's abdomen, that that's wrong.  Some things

13   you just don't need to be trained on.

14           You heard some good ideas today about maybe a virtual

15   ride-along, or even the body cameras that Your Honor was so

16   favorable to could be used.  The body camera footage of two hours

17   in the day of a life of an officer can be something they have to

18   watch in order to become a member, but they don't have to go on a

19   ride-along or to the academy.

20           Overall, sometimes some of the implementation that's

21   being done, including the adding of the police nominees and the

22   nominating committee, seem like the City is saying not what the

23   PAC did, which was to say let's see what the charter says and how

24   do we amplify it, they seem to be saying, let's see what the

25   charter says and see if we can find loopholes, such as putting

1    officers on the nominating committee, but they're not allowed to

2    be on the board, so let's find something else we can do.

3            And this was also argued and said, I just want to

4    emphasize it, that this board should be going in 20 years out to

5    the future or more.  And having the monitor involved in reviewing

6    the nominating process, you know, is a good step forward or

7    having Your Honor participate in ride-alongs, but presumably in

8    two or three years from now, there's no settlement agreement.  So

9    those -- you know, your participation and the monitor's

10   participation won't be here anymore, so we have to take an

11   institutional look.

12           And also we're talking about the new city council.

13   There also could be a new city attorney coming January, because

14   the mayor will appoint who the city attorney is.  So I don't know

15   if that's part of the rush to get this done now, too.

16           And I just want to add one last thing, which is about

17   the bias issue.  You asked about the Boulder situation, and

18   there's been discussions about the language of "objective" versus

19   "perceived."  That's not the problem.  The operative problem word

20   is the word "bias."

21           And what happened there was a black woman, community

22   activist, was on that committee, and she was thrown off it for

23   being biased allegedly.  She filed a lawsuit saying it was

24   violating her constitutional rights.  And the City of Boulder,

25   they haven't resolved that lawsuit yet, but they immediately

1    changed the language of their oversight board to be similar to

2    what you heard the PCCEP testify about, which is already in the

3    City Code, that they have to follow the law and they have to make

4    reasonable objective decisions about whether or not an officer

5    violated the policy.  That's adequate.  You don't have to have

6    "bias" language if you have that other language there.

7            And speaking from Portland Copwatch, who has been

8    called by a sitting city commissioner both extreme and

9    abolitionist here in the last several months from the dais at

10   public meetings for reasons that he has not explained, I don't

11   think that's something that Your Honor would agree with, I think

12   that bias is in the eye of the beholder.  And I really hope you

13   take that to heart, and I really appreciate your offer to wait to

14   make a decision on this today.  Thank you.

15           THE COURT:  Thank you very much, Mr. Handelman.

16   Appreciate that.

17           Ms. Bochinski.

18           (Pause in proceedings)

19           THE COURT:  I'd like to invite Seemab Hussaini, whose

20   in the courtroom, to provide in-person testimony now.

21           UNIDENTIFIED SPEAKER:  Not here.

22           THE COURT:  Not here.  Okay.  Teressa Raiford, are you

23   here?  No.

24           Char Michelle-Westley, are you here?  Come on up,

25   please.

 1              MS. MICHELLE-WESTLEY:  It's Charlie.

 2              THE COURT:  Charlie.  Thank you for your patience.

 3              MS. MICHELLE-WESTLEY:  Good afternoon, Your Honor.  We

 4    speak again.

 5              THE COURT:  Wait till the microphone, so...

 6              MS. MICHELLE-WESTLEY:  I said good afternoon, Your

 7    Honor.  We speak again.

 8              THE COURT:  Good to see you.

 9              MS. MICHELLE-WESTLEY:  All right.  So I'm going to ask

10    that you bear with me as I testify not from a technical or

11    academic or political experience.  I'm going to be presenting as

12    a community member and I will be sharing from a unique

13    perspective of lived experience that is often lacking when making

14    decisions that affect us.

15              So, again, my name is Charlie Michelle-Westley,

16    W-E-S-T-L-E-Y, and I'm a member of the -- and I am a member of

17    the Confederated Tribes and descendant of many tribes of what is

18    now called Oregon and Washington.  I'm very connected to this

19    land and my people, as well as other BIPOC and marginalized folks

20    that share intergenerational and current day trauma from the

21    continued racist systemic foundation of this country.  And I'm

22    obligated to be the uncensored voice, uncensored radical truth

23    teller of those people I hold dear.

24              I need to share this by painting a picture of my lived

25    experience.  And keep in mind, as an indigenous woman, we are

1    storytellers, so I got a story to tell.

2        So a picture of my lived experience is a witness to, a

3    target of, a victim of, and a survivor of police violence, which

4    is one of the main reasons I was asked to be on the Police

5    Accountability Commission, although I am here as a community

6    member mainly.  I'm also a rad- -- a racial social justice

7    activist, organizer.  I do outreach to the unhoused.  I'm an

8    addiction peer mentor, and serve on our Tribal health committee,

9    amongst many other things.

10        It is also a fact that I experienced racism while still

11    in my mother's womb, unwanted by white society; raised and lived

12    in poverty in what I affectionately call the hood, a very

13    ethnically mixed, poor neighborhood.

14        My experience included neglect, abuse that's

15    unimaginable -- and I'm going to get to those amendments; I'm

16    going to weave them in here -- unimaginable, addictions, mental

17    illness, extensive physical and emotional violent experiences,

18    incarceration, tragic deaths of friends, loved ones, including

19    the killing of my mother, and the police beatings and

20    imprisonment for my mentally ill father, a brother that became

21    institutionalized in this country's penal system starting at the

22    age of 12.  There was no specialty courts, nor attempts to

23    understand the systemic racial disparities, or help to divert

24    from incarceration.  No.  Instead, thrown away into the discourse

25    of the penal system after maybe breaking the law, maybe not, but

1    often a victim of police violence, as if police violence works.

2              And I must say, the penal system continues in its

3    unfair and inadequate and unreasonable system.  How about

4    believing in humane solutions versus incarceration?

5              The notion that this is simply personal choices in life

6    is a thoroughly inadequate thought.  It's ignoring the crony

7    threat of systemic white supremacy, the foundation of all our

8    institutions.  Yet we aren't supposed to talk about it or admit

9    the barriers to accountability are rooted in it, but we have to

10   adhere to its laws, policies, and policing, and we suffer from

11   it.

12             By some miracle, I lived to find recovery, influenced

13   by diversion from incarceration.  I celebrated 23 years this year

14   in addiction recovery and ongoing trauma therapy.  While in my

15   healing journey, I discovered my calling, my passion, my voice,

16   to stand up -- and, oh, my culture and traditions.  I found

17   out -- I found my identification, my -- and my voice to stand up

18   to injustice and dedicate myself to be an uncensored voice of

19   those people dear to me that have adversely and

20   disproportionately been affected by racial and social injustices,

21   to take on policing as we have experienced for decades, hence

22   centuries.

23             I made it my intent to use my lived experience to work

24   to the best of my ability to fight, to no longer allow

25   justification for no accountability as police act as judge, jury,

1    and executioners, and oppress with violence.

2            Nothing in my extreme life of injustice and abuse was

3    more disturbing than when I, as a police accountability

4    commissioner, helplessly experienced this imbalance of power that

5    thoroughly ignored the Portland City's core values, which I have

6    here, and nobody seems to know what they are.  If they do, they

7    don't abide by them or take them into consideration.

8            They obliterate too much of the Department of Justice

9    mandates, the hope of Measure 26-217, and discount countless

10   hours and meetings, research, re-traumatizing, sharing PPB and

11   what -- PPB and PPA extensive community outreach, fine-tuning

12   this oversight system to meet the people's expectations and hope

13   to finally hold police truly accountable.

14           It met my normal anticipation, unfortunately:  the

15   blatant power of racism.  Not allowing anyone who is biased for

16   or against police is an obvious unfair and, I dare say, racist

17   manipulation to prevent those of us who fight for police

18   accountability and to save black lives or who have a lived

19   experience like mine to not be on the new oversight system.  I

20   can't be on it.

21           Yet the City found a potentially pro-police bias

22   loophole to allow three law enforcement members on the hiring

23   committee that goes against the required independency from

24   allowing any law enforcement influence.  Along with that goes any

25   community trust.

1          When these changes by the City goes against what was

2    voted for, especially by community that have so adversely been

3    affected by policing, again, this is more of the same anti-black,

4    anti-brown, anti-indigenous decisions when our voices of lived

5    experience are ignored, continue to be ignored.

6          We are all biased to some extent.  And for those of us

7    who have been out in the streets protesting for police

8    accountability, that kind of perceived anti-police bias can lead

9    to incorrect assumptions, and those perceived to be pro-police

10   can lead to elitism.

11         Bringing bias to the mix can only create more bias,

12   because by allowing police on the hiring committee but someone

13   like me not allowed to be on this new oversight system due to my

14   activism is in itself bias, instead of trusting we know how to be

15   objective and fair.

16         And just because I had all those horrible experiences

17   with police, what I really want, what I really want is fairness,

18   accountability, and to not have to teach my grandson when he

19   turned 16 and able to drive, and to teach him how to stay alive

20   when he gets pulled over by police as a young man of color.

21   That -- no child should have to go through that.

22         Bias really, if we look at it, at least from my

23   perspective, is really radical truth demanding change.  It's

24   not -- we don't want to, like, have -- we don't want to hate the

25   police, you know.  We just -- we just want some justice.

1          And the required ride-alongs with police the City

2     added, there needs to at least be some alternative.  So thank you

3     for those who, like, "Ride-Along with me."  I -- I have so much

4     to share.  And I'm willing to listen, you know.  Like, I talk to

5     the police, and there's some good human beings, but they're

6     upholding a system that is killing us.

7          There needs to at least be an alternative for those who

8     it re-traumatizes or they just don't feel this ride-along is

9     sufficient to get a full picture, because I, too -- you know, I'm

10    skeptical of their best behavior, which brings me to suggestions

11    based in humanity and radical truth.

12         How about a ride-along with Portland Street Response to

13    see how most of our community members in dire straights, in some

14    of the darkest times of their lives -- I just witnessed the other

15    day the police -- I knew I was going to watch them shoot this

16    young black woman in a mental health crisis if we hadn't

17    intervened, because they just -- they just have, like, this hate

18    in them.  They were spitting mad and pointing weapons at her

19    because she had a stick in her hand and in a mental health

20    crisis.  And all we did is say, "Hey, baby doll.  Hey,

21    sweetheart, please put down the stick so you don't get hurt."

22    And she put it down and looked at us and cried.  That's all it

23    took to see how most of our community members in dire straights

24    and dark places can be treated with humane compassion and dignity

25    and provided help instead of handcuffs or worse.

1      I always say over-resource instead of over-police.
2  I've lived in the hood my entire life, from infancy to teen to
3  adult, and if you -- yes.  So if we just had this going on
4  instead of over-policing.  "Radical" is about honesty,
5  open-mindedness, and willingness.  And people think that word is
6  a negative.  No, it's not.
7      To implement something new and different is radical.
8  And that's what we are going for with Measure 26-217.  And,
9  unfortunately, the city council, I just felt like it turned on
10  us.  It just turned on us.  And so trying to have them deal with
11  this now, I have so much more hope with the new city council.  It
12  just -- it can't be worse.
13      So based on the facts of our radical truth that we have
14  shared with the powers that be and with you and with the new
15  oversight system, what we ask for is, in fact, laid out in the
16  current City Core Values.  If they would actually pay attention
17  and do these -- this is what we want.  This is what we need.
18  This is what we ask for and beg for, protested for for -- since
19  before I was born.
20      And if only they would actually read them, understand
21  them, and implement them with city-wide anti-racist inclusivity
22  and equity training.  There can be no racial justice, no real
23  police accountability, no fair, adequate, and reasonable
24  oversight system with these city amendments and without our
25  radical truth.

1          I was warned that the powers that be would not allow

2    police accountability, but I hung on to hope, because the people

3    had spoken with Measure 26-217.  I was even excited, but as

4    usual, I always anticipate racism would get in the way, and once

5    again, it prevailed, and my hope is withering.

6          I guess I would just like to remind you and everyone

7    why hundreds of thousands of people around the world took to the

8    streets, because we know the radical truth.  This is not a few

9    bad apples.  This is a rotten systemic issue with the powers that

10   be that scraped systemic -- you know, looking into systemic

11   issues from the -- from being addressed in the oversight system

12   we created.  This is mainly why the current system doesn't work,

13   at least not for those over-policed, targeted folks.  The

14   systemic issues of racist white supremacy and opposition continue

15   to send the message and still gets enacted, but it sends a

16   message to community that our lives don't matter.

17         Without addressing systemic issues, the powers that be

18   are knowingly keeping the status quo of pro-police bias,

19   violence, and power to continue to get away with excessive and

20   deadly force.  This new oversight system was to address racial

21   disparities, not keep them in place.

22         Black lives still matter.  As an activist that

23   continues to organize peaceful protests for racial justice, I

24   asked a young black comrade to make a sign for our protest, and

25   after much heartfelt contemplation by him, I asked, "What is it

1    you really want most from our protest?"  He then created a sign,

2    and here is what it said:  "Stop killing us."  It brought me to

3    tears and only increased my resolve to keep spreading radical

4    truth for racial justice.

5              Let's never forget what brought us here today:  to save

6    lives.  This is life and death for us.  Please take my testimony

7    for serious reflection when making your decisions today or

8    whenever you decide to.

9              And I'd just like to conclude:  Rest in peace, rest in

10   power, rest in love, George Floyd and all others.  We have not

11   forgotten you and we will never give up.

12             Thank you for listening, Your Honor.

13             THE COURT:  Thank you for your comments,

14   Ms. Michelle-Westley.  And good seeing you again.  Thank you.

15             Ms. Bochinski, let's give it a try again.  Can you hear

16   me?  I'd love to hear from you.

17             (Pause in proceedings)

18             THE COURT:  Let me invite Debbie Aiona, who's also, I

19   believe, on video to speak.

20             MS. AIONA:  I noticed someone named Cheryl wants to

21   leave by 2:00.  Do you want to ask her first?

22             THE COURT:  Sure.  Although I don't have a Cheryl on my

23   list.

24             (Discussion off the record)

25             THE COURT:  All right.  Cheryl Jordan, if you're on

1   audio right now, identify yourself.  And if you wish -- there you

2   are.  Cheryl Jordan, you have the floor.

3            MS. JORDAN:  I really appreciate that.  Thank you so

4   much for making time for me to speak.

5            My name is Cheryl Jordan.  I'm here both as a member of

6   the community and also as an organizer with Cascades Abortion

7   Support Collective.  Sorry.  I didn't actually think that anybody

8   was going to see that in the chat and wasn't anticipating getting

9   a chance to speak.

10           So several others have mentioned many of my concerns,

11  so I won't go into details on a lot of those.  So I just wanted

12  to touch on a point that you, Judge, had mentioned.  You

13  requested to hear testimony from someone who has done a

14  ride-along and felt that it was not entirely necessary to

15  accurately convey the perspective of police experience, and I

16  believe I can represent that.  I have done ride-alongs in my

17  previous role at Safe City, which is an organization in Denver,

18  Colorado, where I was required to do them and was required to

19  regularly interact with law enforcement, and did come to

20  understand their roles and experiences through many avenues, not

21  just through ride-alongs.  This was a requirement and a condition

22  when I got there.  I was not comfortable doing it, but I did

23  comply and do them.  And I can tell you confidently, I do not

24  believe that my ride-alongs were critical in crafting and shaping

25  my understanding and experience of what police and law

1    enforcement's roles in the community are, certainly not any more

2    so than observing dash cam and body cam footage or interacting

3    with individual officers or groups.

4         It was also previously mentioned that simply

5    participating in this community might cause one to be exposed to

6    traumatic video testimony and evidence.  There is a significant

7    difference between watching hours of footage and meeting with

8    police officers versus being forced to ride along with officers

9    in their vehicles.

10         It is not necessary to be involved in a ride-along to

11   understand the nature of police work and what one might encounter

12   in the course of their role within the CBPA.

13         I can appreciate where you are coming from, Judge

14   Simon, in offering to accompany prospective committee members on

15   ride-alongs, and I want to respectfully ask you to consider that,

16   as you mentioned earlier, this is something you might not fully

17   understand for a number of reasons, but that while this might

18   neutralize some of the fear for some, it certainly will not

19   eliminate the trauma or very real threat for many, and, in fact,

20   it might actually increase the trauma and threat for many people

21   to be in a car with police officers and another man.  It could

22   certainly increase the trauma for me to be in that position, and

23   I hope that that's something that you can understand.

24         In addition, I want to -- I want to ask that you

25   consider -- I keep hearing you say that you hear what we're

1    saying -- or you hear what's being said, and that you are hopeful

2    that a person in that position might feel safer with you sitting

3    next to them.  And I do believe that that is an admirable want

4    and a want that is coming from a place of compassion and empathy,

5    but I believe that you've heard from a number of people that that

6    is not necessarily the case.  And I think it's really important

7    that you hear that and that you believe people when we tell

8    them -- or when we hear them saying that that is not the case.

9            THE COURT:  Understood.  I've been -- I've been told

10   before that I come from a position of compassion, empathy, and

11   ignorance.  So I get that.

12           MS. JORDAN:  And we all do.  Certainly we all have our

13   ignorance and our bias, and I appreciate you acknowledging yours.

14   I am not without my own.

15           For what it's worth, both my parents are police

16   officers, and so I am -- I have a unique relationship to police

17   and law enforcement, but I appreciate you hearing the feedback

18   from the community that that is not something that is necessary

19   and it is not something that can be accommodated easily to make

20   people feel comfortable.

21           THE COURT:  Ms. Jordan, I understand, and that's why

22   we're going to work out a process also where someone who just --

23   that is just not going to work for them can ask for an exemption,

24   and we'll meet with them and we'll try to figure out an

25   alternative path.

1          By the way, we do have one other person who said they

2     have to leave by 2:00.  Can I ask you to wrap up your comments,

3     especially since you didn't previously sign up, so I can get to

4     someone who did sign up and says she has to leave by 2:00?

5          MS. JORDAN:  Yes.  Also, I just want to say I did sign

6     up.  I did receive a message from Mary inviting me to speak

7     today.

8          But the last point that I want to make is to just say

9     in the qualifications and the selection criteria, it's stated

10    that CBPA members must live or work in the city of Portland for

11    at least 12 months prior to their appointment.  And I would like

12    to know if that includes people who live in Portland but don't

13    have addresses, because they, too, are members of the community

14    and are forced to live under police authority.

15         And the same section explicitly states, making

16    provisions to ensure that the CBPA's membership includes

17    representation from diverse communities, particularly those who

18    have experienced systemic racism and those who have

19    experienced -- (interruption in video and audio transmission) --

20    but it does leave out homelessness, and I believe that

21    this section needs to be corrected, and as members of --

22    (interruption in video and audio transmission) -- community needs

23    to -- (interruption in video and audio transmission) -- and

24    violence.

25         THE COURT:  Understood.

1          MS. JORDAN:  I appreciate you giving me this time and

2     accommodating my need to leave, and I have 30 seconds to go.  So

3     thank you.

4          THE COURT:  Thank you, Ms. Jordan.  Appreciate it.

5          Why don't we go to Ms. Brayfield, with apologies to

6     Ms. Bochinski.  We'll get to you in a moment.

7          Ann Brayfield, are you on?  All right.  I understand

8     you need to leave any moment.  Ms. Brayfield, the floor is yours.

9          (Pause in proceedings)

10         THE COURT:  Barbara, can you speak to us?  Barbara

11     Bochinski.

12         MS. BOCHINSKI:  Yes.  Can you hear me now?

13         THE COURT:  We can.  Well done.  And I apologize, and

14     thank you for your patience.

15         MS. BOCHINSKI:  Yeah.  Maybe I can call and explain

16     something later to Mary Austad about what happened.

17         Okay.  So thank you, Your Honor, and everyone else, and

18     thank you to Charlie who just spoke.

19         We recognize Your Honor has no jurisdiction over the

20     Code, but we want to make sure the settlement agreement will not

21     override the Code, and the City's implementation should not

22     undermine the agreement or the will of the voters.

23         One other topic you will probably hear about is the

24     size of the panel.  The resistance to the advisory body

25     (indiscernible) board, which is currently in Section VIII

1    (indiscernible) CPB members vote on regular occasions and seven

2    vote on deadly force and other incidents.  The PAC proposed

3    retaining these members as a (indiscernible) the board, so not

4    the makeup of them are one instance in which the current system

5    is adequate.

6         Though Section VIII said that the panel shall be of

7    three or more people, the Code is requiring the panel to be of

8    only three people for regular cases and somewhere between 11 and

9    21 for full cases.

10        That is unreasonable, chiefly in light of the City's

11   promise to value anti-racism and equity.  One cannot represent

12   the diversity of this city with only three people.

13        Another area where we anticipate the City's

14   interpretation is about the jurisdiction over the chief of

15   police.  And I'm just going to make it short and say we agree

16   with what PCCEP said.  I thought they said it very well.  And in

17   addition and (indiscernible) on that, this is important as the

18   IPR was initially not informed when former Chief Larry O'Dea shot

19   a friend while hunting, and ended up investigating not only the

20   chief's behavior, but the actions of other high ranking staff who

21   helped cover it up.  This incident occurred in April 2016, over

22   three years after the City agreed to the changes by DOJ to

23   improve oversight.

24        Your Honor may also hear from one or more other

25   community members how the current system left many others in the

1    United States due to four findings of misconduct investigations.

2    This is a way to avoid the win-lose type of scenario which

3    plagues our criminal justice system by having findings for when

4    there is insufficient evidence to prove or disprove an allegation

5    and one showing an incident did not happen as it was described;

6    how the City cut those four findings down to just two in or out

7    of policy, not based on research nor the experience of being a

8    complainant or officer, nor months of public discussion, but

9    rather than on it being a pet peeve of one deputy city attorney,

10   who stated as much at a July 15th meeting about the oversight

11   system.

12         This is an example of why the settlement agreement

13   should not be approved at this time without further guarantees

14   that the City will honor the intent of the voters.  There also

15   needs to be written assurance that the DOJ and monitor will not

16   interfere with the board's activities unless they somehow violate

17   one or more aspects of the agreement.

18         So, finally, the amended agreement needs to be

19   sharpened to make sure that the new system does what it is

20   intended to do, which is to have a community-run oversight system

21   that can fairly, adequately, and reasonably hold officers

22   accountable for misconduct.  Thank you.

23         And I've just got to say, this is very, very exciting

24   today, all the issues that are brought up and discussed, like

25   about bias and ride-alongs and all this is, like, great.

1              THE COURT:  We're making progress.  Thank you,

2     Ms. Bochinski.  Always good to hear your comments.

3              So back to Ms. Brayfield.  Are you still with us?  Ann

4     Brayfield?

5              THE COURTROOM DEPUTY:  I don't see her on the list.

6              THE COURT:  Okay.  Let's go to Debbie Aiona.  Are you

7     with us on video?  Debbie.  There you are.  Please don't be

8     muted.

9              MS. AIONA:  I'm not muted.

10             THE COURT:  Oh, excellent.  Good to hear from you.  We

11    don't see you, but as long as we can hear from you.

12             MS. AIONA:  Let me try a different plug.

13             THE COURT:  It's more important to hear you than to see

14    you.  Nothing personal.

15             MS. AIONA:  I realize that.  Let me just try this other

16    plug and see if it changes anything.

17             THE COURT:  Okay.

18             MS. AIONA:  Well, maybe not.  Okay.  That's weird.

19             So I'm Debbie Aiona representing the League of Women

20    Voters of Portland.  I also served on the Police Accountability

21    Commission.

22             The League supported Measure 26-217 and has encouraged

23    the City to create a new police accountability system that lives

24    up to voters' expectations and to the aspirations captured in the

25    settlement agreement.

1          The City's current draft Code is a significant

2    departure from the PAC's final proposal.  The PAC's proposal

3    carefully followed the charter amendment's provisions and city

4    council direction, incorporated effective and promising practices

5    from other jurisdictions, relying on expert research and reports

6    and on community input.  It is disappointing that this work is

7    not reflected in the City's proposal.

8          The League has the following concerns regarding the

9    proposed settlement agreement amendments.  Section VIII describes

10   a system in which the police bureau's Internal Affairs Division

11   continues to have jurisdiction over a significant number of

12   police misconduct complaints.  This means that Portland will

13   continue to have a two-track system, a problem the DOJ identified

14   in its 2012 findings letter.  It is unreasonable to think that

15   community members will trust the system once they learn police

16   bureau staff will investigate their complaints.  In order to keep

17   faith with the public, we believe that all complaints should be

18   investigated by the OCPA.

19         Under our current system, complainants have the right

20   to appeal the outcome of their case to the Citizen Review

21   Committee.  The City's draft Code eliminates this right, but

22   provides police bureau members with more than one avenue for

23   appeal.  This imbalance will lead some to question whether our

24   oversight system is fair to all.  In the interests of fairness,

25   the complainant's right to appeal the findings in their case

1    should be restored.  And to echo Copwatch's comment, lawsuits do

2    not hold officers accountable.

3        Paragraphs 131 and 132 address panel sizes for

4    misconduct complaints:  currently, seven for the most serious.

5    The City's draft Code required a minimum of 11 CBPA members on

6    deadly force cases.

7        As Police Review Board members report,

8    investigations -- I'm sorry -- investigative files in these cases

9    can be extremely lengthy and -- and are required reading.  We do

10   not understand why it will take more people to hear these cases

11   than it does now.  Indeed, tying up so many in time-consuming

12   preparation risks board member fatigue and resignations.

13       We recognize the Court does not have jurisdiction over

14   City Code; however, we feel it is important to share concerns

15   about some of the inadequacies in the draft City Code that depart

16   from voter expectations.  Effective police oversight systems do

17   more than handle individual complaints.  They incorporate

18   continuous improvement practices that capture what is learned

19   from individual misconduct cases in order to make broader

20   improvements.

21       The National Association for Civilian Oversight of Law

22   Enforcement states that:  The ability to examine broader issues

23   relating to policy, training, discipline, and supervision may

24   promote long-term organizational change that can improve

25   community relations and deter future misconduct, civil rights

1    violations, and legal liability.

2         The PAC included methods for identifying broader issues

3    of concern.  The following were removed from the City's draft

4    Code:  systemic findings point to issues beyond individual

5    officer's control, such as training, equipment, and policy

6    problems that should be addressed; signal event reviews are

7    non-blaming reviews of larger undesirable events involving the

8    police; the public is involved in the process -- in that type of

9    process.  The PAC recommended Code calls for regular reviews of

10   the new board's performance, the charter, City Code, board

11   policies and protocols on an ongoing basis.

12        Our new system should use what is learned through

13   individual officer interactions and from larger events to make

14   broader improvements to policing and the oversight system.

15        The new board will hold its misconduct hearings behind

16   closed doors, but vote in public.  In the interests of

17   transparency, we recommend that the board share basic facts of

18   the case when it votes, without naming names.  This balances

19   privacy with the public's right to know.

20        The City's proposal fails to include many of the

21   features that would create the type of system voters supported

22   when they overwhelmingly passed Measure 26-217.  For the amended

23   settlement agreement to be fair, adequate, and reasonable, the

24   Court should require amendments that reflect the spirit as well

25   as the letter of the charter amendment voters passed in 2020.

1          And just to respond to your suggestion that it might be

2     a good idea to have the new city council appoint the nominating

3     committee, I agree.  I think that there's a lot of enthusiasm and

4     hope now in the city with all of these candidates running, and I

5     think the people who are elected are going to really want to

6     succeed, and one thing that you can succeed at is appointing a

7     good nominating committee that selects a board that runs an

8     effective oversight system.  Thank you very much.

9          THE COURT:  Thank you, Ms. Aiona.  And thank you for

10    your patience as well.

11         I think the last two folks that we have are both in the

12    courtroom.  And then I'll make sure I haven't missed anyone.

13         Patrick Nolen, are you here and do you -- Patrick, do

14    you want to come up and speak?  Mr. Nolen.

15         And then after that, we'll go to Pastor Robin Wisner.

16    And if I've not identified you and you want to speak, let me

17    know.

18         MR. NOLEN:  I was not planning on speaking today, but

19    throughout the day, I realized that I really kind of needed to

20    speak.  I am the person you were asking for earlier.  I served on

21    PCCEP.  I was -- in order to serve on PCCEP, I was required to do

22    both the ride-along and the two-day training up in North

23    Portland.  I was there as a person with a mental illness.  I was

24    one of two people that were initially recruited to be on PCCEP

25    because of mental illness.

1          I will say I did the ride-along.  It was about three
2     and a half hours.  I don't think I learned anything that I hadn't
3     learned anywhere else.  I could be -- you know, I mean, it's been
4     several years, so I could be wrong, but I don't remember anything
5     that was, like, you know, changing my mind.
6          The two-day training we did up in North Portland, it --
7     the two things that I came away from it was the unwillingness to
8     look for other solutions other than what was already in the -- in
9     the training matrix, and then the other one was the fact that six
10    months later, what the PCCEP was talking about in our -- in our
11    meetings was not about any specific aspect of the training, but
12    about the last two and a half hours of the last day was spent in
13    the parking lot in the back of a cruiser doing J-hook turns, and
14    that was kind of fun.  And that's what was the moment that was
15    the most memorable in the whole process.
16         The reason I felt comfortable doing the ride-along at
17    that particular point was as a person with mental illness, for a
18    very long time, I was convinced I was dead.  And being a person
19    with a mental illness that was convinced I was dead, I wasn't
20    sure there was anything else a cop could do to me.
21         I appreciate the fact that you are willing to be a
22    person that -- to be an ally.  In the community, we call that a
23    peer support specialist.  You don't have the training for it, but
24    I assume you -- maybe you can sign for the training.
25              THE COURT:  I don't.  I don't.

 1              MR. NOLEN:  Yeah.  But --

 2              THE COURT:  But I do a lot of things I don't have the

 3    training for.

 4              MR. NOLEN:  Yeah.  But what I will say is if you've

 5    been incarcerated, you're not the person that somebody wants.

 6              THE COURT:  Yeah.  I've not been incarcerated, either.

 7              MR. NOLEN:  Yeah.

 8              THE COURT:  Although I've toured several prisons --

 9              MR. NOLEN:  Yes, but --

10              THE COURT:  -- but in a different capacity.

11              MR. NOLEN:  What I'm saying is from the other person --

12    from the person who you are trying to be an ally to, if they've

13    been incarcerated, they're not going to want you.  If they have a

14    person with -- that has had a drug dependency in the past,

15    they're not going to want you.

16              THE COURT:  That one I will disagree with you on,

17    because I've had a number of people who I've sentenced who've

18    come back, and we've had continuing and good, positive

19    interactions, including, you know, visits in chambers after

20    they've gotten their addictions under control.

21              MR. NOLEN:  I wanted to continue by saying --

22              THE COURT:  I'm sorry.

23              MR. NOLEN:  -- a lot of the conversation today has been

24    around fairness and bias.  I am very much for fairness and I'm

25    against people being explicitly biased.  I understand that just

1   by the society I was born in and my position in life, I have

2   biases, and that is changed by my race, by my gender, by my

3   station in life, and I can't change those things.  It's whether

4   I'm explicit about them and whether I act on those biases that

5   are the problem.

6           I think that if we are going to be talking about the

7   fact that it should be fair, I think it should be fair to

8   everybody.  And we have the ride-along process that we want for

9   our new people, okay, that's great.  We should have ride-alongs

10  where people spend two nights in the county jail or the federal

11  penitentiary.  We should spend eight hours in the state hospital.

12  Those are things that people like me have to deal with or have to

13  see.  Why aren't those things that we're talking about?  Why are

14  we talking about specifically ride-alongs with the cops?

15          The other thing is if we're talking about the fact that

16  we want to do -- if we want to be fair and unbiased, why is it

17  specifically that we have to hurry now, even though it's --

18  throughout the whole process, it's been one side wanting to slow

19  down to see, you know, how far it can -- how far and what can

20  change - in basketball, that would be the four corners - and the

21  other side willing to allow it.  And that's just -- from sitting

22  in the back, I could be wrong.

23          There's a thing called short-timers disease.  If you

24  have a short time left, you're not interested in -- you're

25  interested in having a good name at the end of it and you're

1    interested in just, you know, doing what you can do to make sure

2    that you're happy with where you're at.  You're not interested in

3    what the rest of the world's interested in as much.  And I am

4    completely for changing to six months, whatever it takes to get

5    us past the new year.

6             When you talk about justice and justice delayed, I was

7    working as a community organizer when James Chasse died, and

8    James Chasse died a very long time ago, and there was no justice.

9    And so I -- that really bothers me.

10            And the last thing I want to say, I grew up on a Marine

11   Corps base, and I understand positions of authority and how that

12   relates to the world.  And, you know, I read Max Glover's

13   policies as a vocation.

14            And I understand that, you know, as a society, we

15   recognize that the monopoly on violence is held by the

16   government, and the police are that representative of the

17   government.  And for a City to come forward and say, "No.  This

18   is wrong what they're doing," why are -- you know, why is it --

19   why are we at a position where we're trying to figure out ways

20   around what the -- what the population is saying?  I am sorry.  I

21   can't remember your name, ma'am.

22            THE COURT:  Ms. Brown.

23            MR. NOLEN:  Ms. Brown, yeah.  Ms. Brown said earlier

24   that her -- her -- the people she represents, she represents the

25   people that we voted for, she represents our representatives, and

1  so it's kind of weird that we're talking about, you know, ways to

2  make it comfortable for them.  This is supposed to be comfortable

3  for me, you know.

4           And there's going to be three people on that board that

5  represent police.  Can there be three people that -- in order to

6  make sure there's no bias and make sure it's fair for all, the

7  key words we're talking about, fairness and bias, can we make

8  sure there's three people who represent people with mental

9  illnesses?

10          I can't speak for the Albina Ministerial Alliance, but,

11  you know, their community being represented by three people, you

12  know, that might be important.

13          I can't speak for women.  I'm not a woman.  I recognize

14  that.  I make sure to walk a little bit rougher when I'm around a

15  woman from behind, because I want to make sure that she knows

16  that I'm approaching, so I don't scare her.  That's important

17  that we think about that, that women might need to know that.

18  They might -- they might have a voice that we aren't hearing.

19  Why are we not talking about whether women are fairly represented

20  and are representing themselves against bias in this community?

21  I mean, does that -- does that make sense?

22          THE COURT:  It makes sense, but on the other hand, we

23  don't want to go so far as to require a quota system:  we need

24  one person of this category and one of that category and one of

25  the other.  And that's why I'm generally willing to let our

1    elected officials from various districts put someone on the

2    nominating committee and then let the nominating committee find

3    the right people to be on the oversight committee.

4         MR. NOLEN:  I would totally agree, and that's why I

5    think it's odd that we're starting with having one group

6    represented.

7         THE COURT:  I understand.

8         MR. NOLEN:  Okay.  Thank you.

9         THE COURT:  Thank you very much, Mr. Nolen.  I

10   appreciate it.

11        MR. NOLEN:  Sorry for taking your time.

12        THE COURT:  No, no, no.  You're welcome to it, and

13   that's why we're doing this, and I appreciate your comments.

14        Pastor Robert Wisner.

15        MR. WISNER:  Thank you, Judge.

16        THE COURT:  Good afternoon.

17        MR. WISNER:  Judge, I won't be long, because I, in my

18   experience as a pastor, recognize the audience is tired.  It's

19   been a long day.

20        THE COURT:  The good news is I'm not keeping them from

21   lunch.  We're way past that.

22        MR. WISNER:  Well, I want to say I was like Patrick.  I

23   was not going to speak, but I did believe everyone has said in

24   the three questions that you asked about why and wanted to give

25   an answer, and I'm pretty sure you heard very well.

1          I only stood because of my history and where I've come

2     from from the Albina Ministerial Alliance, beginning with

3     Commissioner Hardesty in the very beginning, I believe I was the

4     very first one who went through the Citizen Academy as well as

5     through the ride-alongs.  I was also very good friends with

6     Officer Mark Delowy (phonetic), who passed away, and did

7     ride-alongs with him.  I also test- -- in unity with Mark Delowy,

8     we spoke about a ride-along that I had that occurred with him.

9          So all of that to be said is that I stood on the --

10    stood up to say the question that you were asking, how could we,

11    and was it beneficial.  And I think you've heard community also

12    kind of say to you, you know, it's a different opinion from your

13    perspective of being an authority in the car with someone

14    comfortable.

15         I would just like to point out an incident where I was

16    at the very beginning, and it was around the firearms, the range.

17    I'm not one that carried firearm permits or carried weapons and

18    never been one who really was around a lot of guns and weapons,

19    but when Kendra James was shot and killed, she had a cousin by

20    the name of Jimmy Parker, Officer Parker, and I was going through

21    the academy with him at that time.  And when we got to the part

22    of where it was time to go down to the range, I wanted to opt

23    out.  And everyone was insistent.  Well, you know, because of the

24    relationships that I have had with my encounters stepping into

25    the areas of my reasoning for wanting to be a part of

1    understanding what officers go through as well as the areas of my

2    own, I guess, bias, what I perceived about police, I wanted to

3    get more involved in learning on the other side, but in that

4    class when we got to the firearms, I chose not to do it.  And

5    everyone was trying to say, "Well, you know, this is an

6    experience.  You might as well try it."  First safe and

7    everything around there.

8        I was adamant that in my thinking, guns kill.  In my

9    community, people who I knew died with guns.  So weapons is

10    something I just did not want to be encountered with.

11        And they were respectful, but then as I was listening

12    through the training class, they started talking about sporting,

13    you know, going out target shooting with friends and using it in

14    a sports concept of what people use guns for, different concept

15    to what I have always encountered with guns.  And so then at that

16    time, Officer Parker said -- I told him, I said, "Well, I'll try

17    it."

18        And when I got to the range, Judge, they handed me the

19    Glock, and literally there was a fear that came on that I could

20    not control.  I began to shake vigorously.  I could -- I was

21    trying to stop it, trying to, you know, not look like I'm kind of

22    a soft guy in the room and didn't want to show that I was really

23    scared, but that shake, I could not control.  And I recall

24    Officer Jimmy Parker putting his arms on -- hand on me and

25    saying, "Just relax.  I'm right beside, and just relax."

1          So, of course, I was shooting, and I missed everything

2    that you can shoot at in that -- that space, but I remember, I

3    recalled the sport analogy, and I have been very active in

4    sports, so I wanted to compete with myself.  So the next time I

5    stood up, I shot, and I finally hit the target.  And then the

6    next time I got up, I hit the target again.

7          To make a long story short, at graduation I received an

8    award for shooting, where I -- they had in the corner the little

9    mark spot, and I was shooting the mark spot because of the way I

10   changed my thinking.

11         There had been another encounter from the Citizens

12   Academy that I would like to share.  On the Citizens Academy I

13   went through, there was a scenario where we went in, and I was

14   driving with my partner on the vehicle, and on the vehicle when

15   we approached it, a gentleman -- it was an unknown call, and

16   there was someone that called and said they were breaking into a

17   car.  And as I'm a distance from myself to Pastor Knutsen, began

18   to walk up using the training that everybody tells me to use and

19   calling out the name and trying to be customer service friendly,

20   the gentleman was just adamant.  He was in the car -- which was

21   an officer role-playing -- and he just turned around and said,

22   "Leave me alone" with some foul language.  The officer didn't use

23   foul language, but it was considered to be foul language.  And

24   I'm approaching the vehicle with the concept of, you know, trying

25   to engage, but when he turned, this time he shot me.  And when it

1    happened, it happened so fast.  And everyone was saying, the

2    trainers, "You're not dead," you know, "Just fire back, fire

3    back," in the department, "Fire back, fire back."

4           I couldn't.  So I feel that just kind of in a way, I

5    thought about that, the reason I couldn't fire back, 'cause I

6    didn't have it in me to take a life, the same fear that I had

7    with the gun.

8           So a lot of people who, as you probably have seen my

9    point, of trying to get people to overcome those things with

10   ride-alongs, Citizens Academy training, there's a lot of things

11   that I had to deal with first personally before I was able to

12   participate.

13          Should it be a requirement?  I'm with you on whatever

14   you decide today, but I thought I would share my perspective with

15   you today.

16          THE COURT:  I really appreciate that perspective.  And

17   it seems to me like we all approach things very differently, but

18   it's sometimes good to understand how other people approach

19   things, too.

20          MR. WISNER:  I thought I would share that.  Thank you

21   again.

22          THE COURT:  Appreciate that, Pastor.  Thank you very

23   much.

24          Is there anyone else here who wants to provide public

25   testimony?  Seeing no hands.  Mary, no one else on the screen?

1          All right.  Let me invite Mr. Geissler, then Ms. Brown,

2     or anybody else who wants to speak for the parties or the amici,

3     any final comments based on what we've heard.  And by the way,

4     could you make sure my understanding is correct that the joint

5     motion that I have before me is solely dealing with amendments

6     Section V, the officer accountability section, right?

7               MR. GEISSLER:  Section VIII, Your Honor.

8               THE COURT:  I see a big V, and I forget the little I.

9     Yes, Section VIII, only officer accountability.

10              MR. GEISSLER:  Correct, Your Honor.

11              THE COURT:  Okay.  Thank you.  Mr. Geissler.

12              MR. GEISSLER:  Your Honor, I'm going to address the

13    point that you had asked the United States to speak to later

14    today, which is where we're here now, this is a point raised by

15    our colleagues at the Mental Health Alliance, would the CBPA be

16    undercut, be *void ab initio* because of one of two things, the

17    nominating process creating bias, or two, the ride-along

18    disincentive, that is, people won't even apply.

19              For both of these, the issue is not ripe.  It's a

20    concern for the unknown, what may happen.  And in that respect,

21    we believe, Your Honor, it's not a basis today to deny the

22    motion.

23              Now, is the system itself set up to fail through those

24    two bases?  Any day of the week, the nominating committee

25    composed of three people, one appointed by the chief, one

1    appointed by PPA, one appointed by PPCOA, that nominating

2    committee can out vote those three people.  Doesn't really matter

3    who else is on that committee.  If our concern is those three

4    individuals are associated with the police, they can be

5    out-voted, but let's not presume that those three people are

6    themselves biased.

7         And I don't want to buy in to the mind-set, Your Honor,

8    that merely because the origin is appointed by PPA, PPCOA, or the

9    chief that those people are somehow less valuable to the

10   discussion or that their perspectives don't matter.  They do.

11   Which is a part why it is fair, reasonable, and adequate, because

12   paragraph 195.c specifically required the City to negotiate with

13   PPA and PPCOA, and this is what they came up with.  This is

14   precisely what we contemplated, so, therefore, not *void ab*

15   *initio*, because, frankly, this Court previously approved that

16   requirement.

17        There also needs to be buy-in from those unions, from

18   the PPA, PPCOA.  So one might argue that the nominating committee

19   is biased in favor of police, but what would it seem like from

20   the police perspective?  This nominating committee is choosing

21   the people who will decide sustain or not sustain, decide

22   people's careers.  Should that be in a position where only one

23   part of the community feels like they have been heard or should

24   all the parts of the community be heard on that?  I submit, Your

25   Honor, that all parts should be, including the officers that

1    police this community.

2            There's an analog that we could make to appointments

3    for the federal judiciary such as Your Honor.  Your Honor

4    certainly was not scared off from the prospect of going before

5    the Senate for confirmation for going to the bench, really

6    because you had to go through the process of going to the federal

7    judiciary's training to be a judge, you need to know the basic

8    information for the role.  So, too, this group must be

9    knowledgeable.

10           They're required to go on a ride-along, they're

11   required to go to the Civilian Academy.  It gives them the basis

12   of information in order to apply the PPB policies to determine

13   whether or not somebody violated those policies.

14           The specific request for ride-along, Your Honor brought

15   up the prospect of an accommodation.  Our colleagues at AMAC

16   brought up the ADA accommodation.  The City has two current

17   methods already for Title I, assuming that we're looking at the

18   CBPA members as employees, the Bureau of Human Resources already

19   has an ADA accommodation methodology.  For Title II, even if they

20   weren't assumed to be employees but they're taking up a public

21   accommodation, the City has its Office of Equity as the ADA

22   accommodation method.  And there's a representative on the

23   nominating committee for that Office of Equity.

24           I submit to Your Honor that we can look at solutions,

25   but the solutions may, in fact, be already existent in the

1   system.

2           THE COURT:  Okay.

3           MR. GEISSLER:  The CBPA does not need to have

4   everything in the Code or the amendments today for this Court to

5   approve today those amendments.

6           Your Honor, our colleagues today, and specifically

7   Reverend Dr. Haynes, has pointed out the need to define bias and

8   racial profiling, and that's what ended up in PPB policy 344.05.

9   Precisely that same sort of system can be employed by the CBPA to

10  establish its policies on bias, its policies on selection, its

11  policies on training, and those will be subjected to the monitor

12  and DOJ's review for consistency with the settlement agreement.

13          And lastly, Your Honor, I'd like to speak to solutions.

14  Today, we can look to a solution.  We want haste with

15  Section VIII.  We want the accountability system to get up and

16  running with a known quantity.  The city council voted last

17  November for it.  It's taken far too long to get to our desk and

18  then far too long to get through the negotiation process with the

19  City.

20          We're now at the eleventh hour.  Let's carry this

21  across the finish line and get Section VIII implemented with Your

22  Honor's approval, because there needs to be accountability.  And

23  from our perspective, there have been impediments to

24  accountability, and I've cited for Your Honor paragraph 192.

25  Those investigations took 800 days.  I see officer-involved

1    shooting investigations that have taken over a year;

2    officer-involved shooting investigations where the training

3    analysis alone takes over a year.

4            THE COURT:  But we already do have a plan for

5    transition.  The investigations that are undergoing now will not

6    be affected.

7            MR. GEISSLER:  Correct, but the investigations between

8    now and X date in the future --

9            THE COURT:  I get it.

10           MR. GEISSLER:  -- will be affected by that same core

11   system.  It's unfair to the officers to have it hanging over

12   their head for a year if they've been truly justified in what

13   they did.  It's unfair for the community not to have an answer on

14   whether or not a shooting or any other use of force is justified

15   or unjustified.

16           The "justice delayed" analogy here that we talk about

17   with respect to the civil rights movement is apropos to today's

18   discussion.  If we further delay the remedy of accountability,

19   it's already been 12 years, must it be 13?  We need not delay any

20   further.  And, Your Honor, I would submit let us please look to

21   approving today Section VIII, let us ask the City to include on

22   its application process the ADA accommodations.  And to the

23   extent that there's an individual who feels they are not

24   qualified for the ADA but nonetheless requires an accommodation,

25   let's please have a methodology in the City's application process

1   to reach an agreement to meet that sort of accommodation, but

2   that's not a reason to say no today, Your Honor.

3         THE COURT:  I understand and agree with that last

4   point.

5         MR. GEISSLER:  Thank you, Your Honor.

6         THE COURT:  Ms. Brown, anything further?

7         MS. BROWN:  Thank you, Your Honor.  I think just

8   briefly on the last point regarding the delay, one, I would ask

9   that if Your Honor is not willing to rule today, that the City be

10  allowed to brief this issue.  I just am concerned about the fact

11  that if you look at our council members today, these are the

12  people that the voters chose to be in those positions.  And as

13  Mr. Geissler pointed out, they have been working on this and the

14  issues surrounding the settlement agreement, the oversight

15  system, et cetera, for four years now in relationship to this.

16        And I know -- I know it doesn't seem like a big deal to

17  wait that long, but for the City to go through all the changes

18  that we are facing over the next several months, that are taking

19  countless number of hours of staff time right now, to then try to

20  get 12 council members up to speed on all systems related to the

21  City of Portland and try to get this issue and have them

22  understand what we need them to do, what the nominating committee

23  needs to do, it's a lot.  And it is for that reason that we put

24  this on the agenda for next week in hopes, not assuming, but in

25  hopes that this would be -- that you would adopt these today

1    and --

2            THE COURT:  So what exactly is on the agenda for next

3    week?

4            MS. BROWN:  The agenda for next week is to adopt the

5    Code language.

6            THE COURT:  Okay.

7            MS. BROWN:  So -- and then from there, we would seat

8    the nominating committee and move forward with --

9            THE COURT:  Those are two distinct things, right --

10           MS. BROWN:  Yes.

11           THE COURT:  -- adopting the Code language and then

12   actually appointing a nominating committee?

13           MS. BROWN:  Correct.

14           THE COURT:  Understood.

15           MS. BROWN:  Yes.  That is correct.  I think that,

16   Judge, I have concerns about, you know, this process interfering

17   with the election or that we are making decisions without

18   considering what the voters asked for for today.  What the voters

19   asked for today was the charter amendments to create the

20   oversight system.  What the voters asked for today was at the

21   same time that they considered that change to the charter, they

22   also appointed several members of our current council, and

23   subsequently we affirmed that for Commissioner Ryan and appointed

24   Commissioner Gonzalez.  And so we -- I feel like we do have the

25   will of the voters before us and that those people that were duly

1    elected can appoint those so that -- I am really concerned about

2    the changes and how much work we're asking of a new council and

3    trying to add this in to their -- the delay that it will cause.

4              THE COURT:  Thank you.

5              MS. BROWN:  Thank you for hearing me.

6              THE COURT:  Anything further, Mr. Karia?

7              MR. KARIA:  No, sir.

8              THE COURT:  Anything further, Mr. Chavez?

9              MR. CHAVEZ:  Only to the extent that if this Court were

10   to take the DOJ's words on these issues being unripe, they are

11   far from unripe.  It's not speculative in the least.  Multiple

12   people have testified today regarding their concerns regarding

13   ride-alongs.

14             THE COURT:  I do think we've reached a mechanism to

15   solve that problem.

16             MR. CHAVEZ:  Understood.

17             THE COURT:  One is to offer me; second is if that won't

18   work, to propose an alternative and to seek a waiver.

19             MR. CHAVEZ:  Certainly.

20             THE COURT:  And if that creates problems, then we'll

21   talk about that next time.

22             MR. CHAVEZ:  Thank you, Your Honor.  Nothing further.

23             THE COURT:  Anything further from the Albina Coalition?

24             MS. PECK:  No, Your Honor.

25             THE COURT:  All right.  We have before me right now the

1    Joint Stipulated Motion, Docket 431.  This has been part of our

2    12-year agreement.  We really are making great progress.  It's

3    been a few steps forward, a few steps back, but over 12 years,

4    we've made progress.

5         I really want to make sure we have something that

6    succeeds.  To have it succeed, it needs buy-in from all of the

7    stakeholders.  Obviously that includes the City and the police

8    bureau and police officers, but it also includes the community.

9         So what I'm going to do now is something that probably

10   nobody's going to like, but I think it maximizes the likelihood

11   of getting buy-in, but I do recognize the City wants to and has

12   set aside time on the agenda to approve changes to the City

13   Charter.  I'm not going to interfere with that, but I also want

14   to make sure we maximize the likelihood of community acceptance.

15        Therefore, for the Joint Stipulated Motion, Docket 431,

16   I hereby approve the Joint Stipulated Motion effective

17   January 2nd, 2025.  That way, the independent monitor can start

18   and continue the work of planning on how we're going to implement

19   all of these things, including that.  The City can approve the

20   charter amendments next week.  All that I can see is that we're

21   not going to do is actually select the nominating committee until

22   January 2nd, 2025, or afterwards.

23        I get this is an imperfect solution, but I do believe

24   it maximizes the likelihood of community acceptance.  And without

25   it, the comments that I've heard might very well make the

1    proposed motion at this time unreasonable, unfair, and unlikely

2    to succeed.

3         That's my ruling.  Any party can appeal it if you want

4    to, but hopefully this will succeed in making the amended

5    settlement, when it becomes effective January 2nd, 2025, in the

6    best position to succeed for everyone and to maximize community

7    acceptance and buy-in and maximize acceptance by the City and the

8    police department.  That's all we can do.

9         We do have a status conference scheduled for

10   December 3rd.  I would like to propose that instead of that, we

11   do a status conference in January.  And there are only three

12   times that are available to me.  Let me propose them to you all.

13   Monday January 6th, Tuesday January 7th, or Friday January 17th.

14        And I do understand and remember the burden on the

15   Government to not do it on a Tuesday, Wednesday, or Thursday.

16        Tuesday January 7th could work, but otherwise, the only

17   times available to us are January 6, January 7, and January 17th.

18   If that doesn't work, we could find time the week of March 3rd.

19        What do you all think?

20        MR. GEISSLER:  One moment, Your Honor.  Does Your Honor

21   happen to know -- I beg Your Honor's pardon.

22        THE COURT:  Yes.

23        MR. GEISSLER:  Do you happen to know the Inauguration

24   day?  What's the certification date?

25        THE COURT:  I believe it's the 5th or 6th.

1          MR. GEISSLER:  I hesitate to schedule something on a

2     date that might have heavy police activity if there's any

3     protests that day, in case they're busy.  It's an anniversary,

4     Your Honor.

5          THE COURT:  I get it.  Let's take a look.  In terms of

6     the counting of the Electoral College ballots, I believe that is

7     going to occur the week of January 6.  The new Congress gets

8     sworn in Friday, January 3rd, and then it's the new Congress

9     that's responsible for counting of the Electoral College ballots.

10     I'm assuming that's going to be the 6th, 7th, or 8th.  I don't

11     know which of those dates.

12          Obviously the president gets sworn in on January 20th.

13     That's always Inauguration day.

14          MR. GEISSLER:  January 6th, that date.  How about if we

15     shoot for the 7th, Your Honor.

16          THE COURT:  Fine.  January 7th works for us.

17          Does it work for the City?

18          MS. BROWN:  Yes, Your Honor.  The 6th, 7th, or 17th all

19     work.

20          THE COURT:  Right now we're talking about the 6th.

21     Mr. Geissler's asked for the 7th, Tuesday the 7th.

22          Mary, am I correct that works for us?

23          THE COURTROOM DEPUTY:  Yes.  After the pretrial

24     conference.

25          THE COURT:  We can move that.

1            Mr. Chavez, can you make that work?

2            MR. CHAVEZ:  That works, Your Honor.

3            THE COURT:  And can Albina Coalition make that work?

4            MS. PECK:  Yes, Your Honor.

5            THE COURT:  And Mr. Karia, can you make that work?

6            MR. KARIA:  Yes.

7            THE COURT:  Thank you all.  All right.  Our next status

8     conference will be January 7th, Tuesday, 9:00 a.m. in this

9     courtroom.

10           Thank you all very much.  And, again, I really commend

11    all parties, and that includes the amici and the intervenor, I

12    commend all parties for making tremendous progress.  I believe

13    everyone is working in good faith.  This is something that I

14    think both our community can be proud of and it may actually even

15    be a model for other communities.

16           I welcome the participation of the independent monitor.

17    I think that's going to be an important part of the continuing

18    success here.

19           We may have made a couple of people's jobs more

20    difficult and more burdensome, but we're in a marathon, not a

21    sprint.

22           Thank you all.  Have a good day.

23           MR. GEISSLER:  Thank you, Your Honor.

24           (Proceedings adjourned at 2:45 p.m.)

25

1          **C E R T I F I C A T E**

2

3          I certify, by signing below, that the foregoing is a

4   true and correct transcript of the record, taken by stenographic

5   means, of the proceedings in the above-entitled cause.

6          A transcript without an original signature, conformed

7   signature, or digitally signed signature is not certified.

8

9          DATED this 2nd day of October 2024.

10

11

12                        /s/ Kellie M. Humiston

13                        Kellie M. Humiston, RMR, CRR
                          Official Court Reporter
14                        Certificates Expire:  9/2024

15

16

17

18

19

20

21

22

23

24

25

## $

**$14** [1] - 166:12
**$7,000** [1] - 165:22

## '

**'88** [1] - 147:2
**'Black** [1] - 107:10

## /

**/s** [1] - 215:12

## 1

**1** [8] - 22:24, 23:13, 23:14, 40:5, 41:1, 134:17, 140:3, 163:13
**10** [6] - 44:15, 119:24, 120:15, 120:16, 143:6, 152:16
**10-minute** [1] - 94:23
**10-person** [1] - 152:16
**1000** [1] - 2:3
**1010** [1] - 22:24
**102** [1] - 157:25
**11** [6] - 119:23, 120:16, 152:16, 167:6, 186:8, 190:5
**11.2** [1] - 22:22
**115** [1] - 23:19
**11:26** [1] - 95:1
**11:30** [3] - 92:5, 92:8, 92:10
**11:39** [1] - 95:1
**12** [9] - 6:7, 18:6, 57:2, 147:12, 173:22, 184:11, 207:19, 208:20, 211:3
**12-person** [1] - 119:17
**12-year** [1] - 211:2
**121** [1] - 47:4
**122** [1] - 47:5
**1221** [1] - 2:10
**123** [1] - 47:12
**124** [1] - 47:12
**125** [1] - 47:14
**126** [1] - 47:14
**127** [1] - 47:14
**128** [1] - 47:15
**129** [1] - 47:18
**13** [2] - 142:19, 207:19
**13-year** [1] - 148:12
**130** [1] - 47:25
**131** [8] - 10:17, 31:15, 48:1, 48:3, 56:6, 70:9, 190:3
**131's** [1] - 48:2

**131.a.iii** [2] - 34:15, 37:4
**131.b.vi** [1] - 30:6
**132** [2] - 48:4, 190:3
**132nd** [1] - 86:24
**133** [2] - 38:13, 48:4
**14** [1] - 74:17
**15** [1] - 168:11
**15th** [2] - 132:10, 187:10
**16** [1] - 176:19
**17** [1] - 124:5
**17th** [3] - 212:13, 212:17, 213:18
**18** [5] - 27:11, 44:23, 44:25, 124:7, 127:10
**180-day** [2] - 47:4, 47:9
**1850** [1] - 2:17
**192** [2] - 153:8, 206:24
**195** [9] - 27:1, 27:10, 27:17, 27:22, 29:9, 44:15, 45:19, 154:1, 154:22
**195.c** [1] - 204:12
**1967** [1] - 67:3
**1988** [1] - 142:10
**19th** [1] - 44:7

## 2

**2** [2] - 23:8, 40:20
**20** [9] - 44:22, 45:2, 85:8, 86:9, 128:11, 143:6, 144:19, 145:24, 170:4
**20-member** [1] - 44:11
**2001** [2] - 142:17, 147:2
**2010** [1] - 76:8
**2012** [1] - 189:14
**2016** [1] - 186:21
**2017** [1] - 166:7
**2019** [1] - 62:22
**2020** [5] - 43:22, 128:9, 164:11, 169:3, 191:25
**2021** [1] - 44:7
**2022** [2] - 44:13, 44:21
**2023** [3] - 62:14, 64:16, 76:1
**2024** [4] - 1:7, 3:1, 62:13, 215:9
**2025** [3] - 211:17, 211:22, 212:5
**20530** [1] - 2:7
**20th** [1] - 213:12
**21** [4] - 154:20, 155:13, 167:7, 186:9
**21st** [3] - 76:13, 84:9,

86:4
**23** [1] - 174:13
**24** [2] - 35:6, 136:9
**25** [1] - 146:25
**26-217** [6] - 8:22, 175:9, 178:8, 179:3, 188:22, 191:22
**27** [1] - 45:10
**29** [2] - 1:7, 3:1
**2:00** [3] - 180:21, 184:2, 184:4
**2:45** [1] - 214:24
**2nd** [4] - 211:17, 211:22, 212:5, 215:9

## 3

**3** [3] - 23:8, 32:15, 41:6
**30** [7] - 21:2, 42:11, 85:13, 142:25, 146:14, 155:4, 185:2
**3021** [1] - 2:14
**30th** [1] - 42:16
**31st** [1] - 42:16
**326-8186** [1] - 1:24
**344.05** [1] - 206:8
**35** [1] - 85:7
**35B.020** [1] - 116:7
**39** [1] - 85:7
**3:12-cv-02265-SI** [1] - 1:6
**3:12-cv-2265** [1] - 3:8
**3rd** [2] - 212:10, 212:18, 213:8

## 4

**4** [3] - 23:8, 24:18, 41:6
**430** [1] - 2:11
**431** [4] - 5:6, 6:15, 211:1, 211:15
**433** [1] - 6:16
**434** [1] - 6:17
**435** [1] - 6:18
**436** [2] - 6:19, 25:3
**438** [1] - 6:25
**439** [1] - 7:1
**440** [1] - 7:2
**441** [1] - 6:21
**442** [1] - 7:3
**443** [2] - 7:6, 141:20
**444** [1] - 7:7
**445** [1] - 7:8
**446** [1] - 7:8
**447** [1] - 7:9
**448** [1] - 7:10
**449** [1] - 7:11
**450** [1] - 6:23

**451** [1] - 7:12
**452** [1] - 7:14
**453** [1] - 7:15
**454** [1] - 7:15
**455** [1] - 28:12
**48** [2] - 23:5, 40:7

## 5

**50** [1] - 74:8
**500** [1] - 62:17
**503** [1] - 1:24
**51** [2] - 64:17, 85:9
**5248** [1] - 2:20
**59** [1] - 158:1
**5K** [1] - 64:7
**5th** [1] - 212:25

## 6

**6** [2] - 212:17, 213:7
**60** [5] - 27:14, 64:4, 155:7, 156:20, 156:21
**600** [1] - 2:3
**61** [2] - 64:16, 85:9
**620** [1] - 22:7
**66** [1] - 144:10
**6th** [2] - 212:13, 212:25, 213:10, 213:14, 213:18, 213:20

## 7

**7** [1] - 212:17
**70** [3] - 62:22, 64:4, 148:6
**75** [1] - 85:2
**7th** [9] - 212:13, 212:16, 213:10, 213:15, 213:16, 213:18, 213:21, 214:8

## 8

**800** [2] - 153:9, 206:25
**82** [3] - 86:7, 143:9, 147:6
**8th** [1] - 213:10

## 9

**9** [1] - 120:15
**9/2024** [1] - 215:14
**90** [1] - 155:12
**911** [1] - 41:24
**950** [1] - 2:6
**96** [1] - 45:7

**97204** [3] - 2:4, 2:11, 2:18
**97208** [1] - 2:20
**97232** [1] - 2:14
**9:00** [1] - 214:8
**9:06** [1] - 3:1

## A

**a.m** [2] - 3:1, 214:8
**ab** [3] - 154:5, 203:16, 204:14
**abbreviated** [1] - 33:10
**abdomen** [1] - 169:12
**abide** [1] - 175:7
**abided** [1] - 24:21
**ability** [15] - 12:3, 26:17, 31:23, 64:10, 75:8, 96:2, 111:13, 118:12, 125:2, 142:16, 145:14, 162:12, 174:24, 190:22
**able** [22] - 13:2, 33:15, 41:19, 45:1, 49:4, 49:7, 49:24, 53:13, 53:22, 54:15, 54:16, 57:18, 65:15, 65:17, 104:13, 104:18, 111:5, 121:6, 140:25, 157:17, 176:19, 202:11
**abolish** [1] - 139:22
**abolitionist** [1] - 171:9
**Abortion** [1] - 181:6
**above-entitled** [1] - 215:5
**aboveboard** [2] - 31:22, 36:4
**absence** [1] - 60:21
**absent** [1] - 36:24
**absolute** [2] - 73:16, 140:13
**absolutely** [11] - 24:25, 53:5, 53:10, 66:20, 90:8, 90:12, 102:2, 104:21, 148:1, 148:24
**absurd** [1] - 130:16
**abundance** [3] - 138:2, 138:5, 138:15
**abuse** [3] - 141:4, 173:14, 175:2
**academic** [1] - 172:11
**academies** [3] - 54:4, 54:20
**Academy** [29] - 10:23, 12:14, 12:21, 13:4, 34:12, 54:2, 54:9,

54:13, 65:21, 71:2, 72:8, 72:13, 75:2, 75:10, 81:18, 87:20, 90:5, 97:14, 100:7, 100:8, 120:23, 130:7, 159:20, 164:10, 199:4, 201:12, 202:10, 205:11

**academy** [8] - 13:11, 35:7, 37:4, 81:23, 87:21, 169:7, 169:19, 199:21

**accept** [2] - 100:9, 131:1

**acceptable** [2] - 101:16, 153:10

**acceptance** [6] - 148:14, 152:19, 211:14, 211:24, 212:7

**accepted** [3] - 99:21, 130:25, 162:24

**accepting** [1] - 147:17

**access** [7] - 36:6, 36:7, 36:17, 36:24, 36:25, 59:14, 93:9

**accessibility** [2] - 19:5, 19:6

**accessible** [1] - 94:3

**accommodate** [1] - 123:11

**accommodated** [1] - 183:19

**accommodating** [2] - 92:16, 185:2

**accommodation** [10] - 99:18, 104:14, 104:17, 205:15, 205:16, 205:19, 205:21, 205:22, 207:24, 208:1

**accommodations** [15] - 90:10, 90:11, 90:14, 90:15, 93:23, 94:10, 94:14, 101:15, 130:23, 130:24, 131:1, 131:4, 207:22

**accompanies** [1] - 96:8

**accompany** [10] - 51:20, 52:1, 72:3, 80:15, 94:10, 94:15, 100:7, 105:4, 122:2, 182:14

**accomplish** [1] - 99:6

**accomplishing** [1] - 99:9

**accordingly** [1] -

92:19

**account** [1] - 40:24

**Accountability** [14] - 7:13, 10:20, 12:4, 12:13, 27:10, 44:19, 45:6, 92:24, 102:7, 110:13, 110:22, 164:21, 173:5, 188:20

**accountability** [70] - 5:8, 16:13, 17:14, 24:6, 27:3, 27:4, 28:2, 33:13, 37:8, 37:12, 46:5, 47:3, 58:19, 66:8, 69:1, 69:7, 70:25, 76:12, 76:15, 79:24, 82:19, 82:25, 83:1, 83:2, 93:2, 97:6, 97:9, 97:18, 106:8, 107:21, 111:4, 117:20, 117:23, 118:4, 118:17, 118:19, 119:1, 137:14, 140:4, 141:1, 141:4, 141:10, 142:11, 142:25, 143:3, 143:22, 145:25, 147:1, 147:22, 153:8, 156:12, 158:9, 159:14, 163:9, 174:9, 174:25, 175:3, 175:18, 176:8, 176:18, 178:23, 179:2, 188:23, 203:6, 203:9, 206:15, 206:22, 206:24, 207:18

**accountable** [18] - 50:5, 58:24, 82:19, 82:23, 97:21, 117:21, 142:16, 145:22, 146:1, 147:18, 148:22, 149:9, 161:24, 168:21, 169:2, 175:13, 187:22, 190:2

**accounting** [1] - 75:8

**accurate** [1] - 62:16

**accurately** [1] - 181:15

**accuse** [1] - 68:22

**accuses** [1] - 68:15

**achievable** [1] - 53:5

**acknowledging** [1] - 183:13

**Act** [1] - 90:6

**act** [9] - 24:16, 29:19, 29:21, 33:3, 146:13, 149:6, 162:12, 174:25, 195:4

**acted** [1] - 157:9

**Action** [1] - 17:9

**action** [3] - 18:4, 40:25, 46:14

**actions** [7] - 38:11, 62:11, 82:12, 82:20, 168:2, 186:20

**active** [1] - 201:3

**activism** [1] - 176:14

**activist** [3] - 170:22, 173:7, 179:22

**activists** [1] - 87:24

**activities** [6] - 15:11, 16:22, 81:19, 82:14, 168:16, 187:16

**activity** [2] - 18:14, 213:2

**actual** [5] - 99:6, 108:22, 124:22, 139:9, 153:13

**ADA** [8] - 90:15, 93:23, 104:13, 205:16, 205:19, 205:21, 207:22, 207:24

**ADA-related** [1] - 90:15

**adamant** [2] - 200:8, 201:20

**add** [10] - 5:13, 47:12, 52:23, 55:2, 70:5, 72:18, 95:20, 120:14, 170:16, 210:3

**added** [8] - 46:25, 96:25, 117:12, 120:13, 127:18, 127:19, 134:21, 177:2

**addiction** [2] - 173:8, 174:14

**addictions** [2] - 173:16, 194:20

**adding** [1] - 169:21

**addition** [6] - 6:13, 6:14, 13:3, 165:10, 182:24, 186:17

**additional** [3] - 20:22, 100:19, 154:24

**additionally** [1] - 49:9

**address** [18] - 10:13, 14:22, 19:7, 22:4, 24:23, 29:2, 40:10, 41:15, 48:7, 52:17, 56:4, 98:6, 98:20, 102:16, 120:22,

179:20, 190:3, 203:12

**addressed** [3] - 71:5, 179:11, 191:6

**addresses** [1] - 184:13

**addressing** [3] - 28:1, 111:9, 179:17

**adequacy** [1] - 70:14

**adequate** [22] - 9:1, 9:7, 10:1, 10:7, 27:5, 28:7, 32:8, 32:19, 34:6, 34:9, 61:3, 98:13, 101:17, 157:1, 163:24, 164:3, 167:3, 171:5, 178:23, 186:5, 191:23, 204:11

**adequately** [7] - 8:21, 9:11, 9:20, 10:9, 162:19, 168:21, 187:21

**adhere** [2] - 62:9, 174:10

**adjacent** [2] - 116:5, 117:15

**adjourned** [1] - 214:24

**adjudicates** [1] - 14:8

**adjudicating** [1] - 105:19

**adjudicative** [5] - 32:11, 32:18, 35:17, 37:24, 71:23

**adjustments** [3] - 54:8, 72:6, 81:14

**administration** [1] - 16:15

**administrative** [4] - 38:15, 38:19, 47:8, 47:23

**administrator** [2] - 42:2, 152:5

**admirable** [1] - 183:3

**admire** [2] - 68:5, 126:19

**admit** [1] - 174:8

**admitted** [1] - 67:11

**adolescent** [1] - 136:14

**adopt** [4] - 32:21, 154:19, 208:25, 209:4

**adopted** [4] - 6:18, 44:7, 44:15, 54:12

**adopting** [2] - 110:12, 209:11

**adopts** [1] - 154:20

**adult** [3] - 54:11, 141:11, 178:3

**advanced** [2] - 27:25,

105:11

**adversely** [2] - 174:19, 176:2

**advisement** [4] - 155:1, 156:2, 156:19, 157:14

**advisory** [2] - 166:22, 185:24

**Advisory** [2] - 18:13, 136:11

**advocate** [2] - 65:25, 106:8

**advocates** [1] - 76:20

**affairs** [1] - 35:20

**Affairs** [7] - 16:10, 23:4, 47:16, 47:18, 145:18, 164:3, 189:10

**affect** [11] - 6:2, 6:6, 6:9, 43:1, 117:2, 129:24, 129:25, 130:1, 150:25, 166:5, 172:14

**affected** [7] - 66:12, 131:8, 131:12, 174:20, 176:3, 207:6, 207:10

**affectionately** [1] - 173:12

**affirmed** [2] - 65:3, 209:23

**affording** [1] - 110:14

**afraid** [1] - 82:9

**African** [2] - 67:11, 85:8

**African-American** [2] - 67:11, 85:8

**after-action** [1] - 40:25

**afternoon** [4] - 128:4, 172:3, 172:6, 198:16

**afterwards** [2] - 120:5, 211:22

**age** [2] - 124:7, 173:22

**agencies** [2] - 63:14, 63:16

**agency** [3] - 16:5, 16:11, 65:17

**agenda** [7] - 6:18, 148:18, 165:9, 208:24, 209:2, 209:4, 211:12

**ago** [9] - 16:2, 28:12, 64:4, 74:17, 84:16, 98:12, 110:7, 128:11, 196:8

**agree** [42] - 29:23, 35:22, 35:25, 37:19, 40:13, 43:2, 48:17, 59:23, 59:24, 60:6, 60:11, 61:2, 61:9,

3

66:11, 66:18, 69:12,
79:21, 80:5, 82:1,
83:4, 91:17, 115:11,
119:19, 126:4,
126:5, 127:9, 129:5,
131:9, 132:22,
134:8, 149:4,
153:18, 154:13,
155:24, 156:14,
157:8, 161:6,
171:11, 186:15,
192:3, 198:4, 208:3
**agreed** [3] - 30:2,
43:3, 186:22
**agreement** [92] - 5:1,
5:5, 6:3, 6:9, 8:24,
11:12, 17:13, 22:3,
24:6, 24:17, 24:18,
27:1, 27:4, 27:9,
27:16, 27:17, 28:2,
29:7, 31:6, 31:24,
31:25, 32:6, 32:24,
33:8, 33:9, 33:17,
34:4, 34:17, 36:7,
37:9, 38:3, 38:17,
43:2, 43:20, 44:14,
44:23, 44:25, 45:21,
58:11, 59:14, 60:3,
60:4, 60:11, 60:12,
70:15, 70:18, 70:19,
70:23, 74:9, 74:10,
74:12, 74:21, 74:23,
76:7, 76:9, 98:17,
105:15, 109:7,
110:15, 110:16,
110:17, 111:10,
111:21, 119:2,
151:13, 153:11,
154:1, 154:21,
155:19, 155:22,
163:24, 165:15,
166:18, 166:20,
168:12, 168:17,
168:18, 170:8,
185:20, 185:22,
187:12, 187:17,
187:18, 188:25,
189:9, 191:23,
206:12, 208:1,
208:14, 211:2
**agreement's** [2] -
27:22, 74:15
**agreements** [2] - 70:3,
70:14
**ahead** [4] - 77:15,
109:24, 133:12,
148:16
**aid** [2] - 117:20,
130:15
**aiken** [1] - 92:13

**Aiken** [3] - 8:5, 92:12,
92:22
**AIKEN** [4] - 92:14,
92:16, 92:21, 94:17
**AIONA** [5] - 180:20,
188:9, 188:12,
188:15, 188:18
**Aiona** [6] - 7:11, 8:3,
180:18, 188:6,
188:19, 192:9
**Albies** [8] - 2:16, 2:17,
4:4, 94:9, 100:3,
100:10, 135:15,
135:19
**ALBIES** [15] - 4:4,
25:11, 25:20, 73:23,
74:1, 74:4, 74:17,
75:1, 90:2, 90:4,
90:9, 90:20, 135:11,
135:16, 135:20
**Albies'** [1] - 101:14
**Albina** [12] - 4:1, 6:20,
8:14, 14:20, 17:8,
73:21, 132:1, 135:1,
197:10, 199:2,
210:23, 214:3
**Albuquerque** [2] -
35:5, 35:15
**Alexander** [1] - 2:5
**align** [2] - 96:23, 129:8
**alive** [1] - 176:19
**allegation** [5] - 56:10,
65:24, 117:24,
117:25, 187:4
**allegations** [2] -
32:13, 72:22
**alleged** [1] - 105:22
**allegedly** [1] - 170:23
**Alliance** [21] - 4:2, 4:9,
4:11, 6:20, 6:22,
8:14, 14:20, 17:9,
18:12, 73:22, 83:21,
91:24, 92:2, 95:4,
98:4, 105:14, 135:1,
154:4, 197:10,
199:2, 203:15
**allow** [13] - 56:16,
71:18, 87:13, 98:13,
98:17, 132:11,
139:17, 161:5,
162:10, 174:24,
175:22, 179:1,
195:21
**allowed** [6] - 44:23,
111:17, 112:6,
170:1, 176:13,
208:10
**allowing** [4] - 118:21,
175:15, 175:24,
176:12

**ally** [2] - 193:22,
194:12
**almost** [7] - 49:20,
62:8, 62:21, 105:10,
128:11, 144:20,
164:18
**alone** [7] - 87:9, 97:4,
112:9, 140:24,
157:13, 201:22,
207:3
**alongs** [36] - 13:10,
34:16, 34:19, 35:6,
48:8, 48:15, 52:7,
52:13, 53:16, 55:18,
65:20, 86:18, 93:14,
97:13, 98:22, 99:7,
99:19, 102:22,
122:23, 126:8,
130:6, 131:6,
137:18, 170:7,
177:1, 181:16,
181:21, 181:24,
182:15, 187:25,
195:9, 195:14,
199:5, 199:7,
202:10, 210:13
**Alt** [2] - 96:10
**alternative** [13] - 8:16,
75:6, 80:7, 100:12,
100:13, 105:8,
138:12, 156:18,
161:8, 177:2, 177:7,
183:25, 210:18
**alternatives** [3] -
12:22, 104:24,
137:24
**AMA** [7] - 75:13,
75:24, 76:1, 76:2,
76:16, 77:7, 90:13
**AMAC** [10] - 2:16, 4:5,
4:6, 35:22, 35:25,
36:3, 74:1, 75:5,
135:13, 205:15
**AMAC's** [2] - 35:22,
74:5
**Amaechi** [3] - 8:1,
127:22
**ambulance** [1] -
136:17
**amen** [1] - 96:19
**amend** [3] - 5:5, 6:19,
22:3
**amended** [4] - 168:18,
187:18, 191:22,
212:4
**amendment** [13] - 5:6,
10:1, 27:2, 43:23,
98:12, 98:17, 100:2,
100:19, 101:4,
101:9, 156:10,

163:8, 191:25
**amendment's** [1] -
189:3
**amendments** [40] -
5:11, 8:25, 9:1, 9:4,
10:7, 10:16, 24:22,
26:25, 27:3, 27:5,
27:6, 27:24, 33:7,
33:12, 44:14, 44:15,
44:17, 60:1, 97:23,
98:21, 100:18,
132:10, 151:5,
153:24, 154:21,
156:16, 156:25,
163:23, 165:2,
165:5, 165:8,
173:15, 178:24,
189:9, 191:24,
203:5, 206:4, 206:5,
209:19, 211:20
**America** [3] - 3:7,
137:4, 141:8
**AMERICA** [1] - 1:5
**American** [3] - 67:11,
85:8, 139:15
**Americans** [2] - 67:19,
90:6
**Ames** [2] - 2:8, 3:17
**amici** [11] - 11:14,
12:9, 14:18, 39:10,
55:15, 98:16, 100:4,
106:9, 111:8, 203:2,
214:11
**amici's** [1] - 75:23
**AMICUS** [2] - 2:16,
2:19
**amicus** [3] - 4:1, 4:8,
135:1
**amidst** [1] - 19:14
**amok** [1] - 139:23
**amount** [7] - 37:12,
64:15, 93:6, 130:16,
136:24, 137:17,
157:25
**ample** [1] - 138:6
**amplify** [1] - 169:24
**analog** [1] - 205:2
**analogy** [2] - 201:3,
207:16
**analysis** [2] - 16:13,
207:3
**analyst** [1] - 92:22
**Anderson** [2] - 87:2,
87:4
**Angeles** [3] - 16:2,
16:6, 16:18
**angst** [2] - 65:10,
86:15
**Anil** [2] - 2:13, 3:23
**Ann** [4] - 8:6, 185:7,

188:3
**Annie** [1] - 7:2
**anniversary** [1] -
213:3
**anoint** [1] - 96:16
**answer** [20] - 14:8,
35:15, 50:24, 105:4,
113:23, 115:14,
121:11, 122:1,
122:5, 122:6, 122:9,
134:15, 134:20,
144:1, 148:5, 155:6,
198:25, 207:13
**answers** [3] - 78:6,
85:18, 115:20
**anti** [11] - 106:23,
112:11, 114:1,
115:23, 167:8,
176:3, 176:4, 176:8,
178:21, 186:11
**anti-black** [1] - 176:3
**anti-brown** [1] - 176:4
**anti-indigenous** [1] -
176:4
**anti-police** [3] -
106:23, 114:1, 176:8
**anti-racism** [2] -
167:8, 186:11
**anti-racist** [1] - 178:21
**anticipate** [7] - 6:1,
16:24, 17:24, 42:25,
74:21, 179:4, 186:13
**anticipated** [1] - 64:20
**anticipating** [1] -
181:8
**anticipation** [1] -
175:14
**anxiety** [2] - 93:18,
161:14
**anyway** [2] - 14:13,
159:12
**apart** [1] - 70:15
**apologies** [1] - 185:5
**apologize** [6] - 69:22,
79:11, 127:21,
133:9, 133:14,
185:13
**appeal** [9] - 37:18,
37:22, 37:23, 38:6,
168:25, 189:20,
189:23, 189:25,
212:3
**appealing** [1] - 147:5
**appear** [3] - 29:24,
60:2, 114:11
**appearance** [7] - 3:9,
3:14, 3:22, 4:3, 4:9,
4:14, 115:10
**appeared** [1] - 15:19
**applaud** [1] - 111:3

**apples** [3] - 68:18, 179:9
**apples-to-apples** [1] - 68:18
**applicable** [2] - 67:7, 99:7
**applicants** [2] - 130:11, 130:22
**application** [3] - 140:16, 207:22, 207:25
**applications** [1] - 64:14
**applied** [4] - 32:16, 32:17, 78:17, 101:7
**applies** [4] - 22:22, 37:3, 90:6, 130:18
**apply** [15] - 37:3, 46:10, 48:22, 81:1, 94:12, 99:20, 99:24, 130:12, 130:17, 130:20, 138:1, 138:16, 138:17, 203:18, 205:12
**applying** [4] - 50:22, 81:4, 131:3, 138:16
**appoint** [18] - 119:12, 119:25, 120:3, 120:9, 143:19, 143:20, 148:9, 148:23, 149:10, 149:11, 152:15, 152:20, 154:11, 154:15, 170:14, 192:2, 210:1
**appointed** [15] - 5:22, 42:9, 43:12, 44:11, 61:24, 106:2, 110:7, 140:19, 155:20, 203:25, 204:1, 204:8, 209:22, 209:23
**appointing** [3] - 44:20, 192:6, 209:12
**appointment** [2] - 152:6, 184:11
**appointments** [2] - 106:3, 205:2
**appreciate** [43] - 5:13, 10:12, 15:17, 20:3, 20:5, 21:18, 37:6, 55:20, 56:3, 59:16, 74:5, 75:1, 75:9, 83:18, 84:10, 86:21, 97:25, 111:2, 113:5, 113:18, 119:5, 126:15, 127:13, 128:21, 130:8, 134:9, 134:10, 135:16, 141:14,

158:12, 171:13, 171:16, 181:3, 182:13, 183:13, 183:17, 185:1, 185:4, 193:21, 198:10, 198:13, 202:16, 202:22
**appreciates** [1] - 118:22
**approach** [7] - 41:11, 41:12, 67:18, 105:3, 108:11, 202:17, 202:18
**approached** [1] - 201:15
**approaching** [2] - 197:16, 201:24
**appropriate** [10] - 32:11, 46:15, 59:12, 60:5, 61:6, 74:19, 98:17, 135:2, 153:16, 153:25
**appropriately** [2] - 107:12, 132:3
**appropriateness** [1] - 29:8
**approval** [6] - 28:8, 33:19, 34:8, 98:19, 156:9, 206:22
**approve** [11] - 13:22, 60:1, 100:18, 142:5, 155:18, 156:20, 165:24, 206:5, 211:12, 211:16, 211:19
**approved** [10] - 22:17, 36:13, 36:16, 43:23, 98:12, 142:6, 154:1, 168:13, 187:13, 204:15
**approving** [2] - 142:8, 207:21
**April** [2] - 44:13, 186:21
**apropos** [1] - 207:17
**arbitrate** [1] - 38:2
**arbitration** [1] - 79:18
**archivist** [1] - 95:23
**area** [6] - 63:17, 64:12, 67:16, 69:9, 167:9, 186:13
**areas** [8] - 6:14, 24:6, 62:5, 62:6, 63:21, 63:24, 199:25, 200:1
**argue** [4] - 137:5, 137:9, 167:12, 204:18
**argued** [1] - 170:3
**argument** [2] - 37:5, 78:5

**arguments** [1] - 166:9
**arise** [1] - 58:5
**arisen** [1] - 7:18
**arm** [1] - 96:9
**armed** [3] - 87:10, 104:4, 136:17
**arms** [1] - 200:24
**arrested** [1] - 136:13
**artful** [2] - 72:4, 72:5
**articulated** [1] - 105:22
**artificial** [1] - 164:16
**artist** [1] - 95:22
**Ashlee** [1] - 2:16
**Ashley** [1] - 4:4
**aside** [2] - 29:1, 211:12
**aspect** [3] - 74:13, 168:17, 193:11
**aspects** [4] - 12:24, 68:24, 132:3, 187:17
**aspirations** [1] - 188:24
**asserts** [1] - 167:14
**assessed** [2] - 28:14, 112:21
**assessment** [1] - 114:3
**assigned** [1] - 16:7
**assignments** [1] - 16:3
**assist** [1] - 75:13
**assistance** [2] - 101:14, 101:15
**Assistant** [2] - 17:17, 156:9
**associated** [2] - 129:22, 204:4
**Association** [21] - 8:14, 8:15, 17:20, 27:19, 27:21, 69:21, 70:2, 73:10, 75:23, 83:22, 102:6, 103:19, 116:13, 116:15, 143:24, 145:11, 145:20, 146:20, 147:15, 190:21
**ASSOCIATION** [1] - 2:13
**Association's** [1] - 3:22
**assume** [4] - 14:17, 14:19, 54:6, 193:24
**assumed** [1] - 205:20
**assuming** [13] - 51:14, 60:1, 60:9, 119:11, 119:22, 120:8, 131:24, 134:25, 137:11, 149:5,

205:17, 208:24, 213:10
**assumption** [2] - 142:5, 153:20
**assumptions** [2] - 137:11, 176:9
**assurance** [2] - 168:15, 187:15
**asymmetric** [1] - 131:16
**attempting** [1] - 103:19
**attempts** [1] - 173:22
**attend** [3] - 35:9, 100:6, 164:9
**attendance** [1] - 13:10
**attended** [3] - 18:1, 35:8, 91:18
**attendees** [1] - 114:21
**attention** [5] - 25:7, 25:8, 75:3, 133:22, 178:16
**attitude** [1] - 68:15
**attorney** [10] - 75:22, 75:23, 102:13, 102:18, 102:19, 114:20, 132:24, 170:13, 170:14, 187:9
**Attorney** [4] - 3:19, 75:21, 75:22, 156:9
**Attorney's** [3] - 2:2, 2:10, 3:16
**attorney's** [1] - 117:5
**attorneys** [1] - 168:10
**attorney's** [1] - 165:6
**audience** [1] - 198:18
**audio** [4] - 181:1, 184:19, 184:22, 184:23
**audit** [3] - 24:5, 76:5, 142:19
**auditing** [1] - 24:8
**Auditor** [1] - 145:11
**August** [2] - 3:1, 45:6
**august** [1] - 1:7
**Austad** [3] - 7:23, 8:10, 185:16
**authentically** [1] - 118:25
**authority** [16] - 9:2, 10:6, 13:21, 29:22, 111:23, 118:5, 138:25, 155:17, 155:21, 155:24, 156:8, 157:4, 167:19, 184:14, 196:11, 199:13
**authorization** [2] - 155:25, 156:4

**Autism** [2] - 136:8, 139:2
**autism** [1] - 139:6
**autistic** [1] - 136:8
**automatic** [1] - 161:10
**automatically** [2] - 79:25, 143:24
**available** [12] - 19:3, 20:23, 20:24, 42:20, 56:18, 69:4, 80:2, 80:8, 96:5, 104:25, 212:12, 212:17
**avenue** [3] - 38:11, 38:12, 189:22
**Avenue** [3] - 2:3, 2:6, 2:10
**avenues** [3] - 122:17, 122:21, 181:20
**average** [1] - 136:20
**aversion** [1] - 87:8
**avid** [1] - 66:22
**avoid** [2] - 97:22, 187:2
**awaiting** [1] - 39:16
**award** [1] - 201:8
**aware** [8] - 13:12, 50:22, 50:23, 51:2, 57:9, 60:19, 67:10, 137:21
**awareness** [1] - 54:21
**awful** [1] - 125:17

**B**

**B-A-U-T-I-S-T-A** [1] - 110:5
**baby** [1] - 177:20
**bachelor's** [1] - 16:14
**background** [5] - 12:23, 101:17, 131:25, 136:7, 149:20
**backseat** [1] - 104:3
**backward** [1] - 76:10
**bad** [5] - 137:4, 137:11, 137:12, 151:9, 179:9
**bad's** [1] - 125:25
**balances** [1] - 191:18
**ballot** [4] - 9:15, 9:22, 145:10, 167:14
**ballots** [2] - 213:6, 213:9
**bandaged** [1] - 96:18
**Barbara** [5] - 8:2, 141:24, 141:25, 185:10
**bargaining** [2] - 38:3, 45:11
**barred** [1] - 117:10

barrier [1] - 94:1
barriers [1] - 174:9
barring [1] - 137:22
base [1] - 196:11
based [28] - 11:4,
11:13, 24:1, 28:5,
46:8, 47:11, 51:24,
54:10, 65:23, 78:6,
80:13, 101:4,
105:22, 112:10,
114:1, 114:4, 115:2,
123:9, 130:2,
137:10, 153:16,
155:3, 168:8,
168:23, 177:11,
178:13, 187:7, 203:3
baseline [1] - 71:21
bases [3] - 90:15,
153:6, 203:24
basic [2] - 191:17,
205:7
basing [1] - 12:8
basis [13] - 28:24,
30:13, 30:15, 31:3,
31:7, 60:9, 77:23,
100:3, 101:9, 121:1,
191:11, 203:21,
205:11
basketball [1] -
195:20
bat [1] - 96:15
batting [1] - 26:5
BAUTISTA [8] - 110:3,
113:19, 123:22,
123:24, 124:3,
126:16, 127:12,
127:15
Bautista [4] - 110:4,
113:6, 119:4
bear [3] - 67:8, 73:16,
172:10
beatings [1] - 173:19
became [1] - 173:20
become [4] - 81:16,
109:10, 151:22,
169:18
becomes [1] - 212:5
BEFORE [1] - 1:18
beforehand [1] -
104:5
beg [2] - 178:18,
212:21
began [3] - 88:10,
200:20, 201:17
begging [1] - 145:24
beginning [9] - 19:20,
19:21, 39:22, 51:13,
86:15, 89:15, 199:2,
199:3, 199:16
begins [2] - 59:9,

114:17
behalf [8] - 15:8,
19:24, 65:1, 109:17,
110:9, 118:24,
120:18
behavior [13] - 30:17,
30:18, 31:2, 109:8,
113:25, 114:2,
125:21, 126:8,
159:6, 159:10,
168:2, 177:10,
186:20
behavioral [2] - 16:14,
17:15
Behavioral [1] - 55:24
behest [1] - 72:1
behind [4] - 72:24,
110:6, 191:15,
197:15
behold [1] - 145:20
beholder [1] - 171:12
beings [1] - 177:5
belief [2] - 62:10,
113:11
believes [3] - 79:3,
115:25, 163:22
below [4] - 62:21,
62:22, 63:22, 215:3
bench [1] - 205:5
bending [1] - 89:19
beneficial [1] - 199:11
benefit [3] - 12:20,
20:8, 54:13
benefits [3] - 11:22,
12:22, 150:15
beside [1] - 200:25
best [18] - 9:15, 17:2,
30:18, 48:16, 48:17,
96:24, 97:10, 103:9,
105:23, 111:3,
125:21, 126:8,
137:24, 142:9,
155:10, 174:24,
177:10, 212:6
Beth [1] - 7:8
Bethel [1] - 84:15
better [15] - 26:1,
26:12, 62:20, 70:20,
79:10, 81:3, 82:3,
99:9, 110:24,
128:22, 128:24,
146:13, 147:23,
151:6
between [13] - 47:15,
48:13, 60:20, 62:1,
62:7, 68:13, 93:14,
139:21, 140:7,
167:6, 182:7, 186:8,
207:7
beyond [2] - 33:10,

191:4
BHU [2] - 52:24, 55:23
bias [102] - 11:4,
13:24, 14:6, 14:11,
30:3, 32:4, 32:10,
36:4, 48:7, 55:11,
56:5, 56:6, 56:25,
57:9, 57:23, 58:7,
58:13, 59:10, 59:25,
60:10, 60:18, 60:21,
60:25, 61:3, 61:5,
61:8, 72:16, 72:25,
73:9, 74:7, 76:24,
76:25, 77:7, 77:8,
77:11, 77:13, 77:24,
78:12, 78:19, 78:20,
87:23, 88:7, 88:25,
89:1, 97:12, 98:22,
99:15, 105:15,
105:18, 105:23,
106:13, 106:24,
108:3, 111:12,
111:20, 111:24,
112:11, 112:17,
112:19, 112:20,
113:2, 113:9,
113:14, 114:1,
114:15, 114:19,
114:23, 114:24,
115:5, 115:10,
115:23, 117:3,
117:5, 118:18,
129:15, 131:6,
143:21, 164:1,
170:17, 170:20,
171:6, 171:12,
175:21, 176:8,
176:11, 176:14,
176:22, 179:18,
183:13, 187:25,
194:24, 197:6,
197:7, 197:20,
200:2, 203:17,
206:7, 206:10
bias-based [1] - 11:4
biased [16] - 30:4,
30:15, 78:3, 78:7,
108:1, 113:12,
114:6, 161:21,
161:22, 162:4,
170:23, 175:15,
176:6, 194:25,
204:6, 204:19
biases [7] - 76:18,
76:21, 81:24, 97:7,
106:21, 195:2, 195:4
big [9] - 42:3, 53:22,
56:3, 66:25, 67:1,
91:10, 91:19, 203:8,
208:16

bigger [2] - 84:22,
94:1
bills [1] - 96:13
binary [3] - 82:2,
139:20, 139:21
BIPOC [4] - 85:7,
85:10, 124:11,
172:19
Bishop [1] - 7:16
bit [19] - 5:25, 10:4,
12:17, 12:19, 39:20,
47:22, 53:21, 68:1,
78:17, 108:5, 108:6,
121:16, 124:5,
128:18, 136:6,
148:10, 151:7,
155:2, 197:14
bitterness [4] - 68:11,
68:12, 68:15
black [11] - 81:11,
82:16, 82:21,
106:23, 139:24,
170:21, 175:18,
176:3, 177:16,
179:22, 179:24
blaming [1] - 191:7
blatant [1] - 175:15
bless [1] - 83:9
blindness [1] - 68:12
blood [1] - 4:6
BO [1] - 96:12
Board [16] - 5:9,
10:20, 12:4, 12:13,
18:1, 43:24, 56:7,
56:16, 56:18, 56:20,
56:21, 57:13,
110:13, 166:23,
190:7
board [115] - 11:8,
13:12, 44:5, 44:6,
46:7, 48:22, 48:24,
49:4, 49:9, 49:11,
49:17, 49:25, 50:3,
53:19, 57:17, 57:18,
57:21, 59:7, 66:6,
66:7, 71:12, 72:22,
80:1, 81:19, 86:8,
93:12, 93:15, 99:3,
99:22, 100:5,
100:10, 101:11,
101:13, 107:25,
110:23, 112:6,
112:7, 112:14,
112:24, 114:6,
114:10, 114:14,
116:19, 116:23,
117:7, 117:10,
117:11, 118:12,
118:16, 118:20,
119:1, 119:20,

123:17, 127:4,
128:16, 128:23,
128:24, 129:6,
129:9, 129:11,
129:12, 129:13,
129:14, 129:15,
129:17, 129:23,
130:1, 130:13,
131:7, 131:12,
131:15, 142:12,
143:12, 143:13,
143:16, 143:23,
143:25, 144:17,
145:3, 145:14,
146:19, 147:4,
147:22, 148:13,
148:24, 149:5,
149:7, 149:11,
151:14, 158:9,
158:17, 163:10,
165:12, 165:18,
165:20, 165:23,
166:8, 166:16,
167:11, 167:16,
167:21, 170:2,
170:4, 171:1,
185:25, 186:3,
190:12, 191:10,
191:15, 191:17,
192:7, 197:4
board's [2] - 187:16,
191:10
boards [9] - 13:8,
30:21, 32:7, 35:17,
35:18, 57:11, 121:8,
144:25, 167:1
board's [3] - 166:6,
167:19, 168:16
Bob [1] - 4:22
BOCHINSKI [2] -
185:12, 185:15
Bochinski [7] - 8:3,
141:24, 171:17,
180:15, 185:6,
185:11, 188:2
body [28] - 5:16, 22:5,
22:18, 22:19, 38:1,
39:14, 39:15, 39:17,
40:24, 41:5, 41:7,
41:16, 49:5, 49:7,
63:6, 71:23, 74:10,
91:20, 99:10, 106:3,
109:7, 109:8,
146:18, 166:22,
169:15, 169:16,
182:2, 185:24
body-worn [9] - 5:16,
22:5, 22:18, 22:19,
39:14, 39:15, 49:5,
63:6, 91:20

**Boise** [1] - 64:7
**Boise-Eliot** [1] - 64:7
**book** [6] - 66:25, 67:1, 67:3, 67:4, 137:15
**born** [4] - 93:3, 110:16, 178:19, 195:1
**borrowing** [1] - 70:17
**bother** [2] - 99:20, 99:21
**bothers** [1] - 196:9
**Boulder** [5] - 13:19, 115:7, 115:12, 170:17, 170:24
**bound** [3] - 24:20, 32:14, 43:3
**boundaries** [1] - 99:1
**box** [1] - 9:22
**Box** [1] - 2:20
**Boys** [1] - 96:9
**brainstorm** [1] - 55:22
**branch** [1] - 17:18
**branches** [1] - 74:24
**brand** [1] - 148:21
**brand-new** [1] - 148:21
**brass** [1] - 71:25
**Brayfield** [6] - 8:6, 185:5, 185:7, 185:8, 188:3, 188:4
**breach** [1] - 60:14
**break** [4] - 7:22, 83:1, 83:2, 92:1
**breakdown** [4] - 85:1, 85:10, 85:23, 86:13
**breaking** [2] - 173:25, 201:16
**Brian** [2] - 4:18, 15:9
**brief** [12] - 6:18, 6:23, 15:10, 15:16, 16:24, 18:15, 24:23, 26:24, 27:23, 67:9, 76:24, 208:10
**briefly** [7] - 19:7, 24:23, 40:3, 45:23, 46:1, 157:19, 208:8
**bring** [15] - 31:20, 53:1, 53:3, 53:4, 60:13, 67:8, 68:25, 88:20, 89:1, 96:2, 97:18, 114:25, 116:6, 133:24, 161:5
**bringing** [5] - 12:24, 76:4, 77:2, 79:19, 176:11
**brings** [3] - 33:20, 117:17, 177:10
**broad** [2] - 10:2, 44:2
**broader** [6] - 40:18, 70:5, 190:19,

190:22, 191:2, 191:14
**Broadway** [1] - 2:14
**broken** [2] - 22:23, 147:1
**brother** [1] - 173:20
**brothers** [1] - 92:25
**brought** [11] - 33:23, 35:22, 70:9, 86:6, 93:12, 102:16, 180:2, 180:5, 187:24, 205:14, 205:16
**BROWN** [69] - 3:15, 25:21, 39:2, 39:6, 43:7, 43:10, 43:15, 46:2, 46:24, 48:3, 48:20, 50:15, 50:23, 51:2, 52:10, 52:13, 52:17, 55:8, 55:11, 55:20, 56:3, 57:3, 57:9, 58:10, 58:16, 59:6, 59:13, 60:7, 60:24, 61:9, 61:11, 61:14, 61:18, 69:19, 85:19, 85:22, 119:10, 119:14, 119:18, 120:4, 120:6, 132:8, 132:18, 134:15, 134:20, 135:6, 149:15, 150:6, 151:10, 151:12, 151:20, 152:1, 152:4, 154:9, 155:9, 157:3, 162:7, 162:9, 162:25, 163:13, 208:7, 209:4, 209:7, 209:10, 209:13, 209:15, 210:5, 213:18
**brown** [18] - 55:19, 61:17, 63:15, 69:18, 70:6, 85:16, 115:9, 115:11, 119:7, 132:6, 134:14, 148:5, 149:13, 176:4, 196:22, 196:23, 203:1, 208:6
**Brown** [6] - 2:8, 3:15, 39:1, 55:7, 63:9, 196:23
**Browne** [2] - 7:1, 8:5
**brutality** [1] - 96:25
**brutalized** [1] - 146:5
**Buchner** [3] - 4:18, 15:9, 21:23
**buddy** [1] - 53:1
**budget** [3] - 133:17, 133:19, 166:12

**build** [2] - 59:20, 104:17
**building** [5] - 19:2, 63:7, 76:13, 85:13, 161:12
**built** [1] - 159:20
**Buppert** [1] - 7:11
**burden** [2] - 90:13, 212:14
**burdensome** [2] - 11:18, 214:20
**bureau** [22] - 41:22, 41:24, 41:25, 53:13, 54:24, 61:22, 62:9, 65:2, 66:9, 71:4, 76:13, 97:6, 108:24, 118:5, 133:7, 133:16, 166:9, 189:16, 189:22, 211:8
**Bureau** [16] - 12:21, 15:24, 17:10, 22:6, 22:24, 27:20, 64:16, 73:2, 76:2, 76:6, 96:7, 96:20, 103:18, 107:2, 143:3, 205:18
**Bureau's** [2] - 10:23, 12:14
**bureau's** [3] - 11:3, 61:15, 189:10
**bureaus** [3] - 6:6, 41:24, 43:11
**business** [2] - 15:15, 71:25
**busy** [2] - 19:23, 213:3
**buy** [6] - 151:6, 204:7, 204:17, 211:6, 211:11, 212:7
**buy-in** [5] - 151:6, 204:17, 211:6, 211:11, 212:7

--- C ---

**cage** [1] - 53:9
**caged** [1] - 138:20
**Caldwell** [1] - 57:6
**calendar** [1] - 63:10
**cam** [3] - 99:10, 182:2
**camera** [10] - 22:5, 22:18, 22:20, 40:24, 41:5, 41:8, 49:5, 49:8, 63:6, 169:16
**cameras** [9] - 5:16, 39:14, 39:15, 39:17, 41:16, 91:20, 109:7, 109:8, 169:15
**Cameron** [2] - 7:1, 8:5
**camping** [1] - 91:8
**cams** [1] - 146:18

**cancel** [1] - 79:25
**candid** [1] - 40:24
**candidate** [2] - 79:23, 125:6
**candidate's** [1] - 113:25
**candidates** [7] - 117:10, 134:5, 157:23, 157:25, 158:16, 164:8, 192:4
**cannot** [10] - 25:19, 68:21, 68:22, 89:1, 90:25, 96:8, 116:19, 138:12, 140:22, 186:11
**Canon** [1] - 32:15
**Canon's** [1] - 32:15
**capabilities** [2] - 112:16, 137:24
**capable** [2] - 112:5, 112:25
**capacity** [3] - 68:13, 92:23, 194:10
**Capestany** [1] - 7:2
**captain** [1] - 16:2
**capture** [1] - 190:18
**captured** [1] - 188:24
**car** [15] - 51:25, 52:14, 80:14, 87:6, 93:18, 98:25, 102:24, 103:3, 103:8, 103:12, 126:13, 182:21, 199:13, 201:17, 201:20
**care** [5] - 20:6, 20:8, 127:6, 127:7, 139:2
**Care** [1] - 136:10
**career** [2] - 16:4, 16:9
**careers** [1] - 204:22
**careful** [2] - 21:11, 89:3
**carefully** [1] - 189:3
**Carolyn** [1] - 7:11
**carpenter** [3] - 95:9, 95:10, 97:25
**Carpenter** [4] - 8:4, 95:10, 95:18, 95:22
**CARPENTER** [3] - 95:12, 95:17, 95:19
**carried** [2] - 199:17
**carry** [2] - 84:21, 206:20
**cars** [4] - 68:4, 87:8, 87:10, 87:12
**Cascades** [1] - 181:6
**case** [28] - 3:7, 28:4, 30:22, 32:10, 32:18, 33:18, 34:20, 37:15, 56:10, 60:17, 88:4, 100:3, 115:6, 115:8,

115:16, 115:17, 139:14, 139:15, 159:1, 159:3, 159:5, 183:6, 183:8, 189:20, 189:25, 191:18, 213:3
**Case** [1] - 3:7
**case-by-case** [1] - 100:3
**cases** [22] - 24:1, 29:13, 46:20, 46:21, 56:9, 56:19, 65:22, 77:2, 105:19, 114:20, 129:3, 154:23, 164:4, 166:24, 167:6, 167:7, 186:8, 186:9, 190:6, 190:8, 190:10, 190:19
**Casey** [1] - 7:2
**casket** [1] - 88:18
**categories** [1] - 40:22
**Categories** [1] - 41:6
**categorize** [1] - 23:10
**categorized** [1] - 28:14
**category** [6] - 10:2, 79:4, 86:1, 166:4, 197:24
**Category** [3] - 40:5, 40:20, 41:1
**caught** [1] - 107:24
**caused** [1] - 13:19
**causes** [2] - 65:10, 107:5
**causing** [1] - 101:8
**CBC** [1] - 35:7
**CBPA** [51] - 11:2, 12:23, 13:1, 13:22, 29:13, 29:17, 29:18, 29:21, 29:24, 30:4, 32:9, 32:18, 33:14, 33:22, 34:8, 34:24, 36:3, 36:5, 37:18, 37:24, 110:13, 110:18, 111:4, 111:10, 111:16, 111:18, 111:23, 112:23, 113:1, 114:8, 114:16, 114:18, 114:20, 115:4, 116:1, 116:4, 116:7, 116:9, 117:18, 117:23, 118:4, 118:6, 118:10, 118:25, 182:12, 184:10, 190:5, 203:15, 205:18, 206:3, 206:9
**CBPA's** [2] - 115:23,

184:16
**celebrated** [2] - 96:22, 174:13
**celebrating** [1] - 96:25
**celebration** [1] - 64:8
**Celeste** [1] - 7:9
**Center** [1] - 2:19
**Central** [1] - 39:23
**centuries** [1] - 174:22
**century** [3] - 76:13, 84:9, 86:4
**cerebral** [1] - 93:3
**ceremonies** [1] - 64:17
**certain** [6] - 11:17, 28:15, 44:5, 68:12, 137:17, 155:11
**certainly** [27] - 6:5, 18:11, 19:11, 19:22, 53:23, 54:8, 58:23, 65:9, 69:5, 75:4, 77:16, 80:20, 82:15, 90:15, 100:17, 104:13, 105:12, 105:24, 107:18, 108:13, 182:1, 182:18, 182:22, 183:12, 205:4, 210:19
**Certificates** [1] - 215:14
**certification** [1] - 212:24
**certified** [1] - 215:7
**certify** [1] - 215:3
**cetera** [4] - 44:20, 138:17, 208:15
**chair** [2] - 110:1, 136:8
**chairperson** [1] - 75:24
**challenge** [1] - 78:9
**challenges** [1] - 82:4
**challenging** [1] - 155:14
**chambers** [1] - 194:19
**championing** [1] - 91:7
**chance** [7] - 15:20, 17:21, 17:23, 97:10, 108:20, 131:4, 181:9
**change** [30] - 27:12, 29:18, 47:12, 47:14, 47:18, 56:13, 65:15, 65:18, 84:19, 84:22, 86:4, 87:13, 91:2, 126:11, 126:12, 130:12, 142:6, 142:8, 149:19, 163:2, 166:3,

166:10, 166:14, 176:23, 190:24, 195:3, 195:20, 209:21
**changed** [5] - 85:8, 128:18, 171:1, 195:2, 201:10
**changes** [28] - 5:7, 6:1, 24:14, 27:11, 27:15, 27:22, 43:1, 45:15, 45:20, 48:5, 76:9, 89:12, 108:17, 111:10, 128:15, 129:8, 129:14, 137:5, 140:17, 155:2, 155:5, 164:23, 176:1, 186:22, 188:16, 208:17, 210:2, 211:12
**changing** [4] - 6:6, 74:21, 193:5, 196:4
**chaos** [1] - 67:4
**char** [1] - 171:24
**Char** [1] - 8:5
**characterization** [1] - 150:13
**charge** [2] - 66:7, 74:11
**charges** [1] - 118:11
**Charlie** [4] - 172:1, 172:2, 172:15, 185:18
**chart** [1] - 118:7
**charter** [19] - 27:2, 27:12, 44:1, 44:18, 45:19, 72:20, 118:8, 163:2, 163:8, 167:10, 167:11, 169:23, 169:25, 189:3, 191:10, 191:25, 209:19, 209:21, 211:20
**Charter** [6] - 29:21, 33:3, 33:4, 43:23, 165:16, 211:13
**Chasse** [2] - 196:7, 196:8
**chat** [1] - 181:8
**CHAVEZ** [19] - 4:10, 92:3, 92:9, 92:11, 95:5, 95:9, 98:3, 100:16, 101:22, 109:15, 157:16, 157:19, 158:3, 158:6, 210:9, 210:16, 210:19, 210:22, 214:2
**Chavez** [12] - 2:19, 4:10, 92:10, 94:8,

95:4, 95:14, 98:2, 98:3, 104:23, 109:14, 210:8, 214:1
**check** [2] - 87:7, 129:20
**checks** [1] - 165:4
**Cheryl** [4] - 180:20, 180:22, 180:25, 181:5
**cheryl** [1] - 181:2
**Chicago** [1] - 88:5
**chief** [32] - 48:11, 52:10, 52:15, 55:8, 58:23, 65:3, 65:5, 65:15, 84:10, 84:16, 84:23, 84:25, 87:14, 97:3, 111:17, 116:12, 117:4, 117:20, 117:24, 118:3, 118:6, 118:9, 118:11, 152:5, 167:10, 167:13, 167:16, 167:18, 167:22, 186:14, 203:25, 204:9
**Chief** [14] - 4:21, 17:18, 50:14, 52:6, 52:20, 55:12, 61:14, 61:19, 69:12, 70:6, 71:3, 76:22, 167:25, 186:18
**CHIEF** [12] - 4:23, 52:19, 52:21, 53:4, 53:7, 54:8, 55:4, 61:21, 66:20, 67:1, 69:14, 69:17
**chief's** [6] - 72:6, 117:18, 117:21, 118:4, 118:18, 186:20
**chiefly** [1] - 186:10
**chiefs** [2] - 58:23, 143:6
**chief's** [1] - 168:2
**child** [1] - 76:21
**Child** [1] - 136:10
**Children's** [1] - 136:9
**choice** [1] - 33:4
**choices** [1] - 174:5
**choir** [1] - 108:18
**choose** [2] - 79:24, 139:16
**choosing** [1] - 204:20
**chose** [3] - 150:8, 200:4, 208:12
**chosen** [2] - 163:25, 167:24
**Chris** [1] - 7:15
**Christian** [1] - 96:15
**Christoff** [1] - 42:19

**chronic** [1] - 93:18
**Chuck** [1] - 17:18
**chuckled** [1] - 103:13
**church** [2] - 87:12, 89:1
**Circuit's** [1] - 70:13
**circumstances** [4] - 12:2, 49:1, 94:13, 115:3
**cited** [2] - 67:4, 206:24
**cities** [2] - 13:9, 35:5
**Citizen** [14] - 5:10, 18:12, 46:20, 48:9, 51:4, 56:12, 56:17, 56:24, 57:12, 112:2, 120:7, 159:20, 189:20, 199:4
**citizen** [5] - 13:8, 30:13, 35:14, 79:23, 82:19
**citizens** [1] - 83:1
**Citizens** [3] - 201:11, 201:12, 202:10
**citizens'** [1] - 97:7
**City** [142] - 2:10, 3:7, 3:14, 3:16, 3:19, 5:4, 8:13, 8:21, 14:5, 22:11, 22:13, 23:12, 23:20, 24:10, 24:14, 24:15, 27:1, 27:10, 27:12, 27:16, 29:5, 29:6, 29:14, 29:16, 29:20, 29:21, 31:10, 32:21, 32:23, 33:3, 33:4, 33:5, 33:7, 35:1, 36:17, 37:13, 39:1, 41:9, 41:19, 41:21, 42:4, 42:23, 43:3, 43:17, 43:23, 44:17, 44:18, 45:9, 50:22, 51:3, 57:15, 58:6, 58:7, 59:9, 59:10, 59:14, 59:15, 59:23, 59:24, 60:6, 60:13, 65:1, 75:21, 76:20, 76:24, 78:20, 83:20, 86:13, 90:10, 90:16, 97:20, 100:12, 101:16, 104:17, 108:23, 110:12, 111:1, 111:8, 115:22, 116:1, 117:12, 129:10, 133:23, 144:25, 145:10, 146:19, 147:4, 147:14, 149:16, 153:24, 154:22, 156:11, 158:16, 158:19, 158:20,

163:23, 163:25, 164:16, 164:18, 164:22, 164:24, 165:1, 165:16, 165:23, 166:2, 167:23, 168:7, 168:14, 169:2, 169:22, 170:24, 171:3, 175:21, 176:1, 177:1, 178:16, 181:17, 186:22, 187:6, 187:14, 188:23, 190:14, 190:15, 191:10, 196:17, 204:12, 205:16, 205:21, 206:19, 207:21, 208:9, 208:17, 208:21, 211:7, 211:11, 211:12, 211:19, 212:7, 213:17
**CITY** [2] - 1:8, 2:8
**city** [98] - 6:1, 6:3, 6:7, 9:9, 9:11, 9:18, 9:20, 13:20, 15:23, 19:19, 24:15, 24:19, 27:14, 29:19, 31:16, 31:18, 33:1, 42:2, 43:1, 43:12, 44:1, 44:7, 57:11, 58:21, 62:9, 69:5, 73:4, 76:18, 78:25, 84:23, 85:2, 85:3, 85:12, 85:20, 86:7, 86:25, 90:9, 95:24, 97:8, 103:20, 104:15, 111:22, 114:20, 117:4, 133:5, 133:17, 133:19, 140:6, 142:9, 143:1, 143:2, 143:7, 143:11, 143:18, 144:15, 144:22, 144:23, 147:18, 147:24, 147:25, 148:7, 148:18, 149:9, 149:19, 150:23, 152:5, 153:23, 155:20, 157:23, 159:14, 159:17, 159:24, 160:21, 163:12, 165:6, 165:16, 165:23, 167:15, 168:10, 170:12, 170:13, 170:14, 171:8, 178:9, 178:11, 178:21, 178:24, 184:10, 186:12,

187:9, 189:3, 192:2, 192:4, 206:16
**city's** [4] - 10:8, 10:9, 72:20, 132:24
**City's** [21] - 6:16, 25:8, 29:5, 30:20, 31:11, 45:19, 120:14, 128:9, 149:16, 159:9, 175:5, 185:21, 186:10, 186:13, 189:1, 189:7, 189:21, 190:5, 191:3, 191:20, 207:25
**city-wide** [1] - 178:21
**City's** [3] - 166:19, 167:8, 167:9
**civil** [5] - 67:20, 67:24, 153:16, 190:25, 207:17
**Civil** [2] - 2:5, 3:11
**Civilian** [2] - 190:21, 205:11
**civilian** [10] - 16:5, 16:8, 27:2, 29:16, 35:7, 37:3, 37:25, 38:1, 38:7, 164:17
**civilians** [4] - 33:14, 37:13, 38:7, 103:19
**claims** [1] - 115:22
**clarifications** [1] - 40:16
**clarify** [1] - 60:7
**class** [4] - 85:9, 85:11, 200:4, 200:12
**classes** [1] - 85:10
**clear** [8] - 47:24, 76:20, 96:21, 112:24, 119:15, 143:2, 144:14, 145:9
**clearly** [5] - 83:23, 86:7, 87:17, 125:24, 147:7
**Cleinman** [5] - 8:2, 128:1, 132:20, 133:11, 134:13
**CLEINMAN** [8] - 128:2, 128:6, 131:23, 132:5, 132:22, 133:9, 133:13, 134:8
**Cleveland** [1] - 35:6
**clients** [1] - 157:4
**close** [2] - 89:6, 158:15
**closed** [2] - 72:24, 191:16
**closely** [4] - 6:13, 6:15, 65:12, 89:4
**closing** [1] - 158:11

**closure** [1] - 47:23
**cloth** [1] - 106:4
**co** [3] - 58:22, 110:1, 136:8
**co-chair** [2] - 110:1, 136:8
**co-workers** [1] - 58:22
**Coalition** [12] - 4:2, 6:21, 14:20, 73:22, 75:24, 76:1, 76:2, 76:16, 132:1, 135:1, 210:23, 214:3
**COCL** [3] - 17:1, 33:24, 42:15
**Code** [46] - 27:12, 27:16, 29:5, 29:6, 29:17, 32:23, 33:5, 33:7, 56:13, 72:19, 73:1, 110:22, 111:11, 112:9, 112:23, 113:1, 114:18, 116:6, 116:7, 117:23, 120:7, 129:10, 132:10, 132:15, 153:24, 154:19, 164:22, 166:18, 166:19, 167:5, 171:3, 185:20, 185:21, 186:7, 189:1, 189:21, 190:5, 190:14, 190:15, 191:4, 191:9, 191:10, 206:4, 209:5, 209:11
**codified** [2] - 32:23, 75:7
**coffee** [2] - 99:9, 159:7
**coin** [3] - 71:5, 71:21, 71:24
**collaboration** [2] - 137:14, 139:18
**Collaborative** [1] - 17:9
**collaboratively** [1] - 24:10
**colleagues** [8] - 4:14, 67:24, 83:20, 89:10, 154:4, 203:15, 205:15, 206:6
**collective** [2] - 38:3, 91:3
**Collective** [1] - 181:7
**college** [1] - 130:15
**College** [2] - 213:6, 213:9
**colleges** [1] - 130:14
**collusion** [3] - 27:7, 27:13, 27:18

**color** [4] - 85:25, 106:10, 140:19, 176:20
**Colorado** [9] - 13:19, 60:17, 115:6, 115:7, 115:8, 115:12, 115:16, 115:17, 181:18
**colors** [1] - 140:15
**Columbia** [1] - 2:17
**comedy** [1] - 96:22
**comfort** [3] - 52:23, 72:16, 78:17
**comfortable** [26] - 12:2, 51:19, 55:23, 80:7, 80:16, 84:3, 95:13, 95:15, 98:16, 105:4, 105:6, 122:3, 122:13, 122:15, 124:8, 125:23, 126:2, 126:25, 130:10, 161:3, 181:22, 183:20, 193:16, 197:2, 199:14
**comfortably** [1] - 11:19
**comforted** [2] - 107:6, 107:15
**comforting** [1] - 130:9
**coming** [17] - 22:9, 26:6, 29:10, 44:19, 48:14, 71:20, 91:2, 108:18, 123:25, 136:17, 138:4, 144:11, 158:24, 160:2, 170:13, 182:13, 183:4
**command** [1] - 16:17
**Commanding** [2] - 27:21, 116:14
**commanding** [1] - 16:10
**commend** [4] - 5:1, 36:17, 214:10, 214:12
**comment** [12] - 7:25, 15:2, 21:1, 21:14, 72:17, 88:6, 89:15, 89:23, 90:2, 92:18, 98:5, 190:1
**commentators** [1] - 30:3
**commented** [1] - 46:6
**commenters** [5] - 32:22, 33:22, 37:22, 92:4, 94:25
**comments** [83] - 6:13, 6:20, 6:22, 6:24, 6:25, 7:1, 7:2, 7:3,

7:6, 7:7, 7:8, 7:9, 7:10, 7:12, 7:14, 7:15, 7:19, 7:20, 8:12, 8:16, 8:17, 8:19, 11:13, 11:14, 14:18, 14:19, 17:19, 18:3, 18:8, 18:15, 18:16, 18:18, 18:23, 20:21, 20:22, 21:3, 21:11, 24:4, 33:20, 37:18, 39:1, 40:16, 55:13, 58:3, 61:14, 61:16, 61:20, 65:2, 66:2, 67:21, 67:22, 69:6, 69:20, 72:6, 73:21, 74:2, 83:7, 83:11, 85:17, 89:6, 92:1, 92:5, 92:19, 95:3, 98:1, 98:5, 108:9, 109:18, 113:5, 113:18, 141:14, 141:19, 168:23, 180:13, 184:2, 188:2, 198:13, 203:3, 211:25
**Commission** [14] - 7:14, 27:11, 44:19, 45:6, 57:12, 92:24, 102:7, 110:22, 136:7, 136:11, 139:1, 164:21, 173:5, 188:21
**commission** [14] - 6:7, 9:18, 44:8, 44:11, 46:7, 69:1, 86:8, 86:10, 86:14, 92:24, 94:12, 140:9, 160:23
**Commissioner** [7] - 84:17, 91:6, 149:18, 163:6, 199:3, 209:23, 209:24
**commissioner** [4] - 103:21, 151:22, 171:8, 175:4
**commissioners** [4] - 143:6, 152:15, 152:20, 152:22
**commissions** [1] - 57:11
**commit** [1] - 19:12
**commitment** [2] - 111:3, 135:12
**committed** [3] - 67:24, 69:8, 140:10
**Committee** [13] - 5:10, 17:5, 18:13, 46:20, 48:9, 51:4, 56:13, 56:17, 56:24, 110:9, 112:2, 120:7, 189:21

**committee** [76] - 11:16, 48:10, 50:19, 50:20, 51:10, 51:16, 51:17, 51:23, 52:3, 77:14, 81:4, 87:16, 89:7, 106:2, 106:12, 107:9, 108:3, 111:16, 116:4, 116:8, 116:17, 116:19, 116:25, 117:9, 117:15, 118:15, 118:18, 118:24, 119:9, 119:11, 119:22, 119:23, 120:2, 120:8, 120:11, 129:24, 131:25, 132:3, 148:9, 149:8, 149:10, 149:12, 152:7, 152:8, 152:9, 152:12, 152:16, 152:20, 154:11, 154:15, 155:20, 160:9, 161:12, 161:18, 169:22, 170:1, 170:22, 173:8, 175:23, 176:12, 182:14, 192:3, 192:7, 198:2, 198:3, 203:24, 204:2, 204:3, 204:18, 204:20, 205:23, 208:22, 209:8, 209:12, 211:21
**committees** [2] - 80:24, 81:1
**committing** [1] - 52:5
**common** [1] - 99:14
**Communications** [1] - 17:10
**communities** [10] - 83:25, 110:20, 112:4, 131:8, 131:11, 139:25, 140:19, 141:5, 184:17, 214:15
**communities'** [1] - 97:17
**Community** [34] - 5:9, 10:20, 10:23, 12:4, 12:13, 12:14, 12:21, 13:4, 17:5, 34:12, 41:22, 43:24, 54:2, 54:9, 54:13, 65:21, 67:4, 71:2, 72:8, 72:13, 75:2, 75:10, 87:20, 97:14, 100:6, 100:8, 100:1, 110:8, 110:10, 110:13,

120:23, 130:7, 136:10, 164:10

**community** [162] - 13:11, 16:4, 17:7, 17:16, 19:17, 20:25, 29:14, 30:20, 35:16, 41:23, 42:23, 45:12, 46:4, 47:15, 48:9, 48:22, 51:16, 54:4, 54:19, 56:9, 56:11, 56:15, 56:16, 56:18, 60:16, 62:9, 62:10, 62:11, 62:12, 62:14, 62:18, 62:25, 63:4, 63:7, 64:5, 64:7, 64:10, 65:18, 66:3, 66:18, 66:19, 71:4, 71:6, 71:13, 71:16, 75:4, 76:13, 76:15, 76:19, 81:12, 81:13, 81:24, 82:5, 82:11, 83:23, 84:9, 85:10, 86:4, 87:18, 87:24, 90:5, 90:23, 91:4, 95:6, 97:4, 98:18, 103:11, 109:4, 110:23, 111:7, 112:14, 114:13, 114:21, 114:23, 116:9, 116:19, 118:24, 119:14, 119:20, 119:25, 120:2, 120:11, 124:12, 126:24, 128:7, 128:22, 129:1, 129:12, 129:18, 131:15, 132:2, 133:2, 134:21, 135:4, 139:7, 140:8, 140:19, 140:25, 141:2, 142:24, 142:25, 144:19, 144:20, 144:22, 145:2, 145:14, 146:15, 146:21, 147:7, 147:15, 147:16, 147:23, 150:10, 151:6, 152:10, 152:19, 154:14, 159:21, 161:13, 162:24, 163:10, 164:10, 168:5, 168:20, 168:25, 170:21, 172:12, 173:5, 175:11, 175:25, 176:2, 177:13, 177:23, 179:16, 181:6, 182:1, 182:5, 183:18, 184:13,

184:22, 186:25, 187:20, 189:6, 189:15, 190:25, 193:22, 196:7, 197:11, 197:20, 199:11, 200:9, 204:23, 204:24, 205:1, 207:13, 211:8, 211:14, 211:24, 212:6, 214:14

**community's** [3] - 134:11, 141:3, 146:1

**Community-Engaged** [2] - 17:5, 110:10

**community-led** [1] - 47:15

**community-run** [2] - 168:20, 187:20

**compared** [1] - 62:14

**comparison** [1] - 68:18

**compassion** [4] - 91:13, 177:24, 183:4, 183:10

**compassionate** [1] - 69:12

**compatibility** [1] - 165:14

**compensating** [1] - 165:19

**compensation** [2] - 165:23, 165:24

**compete** [1] - 201:4

**competing** [2] - 67:8, 67:17

**complainant** [2] - 168:8, 187:8

**complainant's** [1] - 189:25

**complainants** [1] - 189:19

**complaint** [3] - 38:11, 145:15, 145:16

**complaints** [10] - 53:18, 152:11, 152:13, 152:22, 166:8, 189:12, 189:16, 189:17, 190:4, 190:17

**complete** [5] - 17:21, 18:15, 40:14, 47:22, 140:24

**completely** [3] - 83:4, 105:15, 196:4

**complex** [1] - 53:18

**complexity** [1] - 16:13

**compliance** [5] - 17:13, 28:1, 28:3,

37:9, 74:12

**complicated** [1] - 124:6

**comply** [1] - 181:23

**composed** [1] - 203:25

**composition** [2] - 16:19, 152:11

**comprehensively** [2] - 70:6, 70:7

**comprised** [1] - 116:8

**compromise** [6] - 51:14, 51:19, 52:8, 72:5, 152:15, 152:18

**compromised** [1] - 12:6

**comrade** [1] - 179:24

**concept** [6] - 71:3, 113:15, 115:11, 200:14, 201:24

**concern** [20] - 6:14, 10:15, 10:17, 13:16, 13:20, 25:8, 33:21, 52:22, 57:16, 104:11, 105:20, 106:1, 112:9, 113:23, 116:3, 117:17, 130:11, 191:3, 203:20, 204:3

**concerned** [22] - 34:10, 34:11, 81:11, 82:7, 87:15, 107:21, 107:22, 111:12, 115:5, 128:7, 128:16, 128:23, 129:16, 131:6, 145:23, 161:25, 162:9, 162:15, 162:16, 165:11, 208:10, 210:1

**concerning** [2] - 136:23, 136:24

**concerns** [46] - 8:18, 10:11, 10:14, 10:18, 13:15, 14:15, 14:21, 22:19, 28:1, 37:4, 37:17, 45:14, 51:9, 51:24, 54:25, 57:14, 57:19, 58:4, 66:1, 76:16, 97:11, 98:24, 99:22, 101:1, 101:2, 105:14, 107:5, 107:19, 111:9, 111:19, 117:19, 118:22, 120:22, 134:11, 139:12, 145:13, 152:14, 157:10, 157:12, 157:14, 162:13, 181:10, 189:8,

190:14, 209:16, 210:12

**concert** [1] - 65:19

**conclude** [2] - 20:1, 180:9

**concluding** [1] - 84:7

**conclusion** [2] - 82:16, 118:15

**concurrently** [1] - 47:6

**condensed** [1] - 92:18

**condition** [2] - 78:24, 181:21

**conditional** [1] - 98:19

**conditionally** [1] - 98:12

**conditioning** [1] - 159:18

**conduct** [5] - 49:15, 57:14, 73:3, 111:18, 123:8

**conduit** [1] - 146:23

**Confederated** [1] - 172:17

**confer** [1] - 32:1

**conference** [7] - 85:18, 88:10, 131:1, 212:9, 212:11, 213:24, 214:8

**Conference** [1] - 1:16

**confidence** [4] - 64:23, 144:14, 144:15, 152:9

**confident** [1] - 16:19

**confidently** [2] - 16:11, 181:23

**confirm** [1] - 58:4

**confirmation** [1] - 205:5

**conflict** [6] - 33:4, 33:17, 34:1, 34:3, 34:17, 60:21

**conflicts** [1] - 30:24

**conformed** [1] - 215:6

**confronting** [1] - 126:11

**confusing** [1] - 164:6

**Congress** [2] - 213:7, 213:8

**connected** [1] - 172:18

**connection** [2] - 117:1, 167:17

**conscientious** [1] - 86:12

**consent** [3] - 156:23, 156:24, 156:25

**consequence** [1] - 153:23

**consequences** [2] -

93:8, 97:22

**consider** [12] - 18:24, 22:2, 28:18, 45:3, 90:11, 106:22, 111:9, 115:6, 118:23, 154:10, 182:15, 182:25

**consideration** [6] - 21:12, 50:2, 73:4, 111:20, 134:10, 175:7

**considered** [6] - 27:15, 48:24, 49:1, 111:22, 201:23, 209:21

**considering** [1] - 209:18

**consistency** [1] - 206:12

**consistency's** [1] - 26:8

**consistent** [7] - 21:6, 27:4, 33:7, 33:9, 34:18, 45:20, 65:8

**consistently** [1] - 142:21

**constitution** [3] - 44:2, 72:20, 82:20

**constitutional** [9] - 159:22, 159:24, 160:2, 160:3, 160:5, 160:7, 160:8, 160:9, 170:24

**constitutionally** [1] - 160:10

**consuming** [1] - 190:11

**consumption** [1] - 71:15

**contact** [2] - 19:12, 100:11

**contacted** [1] - 19:1

**contains** [1] - 32:15

**contemplated** [1] - 204:14

**contemplates** [1] - 38:17

**contemplation** [1] - 179:25

**contend** [3] - 9:24, 38:10, 61:4

**contends** [2] - 14:5, 58:7

**content** [1] - 49:7

**context** [8] - 70:11, 70:12, 70:22, 77:9, 88:1, 93:10, 102:8, 136:6

**continue** [23] - 4:24, 18:11, 19:22, 19:24,

42:13, 58:22, 59:17,
63:20, 64:13, 65:25,
69:9, 96:1, 96:4,
97:2, 97:22, 133:1,
135:12, 176:5,
179:14, 179:19,
189:13, 194:21,
211:18
**continued** [4] - 41:18,
69:15, 135:18,
172:21
**continues** [7] - 42:4,
74:14, 96:3, 137:4,
174:2, 179:23,
189:11
**continuing** [6] - 42:13,
42:14, 69:8, 163:15,
194:18, 214:17
**continuous** [1] -
190:18
**contrast** [1] - 76:21
**contribute** [3] - 111:6,
135:2, 136:2
**contributes** [1] - 64:9
**contributions** [2] -
11:16, 135:19
**control** [4] - 191:5,
194:20, 200:20,
200:23
**conversation** [6] -
24:9, 53:14, 67:7,
68:18, 84:2, 194:23
**conversations** [2] -
66:3, 93:1
**convey** [1] - 181:15
**convince** [1] - 113:12
**convinced** [2] -
193:18, 193:19
**coordinate** [1] - 90:16
**coordinating** [1] -
75:14
**cop** [2] - 124:13,
193:20
**cops** [2] - 140:23,
195:14
**Copwatch** [8] - 7:3,
7:4, 7:6, 141:18,
141:25, 163:22,
165:11, 171:7
**Copwatch's** [1] -
190:1
**core** [4] - 43:19,
130:10, 175:5,
207:10
**Core** [1] - 178:16
**corner** [1] - 201:8
**corners** [4] - 70:19,
156:24, 156:25,
195:20
**Corps** [1] - 196:11

**correct** [13] - 23:6,
54:7, 77:16, 81:15,
121:14, 134:25,
203:4, 203:10,
207:7, 209:13,
209:15, 213:22,
215:4
**corrected** [1] - 184:21
**correction** [2] - 23:11,
30:20
**corrections** [1] - 41:4
**corrective** [2] - 18:4,
46:14
**correctly** [5] - 9:11,
23:10, 79:9, 113:16,
163:5
**Council** [4] - 18:13,
136:10, 158:16,
165:1
**council** [78] - 6:7, 9:9,
9:11, 9:18, 13:20,
27:15, 29:19, 31:16,
31:18, 33:2, 44:7,
44:10, 44:11, 45:3,
73:4, 76:18, 78:25,
111:22, 116:9,
116:10, 119:8,
119:11, 119:12,
119:17, 119:18,
119:19, 119:22,
120:1, 143:1, 143:2,
143:18, 144:15,
144:22, 144:23,
146:23, 147:24,
147:25, 148:7,
148:18, 148:20,
148:21, 149:9,
149:24, 150:1,
150:4, 150:7,
150:13, 150:23,
151:7, 151:16,
151:17, 151:23,
153:23, 154:12,
154:19, 155:13,
155:15, 155:20,
157:24, 158:7,
163:1, 163:12,
165:9, 165:24,
167:15, 170:12,
178:9, 178:11,
189:4, 192:2,
206:16, 208:11,
208:20, 209:22,
210:2
**councilors** [1] -
149:22
**counsel** [8] - 3:8,
3:13, 3:22, 4:5, 4:6,
4:8, 39:9, 69:20
**count** [1] - 85:24

**counted** [1] - 85:25
**counting** [3] - 86:1,
213:6, 213:9
**countless** [2] - 175:9,
208:19
**country** [6] - 63:14,
69:5, 84:6, 89:13,
137:6, 172:21
**country's** [1] - 173:21
**county** [1] - 195:10
**couple** [15] - 15:11,
16:1, 16:23, 19:17,
19:23, 41:10, 55:4,
63:11, 64:17, 66:22,
80:14, 84:11,
128:16, 158:14,
214:19
**course** [21] - 6:15,
16:23, 18:10, 19:9,
23:18, 34:19, 34:20,
43:22, 49:5, 70:10,
74:3, 90:3, 120:20,
124:3, 125:8, 128:6,
137:20, 148:12,
162:8, 182:12, 201:1
**courses** [2] - 18:7,
18:8
**court** [12] - 9:23, 26:2,
28:19, 31:19, 69:23,
70:17, 77:2, 91:25,
115:24, 141:9,
165:19, 168:24
**Court** [39] - 5:3, 9:4,
10:3, 15:15, 15:19,
22:2, 22:20, 28:18,
28:19, 28:21, 29:8,
29:10, 29:15, 31:10,
32:8, 40:3, 52:18,
59:12, 61:6, 70:7,
70:16, 72:1, 72:16,
74:5, 98:6, 98:9,
98:11, 98:12, 98:15,
98:21, 100:18,
115:6, 155:9,
190:13, 191:24,
204:15, 206:4,
210:9, 215:13
**COURT** [319] - 1:1,
1:19, 1:23, 3:4, 3:6,
3:13, 3:20, 3:25, 4:7,
4:12, 4:19, 4:24,
20:2, 21:16, 21:18,
21:21, 21:23, 22:9,
22:12, 22:15, 23:13,
23:16, 23:21, 24:25,
25:4, 25:7, 25:15,
25:18, 25:25, 26:8,
26:10, 28:25, 29:23,
30:9, 31:4, 32:3,
34:12, 34:22, 35:3,

35:9, 35:11, 35:24,
36:1, 36:9, 36:12,
37:16, 38:9, 38:20,
38:22, 38:25, 39:4,
43:5, 43:9, 43:14,
46:1, 46:23, 48:2,
48:17, 50:12, 50:16,
51:1, 51:7, 52:12,
52:16, 52:20, 53:3,
53:6, 53:24, 55:1,
55:6, 55:10, 55:12,
56:1, 57:1, 57:8,
58:2, 58:15, 59:1,
59:5, 59:8, 59:18,
59:22, 60:23, 61:2,
61:10, 61:13, 61:17,
61:19, 66:11, 66:25,
69:11, 69:15, 69:18,
69:20, 69:24, 72:11,
73:6, 73:13, 73:18,
73:20, 73:25, 74:3,
74:15, 74:18, 75:12,
75:17, 77:4, 77:6,
77:12, 77:25, 79:21,
80:3, 81:2, 81:9,
82:1, 83:4, 83:7,
83:10, 83:13, 85:15,
87:2, 87:4, 87:20,
87:22, 88:2, 88:11,
89:14, 90:1, 90:3,
90:8, 90:12, 91:17,
91:23, 92:7, 92:10,
92:12, 92:15, 92:20,
94:5, 94:18, 94:22,
95:2, 95:8, 95:10,
95:13, 95:18, 97:25,
99:25, 100:23,
101:25, 102:4,
103:1, 103:25,
104:19, 104:22,
105:2, 105:25,
107:6, 108:5,
109:13, 109:16,
109:22, 109:24,
113:5, 113:20,
115:8, 115:21,
119:3, 119:13,
119:16, 120:3,
120:5, 120:17,
120:20, 121:10,
121:16, 121:21,
121:24, 122:5,
122:11, 122:22,
123:14, 123:19,
123:21, 123:23,
124:2, 125:14,
127:9, 127:13,
127:17, 127:24,
128:3, 131:21,
131:24, 132:6,
132:16, 132:19,

133:8, 133:10,
134:1, 134:12,
134:18, 134:25,
135:7, 135:14,
135:18, 135:21,
135:25, 141:13,
141:16, 141:24,
142:14, 144:1,
147:21, 148:4,
148:16, 148:25,
149:4, 150:5,
150:14, 151:11,
151:19, 151:25,
152:2, 152:6, 153:2,
153:4, 154:8,
154:25, 155:17,
156:1, 156:13,
156:17, 157:8,
157:18, 158:2,
158:4, 158:10,
159:1, 160:12,
160:18, 160:23,
161:1, 161:6, 161:8,
162:3, 162:6, 162:8,
162:16, 163:12,
163:14, 163:18,
171:15, 171:19,
171:22, 172:2,
172:5, 172:8,
180:13, 180:18,
180:22, 180:25,
183:9, 183:21,
184:25, 185:4,
185:10, 185:13,
188:1, 188:6,
188:10, 188:13,
188:17, 192:9,
193:25, 194:2,
194:6, 194:8,
194:10, 194:16,
194:22, 196:22,
197:22, 198:7,
198:9, 198:12,
198:16, 198:20,
202:16, 202:22,
203:8, 203:11,
206:2, 207:4, 207:9,
208:3, 208:6, 209:2,
209:6, 209:9,
209:11, 209:14,
210:4, 210:6, 210:8,
210:14, 210:17,
210:20, 210:23,
210:25, 212:22,
212:25, 213:5,
213:16, 213:20,
213:25, 214:3,
214:5, 214:7
**court's** [2] - 96:2,
159:4
**Court's** [10] - 20:10,

24:20, 28:8, 34:5, 73:14, 75:1, 98:23, 100:16, 154:16
**COURTROOM** [4] - 25:16, 127:23, 188:5, 213:23
**courtroom** [13] - 7:23, 8:10, 15:7, 68:20, 90:18, 95:25, 100:11, 134:16, 136:3, 164:14, 171:20, 192:12, 214:9
**courts** [2] - 70:13, 173:22
**courts's** [1] - 159:2
**cousin** [1] - 199:19
**cover** [3] - 165:18, 168:3, 186:21
**CPB** [1] - 186:1
**CPBA** [1] - 32:11
**crackdown** [1] - 91:8
**crackling** [1] - 25:22
**craft** [2] - 101:18, 105:10
**crafting** [1] - 181:24
**crazy** [1] - 80:11
**CRC** [12] - 11:12, 30:20, 30:23, 30:25, 37:22, 38:6, 48:13, 56:19, 58:11, 58:12, 80:24
**create** [9] - 28:3, 54:16, 66:7, 94:1, 111:1, 176:11, 188:23, 191:21, 209:19
**created** [9] - 11:15, 13:21, 44:4, 44:8, 86:15, 96:7, 106:4, 179:12, 180:1
**creates** [2] - 115:25, 210:20
**creating** [9] - 12:16, 27:2, 107:4, 107:19, 107:25, 111:3, 161:16, 166:4, 203:17
**creative** [2] - 55:21, 93:25
**cried** [1] - 177:22
**crime** [12] - 62:2, 62:3, 63:19, 63:20, 63:24, 64:2, 64:10, 82:6, 82:7, 82:8
**criminal** [3] - 47:7, 102:9, 187:3
**crises** [3] - 139:1, 139:6, 153:13
**crisis** [5] - 11:5, 87:9,

139:5, 177:16, 177:20
**criteria** [9] - 9:25, 10:2, 14:1, 14:10, 61:7, 111:11, 111:13, 162:21, 184:9
**criterion** [3] - 77:13, 112:1, 115:13
**critical** [9] - 58:25, 75:4, 85:5, 86:25, 90:24, 91:15, 140:6, 148:24, 181:24
**criticism** [1] - 69:6
**critique** [2] - 87:24, 89:2
**crony** [1] - 174:6
**cross** [1] - 28:21
**cross-examination** [1] - 28:21
**crossroads** [1] - 139:16
**CRR** [2] - 1:24, 215:13
**crucial** [1] - 116:6
**cruiser** [1] - 193:13
**cues** [1] - 39:7
**cuffed** [1] - 96:17
**cultural** [4] - 81:24, 84:19, 87:13, 89:12
**culture** [2] - 86:3, 174:16
**curiae** [3] - 4:1, 4:8, 135:1
**curious** [4] - 14:2, 14:11, 160:16, 161:23
**current** [36] - 5:9, 9:19, 27:17, 31:24, 32:5, 34:7, 46:3, 46:19, 56:8, 56:23, 104:12, 117:14, 128:24, 141:7, 144:15, 145:10, 148:3, 149:24, 150:1, 150:7, 150:13, 156:16, 162:12, 163:11, 164:5, 167:2, 168:5, 172:20, 178:16, 179:12, 186:4, 186:25, 189:1, 189:19, 205:16, 209:22
**curricula** [1] - 18:6
**custody** [4] - 22:25, 23:15, 40:6, 56:11
**customer** [1] - 201:19
**cut** [2] - 168:7, 187:6

**D**

**DA's** [1] - 144:11
**daily** [1] - 62:8
**dais** [1] - 171:9
**Dallas** [1] - 81:17
**Dan** [4] - 8:2, 86:9, 141:17, 141:21
**dangerous** [3] - 71:11, 97:23, 103:5
**dare** [1] - 175:16
**dark** [1] - 177:24
**darkest** [1] - 177:14
**dash** [1] - 182:2
**data** [1] - 166:6
**date** [5] - 19:20, 207:8, 212:24, 213:2, 213:14
**DATED** [1] - 215:9
**dates** [2] - 137:2, 213:11
**dating** [2] - 136:12, 139:7
**Dawson** [2] - 64:3, 64:4
**DAY** [12] - 4:23, 52:19, 52:21, 53:4, 53:7, 54:8, 55:4, 61:21, 66:20, 67:1, 69:14, 69:17
**day-to-day** [1] - 99:5
**days** [15] - 19:18, 21:2, 27:14, 40:14, 42:11, 148:6, 153:9, 154:20, 155:4, 155:7, 155:12, 155:13, 156:20, 156:21, 206:25
**DC** [1] - 2:7
**de** [1] - 11:4
**de-escalation** [1] - 11:4
**dead** [3] - 193:18, 193:19, 202:2
**deadline** [3] - 23:24, 164:17
**deadlines** [1] - 164:16
**deadly** [6] - 40:5, 56:11, 166:24, 179:20, 186:2, 190:6
**deal** [13] - 36:22, 50:1, 54:3, 56:3, 65:10, 77:22, 100:2, 105:11, 106:17, 178:10, 195:12, 202:11, 208:16
**dealing** [1] - 203:5
**dealt** [1] - 124:18
**dean** [1] - 164:17
**dear** [2] - 172:23,

174:19
**death** [5] - 22:25, 23:15, 40:6, 56:11, 180:6
**deaths** [1] - 173:18
**Debbie** [6] - 7:11, 8:3, 180:18, 188:6, 188:7, 188:19
**debrief** [1] - 54:17
**decade** [1] - 149:3
**decades** [3] - 84:14, 146:11, 174:21
**December** [3] - 44:21, 164:23, 212:10
**decide** [16] - 8:25, 9:6, 10:6, 35:19, 46:9, 46:11, 76:23, 78:13, 157:15, 162:1, 164:4, 167:16, 180:8, 202:14, 204:21
**decided** [3] - 50:3, 67:12, 163:11
**decides** [2] - 155:9, 157:5
**deciding** [4] - 9:25, 106:13, 143:16, 144:3
**decision** [27] - 48:12, 49:2, 49:11, 49:18, 50:10, 55:15, 72:24, 77:20, 78:8, 79:6, 79:18, 79:19, 105:20, 112:17, 112:25, 116:17, 116:24, 117:2, 118:7, 118:14, 133:19, 155:7, 156:15, 156:20, 162:10, 162:11, 171:14
**decision-makers** [5] - 48:12, 49:11, 49:18, 50:10, 79:6
**decision-making** [6] - 77:20, 79:19, 112:17, 112:25, 116:17, 117:2
**decisions** [16] - 9:9, 37:19, 65:9, 65:13, 111:18, 112:5, 112:8, 114:10, 114:12, 115:24, 117:7, 171:4, 172:14, 176:4, 180:7, 209:17
**decrease** [1] - 63:20
**decreased** [1] - 45:10
**decree** [3] - 156:23, 156:25, 157:1

**dedicate** [1] - 174:18
**deeper** [1] - 130:19
**deeply** [5] - 69:9, 104:9, 137:2, 156:7, 165:11
**default** [1] - 118:10
**defendant** [3] - 5:8, 27:19, 169:8
**Defendant** [4] - 1:9, 3:14, 3:21, 5:4
**defender** [1] - 102:10
**defense** [1] - 96:9
**defensible** [1] - 111:2
**defer** [2] - 52:14, 92:5
**define** [2] - 96:24, 206:7
**defining** [1] - 139:15
**definitely** [5] - 11:22, 122:14, 126:17, 126:20, 134:8
**definition** [13] - 14:10, 76:20, 76:21, 76:24, 76:25, 77:1, 77:3, 77:8, 77:19, 79:13, 79:15, 79:16, 79:20
**definitions** [5] - 44:8, 77:11, 78:11, 78:15, 78:16
**degree** [1] - 16:16
**DEIAN** [1] - 135:24
**Deian** [4] - 127:19, 134:16, 134:18, 135:8
**delay** [5] - 157:21, 207:18, 207:19, 208:8, 210:3
**delayed** [4] - 153:7, 156:11, 196:6, 207:16
**delaying** [3] - 148:10, 148:11, 162:10
**delegated** [1] - 156:9
**deliver** [1] - 153:25
**delivering** [1] - 153:8
**delivery** [1] - 75:11
**Delowy** [2] - 199:6, 199:7
**demanding** [2] - 86:23, 176:23
**democratic** [1] - 150:16
**demonstrable** [1] - 72:25
**demonstrate** [3] - 30:4, 105:18, 115:5
**demonstrated** [3] - 97:12, 112:10, 130:17
**demonstration** [27] - 13:24, 14:6, 30:8,

56:25, 58:7, 58:13, 59:4, 59:10, 59:25, 60:10, 60:25, 61:3, 61:5, 61:8, 72:25, 73:9, 77:7, 78:19, 78:20, 87:23, 111:24, 113:2, 113:9, 113:13, 113:17, 114:15, 115:10
**denied** [2] - 87:16, 154:23
**Denver** [1] - 181:17
**deny** [1] - 203:21
**depart** [1] - 190:15
**department** [10] - 18:9, 76:4, 82:22, 82:23, 82:24, 89:8, 91:14, 160:11, 202:3, 212:8
**Department** [9] - 16:3, 16:6, 16:18, 76:5, 83:21, 87:11, 112:13, 153:15, 175:8
**departure** [1] - 189:2
**depended** [1] - 144:19
**dependency** [1] - 194:14
**Dept** [1] - 2:5
**depth** [1] - 40:19
**deputy** [7] - 7:23, 8:10, 42:2, 90:18, 100:11, 102:18, 168:10, 187:9
**Deputy** [3] - 3:19, 4:17, 15:9
**DEPUTY** [4] - 25:16, 127:23, 188:5, 213:23
**descendant** [1] - 172:17
**describe** [1] - 46:17
**described** [3] - 20:15, 100:14, 187:5
**describes** [1] - 189:9
**describing** [1] - 20:4
**description** [1] - 20:11
**deserve** [2] - 97:20, 140:15
**designated** [2] - 116:10, 116:12
**designed** [1] - 96:23
**desirable** [1] - 137:10
**desire** [6] - 64:9, 64:23, 66:4, 69:9, 116:16
**desired** [2] - 93:15, 94:2
**desk** [1] - 206:17

**despair** [2] - 68:10, 68:11
**despite** [1] - 69:4
**detail** [3] - 44:3, 47:23, 165:5
**details** [3] - 44:9, 116:6, 181:11
**detected** [1] - 91:18
**deter** [1] - 190:25
**determination** [4] - 31:16, 38:8, 79:7, 153:16
**determinations** [1] - 32:12
**determine** [4] - 46:14, 77:23, 114:22, 205:12
**detriment** [1] - 58:21
**develop** [1] - 159:25
**developed** [2] - 79:15, 142:18
**developer** [1] - 19:1
**developing** [1] - 110:22
**development** [3] - 11:3, 62:4, 64:13
**device** [2] - 89:16
**dictate** [1] - 139:18
**died** [3] - 196:7, 196:8, 200:9
**difference** [2] - 153:21, 182:7
**differences** [2] - 60:19, 81:24
**different** [23] - 16:3, 17:23, 18:6, 23:12, 35:16, 43:4, 43:13, 61:1, 61:7, 77:3, 82:3, 115:1, 117:6, 121:8, 126:21, 150:2, 150:19, 153:22, 178:7, 188:12, 194:10, 199:12, 200:14
**differently** [4] - 86:19, 115:2, 117:5, 202:17
**difficult** [7] - 11:18, 78:10, 78:15, 99:11, 115:4, 124:19, 214:20
**difficulty** [1] - 114:5
**digging** [1] - 19:25
**digitally** [1] - 215:7
**dignity** [1] - 177:24
**diligence** [1] - 5:2
**diligently** [1] - 108:4
**dire** [3] - 106:19, 177:13, 177:23
**direct** [3] - 22:8, 59:14, 77:20

**direction** [9] - 16:7, 62:12, 91:21, 100:25, 105:18, 111:5, 114:11, 157:10, 189:4
**Directive** [2] - 22:6, 22:24
**directive** [2] - 22:22, 23:1
**directives** [3] - 18:5, 33:25, 46:10
**directly** [7] - 17:8, 30:17, 39:4, 41:19, 42:2, 116:25, 149:11
**director** [1] - 57:5
**dirty** [1] - 96:11
**Disabilities** [1] - 90:6
**disabilities** [2] - 94:2, 137:21
**Disability** [1] - 104:12
**disability** [3] - 90:11, 93:4, 93:17
**disabled** [1] - 92:25
**disagree** [6] - 12:7, 20:18, 73:10, 103:20, 167:9, 194:16
**disagreement** [2] - 14:4, 30:14
**disagrees** [2] - 14:7, 73:10
**disappears** [1] - 91:3
**disappointing** [1] - 189:6
**disappointment** [1] - 68:10
**disciplinary** [1] - 16:19
**discipline** [17] - 46:15, 46:16, 49:14, 49:15, 49:16, 49:17, 50:11, 65:5, 65:9, 65:10, 114:19, 115:24, 118:13, 129:19, 167:19, 167:22, 190:23
**disciplined** [1] - 109:5
**disciplining** [1] - 65:16
**disclose** [1] - 6:11
**discomfort** [2] - 121:5, 121:17
**discount** [1] - 175:9
**discourse** [2] - 139:17, 173:24
**discovered** [1] - 174:15
**discretion** [3] - 10:3, 33:2, 118:6
**discretionary** [1] -

71:9
**discrimination** [1] - 57:17
**discuss** [5] - 17:3, 19:1, 54:17, 93:13, 166:15
**discussed** [6] - 17:22, 21:8, 41:10, 120:22, 165:5, 187:24
**discussing** [1] - 90:4
**Discussion** [1] - 180:24
**discussion** [7] - 32:20, 47:9, 50:2, 70:10, 187:8, 204:10, 207:18
**discussions** [6] - 18:22, 24:13, 36:19, 36:21, 168:9, 170:18
**disease** [1] - 195:23
**disincentive** [2] - 154:6, 203:18
**disinfectant** [1] - 31:21
**dismissal** [1] - 111:14
**dismissed** [1] - 97:16
**dismissive** [1] - 68:22
**disorders** [1] - 99:1
**disparities** [2] - 173:23, 179:21
**displays** [1] - 112:19
**disproportionately** [1] - 174:20
**disprove** [1] - 187:4
**dispute** [3] - 14:8, 35:1, 89:18
**disputes** [1] - 31:9
**disqualified** [2] - 114:6, 143:25
**disqualifying** [3] - 12:3, 12:6, 14:11
**disregarded** [1] - 86:14
**dissonance** [1] - 67:23
**distance** [1] - 201:17
**distinct** [1] - 209:9
**distinction** [4] - 8:23, 9:14, 48:13, 68:13
**distract** [1] - 125:4
**distracting** [1] - 88:13
**district** [7] - 102:18, 116:10, 119:18, 119:20, 119:24, 119:25
**DISTRICT** [3] - 1:1, 1:2, 1:19
**District** [2] - 115:6, 140:3
**districts** [3] - 119:25,

152:8, 198:1
**distrust** [1] - 138:21
**disturbing** [2] - 49:6, 175:3
**diverse** [7] - 112:4, 112:7, 117:7, 124:12, 140:9, 141:3, 184:17
**diversion** [1] - 174:13
**diversity** [3] - 54:20, 117:14, 186:12
**divert** [1] - 173:23
**DIVISION** [1] - 1:3
**division** [2] - 42:1
**Division** [6] - 2:6, 3:11, 16:10, 41:23, 189:10
**Docket** [22] - 5:6, 6:15, 6:17, 6:19, 6:21, 6:23, 6:25, 7:1, 7:2, 7:3, 7:6, 7:7, 7:8, 7:9, 7:10, 7:11, 7:12, 7:14, 28:12, 141:20, 211:1, 211:15
**docket** [1] - 25:2, 159:1, 159:4
**dockets** [1] - 159:2
**doctor** [1] - 169:11
**document** [5] - 18:19, 24:2, 24:11, 97:5, 100:21
**documentation** [2] - 93:24, 94:6
**documented** [1] - 103:17
**documents** [2] - 24:8, 28:14
**dodge** [1] - 133:22
**doesn't** [1] - 165:18
**dogs** [2] - 133:9, 133:10
**DOJ** [21] - 3:11, 22:17, 29:14, 33:21, 33:25, 40:6, 43:18, 45:11, 47:1, 69:7, 79:16, 154:23, 163:25, 165:13, 165:25, 166:2, 168:15, 186:22, 187:15, 189:13
**DOJ's** [6] - 29:6, 33:6, 34:16, 34:18, 206:12, 210:10
**doll** [1] - 177:20
**dominant** [1] - 68:14
**done** [31] - 16:25, 17:25, 22:17, 28:15, 44:17, 52:7, 53:10, 65:19, 68:20, 84:20, 84:21, 84:24, 85:24,

86:2, 87:10, 101:8,
102:21, 119:11,
121:13, 122:23,
123:5, 124:4, 127:2,
146:11, 146:17,
161:16, 169:21,
170:15, 181:13,
181:16, 185:13
**doors** [2] - 72:24,
191:16
**double** [1] - 85:24
**doubt** [1] - 161:9
**doubtful** [1] - 103:14
**down** [19] - 8:1, 22:23,
25:23, 57:18, 63:21,
63:23, 84:4, 106:12,
108:18, 108:24,
128:14, 152:13,
166:1, 168:7,
177:21, 177:22,
187:6, 195:19,
199:22
**downs** [1] - 76:9
**Dr** [15] - 7:7, 67:3,
73:23, 74:2, 75:15,
75:24, 77:4, 83:4,
84:7, 84:15, 86:6,
108:14, 146:24,
206:7
**DR** [13] - 75:16, 75:20,
77:5, 77:10, 77:16,
79:12, 79:22, 80:20,
81:8, 81:10, 82:15,
83:6, 83:9
**draft** [11] - 18:15,
20:19, 23:24, 42:11,
72:19, 73:1, 189:1,
189:21, 190:5,
190:15, 191:3
**drank** [1] - 136:16
**dreadlocks** [1] - 96:14
**drew** [1] - 67:5
**drive** [1] - 176:19
**driving** [2] - 125:6,
201:14
**drug** [1] - 194:14
**due** [8] - 49:12, 49:19,
72:21, 73:5, 108:1,
137:5, 176:13, 187:1
**duly** [1] - 209:25
**durable** [2] - 28:3,
37:14
**duration** [2] - 74:8,
74:21
**during** [18] - 7:22,
7:25, 8:9, 15:11,
16:9, 16:15, 27:8,
29:3, 30:22, 34:19,
42:13, 84:3, 111:6,
114:8, 122:25,

125:25, 155:14
**duties** [1] - 167:15
**duty** [6] - 118:17,
121:7, 144:6, 144:8,
144:10, 144:12
**dynamic** [5] - 53:18,
62:1, 62:7, 81:6,
150:19

## E

**e-mail** [2] - 19:7, 144:7
**early** [1] - 45:3
**ears** [1] - 67:22
**easily** [3] - 89:3,
114:5, 183:19
**East** [1] - 140:3
**easy** [2] - 113:24,
114:22
**echo** [1] - 190:1
**educated** [3] - 81:22,
81:24, 132:3
**education** [6] - 12:22,
81:18, 85:5, 86:20,
131:25
**educational** [8] - 75:6,
80:1, 80:4, 80:8,
81:20, 127:11,
134:22, 135:2
**effect** [1] - 130:18
**effective** [7] - 65:16,
156:11, 189:4,
190:16, 192:8,
211:16, 212:5
**effectively** [2] - 28:1,
118:20
**effort** [3] - 37:13, 76:1,
76:3
**efforts** [1] - 17:16
**Eig** [1] - 66:24
**Eig's** [1] - 67:4
**eight** [2] - 92:17,
195:11
**EIS** [1] - 24:6
**either** [17] - 17:24,
20:21, 26:11, 59:6,
74:16, 74:19, 90:14,
95:14, 100:6, 100:8,
100:20, 113:25,
114:11, 139:5,
143:11, 163:1, 194:6
**electability** [1] -
150:25
**elected** [19] - 9:10,
9:20, 10:8, 33:2,
147:4, 148:2, 148:8,
150:7, 153:18,
162:11, 162:12,
162:13, 163:1,
163:5, 163:7,

163:11, 192:5,
198:1, 210:1
**electeds** [2] - 153:21,
156:24
**electing** [2] - 9:17,
9:18
**election** [10] - 9:16,
88:5, 91:2, 134:5,
147:24, 148:7,
151:20, 153:19,
153:23, 209:17
**electoral** [2] - 134:2,
150:22
**Electoral** [2] - 213:6,
213:9
**electorate** [1] - 162:19
**electronics** [1] - 26:3
**element** [2] - 73:5,
93:16
**eleventh** [1] - 206:20
**eliminate** [1] - 182:19
**eliminates** [1] -
189:21
**Eliot** [1] - 64:7
**elitism** [1] - 176:10
**embarrassing** [1] -
133:4
**embodied** [1] - 38:7
**embrace** [2] - 139:18,
140:3
**Emergency** [1] - 17:10
**emergency** [1] - 41:24
**emotional** [1] - 173:17
**empathy** [5] - 99:4,
99:8, 183:4, 183:10
**emphasis** [1] - 63:2
**emphasize** [3] - 62:8,
68:19, 170:4
**employed** [1] - 206:9
**employee** [2] - 17:15,
165:17
**employees** [3] - 59:15,
205:18, 205:20
**empowers** [1] - 141:1
**enabling** [1] - 72:19
**enact** [1] - 33:15
**enacted** [2] - 165:14,
179:15
**enclosed** [1] - 146:6
**encompass** [1] -
137:25
**encompasses** [1] -
112:17
**encounter** [3] - 49:1,
182:11, 201:11
**encountered** [2] -
200:10, 200:15
**encounters** [1] -
199:24
**encourage** [5] - 11:23,

34:23, 53:17, 83:22,
127:10
**encouraged** [7] -
13:13, 34:14, 53:11,
62:23, 63:25, 64:13,
188:22
**end** [16] - 38:14, 40:1,
42:15, 42:17, 45:4,
50:7, 54:21, 103:13,
114:25, 127:20,
131:12, 140:2,
147:13, 161:20,
164:13, 195:25
**endeavor** [3] - 15:16,
25:23, 39:6
**ended** [4] - 16:9,
168:1, 186:19, 206:8
**ends** [1] - 130:25
**enforce** [4] - 9:23,
31:24, 32:2, 60:4
**Enforcement** [1] -
190:22
**enforcement** [10] -
30:5, 60:5, 65:11,
82:22, 140:24,
169:8, 175:22,
175:24, 181:19,
183:17
**enforcement's** [1] -
182:1
**engage** [6] - 24:9,
54:5, 75:2, 146:10,
158:16, 201:25
**engaged** [6] - 27:10,
42:22, 57:13, 71:19,
144:21
**Engaged** [2] - 17:5,
110:10
**Engagement** [2] -
110:1, 110:8
**engagement** [5] -
17:7, 17:16, 62:14,
62:18, 98:18
**engagements** [1] -
45:14
**engaging** [1] - 62:25
**enjoy** [2] - 58:24,
64:11
**ensure** [11] - 9:9,
15:15, 17:2, 18:18,
65:13, 71:20, 74:13,
113:1, 116:18,
141:5, 184:16
**ensures** [1] - 140:25
**ensuring** [1] - 138:18
**enter** [5] - 3:9, 3:22,
4:3, 4:9, 4:14
**entered** [1] - 28:12
**enthusiasm** [1] -
192:3

**entire** [9] - 31:19,
58:9, 79:2, 102:12,
128:22, 139:15,
140:6, 142:12, 178:2
**entirely** [2] - 105:17,
181:14
**entities** [1] - 32:18
**entitled** [2] - 49:12,
215:5
**entity** [9] - 29:16,
29:25, 37:24, 37:25,
38:1, 38:7, 118:1,
129:6, 154:5
**entry** [2] - 25:2, 70:3
**envision** [1] - 31:8
**envisioned** [1] - 30:14
**envisions** [1] - 32:24
**equal** [3] - 11:23,
139:18, 140:15
**equally** [3] - 67:24,
86:23, 128:25
**equation** [1] - 140:5
**equipment** [1] - 191:5
**equitable** [1] - 65:8
**Equity** [5] - 116:11,
117:13, 120:14,
205:21, 205:23
**equity** [4] - 11:4,
167:8, 178:22,
186:11
**equivalent** [2] - 35:8,
169:6
**error** [1] - 28:18
**escalation** [1] - 11:4
**escorting** [1] - 88:17
**especially** [7] - 82:11,
84:6, 91:8, 123:7,
133:18, 176:2, 184:3
**essential** [1] - 118:19
**establish** [4] - 33:12,
137:13, 138:18,
206:10
**established** [3] -
43:19, 43:23, 61:25
**establishment** [1] -
76:11
**et** [4] - 44:20, 138:17,
208:15
**ethnically** [1] - 173:13
**evaluate** [1] - 50:4
**evaluated** [1] - 112:10
**evaluation** [1] -
111:20
**evaluator's** [1] - 114:3
**evaluators** [1] -
113:25
**event** [5] - 64:3, 64:5,
64:6, 123:1, 191:6
**events** [3] - 62:18,
191:7, 191:13

14

**eventually** [2] - 79:14, 138:9
**evidence** [5] - 61:6, 79:5, 125:9, 182:6, 187:4
**evidentiary** [3] - 28:16, 28:21, 28:24
**exact** [1] - 132:8
**exactly** [4] - 23:13, 27:16, 117:6, 209:2
**examination** [1] - 28:21
**examine** [1] - 190:22
**example** [11] - 54:4, 63:1, 63:18, 67:9, 70:20, 93:11, 97:5, 115:6, 166:2, 168:12, 187:12
**exceed** [1] - 64:18
**excellent** [6] - 61:13, 83:7, 87:15, 89:21, 132:16, 188:10
**except** [3] - 47:12, 118:13, 150:19
**excessive** [3] - 71:15, 166:9, 179:19
**excited** [4] - 19:24, 42:24, 110:18, 179:3
**exciting** [1] - 187:23
**exclude** [3] - 66:16, 75:3, 164:8
**excludes** [1] - 93:22
**exclusively** [1] - 16:9
**excuse** [7] - 7:4, 31:11, 42:16, 44:23, 58:11, 78:8, 135:14
**executioners** [1] - 175:1
**executive** [1] - 16:17
**Executive** [1] - 63:16
**exempt** [1] - 118:3
**exemption** [3] - 111:17, 117:22, 183:23
**exercise** [4] - 33:2, 71:8, 71:17, 71:19
**exist** [2] - 113:1, 117:3
**existent** [1] - 205:25
**existing** [6] - 22:24, 47:5, 48:8, 119:11, 133:20, 166:22
**exists** [3] - 48:13, 117:20, 120:23
**expand** [5] - 29:22, 133:7, 133:15, 133:21, 138:23
**expanded** [2] - 120:15, 134:3
**expansion** [6] - 29:17, 29:25, 42:7, 133:1,

133:20, 133:23
**expect** [3] - 24:10, 36:25, 107:11
**expectations** [6] - 54:25, 146:1, 146:2, 175:12, 188:24, 190:16
**expected** [1] - 96:22
**expecting** [1] - 9:23
**expense** [1] - 141:3
**experience** [56] - 16:11, 16:20, 24:1, 25:25, 34:18, 53:15, 53:21, 54:5, 65:24, 78:12, 80:9, 87:16, 92:25, 93:10, 93:16, 97:13, 100:14, 102:9, 102:24, 103:9, 105:8, 105:9, 106:10, 106:11, 107:22, 114:13, 116:19, 122:16, 123:7, 123:11, 124:16, 124:19, 124:25, 125:17, 126:4, 127:11, 136:13, 136:15, 136:20, 146:14, 161:17, 161:18, 168:8, 172:11, 172:13, 172:25, 173:2, 173:14, 174:23, 175:19, 176:5, 181:15, 181:25, 187:7, 198:18, 200:6
**experienced** [6] - 139:4, 173:10, 174:21, 175:4, 184:18, 184:19
**experiences** [23] - 11:17, 12:9, 13:19, 17:4, 47:11, 51:24, 64:11, 66:17, 71:5, 71:6, 80:6, 80:8, 80:13, 80:17, 121:19, 123:9, 124:10, 125:19, 138:14, 173:17, 176:16, 181:20
**experiencing** [4] - 71:23, 82:13, 138:25, 139:6
**experiential** [4] - 85:5, 86:20, 87:1, 140:12
**experiment** [1] - 142:19
**expert** [1] - 189:5
**expertise** [4] - 52:6, 160:19, 160:20,

160:25
**experts** [2] - 159:23, 160:8
**Expire** [1] - 215:14
**explain** [4] - 41:3, 108:10, 142:8, 185:15
**explained** [1] - 171:10
**explaining** [2] - 160:2, 165:6
**explanation** [1] - 14:10
**explicit** [3] - 73:7, 107:3, 195:4
**explicitly** [3] - 165:16, 184:15, 194:25
**explore** [1] - 118:9
**expose** [1] - 49:25
**exposed** [2] - 53:14, 182:5
**exposure** [1] - 48:25
**expressed** [6] - 8:22, 9:12, 9:15, 9:21, 22:19, 51:9
**expression** [2] - 9:23, 13:25
**expressly** [1] - 113:7
**extend** [1] - 101:12
**extends** [1] - 74:10
**extensive** [3] - 102:9, 173:17, 175:11
**extensively** [1] - 18:7
**extent** [9] - 13:8, 14:1, 74:10, 108:7, 108:16, 113:15, 176:6, 207:23, 210:9
**external** [5] - 42:4, 132:25, 133:6, 133:17, 133:21
**extra** [2] - 123:2, 164:24
**extreme** [3] - 137:11, 171:8, 175:2
**extremely** [2] - 58:25, 190:9
**eye** [3] - 6:10, 127:11, 171:12
**eye-opening** [1] - 127:11
**eyes** [1] - 124:7

---

**F**

**face** [3] - 93:19, 96:3, 141:22
**faces** [1] - 96:16
**facie** [1] - 60:2
**facilitating** [1] - 75:13
**facility** [1] - 17:11
**facing** [1] - 208:18

**fact** [32] - 5:24, 49:4, 49:9, 63:13, 76:22, 78:18, 88:3, 93:21, 103:2, 103:14, 107:16, 112:22, 114:4, 133:23, 137:6, 142:15, 145:12, 147:17, 159:13, 159:15, 162:17, 163:3, 168:24, 173:10, 178:15, 182:19, 193:9, 193:21, 195:7, 195:15, 205:25, 208:10
**factor** [4] - 12:3, 12:6, 152:23, 162:17
**facts** [8] - 16:1, 22:13, 46:8, 46:10, 161:24, 178:13, 191:17
**fail** [1] - 203:23
**fails** [1] - 191:20
**failure** [1] - 114:16
**fair** [38] - 9:1, 9:6, 10:1, 10:7, 22:12, 22:15, 27:5, 28:7, 30:10, 32:8, 32:19, 34:6, 34:8, 35:3, 51:7, 52:8, 59:8, 65:8, 70:24, 72:15, 78:14, 92:9, 98:13, 116:24, 117:7, 150:12, 157:1, 163:24, 164:2, 176:15, 178:23, 189:24, 191:23, 195:7, 195:16, 197:6, 204:11
**fairly** [8] - 8:23, 10:2, 29:2, 32:16, 114:12, 168:20, 187:21, 197:19
**fairness** [19] - 7:4, 15:14, 19:14, 27:8, 27:25, 70:11, 70:14, 70:20, 70:21, 72:19, 96:2, 116:16, 162:18, 176:17, 189:24, 194:24, 197:7
**faith** [9] - 5:2, 109:3, 109:4, 137:4, 137:11, 137:12, 157:9, 189:17, 214:13
**fall** [1] - 110:23
**fallacy** [1] - 99:15
**false** [2] - 139:17, 139:20
**familiar** [4] - 35:8,

44:6, 44:16, 45:23
**family** [2] - 136:11, 143:12
**famous** [2] - 84:1, 88:4
**fan** [1] - 91:19
**far** [20] - 14:24, 16:25, 21:8, 34:6, 43:1, 59:17, 62:21, 69:24, 84:8, 84:22, 89:8, 130:5, 130:22, 195:19, 197:23, 206:17, 206:18, 210:11
**fashion** [1] - 154:2
**fast** [4] - 39:8, 128:14, 148:19, 202:1
**father** [1] - 173:20
**fathom** [1] - 68:3
**fatigue** [1] - 190:12
**favor** [4] - 65:1, 106:21, 147:5, 204:19
**favorable** [1] - 169:16
**Faythe** [2] - 8:4, 92:22
**Fear** [1] - 67:13
**fear** [10] - 62:3, 63:19, 64:2, 64:10, 99:14, 112:15, 117:21, 182:18, 200:19, 202:6
**fearful** [1] - 80:13
**featured** [1] - 165:6
**features** [2] - 10:4, 191:21
**federal** [10] - 32:14, 76:6, 104:3, 125:7, 126:1, 159:8, 165:18, 195:10, 205:3, 205:6
**feedback** [9] - 45:11, 45:16, 53:15, 59:16, 59:17, 80:25, 111:6, 129:13, 183:17
**feet** [1] - 98:13
**fell** [1] - 67:22
**fellow** [2] - 110:23, 112:14
**felt** [6] - 21:13, 50:8, 60:12, 178:9, 181:14, 193:16
**female** [1] - 81:13
**Few** [1] - 165:7
**few** [19] - 5:12, 18:22, 19:18, 39:16, 51:22, 61:22, 66:13, 97:16, 98:5, 110:7, 151:2, 151:4, 153:6, 157:10, 164:23, 179:8, 211:3

fewer [1] - 70:24
fifth [1] - 95:23
fight [3] - 131:3, 174:24, 175:17
fighting [2] - 143:5
figure [4] - 94:9, 149:22, 183:24, 196:19
figuring [1] - 43:8
file [2] - 7:19, 169:1
filed [7] - 5:3, 7:20, 22:20, 24:11, 24:12, 145:19, 170:23
files [1] - 190:8
filing [2] - 28:9, 76:6
filled [2] - 116:21, 166:5
filling [2] - 42:7, 56:15
film [2] - 146:12, 146:13
filming [1] - 146:9
films [1] - 146:8
filter [2] - 107:20
filtering [1] - 130:18
final [11] - 18:24, 21:3, 55:14, 65:12, 68:7, 90:2, 96:6, 117:17, 125:10, 189:2, 203:3
finalize [2] - 20:18, 20:24
finalizing [1] - 20:6
Finally [1] - 168:18
finally [7] - 7:16, 64:12, 124:8, 147:2, 175:13, 187:18, 201:5
financial [1] - 130:15
findings [9] - 17:3, 117:25, 168:6, 187:1, 187:3, 187:6, 189:14, 189:25, 191:4
fine [18] - 5:25, 13:13, 25:5, 28:25, 29:23, 43:9, 52:12, 55:10, 55:12, 56:1, 92:8, 92:15, 94:7, 121:12, 128:3, 156:6, 175:11, 213:16
fine-tuning [1] - 175:11
finger [1] - 108:24
finish [4] - 46:20, 55:11, 67:9, 206:21
finished [1] - 66:23
Fire [1] - 202:3
fire [9] - 41:22, 41:25, 133:7, 133:16, 152:4, 202:2, 202:3, 202:5

firearm [3] - 12:18, 54:15, 199:17
firearms [2] - 199:16, 200:4
fired [1] - 64:4
firing [4] - 54:14, 118:9, 118:13, 167:18
first [51] - 6:4, 6:5, 8:17, 10:15, 10:17, 15:11, 15:11, 18:15, 19:15, 21:11, 22:4, 26:24, 28:16, 30:11, 36:15, 50:17, 52:12, 57:3, 58:4, 61:25, 62:13, 62:14, 67:11, 94:6, 102:15, 102:19, 106:2, 110:21, 111:19, 115:20, 119:10, 119:21, 120:8, 121:25, 129:3, 129:6, 129:11, 129:12, 135:23, 136:6, 138:17, 144:17, 148:24, 149:1, 149:15, 180:21, 199:4, 200:6, 202:11
firsthand [1] - 133:2
fitting [1] - 50:6
Five [1] - 166:24
five [11] - 6:7, 57:6, 119:13, 119:21, 143:18, 145:5, 148:12, 148:14, 151:16, 152:1
flexibility [1] - 75:8
flight [1] - 15:25
floor [5] - 55:2, 128:5, 163:19, 181:2, 185:8
Floyd [1] - 180:10
focus [2] - 5:11, 62:3
focused [3] - 15:14, 16:16, 18:2
Focused [1] - 81:12
focusing [3] - 10:5, 16:13, 17:14
folks [32] - 6:24, 21:3, 25:12, 39:5, 39:25, 42:20, 43:25, 44:1, 44:6, 45:14, 45:16, 49:7, 50:19, 50:22, 50:24, 54:20, 56:8, 64:16, 68:2, 83:14, 88:11, 90:14, 93:18, 119:8, 120:25, 124:23, 128:8, 150:20, 163:9, 172:19, 179:13,

192:11
follow [11] - 20:2, 20:5, 31:15, 37:16, 40:19, 50:12, 50:13, 59:18, 109:11, 119:6, 171:3
follow-up [6] - 20:2, 20:5, 37:16, 40:19, 50:12, 50:13
followed [8] - 8:12, 8:13, 8:14, 8:15, 32:1, 189:3
following [5] - 13:23, 109:6, 111:9, 189:8, 191:3
footage [9] - 41:2, 41:5, 41:14, 49:6, 49:8, 99:11, 169:16, 182:2, 182:7
FOR [6] - 1:2, 2:2, 2:8, 2:13, 2:16, 2:19
force [29] - 17:15, 22:23, 22:25, 23:10, 23:14, 24:6, 40:5, 40:21, 47:19, 47:20, 56:10, 56:11, 56:19, 63:17, 71:15, 90:22, 147:18, 153:12, 166:3, 166:5, 166:9, 166:11, 166:25, 179:20, 186:2, 190:6, 207:14
forced [3] - 97:12, 182:8, 184:14
forces [1] - 139:22
foreclose [1] - 29:9
foregoing [1] - 215:3
foreign [1] - 67:22
forerunner [1] - 41:11
forever [3] - 18:19, 74:16, 140:7
forget [2] - 180:5, 203:8
forgive [1] - 169:10
forgot [1] - 127:18
forgotten [1] - 180:11
form [12] - 9:17, 21:4, 33:10, 72:20, 75:11, 96:22, 112:11, 112:17, 140:1, 149:17, 150:2, 166:5
formally [1] - 110:10
format [1] - 24:24
former [7] - 7:13, 81:17, 92:23, 110:21, 112:16, 167:25, 186:18
forth [5] - 18:19, 50:2, 88:21, 96:2, 97:11
fortunate [1] - 130:14

Forum [1] - 63:17
forum [2] - 17:23, 114:18
forward [36] - 5:21, 6:10, 14:13, 14:25, 29:18, 31:3, 36:20, 37:11, 39:1, 39:18, 42:8, 42:12, 45:7, 61:20, 66:2, 69:8, 76:10, 83:10, 86:6, 89:11, 95:3, 109:18, 118:25, 119:24, 140:8, 141:19, 151:3, 154:18, 157:7, 162:23, 164:19, 164:22, 170:6, 196:17, 209:8, 211:3
Foster [1] - 136:10
fosters [1] - 11:24
foul [2] - 201:22, 201:23
foundation [2] - 172:21, 174:7
four [23] - 5:13, 5:23, 14:14, 22:4, 22:24, 70:5, 70:19, 111:9, 119:24, 151:15, 151:17, 152:1, 152:7, 152:15, 153:14, 156:24, 156:25, 164:12, 168:6, 187:1, 187:6, 195:20, 208:15
fourth [2] - 24:14, 117:17
Fourth [1] - 2:10
framework [2] - 33:13
frankly [6] - 11:22, 30:9, 91:17, 103:17, 138:4, 204:15
Fraternal [1] - 96:10
fraud [3] - 27:7, 27:13, 27:18
freaking [1] - 145:24
free [1] - 128:13
frequently [1] - 34:18
Friday [2] - 212:13, 213:8
friend [3] - 88:4, 168:1, 186:19
friendly [1] - 201:19
friends [6] - 124:10, 154:4, 158:23, 173:18, 199:5, 200:13
front [4] - 75:18, 142:4, 147:11, 147:12
fruition [1] - 69:1

frustrated [2] - 84:20, 146:16
frustrating [3] - 137:3, 159:17, 164:10
frustration [2] - 69:7, 142:13
fulfill [2] - 27:2, 138:11
full [15] - 32:21, 32:22, 33:10, 40:23, 47:21, 81:6, 104:24, 126:4, 129:18, 131:14, 140:9, 140:15, 167:7, 177:9, 186:9
fully [12] - 15:14, 18:18, 53:20, 58:8, 72:9, 76:14, 79:12, 81:6, 129:6, 129:12, 152:18, 182:16
fun [1] - 193:14
functional [1] - 111:2
fundamental [1] - 43:19
fundamentally [1] - 98:25
funding [8] - 5:19, 41:17, 41:19, 42:4, 132:25, 133:6, 133:17, 133:21
funeral [2] - 88:9, 88:16
future [13] - 30:18, 58:5, 81:16, 118:25, 129:7, 129:14, 140:7, 150:21, 153:21, 158:8, 170:5, 190:25, 207:8

## G

gain [3] - 34:21, 99:13, 140:2
game [2] - 35:18, 35:19
garner [1] - 99:8
garnered [2] - 99:4
gather [1] - 121:2
gathered [1] - 166:7
GEISSLER [54] - 3:5, 3:10, 22:1, 22:10, 22:13, 22:16, 23:14, 23:17, 23:22, 25:1, 25:6, 25:10, 25:14, 25:23, 26:5, 26:9, 26:23, 29:1, 30:2, 30:17, 31:14, 32:4, 34:15, 34:25, 35:4, 35:10, 35:15, 35:25, 36:2, 36:11, 36:13, 37:21, 38:13, 38:21,

38:24, 152:25, 153:3, 153:5, 155:23, 156:7, 156:14, 156:22, 203:7, 203:10, 203:12, 206:3, 207:7, 207:10, 208:5, 212:20, 212:23, 213:1, 213:14, 214:23

**Geissler** [15] - 2:5, 3:11, 26:22, 73:8, 73:11, 78:22, 102:21, 102:23, 105:21, 108:6, 148:5, 149:13, 203:1, 203:11, 208:13

**Geissler's** [5] - 58:3, 59:22, 69:6, 72:17, 213:21

**gender** [2] - 159:16, 195:2

**General** [2] - 16:5, 156:9

**general** [7] - 8:17, 10:8, 10:9, 20:13, 112:16, 127:5, 131:24

**generally** [7] - 20:14, 57:13, 57:14, 57:17, 83:5, 128:15, 197:25

**generation** [1] - 95:23

**generous** [1] - 93:20

**gentleman** [2] - 201:15, 201:20

**George** [1] - 180:10

**Gilbert** [1] - 7:7

**given** [12] - 36:17, 36:24, 50:9, 59:16, 68:8, 84:7, 116:16, 116:20, 133:18, 139:20, 148:6

**glad** [3] - 39:11, 95:19, 117:12

**Glock** [1] - 200:19

**Glover's** [1] - 196:12

**goal** [8] - 37:7, 54:9, 61:25, 64:1, 76:14, 115:4, 116:23, 153:11

**goals** [4] - 27:5, 54:24, 61:25, 110:17

**God** [3] - 84:2, 84:3

**Gonzalez** [1] - 209:24

**governance** [1] - 91:2

**Government** [1] - 212:15

**government** [12] - 6:1, 9:17, 9:20, 24:15,

24:19, 24:21, 43:1, 124:7, 149:18, 165:18, 196:16, 196:17

**government's** [1] - 159:8

**Government's** [1] - 108:7

**Governor's** [1] - 136:10

**governs** [1] - 157:1

**gracious** [2] - 37:7, 98:23

**graduate** [1] - 16:16

**graduation** [1] - 201:7

**grand** [1] - 24:5

**grandson** [1] - 176:18

**granted** [1] - 7:19

**grassroots** [1] - 142:25

**grateful** [4] - 61:24, 63:12, 63:13, 98:10

**great** [24] - 23:3, 36:21, 36:22, 37:11, 41:19, 42:24, 43:15, 50:1, 51:15, 65:7, 65:10, 69:16, 88:4, 88:24, 91:7, 93:6, 104:13, 125:2, 136:12, 138:23, 147:13, 187:25, 195:9, 211:2

**great-uncle** [1] - 136:12

**greater** [2] - 66:8, 148:13

**greatest** [2] - 31:21, 91:12

**green** [1] - 145:23

**Gretchen** [1] - 6:25

**grew** [1] - 196:10

**ground** [1] - 153:18

**group** [12] - 20:21, 35:16, 35:17, 68:14, 68:16, 68:22, 68:24, 89:17, 106:25, 198:5, 205:8

**Group** [1] - 2:13

**groups** [5] - 20:12, 21:4, 39:16, 145:9, 182:3

**grow** [1] - 137:7

**growing** [2] - 72:16, 141:11

**growth** [2] - 62:4, 64:12

**guarantees** [2] - 168:13, 187:13

**guess** [10] - 9:10, 30:11, 115:18,

123:4, 129:10, 150:10, 155:10, 157:5, 179:6, 200:2

**guessed** [1] - 37:25

**guidance** [4] - 5:25, 42:25, 112:21, 128:8

**guide** [3] - 18:4, 46:14, 77:20

**guided** [1] - 111:7

**gun** [3] - 88:22, 103:6, 200:7

**guns** [6] - 88:18, 199:18, 200:8, 200:9, 200:14, 200:15

**gut** [1] - 144:24

**gutted** [1] - 147:4

**guy** [1] - 200:22

## H

**Hager** [2] - 2:2, 3:12

**Hales** [2] - 84:16, 84:25

**half** [6] - 16:2, 62:13, 62:14, 157:25, 193:2, 193:12

**hall** [3] - 104:15, 120:12, 132:9

**Hall** [1] - 104:17

**halls** [2] - 45:13, 45:17

**hand** [8] - 9:8, 72:14, 76:15, 106:14, 177:19, 197:22, 200:24

**handcuffs** [1] - 177:25

**handed** [1] - 200:18

**HANDELMAN** [2] - 163:17, 163:20

**Handelman** [7] - 7:5, 8:2, 86:9, 141:17, 141:20, 163:16, 171:15

**handle** [4] - 54:7, 99:12, 107:11, 190:17

**handled** [2] - 14:7, 99:12

**handles** [2] - 14:7, 15:15

**handoff** [1] - 17:2

**hands** [3] - 47:20, 103:4, 202:25

**hanging** [1] - 207:11

**happy** [4] - 39:7, 39:18, 92:5, 196:2

**harassment** [1] - 57:17

**hard** [14] - 5:1, 42:10, 58:18, 69:25,

108:23, 109:10, 123:13, 147:16, 151:15, 154:17, 157:6, 157:9, 158:19, 167:12

**hardesty** [1] - 158:10

**HARDESTY** [16] - 142:3, 142:15, 144:2, 148:1, 148:15, 148:17, 149:1, 158:12, 159:6, 160:15, 160:20, 160:24, 161:2, 161:7, 161:10, 162:5

**Hardesty** [6] - 8:6, 84:17, 91:6, 148:16, 149:18, 199:3

**hardship** [1] - 12:15

**harmed** [1] - 143:10

**harmful** [1] - 136:16

**Harris** [1] - 7:7

**hast** [4] - 96:13, 96:14, 96:17

**haste** [1] - 206:14

**hat** [1] - 96:15

**hate** [3] - 114:16, 176:24, 177:17

**HAYNES** [13] - 75:16, 75:20, 77:5, 77:10, 77:16, 79:12, 79:22, 80:20, 81:8, 81:10, 82:15, 83:6, 83:9

**Haynes** [10] - 73:23, 75:15, 75:24, 77:4, 83:4, 84:7, 86:6, 108:14, 146:24, 206:7

**head** [1] - 207:12

**heading** [1] - 33:20

**heads** [1] - 96:16

**healing** [1] - 174:15

**health** [11] - 17:15, 18:5, 82:8, 90:14, 106:11, 138:25, 139:2, 153:13, 173:8, 177:16, 177:19

**Health** [18] - 4:8, 4:11, 6:22, 8:15, 14:20, 18:12, 55:24, 75:23, 83:21, 91:23, 92:1, 95:4, 98:4, 102:6, 105:14, 135:1, 154:4, 203:15

**hear** [51] - 13:5, 25:12, 25:14, 25:19, 26:17, 28:13, 29:13, 39:5, 45:14, 53:19, 53:22, 55:15, 68:1, 75:18,

79:5, 83:15, 88:14, 91:23, 92:14, 94:24, 108:11, 123:1, 123:4, 125:15, 128:3, 133:9, 141:22, 141:25, 156:7, 157:11, 162:16, 163:18, 164:1, 164:7, 166:21, 168:4, 180:15, 180:16, 181:13, 182:25, 183:1, 183:7, 183:8, 185:12, 185:23, 186:24, 188:2, 188:10, 188:11, 188:13, 190:10

**heard** [28] - 20:11, 20:13, 25:18, 48:20, 69:6, 86:10, 88:17, 92:4, 97:3, 99:22, 103:11, 107:13, 114:20, 117:19, 118:23, 124:10, 145:15, 157:20, 169:10, 169:14, 171:2, 183:5, 198:25, 199:11, 203:3, 204:23, 204:24, 211:25

**hearing** [29] - 5:12, 5:21, 6:12, 7:5, 7:25, 14:14, 15:14, 19:14, 31:18, 44:24, 52:21, 88:12, 95:3, 98:9, 104:16, 107:11, 128:18, 136:2, 136:3, 136:21, 136:23, 147:19, 149:19, 152:11, 165:4, 182:25, 183:17, 197:18, 210:5

**hearings** [4] - 26:6, 28:17, 91:18, 191:15

**hearsay** [2] - 28:19, 28:22

**heart** [1] - 171:13

**heartfelt** [1] - 179:25

**heaven** [1] - 108:18

**heavily** [1] - 87:10

**heavy** [3] - 117:8, 130:2, 213:2

**Hebrew** [1] - 84:1

**Heidi** [2] - 2:8, 3:15

**held** [4] - 82:23, 97:21, 145:22, 196:15

**hell** [1] - 144:12

**hello** [1] - 95:19

**help** [7] - 77:20, 97:18,

105:8, 122:2, 159:21, 173:23, 177:25

**helped** [2] - 168:3, 186:21

**helpful** [11] - 6:24, 17:17, 31:4, 38:20, 60:16, 80:22, 123:25, 129:23, 131:9, 131:15, 131:17

**helping** [1] - 133:3

**helpless** [1] - 82:21

**helplessly** [1] - 175:4

**helps** [4] - 11:25, 23:9, 34:21, 79:9

**hence** [1] - 174:21

**hereby** [1] - 211:16

**herself** [1] - 3:18

**Hershberger** [1] - 7:12

**hesitate** [2] - 156:14, 213:1

**hi** [3] - 92:14, 109:20, 124:20

**hickory** [1] - 96:16

**high** [6] - 16:11, 16:12, 44:4, 124:9, 168:2, 186:20

**High** [1] - 86:24

**highest** [1] - 22:25

**highjacked** [1] - 139:25

**highlight** [2] - 14:24, 99:18

**highlighting** [1] - 98:8

**highly** [5] - 17:11, 18:20, 83:17, 131:8, 131:12

**hint** [1] - 91:19

**hip** [1] - 103:7

**hippy** [1] - 96:11

**hire** [1] - 152:4

**hired** [2] - 64:16, 64:17

**hiring** [7] - 64:14, 64:17, 118:8, 164:17, 167:18, 175:22, 176:12

**historically** [4] - 30:11, 57:20, 77:1, 87:25

**history** [10] - 6:4, 11:3, 11:6, 14:3, 66:23, 69:4, 103:18, 139:16, 159:14, 199:1

**hit** [3] - 29:3, 201:5, 201:6

**hold** [21] - 45:17, 50:5, 58:20, 58:24, 82:19,

117:21, 129:20, 132:6, 133:8, 142:16, 145:25, 148:3, 148:22, 161:24, 168:21, 169:1, 172:23, 175:13, 187:21, 190:2, 191:15

**holds** [1] - 118:4

**holidays** [1] - 155:12

**holistic** [2] - 65:22, 139:19

**home** [1] - 107:10

**homelessness** [1] - 184:20

**homicide** [1] - 63:22

**Hon** [1] - 163:21

**honest** [1] - 125:12

**honesty** [1] - 178:4

**honor** [2] - 168:14, 187:14

**Honor** [214] - 3:5, 3:10, 3:15, 3:23, 4:4, 4:10, 4:16, 4:23, 15:6, 15:7, 21:17, 22:1, 22:3, 22:5, 22:10, 22:16, 22:17, 22:21, 23:1, 23:17, 23:18, 23:20, 23:22, 24:11, 24:14, 24:15, 24:17, 24:21, 24:22, 24:24, 25:3, 25:6, 25:24, 26:6, 26:9, 26:23, 26:24, 27:6, 27:8, 27:18, 27:23, 28:5, 28:9, 28:10, 28:23, 29:1, 29:5, 29:20, 30:2, 30:5, 30:6, 30:7, 30:17, 30:19, 30:23, 31:1, 31:14, 32:4, 32:7, 32:14, 32:16, 32:17, 32:20, 33:24, 34:10, 34:11, 34:25, 35:4, 35:21, 36:11, 36:23, 37:2, 37:5, 37:6, 37:21, 37:24, 38:13, 38:21, 38:24, 39:2, 39:9, 43:4, 43:16, 43:25, 44:13, 48:20, 50:23, 52:10, 52:19, 55:20, 58:10, 59:13, 60:15, 61:9, 61:11, 61:21, 67:1, 67:10, 68:20, 69:10, 69:19, 69:22, 70:9, 72:2, 73:23, 79:12, 90:2, 90:20, 92:3, 92:21, 95:5, 98:3, 100:20, 101:22, 102:2,

102:5, 102:16, 105:12, 105:15, 105:21, 107:18, 108:13, 109:15, 109:20, 110:3, 110:9, 113:3, 113:19, 119:10, 120:6, 123:22, 126:16, 127:15, 127:16, 128:2, 128:6, 129:6, 130:4, 132:5, 132:23, 133:14, 134:9, 134:10, 134:15, 135:6, 135:11, 135:16, 137:23, 149:15, 151:10, 153:1, 153:5, 153:15, 154:3, 154:7, 154:9, 154:20, 155:9, 155:14, 155:25, 156:7, 156:16, 156:22, 157:3, 157:5, 157:16, 157:22, 158:3, 158:6, 162:7, 163:17, 165:4, 166:17, 168:4, 169:4, 169:15, 170:7, 171:11, 172:3, 172:7, 180:12, 185:17, 185:19, 186:24, 203:7, 203:10, 203:12, 203:21, 204:7, 204:25, 205:3, 205:14, 205:24, 206:6, 206:13, 206:24, 207:20, 208:2, 208:5, 208:7, 208:9, 210:22, 210:24, 212:20, 213:4, 213:15, 213:18, 214:2, 214:4, 214:23

**Honor's** [9] - 22:7, 22:11, 28:15, 29:3, 37:7, 153:5, 156:8, 206:22, 212:21

**Honorable** [1] - 75:20

**HONORABLE** [1] - 1:18

**honored** [1] - 111:5

**hood** [2] - 173:12, 178:2

**hook** [1] - 193:13

**hoops** [1] - 108:1

**hope** [15] - 19:2, 76:13, 100:19,

111:8, 118:23, 119:22, 138:23, 171:12, 175:9, 175:12, 178:11, 179:2, 179:5, 182:23, 192:4

**hoped** [2] - 142:20, 149:23

**hopeful** [1] - 104:1, 183:1

**hopefully** [4] - 115:20, 136:4, 158:8, 212:4

**hopes** [2] - 208:24, 208:25

**hoping** [1] - 84:11

**horrible** [1] - 176:16

**hospital** [1] - 195:11

**hour** [1] - 206:20

**hours** [16] - 5:19, 23:5, 35:6, 40:7, 40:14, 41:20, 49:5, 80:14, 81:25, 169:16, 175:10, 182:7, 193:2, 193:12, 195:11, 208:19

**house** [1] - 136:18

**houseless** [1] - 91:9

**huge** [3] - 115:25, 139:3, 149:19

**Human** [5] - 73:2, 116:11, 117:13, 120:14, 205:18

**human** [1] - 177:5

**humane** [3] - 91:11, 174:4, 177:24

**humanity** [1] - 177:11

**humanized** [1] - 93:16

**humble** [1] - 96:15

**Humiston** [3] - 1:24, 215:12, 215:13

**hundred** [1] - 64:6

**hundreds** [3] - 49:4, 51:22, 179:7

**hung** [1] - 179:2

**hunting** [2] - 168:1, 186:19

**hurdle** [1] - 93:19

**hurry** [1] - 195:17

**hurt** [1] - 177:21

**Hussaini** [2] - 8:3, 171:19

**hypothetical** [1] - 101:5

**hypotheticals** [1] - 137:10

---

# I

**IA** [2] - 46:19, 164:5

**IAB** [1] - 145:17

**idea** [16] - 11:24, 13:13, 20:17, 20:18, 34:22, 51:12, 52:4, 52:6, 52:7, 75:9, 80:11, 149:14, 165:19, 165:24, 192:2

**ideas** [6] - 34:13, 35:13, 130:8, 146:19, 147:13, 169:14

**identification** [1] - 174:17

**identified** [6] - 15:3, 98:22, 112:20, 114:19, 189:13, 192:16

**identify** [2] - 79:9, 124:11, 181:1

**identifying** [1] - 191:2

**ignorance** [2] - 183:11, 183:13

**ignored** [3] - 175:5, 176:5

**ignoring** [2] - 166:2, 174:6

**II** [1] - 205:19

**iii** [3] - 10:18, 10:19, 12:11

**III** [1] - 10:19

**ill** [1] - 173:20

**Illinois** [1] - 82:18

**illness** [8] - 40:22, 71:14, 102:12, 173:17, 192:23, 192:25, 193:17, 193:19

**illnesses** [1] - 197:9

**illustrates** [3] - 115:1, 115:3, 117:6

**image** [1] - 96:8

**imagine** [2] - 22:10, 114:24

**imagined** [1] - 143:14

**imbalance** [2] - 175:4, 189:23

**imitation** [1] - 164:13

**immediately** [1] - 170:25

**impact** [6] - 62:11, 75:10, 93:11, 111:12, 125:11, 133:18

**impacted** [4] - 97:17, 110:20, 134:23, 156:24

**impactful** [1] - 140:21

**impacts** [1] - 93:4

**impediments** [1] - 206:23

**imperfect** [1] - 211:23
**implement** [11] - 27:12, 33:15, 36:19, 37:8, 37:10, 37:11, 38:18, 169:12, 178:7, 178:21, 211:18
**implementation** [17] - 6:2, 6:9, 27:9, 29:7, 29:9, 29:11, 34:20, 73:15, 74:9, 156:11, 156:16, 156:23, 158:8, 166:1, 166:19, 169:20, 185:21
**implemented** [8] - 14:2, 14:3, 14:4, 30:11, 31:13, 164:12, 166:16, 206:21
**implementing** [5] - 4:25, 26:25, 45:18, 145:8, 164:12
**implied** [1] - 73:7
**importance** [5] - 70:21, 70:24, 82:18, 129:11, 133:2
**important** [27] - 11:7, 18:21, 48:13, 50:9, 51:10, 58:25, 66:12, 71:1, 86:4, 87:19, 90:25, 93:10, 101:4, 109:9, 113:16, 134:4, 140:20, 164:15, 167:24, 183:6, 186:17, 188:13, 190:14, 197:12, 197:16, 214:17
**importantly** [3] - 34:2, 35:16, 153:7
**impose** [2] - 46:15, 118:13
**imposed** [1] - 109:6
**imposing** [1] - 90:13
**impossible** [1] - 11:18
**impression** [1] - 23:7
**impressions** [1] - 23:12
**imprisonment** [1] - 173:20
**improve** [2] - 186:23, 190:24
**improvement** [3] - 98:10, 190:18
**improvements** [2] - 190:20, 191:14
**IN** [1] - 1:1
**in-custody** [3] - 23:15, 40:6, 56:11

**in-person** [1] - 171:20
**inability** [1] - 37:18
**inaccessible** [1] - 93:5
**inadequacies** [1] - 190:15
**inadequate** [3] - 133:4, 174:3, 174:6
**inadvertently** [1] - 115:25
**inappropriate** [2] - 38:10, 157:13
**inappropriately** [1] - 79:4
**Inauguration** [2] - 212:23, 213:13
**incarcerated** [3] - 194:5, 194:6, 194:13
**incarceration** [4] - 173:18, 173:24, 174:4, 174:13
**incident** [4] - 123:1, 186:21, 187:5, 199:15
**incidents** [4] - 40:23, 166:14, 166:25, 186:2
**include** [7] - 21:13, 115:9, 132:15, 135:3, 140:18, 191:20, 207:21
**included** [5] - 16:4, 49:12, 165:8, 173:14, 191:2
**includes** [7] - 17:14, 32:6, 184:12, 184:16, 211:7, 211:8, 214:11
**including** [19] - 5:19, 13:22, 17:6, 17:10, 18:4, 35:22, 61:3, 79:6, 82:6, 102:12, 103:20, 111:24, 151:9, 152:17, 169:21, 173:18, 194:19, 204:25, 211:19
**inclusivity** [1] - 178:21
**incorporate** [2] - 18:24, 190:17
**incorporated** [2] - 44:16, 189:4
**incorrect** [1] - 176:9
**incorrectly** [1] - 114:6
**increase** [5] - 62:17, 81:11, 81:13, 182:20, 182:22
**increased** [5] - 45:10, 62:15, 64:14, 64:23, 180:3
**incredible** [2] - 91:10,

130:15
**incredibly** [1] - 108:15
**indeed** [4] - 22:10, 25:10, 38:13, 190:11
**independency** [1] - 175:23
**Independent** [6] - 5:10, 17:3, 17:9, 46:19, 142:18, 164:5
**independent** [21] - 4:13, 5:22, 8:12, 15:1, 15:11, 57:5, 58:8, 59:11, 79:1, 79:2, 79:24, 82:18, 107:7, 107:16, 110:18, 143:9, 147:3, 160:12, 165:17, 211:17, 214:16
**independently** [1] - 142:22
**indicated** [1] - 72:16
**indication** [3] - 64:22, 73:14, 106:23
**indicator** [1] - 37:9
**indigenous** [2] - 172:25, 176:4
**indirect** [1] - 117:1
**indiscernible** [4] - 185:25, 186:1, 186:3, 186:17
**individual** [10] - 31:17, 72:24, 100:2, 103:15, 182:3, 190:17, 190:19, 191:4, 191:13, 207:23
**individual's** [1] - 72:7
**individuals** [6] - 28:20, 71:22, 72:4, 91:15, 153:12, 204:4
**indulge** [1] - 131:19
**infancy** [1] - 178:2
**influence** [9] - 14:9, 62:12, 66:6, 125:2, 129:17, 129:18, 143:12, 175:24
**influenced** [1] - 174:12
**info@ portlandpolicemonitor .com** [2] - 19:10, 19:11
**inform** [3] - 13:12, 118:21, 163:10
**information** [10] - 17:15, 42:19, 45:8, 75:11, 81:2, 85:16, 124:24, 158:19, 205:8, 205:12

**informative** [1] - 17:11
**informed** [3] - 95:6, 167:25, 186:18
**ingrained** [2] - 104:9, 110:14
**inherently** [2] - 114:3, 137:9
**initial** [6] - 23:9, 27:14, 40:7, 40:23, 41:6, 74:4
**initiated** [1] - 38:16
**initiatives** [3] - 9:13, 9:22, 10:10
**initio** [3] - 154:5, 203:16, 204:15
**inject** [1] - 72:9
**injured** [1] - 38:10
**injury** [2] - 40:20, 63:23
**injustice** [2] - 174:18, 175:2
**injustices** [1] - 174:20
**input** [12] - 20:8, 20:12, 20:14, 46:4, 50:16, 66:12, 66:18, 83:23, 156:18, 158:8, 162:22, 189:6
**inputs** [1] - 126:15
**inquiries** [1] - 27:7
**insights** [1] - 6:8
**insistent** [1] - 199:23
**inspect** [1] - 99:15
**Inspector** [1] - 16:5
**instance** [5] - 44:5, 164:17, 165:19, 167:2, 186:4
**instances** [1] - 50:18
**instead** [9] - 71:10, 113:7, 119:21, 173:24, 176:14, 177:25, 178:1, 178:4, 212:10
**institutional** [1] - 170:11
**institutionalization** [1] - 139:7
**institutionalized** [1] - 173:21
**institutions** [1] - 174:8
**instruction** [1] - 70:13
**instructor** [1] - 81:17
**insufficient** [1] - 187:4
**insulted** [1] - 121:25, 122:1
**integrity** [1] - 83:18
**intellectually** [1] - 161:23
**intended** [3] - 145:8, 168:19, 187:20
**intent** [4] - 66:4,

168:14, 174:23, 187:14
**intentions** [1] - 54:24
**interact** [5] - 10:4, 54:17, 121:6, 124:23, 181:19
**interacting** [1] - 182:2
**interaction** [1] - 29:16
**interactions** [9] - 71:6, 71:7, 99:11, 129:2, 134:24, 135:3, 191:13, 194:19
**interest** [7] - 48:24, 60:22, 64:15, 107:3, 143:3, 154:16, 165:24
**interested** [10] - 14:23, 35:11, 42:12, 45:2, 157:7, 195:24, 195:25, 196:1, 196:2, 196:3
**interesting** [1] - 6:23
**interests** [4] - 27:25, 142:9, 189:24, 191:16
**Interfaith** [1] - 17:9
**interfere** [5] - 26:16, 165:17, 168:16, 187:16, 211:13
**interfering** [1] - 209:16
**intergenerational** [1] - 172:20
**interim** [1] - 43:12
**Internal** [7] - 16:10, 23:4, 47:16, 47:18, 145:18, 164:3, 189:10
**internal** [1] - 35:20
**internally** [1] - 21:9
**interpretation** [3] - 167:10, 167:24, 186:14
**interpretations** [1] - 136:25
**interpreting** [1] - 26:2
**interrupt** [3] - 25:11, 77:14, 85:15
**interrupting** [1] - 79:11
**interruption** [3] - 184:19, 184:22, 184:23
**intervened** [1] - 177:17
**Intervenor** [1] - 3:21
**intervenor** [3] - 27:19, 100:4, 214:11
**intervention** [1] - 11:5
**Intervention** [1] -

81:12
**interview** [5] - 23:4,
40:7, 40:14, 92:17,
94:16
**interviewed** [1] - 40:6
**interviews** [1] - 19:16
**intimidate** [1] - 103:19
**intimidating** [1] - 56:1
**intrinsically** [1] -
140:4
**introduce** [4] - 3:18,
4:14, 15:18, 15:21
**introduction** [1] -
15:21
**investigate** [8] -
117:25, 142:22,
147:8, 167:11,
167:16, 167:19,
167:21, 189:16
**investigated** [2] -
145:18, 189:18
**investigating** [5] -
47:19, 57:20,
166:11, 168:1,
186:19
**investigation** [7] -
38:15, 47:7, 47:8,
73:3, 73:4, 118:2,
118:5
**investigations** [17] -
34:19, 35:20, 38:19,
47:19, 47:20, 47:22,
117:18, 142:23,
153:9, 168:6, 187:1,
190:8, 206:25,
207:1, 207:2, 207:5,
207:7
**investigative** [1] -
190:8
**investigator** [3] -
40:11, 40:17, 118:10
**investigators** [1] -
166:13
**invite** [13] - 3:8, 3:13,
3:21, 4:1, 4:8, 4:13,
69:20, 73:21, 92:1,
141:17, 171:19,
180:18, 203:1
**invited** [1] - 54:5
**invites** [2] - 71:11,
71:17
**inviting** [1] - 184:6
**invoked** [1] - 89:19
**involve** [1] - 50:14
**involved** [14] - 18:2,
40:11, 57:16, 90:18,
127:5, 143:15,
158:2, 167:23,
170:5, 182:10,
191:8, 200:3,

206:25, 207:2
**involvement** [3] -
63:4, 66:8, 117:18
**involving** [1] - 191:7
**IPR** [5] - 33:25,
142:17, 142:21,
167:24, 186:18
**issue** [33] - 28:16,
29:7, 29:12, 30:12,
35:21, 58:5, 74:7,
76:18, 77:2, 77:18,
80:22, 80:23, 82:2,
90:5, 93:13, 94:7,
99:3, 102:17,
105:14, 106:16,
111:11, 112:23,
127:2, 134:4, 139:8,
140:1, 157:15,
170:17, 179:9,
203:19, 208:10,
208:21
**issues** [37] - 5:14,
14:13, 15:3, 15:13,
22:4, 54:15, 56:14,
70:5, 70:8, 77:23,
82:9, 102:16,
105:11, 108:7,
110:24, 132:23,
133:15, 134:2,
134:7, 137:5,
137:22, 155:3,
156:19, 158:4,
159:16, 179:11,
179:14, 179:17,
187:24, 190:22,
191:2, 191:4,
208:14, 210:10
**it'll** [3] - 9:16, 55:9,
61:23
**item** [1] - 165:9
**items** [1] - 165:10
**iteration** [1] - 50:20
**iterations** [1] - 129:14
**iterative** [1] - 24:3
**itself** [3] - 70:23,
176:14, 203:23
**It's** [1] - 167:12

# J

**J-hook** [1] - 193:13
**Jackson** [2] - 2:9,
67:14
**jail** [1] - 195:10
**James** [4] - 67:10,
196:7, 196:8, 199:19
**January** [20] - 148:8,
163:13, 170:13,
211:17, 211:22,
212:5, 212:11,

212:13, 212:16,
212:17, 213:7,
213:8, 213:12,
213:14, 213:16,
214:8
**Jared** [2] - 2:2, 3:12
**Je** [2] - 8:1, 127:22
**Jefferson** [1] - 86:24
**Jenna** [1] - 7:14
**Jimmy** [2] - 199:20,
200:24
**Jo** [1] - 8:6
**Jo-Ann** [1] - 8:6
**job** [13] - 16:12, 49:25,
59:2, 62:20, 70:6,
70:7, 73:17, 85:6,
92:17, 97:2, 104:12,
132:4
**jobs** [2] - 99:5, 214:19
**join** [2] - 72:13, 90:17
**joined** [2] - 92:24,
124:4
**joining** [2] - 21:18,
117:10
**joint** [12] - 5:3, 5:5,
6:15, 6:17, 10:12,
14:15, 14:16, 14:22,
36:10, 155:5,
155:19, 203:4
**Joint** [3] - 211:1,
211:15, 211:16
**jointly** [4] - 5:8, 9:3,
9:5, 119:19
**Jonas** [2] - 2:5, 3:10
**Jonathan** [1] - 66:23
**Jordan** [5] - 180:25,
181:2, 181:5,
183:21, 185:4
**JORDAN** [4] - 181:3,
183:12, 184:5, 185:1
**Jorge** [1] - 110:4
**journey** [1] - 174:15
**Juan** [3] - 2:19, 4:10,
98:3
**JUDGE** [1] - 1:19
**Judge** [22] - 75:20,
80:20, 83:16, 89:9,
89:25, 93:20, 97:11,
142:3, 142:10,
144:2, 146:18,
148:17, 158:13,
161:20, 162:5,
163:20, 163:21,
181:12, 182:13,
198:15, 200:18,
209:16
**judge** [13] - 53:3, 53:4,
60:7, 83:17, 90:21,
104:3, 111:8, 125:7,
126:1, 141:9,

174:25, 198:17,
205:7
**judged** [2] - 114:2,
117:5
**judges** [3] - 32:14,
32:16, 88:2
**judging** [1] - 123:8
**judgment** [8] - 38:14,
38:15, 78:12, 79:2,
82:12, 140:6, 156:8,
165:17
**Judicial** [1] - 32:15
**judicial** [1] - 79:14
**judiciary** [1] - 205:3
**judiciary's** [1] - 205:7
**July** [6] - 42:16, 42:17,
44:7, 132:10,
168:11, 187:10
**jump** [1] - 108:2
**June** [2] - 39:22, 42:16
**juries** [2] - 77:22,
169:4
**jurisdiction** [13] -
29:12, 29:13, 29:17,
29:22, 30:1, 164:4,
166:6, 166:17,
167:10, 185:19,
186:14, 189:11,
190:13
**jurisdictions** [3] -
41:13, 52:8, 189:5
**juror** [4] - 78:5, 78:8,
78:13, 78:14
**jurors** [1] - 78:5
**jury** [12] - 77:22, 78:2,
78:3, 106:17,
106:19, 122:25,
144:5, 144:6, 144:8,
144:10, 144:12,
174:25
**justice** [17] - 96:2,
96:5, 97:15, 102:9,
139:18, 140:16,
153:7, 173:6,
176:25, 178:22,
179:23, 180:4,
187:3, 196:6, 196:8,
207:16
**Justice** [11] - 2:5,
2:19, 4:2, 6:21,
73:22, 75:25, 76:5,
83:21, 112:13,
153:15, 175:8
**justification** [1] -
174:25
**justified** [2] - 207:12,
207:14

# K

**K.C** [3] - 98:4, 101:23,
102:2
**KARIA** [9] - 3:23,
69:22, 69:25, 72:15,
73:12, 73:14, 73:19,
210:7, 214:6
**karia** [2] - 210:6, 214:5
**Karia** [3] - 2:13, 3:23,
73:20
**Katherine** [1] - 7:13
**Katz** [1] - 142:17
**keep** [13] - 26:3, 42:7,
66:5, 89:10, 89:11,
97:2, 103:23,
172:25, 179:21,
180:3, 182:25,
189:16
**keeping** [4] - 6:10,
152:17, 179:18,
198:20
**Keizer** [1] - 87:11
**Kellie** [4] - 1:24,
94:20, 215:12,
215:13
**Kellie_Humiston@
ord.uscourts.gov** [1]
- 1:25
**Kendra** [1] - 199:19
**key** [3] - 48:2, 129:7,
197:7
**kill** [1] - 200:8
**killed** [1] - 199:19
**killing** [3] - 173:19,
177:6, 180:2
**kind** [15] - 39:21,
43:21, 45:10, 45:22,
85:6, 87:6, 99:14,
121:3, 176:8,
192:19, 193:14,
197:1, 199:12,
200:21, 202:4
**King** [4] - 66:23,
67:16, 67:20, 68:6
**King's** [2] - 67:3,
67:18
**kinks** [1] - 39:19
**Knight** [1] - 96:10
**Knights** [1] - 96:10
**Knobloch** [1] - 7:14
**knowing** [3] - 42:19,
107:7, 152:21
**knowingly** [1] -
179:18
**knowledge** [3] -
10:24, 11:8, 16:20
**knowledgeable** [1] -
205:9
**known** [3] - 96:10,

110:10, 206:16
**knows** [3] - 110:24,
137:16, 197:15
**KNUTSEN** [13] -
83:12, 83:16, 85:20,
85:23, 87:3, 87:5,
87:21, 87:23, 88:3,
88:16, 89:25, 90:21,
91:22
**Knutsen** [7] - 74:2,
83:10, 85:17, 88:15,
89:14, 146:24,
201:17
**Kolderup** [2] - 6:25,
7:3

## L

**L-E-D-E-L-L** [1] -
102:3
**label** [1] - 113:25
**Labor** [1] - 2:13
**lack** [2] - 117:19,
118:19
**lacking** [1] - 172:13
**lagging** [1] - 37:9
**laid** [3] - 15:13, 28:10,
178:15
**land** [3] - 67:22, 85:4,
172:19
**landed** [1] - 50:8
**language** [40] - 32:5,
32:8, 32:10, 32:15,
32:17, 44:2, 45:19,
56:23, 60:18, 60:20,
98:22, 99:23,
112:16, 112:18,
112:19, 112:22,
113:24, 115:23,
120:7, 132:9,
132:10, 132:13,
134:20, 136:25,
137:1, 137:5, 137:7,
137:9, 163:25,
170:18, 171:1,
171:6, 201:22,
201:23, 209:5,
209:11
**LAP** [1] - 16:9
**LAPD** [1] - 16:17
**large** [1] - 24:19
**larger** [3] - 105:14,
191:7, 191:13
**Larry** [2] - 167:25,
186:18
**last** [34] - 15:18,
19:18, 27:23, 39:20,
41:18, 57:1, 62:18,
63:11, 63:23, 91:1,
101:1, 102:1,

108:20, 109:22,
110:23, 131:21,
135:21, 135:24,
142:4, 146:14,
147:10, 161:2,
161:20, 170:16,
171:9, 184:8,
192:11, 193:12,
196:10, 206:16,
208:3, 208:8
**lastly** [3] - 19:14,
46:25, 206:13
**late** [1] - 7:19
**lateral** [1] - 64:22
**latest** [1] - 40:1
**Latino** [2] - 136:9,
139:24
**LaVine** [1] - 7:9
**Law** [1] - 190:21
**law** [17] - 9:4, 30:5,
46:10, 65:11, 82:22,
83:1, 83:3, 113:11,
140:23, 169:8,
171:3, 173:25,
175:22, 175:24,
181:19, 181:25,
183:17
**laws** [2] - 165:21,
174:10
**lawsuit** [6] - 145:19,
169:1, 169:2,
170:23, 170:25
**lawsuits** [2] - 116:2,
190:1
**lawyering** [1] - 136:24
**lawyers** [1] - 84:24
**lay** [1] - 18:20
**lays** [1] - 100:19
**lead** [9] - 4:17, 46:2,
46:17, 70:22, 114:4,
138:5, 176:8,
176:10, 189:23
**lead-in** [3] - 46:2,
46:17, 70:22
**leadership** [2] - 91:4,
111:7
**leads** [2] - 137:9,
137:14
**League** [4] - 7:10,
188:19, 188:22,
189:8
**lean** [1] - 124:1
**leaning** [1] - 69:25
**leap** [1] - 37:11
**learn** [16] - 63:14,
71:14, 71:15, 86:19,
91:13, 96:18, 121:2,
123:6, 124:17,
125:16, 132:11,
132:12, 134:22,

149:25, 154:14,
189:15
**learned** [8] - 57:19,
99:7, 115:15, 123:3,
190:18, 191:12,
193:2, 193:3
**learning** [5] - 54:11,
54:21, 62:6, 154:13,
200:3
**learns** [1] - 100:4
**least** [19] - 20:10,
21:2, 50:16, 57:25,
58:8, 60:2, 70:21,
73:2, 73:5, 108:10,
136:12, 136:20,
149:2, 176:22,
177:2, 177:7,
179:13, 184:11,
210:11
**Leave** [1] - 201:22
**leave** [18] - 29:20,
67:13, 87:11, 92:4,
92:7, 92:10, 94:5,
95:7, 134:17, 135:8,
135:15, 169:11,
180:21, 184:2,
184:4, 184:20,
185:2, 185:8
**leaving** [2] - 21:1,
99:23
**led** [6] - 47:15, 54:19,
66:24, 76:1, 76:3,
164:22
**LeDell** [6] - 98:5,
101:24, 102:2,
102:4, 109:13, 119:4
**LEDELL** [10] - 102:2,
102:5, 103:2, 104:8,
104:21, 104:23,
105:12, 106:1,
107:18, 108:13
**left** [5] - 15:25, 93:1,
143:7, 186:25,
195:24
**legal** [13] - 9:1, 9:2,
10:5, 76:20, 76:21,
76:25, 77:1, 77:3,
77:19, 79:13, 79:19,
139:10, 191:1
**legally** [1] - 111:2
**legislation** [1] -
140:21
**legitimacy** [1] - 65:14
**legitimate** [1] - 31:7
**lengthy** [1] - 190:9
**lens** [1] - 71:13
**LeRoy** [1] - 75:24
**less** [3] - 137:8,
137:10, 204:9
**lesson** [1] - 115:15

**lessons** [1] - 99:7
**lethal** [3] - 22:25,
23:14, 63:17
**letter** [3] - 22:20,
189:14, 191:25
**letting** [2] - 152:20,
155:1
**level** [5] - 23:14, 44:4,
46:15, 65:13, 166:11
**Level** [2] - 22:24,
23:13
**Levels** [1] - 23:8
**levels** [2] - 22:23,
22:24
**Levy** [1] - 136:10
**LGBTQ** [1] - 85:11
**liability** [2] - 115:25,
191:1
**lie** [1] - 15:4
**life** [19] - 80:5, 80:6,
87:16, 93:16, 94:3,
102:12, 103:4,
122:23, 126:24,
138:13, 143:22,
169:17, 174:5,
175:2, 178:2, 180:6,
195:1, 195:3, 202:6
**Life** [1] - 66:23
**lifetime** [1] - 6:5
**light** [4] - 26:4,
145:24, 167:7,
186:10
**likelihood** [3] -
211:10, 211:14,
211:24
**likely** [5] - 6:2, 31:2,
130:21, 164:1,
165:21
**likewise** [1] - 23:8
**limited** [5] - 5:24,
13:22, 41:12, 74:8,
165:20
**limiting** [1] - 138:8
**limits** [1] - 112:18
**line** [5] - 3:12, 3:16,
70:17, 150:22,
206:21
**lines** [2] - 75:14, 93:14
**linguistic** [1] - 136:24
**link** [1] - 65:25
**Lisa** [3] - 2:9, 3:19,
115:6
**list** [5] - 71:2, 127:17,
127:20, 180:23,
188:5
**listed** [3] - 37:17,
165:10
**listen** [3] - 83:23,
164:24, 177:4
**listening** [8] - 26:11,

26:13, 67:20, 68:9,
75:18, 78:13,
180:12, 200:11
**listing** [1] - 16:25
**literally** [1] - 200:19
**litigation** [2] - 38:12,
38:14
**live** [8] - 95:24,
124:12, 149:2,
159:20, 160:15,
184:10, 184:12,
184:14
**lived** [14] - 85:2,
102:12, 106:10,
106:11, 107:22,
107:13, 172:24,
173:2, 173:11,
174:12, 174:23,
175:18, 176:4, 178:2
**Lives** [1] - 107:10
**lives** [9] - 63:21,
106:23, 145:1,
175:18, 177:14,
179:16, 179:22,
180:6, 188:23
**living** [1] - 24:2
**LLC** [2] - 2:17, 17:3
**lo** [1] - 145:20
**logical** [1] - 99:14
**long-term** [2] - 86:5,
190:24
**look** [33] - 5:21, 9:5,
39:1, 54:23, 61:20,
63:14, 65:7, 70:15,
70:18, 71:1, 83:10,
88:24, 89:4, 89:11,
95:3, 102:23,
109:18, 118:24,
133:6, 141:18,
159:4, 159:18,
160:10, 162:25,
170:11, 176:22,
193:8, 200:21,
205:24, 206:14,
207:20, 208:11,
213:5
**looked** [4] - 144:11,
145:16, 149:23,
177:22
**looking** [17] - 14:13,
14:25, 42:5, 42:6,
43:16, 59:9, 64:19,
108:4, 126:2,
131:13, 132:25,
133:16, 133:21,
151:13, 160:10,
179:10, 205:17
**looks** [7] - 65:12, 78:6,
123:16, 145:13,
159:24, 160:3, 160:8

**loop** [1] - 129:13
**loophole** [1] - 175:22
**loopholes** [1] - 169:25
**Lord** [1] - 96:11
**Los** [3] - 16:2, 16:6, 16:18
**lose** [5] - 38:5, 131:22, 151:11, 151:12, 187:2
**loss** [1] - 63:21
**lost** [1] - 64:3
**loud** [1] - 19:9
**love** [6] - 66:22, 72:3, 95:23, 155:11, 180:10, 180:16
**loved** [1] - 173:18
**Lovell** [1] - 17:18
**loves** [1] - 93:7
**lower** [1] - 166:11
**luck** [2] - 92:20, 94:16
**ludicrous** [1] - 160:1
**lunch** [1] - 198:21

## M

**ma'am** [1] - 196:21
**mace** [1] - 104:5
**mad** [1] - 177:18
**mail** [2] - 19:7, 144:7
**main** [3] - 18:14, 166:9, 173:4
**maintain** [7] - 10:24, 16:19, 19:5, 43:18, 46:18, 46:19, 47:4
**maintains** [2] - 47:15, 47:21
**major** [2] - 76:14, 81:16
**majority** [2] - 53:18, 138:1
**makers** [5] - 48:12, 49:11, 49:18, 50:10, 79:6
**makeup** [5] - 56:8, 116:3, 130:12, 167:2, 186:4
**male** [1] - 81:13
**man** [2] - 176:20, 182:21
**manage** [1] - 54:25
**management** [3] - 5:20, 6:6, 41:25
**manager** [2] - 6:3, 43:12
**managers** [1] - 58:19
**mandated** [1] - 164:18
**mandates** [1] - 175:9
**mandatory** [8] - 80:23, 101:2, 101:12, 159:13, 159:15,

159:18
**manipulation** [1] - 175:17
**manual** [1] - 97:1
**manufactured** [1] - 97:13
**marathon** [2] - 84:14, 214:20
**march** [1] - 67:17
**March** [1] - 212:18
**margin** [1] - 143:9
**marginalized** [1] - 172:19
**Marine** [1] - 196:10
**mark** [3] - 4:16, 201:9
**Mark** [2] - 199:6, 199:7
**Marx** [1] - 96:12
**Mary** [4] - 184:6, 185:16, 202:25, 213:22
**mary** [1] - 25:15
**Massey** [1] - 82:17
**master's** [1] - 16:14
**match** [1] - 85:12
**materials** [2] - 18:8, 96:23
**matrix** [1] - 193:9
**Matt** [2] - 8:2, 128:1
**matter** [10] - 7:17, 74:4, 97:17, 106:23, 120:8, 137:6, 179:16, 179:22, 204:2, 204:10
**Matter'** [1] - 107:11
**matters** [2] - 14:14, 15:15
**Matthew** [1] - 7:8
**mature** [1] - 141:11
**Max** [1] - 196:12
**maximize** [3] - 211:14, 212:6, 212:7
**maximizes** [2] - 211:10, 211:24
**maximum** [1] - 165:22
**mayor** [21] - 9:10, 9:17, 43:11, 118:1, 118:14, 120:3, 150:2, 150:23, 151:8, 151:17, 151:21, 151:23, 152:2, 152:22, 163:4, 167:16, 167:18, 167:23, 170:14
**Mayor** [3] - 84:15, 84:25, 142:17
**mayor's** [1] - 167:15
**McDowell** [1] - 7:13
**mean** [11] - 9:4, 59:13, 102:20, 106:21,

146:24, 150:14, 157:14, 158:20, 161:15, 193:3, 197:21
**meaningful** [1] - 123:6
**means** [5] - 7:21, 59:6, 114:3, 189:12, 215:5
**meant** [2] - 93:8, 151:21
**Measure** [6] - 8:22, 175:9, 178:8, 179:3, 188:22, 191:22
**measure** [6] - 84:4, 88:8, 128:10, 145:10, 167:14
**measures** [1] - 111:12
**mechanics** [1] - 108:22
**mechanism** [1] - 210:14
**mechanisms** [2] - 24:5, 60:5
**mediation** [1] - 23:19
**medical** [2] - 93:24, 94:6
**meet** [12] - 13:2, 49:18, 54:24, 86:11, 93:24, 104:5, 105:5, 130:16, 164:16, 175:12, 183:24, 208:1
**meeting** [19] - 15:23, 17:17, 19:19, 20:11, 45:12, 49:10, 49:12, 49:19, 84:15, 86:10, 114:20, 135:4, 158:25, 164:23, 165:1, 165:3, 168:11, 182:7, 187:10
**meetings** [13] - 16:23, 17:1, 18:10, 18:12, 45:13, 112:12, 114:8, 132:1, 158:22, 158:23, 171:10, 175:10, 193:11
**member** [62] - 7:13, 10:20, 10:21, 11:2, 11:8, 12:13, 13:21, 15:20, 16:7, 31:17, 41:9, 41:11, 49:21, 49:22, 52:3, 53:12, 53:13, 56:9, 56:15, 56:18, 57:17, 57:18, 66:6, 92:23, 95:6, 102:7, 103:11, 106:6, 109:21, 109:25, 111:23, 114:19, 116:9,

119:12, 119:14, 119:20, 119:25, 120:2, 120:21, 121:6, 121:7, 128:7, 134:21, 142:24, 143:1, 150:1, 151:23, 154:15, 160:23, 161:13, 164:21, 169:18, 172:12, 172:16, 173:6, 181:5, 190:12
**members** [128] - 6:7, 6:8, 7:5, 9:18, 11:12, 12:23, 17:8, 17:21, 17:23, 18:13, 19:17, 30:4, 30:20, 30:24, 30:25, 32:11, 35:7, 36:2, 36:5, 39:10, 40:4, 42:23, 44:21, 45:12, 48:9, 48:22, 48:25, 49:4, 49:10, 49:25, 50:3, 51:15, 52:24, 54:16, 56:9, 56:12, 56:17, 56:19, 56:21, 57:10, 58:12, 60:16, 62:25, 64:5, 64:7, 66:13, 68:14, 72:21, 75:4, 82:11, 84:16, 85:11, 93:15, 99:3, 106:6, 106:7, 106:9, 108:3, 110:6, 111:14, 111:16, 112:2, 112:3, 112:7, 112:9, 112:14, 114:5, 114:7, 114:23, 115:4, 116:10, 116:20, 117:16, 118:24, 119:8, 119:19, 119:23, 120:1, 120:9, 120:10, 120:11, 129:1, 129:22, 131:7, 131:25, 132:2, 143:10, 143:12, 143:18, 144:15, 144:20, 145:2, 145:14, 151:8, 151:16, 151:17, 152:16, 154:12, 157:20, 162:24, 163:1, 164:10, 165:7, 165:20, 166:24, 167:20, 168:5, 168:25, 175:22, 177:13, 177:23, 182:14, 184:10, 184:13, 184:21, 186:1, 186:3, 186:25, 189:15, 189:22,

190:5, 190:7, 205:18, 208:11, 208:20, 209:22
**membership** [8] - 48:19, 63:9, 65:12, 107:4, 111:11, 111:20, 117:14, 184:16
**meme** [1] - 96:25
**memorable** [1] - 193:15
**memorandum** [1] - 6:16
**memories** [1] - 12:17
**memory** [2] - 41:4, 91:3
**Memphis** [2] - 67:14, 67:15
**men** [1] - 85:11
**Mental** [17] - 4:8, 4:11, 6:22, 8:15, 14:20, 18:12, 75:23, 83:21, 91:23, 92:1, 95:3, 98:4, 102:6, 105:14, 135:1, 154:4, 203:15
**mental** [18] - 18:5, 40:22, 71:14, 82:8, 90:14, 102:12, 106:11, 138:25, 139:2, 153:13, 173:16, 177:16, 177:19, 192:23, 192:25, 193:17, 193:19, 197:8
**mentally** [1] - 173:20
**mention** [6] - 15:17, 15:19, 16:1, 16:15, 18:15, 112:18
**mentioned** [12] - 13:15, 19:17, 33:19, 34:7, 63:6, 71:3, 80:24, 138:22, 181:10, 181:12, 182:4, 182:16
**mentioning** [1] - 133:21
**mentions** [1] - 70:23
**mentor** [1] - 173:8
**mentoring** [1] - 81:20
**Meredith** [1] - 67:10
**merely** [4] - 29:8, 34:21, 37:23, 204:8
**merited** [1] - 72:17
**merits** [1] - 28:7
**message** [4] - 50:24, 179:15, 179:16, 184:6
**messaged** [1] - 57:6
**met** [7] - 21:4, 22:18, 23:23, 42:18, 120:9,

130:2, 175:14
**method** [1] - 205:22
**methodology** [2] - 205:19, 207:25
**methods** [2] - 191:2, 205:17
**MHA** [9] - 2:19, 75:4, 75:13, 90:13, 94:24, 98:25, 131:25, 157:20, 157:24
**MHA's** [1] - 92:5
**mic** [1] - 25:13
**MICHAEL** [1] - 1:18
**Michael** [2] - 75:20, 163:21
**MICHELLE** [4] - 172:1, 172:3, 172:6, 172:9
**Michelle** [4] - 8:5, 171:24, 172:15, 180:14
**MICHELLE-WESTLEY** [4] - 172:1, 172:3, 172:6, 172:9
**Michelle-Westley** [4] - 8:5, 171:24, 172:15, 180:14
**micromanage** [1] - 157:11
**microphone** [9] - 25:24, 26:14, 39:5, 55:2, 75:17, 83:14, 95:14, 95:15, 172:5
**microphones** [3] - 26:1, 26:12, 26:19
**mics** [1] - 25:16
**mid** [1] - 8:9
**mid-morning** [1] - 8:9
**middle** [1] - 145:13
**might** [49] - 11:16, 12:25, 52:8, 53:9, 54:2, 55:22, 59:19, 66:4, 66:16, 75:3, 80:15, 81:2, 81:3, 102:25, 104:2, 104:6, 104:9, 113:23, 114:2, 122:18, 126:3, 126:23, 127:7, 130:1, 130:2, 130:9, 130:10, 130:12, 130:19, 130:23, 131:2, 131:14, 156:1, 162:7, 182:5, 182:11, 182:16, 182:17, 182:20, 183:2, 192:1, 197:12, 197:17, 197:18, 200:6, 204:18, 211:25,

213:2
**migraines** [1] - 93:18
**military** [1] - 88:17
**million** [1] - 166:12
**mind** [10] - 70:10, 129:21, 138:2, 138:3, 138:15, 153:3, 154:7, 172:25, 193:5, 204:7
**mind-set** [4] - 138:2, 138:3, 138:15, 204:7
**mindedness** [1] - 178:5
**mindset** [1] - 138:19
**mine** [3] - 63:2, 88:4, 175:19
**minimis''** [1] - 166:4
**minimum** [1] - 190:5
**Ministerial** [8] - 4:2, 6:20, 8:14, 14:20, 17:8, 73:21, 197:10, 199:2
**minor** [3] - 48:5, 124:5, 136:14
**minorities** [1] - 82:6
**minutes** [4] - 92:17, 92:20, 94:19, 94:25
**miracle** [1] - 147:12
**Miran** [1] - 115:7
**misconduct** [15] - 32:13, 116:24, 117:24, 118:10, 143:24, 167:22, 168:6, 168:22, 187:1, 187:22, 189:12, 190:4, 190:19, 190:25, 191:15
**misconstrued** [1] - 89:3
**mispronouncing** [1] - 127:21
**miss** [1] - 110:5
**missed** [5] - 20:13, 66:9, 164:16, 192:12, 201:1
**missing** [1] - 65:25
**mission** [1] - 118:16
**Mississippi** [1] - 67:12
**misuse** [1] - 164:2
**mix** [2] - 124:12, 176:11
**mixed** [1] - 173:13
**mobility** [1] - 137:22
**model** [4] - 54:10, 54:11, 86:15, 214:15
**models** [1] - 81:20
**modification** [2] - 76:12, 76:17
**modifications** [2] -

36:9, 128:9
**moment** [11] - 76:11, 87:13, 108:16, 108:18, 108:19, 134:19, 139:15, 185:6, 185:8, 193:14, 212:20
**moments** [3] - 5:12, 28:12, 128:13
**Monday** [1] - 212:13
**money** [2] - 130:16, 169:2
**monitor** [53] - 4:13, 4:17, 5:22, 8:12, 8:24, 15:1, 15:11, 23:23, 24:4, 24:9, 31:19, 33:21, 34:20, 36:3, 36:6, 36:7, 36:8, 36:17, 36:18, 36:20, 36:21, 36:24, 36:25, 39:10, 42:13, 42:17, 42:18, 46:25, 58:8, 59:11, 59:14, 73:15, 74:6, 74:7, 74:11, 74:20, 76:11, 79:1, 107:7, 107:16, 160:13, 165:13, 165:19, 165:25, 168:15, 170:5, 187:15, 206:11, 211:17, 214:16
**Monitor** [3] - 4:18, 15:9, 17:3
**monitor's** [4] - 23:22, 73:17, 74:20, 170:9
**monitoring** [15] - 4:17, 18:16, 19:2, 19:7, 20:7, 23:24, 24:2, 36:13, 36:16, 36:19, 36:25, 42:14, 74:12, 107:7
**monitors** [2] - 42:9, 42:21
**monitorship** [3] - 16:20, 18:20, 19:25
**monopoly** [1] - 196:15
**month** [4] - 61:23, 64:4, 64:19, 66:21
**months** [21] - 15:12, 16:23, 19:23, 27:11, 44:22, 44:23, 44:25, 45:2, 45:10, 110:7, 148:12, 148:14, 151:4, 153:14, 168:9, 171:9, 184:11, 187:8, 193:10, 196:4, 208:18
**Moreover** [1] - 166:9
**morning** [41] - 3:4,

3:5, 3:10, 3:13, 3:15, 3:20, 3:23, 3:25, 4:4, 4:7, 4:10, 4:12, 4:16, 4:23, 8:9, 15:6, 15:7, 15:25, 39:2, 39:9, 52:19, 52:20, 55:3, 61:19, 61:21, 70:10, 73:11, 92:14, 92:21, 95:2, 95:5, 98:3, 101:2, 108:8, 110:3, 128:8, 128:17, 128:20, 130:5, 132:25, 159:7
**most** [22] - 14:24, 34:2, 41:12, 56:9, 78:10, 91:11, 97:17, 110:24, 112:12, 118:5, 126:24, 128:13, 133:3, 146:17, 153:6, 159:10, 163:3, 177:13, 177:23, 180:1, 190:4, 193:15
**mother** [3] - 82:17, 82:21, 173:19
**mother's** [1] - 173:11
**Motion** [3] - 211:1, 211:15, 211:16
**motion** [19] - 5:3, 5:6, 6:15, 6:17, 6:19, 10:12, 14:15, 14:16, 14:22, 22:2, 32:2, 36:10, 61:5, 79:5, 155:5, 155:19, 203:5, 203:22, 212:1
**mouth** [1] - 26:20
**move** [15] - 31:24, 41:21, 57:25, 60:4, 65:4, 69:8, 75:17, 93:4, 100:1, 113:23, 116:3, 139:13, 151:3, 209:8, 213:25
**moved** [2] - 41:22, 128:11
**movement** [5] - 67:20, 67:25, 76:10, 162:23, 207:17
**moving** [8] - 26:20, 39:18, 42:8, 42:12, 91:20, 149:17, 154:18, 157:7
**MR** [150] - 3:5, 3:10, 3:23, 4:10, 4:16, 15:6, 21:8, 21:17, 21:20, 21:22, 22:1, 22:10, 22:13, 22:16, 23:14, 23:17, 23:22, 25:1, 25:6, 25:10, 25:14, 25:23, 26:5, 26:9, 26:23, 29:1,

30:2, 30:17, 31:14, 32:4, 34:15, 34:25, 35:4, 35:10, 35:15, 35:25, 36:2, 36:11, 36:13, 37:21, 38:13, 38:21, 38:24, 59:21, 69:22, 69:25, 72:15, 73:12, 73:14, 73:19, 83:12, 83:16, 85:20, 85:23, 87:3, 87:5, 87:21, 87:23, 88:3, 88:16, 89:25, 90:21, 91:22, 92:3, 92:9, 92:11, 95:5, 95:9, 98:3, 100:16, 101:22, 102:2, 102:5, 103:2, 104:8, 104:21, 104:23, 105:12, 106:1, 107:18, 108:13, 109:15, 110:3, 113:19, 123:22, 123:24, 124:3, 126:16, 127:12, 127:15, 128:2, 128:6, 131:23, 132:5, 132:22, 133:9, 133:13, 134:8, 135:10, 135:23, 136:1, 141:15, 152:25, 153:3, 153:5, 155:23, 156:7, 156:14, 156:22, 157:16, 157:19, 158:3, 158:6, 163:17, 163:20, 192:18, 194:1, 194:4, 194:7, 194:9, 194:11, 194:21, 194:23, 196:23, 198:4, 198:8, 198:11, 198:15, 198:17, 198:22, 202:20, 203:7, 203:10, 203:12, 206:3, 207:7, 207:10, 208:5, 210:7, 210:9, 210:16, 210:19, 210:22, 212:20, 212:23, 213:1, 213:14, 214:2, 214:6, 214:23
**MS** [143] - 3:15, 3:19, 4:4, 25:11, 25:20, 25:21, 39:2, 39:6, 43:7, 43:10, 43:15, 46:2, 46:24, 48:3, 48:20, 50:15, 50:23, 51:2, 52:10, 52:13,

52:17, 55:8, 55:11,
55:20, 56:3, 57:3,
57:9, 58:10, 58:16,
59:3, 59:6, 59:13,
60:7, 60:24, 61:9,
61:11, 61:14, 61:18,
69:19, 73:23, 74:1,
74:4, 74:17, 75:1,
85:19, 85:22, 90:2,
90:4, 90:9, 90:20,
92:14, 92:16, 92:21,
94:17, 95:12, 95:17,
95:19, 109:20,
109:23, 109:25,
113:22, 115:14,
115:22, 119:10,
119:14, 119:18,
120:4, 120:6,
120:18, 120:21,
121:15, 121:18,
121:22, 122:4,
122:10, 122:14,
123:13, 123:15,
123:20, 127:16,
132:8, 132:18,
134:15, 134:20,
135:6, 135:11,
135:16, 135:20,
142:3, 142:15,
144:2, 148:1,
148:15, 148:17,
149:1, 149:15,
150:6, 151:10,
151:12, 151:20,
152:1, 152:4, 154:9,
155:9, 157:3,
158:12, 159:6,
160:15, 160:20,
160:24, 161:2,
161:7, 161:10,
162:5, 162:7, 162:9,
162:25, 163:13,
172:1, 172:3, 172:6,
172:9, 180:20,
181:3, 183:12,
184:5, 185:1,
185:12, 185:15,
188:9, 188:12,
188:15, 188:18,
208:7, 209:4, 209:7,
209:10, 209:13,
209:15, 210:5,
210:24, 213:18,
214:4
**multi** [1] - 16:19
**multi-disciplinary** [1]
- 16:19
**multiple** [5] - 15:23,
16:23, 17:1, 17:12,
210:11
**murder** [1] - 82:16

**murdered** [1] - 82:22
**mushy** [1] - 115:11
**music** [1] - 67:22
**must** [22] - 10:21,
11:2, 23:4, 23:8,
24:20, 29:19, 29:21,
30:7, 34:7, 35:1,
49:18, 96:4, 97:10,
112:3, 116:17,
117:8, 120:25,
140:2, 174:2,
184:10, 205:8,
207:19
**mute** [7] - 26:12,
26:18, 26:21, 88:12,
88:13, 133:11
**muted** [3] - 26:14,
188:8, 188:9
**mutilated** [1] - 139:25
**mutual** [1] - 138:20

## N

**N.W** [1] - 2:6
**NACOLE** [1] - 48:16
**naked** [1] - 88:23
**name** [22] - 7:21, 8:8,
15:22, 47:5, 92:22,
95:22, 102:1,
109:20, 109:22,
110:3, 135:22,
135:23, 135:24,
141:21, 144:11,
144:13, 172:15,
181:5, 195:25,
196:21, 199:20,
201:19
**named** [2] - 82:17,
180:20
**names** [4] - 109:18,
127:18, 151:21,
191:18
**naming** [1] - 191:18
**narrative** [3] - 40:8,
140:12, 141:2
**narratives** [3] -
139:17, 140:15,
141:3
**Natalie** [1] - 7:7
**nation** [3] - 13:9, 84:3,
84:4
**National** [1] - 190:21
**national** [6] - 63:18,
159:23, 160:8,
160:18, 160:20,
160:25
**nationally** [1] - 41:10
**nature** [3] - 108:1,
117:22, 182:11
**NE** [1] - 2:14

**nearly** [2] - 164:12,
164:20
**necessarily** [10] -
53:2, 57:11, 57:12,
68:17, 81:1, 102:23,
107:4, 108:4, 117:1,
183:6
**necessary** [16] -
11:21, 12:7, 12:10,
13:6, 44:9, 58:1,
115:23, 120:25,
122:16, 123:17,
123:18, 137:16,
140:20, 181:14,
182:10, 183:18
**necessity** [2] - 30:4,
38:18
**need** [73] - 22:11,
24:2, 24:5, 24:9,
26:21, 28:2, 37:10,
39:19, 49:4, 49:7,
49:24, 50:3, 54:14,
58:16, 58:17, 66:18,
74:24, 80:8, 81:2,
81:3, 81:18, 81:23,
82:10, 82:12, 82:25,
83:1, 83:2, 86:22,
86:25, 90:14, 94:6,
94:10, 94:14, 97:6,
99:2, 101:17, 105:5,
105:7, 115:14,
119:19, 120:1,
128:21, 129:9,
129:15, 129:18,
130:17, 138:15,
140:9, 140:18,
140:24, 143:15,
143:16, 144:8,
151:8, 153:13,
154:23, 155:13,
156:3, 160:21,
162:9, 169:13,
172:24, 178:17,
185:2, 185:8,
197:17, 197:23,
205:7, 206:3, 206:7,
207:19, 208:22
**needed** [4] - 34:2,
89:12, 137:17,
192:19
**needing** [1] - 97:21
**needs** [23] - 15:15,
20:7, 22:13, 24:16,
37:14, 54:23, 74:12,
77:19, 81:22, 130:2,
158:11, 168:15,
168:18, 177:2,
177:7, 184:21,
184:22, 187:15,
187:18, 204:17,

206:22, 208:23,
211:6
**negative** [2] - 164:20,
178:6
**negatively** [1] - 134:23
**neglect** [1] - 173:14
**negotiate** [2] - 155:2,
204:12
**negotiated** [1] - 27:21
**negotiating** [1] -
145:13
**negotiation** [1] -
206:18
**neighborhood** [2] -
64:8, 173:13
**neighbors** [1] - 133:4
**nerve** [1] - 103:9
**nerve-racking** [1] -
103:9
**nervous** [1] - 102:24
**neurological** [1] - 93:3
**neutral** [4] - 112:4,
112:24, 113:13,
114:2
**neutrality** [4] - 112:18,
113:1, 113:6, 113:16
**neutralize** [1] - 182:18
**never** [13] - 57:7,
58:23, 82:21, 82:23,
99:16, 101:8,
121:13, 124:18,
136:12, 143:18,
180:5, 180:11,
199:18
**nevertheless** [1] -
140:18
**new** [89] - 4:5, 4:6,
5:9, 9:17, 9:18,
10:18, 12:4, 13:3,
13:4, 15:20, 24:21,
27:12, 37:11, 38:15,
42:2, 44:10, 45:19,
47:1, 76:11, 76:17,
84:14, 86:8, 86:15,
93:12, 112:17,
112:19, 118:8,
120:5, 143:14,
144:17, 145:14,
147:7, 147:24,
147:25, 148:7,
148:19, 148:21,
149:7, 149:9,
149:17, 149:22,
149:25, 150:4,
150:23, 151:7,
151:8, 152:3,
152:15, 152:20,
152:22, 154:11,
154:13, 154:14,
155:15, 155:25,

157:23, 158:7,
158:17, 160:9,
161:16, 163:12,
165:12, 166:4,
166:12, 168:19,
170:12, 170:13,
175:19, 176:13,
178:7, 178:11,
178:14, 179:20,
187:19, 188:23,
191:10, 191:12,
191:15, 192:2,
195:9, 196:5, 210:2,
213:7, 213:8
**newly** [3] - 5:22,
13:21, 42:9
**news** [1] - 198:20
**next** [31] - 13:16,
21:13, 43:6, 43:14,
55:12, 61:23, 63:10,
74:8, 85:14, 85:18,
103:6, 104:2,
105:13, 126:1,
126:13, 144:6,
148:18, 149:2,
154:19, 155:11,
155:20, 183:3,
201:4, 201:6,
208:18, 208:24,
209:2, 209:4,
210:21, 211:20,
214:7
**nice** [2] - 70:6, 70:7
**night** [1] - 101:1
**nights** [1] - 195:10
**Ninth** [1] - 70:12
**nobody** [1] - 175:6
**nobody's** [2] - 152:18,
211:10
**Noche** [1] - 7:9
**NOCHE** [1] - 7:9
**Nolen** [4] - 127:19,
192:13, 192:14,
198:9
**NOLEN** [12] - 192:18,
194:1, 194:4, 194:7,
194:9, 194:11,
194:21, 194:23,
196:23, 198:4,
198:8, 198:11
**nominate** [1] - 116:20
**nominating** [47] -
89:7, 111:16, 116:4,
116:8, 116:17,
116:21, 116:25,
117:9, 117:15,
118:18, 119:9,
119:11, 119:21,
119:23, 120:8,
120:10, 129:24,

130:3, 148:9, 149:7, 149:10, 149:11, 152:7, 152:8, 152:12, 152:16, 152:20, 154:11, 154:15, 155:20, 169:22, 170:1, 170:6, 192:2, 192:7, 198:2, 203:17, 203:24, 204:1, 204:18, 204:20, 205:23, 208:22, 209:8, 209:12, 211:21

**nomination** [6] - 36:3, 36:5, 37:1, 129:5, 129:21, 154:6

**nominations** [2] - 35:21, 36:2

**nominees** [1] - 169:21

**non** [2] - 67:18, 191:7

**non-blaming** [1] - 191:7

**non-violence** [1] - 67:18

**none** [2] - 146:19, 147:14

**nonetheless** [2] - 141:8, 207:24

**normal** [3] - 159:6, 159:10, 175:14

**normally** [1] - 52:14

**North** [2] - 192:22, 193:6

**Northeast** [2] - 85:4, 86:24

**northeast** [1] - 128:12

**note** [14] - 7:16, 9:15, 13:3, 24:17, 28:16, 34:18, 41:9, 48:15, 48:20, 55:5, 56:5, 74:4, 138:24, 151:15

**noted** [12] - 40:7, 42:9, 46:17, 46:25, 48:8, 56:23, 63:9, 63:15, 74:5, 98:9, 132:25

**nothing** [12] - 38:24, 70:5, 86:21, 105:7, 109:15, 125:24, 142:6, 157:12, 161:7, 175:2, 188:14, 210:22

**notice** [1] - 31:25

**noticed** [2] - 48:10, 180:20

**notion** [2] - 167:17, 174:5

**November** [5] - 43:22, 64:19, 164:22, 165:1, 206:17

**nowhere** [1] - 76:24

**nuanced** [2] - 8:23, 9:14

**number** [28] - 5:15, 5:18, 5:21, 5:23, 6:23, 8:19, 18:10, 20:12, 25:2, 40:9, 45:13, 51:15, 54:12, 60:8, 64:1, 64:18, 81:13, 84:16, 85:20, 89:7, 91:24, 111:11, 111:12, 182:17, 183:5, 189:11, 194:17, 208:19

**Number** [1] - 3:8

**numbers** [6] - 62:15, 62:24, 63:3, 63:22, 85:24, 167:1

**numerical** [1] - 167:1

**numerous** [3] - 54:19, 63:15, 117:19

**nutshell** [1] - 24:24

## O

**o'clock** [1] - 134:17

**O'Dea** [1] - 186:18

**objected** [1] - 30:3

**objection** [5] - 28:24, 58:8, 59:11, 70:2, 160:14

**objections** [2] - 138:4, 162:17

**objective** [45] - 13:24, 14:6, 30:7, 30:15, 31:7, 56:22, 56:24, 58:7, 58:13, 59:4, 59:10, 59:25, 60:9, 60:25, 61:2, 61:5, 72:25, 73:9, 74:13, 77:6, 78:2, 78:11, 78:18, 79:6, 88:7, 97:12, 111:24, 112:5, 112:8, 112:16, 112:25, 113:2, 113:8, 113:9, 113:10, 113:17, 114:15, 115:9, 115:19, 116:24, 117:7, 162:1, 170:18, 171:4, 176:15

**objectively** [3] - 78:20, 112:20, 114:12

**objectives** [1] - 96:24

**objectivity** [3] - 112:18, 115:2, 116:16

**obligated** [1] - 172:22

**obligation** [1] - 111:1

**obligations** [1] - 51:18

**obliged** [1] - 32:21

**obliterate** [1] - 175:8

**observations** [1] - 8:11

**observe** [6] - 31:19, 36:3, 36:8, 59:15, 72:8, 74:6

**observing** [9] - 15:8, 15:23, 19:19, 58:9, 59:11, 73:15, 74:9, 107:8, 182:2

**obsessed** [1] - 164:19

**obstacle** [2] - 107:20

**obstruct** [2] - 29:6, 34:4

**obvious** [4] - 125:24, 134:3, 134:7, 175:16

**obviously** [4] - 53:7, 64:25, 211:7, 213:12

**occasionally** [1] - 122:25

**occasions** [2] - 41:11, 186:1

**occur** [2] - 40:13, 213:7

**occurred** [4] - 46:9, 57:1, 186:21, 199:8

**occurring** [1] - 57:10

**occurs** [5] - 41:1, 47:11, 47:24, 49:15, 54:21

**OCPA** [2] - 117:25, 189:18

**October** [1] - 215:9

**odd** [2] - 98:11, 198:5

**Odelia** [2] - 109:20, 120:13

**OF** [4] - 1:2, 1:5, 1:8, 1:15

**offer** [15] - 6:12, 51:20, 52:1, 53:11, 72:3, 77:9, 80:12, 86:21, 93:11, 98:23, 100:7, 101:13, 142:7, 171:13, 210:17

**offer's** [1] - 101:14

**offered** [2] - 69:3, 165:23

**offering** [1] - 182:14

**office** [6] - 3:17, 16:7, 16:8, 144:11, 148:8, 163:12

**Office** [11] - 2:2, 2:10, 3:16, 16:4, 75:21, 75:22, 116:11, 117:12, 120:14, 205:21, 205:23

**officer** [44] - 5:7, 16:10, 17:25, 18:2, 23:7, 23:8, 23:11, 38:2, 40:6, 40:8, 40:12, 40:15, 40:23, 41:2, 47:2, 47:7, 49:18, 49:20, 55:23, 55:24, 80:9, 80:17, 82:22, 88:9, 88:16, 98:25, 99:10, 102:25, 103:3, 103:15, 146:11, 168:9, 169:7, 169:8, 169:17, 171:4, 187:8, 191:13, 201:21, 201:22, 203:6, 203:9, 206:25, 207:2

**Officer** [4] - 199:6, 199:20, 200:16, 200:24

**officer's** [1] - 191:5

**officer-involved** [3] - 18:2, 206:25, 207:2

**officers** [49] - 11:25, 23:1, 49:10, 49:11, 49:24, 50:1, 51:25, 62:24, 64:21, 66:14, 71:7, 82:4, 82:10, 82:19, 85:2, 85:7, 86:23, 91:13, 96:7, 99:5, 99:10, 105:9, 106:13, 106:22, 123:8, 125:20, 125:21, 126:7, 126:10, 131:14, 143:11, 145:21, 166:10, 167:12, 167:13, 168:21, 169:1, 170:1, 182:3, 182:8, 182:21, 183:16, 187:21, 190:2, 200:1, 204:25, 207:11, 211:8

**Officers** [2] - 27:21, 116:14

**official** [1] - 82:14

**Official** [1] - 215:13

**officials** [13] - 9:10, 9:20, 10:8, 15:24, 19:19, 24:19, 33:3, 147:4, 150:8, 162:11, 162:12, 163:11, 198:1

**often** [9] - 85:3, 86:11, 87:24, 91:3, 91:4, 93:1, 93:22, 172:13, 174:1

**old** [4] - 47:12, 86:1, 136:9, 144:10

**Olson** [1] - 7:15

**on-paper** [1] - 105:16

**on-scene** [1] - 23:2

**once** [12] - 15:7, 74:11, 96:17, 104:20, 114:13, 124:13, 131:20, 149:5, 154:20, 179:4, 189:15

**one** [160] - 5:15, 12:12, 14:2, 15:20, 23:13, 25:17, 27:7, 30:12, 31:5, 31:17, 33:20, 35:21, 36:15, 37:16, 37:17, 37:21, 37:22, 38:11, 38:16, 50:17, 52:24, 52:25, 56:9, 56:12, 56:18, 56:19, 56:20, 59:19, 60:15, 61:7, 62:2, 62:3, 62:9, 63:11, 64:1, 64:11, 65:19, 66:1, 66:19, 67:8, 67:21, 68:11, 68:22, 70:24, 71:3, 71:4, 72:18, 78:4, 78:10, 78:18, 78:25, 79:13, 85:1, 85:16, 87:17, 87:18, 89:5, 90:2, 90:23, 91:10, 91:12, 92:11, 93:7, 93:11, 97:4, 99:15, 100:3, 100:7, 101:11, 101:12, 101:19, 103:12, 105:18, 106:19, 107:19, 110:1, 110:5, 111:11, 116:9, 116:11, 116:12, 116:13, 117:12, 119:6, 119:12, 119:19, 119:25, 121:3, 128:12, 129:4, 133:8, 136:11, 136:23, 138:23, 140:5, 141:12, 142:19, 143:14, 149:1, 149:25, 150:6, 150:15, 150:20, 151:4, 151:16, 151:22, 152:23, 154:9, 154:22, 154:25, 155:18, 160:23, 161:2, 161:3, 161:20, 162:7, 163:4, 166:9, 167:2, 168:4, 168:10, 170:16, 173:4, 182:5, 182:11, 184:1, 185:23, 186:4, 186:11,

186:24, 187:5, 187:9, 187:17, 189:22, 192:6, 192:24, 193:9, 194:16, 195:18, 197:24, 198:5, 199:4, 199:17, 199:18, 202:25, 203:16, 203:25, 204:1, 204:18, 204:22, 208:8, 210:17, 212:20
**One** [2] - 2:17, 166:21
**one-year** [1] - 142:19
**ones** [5] - 16:24, 99:12, 99:16, 148:21, 173:18
**ongoing** [4] - 28:24, 37:10, 174:14, 191:11
**open** [3] - 124:15, 125:1, 178:5
**open-mindedness** [1] - 178:5
**opening** [3] - 108:18, 127:11, 165:11
**operate** [2] - 118:20, 129:15
**operates** [2] - 129:10, 130:1
**operation** [4] - 5:19, 29:15, 34:4, 41:20
**operations** [1] - 116:17
**operative** [1] - 170:19
**opinion** [8] - 80:12, 105:1, 115:18, 123:7, 147:22, 148:20, 157:12, 199:12
**opinions** [4] - 77:3, 103:20, 114:10, 158:7
**opportunities** [4] - 35:12, 54:16, 72:1, 75:7
**opportunity** [22] - 10:13, 15:10, 15:18, 20:22, 20:25, 21:2, 21:14, 32:1, 53:12, 53:14, 61:24, 66:9, 66:14, 66:21, 87:17, 107:12, 110:11, 134:22, 135:3, 135:17, 148:23, 158:16
**oppose** [3] - 101:19, 101:20, 156:4
**opposed** [4] - 10:7, 105:10, 114:4,

145:10
**opposes** [1] - 101:19
**opposing** [1] - 139:21
**opposite** [1] - 114:2
**opposition** [1] - 179:14
**oppress** [1] - 175:1
**opt** [1] - 199:22
**optimistic** [1] - 111:4
**option** [7] - 38:1, 55:25, 71:9, 72:3, 80:21, 80:22, 81:21
**options** [3] - 80:1, 80:4, 155:18
**opts** [1] - 118:1
**OR** [5] - 2:4, 2:11, 2:14, 2:18, 2:20
**order** [22] - 6:16, 7:25, 8:7, 10:19, 11:1, 13:11, 21:10, 24:20, 34:5, 37:14, 49:8, 78:19, 108:9, 115:23, 117:6, 169:18, 189:16, 190:19, 192:21, 197:5, 205:12
**Order** [1] - 96:10
**orderly** [1] - 29:7
**OREGON** [1] - 1:2
**Oregon** [7] - 1:8, 2:19, 75:21, 104:12, 136:7, 139:1, 172:18
**Oregonian** [1] - 95:23
**organization** [6] - 62:8, 62:25, 64:23, 65:10, 65:15, 181:17
**organization's** [1] - 63:12
**organizational** [4] - 62:4, 64:12, 118:7, 190:24
**organizationally** [1] - 54:12
**organizations** [4] - 20:12, 106:8, 107:3, 111:15
**organize** [1] - 179:23
**organized** [1] - 145:9
**organizer** [3] - 173:7, 181:6, 196:7
**origin** [1] - 204:8
**original** [2] - 52:22, 215:6
**originally** [1] - 7:17
**otherwise** [15] - 12:25, 13:1, 20:21, 51:17, 51:23, 65:11, 66:16, 72:12, 80:13, 101:4, 125:23, 130:12, 164:8, 212:16

**ourselves** [2] - 86:7, 127:4
**out-voted** [1] - 204:5
**outcome** [5] - 35:19, 93:15, 94:2, 153:19, 189:20
**outcomes** [1] - 117:1
**outlined** [1] - 111:22
**outlining** [1] - 71:24
**outreach** [3] - 63:2, 173:7, 175:11
**outset** [1] - 104:4
**outside** [7] - 28:19, 65:17, 67:15, 85:3, 99:8, 129:18, 160:2
**outstanding** [1] - 153:9
**over-police** [1] - 178:1
**over-policed** [3] - 93:22, 132:13, 179:13
**over-policing** [1] - 178:4
**over-resource** [1] - 178:1
**overall** [6] - 70:13, 70:19, 85:20, 85:23, 133:19, 169:20
**overarching** [1] - 44:3
**overcome** [2] - 118:19, 202:9
**overlap** [1] - 42:17
**overly** [1] - 111:15
**override** [3] - 26:15, 166:19, 185:21
**oversee** [1] - 125:3
**overseeing** [1] - 125:3
**oversees** [1] - 42:3
**Oversight** [3] - 5:9, 43:24, 190:21
**oversight** [65] - 5:20, 11:5, 16:5, 16:8, 27:2, 29:16, 38:7, 44:5, 44:6, 44:10, 46:5, 46:18, 47:1, 47:17, 47:20, 47:21, 48:5, 48:14, 58:12, 60:8, 74:10, 76:17, 86:8, 99:3, 111:1, 128:16, 129:25, 143:9, 144:16, 144:17, 145:13, 146:19, 147:4, 148:13, 151:14, 152:9, 158:17, 163:10, 164:4, 164:11, 164:19, 165:12, 166:12, 168:11, 168:20, 171:1, 175:12,

175:19, 176:13, 178:15, 178:24, 179:11, 179:20, 186:23, 187:10, 187:20, 189:24, 190:16, 191:14, 192:8, 198:3, 208:14, 209:20
**overview** [3] - 40:10, 61:15, 62:5
**overwhelmingly** [3] - 109:2, 143:8, 191:22
**own** [24] - 30:24, 33:15, 35:1, 106:21, 114:1, 140:2, 141:3, 141:5, 159:25, 167:24, 183:14, 200:2
**owner** [1] - 22:13
**owns** [1] - 24:15
**O'Dea** [1] - 167:25

## P

**p.m** [1] - 214:24
**P.O** [1] - 2:20
**PAC** [13] - 32:22, 33:1, 106:5, 110:22, 110:25, 165:21, 165:22, 166:25, 169:23, 186:2, 191:2, 191:9
**PAC's** [3] - 27:14, 189:2
**package** [3] - 45:4, 45:9, 110:23
**pages** [2] - 45:7, 45:10
**paid** [2] - 96:13, 169:3
**pain** [1] - 93:18
**painting** [1] - 172:24
**palsy** [1] - 93:3
**pandemic** [1] - 93:8
**panel** [6] - 35:14, 107:4, 185:24, 186:6, 186:7, 190:3
**panels** [4] - 30:13, 166:22, 167:4, 167:5
**panoply** [2] - 32:21, 33:10
**paper** [3] - 65:23, 105:16, 109:10
**paperwork** [2] - 165:9, 166:11
**paragraph** [32] - 10:16, 10:17, 10:18, 23:19, 24:17, 27:1, 27:10, 27:17, 27:22, 29:9, 31:15, 38:13, 44:15, 45:19, 45:24, 46:2, 46:17, 47:4,

47:5, 47:18, 47:25, 48:1, 56:6, 70:9, 153:8, 154:1, 154:22, 165:11, 204:12, 206:24
**paragraphs** [1] - 190:3
**paramount** [1] - 65:14
**pardon** [2] - 17:14, 212:21
**parents** [1] - 183:15
**Park** [2] - 64:3, 64:4
**Parker** [4] - 199:20, 200:16, 200:24
**parking** [1] - 193:13
**part** [39] - 15:3, 21:21, 27:13, 27:18, 36:18, 36:20, 49:3, 49:10, 59:1, 64:8, 64:24, 67:19, 71:22, 84:17, 86:13, 89:17, 90:9, 91:10, 100:5, 110:4, 111:20, 115:12, 123:17, 125:5, 128:23, 131:15, 131:24, 149:23, 158:15, 159:18, 162:17, 170:15, 199:21, 199:25, 204:11, 204:23, 211:1, 214:17
**participant** [2] - 52:2, 111:15
**participants** [1] - 54:5
**participate** [13] - 10:21, 10:22, 11:12, 11:19, 11:21, 11:23, 12:14, 66:17, 98:23, 100:6, 134:22, 170:7, 202:12
**participated** [3] - 54:19, 63:1, 76:8
**participating** [9] - 12:20, 12:25, 13:4, 64:7, 72:10, 75:9, 90:22, 93:12, 182:5
**participation** [12] - 12:17, 13:10, 65:4, 67:19, 69:2, 72:7, 93:6, 94:1, 134:12, 170:9, 170:10, 214:16
**particular** [5] - 10:1, 68:23, 78:5, 78:7, 193:17
**particularly** [7] - 52:25, 63:17, 68:14, 137:13, 153:12, 167:7, 184:17
**parties** [29] - 8:20, 9:3, 10:13, 12:6, 14:17,

14:19, 18:11, 18:17, 21:11, 23:18, 23:25, 27:25, 31:5, 54:22, 71:12, 71:19, 100:4, 101:19, 125:9, 137:12, 155:1, 155:5, 155:19, 155:22, 164:3, 203:2, 214:11, 214:12

**partner** [4] - 161:11, 161:13, 201:14

**parts** [2] - 204:24, 204:25

**party** [4] - 31:10, 78:4, 78:7, 212:3

**pass** [4] - 33:4, 84:24, 110:2, 113:3

**passage** [1] - 89:17

**passages** [2] - 89:17, 89:24

**passed** [5] - 9:13, 76:17, 191:22, 191:25, 199:6

**passion** [2] - 64:1, 174:15

**past** [12] - 28:17, 30:17, 31:2, 33:24, 36:23, 66:16, 66:21, 74:10, 194:14, 196:5, 198:21

**pastor** [2] - 198:14, 198:18

**Pastor** [3] - 192:15, 201:17, 202:22

**patchouli** [1] - 96:12

**path** [3] - 55:14, 55:16, 183:25

**pathways** [1] - 96:4

**patience** [5] - 128:5, 163:19, 172:2, 185:14, 192:10

**Patrick** [2] - 127:19, 192:13, 198:22

**patrol** [7] - 10:25, 11:9, 53:19, 80:9, 80:17, 122:25, 126:10

**patrols** [1] - 82:13

**patronage** [1] - 140:1

**Paul** [1] - 2:9

**Pause** [5] - 141:23, 142:2, 171:18, 180:17, 185:9

**pause** [3] - 68:8, 127:23, 134:19

**pay** [2] - 169:2, 178:16

**PCCEP** [33] - 8:16, 17:5, 94:24, 98:11, 98:13, 109:17,

109:21, 109:25, 110:10, 110:16, 110:24, 110:25, 111:9, 112:8, 112:12, 112:23, 114:18, 115:18, 115:24, 117:19, 118:22, 119:5, 120:17, 120:19, 121:5, 121:7, 124:4, 171:2, 186:16, 192:21, 192:24, 193:10

**PCW** [1] - 167:21

**peace** [1] - 180:9

**Peace** [1] - 17:9

**peaceful** [1] - 179:23

**peacekeeping** [1] - 84:9

**Peck** [3] - 2:16, 4:5, 135:12

**PECK** [2] - 210:24, 214:4

**peel** [1] - 70:15

**peer** [2] - 173:8, 193:23

**peers** [1] - 67:23

**peeve** [1] - 187:9

**peeve"** [1] - 168:10

**pen** [1] - 70:18

**penal** [3] - 173:21, 173:25, 174:2

**pending** [1] - 36:10

**penitentiary** [1] - 195:11

**Pennsylvania** [1] - 2:6

**people** [181] - 9:19, 11:15, 11:23, 11:25, 12:15, 12:25, 25:1, 25:18, 26:1, 26:2, 38:10, 45:4, 48:21, 49:2, 50:5, 50:9, 50:25, 51:10, 51:22, 52:2, 52:14, 57:24, 58:16, 58:17, 58:18, 58:24, 60:8, 62:2, 62:7, 64:20, 65:16, 66:16, 75:3, 80:21, 80:25, 81:11, 81:14, 86:9, 91:9, 91:17, 91:25, 93:22, 93:24, 94:1, 99:1, 99:24, 101:6, 101:8, 102:22, 102:25, 103:12, 104:1, 104:9, 104:25, 105:18, 106:1, 106:10, 106:11, 106:20, 107:21, 107:22, 108:1,

108:2, 108:19, 109:2, 109:12, 110:5, 112:7, 114:5, 114:7, 114:9, 117:6, 120:24, 122:15, 123:9, 126:9, 127:1, 129:16, 130:9, 130:17, 130:18, 131:2, 132:11, 132:12, 134:23, 135:4, 136:22, 137:4, 137:18, 137:21, 138:5, 138:10, 138:13, 138:25, 139:5, 140:3, 140:4, 140:15, 140:23, 142:9, 143:4, 143:7, 143:19, 143:20, 144:3, 144:16, 144:21, 145:1, 145:4, 145:5, 146:5, 148:2, 148:3, 148:23, 150:3, 150:8, 150:9, 150:16, 153:22, 157:9, 159:7, 159:10, 159:19, 160:2, 161:3, 161:17, 161:24, 162:13, 164:1, 167:6, 167:17, 172:19, 172:23, 174:19, 178:5, 179:2, 179:7, 182:20, 183:5, 183:7, 183:20, 184:12, 186:7, 186:8, 186:12, 190:10, 192:5, 192:24, 194:17, 194:25, 195:9, 195:10, 195:12, 196:24, 196:25, 197:4, 197:5, 197:8, 197:11, 198:3, 200:9, 200:14, 202:8, 202:9, 202:18, 203:18, 203:25, 204:2, 204:5, 204:9, 204:21, 208:12, 209:25, 210:12

**people's** [4] - 128:19, 175:12, 204:22, 214:19

**people,"** [1] - 167:5

**pepper** [3] - 96:16, 103:6, 104:5

**per** [1] - 165:22

**perceived** [7] - 60:21, 61:8, 153:13, 170:19, 176:8, 176:9, 200:2

**percent** [6] - 62:17, 62:22, 85:2, 86:7, 143:9, 147:6

**percentages** [1] - 62:17

**perception** [1] - 108:23

**perceptual** [1] - 40:8

**PERF** [1] - 41:10

**perfect** [3] - 21:16, 69:24, 105:24

**perform** [2] - 49:8, 118:1

**performance** [1] - 191:10

**perhaps** [6] - 11:18, 30:18, 70:16, 96:18, 99:8, 108:2

**period** [4] - 43:10, 46:23, 56:16, 156:2

**permeate** [1] - 139:17

**permission** [1] - 7:19

**permits** [1] - 199:17

**person** [42] - 8:3, 8:4, 8:5, 8:6, 14:7, 52:23, 53:2, 67:15, 80:13, 80:16, 85:25, 86:19, 87:15, 88:22, 92:11, 102:8, 102:11, 103:11, 104:2, 104:14, 107:9, 113:13, 125:18, 125:22, 125:25, 127:5, 136:20, 137:25, 171:20, 183:2, 184:1, 192:20, 192:23, 193:17, 193:18, 193:22, 194:5, 194:11, 194:12, 194:14, 197:24

**personal** [3] - 115:2, 174:5, 188:14

**personally** [2] - 121:4, 155:10, 202:11

**personnel** [1] - 143:20

**persons** [1] - 98:24

**perspective** [29] - 20:10, 22:16, 33:6, 34:16, 34:21, 52:24, 53:22, 78:1, 82:10, 99:13, 100:17, 102:17, 108:7, 122:20, 128:25, 129:1, 131:15, 138:9, 138:10,

140:24, 149:16, 172:13, 176:23, 181:15, 199:13, 202:14, 202:16, 204:20, 206:23

**perspectives** [12] - 82:3, 112:7, 115:3, 117:7, 121:2, 128:22, 131:10, 134:23, 138:6, 139:19, 140:10, 204:10

**pertaining** [1] - 117:18

**pet** [1] - 187:9

**phase** [1] - 111:6

**phonetic** [2] - 139:4, 199:6

**photographs** [1] - 123:2

**phrased** [1] - 115:17

**phrases** [1] - 113:2

**physical** [4] - 40:20, 93:5, 93:6, 173:17

**physically** [1] - 169:6

**pick** [1] - 144:16

**picking** [2] - 25:13, 78:5

**picture** [4] - 125:12, 172:24, 173:2, 177:9

**piece** [5] - 65:23, 129:4, 130:4, 130:5, 140:21

**pieces** [5] - 84:20, 86:6, 128:17, 129:4, 131:18

**PIIAC** [1] - 142:11

**pilot** [2] - 39:18, 39:23

**pivotal** [2] - 76:10, 108:15

**place** [18] - 9:22, 33:1, 74:13, 74:16, 77:19, 80:25, 81:21, 84:8, 86:9, 106:2, 115:20, 142:11, 149:8, 153:14, 153:24, 164:11, 179:21, 183:4

**places** [3] - 64:11, 85:3, 177:24

**plagues** [1] - 187:3

**plaintiff** [10] - 3:8, 5:8, 21:25, 31:8, 31:23, 34:21, 38:22, 60:4, 61:4, 108:10

**Plaintiff** [2] - 1:6, 5:4

**PLAINTIFF** [1] - 2:2

**plaintiff's** [2] - 31:12, 37:19

**plan** [20] - 18:16, 18:24, 19:20, 19:21,

20:7, 20:14, 20:19, 20:23, 30:7, 36:13, 36:16, 36:19, 36:25, 40:1, 42:11, 42:12, 59:20, 207:4

**planes** [1] - 99:16
**planned** [1] - 29:15
**planning** [4] - 127:12, 134:6, 192:18, 211:18
**plans** [2] - 24:16, 128:24
**platform** [1] - 110:19
**play** [3] - 159:16, 160:13, 160:21
**played** [2] - 32:25, 159:17
**playing** [3] - 72:8, 72:10, 201:21
**pleased** [3] - 23:23, 62:13, 157:9
**pleasure** [3] - 4:19, 75:15, 142:4
**plug** [2] - 188:12, 188:16
**plumb** [2] - 84:5, 89:16
**plumbing** [1] - 89:16
**plumbline** [2] - 84:4, 84:6
**podium** [1] - 25:12
**point** [41] - 11:20, 12:11, 29:24, 30:10, 32:5, 33:12, 39:15, 40:15, 40:17, 41:20, 59:8, 59:23, 67:18, 68:23, 75:4, 77:25, 80:22, 86:3, 86:18, 88:25, 89:21, 101:7, 105:13, 113:16, 126:3, 126:6, 131:21, 133:25, 155:24, 157:22, 158:6, 181:12, 184:8, 191:4, 193:17, 199:15, 202:9, 203:13, 203:14, 208:4, 208:8
**pointed** [9] - 27:24, 28:17, 30:6, 32:7, 32:20, 35:4, 115:9, 206:7, 208:13
**pointing** [2] - 79:17, 177:18
**points** [10] - 11:17, 13:7, 24:23, 26:24, 36:15, 37:3, 78:22, 86:17, 107:23, 118:23
**Police** [71] - 3:21, 4:2,

4:21, 5:9, 5:10, 6:21, 7:13, 8:14, 10:23, 12:14, 12:21, 15:24, 16:3, 16:6, 17:10, 17:20, 18:1, 22:6, 22:23, 27:10, 27:19, 27:20, 27:21, 43:24, 44:19, 45:6, 46:19, 56:7, 56:15, 56:17, 56:20, 56:21, 57:12, 63:16, 64:16, 69:21, 70:2, 73:10, 73:22, 75:22, 75:25, 76:2, 76:6, 81:18, 83:21, 87:11, 92:23, 96:7, 96:20, 102:7, 103:18, 107:1, 110:13, 110:22, 116:13, 116:14, 142:18, 143:3, 143:23, 145:11, 145:20, 146:20, 147:14, 164:5, 164:21, 166:23, 173:4, 188:20, 190:7
**POLICE** [1] - 2:13
**police** [265] - 10:22, 10:25, 11:9, 11:19, 13:11, 13:24, 14:6, 16:13, 27:3, 30:21, 32:7, 38:11, 41:25, 42:23, 44:10, 47:7, 48:11, 48:25, 49:1, 49:10, 49:11, 49:18, 49:24, 50:1, 53:13, 53:17, 54:24, 56:9, 56:25, 57:5, 58:14, 58:17, 59:4, 60:10, 61:22, 62:1, 62:7, 62:10, 65:2, 65:4, 65:5, 66:5, 66:8, 66:9, 68:4, 71:6, 73:1, 76:2, 76:3, 76:12, 76:18, 76:19, 77:7, 77:8, 77:13, 77:23, 79:24, 80:14, 81:19, 81:22, 81:23, 82:8, 82:9, 82:12, 82:13, 82:19, 82:23, 82:25, 83:2, 84:16, 84:25, 86:23, 87:8, 88:9, 88:17, 88:25, 89:8, 90:6, 90:16, 90:22, 91:14, 93:1, 93:13, 97:3, 97:6, 98:25, 99:5, 100:13, 101:17, 102:25, 103:3, 103:15, 103:23, 105:9, 106:6, 106:7, 106:8, 106:13, 106:21,

106:22, 106:23, 107:21, 108:3, 108:24, 109:5, 109:11, 111:15, 111:17, 111:25, 112:11, 112:19, 114:1, 114:15, 114:19, 114:23, 114:25, 116:4, 116:5, 116:12, 116:21, 117:3, 117:8, 117:15, 117:20, 117:21, 117:22, 117:24, 118:3, 118:11, 121:2, 121:19, 123:8, 124:19, 125:20, 127:2, 127:3, 127:6, 127:7, 128:25, 129:2, 129:17, 129:18, 129:19, 129:22, 129:24, 130:2, 131:8, 131:9, 131:12, 131:16, 132:12, 133:7, 133:16, 134:24, 136:17, 139:22, 139:24, 140:7, 140:22, 140:23, 141:5, 141:6, 141:10, 142:11, 142:16, 142:22, 142:23, 142:24, 143:6, 143:9, 143:11, 143:12, 143:15, 143:19, 143:21, 145:12, 145:21, 145:25, 146:8, 146:9, 146:10, 146:12, 146:18, 147:1, 147:3, 147:5, 147:8, 147:18, 152:5, 152:17, 159:14, 159:19, 159:25, 160:6, 160:7, 160:11, 161:19, 163:9, 164:9, 167:11, 169:7, 169:21, 173:3, 173:19, 174:1, 174:25, 175:3, 175:13, 175:16, 175:17, 175:21, 176:7, 176:8, 176:9, 176:12, 176:17, 176:20, 176:25, 177:1, 177:5, 177:15, 178:1, 178:23, 179:2,

179:18, 181:15, 181:25, 182:8, 182:11, 182:21, 183:15, 183:16, 184:14, 186:15, 188:23, 189:10, 189:12, 189:15, 189:22, 190:16, 191:8, 196:16, 197:5, 200:2, 204:4, 204:19, 204:20, 205:1, 211:7, 211:8, 212:8, 213:2
**police's** [1] - 117:4
**police-adjacent** [2] - 116:5, 117:15
**police-heavy** [1] - 130:2
**police-related** [2] - 116:21, 127:3
**police-weighted** [1] - 129:24
**policed** [2] - 93:22, 132:13, 179:13
**policies** [17] - 18:3, 33:22, 34:8, 38:18, 42:6, 42:21, 47:2, 82:20, 83:2, 174:10, 191:11, 196:13, 205:12, 205:13, 206:10, 206:11
**policing** [25] - 11:4, 63:18, 69:4, 76:13, 84:19, 86:4, 110:24, 114:14, 139:19, 143:10, 159:16, 159:22, 159:24, 160:3, 160:5, 160:8, 160:9, 160:25, 161:14, 174:10, 174:21, 176:3, 178:4, 191:14
**Policing** [1] - 17:5
**policing's** [1] - 146:1
**Policy** [2] - 110:8, 110:10
**policy** [26] - 11:3, 17:6, 17:16, 22:6, 22:18, 36:21, 46:12, 46:13, 49:16, 58:20, 63:15, 65:23, 102:11, 134:4, 139:10, 139:11, 139:18, 165:13, 165:25, 168:7, 171:5, 187:7, 190:23, 191:5, 206:8
**political** [9] - 74:24, 103:19, 134:2, 134:7, 139:17,

140:1, 153:17, 158:4, 172:11
**politically** [1] - 149:9
**polling** [1] - 157:22
**poor** [3] - 129:2, 164:12, 173:13
**population** [2] - 91:11, 196:20
**portion** [2] - 7:25, 27:9
**portland** [1] - 139:14
**PORTLAND** [3] - 1:3, 1:8, 2:13
**Portland** [124] - 1:8, 2:4, 2:11, 2:14, 2:18, 2:20, 3:7, 3:14, 3:16, 3:21, 4:21, 5:4, 5:18, 6:1, 7:3, 7:4, 7:6, 7:10, 8:13, 10:22, 10:23, 12:14, 12:21, 15:23, 15:24, 17:5, 17:20, 22:6, 22:23, 27:19, 27:20, 27:21, 41:17, 41:21, 41:25, 42:5, 64:15, 69:21, 70:2, 73:10, 75:22, 76:2, 76:5, 82:17, 84:19, 85:3, 85:4, 85:13, 85:21, 86:8, 86:14, 86:24, 89:13, 90:25, 91:6, 91:8, 91:11, 91:19, 96:7, 96:20, 97:20, 103:15, 103:18, 107:1, 109:2, 110:9, 112:4, 116:13, 116:14, 117:23, 128:11, 129:19, 131:19, 132:21, 133:1, 133:2, 133:5, 133:18, 133:24, 134:3, 136:9, 138:22, 139:15, 140:3, 140:19, 141:17, 141:24, 142:10, 143:3, 143:7, 143:11, 143:23, 145:1, 145:11, 145:20, 146:18, 146:20, 147:14, 147:19, 158:16, 158:20, 159:15, 159:17, 159:25, 160:7, 160:22, 161:19, 163:22, 163:24, 165:10, 171:7, 175:5, 177:12, 184:10, 184:12, 188:20, 189:12, 192:23, 193:6,

208:21

**Portland's** [3] - 6:4, 41:9, 158:21

**posed** [1] - 98:7

**position** [14] - 37:20, 96:25, 104:2, 117:12, 118:4, 151:21, 163:7, 182:22, 183:2, 183:10, 195:1, 196:19, 204:22, 212:6

**positions** [8] - 16:17, 42:7, 66:6, 116:21, 150:9, 150:10, 196:11, 208:12

**positive** [2] - 91:21, 194:18

**possibility** [2] - 122:14, 166:15

**possible** [6] - 17:2, 93:23, 111:4, 117:21, 118:17, 130:9

**possibly** [1] - 147:16

**post** [2] - 74:20, 74:23

**post-monitor** [1] - 74:20

**post-settlement** [1] - 74:23

**posted** [1] - 45:15

**potential** [14] - 18:4, 29:17, 116:1, 116:24, 117:10, 118:18, 122:21, 130:11, 130:22, 130:23, 131:1, 136:25, 137:1, 157:23

**potentially** [8] - 54:3, 74:6, 103:5, 103:14, 106:10, 130:1, 166:13, 175:21

**poverty** [1] - 173:12

**power** [10] - 68:15, 117:15, 118:5, 125:8, 141:4, 152:2, 175:4, 175:15, 179:19, 180:10

**powers** [4] - 178:14, 179:1, 179:9, 179:17

**PPA** [9] - 3:24, 107:2, 108:23, 117:4, 175:11, 204:1, 204:8, 204:13, 204:18

**PPB** [13] - 13:4, 17:12, 17:24, 18:3, 19:16, 33:25, 46:10, 69:2, 167:20, 175:10,

175:11, 205:12, 206:8

**PPB's** [1] - 11:4

**PPCOA** [7] - 27:20, 107:2, 117:4, 204:1, 204:8, 204:13, 204:18

**PPE** [1] - 130:7

**practical** [1] - 148:11

**practice** [6] - 23:3, 48:16, 48:17, 68:15, 82:21, 83:3

**practices** [4] - 91:15, 96:24, 189:4, 190:18

**pray** [1] - 91:12

**Prayer** [1] - 96:11

**PRB** [1] - 166:24

**PRBs** [1] - 30:21

**pre** [3] - 136:5, 136:15, 139:13

**pre-prepared** [2] - 136:5, 139:13

**pre-teen** [1] - 136:15

**preacher** [2] - 87:25, 88:4

**preachers** [1] - 87:23

**precedence** [1] - 26:16

**Precinct** [1] - 39:23

**precincts** [3] - 39:17, 39:24, 63:9

**precisely** [6] - 27:22, 32:25, 38:17, 100:19, 204:14, 206:9

**precursor** [1] - 39:13

**predisposition** [1] - 153:21

**predominantly** [1] - 39:15

**preface** [1] - 70:22

**prefer** [1] - 29:20

**preferable** [1] - 104:25

**prejudice** [1] - 60:21

**premise** [1] - 46:3

**prep** [1] - 131:9

**preparation** [3] - 6:12, 111:6, 190:12

**prepare** [1] - 149:21

**prepared** [5] - 85:17, 102:15, 136:1, 136:5, 139:13

**preparing** [1] - 135:2

**prepping** [1] - 92:18

**present** [5] - 18:17, 73:24, 79:4, 110:11, 157:25

**presentation** [4] - 15:1, 15:4, 74:1, 96:7

**presentations** [1] - 8:16

**presented** [2] - 143:17, 165:3

**presenting** [2] - 98:4, 172:11

**preserve** [2] - 28:23, 154:7

**preserved** [1] - 37:22

**preserves** [1] - 23:6

**preside** [1] - 78:1

**presidency** [1] - 137:8

**president** [2] - 17:19, 213:12

**presidential** [1] - 88:5

**press** [1] - 88:10

**pressure** [2] - 16:12, 91:10

**presumably** [1] - 170:7

**presume** [1] - 204:5

**pretrial** [1] - 213:23

**pretty** [5] - 44:6, 88:1, 107:5, 125:24, 198:25

**prevailed** [1] - 179:5

**prevent** [2] - 12:25, 175:17

**prevents** [1] - 7:18

**previous** [8] - 9:21, 50:20, 51:24, 80:13, 112:1, 112:6, 181:17

**previously** [10] - 11:11, 12:8, 23:18, 93:9, 102:10, 104:11, 162:19, 182:4, 184:3, 204:15

**price** [2] - 130:16, 130:19

**pride** [1] - 65:7

**prima** [1] - 60:2

**primarily** [2] - 9:10, 62:6

**primary** [5] - 5:11, 29:25, 54:9, 61:25, 83:24

**principally** [1] - 34:10

**principles** [1] - 43:19

**prioritize** [1] - 133:19

**priority** [1] - 133:17

**prisons** [1] - 194:8

**privacy** [1] - 191:19

**pro** [7] - 108:3, 112:10, 113:25, 117:3, 175:21, 176:9, 179:18

**pro-police** [5] - 108:3, 117:3, 175:21, 176:9, 179:18

**problem** [22] - 29:10,

33:18, 37:10, 53:25, 61:7, 79:9, 79:10, 81:14, 81:15, 81:16, 98:20, 99:18, 101:5, 101:20, 107:14, 115:12, 139:3, 170:19, 189:13, 195:5, 210:15

**problematic** [3] - 71:16, 112:15, 112:22

**problems** [6] - 11:15, 100:2, 104:19, 106:11, 191:6, 210:20

**procedural** [1] - 79:8

**procedurally** [1] - 43:4

**procedure** [2] - 38:12, 81:22

**procedure's** [1] - 14:12

**procedures** [9] - 10:25, 11:3, 11:9, 33:15, 33:22, 42:6, 44:9, 47:2, 78:23

**procedure"** [1] - 165:14

**proceedings** [6] - 141:23, 142:2, 171:18, 180:17, 185:9, 215:5

**Proceedings** [1] - 214:24

**PROCEEDINGS** [1] - 1:15

**process** [71] - 11:3, 18:19, 18:25, 31:20, 31:21, 32:24, 32:25, 33:19, 36:4, 37:1, 38:4, 40:25, 41:10, 42:14, 43:4, 44:20, 46:5, 47:13, 49:12, 49:13, 49:19, 57:20, 58:9, 59:8, 60:13, 60:14, 65:5, 65:9, 66:5, 69:2, 72:21, 73:5, 74:6, 75:5, 76:17, 77:21, 79:2, 83:17, 83:19, 86:16, 90:10, 90:11, 98:14, 105:22, 105:23, 107:24, 111:8, 117:22, 118:4, 118:22, 129:5, 129:21, 130:3, 144:21, 154:6, 158:24, 162:15, 170:6, 183:22, 191:8, 191:9, 193:15, 195:8,

195:18, 203:17, 205:6, 206:18, 207:22, 207:25, 209:16

**processes** [4] - 11:6, 28:18, 73:15, 78:23

**produce** [1] - 117:6

**produced** [1] - 76:7

**produces** [2] - 68:10, 68:11

**product** [2] - 27:7, 27:13

**profiling** [3] - 76:23, 77:18, 206:8

**program** [6] - 11:24, 22:5, 39:18, 39:24, 133:22, 138:23

**progress** [4] - 4:25, 5:22, 23:22, 188:1, 211:2, 211:4, 214:12

**progressing** [1] - 62:6

**prohibit** [1] - 71:12

**project** [1] - 110:25

**projects** [1] - 81:20

**prologue** [2] - 33:24, 36:23

**promise** [4] - 110:18, 156:19, 167:8, 186:11

**promised** [1] - 164:13

**promises** [1] - 119:1

**promising** [1] - 189:4

**promote** [2] - 53:16, 190:24

**promulgated** [1] - 22:6

**prone** [1] - 164:2

**properly** [1] - 109:7

**prophet** [1] - 84:1

**proponent** [3] - 53:22, 65:20, 86:20

**proposal** [9] - 64:25, 77:20, 100:12, 143:18, 162:18, 189:2, 189:7, 191:20

**proposals** [2] - 9:5, 13:5

**propose** [6] - 5:8, 155:5, 161:9, 210:18, 212:10, 212:12

**proposed** [36] - 5:6, 5:11, 6:16, 8:25, 9:3, 10:6, 10:16, 10:18, 27:24, 31:15, 33:7, 35:22, 49:14, 49:16, 49:17, 60:1, 75:6, 77:8, 93:20, 97:23, 98:21, 100:1, 108:17, 110:23,

111:10, 111:13,
111:16, 116:7,
137:5, 163:23,
165:22, 166:25,
167:22, 186:2,
189:9, 212:1
**proposes** [1] - 5:7
**proscribing** [1] - 94:3
**prosecutor** [1] -
102:10
**prospect** [2] - 205:4,
205:15
**prospective** [4] - 52:3,
53:12, 78:8, 182:14
**protect** [6] - 78:23,
96:4, 97:1, 97:19,
143:4, 146:5
**protecting** [1] - 107:3
**protections** [1] - 79:8
**protest** [2] - 179:24,
180:1
**protested** [1] - 178:18
**protesting** [1] - 176:7
**protests** [2] - 179:23,
213:3
**protocol** [4] - 5:16,
22:7, 39:14, 40:2
**protocols** [3] - 33:25,
34:3, 191:11
**proud** [3] - 95:23,
146:17, 214:14
**Proud** [1] - 96:9
**prove** [2] - 97:17,
187:4
**proven** [1] - 129:20
**proverbial** [3] - 71:5,
71:21, 71:24
**provide** [21] - 8:8,
12:22, 15:10, 21:3,
23:2, 23:4, 23:9,
31:6, 38:1, 45:16,
54:9, 59:16, 72:21,
73:3, 93:24, 94:6,
104:14, 110:18,
112:21, 171:20,
202:24
**provided** [5] - 29:6,
31:6, 120:6, 137:23,
177:25
**providers** [1] - 52:25
**provides** [3] - 46:5,
48:10, 189:22
**providing** [3] - 14:10,
23:24, 119:8
**provision** [11] - 30:6,
31:12, 32:1, 32:6,
32:9, 36:6, 46:3,
46:4, 73:2, 73:8,
73:16
**provisions** [9] - 70:15,

71:20, 72:19, 72:20,
72:21, 73:1, 113:1,
184:16, 189:3
**pry** [1] - 121:11
**PSR** [2] - 23:17, 23:20
**Public** [4] - 2:13,
10:20, 12:4, 12:13
**public** [56] - 7:24,
7:25, 8:9, 8:16, 8:20,
11:13, 12:9, 14:18,
16:15, 19:5, 20:14,
20:15, 20:19, 20:20,
21:14, 23:2, 25:2,
28:11, 33:21, 37:18,
39:10, 41:24, 42:3,
55:16, 76:14, 91:25,
92:4, 92:18, 94:25,
95:20, 96:21,
102:10, 104:15,
108:9, 114:18,
126:23, 134:4,
142:20, 146:10,
148:13, 158:15,
158:18, 159:2,
159:4, 163:15,
165:3, 165:7, 166:3,
168:9, 171:10,
187:8, 189:17,
191:8, 191:16,
202:24, 205:20
**public's** [1] - 191:19
**publicly** [3] - 19:3,
20:23, 33:2
**pull** [1] - 89:4
**pulled** [1] - 176:20
**purpose** [3] - 10:24,
118:15, 159:21
**purposes** [2] - 33:8,
148:11
**pursue** [1] - 156:15
**pursuing** [1] - 140:11
**push** [2] - 141:2,
147:16
**pushed** [1] - 162:14
**pushing** [4] - 140:11,
146:21, 164:19
**put** [24] - 19:6, 29:18,
41:19, 45:9, 48:5,
86:9, 97:11, 107:9,
119:20, 122:8,
125:12, 132:1,
132:13, 142:11,
145:12, 150:8,
150:10, 151:21,
158:5, 164:22,
177:21, 177:22,
198:1, 208:23
**putative** [1] - 60:2
**puts** [1] - 155:12
**putting** [8] - 20:6,

103:4, 106:14,
108:24, 122:4,
150:22, 169:25,
200:24

---

## Q

**qualification** [1] - 13:2
**qualifications** [2] -
12:12, 184:9
**qualified** [4] - 51:17,
51:23, 164:8, 207:24
**qualify** [1] - 143:23
**quantity** [1] - 206:16
**questions** [19] - 14:21,
22:11, 39:10, 40:18,
42:20, 45:14, 50:13,
71:14, 74:25, 84:11,
98:6, 121:11, 146:3,
157:23, 161:21,
161:22, 162:1,
162:3, 198:24
**quick** [3] - 45:24,
61:22, 62:5
**quickly** [5] - 26:3,
42:11, 69:23, 88:1,
93:18
**quite** [11] - 6:13, 6:14,
18:10, 38:3, 42:10,
45:8, 61:1, 74:18,
136:13, 136:18,
154:18
**quo** [1] - 179:18
**quorum** [1] - 145:4
**quota** [1] - 197:23
**quote** [7] - 28:20,
68:7, 111:22,
111:24, 112:3,
114:25, 122:20
**quoted** [1] - 87:25

---

## R

**race** [2] - 159:16,
195:2
**racial** [15] - 76:23,
76:25, 77:11, 77:12,
77:18, 82:6, 173:6,
173:23, 174:20,
178:22, 179:20,
179:23, 180:4, 206:8
**racism** [11] - 76:22,
77:2, 79:14, 79:16,
167:8, 173:10,
175:15, 179:4,
184:18, 186:11
**racist** [5] - 68:15,
172:21, 175:16,
178:21, 179:14
**racking** [1] - 103:9

**rad** [1] - 173:6
**radical** [10] - 76:12,
172:22, 176:23,
177:11, 178:4,
178:7, 178:13,
178:25, 179:8, 180:3
**Raiford** [2] - 8:4,
171:22
**Raiford's** [1] - 28:11
**rainbow** [1] - 140:14
**raise** [2] - 162:7, 162:9
**raised** [8] - 14:22,
40:16, 57:14, 57:19,
86:18, 154:4,
173:11, 203:14
**raises** [1] - 85:25
**raising** [1] - 75:5
**rally** [1] - 89:2
**ramp** [2] - 104:16,
104:17
**range** [4] - 40:18,
199:16, 199:22,
200:18
**ranking** [2] - 168:2,
186:20
**rate** [1] - 41:18
**rather** [15] - 9:23,
33:10, 56:19, 72:8,
72:9, 100:1, 121:12,
138:3, 150:1,
155:10, 155:11,
155:15, 156:15,
168:9, 187:9
**re** [4] - 150:25, 163:5,
175:10, 177:8
**re-electability** [1] -
150:25
**re-elected** [1] - 163:5
**re-traumatizes** [1] -
177:8
**re-traumatizing** [1] -
175:10
**reach** [5] - 19:8,
37:14, 38:4, 126:23,
208:1
**reached** [1] - 210:14
**react** [1] - 18:23
**reaction** [1] - 164:20
**reactions** [1] - 104:10
**read** [26] - 6:11, 6:16,
6:19, 6:21, 6:24,
7:20, 8:8, 14:17,
14:18, 14:19, 25:2,
28:11, 30:7, 65:23,
66:1, 66:23, 67:2,
67:3, 93:14, 96:6,
96:9, 100:20,
127:18, 130:22,
178:20, 196:12
**reader** [1] - 66:22

**reading** [4] - 6:13,
6:14, 96:20, 190:9
**ready** [2] - 74:18,
74:22
**real** [9] - 42:24, 60:21,
64:4, 82:25, 101:6,
145:25, 146:7,
178:22, 182:19
**reality** [2] - 62:19, 97:5
**realize** [3] - 68:17,
130:19, 188:15
**realized** [1] - 192:19
**really** [103] - 10:12,
11:6, 11:20, 11:25,
12:2, 12:10, 13:6,
14:11, 15:3, 15:14,
15:17, 16:18, 18:21,
30:10, 33:13, 35:1,
38:5, 43:18, 48:4,
48:24, 50:1, 50:4,
50:13, 51:9, 51:22,
53:20, 54:22, 56:8,
58:14, 64:1, 64:9,
65:12, 65:21, 66:5,
66:11, 66:12, 68:7,
68:19, 77:25, 78:16,
80:5, 81:5, 82:2,
82:5, 89:4, 90:12,
94:10, 100:25,
103:4, 105:13,
106:1, 107:19,
108:14, 108:20,
122:4, 122:24,
125:8, 126:1,
126:15, 126:18,
128:21, 134:1,
137:13, 137:16,
137:21, 138:7,
138:8, 142:22,
144:14, 145:9,
146:6, 146:7,
148:20, 152:8,
152:12, 157:9,
158:12, 158:17,
159:17, 160:1,
160:16, 171:12,
171:13, 176:17,
176:22, 176:23,
180:1, 181:3, 183:6,
192:5, 192:19,
196:9, 199:18,
200:22, 202:16,
204:2, 205:5, 210:1,
211:2, 211:5, 214:10
**reason** [14] - 13:23,
31:8, 70:25, 95:25,
96:1, 102:20,
102:22, 103:14,
138:13, 140:23,
193:16, 202:5,

208:2, 208:23
**reasonable** [25] - 9:1,
9:6, 10:1, 10:7, 27:5,
28:7, 32:9, 32:19,
34:7, 34:9, 40:13,
51:19, 53:10, 98:14,
105:8, 113:13,
137:23, 157:2,
163:25, 164:8,
164:23, 171:4,
178:23, 191:23,
204:11
**reasonableness** [3] -
14:9, 70:14, 162:18
**reasonably** [3] -
149:6, 168:21,
187:21
**reasoning** [1] - 199:25
**reasons** [8] - 13:23,
28:5, 60:8, 90:15,
156:5, 171:10,
173:4, 182:17
**recalled** [1] - 201:3
**receive** [4] - 11:2,
21:3, 21:11, 184:6
**received** [12] - 6:23,
6:25, 7:21, 7:24,
8:19, 18:16, 63:8,
132:4, 135:5,
147:23, 161:9, 201:7
**receiving** [1] - 11:14
**recent** [4] - 13:19,
82:16, 114:18, 166:3
**recently** [3] - 35:6,
56:13, 110:7
**reception** [1] - 26:12
**recess** [2] - 8:9, 94:23
**Recess** [1] - 95:1
**recognize** [14] - 4:13,
4:21, 10:25, 11:11,
15:14, 110:21,
141:10, 166:17,
185:19, 190:13,
196:15, 197:13,
198:18, 211:11
**recognized** [1] - 63:16
**recognizing** [2] -
62:21, 117:14
**recommend** [5] -
27:11, 29:25,
118:12, 118:13,
191:17
**recommendation** [7] -
32:23, 44:9, 46:7,
48:15, 74:5, 134:21,
144:22
**recommendations**
[11] - 17:4, 32:22,
33:1, 44:12, 45:3,
45:7, 48:11, 56:22,

66:6, 66:15, 106:5
**recommended** [3] -
104:24, 132:15,
191:9
**recommends** [1] -
46:23
**reconcile** [1] - 34:2
**record** [14] - 19:7,
28:19, 28:23, 30:18,
31:1, 59:23, 70:4,
95:20, 100:20,
100:23, 100:24,
138:24, 180:24,
215:4
**recorded** [3] - 40:24,
41:7, 62:18
**recording** [1] - 165:4
**recovery** [2] - 174:12,
174:14
**recruited** [1] - 192:24
**recruiting** [1] - 114:5
**recruitment** [3] -
64:13, 111:13, 116:1
**recused** [1] - 57:21
**red** [1] - 70:18
**redirect** [1] - 133:22
**reduce** [2] - 62:2,
123:11
**reducing** [1] - 63:19,
64:2
**reduction** [2] - 63:24,
64:9
**redundancies** [1] -
47:15
**reelect** [1] - 150:18
**reelection** [6] -
150:16, 150:20,
151:16, 151:18,
152:1, 152:24
**reference** [3] - 56:6,
60:17, 79:23
**references** [2] - 56:6,
118:18
**refers** [1] - 112:16
**reflect** [3] - 68:8,
162:19, 191:24
**reflected** [4] - 10:9,
47:16, 113:17, 189:7
**reflecting** [2] - 8:21,
10:9
**reflection** [1] - 180:7
**reflects** [2] - 9:12,
129:12
**Reform** [4] - 4:2, 6:21,
73:22, 75:25
**reform** [4] - 76:2, 76:4,
84:3, 139:24
**regard** [3] - 16:22,
70:3, 70:9
**regarding** [12] - 5:7,

47:2, 63:19, 73:8,
111:19, 116:24,
136:7, 136:25,
189:8, 208:8, 210:12
**Regarding** [1] - 165:1
**regardless** [1] -
114:11
**regards** [1] - 64:25
**regular** [7] - 77:23,
126:10, 166:24,
167:6, 186:1, 186:8,
191:9
**regularly** [2] - 106:17,
181:19
**reject** [5] - 100:1,
101:4, 101:9, 140:4,
167:17
**rejected** [1] - 101:7
**related** [10] - 7:4, 13:7,
14:14, 18:5, 90:15,
113:2, 116:21,
127:2, 127:3, 208:20
**relates** [6] - 10:15,
10:16, 12:11, 13:16,
118:8, 196:12
**relating** [2] - 10:17,
190:23
**relational** [2] - 93:16,
94:2
**relations** [3] - 16:4,
53:1, 190:25
**relationship** [2] -
183:16, 208:15
**relationships** [5] -
11:25, 63:8, 137:16,
140:7, 199:24
**relax** [2] - 200:25
**relevance** [1] - 28:22
**relevant** [2] - 68:9,
162:22
**reluctance** [2] - 66:17,
101:9
**reluctant** [4] - 72:4,
100:25, 101:3,
125:23
**relying** [1] - 189:5
**remain** [3] - 11:1,
11:2, 41:20
**remainder** [1] - 94:24
**remaining** [1] - 21:3
**remains** [2] - 40:2,
76:14
**remarks** [7] - 15:16,
20:1, 84:7, 102:15,
136:1, 136:5, 158:11
**remedies** [2] - 28:2,
109:9, 156:12
**remedy** [8] - 28:3,
35:23, 37:14,
153:10, 153:11,

153:16, 153:25,
207:18
**remember** [12] -
43:22, 70:16, 85:1,
89:20, 98:11,
120:12, 142:12,
163:5, 193:4,
196:21, 201:2,
212:14
**remembers** [1] - 91:4
**remind** [4] - 26:20,
86:7, 119:7, 179:6
**reminded** [7] - 26:7,
66:21, 68:10, 70:12,
84:15, 89:16, 89:23
**reminder** [1] - 128:10
**remote** [1] - 88:13
**remotely** [8] - 15:8,
26:11, 26:13, 26:17,
39:5, 75:18, 83:15,
88:11
**removal** [13] - 30:6,
30:25, 31:2, 31:3,
31:7, 56:24, 57:22,
61:8, 65:4, 73:8,
77:14, 78:24, 113:8
**remove** [8] - 13:21,
57:25, 58:6, 59:9,
59:25, 78:19, 78:21,
111:23
**removed** [12] - 14:5,
30:12, 30:14, 30:22,
31:17, 58:13, 60:8,
79:4, 114:10,
117:11, 149:6, 191:3
**removing** [2] - 31:8,
105:22
**reorganized** [1] -
167:15
**replace** [1] - 5:9
**report** [11] - 6:20,
23:23, 23:24, 27:14,
36:8, 41:3, 79:2,
117:25, 144:7, 190:7
**reported** [2] - 63:20,
63:24
**REPORTER** [2] - 1:23,
94:21
**Reporter** [1] - 215:13
**reporter** [2] - 69:23,
91:25
**reporter's** [1] - 26:2
**reporting** [2] - 12:9,
59:12
**reports** [4] - 24:2,
25:18, 142:23, 189:5
**represent** [7] - 63:3,
119:1, 135:13,
181:16, 186:11,
197:5, 197:8

**representation** [3] -
116:5, 117:9, 184:17
**representations** [3] -
22:14, 29:15, 29:21
**representative** [13] -
102:6, 112:3,
116:11, 116:12,
116:13, 116:14,
117:4, 127:3,
140:12, 150:9,
150:15, 196:16,
205:22
**representatives** [4] -
116:9, 116:22,
117:3, 196:25
**represented** [6] -
68:23, 111:15,
117:8, 197:11,
197:19, 198:6
**representing** [3] -
92:25, 189:19,
197:20
**represents** [4] - 63:4,
196:24, 196:25
**reputation** [1] -
150:22
**request** [4] - 57:7,
104:14, 120:12,
205:14
**requested** [3] - 57:24,
63:15, 181:13
**requests** [2] - 7:24,
75:14
**require** [13] - 13:10,
36:9, 37:12, 50:6,
51:4, 54:14, 69:1,
71:4, 93:23, 130:25,
166:4, 191:24,
197:23
**required** [25] - 12:12,
13:14, 23:2, 27:16,
27:22, 34:14, 34:15,
35:9, 44:5, 47:10,
49:21, 54:6, 56:22,
89:19, 147:16,
175:23, 177:1,
181:18, 190:5,
190:9, 192:21,
204:12, 205:10,
205:11
**requirement** [32] -
10:19, 11:12, 11:21,
34:16, 34:24, 35:2,
40:8, 47:21, 48:8,
48:12, 48:18, 49:19,
50:18, 52:22, 61:2,
71:9, 71:22, 71:23,
80:23, 93:13, 93:19,
93:21, 93:24,
100:15, 105:16,

105:18, 113:17,
131:11, 131:17,
181:21, 202:13,
204:16
**requirements** [10] -
32:16, 34:13, 45:21,
52:11, 71:1, 71:3,
71:4, 97:14, 120:24,
131:7
**requires** [12] - 16:12,
23:1, 24:18, 27:1,
35:5, 35:13, 38:14,
56:11, 93:6, 165:12,
165:23, 207:24
**requiring** [5] - 41:13,
51:13, 71:10, 167:5,
186:7
**research** [5] - 92:22,
168:8, 175:10,
187:7, 189:5
**Research** [2] - 63:16,
165:21
**reservation** [1] - 141:7
**reservations** [1] -
140:17
**resident** [1] - 133:5
**resignations** [1] -
190:12
**resigned** [1] - 142:12
**resilience** [1] - 96:3
**resistance** [1] -
185:24
**resolution** [1] - 44:7
**resolve** [2] - 74:25,
180:3
**resolved** [7] - 23:19,
28:4, 30:16, 31:9,
31:10, 170:25
**resolving** [1] - 58:3
**resonated** [1] - 108:15
**resonates** [1] - 68:21
**resource** [1] - 178:1
**Resource** [1] - 2:19
**resources** [2] - 96:23,
133:20
**Resources** [2] - 73:3,
205:18
**respect** [15] - 22:21,
23:1, 26:6, 27:8,
31:1, 31:25, 32:4,
59:22, 70:8, 70:12,
70:20, 72:15, 156:7,
203:20, 207:17
**respected** [2] - 99:2,
145:15
**respectful** [1] - 200:11
**respectfully** [2] -
146:12, 182:15
**respond** [3] - 91:12,
157:19, 192:1

**responded** [3] - 99:2,
114:21, 158:1
**responding** [1] - 63:3
**Response** [19] - 5:19,
41:17, 41:21, 42:1,
42:5, 91:1, 91:6,
91:11, 91:20,
131:19, 132:21,
133:1, 133:3,
133:18, 133:24,
134:4, 138:22,
146:18, 177:12
**response** [4] - 52:4,
115:1, 133:5, 152:25
**responses** [2] - 42:11,
157:25
**responsibilities** [1] -
51:18
**responsibility** [6] -
8:23, 9:2, 9:8, 10:6,
50:10, 59:1
**responsible** [4] -
17:12, 58:20, 149:6,
213:9
**responsive** [3] - 9:21,
19:12, 108:9
**rest** [8] - 9:11, 39:25,
48:4, 89:23, 180:9,
180:10, 196:3
**restored** [1] - 190:1
**restricted** [1] - 114:7
**result** [9] - 30:24,
38:15, 97:13, 117:9,
128:24, 137:10,
137:16, 138:20,
139:21
**resulted** [2] - 136:17,
164:20
**results** [2] - 147:17,
147:24
**retain** [3] - 50:3,
128:12, 163:25
**retaining** [3] - 114:6,
166:25, 186:3
**retains** [1] - 46:3
**retired** [1] - 16:1
**retirements** [1] - 64:19
**return** [2] - 64:21,
99:16
**returned** [1] - 24:4
**returns** [1] - 38:18
**revealed** [1] - 140:14
**Reverend** [7] - 74:2,
83:10, 85:17, 88:15,
88:23, 89:14, 206:7
**reverend** [1] - 146:24
**reversal** [1] - 89:20
**review** [20] - 11:18,
13:8, 30:21, 32:7,
33:21, 33:25, 35:14,

40:4, 41:9, 41:12,
42:21, 47:1, 57:5,
61:3, 61:6, 63:17,
79:1, 142:22,
165:14, 206:12
**Review** [27] - 5:10,
17:10, 18:1, 18:12,
46:20, 48:9, 51:4,
56:7, 56:12, 56:15,
56:17, 56:20, 56:21,
56:24, 57:12, 112:2,
120:7, 142:18,
164:5, 166:23,
189:20, 190:7
**reviewed** [3] - 18:2,
18:7, 36:21
**reviewing** [5] - 41:13,
58:8, 65:22, 70:13,
170:5
**reviews** [5] - 41:2,
111:18, 191:6,
191:7, 191:9
**revised** [2] - 24:3, 47:1
**revision** [2] - 18:4,
18:6
**revisions** [2] - 111:21,
141:10
**revive** [1] - 67:17
**rewrite** [1] - 112:14
**Rian** [3] - 2:16, 4:5,
135:12
**ride** [115] - 10:21,
10:22, 11:13, 11:19,
11:21, 11:24, 13:10,
17:22, 34:12, 34:16,
34:19, 35:6, 48:7,
48:8, 48:15, 48:21,
50:21, 51:4, 51:11,
51:12, 51:19, 51:20,
52:1, 52:7, 52:13,
53:9, 53:16, 55:18,
55:23, 57:5, 65:20,
66:17, 68:2, 71:2,
71:10, 75:2, 79:23,
79:25, 80:7, 81:5,
86:18, 86:20, 90:5,
93:14, 94:13, 97:13,
98:22, 99:7, 99:19,
100:6, 100:8, 101:2,
101:12, 102:17,
102:19, 102:22,
103:3, 104:25,
107:23, 120:23,
121:5, 121:14,
122:2, 122:19,
122:23, 123:5,
123:25, 124:4,
124:6, 124:15,
124:25, 125:16,
125:23, 125:25,

126:8, 127:10,
130:6, 131:6,
137:18, 146:4,
146:10, 154:6,
161:4, 164:9, 169:7,
169:15, 169:19,
170:7, 177:1, 177:8,
177:12, 181:14,
181:16, 181:21,
181:24, 182:8,
182:10, 182:15,
187:25, 192:22,
193:1, 193:16,
195:8, 195:9,
195:14, 199:5,
199:7, 199:8,
202:10, 203:17,
205:10, 205:14,
210:13
**Ride** [1] - 177:3
**ride-along** [76] -
10:22, 11:13, 11:19,
11:21, 11:24, 17:22,
34:12, 48:7, 48:21,
50:21, 51:4, 51:11,
51:12, 51:19, 51:20,
52:1, 55:23, 57:5,
66:17, 68:2, 71:2,
71:10, 75:2, 79:23,
79:25, 80:7, 81:5,
86:20, 90:5, 94:13,
100:6, 100:8, 101:2,
101:12, 102:17,
102:19, 103:3,
104:25, 107:23,
120:23, 121:5,
121:14, 122:2,
122:19, 123:5,
123:25, 124:4,
124:6, 124:15,
124:25, 125:16,
125:23, 125:25,
127:10, 146:4,
146:10, 154:6,
161:4, 164:9, 169:7,
169:15, 169:19,
177:8, 177:12,
181:14, 182:10,
192:22, 193:1,
193:16, 195:8,
199:8, 203:17,
205:10, 205:14
**Ride-Along** [1] - 177:3
**ride-alongs** [36] -
13:10, 34:16, 34:19,
35:6, 48:8, 48:15,
52:7, 52:13, 53:16,
55:18, 65:20, 86:18,
93:14, 97:13, 98:22,
99:7, 99:19, 102:22,
122:23, 126:8,

130:6, 131:6,
137:18, 170:7,
177:1, 181:16,
181:21, 181:24,
182:15, 187:25,
195:9, 195:14,
199:5, 199:7,
202:10, 210:13
**riding** [1] - 52:2
**Rights** [6] - 2:5, 3:11,
104:12, 116:11,
117:13, 120:15
**rights** [6] - 67:20,
67:24, 153:17,
170:24, 190:25,
207:17
**ripe** [1] - 203:19
**risen** [1] - 132:6
**rising** [2] - 81:11,
81:13
**risks** [1] - 190:12
**river** [1] - 89:20
**RMR** [2] - 1:24, 215:13
**Robert** [1] - 198:14
**Robin** [1] - 192:15
**robust** [1] - 69:2
**ROGERS** [1] - 3:19
**Rogers** [3] - 2:9, 3:18,
3:19
**role** [17] - 16:6, 31:11,
34:6, 34:7, 57:7,
65:7, 72:8, 72:10,
83:24, 119:8,
159:15, 160:13,
160:21, 181:17,
182:12, 201:21,
205:8
**role-playing** [3] - 72:8,
72:10, 201:21
**roles** [2] - 181:20,
182:1
**rolled** [1] - 39:15
**rolling** [1] - 39:22
**rollout** [7] - 5:15, 21:9,
22:5, 22:9, 39:14,
39:17, 63:6
**rolls** [1] - 104:15
**Romanette** [6] -
10:18, 10:19, 10:25,
12:11, 13:17, 13:23
**Rome** [1] - 137:3
**Room** [1] - 2:11
**room** [8] - 4:6, 69:5,
84:18, 114:9, 118:9,
144:3, 160:4, 200:22
**rooms** [1] - 40:12
**rooted** [1] - 174:9
**roots** [1] - 128:12
**Rosemary** [2] - 87:2,
87:4

**Ross** [1] - 57:5
**roster** [1] - 117:14
**rotten** [1] - 179:9
**rougher** [1] - 197:14
**rounded** [1] - 140:9
**rounds** [1] - 64:4
**roundtable** [1] - 99:10
**routinely** [1] - 72:7
**Rubio** [1] - 163:6
**rule** [1] - 208:9
**rules** [9] - 28:22,
  33:15, 33:22, 34:3,
  44:8, 44:20, 47:1,
  105:11, 136:24
**ruling** [1] - 212:3
**run** [3] - 139:23,
  168:20, 187:20
**running** [5] - 19:4,
  63:10, 150:1, 192:4,
  206:16
**runs** [1] - 192:7
**rush** [1] - 170:15
**Ryan** [1] - 209:23

## S

**S-A-L-A-Z-A-R** [1] -
  135:24
**Sackler** [1] - 139:4
**safe** [7] - 64:10, 97:7,
  97:20, 103:23,
  122:3, 141:5, 200:6
**Safe** [1] - 181:17
**safer** [3] - 104:2,
  125:24, 183:2
**safety** [5] - 23:2,
  41:24, 42:3, 76:15,
  103:16
**Safety** [2] - 2:13,
  41:23
**sake** [3] - 24:17,
  24:22, 28:22
**SALAZAR** [4] -
  135:10, 135:23,
  136:1, 141:15
**Salazar** [6] - 127:19,
  134:16, 134:18,
  135:8, 135:21,
  141:13
**Sanchez** [1] - 110:4
**Sarah** [2] - 2:8, 3:17
**satisfied** [2] - 108:10,
  152:18
**satisfy** [2] - 101:16,
  105:7
**Saturday** [3] - 63:1,
  64:3, 64:6
**save** [3] - 28:11,
  175:18, 180:5
**saw** [2] - 24:4, 60:23

**scale** [2] - 106:15,
  108:25
**scarcity** [2] - 138:3,
  138:19
**scare** [2] - 130:11,
  197:16
**scared** [2] - 200:23,
  205:4
**scaring** [1] - 130:21
**scary** [1] - 64:4
**scenario** [6] - 38:18,
  54:10, 72:9, 72:10,
  187:2, 201:13
**scenario-based** [1] -
  54:10
**scenarios** [2] - 54:16,
  126:21
**scene** [4] - 23:2,
  123:1, 166:13, 169:5
**schedule** [2] - 92:17,
  213:1
**scheduled** [4] - 18:11,
  64:18, 159:3, 212:9
**scholarships** [1] -
  130:20
**School** [2] - 86:24,
  87:4
**school** [2] - 87:18,
  124:9
**schools** [1] - 86:25
**science** [1] - 16:14
**scope** [1] - 33:11
**scraped** [1] - 179:10
**screen** [2] - 92:11,
  202:25
**seamlessly** [1] - 136:4
**seat** [5] - 53:21, 56:15,
  106:18, 148:20,
  209:7
**seated** [7] - 39:3,
  44:24, 45:1, 95:16,
  154:12, 155:15,
  166:16
**seats** [1] - 148:3
**Sebastian** [1] - 7:16
**second** [15] - 12:11,
  19:14, 27:6, 37:25,
  38:6, 50:13, 62:2,
  67:14, 85:15, 87:18,
  113:23, 130:4,
  133:8, 137:18,
  210:17
**second-guessed** [1] -
  37:25
**secondly** [3] - 78:22,
  105:4, 153:15
**seconds** [1] - 185:2
**section** [6] - 22:3,
  22:23, 44:15,
  184:15, 184:21,

203:6
**Section** [30] - 5:7,
  22:22, 26:25, 27:6,
  27:24, 28:6, 28:7,
  33:12, 33:19, 34:8,
  39:13, 43:16, 43:17,
  70:23, 111:21,
  112:2, 116:7,
  163:23, 165:12,
  166:23, 167:4,
  185:25, 186:6,
  189:9, 203:6, 203:7,
  203:9, 206:15,
  206:21, 207:21
**sections** [1] - 17:13
**see** [73] - 3:6, 4:20,
  4:22, 11:22, 11:25,
  14:1, 21:7, 23:3,
  26:20, 34:23, 39:18,
  52:20, 53:19, 53:22,
  54:13, 54:14, 62:5,
  63:20, 63:21, 63:24,
  64:9, 69:17, 71:13,
  75:15, 80:16, 82:1,
  82:3, 82:4, 83:8,
  83:11, 92:11, 98:10,
  98:13, 98:14, 98:20,
  100:15, 101:10,
  101:19, 101:21,
  109:19, 114:16,
  117:13, 120:25,
  123:2, 124:13,
  130:18, 130:22,
  140:11, 141:21,
  141:25, 146:7,
  159:8, 159:9,
  159:19, 169:5,
  169:23, 169:24,
  169:25, 172:8,
  177:13, 177:23,
  181:8, 188:5,
  188:11, 188:13,
  188:16, 195:13,
  195:19, 203:8,
  206:25, 211:20
**seeing** [20] - 62:24,
  64:14, 64:20, 64:21,
  69:16, 71:25, 82:6,
  82:7, 82:8, 82:13,
  86:22, 123:3, 126:9,
  126:11, 147:19,
  162:6, 180:14,
  202:25
**seek** [5] - 42:4,
  117:14, 140:1,
  156:9, 210:18
**seeking** [5] - 151:16,
  151:17, 151:20,
  151:22, 151:23
**seem** [5] - 108:17,

169:22, 169:24,
  204:19, 208:16
**Seemab** [2] - 8:3,
  171:19
**select** [1] - 211:21
**selected** [3] - 107:1,
  120:10, 129:25
**selection** [4] - 74:6,
  129:5, 184:9, 206:10
**selections** [1] - 66:14
**selects** [1] - 192:7
**self** [1] - 140:19
**self-appointed** [1] -
  140:19
**Senate** [1] - 205:5
**send** [3] - 96:14,
  166:13, 179:15
**sends** [1] - 179:15
**senior** [1] - 16:2
**sense** [11] - 12:16,
  21:6, 72:10, 73:17,
  105:17, 122:18,
  149:8, 151:4,
  152:24, 197:21,
  197:22
**sensitive** [2] - 54:22,
  68:5
**sent** [2] - 66:2, 112:13
**sentence** [1] - 70:24
**sentenced** [1] -
  194:17
**separate** [3] - 24:8,
  40:12, 42:1
**September** [1] - 40:1
**sequence** [1] - 23:6
**sergeant** [3] - 17:25,
  40:25, 88:22
**Sergeant** [1] - 88:24
**sergeants** [1] - 88:21
**serious** [10] - 40:20,
  107:5, 139:8, 141:7,
  152:14, 157:11,
  157:14, 166:25,
  180:7, 190:4
**seriously** [4] - 9:3,
  103:16, 128:16,
  133:23
**sermon** [1] - 88:6
**sermons** [1] - 89:2
**servants** [1] - 96:15
**serve** [22] - 12:3,
  12:12, 13:11, 62:2,
  62:8, 97:1, 97:14,
  97:19, 120:2,
  120:10, 127:3,
  129:25, 136:7,
  136:9, 138:5, 143:4,
  143:23, 144:10,
  144:16, 146:5,
  173:8, 192:21

**served** [6] - 30:21,
  143:12, 144:8,
  144:12, 188:20,
  192:20
**serves** [2] - 30:18,
  143:16
**service** [5] - 42:16,
  49:5, 52:25, 69:15,
  201:19
**services** [3] - 17:18,
  90:6, 136:8
**serving** [5] - 16:20,
  57:7, 71:12, 80:1,
  143:25
**sessions** [1] - 15:23
**set** [16] - 9:18, 21:15,
  29:1, 97:1, 99:1,
  105:11, 114:16,
  116:18, 129:14,
  138:2, 138:3,
  138:15, 155:11,
  203:23, 204:7,
  211:12
**setting** [1] - 6:17
**Settlement** [1] - 110:8
**settlement** [79] - 4:25,
  5:5, 6:3, 6:9, 8:24,
  14:3, 17:6, 17:13,
  22:3, 24:6, 24:17,
  24:18, 27:1, 27:4,
  27:9, 27:16, 27:17,
  28:2, 29:7, 31:24,
  31:25, 32:6, 32:24,
  33:8, 33:9, 33:17,
  34:4, 34:17, 36:7,
  38:17, 43:2, 43:20,
  44:14, 44:22, 44:25,
  58:11, 59:14, 60:11,
  60:12, 70:3, 70:13,
  70:18, 70:23, 71:20,
  74:23, 76:7, 76:9,
  98:17, 104:4, 109:7,
  110:14, 110:15,
  110:16, 110:17,
  111:10, 111:21,
  119:2, 128:9,
  148:12, 151:5,
  151:13, 153:11,
  154:1, 154:21,
  162:23, 163:24,
  166:18, 168:12,
  170:8, 185:20,
  187:12, 188:25,
  189:9, 191:23,
  206:12, 208:14,
  212:5
**seven** [4] - 92:20,
  166:24, 186:1, 190:4
**several** [20] - 28:10,
  42:18, 45:13, 63:13,

64:6, 65:2, 66:2, 67:12, 67:16, 76:16, 84:13, 129:16, 129:22, 136:22, 171:9, 181:10, 193:4, 194:8, 208:18, 209:22

**severe** [2] - 139:5, 139:6

**severely** [1] - 165:20

**shake** [2] - 200:20, 200:23

**shall** [7] - 13:20, 96:14, 96:18, 111:22, 117:25, 167:4, 186:6

**shape** [3] - 75:11, 140:7, 140:25

**shaping** [1] - 181:24

**share** [22] - 8:11, 8:17, 37:7, 42:19, 78:1, 79:11, 93:9, 96:8, 97:10, 118:21, 121:9, 121:13, 121:16, 145:3, 172:20, 172:24, 177:4, 190:14, 191:17, 201:12, 202:14, 202:20

**shared** [2] - 118:23, 178:14

**sharing** [3] - 114:7, 172:12, 175:10

**sharpened** [2] - 168:18, 187:19

**sharpening** [1] - 112:1

**Sheriff's** [1] - 16:18

**shit** [1] - 96:19

**shocking** [1] - 136:18

**shoot** [3] - 177:15, 201:2, 213:15

**shooting** [8] - 18:2, 200:13, 201:1, 201:8, 201:9, 207:1, 207:2, 207:14

**shootings** [1] - 63:23

**short** [9] - 15:21, 35:15, 56:16, 97:16, 186:15, 195:23, 195:24, 201:7

**short-timers** [1] - 195:23

**shot** [6] - 67:14, 167:25, 186:18, 199:19, 201:5, 201:25

**show** [7] - 78:20, 96:3, 99:10, 121:7, 145:5, 149:5, 200:22

**showcases** [1] -

140:18

**showed** [1] - 39:19

**showing** [1] - 187:5

**shows** [2] - 31:1, 82:18

**siblings** [1] - 93:1

**sick** [1] - 96:22

**side** [7] - 59:7, 78:4, 106:19, 140:5, 195:18, 195:21, 200:3

**side's** [1] - 82:4

**sides** [6] - 71:4, 71:21, 71:24, 78:14, 82:1, 128:21

**sight** [1] - 38:5

**sign** [8] - 38:3, 107:10, 179:24, 180:1, 184:3, 184:4, 184:5, 193:24

**signal** [1] - 191:6

**signature** [3] - 215:6, 215:7

**signed** [3] - 7:5, 7:17, 215:7

**significant** [7] - 65:6, 112:15, 113:10, 157:24, 182:6, 189:1, 189:11

**significantly** [2] - 62:15, 63:23

**signing** [1] - 215:3

**silly** [1] - 144:9

**similar** [15] - 13:8, 25:21, 28:13, 32:9, 32:15, 32:17, 35:5, 37:4, 40:22, 41:1, 131:7, 131:11, 139:3, 171:1

**similarly** [4] - 71:17, 72:6, 82:10, 130:21

**SIMON** [1] - 1:18

**Simon** [13] - 75:20, 80:20, 83:16, 89:9, 93:20, 97:11, 142:3, 144:2, 146:18, 158:13, 163:20, 163:21, 182:14

**simple** [2] - 26:24, 137:6

**simply** [11] - 28:22, 50:20, 100:1, 113:11, 126:9, 137:10, 138:10, 138:11, 165:25, 174:5, 182:4

**single** [3] - 137:25, 140:11, 140:12

**sisters** [1] - 92:25

**sit** [5] - 49:23, 57:18,

82:11, 95:14, 153:3

**site** [3] - 19:15, 19:21

**sitting** [17] - 49:25, 52:21, 80:14, 81:22, 89:17, 90:4, 103:6, 103:20, 104:2, 106:12, 106:14, 126:1, 126:12, 128:8, 171:8, 183:2, 195:21

**situation** [9] - 65:11, 103:10, 103:22, 106:18, 124:6, 126:21, 126:25, 140:13, 170:17

**situations** [4] - 57:15, 103:5, 121:20, 126:17

**six** [6] - 98:11, 148:12, 153:14, 158:1, 193:9, 196:4

**Sixty** [1] - 158:1

**Sixty-six** [1] - 158:1

**size** [3] - 166:22, 167:1, 185:24

**Sizer** [1] - 76:22

**sizes** [1] - 190:3

**skeptical** [4] - 12:5, 13:14, 126:9, 177:10

**skewed** [1] - 114:11

**skin** [3] - 35:18, 35:19, 96:14

**slide** [2] - 96:6, 103:13

**slideshow** [1] - 165:6

**slightly** [1] - 63:22

**slippery** [2] - 71:11, 71:17

**slope** [2] - 71:11, 71:17

**slow** [4] - 70:1, 128:14, 166:1, 195:18

**slowly** [4] - 26:1, 26:7, 39:7, 128:11

**smaller** [1] - 84:20

**Smith** [8] - 4:14, 4:16, 15:1, 20:3, 21:19, 23:23, 42:20, 59:18

**SMITH** [7] - 4:16, 15:6, 21:8, 21:17, 21:20, 21:22, 59:21

**smooth** [1] - 17:2

**so..** [1] - 172:5

**social** [3] - 136:8, 173:6, 174:20

**society** [4] - 91:16, 173:11, 195:1, 196:14

**sociological** [1] - 77:10

**soft** [1] - 200:22

**sole** [2] - 16:6, 60:9

**solely** [1] - 203:5

**solicit** [1] - 20:14

**solution** [21] - 53:25, 55:14, 55:16, 55:21, 72:4, 79:10, 80:19, 93:20, 93:25, 99:25, 101:3, 104:6, 104:8, 121:3, 123:16, 126:18, 127:8, 132:23, 139:10, 206:14, 211:23

**solutions** [7] - 69:3, 137:24, 174:4, 193:8, 205:24, 205:25, 206:13

**solve** [3] - 79:9, 104:19, 210:15

**solved** [1] - 101:20

**someone** [45] - 12:1, 14:5, 26:13, 30:14, 54:6, 58:6, 59:9, 59:25, 72:11, 78:24, 79:3, 80:5, 89:19, 92:7, 93:12, 93:17, 100:4, 101:20, 104:14, 105:22, 113:12, 114:2, 120:3, 122:12, 123:4, 123:8, 125:1, 127:5, 127:6, 137:20, 138:22, 139:1, 146:8, 146:11, 149:5, 161:5, 161:11, 176:12, 180:20, 181:13, 183:22, 184:4, 198:1, 199:13, 201:16

**sometimes** [9] - 26:3, 34:1, 57:16, 84:20, 85:24, 169:5, 169:6, 169:20, 202:18

**somewhat** [1] - 99:19

**somewhere** [2] - 167:6, 186:8

**Sonya** [1] - 82:17

**soon** [4] - 9:16, 19:3, 147:19, 148:7

**sorry** [12] - 25:11, 44:23, 77:14, 87:21, 119:4, 141:9, 148:17, 181:7, 190:8, 194:22, 196:20, 198:11

**sort** [29] - 21:15, 40:18, 41:11, 44:16, 45:18, 47:10, 55:21, 66:5, 67:16, 68:7,

75:13, 99:13, 102:16, 105:13, 105:16, 105:21, 106:3, 106:4, 106:14, 107:20, 107:25, 108:17, 108:18, 108:22, 108:23, 109:10, 136:16, 206:9, 208:1

**Soul** [2] - 63:1, 64:2

**sound** [2] - 10:3, 146:16

**sounds** [4] - 21:16, 26:14, 43:15, 60:5

**space** [2] - 118:22, 201:2

**spaces** [2] - 93:5, 93:9

**speaker** [1] - 26:16

**SPEAKER** [1] - 171:21

**speaker's** [1] - 26:18

**speakest** [1] - 96:12

**speaking** [12] - 7:24, 57:13, 86:17, 109:17, 114:13, 114:23, 116:18, 121:4, 123:16, 150:11, 171:7, 192:18

**speaks** [3] - 30:5, 130:1, 133:20

**special** [1] - 164:23

**specialist** [1] - 193:23

**specialty** [2] - 39:16, 173:22

**specific** [12] - 6:12, 8:17, 10:16, 19:20, 22:7, 31:12, 53:8, 70:8, 86:17, 93:11, 193:11, 205:14

**specifically** [18] - 5:6, 7:11, 9:4, 12:20, 14:23, 17:6, 20:14, 22:21, 24:3, 25:8, 29:13, 36:1, 75:6, 118:8, 195:14, 195:17, 204:12, 206:6

**specification** [1] - 47:10

**specifics** [1] - 137:7

**speculation** [1] - 5:23

**speculative** [1] - 210:11

**speed** [4] - 26:4, 150:3, 151:8, 208:20

**speediness** [1] - 164:20

**speeding** [1] - 128:13

**spell** [4] - 101:25, 109:22, 110:4,

135:21

**spelled** [2] - 135:24

**spend** [8] - 53:21, 131:7, 131:11, 158:20, 158:21, 166:10, 195:10, 195:11

**spending** [3] - 19:16, 77:17, 131:13

**spent** [8] - 17:1, 17:2, 17:4, 17:18, 19:18, 76:22, 131:13, 193:12

**spirit** [2] - 111:7, 191:24

**spitting** [1] - 177:18

**spoken** [3] - 112:12, 153:22, 179:3

**spokespersons** [1] - 140:20

**sport** [1] - 201:3

**sporting** [1] - 200:12

**sports** [2] - 200:14, 201:4

**spot** [4] - 122:4, 122:8, 201:9

**spray** [3] - 96:16, 103:7, 104:5

**spreading** [1] - 180:3

**spring** [3] - 43:6, 43:14, 62:18

**sprint** [1] - 214:21

**squirrel** [1] - 168:1

**stabilization** [1] - 139:5

**staff** [7] - 17:8, 58:20, 84:17, 168:2, 186:20, 189:16, 208:19

**staffing** [1] - 85:13

**stake** [2] - 150:21, 150:23

**stakeholders** [5] - 66:13, 76:3, 76:19, 115:1, 211:7

**stand** [12] - 33:5, 76:10, 83:12, 83:14, 95:12, 95:15, 142:4, 150:16, 152:24, 156:10, 174:16, 174:17

**standard** [1] - 115:25

**standards** [2] - 43:19, 50:6

**standing** [4] - 42:5, 95:16, 150:20, 151:13

**stands** [2] - 37:5, 116:18

**Stark** [1] - 2:17

**start** [9] - 39:7, 39:12, 91:3, 98:8, 128:14, 136:3, 154:22, 211:17

**started** [6] - 19:15, 39:22, 44:20, 44:21, 46:21, 200:12

**starting** [5] - 60:19, 102:19, 148:8, 173:21, 198:5

**state** [7] - 29:23, 87:9, 109:18, 134:2, 135:22, 141:8, 195:11

**State's** [1] - 159:9

**statement** [9] - 13:20, 23:2, 23:9, 40:9, 41:7, 41:13, 117:5, 134:7, 139:14

**statements** [4] - 28:13, 28:19, 28:20, 115:5

**STATES** [3] - 1:1, 1:5, 1:19

**states** [5] - 112:9, 117:23, 165:16, 184:15, 190:22

**States** [21] - 3:7, 3:12, 5:4, 8:13, 21:24, 43:2, 46:6, 48:10, 56:14, 60:3, 60:13, 75:21, 76:4, 79:3, 139:14, 141:8, 155:23, 156:15, 168:6, 187:1, 203:13

**States'** [1] - 6:18

**station** [1] - 195:3

**statistical** [1] - 166:6

**Status** [1] - 1:16

**status** [10] - 5:15, 5:16, 5:18, 39:13, 41:17, 85:18, 179:18, 212:9, 212:11, 214:7

**stay** [5] - 39:3, 84:11, 134:1, 134:6, 176:19

**stenographic** [1] - 215:4

**step** [14] - 21:13, 26:25, 88:5, 100:7, 100:8, 101:11, 101:12, 101:13, 105:3, 110:12, 110:13, 111:5, 138:18, 170:6

**stepping** [1] - 199:24

**steps** [3] - 42:3, 211:3

**stick** [3] - 64:20, 177:19, 177:21

**sticker** [1] - 130:15

**stickers** [1] - 124:20

**still** [33] - 20:22, 39:16, 41:20, 62:21, 63:21, 64:19, 74:12, 76:13, 79:17, 84:8, 84:22, 86:18, 93:21, 98:15, 100:9, 101:13, 112:8, 115:15, 121:6, 122:16, 122:17, 122:20, 122:22, 124:9, 126:7, 127:22, 130:16, 164:11, 169:1, 173:10, 179:15, 179:22, 188:3

**stipulated** [3] - 5:5, 6:15, 10:12

**Stipulated** [3] - 211:1, 211:15, 211:16

**stitched** [1] - 96:18

**stone** [1] - 21:15

**stood** [4] - 199:1, 199:9, 199:10, 201:5

**stop** [4] - 89:8, 145:3, 180:2, 200:21

**stops** [2] - 81:11, 81:13

**stories** [1] - 89:23

**story** [8] - 62:16, 67:9, 89:16, 89:18, 89:20, 139:21, 173:1, 201:7

**storytellers** [1] - 173:1

**straights** [2] - 177:13, 177:23

**strategy** [1] - 21:9

**stream** [1] - 89:20

**Street** [20] - 2:17, 5:19, 41:17, 41:21, 41:25, 42:5, 91:1, 91:6, 91:11, 91:19, 131:19, 132:21, 133:1, 133:3, 133:18, 133:24, 134:3, 138:22, 146:18, 177:12

**street** [2] - 105:9, 146:4

**streets** [4] - 11:10, 12:1, 176:7, 179:8

**strengthens** [1] - 46:4

**stress** [2] - 80:22, 93:6

**stressed** [1] - 112:7

**strictly** [1] - 31:9

**strike** [1] - 108:17

**strikes** [1] - 112:14

**strives** [1] - 16:18

**striving** [2] - 65:19, 101:3

**Stroll** [2] - 63:1, 64:3

**strong** [1] - 82:18

**struck** [4] - 64:5, 67:6, 67:10, 67:21

**structure** [4] - 11:6, 47:6, 54:23, 152:13

**struggles** [1] - 91:10

**struggling** [5] - 48:18, 80:4, 122:11, 122:23, 123:12

**student** [1] - 124:9

**studies** [1] - 16:16

**study** [1] - 16:16

**stuff** [4] - 137:15, 139:2, 139:11

**stuffed** [1] - 96:17

**Subcommittee** [1] - 110:2

**subcommittee** [2] - 17:7

**Subcommittees** [1] - 110:8

**subject** [4] - 24:13, 24:14, 28:21, 157:10

**subjected** [2] - 23:18, 206:11

**subjective** [4] - 23:6, 113:11, 114:4, 115:18

**submission** [1] - 98:9

**submissions** [3] - 28:10, 28:11, 112:13

**submit** [7] - 9:3, 20:22, 28:6, 32:17, 204:24, 205:24, 207:20

**submitted** [5] - 6:22, 9:6, 14:19, 20:21, 28:6

**subsection** [3] - 11:1, 13:16

**subsequent** [3] - 163:3, 163:4, 167:14

**subsequently** [2] - 163:7, 209:23

**substance** [1] - 136:16

**substantial** [1] - 4:25

**subtle** [1] - 91:18

**succeed** [6] - 192:6, 211:6, 212:2, 212:4, 212:6

**succeeds** [1] - 211:6

**success** [1] - 214:18

**successful** [3] - 97:9, 108:21, 118:16

**successfully** [1] - 116:20

**successors** [1] - 24:18

**sudden** [1] - 145:21

**sued** [1] - 143:23

**suffer** [1] - 174:10

**suffers** [1] - 139:2

**sufficient** [6] - 10:24, 11:8, 81:5, 94:20, 152:13, 177:9

**sufficiently** [2] - 105:3, 105:6

**suggest** [2] - 118:12, 150:11

**suggested** [6] - 25:3, 36:3, 100:20, 120:13, 132:11, 167:21

**suggesting** [2] - 129:8, 160:12

**suggestion** [3] - 100:16, 132:9, 192:1

**suggestions** [1] - 177:10

**suggests** [1] - 112:20

**suicidal** [1] - 136:15

**suit** [1] - 76:6

**suite** [1] - 18:5

**Suite** [2] - 2:3, 2:17

**summarize** [2] - 25:4, 130:6

**summons** [1] - 144:5

**sunlight** [1] - 31:20

**supervising** [1] - 104:3

**supervision** [2] - 160:13, 190:23

**supervisor** [4] - 23:3, 23:9, 23:10, 167:13

**supervisors** [2] - 58:19, 167:12

**supplement** [1] - 23:5

**support** [10] - 6:17, 6:19, 16:8, 66:13, 91:19, 110:17, 112:24, 141:9, 156:5, 193:23

**Support** [1] - 181:7

**supported** [4] - 158:1, 167:14, 188:22, 191:21

**supporting** [2] - 110:19, 133:23

**supportive** [2] - 128:15, 157:21

**supposed** [8] - 32:25, 142:18, 143:20, 144:6, 154:20, 166:8, 174:8, 197:2

**supremacy** [2] - 174:7, 179:14

**surely** [3] - 93:25

**surgery** [1] - 169:11

**surprising** [1] -

136:18
**surrounding** [2] - 73:15, 208:14
**survivor** [2] - 99:15, 173:3
**suspect** [1] - 140:23
**suspicion** [1] - 138:21
**sustain** [4] - 38:2, 204:21
**sustained** [5] - 32:12, 38:4, 38:5, 49:16
**SW** [3] - 2:3, 2:10, 2:17
**swapping** [1] - 46:21
**Sweeney** [1] - 115:7
**Sweeney-Miran** [1] - 115:7
**sweetheart** [1] - 177:21
**sworn** [14] - 16:6, 51:25, 66:13, 79:5, 82:4, 82:9, 82:14, 97:18, 143:4, 146:5, 167:11, 167:20, 213:8, 213:12
**system** [107] - 17:15, 27:3, 33:14, 33:16, 37:8, 37:10, 37:12, 44:10, 46:5, 46:18, 46:19, 47:12, 47:16, 47:17, 47:20, 47:21, 48:5, 48:14, 54:11, 58:12, 60:9, 70:25, 76:11, 76:12, 76:17, 78:2, 79:14, 82:19, 89:2, 97:9, 102:9, 102:14, 109:1, 109:3, 109:4, 111:2, 111:4, 118:8, 142:11, 142:20, 143:14, 144:18, 145:25, 147:1, 147:6, 147:7, 147:23, 148:22, 149:25, 150:16, 150:24, 152:3, 153:8, 153:13, 154:14, 161:16, 164:4, 164:5, 164:11, 164:19, 166:12, 166:22, 167:2, 168:5, 168:11, 168:19, 168:20, 173:21, 173:25, 174:2, 174:3, 175:12, 175:19, 176:13, 177:6, 178:15, 178:24, 179:11, 179:12, 179:20,

186:4, 186:25, 187:3, 187:11, 187:19, 187:20, 188:23, 189:10, 189:13, 189:15, 189:19, 189:24, 191:12, 191:14, 191:21, 192:8, 197:23, 203:23, 206:1, 206:9, 206:15, 207:11, 208:15, 209:20
**systemic** [10] - 172:21, 173:23, 174:7, 179:9, 179:10, 179:14, 179:17, 184:18, 191:4
**systems** [8] - 11:6, 47:1, 47:2, 70:21, 96:4, 110:19, 190:16, 208:20

---

# T

**table** [1] - 106:14
**tables** [2] - 83:20, 89:10
**tacks** [1] - 71:25
**tactical** [1] - 96:9
**talks** [1] - 47:6
**Talmudic** [1] - 89:22
**tapestry** [1] - 140:14
**Tara** [1] - 7:12
**target** [4] - 173:3, 200:13, 201:5, 201:6
**targeted** [1] - 179:13
**taser** [2] - 40:21, 103:7
**task** [1] - 42:10
**tasked** [2] - 44:11, 44:19
**tasks** [1] - 17:4
**teach** [2] - 176:18, 176:19
**Team** [1] - 81:12
**team** [17] - 4:17, 15:18, 15:20, 16:18, 16:22, 17:12, 17:21, 19:2, 19:17, 19:24, 21:9, 21:18, 21:21, 42:18, 84:17, 161:12
**team's** [1] - 19:7
**teams** [1] - 42:22
**tears** [1] - 180:3
**technical** [1] - 172:10
**teen** [2] - 136:15, 178:2
**teenager** [1] - 136:15
**telephone** [2] - 26:11, 26:14

**telephones** [1] - 26:18
**teller** [1] - 172:23
**ten** [4] - 94:19, 94:25, 116:20, 145:4
**tend** [2] - 26:2, 137:4
**tends** [1] - 26:1
**tentative** [1] - 126:14
**tentatively** [1] - 123:7
**tenure** [2] - 30:22, 57:15
**Teressa** [2] - 8:4, 171:22
**term** [3] - 18:20, 86:5, 190:24
**terminated** [2] - 47:25, 48:6
**termination** [1] - 167:23
**terms** [8] - 43:2, 43:3, 66:5, 77:17, 89:7, 105:16, 116:1, 213:5
**terrific** [3] - 34:13, 34:22, 35:13
**territory** [1] - 156:23
**test** [2] - 43:10, 199:7
**testified** [3] - 136:22, 165:8, 210:12
**testify** [2] - 171:2, 172:10
**testimony** [13] - 7:17, 8:9, 28:20, 79:5, 93:10, 112:12, 112:13, 163:15, 171:20, 180:6, 181:13, 182:6, 202:25
**that'll** [1] - 156:6
**THE** [327] - 1:1, 1:2, 1:8, 1:18, 2:2, 2:8, 3:4, 3:6, 3:13, 3:20, 3:25, 4:7, 4:12, 4:19, 4:24, 20:2, 21:16, 21:18, 21:21, 21:23, 22:9, 22:12, 22:15, 23:13, 23:16, 23:21, 24:25, 25:4, 25:7, 25:15, 25:16, 25:18, 25:25, 26:8, 26:10, 28:25, 29:23, 30:9, 31:4, 32:3, 34:12, 34:22, 35:3, 35:9, 35:11, 35:24, 36:1, 36:9, 36:12, 37:16, 38:9, 38:20, 38:22, 38:25, 39:4, 43:5, 43:9, 43:14, 46:1, 46:23, 48:2, 48:17, 50:12, 50:16, 51:1, 51:7, 52:12, 52:16, 52:20, 53:3, 53:6,

53:24, 55:1, 55:6, 55:10, 55:12, 56:1, 57:1, 57:8, 58:2, 58:15, 59:1, 59:5, 59:8, 59:18, 59:22, 60:23, 61:2, 61:10, 61:13, 61:17, 61:19, 66:11, 66:25, 69:11, 69:15, 69:18, 69:20, 69:24, 72:11, 73:6, 73:13, 73:18, 73:20, 73:25, 74:3, 74:15, 74:18, 75:12, 75:17, 77:4, 77:6, 77:12, 77:25, 79:21, 80:3, 81:2, 81:9, 82:1, 83:4, 83:7, 83:10, 83:13, 85:15, 87:2, 87:4, 87:20, 87:22, 88:2, 88:11, 89:14, 90:1, 90:3, 90:8, 90:12, 91:17, 91:23, 92:7, 92:10, 92:12, 92:15, 92:20, 94:5, 94:18, 94:21, 94:22, 95:2, 95:8, 95:10, 95:13, 95:18, 97:25, 99:25, 100:23, 101:25, 102:4, 103:1, 103:25, 104:19, 104:22, 105:2, 105:25, 107:6, 108:5, 109:13, 109:16, 109:22, 109:24, 113:5, 113:20, 115:8, 115:21, 119:3, 119:13, 119:16, 120:3, 120:5, 120:17, 120:20, 121:10, 121:16, 121:21, 121:24, 122:5, 122:11, 122:22, 123:14, 123:19, 123:21, 123:23, 124:2, 125:14, 127:9, 127:13, 127:17, 127:23, 127:24, 128:3, 131:21, 131:24, 132:6, 132:16, 132:19, 133:8, 133:10, 134:1, 134:12, 134:18, 134:25, 135:7, 135:14, 135:18, 135:21, 135:25, 141:13, 141:16, 141:24, 142:14, 144:1, 147:21,

148:4, 148:16, 148:25, 149:4, 150:5, 150:14, 151:11, 151:19, 151:25, 152:2, 152:6, 153:2, 153:4, 154:8, 154:25, 155:17, 156:1, 156:13, 156:17, 157:8, 157:18, 158:2, 158:4, 158:10, 159:1, 160:12, 160:18, 160:23, 161:1, 161:6, 161:8, 162:3, 162:6, 162:8, 162:16, 163:12, 163:14, 163:18, 171:15, 171:19, 171:22, 172:2, 172:5, 172:8, 180:13, 180:18, 180:22, 180:25, 183:9, 183:21, 184:25, 185:4, 185:10, 185:13, 188:1, 188:5, 188:6, 188:10, 188:13, 188:17, 192:9, 193:25, 194:2, 194:6, 194:8, 194:10, 194:16, 194:22, 196:22, 197:22, 198:7, 198:9, 198:12, 198:16, 198:20, 202:16, 202:22, 203:8, 203:11, 206:2, 207:4, 207:9, 208:3, 208:6, 209:2, 209:6, 209:9, 209:11, 209:14, 210:4, 210:6, 210:8, 210:14, 210:17, 210:20, 210:23, 210:25, 212:22, 212:25, 213:5, 213:16, 213:20, 213:23, 213:25, 214:3, 214:5, 214:7
**themes** [3] - 28:15, 29:2, 29:3
**themselves** [19] - 27:5, 33:14, 51:25, 57:21, 72:9, 72:22, 80:14, 125:19, 129:20, 140:22, 140:25, 147:8, 147:9, 160:1, 161:13, 197:20, 204:6

**theoretical** [1] - 150:14

**theory** [1] - 74:15

**therapy** [1] - 174:14

**thereafter** [3] - 44:10, 44:13, 45:17

**therefore** [8] - 20:9, 32:18, 34:17, 50:21, 53:20, 125:14, 204:14, 211:15

**they've** [9] - 57:13, 59:16, 107:9, 112:10, 124:21, 145:15, 194:12, 194:20, 207:12

**thick** [2] - 66:25, 67:1

**thinking** [15] - 20:15, 51:8, 51:14, 52:5, 55:21, 58:6, 72:11, 80:10, 144:9, 149:4, 152:6, 154:25, 155:8, 200:8, 201:10

**thinks** [2] - 52:6, 134:3

**third** [8] - 13:16, 19:21, 27:23, 59:22, 62:3, 116:3, 138:22, 153:20

**Third** [1] - 2:3

**Thomas** [1] - 15:22

**thoroughly** [3] - 160:17, 174:6, 175:5

**thoroughness** [1] - 20:3

**thou** [7] - 96:12, 96:13, 96:17, 96:18

**thoughtful** [3] - 17:19, 56:22, 144:21

**thoughts** [6] - 114:8, 128:19, 130:6, 131:18, 134:9

**thousand** [2] - 26:5, 55:17

**thousands** [4] - 68:3, 137:2, 144:21, 179:7

**threat** [4] - 111:14, 174:7, 182:19, 182:20

**threaten** [1] - 97:7

**three** [49] - 5:21, 10:11, 10:14, 13:15, 14:15, 14:24, 24:23, 25:8, 26:24, 28:5, 29:3, 31:14, 31:23, 61:23, 61:25, 70:8, 70:24, 79:3, 86:17, 89:7, 106:6, 116:20, 119:19, 120:1, 143:19, 145:21, 151:20, 151:23,

152:17, 154:12, 165:10, 167:6, 170:8, 175:22, 186:7, 186:8, 186:12, 186:22, 193:1, 197:4, 197:5, 197:8, 197:11, 198:24, 203:25, 204:2, 204:3, 204:5, 212:11

**threshold** [2] - 98:20, 147:3

**throughout** [6] - 75:5, 93:4, 128:17, 128:19, 192:19, 195:18

**throw** [2] - 87:9, 166:6

**thrown** [3] - 72:23, 170:22, 173:24

**Thursday** [2] - 144:6, 212:15

**Tia** [2] - 8:4, 95:10

**tied** [2] - 116:25, 118:7

**ties** [1] - 105:13

**tiger** [1] - 109:10

**time-consuming** [1] - 190:11

**timeline** [2] - 47:4, 47:9

**timely** [1] - 154:2

**timers** [1] - 195:23

**tired** [2] - 96:18, 198:18

**Tishana** [1] - 95:22

**Title** [2] - 205:17, 205:19

**today** [76] - 4:18, 5:3, 15:8, 15:25, 17:23, 19:18, 22:2, 25:2, 28:6, 28:8, 28:13, 29:8, 39:11, 48:14, 64:16, 68:19, 69:3, 70:4, 84:6, 84:24, 85:12, 86:5, 93:10, 95:20, 97:11, 98:4, 98:6, 98:7, 102:6, 102:8, 110:11, 111:22, 116:6, 131:17, 131:20, 133:24, 136:3, 145:7, 145:17, 146:3, 147:20, 153:22, 155:3, 155:7, 157:15, 160:4, 162:14, 165:2, 168:24, 169:14, 171:14, 180:5, 180:7, 184:7, 187:24, 192:18, 194:23, 202:14,

202:15, 203:14, 203:21, 206:4, 206:5, 206:6, 206:14, 207:21, 208:2, 208:9, 208:11, 208:25, 209:18, 209:19, 209:20, 210:12

**today's** [4] - 5:12, 64:25, 100:18, 207:17

**together** [9] - 40:15, 45:9, 69:9, 89:10, 90:24, 95:25, 120:1, 132:1, 140:10

**tolling** [2] - 47:9, 47:11

**Tom** [1] - 42:19

**took** [6] - 16:7, 45:9, 98:15, 142:19, 164:18, 177:23, 179:7, 206:25

**tools** [2] - 24:8, 24:12

**top** [2] - 50:25, 114:9

**topic** [6] - 24:16, 59:19, 73:11, 164:7, 166:21, 185:23

**totally** [10] - 25:5, 51:11, 62:16, 103:1, 121:12, 121:24, 123:5, 123:9, 157:8, 198:4

**touch** [2] - 58:14, 181:12

**touched** [1] - 65:2

**touching** [1] - 86:22

**tough** [1] - 156:18

**tour** [1] - 17:11

**toured** [1] - 194:8

**toward** [3] - 25:23, 26:25, 137:21

**towards** [10] - 58:3, 65:4, 88:25, 100:1, 101:3, 110:12, 110:14, 112:11, 115:4, 124:1

**town** [4] - 45:13, 45:17, 120:12, 132:9

**track** [6] - 31:17, 31:19, 31:23, 131:22, 148:19, 189:13

**tracked** [1] - 166:3

**tracking** [1] - 62:20

**tracks** [1] - 31:15

**traditions** [1] - 174:16

**tragic** [1] - 173:18

**train** [3] - 86:23, 160:6, 160:7

**trained** [3] - 120:24,

169:4, 169:13

**trainers** [1] - 202:2

**training** [48] - 11:2, 11:4, 11:5, 12:18, 15:23, 17:14, 18:3, 18:7, 18:8, 24:7, 35:6, 36:18, 36:22, 42:6, 42:21, 42:22, 54:10, 96:6, 96:22, 96:23, 97:1, 103:13, 109:6, 159:13, 159:14, 159:15, 159:25, 160:9, 160:13, 160:14, 164:18, 169:6, 178:22, 190:23, 191:5, 192:22, 193:6, 193:9, 193:11, 193:23, 193:24, 194:3, 200:12, 201:18, 202:10, 205:7, 206:11, 207:2

**Training** [1] - 18:13

**trainings** [2] - 19:19, 87:11

**TRANSCRIPT** [1] - 1:15

**transcript** [4] - 100:24, 165:4, 215:4, 215:6

**transfers** [1] - 64:22

**transform** [1] - 62:1

**transforming** [1] - 62:7

**transition** [5] - 46:23, 74:19, 74:22, 136:4, 207:5

**translate** [1] - 122:16

**translates** [1] - 62:19

**transmission** [3] - 184:19, 184:22, 184:23

**transparency** [3] - 65:14, 110:19, 191:17

**transparent** [1] - 62:16

**transport** [1] - 138:25

**trauma** [10] - 49:2, 80:18, 99:1, 123:12, 172:20, 174:14, 182:19, 182:20, 182:22

**traumatic** [11] - 12:16, 12:24, 48:21, 50:21, 54:2, 54:3, 54:15, 123:10, 137:19, 182:6

**traumatizes** [1] - 177:8

**traumatizing** [1] - 175:10

**treat** [1] - 141:11

**treated** [1] - 177:24

**tree** [1] - 89:19

**tremendous** [5] - 37:12, 53:12, 91:9, 110:24, 214:12

**trial** [3] - 78:2, 78:4, 78:14

**trials** [1] - 78:2

**Tribal** [1] - 173:8

**Tribes** [1] - 172:17

**tribes** [1] - 172:17

**tried** [2] - 34:2, 45:16

**trigger** [1] - 11:17

**triggering** [3] - 12:16, 12:24, 80:18

**trouble** [2] - 80:10, 122:22

**troubling** [1] - 14:24

**truck** [1] - 133:13

**true** [9] - 97:6, 137:8, 137:13, 137:14, 140:9, 140:22, 141:10, 215:4

**truly** [6] - 89:12, 141:1, 143:9, 147:3, 175:13, 207:12

**trust** [10] - 63:7, 76:15, 79:18, 137:17, 138:18, 141:4, 146:7, 148:2, 175:25, 189:15

**trusting** [1] - 176:14

**truth** [9] - 140:13, 140:14, 172:22, 176:23, 177:11, 178:13, 178:25, 179:8, 180:4

**try** [20] - 50:24, 54:24, 66:7, 88:8, 100:2, 100:11, 104:7, 123:10, 126:18, 130:6, 130:8, 149:20, 180:15, 183:24, 188:12, 188:15, 200:6, 200:16, 208:19, 208:21

**trying** [35] - 17:1, 37:7, 43:10, 43:12, 52:22, 55:21, 65:7, 67:7, 69:25, 76:23, 99:8, 104:24, 105:10, 106:16, 106:18, 115:18, 122:12, 125:22, 132:8, 134:6, 145:1, 154:17, 160:4,

162:17, 164:16,
178:10, 194:12,
196:19, 200:5,
200:21, 201:19,
201:24, 202:9, 210:3
**Tuesday** [5] - 212:13,
212:15, 212:16,
213:21, 214:8
**tug** [1] - 139:21
**tug-o-war** [1] - 139:21
**tuning** [1] - 175:11
**turn** [12] - 5:12, 21:24,
51:21, 61:12,
100:22, 101:23,
129:25, 134:14,
134:18, 141:18,
152:13, 165:12
**turned** [5] - 176:19,
178:9, 178:10,
201:21, 201:25
**turning** [1] - 8:12
**turns** [1] - 193:13
**tweaks** [1] - 129:9
**twice** [2] - 85:25,
131:20
**twisted** [1] - 139:25
**two** [60] - 5:18, 8:11,
10:3, 13:7, 14:3,
31:19, 33:22, 35:6,
39:24, 45:13, 50:13,
52:2, 56:5, 56:11,
56:12, 56:16, 56:18,
56:19, 62:19, 70:9,
71:4, 71:21, 78:18,
78:25, 85:16, 100:8,
101:13, 105:3,
110:6, 111:12,
116:9, 120:9,
120:10, 120:11,
127:18, 129:3,
131:18, 139:21,
144:20, 145:9,
147:12, 149:3,
156:6, 168:7,
169:16, 170:8,
187:6, 189:13,
192:11, 192:22,
192:24, 193:6,
193:7, 193:12,
195:10, 203:16,
203:17, 203:24,
205:16, 209:9
**two-day** [2] - 192:22,
193:6
**two-step** [1] - 105:3
**two-track** [1] - 189:13
**tying** [1] - 190:11
**type** [7] - 53:8, 101:15,
124:23, 126:25,
187:2, 191:8, 191:21
**types** [2] - 40:21,
40:22
**typically** [1] - 126:8

## U

**U.S** [3] - 2:2, 2:5,
163:23
**ultimate** [2] - 24:11,
152:9
**ultimately** [8] - 28:2,
30:24, 32:2, 38:4,
50:3, 116:23,
118:14, 164:13
**unable** [2] - 71:13,
129:20
**unbias** [1] - 77:24
**unbiased** [10] - 56:22,
58:16, 58:17, 78:14,
106:16, 106:19,
107:4, 112:4,
129:23, 195:16
**uncensored** [3] -
172:22, 174:18
**uncle** [1] - 136:12
**unclear** [4] - 10:4,
115:19, 118:3,
145:17
**uncomfortable** [2] -
51:11, 72:12
**unconstitutional** [1] -
153:12
**undefined** [1] - 10:2
**under** [28] - 8:24,
10:25, 21:12, 22:24,
27:9, 31:23, 38:3,
38:19, 43:11, 49:21,
59:13, 76:22, 78:24,
79:4, 94:13, 113:11,
116:7, 142:17,
153:25, 154:1,
154:21, 155:1,
156:2, 156:19,
157:14, 184:14,
189:19, 194:20
**undercut** [1] - 203:16
**undergoing** [1] -
207:5
**underlying** [1] - 80:18
**undermine** [2] -
166:20, 185:22
**undermines** [2] -
117:22, 148:21
**underscore** [1] - 90:25
**underscores** [1] -
129:10
**understood** [12] -
21:12, 32:3, 34:25,
59:21, 90:20, 108:5,
109:13, 158:6,

183:9, 184:25,
209:14, 210:16
**undertake** [1] - 51:18
**undertaken** [1] - 37:14
**undertaking** [1] -
110:25
**undertook** [1] - 27:15
**undesirable** [1] -
191:7
**undo** [1] - 146:25
**undoubtedly** [2] -
129:24, 158:7
**uneasy** [1] - 153:18
**unequivocally** [1] -
163:22
**unfair** [6] - 97:23,
174:3, 175:16,
207:11, 207:13,
212:1
**unfairly** [3] - 78:3,
117:10, 117:11
**unfamiliar** [1] - 156:23
**unfortunately** [4] -
15:24, 64:5, 175:14,
178:9
**Unfortunately** [1] -
165:18
**unhoused** [1] - 173:7
**UNIDENTIFIED** [1] -
171:21
**unimaginable** [2] -
173:15, 173:16
**unintended** [1] - 93:8
**union** [4] - 27:20,
49:20, 49:21, 49:23
**union's** [1] - 114:25
**unions** [3] - 45:12,
129:22, 204:17
**unique** [5] - 12:1,
92:25, 136:13,
172:12, 183:16
**Unit** [1] - 55:24
**UNITED** [3] - 1:1, 1:5,
1:19
**United** [22] - 3:7, 3:11,
5:4, 6:18, 8:13,
21:24, 43:2, 46:6,
48:10, 56:14, 60:3,
60:13, 75:21, 76:4,
79:3, 139:14, 141:8,
155:23, 156:15,
168:6, 187:1, 203:13
**units** [2] - 17:12,
139:5
**Units** [1] - 139:4
**unity** [1] - 199:7
**University** [1] - 67:12
**unjustified** [1] -
207:15
**unknown** [2] - 201:15,

203:20
**unless** [3] - 118:1,
168:16, 187:16
**unlikely** [1] - 212:1
**unmute** [3] - 26:21,
141:18, 142:1
**unmuted** [1] - 141:22
**unquote** [1] - 122:20
**unreasonable** [8] -
78:24, 97:24,
157:13, 167:7,
174:3, 186:10,
189:14, 212:1
**unreasonably** [3] -
78:3, 78:6, 154:23
**unripe** [2] - 210:10,
210:11
**unsafe** [1] - 136:19
**unsafety** [1] - 121:20
**unseen** [1] - 40:25
**unto** [1] - 96:11
**unwanted** [1] - 173:11
**unwilling** [4] - 71:13,
71:14, 71:15, 138:12
**unwillingness** [1] -
193:7
**up** [110] - 7:17, 18:5,
19:4, 19:9, 20:2,
20:5, 20:16, 20:19,
21:1, 25:13, 26:3,
29:12, 29:18, 33:23,
35:22, 37:2, 37:6,
37:16, 40:19, 42:5,
44:19, 50:12, 50:13,
54:17, 56:7, 59:18,
63:10, 64:14, 70:9,
71:20, 72:3, 74:18,
75:14, 79:19, 80:11,
83:14, 85:12, 91:2,
93:12, 95:11,
100:11, 100:13,
102:17, 104:15,
105:23, 107:9,
107:24, 108:14,
108:18, 109:17,
112:11, 114:16,
114:25, 116:6,
116:18, 119:6,
121:7, 127:1,
128:13, 128:17,
129:4, 129:14,
130:25, 131:12,
133:24, 135:9,
141:11, 144:11,
145:5, 147:17,
149:5, 150:3, 150:7,
151:8, 151:14,
152:1, 159:4, 159:7,
168:1, 168:3,
171:24, 174:16,

174:17, 180:11,
184:2, 184:3, 184:4,
184:6, 186:19,
186:21, 187:24,
188:24, 190:11,
192:14, 192:22,
193:6, 196:10,
199:10, 201:5,
201:6, 201:18,
203:23, 204:13,
205:15, 205:16,
205:20, 206:8,
206:15, 208:20
**upcoming** [3] - 6:1,
42:25, 134:5
**update** [3] - 5:13,
15:10, 61:22
**updating** [2] - 70:6,
70:7
**upheld** [1] - 115:24
**uphold** [1] - 119:1
**upholding** [1] - 177:6
**ups** [1] - 76:9
**upsetting** [1] - 49:6
**urge** [1] - 141:8
**useful** [2] - 137:13,
140:5
**useless** [1] - 123:5
**uses** [4] - 22:25,
153:12, 166:11,
168:6
**usual** [1] - 179:4

## V

**V-I** [1] - 13:17
**vacation** [2] - 45:5,
67:2
**vague** [3] - 14:1,
113:24, 164:2
**vagueness** [2] - 13:25,
97:12
**Val** [1] - 15:22
**Val's** [1] - 16:20
**Valencia** [1] - 15:22
**valuable** [8] - 11:16,
31:5, 101:4, 122:24,
123:7, 125:17,
126:10, 204:9
**value** [3] - 38:5, 167:8,
186:11
**values** [2] - 110:14,
175:5
**Values** [1] - 178:16
**variety** [1] - 54:20
**various** [6] - 9:12,
17:13, 18:3, 63:1,
165:21, 198:1
**vast** [2] - 53:18, 138:1
**vehicle** [5] - 53:8,

146:6, 201:14, 201:24
**vehicles** [1] - 182:9
**vein** [1] - 72:18
**Vera** [1] - 142:17
**version** [4] - 112:6, 120:5, 136:24, 165:2
**versions** [1] - 129:7
**versus** [5] - 108:2, 139:16, 170:18, 174:4, 182:8
**vested** [1] - 10:2
**vi** [2] - 13:17, 13:23
**viable** [1] - 160:10
**vice** [1] - 137:8
**vice-presidency** [1] - 137:8
**victim** [2] - 173:3, 174:1
**video** [30] - 7:17, 8:2, 8:3, 8:4, 8:5, 8:6, 12:18, 23:5, 23:11, 26:11, 26:13, 39:14, 40:2, 40:4, 40:12, 40:17, 54:5, 93:7, 122:19, 127:22, 128:1, 141:18, 180:19, 182:6, 184:19, 184:22, 184:23, 188:7
**videos** [1] - 5:17
**view** [8] - 23:11, 37:20, 65:22, 68:23, 115:2, 126:14, 140:5, 157:1
**viewing** [6] - 5:17, 22:8, 22:21, 22:22, 39:14, 40:2
**views** [2] - 67:8, 67:18
**vigorously** [1] - 200:20
**VIII** [27] - 5:7, 26:25, 27:6, 27:24, 28:6, 28:7, 33:12, 33:19, 34:8, 39:13, 43:16, 43:17, 70:23, 111:21, 112:2, 163:23, 165:12, 166:23, 167:4, 185:25, 186:6, 189:9, 203:7, 203:9, 206:15, 206:21, 207:21
**violate** [3] - 82:20, 168:16, 187:16
**violated** [3] - 60:12, 171:5, 205:13
**violating** [1] - 170:24
**violation** [6] - 46:12, 46:13, 49:16, 60:3,

61:4, 153:17
**violations** [2] - 58:20, 191:1
**violence** [9] - 67:18, 96:21, 173:3, 174:1, 175:1, 179:19, 184:24, 196:15
**violent** [4] - 63:20, 96:4, 96:25, 173:17
**virtual** [1] - 169:14
**virtually** [1] - 122:19
**vision** [3] - 84:9, 84:22, 158:17
**visit** [3] - 19:15, 19:21
**visits** [1] - 194:19
**vital** [1] - 158:17
**vocation** [1] - 196:13
**voice** [8] - 89:11, 95:20, 118:22, 172:22, 174:15, 174:17, 174:18, 197:18
**voices** [4] - 97:15, 97:17, 110:20, 176:4
**void** [3] - 154:5, 203:16, 204:14
**voir** [1] - 106:19
**volume** [1] - 16:12
**volumes** [1] - 133:20
**voluminous** [1] - 45:8
**voluntarily** [1] - 35:9
**voluntary** [4] - 35:10, 35:12, 121:1
**volunteer** [1] - 35:7, 55:17, 144:20, 144:25, 145:1
**volunteering** [1] - 122:2
**volunteers** [2] - 30:21, 90:7
**vote** [12] - 45:4, 78:25, 96:1, 150:17, 150:18, 154:18, 166:24, 186:1, 186:2, 191:16, 204:2
**voted** [15] - 27:15, 86:8, 109:2, 143:9, 147:7, 150:10, 153:24, 162:20, 163:2, 164:11, 165:7, 176:2, 196:25, 204:5, 206:16
**voter** [1] - 190:16
**Voters** [2] - 7:10, 188:20
**voters** [31] - 8:22, 9:12, 9:15, 9:21, 9:24, 43:22, 74:24, 143:2, 143:8, 145:8,

147:6, 150:8, 150:12, 150:17, 162:14, 163:2, 163:10, 166:20, 167:14, 168:14, 185:22, 187:14, 191:21, 191:25, 208:12, 209:18, 209:20, 209:25
**voters'** [1] - 188:24
**votes** [2] - 10:10, 191:18
**vs** [4] - 3:7, 115:7, 139:14, 163:23
**vulnerable** [1] - 133:3

---

## W

**wait** [9] - 147:23, 148:9, 153:6, 153:14, 155:10, 155:15, 171:13, 172:5, 208:17
**waiting** [5] - 148:14, 151:2, 151:4, 151:6, 155:12
**waive** [2] - 51:5, 57:4
**waiver** [6] - 100:14, 101:18, 101:19, 101:20, 210:18
**wake** [1] - 159:7
**Walk** [1] - 67:13
**walk** [4] - 67:14, 145:14, 197:14, 201:18
**walking** [2] - 43:21, 67:20
**wants** [10] - 58:6, 100:5, 112:23, 155:14, 159:3, 180:20, 194:5, 202:24, 203:2, 211:11
**war** [2] - 99:16, 139:21
**warned** [1] - 179:1
**Washington** [2] - 2:7, 172:18
**watch** [9] - 23:5, 40:12, 41:7, 42:22, 49:4, 49:7, 120:24, 169:18, 177:15
**watched** [1] - 41:4
**watching** [4] - 26:13, 40:17, 122:19, 182:7
**ways** [15] - 54:2, 54:3, 55:22, 63:2, 63:3, 65:22, 84:21, 85:5, 86:14, 99:5, 99:9, 103:5, 121:2, 196:19, 197:1

**weapon** [2] - 54:5, 54:7
**weapons** [8] - 87:9, 87:12, 87:13, 89:1, 177:18, 199:17, 199:18, 200:9
**weave** [1] - 173:16
**web** [1] - 19:2
**website** [11] - 19:1, 19:2, 19:8, 20:15, 20:19, 20:20, 20:23, 20:24, 158:21, 159:2, 159:4
**Wednesday** [1] - 212:15
**weeded** [1] - 107:24
**week** [13] - 144:6, 144:7, 148:18, 154:19, 155:11, 156:6, 203:24, 208:24, 209:3, 209:4, 211:20, 212:18, 213:7
**weekend** [1] - 88:21
**weeks** [3] - 61:23, 63:11, 66:22
**weighted** [1] - 129:24
**Weingarten** [1] - 49:21
**weird** [2] - 188:18, 197:1
**welcome** [20] - 3:20, 4:7, 4:19, 4:22, 15:2, 19:12, 21:23, 30:19, 53:11, 53:16, 69:2, 75:19, 95:2, 95:11, 95:18, 102:4, 135:9, 135:25, 198:12, 214:16
**well-documented** [1] - 103:17
**well-qualified** [1] - 164:8
**well-rounded** [1] - 140:9
**WESTLEY** [5] - 172:1, 172:3, 172:6, 172:9, 172:16
**Westley** [4] - 8:5, 171:24, 172:15, 180:14
**whack** [1] - 84:8
**wheelchair** [1] - 104:15
**whereas** [2] - 35:18, 150:22
**wherein** [1] - 44:15
**whichever** [1] - 95:15
**white** [6] - 67:15, 67:19, 96:14,

173:11, 174:7, 179:14
**who've** [1] - 194:17
**whoa** [1] - 96:11
**whole** [16] - 60:13, 62:15, 67:7, 68:16, 68:22, 70:16, 75:5, 76:22, 91:14, 106:4, 127:2, 154:13, 154:14, 163:24, 193:15, 195:18
**wholeheartedly** [1] - 112:24
**wholesale** [1] - 100:2
**wide** [1] - 178:21
**widely** [1] - 164:6
**william** [1] - 7:7
**willing** [15] - 51:17, 72:12, 72:13, 124:2, 125:15, 130:12, 138:5, 164:9, 177:4, 193:21, 195:21, 197:25, 208:9
**willingness** [2] - 75:2, 178:5
**Wilson** [1] - 7:8
**win** [1] - 187:2
**win-lose** [1] - 187:2
**window** [1] - 107:10
**windshield** [1] - 131:13
**wisdom** [1] - 83:18
**wise** [1] - 69:11
**wish** [7] - 21:3, 25:4, 83:13, 97:4, 104:6, 145:7, 181:1
**wishes** [1] - 150:12
**Wisner** [2] - 192:15, 198:14
**WISNER** [4] - 198:15, 198:17, 198:22, 202:20
**withering** [1] - 179:5
**withstand** [1] - 23:11
**witness** [1] - 173:2
**witnessed** [1] - 177:14
**woman** [6] - 85:25, 170:21, 172:25, 177:16, 197:13, 197:15
**womb** [1] - 173:11
**Women** [2] - 7:10, 188:19
**women** [5] - 16:17, 85:11, 197:13, 197:17, 197:19
**won** [1] - 143:24
**wonder** [1] - 75:10
**wonderful** [3] - 73:25, 132:23, 163:20

**word** [8] - 89:3, 94:7, 96:3, 113:7, 113:10, 170:19, 170:20, 178:5

**words** [8] - 46:11, 69:12, 70:9, 70:25, 84:10, 106:23, 197:7, 210:10

**workers** [2] - 58:22, 90:9

**works** [14] - 41:23, 42:2, 49:14, 110:16, 114:14, 137:20, 139:1, 149:25, 150:4, 150:24, 174:1, 213:16, 213:22, 214:2

**world** [7] - 74:23, 93:4, 159:19, 179:7, 196:12

**world's** [1] - 196:3

**worn** [9] - 5:16, 22:5, 22:18, 22:19, 39:14, 39:15, 49:5, 63:6, 91:20

**worried** [3] - 125:18, 125:19, 130:23

**worry** [1] - 26:20

**worse** [3] - 161:7, 177:25, 178:12

**worth** [3] - 27:11, 148:14, 183:15

**worthy** [1] - 144:3

**wrap** [4] - 37:6, 74:18, 108:14, 184:2

**wrapping** [1] - 37:2

**wrestled** [1] - 68:6

**wrestling** [1] - 67:23

**writ** [1] - 24:19

**write** [4] - 8:20, 41:2, 44:8, 105:10

**write-in** [1] - 8:20

**writing** [1] - 140:20

**written** [14] - 6:24, 6:25, 7:1, 7:19, 7:20, 8:1, 67:3, 100:21, 112:12, 115:22, 141:19, 168:15, 187:15

**wrongdoing** [2] - 145:18, 145:19

**wrongfully** [1] - 114:10

**wrought** [1] - 29:12

## Y

**year** [23] - 16:2, 41:18, 45:4, 61:23, 62:19, 63:23, 64:18, 76:22,

77:17, 85:14, 104:18, 109:21, 110:1, 142:19, 154:22, 164:18, 165:22, 174:13, 196:5, 207:1, 207:3, 207:12

**years** [38] - 54:12, 57:2, 57:6, 67:12, 74:8, 74:17, 79:15, 81:15, 84:13, 84:16, 85:8, 85:13, 97:16, 98:11, 128:11, 129:19, 136:9, 137:2, 142:19, 142:25, 144:10, 144:20, 145:24, 146:14, 146:25, 147:12, 151:2, 151:15, 164:12, 170:4, 170:8, 174:13, 186:22, 193:4, 207:19, 208:15, 211:3

**yesterday** [1] - 101:1

**young** [3] - 176:20, 177:16, 179:24

**yourself** [6] - 88:12, 125:2, 125:16, 141:18, 142:1, 181:1

**yourselves** [1] - 88:13

**youth** [3] - 109:21, 109:25, 110:6

## Z

**Z-U-C-K-E-R-M-A-N** [1] - 109:23

**ZUCKERMAN** [18] - 109:20, 109:23, 109:25, 113:22, 115:14, 115:22, 120:18, 120:21, 121:15, 121:18, 121:22, 122:4, 122:10, 122:14, 123:13, 123:15, 123:20, 127:16

**Zuckerman** [5] - 109:21, 110:6, 113:4, 113:21, 119:3

## "

**"de** [1] - 166:4

**"pet** [1] - 168:10

**"rule** [1] - 165:13

**"three** [1] - 167:5

## —

**—** [2] - 168:7