**MENTAL HEALTH ALLIANCE**

**Comments on Draft Methodological Plan presented by the Independent Monitor in US DOJ v City of Portland**

December 2024

The Mental Health Alliance finds much to admire in the draft Methodological Plan presented by the Independent Monitor for the Settlement Agreement on Policing in Portland.  The Monitor appears both realistic and dedicated to producing updates that are thoughtful and thorough, and that will be of real use to the Portland Police Bureau, both officers and leaders.  It is good to see that the Independent Monitor demands to receive and review all the documentation, including BWC video, relevant to use of force events, supervision, discipline, and adherence to policies, and that the Monitor reserves the right to interview individuals directly as needed.  We are hopeful that the monitoring process will prove credible and useful to all the parties, and to the city as a whole.

The Monitor also promises to use "standardized evaluation instruments" to assess the varied sources of evidence.  This approach should help assure objectivity and protect the Bureau from a biased or cherry-picking approach.  However, none of these to-be-standardized instruments are provided and the meaning of the term, "standardization," is unclear.  Is standardization proven scientific validation? Is standardization simply a history of use by the Monitor or by others in other cities? Or, is it simply the consistent use of the same instrument, whatever it turns out to be, across sampled cases?  Video evidence, in particular, can be time-consuming, ambiguous, and complex to "standardize."  **It would be helpful for the parties and for the community to have the opportunity to review and comment on these instruments as they are better defined or developed by the Independent Monitor.**

We also have several topic-specific questions and concerns to share with the Monitor for use in finalizing its technical plan.

**CONCERN 1: Row 2, SA 67, Use of Force**

How are disengagement and de-escalation defined?  The simple presence of armed officers making demands is a large use of force in itself and a frequent trigger of dysfunction by a mentally ill civilian.  Will the Independent Monitor only consider the use of physically painful or injurious kinds of force will the Independent Monitor consider the totality of the situation, including the need for police intervention and the danger, if any, to the public?  Good to see that Row 7, SA 74 does clarify this question with a long list of specific behaviors that define appropriateness in the use of force.

1

**CONCERN 2:  Row 3, SA 69, Use of Force**

It is good to see that the Independent Monitor will study whether reported uses of force are described accurately and quickly in reports, but how will the Independent Monitor ascertain whether all uses of force are reported in the first place?

Rather than studying a sample of reports, it would be stronger to study video of a sample of encounters to see whether all observed uses of force have been reported.  Similarly, it seems vital to study whether BWCs are always turned on as required by policy and whether BWCs are sometimes turned off to conceal officer behaviors.  It is also vital to know whether alternative communication channels, e.g., WhatsApp or Signal, are used to conceal communications among officers during encounters.

**CONCERN 3: Row 6, SA 73, Use of Force**

Good to see that the Independent Monitor will verify that use-of-force violations are linked to PPB's EIS (Employee Information System) and that corrective action extends to rapid re-training and effective supervisory involvement.  However, to study these behaviors, the incident sampling plan will have to include oversampling of the use-of-force incidents that are likely to raise these issues.  How will this be done?

**CONCERN 4: Row 8, SA 75, Sampling for Use-of-Force Compliance Assessment**

It is good to see that the Independent Monitor will deeply assess compliance and managerial response to inappropriate uses of force.  However, we are concerned that either a very large sample of force-incidents will need to be studied to harvest sufficient problematic incidents to study supervisory responses, or that some way to identify a subsample containing such events will need to be devised.  If the latter, how will that be accomplished?

**CONCERN 5: Row 9, SA 76, Use of Force, Compliance Audits**

The Independent Monitor proposes to audit the Bureau's quarterly analyses and reports based on use-of-force data.  The Bureau puts much skilled effort into the production of these reports but the reporting has been criticized on several grounds.  For example, PPB's Training Advisory Task Force has complained that the number of force-report cases are too few to detect differences among groups of officers or near-term changes in behavior, despite widespread tabulation of such statistics.  A larger problem is that the data reported are not standardized or contextualized by the calculation of rates or ratios that can show how behavior is changing relative to the need for police activity, the frequency of calls for service or the requests of mental health professionals, or changes in the kinds of crime and other behaviors to which officers must or can respond.  In addition, the datasets that the Bureau provides to the public are selectively

2

redacted and/or de-linked so as to prevent outside analysts from calculating most such rates. For example, occurrences of use of force when an officer notes probable mental impairment are not compared to the number of all calls when mental impairment is noted, or to the number of calls for service with a notation of mental distress.  In the public data, force-incidents cannot be linked (without great effort, and then only approximately) to encounter and call data.

Counts of numbers of uses of force are, on their own, almost meaningless statistics.  Do fewer force-incidents indicate improved de-escalation skills, or failures to assist the ill or enforce the laws? Quarterly increases or decreases mean little without comparison to increases and decreases in police engagements with various groups and responses to the number of calls for various services.  The Mental Health Alliance has developed methods to calculate revealing rates and ratios and we would be happy to show these to the Independent Monitor and discuss the nuts and bolts.

**CONCERN 6: Community-Based Mental Health Services**

The Independent Monitor proposed to consult with the Bureau on its self-monitoring plan for Community-Based Mental Health Services.  This section of the Settlement Agreement is out-of-date in terms of the mental health system that it describes and was, at the time of writing, vague about the obligations of the City and aspirational about the future activities of the State, the County, and other non-PPB and non-City actors.  In essence, the Settlement Agreement requires PPB to work constructively with others, in a changing environment, to facilitate mental illness prevention, treatment, and safety.  Our concern is that any useful self-monitoring in this area has to specify a policing strategy with sufficient clarity and detail that it can be monitored, and justify this strategy, based on a review of the difficult mental illness environment in which it finds itself and an evidence-based consideration of how PPB could perform most constructively in this environment.  Can PPB articulate such a strategy?  Can it justify it?

PPB has established a Behavioral Health Unit that might be, and hopefully is performing useful work, but its effectiveness has not truly been documented, its advisory meetings are closed to the public, and the question of whether the BHU is the best contribution that PPB could make to community mental health has not been debated.  Concerns have been raised about the apparent wide-spread refusal of PPB officers to transport persons in mental crisis to hospitals, even when legally directed by County-authorized mental health professionals to do so.  The City's constriction of jurisdiction and de-funding of Portland Street Response, a program that diverts people in a mental illness crisis away from police involvement, is another major issue. How will the Independent Monitor assess the performance of the City in self-monitoring "community-based mental health services," given these realities?

**CONCERN 7: Row 49, SA 189, City Response to Public Facing Report of Crowd Control in 2020**

3

The City of Portland paid for and received an excellent review of the PPB's performance during the Black Lives Matter demonstrations and protests during 2020 from the OIG group (AN INDEPENDENT REVIEW OF THE PORTLAND POLICE BUREAU: Agency Culture, Community Perception, and Public Safety in a Time of Change.  OIR Group,  January 2022).  This report made a number of findings and provided 28 recommendations that encompass far more than "training needs."  However, "training needs" is the only area of compliance that the Monitor proposes to track.  These other areas include ascertaining responsibility for false orders and supervision given during crowd control, stopping officers' associations with hate groups, hiring of additional officers, more thoughtful and transparent hiring procedures, and correcting a culture of resistance to information-sharing and accountability within the Bureau.  We think that the Independent Monitor's audits in this area should be expanded to include the full range of recommendations and concerns that OIR voiced in its report.

**CONTACT**

Juan Chavez, JD
jchavez@ojrc.info


Jason Renaud
info@mentalhealthportland.org

4