# SETTLEMENT AGREEMENT ON POLICING IN PORTLAND

## Semi-Annual Compliance Report
## July 1, 2024 – December 31, 2024

Prepared by the Independent Court Appointed Monitor

JUNE 30, 2025

# Table of Contents

Letter from the Monitor ...................................................................................................... Page 3

Work Conducted by the Monitoring Team During the Reporting Period ................................ Page 5

Notes about Reading this Report ........................................................................................ Page 8

Executive Summary ........................................................................................................... Page 11

Compliance Tracking Chart ............................................................................................... Page 18

Compliance Assessments by Settlement Agreement Section ................................................. Page 19

    Use of Force ................................................................................................................ Page 19

    Training ....................................................................................................................... Page 42

    Crisis Intervention ....................................................................................................... Page 50

    Employee Information System ....................................................................................... Page 52

    Officer Accountability .................................................................................................. Page 58

    Addendum of Additional Remedies ............................................................................... Page 72

Discrete Sections in Self-Monitoring .................................................................................. Page 81

Work to Be Completed; Anticipated Barriers to Substantial Compliance ............................. Page 94

Appendix .......................................................................................................................... Page 97

    Settlement Agreement Paragraph Summaries .................................................................. Page 98

    Glossary of Acronyms .................................................................................................. Page 102

# Letter from the Monitor

On behalf of the Independent Court Appointed Monitoring Team, I am pleased to present this report on the City's compliance with the Settlement Agreement on Policing in Portland. As this is the first such report for the Monitoring Team, I think it is important to share a few thoughts about our overall approach to conducting the compliance assessments that comprise the main focus of the report. Of primary significance, we have invariably maintained our independence in all facets of the work we did to complete this report. Our determinations about the status of the City's (including PPB's) compliance with the Settlement Agreement are not, and must not be, unduly influenced by the preferences of either the City or the United States Department of Justice, or by the preferences of any other stakeholders for that matter.

To be clear, we place tremendous value on the commentary we have received from both Parties to the Settlement Agreement regarding this report, and we equally value the commentary we have received from members of the public in general as well as from Portlanders specifically. We have dutifully considered all of it in arriving at our assessments. With that being said, the Monitoring Team's final assessments are ultimately our own, and each one is based on our independent and objective judgment of all relevant evidence provided to us demonstrating the City's level of compliance with the requirements in the Settlement Agreement. We stepped into the role of the Monitoring Team with a commitment to allowing the facts to lead us to our conclusions, and we have been intentional about living up to that commitment in each of the compliance assessments we have made.

I believe it is worth briefly recalling the circumstances that gave rise to the Settlement Agreement as well as the key goals that the Agreement set out to achieve. As the Monitoring Team quickly learned after our appointment by the US District Court—through meetings with the Albina Ministerial Alliance Coalition for Justice and Peace Reform, the Mental Health Alliance, and multiple other community groups—a variety of issues existed in combination that tested the trust between Portlanders and the PPB. In the collective experience on our Team overseeing police departments around the country, this was not an unfamiliar phenomenon. Included amongst these complex and challenging issues, and specifically highlighted in the language of the Settlement Agreement, was the need to ensure that encounters between PPB and persons experiencing a mental illness or a mental health crisis did not result in unnecessary force. Our Team operates with a recognition of the many intersecting areas of policing in Portland that warranted reform when the Settlement Agreement was reached between the City and the DOJ.

We also remain mindful, as we conduct our work, of the principal goals that the Settlement Agreement was put in place to achieve. Policing that is constitutional, that is carried out with the deliberate aim of maximizing public and officer safety, and that puts a premium on developing and maintaining community trust is the type of policing that best serves the needs of all stakeholders. While the Monitoring Team's semi-annual compliance reports, like this one, focus squarely on

assessing whether the City fulfilled the explicit requirements enumerated throughout the Settlement Agreement, we keep these goals in mind as guiding principles, without which mere compliance would be of little consequence to those who come into contact with PPB as well as to the members of PPB themselves.

Just as it is worth recalling the circumstances giving rise to the Settlement Agreement, it is equally important to acknowledge and respect the significant, hard-earned gains made by the City (including PPB) since the Agreement was enacted. From the Monitoring Team's perspective, which includes law enforcement executives with highly distinguished careers, the profession of policing is uniquely challenging, and it is an especially challenging profession to do exceptionally well. There is a great deal for the City and PPB to be proud of in terms of the many improvements they have made, as evidenced by changes in PPB's culture—notably including those focused on officer safety and wellness, which translate to increased public safety and wellness; the immeasurable and invaluable amount of time and effort spent by the City and PPB to successfully prove Substantial Compliance with those provisions of the Settlement Agreement that have moved to Partial Termination; and the genuine commitment by City and PPB leadership to attaining Substantial Compliance with the remaining provisions of the Agreement. The Monitoring Team remains mindful of this as well, and we will continue to do so throughout the term of the Monitorship.

Finally, I would like to reiterate the Monitoring Team's genuine commitment to listening to voices from every corner of the Portland community. We initiated the Monitorship with that very commitment, and we will continue to uphold it throughout our term as the Independent Court Appointed Monitor. The reforms that are listed in the Settlement Agreement, which are in the process of being implemented by the City, were put in place to have lasting positive effects on everyone who has a stake in the policing of Portland, sworn and civilian alike. In order to monitor compliance with the Agreement effectively, and avoid having blind spots in making our assessments, our Team must maintain an open ear to all of the diverse communities that make up Portland.

On behalf of the Monitoring Team, thank you for allowing us to present this report on the City's compliance with the Settlement Agreement. We look forward to seeing future reports reflect continuous improvement and the eventual termination of the Agreement as a result of sustained Substantial Compliance.

Very respectfully,

Mark P. Smith
Lead Monitor

# Work Conducted by the Monitoring Team During the Reporting Period

During the Reporting Period of July 1 through December 31, 2024, the Independent Court Appointed Monitoring Team (Monitoring Team) endeavored to complete all of the startup activities we needed to put ourselves in position to independently and objectively assess the City of Portland's compliance with the Settlement Agreement. A significant portion of those activities involved initial and ongoing meetings with key stakeholders from the City of Portland (City), the United States Department of Justice (DOJ), and various community organizations, all of which helped to ensure our comprehensive and thorough understanding of the context in which the Settlement Agreement exists.

In addition to the Parties, a non-exhaustive list of stakeholders with whom the Monitoring Team met follows here (note that some of these meetings were held in-person, others were conducted remotely, and some were a hybrid of those two):

- o The Compliance Officer/Community Liaison (or COCL) to obtain both guidance and context with regard to past compliance efforts
- o Independent Monitor, LLC to discuss their assessment of PPB's public order policing in the aftermath of sustained protest activity in 2020
- o Albina Ministerial Alliance Coalition for Justice and Police Reform (AMAC)
- o Mental Health Alliance (MHA)
- o Portland Committee on Community Engaged Policing (PCCEP)
- o Citizen Review Committee (CRC)
- o Training Advisory Council (TAC)
- o Focused Intervention Team – Community Oversight Group (FITCOG)
- o Portland Copwatch
- o Interfaith Peace & Action Collaborative (IPAC)

This list of community organizations will undoubtedly continue to grow. The Monitoring Team has stated on numerous occasions the high value we place on having diverse community voices inform our Monitorship activities, and we intend to continue upholding that value through further engagements such as these ones. Through all of our conversations with the community thus far, we are confident that we have gained crucial information and guidance that provides us with context and perspective as we carry out the duties of the Independent Monitor.

Another key piece of the Monitoring Team's startup efforts was our detailed review of, and commentary on, roughly 30 new or revised Portland Police Bureau (PPB) policies and/or training curricula. These reviews were conducted with the purpose of ensuring adherence to the mandates of the Settlement Agreement. Additionally, we observed seven Police Review Boards (PRBs), both to

5

familiarize ourselves with the procedures of the PRB and to ensure compliance with the associated paragraphs of the Settlement Agreement.

Varying members of the Monitoring Team also conducted one or more site visits to Portland in this Reporting Period. During each such visit we sought to be as productive as possible in continuing to learn about PPB, stakeholders in the community, and what information we would need in order to assess the City's compliance with the Settlement Agreement. Monitoring Team members spent time with various PPB units responsible for ensuring compliance with specific areas of the Settlement Agreement, including Training, Accountability, Use of Force, the Employee Information System, Behavioral Health, Policy, and Community Engagement.

We additionally spent time during these visits meeting with members of PPB's command staff and conducting in-person observation of numerous PPB trainings, including the Rapid Response Team's (RRT's) monthly training and grenadier training, joint training with PPB and the Oregon State Police, and In-Service Training for both officers and supervisors. Multiple members of the Monitoring Team engaged more directly with PPB officers by participating in one or more ride-alongs while visiting Portland.

Additional activities during the Monitoring Team's visits included a valuable and informative discussion with Independent Police Review (IPR), a tour of the Bureau of Emergency Communications (BOEC) followed by a discussion with BOEC's training personnel in order to begin understanding that bureau's operations and role in crisis triage, and meetings with the heads of the Portland Police Association and the Portland Police Commanding Officers Association to hear their perspectives on PPB and on the Settlement Agreement. Finally, we also took advantage of opportunities to meet with some of the newest Portland City Councilors, and we look forward to meeting more of them and engaging with the City's new leadership in the next Reporting Period.

While the Monitoring Team worked to establish strong foundations though all of the engagements described above, we also focused on crafting, revising, and refining our Monitoring Plan and our accompanying Methodological Plan. We were very deliberate in developing these plans, as we placed great importance on setting appropriate expectations – at least as much as is feasible in this circumstance. To that end, we received multiple rounds of comments from, and had multiple discussions with, the Parties about both of these plans. We also participated in multiple Mediation sessions about the Plans at the Parties' request.

We additionally published drafts of the Monitoring Team's plans online and circulated them via email to both our own growing list of contacts in Portland and to approximately 150 individuals or organizations on a City distribution list which was provided to us. We received comments about the Draft Monitoring and Draft Methodological Plans from the public—including some of the amici in this case—and we carefully reviewed and considered every comment we received. Some of them resulted in immediate modifications to either or both of the two plans, while others gave us valuable

guidance to follow in ensuring that all of the Monitoring Team's reports are communicated in a digestible and user-friendly way that is considerate of various different audiences.

In addition to our own plans, the Monitoring Team consulted with the City on its development of monitoring plans for those paragraphs of the Settlement Agreement that are currently subject to self-monitoring. Our consultation was focused on ensuring that the City's plans emphasize assessments to evidence continued substantial compliance, as is called for by the Settlement Agreement.

Finally, near the end of the Reporting Period, the Monitoring Team developed a website as is required by the Settlement Agreement. The site addresses a number of basic topics regarding the Settlement Agreement and the Monitorship that we think are generally helpful to the public, although we do anticipate building it out further over time—not only with the reports that we will produce, but also with event information and additional topics relevant to the Monitorship that we learn are of interest to members of the public with whom we engage. We also established a single group email account for easy recall where the Monitoring Team can be reached anytime. We are committed to being as responsive as we feasibly can, as it is important to us that all members of the community feel they can communicate effectively with us should they wish to do so.

The Monitoring Team's website can be accessed here: portlandpolicemonitor.com.
The Monitoring Team can be reached via email here: info@portlandpolicemonitor.com.

# Notes about Reading this Report

- The Independent Court Appointed Monitoring Team's compliance assessment report is intended to be read in conjunction with the Settlement Agreement on Policing in Portland. In an effort to avoid being unnecessarily duplicative in this report, we have not reproduced verbatim the language of each Settlement Agreement paragraph that we assessed for compliance. Some of our written assessments do recite substantial portions of the Settlement Agreement's wording, while others move immediately into the assessment itself without the inclusion of any Settlement Agreement language. In either case, we wrote the report acknowledging that the Settlement Agreement itself is publicly accessible at any time should there be a desire to consult it, including on the Monitoring Team's website, here.

  - It is important to note that the Monitoring Team assessed the City's/PPB's compliance with the version of the Settlement Agreement that was in effect during the Reporting Period (Q3-Q4 2024), which was filed with the United States District Court, District of Oregon on January 26, 2024.

- Additionally, in case it proves convenient, we have provided summaries of each Settlement Agreement paragraph that we assessed for compliance in the Appendix to this report.

- Guided by the language of the Settlement Agreement as well as the historical reports on the City's compliance with it that were conducted by the Compliance Officer/Community Liaison, and as noted in the Monitoring Team's Methodological Plan, we used the following compliance standards in reaching our assessments:

  - **Substantial Compliance**: The City/PPB has satisfied the requirement of the provision in a comprehensive fashion and with a high level of integrity, and any violations of the Agreement are minor or occasional and are not systemic.
  - **Partial Compliance**: The City/PPB has made significant progress toward the satisfaction of the provision's requirements, though additional work is needed.
  - **Non-Compliance but Initial Steps Taken**: The City/PPB has begun the necessary steps toward compliance, though significant progress is lacking.

  It is worthwhile to communicate the Monitoring Team's position that a finding of Substantial Compliance for a Settlement Agreement paragraph should not be interpreted as a minimization or diminution of the potential impact of any violations of that paragraph's requirements. For instance, even if a finding of Substantial Compliance is attained with regard to a paragraph that requires officers to use the least amount of appropriate force on a subject, the occurrence of even one event wherein an officer used more than the least amount of appropriate force on a subject may still result in severe consequences for that subject.

8

Conversely, it is also worthwhile to communicate the Monitoring Team's position that a finding of Partial Compliance for a Settlement Agreement paragraph should not be interpreted as a minimization or diminution of the measurable and verifiable progress made by the City/PPB toward compliance with that paragraph's requirements. The additional work that is needed in order to attain a finding of Substantial Compliance for such a paragraph may often be easily within reach for the City/PPB, specifically because of the progress they have already made and the efforts they have already expended toward meeting the Settlement Agreement's requirements.

- Some of the Monitoring Team's assessments of compliance with the Settlement Agreement relied on the selection of a sample of cases. The size of each sample was determined by the number of cases needed to attain a statistically sound sample based on the total number of cases provided by the City/PPB and may have included oversampling for rare events that were part of our assessment. For instance, when we drew a sample from the population of force events, it was selected using stratified random sampling to ensure an even distribution of events involving subjects with and without perceived mental health concerns.

  The Monitoring Team acknowledges that larger sample sizes are preferable to smaller ones, particularly insofar as the former allow for the review of a greater number of cases and, therefore, greater precision in making compliance assessments. In selecting our samples for this semi-annual compliance report, we strived to balance this position with other relevant variables including, but not limited to, the sample sizes used in the past by the Compliance Officer/Community Liaison, the time and resources available to us as we completed our assessments, and the type and amount of material we would need to review for each case in a given sample (such as multiple body-worn camera videos, for instance).

- As required by the Settlement Agreement, the Monitoring Team provided recommendations to the City/PPB on how to achieve and maintain Substantial Compliance for each paragraph we assessed as not having achieved that status during this Reporting Period.

  Additionally, in some instances where the Monitoring Team determined that the City/PPB was in Substantial Compliance with a particular Settlement Agreement paragraph during this Reporting Period, we offered recommendations intended to support ongoing compliance into and beyond future Reporting Periods. These recommendations should not be construed as detracting from the City's/PPB's achievement of Substantial Compliance with the associated paragraph.

  Finally, irrespective of compliance status, the Monitoring Team made additional recommendations about some paragraphs, based on our assessment, intended as technical

assistance and/or general suggestions for improvements to the City/PPB, which are not required for compliance with the Settlement Agreement.

# Executive Summary

This Semi-Annual Compliance Report, covering the period from July 1 through December 31, 2024 (the Reporting Period), evaluates the Portland Police Bureau's (PPB's) implementation of reforms required by the Settlement Agreement between the City of Portland (City) and the United States Department of Justice (DOJ) (Settlement Agreement). This report presents a detailed assessment of PPB's compliance with the active provisions of the Settlement Agreement, as independently evaluated by the Independent Court Appointed Monitor (Monitoring Team).

This report also incorporates data-driven analyses, findings, and recommendations derived from documentary review, interviews, observations, and other source materials including data and information supplied by PPB. The report reflects the Monitoring Team's independent determinations regarding progress made as well as challenges remaining in reaching full compliance with the Settlement Agreement and achieving the goals of providing constitutional policing, demonstrating public accountability, and enhancing community trust.

The United States Department of Justice (DOJ) launched a civil investigation into the Portland Police Bureau on June 8, 2011, in response to concerns about patterns of use of force, particularly against individuals experiencing mental health crises. That investigation concluded on September 13, 2012, with the DOJ finding that PPB officers had engaged in a pattern or practice of excessive force against people with actual or perceived mental illness. In response, the City and the DOJ entered into a court-enforceable Settlement Agreement on October 26, 2012. The Portland City Council unanimously approved the Settlement Agreement on November 14, 2012, and the United States District Court, District of Oregon (the Court) formally accepted the Agreement and retained jurisdiction on August 29, 2014. The original Settlement Agreement contained a set of provisions for reform across multiple domains, including policies, training, supervision, accountability, community engagement, and oversight.

Many amendments have been made to the Settlement Agreement over time, including some that were intended to strengthen aspects of the Settlement Agreement related to community oversight and others that were adopted to address PPB's response to protests and demonstrations following the murder of George Floyd by a police officer in Minneapolis, Minnesota. These amendments emphasized the proper and justifiable use of force, enhanced oversight and accountability, and additional transparency related to crowd management operations and other law enforcement activities.

Another amendment to the Settlement Agreement was entered as an Order of the Court on November 30, 2023, introducing Section XII, which established the role of an Independent Court Appointed Monitor to assess the City's and PPB's compliance with the active provisions. This amendment also resulted in the immediate termination of 40 of the Settlement Agreement's paragraphs as a result of the City's successful demonstration of sustained substantial compliance

with those provisions. The amendment additionally moved 15 paragraphs into Self-Monitoring[1] status, leaving 41 paragraphs to be assessed for compliance by the Monitoring Team. Subsequently, on May 15, 2024, the Court appointed MPS & Associates, LLC to serve as the Independent Court Appointed Monitor. This report represents the Monitoring Team's first required semiannual assessment since assuming that role.

The Monitoring Team's assessment finds that PPB is in Substantial Compliance with a sizeable majority of the monitored provisions of the Settlement Agreement. However, a small handful of areas remain in Partial Compliance and warrant additional focused attention. The recommendations included in this report reflect the Monitoring Team's technical findings and strategic direction to promote and support full and sustained compliance with all remaining provisions of the Settlement Agreement.

## Settlement Agreement Section III – Use of Force

The Monitoring Team's assessment of PPB's compliance with the Settlement Agreement's use of force provisions involved a review of relevant directives, 25 events involving the use of non-deadly force, 6 deadly force investigations, and an audit of the Force Audit Report prepared by the PPB Office of the Inspector General. Reviews were guided by specific requirements set forth in Section III and were conducted by members of the Monitoring Team with subject matter expertise in law enforcement oversight, policy, and data analysis. Each case was evaluated against the specific language of the Settlement Agreement, and multiple levels of review were employed to ensure rigor, objectivity, and consistency across all assessments.

The Monitoring Team noted PPB's application of principles reinforcing the use of only that amount of force that is reasonably necessary under the totality of circumstances and resolving confrontations using the least amount of appropriate force, if any. The Monitoring team also noted that PPB personnel made at least some effort toward de-escalation in nearly every case we reviewed.

The Monitoring Team encourages PPB to strengthen documentation practices, eliminate group interviews, clarify and distinguish types of de-escalation, and continue to ensure that officers consistently and properly identify and appropriately respond to individuals experiencing an actual or perceived mental health crisis. The Monitoring Team made additional recommendations that were focused on improving supervisor accountability, ensuring compliance with PPB Directive 1010.10, and incorporating corrective action and explanatory findings into use of force audit reports. Collectively, the recommendations reflect a continued emphasis on officer decision-making, supervisory oversight, documentation quality, and systemic accountability.

---

[1] Self-monitoring is a transition phase that involves continued review by the Monitoring Team of the City's methodology and self-assessments while allowing the City to demonstrate its ability to sustain compliance after termination.

**Settlement Agreement Section IV – Training**

The Monitoring Team's assessment of PPB's training practices focused on compliance with the requirements defined in Section IV of the Settlement Agreement. To conduct this review, the Monitoring Team examined documents and materials including the PPB Learning Management System (LMS), the FY2025 Annual Training Plan, the 2024 Annual Training Needs Assessment, the 2022 Training Division Assessment, and training curricula and materials, and we also attended numerous in-person training sessions. The evaluation also included a review of data reporting processes and interactions with the Training Advisory Council (TAC). These assessments were conducted by members of the Monitoring Team with expertise in police oversight, law enforcement operations, consent decree compliance, training evaluation, and data analysis, and the Monitoring Team's assessment process was guided by the specific requirements of the Settlement Agreement language.

The Monitoring Team found that PPB has generally implemented a comprehensive and thoughtful training program. Annual plans and needs assessments were data-informed and addressed a wide range of performance, legal, and policy considerations. Curricula reviewed by the Monitoring Team generally aligned with policy and included relevant content such as de-escalation, the duty to procure medical care, and various use of force scenarios. The LMS system successfully tracked training records, and that system reflected a centralized and organized database that tracks all in-service, online, and other forms of training undertaken by PPB employees. The LMS system appeared to be appropriately accessible and capable of producing detailed records of training across a wide range of variables. However, enhancements in automation and consistency of documentation were noted as potential areas for improvement. Relatedly, the Monitoring Team learned that PPB is already in the process of increasing its automation of training attendance records, which should be of benefit to individual officers and to PPB as a whole. The Monitoring Team also identified opportunities for continued progress related to internal coordination on force data analysis and formal documentation of data-informed training adjustments. Improvements in these areas would reflect a broader focus on increasing the accuracy of data collection, the transparency of training-related decisions, and the integration of data into the training development process.

**Settlement Agreement Section VI – Crisis Intervention**

The Monitoring Team's assessment of PPB's implementation of the Crisis Triage provisions set forth in Paragraph 115 focused on evaluating the operational effectiveness of the triage system for mental health-related calls to City dispatchers. We reviewed internal audits conducted by the Bureau of Emergency Communications (BOEC) and had discussions with BOEC staff regarding the use of audit results for performance improvement; we also reviewed a sample of 80 dispatched calls, including the associated audio recordings and written documentation. The Monitoring Team found that BOEC's internal audit and the processes for continuous feedback and improvement are

functioning with a high degree of reliability when identifying calls that do not meet criteria for dispatching specialized mental health response units. More specifically, the level of agreement between the Monitoring Team's audit and BOEC's own internal audit suggests that BOEC call-takers and dispatchers are largely successful in identifying calls that do not warrant attention from an Enhanced Crisis Intervention Team (ECIT) or Portland Street Response (PSR). Furthermore, our review found that BOEC consistently triaged eligible calls to the appropriate mental health resource providers, in accordance with its policies, demonstrating the full operational effectiveness required by the Settlement Agreement.

**Settlement Agreement Section VII – Employee Information System**

The Monitoring Team's assessment of PPB's compliance with the Settlement Agreement's Employee Information System (EIS) provisions was informed in large part by meetings with PPB's EIS staff, reviews of relevant directives and standard operating procedures (SOPs)—particularly Directive 0345.00 and SOP #44—and analyses of data outputs and audit reports covering the Reporting Period. The Monitoring Team also reviewed the ways in which force audit data was used to identify trends and assess supervisory performance, and we evaluated whether threshold-based alerts were functioning as intended to prompt timely and meaningful interventions.

PPB has developed structural components within its EIS to support early identification of potentially problematic patterns at the individual and supervisory levels. Supervisors are required to review officer performance upon transfer and annually, and the system appropriately includes mechanisms for analyzing unit-level activity and triggering case management reviews when force usage meets established thresholds. The Monitoring Team's review of PPB's EIS confirmed that PPB has developed policies and procedures designed to support the early identification of potentially problematic trends among officers, supervisors, and teams. In accordance with the Settlement Agreement, PPB has also implemented mechanisms requiring supervisors and commanders to conduct regular performance reviews of officers, including upon transfer, and to document those reviews in the Performance Data Tracker (PDT).

While the requirements in this section of the Settlement Agreement are largely implemented, and reviews of conduct do occur, questions remain about the practical use of the system to drive intervention, the transparency of decision-making, and whether alerts—particularly those related to force—are addressed in a consistent and meaningful way. For example, a significant portion of force-related alerts are closed administratively, and it remains unclear whether data analyses and audit recommendations are being used to inform supervisory practices or trigger follow-up discussion with personnel. Similarly, although audit data is disaggregated by member, supervisor, and unit, the extent to which that information results in actual behavioral or supervisory changes is not always documented.

Finally, the Monitoring Team's review of PPB's EIS revealed that a technological issue prevented the addition of certain data to the system for a portion of the Reporting Period. Importantly, PPB informed the Monitoring Team that the issue has been rectified. However, the absence of this data hindered the EIS's functioning in accounting for all of the incidents that might ultimately lead to a review of an officer's behavior in order to address any potential concerns.

