**Juan C. Chavez**, OSB #136428
Email: jchavez@ojrc.info
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208
Telephone: 503-944-2270

Attorney for *Amicus Curiae* Mental Health Alliance

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 3:12-cv-02265-SI |
| Plaintiff, | |
| vs. | *AMICUS CURIAE* MENTAL HEALTH ALLIANCE'S JULY 2025 STATUS REPORT |
| CITY OF PORTLAND, | |
| Defendant. | |

## Dan Handelman: Peace and Justice

The two words that to many of us define Dan Handelman he put into the name of the organization he helped create, "**Peace** and **Justice** Works." Many members of MHA worked alongside Dan Handelman for decades, struggling for justice in this community. Mr. Handelman devoted his life to this work—always from a place of compassion, always with dogged focus, and always with the understanding that there can be no peace and justice in our beloved community until we move beyond our overreliance on policing.

In his eulogy, MHA member Jason Renaud remarked that Mr. Handelman was among the first, alongside Jo Ann Hardesty, to take the mental health community's calls for police reform

seriously. Mark Chasse, brother of James Chasse, spoke of how generous and compassionate Mr. Handelman was after his brother's death at the hands of PPB officers. Dr. Rev. Haynes called Mr. Handelman "a true American original."

Our city's police bureau's deep-seated issues with accountability, transparency, and justice have sadly outlasted many of the people most committed to addressing them. In their memory, and in the memories of all whose lives were lost to excessive force, MHA remains committed to carrying on this cause for as long as needed until we achieve the just and lasting peace we have all desired.

## I.  INTRODUCTION

The Mental Health Alliance ("MHA") provides this commentary on the on-going progress of the United States' lawsuit against the City of Portland over its pattern and practice of excessive force against persons in a mental health crisis. We ask that the Court hold the main parties in this case to the commitments they made in their settlement agreement.

## II.  DISCUSSION

### A.  Self-Monitoring Paragraphs

#### a.  City's Self-Monitoring in Community Based Health Services

As the Court is well aware from past briefing, MHA maintains that the City has never complied with the plain language of Paragraphs 88-90. The City has neither worked to create nor attempted to create a walk-in/drop-off center, maintaining it has no such obligation. Remarkably, the City's self-monitoring approach for these paragraphs consisted of simply informing the Independent Monitor that no plan was required—and the Independent Monitor accepted this position. ECF 490-1, p. 81 ("[T]he Monitoring Team's evaluation of the City's compliance report found that the City is not expressly called on to satisfy any of the requirements included in the

discrete section"). This abdication of oversight fundamentally undermines the trust MHA placed

in the Independent Monitor to ensure City compliance under the amended settlement agreement's

self-monitoring framework.

     **b. City's Self-Monitoring on Behavioral Health Unit Advisory Committee (BHUAC)**

     MHA appreciates that the Monitor calls for means to provide greater transparency from

the BHUAC. But as the Court knows, MHA believes that here transparency necessitates opening

the BHUAC to the community. Members of MHA and the public deserve to be at meetings when

such valuable information is being shared. Telling the public that the committee discussed

specific agenda items brings little value or transparency.

    **B. Areas of Compliance, Partial Compliance, or No Assessment Made**

     **a. Paragraphs 69 and 76: Use of Force Reporting**

     Based on the areas of flagged for potential improvement, such as Paragraph 69 and 76,

MHA does not believe that the Monitor's assessment places the City on a path towards ending its

pattern and practice of excessive use of force. While improving reporting requirements has its

usefulness, after over ten years of attempts at improving the City's use of force reporting, the

reporting requirements do not appear to have improved outcomes for people in mental health

crisis having the police called on them.

     **b. Paragraph 245: Monitor Reverses on Assessing Accountability**

     In one notable place, the Monitor excuses itself from reviewing a critical piece of the

settlement agreement, Paragraph 245 (formerly Paragraph 169) backsliding from the position

held by the COCL and the Plaintiff United States. Paragraph 245 states: "PPB shall apply

policies uniformly and hold officers accountable for complying with PPB policy and procedure."

The Monitor explains its retreat on assessing this paragraph by claiming that its placement

amongst other procedural paragraphs within the revised settlement agreement implies its unimportance. ECF 490-1, pp. 79-80. Whether or not the City is holding its officers accountable for complying with its policy and procedure is why the community, amici, and sometimes the Plaintiff continue to advocate in this Court for continued supervision. Not assessing this critical component undermines the entire oversight process.

### c. Paragraph 66 and 67: ECIT and Use of Force

#### i. ECIT Officers Need More Scrutiny

The Monitor discusses one ECIT ("Enhanced Crisis Intervention Team") member use of force that highlights the issue. The Monitor rightfully expresses concern that an ECIT officer pepper sprayed a person presenting a mental health crisis. The officers were responding to a trespass call. The Monitor notes that "there appeared to be no particular exigency with regard to taking the subject into custody, meaning that the officer and the sergeant had the option to take advantage of time in trying to use the least amount of force that they could." ECF 490-1, p. 21. Instead, the officers attempted to restrain the individual. The individual allegedly threw a punch at one of the officers, and the ECIT officer pepper sprayed the individual three times. "The third use of the incapacitant appeared to occur after the subject had placed their hands behind their back and turned away from the officer and the sergeant, essentially offering little to no resistance."

