**Robert Taylor, OSB No. 044287**
City Attorney
Email: robert.taylor@portlandoregon.gov
**Heidi Brown, OSB No. 922410**
Chief Deputy City Attorney
Email: heidi.brown@portlandoregon.gov
**Sarah Ames, OSB No. 163350**
Deputy City Attorney
Email: sarah.ames@portlandoregon.gov
**Lisa Rogers, OSB No. 176519**
Deputy City Attorney
Email: lisa.rogers@portlandoregon.gov
**PORTLAND CITY ATTORNEY'S OFFICE**
1221 SW Fourth Ave., Room 430
Portland, Oregon 97204
Telephone: (503) 823-4047
Facsimile: (503) 823-3089

Of Attorneys for Defendant City of Portland

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### PORTLAND DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA**,<br><br>Plaintiff,<br><br>v.<br><br>**CITY OF PORTLAND,**<br><br>Defendant. | Case No. 3:12-cv-02265-SI<br><br>**DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFF'S MOTION TO ENFORCE THE SETTLEMENT AGREEMENT** |

**Page i - DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFF'S MOTION TO ENFORCE THE SETTLEMENT AGREEMENT**

## TABLE OF CONTENTS

MEMORANDUM OF LAW ......................................................................................................1

I.      INTRODUCTION ...................................................................................................1

II.     STATEMENT OF FACTS .....................................................................................1

      A.     President Orders National Guard Troops to Portland, the State and City File Suit,  and DOJ Weaponizes the Settlement Agreement with Demands for Information ...............................................................................................................1

              1.     DOJ Sends Request Proposing "Expansion" of Settlement Agreement to Cover Viewpoint Discrimination During the TRO Hearing.......................2

      B.     The United States' Excessive Force Against ICE Protestors and Viewpoint Discrimination Favoring Right-Wing Media Personalities ....................................6

III.    LEGAL STANDARD.............................................................................................11

      A.     Enforcement Principles - Scope of Settlement Agreement....................................11

      B.     Equitable Principles of the Doctrine of Unclean Hands .......................................12

IV.    ARGUMENT .........................................................................................................13

      A.     The United States Has Not Satisfied the Agreement's Pre-Enforcement Requirement..........................................................................................................14

      B.     DOJ is Usurping the Monitor's Role ....................................................................15

      C.     The Agreement is About Constitutional Force, Not Viewpoint Discrimination; Thus, .DOJ's Allegations Fall Outside the Scope of the Settlement Agreement and Are Unsuitable for Enforcement..........................................................................17

              1.     DOJ Admitted its Effort was an Expansion of the Scope of the Agreement.................................................................................................19

              2.     DOJ Incorrectly Interprets "Uniformly" in Paragraph 245.......................19

              3.     DOJ Incorrectly Interprets PPB Directives.................................................20

              4.     The Specific Records Requested by DOJ Further Illustrate its Pretextual Nature and that it is Outside the Scope of the Agreement........................23

      D.     DOJ has Unclean Hands ........................................................................................24

      E.     AAG Dhillon Should Attend the Status Conference in Person to Answer for the Conduct of the Federal Government in Portland .................................................28

V.     CONCLUSION......................................................................................................29

**Page ii - DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFF'S MOTION TO ENFORCE THE SETTLEMENT AGREEMENT**

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

<u>Cases</u>

*Arreola v. Godinez,*
    546 F.3d 788 (7th Cir. 2008) ...............................................................................12

*Fafel v. DiPaola,*
    399 F.3d 403 (1st Cir. 2005) ...............................................................................11

*Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*
    826 F.2d 837 (9th Cir. 1987) .........................................................................13, 27

*Hadix v. Caruso,*
    297 F. App'x 504 (6th Cir. 2008)...................................................................12, 18

*Harvey v. Johanns,*
    494 F.3d 237 (1st Cir. 2007)..........................................................................11, 19

*Johnson v. Yellow Cab Transit Co.,*
    321 U.S. 383 (1944)......................................................................................12, 24

*Kokkonen v. Guardian Life Ins. Co. of Am.,*
    511 U.S. 375 (1994).............................................................................................11

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.,*
    324 U.S. 806 (1945)......................................................................................13, 24

*Sealy Mattress Co. of Michigan v. Sealy, Inc.,*
    789 F.2d 582 (7th Cir. 1986) ....................................................................11, 12, 23

*United States v. City of Northlake, Ill.,*
    942 F.2d 1164 (7th Cir. 1991) ...........................................................11, 12, 19, 20

<u>State Statutes</u>

ORS 192.192.410...............................................................................................................1
ORS 192.505.....................................................................................................................1

<u>**MEMORANDUM OF LAW**</u>

**I.    INTRODUCTION**

The City of Portland respectfully submits the following response to the United States Department of Justice (DOJ) Motion to Enforce the Settlement Agreement. The City has rightfully resisted the DOJ's effort to usurp the role of the Independent Monitor and expand the scope of the Settlement Agreement (Agreement) between the United States and the City of Portland through its October 3 and October 29, 2025 records requests to investigate spurious allegations of viewpoint discrimination. ECF 486, ECF 506. This is an effort to misuse and abuse the long-standing Agreement between the parties under the pretext of an enforcement action that is, in reality, base political weaponization of the DOJ against a city the President dislikes. The City respectfully asks this Court deny the Motion for Enforcement.

**II.    STATEMENT OF FACTS**

The current dispute between the City and DOJ should be understood in context: namely, the simultaneous attempt by the Trump administration – now enjoined – to deploy National Guard troops on the streets of Portland. Given that context, and having determined that DOJ's demands for information on October 3 and 29 fell outside the scope of the Agreement, the City has responded in good faith to the DOJ's October 3 and 29 letters as public records requests under the Oregon Public Records Law, ORS 192.192.410 to 192.505.

**A.    President Orders National Guard Troops to Portland, the State and City File Suit, and DOJ Weaponizes the Settlement Agreement with Demands for Information.**

President Trump's September 27, 2025, order directing the deployment of Oregon – and then California and Texas – National Guard troops to the ICE facility in Portland has been much publicized and litigated. The facts are summarized well in Judge Immergut's decision enjoining the deployment, issued in the State of Oregon's and City of Portland's lawsuit (later joined by

///

**Page 1- DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFF'S MOTION TO ENFORCE THE SETTLEMENT AGREEMENT**

the State of California) against President Trump. Findings of Fact and Conclusions of Law,
*Oregon v. Trump*, No. 25-1756, ECF 146 at 7 (J. Immergut) (Nov. 7, 2025).

Oregon and the City filed the lawsuit on Saturday, September 28, the same day Secretary
of Defense Pete Hegseth called for 200 members of the Oregon National Guard to deploy to
Portland, over the Governor's objection. *Oregon v. Trump*, ECF 146 at 7. Plaintiffs moved for a
temporary restraining order (TRO) the following day, and the court held a hearing on the that
motion on Friday, October 3, 2025. *Id.*

### 1.    DOJ Sends Request Proposing "Expansion" of Settlement Agreement to Cover Viewpoint Discrimination During the TRO Hearing.

On the morning of Friday, October 3, the same day as the TRO hearing, Assistant
Attorney General (AAG) Harmeet Dhillon publicly announced that DOJ would conduct a "full
investigation" of Portland's policing of the ICE protests. At 8:07 a.m. [1] on October 3, AAG
Dhillon posted on the social media platform X (formerly Twitter) the following message to the
City, using an abbreviation for the Trump Administration's common slogan, "F*** Around and
Find Out": "Portland: it's FO time. Buckle up." *Declaration of Heidi Brown (Brown Decl.*) Ex.
1.a-1 at 1. Under that message, she retweeted a post by conservative media personality Nick
Sortor reporting that Attorney General Pam Bondi had called him personally to say she had
ordered a "full investigation" into his arrest by Portland police, concluding "The Trump DOJ
WILL NOT allow Portland Police to continue to do the bidding of Antifa." *Brown Decl.,* Ex. 1.a-
1 at 1; *see also Brown Decl.*, Ex. 1.a-2 at 1.

