**Juan C. Chavez**, OSB #136428
Email: jchavez@ojrc.info
PO Box 5748
Portland, OR 97208
Telephone: 503-944-2270 ext. 212
Facsimile: 971-275-1839

    Attorney for *Amicus* Mental Health Alliance

**J. Ashlee Albies**, OSB #051846
Email: ashlee@albiesstark.com
Albies & Stark, LLC
1500 SW First Ave., Suite 1000
Portland, OR 97201
Phone: 503-308-4770

**Rian Peck**, OSB #144012
Email: rian@visible.law
Visible Law LLC
333 SW Taylor Street, Suite 300
Portland, OR 97204
Phone: 503-773-0103

    Attorneys for Enhanced *Amicus* AMA Coalition for Justice and Police Reform

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>    Plaintiff,<br><br>vs.<br><br>CITY OF PORTLAND,<br><br>    Defendant. | Case No. 3:12-cv-02265-SI<br><br>JOINT *AMICUS* BRIEF IN OPPOSITION TO DISMISSAL OF SECTION V AND PARAGRAPHS 95 AND 96 |

JOINT *AMICUS* BRIEF IN OPPOSITION TO DISMISSAL
Page 1 of 13

COMES NOW, *enhanced-amicus* Albina Ministerial Alliance Coalition for Justice and Police Reform and *amicus* Mental Health Alliance provide this brief in response to the parties' joint motion to dismiss Section V and Paragraphs 95 and 96 of the Settlement Agreement. This Response is supported by the Declarations of Juan C. Chavez and Melissa Eckstein, MSSW, MBA, LCSW, President of Unity Center for Behavioral Health.

## INTRODUCTION

*Amicus* Mental Health Alliance ("MHA") formed because, as the Settlement Agreement acknowledges, "[t]he absence of a comprehensive community mental health infrastructure often shifts to law enforcement agencies throughout Oregon the burden of being first responders to individuals in mental health crisis." ECF 486, ¶ 88. Year after year, report after report, the parties have relied on the mistaken belief that Unity Behavioral Health Center is a walk-in/drop-off center and thus fulfills their obligations under Section V of the Settlement Agreement. MHA has consistently relayed to the Court that Unity is not a walk-in/drop-off center, a position Unity itself agrees with, and that any real, substantive engagement with the issue would show that the City has never complied with ¶ 88 and 89. The Court is now asked to determine whether the City fulfilled their obligation.

As the records would show, neither the Plaintiff nor the court monitors seriously considered whether the City did in fact comply with the mandate to support and coordinate with a drop-off/walk-in center as those definitions are commonly known and understood in the medical services field. While MHA greatly supports and acknowledges the role Unity does serve in the community as an emergency psychiatric hospital, it is not a walk-in/drop-off center. Until one such facility exists and is created in whole by the defendant under their own administration

or by proxy with the Coordinated Care Organizations, and the City supports and coordinates with it, the *Amici* must oppose dismissing Section V.

Additionally, as the *amici* have noted in the past, we have been dismayed that the BHUAC has remained closed to public participation since its inception. Because we have no transparency as to whether the BHUAC has "utilized the ABHU Advisory Committee's recommendations in determining appropriate changes to systems, policies, and staffing," ECF 486, ¶ 96, we cannot condone dismissing these paragraphs as well.

## FACTUAL BACKGROUND

### A. What Does the Agreement Say

After a comprehensive pattern and practices review of the Portland Police Bureau, the United States Department of Justice concluded that the City's police used too much force when encountering people in mental health crises. On the first page of its findings letter, the USDOJ wrote that "[o]ur findings take place against a backdrop of a mental health infrastructure that has a number of key deficiencies. The absence of a comprehensive community mental health infrastructure often shifts to law enforcement agencies throughout Oregon the burden of being first responders to individuals in mental health crisis." The United States filed suit on December 17, 2012, ECF 1 ("Complaint"), and immediately moved to enter into a settlement agreement with the Defendant City of Portland. ECF 3 ("Joint Motion to Settle").

