## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................................................ 1

I.      GENERAL PROVISIONS ........................................................................................................................ 3

II.     DEFINITIONS ........................................................................................................................................... 5

III.    USE OF FORCE ...................................................................................................................................... 12

    A.  Use of Force Policy .................................................................................................................................. 12

        1.      Electronic Control Weapons ...................................................................................... 13

        2.      Use of Force Reporting Policy and Use of Force Report ................................... 13

        3.      Use of Force Supervisory Investigations and Reports ........................................ 14

    B.  Compliance Audits Related to Use of Force ....................................................................................... 16

IV.     TRAINING ................................................................................................................................................ 20

V.      COMMUNITY-BASED MENTAL HEALTH SERVICES ................................................................ 24

VI.     CRISIS INTERVENTION ..................................................................................................................... 26

    A.  Addictions and Behavioral Health Unit and Advisory Committee ................................................ 26

    B.  Continuation of C-I Program ................................................................................................................ 27

    C.  Establishing "Memphis Model" Crisis Intervention Team .............................................................. 27

    D.  Mobile Crisis Prevention Team ............................................................................................................ 28

    E.  Service Coordination Team .................................................................................................................... 28

    F.  BOEC ........................................................................................................................................................ 28

VII.    EMPLOYEE INFORMATION SYSTEM ........................................................................................... 28

VIII.   OFFICER ACCOUNTABILITY ........................................................................................................... 29

    A.  Investigation Timeframe ......................................................................................................................... 30

    B.  On Scene Public Safety Statements and Interviews .......................................................................... 31

    C.  Conduct of Investigations ..................................................................................................................... 32

    D.  CRC Appeals ............................................................................................................................................ 34

    E.  Discipline ................................................................................................................................................... 34

    F.  Communication with Complainant and Transparency ..................................................................... 35

IX.     COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY-ENGAGED POLICING ............................................................................................... 35

X.      AGREEMENT IMPLEMENTATION AND ENFORCEMENT .................................................... 37

    A.  Compliance Officer/Community Liaison ........................................................................................... 37

    B.  PPB Compliance Coordinator .............................................................................................................. 37

    C.  Access to People and Documents ........................................................................................................ 37

    D.  Review of Policies and Investigations ................................................................................................. 38

    E.  City Reports and Records ...................................................................................................................... 38

    F.  Enforcement ............................................................................................................................................. 38

XI.     ADDENDUM OF ADDITIONAL REMEDIES ................................................................................ 39

XII.    AGREEMENT IMPLEMENTATION AND ENFORCEMENT .................................................... 44

A. Implementation ........................................................................................................................... 44

B. Independent Monitor ................................................................................................................... 45

    1.      Selection, Term, Compensation, and Replacement............................................................ 45

    2.      Monitor's Duties ................................................................................................................. 50

          a.    Monitoring Plan.............................................................................................................. 50

          b.    Compliance Assessments .............................................................................................. 51

          c.    Outcome Measurements................................................................................................. 52

          d.    Recommendations .......................................................................................................... 55

          e.    Semi-Annual Monitor Reports ...................................................................................... 56

C. PPB Compliance Coordinator, City Reports, and Records ............................................................ 59

D. Access to People and Documents.................................................................................................. 60

E. Review of Policies, Trainings, and Investigations......................................................................... 62

F. Changes, Modifications, and Amendments ................................................................................... 63

G. Partial Termination, Self-Monitoring, and Final Termination...................................................... 64

    1.      Immediate Partial Termination........................................................................................... 66

    2.      Self-Monitoring Followed by Partial Termination ............................................................. 69

    3.      Final Termination................................................................................................................. 71

H. Enforcement.................................................................................................................................. 72

**ATTACHMENTS**

PARAGRAPH 142 – AMENDED PCCEP PLAN (ECF 215-1)............................................................ 76

PARAGRAPH 191 – ROLES AND RESPONSBILITIES .................................................................... 85

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

**UNITED STATES OF AMERICA**,

      Plaintiff,

    v.

**CITY OF PORTLAND**,

      Defendant.

Case No. 3:12-cv-02265-SI

AMENDED SETTLEMENT AGREEMENT PURSUANT TO FED. R. CIV. P. 41(a)(2)

## **INTRODUCTION**

The United States and the City of Portland ("City") (collectively "the Parties") recognize that the vast majority of the City's police officers are honorable law enforcement professionals who risk their physical safety and well-being for the public good. The Parties enter into this Agreement with the goal of ensuring that the Portland Police Bureau ("PPB") delivers police services to the people of Portland in a manner that effectively supports officer and public safety, and complies with the Constitution and laws of the United States. Specifically, this Agreement is targeted to strengthen initiatives already begun by PPB to ensure that encounters between police and persons with perceived or actual mental illness, or experiencing a mental health crisis, do not result in unnecessary or excessive force.

The Parties recognize there has been an accelerating movement toward a model of police management that relies on both existing and still-developing management and monitoring tools and systems. This model requires both vision and fiscal commitment, and is necessary to legitimate policing. The United States recognizes that PPB has endeavored to adopt components of modern management despite being a lean organization, and greatly appreciates the City's commitment, in this agreement, to provide PPB the fiscal support necessary to rapidly and fully implement

Page 1 —~~FURTHER~~ AMENDED SETTLEMENT AGREEMENT

complete state-of-the-art management and accountability system. The Parties further recognize that the ability of police officers to protect themselves and the community they serve is largely dependent on the quality of the relationship they have with that community.

Public and officer safety, constitutional policing, and the community's trust in its police force are, thus, interdependent. The full and sustained implementation of this Agreement is intended to protect the constitutional rights of all members of the community, continuously improve the safety and security of the people of Portland, keep PPB employees safe, and increase public confidence in PPB, all in a cost- effective, timely, and collaborative manner. The United States commends the City for the steps it already has taken to implement measures to effectuate these goals.

To fully achieve these goals, this Agreement requires the City and PPB to further revise or, where needed, adopt new policies, training, supervision, and practices in the following areas: the use of force, training, community-based mental health services, crisis intervention, employee information system, officer accountability, and community engagement.

This Agreement further requires that the City and PPB put in place more effective systems of oversight and self-correction that will identify and correct problems before they develop into patterns or practices of unconstitutional conduct and/or erode community trust.

This Agreement further identifies measures, to be met within fixed periods of time, that will assist the Parties and the community in determining whether: (1) the City has changed its procedures and taken the actions listed in this agreement; (2) community trust in PPB has increased; and (3) the improvements will be sustainable.

For these reasons, and noting the general principle that settlements are to be encouraged, particularly settlements between government entities, the Parties agree to implement this Agreement under the following terms and conditions.

Page 2 – FURTHER AMENDED SETTLEMENT AGREEMENT

## I.    GENERAL PROVISIONS

1.      The United States has filed a complaint in the Federal District Court for the District of Oregon in Portland, Oregon asserting that the City has engaged in a pattern and practice of constitutional violations pursuant to the authority granted to United States Department of Justice ("DOJ") under 42 U.S.C. § 14141 to seek declaratory or equitable relief to remedy a pattern or practice of conduct by law enforcement officers that deprives individuals of rights, privileges, or immunities secured by the Constitution or federal law. The City expressly denies that the allegations of the complaint are true.

2.      The Parties agree that nothing in this Agreement shall be construed as an admission of wrongdoing by the City or evidence of liability under any federal, state, or municipal law. Upon execution of this Agreement by both Parties, the United States agrees to conditionally dismiss the complaint it filed with prejudice, subject to the Court retaining jurisdiction to enforce the Agreement, followed by final dismissal with prejudice upon performance of this Agreement.

3.      This Agreement shall constitute the entire integrated agreement of the Parties. No prior drafts or prior or contemporaneous communications, oral or written, shall be relevant or admissible for purposes of determining the meaning of any provisions herein in any litigation or any other proceeding. If, in the course of interpreting this Agreement, there is an ambiguity that cannot be resolved by the Parties or in mediation, evidence including the Parties' course of dealing and parol evidence may be used.

4.      This Agreement is binding upon all Parties hereto, by and through their officials, agents, employees, and successors. If the City establishes or reorganizes a government agency or entity whose function includes overseeing, regulating, accrediting, investigating, or otherwise reviewing the operations of PPB or any aspect thereof, the City agrees to ensure these functions and

entities are consistent with the terms of this Agreement and shall incorporate the terms of this Agreement into the oversight, regulatory, accreditation, investigation, or review functions of the government agency or entity as necessary to ensure consistency.

5.      This Agreement is enforceable only by the Parties. No person or entity is, or is intended to be, a third-party beneficiary of the provisions of this Agreement for purposes of any civil, criminal, or administrative action, and accordingly, no person or entity may assert any claim or right as a beneficiary or protected class under this Agreement. The Parties agree to defend the terms of this Agreement should they be challenged in this or any other forum.

6.      This Agreement is not intended to impair or expand the right of any person or organization seeking relief against the City, PPB, or any officer or employee thereof, for their conduct or the conduct of PPB officers; accordingly, it does not alter legal standards governing any such claims by third parties, including those arising from city, state, or federal law. This Agreement does not expand, nor will it be construed to expand access to any City, PPB, or DOJ document, except as expressly provided by this Agreement, by persons or entities other than DOJ, the City, and PPB. All federal and state laws governing the confidentiality or public access to such documents are unaffected by the terms of this Agreement.

7.      The City shall be responsible for providing necessary support and resources to enable PPB to fulfill its obligations under this Agreement. The improvements outlined in this Agreement will require the dedication of additional funds and personnel.

8.      The purpose of this Agreement is to ensure that the City and PPB, by and through their officials, agents, employees, and successors, undertake the actions required by the Agreement, which in turn will resolve the concerns expressed by the United States in its complaint. The United States greatly appreciates the effort and expertise the current PPB leadership team has contributed to the investigation, agreement, and ongoing reform processes. The United States feels that continuity of management and effort is essential for timely compliance with the terms of this Agreement.

Page 4 – FURTHER AMENDED SETTLEMENT AGREEMENT

## II.    DEFINITIONS

Unless otherwise noted, the following terms and definitions shall apply to this Agreement:

9.    "Chief" means the Chief of Police of the Portland Police Bureau or his or her authorized designee.

10.    "City" means the City of Portland, including its agents, officers, and employees in their official capacity.

11.    "C-I-Team" stands for Crisis Intervention Team.

12.    "C-I-Training" stands for Crisis Intervention Training, which is training on how to respond to persons in behavioral or mental health crisis, including persons under the influence of drugs or alcohol. Officers who receive such training are "C-I- Trained."

13.    "City Auditor" is the City Auditor, whose duties regarding independent police oversight are governed by Portland City Code Chapter 3.21.

14.    "COCL" refers to the Compliance Officer Community Liaison, discussed in detail in Section X.

15.    "Complainant" means any person, including a PPB officer or employee, who makes a complaint against PPB or a sworn officer.

16.    "Complaint" means any complaint made to the City by a member of the public, a PPB officer, or a civilian PPB employee of alleged misconduct by a sworn PPB employee.

17.    Computer-Assisted Dispatch ("CAD") is a computerized method of dispatching police officers on a service call. It can also be used to send messages to the dispatcher and store and retrieve data (i.e., radio logs, field interviews, schedules, etc.). PPB Manual 612.00.

18.    "CRC" is the Citizen Review Committee, whose duties are governed by Portland City Code Section 3.21.080.

19.    "Critical firearm discharge" means each discharge of a firearm by a PPB officer. This term includes discharges at persons where no one is struck. This term is not intended to include

Page 5 – ~~FURTHER~~ AMENDED SETTLEMENT AGREEMENT

discharges at the range or in training or negligent discharges not intended as an application of force, which are still subject to administrative investigation.

20.     "Day" means a calendar day.

21.     "Demographic category" means to the extent such information is currently collected by PPB, age, race, color, ethnicity, national origin, religion, gender, disability, sexual orientation, source of income, or gender identity.

22.     "Discipline" means a personnel action for violation of an established law, regulation, rule, or PPB policy, including written reprimand, suspension, demotion, or dismissal.

23.     "DOJ" refers jointly to the Civil Rights Division of the United States Department of Justice and the United States Attorney's Office for the District of Oregon.

24.     "ECW" means Electronic Control Weapon, a weapon, including Tasers, designed primarily to discharge electrical charges into a subject that will cause involuntary muscle contractions and overrides the subject's voluntary motor responses.

25.     "ECW application" means the contact and delivery of electrical impulse to a subject with an ECW.

26.     "Effective Date" means the date this Agreement is entered by the Court.

27.     "EIS" means the Employee Information System as provided in PPB Manual 345.00.

28.     "Ensure" means that the City and PPB are using objectively good faith efforts to achieve the outcome desired.

29.     "Exigent circumstances" means circumstances in which a reasonable person would believe that imminent and serious bodily harm to a person or persons is about to occur.

30.     "Firearm" is any instrument capable of discharging ammunition as defined in PPB Manual 1020.00.

31.     "Force" means any physical coercion used to effect, influence or persuade an

Page 6 – ~~FURTHER~~ AMENDED SETTLEMENT AGREEMENT

individual to comply with an order from an officer. The term shall not include the ordinary handcuffing of an individual who does not resist.

32. "IA" means the Internal Affairs unit of PPB's Professional Standards Division ("PSD").

33. "Implement" or "implementation" means the development or putting into place of a policy or procedure, including the appropriate training of all relevant personnel, and the consistent and verified performance of that policy or procedure in actual practice through the regular use of audit tools.

34. "Including" means "including, but not limited to."

35. "Inspector" is a command position in the PSD responsible for reviewing all uses of force and making recommendations regarding improvements to systems of accountability in relation to force management.

36. "IPR" means the Independent Police Review Division, an independent, impartial office, readily available to the public, empowered to act on complaints against sworn PPB members for alleged misconduct, and recommend appropriate changes of PPB policies and procedures toward the goals of safeguarding the rights of persons and of promoting higher standards of competency, efficiency, and justice in the provision of community policing services, governed by Portland City Code Chapter 3.21.

37. "Less-lethal" force means a force application that is not intended or expected to cause death or serious injury and that is commonly understood to have less potential for causing death or serious injury than conventional, more lethal police tactics. Nonetheless, use of less-lethal force can result in death or serious injury.

38. "Lethal force" means any use of force likely to cause death or serious physical injury, including the use of a firearm, carotid neck hold, or strike to the head, neck, or throat with a hard object.

Page 7 – ~~FURTHER~~ AMENDED SETTLEMENT AGREEMENT

39.     "Line Investigation" or "Directive 940.00 Investigation" means the use of force investigation conducted pursuant to PPB Directive 940.00.

40.     "Mental Health Crisis" means an incident in which someone with an actual or perceived mental illness is experiencing intense feelings of personal distress (e.g., anxiety, depression, anger, fear, panic, hopelessness), obvious changes in functioning (e.g., neglect of personal hygiene, unusual behavior) and/or catastrophic life events (e.g., disruptions in personal relationships, support systems or living arrangements; loss of autonomy or parental rights; victimization or natural disasters), which may, but not necessarily, result in an upward trajectory of intensity culminating in thoughts or acts that are dangerous to self and/or others.

41.     "Mental Illness" is a medical condition that disrupts an individual's thinking, perception, mood, and/or ability to relate to others such that daily functioning and coping with the ordinary demands of life are diminished. Mental illness includes, but is not limited to, serious mental illnesses such as major depression, schizophrenia, bipolar disorder, obsessive compulsive disorder ("OCD"), panic disorder, posttraumatic stress disorder ("PTSD"), and borderline personality disorder. Mental illness includes individuals with dual diagnosis of mental illness and another condition, such as drug and/or alcohol addiction.

42.     "Misconduct" means conduct by a sworn officer that violates PPB regulations or orders, or other standards of conduct required of City employees.

43.     "Misconduct complaint" means any allegation of improper conduct by a sworn officer, whether the complaint alleges corruption or other criminal misconduct; a violation of law; or a violation of PPB policy, procedure, regulations, orders, or other standards of conduct required of City employees including, but not limited to, the improper use of force. This definition is not intended to create a right of appeal to the CRC for lethal force or in-custody death cases.

44.     "Mobile Crisis Prevention Team" (formerly Mobile Crisis Unit) means the team of a PPB patrol officer and mental health case worker who are specifically detailed to conduct outreach

Page 8 – ~~FURTHER~~ AMENDED SETTLEMENT AGREEMENT

and response to persons with known mental illness or experiencing an actual or perceived mental health crisis, with the goal of intervening with individuals before a crisis exists and to link the individual with community mental health services.

45.    "Non-disciplinary corrective action" refers to action other than discipline taken by a PPB supervisor to enable or encourage an officer to improve his or her performance.

46.    "Passive resistance" means non-compliance with officer commands that is non-violent and does not pose an immediate threat to the officer or the public.

47.    "Personnel" means PPB officers and employees.

48.    "Police officer" or "officer" means any law enforcement agent employed by or volunteering for PPB, including supervisors, reserve officers, and cadets.

49.    Police Review Board ("PRB") is an advisory body to the Chief governed by Portland City Code § 3.20.140. The PRB makes recommendations as to findings and proposed officer discipline to the Chief.

50.    "Policies and procedures" means regulations or directives, regardless of the name, describing the duties, functions, and obligations of PPB officers and/or employees, and providing specific direction in how to fulfill those duties, functions, or obligations.

51.    "PPB Manual" refers to PPB's Policy and Procedure Manual, revised January 2009, and includes the most current edition and supplements thereto.