The Monitoring Team recommends that PPB improve its documentation of how performance reviews are used to address officer conduct, ensure that force audit findings inform supervisory practices, and employ any appropriate measures to help minimize the chance that the technological issue preventing the addition of data to the EIS during the Review Period might reoccur. Doing so will further support the overarching themes across all three paragraphs in this section, which include enhancing accountability, ensuring that EIS triggers lead to meaningful reviews and interventions, and using audit data to steer and refine supervisory decision-making.

## Settlement Agreement Section VIII – Officer Accountability

The Monitoring Team's assessment of PPB's officer accountability systems examined 25 completed misconduct investigations, multiple Officer-Involved Shooting (OIS) cases, relevant Standard Operating Procedures (SOPs), and internal PPB data analyses. Investigations were evaluated against timelines, procedures, and oversight mechanisms established by this section of the Settlement Agreement. The Monitoring Team also conducted file reviews and interviewed key personnel to assess adherence to performance standards across oversight bodies as well as to evaluate Police Review Board (PRB) functions. Each investigative file was scrutinized for structural and procedural integrity, with emphasis on adherence to documentation protocols, timeliness requirements, and the accurate application of tolling provisions.

Our review confirmed that PPB has successfully adhered to the Settlement Agreement's accountability-related provisions, including prompt investigative initiation, proper use of *Garrity* warnings, and consistent application of PRB procedures and processes. However, some documentation gaps remain, particularly regarding the explicit recording of tolling events and delay mitigation efforts. Similarly, while the Corrective Action Guide (CAG) was applied in the majority of disciplinary cases reviewed, some memoranda lacked sufficient narrative support to explain the application of aggravating or mitigating factors. The Monitoring Team's recommendations emphasized enhanced documentation of delay rationales and the application of tolling provisions, incorporation of tolling summaries into investigative files, and enhanced accuracy with regard to identifying and documenting the date that a complaint was received. The Monitoring Team also advised PPB to use its body-worn cameras (BWCs) to record supervisor briefings conducted in connection with use of force incidents, improve administrative closure and investigative progress documentation, and update City Code language to reflect Settlement Agreement limits on PRB service duration. Collectively, these recommendations focus on reinforcing transparency, procedural

consistency, and sustained oversight as PPB continues transitioning to a new civilian accountability system.

**Settlement Agreement Section XI – Addendum of Additional Remedies**

The Monitoring Team's review of the Addendum of Additional Remedies provisions focused on compliance with key technical and procedural requirements related to PPB's reporting systems, oversight structure transitions, third-party review of 2020 crowd control activities, training initiatives, and implementation of a body-worn camera program. Our assessments included document reviews, data sampling, interviews with relevant personnel, and audits of compliance across multiple operational domains. Each paragraph was evaluated for adherence to the specific requirements of the Settlement Agreement. The City and PPB performed well in most areas and demonstrated comprehensive implementation of required provisions ranging from enhanced tracking and accountability of use of force reports, the completion of a crowd-control assessment by an independent reviewer, and the hiring of a civilian Police Education Director.

Our review did reveal some work yet to be completed on pending Independent Police Review (IPR) investigations, the full and consistent implementation of PPB's body-worn camera (BWC) policy, and the pending operationalization of the new Community Police Oversight Board (which was ultimately named the "Community Board for Police Accountability" and will be referred to as such throughout this report. The Monitoring Team encourages PPB and the City to continue strengthening training and supervisory mechanisms that reinforce frontline compliance with new policy requirements, particularly as they relate to BWC protocols. Additional recommendations emphasize the need to finalize outstanding IPR investigations and to ensure timely activation, population, and staffing of the Community Board for Police Accountability (CBPA). Collectively, these recommendations reflect a continued focus on administrative readiness, transparency, and high-integrity documentation practices across technical and accountability-related reforms.

**Recommendations and Conclusion**

The Monitoring Team's assessments during this Reporting Period confirm that the City and PPB have made substantial progress toward meeting the requirements of the Settlement Agreement, with the majority of reviewed provisions found in Substantial Compliance. In areas where Partial Compliance remains, the deviations were largely ones that seem reasonably feasible to rectify, and many were tied to implementation practices, documentation gaps, or transitional processes rather than entrenched noncompliance. The Monitoring Team's recommendations across sections consistently highlight the need for enhanced documentation, enhanced supervisory accountability, and sustained attention to implementation fidelity as PPB continues to institutionalize the Settlement Agreement's reforms. While critical work remains to be done—including consistent performance of reforms in practice—the City's trajectory reflects a genuine commitment to the

Settlement Agreement's core principles of constitutional policing, public and officer safety, effective accountability, and community trust in law enforcement.

# Compliance Tracking Chart

| Settlement Agreement Paragraph | Compliance Assessment |
|---|---|
| **Use of Force** | |
| *Use of Force Policy* | |
| Paragraph 66 | Substantial Compliance |
| Paragraph 67 | Substantial Compliance |
| *Use of Force Reporting Policy and Use of Force Report* | |
| Paragraph 69 | Partial Compliance |
| *Use of Force Supervisory Investigations and Reports* | |
| Paragraph 70 | Substantial Compliance |
| Paragraph 72 | Substantial Compliance |
| Paragraph 73 | Substantial Compliance |
| *Compliance Audits Related to Use of Force* | |
| Paragraph 74 | Substantial Compliance |
| Paragraph 75 | Substantial Compliance |
| Paragraph 76 | Partial Compliance |
| Paragraph 77 | Substantial Compliance |
| **Training** | |
| Paragraph 78 | Substantial Compliance |
| Paragraph 79 | Substantial Compliance |
| Paragraph 81 | Substantial Compliance |
| Paragraph 84 | Substantial Compliance |
| Paragraph 85 | Substantial Compliance |
| Paragraph 86 | Substantial Compliance |
| **Crisis Intervention** | |
| *BOEC* | |
| Paragraph 115 | Substantial Compliance |
| **Employee Information System** | |
| Paragraph 116 | Substantial Compliance |
| Paragraph 117 | Substantial Compliance |
| Paragraph 118 | Partial Compliance |
| **Officer Accountability** | |
| *Investigation Timeframe* | |
| Paragraph 121 | Substantial Compliance |
| Paragraph 122 | Substantial Compliance |
| Paragraph 123 | Substantial Compliance |
| *On Scene Public Safety Statements and Interviews* | |
| Paragraph 124 | Substantial Compliance |
| Paragraph 125 | Substantial Compliance |
| Paragraph 126 | Substantial Compliance |
| Paragraph 127 | Substantial Compliance |
| *Conduct of IA Investigations* | |
| Paragraph 128 | Substantial Compliance |
| Paragraph 129 | Substantial Compliance |
| Paragraph 131 | Substantial Compliance |
| Paragraph 132 | Substantial Compliance |
| Paragraph 133 | Substantial Compliance |
| *Discipline* | |
| Paragraph 137 | Substantial Compliance |
| **Addendum of Additional Remedies** | |
| Paragraph 188 | Substantial Compliance |
| Paragraph 189 | Substantial Compliance |
| Paragraph 190 | Substantial Compliance |
| Paragraph 191 | Substantial Compliance |
| Paragraph 192 | Partial Compliance |
| Paragraph 194 | Partial Compliance |
| Paragraph 195 | Partial Compliance |

# Compliance Assessments by Settlement Agreement Section

## Use of Force

For the Monitoring Team's assessment of Settlement Agreement Paragraphs 66, 67, 69, 70, 72, and 73, we reviewed multiple PPB Directives related to the use of force by PPB officers in order to confirm their inclusion of the principles required by this portion of the Settlement Agreement. We additionally reviewed PPB's After-Action Report (AAR) and any revisions made to it. Among the directives we reviewed were the following:

- 0910.00 Use of Force Reporting, Review, and Investigation
- 1010.00 Use of Force
- 1010.10 Deadly Force and In-Custody Death Reporting and Investigation Procedures
- 1015.00 Less Lethal Weapons and Tools

Additionally, in order to assess the consistent and verified performance of the principles referenced above by PPB officers in actual practice, the Monitoring Team reviewed a sample of use of non-deadly force events that occurred during the Reporting Period as well as all deadly force investigations that were completed during the period. Our sample consisted of 25 randomly selected use of non-deadly force events that occurred as well as all six deadly force investigations that were completed.[2] It is important to note that the Monitoring Team utilized the same sample of cases for its evaluations of each of the Settlement Agreement paragraphs listed earlier in this section. It is additionally important to note that each use of force event in our sample could potentially include more than one use of force; in all such instances, we separately assessed each use of force that occurred during the event.

For the Monitoring Team's assessment of Settlement Agreement Paragraphs 74, 75, 76, and 77, we reviewed a series of reports prepared by the PPB Office of the Inspector General (OIG) covering this Reporting Period including the Applications of Force Report, the Force Audit Report, and the quarterly and annual Force Analysis Summary Reports.

The Force Audit Report examines reports and investigations of uses of force by PPB officers, including chain of command reviews of AARs completed by supervisors following a use of force. In addition to reviewing that report and the multiple sources of data on which it is based, the Monitoring Team also conducted our own reviews in order to validate the report's results. These efforts, in addition to informative conversations with OIG staff about the Force Audit Report (FAR), put us in position to assess compliance with Paragraphs 74, 75, and 77. Each of those paragraphs lists numerous pieces of information to be addressed by, or standards of review to be

---

[2] No in-custody death investigations were completed during this Reporting Period. Had there been any, the Monitoring Team would have included each of them in our sample as well.

incorporated into, the Force Audit Report, with PPB responsible for ensuring that they all are addressed or incorporated as appropriate.

The Monitoring Team endeavored to complete a rigorous and thorough review of the FAR in order to comprehensively evaluate the multitude of data points and standards listed in Paragraphs 74, 75, and 77 (collectively). Guided by the language in those paragraphs, our review encompassed a total of 97 separate questions, which we applied to each case in a randomly-selected sample of 25 of the cases that had been audited by the OIG.[3] Our review was developed and conducted by multiple members of the Monitoring Team, allowing us to rely on a collective set of skills and expertise including civilian oversight of law enforcement, consent decree compliance, and criminal justice statistical analysis. Crucially, having more than one Monitoring Team member involved in different aspects of the review also helped us to ensure that we infused different perspectives into the assessments we made, as opposed to relying solely on a single person's experiences or point of view. Furthermore, we validated each finding in our own review that disagreed with a finding in the OIG's audit with a secondary reviewer in order to help confirm our accuracy with respect to those results.

## Paragraph 66
*Substantial Compliance*

**The Monitoring Team's review of PPB's use of force directives confirmed their inclusion of principles required by Paragraph 66 of the Settlement Agreement.** These include: 1) only force that is reasonably necessary under the totality of the circumstances shall be used; and 2) officers are expected to develop and display the skills and abilities that allow them to resolve confrontations without using force, or by using the least amount of appropriate force.

**The Monitoring Team's review of a sample of use of force events and investigations confirmed the consistent and verified performance of these principles by PPB officers in actual practice.** In 24 of the 25 use of non-deadly force events reviewed by the Monitoring Team, and in all six of the deadly force investigations we reviewed, we determined that PPB officers used only force that was reasonably necessary under the totality of the circumstances to lawfully perform

---

[3] The OIG provided the Monitoring Team with a population of 100 cases that it audited for the Force Audit Report covering this Reporting Period; we selected our sample from that population.

their duties and resolve confrontations effectively and safely; and that officers exhibited the ability to resolve confrontations without resorting to force or by using the least amount of appropriate force.[4] In the remaining case that was part of our review, the involved officer's use of force went beyond what was reasonably necessary under the circumstances. Furthermore, the officer did not display the ability to resolve the confrontation at hand with the least amount of appropriate force. The officer who used force, along with a sergeant, had responded to a report of a person trespassing. According to the officer, the subject attempted to throw a punch at the sergeant. In response, the officer sprayed a chemical incapacitant (Oleoresin Capsicum spray) at the subject three times. The third use of the incapacitant appeared to occur after the subject had placed their hands behind their back and turned away from the officer and the sergeant, essentially offering little to no resistance. Additionally, there appeared to be no particular exigency with regard to taking the subject into custody, meaning that the officer and the sergeant had the option to take advantage of time in trying to use the least amount of force that they could. In sum, the officer's use of force appeared to be more than what was reasonably necessary under these circumstances, and the officer did not display the ability to resolve the confrontation with the least amount of appropriate force.

Notably, the Monitoring Team's review of this case also revealed that PPB's own chain of command review also identified concerns related to the use of force during this event (unrelated to our assessment). Although the reviewing supervisor deemed the force to be within PPB policy, the reviewing Lieutenant reversed that conclusion, and the reviewing Captain concurred with the Lieutenant. The event was referred to the Professional Standards Division (PSD) for further appropriate action, which remains pending at present.

The Monitoring Team's assessment of compliance with Paragraph 66 confirmed that PPB has satisfied its requirements in a comprehensive fashion and with a high level of integrity. While we recognize the importance and impact of the one event from our review that violated the paragraph's provisions, we do not believe it amounts to or represents a systemic issue. **We therefore conclude that PPB is in Substantial Compliance with Paragraph 66 of the Settlement Agreement.**

**Recommendations:**

The Monitoring Team makes the following recommendation to support ongoing compliance with Paragraph 66 of the Settlement Agreement:

---

[4] It is important to acknowledge that our review looked solely at events that involved one or more uses of force. As such, our focus was on the aspect of the second principle identified above that calls on officers to resolve confrontations using the least amount of appropriate force; not on the aspect of that same principle addressing the resolution of confrontations without force. We do not underestimate the importance of either aspect of the overarching principle. However, an objective assessment of the latter would have required an entirely different type of evaluation – one that potentially includes the challenge of attempting to "prove a negative" by determining, for instance, when an officer *would have* used force but for their skill and ability to resolve a confrontation without it.

1. Reinforce to officers and supervisors the principles of using only the force reasonably necessary under the circumstances and resolving confrontations with the least amount of appropriate force.

**Paragraph 67**
**Substantial Compliance**

**The Monitoring Team's review of PPB's use of force directives confirmed their inclusion of principles required by Paragraph 67 of the Settlement Agreement.** These include: 1) officers must use disengagement and de-escalation techniques when possible and/or must call for specialized units when practical to reduce the need for force and increase officer and civilian safety; 2) officers must take into account all information, when feasible, in determining whether to use force, including indications that a person has, or is perceived to have, mental illness; 3) officers must de-escalate force, as resistance decreases, to the least amount reasonably calculated to maintain control; and 4) objectively unreasonable uses of force must result in corrective action and/or discipline, up to and including termination.

**The Monitoring Team's review of a sample of use of force events and investigations confirmed the consistent and verified performance of these principles by PPB officers in actual practice.** We observed that PPB officers consistently used at least some form of de-escalation in nearly all of the cases that made up our sample. In two cases, when it was feasible, officers also appropriately disengaged from their contact with a person.[5] Additionally, with only one noted exception, our review indicated that officers commonly requested assistance from specialized units, when feasible, to help manage confrontational situations and decrease the chance that force would be applied. These calls for specialized units were often made to PPB's Enhanced Crisis Intervention Team (ECIT), as was appropriate in our estimation.

The Monitoring Team did observe one use of force event in its sample when a call for an ECIT officer was not made by the involved officers, even though it would have been advisable and was reasonably feasible. In this event, however, the two involved officers (neither of whom were trained ECIT officers) notably displayed good communication skills and patience, as well as effective usage of both distance (from the subject) and time, all of which allowed them to use the least amount of force that was reasonably necessary under the circumstances.

The Monitoring Team's review of force events and investigations indicated that, overall, PPB officers performed well when considering all the available information indicating that a person has, or is perceived to have, mental illness, including behavior, reports, and known history. However, we

---

[5] In each case, the officers were required to reinitiate contact with the subject. Even so, their decision to initially disengage, when feasible, was appropriate and consistent with the requirements of the Settlement Agreement.

did identify one event in our sample (the same event as the one described in the Monitoring Team's assessment of Settlement Agreement Paragraph 66) wherein an officer used a chemical incapacitant on a subject before taking them into custody. The officer, who was ECIT trained, acknowledged in their reporting about the use of force that the subject's behavior and verbalization were potential indicators of the presence of mental illness. This event appeared to be an aberration from the normal conduct displayed by officers in our sample of cases. Furthermore, we noted that PPB's own chain of command also identified this specific issue during their internal review of the event.

Another area of strength for PPB in terms of compliance with Paragraph 67 was officers' consistent de-escalation of force as the resistance they were facing decreased. The amount of force used by officers, as well as the number of officers who were using force, was appropriately de-escalated to the minimal levels that were reasonably calculated to maintain control of a subject under the circumstances. This was true in all of the cases we reviewed except for one (again, the same event as the one described in the Monitoring Team's assessment of Settlement Agreement Paragraph 66). In that case, the officer did not attempt to use proper de-escalation techniques despite the presence of indicators that the subject might be experiencing a mental health crisis.

Finally, with regard to the Settlement Agreement principle that unreasonable uses of force must result in corrective action and/or discipline, none of the force events or investigations that made up the Monitoring Team's sample from this Reporting Period gave rise to an administrative finding of an unreasonable use of force. The one event that was described in our assessment of this paragraph as well as in the assessment of Paragraph 66, in which PPB's chain of command identified the use of more force by an officer than was reasonably necessary, is still pending an administrative adjudication (separate from the chain of command review of the event) that will ultimately determine whether the officer violated PPB policy. The Monitoring Team plans to track the status of that adjudication. If the outcome bears relevance to the principle noted above (regarding corrective action/discipline as a response to the use of unreasonable force), we will seek to include information about it in our next semi-annual compliance report.

The Monitoring Team's assessment of compliance with Paragraph 67 confirmed that PPB has satisfied its requirements in a comprehensive fashion and with a high level of integrity. Only one case in the sample of 20 cases that we reviewed showed a lack of adherence to a number of the principles required by this paragraph, which does not amount to or represent a systemic issue. **We therefore conclude that PPB is in Substantial Compliance with Paragraph 67 of the Settlement Agreement.**

**Recommendations:**

The Monitoring Team makes the following recommendations to support ongoing compliance with Paragraph 67 of the Settlement Agreement:

1. Continue to reinforce for officers the importance of calling for specialized units, such as ECIT, when warranted by the circumstances they are facing.
2. Continue to train to officers about the importance of using all available information to recognize when a person they encounter is, or may be, experiencing mental illness.
3. Remind officers of the requirement to use disengagement and de-escalation techniques when possible.

Based on the review we conducted for our assessment of compliance with Paragraph 67, the Monitoring Team makes the following additional recommendation, which is not required for compliance with the Settlement Agreement:

1. To ensure a consistent understanding amongst all PPB officers, consider clarifying and re-emphasizing the importance of both de-escalation that is used to reduce the need for force and de-escalation in the form of a reduction in the amount of force being used as resistance decreases. Furthermore, re-emphasize the importance of documenting each of these different de-escalation tactics separately and clearly in appropriate incident reports.

**Paragraph 69**
*Partial Compliance*

**The Monitoring Team's review of PPB's use of force reporting directives confirmed their inclusion of requirements listed in Paragraph 69 of the Settlement Agreement.** These include: 1) all officers who use force must draft timely use of force reports that include sufficient information to facilitate a thorough supervisory review; 2) all officers who are involved in, or witness to, a use of force must provide a full and candid account to supervisors; and 3) in case of an officer-involved shooting resulting in death, a use of lethal force, or an in-custody death, the reporting and review requirements specified in PPB Directive 1010.10 must be fulfilled.

**The Monitoring Team's review of a sample of use of force events and investigations confirmed that significant progress has been made by PPB in satisfying this paragraph's requirements, but that some additional work is needed.** In all of the use of non-deadly force events that we reviewed as part of our sample, we found that officers who used force completed use of force reports that were timely and contained sufficient information to allow for a thorough supervisory review of the event.[6] Similarly, across our entire sample, our review found that officers

---

[6] The reporting requirements for officers who use deadly force, including those in the 6 deadly force events that were part of our review sample, are different from non-deadly force reporting requirements and are assessed separately within Settlement Agreement Paragraph 69.

who were involved in, or witnesses to, a use of force provided full and candid accounts to supervisors, as required.[7]

The reporting and review requirements arising out of a use of lethal force or an in-custody death, which are contained in PPB Directive 1010.10, are understandably numerous and extensive. Any loss of life related to law enforcement activity, or the foreseeable potential for it, warrants the most rigorous and thorough levels of examination. With respect to the 6 lethal force investigations that we reviewed as part of our sample, we looked at adherence to multiple requirements in the areas of involved member responsibilities immediately following the event as well after departure from the scene; witness member responsibilities immediately following the event as well as after departure from the scene; on-scene supervisor responsibilities in the aftermath of the event; notification protocols up the chain of command as well as to other City entities; Homicide Detective responsibilities; PSD responsibilities; Responsibility Unit (RU) manager responsibilities; Training Division responsibilities; issuance of Communication Restriction Orders (CROs); and more.

**In general, the Monitoring Team found PPB's investigations into all six of the deadly force events in our sample – all of which were officer-involved shootings – to be thorough, detailed, and appropriate in terms of the conclusions they reached regarding whether the force used was allowable pursuant to PPB policy. There were, however, a handful of requirements which, based on the data we received appeared to be unmet and/or undocumented.** While acknowledging the intricacy and complexity of these critical incidents and the investigations into them that follow, we also find it important that each of the requirements in PPB policy on deadly force and in-custody death procedures be met in every instance, and that they be clearly documented accordingly.

In all of the use of deadly force cases we reviewed, the involved officers met their reporting requirements, as enumerated in PPB policy. This includes making the initial notification(s) of their involvement in such an incident as soon as practicable, making it known to the on-scene supervisor that they are the involved member, and submitting to an audio-recorded interview if/when properly compelled to do so. Similarly, witness officers met their respective reporting responsibilities in all of

---

[7] The Monitoring Team notes that, during the course of this Reporting Period, PPB revised its directives governing use of force reporting (0910.00) and use of force (1010.00) which eliminated the designation of "Category IV" use of force and introduced the definition of, and procedures surrounding, "De Minimis Force." None of the cases in the Monitoring Team's random sample used for the assessment of this paragraph met the definition of De Minimis Force.

The Monitoring Team further notes that PPB Directive 0620.00 Body-Worn Camera Use and Management requires involved and witness officer accounts given in conformance with Directive 0910.00, when those accounts are of a use of force determined to be Category III or Category IV, to not be recorded on Body-Worn Cameras. Therefore, for all such cases reviewed by the Monitoring Team as part of the sample it used to assess Paragraph 69, our review focused primarily on written documentation and reviews of the event, such as Force Data Collection Reports and After-Action Reports.

the cases we reviewed for the assessment of Paragraph 69, including notification of their involvement and role to the on-scene supervisor, the provision of a Public Safety Statement (PSS)[8] as required, and providing a full and candid account of the use of force event while on-scene and as directed by detectives.

Following a use of deadly force, an on-scene supervisor is required to complete numerous tasks such as ensuring that medical aid is rendered as appropriate, locating and separating all involved and witness officers, admonishing those officers not to discuss the incident prior to the issuance of a CRO, obtaining public safety information, procuring any civilian witness information, and ensuring the delivery of notifications about the incident up the chain of command. Most of these requirements were met by the on-scene supervisor in each of the six use of deadly force cases we reviewed.

One area of concern for the Monitoring Team centered around the requirement for on-scene supervisors to obtain PSSs and to generate sufficient documentation of the fulfillment of this requirement. On-scene supervisors who respond to officer-involved shooting incidents (like the six deadly force cases in the Monitoring Team's sample) are required to list public safety information about the event, including how many rounds were fired and by whom, the direction of rounds fired, the location of any injured persons, descriptions of at-large suspects as well as of any weapons they may possess, etc. Supervisors may obtain this information from witness officers and other sources. However, if they are unable to obtain the requisite information from those sources, they must then require the involved member to provide a PSS. In questioning the involved member, on-scene supervisors are limited to asking a prescribed list of questions, and they must document the responses they receive.

In one of the officer-involved shooting events reviewed by the Monitoring Team, documentation was provided indicating that the on-scene supervisor obtained the required public safety information from a witness officer. In a second event, the on-scene supervisor made an indication that their own personal observation of the incident had afforded them sufficient public safety information to negate the need to obtain more. Both of these appeared to comport with PPB policy. In each of two more officer-involved shootings, the on-scene supervisor obtained a PSS from the involved member, as opposed to a witness. However, insufficient information was provided documenting the involved member's response to the questions asked and confirming that the supervisor only asked the prescribed questions in adherence to PPB Directives. The supervisor in a fifth event discussed some elements of the required public safety information that they had gathered from other officers; without clarifying whether they had obtained the remainder of the required elements of a PSS, however, the supervisor then determined that no further information was needed given the specific

---

[8] A Public Safety Statement is a brief statement that an officer provides to a supervisor immediately after a critical incident to assess any public safety concerns and to identify potential hazards. It's a preliminary overview aimed at determining whether there are injured individuals, outstanding suspects, or other risks that need immediate attention, as well as preserving evidence.

circumstances of the incident. In the sixth officer-involved shooting event reviewed by the Monitoring Team, no documentation was supplied demonstrating the on-scene supervisor's efforts to obtain public safety information.