This exposes a critical gap in the heretofore enforcement of the Settlement Agreement: scrutiny of how the City trains, retrains, and disciplines ECIT officers. Based on information and belief, there remains a dangerous gap between what officers putatively learn in ECIT training, and what coming to rely on them means.

MHA notes that neither the Plaintiff United States or the Monitor have detailed any review of three recent shooting deaths that occurred in Portland—Robert Delgado, Michael Townsend, and Immanueal Clark—and how their handling demonstrates that the City has not

cured itself of its pattern and practice. Mr. Delgado was shot and killed by ECIT Officer Zachary DeLong while in a mental health crisis. No fulsome review of whether his actions comported with ECIT trainings occurred. Mr. Townsend was shot and killed by Officer Curtis Brown while in a mental health crisis. A jury found the City negligent for not deescalating or using CIT skills. Mr. Clark was shot and killed by officer Chris Sathoff. Remarkably, an Internal Affairs review found that Officer Sathoff broke department policy. The Bureau ignored that finding and did not discipline Officer Sathoff.

While the latter two officers were not members of the ECIT, all three feature officers who did not follow their training and used unjustified force to little or no scrutiny from the Bureau. Failing to train or discipline officers create the assumption that officers can violate the Constitution, or just good sense, with impunity. When that happens, it creates the circumstances that faced Damon Lamarr Johnson.

    ii.  <u>Damon Lamarr Johnson</u>

This brings us to the recent shocking death of Damon Lamarr Johnson at the hands of three officers, including one with ECIT training. After minimal consultation with building security, the officers entered the building and found Mr. Johnson's door open to the hallway. He was on the far side of his small apartment attempting to clean his bed in a dysregulated manner. Three officers positioned themselves in the doorway—one with a gun drawn—and attempted to talk with Mr. Johnson without announcing they were police. When asked to come into the hallway, Mr. Johnson clearly said "no" and continued cleaning while largely ignoring the officers' questions. Despite acknowledging the risks and having other de-escalation options available, the officers decided to enter the apartment.

The police quickly entered while Mr. Johnson's back was turned and grabbed his arms as he was about to eat rainbow cake. They never announced they were police and told him, "Don't resist or force will be used against you." After briefly allowing him to take a bite of cake, they forcibly twisted his arms behind his back when he moved toward the window. All four fell to the floor in a struggle, with the three officers using pain techniques and their weight to force Mr. Johnson onto his stomach in a prone position, pinning his head and body to the wet kitchen floor. Despite Mr. Johnson saying, "I surrender" several times and becoming quiet and still, they continued restraining him. The officers eventually realized he was non-responsive with a weak pulse, moved him to his side, and called urgently for paramedics. When paramedics arrived and requested the handcuffs be removed, one officer initially refused before relenting, and the three officers were then relieved by backup.

Mr. Johnson had not committed a crime and was not suspected of a crime. He was known to have a severe and persistent mental illness, and he was clearly symptomatic. Johnson did not have weapons or make threats sufficient for BOEC to send police. Who should have responded to this call was a fully funded, fully implemented alternative response team. MHA agrees with PPB Chief Robert Day, who said, "This is not the right response model. This is not who we need going to these calls."

MHA calls for transparency and accountability for this death. However, it remains doubtful that the Plaintiff, Defendant, or Monitor will review this death with appropriate scrutiny.

### d.  Paragraph 192: IPR Review of 2020 Commanders

The Independent Police Review has not completed its investigation into command-level mismanagement of the 2020 protest response from PPB. There appears to be no deadline for

compliance on this paragraph. MHA recommends this paragraph be moved to non-compliance and for the Plaintiff to initiate contempt proceedings.

### e. Paragraph 195: CBPA

As the Court is aware, MHA members have been involved in the planning and creation of the Community Board for Police Accountability ("CBPA"). MHA is excited that Board members have been announced, and the work of community-led oversight may soon begin. However, MHA notes that two members of the CBPA are in fact former law enforcement, coming from district attorneys' offices. This directly conflicts with the by-laws of the CBPA and needs to be remediated.

### III. CONCLUSION

We again thank the Court for the opportunity to present our testimony. We ask that the Court remains steadfast in its oversight and authority over this case despite pressure to expedite, defer, and move on from this litigation. While the work remains staggering in its breadth, the community, like Dan Handelman, must be undaunted and dogged in the face of these problems. Portland deserves nothing less than our complete devotion to the cause of justice for the most vulnerable among us.

DATED: July 22, 2025

/s/ *Juan C. Chavez*
Juan C. Chavez, OSB 136428
Oregon Justice Resource Center
Attorney for Amicus MHA