At 9:51 a.m., Deputy AAG Jonas Geissler sent an email to the Portland City Attorney's
Office and Portland Police Bureau (PPB) titled "Teams video call" from stating, "I would like to
have a Teams video call as soon as possible. Could you speak at 1:00 PM ET/10:00 AM PT

///

---

[1] All time references are in Pacific Time.

**Page 2- DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFF'S MOTION
TO ENFORCE THE SETTLEMENT AGREEMENT**

today?" *Brown Decl.,* Ex. 2. The email contained no explanation about what Mr. Geissler wished to discuss or why it was such an urgent matter. *Id*.

At 10:45 a.m., AAG Dhillon again tweeted, posting a Fox News story on the Sortor arrest, commenting that "Nick and I have spoken, as have @AGPamBondi and I. This is a high priority for @CivilRights. About damn time Portland took the law seriously. 😠" (Tags to the Attorney General and Civil Rights Division, and emoji as in original.) *Brown Decl*., Ex. 1.b-1 at 1; *see also Brown Decl.*, Ex. 1.b-2 at 1.

At 11:07 a.m., little more than an hour after the disingenuous invitation to meet, Mr. Geissler sent an email to the City with the first document request. *Brown Decl*., Ex. 3; *Motion to Enforce the Settlement Agreement*, ECF 520-1. AAG Dhillon immediately posted the letter to X, with the comment "Portland: Signed, sealed, delivered!"[2] *Brown Decl*., Ex. 1.c at 1; *see also Brown Decl.*, Ex. 1.e at 1, AAG Dhillon X Post & Video (Oct. 3, 2025) ("Investigation underway!"); *Brown Decl.*, Ex. 1.f, AAG Dhillon X Post & Video (Oct. 3, 2025) (discussing an investigation into Portland Police); *Brown Decl*., Ex. 7.a, AAG Dhillon X Post & Video (Oct. 8, 2025); *Brown Decl*., Ex. 7.c, AAG Dhillon X Post & Video (Oct. 24, 2025).

The October 3 letter from DOJ includes the subject line, "Potential Viewpoint Discrimination *Expansion* of Amended Settlement Agreement."  ECF 520-1 at 1 (emphasis added). The letter identified three issues that had been brought to DOJ's attention: 1) PPB's arrest of Mr. Sortor; 2) PPB's reported failure to arrest individuals who allegedly assaulted another conservative social media personality, Katie Daviscourt; and 3) "The City of Portland reportedly has attempted to use its policing powers through a zoning enforcement action to limit ICE's use of its Portland facility." The letter claimed that all three allegations "implicate the

---

[2] The letter sent to the City and posted on X misspelled Mr. Sortor's name. At noon that same day, Mr. Geissler sent the City a corrected version of the letter, which is the one attached to the Motion to Enforce the Settlement Agreement, ECF 520-1.

**Page 3- DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFF'S MOTION TO ENFORCE THE SETTLEMENT AGREEMENT**

City's performance under the Settlement Agreement in the above-referenced case." *Id*. at 2. The letter proceeded to make seven specific requests of the City.

On Saturday, October 4, Judge Immergut issued a TRO prohibiting the deployment of the Oregon National Guard to Portland, and on Sunday, October 5, she issued a second TRO prohibiting deployment of California and Texas Guard members, after the Defendants' "apparent violation of the First TRO." *Oregon v. Trump*, ECF 146 at 9. AAG Dhillon was tracking these developments, and not pleased: On October 4, she retweeted a post that suggested Judge Immergut "lied," and on October 5, retweeted two calls for Judge Immergut to be impeached. *Brown Decl.*, Ex. 5.a at 1; *Brown Decl.*, Ex. 5.b at 1; *Brown Decl.*, Ex. 5.c at 1; see also *Brown Decl.*, Ex. 5.d at 1, AAG Dhillon X Post (Oct. 5, 2025).

On October 6, City Attorney Taylor responded to DOJ. ECF 520-4. In no uncertain terms, Mr. Taylor called out the federal administration's evident hypocrisy. *Id*. Federal law enforcement used excessive force against peaceful protestors and those only passively resisting. Id. And the federal government engaged in viewpoint discrimination by targeting demonstrators based on the content of their speech, favoring conservative media personalities who were given special access to the ICE facility while targeting with force those who use social media to document the federal government's conduct. *Id*. at 2–3.

He wrote that "the City of Portland opposes what appears to be an effort by the Civil Rights Division to politically weaponize the Amended Settlement Agreement." *Id*. at 2. He reminded DOJ that the Court approved an Independent Monitor, in part, "to ensure that the political whims of the federal administration would not be used continually to move the goal posts and whipsaw the community and our local law enforcement." *Id*. at 2. In closing, Mr. Taylor implored the DOJ Civil Rights Division not to fail Portland or America:

> Please investigate – and stop – the apparent First and Fourth Amendment violations occurring in Portland by the federal government. Please ensure that the federal administration complies with orders of our federal courts.

**Page 4- DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFF'S MOTION TO ENFORCE THE SETTLEMENT AGREEMENT**

> Please show that the Civil Rights Division cares about the rule of law and
> the constitutional protections guaranteed to everyone, including those with
> whom the federal administration appears to disagree politically.

*Id*. at 3. Because the Agreement had no relationship to the allegations of viewpoint

discrimination and therefore DOJ did not have authority to demand the information requested

through that venue, the City treated the letter as a public records request, offering to produce

documents through the records request management system, GovQA. A file was opened for the

request on October 7, and notification was sent to AAG Dhillon. GovQA messages for Case No.

422352, *Brown Decl.*, Ex. 4 at 6.

On October 20, 2025, a split Ninth Circuit panel stayed the first TRO upon appeal, but on

October 24, the Court administratively stayed the panel's decision. On October 28, a majority of

Ninth Circuit judges voted to rehear the case en banc, vacating the panel's order. *Oregon v.

Trump*, ECF 146 at 12. The Trump administration was left to argue their case before Judge

Immergut.

Judge Immergut held a three-day consolidated preliminary injunction hearing on October

29, 2025. *Oregon v. Trump*, ECF 146 at 12. And once again, DOJ chose the day of the National

Guard hearing to launch a collateral attack on the City by issuing a second document request. In

DOJ's October 29 document request, the subject line no longer accurately declares the

investigation an attempt to expand the Agreement, but instead cited to Paragraph 241. ECF 520-

2. There is no good faith rationale for the requests – which had expanded to 29 requests, from the

original seven. *Id*. DOJ did not cite to any paragraph in the Agreement as the underlying

obligation that its information request was assessing for possible enforcement. *Id*. The letter

requested the City provide responsive documents on a rolling basis, "but no later than November

28, 2025." *Id*. Given the letter's inability to express any connection to enforcement of the

Agreement, the City again treated the letter as a new – and extensive – public records request

under Oregon law. GovQA messages for Case No. 427176, *Brown Decl.*, Ex. 6.

**Page 5- DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFF'S MOTION
TO ENFORCE THE SETTLEMENT AGREEMENT**

Also on October 29, 2025, DOJ sent a "Notice of Failure to Comply with Paragraph 241 of the Settlement Agreement," alleging that the City had failed to comply Paragraph 241. ECF 520-5. For the first time, DOJ referred to Paragraph 245, claiming that it sought to assess "the City's *compliance* with Paragraph 245." *Id*. (emphasis added).