In order to remedy this absence of infrastructure, the settlement agreement included provisions under the title of "Section V—Community-Based Mental Health Services." ECF 4-1, p. 32. This section provides the two paragraphs in question here. While there have been subsequent amendments to this settlement agreement, these paragraphs have remained static:

> 88. The absence of a comprehensive community mental health infrastructure often shifts to law enforcement agencies throughout

Oregon the burden of being first responders to individuals in mental health crisis. Under a separate agreement, the United States is working with State of Oregon officials in a constructive, collaborative manner to address the gaps in state mental health infrastructure. The state-wide implementation of an improved, effective community-based mental health infrastructure should benefit law enforcement agencies across the State, as well as people with mental illness. The United States acknowledges that this Agreement only legally binds the City to take action. Nonetheless, *in addition to the City*, the United States expects the City's partners to help remedy the lack of community-based addiction and mental health services to Medicaid clients and uninsured area residents. The City's partners in the provision of community-based addiction and mental health services include: the State of Oregon Health Authority, area Community Care Organizations ("CCOs"), Multnomah County, local hospitals, health insurance providers, commercial health providers, and existing Non-Governmental Organizations ("NGOs") such as community-based mental health providers, and other stakeholders.

89. ***The United States expects that the local CCOs will establish, by mid-2013, one or more drop-off center(s) for first responders and public walk-in centers for individuals with addictions and/or behavioral health service needs***. All such drop off/walk in centers should focus care plans on appropriate discharge and community-based treatment options, including assertive community treatment teams, rather than unnecessary hospitalization.

ECF 4-1, ¶¶ 88-89 (emphasis added).

B. **Court Monitoring on Section V**

MHA has done its best to collect and analyze the publicly available reports from the Compliance Office/Community Liaison ("COCL"). Unfortunately, and despite specific instructions to the defendant from this court to provide all documents associated with the COCL and PCCEP online, the COCL website (portlandcocl.com) that still operates has an incomplete report history. The other website that formerly housed information about the COCL (cocl-coab.org) only exists as an archived version on the "Wayback Machine." Links to reports often lead to no further information or documents.

From the documents that were available, MHA summarizes them as follows (emphasis added in bold):

| Report | Period Covered | Overall Rating | Key Findings & Notes |
|---|---|---|---|
| **Q1 2015** | Jan–Mar 2015 | **Not Formally Rated (Initial Impressions)** | First report; methodology being established. COCL described the **CCO drop-off center requirement and the City's role as a supporting partner, not a lead actor**. No compliance label issued; monitoring framework being developed. |
| **Q2 2015** | Apr–Jun 2015 | **Partial Compliance** | PPB participating in BHUAC and related workgroups. **Drop-off center expectations not yet fully met.** Gaps remained in CCO subcommittee development. |
| **Oct 2015 (Special Report)** | Special Report | **Partial Compliance** | Consistent with contemporaneous quarterly reports. City and PPB engaging with community partners; **Par. 88 still treated as a summative paragraph not yet fully assessable.** |
| **Q3 & Q4 2015** | Jul–Dec 2015 | **Partial Compliance** | Par. 88 rated "Not Yet Assessed" (summative paragraph). Par. 89 (drop-off center) and Par. 90 (improvements subcommittees) noted as works in progress. Recommended continued engagement with community partners. |
| **Q4 2019** | Oct–Dec 2019 | **Substantial Compliance** | City and PPB maintained committee participation (BHUAC, BHCT, etc.). **Unity Center functioning as the designated drop-off center consistent with the Memphis Model.** PPB participating in cross-agency AMR transport training. |
| **Q1 2020** | Jan–Mar 2020 | **Substantial Compliance** | PPB active in multiple behavioral health workgroups. COCL acknowledged inability to assess whether all Par. 90 goals were comprehensively met due to lack of non-party data, but found City/PPB contributions satisfactory. **Unity Center continuing as drop-off center.** |
| **Q2 2020** | Apr–Jun 2020 | **Substantial Compliance** | Consistent with surrounding reports. Committee engagement maintained; **Unity Center operational**; cross-agency collaboration with AMR ongoing. |