52.    "PPB unit" or "unit" means any designated organization of officers within PPB, including precincts and specialized units.

53.    Portland Police Data System ("PPDS") is PPB's records management system that integrates officers' access to other agency systems such as LEDS, NCIC/III, DMV, DA-Crimes, ESWIS and OJIN. *See, e.g.*, PPB Manual 1226.00.

54.    "Precinct" refers to one of the service areas of PPB, which together cover the entire

Page 9 – ~~FURTHER~~ AMENDED SETTLEMENT AGREEMENT

geographic area of the City of Portland. Each precinct is led by a precinct commander.

55. "Probable cause" means that there is a substantial objective basis for believing that, more likely than not, an offense has been committed and a person to be arrested has committed it.

56. "PSD" means the Professional Standards Division, the PPB unit charged with, among other tasks, conducting or overseeing all internal and administrative investigations of PPB officers, agents, and employees arising from complaints, whose current duties are governed by PPB Manual 330.00.

57. "Qualified Mental Health Professional" means an individual who has, at a minimum, a masters-level education and training in psychiatry, psychology, counseling, social work, or psychiatric nursing, and is currently licensed by the State of Oregon to deliver those mental health services he or she has undertaken to provide.

58. "Serious Use of Force" means: (1) all uses of force by a PPB officer that reasonably appear to create or do create a substantial risk of death, serious disfigurement, disability, or impairment of the functioning of any body part or organ; (2) all critical firearm discharges by a PPB officer; (3) all uses of force by a PPB officer resulting in a significant injury, including a broken bone, an injury requiring hospitalization, or an injury deemed to be serious by an officer's supervisor; (4) all head, neck, and throat strikes with an object or carotid neck holds; (5) force used upon juveniles known or reasonably assumed to be under 15 and females known or reasonably assumed to be pregnant; (6) all uses of force by a PPB officer resulting in a loss of consciousness; (7) more than two applications of an ECW on an individual during a single interaction, regardless of the mode or duration of the application, regardless of whether the applications are by the same or different officers, and regardless of whether the ECW application is longer than 15 seconds, whether continuous or consecutive; (8) any strike, blow, kick, ECW application, or similar use of force against a handcuffed, otherwise restrained, under control, or in custody subject with or without injury; and (9) any use of force referred by an officer's supervisor to IA that IA deems

Page 10 – ~~FURTHER~~ AMENDED SETTLEMENT AGREEMENT

serious.

59.     "Shall" means a mandatory duty.

60.     "Supervisor" means a sworn PPB employee at the rank of sergeant or above (or anyone acting in those capacities) and non-sworn personnel with oversight responsibility for other officers.

61.     "Supported by evidence" means the standard of proof applied in CRC appeals pursuant to Portland City Code Section 3.21.160. A finding regarding a complaint is "supported by the evidence" when a reasonable person could make the finding regarding a complaint in light of the evidence, whether or not the reviewing body agrees with the finding. The CRC decides whether the recommended finding is supported by the evidence using a reasonable person standard, that is, the CRC decides whether City decision makers could have reached the conclusion they reached based on the evidence developed by the investigation.

62.     "Training" means any adult-learning methods that incorporate role- playing scenarios and interactive exercises that instruct officers about how to exercise their discretion at an administrative level, as well as traditional lecture formats. Training also includes testing and/or writings that indicate that the officer comprehends the material taught.

63.     "Use of Force" means any physical coercion used to effect, influence, or persuade an individual to comply with an order from an officer, above unresisted handcuffing, including actively pointing a firearm at a person.

64.     "Use of force that could result in criminal charges" means that use of force that a reasonable and trained supervisor could conclude would result in criminal charges due to the apparent circumstances, such as: (a) the level of force used as compared to the offense committed or resistance encountered; (b) material discrepancies between the force actually used and the use of force as described by the officer; or (c) the nature of the injuries.

Page 11 – ~~FURTHER~~ AMENDED SETTLEMENT AGREEMENT

65.    "Welfare Check" means a response by PPB to a call for service that is unrelated to an allegation of criminal conduct, but is instead to determine whether a person requires assistance for a medical or mental health crisis.

### III.    <u>USE OF FORCE</u>

PPB shall revise its existing use of force policy and force reporting requirements to ensure that all force, particularly force involving persons with actual or perceived mental illness: (a) is used only in accordance with the Constitution and laws of the United States; (b) is no greater than necessary to accomplish a lawful objective; (c) is properly documented, reported, and accounted for; and (d) is properly investigated, reviewed, evaluated, and, if necessary, remedied. PPB shall attempt to avoid or minimize the use of force against individuals in perceived behavioral or mental health crisis, or those with mental illness and direct such individuals to the appropriate services where possible. In addition, PPB shall ensure that officers use non-force and verbal techniques to effect compliance with police orders whenever feasible, especially in the course of conducting welfare checks or effecting arrests for minor offenses or for persons whom officers have reason to believe are experiencing a mental health crisis; de-escalate the use of force at the earliest possible moment; only resort to those use of force weapons, including less-lethal weapons, as necessary; and refrain from the use of force against individuals who are already under control by officers, or who may express verbal discontent with officers but do not otherwise pose a threat to officers or others, or impede a valid law enforcement function. To achieve these outcomes, PPB shall implement the requirements set out below.

### A.    Use of Force Policy

66.    PPB shall maintain the following principles in its existing use of force policies:

    a.    PPB shall use only the force reasonably necessary under the totality of circumstances to lawfully perform its duties and to resolve confrontations

effectively and safely; and

b.      PPB expects officers to develop and display, over the course of their practice of law enforcement, the skills and abilities that allow them to regularly resolve confrontations without resorting to force or the least amount of

c.      appropriate force.

67.     PPB shall add to its use of force policy and procedures the following use of force principles:

a.      Officers shall use disengagement and de-escalation techniques, when possible, and/or call in specialized units when practical, in order to reduce the need for force and increase officer and civilian safety;

b.      In determining whether to use force, officers will take into account all information, when feasible, including behavior, reports, and known history as conveyed to or learned by the officer by any means, indicating that a person has, or is perceived to have, mental illness;

c.      The use of force shall be de-escalated as resistance decreases and the amount of force used, including the number of officers who use force, shall de-escalate to a level reasonably calculated to maintain control with the least amount of appropriate force; and

d.      Objectively unreasonable uses of force shall result in corrective action and/or discipline, up to and including termination.

## 1.    Electronic Control Weapons

68.     [Terminated, ECF 401]

## 2.    Use of Force Reporting Policy and Use of Force Report

69.     PPB shall revise its policies related to use of force reporting, as necessary, to require

Page 13 – ~~FURTHER~~ AMENDED SETTLEMENT AGREEMENT

that:

    a.    All PPB officers that use force, including supervisory officers, draft timely use of force reports that include sufficient information to facilitate a thorough review of the incident in question by supervisory officers; and

    b.    All officers involved or witnesses to a use of force provide a full and candid account to supervisors.

    c.    In case of an officer involved shooting resulting in death, use of lethal force, or an in-custody death, PPB will fulfill its reporting and review requirements as specified in directive 1010.10, as revised. This will take place of Directive 940.00 reports for purposes of paragraphs 70, and 72-77 of this Agreement.

**3.     Use of Force Supervisory Investigations and Reports**

70.     PPB shall continue enforcement of Directive 940.00, which requires supervisors who receive notification of a force event to respond to the scene, conduct an administrative review and investigation of the use of force, document their findings in an After Action Report and forward their report through the chain of command. PPB shall revise Directive 940.00 to further require that supervisory officers:

    a.    Complete After Action Reports within 72 hours of the force event;

    b.    Immediately notify his or her shift supervisor and PSD regarding all officer's Serious Use of Force, any Use of Force against persons who have actual or perceived mental illness, or any suspected misconduct. Where the supervisor suspects possible criminal conduct, the supervisor shall notify the PPB Detective Division. Where there is no misconduct, supervisors also shall determine whether additional training or counseling is warranted. PPB shall then provide such counseling or training consistent with this Agreement;

    c.     Where necessary, ensure that the subject receives medical attention from an appropriate medical provider; and

    d.     Interview officers individually and not in groups.

71.     [Terminated, ECF 401]

72.     PPB shall develop a supervisor investigation checklist to ensure that supervisors carry out these force investigation responsibilities. PPB shall review and revise the adequacy of this checklist regularly, at least annually.

73.     PPB shall revise its policies concerning chain of command reviews of After Action Reports, as necessary, to require that:

    a.     EIS tracks all Directive 940.00 material findings and corrections;

    b.     All supervisors in the chain of command are subject to and receive corrective action or discipline for the accuracy and completeness of After Action Reports completed by supervisors under their command;

    c.     All supervisors in the chain of command are accountable for inadequate reports and analysis;

    d.     A supervisor receives the appropriate corrective action, including training, demotion, and/or removal from a supervisory position when he or she repeatedly conducts deficient investigations. Where a shift commander, or precinct commander, repeatedly permits deficient investigations, the shift commander, or precinct commander, receives the appropriate corrective action, including training, demotion, and/or removal from a supervisory position;

    e.     When, after investigation, a use of force is found to be out of policy, PPB shall take appropriate corrective action consistent with the Accountability provisions of this Agreement;

Page 15 – ~~FURTHER~~ AMENDED SETTLEMENT AGREEMENT

  f.  Where the use of force indicates policy, training, tactical, or equipment concerns, the immediate supervisor shall notify the Inspector and the Chief, who shall ensure that PPB timely conducts necessary training and that PPB timely resolves policy, tactical, or equipment concerns; and

  g.  The Chief or designee, as well as PSD, has discretion to re- assign a use of force investigation to the Detective Division or any PPB supervisor.

**B. Compliance Audits Related to Use of Force**

74. In consultation with the COCL, the Inspector, as part of PPB's quarterly review of force, will audit force reports and Directive 940.00 Investigation Reports to ensure that:

  a.  With respect to use of force generally:

    i. reports describe the mental health information available to officers and the role of that information in their decision making;

    ii. officers do not use force against people who engage in passive resistance that does not impede a lawful objective;

    iii. when resistance decreases, officers de-escalate to a level reasonably calculated to maintain control with the least amount of appropriate force;

    iv. officers call in specialty units in accordance with procedure;

    v. officers routinely procure medical care at the earliest available opportunity when a subject is injured during a force event; and

    vi. officers consistently choose options reasonably calculated to establish or maintain control with the least amount of appropriate force.

  b.  With respect to ECW usages:

    i. ECW deployment data and Directive 940.00 reports are consistent, as determined by random and directed audits. Discrepancies within the

Page 16 – ~~FURTHER~~ AMENDED SETTLEMENT AGREEMENT

audit should be appropriately investigated and addressed;

    ii.  officers evaluate the reasonableness and need for each ECW cycle and justify each cycle; when this standard is not met, this agreement requires supervisor correction;

    iii.  officers are universally diligent in attempting to use hands-on control when practical during ECW cycles rather than waiting for compliance; and

    iv.  officers do not attempt to use ECW to achieve pain compliance against subjects who are unable to respond rationally unless doing so is reasonably calculated to prevent the use of a higher level of force.

c.    With respect to use of force reporting, the reports:

    i.  are completed as soon as possible after the force incident occurs, but no later than the timeframes required in policy;

    ii.  include a detailed description of the unique characteristics of the event, using common everyday language, sufficient to allow supervisors to accurately evaluate the quality of the officer's decision making and performance;

    iii.  include a decision point description of the force decision making;

    iv.  include a detailed description of the force used, to include descriptive information regarding the use of any weapon;

    v.  include a description of any apparent injury to the suspect, any complaint of injury, or the absence of injury (including information regarding any medical aid or on-scene medical evaluation provided);

    vi.  include the reason for the initial police presence;

    vii.  include a description of the level of resistance encountered by each officer

Page 17 – ~~FURTHER~~ AMENDED SETTLEMENT AGREEMENT

that led to each separate use of force and, if applicable, injury;

viii.  include a description of why de-escalation techniques were not used or whether they were effective;

ix.  include whether the individual was known by the officer to be mentally ill or in mental health crisis;

x.  include a general description of force an officer observes another officer apply; and

xi.  demonstrate that officers consistently make diligent efforts to document witness observations and explain when circumstances prevent them from identifying witnesses or obtaining contact information. Reports will include all available identifying information for anyone who refuses to provide a statement.

75.     In consultation with the COCL, the Inspector shall audit force reports and Directive 940.00 investigations to determine whether supervisors consistently:

a.    Complete a Supervisor's After Action Report within 72 hours of notification;

b.    Review all use of force reports to ensure they include the information required by this Agreement and PPB policy;

c.    Evaluate the weight of the evidence;

d.    Use a "decision-point" approach to analyze each use of force;

e.    Determine whether the officer's actions appear consistent with PPB policy, this Agreement, and best practices;

f.    Determine whether there was legal justification for the original stop and/or detention;

g.    Assess the incident for tactical and training implications, including whether the use of force may have been avoided through the use of de-escalation

Page 18 – ~~FURTHER~~ AMENDED SETTLEMENT AGREEMENT

techniques or lesser force options;

 h. Determine whether additional training or counseling is warranted;

 i. Implement corrective action whenever there are material omissions or inaccuracies in the officers' use of force report, and for failing to report a use of force, whether applied or observed;

 j. Document any non-disciplinary corrective action to remedy training deficiencies, policy deficiencies, or poor tactical decisions in EIS;

 k. Notify PSD and the shift supervisor of every incident involving an officer's Serious Use of Force, and any Use of Force that could appear to a reasonable supervisor to constitute misconduct; and

 l. Notify the Detective Division and shift supervisor of every force incident in which it could reasonably appear to a supervisor that an officer engaged in criminal conduct.

76. In consultation with the COCL, the Inspector shall conduct a quarterly analysis of force data and supervisors' Directive 940.00 reports designed to:

 a. Determine if significant trends exist;

 b. Determine if there is variation in force practice away from PPB policy in any unit;

 c. Determine if any officer, PPB unit, or group of officers is using force differently or at a different rate than others, determine the reason for any difference and correct or duplicate elsewhere, as appropriate;

 d. Identify and correct deficiencies revealed by the analysis; and

 e. Document the Inspector's findings in an annual public report.

77. In consultation with the COCL, the Inspector shall audit the adequacy of chain of command reviews of After Action Reports using the following performance standards to ensure that

Page 19 – ~~FURTHER~~ AMENDED SETTLEMENT AGREEMENT

all supervisors in the chain of command:

     a.     Review Directive 940.00 findings using a preponderance of the evidence standard;

     b.     Review Directive 940.00 reports to ensure completeness and order additional investigation, when necessary;

     c.     Modify findings as appropriate and document modifications;

     d.     Order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improve the reliability or credibility of the findings and counsel the investigator;

     e.     Document any training deficiencies, policy deficiencies, or poor tactical decisions, ensure a supervisor discusses poor tactical decisions with the officer and ensure the discussion is documented in EIS;

     f.     Suspend an investigation immediately and notify the branch Assistant Chief, the Director of PSD, and the Detectives Division whenever the investigating supervisor, shift commander or Division commander finds evidence of apparent criminal conduct by a PPB officer; and

     g.     Reports a matter to PSD for review and investigation whenever an investigating supervisor, shift commander or precinct commander finds evidence of apparent misconduct by a PPB officer or employee.

## IV.    TRAINING

78.    All aspects of PPB training shall reflect and instill agency expectations that officers are committed to the constitutional rights of the individuals who have or are perceived to have mental illness whom they encounter, and employ strategies to build community partnerships to effectively increase public trust and safety. To achieve these outcomes, PPB shall implement the requirements below.

Page 20 – ~~FURTHER~~ AMENDED SETTLEMENT AGREEMENT

79.      The Training Division shall review and update PPB's training plan annually. To inform these revisions, the Training Division shall conduct a needs assessment and modify this assessment annually, taking into consideration: (a) trends in hazards officers are encountering in performing their duties; (b) analysis of officer safety issues; (c) misconduct complaints; (d) problematic uses of force; (e) input from members at all levels of PPB; (f) input from the community; (g) concerns reflected in court decisions; (h) research reflecting best practices; (i) the latest in law enforcement trends; (j) individual precinct needs; and (k) any changes to Oregon or federal law or PPB policy.

80.      [Terminated, ECF 401]

81.      PPB shall ensure that the Training Division is electronically tracking, maintaining, and reporting complete and accurate records of current curricula, lesson plans, training delivered, attendance records, and other training materials in a central, commonly accessible, and organized file system. Each officer's immediate supervisor shall review the database for the officers under his/her command at least semi-annually.

82.      [Terminated, ECF 401]

83.      [Terminated, ECF 401]

84.      All training that PPB provides shall conform to PPB's current policies at the time of training. PPB shall train all officers on the Agreement's requirements during the next in-service training scheduled.

    a.      With respect to patrol officers, PPB shall:

      i. increase the use of role-playing scenarios and interactive exercises that illustrate proper use of force decision making, specifically including interactions with people who have or are perceived to have mental illness, including training officers on the importance and impact of ethical decision making and peer intervention;

Page 21 – ~~FURTHER~~ AMENDED SETTLEMENT AGREEMENT

ii.  emphasize the use of integrated de-escalation techniques, when appropriate, that encourage officers to make arrests without using force;

iii.  continue to provide training regarding an officer's duty to procure medical care whenever a subject is injured during a force event, and enhance and revise training as necessary to ensure that PPB's training in this regard is proactive and responsive to deficiencies identified by the Inspector, if any;

iv.  continue to train on proactive problem solving and to utilize, when appropriate, disengagement, area containment, surveillance, waiting out a subject, summoning reinforcements, requesting specialized units, including CIT officers and mental health professionals, or delaying arrest;

v.  describe situations in which a force event could lead to potential civil or criminal liability; and

vi.  continue to train officers to avoid using profanity, prohibit using derogatory/demeaning labels, and also avoiding terms not currently appropriate for person-center communication, such as the term "mentals," in all work-related settings and communications, as well as when interacting with the public.

b.    With respect to supervisors, provide additional training on how to:

i.  conduct use of force investigations, including the supervisory investigatory responsibilities identified in Section III.A.3;

ii.  evaluate officer performance as part of PPB's annual performance evaluation system; and

iii.  foster positive career development and impose appropriate disciplinary sanctions and non-disciplinary corrective action.