Strict adherence to protocols in the immediate aftermath of an incident involving the use of lethal force—including the process of obtaining all relevant public safety information—can potentially be the difference between life and death for individuals who are involved in or impacted by the incident. Furthermore, in order to ensure that protocols are being rigorously followed, their completion must be sufficiently documented without exception. In sum, the Monitoring Team's review of the six officer-involved shooting cases that occurred during this Review Period found a couple of occasions when these protocols appear to not have been followed and a couple occasions when documentation of their completion was insufficient.

Finally, with regard to on-scene supervisors, the Monitoring Team noted that they met their obligation in all of the cases we reviewed to issue admonishments to involved and witness officers to refrain from discussing the incident prior to the issuance of a CRO. Beyond the handful of exceptions noted above, on-scene supervisors in the six cases we reviewed did complete a multitude of other tasks required of them after a use of deadly force. However, completing all of their requirements, and sufficiently documenting their completion, is a critical aspect of properly managing these critical incidents.

In addition to on-scene supervisors, PPB personnel from PSD and Detective Division each have a set of required responsibilities to complete as well in response to the use of deadly force. The PSD is responsible for conducting an administrative investigation of the incident; Detective Division is responsible for conducting a criminal investigation of it. In addition to other requirements, PSD personnel are required to compel a statement from the involved member after the provision of a *Garrity* warning,[9] to audio-record their interview with the involved member, to conduct their administrative review concurrently with any criminal investigations and, ultimately, to determine whether member actions during the event were consistent with PPB policy. In the six cases reviewed by the Monitoring Team, PSD personnel met all of the requirements.

Detective Division personnel who respond to a use of deadly force event are required to, among other things, request a voluntary statement and on-scene walk-through from the involved member. If the member agrees, the Detective must conduct complete and thorough interviews of that member to ensure that all applicable information is obtained. If the member declines, then the Detective must not compel them to provide a statement or a walk-through. The Detective must also

---

[9] As defined in PPB Directive 1010.10, a *Garrity* warning is an advisement given to a member who is the subject of an internal administrative investigation or review. A *Garrity* warning apprised the member that they are required to answer questions asked by Professional Standards Division investigators and are subject to discipline, up to and including termination, for failing or refusing to answer the questions.

direct any necessary witness officers to provide a walk-through. In the cases reviewed by the Monitoring Team for its assessment of Paragraph 69, Detectives consistently met all of these requirements.[10]

A final set of policy requirements that the Monitoring Team noted in its review of six use of deadly force events are those of the Training Division and the RU manager. Once the criminal investigation and administrative review of the incident are complete, Training Division must conduct its own review as well as an analysis of the investigative findings to determine whether member actions were consistent with training and/or reflect any training deficiencies. The completed review from the Training Division is provided to the involved member's RU manager. Subsequently, that manager is required to discuss the Training Division review with the involved member. None of the six cases we reviewed included documentation of that discussion.

As indicated earlier, there are numerous requirements embedded in PPB policy that must be met in connection with every use of deadly force by an officer. Our review indicated that PPB consistently met most of those requirements. However, there were also a number of requirements that were either not met or not documented as having been completed, which is concerning given the gravity of the lethal or potentially lethal incidents with which they are associated. These include some apparent deviations that were present in multiple, if not all, of the use of deadly force cases we reviewed. **We therefore conclude that PPB is in Partial Compliance with Paragraph 69 of the Settlement Agreement.**

**Recommendations:**

Pursuant to Settlement Agreement Paragraph 226, the Monitoring Team recommends the following step necessary to achieve and maintain Substantial Compliance with Paragraph 69:

1. Reinforce with supervisors and RU managers all requirements of Policy 1010.10 as they apply to those ranks. Emphasizing the importance of clearly documenting PSS responses when such documentation is required by policy, as well as consistently obtaining—and documenting—full PSSs that cover all of the elements required by policy, will go a long way to ensuring rigorous adherence to these crucial protocols after every incident involving the use of deadly force.

Based on the review we conducted for our assessment of compliance with Paragraph 69, the Monitoring Team makes the following additional recommendations, which are not required for compliance with the Settlement Agreement:

---

[10] One of the six officer-involved shootings reviewed by the Monitoring Team occurred outside of the City of Portland and was criminally investigated by a law enforcement agency other than PPB. The Monitoring Team does not have the authority to assess external agencies' compliance with the Settlement Agreement, and we did not do so here.

1. PPB Directive 0910.00 Use of Force Reporting, Review, and Investigation requires all officers who are involved in, or a witness to, a Category II or Category III use of force event to provide a full and candid account of the event to the supervisor at the scene. PPB Directive 0620.00 Body-Worn Camera Use and Management dictates that, in Category III events, the officers' accounts are not recorded on body-worn camera. In furtherance of transparency and accountability (with respect to assessing whether an officer's account is full and candid, as required), PPB should consider revising its policies to require that these officer statements regarding Category III events be recorded on body-worn camera, just as is the case with Category II events.

2. There is room for greater specificity in some reports of injuries after a use of force event has occurred. Requiring officers to be as specific as feasible regarding when the injuries occurred (or are believed to have occurred) and whether they were pre-existing or a result of the use of force, for instance—and training officers to include this information in their reports—would help ensure that this information is not missed or permitted to remain ambiguous in the report.

3. In order to avoid any bias, or the perception of it, PPB should consider revising its policies to prohibit any supervisors who are involved in or witness to a use of force from completing the on-scene supervisor responsibilities related to the reporting of the use of force and, similarly, the required AAR related to the use of force event. These responsibilities should be assigned only to an uninvolved supervisor. The involved/witness supervisor should merely be required to report their involvement in the use of force, or their observations as a witness to it, just as any non-supervisory officer is required to do in the same circumstances.

4. As it is presently written, Directive 1010.10 allows for more discretion than might be ideal with regard to a supervisor's responsibility to obtain public safety information after an incident involving the use of lethal force. This responsibility is critical to the maximizing the safety of all involved in or impacted by such an incident, and PPB should therefore consider revising the directive to require supervisors to obtain full PSSs—including each question listed in Section 2.1.1.2 of the directive—from each involved member after every such incident (with an appropriate exception for when an involved member is incapacitated and unable to give such a statement) and to clearly document the responses they receive. This should occur regardless of whether the supervisor observed the incident themselves or has received public safety information from other sources.

**Paragraph 70**
*<mark>Substantial Compliance</mark>*

**The Monitoring Team's review of PPB's use of force directives confirmed their inclusion of requirements listed in Paragraph 70 of the Settlement Agreement.** These include: 1) complete AARs within 72 hours of the force event; 2) immediately notify their shift supervisor and

Professional Standards Division regarding all serious uses of force, any use of force against a person who has actual or perceived mental illness, and any suspected misconduct; notify Detective Division of any suspected criminal conduct; where there is no misconduct, determine whether additional training our counseling – to be provided by PPB consistent with the Settlement Agreement – is warranted; 3) where necessary, ensure the subject receives appropriate medical attention; and 4) interview officers individually and not in groups.

**The Monitoring Team's review of a sample of use of force events and investigations confirmed the consistent and verified performance of these requirements by PPB officers in actual practice.** In all 25 of the use of non-deadly force events reviewed by the Independent Monitor for its assessment with this paragraph, supervisors' AARs were completed within 72 hours of the event.[11] There were no instances of suspected misconduct in our sample, and the supervisor completed the appropriate notifications in the one case that involved a serious use of force.[12]

Our review did reveal that, in one case, a supervisor failed to recognize that force had been used against an individual with actual or perceived mental illness and had not made the required notifications to the shift supervisor and Professional Standards Division accordingly. This is concerning because it increases the chance that a use of force against such a subject will not receive the proper level of scrutiny and, relatedly, deviates from a core principle behind the Settlement Agreement. However, the Monitoring Team was pleased to observe that a lieutenant in the chain of command who reviewed this incident (unrelated to our assessment) identified the issue and ensured that the proper notifications were, in fact, made. We believe this case to be an aberration from the normal conduct displayed by supervisors who are called upon to respond to force events.

The Monitoring Team's review of a sample of cases indicated that supervisors consistently ensured that individuals received medical attention whenever it was needed after a use of force event. In 22 of the 25 non-deadly force cases in our sample, supervisors also took care to conduct interviews of involved and/or witness officers individually as opposed to in groups.

---

[11] In accordance with PPB Directive 1010.10, an After-Action Review is not required after a use of deadly force because the administrative review of the force event serves this function.

[12] As defined in PPB Directive 0910.00, and as used in multiple places in this report, a "serious use of force" includes any of the following: 1) all uses of force by a member that reasonably appear to create or do create a substantial risk of death, serious disfigurement, disability, or impairment of the functioning of any body part or organ; 2) all critical firearm discharges by a member; 3) all uses of force by a member resulting in a significant injury, including a broken bone, an injury requiring hospitalization, or an injury deemed to be serious by a member's supervisor; 4) all head, neck, and throat strikes with an object or neck holds; 5) force used upon juveniles known or reasonably assumed to be under fifteen, or persons known or reasonably assumed to be pregnant; 6) all uses of force by a member resulting in a loss of consciousness; 7) more than two applications of a Conducted Electrical Weapon (CEW) on a person during a single interaction, regardless of the mode or duration of the application, regardless of whether the applications are by the same or different officers, and regardless of whether the CEW application is longer than 15 seconds, whether continuous or consecutive; 8) any strike, blow, kick, CEW application, or similar use of force against a handcuffed, otherwise restrained, under control, or in custody subject, with or without injury; 9) any use of force referred by a member's supervisor to Professional Standards Division which that division deems a serious use of force.

In the three remaining cases, however, supervisors interviewed involved and/or witness officers together or appeared to do so. Group interviews in these circumstances run counter to sound investigative principles and PPB policy, and greater efforts should be made to definitively eradicate them. With that being said, the Monitoring Team also took note that a part of the issue may be the product of overly casual behavior by supervisors as opposed to any intentional effort to facilitate collusion. Although we consider the issue to be a significant one overall and, once again, worthy of swift and complete correction, we also note that it appeared to be occasional and less-than-systemic. The same is true of all other issues we found in the sample of cases we reviewed to assess Paragraph 70, as the overwhelming majority of the paragraph's requirements were fulfilled by PPB comprehensively and with a high level of integrity. **We therefore conclude that PPB is in Substantial Compliance with Paragraph 70 of the Settlement Agreement.**

**Recommendations:**

The Monitoring Team makes the following recommendations to support ongoing compliance with Paragraph 70 of the Settlement Agreement:

1. Remind supervisors of their responsibility to make required notifications upon learning that force was used against an individual with actual or perceived mental illness.
2. Reinforce to all supervisors the criticality of avoiding group interviews with officers involved in and/or witness to a use of force.

**Paragraph 72**
***Substantial Compliance***

For the Monitoring Team's assessment of Settlement Agreement Paragraph 72, we reviewed PPB's AAR, which PPB utilizes as a force investigation checklist for supervisors. We also reviewed any revisions made to the checklist.

**The Monitoring Team's review of the AAR confirmed that it is an appropriate effort to ensure that supervisors fully perform their force investigation responsibilities. Additionally, PPB notably and laudably revised the AAR during the Reporting Period and converted the report from a form to an application, which essentially gave the AAR increased functionality by integrating it with the Force Data Collection Report (FDCR) form and with PPB's Axon evidence management system.**

Supervisors' responsibilities following a use of force include conducting an administrative review and investigation of the use of force, documenting their findings, forwarding their report through the chain of command, completing the AAR within 72 hours of the force event, making appropriate

notifications regarding a serious use of force or a use of force against a person with a perceived or actual mental illness, ensuring that subjects receive medical attention when necessary, and interviewing officers individually and not in groups. The AAR is appropriately designed to require a supervisor to address each of these responsibilities.

The Monitoring Team observed one minor but notable absence in its review of the AAR form presently used by PPB. One additional responsibility of a supervisor following a use of force incident is simply to respond to the scene of the incident. Although the fact of their response may commonly be inferred by other portions of the AAR form, we believe that this supervisorial responsibility should be explicitly added to those that comprise the AAR's existing checklist, as with all of the other responsibilities referenced above.

Apart from this minor exception, which we believe calls for a relatively simple resolution, we find that PPB has satisfied the requirements of this paragraph in a comprehensive fashion and with a high level of integrity **We therefore conclude that PPB is in Substantial Compliance with Paragraph 72 of the Settlement Agreement.**

**Recommendations:**

The Monitoring Team makes the following recommendation to support ongoing compliance with Paragraph 72 of the Settlement Agreement:

1. Include a requirement for supervisors to verify in an AAR their response to the scene of a use of force incident, as required.


**<u>Paragraph 73</u>**
**<mark>*Substantial Compliance*</mark>**

**The Monitoring Team's review of PPB's use of force reporting directives confirmed their inclusion of the requirements listed in Paragraph 73 of the Settlement Agreement.** These include: 1) the Employee Information System tracks all use of force investigation findings and corrections; 2) all supervisors in the chain of command are subject to and receive corrective action or discipline for the accuracy and completeness of AARs completed by supervisors under their command; 3) all supervisors in the chain of command are accountable for inadequate reports and analysis; 4) supervisors receive the appropriate corrective action when they repeatedly conduct deficient investigations, and shift or precinct commanders receive the appropriate corrective action when they repeatedly permit deficient investigations; 5) PPB takes appropriate corrective action consistent with the Accountability provisions of the Settlement Agreement when a use of force is found to be out of policy; 6) where a use of force indicates policy, training, tactical, or equipment concerns, the immediate supervisor shall notify the Inspector and the Chief, who shall ensure PPB

timely addresses all such concerns; and 7) the Chief (or their designee) and Professional Standards Division have discretion to reassign a use of force investigation to Detective Division or any supervisor.

**The Monitoring Team's review of a sample of use of force events and investigations confirmed the consistent and verified performance of these requirements by PPB officers in actual practice.** Our review found appropriate tracking of use of force investigation findings in the Employee Information System. Our sample did not uncover any cases where discipline for chain of command supervisors was warranted, where a supervisor repeatedly conducted deficient investigations or a shift/precinct commander repeatedly permitted them, or where a use of force investigation gave rise to policy, tactical, training, or equipment concerns. In the one case from our sample that included an inadequate AAR which deemed a particular use of force to be in policy, the chain of command supervisors identified the issues with the report and rectified them, including by appropriately determining the use of force to be out of policy. Finally, with respect to that same case, its ultimate adjudication via an administrative investigation remains pending; no other cases in our sample involved an out of policy use of force.

Our review of a sample of cases determined that PPB has satisfied the requirements of this paragraph in a comprehensive fashion and with a high level of integrity. **We therefore conclude that PPB is in Substantial Compliance with Paragraph 73 of the Settlement Agreement.**

**Recommendations:**

The Monitoring Team makes the following recommendation to support ongoing compliance with Paragraph 73 of the Settlement Agreement:

1. Remind supervisors of PPB policy governing the use of force in order to minimize, to the fullest extent possible, instances when they reach the wrong conclusion about the appropriateness of a use of force in an AAR.

**<u>Paragraph 74</u>**
***Substantial Compliance***

The PPB Force Inspector is required, as part of PPB's quarterly review of force, to audit force reports and Directive 0910.00 Investigation Reports.[13] **The Monitoring Team's review confirmed the consistent and verified performance of these requirements by the PPB Force Inspector in actual practice.** The purpose of the audit is to ensure: 1) that force is used and reported appropriately; 2) that Electronic Control Weapons (ECWs) are used in compliance with PPB policy and ECW usage is reported properly; and 3) that reports are completed in a timely manner, with

---

[13] The full title of PPB Directive 0910.00 is, "Use of Force Reporting, Review, and Investigation".

detailed descriptions of the events and decision-making process used by officers as it relates to force (i.e. the level of resistance encountered, the number and types of force used, any complaints of injury or apparent injury to the subject, medical care provided, use of de-escalation techniques, and efforts to identify witnesses to the use of force).

The Monitoring Team performed a review of the OIG's audit of force reports in order to assess Paragraph 74.

> **Note:** The same review was used by the Monitoring Team in its assessment of the City's compliance with Paragraphs 75 and 77, both of which are discussed in further detail below.

The 25 case numbers in the sample we reviewed were associated with 55 Force Data Collection Reports (FDCRs). For each of the sampled cases, we requested: 1) the FDCRs completed by PPB members; 2) the use of force AARs completed by PPB supervisors; 3) all narrative reports of the event and Computer Aided Dispatch reports; and 4) the results obtained by the OIG during its audit of the force reports. We then reviewed the force reports, following the OIG's audit methodology, and compared the results obtained from our review to those obtained by the OIG. We recorded any instance in which the findings of our review disagreed with the findings of the OIG's audit.

Our review of the Force Audit Report for Paragraph 74 focused on 44 specific elements across each of the 55 FDCRs from our sample. In other words, our compliance assessment of this paragraph included an examination of 2,420 elements. Although our findings resulted in at least one disagreement with those of the OIG with respect to about half of the FDCRs we reviewed, an aggregate look across all elements from within those FDCRs that we reviewed resulted in a 97 percent rate of agreement with the OIG. The discrepancies that our review found, therefore, were relatively small in number; they also appeared to be largely isolated to minor, case-specific issues that were not consistently repeated across all of the cases in our sample. This result aligns well, overall, with PPB's Force Audit Report findings that, across ranks, PPB members are accurate in over 99 percent of the elements assessed for potential deficiency. **Significantly, despite the fact that our review of the OIG Force Audit findings indicates discrepancies between the content of reports and the audit results in over half the cases reviewed, the audit elements specifically required by Paragraph 74 were found to be highly accurate.**

The OIG audit results for all six requirements listed in Paragraph 74.a. (with respect to use of force) generally agreed with the Monitoring Team's findings in more than 90 percent of cases. The OIG audit results for the three requirements listed in Paragraph 74.b. (with respect to ECW usages) were in 100 percent agreement with our findings. Additionally, the OIG audit results for 10 of the 11 requirements listed in Paragraph 74.c. (with respect to use of force reporting) agreed with our findings in more than 90 percent of cases. The one requirement where the Monitoring Team's

findings diverged from the OIG's was whether subject injuries—either apparent injury, complaint of injury, or no injury—were identified (80 percent agreement).

In some cases, the OIG audit failed to record a subject injury that was reported in the FDCR, while in other cases, it stated that the subject injury was in the report even though it was not. The Monitoring Team notes that the FDCR form was revised after the introduction of Body Worn Cameras at PPB, and one section that changed was related to the documentation of subject injuries. In the past, there were open text boxes for the reporting officer to complete in order to document injuries, complaints of injuries, or the lack of either one. In the revised form, however, there is a checkbox to indicate the presence of an injury or a complaint of one; while a checked box affirms that one of these things is present, it is less apparent to reviewers whether an unchecked box is an affirmation that neither of these things are present, or if it might be merely the result of a mistake (an oversight) by the reporting officer.  PPB advised the Monitoring Team that after changing its review processes in September 2024, where no box is checked the PPB analysts now review the associated narrative, BWC recordings, and other records to see if something was missed. Otherwise, an unchecked box means the item was not present.

The Monitoring Team's review yielded a high rate of accurate findings in PPB's Force Audit Report with regard to the requirements for it that are listed throughout Paragraph 74. Additionally, it determined that the discrepancies with the Force Audit Report that were identified were primarily occasional, and that those discrepancies did not amount to a systemic issue that impacts the entire audit report. **We therefore conclude that PPB is in Substantial Compliance with Paragraph 74 of the Settlement Agreement.**

**Recommendations:**

The Monitoring Team makes the following recommendation to support ongoing compliance with Paragraph 74 of the Settlement Agreement:

1. Review and revise the FDCR form to allow officers to affirmatively report the presence or absence of an injury or complaint of an injury, as well as whether the subject's injury and medical treatment status are known to the officer.

   **Note:** PPB acknowledged the reporting and auditing challenge created by this change to the FDCR form and indicated to the Monitoring Team that it may seek to review and revise the form.

Based on the review we conducted for our assessment of compliance with Paragraph 74, the Monitoring Team makes the following additional recommendation, which is not required for compliance with the Settlement Agreement:

1.  PPB advised the Monitoring Team that it records a case as "not deficient" in the audit required by this paragraph if a deficiency at a lower level of reporting is corrected at any point during the standard chain of command review process, rather than noting it as deficient at the level(s) where the review failed to report and/or address the deficiency. In order to maximize the utility of these audits, consider counting and tracking all deficiencies, at all levels of reporting and review, as described in Directive 0910.00. Doing so will more effectively allow PPB to see levels of adherence to policy by rank, identify members who have repeated deficiencies and may benefit from remedial action, etc.

**Paragraph 75**
***Substantial Compliance***

The PPB Force Inspector is required to audit force reports and Directive 0910.00 investigations to determine whether supervisors consistently meet a set of requirements that arise after a use of force occurs.  **The Monitoring Team's review confirmed the consistent and verified performance of these requirements by the PPB Force Inspector in actual practice.** These requirements include: 1) completing an AAR within 72 hours of notification of a use of force; 2) reviewing all use of force reports to ensure they include the information required by the Settlement Agreement and PPB policy; 3) evaluating the weight of the evidence; 4) using a "decision-point" approach to analyze each use of force; 5) determining whether actions of the officer who used force appear consistent with PPB policy, the Settlement Agreement, and best practices; 6) determining whether there was legal justification for the original stop and/or detention; 7) assessing the incident for tactical and training implications, including whether the use of force may have been avoided through the use of de-escalation techniques or lesser force options; 8) determining whether additional training or counseling is warranted; 9) implementing corrective action wherever there are material omissions or inaccuracies in officers' use of force reports, and for failing to report a use of force, whether applied or observed; 10) documenting any non-disciplinary corrective action to remedy training deficiencies, policy deficiencies, or poor tactical decisions in the Employee Information System; 11) notifying Professional Standards Division and the shift supervisor of every incident involving an officer's serious use of force, as well as any use of force that could appear to a reasonable supervisor to constitute misconduct; and 12) notifying Detective Division and the shift supervisor of every force incident in which it could reasonably appear to a supervisor that an officer engaged in criminal conduct.

**The Monitoring Team's review and the OIG's audit exhibited more than 90 percent agreement for all 12 of the audit requirements listed in Paragraph 75.**

With fairly limited exceptions, the Monitoring Team's review found a sizeable majority of accurate findings in PPB's Force Audit Report with regard to that report's requirements, which are listed in Paragraph 75. Furthermore, the discrepancies that exist appear to be infrequent and not systemic in

terms of their impact on the entire audit report. **We therefore conclude that PPB is in Substantial Compliance with Paragraph 75 of the Settlement Agreement.**

**Recommendations:**

The Monitoring Team makes the following recommendation to support ongoing compliance with Paragraph 75:

1. PPB advised the Monitoring Team that it records a case as "not deficient" in the audit required by this paragraph if a deficiency at a lower level of reporting is corrected at any point during the standard chain of command review process, rather than noting it as deficient at the level(s) where the review failed to report and/or address the deficiency. In order to maximize the utility of these audits, consider counting and tracking all deficiencies, at all levels of reporting and review, as described in Directive 0910.00. Doing so will more effectively allow PPB to see levels of adherence to policy by rank, identify members who have repeated deficiencies and may benefit from remedial action, etc. Furthermore, it will better position PPB to ensure that any deficiencies found in FDCRs and AARs are duly corrected so that the content of those reports is as accurate as possible.

## Paragraph 76
### *Partial Compliance*

For the Monitoring Team's assessment of Settlement Agreement Paragraph 76, we reviewed a series of reports and analyses required to be conducted by the PPB Force Inspector in connection with use of force data and supervisors' Directive 0910.00 reports (regarding the use of force). **The Monitoring Team's review of these reports and analyses found that they are appropriately designed to accomplish some, but not all, of the outcomes listed in Paragraph 76.**
We used a series of eight questions to help us evaluate the fulfillment of the requirements in this paragraph.

The reports we reviewed included:

- Applications of Force Report (2024)
- Force Audit Report (Q3-Q4 2024)
- Force Analysis Summary Report (Q4 2024)
- Force Analysis Summary Report (2024)

The complete list of requirements includes: 1) determining whether significant trends exist; 2) determining if there is variation in force practice away from PPB policy in any unit; 3) determining if any officer, PPB unit, or group of officers is using force differently or at a different rate than others,

determine the reason for any difference, and correct or duplicate the difference elsewhere, as appropriate; 4) identifying and correct deficiencies revealed by the analysis; and 5) documenting the Force Inspector's findings in an annual public report.