On November 4, 2025, the City responded to the October 29 Notice. ECF 520- 6. The City disagreed that DOJ had met the requirement to initiate enforcement proceedings, as DOJ neglected to say in what manner the City had failed to implement the terms of the Agreement. *Id*. at 2. The City reiterated that it is the Monitor's job, not DOJ's, to assess compliance, and that DOJ was overstepping its role. Id. The City contended that DOJ's allegations had "no relationship whatsoever to the target of the Agreement, which is, 'to strengthen initiatives already begun by PPB to ensure that encounters between police and persons with perceived or actual mental illness, or experiencing a mental health crisis, do not result in unnecessary or excessive force.' (Dkt. 485-1, p. 1)." *Id*. The City further reinforced the points made in response to the first information demand, namely that "this action is an attempt to politically weaponize the Agreement as well as an overreach and abuse of the authority granted therein." *Id*. at 1–2.

**B.      The United States' Excessive Force Against ICE Protestors and Viewpoint Discrimination Favoring Right-Wing Media Personalities.**

While the City has been successfully implementing remedies resulting from the amendments to the Agreement after the 2020 protests, evidence presented during the State and City's lawsuit against the Trump Administration's National Guard Deployment, as well as contemporaneous media coverage, clearly demonstrate that the federal agents regularly used excessive force against protestors at the ICE facility, and that federal leadership consistently tried to influence national opinion by providing access and interviews to right-wing social media personalities and conservative news outlets, while disfavoring mainstream reporters or left-leaning media personalities.

**Page 6- DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFF'S MOTION TO ENFORCE THE SETTLEMENT AGREEMENT**

Throughout the protests, "PPB carried out its duties to enforce law and order on public property around the ICE Facility," was "responsive to ICE's calls for serious criminal activity;" and "made arrests for even minor criminal violations[.]" *Oregon v. Trump*, ECF 146 at 40. As noted by Judge Immergut, PPB has "deep experience in managing crowds and protests in the City of Portland." *Id*. at 34. For those reasons, along with "contradictions" in the federal officials' testimony and evidence, and her observation and evaluation of the demeanor of witnesses, the Court found "PPB's version of events more credible." *Id*. at 34.

The use of excessive force and federal government's viewpoint discrimination was reported in several forums. PPB's commander testified that on several dates during the protests at the ICE facility, federal officers used "types and amounts of force" that were "disproportionate to the level of criminal conduct or violence" that PPB had witnessed at the ICE facility. *Brown Decl*., Ex. 8, *Oregon v. Trump* Excerpted Transcript of Proceedings (Direct Testimony of Portland Police Bureau Commander Franz Schoening) at 99:03– 13. On October 2, 2025, a federal police officer blasted a 19-year-old directly in the face with chemical spray in an unjustified response to her merely verbally insulting the officer. *Brown Decl*., Ex. 11, Jonathan Bach, *The Oregonian/OregonLive*, "Federal office blasts chemical spray into vocal but nonviolent Portland protestor, video shows" (Oct. 3, 2025). The 19-year-old posed absolutely no physical threat and had complied with the request to move away from the entrance. *Id*. Federal officers also shot pepper balls into the crowd and deployed chemical spray directly into the vent of a person's frog costume. *Brown Decl.*, Ex. 10, Fedor Zarkhin *et al*., *The Oregonian/OregonLive*, "24 hours outside Portland's ICE facility: Is this what 'lawless mayhem' looks like?" (Oct. 4, 2025), at 25. On that same night, FOX News correspondent Bill Melugin was given an inside look of the ICE facility, along with the ability to film and broadcast. *Brown Decl.*, Ex. 9, Lillian Mongeau Hughes, *The Oregonian/OregonLive*, "Feds grant ICE building access to conservative media, influencers, ignore local Portland press" (Oct. 7, 2025), at 2.

**Page 7- DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFF'S MOTION TO ENFORCE THE SETTLEMENT AGREEMENT**

Conversative influencer Katie Daviscourt was photographed on the roof of the ICE facility. *Brown Decl.*, Ex. 10 at 20.

On October 4, DOJ's viewpoint discrimination became even more apparent. That day, AAG Dhillon reposted on X Katie Daviscourt's post from the day before of herself, along with Chelly Bouferrache, a right-wing influencer known on X as @Hunnybadgermom, on the roof of the ICE facility. *Brown Decl.*, Ex. 1.g-1 at 1; *see also Brown Decl.*, Ex. 1.g-2 at 1; *Brown Decl.*, Ex. 9. "Two amazing and brave warriors for truth!" AAG Dhillon commented. *Id.*

October 4 was also a notable day at the ICE facility with both daytime and evening events. *Brown Decl.*, Ex. 8 at 81:05–12. The daytime event was "largely just community members, a lot of older folks showing up down there." *Id.* at 81:12–16. Although some of the crowd did trespass on ICE property, PPB did not observe any criminal conduct under Oregon law that would cause a safety risk. *Id.* at 81:13–82-01. Federal officers entered the crowd from the ICE facility to conduct arrests and afterwards PPB officers located an undeployed tear gas canister on the ground where the federal officers had been. Commander Schoening witnessed federal officers re-emerge from the ICE facility and deploy CS gas on the crowd, although the crowd was engaging in "no violent criminal conduct. It was all passive trespassing, civil disobedience-type." *Id.* at 82:02–14. Commander Schoening found the use of CS gas on the crowd "startling" and "certainly a depart[ure] from what I would say was best practice or legal under ORS." *Id.*[3]

Laurie Eckman, 84, was in the October 4 daytime crowd along with her husband, who uses a walker. *Brown Decl.*, Ex. 12, Gosia Wozniacka, *The Oregonian/OregonLive*, "Federal agents knock down elderly couple during Portland protest" (Oct. 4, 2025). She reported that federal officers, unprovoked and without warning, "charged into us, knocked us down and

---

[3] Judge Immergut specifically found credible Commander Schoening's account of the events of October 4, 2025. *See Oregon v. Trump*, ECF 146 at 53.

**Page 8- DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFF'S MOTION TO ENFORCE THE SETTLEMENT AGREEMENT**

sprayed us. I was hit in the head with a projectile." *Id*. Ms. Eckman reported that she sustained a concussion as a result of the actions of the federal officers. *Id*.

Again, that evening, federal officers engaged in excessive force against protesters. The protest activity was largely trespassing, passive conduct, civil disobedience. *Brown Decl*., Ex. 8 at 82:17–19. Despite the crowd's passive behavior, federal officers departed from their usual practice of simply clearing the path for federal vehicles and instead used significant numbers of federal officers to push the crowd "quite a distance" away from the facility, and "a significant amount of crowd control munitions, including a significant amount of tear gas." *Id*. at 82:20-83:14. The tear gas also impacted PPB members, who had to retreat until the gas dissipated. *Id*. at 84:10-85:03. Similar to what happened earlier that day, PPB did not witness any criminal conduct that would justify this response and Commander Schoening also found the evening uses of force "startling," and a departure from his belief of what "is best practices and what was justifiable under ORS or *even under the Graham standard*." *Id*. at 83:15-19 (Emphasis added). When Commander Schoening contacted the Federal Protective Service (FPS) incident commander to ask why this conduct was happening, the response was simply, "I don't know why." *Id*. at 84:3. When FPS used the gas, PPB members were also impacted. *Id*. at 84:25-85:03.

On October 7, The Oregonian/OregonLive reported that its reporters had first requested a tour of the ICE facility on September 25, 2025, eight days before Fox Correspondent Melugin was provided internal access. *Brown Decl.*, Ex. 9 at 2. The Oregonian reporter never received any response from ICE. *Id*. They renewed their request on October 6, and were again met with silence. *Id*.

On October 18, federal officers again used excessive force in the form of a significant amount of indiscriminate crowd munitions. *Brown Decl*., Ex. 8 at 85:04-18. For example, federal officers arbitrarily launched crowd control munitions into the crowd, which also struck PPB

**Page 9- DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFF'S MOTION TO ENFORCE THE SETTLEMENT AGREEMENT**

officers. *Id.* at 85:19-21, 85:25-16. Again, PPB did not witness any violent behavior in the crowd that would have justified the use of force. *Id.* at 86:11-14. Specifically, a PPB Sergeant, who was 100 feet away from the ICE facility's driveway, was exposed to CS gas and then struck by an impact munition. *Id.* at 87:11-88:10. He believed that 100 feet away from the facility was a safe distance from FPS' deployment of crowd control munitions. *Id.* at 88:04-05. After he was struck, he determined it was unsafe for Rapid Response Team (RRT)[4] officers to remain and they left the area. *Id.* at 88:11-13.