| Report | Period Covered | Overall Rating | Key Findings & Notes |
|---|---|---|---|
| **Q3 2020** | Jul–Sep 2020 | **Substantial Compliance** | Explicit finding of "substantial compliance with the entirety of Section V." BHUAC, BHCT, Unity Transportation Work Group, Oregon Behavioral Health Collaborative, and Legacy ED Outreach Group all active. **Unity Center conforms to Memphis Model.** |
| **Q3 2020 (Draft)** | Jul–Sep 2020 | **Substantial Compliance** | Draft version of Q3 2020 report. Same conclusions as the final Q3 2020 report; **Unity Center confirmed as functioning per Settlement Agreement intent**. |
| **Q4 2020** | Oct–Dec 2020 | **Substantial Compliance** | Same committee engagement sustained despite COVID and 2020 protest disruptions. **Unity Center operational**; AMR training ongoing. COCL acknowledged Par. 90 goals could not be comprehensively assessed due to non-party data limitations, but City/PPB actions found satisfactory. |
| **Q1 2021** | Jan–Mar 2021 | **Substantial Compliance** | Portland Street Response (PSR) pilot launched in Lents neighborhood — the first civilian alternative to police for certain mental health calls (Par. 90(d)). BOEC telecommunicators had not yet received full PSR training; COCL flagged data quality questions but found overall Section V compliance maintained. |
| **Q2 2021** | Apr–Jun 2021 | **Substantial Compliance** | PSR still in early stages; COCL noted PPB and BOEC need additional policies/training around PSR call types. **Unity Center and committee participation maintained**. COCL cautioned against blanket exclusion of police from mental health calls. |
| **Q3 2021** | Jul–Sep 2021 | **Substantial Compliance** | **Committee engagement and Unity Center functions maintained.** COCL continued to monitor PSR development. |
| **Q4 2021** | Oct–Dec 2021 | **Substantial Compliance** | PSU released a six-month evaluation of PSR: found capability to provide some relief but restricted call types. BOEC maintained PSR dispatch protocols reviewed by BHUAC. PSR beginning citywide expansion. COCL recommended formal BOEC training program for PSR. **Unity Center and AMR participation ongoing.** |

| Report | Period Covered | Overall Rating | Key Findings & Notes |
|---|---|---|---|
| Q1 2022 | Jan–Mar 2022 | Substantial Compliance | Substantial Compliance maintained for all Section V paragraphs. PSR operating citywide. Continued BHUAC, BHCT, and workgroup participation. BOEC PSR dispatch protocols and training in place. |
| Q2 2022 | Apr–Jun 2022 | Substantial Compliance | All Section V paragraphs in Substantial Compliance. PSR now fully citywide though COCL found potential capacity limitations. PSU evaluation recommended formal BOEC training program for PSR; PPB indicated such training planned for Q3 2022. |
| Q3 2022 | Jul–Sep 2022 | Substantial Compliance | All paragraphs in Substantial Compliance. BOEC maintained PSR dispatch protocols and telecommunicator training, both reviewed by BHUAC. **Unity Center continues in drop-off function per Memphis Model.** |
| Q4 2022 | Oct–Dec 2022 | Substantial Compliance | All three monitorable paragraphs (Par. 88, 89, 90) rated Substantial Compliance. BOEC PSR policy finalized internally, updated for new floater PSR unit. PPB participating in Transportation Workgroup. No recommendations for Section V paragraphs. |
| Q1 2023 | Jan–Mar 2023 | Substantial Compliance | All Section V paragraphs in Substantial Compliance. BOEC maintained PSR dispatch protocols reviewed by BHUAC. **Unity Center operational per Memphis Model. PPB continued AMR training.** |
| Q2 2023 | Apr–Jun 2023 | Substantial Compliance | All Section V paragraphs (Par. 88, 89, 90) in Substantial Compliance. COCL recommended continued data collection and review to update services. Noted BHUAC quorum concerns; recommended increasing membership or substituting representatives. |
| Q3 2023 | Jul–Sep 2023 | Substantial Compliance | All Section V paragraphs in Substantial Compliance. BOEC provided COCL with SOP 6.011 (Portland Street Response), formally defining PSR function and crisis criteria. BOEC also maintains ECIT dispatch criteria. **Unity Center and AMR participation ongoing.** |

| Report | Period Covered | Overall Rating | Key Findings & Notes |
|---|---|---|---|
| **Q4 2023** | Oct–Dec 2023 | **Substantial Compliance** | All three monitorable paragraphs in Substantial Compliance. BHUAC met twice during the quarter, discussing BHU data, ECIT in-service training, and Settlement Agreement updates. **Unity Center confirmed in drop-off role per Memphis Model.** PPB continued AMR training. |

The COCL refers to the "Memphis Model" in a number of its reports regarding Unity. This term is not used in the Settlement Agreement. "The Memphis Model" is a program developed in Memphis by Sam Cochran who managed the Memphis Police Department's Crisis Intervention Team in the early 1990s. Sometimes the Memphis Police Department's CIT linked with resources like training programs at the University of Memphis, but the name still refers to the model of how responders are trained and how the system works, not to qualities of a physical treatment facility.