Page 22 – ~~FURTHER~~ AMENDED SETTLEMENT AGREEMENT

85.    In consultation with the COCL, the Inspector shall audit the training program using the following performance standards to ensure that PPB does the following:

a.    Conducts a comprehensive needs assessment annually;

b.    Creates a Training Strategic Plan annually;

c.    Within 180 days of the Effective Date, develops and implements a process for evaluation of the effectiveness of training;

d.    Maintains accurate records of Training delivered, including substance and attendance;

e.    Makes Training Records accessible to the Director of Services, Assistant Chief of Operations, and DOJ;

f.    Trains Officers, Supervisors, and Commanders on areas specific to their responsibilities; and

g.    Ensures that sworn PPB members are provided a copy of all PPB directives and policies issued pursuant to this Agreement, and sign a statement acknowledging that they have received, read, and had an opportunity to ask questions about the directives and/or policies, within 30 days of the release of the policy.

86.    In consultation with the COCL, the Inspector shall gather and present data and analysis on a quarterly basis regarding patterns and trends in officers' uses of force to the Chief, the PPB Training Division, and to the Training Advisory Council. The Training Division and Training Advisory Council shall make written recommendations to the Chief regarding proposed changes in policy, training, and/or evaluations based on the data presented. The Inspector shall also, in coordination with the COCL and PSD, identify problematic use of force patterns and training deficiencies. The Chief's Office shall assess all use of force patterns identified by the Training Division and/or Training Advisory Council and timely implement necessary remedial training to

Page 23 – ~~FURTHER~~ AMENDED SETTLEMENT AGREEMENT

address deficiencies so identified.

87.     [Terminated, ECF 401]

## V.    COMMUNITY-BASED MENTAL HEALTH SERVICES

88.     [Terminated, ECF 548] The absence of a comprehensive community mental health infrastructure often shifts to law enforcement agencies throughout Oregon the burden of being first responders to individuals in mental health crisis. Under a separate agreement, the United States is working with State of Oregon officials in a constructive, collaborative manner to address the gaps in state mental health infrastructure. The state-wide implementation of an improved, effective community- based mental health infrastructure should benefit law enforcement agencies across the State, as well as people with mental illness. The United States acknowledges that this Agreement only legally binds the City to take action. Nonetheless, in addition to the City, the United States expects the City's partners to help remedy the lack of community-based addiction and mental health services to Medicaid clients and uninsured area residents. The City's partners in the provision of community- based addiction and mental health services include: the State of Oregon Health Authority, area Community Care Organizations ("CCOs"), Multnomah County, local hospitals, health insurance providers, commercial health providers, and existing Non-Governmental Organizations ("NGOs") such as community-based mental health providers, and other stakeholders.

89.     [Terminated, ECF 548] The United States expects that the local CCOs will establish, by mid-2013, one or more drop-off center(s) for first responders and public walk-in centers for individuals with addictions and/or behavioral health service needs. All such drop off/walk in centers should focus care plans on appropriate discharge and community- based treatment options, including assertive community treatment teams, rather than unnecessary hospitalization.

90.     [Terminated, ECF 548] The CCOs will immediately create addictions and mental

Page 24 – FURTHER AMENDED SETTLEMENT AGREEMENT

health- focused subcommittee(s), which will include representatives from PPB's Addictions and Behavioral Health Unit ("ABHU"), the ABHU Advisory Board, Portland Fire and Rescue, Bureau of Emergency Communications ("BOEC") and other City staff. These committees will pursue immediate and long-term improvements to the behavioral health care system. Initial improvements include:

a.    Increased sharing of information, subject to lawful disclosure, between agencies and organizations including BOEC, Multnomah County, and health care providers to create an information exchange among first responders and providers to better serve those suffering from mental illness;

b.    Creation of rapid-access clinics so those in crisis have access to timely medication management appointments;

c.    Enhancing access to primary care providers to shift low-to- moderate acuity patients to primary care programs creating more capacity for acute patients in existing outpatient crisis mental health systems;

d.    Expanding the options and available capacity for BOEC Operators to appropriately divert calls to qualified civilian mental health providers as first responders;

e.    Addressing issues of unmet needs identified by Safer PDX and its community partners;

f.    Expanding and strengthening networks of Peer-Mediated services to:

i.    develop a referral guide delineating these services and locations and assist with accessing information;

ii.   better educate the community of the viability of these services as alternative first engagement sites/programs for those having difficulty engaging with "professional driven" services;

Page 25 – FURTHER AMENDED SETTLEMENT AGREEMENT

iii. ~~expand peer services connected to peer supports in the community for inpatient psychiatric units (including Emergency Departments) and in the community;~~

iv. ~~add peer guides to work alongside Emergency Department guides for those patients with behavioral health issues entering the Emergency Department; and~~

v. ~~evaluate opportunities to expand use of peers to coordinate with PPB ABHU (as described herein) and function as a link with impacted individuals; and~~

g. ~~pursue tele-psychiatry (a provision of mental health care by video conferencing) as a way for first responders to take advantage of existing IT infrastructure to provide direct care or provider-evaluation supporting the provision of appropriate services to an individual in crisis.~~

## VI.    CRISIS INTERVENTION

The City acknowledges that the community of consumers of mental health services, and their families and advocates, have an interest in interactions between PPB and people experiencing mental health symptoms or crises. The PPB will add new capacity and expertise to deal with persons perceived or actually suffering from mental illness, or experiencing a mental health crisis as required by this Agreement. Despite the critical gaps in the state and local mental health system, the City and PPB must be equipped to interact with people in mental health crisis without resorting to unnecessary or excessive force.

### A.    Addictions and Behavioral Health Unit and Advisory Committee

91.    [Terminated, ECF 401]

92.    [Terminated, ECF 401]

93.    [Terminated, ECF 401]

Page 26 – ~~FURTHER~~ AMENDED SETTLEMENT AGREEMENT

94.    [Terminated, ECF 548] Within 90 days of the Effective Date, PPB shall also establish an ABHU Advisory Committee. The ABHU Advisory Committee shall include representation from: PPB command leadership, CIT, MCPT, and SCT; BOEC; civilian leadership of the City government; and shall seek to include representation from: the Multnomah County's Sheriff's Office; Oregon State Department of Health and Human Services; advocacy groups for consumers of mental health services; mental health service providers; coordinated care organizations; and persons with lived experience with mental health services.

95.    [Terminated, ECF 548] The ABHU Advisory Committee shall provide guidance to assist the City and PPB in the development and expansion of C-I Team, MCPT, SCT, BOEC Crisis Triage, and utilization of community-based mental health services. The ABHU Advisory Committee shall analyze and recommend appropriate changes to policies, procedures, and training methods regarding police contact with persons who may be mentally ill or experiencing a mental health crisis, with the goal of de-escalating the potential for violent encounters. The ABHU Advisory Committee shall report its recommendations to the ABHU Lieutenant, PPB Compliance Coordinator, COCL (as described herein), and the BOEC User Board.

96.    [Terminated, ECF 548] Within 240 days of the Effective Date of this Agreement, the ABHU Advisory Committee will provide status reports on the implementation of the ABHU and BOEC Crisis Triage, and identify recommendations for improvement, if necessary. PPB will utilize the ABHU Advisory Committee's recommendations in determining appropriate changes to systems, policies, and staffing.

## B.    Continuation of C-I Program

97.    [Terminated, ECF 401]

98.    [Terminated, ECF 401]

## C.    Establishing "Memphis Model" Crisis Intervention Team

Page 27 – FURTHER AMENDED SETTLEMENT AGREEMENT

99.      [Terminated, ECF 401]

100.     [Terminated, ECF 401]

101.     [Terminated, ECF 401]

102.     [Terminated, ECF 401]

103.     [Terminated, ECF 401]

104.     [Terminated, ECF 401]

105.     [Terminated, ECF 401]

### D.      Mobile Crisis Prevention Team

106.     [Terminated, ECF 401]

107.     [Terminated, ECF 401]

108.     [Terminated, ECF 401]

109.     [Terminated, ECF 401]

110.     [Terminated, ECF 401]

111.     [Terminated, ECF 401]

### E.      Service Coordination Team

112.     [Terminated, ECF 401]

### F.      BOEC

113.     [Terminated, ECF 401]

114.     [Terminated, ECF 401]

115.     [Subject to outcome of the process laid out in Paragraph 252(a) below, ECF 401] Within 180 days of the Effective Date, the City shall ensure Crisis Triage is fully operational to include the implementation of the policies and procedures developed pursuant to the above paragraph [Paragraph 113, ECF 354-1] and operation by trained staff.

### VII.     EMPLOYEE INFORMATION SYSTEM

Page 28 – FURTHER AMENDED SETTLEMENT AGREEMENT

116.    PPB has an existing Employee Information System ("EIS") to identify employees and design assistance strategies to address specific issues affecting the employee. *See* PPB Manual 345.00. PPB agrees to enhance its EIS to more effectively identify at-risk employees, supervisors and teams to address potentially problematic trends in a timely fashion. Accordingly, within 90 days of the Effective Date, PPB shall:

      a.     Require that commanders and supervisors conduct prompt reviews of EIS records of employees under their supervision and document the review has occurred in the EIS performance tracker;

      b.     Require that commanders and supervisors promptly conduct reviews of EIS for officers new to their command and document the review has occurred in the EIS performance tracker; and

      c.     Require that EIS staff regularly conduct data analysis of units and supervisors to identify and compare patterns of activity.

117.    PPB agrees to use force audit data to conduct similar analyses at supervisor- and team-levels.

118.    PPB shall continue to use existing thresholds, and specifically continue to include the following thresholds to trigger case management reviews:

      a.     Any officer who has used force in 20% of his or her arrests in the past six months; and

      b.     Any officer who has used force three times more than the average number of uses of force compared with other officers on the same shift.

119.    [Terminated, ECF 401]

120.    [Terminated, ECF 401]

Page 29 – ~~FURTHER~~ AMENDED SETTLEMENT AGREEMENT

## VIII.   OFFICER ACCOUNTABILITY

PPB and the City shall ensure that all complaints regarding officer conduct are fairly addressed; that all investigative findings are supported by a preponderance of the evidence and documented in writing; that officers and complainants receive a fair and expeditious resolution of complaints; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair and consistent. The City and PPB seek to strengthen the community input mechanisms that already exist in the PPB's misconduct investigations by implementing a Community Board for Police Accountability (CBPA) and Office of Community-based Police Accountability (OCPA, together referred to as the Oversight System as provided in this Agreement). The CBPA will be made up of community members. The OCPA staff will investigate allegations of misconduct within the CBPA's jurisdiction, and the CBPA will make disciplinary decisions for matters within its jurisdiction. IA will investigate allegations of misconduct for which the Oversight System does not have jurisdiction.  The City shall maintain the current IPR and IA system until the Oversight System described herein is implemented and starts taking and investigating complaints, and IPR has completed any pending investigations. As they are proposed and before enactment, the Oversight System shall send to the Monitor and DOJ new or revised rules, policies, or procedures regarding systems of officer accountability that are related to the work of the Oversight System. The City, Monitor, and DOJ will use the process in paragraph 243 for resolving any objections about an Oversight System rule, policy, or procedure that is subject to this Agreement.

### A.   Investigation Timeframe

121.    PPB and the City shall complete all administrative investigations of officer misconduct, including but not limited to supervisory investigations, within one-hundred eighty (180) days of receipt of a complaint of misconduct, or discovery of misconduct by other means. For the

Page 30 – ~~FURTHER~~ AMENDED SETTLEMENT AGREEMENT

purposes of this provision, completion of administrative investigations includes all steps from intake

of complaints through approval of recommended findings by either the CBPA or the Chief, or

approval by the Mayor for investigations involving the Chief, as appropriate.

122.    PPB and the Oversight System shall conduct administrative investigations

concurrently with criminal investigations, if any, concerning the same incident. All administrative

investigations shall be subject to appropriate tolling periods as necessary to conduct a concurrent

criminal investigation, or as otherwise provided by law, or as necessary to meet any

recommendation from the reviewing authority at PPB or CBPA to further investigate.  In addition,

PPB and the Oversight System may toll up to 10 business days per investigation when necessary to

ensure either the complainant's or involved member's attorney is available to accompany them at an

intake or investigatory meeting.

123.    If PPB or the Oversight System is unable to meet these timeframe targets, it shall

undertake and provide to the Monitor and DOJ a written review of the investigation process, to

identify the source of the delays and implement an action plan for reducing them.

**B.    On Scene Public Safety Statements and Interviews**

124.    Within 90 days of the Effective Date, the City and PPB shall review its protocols for

compelled statements to PSD or the Oversight System and revise as appropriate so that it complies

with applicable law and current professional standards, pursuant to *Garrity* v. *New Jersey*, 385 U.S.

493 (1967). The City will submit the revised protocol to DOJ for review and approval. Within 45

days of obtaining DOJ's approval, PPB shall ensure that all officers are advised on the revised

protocol.

125.    Separation of all witness and involved officers to lethal force events is necessary in

order to safeguard the integrity of the investigation of that event. Immediately following any lethal

force event, the City shall continue to issue a communication restriction order ("CRO") to all

witness and involved officers, prohibiting direct or indirect communications between those officers

Page 31 – ~~FURTHER~~ AMENDED SETTLEMENT AGREEMENT

regarding the facts of the event. The CRO will continue, unless extended further, until the conclusion of the Grand Jury or, if no Grand Jury is convened, until a disposition is determined by the District Attorney.

126.    PPB shall continue to require witness officers to lethal force events to give an on-scene briefing to any supervisor and/or a member of the Detective Division to ensure that victims, suspects, and witnesses are identified, evidence is located, and provide any information that may be required for the safe resolution of the incident, or any other information as may be required.

127.    In agreement and collaboration with the Multnomah County District Attorney, PPB shall request that involved officers in lethal force and in-custody death events provide a voluntary, on-scene walk-through and interview, unless the officer is incapacitated.

**C.      Conduct of Investigations**

128.    IA and the Oversight System shall collaborate to determine which entity has jurisdiction over the investigation and to ensure there is not redundant interview of witnesses by both the Oversight System and IA.

129.    The City shall ensure that all allegations of use of excessive force are subject to full and completed investigations resulting in findings, unless there is clear and convincing evidence to the Oversight System that the allegation has no basis in fact in which case the matter will be administratively closed. In addition, a matter may be administratively closed, subject to reopening based on additional evidence, in the following circumstances: 1) a full investigation is not feasible without additional information from the Complainant and the Complainant cannot be reached or refuses to participate; or 2) the involved officer cannot be identified after reasonable steps to identify the involved officer.  Prior to administratively closing any matter under this paragraph, the investigating entity shall document the investigative efforts undertaken and explain why closure meets the requirements of this paragraph.

130.    [Terminated, ECF 401]

Page 32 – ~~FURTHER~~ AMENDED SETTLEMENT AGREEMENT

131.    The City shall adopt an Oversight System to perform administrative investigations for matters under their jurisdiction, make findings and conclusions on administrative complaints under their jurisdiction, and impose corrective action as applicable under any binding disciplinary rules.  If the City Charter changes the Parties will return to Court for changes necessary to the Settlement Agreement.

    a.    All CBPA members must meet the following qualifications:

      i.  Pass a background check performed by an entity other than the PPB;

      ii.  Receive training about the Bureau's history, procedures, policy development process, and PPB's training on de-escalation, equity, bias-based policing, and crisis intervention, as well as training on the Oversight System's history, internal structure, and processes (including bylaws, rules, and procedures;).

      iii.  Sign a confidentiality agreement;

      iv.  Participate in a ride-along and PPB Community Academy to maintain sufficient knowledge of police patrol procedures; and

      v.  Other qualifications as determined appropriate by City Council.

    b.    City Council shall have authority to remove a member of the CBPA for cause, including, but not limited, to the following reasons:

      i.  Unexcused absences, failure to participate, or inactivity;

      ii.  Excessive excused absences;

      iii.  Failure to timely disclose an actual conflict of interest;

      iv.   Official misconduct (See ORS 162.405-162.415);

      v.  Breach of confidentiality;

      vi.  Objective demonstration of bias for or against the police;

      vii.  Other bases as determined appropriate by City Council; or

viii.  Objective demonstration of conflict of interest.

132.    By majority vote of a panel of three or more CBPA members, Oversight System administrative investigations of misconduct of PPB sworn members and supervisors thereof within the jurisdiction of the Oversight System may be returned to the OCPA investigator to perform further investigation as to factual matters necessary to reach a finding regarding the alleged misconduct. The investigating entity must make reasonable attempts to conduct the additional investigation or obtain the additional information within 10 business days or provide a written statement to the CBPA explaining why additional time is needed.