In its Applications of Force Report, PPB relies on FDCRs to report on uses of force within specific precincts and work shifts. The report includes information on statistical means and standard deviations from them in order to identify personnel who used force at notably different rates than others. The Monitoring Team did note in its review of this PPB report, however, that it did not address the reason(s) (or potential reason(s)), behind these differences, and that it did not address how the information being reported on would (or could) be used to correct behavior, where appropriate.

The Force Audit Report[14] (FAR) includes data on officer, sergeant, and command reporting accuracy rates as well as comparisons of that information across different Reporting Periods, precincts/divisions, and the Bureau as a whole. The report also provides information on reporting deficiencies over time, allowing PPB to identify trends in these data. The FAR also includes a breakdown of categories of required elements of use of force reporting, identifying those with the greatest and fewest number of deficiencies. The Monitoring Team did note in its review of this PPB report, however, that it does not address the correction of the deficiencies identified within the report. PPB indicated to the Monitoring Team that the correction of any deficiency is identified in the Employee Information System (EIS), and that the FAR is not intended to be retroactively updated after the issuance of any coaching and/or counseling.

The Force Inspector presents results from the Applications of Force Report, and Force Audit Reports to the RU managers in each precinct. The presentation includes the reporting accuracy by officer, sergeant, and command staff; identification of staff with the highest number of reporting deficiencies; and any staff recommended by the Force Inspector for potential discussion or intervention related to their use of force. A summary of this presentation is included as a Precinct alert in the EIS for the RU manager to follow up on. The Monitoring Team notes that while this presentation includes recommendations regarding members who may benefit from discussions or interventions in response to uses of force, no specific action is recommended, and the reports provided do not indicate the actions taken to address such recommendations.

In its Force Analysis Summary Reports, PPB includes multiple pieces of information on use of force incidents, including subject demographics, applications of force, yearly comparisons, etc. The reports separate this data by precinct and additional subject information (i.e. whether the subject was armed, in mental health crisis, and/or affected by drugs/alcohol). They also include reviews of use of force incidents adjudicated as Out of Policy. PPB's 2024 Force Analysis Summary report is the annual report published by the Force Inspector documenting the findings of their analyses of use of

---

[14] This is the same report relied on for the Monitoring Team's assessment of Settlement Agreement paragraphs 74, 75, and 77, and it is discussed further in our descriptions of those paragraphs.

force data and supervisors' Directive 0910.00 reports. The Monitoring Team notes that this annual public report also excludes the reason(s) for differences in uses of force and discussion of corrections for deficiencies identified by the analysis.

The combination of reports and analyses reviewed by the Monitoring Team for its assessment of PPB's compliance with Paragraph 76 collectively illustrate that PPB is fulfilling a large portion of its requirements related to the recurring analysis of force data and supervisors' Directive 0910.00 reports regarding the use of force. Other requirements warrant further attention in these reports, however, including the ones importantly focused on determining the reasons behind differing use of force data across PPB and identifying appropriate corrections to deficiencies when they are discovered by the analyses. The Monitoring Team views these exceptions as a systematic exclusion of data and worthy of rectification to meet the requirements of Paragraph 76. **We therefore conclude that PPB is in Partial Compliance with Paragraph 76 of the Settlement Agreement.**

**Recommendations:**

Pursuant to Settlement Agreement Paragraph 226, the Monitoring Team recommends the following steps necessary to achieve and maintain Substantial Compliance with Paragraph 76:

1. Include in its analysis of force data reporting any determinations made regarding the reasons(s) for differences in uses of force across any officer, groups of officers, or PPB units, and whether the factors driving such variations represent deficiencies that might be corrected, or successes to be duplicated elsewhere.
2. Include in its analysis of force data reporting a summary of corrective actions taken by PPB to address any deficiencies revealed by the analysis, or a confirmatory statement if no deficiencies were identified in the analysis.

**Paragraph 77**
*Substantial Compliance*

The PPB Force Inspector is required to audit chain of command reviews of AARs to determine whether all supervisors in the chain of command consistently meet their review requirements subsequent to a use of force. **The Monitoring Team's review confirmed the consistent and verified performance of these requirements by the PPB Force Inspector in actual practice.** These requirements include: 1) reviewing supervisors' findings about the use of force, as are required by PPB Directive 0910.00, using a preponderance of the evidence standard; 2) reviewing reports on the use of force, as are required by PPB Directive 0910.00, to ensure completeness, and ordering additional investigation, when necessary; 3) modifying findings as appropriate, and documenting modifications; 4) ordering additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improving the reliability or credibility of the

findings, and counseling the investigator; 5) documenting any training deficiencies, policy deficiencies, or poor tactical decisions, ensuring a supervisor discusses poor tactical decisions with the officer, and ensuring the discussion is documented in the Employee Information System; 6) suspending an investigation immediately and notifying the branch Assistant Chief, Director of Professional Standards Division, and Detective Division whenever the investigating supervisor, shift commander, or division commander finds evidence of apparent criminal conduct by a PPB officer; and 7) reporting a matter to Professional Standards Division for review and investigation whenever an investigating supervisor, shift commander, or precinct commander finds evidence of apparent misconduct by a PPB officer or employee.

Of the seven requirements listed in Paragraph 77 of the Settlement Agreement, the Monitoring Team and the OIG exhibited more than 90 percent agreement on six of them. The one area of review where the Monitor and OIG were not in agreement in at least 90 percent of cases was whether chain of command reviewers were ensuring completeness of reports and ordering additional investigation when necessary (88 percent agreement).

With fairly limited exceptions, the Monitoring Team's review found a sizeable majority of accurate findings in PPB's Force Audit Report with regard to the requirements for that report listed throughout Paragraph 77. Even in the one noted area of exception, agreement between the findings of our review and the OIG's audit remained relatively high. Furthermore, the discrepancies that exist appear to be no more than occasional in their frequency and not systemic in terms of their impact on the entire audit report. **We therefore conclude that PPB is in Substantial Compliance with Paragraph 77 of the Settlement Agreement.**

**Recommendations:**

The Monitoring Team makes the following recommendation to support ongoing compliance with Paragraph 77 of the Settlement Agreement:

1. Ensure that audits of chain of command reviews of AARs focus more carefully on whether chain of command reviewers ensured completeness of reports and ordered additional investigation when necessary.

Based on the review we conducted for our assessment of compliance with Paragraph 77, the Monitoring Team makes the following additional recommendation, which is not required for compliance with the Settlement Agreement:

1. PPB advised the Monitoring Team that it records a case as "not deficient" in the audit required by this paragraph if a deficiency at a lower level of reporting is corrected at any point during the standard chain of command review process, rather than noting it as deficient at the level(s) where the review failed to report and/or address the deficiency. In order to maximize the utility of these audits, consider counting and tracking all deficiencies,

at all levels of reporting and review, as described in Directive 0910.00. Doing so will more effectively provide PPB with an accurate picture of where deficiencies lie across its membership and how to best address them.

## Training

### Paragraph 78
*Substantial Compliance*

Settlement Agreement Paragraph 78 identifies a number of immensely valuable outcomes for PPB to achieve with regard to the training of its officers. In order to do so, according to the language of this paragraph, PPB must consistently and verifiably perform the requirements in the subsequent Settlement Agreement paragraphs that address training (Paragraphs 79, 81, 84, 85, and 86, specifically). Therefore, the Monitoring Team's assessment of PPB's compliance with Paragraph 78 is dependent upon PPB's performance of those subsequent paragraphs. **As is described in greater detail below, PPB has generally met the numerous requirements with regard to training that are listed throughout those paragraphs, and any areas of deviation from the requirements are minor or occasional and not systemic. We therefore conclude that PPB is in Substantial Compliance with Paragraph 78 of the Settlement Agreement.**

### Paragraph 79
*Substantial Compliance*

For its assessment of compliance with this paragraph, the Monitoring Team reviewed the following reports completed by PPB related to officer training:

- 2024 Annual Training Needs Assessment
- FY2025 Annual Training Plan
- 2024 Training Needs Assessment: Law Enforcement Response to Mass Demonstrations

As we reviewed them, we answered a series of 13 questions about them (collectively), which we developed based on the requirements laid out for the training plan and the needs assessment in Paragraph 79. **Our review confirmed that the updates PPB made to its Annual Training Plan during this Reporting Period, as well as the Training Needs Assessment PPB conducted to inform those updates, met the requirements of Settlement Agreement Paragraph 79.**

PPB's Training Division is required to review and update PPB's training plan annually. The updates it makes must be informed by a training needs assessment, to be modified annually, which takes into consideration the following elements: 1) trends in hazards officers are encountering in performing their duties; 2) analysis of officer safety issues; 3) misconduct complaints; 4) problematic uses of force; 5) input from members at all levels of PPB; 6) input from the community; 7) concerns reflected in court decisions; 8) research reflecting best practices; 9) the latest in law enforcement trends; 10) individual precinct needs; and 11) any changes to Oregon or federal law or PPB policy.

Our review of the 2024 Annual Training Needs Assessment found it to be thorough, comprehensive, and effective in its utilization of data, findings, and recommendations related to the various elements listed in Paragraph 79. Furthermore, the conclusions in the assessment were appropriately relied on to inform PPB's FY2025 Annual Training Plan and revisions made to it from prior iterations. PPB satisfied the requirements of this paragraph in a comprehensive fashion and with a high level of integrity. **We therefore conclude that PPB is in Substantial Compliance with Paragraph 79 of the Settlement Agreement.**


**Paragraph 81**
***Substantial Compliance***

The Monitoring Team spent time with PPB staff in order to observe their utilization of the Cornerstone Learning Management System (LMS) to track, maintain, and report various records of training for PPB members. **Although there is some room for improvement in PPB's tracking and organization of its training records, the Monitoring Team's review of PPB's LMS confirmed that such tracking is operating, on balance, as required by Paragraph 81.** At our request, staff facilitated our evaluation of a variety of members' training records to verify their completion and accuracy as well as their required reviews by an immediate supervisor. We also reviewed a biannual online training LMS report, which reflected over 125 trainings relating to PPB directives, standard operating procedures, legal updates, supervisor and officer field operations, and other topics that were administered to PPB members. PPB is required to ensure that its Training Division is electronically tracking, maintaining, and reporting complete and accurate records of current curricula, lesson plans, training delivered, attendance records, and other training materials in a centralized, commonly accessible, and organized file system. Additionally, each PPB officer's immediate supervisor is required to review the database for the officers under their command at least semi-annually.

The Monitoring Team's review of PPB's LMS found that it successfully fulfills most of these requirements.[15] It is a centralized and organized database that tracks all in-service, online, and other forms of training undertaken by PPB employees, and it is appropriately accessible and capable of producing detailed records of training across a wide range of variables. During our review of members' training records with PPB staff, we did note that the LMS currently relies on staff to manually input certain aspects of training data, such as attendance records at a particular training course, which are obtained from written sign-in sheets completed by attendees. While it is not a deviation from any requirement in Paragraph 81, this process is not necessarily ideal for minimizing the chances of human error occurring. The Monitoring Team was encouraged to hear that PPB

---

[15] The Monitoring Team notes that PPB does not maintain its current curricula or lesson plans in the Learning Management System. Those records are electronically maintained separately by the Training Division, on an organized, centralized PPB network drive.

intends to move to an automated attendance recordation system, whereby attendees in a given training course will electronically document their attendance through the use of a QR code.

Additionally, we noted that there appears to be some inconsistency in how PPB is documenting supervisors' required reviews of the database for officers under their command. It is our understanding that while the completion of such reviews may sometimes be noted on an officer's record within PPB's Employee Information System, they may at other times be noted only on an officer's periodic performance evaluation report.

While noting these potential areas in which the overall accuracy of PPB's tracking, maintaining, and reporting of training data may potentially be increased, the Monitoring Team also notes that PPB has satisfied the requirements of this paragraph in a comprehensive fashion and with a high level of integrity. **We therefore conclude that PPB is in Substantial Compliance with Paragraph 81 of the Settlement Agreement.**

**Recommendations:**

The Monitoring Team makes the following recommendations to support ongoing compliance with Paragraph 81 of the Settlement Agreement:

1.  Continue to move forward with plans to increase the automation of training data/records where feasible, including through the use of QR codes to verify officer attendance at a training course.
2.  Ensure that documentation of supervisors' required reviews of the training database for all officers under their command is consistent across PPB and is collected in a manner that is easily trackable in order to assess adherence to the requirement.

**Paragraph 84**
***Substantial Compliance***

During this Reporting Period, multiple members of the Monitoring Team reviewed and provided comments on approximately 20 of PPB's In-Service Training curricula covering a wide variety of law enforcement practices and procedures, as well as approximately 12 of PPB's Rapid Response Team (RRT) training curricula covering multiple responsibilities of that specialized unit within PPB.[16] **The Monitoring Team's review verified the consistent conformity of these training courses with the language of the applicable Directives and the Settlement Agreement, and our observations of PPB training during the Reporting Period confirmed that PPB is fulfilling the requirements of this paragraph in actual practice.**

---

[16] These reviews were conducted pursuant to requirements contained in Settlement Agreement Paragraph 246.

Our review generally included evaluations of both Lesson Plans and Materials for each course (unless one of those elements of the curriculum was not in use for that course), as well as relevant PPB Directives, Standard Operating Procedures (SOPs), and other associated records, as appropriate. We aimed to be thoughtful, thorough, and comprehensive in each review we conducted and in each comment for PPB's consideration we provided.

In addition to these detailed reviews of training curricula, multiple members of the Monitoring Team conducted in-person observations of some of PPB's training courses, including the following ones:

- 2024 2-day In-Service Training
- 2024 Supervisory In-Service Training
- 2024 Crisis Negotiation Team Demonstration Liaison Officer (video-recorded)
- 2024 August Monthly RRT Training
- 2024 October Monthly RRT Training
- 2024 October Joint Training with RRT and Oregon State Police Mobile Response Team
- 2024 December Monthly RRT Training

Having multiple members of the Monitoring Team engaged in these reviews and in-person observations related to PPB training allowed us to rely on a collective set of skills including civilian oversight of law enforcement, police operations, and consent decree compliance. Crucially, having more than one Monitoring Team member involved in these activities also helped us to ensure that we infused different perspectives into the assessments we made, as opposed to relying solely on a single person's experiences or point of view.

Settlement Agreement Paragraph 84 requires all PPB training to conform to PPB's current policies at the time of training. It requires the training of patrol officers to include the following six elements: 1) increased use of role-playing scenarios and interactive exercises that illustrate proper use of force decision making; 2) emphasized use of integrated de-escalation techniques, when appropriate; 3) continued training regarding an officer's duty to procure medical care whenever a subject is injured during a force event; 4) continued training on proactive problem solving and utilization of disengagement, area containment, surveillance, waiting out a subject, summoning reinforcements, requesting specialized units, or delaying arrest, when appropriate; 5) description of situations in which a force event could lead to civil or criminal liability; and 6) continued training on avoiding the use of profanity, prohibiting the use of derogatory/demeaning labels, and avoiding terms not currently appropriate for person-center communication.

With regard to the training of supervisors, Paragraph 84 requires the inclusion of the following three elements: 1) how to conduct use of force investigations; 2) how to evaluate officer performance as part of PPB's annual performance evaluation system; 3) how to foster positive career development

and impose appropriate disciplinary sanctions and non-disciplinary corrective action. Finally, this paragraph requires officers to be trained on the Settlement Agreement's requirements.

Although we did not see every training administered during the period, and although this paragraph's requirements were not all directly relevant to every training we did see during the period, our reviews and observations led us to the conclusion that PPB training conforms to PPB's current policies (as of the time of the training). Furthermore, PPB generally makes appropriate efforts to infuse its training with the many requirements listed in Paragraph 84, where relevant. The Monitoring Team's reviews, observations, and commentary to PPB specifically and intentionally focused on those requirements. Finally, PPB also provided a training schedule documenting the initial In-Service Training (in 2013) that included guidance on the Settlement Agreement's requirements for PPB officers.

Based on our reviews and observations of PPB training, the Monitoring Team found that that PPB has satisfied the requirements of this paragraph in a comprehensive fashion and with a high level of integrity. **We therefore conclude that PPB is in Substantial Compliance with Paragraph 84 of the Settlement Agreement.**

**Paragraph 85**
==*Substantial Compliance*==

The Monitoring Team reviewed the December 2022 Training Division Assessment conducted by the PPB Office of the Inspector General (OIG)[17] and used a series of 10 questions during our review to verify whether all of the requirements included in the Settlement Agreement for that audit were fulfilled. **The Monitoring Team's review verified that the Training Division Assessment consistently satisfied the essential requirements included in Paragraph 85 of the Settlement Agreement.**

Settlement Agreement Paragraph 85 requires PPB to audit its training program using the following performance standards to ensure PPB does the following: 1) conducts a comprehensive needs assessment annually; 2) creates a Training Strategic Plan annually; 3) develops and implements a process for evaluation of the effectiveness of training (within 180 days of the Effective Date of the Settlement Agreement); 4) maintains accurate records of training delivered, including substance and attendance; 5) makes training records accessible to the Director of Services, Assistant Chief of Operations, and DOJ; 6) trains officers, supervisors, and commanders on areas specific to their

---

[17] PPB informed the Monitoring Team that it had completed multiple previous assessments pursuant to Paragraph 85. We were provided materials from those assessments, including the initial one conducted in 2015 (slightly after the 180-day deadline referenced in this paragraph). Given that Paragraph 85 does not include any specific requirement for PPB to conduct recurring assessments, including during the present Reporting Period, we limited our review to the most recently completed one and assessed its compliance with the requirements of Paragraph 85.

responsibilities; and 7) ensures sworn PPB members are provided a copy of all PPB directives and policies issued pursuant to the Settlement Agreement and that they sign a statement acknowledging that they have received, read, and had an opportunity to ask questions about the directives and/or policies, within 30 days of the release of the directives and/or policies.

Our review of the 2022 Training Division Assessment found that it satisfied the essential requirements of this paragraph in a comprehensive fashion and with a high level of integrity. **We therefore conclude that PPB is in Substantial Compliance with Paragraph 85 of the Settlement Agreement.**

**Recommendations:**

The Monitoring Team makes the following recommendation to support ongoing compliance with Paragraph 85:

1. Given that the last audit of PPB's training program pursuant to the requirements of Paragraph 85 occurred in 2022, PPB should initiate another audit as soon as feasible. Doing so may provide updated information about how to improve the effectiveness of the training program, which would benefit all PPB members as well as members of the public whom PPB serves.[18]


**<u>Paragraph 86</u>**
**<mark>*Substantial Compliance*</mark>**

Paragraph 86 includes a number of requirements regarding the gathering, presentation of, and responding to use of force data as well as the analysis of it. **The Monitoring Team's review found that PPB consistently met the requirements of Paragraph 86 in actual practice.**

The Monitoring Team met with members of PPB's OIG twice during the Reporting Period to examine the ways in which PPB collects data and how they analyze that data. We confirmed that PPB gathers data specifically regarding patterns and trends in officers' uses of force. This data includes, but is not limited to, the percentage of calls for service when non-deadly force is used, the increase or decrease of uses of force by quarter, the percentage of subjects of non-deadly force who were experiencing a mental health crisis, whether or not the subject was armed or affected by drugs and/or alcohol, the types of force used, and uses of force by precinct and bureau-wide. PPB primarily collects its use of force data through officer Force Data Collection Reports and supervisory After-Action Reports (AARs).

---

[18] The Monitoring Team notes that the Compliance Officer/Community Liaison similarly suggested the initiation of a new audit of PPB's training program in its final compliance assessment report (COCL Quarterly Report: Quarter 1 Updates & Analysis, January 1, 2024, to March 31, 2024).

The Monitoring Team also reviewed meeting agendas provided by PPB and meeting minutes posted on City of Portland's Training Advisory Council (TAC) website. These materials confirmed that PPB presented quarterly use of force data and analysis during each of two meetings with the TAC – on July 10, 2024, and November 13, 2024. Furthermore, they evidenced that this data was presented to PPB Training Division and the Chief, in addition to the TAC itself, as required.

We searched the TAC webpage on the City of Portland website and did not locate any written recommendations to the Chief from this Reporting Period regarding proposed changes in policy, training, and/or evaluations based on presented data. PPB informed us that the Training Division did not submit any written recommendations to the Chief during this period.

Paragraph 86 requires the Force Inspector to identify problematic use of force patterns and training deficiencies, and to coordinate with Professional Standards Division (PSD) in doing so. PPB verified that no such patterns or deficiencies were identified during this Reporting Period, as evidenced by the Force Inspector's presentations of data to the TAC. Accordingly, the Chief's Office did not assess any problematic patterns and did not implement any remedial training to address deficiencies.

The Monitoring Team's review found that PPB satisfied most of the requirements in Paragraph 86. Although no information was provided regarding the required collaboration between the Force Inspector and PSD in identifying problematic patterns and training deficiencies, we consider this to be a minor deviation from the requirements and one that is not systemic in its impact on the overall compliance with this paragraph. **We therefore conclude that PPB is in Substantial Compliance with Paragraph 86 of the Settlement Agreement.**

**Recommendations:**

The Monitoring Team makes the following recommendation to support ongoing compliance with Paragraph 86 of the Settlement Agreement:

1. Continue to ensure that consistent coordination between the Force Inspector and PSD occurs, as required, in the Force Inspector's identification of problematic use of force patterns and training deficiencies and continue to ensure that the coordination is documented.

Based on the review we conducted for our assessment of compliance with Paragraph 86, the Monitoring Team makes the following additional recommendations, which are not required for compliance with the Settlement Agreement:

1. Continue to work toward greater transparency and trust with the community of Portland by reporting more comprehensive and extensive data on use of force patterns and potential

training and policy challenges, with a focus on how PPB is addressing any patterns and challenges.

2. Apply existing continuous quality improvement approaches to support the identification of potential problems and strive for continuous incremental improvement across all of PPB's interactions with the public and across all law enforcement actions.

## Crisis Intervention

**Paragraph 115**
*Substantial Compliance*

Paragraph 115 requires the City to ensure that Crisis Triage is fully operational, including the implementation of policies and procedures developed by the Bureau of Emergency Communications (BOEC) and the Portland Police Bureau (PPB). The policies and procedures developed by BOEC and PPB triage calls related to mental health issues and assign them for handling by PPB, the Multnomah County Crisis Line (MCCL), or the City's Portland Street Response (PSR). To assess compliance with this paragraph, the Monitoring Team: 1) reviewed relevant BOEC policies for the Crisis Triage System; 2) reviewed the results of BOEC's internal audit of dispatch calls; and 3) performed additional review of a random sample of 20 calls dispatched to each of four sets of responders: PSR, Enhanced Crisis Intervention Team (ECIT), MCCL, and non-ECIT PPB. **The Monitoring Team's review confirmed that BOEC is dispatching incoming calls in accordance with its policies regarding the appropriate use of the City's Crisis Triage System.**

BOEC's internal audit assesses the subset of 9-1-1 emergency calls for which responding officers documented in the Computer-Aided Dispatch (CAD) system that there was a mental health component, and a PPB ECIT was not dispatched. The purpose of BOEC's audit is to determine whether any of these calls should have been dispatched to ECIT. There were 9,180 calls received by BOEC during the Reporting Period meeting these review criteria. BOEC audited a random sample of 689 of those calls, finding that 36 of them (5.2 percent of the sample) met the criteria for dispatching ECIT but did not reflect a change in the call type to indicate ECIT response. BOEC also reported transferring 411 calls to MCCL, with 13 calls (3.2 percent) returned to BOEC for ECIT dispatch. This finding does not indicate fault with the BOEC call-takers, as MCCL staff may learn new information after the transfer requiring an ECIT response. Additionally, BOEC reports transferring 7,463 calls to PSR during the Reporting Period.

The Monitoring Team talked with BOEC staff about the lessons learned during their audits of dispatch calls. BOEC reported that any results suggesting systematic issues in call-taker or dispatcher performance were fed back into their training system for remediation. Additionally, BOEC reported that in the coming months staff members will receive direct feedback on their individual performances from call audits.

BOEC provided the Monitoring Team with the dispatch call audio and summary documents for a stratified random sample of 20 audited calls. The sample was stratified to include both calls that BOEC indicated did not meet ECIT criteria (12 calls), and those that did (eight calls, or 40 percent of the sample). We reviewed the call audio and documentation to determine whether these calls

should have been dispatched to ECIT. Of the 20 calls reviewed, we found one call that was dispatched to ECIT and should not have been included in the sample. Of the remaining 19 calls, we identified seven (36.8 percent) meeting the criteria for ECIT dispatch, which is close to the 40 percent anticipated by the sample. The audit results from BOEC agreed with the Monitoring Team's results in 18 of the 19 calls, or 94.7 percent agreement.