On October 20, federal officers fired pepper ball munitions at people shining flashlights at the ICE facility. *Id.* at 91:08-18. When one of the people with the group shining flashlights ran behind a member of PPB's RRT, a federal officer told the PPB officers, and "in summary basically said, 'You need to engage or get out of the way.'" *Id.* at 91:13-2. PPB officers had already determined there was no legal basis to engage because they did not witness actionable criminal conduct by the protesters. *Id.* at 92:05-11.

Lastly, on November 24, Oregon Attorney General Dan Rayfield, Multnomah County District Attorney Nathan Vasquez, Washington County District Attorney Kevin Burton, and Clackamas County District Attorney John Wentworth sent a "Notice of Investigation and Demand to Cease and Desist Unlawful Actions" to Attorney General Pam Bondi and Secretary Kristi Noem. *Brown Decl.*, Ex. 13. They made several demands aimed at improving the safety of residents of Oregon, noting the following:

> Evidence introduced recently at trial in *State of Oregon v. Donald Trump* documented the frequent disproportionate use of force by DHS in response to protests near the Immigration and Customs Enforcement facility in Portland. Senior leaders from both DHS and the Portland Police Bureau (PPB) testified under oath that federal law enforcement used excessive force against nonviolent protesters.
>
> Additionally, we have seen multiple reports of immigration enforcement

---

[4] RRT is a team that respond to public order events.

**Page 10- DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFF'S MOTION TO ENFORCE THE SETTLEMENT AGREEMENT**

actions conducted throughout Oregon that appear to involve excessive amounts of force, creating safety concerns in the community. In October, an unmarked van with federal agents stopped a group of teenagers at gunpoint at a Dutch Bros Coffee drive thru in Hillsboro, creating a volatile situation as community members called 911. Last week, federal agents reportedly arrested a 17-year-old high school student and US citizen in McMinnville after stopping his car and breaking through his window while he was on a lunch break from school. These examples, among others, are highly concerning.

Citizens exercising their constitutional rights have been accosted with tear gas and pepper balls, shot with nonlethal munitions, and subjected to takedowns that were disproportionate to any evident threat. DHS personnel have repeatedly teargassed each other, law enforcement officers from the PPB, and on at least one occasion officers from the Oregon State Police. In at least one incident, a DHS law enforcement officer hit a Portland Police officer with a munition. Many of these incidents were captured on DHS's own video.

*Id*. at 2.

## III.     LEGAL STANDARD

### A.     Enforcement Principles - Scope of Settlement Agreement.

A federal court has ancillary jurisdiction "to . . . vindicate its authority, and effectuate its decrees." *Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 380 (1994). However, "[a] court's power to enforce a judgment is confined to the four corners of the judgment itself." *Harvey v. Johanns,* 494 F.3d 237, 244 (1st Cir. 2007) (citing *Fafel v. DiPaola,* 399 F.3d 403, 411 (1st Cir. 2005)). "Enforcement proceedings are summary in nature; they cannot be used to take up matters beyond the contours of the judgment and thereby short-circuit the usual adjudicative processes. Consequently, when a matter is beyond the scope of a judgment, no relief is available through a motion to enforce the judgment." *Harvey*, at 245.

Thus, enforcement actions must seek to remedy conduct "already comprehended by the plain language of the consent decree." *See United States v. City of Northlake, Ill.*, 942 F.2d 1164, 1169 (7th Cir. 1991); *see also Harvey*, 494 F.3d at 245 ("We hold only that the appellant cannot alter the dimensions of his original suit in a post-judgment enforcement proceeding."); *Sealy*

**Page 11- DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFF'S MOTION TO ENFORCE THE SETTLEMENT AGREEMENT**

*Mattress Co. of Michigan v. Sealy, Inc.*, 789 F.2d 582, 586 (7th Cir. 1986) (holding that scope of consent decree specific to Sherman Act violations could not be construed to apply to facts that did not constitute Sherman Act violations).

To determine whether an enforcement action by the government is within the scope of an existing agreement, courts look to the plain language of the consent decree and will consider whether the conduct complained of is a similar type as alleged in the government's complaint. *See Northlake*, 942 F.2d at 1167 (finding enforcement action procedurally appropriate, and a needed reminder of the City's existing obligations under the consent decree, when the City continued to impede minority hiring by using subjective interview techniques even though the broad plain language of the consent decree required it remedy racially discriminatory hiring practices).

If there is not language within the agreement to support applying a "broad, uncertain, [or] ever-lasting scope," then a court may use common sense to confine the agreement to a reasonable scope. *See Hadix v. Caruso*, 297 F. App'x 504, 506–07 (6th Cir. 2008) (declining to expand the scope of facilities covered by a consent decree beyond a conventional understanding of the terms within the relevant definitions); *see also Arreola v. Godinez*, 546 F.3d 788, 797 (7th Cir. 2008) ("We hold that the *Duran* decree has no bearing on this case. It addressed overcrowding and related issues (such as food service, personal hygiene, access to the law library, exercise, and emergency situations), none of which comes close to the Jail's policy with respect to medical devices in the living units."). Moreover, the court should not "stretch" the agreement if a given construction of an agreement would require a modification of the agreement through amendment. *See Sealy, Inc.*, 789 F.2d at 586.

**B.      Equitable Principles of the Doctrine of Unclean Hands.**

"He who comes into equity must come with clean hands." *Johnson v. Yellow Cab Transit Co.*, 321 U.S. 383, 387 (1944). The equity court has broad powers when applying this doctrine:

**Page 12- DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFF'S MOTION TO ENFORCE THE SETTLEMENT AGREEMENT**

> This maxim necessarily gives *wide range to the equity court's use of discretion* in refusing to aid the unclean litigant. It is "not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion." Accordingly one's misconduct need not necessarily have been of such a nature as to be punishable as a crime or as to justify legal proceedings of any character. *Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient* cause for the invocation of the maxim by the chancellor.

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.,* 324 U.S. 806, 814 (1945) (emphasis added) (citations omitted).

To succeed, a defendant must show "that the plaintiff's conduct is inequitable and that the conduct relates to the subject matter of its claims." *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.,* 826 F.2d 837, 847 (9th Cir. 1987) (discussing unclean hands defense in the context of a Lanham Act trademark claim).

Further, the equity court will consider the impact of the decision on the public interest:

> [W]here a suit in equity concerns the public interest as well as the private interests of the litigants this doctrine assumes even wider and more significant proportions. For if an equity court properly uses the maxim to withhold its assistance in such a case it not only prevents a wrongdoer from enjoying the fruits of his transgression but averts an injury to the public. The determination of when the maxim should be applied to bar this type of suit thus becomes of vital significance.

*Precision Instrument Mfg. Co.*, 324 U.S. at 815.

## IV.    ARGUMENT

The Court should deny DOJ's effort to weaponize the Agreement against the City for many important reasons. First, DOJ has not satisfied a necessary requirement before taking enforcement action. Next, DOJ is no longer the Monitor and cannot usurp the independent court-appointed Monitor's authority and responsibilities. Furthermore, this supposed enforcement action stretches well outside the scope of the Agreement. DOJ cannot use an enforcement action within this proceeding to expand the scope of the Agreement and bypass usual litigation

**Page 13- DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFF'S MOTION TO ENFORCE THE SETTLEMENT AGREEMENT**

procedures. Finally, DOJ is proceeding with unclean hands, in bad faith, and to the detriment of the Portland community. For these reasons, the Court should deny the United States' Motion to Enforce the Settlement Agreement.[5]

## A.     The United States Has Not Satisfied the Agreement's Pre-Enforcement Requirement.

As a preliminary issue, the City notes that DOJ has not met one of the prerequisites for an enforcement action. DOJ cites to Paragraph 241 as the basis for its enforcement motion. Paragraph 241 provides:

> For the purpose of assessing the Monitor's work and whether enforcement of this Agreement is appropriate, DOJ as the plaintiff and its consultative experts and agents shall have full and direct access to all City staff, employees, facilities, and documents, to the extent necessary to carry out the enforcement provisions of this Agreement under Section XII, subsection H to the extent permitted by law.