After adoption of Section XII of the settlement agreement, the parties moved Section V into "self-monitoring." To date, only one City self-monitoring report exists online for Q3 to Q4 of 2024. On Paragraph 89, it reads as follows:

> "Name of Community Care drop-off/walk-in center: Unity
> Website active? Y (2/12/25)
> Phone confirmation of assessment period access? Y (2/12/25)
> Access for drop off/walk in services confirmed? Y"

*Exhibit 1*, Decl. of Juan C. Chavez.

In its two reports to the Court, the Court Monitor has assessed the City's self-monitoring for Section V as follows:

> "With regard to the Community Based Health Services discrete section of the Settlement Agreement, the Monitoring Team's evaluation of the City's compliance report found that the City is

>not expressly called on to satisfy any of the requirements included
>in the discrete section."

ECF 290-1, p. 81 (Q3-Q4 2024 Compliance Report); and ECF 526-1, p. 76 (Q1-Q2 2025 Compliance Report).

### C. What is the Unity Center for Behavioral Health

Since joining the case as an *amicus curiae*, at every status hearing, except for 2024, MHA has informed the parties and the Court that relying on the Unity Center to fulfill the role of a walk-in/drop-off center undermines progress under this agreement. ECF 203, pp. 6-7 (MHA Oct. 2019 Status Brief); ECF 217, pp. 10-11 (MHA Feb. 2020 Status Brief); ECF 247, p. 25 (MHA Aug. 2021 Status Brief); ECF 297, p. 14 (MHA July 2022 Status Brief); ECF 378, p. 7 (MHA Aug. 2023 Status Brief); and ECF 497, pp. 2-3 (MHA July 2025 Status Brief). MHA came to that conclusion based on years of experience in the field and consultation with the community partners, including Unity, that the City was obligated to coordinate with under ¶¶ 88 and 89.

Melissa L. Eckstein has served as President of the Unity Center for Behavioral Health since September 30, 2019. Decl. of Melissa L. Eckstein ("Eckstein Decl.") ¶ 1. Unity Center is a psychiatric hospital in Portland, Oregon, that provides acute care to people experiencing behavioral health crises, offering immediate triage and access to psychiatric emergency services and inpatient care for both adults and adolescents. Eckstein Decl., Ex. 1. In its first four years of operation, Unity Center received more than 43,000 visits from people seeking care. *Id.* It is Ms. Eckstein's understanding that the parties have represented to the Court and the court monitors that Unity is a drop-off/walk-in center as described by Paragraph 89 of the Settlement Agreement. Eckstein Decl. ¶ 3.

However, while Unity Center provides emergency psychiatric services, it is not a "walk-in" center as envisioned by the Settlement Agreement. Eckstein Decl. ¶ 4. Paragraph 89

contemplates that local CCOs would establish drop-off and walk-in centers for individuals with addictions and behavioral health service needs, focused on appropriate discharge, community-based treatment options, and assertive community treatment teams rather than unnecessary hospitalization. Eckstein Decl. ¶ 2. Unity Center, by contrast, is focused on providing acute-level psychiatric care and stabilization, not the community-based, sub-acute model described in the Agreement. Eckstein Decl., Ex. 1.

Ms. Eckstein's letter further identifies significant gaps in Portland's behavioral health infrastructure that the walk-in center model was intended to address. Many patients discharged from Unity Center no longer need acute care but would benefit from stepdown services that do not currently exist at sufficient scale in the community. Eckstein Decl., Ex. 1. The lack of stable housing, supported housing, mental health-focused shelter beds, and substance abuse treatment services makes it challenging for discharged patients to access follow-up care, increasing the likelihood they will return to Unity Center in crisis. *Id.* Greater availability of sub-acute services in the community would better serve the population contemplated by Paragraph 89 of the Settlement Agreement. *Id.*

### D. What is a Walk-In/Drop-Off Center?

In the past, MHA provided the Court a letter from Dr. Eisen, formerly of Cascadia Behavioral Health, describing what a walk-in/drop-off looks like. ECF 218, *Exhibit 2*. Dr. Eisen wrote:

> "An effective and efficient drop off/walk in service is designed to provide:
>
> • Client-centered, trauma-informed care that is based upon the urgent or emergent concern identified at the time of arrival to such location;
> • Resources for follow-up care and support in the community, including geographic proximity to a mental health shelter or other service that might immediately meet client needs;

> • Peer support- individuals with mental health and/or substance use disorder lived experiences who are trained to provide engagement and assistance - as well as access to mental health and substance use providers for matters of greater acuity and emergency; •
> • Culturally relevant and specific support and resources reflective of those that utilize the service;
> • Opportunities to address basic living needs at the time of visit, including such services as restrooms, showers, laundry, light meal/food, and phone chargers.
> • Diversion from emergency departments and the criminal justice system, including jails;
> • Support for police drop-off and individual or referred walk-in methods of arrival;
> • 24 hours per day, 7 days per week operations to meet the needs of the community at any time;
> • Access regardless of insurance or ability to pay, with a funding source not dependent upon Medicaid alone."