133.    If an identified PPB officer's use of force gives rise to a finding of liability in a civil trial, the City shall:  (1) ensure PPB enters that civil liability finding in the EIS; (2) reevaluate the officer's fitness to participate in all current and prospective specialized units; (3) if no investigation has previously been conducted based upon the same allegation of misconduct and reached an administrative finding, conduct a full investigation with the civil trial finding creating a rebuttable presumption that the force used also violated PPB policy, which presumption can only be overcome by specific, credible evidence by a preponderance of evidence; (4) if an investigation has already concluded based upon the same allegation of misconduct and failed to reach a sustained finding, identify whether any new evidence exists in the record of the civil trial to justify the reopening of the investigation, and if so, reinitiate an investigation; and (5) if an investigation has already concluded based upon the same allegation of misconduct and failed to reach a sustained finding, and no new evidence from the civil trial justifies reopening the investigation, the investigative entity will work to identify the reason why the administrative finding was contrary to the civil trial finding and publish a summary of the results of the inquiry.

D.    **CRC Appeals**

134.    [Terminated, ECF 401]

135.    [Terminated, ECF 401]

Page 34 – ~~FURTHER~~ AMENDED SETTLEMENT AGREEMENT

136.    [Terminated, ECF 401]

### E.    Discipline

137.    Within 60 days of the Effective Date, PPB and the City shall ensure there are binding discipline rules to ensure that discipline for sustained allegations of misconduct is based on the nature of the allegation and defined, consistent, mitigating and aggravating factors and to provide discipline that is reasonably predictable and consistent. In all instances, the City shall follow any statutorily mandated disciplinary standards.

### F.    Communication with Complainant and Transparency

138.    [Terminated, ECF 401]

139.    [Terminated, ECF 401]

140.    [Terminated, ECF 401]

## IX.    COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY-ENGAGED POLICING

There is significant community and City interest in improving PPB's community relationships. The community is a critical resource. Soliciting community input regarding PPB's performance, while also enhancing PPB's current community outreach efforts, will promote community confidence in PPB and facilitate police/community relationships necessary to promote public safety.

141. [Terminated, ECF 548] To leverage the ideas, talent, experience, and expertise of the community, the City, in consultation with DOJ, shall establish a Portland Committee on Community Engaged-Policing ("PCCEP"), within 90 days of the Effective Date of the relevant amendments to this Agreement.

142. [Terminated, ECF 548] The PCCEP shall be authorized to: (a) solicit information from the community and the PPB about PPB's performance, particularly with regard to constitutional

Page 35 – FURTHER AMENDED SETTLEMENT AGREEMENT

policing; (b) make recommendations to the Chief, Police Commissioner, the Director of the Office of Equity and Human Rights, and community and, during the effective period of this Agreement, to the DOJ; (c) advise the Chief and the Police Commissioner on strategies to improve community relations; (d) contribute to the development and implementation of a PPB Community Engagement Plan; and (e) receive public comments and concerns. The composition, selection/replacement process and specific duties of the PCCEP shall be set forth in a separate Plan for Portland Committee on Community-Engaged Policing ("the PCCEP Plan") which shall be substantially similar to Exhibit 1 to this Agreement. Amicus AMAC and Intervenor PPA shall be consulted regarding and DOJ shall review and approve any amendments to the PCCEP Plan proposed to occur during the effective period of this Agreement.

143. [Terminated, ECF 548] PCCEP's membership will come from a reasonably broad spectrum of the community. PCCEP members shall not have an actual or perceived conflict of interest with the City of Portland.

144. [Terminated, ECF 548] The City shall provide administrative support so that the PCCEP can perform the duties and responsibilities identified in this Agreement and in the PCCEP Plan.

145. [Terminated, ECF 401]

146. [Terminated, ECF 401]

147. [Terminated, ECF 401]

148. PPB shall continue to require that officers document appropriate demographic data regarding the subjects of police encounters, including the race, age, sex and perceived mental health status of the subject, and shall provide such information to the PCCEP and make such information publicly available to contribute to the analysis of community concerns regarding discriminatory policing. PPB shall consider enhancements to its data collection efforts, and report on its efforts to

Page 36 – FURTHER AMENDED SETTLEMENT AGREEMENT

enhance data collection to the DOJ by no later than December 31, 2013, and quarterly thereafter.

149. [Terminated, ECF 401]

150. Annually, PPB shall issue a publicly available PPB Annual Report, which shall include a summary of its problem-solving and community policing activities. A draft of the Annual Report shall be provided to the PCCEP for review and comment before the report is finalized and released to the public. Once released, PPB shall hold at least one meeting in each precinct area and at a City Council meeting, annually, to present its Annual Report and to educate the community about its efforts in community policing in regard to the use of force, and about PPB's policies and laws governing pedestrian stops, stops and detentions, and biased-free policing, including a civilian's responsibilities and freedoms in such encounters.

151. [Terminated, ECF 548] PCCEP shall meet as needed to accomplish their objectives as set forth in the PCCEP Plan. PCCEP shall hold regular Town Hall meetings which shall be open to the public. To the extent that PCCEP meetings are subject to the Oregon Public Meetings Law, or similar regulatory or statutory requirements, the City shall be responsible to give advice necessary to the PCCEP to ensure compliance with those laws and agrees to represent PCCEP in any challenges regarding compliance with those laws.

152. [Terminated, ECF 548] The City shall provide PCCEP members with appropriate training necessary to comply with requirements of City and State law.

## X.    AGREEMENT IMPLEMENTATION AND ENFORCEMENT

153. [Superseded, ECF 401]

154. [Superseded, ECF 401]

155. [Superseded, ECF 401]

156. [Superseded, ECF 401]

### A.    Compliance Officer/Community Liaison

157. [Superseded, ECF 401]

Page 37 – FURTHER AMENDED SETTLEMENT AGREEMENT

158. [Superseded, ECF 401]

159. [Superseded, ECF 401]

160. [Superseded, ECF 401]

161. [Superseded, ECF 401]

## B.    PPB Compliance Coordinator

162. [Superseded, ECF 401]

## C.    Access to People and Documents

163. [Superseded, ECF 401]

164. [Superseded, ECF 401]

165. [Superseded, ECF 401]

## D.    Review of Policies and Investigations

166. [Superseded, ECF 401]

167. [Superseded, ECF 401]

168. [Superseded, ECF 401]

169. [Superseded, ECF 401]

170. [Superseded, ECF 401]

171. [Superseded, ECF 401]

172. [Superseded, ECF 401]

## E.    City Reports and Records

173. [Superseded, ECF 401]

174. [Superseded, ECF 401]

## F.    Enforcement

175. [Superseded, ECF 401]

176. [Superseded, ECF 401]

177. [Superseded, ECF 401]

178. [Superseded, ECF 401]

179. [Superseded, ECF 401]

180. [Superseded, ECF 401]

181. [Superseded, ECF 401]

182. [Superseded, ECF 401]

183. [Superseded, ECF 401]

184. [Superseded, ECF 401]

185. [Superseded, ECF 401]

186. [Superseded, ECF 401]

187. [Superseded, ECF 401]

## XI.    ADDENDUM OF ADDITIONAL REMEDIES

On April 2, 2021, the United States issued a notice of noncompliance pursuant to Paragraph 178. The purpose of this Addendum is to ensure that the City, by and through its officials, agents, employees, and bureaus, takes actions to resolve the concerns expressed by the United States in the noncompliance notice. Specifically, the United States found that the City failed to implement the following provisions of this Agreement: Section III – Use of Force, Paragraphs 66, 67, 69, 70, and 73; Section IV – Training, Paragraphs 78 and 84; Section VIII – Officer Accountability, Paragraphs 121, 123, and 169; and Section IX – Community Engagement and Creation of Portland Committee on Community Engaged Policing, Paragraph 150. The City does not admit that the allegations of noncompliance are true.

188.    The City shall revise Force Data Collection Report (FDCR) and After Action Report forms to capture when the forms are edited and completed as part of PPB's implementation of Office365, which is ongoing. In the interim, pursuant to a process approved by the United States, PPB shall capture in the existing FDCR and After Action Report forms the

Page 39 – ~~FURTHER~~ AMENDED SETTLEMENT AGREEMENT

author's name and the time and date of initial submission and any subsequent edits, as well as the name, time, and date of each level of review.

189.    Before November 25, 2021, the City shall provide funding for a qualified outside entity to critically assess the City's response to crowd control events in 2020 in a public-facing report and prepare a follow-on review of the City's response to the report. The City will use the report to prepare a training needs assessment. The report, training needs assessment, and follow-on review will be completed consistent with a Scope of Work and deadlines agreed upon by the City and the United States, and such agreement shall not be unreasonably withheld by either Party. If the City demonstrates to the United States that significant progress is being made toward meeting the obligations under the agreed upon Scope of Work and deadlines, the City may request a reasonable modification of the Scope of Work or extension of deadlines, which the United States shall not unreasonably decline.

190.    Before November 25, 2021, the City shall provide in the budget a separate line item for overtime costs to conduct necessary training for PPB officers. The City shall include a similar line item in subsequent budgets for the duration of this Agreement.

191.    [Terminated, ECF 548] Before November 25, 2021, the City shall budget for a qualified civilian in PPB to direct all educational aspects of PPB's Training Division alongside the Captain of the Training Division, who will direct administrative aspects of PPB's Training Division. The respective roles and responsibilities of the civilian and the Captain are outlined in Attachment 1 appended to this Agreement, provided that the Parties may agree to modify those roles and will not unreasonably withhold such agreement. Once funding is provided, the City shall post the position within 90 days. Once the position is posted, the City shall make a job offer to a suitable candidate and complete any required background screenings within 150 days. If the City demonstrates to the United States that no suitable candidate applied for or accepted the position, or that the City is otherwise making significant progress toward meeting the deadlines in this

Page 40 – FURTHER AMENDED SETTLEMENT AGREEMENT

Paragraph, the City may request a reasonable extension of time to fill the position, which the United States shall not unreasonably withhold.

192.     Within 60 days of the date this paragraph is entered as an order of the Court, the City shall initiate an appropriate investigation through IPR to identify: (a) the PPB Lieutenant(s) and above who trained Rapid Response Team members to believe that they could use force against individuals during crowd control events without meeting the requirements of PPB Directive 1010.00; (b) the PPB incident commander(s) and designee(s) with the rank of Lieutenant or above who directed or authorized any officer to use force in violation of PPB Directive 1010.00, or who failed to ensure that FDCRs and After Action Reports arising from the crowd control events starting on May 29, 2020, and ending on November 16, 2020, were completed as required by Section 13.1 of PPB Directive 635.10; and (c) the PPB Commanders and above who failed to timely and adequately clarify misunderstandings and misapplications of PPB policy (including this Agreement) governing the use, reporting, and review of force during the crowd control events starting on May 29, 2020, and ending on November 16, 2020. Once the IPR investigation is complete, the Police Commissioner and/or the Chief of Police, as required by this Agreement, shall hold accountable those investigated members of the rank of Lieutenant and above who are determined to have violated PPB policies (including this Agreement) as outlined in this paragraph. The Parties affirm the obligation in this Agreement and Directive 330 for IPR and PPB to investigate any sworn member if, during the investigations of Lieutenants and above required by this paragraph, information is discovered suggesting that any sworn member may have violated PPB policy or this Agreement.

193.     In addition to the requirements of paragraph 150 of this Agreement, PPB shall release its Annual Report and hold the required precinct meetings no later than September 20 of each year for the duration of this Agreement.

194.     Within 210 days of the date this paragraph is entered as an order of the Court, the

Page 41 – FURTHER AMENDED SETTLEMENT AGREEMENT

City shall implement body-worn cameras (BWCs) pursuant to a policy that is subject to the policy-review-and-approval provisions of this Agreement; provided, however, if the City is making substantial progress this deadline may be extended by agreement of the United States, which shall not be unreasonably withheld.

a. The City will comply with any collective bargaining obligations it may have related to BWCs, which the City agrees to fulfill expeditiously and in compliance with its obligation to bargain in good faith.

b. Within 60 days of the date this paragraph is entered as an order of the Court, the Compliance Officer shall gather public input on the use of BWCs and provide this information and any technical assistance to the public and the Parties to inform the drafting of a policy. The United States reserves its policy review rights related to the BWC program under the terms of this Agreement.

c. If the City has not finally discharged its collective bargaining obligations as to BWCs within 120 days of the date this paragraph is entered as an order of the Court, the Parties stipulate that the Court may thereafter hold periodic status conferences every 60 days to receive an update on the procedural status of the collective bargaining process related to BWCs. The City will provide a final procedural status update upon the completion of the collective bargaining process. The United States reserves its enforcement rights related to the BWC program under the terms of this Agreement. If collective bargaining or any related arbitration or appeal results in a BWC program that the United States determines, in its sole and absolute discretion, will not adequately resolve the compliance concerns identified in the April 2, 2021 notice of noncompliance, the Parties agree that the United States can seek court enforcement pursuant to

Page 42 – ~~FURTHER~~ AMENDED SETTLEMENT AGREEMENT

paragraph 183, without having to repeat the steps laid out in paragraphs 178 to 182.

195.    In 2020, the City referred to voters a ballot measure that would overhaul the police accountability system incorporated into this Agreement by establishing a new Community Police Oversight Board to replace IPR for investigations of certain complaints of police misconduct and to replace the Chief of Police for imposition of discipline. City voters approved the ballot measure. The City has since empowered a 20-member civilian Commission to define the duties and authority of the Oversight Board and submit a proposal to City Council for final approval.

a.    Before January 1, 2022, the City Council and Auditor shall each present a plan to the United States for an orderly transition to the Community Police Oversight Board by ensuring the continuity of IPR operations while the Commission develops the Oversight Board for City Council's approval. The United States shall determine whether either of these two plans is acceptable. City Council will then adopt a plan that the United States has determined is acceptable. The Parties agree that the adopted plan shall be appended to this Agreement and will become part of this Order, provided that the Parties may agree to modify the plan if warranted by the circumstances. Until the Oversight Board becomes operational, the City shall ensure that administrative investigations are completed as required by Section VIII – Officer Accountability and that officers are held accountable for violating PPB policy and procedure as required by Paragraph 169.

b.    Within 18 months of the date this paragraph is entered as an order of the Court, the Commission shall propose to City Council changes to City Code to create a new police oversight system as reflected in the City of Portland

Page 43 – ~~FURTHER~~ AMENDED SETTLEMENT AGREEMENT

Charter amendment establishing a Community Police Oversight Board. Within 60 days of receiving the Commission's proposal, the City will propose amendments to City Code to address the Commission's proposal, and corresponding amendments to this Agreement, subject to the United States' and the Court's approval, to ensure full implementation of the Oversight Board and effective police accountability, consistent with the requirements of this Agreement. Within 21 days of the approval of the amendments to the Agreement by the United States and the Court, the City Council shall consider and vote on the conforming City Code provisions creating the Oversight Board. Within 12 months of the Council's adoption of the City Code provisions, the new Oversight Board shall be staffed and operational, and IPR shall then cease taking on new work and complete any pending work. For good cause shown, the deadlines imposed by this subparagraph

c.  (b) may be reasonably extended provided that the City is in substantial compliance with subparagraph (a).

d.  The City will comply with any collective bargaining obligations it may have

e.  related to the Oversight Board, which the City agrees to fulfill expeditiously and in compliance with its obligation to bargain in good faith.

## XII.    AGREEMENT IMPLEMENTATION AND ENFORCEMENT
### [Supersedes Section X, ECF 401]

### A.    Implementation

196.    The City shall implement immediately all provisions of this Agreement which involve the continuation of current policies, procedures, and practices specific to force, training, community-based mental health services, crisis intervention, employee information system, officer accountability, and community engagement. Except where otherwise specifically indicated, the City

Page 44 – FURTHER AMENDED SETTLEMENT AGREEMENT

shall implement all other provisions of this Agreement no later than within 180 days of the Effective Date.

197.    With regard to any provision that provides for review and approval by the DOJ or the Monitor, approval will be granted in a timely fashion provided that the PPB's action reasonably satisfies the requirements and standards set forth in the relevant provision(s).

198.    All PPB audits and reports related to the implementation of this Agreement shall be made publicly available via website and at PPB, IPR, City Hall, and other public locations. Audits and reports shall be posted on PPB's website.

199.    PPB shall collect, and maintain, and post for public download all data and records necessary to facilitate and ensure transparency and wide public access to information related to PPB decision making and activities, and compliance with this Agreement, in accordance with the Oregon Public Records Law.

200.    All PPB officers and persons related to the implementation of this Agreement shall sign a statement indicating that they have read and understand this Agreement within 90 days of the effective date of this Agreement. When there are amendments to this Agreement, PPB officers and persons related to the implementation of this Agreement shall acknowledge review and understanding of the amendments within 90 days of the effective date of the amendments. Such statements and acknowledgements shall be retained by PPB. PPB shall require compliance with this Agreement and any amendments by their respective officers, employees, agencies, assigns, or successors.

## B.    Independent Monitor

201.    An Independent Monitor (Monitor) shall assess the City's compliance with, and implementation of, this Agreement. The Monitor will include a team of people with expertise in policing, civil rights, data analysis and auditing, project management, behavioral health, emergency

Page 45 – ~~FURTHER~~ AMENDED SETTLEMENT AGREEMENT

dispatch, and writing about complex matters succinctly in plain language intended for a general audience. The Monitor will work with the Parties to identify and address any barriers to substantial compliance and report regularly on the City's progress. All references to the COCL in this Agreement outside this Section XII shall be read to mean the Monitor.