Finally, BOEC provided the Monitoring Team with the dispatch call audio and summary documents for a random sample of 20 calls dispatched to each of three key Crisis Triage Responders: PSR, ECIT, and MCCL. As with the audited calls reviewed, the Monitoring Team reviewed the call audio and documentation to determine whether these calls were dispatched to the correct responder in the Crisis Triage System based on BOEC policy. Of these 60 calls that we reviewed, one PSR call did not have call audio because the PSR team self-dispatched. Among the remaining 59 calls, 58 (98.3 percent) were dispatched to the correct responders as required by BOEC policy.

The agreement between our results and BOEC's internal audit results suggests that BOEC call-takers and dispatchers are largely successful in identifying calls that do not warrant an ECIT or PSR response. However, BOEC's internal audit is limited to assessing only those calls that were identified as not requiring an ECIT or PSR response. A review of calls dispatched to PSR, ECIT, and MCCL further demonstrated a high degree of integrity by BOEC call takers and dispatchers in triaging calls to the appropriate responders in the City's Crisis Triage system. **We therefore conclude that PPB is in Substantial Compliance with Paragraph 115 of the Settlement Agreement.**

## Employee Information System

To assess compliance with paragraphs 116, 117, and 118, the Monitor met with PPB on three separate occasions in July 2024, December 2024, and March 2025 to discuss and review the use and functionality of the Employee Information System (EIS) in order to confirm the application of the principles required by this portion of the Settlement Agreement. The Monitor also reviewed PPB Directives related to the application of the EIS, including, primarily, Directive 345.00, to evaluate PPB's implementation of the principles and processes required by this portion of the Settlement Agreement. The Monitor also reviewed relevant Standard Operating Procedures (SOPs) and the results of analyses conducted by PPB.

The Monitoring Team's review of PPB's EIS confirmed that PPB has developed policies and procedures intended to support the early identification of potentially problematic trends among officers, supervisors, and teams. In accordance with the Settlement Agreement, PPB has implemented mechanisms requiring supervisors and commanders to conduct regular performance reviews of officers, including upon transfer, and to document those reviews in the Performance Data Tracker (PDT).

The EIS is structured to support analyses of officer behavior/activity (including, but not limited to, the use of force) at both the individual and unit levels, and to trigger case management reviews when that behavior/activity crosses a set of predetermined thresholds. The Monitoring Team's review confirmed that, with one notable exception regarding traumatic incidents, structural components such as these were properly in place during the Reporting Period, and the majority of required reviews were completed in a timely manner. At the same time, concerns remain as to whether the system is being used to its full potential, particularly with respect to identifying patterns that warrant intervention, ensuring transparency in decision-making, and applying threshold criteria in a consistent and meaningful way.

Paragraph 116 of the Settlement Agreement requires supervisors and commanders to conduct reviews of EIS records of employees and new transfers, and to document these reviews in the PDT. It also requires PPB staff to regularly analyze unit and supervisor data to identify and compare activity patterns.

Similar to Paragraph 116(c), Paragraph 117 requires PPB to use force audit data to conduct analyses at supervisor and team levels. Finally, Paragraph 118 requires PPB to use multiple thresholds to trigger case management reviews including, but not limited to, the following two:

1. When an officer has used force in 20 percent of their arrests in the past six months or
2. When an officer has used force three times more than the average number of uses of force compared with other officers on the same shift.

**Paragraph 116**
*Substantial Compliance*

**The Monitoring Team found that PPB has implemented the policy and procedural requirements needed to satisfy the three elements of paragraph 116.** Commanders and supervisors are required to perform annual reviews of employee performance and EIS records and to perform a similar review for officers new to their command, whether the result of the officer or the supervisor having been transferred. EIS staff also perform daily analyses of PPB members to assess performance threshold breaks, and the OIG Force Inspector analyzes use of force data quarterly to identify patterns of activity across units and teams.

To comply with Paragraph 116(a), PPB must require that commanders and supervisors conduct prompt reviews of EIS records of employees under their supervision and document that the review has occurred in the EIS Performance Data Tracker. PPB Directive 0215.00 (Member Performance Evaluations), PPB Directive 0345.00 (Employee Information System), and Professional Standards Division (PSD) SOP #58 (Tracking of Yearly Member Performance Evaluations) require annual performance reviews of employees, including their EIS records. Supervisors must complete the performance review by the end of the month of the member's hiring or promotion anniversary and document the completed review in the EIS.

To comply with Paragraph 116(b), PPB must require that commanders and supervisors conduct prompt reviews of the EIS for officers new to their commands and document that the review has occurred in the EIS PDT. PPB Directive 0345.00 requires supervisors to complete a review and EIS documentation within 30 days of having a new officer under their command. The transfer review is required regardless of whether the officer or the supervisor was the transferred employee.

To comply with Paragraph 116(c), PPB must require that EIS staff regularly conduct data analysis of units and supervisors to identify and compare patterns of activity. PPB Directive 0345.00 and PSD SOP #44 (Employee Information System Alert Processing Guide) require the EIS Administrator to perform regular analyses. The EIS Administrator uses the daily pre-programmed analyses of the EIS to identify and assess threshold breaks by members related to their uses of force. When necessary, the EIS Administrator creates EIS Alerts within the system that notify supervisors and command staff to review the threshold break for possible discussion or intervention with an officer.

After meeting with EIS and OIG staff, examining data in EIS, reviewing PPB Directives and SOPs, and assessing analyses submitted by PPB, **the Monitoring Team concludes that PPB in Substantial Compliance with Paragraph 116 of the Settlement Agreement.**

**Recommendations:**

The Monitoring Team makes the following recommendations to support ongoing compliance with Paragraph 116:

1. Ensure supervisors performing evaluation and transfer reviews are accurately and consistently documenting findings or patterns of activity in the EIS that indicate a member may potentially be at risk of problematic activity in the future.

2. Ensure supervisors are addressing any concerning findings or patterns of activity with the involved member directly, and that they are consistently documenting such non-disciplinary corrective actions in the PDT. Furthermore, ensure supervisors understand all expectations for accurate and consistent EIS entries through regular reinforcement opportunities including, but not limited to Manager Meetings, In-service training, and reminder emails associated with evaluation and transfer reviews.


**Paragraph 117**
*Substantial Compliance*

As required by the Settlement Agreement, and as with paragraph 116(c), paragraph 117 also requires PPB to use data to identify and compare activity patterns, but with force audit data and at supervisor- and team-levels. PPB uses force audit data to analyze the completeness and accuracy for force reporting across three groups: members, supervisors, and command staff.

**The Monitoring Team's review of PPB's practices under paragraph 117 verified that the Bureau has developed processes for using force audit data to identify and assess patterns of officer activity at the supervisor and team levels. The Monitoring Team's review found that these mechanisms are in place and consistently applied, and that PPB has incorporated procedures for analyzing force data by officer, supervisor, and division.** At the same time, questions remain regarding the extent to which identified deficiencies are addressed through follow-up actions, and whether the findings from audit reviews are being used to inform meaningful changes in supervisory practices.

This data and information review process is intended to ensure that PPB not only evaluates individual uses of force but also effectively examines broader trends that may reflect systemic issues or deficiencies in supervisory oversight. PPB's audit reviews are designed to assess the completeness and accuracy of force reporting across members, supervisors, and command staff, and to identify individuals or groups with the highest number of reporting deficiencies.

PPB also conducts Force Audit Reviews where they include analyses by precinct/division, and at officer, supervisor, and command levels. They also identify individuals and categories with the

highest number of deficiencies and provide recommendations on how to address these deficiencies (i.e., reminder discussions).

While the OIG Audit teams reported a high degree of accuracy (over 99 percent) across all groups, the Monitor's review of the audit results indicates a lower degree of accuracy in the reports, particularly for a few specific data elements.[19] **Nevertheless, the inaccuracies are minor in nature and are not systemic, and we therefore conclude that PPB is in Substantial Compliance with Paragraph 117 of the Settlement Agreement.**

**Recommendations:**

The Monitoring Team makes the following recommendations to support ongoing compliance with Paragraph 117 of the Settlement Agreement:

1. Discern whether the recommendations made in the Force Audit Reviews have been implemented (i.e. reminder discussions) and report on how they have mitigated the identified deficiencies.
2. Address any deficiencies through follow-up actions and apply the findings from audit reviews to inform meaningful changes in supervisory practices.

**<u>Paragraph 118</u>**
*<mark>Partial Compliance</mark>*

PPB performed analyses of the alerts generated by the Employee Information System during the second half of 2024 and provided comparative data for the same time periods for 2022 and 2023. To assess compliance with this paragraph, the Monitoring Team met with PPB EIS personnel, reviewed system documentation, and examined data outputs from the EIS covering the second half of 2024. **The Monitoring Team determined that the EIS consistently tracked and applied most, but not all, of the thresholds specified in Paragraph 118.**

Paragraph 118 of the Settlement Agreement requires that PPB continue to use existing thresholds in its EIS and, specifically, that the following two thresholds remain active to trigger case management reviews: (a) any officer who has used force in 20 percent of their arrests in the past six months; and (b) any officer who has used force three times more than the average number of uses of force compared with other officers on the same shift. PPB confirmed that these thresholds generally remain active within the system's configuration and are part of the automated daily scans that generate alerts for potential supervisory review.

---

[19] See discussion for Settlement Agreement Paragraphs 74, 75, and 77.

The Monitoring Team's review of SOP #44 and discussions with the EIS team revealed that it is PPB's standard practice to require daily analysis of eight different performance thresholds related to the use of force, complaints, traumatic incidents (TIs), and commendations. The EIS analysis provided by PPB indicates that the bureau created 530 total alerts during the Review Period. The total number of alerts created might have been higher, however, had a technological issue not prevented the addition of TI data to the EIS between October 25, 2024, and December 31, 2024. Unfortunately, the total number of missing alerts was not included in the data provided, preventing an assessment of how the number of alerts has changed over time.

The term, "Traumatic Incident" is defined in SOP #44 as an on-duty event that "may cause physical, emotional, and/or psychological injury or harm, and has the potential to interfere with a member's ability to function either at the scene or later." Properly accounting for and addressing these types of events can potentially play a pivotal role in maximizing the safety of both officers and the public. In light of this, the issue that prevented an accurate accounting of these important data in the EIS, which lasted for more than two months during the Reporting Period, was neither minor nor occasional in terms of its impact on PPB's continued usage of the existing TI threshold.

> **Note:** PPB indicated that the IT issue preventing TI data from downloading into the EIS during the fourth quarter of 2024 has been fixed.

PPB reported closing 554 alerts during the Review Period. 293 (52.9%) were forwarded to the member's Responsibility Unit (RU), and 187 (33.8%) resulted in some form of action, such as a debrief or counseling session. The 261 alerts that were not forwarded to an RU for review were administratively closed by Professional Standards Division after meeting any one of six criteria outlined in SOP #44. The criteria for such closures include: a single use of force is related to the alert; the alert is a duplicate, with no new use of force incident; the alert is the result of a system error; the employee associated with the alert is not subject to an EIS review (e.g. PPB's professional/non-sworn personnel); the alert involves an incident that was already addressed or an employee who has separated from PPB; and applicable adjustments due to Category IV (or de minimis) force events no longer being included as alert triggers. With respect to force-related alerts specifically, 369 were created during the Review Period; pursuant to the criteria described above, PPB administratively closed 308 (83.5%) of those alerts and forwarded the remaining 61 to the RU for review.

In addition to the EIS data from this Reporting Period, PPB provided the Monitoring Team with comparative data and analyses to demonstrate trends in the number of alerts created and closed over time, the number and proportion of alerts—by type of alert—sent to RU managers for review, and the final disposition of alerts within the RU. The Monitoring Team's overall review of the EIS data and analysis provided by PPB indicated that most, but not all, of the thresholds in SOP #44 that are relied on to trigger alerts regarding an officer's performance and/or behavior were consistently used by PPB during the Reporting Period. This amounts to significant progress toward meeting the

requirements of Paragraph 118. However, the protracted interruption of data that tracks traumatic incidents during the Reporting Period (which was due to a technological issue and not a lack of effort toward compliance by PPB, and which PPB indicated has since been rectified) indicates that more work remained to be done as of the end of the period.

**After meeting with EIS staff, examining EIS data, and reviewing analyses submitted by PPB, the Monitoring Team concludes that PPB is in Partial Compliance with Paragraph 118.**

**Recommendations:**

Pursuant to Settlement Agreement Paragraph 226, the Monitoring Team recommends the following step necessary to achieve and maintain Substantial Compliance with Paragraph 118:

1. Ensure the sustained resolution of the technological issue that temporarily prevented the addition of Traumatic Incident data to the Employee Information System, and consider employing any proactive audits or other measures that may help minimize the chance of such an issue reoccurring with respect to any EIS-related data.

Based on the review we conducted for our assessment of compliance with Paragraph 118, the Monitoring Team makes the following additional recommendations, which are not required for compliance with the Settlement Agreement:

1. Noting that only around one-third of all EIS threshold breaks during the Reporting Period appeared to result in some sort of intervention with an officer by a supervisor, and, furthermore, that 83.5 percent of EIS alerts tied to uses of force met the criteria for administrative closure (meaning that no intervention with the involved officer was warranted), consideration should be given to updating the EIS in order to allow PPB's alert processing efforts to focus more precisely on those incidents that do warrant some type of intervention with an officer. Such updates could potentially reduce the amount of resources currently spent on reviewing EIS alerts while also providing a clearer account of those alerts that do reflect the need for an evaluation of an officer's performance and/or behavior—to the benefit of the officer and the public alike.
2. PPB should seek to identify the total number of TI events that were not downloaded into the EIS due to an technological issue and recalculate any relevant Paragraph 118 analyses to allow for a trend analysis and comparison to future Review Periods that is as accurate as feasibly possible.

## Officer Accountability

**Paragraph 121**
*Substantial Compliance*

The Monitoring Team's review of administrative misconduct investigations conducted by PPB verified the consistent implementation of policies designed to meet the requirements of Paragraph 121 of the Settlement Agreement, including the timely completion of administrative misconduct investigations.

Paragraph 121 requires that all administrative investigations of officer misconduct, including those conducted by PPB, Professional Standards Division (PSD), or the independent oversight body must be completed within 180 calendar days from the date a complaint is received, or the alleged misconduct is otherwise discovered. Pursuant to the Settlement Agreement, completion requires performance of the full administrative process from complaint intake through and including the final approval of recommended findings by the Chief, CBPA, or the mayor in cases involving the Chief.

To assess compliance with this accountability requirement, the Monitoring Team reviewed a dataset comprised of 25 misconduct investigations completed during the Reporting Period.[20] Each case was examined to determine the total elapsed time from complaint intake to final case closure, with appropriate consideration given to legally justified tolling periods as defined in Paragraph 122 of the Settlement Agreement. These tolling periods may include such events as the absence of the subject officer(s) due to the exercise of protected leave, active concurrent criminal investigations or civil litigation, or documented delays requested by parties or counsel.

PPB and Independent Police Review (IPR) each provided a Quarterly Accountability Analysis for the two quarters within the Reporting Period and these data analyses reflected 100 percent compliance with the 180-day investigation completion window.

Of the 25 completed cases reviewed by the Monitoring Team in connection with this assessment, 22 were completed within 180 days. The three cases that exceeded the deadline were individually assessed for tolling and procedural context. The Monitoring Team consulted with PPB and IPR personnel and closely reviewed investigative reports, available documentation, correspondence, and

---

[20] The Monitoring Team's review of 25 cases was based on a random sample drawn from the population of investigations closed during the Reporting Period. The Monitoring Team started with the population of all investigations (whether assigned to IA or IPR) active during the Reporting Period; we then restricted the population list to cases with disposition dates during the Review Period, drew a random sample of 25 case numbers, and requested the associated case documentation for review.

investigative notes for these three investigations to consider the legitimacy and materiality of the delays. The results of our review are summarized below:

- One case involved an officer on extended protected leave, resulting in 533 tolled days. Once tolling was excluded, the investigation was completed in 134 counted days, which is within the applicable 180-day limit. The delay was fully documented, and the case does not represent a deviation from the Settlement Agreement.

- In another case, PPB and IPR files reflect that PPB's efforts to accommodate member unavailability in addition to the discovery of additional information requiring follow-up interviews and investigation reasonably extended the investigation's completion time, and that tolling was properly applied.

- A third investigation was initially administratively closed, then later reopened. Documentation noted a four-day exclusion due to the administrative closure, although the Monitoring Team noted that no clear supporting documentation explained the remaining delay in the case.

As of the current Reporting Period, the City remains in an active transitional phase between the IPR and the voter-approved Community Police Oversight Board, which is now known as the Community Board for Police Accountability (CBPA). The CBPA is intended to replace the IPR as the City's primary civilian oversight body and was approved via ballot measure in November 2020. It will have expanded authority to investigate allegations of police misconduct and issue binding disciplinary decisions, subject to procedural safeguards.

Pursuant to Paragraph 195 of the Settlement Agreement, the City is required to (among other things) maintain continuous functionality of the IPR until the CBPA becomes fully operational, close all existing IPR investigations, and cease new IPR intake after achieving full operational readiness of the new oversight body.

The City remains bound to the investigative performance standards outlined in Section VIII of the Agreement, including the 180-day timeline for completion of all administrative misconduct investigations. The Monitoring Team's review of misconduct investigations completed during this Reporting Period confirms that the IPR has remained operational and has continued to process investigations in a timely manner.

The Monitoring Team will continue to assess whether the investigative timeliness standards remain viable throughout the oversight transition, and the City appears to be meeting its obligations under Paragraph 121 while concurrently preparing for a significant organizational shift in civilian accountability.

Our analysis confirmed that 22 of the 25 cases were actually completed within the required 180-day deadline and that all 25 cases were completed within the required time frame as adjusted for tolling exclusions. **The Monitoring Team found that investigative thoroughness was preserved, and that process integrity was not sacrificed for expediency.** These investigations reflected timely and procedurally sound progression from intake through approval of findings. The cases reviewed spanned a range of allegations and investigative complexity and included cases handled both internally by PPB as well as by the IPR.

The Monitoring Team acknowledges that cases in which the tolling was validated and appropriately applied should not count against the City or be viewed as a barrier to PPB's compliance with Paragraph 121 because the investigations remained within the required timelines. **Notably, the Monitoring Team found no evidence of broader performance issues, capacity constraints, or bottlenecks in investigative flow that would suggest institutional noncompliance.** Investigators completed the majority of cases on time, and our review found no patterns of routine delay, unacknowledged extensions, or improper closures.

The Monitoring Team finds that the City of Portland and PPB have demonstrated overarching adherence to the requirements of Paragraph 121. 88 percent of the reviewed investigations were completed within the applicable 180-day threshold. The cases in which delays were present were occasional and non-systemic, and tolling was appropriately applied. Continued monitoring of case lifecycle documentation and exception handling is recommended and our review underscores the importance of robust and transparent documentation when exceptions or administrative complexities affect case investigation duration.

The data and supporting documentation justify the conclusion that the City and PPB are adhering to the requirements for timely completion of administrative investigations of officer misconduct. **The Monitoring Team therefore concludes that PPB is in Substantial Compliance with Paragraph 121 of the Settlement Agreement.**

**Recommendations:**

The Monitoring Team makes the following recommendations to support ongoing compliance with Paragraph 121 of the Settlement Agreement:

1. Because investigative chronologies do not consistently reflect issues related to delays or the application of appropriate tolling periods, PPB should endeavor to generate more comprehensive and detailed investigative chronologies including the "disposition date" as determined by PPB personnel.
2. Investigative reports should be enhanced to include discussion of any delays in the investigative process that require the application of a tolling period. This will provide greater clarity in case lifecycle documentation without the need to rely on collateral documentation.

  a. General information related to the availability of a subject or witness officer may be included in an investigative report without disclosing any protected information related to the reason for the officer's unavailability (e.g., FMLA or other medical or personal information). Nevertheless, the Monitoring Team recommends that PPB seek guidance from the City Attorney about whether this can be accomplished without violating any protections for PPB personnel.

3. Investigative reports and supporting documentation should clearly identify the date the complaint was received by PPB, which should be differentiated from the date an investigator was assigned the case.

  a. Generally, it would be preferable for each investigative report to include a narrative about how, when, and by whom the complaint was originally received.


**Paragraph 122**
*Substantial Compliance*

**The Monitor verified that PPB and the oversight system consistently initiated administrative investigations concurrently with criminal investigations in all of the completed cases reviewed for the applicable Reporting Period.** Case documentation confirmed that administrative and criminal investigations were opened on the same day across the entire sample of cases reviewed, suggesting that the concurrency requirement in Paragraph 122 has been structurally adopted into PPB's investigative practices. This level of consistency in concurrent case initiation reflects a process that aligns with this aspect of Settlement Agreement's requirement to ensure timely and parallel accountability processes.

Paragraph 122 requires administrative investigations to be subject to an appropriate tolling period in limited circumstances, including when necessary to allow a concurrent criminal investigation to proceed, as otherwise provided by law, or as necessary to conduct further investigation pursuant to a duly authorized request. These tolling allowances are permissible exceptions that should be consistently documented to ensure adherence to the requirements of the Settlement Agreement and to facilitate efficient compliance assessments.

To assess compliance with this requirement, the Monitoring Team reviewed documentation from the Reporting Period, focusing on the PPB Criminal/IA Concurrent Investigation Audit for Q3-Q4 of 2024 and related investigative files. **Concurrent initiation was evident in all cases reviewed.** Although concurrent investigation initiation is now operationalized, PPB has not yet implemented a procedure to ensure that tolling events—when they occur—are consistently and transparently recorded within the related investigative report (separate and aside from the Audit Report identified above). However, as Paragraph 122 only requires that PPB conduct administrative investigations concurrently with criminal investigations and that all administrative investigations shall be subject to appropriate tolling periods as necessary to conduct a concurrent criminal investigation, the lack of

documentation related to tolling periods within investigative reports does not amount to or support a determination that PPB is out of compliance with this paragraph.

After reviewing case documentation and timelines and assessing the structural alignment of investigative practices with the requirements of the Settlement Agreement, **the Monitor finds PPB in Substantial Compliance with Paragraph 122.**

**Recommendations:**

The Monitoring Team makes the following recommendation to support ongoing compliance with Paragraph 122 of the Settlement Agreement:

1. PPB should incorporate a formal requirement into its investigative reporting protocols mandating that every completed misconduct investigation include a section explicitly addressing whether and why tolling was applied. That section should identify the basis for any tolling and the specific duration and authorizing entity. If no tolling occurred, that determination should also be documented affirmatively to close the evidentiary loop.

**Paragraph 123**
*Substantial Compliance*

Paragraph 123 of the Settlement Agreement requires that if PPB is unable to complete an administrative investigation of officer misconduct within 180 calendar days, it must undertake and submit a written review of the delay and implement an action plan to reduce future delays. Importantly, the Settlement Agreement expressly requires that these written reviews be submitted to the United States Department of Justice (DOJ). Implementation of this provision may help to ensure that any delay is addressed through a structured process that identifies the cause and initiates timely, remedial action to strengthen system performance.

The Monitoring Team found that PPB has processes in place to track the duration of administrative investigations. The supporting documentation provided during the current Reporting Period demonstrates that the requirement for delay reviews and mitigation plans did not apply to the cases we reviewed that exceeded the 180-day timeline due to the appropriate application of tolling exceptions as noted in Paragraph 122 of the Settlement Agreement.

To assess compliance with this requirement, the Monitoring Team reviewed documentation from the Q3–Q4 2024 Reporting Period, focusing on the following primary data sources:

1. A dataset of 25 completed administrative misconduct investigations, of which three cases (12 percent) exceeded the 180-day timeline established by Paragraph 121—when not accounting for applicable tolling; and

2. IPR Quarterly Accountability Analyses for Q3 and Q4 of 2024.

Given that each of the three completed investigations that exceeded 180 days were subjected to the appropriate application of tolling provisions, **we find the City and PPB in Substantial Compliance with Paragraph 123 of the Settlement Agreement.**

**Recommendations:**

The Monitoring Team makes the following recommendations to support ongoing compliance with Paragraph 123 of the Settlement Agreement:

1. Implement a mandatory review protocol that triggers automatically when an administrative investigation exceeds 180 days, regardless of the cause for the delay or the applicability of tolling.

2. Improve and update standardized delay review templates, including a clear timeline and case chronology, documentation of the cause(s) of delay, a record of any tolling applied and the authority invoked, and a structured mitigation plan to reduce future risk of similar delays.

3. Update delay review tracking into case management systems, with supervisory notification and a requirement that the Paragraph 123 review be completed and logged before final case closure.

**Paragraph 124**
***Substantial Compliance***

**The Monitoring Team's review of PPB's protocols for compelled statements confirmed that PPB has adopted procedures consistent with Paragraph 124 of the Settlement Agreement.** This paragraph requires that, within 90 days of the Effective Date, PPB review and revise its protocols for compelled statements to ensure compliance with applicable law, including Garrity v. New Jersey, 385 U.S. 493 (1967). The City must submit these protocols to DOJ for approval, and PPB must inform officers of the revisions within 45 days of that approval.