Section XII, subsection H, Paragraph 267 requires as a prerequisite to any enforcement action that DOJ "reasonably [believe] the City has failed to *implement* the terms of the Agreement." (Emphasis added.) DOJ's notice pursuant to Paragraph 267 sole allegation is that the City failed to comply with the provisions of Paragraph 241.

The term, "Implement," is defined in Paragraph 33 of the Agreement, as follows: "'Implement' or 'implementation' means the development or putting into place of a policy or procedure, including the appropriate training of all relevant personnel, and the consistent and verified performance of that policy or procedure in actual practice through the regular use of audit tools."

The records access provisions of Paragraph 241 are not capable of implementation as the Agreement defines the term. Therefore, DOJ did not notify the City of any failure to

---

[5] References to the Agreement and its paragraphs shall be understood as citing to the Further Amended Settlement Agreement, ECF 486, as amended by Court Order ECF 506.

**Page 14- DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFF'S MOTION TO ENFORCE THE SETTLEMENT AGREEMENT**

"implement" the terms of the Agreement, and has not met this prerequisite for an enforcement action.

**B.      DOJ is Usurping the Monitor's Role.**

Paragraph 229 ensures the Monitor's independence by providing that the Parties, including the DOJ, "may not direct the Monitor's conduct or findings, *shall respect the Monitor's independence*, and will *give deference to the expertise of the Monitor*."  (Emphasis added.)  Paragraph 241 grants to DOJ access to records for the purpose of assessing the Monitor's work to determine if enforcement of this Agreement is appropriate. Under the Agreement, DOJ does not independently decide compliance. Rather, DOJ reviews the Monitor's assessment of the City's compliance with the requirements of the Agreement. Only then, does DOJ have enforcement authority within the scope of the Agreement.

When the Parties adopted and the Court approved the amendments in Section XII, DOJ shifted from a dual role as plaintiff and monitor to a singular role of plaintiff only. As DOJ wrote in their Memorandum in Support of Joint Motion to Amend the Amended Settlement Agreement, "[t]he amendments would shift monitoring to a single independent monitor selected with broad community input," marking "a substantial change from the current dual system of the United States monitoring compliance with the Agreement while the Parties are informed by the quarterly outcome and assessment reports of the COCL." ECF 391, at 7.

It is the role of the Monitor to conduct semi-annual compliance assessments. Agreement, ¶¶ 216, 220–21. DOJ retains its enforcement authority under the procedures laid out in Paragraphs 263 to 272, but that authority does not include the power to conduct parallel, real-time compliance assessments of the City's performance.

Further, DOJ has not made any legitimate claim that this request is an effort to assess the Independent Monitor's compliance assessment work as pertains to the protests at the ICE facility. In fact, any such effort would be premature given the recency of the cited events. In its

**Page 15- DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFF'S MOTION TO ENFORCE THE SETTLEMENT AGREEMENT**

enforcement motion, DOJ for the first time asserts that it seeks these records to assess the Monitor's decision that Paragraph 245 should not be monitored. ECF 520 at 14, Curiously, DOJ was silent about this concern before its recent political theater and grandstanding. The Monitor explained why they decided not to offer a compliance assessment for Paragraph 245 in their first semi-annual report, covering Q3 and Q4 of 2024, ECF 490-1 at 79–80 (June 30, 2025), and DOJ has full access to voluminous records from that compliance period. If assessing the Monitor's work on Paragraph 245 were the real concern – rather than a pretext – DOJ could easily have used those records to assess the Monitor's decision regarding Paragraph 245, rather than issuing new demands. The records sought here are not necessary for the purpose of assessing the Monitor's work. Rather, DOJ clearly seeks these records to overstep the Monitor's compliance role and force the City to report to two Monitors.

It is the Monitor's duty to assess the City's compliance with the terms of the Agreement. Agreement, ¶ 201 ("An Independent Monitor shall assess the City's compliance with, and implementation of, this Agreement."). Paragraphs 201, 216, 220, and 226 further describe the Independent Monitor's compliance duties and required reports. Accordingly, the Monitor has "full and direct access to all PPB and City staff, employees, facilities, and documents that the Monitor reasonably deems necessary to carry out their duties." Agreement, ¶ 240. In contrast, as already explained, DOJ's access to people and documents is circumscribed by Paragraph 241.

DOJ asks the City to produce numerous documents from recent protest events to assess "whether PPB has uniformly applied the requirements of Directives 0315.00, 0635.10, 0620.00, and 1010.00 when monitoring and responding to protest-related incidents . . . [and] uniformly applied post-incident policies." ECF 520, at 21. Assessing compliance is the job of the Monitor and DOJ no longer serves in that role.

Further, the breadth of this information request evidences an intent to retake the role of monitor and shows this is not a question of enforcement. For example, DOJ requests post-

**Page 16- DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFF'S MOTION TO ENFORCE THE SETTLEMENT AGREEMENT**

incident reports, but has asserted no basis for a possible need for enforcement regarding such reports. There is nothing to suggest that PPB has failed to complete such reports. Rather, this broad information request is similar to the production that occurs during regular compliance assessments.[6] This also supports a determination that DOJ is attempting to serve as monitor and is failing to respect the role delegated to the court-appointed Monitor.

The parties amended the Agreement to provide for a Monitor for a reason. Under the current Agreement, DOJ does not independently decide compliance. Rather, the Monitor assesses the City's compliance with the requirements of the Agreement, and only then, does DOJ have enforcement authority, provided such action is within the scope of the Agreement.

DOJ does not have a legitimate basis to seek enforcement. Instead, this effort is better understood as an attempt by DOJ to take back the compliance assessment role for political purposes, rather than leave compliance assessment in the hands of the independent court-appointed Monitor.

**C.      The Agreement is About Constitutional Force, Not Viewpoint Discrimination; Thus, DOJ's Allegations Fall Outside the Scope of the Settlement Agreement and Are Unsuitable for Enforcement.**

This is, unquestionably, a case about the Fourth Amendment, with a focus on use of force involving individuals with actual mental illness or experiencing a mental health crisis. The plain language of the Agreement, and Paragraph 245 in particular, contain no reference to the First Amendment or viewpoint discrimination and contain no provisions related to zoning enforcement decision making. Indeed, the fact that DOJ cites to only one paragraph out of the entire Agreement spotlights their nakedly political attempt to shoehorn these unrelated allegations into the City's long-standing Agreement.

A holistic reading of the Agreement supports the same conclusion. Contrary to DOJ's assertion, such a reading shows that the Agreement's purpose was, and is, to address concerns

---

[6] The City and PPB provide the Monitor such information for the semi-annual status reports required under Paragraph 238.

**Page 17- DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFF'S MOTION TO ENFORCE THE SETTLEMENT AGREEMENT**

regarding uses of excessive force, and specifically uses of force against persons with a mental illness or who are experiencing a mental health crisis. *See* Agreement, Section V – Community-Based Mental Health Services, Section VI – Crisis Intervention, Section III – Use of Force. *See* Agreement, Section V – Community-Based Mental Health Services, Section VI – Crisis Intervention, Section III – Use of Force.