*Id*.

## ARGUMENT

The Parties have long told the *amici* that the provisions of Paragraphs 88 and 89 were aspirational rather than actionable. The *amici* disagree. Despite saying that performance on this settlement agreement item is not necessary, the City has also purported that it has performed under those paragraphs of the settlement agreement, and the Plaintiff and the COCL accepted performance on those items. They embraced the existence of the Unity Center as proof that their mission was accomplished.

The COCL graded the City on a single metric regarding these paragraphs: Is Unity operational? Following the adoption of the self-monitoring paragraphs, the City has also graded itself on that sole metric: Is Unity operational? The presumption in making this the assessment metric is that Unity meets the definition of a "walk-in/drop-off" center. It does not. The President of Unity agrees that it does not. *Eckstein Decl.*, ¶ 4. The description provided by Dr. Eisen shows

that it does not. ECF 218, *Exhibit 2*. But nevertheless, the Court is asked to assume that *it is* and to endorse that the items in paragraphs 88 and 89 are fulfilled.

Neither *amici* participated in the drafting and adoption of Section V of the Settlement Agreement. It is the Court's duty to protect the interests of the parties who were not allowed to participate. While not a consent decree in the classic sense, the Settlement Agreement nevertheless affects the public interest and third parties. This "imposes a heightened responsibility on the court to protect" interests of parties who were not present to negotiate settlement. *Davis v. City and County of San Francisco*, 890 F.2d 1438, 1444 n. 5 (9th Cir. 1989); *Collins v. Thompson*, 679 F.2d 168, 172 (9th Cir.1982). As in class action context under Fed. R. Civ. P. 23(e), the standard is fairness, adequacy, and reasonability. *U.S. v. State of Oregon*, 913 F.2d 576, 580 (9th Cir. 1990).

If there was ambiguity in the terms of the agreement as to how they can perform their contracted obligations, the parties have demonstrated that they understood Paragraphs 88 and 89 to mean that there must be, at least nominally, an existing walk-in/drop-off center. Both the COCL and the City of Portland concluded that Unity's existence is sufficient for performance under the agreement. The Plaintiff likewise has not initiated enforcement actions on these representations of compliance. The parties agree then that there is *some* responsibility on the part of the City to perform under these provisions. The language of Paragraph 88 supports this by first acknowledging that the City is bound by the agreement, then announcing an expectation that the City will work with its community partners on fixing the problem.

Given that neither Plaintiff nor Defendant have demonstrated that a walk-in/drop-off center exists and that the City collaborates with it, it would not be fair, adequate, or reasonable to dismiss Section V until they can adequately demonstrate so.

## CONCLUSION

The *amici* do not wish to prolong the life of this settlement agreement long past its ripeness. We understand that fulfilling the terms of the settlement agreement as ordered would and has already benefited the lives of Portlanders with mental illness. We strive and organize for that very future envisioned in the initial findings letter and the settlement agreement. But it would be fundamentally unfair, inadequate, and unreasonable to award the parties the satisfaction of accomplishing something they did not. As we have informed the parties countless times, we can be a partner on these issues, and point them in the right direction that would actually fulfill their obligations.

As we said before, "[t]he public demands and deserves durable solutions and long-term outcomes." ECF 420, p. 4. Section V is the last remaining provision in the Settlement Agreement that speaks to the needs of the mental health community, and the Portland Police Bureau's responsibility to it. If dismissed, the animating purpose of this agreement goes with it. We ask that the Court tell the parties to continue working on these issues until they have done what they are obligated to do.

DATED: February 26, 2026

Respectfully submitted,

/s/ *Juan C. Chavez*
Juan C. Chavez, OSB 136428
Oregon Justice Resource Center
Attorney for Mental Health Alliance

/s/ *J. Ashlee Albies*
J. Ashlee Albies, OSB 051846
Albies & Stark, LLC

/s/ *Rian Peck*
Rian Peck, OSB 144012
Visible Law LLC

Attorneys for AMA Coalition