202.    The Monitor will have only the role, responsibilities, and authority conferred by this Agreement. The Monitor will not, and is not intended to, replace or assume the role or responsibilities of any City or PPB employee, including the Police Commissioner, or any other City official. It is not the Monitor's role to change either the scope or the terms of this Agreement.

## 1.    Selection, Term, Compensation, and Replacement

203.    Within 15 days of the date this paragraph is entered as an order of the Court, or additional time if mutually agreed to by the Parties, the Parties will agree on the terms the City will include in a Request for Proposal. The City will post the Request for Proposal within 15 days of the agreement.

204.    Within 60 days of the date of the posting of the Request for Proposal, or additional time if mutually agreed to by the Parties, the Parties will jointly select three finalists to be the Monitor, after considering input from the Intervenor-Defendant Portland Police Association (PPA), Enhanced Amicus Albina Ministerial Alliance Coalition for Justice and Police Reform (AMAC), and Amicus Mental Health Alliance (MHA). The Parties will evaluate Monitor applications based on, but not limited to: ethics; subject matter expertise in policing; project management capacity; ability to write about complex matters succinctly in plain language intended for a general audience; commitment to establish a local presence; demonstrated experience, willingness, and ability to solicit and obtain meaningful community participation; ability to seek out varied stakeholder interests and perspectives, including law enforcement, the Black community, communities of color, mental health communities, and LGBTQIA+ communities; demonstrated

Page 46 – ~~FURTHER~~ AMENDED SETTLEMENT AGREEMENT

knowledge about Portland's history of policing, mental health needs and services, and institutional racism, and willingness to expand upon that knowledge.

205.    The Parties may interview each team member of Monitor applicants in determining or assessing the three finalists and will invite a representative from the PPA, AMAC, MHA, and the PCCEP to observe any such interview and, thereafter, offer their comments on the candidates for consideration by the Parties. The Parties will publicly announce the three finalists through various media intended to reach diverse populations, will post their resumes and proposed team members' profiles on the City website, and will provide and advertise a 32-day public comment period. Within two weeks of being announced, the finalists will participate in a public town hall forum, hosted by the Parties, to answer facilitated community questions about their experience, qualifications, and approach to monitoring the terms of the Agreement. The town hall will be held in a manner that is easily accessible, will allow for remote participation, and will be widely publicized to encourage broad participation.

206.    Within 30 days of the date of the close of the public comment period, the Parties will jointly select a candidate for the Court to appoint as the Monitor. In selecting the final candidate, the Parties will consider public input and any input from the PPA, AMAC, MHA, and PCCEP. The Parties' joint selection of a Monitor will be subject to the Court's appointment, provided that the Monitor's activities will be governed solely by the terms of this Agreement. The Court will give deference to the Parties' joint selection of the Monitor. If the Court does not appoint the Parties' selection, the Court will meet and confer with the Parties and then refer the Parties to mediation for selection of another candidate for the Court's consideration. The Parties shall hold one session after Court referral to mediation and thereafter will jointly select another candidate to serve as Monitor subject to the Court's appointment and with deference to the Parties' selection. The process of selecting a Monitor for Court appointment shall continue until the Court makes an appointment.

Page 47 – FURTHER AMENDED SETTLEMENT AGREEMENT

207.    If the Parties are unable to agree on a joint selection, the Parties agree to engage in mediation pursuant to Paragraph 271 of this Agreement. If the Parties are unable to agree on a selection within one mediation session, each Party may submit to the Court a proposed Monitor, and the Court will give deference to those proposals in selecting and appointing the Monitor, after a hearing and opportunity for public comment, and input from the PPA, AMAC, MHA, and the PCCEP. If Court does not accept either candidate, the Court will meet and confer with the Parties and then refer the Parties to mediation for selection of additional candidate(s) for the Court's consideration. Subject to the mediator's discretion and invitation, such mediation shall include the PPA, AMAC, and MHA.

208.    During the Monitor selection process, the City will continue to fund the COCL position to continue the COCL's duties under the prior version of this Agreement (ECF 354-1). The City will continue to fund the COCL during a period of transition to the appointed Monitor for no fewer than 30 days after the Monitor begins work; provided, however, if the contract with the current COCL expires while the Parties are in the process of transitioning to a Monitor as provided herein, the Parties may agree to select a temporary COCL or suspend the COCL requirements and duties during the transition to a Monitor. The COCL shall provide the Monitor with a copy of reports and methodologies and debrief the Monitor on the status of the City's compliance and any barriers to implementation.

209.    The Monitor will be appointed for a term of two years, which may be extended for additional two-year terms if the Parties jointly request, and the Court approves. The Parties will consult with the PPA, AMAC, MHA, and PCCEP and will consider their input before seeking to extend the Monitor's appointment for additional two-year terms. In deciding whether to extend the appointment, the Court will give deference to the request of the Parties, and will consider public input, including that of the PPA, AMAC, MHA, and PCCEP, and the Monitor's performance under this Agreement, including whether the Monitor is completing their work on time, within

Page 48 – FURTHER AMENDED SETTLEMENT AGREEMENT

budget, and in a manner that facilitates the City's ability to achieve substantial compliance with this Agreement.

210.    The Parties recognize the importance of constraining the Monitor's fees and costs. Accordingly fees and costs will be a factor to consider in selecting the Monitor, including the ability to offer pro bono time or reduced rates, geographic proximity of the Monitor or team members to limit travel costs, affiliation with academic institutions or non-profit organizations, and willingness to enter an "alternative fee" arrangement that reduces costs and promotes efficiency by, for example, capping fees and costs at a flat rate that decreases each year as provisions of this Agreement become subject to self-monitoring and partial termination.

211.    The Monitor's budget will be publicly filed with the Court. The Monitor will submit quarterly statements to the Parties and the Court detailing the work that they did for the quarter, as well as a projection for future work.

212.    The Monitor may request at any time to hire, employ, or contract with additional persons or entities reasonably necessary to perform the tasks assigned to the Monitor by this Agreement, but will be judicious in their decision to do so. Any such requests that exceed the annual contracted amount will be subject to approval by the appropriate City officialCouncil and DOJ, which may be decided at their respective discretion. Any person or entity so retained by the Monitor will be subject to the provisions of this Agreement. The Monitor will notify the Parties in writing of requests to retain such additional persons or entities and identify relevant qualifications. If the Parties agree with the proposal, the Monitor will be authorized to retain such additional persons or entities. All persons employed or retained by the Monitor shall successfully complete any required background checks before accessing applicable data, reports, or other information.

213.    If a dispute arises regarding the reasonableness or payment of the Monitor's fees and costs, the City, DOJ, and the Monitor will attempt to resolve such dispute cooperatively. If the dispute remains unresolved, the City, DOJ, and the Monitor will engage in mediation pursuant to

Page 49 – FURTHER AMENDED SETTLEMENT AGREEMENT

Paragraph 271 of this Agreement. Such mediation shall include the Monitor. For anything other than requests to exceed the annual contracted amount, either Party may file a motion petitioning the Court for relief pursuant to Paragraph 272 for disputes not resolved within 45 days of the start of mediation.

214.    If either Party to this Agreement determines that the Monitor, or members of the Monitor's team, have exceeded their authority or failed to perform the duties required by this Agreement, the Party may, after consultation with the other Party and the Monitor, request mediation with the Monitor pursuant to Paragraph 271 of this Agreement. If the issue is not resolved within 45 days of the start of mediation, either Party may file a motion petitioning the Court for relief pursuant to Paragraph 272 of this Agreement. If either Party disagrees with another Party's interpretation of authority or duties provided under this Agreement, the Party may request mediation with the Monitor pursuant to Paragraph 271 of this Agreement. If the dispute is not resolved within 45 days of the start of mediation, either Party may file a motion petitioning the Court for relief pursuant to Paragraph 272 of this Agreement.

215.    If the Monitor is no longer able to perform their functions, the Parties will meet and confer to determine whether a Monitor is still necessary. If the Parties are unable to agree on whether a Monitor is still necessary, either Party may submit the dispute to mediation pursuant to Paragraph 271 of this Agreement. If the Parties are unable to resolve the dispute within 45 days of the start of mediation, either Party may file a motion petitioning the Court for relief pursuant to Paragraph 272 of this Agreement. If the Court decides that a Monitor is still necessary to oversee implementation of the Agreement, the Parties, after consideration of input from the PPA, AMAC, and MHA will jointly select a replacement Monitor for the Court to approve. If the Parties are unable to agree on a selection for replacement Monitor, the Parties will participate in mediation pursuant to Paragraph 271 of this Agreement. If the dispute is not resolved within 45 days of the start of mediation, each Party will submit a proposed replacement Monitor to the Court, along with

Page 50 – ~~FURTHER~~ AMENDED SETTLEMENT AGREEMENT

resumes and cost proposals, and the Court will select and appoint the Monitor.

## 2.    Monitor's Duties

216.    The Monitor's core duties include: (a) developing a Monitoring Plan, updated at the beginning of each two-year term, to ensure reliable compliance assessments; (b) conducting semi-annual assessments of the City's compliance with the terms of this Agreement; (c) conducting the outcome assessments required by this Agreement; (d) identifying barriers to compliance and providing recommendations on how to overcome such barriers; and (e) filing semi-annual reports with the Court that detail the status of the City's progress in implementing this Agreement.

### a.    Monitoring Plan

217.    Using as guidance prior COCL and DOJ Compliance Assessment Reports, within 30 days of appointment, the Monitor will develop a plan for conducting compliance assessments and filing its reports (Monitoring Plan). The Parties will have 15 days to provide the Monitor with written comments on the draft Monitoring Plan. The Monitor will modify the draft Monitoring Plan as appropriate to address the comments or will inform the Parties in writing of the reasons for not modifying the draft. Either Party may submit unresolved disputes regarding the draft Monitoring Plan to mediation with the Monitor pursuant to Paragraph 271 of this Agreement. If the Parties are unable to resolve the dispute within 45 days of the start of mediation, either Party may file a motion petitioning the Court for relief pursuant to Paragraph 272 of this Agreement.

218.    The Monitor shall file the final Monitoring Plan with the Court. The Monitoring Plan will, at a minimum: (a) delineate the requirements of this Agreement that the Monitor will assess for substantial compliance; (b) identify the assessments necessary to determine whether the City has reached substantial compliance; and (c) set a schedule for the Monitor's two-year term, including assessments, outcome measurements, and reports that will ensure a semi-annual review of each discrete section, as defined below.

Page 51 – ~~FURTHER~~ AMENDED SETTLEMENT AGREEMENT

219.    If the Monitor is appointed for an additional two-year term, then the Monitor will file an updated Monitoring Plan with the Court after following the same process outlined in this section. The updated Monitoring Plan will, at a minimum, set a schedule for the Monitor's two-year term, including assessments and reports that will ensure a semi-annual review of each substantive section.

### b.    Compliance Assessments

220.    Six months after approval of the initial Monitoring Plan and every six months thereafter, the Monitor will assess whether the City is in substantial compliance with the requirements of this Agreement that are not subject to either self-monitoring or partial termination pursuant to Section XII, subsection G. Compliance assessments will contain the elements necessary for reliability and comprehensiveness. The Monitor may use sampling and compilation data where appropriate.

221.    Prior to initiating any audit pursuant to the Monitoring Plan, the Monitor will submit a proposed methodology to the Parties. The Parties will have 15 days to provide written comments on the proposed methodology. The Monitor will modify the methodology as appropriate to address the comments or will inform the Parties in writing of the reasons for not modifying the methodology. Either Party may submit unresolved disputes involving the Monitor's audit methodology to requested mediation with the Monitor pursuant to Paragraph 271 of this Agreement. If the Parties are unable to resolve the dispute within 45 days of the start of mediation, either Party may file a motion petitioning the Court for relief pursuant to Paragraph 272 of this Agreement.

### c.    Outcome Measurements

222.    In addition to compliance reviews, the Monitor will conduct semi-annual qualitative and quantitative outcome assessments to measure whether the implementation of this Agreement has created: (1) capable systems and resources for responding to persons in mental health crisis; (2)

Page 52 – ~~FURTHER~~ AMENDED SETTLEMENT AGREEMENT

competent accountability and oversight systems; (3) effective training for police officers that increases the knowledge, skills and abilities necessary for effective and successful delivery of service to persons in mental health crisis; (4) proper management of the use of force to meet constitutional standards; and (5) robust systems of community engagement. These outcome assessments will be informed by the following:

a. Use of Force Data:

    i. the number of police interactions where force was used on individuals in an actual or perceived mental health crisis, including the type of force used; the reason for the interaction, i.e., suspected criminal conduct or a well- being check; the threat to public safety, including whether the person was armed and if so, weapon type; a description of the facts and circumstances of resistance offered, if any; and a description of any attempts at strategic disengagement or de-escalation;

    ii. the rate of force used per arrest by PPB; force type used; geographic area (i.e., street address, neighborhood, or police precinct); reason for arrest; and the subject's age, gender, race, and whether they were in an actual or perceived mental health crisis);

    iii. the number of officers who repeatedly use force within the outcome measurement reporting period, or have more than one instance of force found to violate policy;

    iv. number of officer and subject injuries resulting from force interactions, and force type used by the officer; and

    v. a comparison of the category of non-deadly use of force cases for force used against persons in a mental health crisis and persons not in a mental health crisis.

b. Mental health interaction data on:

    i. Percentage of ECIT dispatched calls that have an ECIT officer on-scene;

    ii. MCPT, currently known as Behavioral Health Response Team (BHRT), dispositions,

Page 53 – ~~FURTHER~~ AMENDED SETTLEMENT AGREEMENT

including the percent of outcomes that are due to behavioral health system coordination (i.e., coordinated services, civil commitment, and systems coordination);

   iii.  the number of people with an actual or perceived mental illness encountered by PPB;

   iv.  the number of calls for service involving an individual with an actual or perceived mental illness who has been the subject of a prior call for service related to their behavioral health;

   v.  the number of police officer holds placed by PPB officers; and

   vi.  the disposition of PPB service interactions (e.g., calls for service and BHRT interactions) involving people with an actual or perceived mental illness (e.g., transfer to ambulance, hospital, Unity Center, jail, juvenile detention; community mental health referrals; dis-engagement; or none).

c.  Training data, including:

   i.  the number of officers trained, by the type of training provided;

   ii.  Training Division response to Force Inspector's referral of concerns of training deficiencies identified through use of force reviews or investigations;

   iii.  officer evaluation of adequacy of training; and

   iv.  the Training Division's assessment of incidents involving officer or subject injury.

d.  Performance data, including:

   i.  uses of force found to be out of policy;

   ii.  force allegations sustained and not sustained; and

   iii.  initial identification of officer policy violations and performance problems by supervisors, and effectiveness of supervisory response.

e.  Accountability data, including:

   i.  the number of complaints (broken out by type of complaint);

   ii.  uses of force that were found to violate policy overall and by force type; reason for arrest;

Page 54 – ~~FURTHER~~ AMENDED SETTLEMENT AGREEMENT

the subject's age, gender, race, and whether they were in an actual or perceived mental health crisis; force type used; and number of officers involved;

iii. the number and rate of complaints that are sustained annually and by type; source of complaint (internal or external); type of arrest; the subject's age, gender, race, and whether they were in an actual or perceived mental health crisis;

iv. the rate of complaints closed within 180 days, and the explanation for cases that take longer;

v. the number and rate of disposition of allegations categorized by finding for all finding types;

vi. the number and rate of complaints, including use of force complaints, in which the finding for each allegation is supported by a preponderance of the evidence;

vii. the number of officers who are subjects of repeated complaints, or have repeated instances of sustained complaints, other than auto accidents; and

viii. the number, nature, and settlement amount of civil suits against the City based on PPB officers' conduct but not including auto accidents.

223.    In conducting these outcome assessments, the Monitor may use any relevant data collected and maintained or owned by the City, provided that the Monitor determines, and the Parties agree, that the data is reasonably reliable and complete. The Monitor will also solicit input from community members and groups that have information or expertise relevant to an outcome assessment.

224.    At least 45 days prior to the initiation of any outcome assessment, the Monitor will submit a proposed methodology to the Parties. The Parties will have 15 days to provide written comments on the proposed methodology. The Monitor will modify the methodology as appropriate to address the comments or will inform the Parties in writing of the reasons for not modifying the proposed methodology. Either Party may submit unresolved disputes involving the Monitor's methodology to requested mediation with the Monitor pursuant to Paragraph 271 of this

Page 55 – ~~FURTHER~~ AMENDED SETTLEMENT AGREEMENT

Agreement. If the Parties are unable to resolve the dispute within 45 days of the start of mediation, either Party may file a motion petitioning the Court for relief pursuant to Paragraph 272 of this Agreement.

### d.    Recommendations

225.    The Monitor may make recommendations to the Parties regarding actions necessary to ensure timely substantial compliance with this Agreement. Such recommendations may include revising a policy related to this Agreement, conducting additional training, or seeking technical assistance. The Monitor has no authority to modify any aspect of this Agreement by making recommendations, or by any other means.