PPB Directive 1010.10, Deadly Force and In-Custody Death Reporting and Investigation Procedures, mandates that the PSD administer *Garrity* warnings to involved officers prior to any administrative interview. To evaluate compliance with this requirement, the Monitoring Team reviewed six Officer-Involved Shooting (OIS) cases initiated during the current Reporting Period. In all six cases, documentation confirmed that PSD issued *Garrity* warnings to the involved officers as

required. The warnings were administered in accordance with PPB policy, ensuring that the administrative investigation could proceed in parallel with any pending criminal investigation.

Because PPB has satisfied the procedural obligations of Paragraph 124, both in terms of written policy and documented practice during actual investigations, **the Monitoring Team finds PPB in Substantial Compliance with Paragraph 124.**

### Paragraph 125
*Substantial Compliance*

**The Monitoring Team's review of PPB's use of Communication Restriction Orders (CROs) following officer-involved lethal force events found that the Bureau has implemented consistent procedures that align with the requirements of Paragraph 125, which safeguard the integrity of investigative processes through timely separation of involved and witness officers.**

The Monitoring Team reviewed PPB's practices regarding the issuance of CROs to assess compliance with Paragraph 125 of the Amended Settlement Agreement. This provision requires that PPB immediately issue CROs to separate involved and witness officers following a lethal use of force event. The purpose is to prevent officers from communicating about the incident until after the conclusion of the Grand Jury process or the District Attorney's (DA) determination.

To evaluate PPB's compliance, the Monitoring Team reviewed documentation from six OIS cases that occurred during the Reporting Period. In each case, detectives documented the issuance of a CRO shortly after the incident and confirmed that involved officers and witness officers were separated in accordance with protocol. There was no evidence of policy deviation or communication between officers in violation of the restriction.

**Based on the documentation reviewed, the Monitoring Team verified that PPB consistently complied with the requirements of Paragraph 125 during the Reporting Period and is therefore in Substantial Compliance with that paragraph.**

### Paragraph 126
*Substantial Compliance*

**The Monitoring Team's assessment of PPB's response protocols for lethal force incidents found that witness officer briefings were consistently conducted as required by Paragraph 126.** This paragraph mandates that PPB require witness officers to lethal force events to provide on-scene briefings to any supervisor and/or member of the PPB Detective Division to ensure that

victims, suspects, and witnesses are identified, evidence is located, and any information is provided that may be required for the safe resolution of the incident.

To assess compliance, the Monitoring Team reviewed documentation from five OIS incidents in which witness officers were present. In each case, PPB records demonstrated that walk-through briefings between witness officers and investigators were requested, conducted, and documented in accordance with policy. These briefings occurred on-scene and were described in associated investigative summaries. The purpose of the briefings was to clarify relevant officer positions, threat perceptions, and basic facts known at the time of the event.

Our review found that PPB has met the requirements of this paragraph in a comprehensive fashion and with a high level of integrity. **We therefore conclude that PPB is in Substantial Compliance with Paragraph 126 of the Settlement Agreement.**

**Recommendations:**

Based on the review we conducted for our assessment of compliance with Paragraph 126, the Monitoring Team makes the following recommendation, which is not required for compliance with the Settlement Agreement:

1. PPB should consider revising the applicable Directive (0620.00) such that it requires personnel to use their BWCs to record directions for briefings that are issued to witness officers after lethal force incidents, as well as to record the briefings themselves.

**Paragraph 127**
*Substantial Compliance*

The Monitoring Team assessed PPB's procedures for requesting voluntary statements and walk-throughs from involved officers in lethal force incidents, as required by Paragraph 127 of the Settlement Agreement. This provision requires PPB, in agreement and collaboration with the District Attorney, to request a voluntary walk-through and interview from an officer involved in a deadly force event, unless that officer is incapacitated. **The documentation reviewed reflects that in all but one of the cases reviewed, PPB requested voluntary participation in post-incident walk-throughs, as required by Paragraph 127.**

To assess compliance, the Monitoring Team reviewed documentation from six OIS investigations initiated during the current Reporting Period. In five of the six cases for which PPB provided a case file (83.33 percent), investigators documented that a request was made for a voluntary walk-through

and a statement by the involved officer.[21] In the remaining OIS investigation, no documentation of such a request was provided.

Because the documentation reviewed shows that PPB has implemented a consistent process of requesting voluntary participation in post-incident walk-throughs, the **Monitoring Team concludes that PPB is in Substantial Compliance with Paragraph 127 of the Settlement Agreement.**

**Recommendations:**

The Monitoring Team makes the following recommendation to support ongoing compliance with Paragraph 127:

1.  PPB should consider revising the applicable Directive (0620.00) such that it requires personnel to use their BWCs to record requests for briefings that are made to involved officers after lethal force incidents.

**Paragraph 128**
*Substantial Compliance*

The Monitoring Team assessed PPB's coordination with IPR to evaluate compliance with Paragraph 128 of the Settlement Agreement, which requires that IPR and PPB's Internal Affairs Division (IA) avoid unnecessary redundancy in investigative interviews. Specifically, the paragraph directs that IPR and IA take reasonable steps to eliminate redundant interviews of witnesses and involved officers by using prior interview materials or conducting joint interviews when appropriate.

The Monitoring Team was informed of only one case during the Reporting Period that was initially investigated by IPR but subsequently transferred to IA, at IPR's direction. We examined whether IA duplicated interviews already conducted by IPR in that case or relied upon existing materials to continue the investigation. Our review found that IA explicitly cited and incorporated the existing IPR interviews into its investigative record and did not re-interview previously contacted witnesses.

The Monitoring Team finds that PPB has implemented procedures to reduce redundancy in investigations, and that they applied them appropriately in the one case we reviewed. **Therefore, the Monitoring Team concludes that PPB is in Substantial Compliance with Paragraph 128 of the Settlement Agreement.**

---

[21] Each of the officers declined to participate in a voluntary walk-through or to provide a statement.

**Paragraph 129**
*Substantial Compliance*

Paragraph 129 requires that all allegations of excessive force be subject to a full investigation, unless there is clear and convincing evidence that the allegation has no basis in fact, at which point the case can be administratively closed. Cases can also be administratively closed if a full investigation is not possible without additional information from the Complainant and the Complainant cannot be reached or refuses to participate, and/or if the officer involved cannot be identified. In all cases that are administratively closed, all investigative efforts must be documented, and the investigator must explain why a closure meets the requirements of this paragraph.

The Monitor reviewed evidence from all 33 cases that were administratively closed during the Reporting Period, including Intake Investigation Reports, BWC footage, witness videos, After-Action Reports (AARs), Chronological Record forms, BOEC dispatch calls, email correspondence and the IPR Administrative Closure letters. In 25 (76 percent) of these cases, the Complainant was not interviewed—either because there was no contact information available, they did not respond to contact attempts, or they were represented and not made available for an interview—and this often coincided with cases being referred via the AAR process. In some instances, the Monitor could not verify the contact attempts made by the investigator because the Chronological Record form was not complete and/or there was no evidence of email or phone correspondence in the case file.

Based on the evidence provided, the Monitor agrees with IPR's assessment that there was clear and convincing evidence that the allegations of excessive force either had no basis in fact, a full investigation was not possible without Complainant participation and/or the officer was unidentified. Moreover, in all but two cases, there was an IPR Administrative Closure letter included in the case file, which explained the reason for the closure. We believe there remains some room for improvement in clearly documenting investigators' efforts to contact Complainants. However, the issues we identified with respect to this appeared to be cursory ones; they did not seem to be systemic when considering the investigations we reviewed in aggregate. **For these reasons, the Monitoring Team concludes that the City is in Substantial Compliance with Paragraph 129 of the Settlement Agreement.**

**Recommendations:**

The Monitoring Team makes the following recommendation to support ongoing compliance with Paragraph 129 of the Settlement Agreement:

1.  The Monitor recommends that all phone calls and emails be consistently documented in the Chronological Record forms and maintained in the case file, especially when the investigator relies on those communications to justify an administrative closure.

**Paragraph 131**
*Substantial Compliance*

For our assessment of the City's compliance with Settlement Agreement Paragraph 131, the Monitoring Team reviewed PPB Directives 0336.00 Police Review Board and 0337.00 Police Review Board (PRB) Personnel Selection; we also reviewed Portland City Code Sections 3.20.140 (Police Review Board) and 3.21.080 (Citizen Review Committee). Furthermore, the Monitoring Team observed approximately seven PRB hearings during the Reporting Period.

Paragraph 131 requires the City to retain the PRB procedures that were in place at the time the Settlement Agreement became effective, with a number of exceptions listed in the paragraph. Collectively, the requirements listed in this paragraph address the following aspects of PRB procedures: 1) composition of PRB reviews of use of force cases; 2) rotation protocol for Citizen Review Committee (CRC) members participating on the PRB; 3) confidentiality requirements, as well as requirements for each PRB member's ability to make appropriate recommendations to the Chief of Police; 4) eligibility for cases in which the member elects to accept investigative findings and discipline; 5) qualifications for all community members who participate on the PRB; 6) authority to remove PRB members and CRC members who serve on the PRB; 7) unaffected status of CRC membership in case of removal from participation on the PRB; 8) duration of service of CRC members serving on the PRB; and 9) recusal of CRC members during appeals of cases for which they participated on the PRB.

**Based on our review, the Monitoring Team found that nearly all of these numerous requirements are appropriately included in PPB directives, the City Code, or both.** Although the rotation of the CRC slot on PRBs in use of force cases appears to be proceeding as required, we note that no information was provided to us demonstrating whether the City Auditor developed a formal rotation protocol within 60 days of the Effective Date of the Settlement Agreement, as required. Also, documentation of the requirement in this paragraph that all members participating in the PRB must be able to make thoughtful, unbiased, objective recommendations to the Chief of Police that are based on facts and are consistent with relevant City Code and City Charter provisions as well as City rules and labor laws was not provided. However, we note that this is offset – to some degree – by the confirmation of the conditions for removal of a member from the PRB pool that were available to us in our review, and that overlap somewhat with the previously-discussed requirement. Finally, our review found that City Code Section 3.21.080 authorizes CRC members to serve on the PRB for no more than two terms of three years despite Paragraph 131's requirement that they serve in that capacity for no more than three years.

In sum, nearly all of the numerous individual requirements contained in Paragraph 131 are appropriately codified in various appropriate City documents, and the few deviations we observed in

our review are all minor in nature and not systemic with regard to any effect on the operation of the PRB as required by this paragraph. **For these reasons, the Monitoring Team concludes that PPB is in Substantial Compliance with Paragraph 131 of the Settlement Agreement.**


## Paragraph 132
*Substantial Compliance*

The Monitoring Team assessed PPB's implementation of Paragraph 132 of the Settlement Agreement, which provides that the PRB may, by majority vote, direct the original investigating entity to undertake further investigation if deemed necessary. This provision ensures that the PRB has a mechanism to request additional investigative steps when the initial investigation appears incomplete or insufficient to support a disciplinary recommendation. **Our review found that the PRB's authority to direct further investigation was intact, as required, even though no such requests were deemed necessary in any of the cases we reviewed.**

To evaluate compliance with this requirement, the Monitoring Team reviewed 12 PRB case files from the applicable Reporting Period. These included misconduct investigations involving various allegations ranging from use of force to procedure violations. In each of these cases, the Monitoring Team examined whether any votes were taken to direct further investigation, and whether the PRB exercised its authority under Paragraph 132.

However, in each case, documentation indicated that the investigative materials were fully reviewed and that the PRB concluded no further inquiry was warranted. There were no cases where the PRB failed to act where it was apparent that additional investigation was warranted. As such, while the procedural trigger under Paragraph 132 was not activated during this period, the PRB's authority to do so remains available and its decision-making process was clearly documented. **Therefore, the Monitoring Team concludes that PPB is in Substantial Compliance with Paragraph 132 of the Settlement Agreement.**


## Paragraph 133
*Substantial Compliance*

The Monitoring Team assessed PPB's practices regarding post-incident responses to civil liability findings, as required by Paragraph 133 of the Settlement Agreement. This paragraph mandates that PPB take specific steps when civil liability is established in a use of force case, including an internal review by the Training Division, an IPR inquiry, and an automatic referral to the PSD for investigation. These requirements are designed to ensure that liability findings prompt institutional learning and accountability.

To evaluate compliance with these requirements, the Monitoring Team reviewed PPB's SOPs #32 (Civil Liability and Tort Claims) and #42 (Evaluation of Members' Fitness to Serve in Specialized Units Following a Use of Force Liability Finding in a Civil Trial). The SOPs remain in effect and collectively outline the requirements of Par 133. Although there were no new civil liability cases related to use of force during the applicable Reporting Period, the Monitoring Team confirmed that the SOPs remain in effect and contain the procedural elements required by Paragraph 133.

Because there were no qualifying incidents during the applicable Reporting Period, the Monitoring Team was unable to evaluate the application of the protocols. However, because of the existence and retention of appropriate written procedures, along with confirmation of organizational readiness to respond to such findings, **the Monitoring Team concludes that PPB is in Substantial Compliance with Paragraph 133 of the Settlement Agreement.**

**Paragraph 137**
**Substantial Compliance**

The Monitoring Team reviewed PPB's application of the Corrective Action Guide (CAG), formerly referred to as the Discipline Guide, to assess compliance with Paragraph 137 of the Amended Settlement Agreement. This paragraph requires PPB to adopt and implement a discipline framework that promotes consistency, accountability, and transparency in disciplinary decision-making. The guide must explicitly account for mitigating and aggravating factors and must be applied consistently to achieve effective, progressive, and predictable outcomes.

To evaluate compliance, the Monitoring Team reviewed all 19 Corrective Action Recommendation (CAR) memoranda issued during the applicable Reporting Period. These memoranda included disciplinary decisions related to policy violations of varying severity. **In the vast majority of cases (16 of 19 or 84.2 percent), the Monitoring Team found that the discipline applied was supported by clear application of the CAG and included discussion of applicable mitigating and aggravating factors.**

In three cases (15.8 percent), however, we noted that the memoranda lacked sufficient narratives to describe the application of the factors.

While these instances did not undermine the overall framework or outcome, they suggest inconsistency in documenting how decision-makers determine the basis for proposed discipline. To ensure accountability and transparency, the Monitoring Team emphasizes the importance of complete narrative support for all elements of the discipline decision-making process. Because the majority of cases reviewed illustrated relatively consistent and broad adherence to the requirements of the paragraph and the CAG, **the Monitoring Team concludes that PPB is in Substantial Compliance with Paragraph 137 of the Settlement Agreement.**

**Recommendations:**

The Monitoring Team makes the following recommendation to support ongoing compliance with Paragraph 137 of the Settlement Agreement:

1.  PPB should reinforce the expectation that all CAR memoranda include clear, written explanations for the application of mitigating and aggravating factors. Decision-makers should explicitly document the rationale for recommended corrective action, including how the CAG was applied in each instance.

## Addendum of Additional Remedies

**Paragraph 188**
*Substantial Compliance*

The Monitoring Team reviewed the Force Data Collection Report (FDCR) and After-Action Report (AAR) forms in use by PPB during the Reporting Period. Of note, PPB developed and transitioned both forms to a web-based application during the Reporting Period, indicating that the new forms would be more efficient to use. PPB also provided us with examples of meta-data identifying the times when FDCRs are submitted by reporting officers; PPB additionally indicated that meta-data similarly captures any edits made to both forms.

Pursuant to Paragraph 188, both the FDCR and the AAR are required to capture when they are edited and completed. **Our review of the forms confirmed that they meet this requirement, despite some minor issues (which might possibly be related to their transition to a new platform).**

Our review of these two forms found that, generally, they each included timestamps indicating when they were submitted by the reporting PPB member and when they were subsequently approved by a supervisor. In a non-scientific review of completed FDCRs, however, we noted a number of them that did not include the former timestamp. PPB attributed this to a problem with how the forms print when they are complete, as opposed to a failure to capture this data point. Furthermore, PPB showed us examples of metadata that does capture FDCR submission times, thereby satisfying the associated requirement in Paragraph 188.

Our review also found that the FDCRs contain a text field where the approving supervisor can manually enter the time of their approval of the report. The time entered manually into this field and the corresponding timestamp that appears at the end of the FDCR form did not always match (for what could be entirely understandable and commonplace reasons), rendering the text field seemingly redundant. PPB identified the field as a holdover from the previous version of the FDCR form. Though it appears to be unnecessary, it does not negate the accurate capturing of that data point, as was described to us by PPB. Finally, PPB also indicated that all edits to both FDCR and AAR forms are captured in the forms' respective meta-data, including when the edits were made, by whom, and what was changed.

The issues we identified with these forms (such as the lack of a printed timestamp noting the time of submission of some FDCRs) were minor and occasional in nature. The information provided by PPB addressed each of them. In light of this, the requirements of this paragraph have been met in a comprehensive fashion and with a high level of integrity. **We therefore conclude that PPB is in Substantial Compliance with Paragraph 188 of the Settlement Agreement.**

**Recommendations:**

The Monitoring Team makes the following recommendation to support ongoing compliance with Paragraph 188 of the Settlement Agreement:

1. Evaluate whether there are redundancies on the AAR form that should be removed in order to avoid the reporting of conflicting information (such as, potentially, the time of approval of the report).

**Paragraph 189**
***Substantial Compliance***

The Monitoring Team reviewed City Council Ordinance 190606, passed on November 17, 2021, which included the provision of funding for a qualified outside entity to critically assess the City's response to crowd control events in 2020 in a public-facing report and prepare a follow-on review of the City's response to the report.[22] We reviewed the contract entered into between the City and Independent Monitor LLC to conduct the required assessment, including the Scope of Work contained therein, and we also reviewed the completed report itself as well as the completed follow-on review. We reviewed the training needs assessment that the City was required to prepare using the report, and, finally, we reviewed the DOJ's Seventh Periodic Compliance Assessment Report with regard to the Settlement Agreement, which indicated the DOJ's agreement with the Scope of Work for the assessment project.

Based on all of these materials, the Monitoring Team confirmed that the City met all of the requirements in Paragraph 189 in a comprehensive fashion and with a high level of integrity. **We therefore conclude that the City is in Substantial Compliance with Paragraph 189 of the Settlement Agreement.**

**Paragraph 190**
***Substantial Compliance***

To assess the City's compliance with this paragraph, the Monitoring Team reviewed the City's Adopted Budgets from FY2022-23, FY2023-24, and FY2024-25. We also received spreadsheets showing PPB's budgets for FY2023-24 and FY2024-25, which were identified as part of the City's "technical budget".

---

[22] The ordinance provided $300,000 for this purpose.

The City's FY2022-23 Adopted Budget includes a line item for "Train & Dev", and the City pointed us to a supplementary email communication about that budget indicating that this line item was specifically designated for overtime for the training of PPB officers. The City's FY2023-24 and FY2024-25 Adopted Budgets each included line items for "Training", though no specific designation of those items for overtime training of officers is evident. The spreadsheets from PPB's portion of the City's technical budgets for each of those years, however, break down the total amount listed for training into additional categories, including "Overtime".

Paragraph 190 specifically requires "the City to provide in the budget a separate line item for overtime costs to conduct necessary training for PPB officers." Although the City's publicly posted Adopted Budgets do not include the separate line item for this purpose, the additional materials provided to us by the City illustrated that PPB's sections of the City's technical budgets do. The observation that the City's Adopted Budgets do not explicitly list the item is of minor concern and does not take away from the City's compliance with this paragraph. **We therefore conclude that the City is in Substantial Compliance with Paragraph 190 of the Settlement Agreement.**

**Recommendations:**

The Monitoring Team makes the following recommendation to support the City's ongoing compliance with Paragraph 190 of the Settlement Agreement:

1. Paragraph 190 specifically requires "the City to provide in *the budget* a separate line item for overtime costs to conduct necessary training for PPB officers." (Emphasis added.) The City indicated that the technical budget, which is where the required line item is listed, is not posted publicly due to the large amount of detail contained therein. This is contrasted with the City's Adopted Budget, which is accessible on the City's website. For the sake of transparency in its compliance with the Settlement Agreement, the City should consider including the required line item in the version of its budget that is posted publicly.

**Paragraph 191**
==*Substantial Compliance*==

The Monitoring Team reviewed City Council Ordinance 190606, passed on November 17, 2021, which addressed budgeting for a Training Dean for PPB. We additionally reviewed the position posting for a Police Education Director, which opened on January 10, 2022. **Although no records were provided to confirm the timing of the City's job offer to a suitable candidate and the completion of a background screening on that candidate, a Quarterly Update Report provided to us by the City indicated that the requirement to make the job offer and complete the background screening within 150 days of the posting of the position was not met.**

The update report further provided a reasonable explanation for the delay, noting that an initial offer to one candidate was ultimately rescinded, prior to the initiation of a background screening of that candidate, when it became known that the candidate was ultimately not suitable for the position. The position had to be reposted before a new candidate was ultimately selected. The Monitoring Team notes that Paragraph 191 specifically contemplated the possibility of extending the deadlines that it includes if the City was making significant progress toward meeting those deadlines.

Apart from the unexpected—though reasonable and understandable—delay that caused the hiring of a Police Education Director to take longer than allowed by the requirements of this paragraph, our review still confirmed that the City met all of its other requirements in a comprehensive fashion and with a high level of integrity. The delay faced by the City does not seem to be reflective of any sort of systemic violation or divergence from the provisions of the Settlement Agreement. **We therefore conclude that the City is in Substantial Compliance with Paragraph 191 of the Settlement Agreement.**


**Paragraph 192**
***Partial Compliance***

The Monitoring Team communicated with IPR staff about the investigations it has initiated to identify the following: 1) the PPB Lieutenant(s) and above who trained Rapid Response Team (RRT) members to believe that they could use force against individuals during crowd control events without meeting the requirements of PPB Directive 1010.00; 2) the PPB incident commander(s) and designee(s) with the rank of Lieutenant or above who directed or authorized any officer to use force in violation of PPB Directive 1010.00, or who failed to ensure that FDCRs and AARs arising from the crowd control events starting on May 29, 2020, and ending on November 16, 2020, were completed as required by Section 13.1 of PPB Directive 635.10; and 3) the PPB Commanders and above who failed to timely and adequately clarify misunderstandings and misapplications of PPB policy (including the Settlement Agreement) governing the use, reporting, and review of force during the crowd control events starting on May 29, 2020, and ending on November 16, 2020.

IPR opened an initial series of investigations into these matters (additional investigations were added by IPR, as deemed appropriate) on June 29, 2022. As of the end of this Reporting Period, all such investigations remain pending.

Given that IPR's investigations into the matters included in Paragraph 192 have not yet been completed, no assessments of their appropriateness or any further actions resulting from their findings may be made at present. The Monitoring Team noted that it appears the investigations were initiated one day beyond the deadline set in this paragraph (within 60 days of the paragraph being entered as an order of the Court). We consider this to clearly be a minor violation that is not systemic in terms of its impact on the required investigations.

Additional work is still needed in order to complete the investigation(s) required by this paragraph. **We therefore conclude that the City is in Partial Compliance with Paragraph 192 of the Settlement Agreement.**

**Recommendations:**

Pursuant to Settlement Agreement Paragraph 226, the Monitoring Team recommends the following step necessary to achieve and maintain Substantial Compliance with Paragraph 192:

1. IPR should complete its pending investigations into this matter as expediently as it can without sacrificing investigative quality or thoroughness.

**<u>Paragraph 194</u>**
**<mark>*Partial Compliance*</mark>**

Settlement Agreement Paragraph 194 requires the implementation of body-worn cameras (BWCs) at PPB by the City. More specifically, it requires: that the BWCs be implemented pursuant to a policy that is subject to the policy review-and-approval provisions of the Settlement Agreement; that the City comply with collective bargaining obligations related to BWCs; that public input on the use of BWCs be gathered to inform the policy governing them; and that the City may be required to update the Court upon the completion of the collective bargaining process.

For the Monitoring Team's assessment of compliance with this paragraph, we reviewed a number of materials including: PPB Directive 0620.00 Body-Worn Camera Use and Management; multiple policy development documents that preceded the current version of the policy; communication regarding the process of collective bargaining about the BWC policy; communication between the Parties regarding the BWC policy; a report prepared by the Compliance Officer/Community Liaison titled, "Body-Worn Cameras for the Portland Police Bureau: History and Community Engagement Results".