Under DOJ's interpretation, the Agreement would cover any and all potential constitutional violations by the City. This is an absurd conclusion that is not supported by the plain language of the Agreement and which the Court need not embrace. *See Hadix v. Caruso*, 297 F. App'x 504, 506–07 (6th Cir. 2008). To morph this long-standing Agreement into such an open-ended and undetermined scope defies commonsense and such effort should be denied. *Id*.

Further, the United States' Complaint is clear that the government's concerns about constitutionality of PPB's uses of force initiated this case:

> This action seeks to remedy a pattern or practice of unconstitutional uses of force by officers of the Portland Police Bureau. Too frequently, persons who have or are perceived to have mental illness and are in crisis are subjected to unnecessary or excessive force by police officers. The Portland Police Bureau lacks adequate policies to guide officers in these circumstances, or training, supervision and accountability measures necessary to ensure that officers comply with the constitutional rights of people in mental health crisis.

Complaint, ECF 1, ¶ 1.

The Complaint specifically cites concerns about police officers using higher levels of force than needed, unjustified police use of Tasers, and officers using high levels of force for low-level offenses. *See Id*. at ¶ 9. The Complaint contains no reference to any First Amendment concerns.

DOJ's initial findings further undermine DOJ's assertion that the Agreement is about viewpoint discrimination. Not only did DOJ open its investigation "to consider whether PPB officers engage in a pattern or practice of using excessive force, with a particular focus on the

**Page 18- DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFF'S MOTION TO ENFORCE THE SETTLEMENT AGREEMENT**

use of force against people with mental illness or in mental health crisis," but they ultimately found "reasonable cause to believe that PPB engages in a pattern or practice of unnecessary or unreasonable force during interactions with people who have or are perceived to have mental illness." *Brown Decl.*, Ex. 14 at 1.

As neither the plain language of the Agreement nor the allegations listed in DOJ's Complaint or initial findings letter support the conclusion that the type of conduct complained of is in any way related to the Agreement, DOJ cannot use this venue to bypass or avoid the regular adjudicative process. *See Harvey v. Johanns*, 494 F.3d 237, 244 (1st Cir. 2007); *see also United States v. City of Northlake, Ill.*, 942 F.2d 1164, 1169.

1.     **DOJ Admitted its Effort was an Expansion of the Scope of the Agreement.**

DOJ's October 3 information request had the following subject line: "*United States v. City of Portland*, 3:12-cv-02265-SI, Potential Viewpoint Discrimination Expansion of Amended Settlement Agreement." ECF 520-1. Thus, DOJ immediately and correctly acknowledged that a potential viewpoint discrimination claim under the First Amendment would be an expansion of the Agreement, unrelated to the original cause of action or to any portion of the existing Agreement. As mentioned previously, although the October 3 and October 29 information requests made brief and superficial reference to the City's performance under the Agreement, neither cited to any individual paragraph. As such, DOJ's initial identification was correct – these requests are completely untethered to the current Agreement and would require an expansion of its scope. DOJ should be estopped from now taking an inconsistent position.

2.     **DOJ Incorrectly Interprets "Uniformly" in Paragraph 245.**

DOJ assert that its information requests are to investigate the City's compliance with Paragraph 245, which states: "PPB shall apply policies uniformly and hold officers accountable for complying with PPB policy and procedure." This rationale is unfounded and an absurd interpretation of that Paragraph.

**Page 19- DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFF'S MOTION TO ENFORCE THE SETTLEMENT AGREEMENT**

First, DOJ contends that the "plain language" of Paragraph 245 "requires" that PPB implement its policies "without regard to political viewpoint." ECF 520, at 18. As an initial point, the City strenuously rejects DOJ's allegations that it has engaged in viewpoint discrimination. Additionally, Paragraph 245's plain language quite obviously does not include any reference to political viewpoint. DOJ alleges that PPB does not uniformly provide its services, (ECF 520 at 18), and thereby engages in viewpoint discrimination. However, Paragraph 245 imposes an internal, not external, requirement – it requires PPB to apply its *policies* "uniformly," not provide its *services* "uniformly." PPB policies apply to PPB members, not the community, and PPB must hold its own members accountable to those policies. Using the ordinary meaning of the word "uniformly," the requirement is that PPB consistently apply its policies within PPB and enforce its policies consistently across PPB members.[7]

Thus, DOJ's spurious allegations of viewpoint discrimination seek to remedy alleged conduct that is not comprehended by the plain language of Paragraph 245 or any other provision of the Agreement. *See United States v. City of Northlake, Ill.*, 942 F.2d 1164, 1169 (7th Cir. 1991).

**3.      DOJ Incorrectly Interprets PPB Directives.**

DOJ similarly misinterprets the four PPB Directives it invokes as the underlying policies that PPB is allegedly applying inconsistently, while also ignoring that it has never had a role in assessing the application of all PPB policies, or even all possible types of violations of the four PPB directives to which it cites.

First, DOJ cites to Directive 315.00 - Laws, Rules, and Orders. This Directive requires PPB members to follow all laws, rules, and orders. DOJ has never been involved in reviewing all potential violations of this Directive, but rather, their oversight has been limited to cases of law

---

[7] DOJ consistently recognized that this paragraph (then numbered 172 or 169) was applied internally, evaluating it in relation to the Agreement's Accountability Section in the DOJ's own compliance assessments. ECF 105-1, 124-1, 158-1, 195-1, 236-1, 292-1, and 369-1.

**Page 20- DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFF'S MOTION TO ENFORCE THE SETTLEMENT AGREEMENT**

violations pertaining to force matters. For example, if a PPB officer is charged with driving under the influence of intoxicants, the City does not notify DOJ of this allegation and DOJ has never contended that it should.

DOJ argues that the requested information is necessary to assess "whether there have been any systemic failures to apply Directive 0315.00's legal compliance requirements." As noted previously, Directive 315.00 requires that PPB members follow laws, rules, and orders, not that PPB uniformly *enforce* the law. The question of consistent application of this internally focused policy does not provide DOJ a basis to access PPB records, and instead appears to be a pretext to justify its weaponization of the Agreement to further its attacks against anyone with opinions that differ from the Trump administration.

Second, DOJ cites to Directive 635.10 – Portland Police Bureau Response to Public Order Events. This Directive is about crowd management. Nothing in this policy applies to the allegations for which DOJ seeks records. Similar to DOJ's argument regarding Directive 315.00, its citation to Directive 635.10 is another pretext to weaponize the Agreement.

Third, DOJ cites to Directive 620.00 – Body-Worn Camera Use and Management. DOJ has not claimed that its underlying justification for the information requests was a concern that PPB is not uniformly applying the BWC policy. Instead, DOJ wants to access BWC footage to try to prove their spurious claims of viewpoint discrimination, which, as already discussed, are outside of the scope of this Agreement and further evidence of pretext.

DOJ alleges that, as part of the 2020 remedies, the City committed to providing DOJ with access to any BWC footage that DOJ specifically identified and that the City should now be estopped from taking an inconsistent position. ECF 520 at 20. While DOJ does receive access to specifically identified BWC footage for purposes that are within the scope of the Agreement, the City never agreed that DOJ could access BWC footage for any and all purposes, and certainly not to weaponize the Agreement to further its political agenda. To the extent there is a need for

**Page 21- DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFF'S MOTION TO ENFORCE THE SETTLEMENT AGREEMENT**

estoppel, it is the DOJ who needs to be estopped from attempting to use the remedies from 2020 for enforcement of its specious viewpoint discrimination claim.

Fourth, DOJ cites to Directive 1010.00 – Use of Force.[8] This Directive clearly has no application to the justifications DOJ has provided for these information requests. It is the federal government, not PPB, who has repeatedly been accused of using excessive force during interactions with peaceful protesters at the Portland ICE facility, to include using excessive force against PPB officers as testified to by Commander Schoening in the case before Judge Immergut. DOJ has not asserted any concern that PPB has used excessive force, and this is again, an attempt to use the Agreement as a pretext to weaponize the Agreement for political retribution.