Page 56 – ~~FURTHER~~ AMENDED SETTLEMENT AGREEMENT

### e.    Semi-Annual Monitor Reports

226.    Six months after approval of the Monitoring Plan and every six months thereafter, the Monitor will prepare a written public report that will:

a.    Describe the work conducted by the Monitor during the reporting period;

b.    List each requirement of this Agreement that is not subject to either self-monitoring or partial termination;

c.    Indicate which paragraphs the City has met requirements for substantial compliance, how long the City has met such requirements, and the data and evidence used to determine substantial compliance as required by this Agreement;

d.    Indicate which paragraphs the City has not met requirements for substantial compliance, how long the City has not met such requirements, the data and evidence used to determine lack of substantial compliance, and recommend steps necessary to achieve and maintain substantial compliance;

e.    Detail the data, evidence, and specific findings for each outcome assessment conducted during the six-month reporting period;

f.    Project the work to be completed during the upcoming reporting period, and any anticipated challenges or barriers to substantial compliance with this Agreement; and

g.    For any requirements that the City is in partial compliance with, explain why the City is not in substantial compliance and identify specific actions the City must take to achieve substantial compliance.

227.    The Monitor will provide a copy of reports to the Parties in draft form within 90 days after the end of each reporting period. The Parties will have 15 days to provide confidential

Page 57 – FURTHER AMENDED SETTLEMENT AGREEMENT

written comments to the draft report; however, nothing in this paragraph precludes the City and Monitor from communicating orally about the draft report. The Monitor will have 14 days to consider and make any revisions based on the Parties' feedback. Then, the Monitor will post the draft report publicly for 32 days to receive any community input, during which the Monitor shall hold the town hall addressed in Paragraph 230. The Monitor will have 14 days to consider the community input, including from PPA, AMAC, MHA, and the PCCEP, before filing a final report with the Court. The Monitor shall substantiate its compliance assessments and recommendations. The Monitor's reports shall be written with due regard for the privacy interests of individual officers and the subjects involved in the use of force interactions, and the interest of PPB in protecting against disclosure of non-public information. The Parties agree that Monitor reports may be used to evidence compliance or non-compliance with this Agreement, subject to the weight afforded to such reports by the Court.

228.    The Court will hold semi-annual status conferences to discuss the Monitor's reported assessments of whether the City is in substantial compliance with this Agreement, and may accept testimony from the PPA, AMAC, MHA, PCCEP and community members at those hearings.

### 1.    Monitor Communications and Conflicts of Interest

229.    The Monitor will maintain regular contact with the Parties to ensure effective and timely communication regarding the status of the City's implementation of this Agreement. To facilitate this communication, the Monitor will hold regular status teleconferences and in-person or virtual meetings with the Parties on a schedule agreed upon by the Parties and the Monitor. The Parties may speak privately with the Monitor but may not direct the Monitor's conduct or findings, shall respect the Monitor's independence, and will give deference to the expertise of the Monitor. DOJ will not issue monitoring reports.

230.    The Monitor will hold town hall meetings twice a year to discuss this Agreement's

Page 58 – ~~FURTHER~~ AMENDED SETTLEMENT AGREEMENT

implementation process, answer questions about the Monitor's reports, assessments, and recommendations, and hear community perspectives of interactions with PPB as those relate to the requirements of this Agreement. The Monitor will conduct community outreach to promote widespread public participation in the town hall meetings. The public will have the opportunity to make comments or raise concerns at these meetings or via online and/or electronic mail submissions. The Monitor and the City, in consultation with the PCCEP, will ensure that the time and location of these town hall meetings are well publicized with sufficient advance notice and that significant efforts are made to procure attendance of a community body broadly representative of the many and diverse communities in Portland, including persons with mental illness, mental health providers, faith communities, the Black community, people of color, student or youth organizations, and other community organizations.

231.    In addition to using town halls to seek community feedback, the Monitor will solicit feedback from stakeholders, including the PPA, AMAC, MHA, and other impacted individuals and communities and law enforcement who live or work in Portland to ensure the Monitor reaches a broad diversity of people. The Monitor will also use modern tools of communication, such as social media, to ensure the Monitor receives feedback from community members whose voices are not as regularly heard. The Monitor shall maintain a website where the documents referenced herein, including the Monitor's invoices and reports, are readily available to the public.

232.    Except as required or allowed by this Agreement, or with the Parties' mutual consent, the Monitor, including any member of the Monitor's team, will not make any public statements or issue findings with regard to any act or omission of the DOJ, City, PPB, or their agents, representatives, or employees; nor shall it disclose non-public information provided to the Monitor pursuant to this Agreement, and shall not make any statement to the press or public regarding its employment or monitoring activities under this Agreement.

Page 59 – FURTHER AMENDED SETTLEMENT AGREEMENT

233.     The Monitor, including any member of the Monitor's team, may testify as to observations, findings, and recommendations before the Court with jurisdiction over this matter. However, the Monitor, including any member of the Monitor's team, may not testify in any other litigation or investigative or pre-litigative proceeding with regard to any act or omission of the City, PPB, or any of their agents, representatives, or employees related to any matter of which knowledge was received as a result of this Agreement. This paragraph does not apply to any proceeding before a court related to performance of contracts or subcontracts for the Monitor services referenced in this Agreement.

234.     Unless such conflict is waived by the Parties, the Monitor and all members of the Monitor's team will not accept employment or provide consulting services that would present a conflict of interest with the Monitor's responsibilities under this Agreement. The Monitor and all members of the Monitor's team may not enter into any contract with the City, PPB, or the United States while serving as the Monitor unless the Monitor first discloses the potential contract to the Parties and the Parties agree in writing to waive any conflict. The Monitor may not serve as a member of another monitoring team, unless both Parties consent.

235.     The Monitor is not a state or local agency, or an agent thereof, and accordingly, the records maintained by the Monitor are not designated as public records subject to public inspection.

236.     The Monitor will not be liable for any claim, lawsuit, or demand arising out of the Monitor's performance pursuant to this Agreement brought by any person or entity that is not a Party to this Agreement.

### C.     PPB Compliance Coordinator, City Reports, and Records

237.     PPB will hire or retain an employee familiar with the operations of PPB for the duration of this Agreement, to serve as a PPB Compliance Coordinator. The Compliance

Coordinator will serve as a liaison between PPB and both the Monitor and DOJ, and will assist with PPB's compliance with this Agreement. At a minimum, the Compliance Coordinator will:

    a. Coordinate PPB's compliance and implementation activities;

    b. Facilitate the provision of data, documents, materials, and access to PPB personnel to the Monitor and DOJ, as required;

    c. Ensure that all documents and records are maintained as provided in this Agreement;

    d. Assist in assigning compliance tasks to PPB personnel, as directed by the Chief of Police or the Chief's designee; and

    e. Take primary responsibility for collecting the information the Monitor requires to carry out the duties contained in this Agreement.

238. The City shall prepare a status report no later than 45 days after the close of each six-month reporting period. The PPB Compliance Coordinator shall lead the effort in preparing this status report and shall provide copies to the Monitor and DOJ, and shall post the status report on the PPB website for access by PPA, AMAC, MHA, and the public. The City's report shall delineate the steps taken during the reporting period to comply with each requirement of this Agreement.

239. The City shall maintain all records, as applicable, necessary to document their compliance with the terms of this Agreement and all documents expressly required by this Agreement.

**D.    Access to People and Documents**

240. The Monitor shall have full and direct access to all PPB and City staff, employees, facilities, and documents that the Monitor reasonably deems necessary to carry out their duties. If a document requested by the Monitor is a privileged attorney-client communication, the Monitor shall not disclose the document in a manner that destroys that privilege without the approval of the

Page 61 – ~~FURTHER~~ AMENDED SETTLEMENT AGREEMENT

City Attorney. The Monitor shall cooperate with PPB and the City to access people, facilities, and documents in a reasonable manner that minimizes, to the extent possible, interference with daily operations. In order to report on the City's implementation of this Agreement, the Monitor shall regularly conduct reviews to ensure that the City implements and continues to implement all requirements of this Agreement.

241.    For the purpose of assessing the Monitor's work and whether enforcement of this Agreement is appropriate, DOJ as the plaintiff and its consultative experts and agents shall have full and direct access to all City staff, employees, facilities, and documents, to the extent necessary to carry out the enforcement provisions of this Agreement under Section XII, subsection H to the extent permitted by law. DOJ and its consultative experts and agents shall cooperate with PPB and the City to access involved personnel, facilities, and documents in a reasonable manner that minimizes interference with daily operations. DOJ shall provide PPB or the City with reasonable notice of a request for copies of documents. Upon such request, PPB or the City shall provide DOJ with copies (electronic, where readily available) of any documents that DOJ is entitled to access under this Agreement, except any documents protected by the attorney-client privilege. Should the City decline to provide DOJ with access to a document based on attorney-client privilege, the City promptly shall provide DOJ with a log describing the document, including its author, recipients, date of production, and general topic.

242.    All non-public information provided to the Monitor or DOJ by the City shall be maintained in a confidential manner. The underlying data for compliance reviews and outcome assessments will not be publicly available unless properly subject to disclosure under the Oregon Public Records Law. Nothing in this Agreement requires the City to disclose documents protected from disclosure by the Oregon Public Records Law to third parties.

Page 62 – ~~FURTHER~~ AMENDED SETTLEMENT AGREEMENT

E.    **Review of Policies, Trainings, and Investigations**

243.    Within 180 days of the Effective Date, PPB shall revise and/or develop its policies, procedures, and practices to ensure that they are consistent with, incorporate, address, and implement all provisions of this Agreement specific to force, training, community-based mental health services, crisis intervention, employee information system, officer accountability, and community engagement. PPB shall revise and/or develop as necessary other written documents such as handbooks, manuals, and forms, to effectuate the provisions of this Agreement. PPB shall send to the Monitor and DOJ as they are promulgated new or revised policies or procedures regarding use of force, interactions with persons in mental health crisis, and systems of accountability. The Monitor shall have access to the public comments received during the policy universal review period and may consider such input. If the Monitor or DOJ objects to the proposed new or revised policy or procedure because it does not incorporate the requirements of this Agreement or is inconsistent with this Agreement or the law, the Monitor or DOJ shall note the objection in writing within 21 days. If neither the Monitor nor DOJ objects, PPB will implement the policy or procedure as soon as practicable consistently with any collective bargaining obligations that may exist. PPB shall have 21 days to resolve any objections. If, after the 21-day period has run, the DOJ maintains its objection, then the Monitor shall have an additional 21 days to resolve the objection. If either Party disagrees with the Monitor's resolution of the objection, they may demand mediation and the Parties and Monitor shall participate in mediation pursuant to Paragraph 271 of this Agreement. If the dispute is not resolved within 45 days of the start of mediation, either Party may file a motion petitioning the Court for relief pursuant to Paragraph 272 of this Agreement. Upon approval consistent with this Agreement or Court decision, policies shall be implemented as soon as practicable consistent with any collective bargaining obligations that may exist. PPB shall document employee review of new or revised policies and procedures. The Chief shall post on PPB's website final drafts of all new or revised policies that are proposed specific to force, training,

Page 63 – ~~FURTHER~~ AMENDED SETTLEMENT AGREEMENT

community-based mental health services, crisis intervention, employee information system, officer

accountability, and community engagement, to allow the public an opportunity for notice and

comment, prior to finalizing such policies.

244.	The Chief's Office shall coordinate a review of each policy or procedure required by

this Agreement 180 days after such policy or procedure is implemented, and biennially thereafter (on

a regularly published schedule), unless either Party requests an annual review, to ensure that such

policy or procedure provides effective direction to PPB personnel and remains consistent with the

purpose and requirements of this Agreement.

245.	PPB shall apply policies uniformly and hold officers accountable for complying with

PPB policy and procedure.

246.	PPB shall revise and/or develop its training curricula to ensure that they are

consistent with, incorporate, address, and implement all provisions of this Agreement specific to

force, training, community-based mental health services, crisis intervention, employee information

system, officer accountability, and community engagement. PPB shall send new or revised training

curricula regarding use of force, interactions with persons in mental health crisis, and systems of

accountability to the Monitor as they are promulgated, with a copy to DOJ. The Monitor will

provide comments within 14 days and will not unreasonably withhold approval of training curricula.

PPB shall provide initial and in-service training to all officers and supervisors with respect to newly

implemented or revised policies and procedures. PPB shall document employee training in new or

revised policies and procedures.

## F.	Changes, Modifications, and Amendments

247.	Nothing prohibits the Parties from engaging in any informal or formal discussions

regarding this Agreement or the City's compliance with this Agreement. After considering input

from the PPA, AMAC, and MHA, the Parties may jointly stipulate to make changes, modifications,

and amendments to this Agreement, which shall be effective, absent further action from the

Page 64 – ~~FURTHER~~ AMENDED SETTLEMENT AGREEMENT

Court,45 days after a joint motion has been filed with the Court. Any modification of this Agreement by the City of Portland must be approved by the City Council of the City by written ordinance.

248.    Where the Parties or the Monitor are uncertain whether a change to this Agreement is advisable, the Parties may agree to suspend the current Agreement requirement for a time period agreed upon at the outset of the suspension. During this suspension, the Parties may agree to temporarily utilize an alternative requirement. The Monitor will assess whether the alternative is as, or more, effective at achieving the purpose as was the original, and the Parties will consider this assessment along with input from PPA, AMAC, and MHA in determining whether to stipulate jointly to the suggested change, modification, or amendment.

### G.    Partial Termination, Self-Monitoring, and Final Termination

249.    Partial termination will serve to acknowledge the successful efforts of PPB and the City to date and will allow the Parties and Monitor to focus their efforts on areas in which the City is not in or has not maintained substantial compliance. Self-monitoring is a transition phase that involves continued Monitor review of the City's methodology and self-assessments while allowing the City to demonstrate its ability to sustain compliance after termination. Final termination is achieved when the City has satisfied its obligations under this Agreement. As used herein:

    a.  A "discrete section" of this Agreement is a paragraph or group of paragraphs that do not necessarily implicate other provisions of the Agreement and may be assessed for compliance independently of other provisions.

    b.  This Agreement has 35 discrete sections:

        1)    Paragraphs 66-67 (force principles);

        2)    Paragraph 68 (ECWs);

        3)    Paragraphs 69, 70, 72-73, 188 (force reports and reviews);

Page 65 – ~~FURTHER~~ AMENDED SETTLEMENT AGREEMENT

4)      Paragraph 71 (supervisory staffing);

5)      Paragraphs 74-77 (force audits);

6)      Paragraphs 78-79, 81, 84, and 190 (training principles);

7)      Paragraphs 80, 82-83 (training, evaluations, reports, and

        qualifications);

8)      Paragraphs 85-86 (training audits, analyses, and recommendations);

9)      Paragraph 87 (training advisory council);

10)     Paragraphs 88-90 (community-based mental health services);

11)     Paragraphs 91-93 (behavioral health unit);

12)     Paragraphs 94-96 (behavioral health unit advisory committee);

13)     Paragraphs 97-98 (continuing the crisis intervention program);

14)     Paragraphs 99-105 (establishing enhanced crisis intervention team);

15)     Paragraphs 106-111 (behavioral health response team);

16)     Paragraph 112 (service coordination team);

17)     Paragraphs 113-114 (BOEC);

18)     Paragraph 115 (crisis triage);

19)     Paragraphs 116-118 (EIS operation);

20)     Paragraphs 119-120 (EIS staffing);

21)     Paragraphs 121-123 (investigation timelines);

22)     Paragraphs  124-127  (on-scene public safety statements and

        interviews);

23)     Paragraphs 128-129, 131-133 (conduct of IA investigations);

24)     Paragraph 130 (retaliation);

25)     Paragraphs 134-136 (CRC appeals);

Page 66 – FURTHER AMENDED SETTLEMENT AGREEMENT

26) Paragraphs 137 and 245 (discipline and accountability);

27) Paragraphs 138-140 (communication and transparency);

28) Paragraphs 141-144, 151-152 (PCCEP);

29) Paragraphs 145-147, 149 (PPB community engagement);

30) Paragraphs 148, 150, 193 (PPB Stops Data and Annual Reports);

31) Paragraph 189 (outside review of 2020 protest response);

32) Paragraph 191 (training dean);

33) Paragraph 192 (investigating 2020 protest response);

34) Paragraph 194 (body-worn cameras); and

35) Paragraph 195 (new accountability structure).

c. Substantial compliance is achieved if any violations of the Agreement are minor or occasional and are not systemic. The Monitor will assess whether the City has achieved substantial compliance in accord with the provisions of this Agreement.

## 1. Immediate Partial Termination

250. Upon approval of this Section XII, the following discrete sections of the Agreement, which the City has achieved and maintained substantial compliance for at least the prior three complete DOJ assessment reports, are terminated:

a. Paragraph 68 (ECWs);

b. Paragraph 71 (supervisory staffing);

c. Paragraphs 80, 82-83 (training evaluations, reports, and qualifications);

d. Paragraph 87 (Training Advisory Council);

e. Paragraphs 91-93 (Behavioral Health Unit);

f. Paragraphs 97-98 (continuing the crisis intervention program);

g. Paragraphs 99-105 (establishing "Memphis Model" crisis intervention team);

Page 67 – ~~FURTHER~~ AMENDED SETTLEMENT AGREEMENT

h.  Paragraphs 106-111 (Behavioral Health Response Team);

i.  Paragraph 112 (Service Coordination Team);

j.  Paragraphs 113-114 (BOEC);

k.  Paragraph 115 (crisis triage), subject to Paragraph 252(a) below;

l.  Paragraphs 119-120 (EIS staffing);

m.  Paragraph 130 (retaliation);

n.  Paragraphs 134-136 (CRC appeals);

o.  Paragraphs 138-140 (communication and transparency); and

p.  Paragraphs 145-147, 149 (PPB community engagement).