The Monitoring Team also believes that the assessment of compliance with this paragraph warrants reviewing a sample of BWC recordings from randomly selected PPB incidents during which an officer's BWC was activated. However, as appropriately pointed out to us by the City, we feel it is prudent to defer such a review until the next Reporting Period due to the fact that BWCs were still being rolled out to some PPB officers around the middle of the current Reporting Period; furthermore, and relatedly, PPB officers are granted a 60-day period after being issued a BWC during which they are expected to progressively grow their familiarity with the policy that governs them, and during which they do not receive discipline for any unintentional deviations from that policy. As PPB was, during this Reporting Period, still in the midst of its considerable efforts to

issue BWCs to all officers who are required to have one, we concurred that it would be premature to conduct a case review until the next Reporting Period.[23]

**Our review found that the City complied with nearly every requirement in the portion of Paragraph 194 that is focused on the development of a BWC policy and the logistics of rolling out a BWC program to PPB.** The one deviation that we noted from this portion of Paragraph 194 was that implementation of the program was not complete by the deadline set in the paragraph. Not only do we find such a deviation unsurprising, given the many foreseeable and unforeseeable challenges of completing a project as complex as this one, Paragraph 194 itself contemplates extending the deadline as long as substantial progress toward implementation is being made. Although we did not locate explicit evidence of the DOJ's agreement to an extension of the deadline that is included in Paragraph 194, it seems clear that they remained informed of how the implementation was progressing, including its timeline, through the project's completion. Further to this point, the DOJ and the City jointly filed a status report with the Court on August 8, 2023, detailing the timeline of BWC implementation up to that point. We therefore consider this to be nothing more than a minor deviation from this aspect of the requirements in Paragraph 194, with no systemic impact.

The City satisfied the policy and logistical portions of Paragraph 194's requirements in a comprehensive fashion and with a high level of integrity. However, the Monitoring Team was not yet able to conduct a reliable review of a sample of BWC recordings due to the recency of their rollout to all PPB officers who are required to have them. **We therefore conclude that the City is in Partial Compliance with Paragraph 194 of the Settlement Agreement.**

**Recommendations:**

Pursuant to Settlement Agreement Paragraph 226, the Monitoring Team recommends the following step necessary to achieve and maintain Substantial Compliance with Paragraph 194:

1. PPB should seek to ensure that all officers who are required to have a BWC, and who are beyond the 60-day period meant to facilitate their efficiency with the newly issued equipment, are fully trained on and familiar with each of the requirements listed in Directive 0620.00 to which they must adhere. Such an emphasis would not only maximize compliance with the policy and Paragraph 194, but also help identify and address any potential areas of ambiguity or uncertainty that might exist for officers with respect to the relatively new policy.

---

[23] PPB also acknowledged to the Monitoring Team that they are presently in the process of developing their own periodic audits of BWC recordings as is required by Section 15.1.3 of Directive 0620.00, which had not yet begun as of the close of the Reporting Period.

**Paragraph 195**
*Partial Compliance*

Settlement Agreement Paragraph 195 requires the City to take a series of actions that will ultimately result in the establishment of the new Community Board for Police Accountability (CBPA) to replace IPR for investigations of certain complaints of police misconduct and to replace the Chief of Police for imposition of discipline. In order to assess compliance with this paragraph, the Monitoring Team reviewed numerous communications between the Parties regarding the complex and multi-faceted transition to this new oversight system, as well as City Council Resolution 37637 and Ordinance 190812.

With only minor exceptions or deviations, the City has evidenced its completion of the many tasks required of it by Paragraph 195, up to the close of the current Reporting Period. The records reviewed by the Monitoring Team indicate that the City Auditor and City Council each submitted a plan to the DOJ for the transition to the CBPA after the January 1, 2022, deadline for doing so; however, both plans were apparently still submitted within a month of that deadline. Specifically, the City proposed amendments to Section VIII of the Settlement Agreement to the Court, which were approved on August 29, 2024, but the Court delayed the effective approval date until January 2, 2025. In other words, any delay that occurred appears to be only a minor one, particularly given the intricate issues involved in this transition. Also, although no documentation explicitly illustrated the DOJ's determination of an acceptable plan from amongst those submitted by the City Auditor and City Council, which was required prior to the City Council's adoption of such a plan, it seems clear that there was no issue with this part of the transition process required by the Settlement Agreement.[24] Finally, although no data was provided with the specific purpose of illustrating that the City has ensured that administrative investigations of PPB members are completed and that officers are held accountable for violating PPB policy and procedure, the Monitoring Team's review of multiple administrative investigations and their outcomes when subject officers are found to have violated policy is sufficient evidence for us to confirm that the City has met this requirement in practice.

The one major requirement in Paragraph 195 that remains unfulfilled as of the end of the current Reporting Period is for the CBPA to be staffed and operational. This must occur within 12 months of the City Council's adoption of the City Code provisions necessary to establish the CBPA, which occurred on September 11, 2024. However, Although the City Council considered and voted to conform the Code on September 11, 2024, the Code was not adopted until October 11, 2024 and, as such, the City's position is that with the Court's delayed effective date, the twelve-month period should not commence until January 2, 2025.

---

[24] No concerns regarding the DOJ's determination of an acceptable transition plan, in compliance with Settlement Agreement Paragraph 195, was mentioned in the DOJ's Seventh Periodic Compliance Assessment Report, which was filed with the Court on August 8, 2023.

The Monitoring Team notes that the Settlement Agreement provides for a reasonable extension of this deadline for good cause shown, provided that the City is in substantial compliance with some other parts of Paragraph 195. Given that the staffing and operation of CBPA remained pending as of the close of this Reporting Period, and although the City has undoubtedly made significant progress toward satisfying all of this paragraph's many requirements, additional work pursuant to the paragraph is still needed. **We therefore conclude that the City is in Partial Compliance with Paragraph 195 of the Settlement Agreement.**

**Recommendations:**

Pursuant to Settlement Agreement Paragraph 226, the Monitoring Team recommends the following steps necessary to achieve and maintain Substantial Compliance with Paragraph 195:

1. The City should maintain its commitment to fully staffing the CBPA and ensuring its operability by September 11, 2025.
2. The City should ensure that all aspects of the plan that was adopted by City Council for the transition to the CBPA are carried out.

**Paragraph 245**

Settlement Agreement Paragraph 245, which falls under Section XII (Agreement Implementation and Enforcement, Subsection E. Review of Policies, Trainings, and Investigations), requires PPB to apply policies uniformly and to hold officers accountable for complying with PPB policy and procedure.[25]

In its Periodic Compliance Assessment Reports, the DOJ has assessed compliance with this paragraph and has, logically, linked its requirements closely to the collection of paragraphs in Section VIII of the Settlement Agreement (Officer Accountability). For its part, the Compliance Officer/Community Liaison (COCL) chose not to assess compliance with (current) Paragraph 245, until it changed course in its Q2 2022 compliance report titled, "Compliance Officer and Community Liaison *Quarterly Report: Quarter 2 Updates and Analysis*." In that report, the COCL noted that it had "historically, not assessed compliance with the requirements of Par. 169 [currently Par. 245] as it is housed within Section X (Agreement Implementation and Enforcement) [currently Section XII]." The COCL further noted that the DOJ argued in its most recent report (at that time) that the paragraph at issue can and should be assessed given its direct relationship to the subject matter of Section VIII (Officer Accountability). The COCL concurred with this argument and began to assess the paragraph alongside the others contained in Section VIII.

---

[25] The Monitoring Team notes that the paragraph was listed under a different number (different from Number 245) in previous iterations of the Settlement Agreement.

The Monitoring Team chooses to reverse that course. Recognizing that Paragraph 245 is located within a section of the Settlement Agreement that includes provisions detailing procedural aspects of the agreement's implementation and enforcement such as selecting a Monitor, modifying the Settlement Agreement, and terminating the Settlement Agreement, and further recognizing that no other paragraphs from this section of the report were monitored by the COCL in its most recent report, the Monitoring Team does not believe that Paragraph 245 should be included among its semi-annual compliance assessments and chooses not to do so.

# Discrete Sections in Self-Monitoring

Pursuant to Paragraph 253 of the Settlement Agreement, the following paragraphs (which the Settlement Agreement groups into "discrete sections" as indicated) are subject to self-monitoring by the City:

- 88-90 (Community Based Health Services);
- 94-96 (Behavioral Health Unit Advisory Committee);
- 141-144 and 151-152 (Portland Committee on Community Engaged-Policing); and
- 148, 150, and 193 (PPB Stops Data and Annual Reports).

For each of these paragraphs, the City created a self-monitoring plan in consultation with the Monitoring Team. The City also prepared a semi-annual compliance report, which the Monitoring Team evaluated to determine whether the City has maintained Substantial Compliance in accordance with its self-monitoring plan. Pursuant to the Settlement Agreement's provisions, if the City has adequately demonstrated maintained substantial compliance with any of the discrete sections listed above for two consecutive semi-annual reports, the discrete section will be subject to termination. Alternatively, if the City has not adequately demonstrated maintained substantial compliance with any of the discrete sections listed above, then the City is required to prepare additional semi-annual reports until the Monitoring Team determines it has adequately demonstrated maintained substantial compliance for two consecutive reports.

The Monitoring Team's evaluation of the City's compliance report found that, in most cases, the City did maintain Substantial Compliance in accordance with its self-monitoring plan. With regard to a few paragraphs, however, our evaluation found that some additional work needed to be completed in order to adhere to the City's plan. Further detail about our evaluation of each discrete section follows below.

### Paragraphs 88-90 (Community Based Health Services)

**With regard to the Community Based Health Services discrete section of the Settlement Agreement, the Monitoring Team's evaluation of the City's compliance report found that the City is not expressly called on to satisfy any of the requirements included in the discrete section.**

**Paragraphs 94-96 (Behavioral Health Unit Advisory Committee)**

**Paragraph 94**

In order to evidence compliance with this paragraph of the Settlement Agreement, PPB provided a spreadsheet that appears to be a roster of Behavioral Unit Advisory Committee (BHUAC) members as of November 2024. This spreadsheet includes members from most of the entities required by Paragraph 94 to be included on BHUAC, as well as members from many of the categories that are required by the paragraph to be sought for inclusion. PPB also provided email communications soliciting new members from amongst the groups listed in the paragraph.

These materials are some of the ones identified by PPB as relevant data sources in its self-monitoring plan; but they would benefit from some additional clarifying information in order to help demonstrate their relevance toward a showing of compliance with Paragraph 94. Additionally, there are more materials discussed as data sources in the self-monitoring plan that were not provided and that would likely prove helpful in comprehensively evidencing compliance with Paragraph 94. For instance, it is not immediately clear whether the provided spreadsheet is indeed the official roster of BHUAC membership, and no further description of the document or the source of the material listed in it was given. Assuming the spreadsheet is the official roster, and in light of its filename indicating November 2024, the Monitoring Team is left to wonder if there are other rosters taken at other times during this Reporting Period that could also be shared as evidence of compliance with Paragraph 94. Furthermore, PPB's self-monitoring plan includes meeting agendas and minutes as additional data sources to be relied on in assessing compliance with this paragraph, but none of those materials were provided or referenced by PPB. Such materials, particularly from a committee that regularly convenes as we understand that BHUAC does, could be tremendously helpful to a more thorough and clear demonstration of who comprised the membership of BHUAC throughout this Reporting Period. The Monitoring Team acknowledges that PPB's compliance report contains a chart that appears to list dates when representatives from different groups/categories listed in Paragraph 94 were or were not in attendance at a BHUAC meeting. However, it does not appear that any source material validating what is contained in the chart was provided; such source material would be more in line with PPB's self-monitoring plan and would also be stronger evidence of compliance with the paragraph's requirements.

Fortunately, BHUAC meeting minutes from throughout the Reporting Period were supplied by PPB as evidence of compliance with a different paragraph from the Settlement Agreement – Paragraph 95 (discussed further below). These minutes provide valuable and clear illustrations of who comprised the membership of BHUAC during the Reporting Period, what types of organizations and/or individuals they represented, and how often they attended recurring BHUAC meetings. They also demonstrate closer adherence to the self-monitoring plan produced by PPB with respect to this paragraph.

PPB's compliance report concluded that PPB was in Substantial Compliance with Paragraph 94 for this Reporting Period. **The Monitoring Team's evaluation found that PPB has maintained Substantial Compliance in accordance with the self-monitoring plan for this paragraph of the Settlement Agreement.**[26,27]

**Paragraph 95**

PPB's self-monitoring plan for Paragraph 95 calls for a review of BHUAC meeting minutes and reports of recommendations in order to determine whether BHUAC provided guidance to the City and PPB as required in this paragraph. PPB provided supporting data in the form of both meeting minutes and email communications regarding any recommendations or other guidance that came out of BHUAC's meetings. With regard to the email communications, PPB was easily able to confirm that they were sent to all of the parties listed as required recipients in Paragraph 95.

With regard to the provision of guidance from BHUAC to the City and PPB in the areas listed in Paragraph 95 (including, but not limited to, development and expansion of the Crisis Intervention Team, the utilization of community-based mental health services, and changes to policies, procedures, and training methods regarding police contact with persons who may be experiencing a mental health crisis), as is evidenced by the provided BHUAC meeting minutes, on the one hand it seems like PPB is giving guidance to BHUAC as opposed to the other way around. The only item presented by BHUAC to PPB during the Reporting Period that appears to fall within the guidance contemplated by the Settlement Agreement is BHUAC's review and recommended approval of a schedule for Enhanced Crisis Intervention Team Training.

On the other hand, to the best understanding of the Monitoring Team, it is not PPB's responsibility to set and/or direct the BHUAC's agenda, as sworn PPB members of BHUAC do not even have voting authority within the group. In hearing from PPB about case studies, Standard Operating Procedures, relevant community resources, and more, BHUAC members do have the chance to ask questions, deliberate over PPB practice and policy, and make recommendations for improvement, at their discretion. Therefore, even if the number of such recommendations – or other forms of guidance – is low, the forum and capacity for BHUAC to make them is what is critical, and PPB's assessment of relevant documentation supports the conclusion that those things are present.

PPB's compliance report concluded that PPB was in Substantial Compliance with Paragraph 95 for this Reporting Period. **The Monitoring Team's evaluation found that PPB has maintained**

---

[26] The Monitoring Team notes that Paragraph 94 of the Settlement Agreement also requires of PPB that it establish BHUAC within 90 days of the agreement's Effective Date. PPB's self-monitoring plan does not address this aspect of the paragraph.

[27] Should there be a reason that any of the groups required by Paragraph 94 to be included in BHUAC are no longer being included as of the Reporting Period (e.g., because they no longer exist or have changed their name), the Monitoring Team believes it would be advisable to provide documentation explaining this.

**Substantial Compliance in accordance with the self-monitoring plan for this paragraph of the Settlement Agreement.**

**Paragraph 96**

This paragraph requires BHUAC to provide status reports on PPB's implementation of an Addictions and Behavioral Health Unit (ABHU) as well as on BOEC Crisis Triage, identifying recommendations for improvement, if necessary. The paragraph further requires PPB to utilize BHUAC's recommendations in determining appropriate changes to systems, policies, and staffing. PPB's self-monitoring plan for Paragraph 96 called for a review of BHUAC meeting agendas, minutes, and correspondence related to recommendations made, as well as documentation of any responses to, and utilization of, such recommendations.

On one hand, no "status reports" from BHUAC regarding ABHU or BOEC Crisis Triage were gathered as part of PPB's assessment of compliance with Paragraph 96.

> **Note:** In a discussion with the Monitoring Team, PPB attested that BHUAC did not provide any status reports which could then be provided to the Monitoring Team.

Additionally, with regard to recommendations bearing relevance to the improvement of either of those units, the only item identified in PPB's review of BHUAC meeting minutes and communications during the Reporting Period was a recommendation to approve a proposed schedule for Enhanced Crisis Intervention Team Training. This recommendation, which was made at a BHUAC meeting near the end of the Reporting Period, was appropriately communicated to PPB (as required in Paragraph 95 of the Settlement Agreement) after the Reporting Period had ended. PPB noted that this recommendation was utilized, though no further documentation evidencing how it was utilized was provided.

On the other hand, the recommendations called for in Paragraph 96 on the part of BHUAC are only required to be made if they are deemed necessary by BHUAC. Furthermore, to the best understanding of the Monitoring Team, it is not PPB's responsibility to set and/or direct the BHUAC's agenda, as sworn PPB members of BHUAC do not even have voting authority within the group. In other words, the requirement on PPB in this paragraph is a reactive one—to utilize BHUAC recommendations regarding improvements to ABHU and/or BOEC, when they are received.

PPB's compliance report concluded that PPB was in Substantial Compliance with Paragraph 96 for this Reporting Period. **The Monitoring Team's evaluation found that PPB has maintained**

**Substantial Compliance in accordance with the self-monitoring plan for this paragraph of the Settlement Agreement.[28]**

**With regard to the Behavioral Health Unit Advisory Committee discrete section of the Settlement Agreement, the Monitoring Team's evaluation of PPB's compliance report found that PPB has adequately demonstrated that it has maintained Substantial Compliance with the section.**


## Paragraphs 141-144 and 151-152 (Portland Committee on Community Engaged-Policing)

### Paragraph 141

This paragraph requires that the City establish a Portland Committee on Community Engaged Policing (PCCEP) within 90 days of the effective date of relevant amendments to the Settlement Agreement.[29] The City provided detailed information memorializing the existence and operation of PCCEP, including a list of PCCEP's general and subcommittee meetings that were convened during the Reporting Period, the dates that these meeting were publicly noticed and the methods by which they were publicized, and the number of attendees from the public, the City, and PCCEP membership. The City also noted the each of these meetings included public comment (except for the PCCEP member retreat).

The Monitoring Team also reviewed the PCCEP membership list, including the start and end dates of each member's appointment, and we followed links leading to the announcements of their appointments on the City's website.

The City's compliance report concluded that the City was in Substantial Compliance with Paragraph 141 for this Reporting Period. Because the information provided by the City clearly demonstrates that PCCEP was established as required by the Settlement Agreement, **the Monitoring Team's evaluation found that the City has maintained Substantial Compliance in accordance with the self-monitoring plan for this paragraph of the Settlement Agreement.**

### Paragraph 142

The Settlement Agreement requires that PCCEP be authorized to perform a series of defined responsibilities intended to advance community trust and inform the membership about PPB's approach to constitutional policing.

---

[28] The Monitoring Team notes that Paragraph 96 of the Settlement Agreement also requires that BHUAC provide the identified status reports and recommendations (if necessary) within 240 days of the agreement's Effective Date. PPB's self-monitoring plan does not address this aspect of the paragraph.

[29] The Monitoring Team notes that the City's self-monitoring plan does not address the deadline listed in this paragraph of the Settlement Agreement.

Specifically, PCCEP must be empowered to: (a) solicit information from both the community and PPB regarding the Bureau's performance, particularly on constitutional policing; (b) make recommendations to City officials—including the Chief of Police, the Police Commissioner, and the Director of the Office of Equity and Human Rights—as well as to the community and, during the effective period of the Agreement, to the DOJ; (c) advise the Chief and Police Commissioner on strategies to improve community relations; (d) contribute to the development and implementation of a PPB Community Engagement Plan; and (e) receive public comments and concerns. The City is further required to establish PCCEP's composition, selection and replacement process, and specific duties in a formal PCCEP Plan, which must be substantially similar to Exhibit 1 of the Settlement Agreement. Any amendments to this Plan during the effective period of the Agreement must be reviewed and approved by the DOJ following consultation with both the Albina Ministerial Alliance Coalition for Justice and Police Reform (AMAC) and the Portland Police Association (PPA).

To evaluate whether the City met its obligations under the Settlement Agreement regarding the authority of, and support for, PCCEP, the Monitoring Team reviewed multiple aspects of PCCEP's implementation, including the Amended PCCEP Plan.[30] Our review confirmed that the City followed the required membership selection and replacement process, with the appointment of four new members during the Review Period. PCCEP members received appropriate orientation and training related to the Settlement Agreement and PPB's organizational structure and processes. Additionally, PCCEP member participation in observational educational activities, including attendance at court proceedings, was documented. The City's self-assessment acknowledged PCCEP member engagement at a status conference, noting that PCCEP members were present and actively participated. The Monitoring Team also assessed compliance with respect to the City's obligation to respond in a timely manner to PCCEP recommendations and requests; the evidence we reviewed showed that two recommendations were made and addressed during the Reporting Period.

The City demonstrated compliance with established PCCEP membership selection and replacement procedures and ensured that members receive training, participate in relevant observational activities, and have an opportunity to engage in formal proceedings such as court status conferences and other court hearings related to the Settlement Agreement. The City also responded to PCCEP recommendations within required timeframes, demonstrating procedural support and respect for PCCEP's advisory role. Additionally, there is no indication that any amendments to the PCCEP Plan were made during the Reporting Period, rendering Paragraph 142's requirements for DOJ review and stakeholder consultation prior to any such amendments. Finally, the Monitoring Team noted that the Amended PCCEP Plan addresses each of the core duties that are explicitly listed in

---

[30] Although the City did not provide the Amended PCCEP Plan to the Monitor in evidencing compliance with Paragraph 142, the plan is available via the following page of the City's website, which is focused on PCCEP: https://www.portland.gov/pccep/key-documents.

this paragraph of the Settlement Agreement and authorizes PCCEP to carry them out, as the paragraph requires.[31]

The City's compliance report concluded that the City was in Substantial Compliance with Paragraph 142 for this Reporting Period. **The Monitoring Team's evaluation found that the City has maintained Substantial Compliance in accordance with the self-monitoring plan for this paragraph of the Settlement Agreement.**

**Paragraph 143**
This paragraph requires PCCEP's membership to consist of a reasonably broad cross-section of the community. It also requires that all PCCEP members will have no actual or perceived conflict of interest with the City.

To evaluate the City's self-assessment of compliance with this paragraph, the Monitoring Team reviewed documentation of PCCEP's membership during the Reporting Period showing that: of the 12 PCCEP members who self-reported their race, they were fairly evenly split among 6 different categories; that 2 out 13 members who self-reported their age were under 24 years old, with the remaining 11 members aged 24 and over; and that members represented 3 of the 4 geographic City Council Districts in effect during the Review Period (District 1 was the one not represented). Finally, membership during the Reporting Period also included 6 individuals who reported having lived or professional experience related to mental illness.

The City attested that to confirm the absence of actual or perceived conflicts of interest, the City Attorney's office reviewed each member's application and determined that none presented a disqualifying relationship with the City. These actions demonstrate the City's active and successful efforts to meet the Settlement Agreement's standards on both independence and representational diversity. Although neither the outcomes of those conflict checks nor documentation detailing the conflict check process were provided by the City, the Monitoring Team did receive documents including member applicants' personal information, which included in the document titles the abbreviation "COI."

> **Note:** The City later informed the Monitoring Team that the reason for not providing the conflict check documentation is because it is subject to attorney-client privilege.

---

[31] In its review of the Amended PCCEP Plan, the Monitoring Team noted that PPB is required to, among other things, "develop a Community Engagement Plan." The fulfillment of this requirement by PPB appears to be a condition precedent to PCCEP's use of its authority—pursuant to the Settlement Agreement—to contribute to the development and implementation of that plan. During its completion of this semi-annual compliance report, PCCEP members advised the Monitoring Team that PPB has yet to develop the required Community Engagement Plan.

The City's compliance report concluded that the City was in Substantial Compliance with Paragraph 143 for this Reporting Period. The Monitoring Team notes that the lack of representation from one City Council district does not represent a compliance deficiency as the Settlement Agreement does not require appointees from each district and the City otherwise met the structural and eligibility requirements outlined in the Settlement Agreement. Because the City appointed members who represent a broad cross-section of the Portland community and attested that they confirmed member eligibility through screening for potential conflicts, **the Monitoring Team's evaluation found that the City has maintained Substantial Compliance in accordance with the self-monitoring plan for this paragraph of the Settlement Agreement.**

**Paragraph 144**

This paragraph of the Settlement Agreement requires the City to provide administrative support to ensure that PCCEP can perform the duties and responsibilities outlined in both the Agreement and the PCCEP Plan.

To evaluate the City's self-assessment of compliance with this paragraph, the Monitoring Team reviewed documentation describing the administrative support provided during the Reporting Period. The City attested that it funded one full-time Program Manager and one half-time Program Coordinator, and that it dedicated partial support from additional City staff. The City indicated that these employees performed a range of responsibilities, including preparation of PCCEP recommendations and statements, coordination of meeting logistics and materials, scheduling and facilitation of events, recruitment and onboarding of new members, training coordination, communication support, and processing of stipends. The City also attested that it provided resources for interpretation services, public broadcasting, event space, refreshments, membership in the National Association for Civilian Oversight of Law Enforcement (NACOLE), and equipment.

The City provided information ostensibly collected from public budget documents in support of the determination that the City allocated General Fund resources to support PCCEP's operations to fund salaries, event support, training, communications, and related program expenses. Furthermore, and as specifically laid out in its self-monitoring plan for this paragraph of the Settlement Agreement, the City verified that it had attended and observed multiple PCCEP meetings in order to analyze the group's dynamics and adherence to community guidelines, and that it consulted directly with PCCEP members and staff regarding the group's administrative needs, in both public and individual meetings, and on numerous occasions during the Reporting Period.