DOJ also argues that nothing limits the PPB policies covered by Paragraph 245. However, Paragraph 245 must be read within the context of its surrounding paragraphs. Paragraph 243 requires PPB to send to the Monitor and DOJ "new or revised policies or procedures regarding *use of force, interactions with persons in mental health crisis, and systems of accountability*" Paragraph 243 also requires PPB to post on the website for comment "final drafts of all new or revised policies that are proposed *specific to force, training, community-based mental health services, crisis intervention, employee information system, officer accountability, and community engagement*." Paragraph 244 requires the Chief's Office review of "each policy or procedure *required by this Agreement*." Paragraph 245's obligations must be read as following these three paragraphs, all clearly indicating that not all policies are covered by the Agreement. Further, the parties have more than a decade of course and conduct of performance interpreting this paragraph more narrowly, and DOJ has never reviewed and approved *all* PPB policies.

///

---

[8] Interestingly, DOJ provides explanations of how Directive 635.10 and 620.00 are purportedly relevant, but does not even bother to attempt to explain how Directive 1010.00 – Use of Force, might possibly apply, since it is the federal government, not PPB, who is using excessive force.

**Page 22- DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFF'S MOTION TO ENFORCE THE SETTLEMENT AGREEMENT**

**4.      The Specific Records Requested by DOJ Further Illustrate its Pretextual Nature and that it is Outside the Scope of the Agreement.**

The specific items that DOJ has requested, and the rationales they have provided, also plainly illustrate the pretextual nature of the information request, along with DOJ's attempt to expand the scope of the Agreement. For example, DOJ's argument as to the necessity for responsive information relating to zoning decisions by the City regarding the ICE facility is completely divorced from the Agreement. There is no straight-faced argument that DOJ can make that ties the City's zoning decisions to the Agreement. Moreover, Paragraph 245, the only paragraph that DOJ has invoked to justify this supposed enforcement, is specific to PPB's Directives. The Agreement separately references the "City" versus "PPB" when a paragraph applies more broadly versus more narrowly. Paragraph 245 references PPB Directives and therefore does not have broader application. PPB has no role in zoning enforcement; therefore, Paragraph 245 cannot be used as a basis to access the City's zoning enforcement records. Yet again, DOJ's attempt to warp the existing Agreement to serve its unrelated interests is plain to see.

When referencing its third point regarding request numbers 9, 20, and 21, DOJ suggests that it needs this data to assess whether PPB's "staffing decisions affected its capacity to uniformly apply its policies." Does DOJ now contend it has a say over the City's staffing decisions and PPB's assignments of work? This is far beyond the terms and purpose of the Agreement. It is the City's determination of where to deploy City resources; it is not DOJ's decision.

Finally, if DOJ wishes to expand the types of records to which they are entitled under the Agreement, they should seek amendment of the Agreement under Paragraph 247, not enforcement. *See Sealy Mattress Co. of Michigan v. Sealy, Inc.*, 789 F.2d 582, 586 (7th Cir. 1986). In reality, DOJ's document requests in this case appear to be an attempt to get a second

**Page 23- DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFF'S MOTION TO ENFORCE THE SETTLEMENT AGREEMENT**

bite at the apple of the discovery requests in Judge Immergut's case. That effort is an abuse of the Settlement Agreement and should be rejected by this Court.

**D.      DOJ has Unclean Hands.**

DOJ brings this proceeding under pretext, in bad faith, and with inequitable motivations. As such, the Court should deny the remedy that it seeks. *See Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.,* 324 U.S. 806, 814 (1945); *Johnson v. Yellow Cab Transit Co.*, 321 U.S. 383, 387 (1944).

As noted above, in its October 3 Letter, DOJ admitted this action is an expansion of the Agreement and outside its scope. Yet, DOJ now puts forth a hollow attempt to justify these requests under the existing Agreement, fully knowing that the Agreement is about excessive force, not viewpoint discrimination. DOJ's disingenuous effort to rebrand this expansion attempt as covered by the existing Agreement has tainted DOJ's hands.

This DOJ is the agency that dismissed all "Biden-Era" police investigations as well as the proposed police consent decrees in Louisville, Kentucky, where police killed Breonna Taylor, and Minneapolis, where a police officer murdered George Floyd.[9] The Civil Rights Division, under the leadership of AAG Dhillon, also announced it would close its investigations into, and would retract "the Biden administration's findings of constitutional violations" by police departments in: Phoenix, Ariz.; Trenton, N.J.; Memphis, Tenn.; Mount Vernon, N.Y.; Oklahoma City, Okla.; and the Louisiana State Police. *Id*.

In fact, in a May 21, 2025, news release, AAG Dhillon also made clear that President Trump's DOJ, in a striking about-face, would no longer pursue *any* constitutional policing reforms: "Overbroad police consent decrees divest local control of policing from communities

---

[9] U.S. Dept. of Justice Press Release No. 25-534, "The U.S. Department of Justice's Civil Rights Division Dismisses Biden-Era Police Investigations and Proposed Police Consent Decrees in Louisville and Minneapolis" (May 21, 2025) (available at https://www.justice.gov/opa/pr/us-department-justices-civil-rights-division-dismisses-biden-era-police-investigations-and, accessed December 5, 2025).

**Page 24- DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFF'S MOTION TO ENFORCE THE SETTLEMENT AGREEMENT**

where it belongs, turning that power over to unelected and unaccountable bureaucrats, often with an anti-police agenda," she wrote. "Today, we are ending the Biden Civil Rights Division's failed experiment of handcuffing local leaders and police departments with factually unjustified consent decrees."

Finally, in an astonishing post on X on Saturday, December 6, 2025, AAG Dhillon scornfully dismissed the very notion of police consent decrees, in a written comment stating, "Local and state law enforcement are cheering the end of these federal consent decrees. Letting them do their jobs without the Washington's micromanagement is long overdue—and the people on the ground know it best. This @TheJusticeDept has your back!" *Brown Decl.*, Ex. 7.d at 1; *see also Brown Decl.*, Ex. 7.e at 1, AAG Dhillon X Post & Video (Dec. 6, 2025) ("Less red tape, more safety."). Her post included a video where she expresses disdain for the very notion of alternate responses to those in mental health crisis:

> Trying to force a city to send social workers instead of cops when a mentally ill person creates a ruckus or threatens somebody? This is all nonsense. This is not how we should be making our laws in this country, from D.C., from a bunch of woke, liberal law school graduates sitting in offices having not confronted the facts on the ground. And so, whenever we're dismissing these types of cases, it's really met with a lot of relief and gratitude from local and state law enforcement.

*Brown Decl.*, Ex.7.d at 1.

Yet, DOJ now approaches the Court under the false pretense of seeking police accountability and reform. DOJ does not have a good faith concern that the City has engaged in a pattern or practice of viewpoint discrimination against journalists. The federal government is the one providing preferential treatment and access to journalists and influencers who share its viewpoints. The Court need only look to AAG Dhillon's many social media posts to see DOJ's true motivation. Indeed, this entire enforcement effort appears to have been started after the U.S.

**Page 25- DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFF'S MOTION TO ENFORCE THE SETTLEMENT AGREEMENT**

Attorney General had a phone call with a social media influencer with whom she is politically aligned. *Brown Decl.*, Ex. 1.a-1 at 1.

Instead of lauding the PPB for their successful management of the protests at the ICE facility with minimal force or escalation, or recognizing PPB's successful implementation of the Section XI remedies, [10] AAG Dhillon decries PPB's "woke cops," and "Portland's woke police practices." *Brown Decl.*, Ex. 1.d at 1, AAG Dhillon X Post (Oct. 3, 2025); *Brown Decl.*, Ex. 7.b. at 1, AAG Dhillon X Post & Video (Oct. 16, 2025). Just as the federal officer expressed to the PPB officers on October 20, the administration expects PPB to "engage or get out of the way." PPB refused to engage, and this administration now asks this Court to permit its perversion of the City of Portland's Agreement to score political points on social media to the detriment of the Portland community.