251.    A discrete section that is terminated is no longer subject to enforcement, monitoring, or self-monitoring, and the requirements under the discrete section are no longer part of this Agreement.

252.    The Parties have a current dispute over the meaning of two provisions of this Agreement:

a.  The Parties disagree about the meaning and requirement of Paragraph 115 of this Agreement and whether it should be immediately partially terminated. The Parties shall attend mediation and exchange information to try to resolve the question of whether Paragraph 115 should also be immediately partially terminated. The Parties shall mediate the matter for not more than 60 days after entry of the Section XII amendments. If the Parties come to agreement that Paragraph 115 should be immediately partially terminated, the Parties shall expeditiously file a joint motion stipulating to terminate the obligations under Paragraph 115 of this Agreement independently of other provisions. During the pendency of a joint motion stipulating to partial termination, the United States agrees not to enforce the obligations, and the obligations of the Monitor, and/or the obligations of the

Page 68 – FURTHER-AMENDED SETTLEMENT AGREEMENT

COCL if a Monitor is not yet assessing compliance, and requirements for self-monitoring shall suspend.  The joint stipulated motion will take effect as an order of the Court if the Court does not act within 45 days of the motion being filed. If, after mediation, the Parties do not agree to immediate partial termination, then either Party may file a motion with the Court for determination of the correct interpretation of Paragraph 115. After a hearing on the motion, the Court will make such determination. If the Court's interpretation of Paragraph 115 means that the City was in substantial compliance with Paragraph 115 during the seventh compliance report period, then the Court will immediately terminate Paragraph 115. If the Court determines that the City was not in substantial compliance with Paragraph 115, then Paragraph 115 will remain in this Agreement until the City meets the requirements for self- monitoring followed by partial termination or until Paragraph 115 is otherwise terminated as an obligation of this Agreement, whichever shall first occur.

b. The Parties disagree about the meaning of the phrase "direct access to documents" as that phrase is used in Paragraphs 240 and 241 and how it applies to access to evidence.com  or  equivalent  cloud  storage  service.   The  Parties shall  attend mediation and exchange information to try to resolve the question of the meaning of direct access as stated above regarding Paragraphs 240 and 241. The Parties shall mediate the matter for not more than 60 days after entry of the Section XII amendments. If, after mediation, the dispute remains unresolved, then either Party may file a motion with the Court as permitted by this Agreement.

## 2.     Self-Monitoring Followed by Partial Termination

253.     Upon approval of this Section XII, the following discrete sections in Paragraph 249(b) shall move into self-monitoring:

a.   Paragraphs 88-90 (Community Based Health Services);

b.   Paragraph 94-96 (BHU Advisory Committee);

c.   Paragraphs 141-144, 151-152 (PCCEP); and

d.   Paragraphs 148, 150, and 193 (PPB Stops Data and Annual Reports).

254.     Going forward, within seven days of the Monitor filing each semi-annual compliance report, the Parties will determineidentify whether additional discrete sections are subject to self-monitoring. A discrete section will become subject to self-monitoring if, for each paragraph within the section: (a) the Monitor's first report and DOJ's Seventh Periodic Compliance Assessment Report (ECF 369) found the City in substantial compliance with the discrete section; (b) the Monitor's first report and COCL's final two quarterly assessment reports found the City in substantial compliance with the discrete section; or (c) the Monitor finds the City in substantial compliance with the discrete section for two consecutive reports.

255.     For discrete sections subject to self-monitoring, the City will create a self-monitoring plan in consultation with the Monitor that emphasizes assessments to evidence continued substantial compliance, prepare semi-annual compliance reports subject to the Monitor's evaluation, and report its findings to the Court at non-evidentiary status conferences.

256.     Within 45 days of receipt, the Monitor shall evaluate the City's semi-annual reports to determine whether the City has maintained substantial compliance in accordance with the self-monitoring plan. The Monitor may reasonably request additional time for evaluation and the Parties shall not unreasonably deny such request.

257.     If the Monitor's evaluations find that the City has adequately demonstrated that it has maintained substantial compliance with a discrete section of this Agreement for two consecutive

Page 70 – FURTHER AMENDED SETTLEMENT AGREEMENT

reports, the discrete section will be subject to termination. In that event, the Parties shall file a joint motion stipulating to terminate the obligations under the discrete section of this Agreement independently of other provisions. During the pendency of a joint motion stipulating to partial termination, the United States agrees not to enforce the obligations, and the obligations of the Monitor and requirements for self-monitoring shall cease. The joint stipulated motion will take effect as an order of the Court if the Court does not act within 45 days of the motion being filed.

258.     If the Monitor's evaluations find that the City has not adequately demonstrated that it has maintained substantial compliance with a discrete section subject to self-monitoring, then the City shall prepare additional semi-annual reports until the Monitor determines that the City has adequately demonstrated that it has maintained substantial compliance with the discrete section for two consecutive reports, at which point the discrete section shall be subject to a motion stipulating to partial termination pursuant to Paragraph 257.

259.     If the Parties disagree about whether a discrete section of this Agreement is appropriate for partial termination, prior to filing a contested motion for partial termination, the City will notify DOJ in writing of the grounds for its motion and provide documents to support its position. Thereafter, the Parties will confer within seven days as to the status of compliance, and DOJ may elect to conduct reasonable assessments, or, for any City assertion in the grounds for its motion for partial termination that have not been subject to the Monitor's assessment, the DOJ may request that the Monitor conduct reasonable assessment of that assertion. Such assessment may include on-site observations, document reviews, or interviews with City and PPB personnel. The period of consultation and assessments shall not exceed 30 days; however, DOJ may request a reasonable extension of time, which the City shall not unreasonably deny. If after the period of consultation and assessment the Parties cannot resolve their disagreement about compliance, the Parties agree to participate in mediation pursuant to Paragraph 271 of this Agreement. If the dispute is not resolved within 45 days of the start of mediation, the City may file a motion to terminate

Page 71 – ~~FURTHER~~ AMENDED SETTLEMENT AGREEMENT

discrete sections of this Agreement. If the City moves to terminate discrete sections of this Agreement, DOJ will have 30 days after the receipt of the City's motion to respond, however, DOJ may request reasonable extensions of this deadline which the City shall not unreasonably oppose. If DOJ objects to the City's motion, the Court will hold a hearing on the motion, and the burden will be on the City to demonstrate that the City remains in substantial compliance with the discrete section(s) at issue after successfully self-assessing its compliance for two consecutive self-assessment reports, as provided in this Agreement, and that partial termination is appropriate.

### 3.    Final Termination

260.    This Agreement will terminate in all respects when all discrete sections identified in Paragraph 249(b) have been terminated pursuant to this Agreement.

261.    The City and the United States shall file a joint motion stipulating to final termination of this Agreement once the City has achieved substantial compliance and adequately demonstrated by self-monitoring consistent with this Agreement that it maintained substantial compliance with each respective discrete section(s) not already terminated, and as documented by the joint motions stipulating to partial termination on file or any judicial findings that result from a contested motion for partial termination. The Court shall consider the stipulation of the Parties, the Monitor's reports, and other admissible evidence. During the pendency of a joint motion stipulating to final termination, the United States agrees not to enforce the obligations, and the obligations of the Monitor and requirement for self-monitoring shall cease. The joint stipulated motion will take effect as an order of the Court if the Court does not act within 45 days of the motion being filed.

262.    If this Agreement has not already been terminated in its entirety within three years of the date of the Monitor's appointment, the Court shall hold a hearing in which the City will be invited to provide evidence to the Court of the progress it has made and, if the City chooses, to demonstrate that the City can be released from this Agreement, either in whole or in part. For work that remains, if any, this hearing shall be used as an opportunity to solidify a plan and timeline for

Page 72 – ~~FURTHER~~ AMENDED SETTLEMENT AGREEMENT

completing any outstanding work as efficiently as possible.

### H.    Enforcement

263.    The Parties agree jointly to file this Agreement with the United States District Court for the District of Oregon, in a matter to be captioned United States v. City of Portland, Civil Action No. 3:12-CV-02265-SI. The joint motion shall request that the Court enter the Agreement pursuant to Federal Rule of Civil Procedure 41(a)(2), and conditionally dismiss the complaint in this action with prejudice, while retaining jurisdiction to enforce the Agreement. If the Court does not retain jurisdiction to enforce the Agreement, the Agreement shall be void.

264.    The Court shall retain jurisdiction of this action for all purposes until the City's obligations are terminated as provided by this Agreement.

265.    The United States acknowledges the good faith of PPB and the City in trying to address the remedial measures that are needed to promote police integrity and ensure constitutional policing in the City. The United States, however, reserves its right to seek enforcement of the provisions of this Agreement if it determines that PPB or the City have failed to fully comply with any provision of this Agreement that is not subject to a pending motion stipulating to termination or has not otherwise been terminated as provided by this Agreement.

266.    The United States understands that some portions of this Agreement will take time to implement and that implementation may require changes to, among other things, collective bargaining agreements, the City Code, and current City policies and will likely require additional revenue resources that have not yet been identified at the time this Agreement is executed.

267.    If the United States reasonably believes the City has failed to implement the terms of the Agreement, it shall promptly notify the City in writing and identify with specificity the portion or portions of the Agreement about which it has concerns. Similarly, if the City believes that DOJ has misinterpreted a provision of this Agreement it may promptly notify DOJ of its concerns, noting the

Page 73 – ~~FURTHER~~ AMENDED SETTLEMENT AGREEMENT

specific portions of the Agreement that it believes has been misinterpreted.

268.    Notices provided by the United States or by the City shall be in writing and provided by mail to the following persons:

Chief of Police
1111 SW Second Ave
Portland, OR 97204

City Attorney
1221 SW Fourth Ave., Suite 430
Portland, OR 97204

Section Chief
Special Litigation Section
950 Pennsylvania Ave, NW
Washington, D.C. 20530

U.S Attorney
District of Oregon
1000 SW Third Ave, Suite 600
Portland, OR 97204

269.    Following receipt by mail of any written Notice, the City or DOJ shall respond in writing within 30 days to the concerns raised by the other Party. Depending on the nature and number of concerns, the City or DOJ may request additional time to respond, and such request shall not be unreasonably denied. The Notice and the response thereto shall be considered to be in the nature of settlement discussions subject to Federal Rule of Evidence 408.

270.    If the response fails to resolve the stated concerns, the Parties agree to meet as soon thereafter as is mutually convenient to discuss the City's compliance with the portion(s) of the Agreement identified in the Notice or the interpretation of the Agreement by DOJ. Persons attending the meeting shall have authority to resolve the concerns, unless resolution of the concern requires adoption of an ordinance or resolution by City Council or by the Assistant Attorney General in Charge of the DOJ Civil Rights Division.

271.    If a meeting between the Parties fails to resolve the concerns, the Parties agree to participate in mediation conducted by a mutually agreeable neutral third party. Any such mediation may include the PPA, AMAC, and MHA at the Mediator's discretion and invitation. If the Parties cannot agree upon the selection of a mediator, the Parties shall submit three names of potential mediators to each other. Each Party may then strike two of the three names provided by the other

Page 74 – FURTHER AMENDED SETTLEMENT AGREEMENT

participant. The remaining two names shall be given to the Chief Judge of the U.S. District Court for the District of Oregon and the Chief Judge shall appoint the mediator from one of the names provided.

272.    If mediation fails to resolve the concerns, the United States or the City may file a Motion in the U.S. District Court for the District of Oregon, located in Portland, Oregon, to enforce compliance with the terms of this Agreement or to seek a Declaration of the meaning of this Agreement. The Motion or request for Declaration shall only allege concerns raised by the City or DOJ that were the subject of mediation. The Parties shall then confer with the Court to schedule a date on which the Motion or Declaration shall be heard or will otherwise comply with the Court's preferred procedure. The Judge hearing the Motion shall determine whether or not the Agreement has been breached and may interpret the meaning of the Agreement and has the power to issue an appropriate remedy, if any. If, for any reason, the Judge finds the City is not in compliance with the Agreement, but that noncompliance was beyond the reasonable control of the City, the City shall not be in breach of this Agreement. However, in the event of noncompliance beyond the reasonable control of the City, the Parties agree that the Court may exercise its equitable powers to devise an appropriate remedy or modification of this Agreement to accomplish the same result as that intended by the portion of the Agreement with which noncompliance was found, provided the Parties cannot reach agreement on the remedy or modification. Both Parties retain the right to appeal these decisions.

273.    The Parties agree to defend the provisions of this Agreement and any joint motion filed pursuant to this Agreement. The Parties shall notify each other of any court or administrative challenge to this Agreement. In the event any provision of this Agreement is challenged in any City, county, or state court, removal to a federal court shall be sought by the Parties.

274.    The Parties agree that the provisions of Section XII of this Agreement are not severable and are effective only when Section XII is adopted in its entirety.

Page 75 – ~~FURTHER~~ AMENDED SETTLEMENT AGREEMENT

275.     The City agrees to promptly notify the Monitor and DOJ if any term of this Agreement becomes subject to collective bargaining. The City agrees to keep the Monitor and DOJ apprised of the status of the resulting negotiations.

DATED: April 1March 18, 202665

**FOR THE CITY OF PORTLAND:**

/s/ Robert Taylor
ROBERT TAYLOR
City Attorney

/s/ Heidi Brown
HEIDI BROWN
Chief Deputy City Attorney

/s/ Sarah Ames
SARAH AMES
Deputy City Attorney

/s/ Lisa Rogers
LISA ROGERS
Deputy City Attorney

**FOR THE UNITED STATES OF AMERICA:**

SCOTT E. BRADFORDNATALIE K. WIGHT
United States Attorney
District of Oregon

HARMEET K. DHILLONKRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

R. JONAS GEISSLER
Deputy Assistant Attorney General
Civil Rights Division

PATRICK MCCARTHYSTEVEN H. ROSENBAUM
Chief, Special Litigation Section

/s/ Laura L. Cowall
LAURA L. COWALL
Deputy Chief

/s/ R. Jonas Geissler
R. JONAS GEISSLER
Trial Attorney

Page 76 – FURTHER AMENDED SETTLEMENT AGREEMENT

/s/ *Jeffrey R. Murray*~~*Jared D. Hager*~~
JEFFREY R. MURRAY~~JARED D. HAGER~~
Trial Attorney

/s/ *Catherine Yoon*~~*Amy Senier*~~
CATHERINE YOON~~AMY SENIER~~
Trial Attorney
Special Litigation Section
Civil Rights Division
United States Department of Justice

Page 77 – ~~FURTHER~~ AMENDED SETTLEMENT AGREEMENT

**EXHIBIT 1: PARAGRAPH 142 – AMENDED PCCEP PLAN (ECF 215-1)**

**City of Portland Plan for**
**Portland Committee on Community-Engaged Policing (PCCEP)**

I.    MISSION

To work with the Mayor/Police Commissioner, Portland Police Bureau, and Portland's diverse constituencies to solicit and exchange information between the community and Portland Police Bureau (PPB) to achieve the desired outcomes of equitable policing which exceeds constitutional requirements, and meaningful community engagement with and trust in PPB.


II.    GOALS

PCCEP members will independently assess the Settlement Agreement using the tools outlined in this Plan. PCCEP will work to facilitate positive police/community relationships and promote public safety by assessing PPB's current community engagement processes, and developing recommendations and strategies for systems to increase public outreach and engagement with a broad cross-section of the community, to build confidence and improve outcomes.

Additionally, PCCEP members will review and make recommendations on PPB policies touching the DOJ Settlement Agreement and/or key areas of concern, including constitutional policing, use of force, interactions with people experiencing mental illnesses, complaint investigations, and racial justice.

In order for PPB to effectively build trust with Portland's diverse communities, the communities' concerns must be heard and meaningful action by PPB must be taken.  To facilitate this outcome, PCCEP members will also make recommendations in the key areas of concern for Portland's diverse communities based on the communities' articulated experiences and grievances.

PCCEP's mission and goals will guide the following:

1. Scope of work
2. Membership
3. City's responsibilities
4. Available tools and resources
5. Members' responsibilities
6. Deliverable products


SCOPE OF WORK

PCCEP will engage with Portland's diverse communities in key areas of concern, including constitutional policing, use of force, interactions with people experiencing mental illnesses, complaint investigations, and racial justice. PCCEP will contribute to the development of the

Page 78 – FURTHER AMENDED SETTLEMENT AGREEMENT

PPB Community Engagement Plan, as directed by the Settlement Agreement between the City of Portland and the United States.

Specifically, PCCEP will be authorized to:

- Develop recommendations for PPB systems to engage meaningfully, both short-term and long-term, Portland's diverse communities and improve community relations. Gather and synthesize information from Portland's diverse communities, and make recommendations based on that information in key areas of concern to communicate to the Mayor, PPB, the Office of Equity and Human Rights, the DOJ, and the public at large.

- Review and make recommendations on PPB directives touching the DOJ Settlement Agreement and/or key areas of concern. Provide information to the community on these directives, and solicit feedback and recommendations from the community to share with the PPB.

- With the Mayor's written approval, and after consultation with the other City Commissioners, PCCEP is authorized to identify for off-schedule review directives not related to the DOJ Settlement Agreement or key areas of concern.[1] PCCEP must provide a written explanation for the request, which will be considered by the Mayor and City Commissioners.