The City's compliance report concluded that PPB was in Substantial Compliance with Paragraph 144 for this Reporting Period. **The Monitoring Team's evaluation found that the City has maintained Substantial Compliance in accordance with the self-monitoring plan for this paragraph of the Settlement Agreement.**

**Paragraph 151**

The Settlement Agreement requires PCCEP to meet as needed to accomplish the objectives set forth in the PCCEP Plan and to hold regular Town Hall meetings that are open to the public. The Agreement also requires the City to provide legal advice necessary to ensure that PCCEP complies with Oregon Public Meetings Law or similar legal requirements, and to represent PCCEP in any challenges regarding compliance with those laws.

To evaluate the City's self-assessment of compliance with this paragraph, the Monitoring Team reviewed documentation covering the Reporting Period during which PCCEP held 11 public meetings and two internal retreats. Some meetings served as planning and discussion spaces for subcommittees and the full body to advance PCCEP's objectives outside of formal public sessions. These events were publicized in advance and structured to allow for public observation and input. The documentation provided also confirmed that PCCEP held no Town Hall meetings during the Reporting Period that were open to the public, as are required in the PCCEP Plan and the Settlement Agreement. However, the requirement for "regular" Town Hall meetings does not also include a frequency requirement. The Monitoring Team confirmed that PCCEP has hosted public Town Hall meetings in prior periods, and we do not believe that the absence of such a meeting during this Reporting Period amounts to a failure to comply with this requirement.

The documentation provided by the City included an attestation that the City Attorney's Office provided legal advice and guidance to PCCEP, noting that there were no legal challenges that arose during the Reporting Period. The Monitoring Team reviewed documentation indicating that the members did receive legal (and common sense) guidance related to the public's access to members' correspondence, human resources guidance, and training related to the duties and responsibilities of public officials.

The City attested, and the Monitoring Team can affirm via observation, that staff from the City Attorney's office does regularly attend PCCEP meetings, and no documentation suggested that the City was required to act in a representative capacity. Though no lists of meeting attendees during the period were provided to confirm the attendance of a City Attorney representative during the Reporting Period, the Monitoring Team notes that Paragraph 151 does not specifically require such attendance.

The City's compliance report concluded that PPB was in Substantial Compliance with Paragraph 151 for this Reporting Period. Because PCCEP held regular Town Hall meetings open to the public, convened additional meetings to support the objectives of the PCCEP Plan, and had the opportunity to receive legal guidance from the City Attorney's Office to ensure compliance with public meeting laws, **the Monitoring Team's evaluation found that the City has maintained Substantial Compliance in accordance with the self-monitoring plan for this paragraph of the Settlement Agreement.**

**Paragraph 152**

This paragraph of the Settlement Agreement requires the City to provide PCCEP members with appropriate training necessary to comply with requirements of City and State law.

The City provided, and the Monitoring Team reviewed, documentation from the Reporting Period which reflected that the City conducted a 3.5-hour orientation session for four PCCEP members who were newly appointed during this Reporting Period. This orientation included instruction related to public meetings and public records laws and identified appropriate City contacts for legal guidance. The Monitoring Team also reviewed the City's PCCEP Training Tracker, which documented that most members completed additional standardized trainings required of City board and commission volunteers. These trainings addressed areas such as ethics responsibilities, harassment and discrimination prevention, and City equity policies. The documentation also noted that training completion for newly appointed members was pending as of the end of the Reporting Period, with follow-up planned in the next period.

Because the City provided training to PCCEP members on legal requirements established by City and State law, documented completion of that training for most members, and initiated instruction for newly appointed members, **the Monitoring Team's evaluation found that the City has maintained Substantial Compliance in accordance with the self-monitoring plan for this paragraph of the Settlement Agreement.**

**With regard to the Portland Committee on Community Engaged-Policing discrete section of the Settlement Agreement, the Monitoring Team's evaluation of the City's compliance report found that the City has adequately demonstrated that it has maintained Substantial Compliance with the section.**

**Paragraphs 148, 150, and 193 (PPB Stops Data and Annual Reports)**

**Paragraph 148**

This paragraph of the Settlement Agreement requires continued documentation by PPB officers of demographic data regarding the subjects of police encounters, the provision of such information to the Portland Committee on Community Engaged Policing (PCCEP), and the making of such information available to the public. It further requires PPB to consider enhancements to its data collection efforts and to report on efforts toward such enhancement to the DOJ on a quarterly basis. PPB's self-monitoring plan identified Stops Data Collection Quarterly and Annual Reports, Directives requiring the collection of demographic data by PPB officers, documentation of efforts toward enhancing data collection, communications with PCCEP, and PPB's own website as the data sources relevant to demonstrating compliance with Paragraph 148.

With regard to PPB's internal requirement for officers to collect demographic data of subjects whom they stop, PPB Directive 0900.00, which is available online via PPB's webpage, includes such a requirement. Regarding the required data itself, the Stops Data Collection Quarterly and Annual Reports appear to supply the necessary evidence for PPB to assess compliance with this paragraph. The annual report contains demographic data regarding the subjects of police encounters, including race, age, sex, and perceived mental health status (the Monitoring Team noted that the quarterly reports appear to leave out information on age and sex). PPB also provided an email communication showing the transmission of its 2023 Annual Report, including the required demographic information on stops conducted by PPB officers, to PCCEP. Additionally, PCCEP's webpage provides further evidence of their receipt of the report, which is itself also available to the public online.

In its evaluation of PPB's self-assessment of compliance with Paragraph 148, the Monitoring Team noted that PPB's self-assessment plan did not address the requirement for PPB to report quarterly to the DOJ on its efforts to enhance data collection. Additionally, none of the evidence provided appeared to demonstrate that these transmissions are indeed taking place. We additionally noted that both of the Stops Data Collection Quarterly Reports provided for this Reporting Period contain sections focused on how PPB has collected data over time, including changes and developments in those practices when they occurred;[32] and we further note that these quarterly reports are available online, where the DOJ can access them.

> **Note:** The City later informed the Monitoring Team that the quarterly transmission of reports to the DOJ on efforts to enhance data collection, required by the Settlement Agreement, have not occurred for some time; and the DOJ indicated to the Monitoring Team that such transmissions are no longer necessary.

PPB's compliance report concluded that PPB was in Substantial Compliance with Paragraph 148 for this Reporting Period. **The Monitoring Team's evaluation found that PPB has maintained Substantial Compliance in accordance with the self-monitoring plan for this paragraph of the Settlement Agreement.**

**Paragraph 150**

PPB is required by this paragraph to issue a publicly available annual report, including a summary of its problem-solving and community policing activities. PPB must share a draft of the report with PCCEP before its finalization and release to the public; and, once it is released, PPB must hold at least one meeting annually in each precinct area to present the report, in addition to presenting it at a City Council meeting. The presentations must focus on, among other things, PPB's efforts in

---

[32] Interestingly, a table of required elements from Paragraph 148 of the Settlement Agreement that was provided by PPB as part of its compliance report for this paragraph indicates that data collection enhancements are addressed in the 2023 Stops Data Collection Annual Report but not in either of the quarterly reports provided for this Reporting Period.

community policing in regard to the use of force, as well as PPB's policies and laws governing pedestrian stops, stops and detentions, and bias-free policing, including a civilian's responsibilities and freedoms during such encounters. PPB's self-monitoring plan for assessing compliance with Paragraph 150 included a review of the PPB Annual Report, relevant correspondence with PCCEP, recordings of relevant precinct meetings and City Council sessions, and relevant PCCEP records, all in order to verify that each requirement in the paragraph was met. The plan included conducting an evaluation to ensure the coverage of required topics during PPB's presentation of the annual report at each Precinct Meeting as well as the City Council Meeting in which the report was presented.

The 2023 PPB Annual Report addresses problem-solving and community policing activities from a variety of different approaches. Although no documentation evidencing the sharing of a draft of the report with PCCEP was provided by PPB specifically in association with its self-assessment of this paragraph, such documentation was indeed provided in association with Paragraph 148—in the form of an email communication showing the transmission of the report to PCCEP prior to the date when the report was shared publicly (on June 14, 2024, as can be found on PPB's webpage).

Furthermore, a review of PCCEP's webpage shows that the 2023 PPB Annual Report was included as a reference item associated with the June 12, 2024 PCCEP Community Engagement Subcommittee Meeting, which took place before the date of PPB's public circulation of its annual report. PPB provided links to each of three separate meetings—one in each precinct area—during which the annual report was presented. A link was similarly provided to the City Council meeting during which the report was presented. Additionally, and as laid out in the self-monitoring plan for this paragraph of the Settlement Agreement, PPB produced a document indicating that its staff had reviewed the video for all four of these meetings and had verified that all of the required topic areas were covered in each of them.

PPB's compliance report concluded that PPB was in Substantial Compliance with Paragraph 150 for this Reporting Period. **The Monitoring Team's evaluation found that PPB has maintained Substantial Compliance in accordance with the self-monitoring plan for this paragraph of the Settlement Agreement.**

### Paragraph 193

PPB's self-monitoring plan for this paragraph of the Settlement Agreement seeks to demonstrate that PPB published its annual report and held the associated precinct meetings to present the report no later than September 20 during a given year, as is required by the paragraph. In order to demonstrate this, PPB indicated that it would rely on the 2023 PPB Annual Report itself as well as recordings of each of the three required precinct meetings.

As supporting documentation for its self-evaluation, PPB provided links to recordings of each of the three required precinct meetings from this Reporting Period during which the annual report was presented; all three meetings occurred prior to September 20, 2024. In an effort to be thorough,

PPB also provided a screenshot of its website editor, accompanied by communication from its Public Information Officer, that appears to show the date the annual report was posted to PPB's webpage (which is before September 20, 2024). Although these materials collectively do seem sufficient to provide the confirmation that PPB sought in accordance with the objectives of its self-monitoring plan, PPB should give further consideration in the future to finding clearer and more definitive documentation of the date when its annual report is published online each year.[33] Doing so will allow PPB to more easily and transparently demonstrate its maintenance of substantial compliance with Paragraph 193.

PPB's compliance report concluded that PPB was in Substantial Compliance with Paragraph 193 for this Reporting Period. **The Monitoring Team's evaluation found that PPB has maintained Substantial Compliance in accordance with the self-monitoring plan for this paragraph of the Settlement Agreement.**

**With regard to the PPB Stops Data and Annual Reports discrete section of the Settlement Agreement, the Monitoring Team's evaluation of PPB's compliance report found that PPB has adequately demonstrated that it has maintained Substantial Compliance with the section.**

---

[33] As one example, the following page on PPB's own website explicitly lists the date and time that the 2023 PPB Annual Report was published—June 14, 2024 at 3:21pm: https://www.portland.gov/police/news/2024/6/14/2023-police-annual-report-and-precinct-meetings.

# Work to Be Completed; Anticipated Barriers to Substantial Compliance

As the Monitoring Team looks forward to the second Review Period of the Monitorship, we are encouraged by all of the valuable information we have been fortunate to gather during the first Review Period – information about many of the diverse communities that make up the City of Portland; information about the historical context that preceded the initial implementation of the Settlement Agreement; information about PPB, including its officers, operations, priorities, culture, etc.; and information about various other stakeholders who have a vested interest in constitutional policing that serves the needs of the public. We recognized that there would be a period of "ramping up" at the start of the Monitorship, and we are encouraged by the valuable information we have gained in a relatively short period of time. We feel that this process of learning, while never coming to an end, has helped put us in a position to continue the Monitorship with a more knowledgeable and informed perspective.

While the Monitoring Team completed many of the requisite start-up activities of the Monitorship, we also maintained a focus on the core responsibility of conducting independent and objective assessments of the City's compliance with the provisions of the Settlement Agreement. Carrying with us all that we have learned over the past months, and all that we are continuing to learn, we will certainly continue that focus as the Monitorship progresses, and we will pay some of our greatest attention to the relatively few remaining paragraphs for which the City is not yet in Substantial Compliance. We believe we will be greatly benefited in this effort by our increased understanding of the City's compliance data and, conversely, by the City's increased understanding of how we conduct our compliance assessments. We also believe we have provided appropriate recommendations to illustrate what must be done to achieve and maintain Substantial Compliance, and we look forward to the opportunity to discuss those recommendations in greater detail with an eye toward putting the City in the best position possible to prove its comprehensive adherence to the terms of the Settlement Agreement.

Of course, we will also not lose sight of the importance of the City's maintenance of Substantial Compliance with the great majority of the Settlement Agreement's paragraphs. As we complete our first set of semi-annual assessments, we feel we are well equipped to communicate with the City about what must be done to maintain Substantial Compliance for the paragraphs currently in that status and how to avoid any potential pitfalls wherever they might exist. Additionally, as our knowledge of PPB continues to increase, we may identify some broader recommendations that can help facilitate and/or expedite the City's efforts toward maintaining compliance. Conducting our assessments of compliance with the Settlement Agreement may also put us in a unique position to detect room for improvement in various areas of PPB's operations in general, which we can address with the provision of technical assistance.

Beyond our continued emphasis on achieving, maintaining, and facilitating substantial compliance, the Monitoring Team is looking forward to conducting our first set of Outcome Measurements pursuant to the terms of the Settlement Agreement. We note that the overarching goal of these measurements is to determine whether implementation of the Settlement Agreement has created: (1) capable systems and resources for responding to persons in mental health crisis; (2) competent accountability and oversight systems; (3) effective training for police officers that increases the knowledge, skills and abilities necessary for effective and successful delivery of service to persons in mental health crisis; (4) proper management of the use of force to meet constitutional standards; and (5) robust systems of community engagement. In light of this goal, the Monitoring Team considers these measurements to be of tremendous importance as they will help to illustrate whether or not the people of Portland are seeing the positive impact of PPB's implementation of the Settlement Agreement's reforms. The Monitoring Team looks forward to finalizing our methodologies for conducting Outcome Measurements and conducting our first such measurements shortly thereafter.

Finally, the Monitoring Team is additionally looking forward to the continued broadening of our community engagement efforts. We have been committed to these efforts since the beginning of the Monitorship, and we fully expect to continue that commitment during and beyond the course of the next Review Period. We maintain that the Monitorship is incomplete, and unnecessarily prone to blind spots, if it is not informed by community voices. To that end, we will continue seeking out connections with a multitude of stakeholders from all segments of the City, and we will find ways to remain as accessible as we feasibly can to anyone who wishes to reach us to discuss issues of relevance to the Settlement Agreement.

With respect to anticipated barriers to the City's achievement and maintenance of Substantial Compliance with the Settlement Agreement, the analysis of each paragraph assessed in this report identifies areas of deviation from the Settlement Agreement's requirements (whether systemic or merely occasional). In this way, the analyses highlight aspects of the Settlement Agreement identified by the Monitoring Team that the City may wish to be mindful of as it maintains Substantial Compliance with the numerous paragraphs in that status and seeks to achieve it for the handful of paragraphs that are not. As indicated previously, the analyses are accompanied by recommendations, when warranted, aimed at addressing the issues that were noted, and the Monitoring Team is available to engage with the City in order to discuss these issues in further detail, if desired.

Apart from this, the Monitoring Team feels that any other potential anticipated barriers we can presently identify are likely correlated with some of the lessons we have learned, as noted above. For instance, it proved challenging during the Monitoring Team's first set of compliance assessments— in at least some respects—for us to gain the City's understanding of what information we required for our compliance assessments, and, conversely, for the City to adjust to some different requirements for information than what they had been used to prior to the Monitorship. However, now that the City and the Monitoring Team are nearing the completion of their respective roles for the first set of compliance assessments under the Monitorship, we have each learned more about the

other's point of view, and we should be better equipped to communicate effectively about such challenges in advance of the next set of assessments. We believe that the exercise of working through this period of adjustment will continue to yield pathways to overcoming such barriers, and we therefore anticipate a less-challenging process for assessing compliance with the Settlement Agreement going forward.

# Appendix

# Settlement Agreement Paragraph Summaries[34]

| Paragraph # | Requirement Summary |
|---|---|
| 66 | PPB policy must include the principles that officers shall use only the force reasonably necessary under the totality of the circumstances and develop skills to resolve conflicts without force or with the least amount of appropriate force. |
| 67 | PPB policy must include the principles that officers shall use disengagement/de-escalation, account for information indicating a person is mentally ill, de-escalate force as resistance decreases, and receive discipline for objectively unreasonable force. |
| 69 | All use-of-force incidents must be timely and thoroughly reported, reviewed by supervisors, and meet criteria for specialized incidents including lethal force or in-custody deaths. |
| 70 | Supervisors must respond to use of force incidents, ensure proper investigation, coordinate medical care, notify relevant divisions, and complete After-Action Reports within 72 hours. |
| 72 | PPB must implement and annually review for revision a supervisor checklist capturing all required review elements for use of force incidents. |
| 73 | After-Action Reports must be reviewed through the chain of command, address training and policy issues, and require corrective actions and referrals as needed. |
| 74 | The Force Inspector must audit use-of-force reports and Reviews to ensure officers use and report force in compliance with PPB use of force and reporting policies. |
| 75 | The Force Inspector must audit use-of-force reports and Reviews to assess supervisors on policy compliance, completeness, timeliness, and systemic concerns, making corrections and notifications as appropriate. |
| 76 | The Force Inspector must perform quarterly analysis of force data to identify patterns of force application that deviate from PPB policy and correct any deficiencies discovered. |
| 77 | PPB must conduct quarterly audits of use-of-force reports and reviews to assess supervisors in the chain of command for policy compliance and identify trends or systemic issues. |
| 78 | PPB training shall instill expectations that officers are committed to the constitutional rights of persons with actual or perceived mental illness, and to build community partnerships to increase public trust and safety. |

---

[34] This chart includes the Monitoring Team's brief summaries of the language from the Settlement Agreement for reference and convenience.

| 79 | The Training Division shall conduct a needs assessment annually as part of the annual review and update to PPB's training plan. |
| 81 | The Training Division maintains a central file system, accessible to supervisors, to electronically track, maintain and report on training curricula and officer performance. |
| 84 | PPB must train officers and supervisors in crisis intervention, de-escalation, communication, procedural justice, and encounters with individuals in mental health crisis. |
| 85 | PPB, in coordination with COCL, must audit training programs using defined metrics including needs assessments, training plans, effectiveness, attendance, and policy accessibility. |
| 86 | PPB must conduct quarterly analysis of patterns and trends of use of force, identify proposed revisions to policy, training, and/or evaluation, and identify and remediate any training deficiencies. |
| 88 | The City's partners in the provision of community- based addiction and mental health services are expected to help remedy the lack of community-based addiction and mental health services to Medicaid clients and uninsured area residents. |
| 89 | Local CCOs are expected to establish one or more drop-off centers for first responders and walk-in centers for individuals with addiction or behavioral health needs. These centers should focus on appropriate discharge planning and community-based treatment. |
| 90 | CCOs must create mental health-focused subcommittees with City agency participation to pursue improvements, including data sharing, rapid access clinics, expanded diversion options, peer services, and tele-psychiatry. |
| 94 | PPB must establish an ABHU Advisory Committee with representation from City and community stakeholders to advise on behavioral health-related policies, practices, and oversight bodies. |
| 95 | The ABHU Advisory Committee must provide guidance and recommendations to improve CI Team, MCPT, SCT, BOEC Crisis Triage, and PPB contact with people in crisis, aiming to de-escalate potentially violent encounters. |
| 96 | The ABHU Advisory Committee must issue implementation status reports on ABHU and Crisis Triage and recommend improvements, and PPB must use these recommendations to inform changes. |
| 115 | The City must fully implement a Crisis Triage system within BOEC in accordance with policies determined under paragraph 113 of the settlement agreement. |

| 116 | PPB must require supervisors to document prompt reviews of employee performance in the Employee Information System (EIS) and analyze conduct data of units and supervisors to identify patterns of activity. |
| 117 | PPB must use force audit data to conduct analyses at supervisor- and team-levels. |
| 118 | PPB must perform case management review of officers using force in 20 percent of arrests in the last six months or using force three times more than the average force of officers on the same shift. |
| 121 | PPB and the City shall complete all administrative investigations of officer misconduct within 180 days of identifying the misconduct. |
| 122 | PPB will conduct administrative investigations concurrently with criminal investigations of alleged officer misconduct, if any, concerning the same incident. |
| 123 | PPB must provide DOJ with a written review of any delays causing investigations to exceed the timelines in the settlement agreement and implement an action plan for reducing them. |
| 124 | PPB shall review and revise its protocols for compelled statements to Professional Standards Division (PSD) to comply with applicable law and professional standards pursuant to *Garrity v. New Jersey* (1967). |
| 125 | PPB will issue a communication restriction order (CRO), prohibiting all direct or indirect communication, to all witness and involved officers following a lethal force event. |
| 126 | PPB will require witness officers to lethal force events to give an on-scene briefing to any supervisor and/or member of the Detective Division. |
| 127 | PPB will request involved officers in lethal force and in-custody death events to provide a voluntary on-scene walk-through and interview. |
| 128 | The City must implement a plan to reduce the redundant interview of witnesses by Independent Police Review (IPR) and Internal Affairs (IA) and enable independent investigation by IPR when necessary. |
| 129 | The City and PPB must ensure all allegations of excessive use of force receive full IA investigations, unless IPR finds clear and compelling evidence the allegation has no basis in fact. |
| 131 | The Police Review Board (PRB) must operate in line with charter, maintain procedural integrity, and address policy or training issues. |
| 132 | Investigating entities (i.e., IA and IPR) must make reasonable attempts to complete additional investigation requests from PRB within 10 business days. |
| 133 | PPB shall document findings of civil liability in the Employee Information System, reevaluate officer fitness for specialized units, and perform a full IA investigation. |

| 137 | PPB must define consistent disciplinary frameworks and apply them proportionately and equitably. |
| 141 | The City must establish the Portland Committee on Community Engaged-Policing (PCCEP) within 90 days of the relevant amendment's Effective Date. |
| 142 | PCCEP must be authorized to solicit information, make recommendations, advise leadership, contribute to PPB's Community Engagement Plan, and receive public comment in accordance with the PCCEP Plan. |
| 143 | PCCEP members must be broadly representative of the community and free from actual or perceived conflicts of interest with the City. |
| 144 | The City must provide administrative support necessary for PCCEP to perform its duties under the Agreement and the PCCEP Plan. |
| 148 | PPB must collect demographic information and must provide that information to PCCEP and to the public, and PPB must consider data collection enhancements. |
| 150 | PPB must issue a public annual report, provide a draft of it to PCCEP prior to finalizing it, and hold public meetings to provide education on community engagement efforts. |
| 151 | PCCEP must meet as needed and hold regular public Town Hall meetings, and the City must advise PCCEP to ensure compliance with applicable public meetings laws. |
| 152 | The City must provide PCCEP members with appropriate training necessary to comply with City and State law requirements. |
| 188 | The City must revise Force Data Collection Report and After-Action Report forms to capture when forms are edited and completed. |
| 189 | The City must fund an external entity to publicly report a critical assessment of the City's response to crown control events in 2020. |
| 190 | The City must provide a separate line item for overtime costs necessary to train PPB officers. |
| 191 | The City must hire a qualified civilian to direct all educational aspects of PPB's Training Division. |
| 192 | PPB must assess command decisions during protest events to ensure accountability and policy compliance. |
| 193 | PPB must release its Annual Report and hold required precinct meetings no later than September 20 of each year. |
| 194 | PPB must implement and enforce a body-worn camera program department-wide, with clear usage and review protocols. |
| 195 | The City must establish an independent civilian oversight body with authority to review, investigate, and recommend accountability measures. |

# Glossary of Acronyms

| Acronym | Definition |
| --- | --- |
| AAR | After-Action Report |
| BHRT | Behavioral Health Response Teams |
| BHU | Behavioral Health Unit |
| BHUAC | Behavioral Health Unit Advisory Committee |
| BOEC | Bureau of Emergency Communications |
| BWC | Body-Worn Camera |
| CAD | Computer-Assisted Dispatch |
| CAG | Corrective Action Guide |
| CAR | Corrective Action Recommendation |
| CBPA | Community Board for Police Accountability |
| CEW | Conducted Electric Weapon |
| COCL | Compliance Officer/Community Liaison |
| CRC | Citizen Review Committee |
| CRO | Communication Restriction Order |
| DOJ | United States Department of Justice |
| ECIT | Enhanced Crisis Intervention Team |
| ECW | Electronic Control Weapon |
| EIS | Employee Information System |
| FDCR | Force Data Collection Report |
| IA | Internal Affairs |
| IMLLC | Independent Monitor, LLC |
| IPR | Independent Police Review |
| LMS | Learning Management System |
| MCCL | Multnomah County Crisis Line |
| OIG | Office of the Inspector General |
| OIS | Officer-Involved Shooting |
| PAC | Police Accountability Commission |
| PCCEP | Portland Committee on Community-Engaged Policing |
| PPA | Portland Police Association |
| PPB | Portland Police Bureau |
| PRB | Police Review Board |
| PSD | Professional Standards Division |
| PSR | Portland Street Response |
| RU | Responsibility Unit |
| SOP | Standard Operating Procedure |
| TAC | Training Advisory Council |