DOJ well knows that its use of indiscriminate force against protesters violates the Fourth Amendment and undermines PPB's successful implementation the goals of the Agreement. In DOJ's 5th Periodic Compliance Assessment Report, DOJ repeatedly criticized PPB for attributing the actions of a few in the crowd to the many. *See* ECF 236-1 at 8–9. In its 6th Periodic Compliance Assessment Report, DOJ continued to criticize PPB for "conflat[ing] the actions of the crowd generally with the individual justification required for each separate application of force." ECF 292-1 at 58. They further stated, "These indiscriminate uses of force could not meet the requirement of the Agreement … requiring individual justification for force." *Id.*

PPB has worked diligently during the ICE protests to protect all participants' First Amendment rights, to head off conflicts between protestors and counter-protestors, to maintain compliance with the law and to de-escalate events. *Brown Decl.,* Ex. 8, at 99:04-101:19. PPB's tactical decision making to avoid further escalation of the crowd was effective and is precisely the type of approach recommended by Independent Monitor LLC, the outside entity that

---

[10] DOJ falsely contends that there was a finding of a breach of the Agreement in 2021 (ECF 520 at 20). There was no such finding; rather, the Parties mutually agreed to amendments.

**Page 26- DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFF'S MOTION TO ENFORCE THE SETTLEMENT AGREEMENT**

critically assessed the City's response to crowd control events in 2020, as called for by Section XI's Paragraph 189. The federal government's excessive force directly and negatively impacted PPB's efforts to gain voluntary compliance from protest groups. [11] *Id.* at 101:18-19. The federal government's unclean hands in trying to undermine the successful implementation of the Agreement requirements does not comport with the principles of equity and prevents them from seeking relief in this forum. *See Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 847 (9th Cir. 1987).

Additional evidence of DOJ's unclean hands is its history of ignoring viewpoint discrimination allegations. Dating back to at least 2017, liberal groups have contended that PPB is colluding and working with "right-wing extremists" to "provide aid and support for their hate marches." *See Brown Decl.,* Ex. 15, Press Release, City of Portland, "Statement from Commissioner Jo Ann Hardesty regarding PPB texts with Patriot Prayer leader" (Feb. 14, 2019). At no time did DOJ suggest that they had the authority to investigate allegations of viewpoint discrimination, even at a time when they were both the monitor and plaintiff.

Yet now, DOJ is requesting training materials, suggesting that it will use them to investigate whether PPB is training its officers to treat conservative influencers differently than others. First, as discussed, it is the Monitor, and not DOJ, who assesses compliance with the training section of the Agreement. Even were that not true, DOJ already received training materials under Paragraph 246[12] and had the ability to comment to the Monitor. If DOJ had

---

[11] Commander Schoening explained:

> Lastly, I'll say that, you know, again, this is a little bit of crowd theory and things like that, but when protest crowds or any crowds experience what they perceive as illegitimate or unjust actions, including the use of force, that can change normative behavior and collective identity in a crowd, and so they become more resistant to exercises of authority, including by the Portland Police Bureau, to try and get compliance or de-escalate events.

*Brown Decl.,* Ex. 8, at 101:18-25.
[12] Paragraph 246 provides, "PPB shall send new or revised training curricula regarding use of

**Page 27- DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFF'S MOTION TO ENFORCE THE SETTLEMENT AGREEMENT**

concerns, they had ample time to raise them. Since they did not raise any concerns, it is clear their request is not made in good faith, but rather to fuel this administration's political conspiracy theories about the City.

This brash attempt by the Civil Rights Division to commandeer the Agreement under false pretenses and for its own political agenda cannot stand. If the Court grants DOJ's effort to redirect this Agreement for their nefarious efforts it will significantly frustrate the public interest in obtaining the durable remedies and reforms that are sought by the Agreement. The City implores this Court to use its discretion to prevent the United States' willful transgression of equitable standards and find that DOJ comes with unclean hands.

**E.      AAG Dhillon Should Attend the Status Conference in Person to Answer for the Conduct of the Federal Government in Portland.**

AAG Dhillon has publicly taken credit for driving the investigation and enforcement action. AAG Dhillon tweeted about Portland no less than seven times on October 3 alone, including announcing that she had spoken to Attorney General Pam Bondi about the Nick Sortor incident, and that "This is a high priority for @CivilRights." *Brown Decl.*, Ex. 1.b-1. If this is a high priority for the Civil Rights Division, as AAG Dhillon's social media posts claim, she should appear before this Court in person rather than just post on social media from Washington, D.C.

Meanwhile, AAG Dhillon has been silent about the unconstitutional and excessive force used by federal agents in Portland, and elsewhere in America. As the head of the Civil Rights Division, AAG Dhillon should answer for those Fourth Amendment constitutional violations and explain why they are ignored by the Civil Rights Division while it pursues this spurious and politically motivated enforcement action on behalf of social media influencers with whom AAG Dhillon is politically aligned.

---

force, interactions with persons in mental health crisis, and systems of accountability to the Monitor as they are promulgated, with a copy to DOJ."

**Page 28- DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFF'S MOTION TO ENFORCE THE SETTLEMENT AGREEMENT**

Finally, AAG Dhillon has expressed disdain for consent decrees while at the same time she seeks to misuse and abuse the Settlement Agreement in this case. This Court should demand answers from AAG Dhillon about whether the DOJ will "respect the Monitor's independence" (Paragraph 229) and ensure that the DOJ's political weaponization of our Settlement Agreement stops immediately.

## V.     CONCLUSION

For the foregoing reasons, the City asks the Court to deny the DOJ's Motion to Enforce the Settlement Agreement.

DATED: December 8, 2025              PORTLAND CITY ATTORNEY'S OFFICE

By: */s/ Heidi Brown*
    Robert Taylor, OSB No. 044287
    City Attorney
    Heidi Brown, OSB No. 922410
    Chief Deputy City Attorney
    Sarah Ames, OSB No. 163350
    Deputy City Attorney
    Lisa Rogers, OSB No. 176519
Of Attorneys for Defendant City of Portland

**Page 29- DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFF'S MOTION TO ENFORCE THE SETTLEMENT AGREEMENT**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 8, 2025, I served or caused to be served a true and correct copy of the foregoing **DEFENDANT CITY OF PORTLAND'S RESPONSE TO PLAINTIFF'S MOTION TO ENFORCE THE SETTLEMENT AGREEMENT** on the interested parties in this action as follows:

| | |
|---|---|
| **HARMEET K. DHILLON** <br> Assistant Attorney General <br> Civil Rights Division <br> **R. JONAS GEISSLER** <br> Deputy Assistant Attorney General <br> **PATRICK MCCARTHY** <br> Chief <br> **LAURA L. COWALL** <br> Deputy Chief <br> **JEFFREY R. MURRAY** <br> **CATHERINE YOON** <br> Trial Attorneys <br> Special Litigation Section <br> Civil Rights Division <br> United States Department of Justice <br> 950 Pennsylvania Avenue, N.W. <br> Washington, D.C. 20530 <br> Email: jonas.geissler@usdoj.gov <br> Email: jeff.murray@usdoj.gov <br> Email: catherine.yoon@usdoj.gov | Attorneys for Plaintiff, <br> United States |
| Mark P. Smith <br> Email: mark.p.smith@portlandpolicemonitor.com | Independent Court-Appointed Monitor |

☒     by **electronic service** via the Court's CM/ECF electronic filing system for registered users.

DATED: December 8, 2025          PORTLAND CITY ATTORNEY'S OFFICE

By: */s/ Heidi Brown*
Robert Taylor, OSB No. 044287
Heidi Brown, OSB No. 922410
Sarah Ames, OSB No. 163350
Lisa Rogers, OSB No. 176519
Of Attorneys for Defendant City of Portland

**Page 1- CERTIFICATE OF SERVICE**