- Provide information to and solicit feedback from Portland's diverse communities through focused and targeted round tables and town halls, to be held at least quarterly and be open to the public. PPB presence is required at quarterly town halls.

- Continue to collaborate with the City on surveys regarding Portland residents' experiences with and perception of PPB's community outreach and accountability efforts. PCCEP will consider survey results in developing recommended strategies.

- Provide ongoing feedback to PPB regarding community engagement initiatives already in progress and those added/needed in the future.

- During the effective period of the Settlement Agreement, appear before the Court at the annual status conference to describe to the Court its assessment of the City's progress toward achieving the goals of the Settlement Agreement.

---

[1] PPB directives are generally scheduled for Bureau review every two years. The City recognizes that the community has an interest in a number of directives, and particularly those that are relevant to current events (e.g., Directive 635.10. Crowd Management, with respect to demonstrations; Directive 810.10, Arrest of Foreign Nationals with respect to Portland's status

Page 79 – FURTHER AMENDED SETTLEMENT AGREEMENT

as a Sanctuary City). This authority is intended to allow PCCEP to be responsive to community concerns when there is a compelling interest to review and revise a Bureau practice.

III.    MEMBERSHIP and REPORTING

PCCEP will be comprised of a diverse group of thirteen mayoral-appointed volunteers, who are committed to improving systems-based police/community relationships and ensuring and exceeding constitutional policing standards. Two of the thirteen seats will be reserved for youth members, ages 16-23. The PCCEP will report directly to the Mayor (Police Commissioner) and consult, separately and at least quarterly with the Director of the Office of Equity and Human Rights.

IV.    SELECTION

Inaugural Selection Process

The Mayor, in consultation with the other Council offices, shall work with the community selection panel described below to develop selection criteria and public outreach strategies for the PCCEP selection process.  This process may begin before the Fairness Hearing and approval of the revised Settlement Agreement by the Court.  Following the development of the selection criteria, a written, downloadable application will be posted and available on the City's website. Posted alongside the application will be the deadline for submission, selection criteria, selection process and a description of PCCEP member responsibilities.  The City will engage the community in a variety of ways to communicate the application and selection process, criteria and timelines.   Extra effort will be made to invite people who have experienced mental illnesses to apply.

The inaugural selection process for PCCEP's first year will adhere to the following framework: (1) Application submission; (2) Initial screening of applicants by mayoral staff and a representative from any Council office who wishes to participate; (3) Review and further screening by the Selection Advisory Committee (a panel consisting of five diverse community members, each chosen by the Mayor and other Commissioners); (4) Candidate interviews with Mayor after soliciting feedback about final candidates from each Council office;  (5) Mayoral appointment and (6) Council confirmation.

Youth Member Selection Process

In accordance with best practices for youth-adult partnerships, the process to select youth members ages 16-23 will be as follows: 1) Outreach to and opportunity for recommendations by David Douglas School District, Parkrose School District, and Portland Public Schools (up to three students per district); 2) Outreach through Portland's 2-year and 4-year colleges and universities in collaboration with student led groups and clubs; 3) Application submission; 4) Group interviews by an interview committee comprised of the PCCEP chair/co-chairs, PCCEP staff, Mayor's staff and the invited participation of a representative each from the Albina Ministerial Alliance Coalition for Justice and Police Reform (AMAC) and the Mental Health Alliance (MHA); 5) Recommendations for youth members/alternates by the interview

Page 80 – FURTHER AMENDED SETTLEMENT AGREEMENT

committee to the Mayor; 6) Mayoral appointment; and 7) Council confirmation.

Any youth who apply through the regular process will be incorporated into the youth selection process. Any youth under the age of 18 must obtain permission from a legal guardian (or provide documentation that they are legally emancipated) to apply and serve on the PCCEP.

Ongoing Selection Process

After the PCCEP's inaugural year, a written, downloadable application will continue to be posted and available on the City's website. Posted alongside the application will be the deadline for submission, selection criteria, selection process and a description of PCCEP member responsibilities. Extra effort will continue to be made to invite people who have experienced mental illnesses to apply.

The process to select members (other than youth members) will be as follows: 1) Application submission; 2) Initial screening of applicants by PCCEP staff, a member of the Mayor's staff, staff from any Council office who wishes to participate and a community representative; 3) Interviews (in-person or by phone) by an interview committee comprised of the PCCEP chair/co-chairs, PCCEP staff, Mayor's staff, Council staff if they elect to participate and the invited participation of a representative each from the AMAC and the MHA; 4) Solicitation of community feedback on candidates recommended by interview committee; 5) Mayoral interviews of recommended candidates; 6) Mayoral appointment; and 7) Council confirmation.

The PCCEP will accept applications on an ongoing basis and will maintain an alternate pool of qualified candidates. There will be no minimum or maximum number of alternate PCCEP members.

The Mayor will consider the selection criteria and views of the community in appointing volunteers. City employees may not be appointed to sit on the PCCEP.

V.      TERM

Volunteers will serve two-year terms, with the option to re-apply at the end of a term. During the first year of PCCEP's life, volunteers will be appointed on a staggered basis where the majority of the board will serve two-year terms, and the remainder will serve one-year terms. Applicants will be able to indicate on their application forms whether they wish to serve one or two-year terms. Any volunteers who serve one-year terms will have the option of re-applying for the opportunity to serve a full term. In accordance with City policy for advisory boards and commissions, volunteers can serve no more than eight years on the PCCEP.

VI.     REMOVAL

The Mayor, after consultation with the Council, the PCCEP Program Manager and PCCEP chair (absent a conflict of interest) will have sole discretion to determine when PCCEP members are no

Page 81 – FURTHER AMENDED SETTLEMENT AGREEMENT

longer fit to serve on the committee due to misconduct. If a member is removed or resigns, the selection process identified above will be used to recruit, appoint and confirm the new member.

VII.    CITY'S RESPONSIBILITIES[2]

To establish the PCCEP and facilitate its work, the City will seek the services of a facilitator to structure board orientation for PCCEP members. This orientation shall include training on the *United States v. City of Portland* Settlement Agreement. Specifically, as part of this training, the Albina Ministerial Alliance Coalition for Justice and Police Reform (AMAC) and mental health advocates will be invited to provide information on the history of the Settlement Agreement. After PCCEP's board orientation, the City shall continue to provide resources for member training as needed so that members continue to fulfill their obligations.

The City shall make appropriate information available regarding PPB's current community engagement initiatives, directives, and directive review and implementation process.

The PPB, in particular, and in accordance with its directive review schedule, shall meet with PCCEP during a universal review period to brief members on directives related to the DOJ Settlement Agreement and/or key areas of concern, provide information as needed/requested, and solicit PCCEP member feedback. The PPB shall make the adjustments necessary to its current directive review system in order to integrate PCCEP into the PPB's work.

The City shall provide thorough and timely responses to PCCEP recommendations and requests for information, and shall endeavor to do so within 60 days.

The City shall provide staffing for the PCCEP including a program manager and administrative support. The City will also provide staff support and funding for community organizing/outreach.

---

[2] With the amendments to Section IX of the Settlement Agreement and the development of the PCCEP, the City understands there is concern about the role of the Portland community in monitoring the Settlement Agreement, and updating the wider community on the status of terms of the Settlement Agreement. The City will provide updates to the community on the status of the City's compliance with its obligations under the Settlement Agreement in the following ways: 1) at the annual status conference before the federal district court; 2) through quarterly community meetings with the COCL either separate from or jointly with the PCCEP, and staffed by the City; 3) through reports on the COCL website; and 4) through other means as appropriate. The United States Department of Justice and the COCL will continue to have responsibility for monitoring the City's compliance with its obligations under the Settlement Agreement during the effective period of the Agreement. After the City is

Page 82 – FURTHER AMENDED SETTLEMENT AGREEMENT

found to be in compliance with the Settlement Agreement and the Court, DOJ and COCL are no longer involved, PCCEP will provide recommendations to the Mayor/Police Commissioner regarding continued assessments of the City's progress, generally, and community engagement.

The City shall provide meeting locations, and work with PCCEP to identify neutral locations that are accessible to and appropriate for the community for public meetings.

To ensure constitutional policing, to closely interact with the community to resolve neighborhood problems, and to increase community confidence, PPB shall work with City resources knowledgeable about public outreach processes, the PCCEP and the PPB's Equity & Diversity Manager to develop a Community Engagement Plan, which shall be adopted by Council following a public hearing.

The Mayor's Office shall publish on the City website an annual report, commencing from the date PCCEP begins meeting through the duration of its existence, that will include updates on progress made by the City in key areas of concern and community engagement recommendations.

The Mayor or the Mayor's delegate, and the PPB Chief or the Chief's delegate, shall endeavor to attend all public meetings of PCCEP, unless PCCEP requests otherwise.  Other Commissioners or their delegates are encouraged to attend, unless PCCEP requests otherwise.  The purpose of such attendance is to listen to understand, provide information either at the meeting or as follow-up, and learn from PCCEP members and public testimony.

VIII.    MEMBERS' RESPONSIBILITIES

PCCEP members must engage all participants in a respectful and collegial manner, and be responsible for the following:

- Prior to voting as a PCCEP member:
    - Learn about the history of the *United States v. City of Portland* Settlement Agreement, with an opportunity for AMAC and MHA to participate.
    - Participate in a ride-along with PPB (1 per PCCEP member). If necessary, the City is willing to provide a reasonable accommodation that would instead permit a PCCEP member to participate in a ride-along with a member of the Behavioral Health Unit or a Neighborhood Response Team (in lieu of regular patrol); or participate in a morning walking beat.
    - Review lessons learned from the COAB.
    - Participate in subject matter and board trainings.
    - Learn about:
        - PPB organizational structure;
        - Policy development and implementation process;
        - PPB Racial Equity Plan;
        - PPB Training Division Plan;

Page 83 – FURTHER AMENDED SETTLEMENT AGREEMENT

✦ PPB's Office of Community Engagement and current community engagement initiatives, generally; and

✦ PPB advisory bodies.

- As soon as practicable, attend PPB community academy, if possible as an alternate prior to appointment to PCCEP as a member. If necessary, the City is willing to provide a reasonable accommodation that would instead permit a PCCEP member to observe a session of the community academy and be given a guided tour of the PPB Training Division (with the opportunity to ask detailed questions about the Training Division).

- Gather input from Portlanders regarding experiences with and perceptions of PPB's community outreach. Input will be gathered through culturally responsive and relevant strategies that center the needs of the community. These strategies will include meeting community members where they are physically, mentally, emotionally and spiritually. Such input will be solicited from (though not limited to) the following groups:
  - General consultation with Office of Neighborhood Involvement (ONI) and/or District Coalitions, Coalition of Communities of Color, and ONI's Diverse Civic Leadership partners
  - AMAC, The Portland Commission on Disabilities, the Human Rights Commission, and the New Portlander Policy Commission

- Evaluate national best practices regarding police and community engagement leading to bias-free policing and community trust.

- Analyze prior community surveys and consult with the City to conduct additional community surveys.

- Receive public comment from Portlanders at large.

- Review PPB directives and make recommendations to PPB based on public feedback in key areas of concern.

- Provide ongoing feedback to PPB's Office of Community Engagement on its community engagement practices and initiatives, and provide feedback on PPB's Community Engagement Plan.

- Hold monthly meetings. Meeting agendas shall be structured in a manner that provides a meaningful opportunity for public comment at the meeting prior to the conclusion of deliberations and voting. PCCEP meetings will generally be open to the public. However, if PCCEP reasonably determines that good cause exists on a particular occasion (for example, to deliberate on sensitive matters, such as matters involving personal medical information, or due to safety concerns), the PCCEP may meet without the public present. Facilitators will ensure that no votes are taken without the public having the opportunity to be present.

- Form subcommittees that may meet at other times during the month. Subcommittee meetings must be open to the public and provide an opportunity for the public to weigh in on the substantive matters being considered.

- PCCEP shall coordinate with the COCL to host open town hall meetings at which the COCL

Page 84 – FURTHER AMENDED SETTLEMENT AGREEMENT

provides quarterly reports and the COCL and PCCEP receives public comment on compliance assessments and recommendations to facilitate Portlanders' ability to review compliance and make recommendations.[3]

- Agendas and minutes from all PCCEP meetings will be published on the City website within 10 business days after the meeting date.

IX.    DELIVERABLE PRODUCT

PCCEP shall be responsible for producing the following:

- Summary reports issued (to the Mayor, PPB, DOJ, and the public at large) contemporaneously with quarterly town halls, providing an overview of community concerns around and any recommendations regarding use of force, interactions with people experiencing mental illness, complaint investigations, and racial justice. Strategies and recommendations developed to ensure greater public outreach and engagement, including opportunities for outreach to a broad cross-section of community members, to inform PPB's Community Engagement Plan, utilizing the following procedure:

    1. PCCEP shall consult with community members and hold at least two (2) public hearings, to be completed within 180 days of PCCEP members being seated (PCCEP's town halls may be utilized for this purpose). To gather public input on PPB's outreach efforts and progress towards eliminating unconstitutional disparate treatment, the hearings shall be held in locations to ensure that PPB receives input from all parts of the Portland community. PCCEP shall review PPB's prior community outreach efforts to contribute strategies to the development of a new Community Engagement Plan.

    2. PCCEP shall meet at least quarterly with the Director of the City's Office of Equity and Human Rights and PPB's Manager of Equity & Diversity, including a review of PPB's current Racial Equity Plan, and evaluate PPB's ongoing efforts to implement that plan.

---

[3] Should COCL decline to combine its quarterly town halls with PCCEP's town halls, the COCL may hold separate town halls for community feedback, with staff support from the City.

3. *PCCEP shall suggest for inclusion in the Community Engagement Plan strategies to ensure greater public outreach and engagement, including opportunities for outreach to a broad cross-section of community members.  The parties recognize that meaningful public engagement involves the ability of community members to affect policies, practices, and PPB culture, thereby improving outcomes and eliminating unconstitutional actions.*

4. *PCCEP may also provide information to the PPB on other areas related to meaningful community engagement and outreach to contribute to the development of the Community Engagement Plan.  The Plan will specify how to integrate community values and problem-oriented policing principles into PPB's management, policies and procedures.*

5. *PCCEP will spend the first year gathering information from the public and compiling recommendations for PPB's Community Engagement Plan.  Recommendations shall be submitted to PPB within one year of PCCEP members being seated.*

6. *The Chief's Office shall consult with the PCCEP and shall consider and utilize to the extent practicable PCCEP's recommendations in developing and implementing the Community Engagement Plan.  The Chief's Office shall present the final proposed Community Engagement Plan (with implementation timeline) to the PCCEP for its final review and comment within 45 days of receiving PCCEP's recommendations.  The recommended Community Engagement Plan shall be considered by the City Council in a public hearing, leading to the Council's adoption of the Plan after review and amendments if indicated.*

*The PCCEP shall meet at least twice per year with the Chief, the Police Commissioner, PPB Precinct Commanders, PPB Neighborhood Response Teams, and a representative of the Office of Neighborhood Involvement Crime Prevention to assess and solicit comment on PPB's activities in regards to community outreach, engagement, and problem-solving policing. The PCCEP shall also provide the opportunity for public comment at any town hall and roundtable meetings to keep open lines of communication with the public at-large.  The PCCEP may also invite testimony from other City bodies, including but not limited to PCoD, BHUAC, TAC, HRC, CRC and the citizen members of the PRB.*

Page 86 – ~~FURTHER~~ AMENDED SETTLEMENT AGREEMENT

**ATTACHMENT 1: PARAGRAPH 191 – ROLES AND RESPONSIBILITIES**

YELLOW = Academic Director
BLUE = Captain
GREEN = Both

| Academic Director | Shared | Captain |
|---|---|---|
| <ul><li>Lesson plan final approval</li><li>Forecasting/scheduling of the yearly training calendar</li><li>Needs assessment and surveys (analyst supervision)</li><li>Instructor development/training</li><li>FTEP and recruit officers training</li><li>Ensure training adheres to policy</li><li>Procedural Justice program</li><li>Patrol Procedures Patrol Vehicle, Operations, Control Tactics, Firearms program training</li><li>Community academy training</li><li>Advanced academy</li><li>Supervisor in-service</li><li>Inservice</li><li>Outside training approval</li><li>Approval of PPB training provided outside the Training Division</li><li>Learning Management System</li><li>Video Production unit</li><li>PS3 training</li><li>Able Program</li><li>CIT/ECIT training</li><li>Satellite instructor schools training</li><li>Return to work training for members who have been on extended leave</li></ul> | <ul><li>Instructor Selection</li><li>DPSST coordination</li><li>FTEP and recruit officers</li><li>Budget</li><li>Wellness programs</li><li>Patrol Procedures Patrol Vehicle, Operations, Control Tactics, Firearms program</li><li>Sworn and non-sworn performance evaluations</li><li>Community academy</li><li>Leadership program</li><li>Officer involved shooting reviews</li><li>Satellite instructor schools</li><li>Training Advisory Council (TAC)</li><li>PRB advisory member</li></ul> | <ul><li>FTEP and recruit officer assignments</li><li>EAP</li><li>Armory and equipment management</li><li>Facility use management (internal and external users)</li><li>Patrol Procedures Patrol Vehicle, Operations, Control Tactics, Firearms program assignments</li><li>Community academy assignments</li><li>Cadet program coordination</li><li>Satellite instructor school assignments</li></ul> |