# SETTLEMENT AGREEMENT ON POLICING IN PORTLAND

## Semi-Annual Compliance Report
## July 1, 2025 – December 31, 2025

Prepared by the Independent Court-Appointed Monitor

JUNE 16, 2026

# Table of Contents

Letter from the Monitor ........ Page 3

Work Conducted by the Monitoring Team During the Reporting Period ........ Page 5

Notes about Reading this Report ........ Page 8

Executive Summary ........ Page 11

Compliance Tracking Chart ........ Page 16

Compliance Tracking Over Time ........ Page 17

Compliance Assessments by Settlement Agreement Section ........ Page 18

- Use of Force ........ Page 18
- Employee Information System ........ Page 44
- Addendum of Additional Remedies ........ Page 51

Discrete Sections in Self-Monitoring ........ Page 60

- Self-Monitoring Evaluation Chart ........ Page 62

Terminated Discrete Sections ........ Page 90

Outcome Measurements ........ Page 91

Work to Be Completed; Anticipated Barriers to Substantial Compliance ........ Page 109

Appendix ........ Page 111

- Settlement Agreement Paragraph Summaries ........ Page 112
- Random Sampling and Margins of Error ........ Page 116
- Glossary of Acronyms ........ Page 119

# Letter from the Monitor

On behalf of the Independent Court-Appointed Monitoring Team, I am pleased to present our third semi-annual report on the City's compliance with the Settlement Agreement on Policing in Portland. As with all aspects of the Monitorship, we have invariably upheld the principle of independence in our efforts to complete this report. Our determinations about the status of the City's and the Portland Police Bureau's compliance with the Settlement Agreement are not, and must not be, unduly influenced by the preferences of either the City or the United States Department of Justice. Rather, our findings are based on our own objective assessments reached in reliance on the information evidencing compliance that was made available to us for this report.

As will always be the case, we place immense value on the commentary we have received from both Parties to the Settlement Agreement regarding this report, just as we do on the commentary we have received from the Portland community. We have dutifully considered all of it in arriving at our assessments. With that being said, the Monitoring Team's final assessments are ultimately our own, and each one is based on our independent judgment of all relevant evidence provided to us demonstrating the City's level of compliance with the requirements in the Settlement Agreement.

Our compliance assessments during this Reporting Period (Q3-Q4 2025) found that the City and PPB commendably improved their adherence to the Settlement Agreement's requirements in some areas, although they unfortunately regressed in their adherence to some others. In the overwhelming majority of Settlement Agreement paragraphs that we assessed, the level of compliance by the City and PPB held steady from the last Reporting Period (Q1-Q2 2025). Recognizing the City's proximity to reaching full Substantial Compliance with the Agreement, and remaining mindful of all of the effort it has put into doing so for more than a decade, the Monitoring Team is committed to producing recommendations that the City can follow to solidify the substantial progress it has already made and facilitate further progress wherever it is needed. This commitment is focused on accelerating the City along its path to demonstrating full compliance with the remaining provisions in the Agreement, achieved through the durable implementation of impactful reforms that benefit both PPB and the broader Portland community.

Renewing a theme from our previous compliance report, this Reporting Period was notable for the number of Settlement Agreement paragraphs that were in self-monitoring status during it—40 of the remaining 55 paragraphs in total. It is important to acknowledge again the work done by the City and PPB to arrive at this balance that leans heavily in favor of provisions with which the City has already demonstrated sustained compliance. Having nearly three-quarters of the Agreement's remaining paragraphs a step closer to termination is objectively commendable, and it only serves to intensify our determination to see the City reach full Substantial Compliance—and to see PPB's policing continue to improve as a result.

Also of note in this report is the inclusion of initial outcome measurements conducted by the Monitoring Team. These analyses are focused on providing information that can assist in determining the impact that the Settlement Agreement's implementation has had on a number of variables that directly affect members of the broader Portland community. We look forward to building on the measurements that are provided here in future reports, and to broadening our overall discussion of measurable outcomes that the Settlement Agreement has created over time.

Finally, as I did in each of our previous compliance reports, I would like to once again restate the Monitoring Team's genuine commitment to listening to voices from every corner of the Portland community. We initiated the Monitorship with that very commitment, and we will continue to uphold it throughout our term as the Independent Court-Appointed Monitor. I remain steadfast in my belief that our Team must always maintain an open ear to all of the diverse communities that make up Portland in order to monitor compliance with the Agreement effectively.

On behalf of the Monitoring Team, thank you for allowing us to present our third semi-annual report on the City's compliance with the Settlement Agreement.

Very respectfully,

Mark P. Smith
Lead Monitor

# Work Conducted by the Monitoring Team During the Reporting Period

During the Reporting Period of July 1 – December 31, 2025, the Monitoring Team endeavored to complete the core activities necessary to independently and objectively assess the City of Portland's (City's) compliance with the Settlement Agreement. A significant portion of those activities involved our continued review of compliance materials, self-monitoring plans and reports, training curricula, proposed policy revisions, use of force reports and investigations, complaint investigations and other accountability-related materials, and additional documentation relevant to various provisions of the Settlement Agreement. The Monitoring Team also continued to meet with a broad variety of stakeholders from the Portland community, as well as both Parties, the Portland Police Bureau (PPB), Independent Police Review (IPR), staff of the Community Board for Police Accountability (CBPA), etc. in order to remain informed about issues relevant to compliance.

In November 2025, the Monitoring Team hosted its second Town Hall at the Vancouver Avenue First Baptist Church. The event served as a vital platform for public dialogue about the City's progress toward compliance with the Settlement Agreement. A diverse audience, combining in-person and online attendance, provided meaningful input on a draft of the Monitoring Team's second compliance report and also shared their own perspectives on the performance of PPB and the impact of policing on the people whom it serves. We carefully considered every comment we received during the Town Hall, in addition to all written public comments that were submitted to us while our draft report was publicly posted, prior to finalizing and filing our second compliance report with the Court.

As was true with regard to the Monitoring Team's first Town Hall, the one during this Reporting Period provided a crucial opportunity for us to hear directly from members of the Portland community. This public input process is a necessary and required complement to the meetings we have with, and the input we receive from, the City and PPB. We remain deeply appreciative of any occasion during which we can receive and absorb such insightful input prior to the completion of our semi-annual compliance reports.

Also during this Reporting Period, the Monitoring Team met with a range of community, advisory, civic, public safety, behavioral health, and police accountability stakeholders, including representatives of community and culturally specific organizations, local and county government offices, public health and public safety entities, and established police oversight and advisory bodies. A non-exhaustive list of individuals and groups with whom the Monitoring Team met during this Reporting Period follows here (note that some of these meetings were held in-person, others were conducted remotely, and some were a hybrid of those two):

- Albina Ministerial Alliance Coalition for Justice and Police Reform
- Cascadia Health/Project Respond
- Citizen Review Committee
- Focused Intervention Team – Community Oversight Group
- Interfaith Peace & Action Collaborative
- Japanese American Citizens League
- Latino Advisory Council
- Mental Health Alliance
- Multnomah County District Attorney
- Multnomah County Health Department
- Multnomah County Local Public Safety Coordinating Council
- Multnomah County Sheriff's Office
- Muslim Advisory Council
- Office of Commissioner Julia Brim-Edwards/Multnomah County
- Office of Congresswoman Janelle Bynum
- Office of Congresswoman Maxine Dexter
- Office of Councilor Koyama Lane/City of Portland
- Portland Committee on Community Engaged Policing
- Portland Police Association
- Portland Street Response
- Pride Northwest
- The Miracles Club
- The Portland Observer
- The Skanner
- Training Advisory Council/Continuous Quality Improvement Subcommittee
- Tsuru4Solidarity
- Volunteers of America/Oregon

It is our hope that the list of community members and organizations with whom we are able to meet will continually grow. The Monitoring Team places a high value on having diverse community voices inform our Monitorship activities, and we intend to continue upholding that value through further engagements such as those listed above. Through all of our conversations with the community thus far, we are confident that we have gained crucial information and guidance that provides us with context and perspective as we carry out our duties.

The Monitoring Team's work during this Reporting Period included the review of the City's self-monitoring efforts. We commented on drafts of the City's self-monitoring plans and provided feedback to support the continuous improvement of the City's self-assessment practices. We also continued to refine our methodologies for conducting the outcome measurements that are required by the Settlement Agreement. Building on methodologies shared in prior quarters, we incorporated

further feedback from the Parties in anticipation of performing data collection and analysis in order to effectively complete these measurements.

Numerous members of the Monitoring Team conducted one or more site visits to Portland during this Reporting Period. During each such visit, we sought to be as productive as possible in conferring with the City and members of PPB's command staff about compliance matters, observing PPB trainings, sitting down with stakeholders in the community, and otherwise making any relevant observations that could assist us in most effectively assessing the City's compliance with the Settlement Agreement. In addition to our in-person visits, members of the Monitoring Team observed a variety of meetings remotely during the Reporting Period, including multiple hearings of the Police Review Board as well as an internal PPB briefing on a critical incident that occurred during the period.

The Monitoring Team looks forward to the next opportunity to report on our continuing work. In the meantime, we would like to invite public feedback on any issues that may be of relevance to the Monitorship. Following is information on how to get in contact with us:

The Monitoring Team can be reached via phone at: (503) 451-0289.
The Monitoring Team can be reached via email at: info@portlandpolicemonitor.com.
The Monitoring Team's website can be accessed here: portlandpolicemonitor.com.

# Notes about Reading this Report

- The Independent Court-Appointed Monitoring Team's compliance assessment report is intended to be read in conjunction with the Settlement Agreement on Policing in Portland. In an effort to avoid being unnecessarily duplicative in this report, we have not reproduced verbatim the language of each Settlement Agreement paragraph that we assessed for compliance. Some of our written assessments do recite substantial portions of the Settlement Agreement's wording, while others move immediately into the assessment itself without the inclusion of any Settlement Agreement language. In either case, we wrote the report acknowledging that the most recent version of the Settlement Agreement filed with the Court is publicly accessible at any time should there be a desire to consult it, including on the Monitoring Team's website, here.

- As the Settlement Agreement periodically undergoes amendments and updates, it is important to note that the Monitoring Team gave consideration to all provisions of the Agreement that were in effect at any point during the Reporting Period (Q3-Q4 2025) as we conducted our compliance assessments.

- Additionally, in case it proves convenient, we have provided summaries of each Settlement Agreement paragraph for which we assessed the City's compliance in the Appendix to this report.

    - These summaries are inclusive of paragraphs that were in self-monitoring status, which is discussed in greater detail later in this report.

- Guided by the language of the Settlement Agreement as well as the historical reports on the City's compliance with it that were conducted by the Compliance Officer/Community Liaison, and as noted in the Monitoring Team's Methodological Plan, we used the following compliance standards in reaching our assessments:

    - **Substantial Compliance**: The City/PPB has satisfied the requirement of the provision in a comprehensive fashion and with a high level of integrity, and any violations of the Agreement are minor or occasional and are not systemic.
    - **Partial Compliance**: The City/PPB has made significant progress toward the satisfaction of the provision's requirements, though additional work is needed.
    - **Non-Compliance but Initial Steps Taken**: The City/PPB has begun the necessary steps toward compliance, though significant progress is lacking.

It is worthwhile to communicate the Monitoring Team's position that a finding of Substantial Compliance for a Settlement Agreement paragraph should not be interpreted as a

minimization or diminution of the potential impact of any violations of that paragraph's requirements. For instance, even if a finding of Substantial Compliance is attained with regard to a paragraph that requires officers to use the least amount of appropriate force on a subject, the occurrence of even one event wherein an officer used more than the least amount of appropriate force on a subject may still result in severe consequences for that subject.

Conversely, it is also worthwhile to communicate the Monitoring Team's position that a finding of Partial Compliance for a Settlement Agreement paragraph should not be interpreted as a minimization or diminution of the measurable and verifiable progress made by the City/PPB toward compliance with that paragraph's requirements. The additional work that is needed in order to attain a finding of Substantial Compliance for such a paragraph may often be easily within reach for the City/PPB, specifically because of the progress they have already made and the efforts they have already expended toward meeting the Settlement Agreement's requirements.

- Some of the Monitoring Team's assessments of compliance with the Settlement Agreement relied on the selection of a sample of cases. The size of each sample was determined by the number of cases needed to attain a statistically sound sample based on the total number of cases provided by the City/PPB and may have included oversampling for rare events that were part of our assessment. For instance, when we drew a sample from the population of force events, it was selected using stratified random sampling to ensure an even distribution of events involving subjects with and without perceived mental health concerns.

  The Monitoring Team acknowledges that larger sample sizes are preferable to smaller ones, particularly insofar as the former allow for the review of a greater number of cases and, therefore, greater precision in making compliance assessments. In selecting our samples for this semi-annual compliance report, we strived to balance this position with other relevant variables including, but not limited to, the sample sizes used in the past by the Compliance Officer/Community Liaison, the time and resources available to us as we completed our assessments, and the type and amount of material we would need to review for each case in a given sample (such as multiple body-worn camera videos, for instance).

  The Monitoring Team also acknowledges that results from sampled data may differ to some degree from true compliance rates arrived at when all data available in a population of relevant cases is reviewed. To account for this and provide additional clarity to our findings, we calculated Margin of Error (MOE) estimates, where necessary, to characterize the precision of our findings. For example, a reported compliance rate of 94% may have an MOE of ± 5%, which would be stated as (94% ± 5%). A more detailed discussion of when and how MOEs were calculated in this report can be found in the report's Appendix.

- As required by the Settlement Agreement, the Monitoring Team provided recommendations to the City/PPB on how to achieve and maintain Substantial Compliance for each paragraph we assessed as not having achieved that status during this Reporting Period.

  Additionally, in some instances where the Monitoring Team determined that the City/PPB was in Substantial Compliance with a particular Settlement Agreement paragraph during this Reporting Period, we offered recommendations intended to support ongoing compliance into and beyond future Reporting Periods. These recommendations should not be construed as detracting from the City's/PPB's achievement of Substantial Compliance with the associated paragraph.

  Finally, irrespective of compliance status, the Monitoring Team made additional recommendations about some paragraphs, based on our assessment, intended as technical assistance and/or general suggestions for improvements to the City/PPB, which are not required for compliance with the Settlement Agreement.

- Included in this report are two compliance tracking charts. The first chart shows the Monitoring Team's compliance findings for each paragraph that we were responsible for assessing during this Reporting Period; the second chart displays the Monitoring Team's compliance findings from previous Reporting Periods alongside those from the current one, in order to allow for a comparison of our findings over time. Both of these charts can be found directly following the Executive Summary below.

# Executive Summary

This Semi-Annual Compliance Report, covering the period from July 1, 2025 through December 31, 2025 (the Reporting Period), evaluates the Portland Police Bureau's (PPB's) implementation of reforms required by the Settlement Agreement between the City of Portland (City) and the United States Department of Justice (Settlement Agreement). This report presents a detailed assessment of PPB's compliance with the active provisions of the Settlement Agreement, as independently evaluated by the Independent Court-Appointed Monitor (Monitoring Team).

This report also incorporates data-driven analyses, findings, and recommendations derived from documentary review, interviews, observations, and other source materials including data and information supplied by PPB. The report reflects the Monitoring Team's independent determinations regarding progress made as well as challenges remaining in reaching full compliance with the Settlement Agreement and achieving the goals of providing constitutional policing, demonstrating public accountability, and enhancing community trust.

The United States Department of Justice (DOJ) launched a civil rights investigation into the Portland Police Bureau on June 8, 2011, in response to concerns about patterns of use of force, particularly against individuals experiencing mental health crises. That investigation concluded on September 13, 2012, with the DOJ finding that PPB officers engaged in a pattern or practice of unnecessary or unreasonable force during interactions with people who had or were perceived to have mental illness. Additionally, the DOJ's examination identified concerns regarding the failure to provide adequate and timely access to medical care as well as the need to strengthen community policing. Specifically in relation to this last issue, the DOJ noted its observation that PPB could benefit from building additional bridges with minority communities, including but not limited to the African American community.

In response to the DOJ's findings, the City and the DOJ entered into a court-enforceable Settlement Agreement on October 26, 2012. The Portland City Council unanimously approved the Settlement Agreement on November 14, 2012, and the United States District Court, District of Oregon (the Court) formally accepted the Agreement and retained jurisdiction on August 29, 2014. The original Settlement Agreement contained a set of provisions for reform across multiple domains, including policies, training, supervision, accountability, community engagement, and oversight. Many amendments have been made to the Settlement Agreement over time, including some that were intended to strengthen aspects of the Settlement Agreement related to community oversight and others that were adopted to address PPB's response to protests and demonstrations following the murder of George Floyd by a police officer in Minneapolis, Minnesota. These amendments emphasized proper and justifiable uses of force, enhanced oversight and accountability, and additional transparency related to crowd management operations and other law enforcement activities.

Another amendment to the Settlement Agreement was entered as an Order of the Court on November 30, 2023, introducing Section XII, which established the role of an Independent Court-Appointed Monitor to assess the City's and PPB's compliance with the active provisions of the Agreement. On May 15, 2024, the Court appointed MPS & Associates, LLC to serve as the Independent Court-Appointed Monitor. This report represents the Monitoring Team's third semi-annual assessment since assuming that role.

The Monitoring Team's assessment finds that PPB is in Substantial Compliance with a sizeable majority of the monitored provisions of the Settlement Agreement. However, a handful of areas remain in Partial Compliance and warrant additional focused attention. The recommendations included in this report reflect the Monitoring Team's technical findings and strategic direction to promote and support full and sustained compliance with all remaining provisions of the Settlement Agreement.

**Settlement Agreement Section III – Use of Force**

The Monitoring Team's assessment of PPB's compliance with the Settlement Agreement's use of force provisions involved a review of relevant directives, 50 randomly selected events involving the use of non-deadly force, two deadly force investigations, PPB After-Action Reports (AAR), the PPB Office of the Inspector General (OIG) Applications of Force Report, quarterly and annual Force Analysis Summary Reports, and an audit of the Force Audit Report prepared by the OIG. Our reviews were guided by specific requirements set forth in Section III of the Settlement Agreement and were conducted by members of the Monitoring Team with subject matter expertise in law enforcement oversight, policy, and data analysis. Each case we reviewed was evaluated against the specific language of the Agreement, and multiple levels of review were employed to ensure rigor, objectivity, and consistency across all assessments.

The Monitoring Team's review of use of force investigations and audits found that although a sizeable majority of the numerous related requirements in the Settlement Agreement and in PPB policy were consistently met with a high level of integrity, a handful of significant ones were not. In particular, supervisors responding to use of force events are required to complete many different tasks, such as conducting interviews and making necessary notifications; some of these requirements take effect in conjunction with the presence of specific circumstances related to the force event. In a significant number of the cases we reviewed, supervisors did not complete all the tasks that were required of them. We recommend reinforcing with supervisors the need to complete all required tasks and identifying an additional accountability mechanism that will assist them in ensuring they have not left any required tasks incomplete. With regard to the investigations that supervisors conduct into use of force incidents, our review identified a number of instances when required documentation was not complete or when appropriate corrective action was not taken in response to a deficient investigation.

Our review of PPB's audits of use of force data revealed that they successfully analyzed some, but not all, of the objectives they are required to focus on by the Settlement Agreement. As part of the remedy for this, we recommend that PPB strengthen its force-analysis and audit reporting by providing explanations for why particular officers, units, or groups are flagged, identifying issues to be corrected or approaches to be duplicated elsewhere, and providing more methodological detail and follow-up information in its findings reports.

**Settlement Agreement Section VII – Employee Information System**

The Monitoring Team's assessment of PPB's compliance with the Settlement Agreement's Employee Information System (EIS) provisions was informed in large part by reviews of relevant directives and standard operating procedures (SOPs), as well as reviews of the results of analyses conducted by PPB's EIS staff. The Monitoring Team also examined the ways in which force audit data was used to identify trends and assess supervisory performance, and we evaluated whether threshold-based alerts were functioning as intended to prompt timely and meaningful interventions. PPB has developed policies and procedures intended to support early identification of potentially problematic patterns at the individual and supervisory levels. Supervisors are required to review the performance of officers under their command, and the EIS appropriately includes mechanisms for analyzing officers' activity and triggering case management reviews when force usage exceeds established thresholds.

The requirements in this section have largely been met successfully by PPB. The Monitoring Team noted in our review that, during the Reporting Period, PPB made efforts to improve the validity and reliability of certain EIS data through improved reporting protocols. We continue to encourage further improvement to the EIS as well as broadened analyses of its data, both of which should increase the system's utility in identifying and comparing patterns of activity by different units and supervisors throughout PPB. One potential improvement would be a recalibration of EIS threshold breaks to ensure that they are optimally configured to flag those circumstances that warrant some type of intervention with an officer.

**Settlement Agreement Section XI – Addendum of Additional Remedies**

The Monitoring Team's review of the Addendum of Additional Remedies provisions focused on compliance with key technical and procedural requirements related to PPB's reporting systems, oversight structure transitions, third-party review of 2020 crowd-control activities, training initiatives, and implementation of a body-worn camera program. Our assessments included document reviews, data sampling, interviews with relevant personnel, and audits of compliance across multiple operational domains. Each provision was evaluated for adherence to the Settlement Agreement. The City and PPB continued to demonstrate their compliance with the Settlement Agreement in some areas, including the completion of an independent crowd-control assessment

and the development of force reporting and investigation forms that document when they are edited.

Our review also identified areas within this section where PPB and the City's work remains in progress. An Independent Police Review investigation series requires final adjudication, consistent adherence to PPB's body-worn camera policy must continue to be reinforced, and the Oversight System (comprised of the CBPA and the Office of Community-based Police Accountability) must be fully staffed and operationalized as part of the City's new police oversight system. Collectively, our recommendations in this section reflect a continued focus on making further progress toward these critical yet complex and multifaceted requirements.

**Discrete Sections in Self-Monitoring**

Self-monitoring is a transition phase in which the City assesses its own compliance with provisions of the Settlement Agreement, thereby demonstrating its ability to maintain Substantial Compliance with certain provisions already found to be in that status by previous compliance assessments (including the Monitoring Team's). The Monitoring Team consults on the City's self-assessment methodologies and evaluates the City's self-assessment reports. If our evaluations find that Substantial Compliance with these provisions has been maintained—as self-assessed by the City in accordance with its self-monitoring plans—for two consecutive Reporting Periods, then the provisions become subject to termination. Of note, and as a result of sustained compliance demonstrated by the City, the majority of Settlement Agreement provisions remaining in effect during this Reporting Period were in self-monitoring status.

Settlement Agreement paragraphs that are in self-monitoring status are grouped into discrete sections, which the Agreement defines as paragraphs or groups of paragraphs that do not necessarily implicate other provisions of the Agreement and may be assessed for compliance independently of other provisions. The part of our report focused on paragraphs in self-monitoring status is organized according to these discrete sections, as they are laid out in the Agreement itself. Across these sections, a total of 27 Settlement Agreement paragraphs were in self-monitoring status. Our review of each of them examined PPB's and the City's self-monitoring plans, the primary materials upon which those plans relied in order to yield reliable compliance assessments, and the compliance reports ultimately produced by the City and PPB.

We determined that the City maintained Substantial Compliance in accordance with the self-monitoring plans for all but one of the paragraphs in self-monitoring status. In conducting our evaluations of the City's self-monitoring efforts, we also noted some areas that could benefit from greater clarity, specificity, and/or thoroughness. Strengthening its self-monitoring efforts in these areas will allow the City to more comprehensively and effectively assess its compliance with the Settlement Agreement.

With regard to the Accountability section of the Settlement Agreement, and the paragraphs under it in self-monitoring status, our review determined that although the City's self-monitoring plans reflected the language of the Agreement in effect during the Reporting Period, the data it produced to evidence its compliance with the paragraphs and the self-monitoring reports it produced were focused on the requirements in language from a previous version of the Agreement. Given this discrepancy, our evaluations of the City's self-monitoring efforts with respect to these specific paragraphs focused on the evidence of compliance that was provided and the conclusions that the City reached in reliance on it.

**Terminated Discrete Sections**

As indicated in the Settlement Agreement, the termination of a discrete section reflects an acknowledgment of successful efforts by PPB and the City to demonstrate sustained Substantial Compliance with the paragraphs comprising the section. Once a discrete section is terminated, it is no longer subject to enforcement, monitoring, or self-monitoring, and the requirements it contains are no longer part of the Settlement Agreement. Since the Monitoring Team's last semi-annual compliance report, four discrete sections, covering 13 paragraphs, have been terminated.

**Outcome Measurements**

The Settlement Agreement calls on the Monitoring Team to conduct semi-annual qualitative and quantitative outcome assessments to measure whether implementation of the Agreement has created a series of intended outcomes. Our initial outcome assessments, included in this report, began with an examination of PPB's uses of force over time. We presented historical data on trends in force events, subjects of force, applications of force, types of force used, and categories of force.

Our conclusions based on these data included the following: uses of force have declined over time in absolute numbers, the number of applications of force, and the number of subjects of force; as PPB transitioned Category IV uses of force to De Minimis force, the number of Category III force events increased; and the number of subjects of force in actual or perceived mental health crises has declined at a greater rate than the number of subjects not in actual or perceived mental crisis.

# Compliance Tracking Chart[1]

| Settlement Agreement Paragraph | Compliance Assessment |
| --- | --- |
| **Use of Force** | |
| *Use of Force Reporting Policy and Use of Force Report* | |
| Paragraph 69 | Substantial Compliance |
| *Use of Force Supervisory Investigations and Reports* | |
| Paragraph 70 | Substantial Compliance |
| Paragraph 72 | Substantial Compliance |
| Paragraph 73 | Partial Compliance |
| *Compliance Audits Related to Use of Force* | |
| Paragraph 74 | Substantial Compliance |
| Paragraph 75 | Substantial Compliance |
| Paragraph 76 | Partial Compliance |
| Paragraph 77 | Substantial Compliance |
| **Employee Information System** | |
| Paragraph 116 | Substantial Compliance |
| Paragraph 117 | Substantial Compliance |
| Paragraph 118 | Substantial Compliance |
| **Addendum of Additional Remedies** | |
| Paragraph 188 | Substantial Compliance |
| Paragraph 192 | Partial Compliance |
| Paragraph 194 | Partial Compliance |
| Paragraph 195 | Partial Compliance |

[1] This chart includes the Settlement Agreement paragraphs subject to compliance assessment by the Monitoring Team during the Reporting Period. It does not include paragraphs subject to self-monitoring by the City; for more information about those paragraphs, see this report's Self-Monitoring Evaluation Chart.

# Compliance Tracking Over Time[2]

| Settlement Agreement Paragraph | Q3-Q4 2024 Compliance Assessment | Q1-Q2 2025 Compliance Assessment | Q3-Q4 2025 Compliance Assessment |
|---|---|---|---|
| **Use of Force** | | | |
| *Use of Force Policy* | | | |
| Paragraph 66 | Substantial Compliance | Moved into Self-Monitoring | Self-Monitored |
| Paragraph 67 | Substantial Compliance | Moved into Self-Monitoring | Self-Monitored |
| *Use of Force Reporting Policy and Use of Force Report* | | | |
| Paragraph 69 | Partial Compliance | Substantial Compliance | Substantial Compliance |
| *Use of Force Supervisory Investigations and Reports* | | | |
| Paragraph 70 | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| Paragraph 72 | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| Paragraph 73 | Substantial Compliance | Substantial Compliance | Partial Compliance |
| *Compliance Audits Related to Use of Force* | | | |
| Paragraph 74 | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| Paragraph 75 | Substantial Compliance | Partial Compliance | Substantial Compliance |
| Paragraph 76 | Partial Compliance | Partial Compliance | Partial Compliance |
| Paragraph 77 | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| **Training** | | | |
| Paragraph 78 | Substantial Compliance | Moved into Self-Monitoring | Self-Monitored |
| Paragraph 79 | Substantial Compliance | Moved into Self-Monitoring | Self-Monitored |
| Paragraph 81 | Substantial Compliance | Moved into Self-Monitoring | Self-Monitored |
| Paragraph 84 | Substantial Compliance | Moved into Self-Monitoring | Self-Monitored |
| Paragraph 85 | Substantial Compliance | Moved into Self-Monitoring | Self-Monitored |
| Paragraph 86 | Substantial Compliance | Moved into Self-Monitoring | Self-Monitored |
| **Crisis Intervention** | | | |
| *BOEC* | | | |
| Paragraph 115 | Substantial Compliance | Moved into Self-Monitoring | Self-Monitored |
| **Employee Information System** | | | |
| Paragraph 116 | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| Paragraph 117 | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| Paragraph 118 | Partial Compliance | Substantial Compliance | Substantial Compliance |
| **Officer Accountability** | | | |
| *Investigation Timeframe* | | | |
| Paragraph 121 | Substantial Compliance | Moved into Self-Monitoring | Self-Monitored |
| Paragraph 122 | Substantial Compliance | Moved into Self-Monitoring | Self-Monitored |
| Paragraph 123 | Substantial Compliance | Moved into Self-Monitoring | Self-Monitored |
| *On Scene Public Safety Statements and Interviews* | | | |
| Paragraph 124 | Substantial Compliance | Moved into Self-Monitoring | Self-Monitored |
| Paragraph 125 | Substantial Compliance | Moved into Self-Monitoring | Self-Monitored |
| Paragraph 126 | Substantial Compliance | Moved into Self-Monitoring | Self-Monitored |
| Paragraph 127 | Substantial Compliance | Moved into Self-Monitoring | Self-Monitored |
| *Conduct of IA Investigations* | | | |
| Paragraph 128 | Substantial Compliance | Substantial Compliance | Moved into Self-Monitoring |
| Paragraph 129 | Substantial Compliance | Substantial Compliance | Moved into Self-Monitoring |
| Paragraph 131 | Substantial Compliance | Substantial Compliance | Moved into Self-Monitoring |
| Paragraph 132 | Substantial Compliance | Substantial Compliance | Moved into Self-Monitoring |
| Paragraph 133 | Substantial Compliance | Substantial Compliance | Moved into Self-Monitoring |
| *Discipline* | | | |
| Paragraph 137 | Substantial Compliance | Moved into Self-Monitoring | Self-Monitored |
| **Addendum of Additional Remedies** | | | |
| Paragraph 188 | Substantial Compliance | Substantial Compliance | Substantial Compliance |
| Paragraph 189 | Substantial Compliance | Substantial Compliance | Moved into Self-Monitoring |
| Paragraph 190 | Substantial Compliance | Moved into Self-Monitoring | Self-Monitored |
| Paragraph 191 | Substantial Compliance | Substantial Compliance | Terminated |
| Paragraph 192 | Partial Compliance | Partial Compliance | Partial Compliance |
| Paragraph 194 | Partial Compliance | Partial Compliance | Partial Compliance |
| Paragraph 195 | Partial Compliance | Partial Compliance | Partial Compliance |

[2] This chart includes the Settlement Agreement paragraphs initially subject to compliance assessment by the Monitoring Team. It does not include paragraphs initially subject to self-monitoring by the City.

# Compliance Assessments by Settlement Agreement Section

## Use of Force

For the Monitoring Team's assessment of Settlement Agreement Paragraphs 69, 70, 72, and 73, we reviewed multiple PPB Directives related to the use of force by PPB officers in order to confirm their inclusion of the principles and requirements identified in this portion of the Settlement Agreement. We additionally reviewed PPB's After-Action Report (AAR) and any revisions made to it. Among the directives we reviewed were the following:

- 0910.00 Use of Force Reporting, Review, and Investigation
- 1010.00 Use of Force
- 1010.10 Deadly Force and In-Custody Death Reporting and Investigation Procedures

Additionally, in order to assess the consistent and verified performance of the principles and requirements referenced above by PPB officers in actual practice, the Monitoring Team reviewed a sample of use-of-non-deadly-force events that occurred during the Reporting Period as well as all use-of-deadly-force investigations that were completed during the period. Our sample consisted of 50 randomly selected use-of-non-deadly-force events from a total of 345 reported as having occurred, as well as each of the two use-of-deadly-force investigations that were completed.[3] It is worth noting that each use of force event in our sample could potentially include more than one use of force; in all such instances, we separately assessed each use of force that occurred during the event.

For the Monitoring Team's assessment of Settlement Agreement Paragraphs 74, 75, 76, and 77, we reviewed a series of materials prepared by the PPB Office of the Inspector General (OIG) covering this Reporting Period including the Applications of Force Report, the Force Audit Report (FAR), the Non-Deadly Use of Force Findings Report, Audit Methodologies, Precinct Alert Memos, Standard Operating Procedure (SOP) documents, and the quarterly and annual Force Analysis Summary Reports.

The FAR examines reports and investigations of uses of force by PPB officers, including chain of command reviews of AARs completed by supervisors following a use of force. In addition to reviewing that report and the multiple sources of data on which it is based, the Monitoring Team also conducted our own reviews in order to validate the report's results. These efforts put us in position to assess compliance with Paragraphs 74, 75, and 77. Each of those paragraphs lists numerous pieces of information to be addressed by, or standards of review to be incorporated into,

[3] No in-custody death investigations were completed during this Reporting Period. Had there been any, the Monitoring Team would have included each of them in our sample as well.

the FAR, with PPB responsible for ensuring that they all are addressed or incorporated as appropriate.

The Monitoring Team endeavored to complete a rigorous and thorough review of the FAR in order to comprehensively evaluate the multitude of data points and standards listed in Paragraphs 74, 75, and 77 (collectively). Guided by the language in those paragraphs, our review encompassed a total of 103 separate questions, which we applied to each case in a randomly-selected sample of 25 of the cases that had been audited by the OIG.[4] Our review was developed and conducted by multiple members of the Monitoring Team, allowing us to rely on a collective set of skills and expertise including civilian oversight of law enforcement, consent decree compliance, and criminal justice statistical analysis. Crucially, having more than one Monitoring Team member involved in different aspects of the review also helped us to ensure that we infused different perspectives into the assessments we made, as opposed to relying solely on a single person's experiences or point of view. Furthermore, we validated each finding in our own review that disagreed with a finding in the OIG's audit with a secondary reviewer in order to help confirm our accuracy with respect to those results.

**Paragraph 69**
***Substantial Compliance***

**The Monitoring Team's review of PPB's use of force reporting directives confirmed the inclusion of requirements listed in Paragraph 69 of the Settlement Agreement.** These include: 1) all officers who use force must draft timely use of force reports that include sufficient information to facilitate a thorough supervisory review; 2) all officers who are involved in, or witness to, a use of force must provide a full and candid account to supervisors; and 3) in case of an officer-involved shooting resulting in death, a use of lethal force, or an in-custody death, the reporting and review requirements specified in PPB Directive 1010.10 must be fulfilled.

**Although a sizeable majority of the requirements in Paragraph 69 were completed successfully by PPB, the Monitoring Team's review found a couple of areas needing improvement.** For this Reporting Period, the Monitoring Team reviewed a sample of 50 use-of-non-deadly-force cases, including 39 Category II or Category III cases and eleven De Minimis Force cases. Within the 39 Category II or Category III cases from our sample, our review included all 23 cases that involved the use of force against a person with perceived or actual mental illness.

> **Note:** As described in more detail by Directive 0910.00 Use of Force Reporting, Review, and Investigation, Category II cases include all member use of force

[4] The OIG provided the Monitoring Team with a population of 86 cases that it audited for the Force Audit Report covering this Reporting Period. Our sample comprised 29.1% of that population, and it included a review of 37 FDCRs, 25 AARs, and all associated case narrative documents.

resulting in serious physical injury, hospitalization, disability, or warranting an elevated review; Category III cases include all member use of force resulting in physical injury, less lethal weapon use without serious physical injury, and any other force that requires After-Action review; and De Minimis Force is defined as the minimally intrusive application of a restraint, (e.g., handcuffs or a hobble), or the use of an empty hand coercive technique to separate, guide and/or gain control of a subject, which is not readily capable of causing or reasonably likely to cause physical injury or persistent pain.[5]

**Note:** Each case classified as Category II could potentially also include one or more Category III or De Minimis uses of force; each case classified as Category III could potentially also include one or more De Minimis uses of force. The eleven cases in our sample of 50 identified as De Minimis Force cases contained only De Minimis Force.

In all of the use-of-non-deadly-force events that we reviewed as part of our sample, the Monitoring Team found that officers completed use of force reports and/or General Offense (GO) reports in a timely manner, as required, and that those reports generally contained sufficient information to allow for a thorough supervisory review of the associated event. In all of the 39 Category II and Category III cases, officers who were involved in, or were witnesses to, a use of force appropriately provided full and candid accounts of the force event to a supervisor. Specifically in the eleven De Minimis Force cases we reviewed, we found that officers consistently completed supplemental reports documenting such uses of force whenever they were required to do so.[6] Officers also appropriately explained not only their own actions in De Minimis Force incidents that involved more than one officer, but also what they witnessed about the actions of other involved officer(s).

In addition to use-of-non-deadly-force cases, the Monitoring Team reviewed each of the two use-of-deadly-force cases that occurred during this Reporting Period. The reporting and review requirements arising out of a use of lethal force or an in-custody death, which are contained in PPB Directive 1010.10 Deadly Force and In-Custody Death Reporting and Investigation Procedures, are understandably numerous and extensive.[7] Any loss of life related to law enforcement activity, or the foreseeable potential for it, warrants the most rigorous and thorough levels of examination.

---

[5] Refer to PPB Directive 0910.00 Use of Force Reporting, Review, and Investigation for further details.

[6] PPB Directive 0910.00 Use of Force Reporting, Review, and Investigation indicates that, in cases where only De Minimis Force was used by a member, witness officers shall complete supplemental reports to document their observations only if "the member's actions result in an actual physical injury, or a complaint of pain or physical injury".

[7] Refer to PPB Directive 1010.10 Deadly Force and In-Custody Death Reporting and Investigation Procedures for further details.

With respect to the two officer-involved shooting investigations that were completed during this Reporting Period and that we reviewed as part of our sample, we looked at adherence to multiple requirements in the areas of involved member responsibilities immediately following the event as well as after departure from the scene; witness member responsibilities immediately following the event as well as after departure from the scene; on-scene supervisor responsibilities in the aftermath of the event; notification protocols up the chain of command as well as to other City entities; Homicide Detective responsibilities; Professional Standards Division (PSD) responsibilities; Responsibility Unit (RU) manager responsibilities; Training Division responsibilities; issuance of Communication Restriction Orders (CROs); and more. Overall, the Monitoring Team found PPB's investigations into both deadly force events in our sample to be detailed and appropriate in terms of the conclusions they reached regarding whether the force used was allowable pursuant to PPB policy. We acknowledge the intricacy and complexity of all deadly force incidents as well as the investigations into them that follow; simultaneously, we acknowledge the criticality of meeting every requirement in PPB policy that applies to each use of lethal force, as well as the importance of documenting adherence to those requirements accordingly.

In both use-of-deadly-force cases we reviewed, the involved officers met their reporting requirements, as enumerated in PPB policy. This includes making the initial notification(s) of their involvement in such an incident as soon as practicable, making it known to the on-scene supervisor that they are the involved member, and submitting to an audio-recorded interview with investigators. Similarly, witness officers met their respective reporting responsibilities in both cases we reviewed for the assessment of Paragraph 69, including notification of their involvement and role to the on-scene supervisor, conducting an on-scene walk-through, and providing a full and candid account of the use of force events as directed by detectives.

Following a use of deadly force, an on-scene supervisor is required to complete numerous tasks such as ensuring that medical aid is rendered as appropriate, locating and separating all involved and witness officers, admonishing those officers not to discuss the incident prior to the issuance of a CRO, obtaining Public Safety Statements (PSSs),[8] procuring any civilian witness information, and ensuring the delivery of notifications about the incident up the chain of command. On-scene supervisors who respond to officer-involved shooting incidents are also required to obtain specific public safety information, including how many rounds were fired and by whom, the direction of rounds fired, the location of any injured persons, descriptions of at-large suspects as well as of any weapons they may possess, etc. from either witness members, initial observations, or other sources. If a supervisor is unable to obtain the requisite information from those sources, they must then require the involved member to provide a PSS. In questioning the involved member, on-scene supervisors are limited to asking a prescribed list of questions, and they must document the responses they receive.

[8] A Public Safety Statement consists of responses by a member to questions asked by an on-scene supervisor to elicit information necessary to protect life and/or ensure public safety.

In both officer-involved shooting cases reviewed by the Monitoring Team, at least one supervisor was on-scene at the time of the shooting. During compelled interviews with PSD, at least one supervisor in each case advised that they were able to obtain the necessary safety information through their own observations. Although the PSS requirements were therefore met in each case, no documentation affirmatively confirming this was provided beyond the recorded and transcribed PSD interviews. The PSS requirement is critical in terms of its focus on the safety of both the public and officers alike; as such, it would be prudent for PPB to document its completion more prominently within each officer-involved shooting investigation than merely as a part of interview testimony, which can only be found via a review of an audio recording or a written transcript.

Finally with regard to on-scene supervisors, the Monitoring Team noted in one case that the number of witness officers who were present made separation at the scene an impracticality. Pursuant to PPB policy, under those circumstances, a supervisor or detective shall be posted with the witnesses to ensure that no communication amongst them regarding the incident takes place. A supervisor in the case indicated to PSD that the witness officers were admonished not to discuss the incident—as required—and that due to an on-scene staffing shortage, the supervisor did not post anyone with a group of witness officers but instead assigned many witness officers to conduct additional duties such as canvassing the area for (civilian) witnesses or external video. The Monitoring Team considered this decision to constitute a reasonable use of limited available resources. However, as with the PSS requirement (discussed above), we note that it would be advisable for PPB to more clearly document within each investigative report how requirements like this one were handled, as opposed to relying only on an audio recording or a written transcript.

In addition to on-scene supervisors, PPB personnel from PSD and Detective Division each have a set of required responsibilities to complete in response to the use of deadly force. PSD is responsible for conducting an administrative investigation of the incident; Detective Division is responsible for conducting a criminal investigation of it. On top of other requirements, PSD personnel are required to compel a statement from the involved member after the provision of a *Garrity* warning,[9] to audio-record their interview with the involved member, to conduct their administrative review concurrently with any criminal investigations and, ultimately, to determine whether member actions during the event were consistent with PPB policy. In the two cases reviewed by the Monitoring Team, PSD personnel met all of these requirements.

Detective Division personnel who respond to a use-of-deadly-force event are required to, among other things, request a voluntary statement and on-scene walk-through from the involved member. If the member agrees, the detective must conduct complete and thorough interviews with that member to ensure that all applicable information is obtained. If the member declines, then the

[9] As defined in PPB Directive 1010.10, a *Garrity* warning is an advisement given to a member who is the subject of an internal administrative investigation or review. A *Garrity* warning apprises the member that they are required to answer questions asked by Professional Standards Division investigators and are subject to discipline, up to and including termination, for failing or refusing to answer the questions.

detective must not compel them to provide a statement or a walk-through. The detective must also direct any necessary witness officers to provide a walk-through. In the cases reviewed by the Monitoring Team for its assessment of Paragraph 69, detectives consistently met all of these requirements.

A final set of policy requirements that the Monitoring Team noted in its review of two use of deadly force events are those of PPB's Training Division and the RU Manager. Once the criminal investigation and administrative review of the incident are complete, Training Division must conduct its own review of the incident as well as an analysis of the investigative findings to determine whether member actions were consistent with training and/or reflect any training deficiencies. The completed review from Training Division is provided to the involved member's RU Manager.

Subsequently, that manager is required to discuss the Training Division review with the involved member. In each of the use-of-deadly-force cases in our sample, Training Division conducted a review of the officer-involved shooting incident as required. However, there was no evidence of a discussion of this review taking place between the RU Manager and the involved member in either of the cases. As pointed out in our last semi-annual compliance report (covering the Reporting Period of Q1-Q2 2025), the Monitoring Team identified the same lack of any evidence of this required discussion between an RU Manager and a member involved in a lethal force event.

As indicated earlier, there are numerous requirements embedded in PPB policy that must be met in connection with every use of force by an officer – regardless of the category of force used. Although our review of a sample of use of force cases found a small number of deviations, as well as some room for improvement in clearly documenting the completion of required tasks, we also found that PPB consistently met most of the requirements and did so with a high level of integrity. **We therefore conclude that PPB is in Substantial Compliance with Paragraph 69 of the Settlement Agreement.**

**Recommendations:**

The Monitoring Team makes the following recommendations to support ongoing compliance with Paragraph 69 of the Settlement Agreement:

1. Ensuring the completion of all tasks required by policy in the aftermath of every critical incident, such as a use of lethal force, is of paramount importance. Reinforce with supervisors and RU Managers each requirement of Directive 1010.10 as they apply to those ranks in the aftermath of a use of deadly force.

2. Documenting the completion of required tasks in the aftermath of a critical incident (e.g. obtaining a Public Safety Statement, or posting a supervisor with a large group of witness

officers) in a manner that effectively lends itself to internal accountability increases the likelihood that such tasks will be consistently completed and that reviewers will successfully catch any deviations if/when they do occur. Ensure that efforts made to meet all requirements within Directive 1010.10 that apply to a use of force incident are clearly and affirmatively documented within the investigation of the incident by those responsible for meeting the requirements.

Based on the review we conducted for our assessment of compliance with Paragraph 69, the Monitoring Team makes the following additional recommendation, which is not required for compliance with the Settlement Agreement:

1. PPB Directive 0910.00 Use of Force Reporting, Review, and Investigation requires all officers who are involved in, or a witness to, a Category II or Category III use of force event to provide a full and candid account of the event to the supervisor at the scene. PPB Directive 0620.00 Body-Worn Camera Use and Management dictates that, in Category III events, the officers' accounts are not recorded on body-worn camera. In furtherance of transparency and accountability (with respect to assessing whether an officer's account is full and candid, as required), PPB should consider revising its policies to require that these officer statements regarding Category III events be recorded on body-worn camera, just as is the case with Category II events.

**Paragraph 70**
***Substantial Compliance***

**The Monitoring Team's review of PPB's use of force directives confirmed their inclusion of requirements listed in Paragraph 70 of the Settlement Agreement.** These requirements are for supervisors who receive notification of an event involving a use of force, and they include the following: 1) respond to the scene upon notification of a force event; 2) conduct an administrative review and investigation of the use of force; 3) document their findings in an AAR; 4) forward their report through the chain of command; 5) complete AARs within 72 hours of the force event; 6) immediately notify their shift supervisor and Professional Standards Division regarding all serious uses of force, any use of force against a person who has actual or perceived mental illness, and any suspected misconduct; notify Detective Division of any suspected criminal conduct; where there is no misconduct, determine whether additional training or counseling – to be provided by PPB consistent with the Settlement Agreement – is warranted; 7) where necessary, ensure the subject receives appropriate medical attention; and 8) interview officers individually and not in groups.

**The Monitoring Team's assessment of a sample of Category II, Category III, and De Minimis use of force events, as well as the reviews and investigations associated with them, confirmed the consistent and verified performance of these requirements by PPB officers in**

**actual practice.** In all 39 Category II or Category III use of force events reviewed by the Monitoring Team for our assessment of compliance with this paragraph, supervisors conducted an administrative review and investigation of the use of force, documented their findings in an AAR, forwarded the AAR through the chain of command, and completed the AAR within 72 hours of the event. When required in conjunction with such events, they also made proper notifications to PSD about any serious uses of force[10] or any uses of force against persons who had actual or perceived mental illness. Additionally, supervisors ensured that persons upon whom force was used received medical attention when necessary, and they appropriately notified Internal Affairs in instances when the subject upon whom force was used raised an allegation of misconduct.

In 36 of the 39 Category II or Category III use of force events (92.3 ± 7.6%), supervisors conducted involved and witness officer interviews at the scene of the incident separately, and not in groups, as required by policy. In the remaining three cases, it appeared from the Monitoring Team's reviews of BWC footage that these required interviews by responding supervisors included both involved and witness officers in close proximity to each other. The Monitoring Team notes the presence of an AAR notation in each of these cases indicating that interviews were conducted separately.[11] Nevertheless, it remained apparent from reviews of BWC footage in each of the three cases that appropriate separation of officers might not have occurred during their at-scene interviews.

In the eleven De Minimis Force cases reviewed by the Monitoring Team for its assessment of compliance with this paragraph, supervisors reviewed and approved officers' GO and supplemental reports about the force, as required. In one of these cases (9.1% ± 16.3%), an individual had been taken into custody for resisting arrest; the reviewing supervisor did not review relevant BWC video of the incident, as required. In all De Minimis Force cases in the Monitoring Team's sample in which the individual upon whom force was used complained of pain, the individual's complaint was entered into the involved member's Employee Information System (EIS) Performance Discussion Tracker, as required. Finally, six of the De Minimis Force cases reviewed by the Monitoring Team

---

[10] As defined in PPB Directive 0910.00, and as used in multiple places in this report, a "serious use of force" includes any of the following: 1) all uses of force by a member that reasonably appear to create or do create a substantial risk of death, serious disfigurement, disability, or impairment of the functioning of any body part or organ; 2) all critical firearm discharges by a member; 3) all uses of force by a member resulting in a significant injury, including a broken bone, an injury requiring hospitalization, or an injury deemed to be serious by a member's supervisor; 4) all head, neck, and throat strikes with an object or neck holds; 5) force used upon juveniles known or reasonably assumed to be under fifteen, or persons known or reasonably assumed to be pregnant; 6) all uses of force by a member resulting in a loss of consciousness; 7) more than two applications of a Conducted Electrical Weapon (CEW) on a person during a single interaction, regardless of the mode or duration of the application, regardless of whether the applications are by the same or different officers, and regardless of whether the CEW application is longer than 15 seconds, whether continuous or consecutive; 8) any strike, blow, kick, CEW application, or similar use of force against a handcuffed, otherwise restrained, under control, or in custody subject, with or without injury; 9) any use of force referred by a member's supervisor to Professional Standards Division which that division deems a serious use of force.

[11] In one of the cases, audio recording of an interview—which might have helped resolve the apparent discrepancy between the video footage and the notation on the AAR—was absent despite being required by applicable PPB policy, due to the muting of the recording officer's BWC device.

gave rise to the requirement that a supervisor notify PSD and their shift supervisor of a use of force against a person with actual or perceived mental illness; the required notifications were made in three (50% ± 40.0%) of these cases.

Paragraph 70 and the PPB directive it references highlight numerous responsibilities to be fulfilled by supervisors responding to a use of force. The Monitoring Team's review of a sample of use of force cases confirmed that, despite the presence of some deviations, an overwhelming majority of those responsibilities were met with a high level of integrity. This is a positive reflection on some of the work that was completed by PPB's supervisors in response to use of force events during the Reporting Period.

With respect to those deviations that were identified by the Monitoring Team during our assessment of PPB's compliance with this paragraph, two of them (one involving apparent group interviews of involved/witness officers after a use of force; and one involving a failure to review BWC recordings of an incident) appear to be no more than aberrations from standard practice. The one remaining area where deviations from requirements were found is worthy of attention. The requirement for supervisors to notify PSD and their shift supervisor of any use of force against a person who has actual or perceived mental illness relates directly to one of the primary issues addressed throughout the Settlement Agreement—ensuring that encounters do not result in unnecessary or excessive force.

The raw number of deviations from this requirement that we identified in our sample of cases was relatively low (three) when compared with the total number of supervisory requirements that are implicated by Paragraph 70 across all of the cases in the sample. Furthermore, it appears reasonable to conclude that issues with adherence to this requirement are isolated to De Minimis Force cases, and, therefore, are not systemic or otherwise reflective of the broader population of use of force cases (i.e. Category II and III cases) that occurred during this Reporting Period. However, the Monitoring Team believes that this deviation may continue to occur in future Reporting Periods if it is not adequately addressed, and that this may negatively impact future assessments of PPB's compliance with Paragraph 70's requirements aimed at ensuring comprehensive reviews of use of force events.

The Monitoring Team notes that, in 2024, PPB revised Directives 1010.00 Use of Force and 0910.00 Use of Force Reporting, Review, and Investigation to include the definition of, and requirements associated with, De Minimis Force. While the requirement for supervisors to notify their shift supervisor and PSD about a use of force against a person with actual or perceived mental illness remained in place and unchanged at the time of those revisions, the review process for newly-defined De Minimis uses of force eliminated the need for officers to complete FDCRs and for supervisors to complete AARs. The completion of these forms, which is still required for all Category II and III uses of force, creates clear documentation of whether the notification of a use of force against a person with actual or perceived mental illness was made in each case. With these

forms no longer required after a De Minimis use of force, the "built-in" accountability they provide with respect to the supervisory notifications at issue is also no longer present. Absent some positive steps taken to reinforce the requirement for these notifications, the Monitoring Team believes there is a foreseeable chance that they will remain a source of deviations from the Settlement Agreement and applicable PPB policy.

With only some isolated exceptions, PPB fulfilled the numerous requirements in this paragraph and in policy that are placed on supervisors who are notified of a use of force. **We therefore conclude that PPB is in Substantial Compliance with Paragraph 70 of the Settlement Agreement.**

**Recommendations:**

The Monitoring Team makes the following recommendations to support ongoing compliance with Paragraph 70 of the Settlement Agreement:

1. Ensure supervisors fully understand all of the requirements in policy and the Settlement Agreement that they must adhere to in response to a De Minimis use of force. Specifically emphasize to supervisors the requirement to notify their shift supervisor and PSD regarding any De Minimis use of force against persons who have actual or perceived mental illness, as well as the requirement to review BWC footage of events involving an arrest for assaulting a public safety officer or resisting arrest.

2. Reinforce with supervisors the requirement in policy and the Settlement Agreement to interview officers individually and not in groups subsequent to receiving notification of a use of force.

Based on the review we conducted for our assessment of compliance with Paragraph 70, the Monitoring Team makes the following additional recommendation, which is not required for compliance with the Settlement Agreement:

1. Develop an accountability mechanism specifically for De Minimis Force events that will help ensure supervisors who receive notification of them complete all of their required responsibilities subsequent to such events and will create a record of that completion.

**Paragraph 72**

***Substantial Compliance***

For the Monitoring Team's assessment of Settlement Agreement Paragraph 72, we reviewed PPB's After-Action Report (AAR), which PPB utilizes as a checklist for supervisors to use in conducting a Category II or Category III force investigation. PPB did not make any revisions to its AAR during

this reporting period. **The Monitoring Team's review of the AAR confirmed that, overall, it is an appropriate tool to ensure that supervisors fully perform their force investigation responsibilities pursuant to Directive 0910.00 Use of Force Reporting, Review, and Investigation.**

Supervisors' responsibilities following a Category II or Category III use of force include conducting an administrative review and investigation of the use of force, documenting their findings, forwarding their report through the chain of command, completing the AAR within 72 hours of the force event, making appropriate notifications regarding a serious use of force or a use of force against a person with a perceived or actual mental illness, ensuring that subjects receive medical attention when necessary, and interviewing officers individually and not in groups. The AAR is appropriately designed to require a supervisor to address each of these responsibilities.

However, as previously pointed out in our last semi-annual compliance report (covering the Reporting Period of Q1-Q2 2025), the Monitoring Team notes that the AAR form does not account for a supervisor's responsibility to respond to the scene of a use of force incident. Although such a response may commonly be inferred from other aspects of the use of force investigation, we continue to believe that this supervisorial responsibility should be explicitly added to those that comprise the AAR's existing checklist, as with all of the other responsibilities referenced above.

Apart from this minor exception, which we believe calls for a relatively simple resolution, we find that PPB has satisfied the requirements of this paragraph in a comprehensive fashion and with a high level of integrity. **We therefore conclude that PPB is in Substantial Compliance with Paragraph 72 of the Settlement Agreement.**

**Recommendations:**

The Monitoring Team makes the following recommendation to support ongoing compliance with Paragraph 72 of the Settlement Agreement:

1. Include a requirement for supervisors to verify in an AAR their response to the scene of a use of force incident, as required.

Based on the review we conducted for our assessment of compliance with Paragraph 72, the Monitoring Team makes the following additional recommendation, which is not required for compliance with the Settlement Agreement:

1. The following supervisorial responsibilities related to the use of force are presently listed in Directive 0620.00 Body-Worn Camera Use and Management: 1) obtain a full and candid account—recorded on a BWC—from involved and witness members for Category II uses of force; and 2) review BWC footage as part of their investigation of Category II and Category

III uses of force. As ensuring that these responsibilities are met is as important as ensuring that the responsibilities in Directive 0910.00 are met, we recommend updating the AAR form to account for them as well.

**Paragraph 73**
***Partial Compliance***

**The Monitoring Team's review of PPB's use of force reporting directives confirmed their inclusion of the requirements listed in Paragraph 73 of the Settlement Agreement.** These include: 1) the Employee Information System tracks all use of force investigation findings and corrections; 2) all supervisors in the chain of command are subject to and receive corrective action or discipline for the accuracy and completeness of AARs completed by supervisors under their command; 3) all supervisors in the chain of command are accountable for inadequate reports and analysis; 4) supervisors receive the appropriate corrective action when they repeatedly conduct deficient investigations, and shift or precinct commanders receive the appropriate corrective action when they repeatedly permit deficient investigations; 5) PPB takes appropriate corrective action consistent with the Accountability provisions of the Settlement Agreement when a use of force is found to be out of policy; 6) where a use of force indicates policy, training, tactical, or equipment concerns, the immediate supervisor shall notify the Inspector and the Chief, who shall ensure PPB timely addresses all such concerns; and 7) the Chief (or their designee) and Professional Standards Division have discretion to reassign a use of force investigation to Detective Division or any supervisor.

**The Monitoring Team's review of a sample of Category II and Category III use of force events and investigations found that although some of these requirements were consistently met in actual practice, there were significant deviations from some others that reflect systemic issues.**

Of the Monitoring Team's sample of 39 Category II and III use of force cases, PPB tracked all investigative findings in the Employee Information System (EIS). There were seventeen identified supervisory chain of command corrections that warranted documentation and tracking in the EIS. Eight of those cases (47.1% ± 23.4%) included the required EIS documentation while the other nine did not. In those nine cases, the chain of command identified, but did not record in EIS, completed corrections as required in Paragraph 73.a. of the Settlement Agreement.[12]

The Settlement Agreement and PPB policy require supervisors to complete multiple on-scene tasks that are needed to produce an accurate and complete supervisory AAR. These responsibilities include, but are not limited to, responding to the scene, ensuring medical attention is provided when

[12] In March 2026, the City provided the team with PDT entries it had made, after the end of the Reporting Period, in seven of these cases.

necessary, gathering applicable evidence, such as conducting separate interviews with the involved and witness officers, interviewing the subject upon whom force was used, ensuring photographs are taken, and obtaining any civilian witness statements. There were four Category II or III use of force cases from the Monitoring Team's sample of 39 (10.3% ± 8.6%) in which a supervisor warranted corrective action or discipline following the production of an inaccurate and/or incomplete AAR. Such corrective action or discipline occurred, and was documented, in two of these cases. No documentation was provided indicating that similar accountability measures were taken in either of the two remaining cases.

In the first of those cases, the supervisor incorrectly classified the incident as a Category III use of force instead of a Category II use of force. This error led to the omission of officer interviews recorded on Body-Worn Camera (BWC), which are mandatory for Category II investigations. Furthermore, it appears that the supervisor did not separate the involved officers prior to their interviews, as policy dictates. These lapses compromised the integrity and thoroughness of the investigative process. The second case involved a supervisor whose investigative report was delayed and submitted late, after multiple corrections to it were required. This delay hindered the timely completion and accuracy of the case review.

While the reviewing chain of command demonstrated commendable oversight by addressing these critical issues, it is important to note that the identified supervisor deficiencies were not entered into the Employee Information System (EIS) as required. No documentation was provided indicating that the supervisors in these cases were subject to corrective action or discipline in connection with the deviations from applicable requirements. Properly documenting investigatory deficiencies is essential for accountability and continuous improvement within the supervisory use of force review process.

The Monitoring Team concurred with the analysis of Category II and III use of force incidents from our sample that was conducted by supervisors in the chain of command with respect to whether the force they were reviewing comported with PPB policy. However, our review (based on PPB's documentation) found that one of the supervisors described above, whose investigative report on a case required multiple corrections and was submitted late, had conducted deficient investigations previously, as well. Specifically, the supervisor failed to record several interviews with officers on BWC, as required, in one previous instance and failed to notify Internal Affairs Division of an allegation of improper force raised by a subject, as required, in another previous instance.

Our review additionally found that the other supervisor described above, who miscategorized a use of force incident, had completed deficient AARs on eight previous occasions over the last five years. The deficiencies were related to areas of policy adherence and officer accountability, and they also included clerical errors. This supervisor did receive counseling as a result of these issues; however, their repeated nature seems to indicate that further corrective action—including training—may be appropriate to reinforce PPB's policies, procedures, and organizational expectations, and also to

strengthen the supervisor's development. Furthermore, the Monitoring Team noted the absence of any information to indicate that other PPB members up the chain of command from this supervisor received any appropriate corrective action for repeatedly permitting the supervisor's deficient investigations.

There was one De Minimis use of force in our sample, which was part of an incident that also included a higher category of use of force, that PPB determined to be out of policy. PPB took appropriate corrective action, consistent with the Settlement Agreement, in response. The Monitoring Team concurred with PPB's finding in the case and noted that an associated EIS entry was completed. There were no cases in our sample in which the Chief or a designee reassigned a use of force investigation to the Detective Division or any PPB Supervisor.

There were two use of force cases (5.1% ± 6.3%) in our sample in which a supervisor or member of the reviewing chain of command indicated a policy, tactical, training, or equipment concern. Of the two cases, one involved a policy issue and the other involved a training issue. Upon reviewing the "Inspector Feedback Loop" provided by PPB, which is intended to document the handling of these concerns as required by Paragraph 73.f., neither case was included.

Our review of a sample of use of force cases determined that PPB successfully met some, but not all, of the requirements of this paragraph. The Monitoring Team considers the deviations we identified to be substantial and reflective of systemic issues. These deficiencies included: the absence of required EIS documentation; the absence of appropriate corrective action in response to the completion of a deficient AAR; the absence of appropriate corrective action in response to repeatedly conducting deficient investigations, as well as in response to supervisors permitting them; and the absence of documentation of PPB's resolution of policy and training concerns indicated by a supervisor regarding a use of force incident. **We therefore conclude that PPB is in Partial Compliance with Paragraph 73 of the Settlement Agreement.**

**Recommendations:**

Pursuant to Settlement Agreement Paragraph 226, the Monitoring Team recommends the following steps necessary to achieve and maintain Substantial Compliance with Paragraph 73:

1. PPB should enhance its efforts to ensure that all supervisors in the chain of command are held accountable for incomplete and inadequate AAR reports and analysis, and that they are subject to, and receive, corrective action or discipline for the accuracy and completeness of AARs completed by supervisors under their command (as required by this paragraph). Enhancing these efforts could involve, among other things, reminder training of this responsibility for all supervisors who are in a position to conduct chain of command reviews of AARs, and, subsequently, a requirement that they acknowledge their understanding of it.

2. PPB should enhance its efforts to ensure that supervisors and reviewing chains of command are properly documenting identified and completed corrective actions in EIS. Enhancing these efforts could involve, among other things, reminder training of this responsibility for all supervisors who are in a position to conduct chain of command reviews of AARs, and, subsequently, a requirement that they acknowledge their understanding of it.

3. PPB should enhance its oversight efforts to ensure that notifications to the Force Inspector and the Chief of Police regarding any policy, training, tactical, or equipment concerns identified during the chain of command review of a use of force incident are documented and included in the "Inspector Feedback Loop" so that they may be timely resolved. Enhancing these efforts could involve a review of current processes to determine where potential communication gaps exist between those in the chain of command and the Force Inspector, and, subsequently, the development of a resolution to fill any such gaps.

**Paragraph 74**
***Substantial Compliance***

As part of PPB's quarterly review of force, PPB's Force Inspector is required to audit force reports and Directive 0910.00 Investigation Reports in order to ensure that a number of requirements related to PPB's use of force and reporting of force are being met. **The Monitoring Team's review confirmed the consistent and verified performance of these requirements by the PPB Force Inspector in actual practice.**

The purpose of the audit is to ensure: 1) that force is used and reported appropriately; 2) that Electronic Control Weapons (ECWs) are used in compliance with PPB policy and that ECW usage is reported properly; and 3) that reports are completed in a timely manner, with detailed descriptions of the incident and the decision-making process used by officers as it relates to force (e.g. the level of resistance encountered, the number and types of uses of force, any complaints of injury or apparent injury to the subject, any medical care provided, the use of de-escalation techniques, and efforts to identify witnesses to the use of force).[13]

PPB advised the Monitoring Team that it had revised its Audit Methodology in September 2025, and that it used the revised methodology for all cases it reviewed during this Reporting Period. The new Audit Methodology only identifies deficiencies in the Use of Force Reporting process, as opposed to both identifying such deficiencies and giving a clear accounting of what was reported in

[13] The Force Inspector's audit of force reports and Directive 0910.00 Investigation Reports covers Category II and III uses of force during the Reporting Period; Category I uses of force and uses of only De Minimis force are not covered.

any non-deficient reports. For example, the new methodology frequently combines non-deficient outcomes for a particular data element together under a single answer value, making it more difficult to validate individual audit elements than in the past. For our review of PPB's audit of force reports, the Monitoring Team assessed a sample of cases from the audit utilizing the same standardized evaluation instrument as it had during the last Reporting Period.[14]

The 25 case numbers in our sample were associated with 37 Force Data Collection Reports (FDCRs). For each of the sampled cases, we requested: 1) the FDCRs completed by PPB members; 2) the use of force AARs completed by PPB supervisors; 3) all narrative reports of the event and Computer Aided Dispatch reports; and 4) the results obtained by PPB during its audit of the force reports. We then reviewed the force reports, following PPB's audit methodology, and compared the results obtained from our review to those obtained by PPB. We recorded any instance in which the findings of our review disagreed with the findings in PPB's audit.

Our review of the Force Audit Report for Paragraph 74 focused on 44 specific elements across each of the 37 FDCRs from our sample. In other words, our compliance assessment of this paragraph included an examination of 1,628 elements. Although our findings resulted in at least one disagreement with those of PPB with respect to 60 percent of the FDCRs we reviewed, an aggregate look across all elements from those FDCRs resulted in a 97.5 percent rate of agreement with PPB. In sum, our review found relatively few discrepancies overall. **Therefore, our review of PPB's Force Audit findings indicates substantial agreement between the content of reports and the audit results in nearly all the cases reviewed.**

In connecting our findings directly to the Settlement Agreement, the Monitoring Team found that PPB's audit results for all six requirements listed in Paragraph 74.a. (with respect to the use of force) agreed with our findings in more than 90 percent of cases. PPB's audit results for all four requirements listed in Paragraph 74.b. (with respect to ECW usage) were in 100 percent agreement with our findings. Additionally, PPB's audit results for all 11 requirements listed in Paragraph 74.c. (with respect to use of force reporting) agreed with our findings in more than 90 percent of cases.

Thus, the Monitoring Team agreed with a sizeable majority of the findings in PPB's Force Audit Report with regard to the requirements for that report listed throughout Paragraph 74. Furthermore, the discrepancies that exist appear to be no more than occasional in their frequency and not systemic in terms of their impact on the entire audit report. **We therefore conclude that PPB is in Substantial Compliance with Paragraph 74 of the Settlement Agreement.**

[14] The same review was used by the Monitoring Team in its assessment of the City's compliance with Paragraphs 75 and 77, both of which are discussed in further detail below.

**Recommendations:**

Based on the review we conducted for our assessment of compliance with Paragraph 74, the Monitoring Team makes the following recommendation, which is not required for compliance with the Settlement Agreement:

1. The Monitoring Team found that PPB's new Audit Methodology, while capable of identifying force reporting deficiencies, does not appear to provide PPB with clear data about specific details of audited force events, which could prove useful for future quality improvement efforts. Moreover, it appears that the language found in the questions and their corresponding answer choices no longer align. Therefore, the Monitoring Team recommends that PPB revise its current Audit Methodology to ensure it allows for the clearest and most accurate accounting of the use of force reporting process; doing so would subsequently allow PPB to target for improvement individual audit elements that have identified deficiencies, or to identify other quality improvements with respect to use of force reporting.

**Paragraph 75**
***Substantial Compliance***

The PPB Force Inspector is required to audit force reports and Directive 0910.00 investigations to determine whether supervisors consistently meet a set of requirements that arise after a use of force occurs. **The Monitoring Team's review confirmed the consistent and verified performance of this requirement by the PPB Force Inspector in actual practice.**

The supervisory requirements subject to the Force Inspector's audit include: 1) completing an AAR within 72 hours of notification of a use of force; 2) reviewing all use of force reports to ensure they include the information required by the Settlement Agreement and PPB policy; 3) evaluating the weight of the evidence; 4) using a "decision-point" approach to analyze each use of force; 5) determining whether actions of the officer who used force appear consistent with PPB policy, the Settlement Agreement, and best practices; 6) determining whether there was legal justification for the original stop and/or detention; 7) assessing the incident for tactical and training implications, including whether the use of force may have been avoided through the use of de-escalation techniques or lesser force options; 8) determining whether additional training or counseling is warranted; 9) implementing corrective action wherever there are material omissions or inaccuracies in officers' use of force reports, and for failing to report a use of force, whether applied or observed; 10) documenting any non-disciplinary corrective action to remedy training deficiencies, policy deficiencies, or poor tactical decisions in the Employee Information System; 11) notifying Professional Standards Division and the shift supervisor of every incident involving an officer's

serious use of force, as well as any use of force that could appear to a reasonable supervisor to constitute misconduct; and 12) notifying Detective Division and the shift supervisor of every force incident in which it could reasonably appear to a supervisor that an officer engaged in criminal conduct.

The Monitoring Team's review and PPB's audit exhibited more than 90 percent agreement for all 12 of the audit requirements listed in Paragraph 75. We agreed with a sizeable majority of the findings in PPB's Force Audit Report with regard to the requirements for that report listed throughout Paragraph 75. Furthermore, those discrepancies that do exist appear to be no more than occasional in their frequency and not systemic in terms of their impact on the entire audit report. **We therefore conclude that PPB is in Substantial Compliance with Paragraph 75 of the Settlement Agreement.**

**Recommendations:**

Based on the review we conducted for our assessment of compliance with Paragraph 75, the Monitoring Team makes the following recommendation, which is not required for compliance with the Settlement Agreement:

1. The Monitoring Team found that PPB's new Audit Methodology, while capable of identifying force reporting deficiencies, does not appear to provide PPB with clear data about specific details of audited force events, which could prove useful for future quality improvement efforts. Moreover, it appears that the language found in the questions and their corresponding answer choices no longer align. Therefore, the Monitoring Team recommends that PPB revise its current Audit Methodology to ensure it allows for the clearest and most accurate accounting of the use of force reporting process; doing so would subsequently allow PPB to target for improvement individual audit elements that have identified deficiencies, or to identify other quality improvements with respect to use of force reporting.

**Paragraph 76**

***Partial Compliance***

This paragraph of the Settlement Agreement requires the PPB Force Inspector to conduct analysis of force data and supervisors' Directive 0910.00 reports designed to accomplish a series of objectives. The Monitoring Team reviewed a series of reports produced by PPB related to the analysis that this paragraph requires. **Our review of these reports and their analyses found that they are appropriately designed to accomplish some, but not all, of the outcomes listed in Paragraph 76.**

The reports reviewed by the Monitoring Team included:

- Applications of Force Report (Q3-Q4 2025)
- Force Analysis Summary Report (Q3-Q4 2025)
- Force Audit Report (Q3-Q4 2025)
- Non-Deadly Use of Force Findings Report (Q1-Q2 2025)[15]
- Force Audit Review Memos for North, Central, and East Precincts (Q2-Q3 2025)[16]

The complete list of objectives in Paragraph 76 includes: 1) determining whether significant trends exist; 2) determining if there is variation in force practice away from PPB policy in any unit; 3) determining if any officer, PPB unit, or group of officers is using force differently or at a different rate than others, determining the reason for any difference, and correcting or duplicating the difference elsewhere, as appropriate; 4) identifying and correcting deficiencies revealed by the analysis; and 5) documenting the Force Inspector's findings in an annual public report.

**Determining if Significant Trends Exist**

Paragraph 76.a. asks whether significant trends exist but does not define metrics for which trends should be established nor specify a time period of review. It also does not differentiate whether trends should be statistically significant using standard analytical significance testing techniques, or whether they should be practically significant in terms of exhibiting a meaningful and non-trivial change over time. Finally, Paragraph 76.a. does not differentiate between determining directionality only (i.e. either increasing or decreasing) or a direction and magnitude of change (e.g. a 10% increase or a 5% decrease). Absent such specifications, the Monitoring Team reviewed all documents and analyses provided by PPB to determine whether they assess trends in data on the whole.

In the Force Analysis Summary Reports, the trends described by PPB represent the change by quarter over the past year. While a longer comparison would be more beneficial, having four time points can still allow for a meaningful understanding of the data. In the Force Audit Report, the trends described by PPB represent the change from a prior quarter to the current quarter, representing the simple change between two time points.

---

[15] The Non-Deadly Use of Force Findings Report requires PPB to perform its routine force auditing process, followed by additional analyses to identify officers who may require further discussion or other intervention, as well as the required review and follow-ups by supervisors and command staff. Because of this, the report cannot be generated on the same reporting schedule as the compliance assessment Review Period. Therefore, our report includes data from the prior Review Period.

[16] The Force Audit Review Memos require analysis by PPB to identify officers who may warrant further discussion or other intervention. Because of this, they cannot be generated on the same reporting schedule as the compliance assessment Review Period. Therefore, our report includes data from the part of the prior Review Period in addition to part of this one.

The analyses submitted help PPB better understand the use of force data and supervisors' Directive 0910.00 reports. While no analysis used statistical testing to assess significant trends, they are still meaningful and informative, fulfilling the requirements in Paragraph 76.a.

**Determining if there is Variation in Force Practice Away from PPB Policy in any Unit**
The documentation provided by PPB in support of compliance with Paragraph 76.b. includes two discussions of force practice away from policy. The quarterly Force Analysis Summary Reports for Q3 and Q4 2025 and the 2025 Annual Force Summary Report both include a list of cases about which a supervisor indicated an application of, or reporting of, force that potentially was not in line with PPB Directives. In Q3 2025, there were three such cases, involving three subjects, while in Q4 2025, there were no cases about which supervisors reported officers using out-of-policy force. Of the three cases identified during this Reporting Period, two force events were attributed to the East Precinct, and the third was attributed to the North Precinct. The types of force used across the three cases included the pointing of a firearm at a subject, the use of a CEW, kicks/strikes, and a takedown. Therefore, PPB is reporting on variations in force practice away from policy by unit, meeting the requirement of Paragraph 76.b.

**Determining if any Officer, PPB Unit, or Group of Officers is Using Force Differently or at a Different Rate than Others, Determining the Reason for any Difference, and Correcting or Duplicating Elsewhere, as Appropriate**
Paragraph 76.c. lists three specific objectives for the Force Inspector's analysis. First, it must determine whether any officer, unit, or group of officers is using force differently or at a different rate than others. Second, it must determine the reasons for any differences. Third, it must correct or duplicate those differences elsewhere, as appropriate.

PPB's Applications of Force Report compares the performance of individual officers against the averages and standard deviations of their units. The report also provides averages and standard deviations that can be compared across units and shifts. PPB informed the Monitoring Team that, unfortunately, the calculations for the means and standard deviations were incorrect in the Applications of Force Report covering this Reporting Period. Therefore, while PPB has historically provided comparative data across units on the use of force, such comparisons were not possible with the data provided for the second half of 2025. Additionally, no documentation provided by PPB provided any explanation or reasons for the differences in force applications that were identified by the Applications of Force Report.

PPB provided additional documentation about two members identified for discussion in Q3 2025 and the specific force ratios that led to their identification. This Force Meeting documentation indicated that one member met with PSD regarding their performance, and that command staff was planning subsequent meetings. For the second member, the documentation indicated that command staff was considering how best to respond to their circumstances. No additional information was provided to the Monitoring Team demonstrating how such differences were corrected or duplicated

elsewhere, as appropriate. Given these deficiencies, the requirements in Paragraph 76.c. were only partially met by PPB.

**Identifying and Correcting Deficiencies Revealed by the Analysis**

PPB's Non-Deadly Use of Force Report provides data from a combination of the Force Audit Report and the Applications of Force Report. The Non-Deadly Use of Force Report describes the extent to which PPB members accurately completed the required data elements in the use of force reporting and supervisory/chain of command review process.

As PPB notes in the Operational Definitions section of the report, "The force audit results are based on the entire force reporting and review process meaning that if a member in the command review addressed a member's reporting and/or review deficiency, the member is no longer found deficient." The practical implication of this approach is that the audited compliance percentages reported by rank are higher than they would be if one were to tabulate the actual number of deficiencies identified among members at each rank. This is because the compliance percentages do not account for corrections caught by other members during the supervisor review process.

For example, after sergeants, lieutenants, and Reporting Unit managers reviewed Central Precinct officers' use of force reports and corrected any deficiencies found, no *further* deficiencies were identified during the audit, resulting in a finding of 100% compliance. It is unknown how many deficiencies Central Precinct officers' use of force reports exhibited *prior to* the supervisor review process. The Monitoring Team spoke with PPB regarding this aspect of its reporting methodology and noted it does not allow for the accurate or reliable measurement of force reporting compliance for specific ranks. However, the approach does allow PPB to estimate the percentage of force events in which there were deficiencies remaining after all reviews of such events that are required by policy had been completed. Thus, the compliance percentages contained in the Non-Deadly Use of Force Report must be interpreted as findings for the entirety of the PPB force reporting review process.

In its Analysis Methodology section, the report lists the following seven metrics, to which members' uses of non-deadly force are compared: (1) the rate of the number of force applications to number of Force Data Collection Reports (FDCRs) written; (2) the rate of the number of FDCRs written to the number of General Offense (GO) Reports written; (3) the rate of force applications to GO Reports written; (4) the rate of the number of FDCRs written to the number of Arrest/Booking reports written; (5) the rate of force applications to the number of Arrest/Booking reports written; (6) the rate of force applications to calls-for-service (CFS); and (7) the rate of FDCRs to CFS. Although the combination of these metrics is potentially informative, it is not clear from the documentation provided how PPB compares its members' uses of force to each metric (e.g. whether each member's rates are compared to the average for their assigned precinct, for their assigned shift, or for some other grouping of officers).

Next, the methodology indicates that the report uses the seven metrics listed above to consider the following six factors to determine which officers may require an intervention:

- FDCR to Custody Ratio > 25%
- Applications to Calls for Service Ratios at or above 2 standard deviations above the mean
- High, Low, and Average Calls for Service
- High, Low, and Average Custodies
- Members who used no force
- Members with the 5 highest total applications on their shift

Again, it is not immediately clear how these factors are considered or whether/when they will indeed result in an intervention with an officer. The next portion of the methodology section appears to play a role in dictating the occurrence of such interventions, as the report indicates that the following eight questions are used to evaluate the six factors listed above:

1. Are total applications explained by a high number of arrests?
2. Are total applications explained by a single critical incident?
3. What is the tenure of the top force users?
4. Are the top force users by total applications or ratios among the top on multiple subsequent reports?
5. Are the top force users by total applications or ratios assigned to the same detail?
6. Is someone using a disproportionate amount of Category II or Category III force?
7. Are identified members part of a specialty or detached unit?
8. Who is not using any force?

However, PPB's utilization of these questions also lacks clarity and specificity. For instance, it is not immediately apparent how some of the terminology from the questions is defined, such as: "high number of arrests"; "top force users"; and "disproportionate amount of Category II or Category III force". It is therefore also unclear how the answers to these questions might impact PPB's analysis of its members' uses of force.

Finally, the report's methodology goes on to indicate that PPB members who meet some combination of the following factors may be identified for discussion and possible intervention:

- FDCR to CFS rate 2+ standard deviations above the mean.
- Applications of Force to CFS rate 2+ standard deviations above the mean.
- Any three or more categories of the ratios more than 3 standard deviations above the mean.

However, the report is unclear on which "categories of the ratios" it is referring to in this list. Additionally, the methodology would benefit from greater clarity regarding how the first list of six factors, the second list of three factors, and the list of eight questions (used to evaluate the list of six

factors) interplay with each other in the identification of members for discussion and possible intervention.

In the Non-Deadly Use of Force Report, PPB indicated that a total of two members from the East and North Precincts were "identified for discussion due to demonstrating some combination of the factors" listed earlier in the report. PPB provided additional documentation about two members identified for discussion in Q3 2025 and the specific force ratios that lead to their identification. This Force Meeting documentation indicated that PSD met with one member, and that command staff would be having a subsequent meeting with them. The documentation noted that command staff was considering how best to handle the situation with the second member. The outcomes noted by PPB with respect to the two identified members include non-disciplinary corrective action for one member and active monitoring for the other.

Based on the information provided, the Monitoring Team could not determine which specific actions were taken as a response to each identified officer. Absent further information about the use of force data that led to these outcomes (with respect to the two officers), it is also unclear whether the actions taken by PPB were necessary and sufficient to address any of the deficiencies that were identified. In sum, and based on the materials provided by PPB, the requirement in Paragraph 76.d. to identify and correct deficiencies was only partially met.

**Documenting the Inspector's Findings in an Annual Public Report**
The Force Inspector's Annual Force Analysis Summary Report for 2025 was posted online in February 2026, as was the Non-Deadly Use of Force Findings Report for Q1 and Q2 2025. These two reports were provided by PPB to demonstrate compliance with Paragraph 76's requirement to document the Force Inspector's findings—arrived at pursuant to the other requirements in this paragraph—in an annual public report. The reports address some of the findings required by Paragraph 76, including trend analyses consistent with the quarterly Force Analysis Summary Reports across 2023, 2024, and 2025; identification of force practice away from PPB policy; identification of differential force used across PPB officers and units; and some limited information regarding the identification and correction of member performance. However, as noted above, the documentation does not include explanations or reasons for the variations identified in uses of force across PPB members and units in the Applications of Force Report. Therefore, the requirement stated in Paragraph 76.e. continues to be partially met.

In conclusion, **the combination of reports and analyses reviewed by the Monitoring Team for its assessment of PPB's compliance with Paragraph 76 of the Settlement Agreement collectively illustrates that PPB is fulfilling some, but not all, of the elements required by that paragraph.** PPB has demonstrated compliance with reporting on data trends by showing changes between four data points (quarters over a year) across several meaningful metrics. Additionally, PPB reports on the number and types of uses of force found to be out of policy, by unit (i.e. precinct), during the Review Period. However, PPB has only partially met the requirements

of the three remaining elements of Paragraph 76. **We therefore conclude that PPB is in Partial Compliance with Paragraph 76 of the Settlement Agreement.**

**Recommendations:**

Pursuant to Settlement Agreement Paragraph 226, the Monitoring Team recommends the following steps necessary to achieve and maintain Substantial Compliance with Paragraph 76:

1. Develop an addendum to the Applications of Force Report to provide explanations as to why specific officers, units, or groups of officers are flagged as higher or lower users of force than comparable peers. Additionally, PPB should identify issues to be corrected, or approaches to be duplicated elsewhere, and include this information in the addendum to fully satisfy the requirements of Paragraph 76.c.

2. Correct the calculations of averages and standard deviations in the Applications of Force Report. The Applications of Force Report is a key analytical tool used by PPB to compare the use of force across individual officers and units. Incorrect averages and standard deviations calculated in the report prevent reviewers from making accurate comparisons, which may inhibit PPB's ability to identify whether members or units are using force at rates different from others.

3. Provide clearer details in the Non-Deadly Use of Force Findings Report about: a) the methodology for identifying members for discussion and possible intervention, including specific threshold criteria used; b) the specific reasons why members were identified in the analysis; and c) the explicit steps taken to address the concerns raised and why those steps are appropriate (or, alternatively, the explicit rationale for why further action was not warranted). Addressing these specific items in the report will help PPB fully satisfy the requirements of Paragraph 76.d.[17]

4. Revise the Force Inspector's Annual Report to include an annualized summary of findings for all elements in Paragraph 76. This recommendation will help PPB fully satisfy the requirements of Paragraph 76.e.; it presupposes that all other recommendations for achieving and maintaining Substantial Compliance with Paragraph 76 have been addressed prior to compiling the annual report.

[17] If PPB is unable or otherwise not inclined to release such details in the public report, it should still provide such details to the Monitoring Team in a separate document in order to support its demonstration of compliance with the requirements of Paragraph 76.d.

Based on the review we conducted for our assessment of compliance with Paragraph 76, the Monitoring Team makes the following additional recommendation, which is not required for compliance with the Settlement Agreement:

1. Include pre-defined, quantifiable thresholds in the Applications of Force Report to identify members and/or units who use force more or less often than average. Such thresholds will streamline the process of objective identification, while also providing criteria that may be adjusted to most effectively satisfy the requirement of Paragraph 76.c.

**Paragraph 77**

***Substantial Compliance***

The PPB Force Inspector is required to audit chain of command reviews of AARs to determine whether all supervisors in the chain of command consistently met their review requirements subsequent to a use of force. **The Monitoring Team's review confirmed the consistent and verified performance of this requirement by the PPB Force Inspector in actual practice.**

The chain of command requirements subject to the Force Inspector's audit include: 1) reviewing supervisors' findings about the use of force, as are required by PPB Directive 0910.00, using a preponderance of the evidence standard; 2) reviewing reports on the use of force, as are required by PPB Directive 0910.00, to ensure completeness, and ordering additional investigation when necessary; 3) modifying findings as appropriate, and documenting modifications; 4) ordering additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improving the reliability or credibility of the findings, and counseling the investigator; 5) documenting any training deficiencies, policy deficiencies, or poor tactical decisions, ensuring a supervisor discusses poor tactical decisions with the officer, and ensuring the discussion is documented in the Employee Information System; 6) suspending an investigation immediately and notifying the branch Assistant Chief, Director of Professional Standards Division, and Detective Division whenever the investigating supervisor, shift commander, or division commander finds evidence of apparent criminal conduct by a PPB officer; and 7) reporting a matter to Professional Standards Division for review and investigation whenever an investigating supervisor, shift commander, or precinct commander finds evidence of apparent misconduct by a PPB officer or employee.

The Monitoring Team and PPB exhibited more than 90 percent agreement on all seven requirements listed in Paragraph 77 of the Settlement Agreement. The Monitoring Team's review found a sizeable majority of accurate findings in PPB's Force Audit Report with regard to the requirements for that report listed throughout Paragraph 77. Furthermore, those discrepancies that do exist appear to be no more than occasional in their frequency and not systemic in terms of their

impact on the entire audit report. **We therefore conclude that PPB is in Substantial Compliance with Paragraph 77 of the Settlement Agreement.**

**Recommendations:**

Based on the review we conducted for our assessment of compliance with Paragraph 77, the Monitoring Team makes the following additional recommendation, which is not required for compliance with the Settlement Agreement:

1. The Monitoring Team found that PPB's new Audit Methodology, while capable of identifying force reporting deficiencies, does not appear to provide PPB with clear data about specific details of audited force events, which could prove useful for future quality improvement efforts. Moreover, it appears that the language found in the questions and their corresponding answer choices no longer align. Therefore, the Monitoring Team recommends that PPB revise its current Audit Methodology to ensure it allows for the clearest and most accurate accounting of the use of force reporting process; doing so would subsequently allow PPB to target for improvement individual audit elements that have identified deficiencies, or to identify other quality improvements with respect to use of force reporting.

## Employee Information System

To evaluate PPB's implementation of the principles and processes required by Paragraphs 116, 117, and 118 of the Settlement Agreement, the Monitor reviewed PPB directives related to the application of the Employee Information System (EIS), including Directive 0345.00, relevant Standard Operating Procedures (SOPs), and the results of analyses conducted by PPB.

The EIS is structured to support analyses of officer behavior/activity (including, but not limited to, the use of force) at both the individual and unit levels. It also triggers case management reviews when officer behavior/activity crosses a set of predetermined thresholds. The Monitoring Team's review of PPB's EIS confirmed that PPB has developed policies and procedures intended to support the early identification of potentially problematic trends among officers, supervisors, and teams. Moreover, in accordance with the Settlement Agreement, PPB has implemented mechanisms requiring supervisors and commanders to conduct regular performance reviews of officers, including upon transfer, and to document those reviews in the Performance Data Tracker (PDT).

Paragraph 116 of the Settlement Agreement requires supervisors and commanders to conduct reviews of EIS records of employees and new transfers, and to document these reviews in the PDT. It also requires PPB staff to regularly analyze unit and supervisor data to identify and compare activity patterns. Similar to Paragraph 116.c., Paragraph 117 requires PPB to use force audit data to conduct analyses at supervisor and team levels. Finally, Paragraph 118 requires PPB to use multiple thresholds to trigger case management reviews including, but not limited to, the following two:

1. When an officer has used force in 20 percent of their arrests in the past six months; or
2. When an officer has used force three times more than the average number of uses of force compared with other officers on the same shift.

**<u>Paragraph 116</u>**
***Substantial Compliance***

**The Monitoring Team found that PPB continues to maintain the policy and procedural requirements needed to satisfy the three elements of Paragraph 116.** Commanders and supervisors are required to perform annual reviews of employee performance and EIS records and to perform a similar review for officers new to their command—whether as a result of the officer or the supervisor having been transferred. EIS staff are also required to perform daily analyses of PPB members to assess performance threshold breaks, and the Force Inspector is required to analyze use of force data quarterly to identify patterns of activity across units and teams.

To comply with Paragraph 116.a., commanders and supervisors must conduct prompt reviews of EIS records of employees under their supervision and document that the review has occurred in the

EIS Performance Data Tracker. PPB Directive 0215.00 Member Performance Evaluations, PPB Directive 0345.00 Employee Information System (EIS), and Professional Standards Division (PSD) SOP #58 Tracking of Yearly Member Performance Evaluations require annual performance reviews of employees, including their EIS records. Supervisors must complete the performance review by the end of the month of the member's hiring or promotion anniversary and document the completed review in the EIS.

PPB submitted a table showing the total number of annual performance evaluation reviews completed during the Reporting Period, including the number and percentage completed on time. Overall, PPB reports a 96.8 percent on-time completion rate for annual performance reviews. The analysis is also broken down by reporting unit, and each unit except for one had on-time compliance rates greater than 90 percent. The Chief's Office/Criminal Investigation Unit was the only unit reporting a lower on-time compliance rate for its performance reviews, at 80 percent (4 out of 5).

To comply with Paragraph 116.b., PPB must require that commanders and supervisors conduct prompt reviews of the EIS for officers new to their commands and document that the review has occurred in the EIS PDT. PPB Directive 0345.00 requires supervisors to complete a review and EIS documentation within 30 days of having a new officer under their command. This transfer-initiated review is required regardless of whether the officer or the supervisor was the transferred employee.

PPB submitted a table showing the total number of transfer reviews completed during the performance period, including the number and percentage completed on time. Overall, PPB reports an 83.0 percent (181 out of 218) on-time completion rate for transfer reviews. The analysis is also broken down by reporting unit, with five units reporting on-time compliance rates greater than 90 percent. Professional Standards Division achieved on-time compliance rates of 50.0 percent (1 out of 2); Central Precinct and Detective Division achieved on-time compliance rates of 72.4 percent (42 out of 58) and 73.3 percent (11 out of 15), respectively; Chief's Office, East Precinct, and Specialized Resources Division achieved on-time compliance rates of 82.6 percent (19 out of 23), 87.3 percent (55 out of 63), and 84.6 percent (11 out of 13), respectively.[18]

To comply with Paragraph 116.c., EIS staff must regularly conduct data analysis of units and supervisors to identify and compare patterns of activity. PPB Directive 0345.00 and PSD SOP #44 Employee Information System Alert Processing Guide require the EIS Administrator to perform regular analyses. The EIS Administrator uses the daily pre-programmed analyses of the EIS to identify and assess threshold breaks by members related to their uses of force. When necessary, the EIS Administrator creates EIS Alerts within the system that notify supervisors and command staff to review the threshold break for possible discussion or intervention with an officer.

---

[18] The compliance rates reported for Detective Division, Specialized Resources Division, and the Chief's Office are inclusive of smaller units within those divisions and that office.

The Monitoring Team's review of documentation provided by PPB indicated that the EIS operates in compliance with the requirements of Paragraph 116. Furthermore, our review found that PPB is actively working to improve some of its EIS reporting to be more accurate and consistent. Specifically, EIS staff provided instruction and guidance to PPB supervisors and command staff during the Review Period on improvements to reporting protocols for "Discussion or Coaching Conducted" entries and "Traumatic Incident" entries in the EIS. These updates will enhance PPB's ability to identify such entries using automated processes, resulting in an improved capacity to take meaningful action in response to both types of entries, whenever such action is warranted.

Although room for improvement remains with regard to on-time completion rates of EIS reviews related to employee transfers, the primary areas of concern that we identified were limited to relatively small and/or specialized units, and the aggregate rate compared favorably to them. On the whole, and in considering PPB's efforts to satisfy all of the requirements of this paragraph (as detailed above), **the Monitoring Team concludes that PPB is in Substantial Compliance with Paragraph 116 of the Settlement Agreement.**

**Recommendations:**

The Monitoring Team makes the following recommendations to support ongoing compliance with Paragraph 116:

1. The Monitoring Team recognizes the efforts of PPB to improve the validity and reliability of EIS data, as shown through their coding updates to "Discussion or Coaching Conducted" and "Traumatic Incident" entries. These changes should improve the types of analyses PPB can conduct. The Monitoring Team encourages PPB to continue efforts to improve the EIS system and recommends that EIS staff broaden their data analysis of units and supervisors to identify and compare patterns of activity. A more expansive analysis—comparing EIS data across precincts, shifts, specialized details, supervisors (of multiple ranks) and the units under their supervision—increases the potential to yield beneficial information and facilitate professional growth through a feedback process that reinforces PPB's management and accountability systems, standards, and expectations.

2. The Monitoring Team recommends that PPB ensure supervisors performing evaluation and transfer reviews of officers' EIS records are consistently and comprehensively documenting findings or patterns of activity identified in the EIS that indicate a member may potentially be at risk of problematic activity in the future.

**Paragraph 117**
***Substantial Compliance***

As required by Paragraph 117 in the Settlement Agreement, PPB must use force audit data to identify and compare patterns of activity at supervisor and team levels. PPB uses force audit data to analyze the completeness and accuracy of force reporting across three groups: members, supervisors, and command staff.

**The Monitoring Team acknowledges that PPB has processes for using force audit data to identify and assess patterns of officer activity at the supervisor and team levels. The Monitoring Team's review found that these mechanisms are in place and consistently applied, and that PPB reviews force data by officer, supervisor, and division.** PPB provided quarterly Force Analysis Alert Memos by precinct, as well as Precinct Alert Case Notes using data from Q4 2024 and Q1 2025. These two documents present largely the same information about Force Audit accuracy rates by officers, supervisors, and command staff, with the Precinct Alert Case Notes representing the precinct-level entry in the EIS system to document the findings. The Force Analysis Alert Memos also include findings from the Force Inspector's analysis of the Applications of Force Report (see Paragraph 76) regarding PPB members identified for discussion based on comparisons of their use of force to other metrics such as number of arrests, calls for service, and comparison to average performance in their units.

In the Force Analysis Alert Memos and the Precinct Alert Case Notes, the OIG Audit teams reported a high degree of accuracy (over 99 percent) across all groups. However, as noted in the compliance assessment for the OIG Force Audit process (see Paragraph 76), PPB provides credit to members, supervisors, and command staff for deficiencies if anyone catches a deficiency that occurred earlier in the process. As such, the OIG Audit results cannot identify the accuracy rate of individual members because the audit process itself inflates accuracy by not counting deficiencies for one member when they are caught by another.

Despite the Monitoring Team's concern with OIG's Force Audit process,[19] PPB is continuing to use force audit data to conduct analyses at supervisor and team levels, thereby meeting the requirements of Paragraph 117. **Therefore, the Monitoring Team concludes that PPB is in Substantial Compliance with Paragraph 117 of the Settlement Agreement.**

**Recommendations:**

Based on the review we conducted for our assessment of compliance with Paragraph 117, the Monitoring Team makes the following recommendation, which is not required for compliance with the Settlement Agreement:

---

[19] These concerns are further addressed in our assessment of Paragraph 76.

1. Reinforce with Precinct Commanders the importance of being rigorous and comprehensive in their responses to all issues identified by the Force Inspector's analysis of use of force data.

**Paragraph 118**

***Substantial Compliance***

Paragraph 118 of the Settlement Agreement requires PPB to continue using its existing thresholds to trigger case management reviews of members' uses of force through the EIS, specifically including the following two thresholds: any officer who has used force in 20 percent of his or her arrests in the past six months; and any officer who has used force three times more than the average number of uses of force compared with other officers on the same shift.

The Monitoring Team reviewed Directive 0345.00 Employee Information System (EIS) and SOP #44 Employee Information System (EIS) Alert Processing Guide to confirm that PPB policy maintains the two new threshold criteria defined by the Settlement Agreement, as well as the six additional thresholds that will trigger an alert in the EIS system: 1) a sworn member who uses force three or more times in the preceding 30 days; 2) a member who receives a complaint with an allegation of criminal misconduct; 3) a member who receives two or more complaints with at least one allegation in each complaint being in the same category (such as two complaints that both have conduct allegations) for events in the preceding six months; 4) a member who received three or more complaints for events in the preceding six months; 5) a member who experiences three or more traumatic incidents in the preceding 30 days; and 6) a member who receives two or more commendations for events in the preceding six months.

In September 2025, the EIS Administrator notified RU managers about a new "Discussion or Coaching Conducted" option to use when responding to EIS alerts. The EIS Administrator advised that an EIS analyst currently must read through every response and manually update the case if the officer had been spoken to yet the default "No Intervention Required" option in the EIS had been incorrectly selected. PPB informed the Monitoring Team that this new selection option was created to "reduce the workload on our analyst and get us better compliance data for the system."

PPB also recently created a new "Traumatic Incident" code to ensure that all such events are being captured in the data by the EIS. As of December 2025, this code could be added to the system by members of any rank. It provides supervisors with the opportunity to check in with officers involved in traumatic incidents and ensure that they are receiving the appropriate resources. PPB communicated to the Monitoring Team its hope that this code "will make the system more accurate and give [PPB] valuable information to consider when making future system improvements."

PPB submitted a table showing a total of 694 EIS alerts triggered in Q3 and Q4 of 2025: 225 force alerts, 214 traumatic incident alerts, 65 complaint alerts, 178 commendation alerts, 10 Precinct alerts, and 2 test/deleted alerts. PPB performed several analyses of the alerts generated and closed by the system during the second half of 2025 to provide supporting evidence that the system is functioning. The analyses include counts of alerts triggered for two of the eight thresholds in SOP #44 (i.e., commendations and traumatic incidents). PPB also provided four additional tables covering a variety of EIS data points as follows: two tables showing alerts that were created during the Reporting Period with a breakdown by (1) alert type sent to RU and (2) closure criteria; and two tables showing alerts closed during the Reporting Period—whether or not they were created during the Reporting Period—with a breakdown by (3) alert type and closure criteria and (4) alert type and resolution type.

Of the 694 alerts, 458 (66.0%) were forwarded to the Reporting Unit (RU) Manager for review and potential follow-up. Of the 225 force alerts, 69 (30.6%) were forwarded to the RU Manager, while a majority of all other types of alerts were forwarded to the RU Manager. As discussed in the Monitoring Team's previous semi-annual compliance report (covering the Q1-Q2 2025 Reporting Period), this low percentage of force alerts being sent to the RU Managers is a function of the EIS algorithm, which often identifies an alert for an issue that was previously identified by another alert. The EIS Administrator reviews each force alert for one of several criteria, the presence of which would allow them to administratively close the alert. The criteria include: 1) a single use of force related to the alert; 2) a duplicate alert with no new use of force; 3) system errors; 4) professional/non-sworn personnel who are not subject to EIS Alert review; 5) alerts that involve incidents/information that have/has already been addressed, or alerts that need to be cleared due to employee separation; and 6) Category IV use of force analysis/recalculation which results in alerts no longer meeting force threshold breaks. PPB also noted that, of the 225 force alerts triggered during this Review Period, nine were for members with three or more uses of force in the 30 days prior to the alert being triggered.

Finally, PPB submitted analyses showing that, of 467 alerts that were closed at the RU level during the Reporting Period, including all categories of alerts, 218 (46.7%) resulted in supervisor intervention, such as a debrief or coaching with the employee. The remaining alerts were closed by the RU Manager or a supervisor, excluding one alert that an RU Manager declined to review.

Directive 0345.00 and SOP #44 document that eight EIS threshold triggers are used by PPB for case management review, including the two triggers explicitly listed in Paragraph 118. The materials submitted by PPB in support of compliance with this paragraph indicate that the EIS system algorithm fired 694 alerts of threshold breaks during the Review Period. PPB also provided analyses showing the breakdown of how often each alert, or combination of alerts, was triggered, as well as reasons why some of them were administratively closed. **Therefore, the Monitoring Team concludes that PPB is in Substantial Compliance with Paragraph 118 of the Settlement Agreement.**

**Recommendations:**

Based on the review we conducted for our assessment of compliance with Paragraph 118, the Monitoring Team makes the following additional recommendation, which is not required for compliance with the Settlement Agreement:

1. Given that only 47 percent of all EIS threshold breaks during the Reporting Period appeared to result in some sort of intervention with an officer by a supervisor, and that 33.7 percent of EIS alerts tied to uses of force met the criteria for administrative closure (meaning that no intervention with the involved officer was warranted), the Monitoring Team suggests that PPB review and adjust its EIS thresholds in order to allow its alert processing efforts to focus more precisely on those incidents that warrant some type of intervention. Such updates could reduce the amount of resources spent on reviewing EIS alerts and also provide a clearer indication of which alerts require an evaluation of an officer's performance and/or behavior.

## Addendum of Additional Remedies

**Paragraph 188**
***Substantial Compliance***

The Monitoring Team reviewed multiple Force Data Collection Report (FDCR) and After-Action Report (AAR) forms completed by PPB members during the Reporting Period. PPB also provided us with meta-data identifying the times when all FDCRs from the Reporting Period were created and submitted by reporting officers, as well as when they were approved by supervisors. Pursuant to Paragraph 188, both the FDCR and the AAR are required to capture when they are edited and completed. **Our review of all of the materials provided confirmed that this requirement is being met, despite some minor issues related to documentation.**

Our review of FDCRs and AARs found that, in many cases, they each included timestamps stating when they were submitted by the reporting PPB member as well as when they were approved by a supervisor. However, a random review of completed FDCRs identified many that did not include the submission timestamp at all. The same concern was identified in each of our two previous compliance reports (covering the Reporting Periods from July 1 – December 31, 2024 and January 1, 2025 – June 30, 2025, respectively).[20] Our review during this Reporting Period also found that some FDCRs included two submission timestamps, each indicating a different time of submission for the same report (without any explanation for the discrepancy).[21]

These shortcomings with respect to FDCR forms stand in stark contrast with the AAR forms that were provided to us by PPB, each of which consistently states not only the time of the form's completion by the authoring supervisor, but also the completion times of each review of the form that is conducted by the involved chain of command. Importantly, however, PPB also provided the Monitoring Team with a spreadsheet containing data that had been queried from all FDCR forms completed during the Reporting Period, which numbered 305 in total. This spreadsheet included times of creation and submission for each of the 305 FDCR forms, evidencing that—on balance—PPB had fulfilled Paragraph 188's requirement to have FDCRs (in addition to AARs) capture the time of their editing and completion.[22]

---

[20] During those Reporting Periods, PPB attributed this intermittent omission on the FDCR to a problem with how the forms print when they are complete, as opposed to a failure to capture this data point.

[21] After the close of the Reporting Period, PPB notified the Monitoring Team that the issues leading to intermittently missing or duplicative timestamps on FDCRs had been fixed as of November 5, 2025.

[22] The Monitoring Team noted in its review of this data that the "created" time and "submitted" time, each measured to the minute, were identical for 102 (33.4%) of 305 FDCRs; many other FDCRs had "submitted" times within only one or two minutes of their "created" times. When we inquired about this with PPB, we were informed that it is common practice for PPB officers to draft their report language in an external

Our review also found that the FDCR form contains a text field in which it appears that the approving supervisor can manually enter the time of their approval of the report. The time entered into this field and the corresponding report approval timestamp that appears at the end of the FDCR form did not always match, resulting in apparent inconsistencies on numerous forms. The Monitoring Team believes such an inconsistency on the face of an FDCR can easily become problematic in any situation where the timing of the form's approval is at issue. Furthermore, the inconsistency seems unnecessary, as the report approval time text box may be rendered superfluous by the report approval timestamp (barring some need to maintain the former, which is not presently apparent). This concern, too, was identified in each of our previous compliance reports.[23]

Despite continuing issues with respect to consistent documentation, which we believe are ultimately minor in nature and not systemic, **the Monitoring Team concludes that PPB is in Substantial Compliance with Paragraph 188 of the Settlement Agreement.**

**Recommendations:**

The Monitoring Team makes the following recommendation to support ongoing compliance with Paragraph 188 of the Settlement Agreement:

1. Update the FDCR form to ensure that each one automatically includes one timestamp that identifies when the FDCR was created as well as one timestamp that identifies when the FDCR was submitted by its author for supervisory review and approval.

Based on the review we conducted for our assessment of compliance with Paragraph 188, the Monitoring Team makes the following additional recommendation, which is not required for compliance with the Settlement Agreement:

1. Revise the aspects of the FDCR form that frequently seem to be contradictory in their identification of two different times when the report was approved by a supervisor.

---

program before creating a new FDCR form. Once their report language has been drafted, the officers then create an FDCR form, copy and paste the report language into the form, and submit the form (for supervisory review and approval), all within a time span as short as one minute.

[23] During a previous Reporting Period, PPB identified the text field as a holdover from an earlier version of the FDCR form and indicated that its presence does not negate the accurate capturing of the supervisory-approval-time data point. PPB also indicated that all edits to both FDCR and AAR forms are captured in the forms' respective meta-data, including when the edits were made, by whom, and what was changed.

**Paragraph 192**

***Partial Compliance***

The Monitoring Team communicated with IPR staff about the series of investigations it initiated, pursuant to the requirements of this paragraph, aimed at identifying the following: 1) the PPB Lieutenant(s) and above who trained Rapid Response Team (RRT) members to believe that they could use force against individuals during crowd control events without meeting the requirements of PPB Directive 1010.00; 2) the PPB incident commander(s) and designee(s) with the rank of Lieutenant or above who directed or authorized any officer to use force in violation of PPB Directive 1010.00, or who failed to ensure that FDCRs and AARs arising from the crowd control events starting on May 29, 2020, and ending on November 16, 2020, were completed as required by Section 13.1 of PPB Directive 635.10; and 3) the PPB Commanders and above who failed to timely and adequately clarify misunderstandings and misapplications of PPB policy (including the Settlement Agreement) governing the use, reporting, and review of force during the crowd control events starting on May 29, 2020, and ending on November 16, 2020. The first investigation into these matters was opened by IPR on June 29, 2022; five related investigations were subsequently added (as was deemed appropriate by IPR in order to most effectively cover all of the required issues identified in this paragraph).

As of the end of this Reporting Period, IPR had completed five of the six investigations in the series that it initiated to comply with Paragraph 192 of the Settlement Agreement, and it had submitted each of them to a final adjudicator designated by the City. The sixth investigation was still in progress as of the end of the Reporting Period.[24] IPR had previously shared with the Monitoring Team a draft of each investigation report that was nearing completion, including any recommended findings that IPR had reached with respect to allegations of misconduct. All six investigations in the series were pending their final adjudication as of the end of the Reporting Period.

Given that the investigations into the matters identified in Paragraph 192 had not yet reached their final adjudication by the end of the Reporting Period, no assessments of their appropriateness or further actions resulting from their findings may be made at present. The Monitoring Team noted that it appears the investigations were initiated one day beyond the deadline set in this paragraph (within 60 days of the paragraph being entered as an order of the Court). We consider this to clearly be a minor violation that is not systemic in terms of its impact on the required investigations.

---

[24] A PPB member involved in this investigation had been on protected leave for an extended period of time and was, therefore, unavailable to be interviewed by IPR. The member remained on protected leave as of the end of the current Reporting Period. IPR informed the Monitoring Team that these circumstances led to the delay in this investigation's completion.

Of note, IPR informed the Monitoring Team that the involved member's leave status had changed after the close of the current Reporting Period; and that IPR was in the process of completing this sixth and final investigation pursuant to Paragraph 192. Once complete, it would be submitted to a final adjudicator designated by the City, as with the other five associated investigations.

Additional work is still needed in order to complete the investigation(s) required by this paragraph. **We therefore conclude that the City is in Partial Compliance with Paragraph 192 of the Settlement Agreement.**

**Recommendations:**

Pursuant to Settlement Agreement Paragraph 226, the Monitoring Team recommends the following steps necessary to achieve and maintain Substantial Compliance with Paragraph 192:

1. IPR should complete its pending investigation into this matter as expediently as it can without sacrificing investigative quality or thoroughness.

2. The City should complete its adjudication of all investigations that have been submitted to it by IPR pursuant to this paragraph as expediently as it can without sacrificing objectivity or fairness.

**Paragraph 194**
***Partial Compliance***

Settlement Agreement Paragraph 194 requires the implementation of body-worn cameras (BWCs) at PPB by the City. More specifically, it requires: that the BWCs be implemented pursuant to a policy that is subject to the policy review-and-approval provisions of the Settlement Agreement; that the City comply with collective bargaining obligations related to BWCs; that public input on the use of BWCs be gathered to inform the policy governing them; and that the City may be required to update the Court upon the completion of the collective bargaining process.

For the Monitoring Team's assessment of compliance with this paragraph, we reviewed a number of materials including:

- PPB Directive 0620.00 Body-Worn Camera Use and Management;
- Multiple policy development documents that preceded the current version of Directive 0620.00;
- Communication regarding the process of collective bargaining about PPB's BWC policy;
- Communication between the Parties regarding PPB's BWC policy;
- A report prepared by the Compliance Officer/Community Liaison titled, "Body-Worn Cameras for the Portland Police Bureau: History and Community Engagement Results."

Additionally, pursuant to the requirements of Directive 0620.00, the Office of the Inspector General (OIG) performed an audit to confirm that PPB's BWC equipment is being used in accordance with applicable policy. The audit assessed policy requirements for both members' use of BWC equipment

pursuant to Directive 0620.00 and supervisors' review of BWC videos in compliance with Directive 0910.00 Use of Force Reporting, Review, and Investigation. The Monitoring Team reviewed the BWC Audit Methodology that was provided by the OIG as well as the PPB OIG Body-Worn Camera Compliance Assessment report containing the audit results.

Furthermore, in order to assess the consistent and verified performance of the BWC policy that was ultimately enacted by PPB, the Monitoring Team performed its own audit of BWC recordings from 26 randomly selected PPB incidents that occurred in the current Reporting Period and during which an officer's BWC was activated; we also reviewed the associated computer-aided dispatch (CAD) reports and narrative reports for each incident.[25] The Monitoring Team endeavored to complete a rigorous and thorough evaluation of each incident in our sample. Guided by the multiple requirements that officers must fulfill in PPB Directive 0620.00, our review of each incident encompassed determinations on 44 different elements.

**Our review found that the City complied with nearly every requirement in the portion of Paragraph 194 that is focused on the development of a BWC policy and the logistics of rolling out a BWC program to PPB.[26] However, audits assessing adherence to the BWC policy that was ultimately implemented by PPB revealed numerous deviations that are neither minor nor occasional.**

The OIG BWC Audit results noted three primary findings:

1. PPB members delivered required BWC recording announcements when making initial contact with members of the public 26 percent of the time.[27]
2. Supervisors completed required BWC video reviews of certain types of incidents, as further specified in policy, 30 percent of the time.
3. PPB members provided required verbal justifications for deactivating their BWCs 18 percent of the time.

---

[25] There were 7,490 cases created in the Axon system during the Review Period. The Monitoring Team sampled every 300th case, rejecting those associated with incidents that did not occur during the Review Period or for which no BWC video was included. A total of 37 cases were examined to identify 26 meeting the audit criteria.

[26] The one deviation that we noted from this portion of Paragraph 194 was that implementation of the program was not complete by the deadline set in the paragraph. We found such a deviation unsurprising, given the many foreseeable and unforeseeable challenges of completing a project as complex as this one, and we maintain our belief that it amounts to only a minor deviation from this aspect of the requirements in Paragraph 194, with no systemic impact.

[27] PPB reports it was unclear whether members delivered the BWC notification to the public in 10 percent of cases, and that they failed to do so at the beginning of the interaction, as required, in 64 percent of cases. Additionally, among that latter group (of 64 percent) of cases, members delivered the required notification at a later point during the interaction 6.9 percent of the time.

In addition to these findings, the OIG's audit determined that PPB members demonstrated more widespread adherence to requirements in policy governing when they must activate their BWC recordings, with a compliance rate of 88 percent.[28] Members were found to have deactivated their BWC recordings earlier than expected in 4 percent of their interactions with the public. Also, among the 54 interactions during which PPB members were required to either turn off their BWC recording or not activate it at all, the OIG's audit found 76 percent compliance.

With respect to reviews of BWC footage, the OIG's audit finding that supervisors only completed 30% of their required reviews was not consistent across all types of incidents. For example, BWC videos from Special Emergency Reaction Team (SERT) interactions were reviewed 14 percent of the time; in contrast, videos from incidents involving member pursuits or Category II uses of force were reviewed 76 and 71 percent of the time, respectively. Furthermore, the completion rate of supervisor reviews declined among higher ranking members of PPB: sergeants completed 52 percent of required reviews; lieutenants completed 31 percent; captains completed 18 percent; and a designee of the Chief completed 14 percent of required reviews. Finally, and specifically with respect to Category II use of force incidents, the OIG's audit found that supervisors effectively recorded member interviews following such incidents, as required, 76 percent of the time.

The Monitoring Team's audit of adherence to BWC policy examined how often PPB officers completed their required BWC notification upon initial contact with a member of the public; how often delayed BWC notifications were given; whether members muted or deactivated their BWC recordings in accordance with policy; whether members deactivated or avoided activating BWC recordings in specifically designated locations (e.g., medical facilities, courthouses, restricted areas of law enforcement facilities, etc.); whether BWC recordings were documented in appropriate reports; and whether BWC interviews were obtained as required by policy in certain cases where PPB members used force against subjects. In areas where the Monitoring Team's audit overlapped with the OIG's audit, our findings were largely consistent with theirs.

As to other areas of adherence to BWC policy audited by the Monitoring Team, we found that PPB members wore their cameras at chest level in all BWC videos we reviewed, and that they did so in such a manner as to provide an unobstructed view of their activities and interactions with the community. Furthermore, among seven cases where emergency vehicle lights were confirmed to have been activated, the Monitoring Team audit found that officers' BWCs automatically activated in all seven cases. Additionally, when PPB members unholstered a CEW or a firearm, we found that their BWCs were already activated, prior to the drawing of those weapons. Confirming that BWCs

[28] PPB reported that members effectively activated their BWC as required in 89 percent of 1,077 in-person contacts and 87 percent of 452 phone contacts. The Monitoring Team used these data to determine that, across all contacts, PPB members demonstrated compliance with requirements to activate their BWCs at a rate of 88 percent.

are automatically activating when required, unless they had already been activated, is important for capturing and maintaining records of these critical actions by PPB members.

The City satisfied the policy and logistical portions of Paragraph 194's requirements in a comprehensive fashion and with a high level of integrity. Additionally, during this Reporting Period, PPB completed its first periodic audit of members' compliance with Directive 0620.00. The OIG BWC Audit methodology is sound, and the Monitoring Team recognizes the considerable time and effort that PPB devoted to its development and implementation. As indicated by the results of both PPB's own audit and the Monitoring Team's, however, substantial deviations across multiple requirements were present in the performance of applicable BWC policy in actual practice during the Reporting Period. **We therefore conclude that the City is in Partial Compliance with Paragraph 194 of the Settlement Agreement.**

**Recommendations:**

Pursuant to Settlement Agreement Paragraph 226, the Monitoring Team recommends the following step necessary to achieve and maintain Substantial Compliance with Paragraph 194:

1. PPB should provide refresher training to all officers regarding the requirements in PPB Directive 0620.00. Specific attention should be paid to the following provisions within the policy: a) notifying persons that they are being recorded; b) recording verbal justifications and/or written justifications in an associated report prior to deactivating or muting a recording; c) stopping a recording, or restarting a recording after stopping it; and d) supervisor responsibilities to review BWC video.

**Paragraph 195**

***Partial Compliance***

Settlement Agreement Paragraph 195 requires the City to take a series of actions that will ultimately result in the establishment of the new Community Board for Police Accountability (CBPA) to replace IPR for investigations of certain complaints of police misconduct and to replace the Chief of Police for imposition of discipline. In order to assess compliance with this paragraph, the Monitoring Team reviewed: numerous communications between the Parties regarding the complex and multi-faceted transition to this new oversight system; City Council Resolution 37637, Ordinance 190812, and Report 2025-246; and multiple materials used by the City to recruit the initial members of the CBPA.

With only minor exceptions or deviations, the City has evidenced its completion of the many tasks required of it by Paragraph 195, up to the close of the current Reporting Period. The records reviewed by the Monitoring Team indicate that the City Auditor and City Council each submitted a

plan to the DOJ for the transition to the CBPA after the January 1, 2022, deadline for doing so; however, both plans were apparently still submitted within a month of that deadline. Specifically, the City proposed amendments to Section VIII of the Settlement Agreement to the Court, which were approved on August 29, 2024, but the Court delayed the effective approval date until January 2, 2025. In other words, any delay that occurred appears to be only a minor one, particularly given the intricate issues involved in this transition. Also, although no documentation explicitly illustrated the DOJ's determination of an acceptable plan from amongst those submitted by the City Auditor and City Council, which was required prior to the City Council's adoption of such a plan, it seems clear that there was no issue with this part of the transition process required by the Settlement Agreement.[29] Additionally, although no data was provided with the specific purpose of illustrating that the City has ensured that administrative investigations of PPB members are completed and that officers are held accountable for violating PPB policy and procedure, the Monitoring Team's review of multiple administrative investigations and their outcomes when subject officers are found to have violated policy is sufficient evidence for us to confirm that the City has met this requirement in practice.

The one major requirement in Paragraph 195 that remains unfulfilled as of the end of the current Reporting Period is for the CBPA to be staffed and operational. This was required to occur within 12 months of the City Council's adoption of the City Code provisions necessary to establish the CBPA, which occurred on September 11, 2024.[30] Although this requirement was not completed by that deadline, or within the current Reporting Period at all, the Monitoring Team notes that the Settlement Agreement provides for a reasonable extension for good cause shown, provided that the City is in Substantial Compliance with other parts of the paragraph.

Of significant note, and continuing to build on progress made toward the staffing and operationalization of the CBPA during the last Reporting Period (which included the selection of the initial slate of CBPA members), the City provided the following update to the Monitoring Team regarding its efforts toward compliance with Paragraph 195:

> *During this review period, CBPA members and alternates attended training required by City Code 35.20.020-CBPA Membership, paragraph (G). Since the Board could not meet with a quorum, most of the trainings were given three to four times each so as to ensure all members had access to the information and the ability to ask questions without violating public meetings laws. This included a*

[29] No concerns regarding the DOJ's determination of an acceptable transition plan, in compliance with Settlement Agreement Paragraph 195, were mentioned in the DOJ's Seventh Periodic Compliance Assessment Report (which was filed with the Court on August 8, 2023).

[30] The City informed the Monitoring Team (during a previous Reporting Period) of its position that the 12-month period referenced in this part of Paragraph 195 should not commence until January 2, 2025 because amendments to the Settlement Agreement that were made in conjunction with the City's establishment of the CBPA did not become effective until that date.

*ride-along, which was not conducted until after CBPA members and alternates successfully completed the background and CJIS [Criminal Justice Information Services] check.*

*All CBPA members and alternates successfully completed their background check, which included a CJIS check performed by Oregon State Police. Code Section 35.20.010(E).*

This update represents one more critical step taken by the City toward the complex and multidimensional task of establishing a brand-new system of civilian oversight for PPB. As of the end of the Reporting Period, the new CBPA members were poised to begin holding public meetings and fulfilling their mandate, including (among other things) hiring a Director to head the Office of Community-Based Accountability (OCPA). The OCPA, once it is staffed, will report to the CBPA, and those two bodies will collectively form the Oversight System that is contemplated by the Settlement Agreement.

Given that the staffing and operationalization of the system remained pending as of the close of this Reporting Period, however, additional work pursuant to this paragraph's requirements is still needed. **We therefore conclude that the City is in Partial Compliance with Paragraph 195 of the Settlement Agreement.**

**Recommendations:**

Pursuant to Settlement Agreement Paragraph 226, the Monitoring Team recommends the following step necessary to achieve and maintain Substantial Compliance with Paragraph 195:

1. The City should maintain its commitment to fully staffing the CBPA and ensuring its operability as expediently as it feasibly can.

# Discrete Sections in Self-Monitoring[31]

Pursuant to the Settlement Agreement, the following paragraphs (which the Settlement Agreement groups into "discrete sections" as indicated) were subject to self-monitoring by the City during the Reporting Period:

- 66-67 (force principles);
- 78-79, 81, 84, and 190 (training principles);
- 85-86 (training audits, analyses, and recommendations);
- 115 (crisis triage);
- 121-123 (investigation timelines);
- 124-127 (on-scene public safety statements and interviews);
- 128-129 and 131-133 (conduct of IA investigations)
- 137 and 245 (discipline and accountability);[32]
- 148, 150, and 193 (PPB Stops Data and Annual Reports);
- 189 (outside review of 2020 protest response); and

For each of these paragraphs, the City created a self-monitoring plan and shared it with the Monitoring Team for our consultation. We reviewed the plans and provided commentary back to the City aimed at ensuring that each plan emphasized assessments to evidence continued Substantial Compliance with the Settlement Agreement.

The City additionally prepared a compliance report for each paragraph subject to self-monitoring. The Monitoring Team evaluated those reports to determine whether the City had maintained Substantial Compliance in accordance with its self-monitoring plans. Pursuant to the Settlement Agreement's provisions, if the City has adequately demonstrated maintained Substantial Compliance with any of the discrete sections listed above for two consecutive semi-annual reports, the discrete section will be subject to termination. Alternatively, if the City has not adequately demonstrated maintained Substantial Compliance with any of the discrete sections listed above, then the City is

[31] According to Paragraph 249 of the Settlement Agreement, "Self-monitoring is a transition phase that involves continued Monitor review of the City's methodology and self-assessments while allowing the City to demonstrate its ability to sustain compliance after termination." For a full description of self-monitoring, including how discrete sections are identified for such status, requirements regarding self-monitoring plans and semi-annual compliance reports prepared by the City, and evaluations conducted by the Monitor, see Paragraphs 253-259 of the Settlement Agreement.

[32] The Monitoring Team did not believe that Paragraph 245 should be included among its semi-annual compliance assessments. (For further information about this decision, refer to our Semi-Annual Compliance Report: July 1, 2024 to December 31, 2024, available here: https://portlandpolicemonitor.com/documents/.) Similarly (and for the same reasons), the Monitoring Team does not believe Paragraph 245 should be included among its evaluations of the City's self-monitoring efforts.

required to prepare additional semi-annual reports until the Monitoring Team determines it has adequately demonstrated maintained Substantial Compliance for two consecutive reports.

The Monitoring Team's evaluations of the City's compliance reports found that, with one exception, the City did maintain Substantial Compliance in accordance with its self-monitoring plans. Below is a chart reflecting the Monitoring Team's evaluations; further detail about our evaluation of each discrete section follows.

# Self-Monitoring Evaluation Chart

| Self-Monitoring Paragraph/Discrete Section | Evaluation Determined City Has Maintained Substantial Compliance |
|---|---|
| Paragraph 66 | Yes |
| Paragraph 67 | Yes |
| **Force Principles** | **City Has Adequately Demonstrated Substantial Compliance** |
| Paragraph 78 | Yes |
| Paragraph 79 | Yes |
| Paragraph 81 | Yes |
| Paragraph 84 | Yes |
| Paragraph 190 | Yes |
| **Training Principles** | **City Has Adequately Demonstrated Substantial Compliance** |
| Paragraph 85 | Yes |
| Paragraph 86 | No |
| **Training Audits, Analyses, and Recommendations** | **City Has Not Adequately Demonstrated Substantial Compliance** |
| Paragraph 115 | Yes |
| **Crisis Triage** | **City Has Adequately Demonstrated Substantial Compliance** |
| Paragraph 121 | Yes (with former provisions of paragraph) |
| Paragraph 122 | Yes (with former provisions of paragraph) |
| Paragraph 123 | Yes (with former provisions of paragraph) |
| **Investigation Timelines** | **Yes (with former provisions of discrete section)** |
| Paragraph 124 | Yes |
| Paragraph 125 | Yes |
| Paragraph 126 | Yes |
| Paragraph 127 | Yes |
| **On-Scene Public Safety Statements and Interviews** | **City Has Adequately Demonstrated Substantial Compliance** |
| Paragraph 128 | Yes (with former provisions of paragraph) |
| Paragraph 129 | Yes (with former provisions of paragraph) |
| Paragraph 131 | Yes (with former provisions of paragraph) |
| Paragraph 132 | Yes (with former provisions of paragraph) |
| Paragraph 133 | Yes (with former provisions of paragraph) |
| **Conduct of IA Investigations** | **Yes (with former provisions of discrete section)** |
| Paragraph 137 | Yes |
| **Discipline and Accountability** | **City Has Adequately Demonstrated Substantial Compliance** |
| Paragraph 148 | Yes |
| Paragraph 150 | Yes |
| Paragraph 193 | Yes |
| **PPB Stops Data and Annual Reports** | **City Has Adequately Demonstrated Substantial Compliance** |
| Paragraph 189 | Yes |
| **Outside Review of 2020 Protest Response** | **City Has Adequately Demonstrated Substantial Compliance** |

**Paragraphs 66-67 (Force Principles)**

**Paragraph 66**

This paragraph of the Settlement Agreement requires PPB's use of force policies to include certain specified principles: that PPB shall use only the force reasonably necessary under the totality of the circumstances; and that PPB expects officers to develop and display the skills and abilities that allow them to resolve confrontations without force or with the least amount of it that is appropriate. The Settlement Agreement further requires the consistent and verified performance of these principles by PPB officers in actual practice.

To evidence compliance with Paragraph 66, PPB provided supporting documents including Directive 1010.00 Use of Force and the results of "Command Review" evaluations of use of force incidents and investigations. PPB identified one command staff member to conduct independent reviews of use of force cases completed during the Reporting Period. In order to verify PPB's performance of the requirements in Paragraph 66, the PPB command member reviewed a random sample of 15 Category II and III use of force incidents that occurred during the Reporting Period.[33] Of those 15 cases, 10 were part of the random sample that the Monitoring Team selected for our assessment of the City's compliance with Settlement Agreement Paragraphs 69, 70, and 73.

In comparing PPB's assessments of whether the 10 use of force cases it reviewed met the requirements of Paragraph 66 to the Monitoring Team's assessments of those same cases, we found that PPB's results matched ours. We consider this to be a positive reflection of PPB's efforts to self-monitor its use of force events for compliance with the mandates of this part of Settlement Agreement. PPB's compliance report concluded that PPB was in Substantial Compliance with Paragraph 66 for this Reporting Period. **The Monitoring Team's evaluation found that PPB has maintained Substantial Compliance in accordance with the self-monitoring plan for this paragraph of the Settlement Agreement.**

**Paragraph 67**

Similar to Paragraph 66, this paragraph of the Settlement Agreement also requires PPB's use of force policies to include certain specified principles: that officers shall use disengagement and de-escalation techniques, when possible, and/or call in specialized units when practical; that officers will account for all relevant information in determining whether to use force—including any indication that a person they encounter may be experiencing a mental illness; that the use of force shall be de-escalated as resistance decreases, and that the amount of force used shall de-escalate to a level that is reasonably calculated to maintain control with the least amount of appropriate force; and that objectively unreasonable force shall result in corrective action and/or discipline. The Settlement Agreement further requires the consistent and verified performance of these principles by PPB officers in actual practice.

---

[33] The Monitoring Team recognizes the time and dedication that is necessary to conduct these assessments, and we commend PPB for selecting a command-staff level individual to complete them.

In order to evidence compliance with Paragraph 67, a member of PPB's command staff[34] reviewed a sample of 15 randomly selected Category II or III use of force incidents that occurred during the Reporting Period. Of those 15 cases, 10 were part of the random sample that the Monitoring Team selected for our assessment of the City's compliance with Settlement Agreement Paragraphs 69, 70, and 73. In comparing PPB's assessments of whether the 10 use of force cases it reviewed met the requirements of Paragraph 67 to the Monitoring Team's assessments of those same cases, we found that, overall, PPB's results were similar to ours.

PPB's compliance report concluded that PPB was in Substantial Compliance with Paragraph 67 for this Reporting Period. **The Monitoring Team's evaluation found that PPB has maintained Substantial Compliance in accordance with the self-monitoring plan for this paragraph of the Settlement Agreement.**

**With regard to the Force Principles discrete section of the Settlement Agreement, the Monitoring Team's evaluation of PPB's compliance report found that PPB has adequately demonstrated that it has maintained Substantial Compliance with the section.**

**<u>Paragraphs 78-79, 81, 84, and 190 (Training Principles)</u>**

**Paragraph 78**

Settlement Agreement Paragraph 78 identifies a number of immensely valuable outcomes for PPB to achieve with regard to the training of its officers. In order to do so, according to the language of this paragraph, PPB must consistently and verifiably perform the requirements in the subsequent Settlement Agreement paragraphs that address training (Paragraphs 79, 81, 84, 85, and 86, specifically, all of which are in self-monitoring status). PPB's self-monitoring plan communicates this requirement, and PPB's compliance assessment report reached a finding of Substantial Compliance based on the fact that the same finding (Substantial Compliance) was reached with respect to each of the above-listed paragraphs. We concur; as such, **the Monitoring Team's evaluation found that PPB has maintained Substantial Compliance in accordance with the self-monitoring plan for this paragraph of the Settlement Agreement.**

**Paragraph 79**

For this paragraph of the Settlement Agreement, PPB's Training Division is required to review and update PPB's training plan annually. The updates it makes must be informed by a training needs assessment, to be modified annually, which takes into consideration the following elements: 1) trends in hazards officers are encountering in performing their duties; 2) analysis of officer safety

---

[34] This was the same member of command staff as the one who had reviewed cases for PPB's self-assessment of Paragraph 66.

issues; 3) misconduct complaints; 4) problematic uses of force; 5) input from members at all levels of PPB; 6) input from the community; 7) concerns reflected in court decisions; 8) research reflecting best practices; 9) the latest in law enforcement trends; 10) individual precinct needs; and 11) any changes to Oregon or federal law or PPB policy.

As supporting documentation for its self-assessment, PPB submitted the 2025 Annual Training Needs Assessment Report, published in October 2025. The data, findings, and recommendations presented in the report address the elements that are outlined in Paragraph 79. Additionally, PPB provided their Needs Assessment Task Tracking Excel sheet—a dynamic document that compiles and monitors the 11 elements required by this paragraph and is used to develop the forthcoming annual needs assessment report. The current FY2026 Annual Training Plan, January 2026 Addendum, was also supplied by PPB.

The Monitoring Team reviewed the documents and determined that, collectively, these materials adequately provide sufficient evidence that the conclusions drawn in the needs assessment were appropriately leveraged to inform PPB's FY2026 Annual Training Plan, including with respect to revisions made from previous versions. PPB's compliance report found that PPB was in Substantial Compliance with Paragraph 79 for this Reporting Period. **The Monitoring Team's evaluation found that PPB has maintained Substantial Compliance in accordance with the self-monitoring plan for this paragraph of the Settlement Agreement.**

**Paragraph 81**

This paragraph of the Settlement Agreement requires PPB to ensure that Training Division is electronically tracking, maintaining, and reporting complete and accurate records of current curricula, lesson plans, training delivered, attendance records, and other training materials in a centralized, commonly accessible, and organized file system. Additionally, each PPB officer's immediate supervisor is required to review the database for the officers under their command at least semi-annually.

To evaluate PPB's self-assessment of compliance with the requirements outlined in this paragraph, the Monitoring Team reviewed a collection of materials provided by PPB including: a summary memorandum from the Learning Management System Administrator affirming that, during this Reporting Period, PPB continued utilizing the Cornerstone Learning Management System (LMS)—the same platform identified in the previous Reporting Period—as a system to track, maintain, and report records of trainings delivered, attendance records, and other training materials; screenshots depicting the location of training materials on a digital network drive; a report generated through the LMS detailing trainings conducted by the Training Division during the Reporting Period, including information about which employee groups were required to attend each training and the number of

hours assigned to each session; and annual reports from the Oregon Department of Public Safety Standards and Training (DPSST), which detail required training completed by PPB members.[35]

During this Reporting Period, PPB's Training Division implemented Standard Operating Procedure (SOP) 10-12, Learning Management System – DPSST Reporting Practice, effective November 25, 2025. This SOP outlines the process by which Training Division captures and reports member training completions to DPSST as well as the process by which its administrators run comparative audits to ensure accurate reporting. Additionally, the Monitoring Team reviewed: a memorandum from the Compliance Coordinator, Professional Standards Division (PSD) explaining the process used in determining supervisor review of performance evaluations compliance; a member training reporting process memorandum from the LMS Administrator; the Supervisors' Review of Officers' Training Records report;[36] performance evaluation coversheet verification documents; and a Training Records Comparison spreadsheet demonstrating the full population of PPB's members (307) who were due for a performance evaluation during the Reporting Period.

Notably, and as identified as an area of concern in the Monitoring Team's two prior semi-annual compliance reports (covering the Reporting Periods of Q3-Q4 2024 and Q1-Q2 2025), documentation of the reviews of members' training records by supervisors may be made in multiple different ways. These include a checkbox marked on the cover sheet accompanying a member's actual performance evaluation, a text entry made in the Employee Information System (EIS), or via the newly implemented Supervisors' Review of Officers' Training Records report. The sources used by PPB to assess compliance with Paragraph 81 during this Reporting Period, for instance, included 7 marked checkboxes, 10 EIS entries, and 290 supervisor DPSST entries in the Supervisors' Review of Officers' Training Records report.

The methodology outlined in PPB's self-monitoring plan included ongoing verification that PPB's training curricula, lesson plans, and attendance records are all tracked and maintained in an organized file system. It further included: identifying the population of PPB members eligible for a performance evaluation during the Reporting Period; verifying that a supervisor reviewed their training records, as documented by a marking on the evaluation form, an EIS entry, or the inclusion of the reviewing supervisor's DPSST number in the Supervisors' Review of Officers' Training Records report; and verifying members' compliance with DPSST training requirements.

---

[35] The DPSST Required Certification Report was not provided despite being listed as a data source in PPB's self-monitoring plan. However, this omission did not impact the Monitoring Team's evaluation of PPB's compliance report.

[36] PPB implemented the Supervisors' Review of Officers' Training Records report during this Reporting Period. Supervisors were instructed to confirm their review of subordinate officers' training records by signing a document stored on a shared file. Entry of a supervisor's DPSST number served as official confirmation that transcript reports for officers under their supervision had been reviewed. This procedure supplements PPB's existing process in which supervisors select a designated verification checkbox within their subordinate officers' performance evaluations.

PPB found that its training materials were being appropriately tracked, maintained, and reported in a central, accessible, organized file system. It also found that affirmative indications had been made of a supervisory review of training records for each of the 307 members who were due for a performance evaluation during this Reporting Period. PPB's compliance report determined that it was in Substantial Compliance with Paragraph 81 for this Reporting Period. Despite the potential to improve reliability by utilizing a single, consistent method for tracking supervisors' reviews of members' training records, **the Monitoring Team's evaluation found that PPB has maintained Substantial Compliance in accordance with the self-monitoring plan for this paragraph of the Settlement Agreement.**[37]

**Paragraph 84**

To assess its compliance with Paragraph 84, PPB identified a lieutenant who has training experience and who is not currently assigned to the Training Division to audit training conducted during the Reporting Period.[38] In addition to the audit's written findings (including individual analyses of whether/how each training course that was reviewed for the audit contributed to compliance with this paragraph), supporting documents were provided including attendance records from PPB's 2025 In-Service training, Annual Supervisor In-Service training, and Crisis Intervention Team (CIT) training between July 1, 2025 and December 31, 2025.

The written audit findings prepared by the assessing lieutenant included a summary, audit objectives and scope, key findings, and next steps. Individual analyses of each course reviewed included course titles, select requirements from Paragraph 84, and the lieutenant's cited proof of compliance, where appropriate. Together, the attendance records and the audit memo with findings served as evidence that PPB trained its officers on the Settlement Agreement's requirements.

PPB's compliance report concluded that PPB was in Substantial Compliance with Paragraph 84 for this Reporting Period. **The Monitoring Team's evaluation found that PPB has maintained Substantial Compliance in accordance with the self-monitoring plan for this paragraph of the Settlement Agreement.**

**Paragraph 190**

Paragraph 190 requires that "the City shall provide in the budget a separate line item for overtime costs to conduct necessary training for PPB officers" for the duration of the Settlement Agreement. The City's self-monitoring plan calls for the provision of evidence validating that such a separate line item was indeed included in the budget.

---

[37] The Monitoring Team recognizes PPB's commitment to improving its process for monitoring the completion of in-person member training. The use of QR codes to record attendance at such training has been fully integrated, facilitating more efficient and accurate tracking than was previously available.

[38] The same lieutenant completed audit as part of PPB's self-assessment of compliance with this paragraph during the last Reporting Period, after which the Monitoring Team found that PPB had maintained Substantial Compliance in accordance with its self-monitoring plan.

In support of its compliance with this requirement, the City provided a document noting that, for years, its "technical budget on the citywide financial management system has provided a separate line item for overtime costs," but that no such line item has been available in the published Adopted Budget Book available on the City's website. For FY2025-26, however, a narrative section of the Adopted Budget (approved by the City Council on June 18, 2025) was modified to include the following statement: "The Training Division was allocated $1.5 million in overtime for required Bureau-wide annual training, including crowd control techniques, and to ensure consistent and appropriate education in alignment with the DOJ Settlement Compliance." The City provided a link to the FY2025-26 Adopted Budget Book on its website, in addition to a screenshot of a record displaying a line item for "Overtime"—budgeted at $1.5 million and associated with the functional area of "Training".[39]

The City's compliance report concluded that the City was in Substantial Compliance with Paragraph 190. **The Monitoring Team's evaluation found that PPB has maintained Substantial Compliance in accordance with the self-monitoring plan for this paragraph of the Settlement Agreement.**

**With regard to the Training Principles discrete section of the Settlement Agreement, the Monitoring Team's evaluation of PPB's compliance report found that PPB has adequately demonstrated that it has maintained Substantial Compliance with the section.**

## Paragraphs 85-86 (Training Audits, Analyses, and Recommendations)

### Paragraph 85

Settlement Agreement Paragraph 85 requires PPB to audit its training program using the following performance standards to ensure PPB does the following: 1) conducts a comprehensive needs assessment annually; 2) creates a Training Strategic Plan annually; 3) develops and implements a process for evaluation of the effectiveness of training (within 180 days of the Effective Date of the Settlement Agreement); 4) maintains accurate records of training delivered, including substance and attendance; 5) makes training records accessible to the Director of Services, Assistant Chief of Operations, and DOJ; 6) trains officers, supervisors, and commanders on areas specific to their responsibilities; and 7) ensures sworn PPB members are provided a copy of all PPB directives and policies issued pursuant to the Settlement Agreement and that they sign a statement acknowledging that they have received, read, and had an opportunity to ask questions about the directives and/or policies, within 30 days of the release of the directives and/or policies.

[39] The screenshot includes identifiers indicating that it depicts a portion of the City's "Budget Vs. Actual Report" from FY2026.

PPB's self-monitoring plan for this paragraph of the Settlement Agreement indicates that compliance with it will be assessed by verifying that an audit has been completed in accordance with the requirements outlined in the paragraph. The plan additionally notes that Training Division audits fulfilling the paragraph's requirements were conducted in 2017, 2018, and 2022, and it further notes that no such audit was conducted during this Reporting Period due to the infeasibility of doing so. The evidence that PPB provided in support of its compliance consisted of its December 2022 Training Division Assessment.

PPB's compliance report indicated that its 2022 Training Division Assessment successfully met each requirement listed in Paragraph 85. The compliance report concluded that PPB was in Substantial Compliance with this paragraph for this Reporting Period. **The Monitoring Team's evaluation found that PPB has maintained Substantial Compliance in accordance with the self-monitoring plan for this paragraph of the Settlement Agreement.**

**Paragraph 86**

Among other things, Paragraph 86 requires PPB's Force Inspector to present data and analysis on a quarterly basis regarding patterns and trends in officers' uses of force to the Chief of Police (Chief), Training Division, and the Training Advisory Council (TAC). Training Division and the TAC are responsible for making recommendations to the Chief regarding policy, training, and/or evaluations based on that data, and the Chief must assess all patterns that Training Division and/or TAC identify and implement remedial measures to address any deficiencies. Additionally, the Force Inspector must, in coordination with Professional Standards Division (PSD), identify problematic use of force patterns and training deficiencies.

In order to evidence compliance with Paragraph 86, PPB provided documents including: the presentation of Q2 2025 use of force data made to the TAC (during its meeting on September 10, 2025), with supporting notes addressing trend analyses; the September 2025 TAC meeting agenda; correspondence from the Office of the Inspector General (OIG) to the Chief's Office transmitting the presentation of Q2 2025 use of force data, stating that no problematic patterns were identified within the data presented to the TAC, and also stating that no communications were received from either Training Division or the TAC identifying any concerning patterns;[40] the Q2 2025 PPB Force Analysis Summary Report; a transcript of the TAC meeting from September 10, 2025; the Force Inspector's AAR Phase II Review Spreadsheet;[41] and a tracking document titled, "Inspector Feedback Loop". No evidence was provided by PPB demonstrating that the Force Inspector coordinated with PSD in identifying problematic use of force patterns and training deficiencies.

[40] The date of the correspondence fell beyond the close of this Reporting Period.

[41] PPB's self-monitoring plan indicates that the Phase 2 Spreadsheet covers July-December 2026 (as opposed to this Reporting Period); this appears to be merely a typographical error.

PPB's self-monitoring plan for assessing compliance with Paragraph 86 addresses in both its objectives and its methodologies confirmation that the Force Inspector gathered and presented required data and analysis "quarterly within the reporting period" to the TAC. PPB's compliance report, however, affirmed that "only one presentation was given to the TAC by the OIG in this assessment period" (which spans two quarters).[42] Despite this, the compliance report failed to identify the presence of a deviation from the paragraph's requirements, as they are reflected in the self-monitoring plan.[43] Notably, Paragraph 86's required quarterly presentations of data are catalysts for the recommendations to the Chief (generated by Training Division and the TAC, and based on the data presented) and the Chief's subsequent response, both of which are also provided for in the paragraph. Deviating from the required quarterly protocol for the presentations may, therefore, additionally affect the timing of any recommendations and associated responses.

PPB's self-monitoring plan also addresses in both its objectives and its methodologies confirmation that the Force Inspector "coordinated with PSD within the reporting period to identify problematic patterns in use of force and training deficiencies." The plan lists amongst its data sources, "Communications, if any, between the Force Inspector, PSD, and the Monitor regarding force patterns and training deficiencies". Despite the indicated coordination between the Force Inspector and PSD being required pursuant to Paragraph 86, PPB's compliance report did not address this issue.

The compliance report did, however, reflect the contents of the Inspector Feedback Loop that was provided to the Monitoring Team by PPB. The Inspector Feedback Loop included two training deficiencies that were identified and submitted to the Training Division during this Reporting Period. One of the two deficiencies had initially been identified by the Monitoring Team as part of the review of use of force incidents we conducted during the previous Reporting Period. We noted that the deficiency had gone undocumented on the Inspector Feedback Loop then; in response, PPB entered it into its tracking document during this Reporting Period.

PPB's compliance report concluded that PPB maintained Substantial Compliance with Paragraph 86 for this Reporting Period. However, the Monitoring Team does not believe that the evidence relied on by PPB for its self-assessment is sufficient to support this conclusion or that the self-assessment was sufficiently aligned with the objectives and methodologies of the self-monitoring plan. **As such, the Monitoring Team's evaluation found that PPB has not maintained Substantial Compliance in accordance with the self-monitoring plan for this paragraph of the Settlement Agreement.**

---

[42] It should be noted that the Force Inspector made three presentations of required data to the TAC during the previous Reporting Period—one in January 2025 (presenting Q3 2024 data), another in March 2025 (presenting Q4 2024 data), and the third in May 2025 (presenting Q1 2025 data).

[43] According to the TAC website, there was a TAC meeting held in November 2025; the agenda for that meeting did not include a presentation of use of force data by PPB.

**With regard to the Training Audits, Analyses, and Recommendations discrete section of the Settlement Agreement, the Monitoring Team's evaluation of PPB's compliance report found that PPB has not adequately demonstrated that it has maintained Substantial Compliance with the section.**

**Paragraph 115 (Crisis Triage)**

**Paragraph 115**

This paragraph requires the City to ensure that Crisis Triage is fully operational, including the implementation of policies and procedures developed pursuant to the Settlement Agreement and operation by trained staff. The City's Bureau of Emergency Communications (BOEC) developed a self-monitoring plan to evidence that its staff appropriately triaged calls in accordance with applicable policies. The plan included amongst its data sources relevant bureau SOPs, Computer Aided Dispatch records, and audio recordings of calls received by BOEC.

BOEC's methodology for assessing compliance with Paragraph 115's requirements involved listening to a random sample of calls that were routed by staff to each of four different responding entities in order to determine whether the calls were routed in accordance with applicable policies. Of significant note, BOEC also indicated in its plan that it would provide follow-up with individual staff members when such a need was identified by its self-assessment in order to provide "spot training" and mitigate further errors. The Monitoring Team commends BOEC for its commitment to using the self-monitoring process related to this paragraph of the Settlement Agreement to pursue continuous improvement and adherence to the Agreement's requirements in a lasting and durable manner.

BOEC's compliance report found that, in aggregate, close to 96 percent of calls it received were being triaged in accordance with relevant policy (based on the sample of calls used by BOEC for its assessment). BOEC's plan to monitor its compliance with this paragraph was clear and comprehensive; and the rate of adherence to policy it found when it carried out the methodology in that plan was remarkably high. **The Monitoring Team's evaluation found that the City has maintained Substantial Compliance in accordance with the self-monitoring plan for this paragraph of the Settlement Agreement.**

**With regard to the Crisis Triage discrete section of the Settlement Agreement, the Monitoring Team's evaluation of the City's compliance report found that the City has adequately demonstrated that it has maintained Substantial Compliance with the section.**

**Paragraphs 121-123 (Investigation Timelines)**

The Settlement Agreement paragraphs in this discrete section include requirements, responsibilities, and/or other references to the Oversight System, which is defined in the Agreement as the combination of the Community Board for Police Accountability (CBPA) and the Office of Community-based Police Accountability (OCPA). The Monitoring Team notes that neither part of the Oversight System was operational during this Reporting Period. The same paragraphs in previous versions of the Settlement Agreement—in effect prior to this Reporting Period—instead included requirements, responsibilities, and/or other references to the City, the Citizen Review Committee (CRC), the Police Review Board (PRB), and/or the Independent Police Review (IPR). With regard to Settlement Agreement provisions in this discrete section that reference the Oversight System, the City focused its self-monitoring plans on the language in the current version of the Agreement; in contrast, the City focused its associated compliance reports, as well as the materials it provided in support of evidencing compliance, on the language in the previous versions of the Agreement. Based on the materials that were provided to us, the Monitoring Team evaluated the City's compliance with the indicated provisions from the previous versions of the Settlement Agreement. Our evaluations of those provisions, therefore, address requirements and other compliance matters related to the City, the CRC, the PRB, and/or IPR; they do not address requirements or other compliance matters related to the Oversight System.[44]

**Paragraph 121**

Paragraph 121 requires PPB and the City to complete all administrative investigations of officer misconduct, including supervisory investigations, within 180 days of receipt of a complaint of misconduct or discovery of misconduct by other means. The paragraph defines the completion of an investigation as including "all steps from intake of complaints through approval of recommended findings by either the CBPA or the Chief, or approval by the Mayor for investigations involving the Chief, as appropriate." PPB's self-monitoring plan for this paragraph calls for comparing the "Reported" and "Disposition" dates for all administrative investigations closed during the Reporting Period (thereby yielding the duration of each case); it additionally calls for the accounting of relevant tolling data in calculating those case durations, essentially removing from the calculation the total number of days (if any) when the investigation was paused for a valid reason. The data sources relied on by PPB in conducting its self-assessment of compliance with this paragraph include a report of all cases closed during the Reporting Period as well as a report on all such cases that were tolled for some period of time.

Based on the data it gathered, PPB determined that a total of 121 investigations were closed during the Reporting Period; and, when accounting for any applicable tolling periods, 115 of those investigations (just over 95 percent) were completed within the timeline required by Paragraph 121.

---

[44] For additional commentary on the discrepancy between the City's self-monitoring efforts and the provisions of the Settlement Agreement that reference the Oversight System, see this report's section titled, "Work to be Completed; Anticipated Barriers to Substantial Compliance."

PPB's compliance report determined that PPB was in Substantial Compliance with Paragraph 121 for this Reporting Period. **The Monitoring Team's evaluation determined that the City has maintained Substantial Compliance with the former provisions of this paragraph that were included in previous versions of the Settlement Agreement.**

**Paragraph 122**

Paragraph 122 requires PPB and the Oversight System to conduct administrative investigations concurrently with criminal investigations, if any, when those investigations concern the same incident; it additionally affirms that all administrative investigations must be subject to appropriate tolling periods as necessary to conduct a concurrent criminal investigation, as provided by law, or as necessary to meet a recommendation from PPB or the CBPA to conduct further investigation.

Tolling, in this context, refers to the temporary pausing of an administrative investigation's timeline for an authorized reason, wherein the tolled time is not counted toward the applicable deadline for the completion of the investigation. Authorized reasons for tolling an administrative investigation's timeline include the presence of a pending parallel criminal investigation and/or the unavailability of a member due to protected leave. In addition, PPB and the Oversight System may toll up to 10 business days per investigation when necessary to ensure either the complainant's or involved officer's attorney is available to accompany them at an intake or investigatory meeting.[45]

PPB identified 23 incidents from this Reporting Period that involved both administrative and criminal investigations. PPB's self-monitoring plan for this paragraph calls for utilizing a Criminal/IA Concurrent Investigation Audit, a confirmation audit conducted by a Senior Police Administrative Support Specialist (PASS) from Internal Affairs, and a Tolling Report to validate that: 1) PPB conducted administrative investigations concurrently with criminal investigations; and 2) all administrative investigations were subject to appropriate tolling based on any of the reasons identified in this paragraph of the Settlement Agreement.

The information contained in the Criminal/IA Concurrent Investigation Audit confirms the investigation start dates for the criminal and Internal Affairs (administrative) investigations in each of the 23 cases identified by PPB as being subject to Paragraph 122. In 17 of the 23 cases, the criminal and administrative investigations were initiated on the same date, while this was not so for the remaining six cases. For all six of those cases, the confirmation audit conducted by a Senior PASS included the reason behind the discrepancy in initiation dates. Those explanations generally reflected brief timing or notification issues, including, for example, information received near the end of a shift, referrals made after supervisory review, delayed notice from another agency, or

[45] A report provided by PPB of cases closed during the Reporting Period that had been subject to tolling listed a total of 14 such cases, with tolling periods ranging from four days to 390 days. The reasons for differences in tolling period durations varied widely based on the specific facts and circumstances of the underlying event and/or the complexity of the investigative process.

additional time needed to confirm whether the complaint involved a PPB member or a possible criminal allegation.

With respect to tolling, PPB provided data indicating that all of the cases in the list of 23 had indeed been subject to it at some point. 17 of the cases were still being actively tolled as of the end of the Reporting Period, while the tolling periods of the remaining six cases had concluded. For those six cases, the duration of tolling lasted between 4 and 138 days, with the justification for tolling in each case being the presence of a pending parallel criminal investigation.

In its compliance report, PPB listed the 23 cases initiated during the Reporting Period that it had identified as having administrative and criminal investigations into the same incident, noted the opening dates for each of the investigations into those incidents, stated whether information was provided regarding any discrepancy between the opening dates, and identified whether or not the cases had been subject to tolling. PPB's compliance report determined that PPB was in Substantial Compliance with Paragraph 122 for this Reporting Period. **The Monitoring Team's evaluation determined that the City has maintained Substantial Compliance with the former provisions of this paragraph that were included in previous versions of the Settlement Agreement.**

**Paragraph 123**

Paragraph 123 of the Settlement Agreement requires that if PPB or the Oversight System is unable to complete an administrative investigation of officer misconduct within 180 calendar days, it must undertake and submit to the Monitoring Team and the DOJ a written review of the investigation identifying the source of the delay and implementing an action plan to reduce it. Meeting this requirement helps PPB and the Oversight System ensure that any such investigative delays are addressed through a structured process that identifies the cause and initiates timely remedial action to strengthen system performance.

PPB's self-monitoring plan for Paragraph 123 identifies three data sources: Overdue Case Reports, Overdue Case Memos (often referred to as 180-day memos), and documentation of transmission to the DOJ and the Monitoring Team. There were 42 administrative investigations closed by PPB during this Reporting Period, and approximately 90 percent of them were completed within the 180-day timeline. The materials PPB provided to evidence its compliance with this paragraph identified the four administrative investigations completed during the Reporting Period that extended beyond 180 days (including when accounting for tolling periods), as well as a 180-day memo for each of those investigations.

Within the list of cases that were identified as having exceeded 180 days in duration, PPB indicated the following determinations: a review of the investigation timeline had been completed; the review included an explanation for the delay; the review included an action plan; and the review was sent to

the DOJ and The Monitoring Team.[46] The Monitoring Team notes that each of the four 180-day memos provided by PPB contained a clear and detailed description of the source(s) of delays in the associated investigation and an associated action plan for mitigating such delays. PPB's compliance report determined that PPB was in Substantial Compliance with Paragraph 123 for this Reporting Period. **The Monitoring Team's evaluation determined that the City has maintained Substantial Compliance with the former provisions of this paragraph that were included in previous versions of the Settlement Agreement.**

**With regard to the Investigation Timelines discrete section of the Settlement Agreement, the Monitoring Team's evaluation of PPB's compliance report found that PPB has adequately demonstrated that it has maintained Substantial Compliance with the former provisions of this section that were included in previous versions of the Settlement Agreement.**

**<u>Paragraphs 124-127 (On-Scene Public Safety Statements and Interviews)</u>**

**Paragraph 124**

Paragraph 124 of the Settlement Agreement requires the City and PPB to review its protocols for compelled statements to the Professional Standards Division (PSD) and revise them as appropriate to comply with applicable law and current professional standards, pursuant to *Garrity v. New Jersey,* 385 U.S. 493 (1967). The City must then submit the revised protocol to the DOJ for review and approval; and, within 45 days of the DOJ's approval, PPB must ensure that all officers are advised of the revised protocol.

PPB's self-monitoring plan for Paragraph 124 identifies the objective of validating that compelled statement protocols have been reviewed and revised. The plan lists sections of PPB Directive 1010.10 Deadly Force and In-Custody Death Reporting and Investigation Procedures as data sources and explains that validation will consist of confirming that protocols comply with applicable law and professional standards. In addition to providing Directive 1010.10 in support of its compliance with this paragraph, PPB also provided email communications between PPB staff indicating when the most recent updates to that directive were completed (September 2017).

Although the Objective section of the self-monitoring plan does not address Paragraph 124's requirement to ensure that all officers are advised on PPB's protocol related to *Garrity*, PPB did provide in the materials supporting its compliance with this paragraph a Learning Management

---

[46] The requirement for PPB or the Oversight System to provide these reviews to the Monitoring Team is the one provision from this paragraph that appears only in the current version of the Settlement Agreement (as opposed to previous versions) and was included in the City's report self-assessing compliance with the paragraph.

System (LMS) report documenting affirmative acknowledgements from some officers of their receipt of the written protocols.[47] The self-monitoring plan also does not address the paragraph's historical requirement to submit its *Garrity* protocol to the DOJ for review and approval; however, PPB did provide an archival email exchange with the DOJ which satisfies the requirement.

PPB's compliance report determined that PPB was in Substantial Compliance with Paragraph 124 for this Reporting Period. **The Monitoring Team's evaluation found that PPB has maintained Substantial Compliance in accordance with the self-monitoring plan for this paragraph of the Settlement Agreement.**

**Paragraph 125**

Paragraph 125 of the Settlement Agreement requires that, immediately following any lethal force event, the City issue a Communication Restriction Order (CRO) to all witness and involved officers. CROs prohibit direct or indirect communication between those officers about the facts of the incident and must remain in effect until the conclusion of the Grand Jury or, if no Grand Jury is convened, until the District Attorney has determined a disposition.

PPB's self-monitoring plan for Paragraph 125 identifies its objective as validating that after all lethal force events during the Reporting Period, CROs were issued to all witness and involved officers and remained in effect until a disposition was made by the District Attorney. The plan includes as data sources to be used to assessing PPB's compliance with this paragraph the CROs themselves, a screenshot from a PPB webpage displaying the dates of deadly force incidents occurring during the Reporting Period, and screenshots of Computer-Aided Dispatch records associated with each of those incidents that indicate when involved and witness officers were released from the scene.

PPB provided copies of issued CROs from three lethal force events that occurred during the Reporting Period. Each CRO contains language admonishing the officer to whom it was issued that it will remain in effect "until rescinded in writing by order of the Chief of Police, his/her designee, or the Assistant Chief of Investigations." The language goes on to say, "The Rescindment Order will be signed as soon as practical after the Grand Jury has reviewed the case and has rendered a decision. If no Grand Jury is held, the order will be rescinded as soon as the Detectives investigation is completed." Each CRO notes the date and time it was signed by the officer to whom it was issued. Although not included in the self-monitoring plan's data sources, PPB also provided copies of rescindments of CROs issued to officers during the Reporting Period.

[47] An internal PPB email provided along with this report indicated that it appeared to include only newly hired PPB officers beginning on October 5, 2018, and that corresponding acknowledgements from other officers were captured "a different way as LMS was not fully up and running at that time." Although it is unfortunate that additional records were not located to further support PPB's evidence of compliance with this paragraph, PPB's good faith efforts to find evidence in support of this part of Paragraph 124's requirements are notable.

PPB's compliance report reflects the dates and times when each CRO was signed by the officer it was issued to during this Reporting Period, as well as the dates and times when each officer who was issued a CRO was released from the scene of one of the deadly force incidents occurring during the period. The report additionally noted that each CRO issued to an officer during the Reporting Period had subsequently been rescinded during the period. The compliance report determined that PPB was in Substantial Compliance with Paragraph 125 for this Reporting Period. **The Monitoring Team's evaluation found that PPB has maintained Substantial Compliance in accordance with the self-monitoring plan for this paragraph of the Settlement Agreement.**

**Paragraph 126**

Paragraph 126 of the Settlement Agreement requires that witness officers to lethal force events provide an on-scene briefing to a supervisor or Detective Division member. The purpose of this briefing is to identify victims, suspects, and witnesses, to locate evidence, and to provide information necessary for the safe resolution of the incident. PPB's self-monitoring plan for Paragraph 126 identifies its objective as confirming that PPB continues to require such briefings after lethal force events. The plan cites Directive 1010.10 Deadly Force and In-Custody Death Reporting and Investigation Procedures as well as witness officer briefing reports, interview transcripts, and other investigative materials as the data sources to be used for evidencing compliance with the paragraph's requirements.

As evidence in support of its compliance with this paragraph's requirements, PPB provided (in addition to Directive 1010.10) records excerpted from the investigations of three lethal force incidents that occurred during this Reporting Period. These records included Internal Affairs worksheets, which appear to have been relied on for the identification of witness members in each incident, as well as documentation of the results of investigators' requests to receive a briefing from them.[48]

In one incident, according to the excerpts provided by PPB in support of compliance with Paragraph 126, a PPB member identified as a witness participated in a walkthrough of the scene, as required. In another incident, the records provided by PPB indicated that a witness officer did not provide an on-scene briefing because they had been transported to a hospital prior to the arrival of an investigator from PPB.[49] In the third incident, according to PPB's compliance report, no witness officers were identified.

---

[48] Each worksheet listed a group of officers that was inclusive of any who were witnesses to the associated lethal force event as well as some who were not; the worksheets did not draw a clear delineation between the witnesses and the non-witnesses, however.

[49] With regard to this case, PPB also provided a note—with no indication of who authored it or when it was written—indicating that the witness officer was also a victim and was transported to the hospital for observation/treatment of their injuries. An excerpt from a narrative report filed in the same case was also provided by PPB, which indicated that "both of the involved officers had been transported to hospitals prior to investigator arrival." The report did not specifically address or identify any witness officers.

PPB's compliance report determined that PPB was in Substantial Compliance with Paragraph 126 for this Reporting Period. **The Monitoring Team's evaluation found that PPB has maintained Substantial Compliance in accordance with the self-monitoring plan for this paragraph of the Settlement Agreement.**

**Paragraph 127**

Paragraph 127 of the Settlement Agreement provides that, in agreement and collaboration with the Multnomah County District Attorney, PPB shall request that involved officers in lethal force and in-custody death events provide a voluntary, on-scene walk-through and interview, unless the officer is incapacitated. PPB's self-monitoring plan for Paragraph 127 identifies as its objective the provision of evidence that such requests are made of involved officers following applicable incidents and the verification of the identity of all members involved in each qualifying incident. The plan cites Directive 1010.10 Deadly Force and In-Custody Death Reporting and Investigation Procedures as well as witness officer briefing reports, interview transcripts, and other investigative materials as the data sources to be used for evidencing compliance with the paragraph's requirements.

As evidence in support of its compliance with this paragraph's requirements, PPB provided (in addition to Directive 1010.10) records excerpted from the investigations of three lethal force incidents that occurred during this Reporting Period. These records included Internal Affairs worksheets that identify involved members in each incident,[50] as well as documentation of the results of investigators' requests to interview those members and/or have them conduct an on-scene walk-through. All of the involved officers, in all three of the cases, declined to provide such a briefing.

---

It is unquestionable that medical treatment for an injured officer who witnessed a lethal force event takes precedence over the requirement that the officer give an on-scene briefing to an investigator. However, based on our review of the materials provided by PPB in association with Paragraph 126, the Monitoring Team notes that it would be prudent for PPB to more clearly, formally, and consistently document instances in which such medical treatment prevented an officer from fulfilling their on-scene briefing requirement. Furthermore, it would be worth considering the feasibility and value of having witness officers who were not initially able to give an on-scene briefing due to an injury or medical issue return to the scene once they were able; such a determination would likely depend on the circumstances of each lethal force event, but engaging in the process of making it would further support PPB's efforts to comply with the requirements of this paragraph.

Notwithstanding these advisements, the Monitoring Team does not believe that the omission of an on-scene walkthrough by the witness officer in this case, due to that officer's transport to a hospital for the observation/treatment of injuries they had sustained, adversely impacts PPB's compliance with the requirements in this paragraph of the Settlement Agreement.

[50] No worksheet was provided for one of three lethal force incidents in support of PPB's compliance with Paragraph 127's requirements. However, the worksheet associated with that incident had already been provided by PPB in support of its compliance in another paragraph (Paragraph 126). This is only a minor issue, and it had no impact on the Monitoring Team's evaluation of PPB's self-monitoring efforts with regard to this paragraph.

PPB's compliance report concluded that Substantial Compliance was achieved for this Reporting Period. **The Monitoring Team's evaluation found that PPB has maintained Substantial Compliance in accordance with the self-monitoring plan for this paragraph of the Settlement Agreement.**

**With regard to the On-Scene Public Safety Statements and Interviews discrete section of the Settlement Agreement, the Monitoring Team's evaluation of PPB's compliance report found that PPB has adequately demonstrated that it has maintained Substantial Compliance with the section.**

**<u>Paragraphs 128-129 and 131-133 (Conduct of IA Investigations)</u>**

The Settlement Agreement paragraphs in this discrete section include requirements, responsibilities, and/or other references to the Oversight System, which is defined in the Agreement as the combination of the Community Board for Police Accountability (CBPA) and the Office of Community-based Police Accountability (OCPA).[51] The Monitoring Team notes that neither part of the Oversight System was operational during this Reporting Period. The same paragraphs in previous versions of the Settlement Agreement—in effect prior to this Reporting Period—instead included requirements, responsibilities, and/or other references to the City, the Citizen Review Committee (CRC), the Police Review Board (PRB), and/or the Independent Police Review (IPR). With regard to Settlement Agreement provisions in this discrete section that reference the Oversight System, the City focused its self-monitoring plans on the language in the current version of the Agreement; in contrast, the City focused its associated compliance reports, as well as the materials it provided in support of evidencing compliance, on the language in the previous versions of the Agreement. Based on the materials that were provided to us, the Monitoring Team evaluated the City's compliance with the indicated provisions from the previous versions of the Settlement Agreement. Our evaluations of those provisions, therefore, address requirements and other compliance matters related to the City, the CRC, the PRB, and/or IPR; they do not address requirements or other compliance matters related to the Oversight System.[52]

---

[51] Unlike the other paragraphs in this discrete section, Paragraph 133 does not reference the Oversight System explicitly. It does, however, assign certain responsibilities to whichever "investigative entity" took certain actions; the Monitoring Team understands the term "investigative entity" in this paragraph to include both PPB Internal Affairs and the Oversight System.

[52] For additional commentary on the discrepancy between the City's self-monitoring efforts and the provisions of the Settlement Agreement that reference the Oversight System, see this report's section titled, "Work to be Completed; Anticipated Barriers to Substantial Compliance."

**Paragraph 128**

Paragraph 128 of the Settlement Agreement requires PPB's Internal Affairs Division (IA) and the Oversight System to collaborate in order to: determine which entity has jurisdiction over an administrative investigation into alleged misconduct on the part of a PPB member; and ensure redundant interviews by both entities do not occur. PPB's self-monitoring plan for Paragraph 128 restates these requirements in its Objective section. The plan lists as its data source an IA memorandum documenting the reason for any redundant interviews that did occur during the Reporting Period.

As supporting evidence for its assessment of compliance with this paragraph, PPB provided an IA memorandum identifying a single case during the Review Period in which both the City's Independent Police Review (IPR) and IA interviewed the complainant. The memorandum included an explanation for why each entity interviewed the same party in that case, which had been transferred to IA after initially starting at IPR. No other administrative investigations were identified as having joint jurisdiction or redundant interviews.

PPB's compliance report reflected this one case as including interviews by IA and IPR; it also reflected the presence of the associated IA memorandum. The report concluded that Substantial Compliance was achieved for this Reporting Period. **The Monitoring Team's evaluation determined that the City has maintained Substantial Compliance with the former provisions of this paragraph that were included in previous versions of the Settlement Agreement.**

**Paragraph 129**

Paragraph 129 of the Settlement Agreement requires that all allegations of use of excessive force be subject to full and completed investigations resulting in findings, unless there is clear and convincing evidence that the allegation has no basis in fact, in which case the matter may be administratively closed. The paragraph further provides that a matter may be administratively closed if a full investigation is not feasible without additional information from the complainant and the complainant cannot be reached or refuses to participate, or if the involved officer cannot be identified after reasonable steps to do so. Additionally, the paragraph requires that, prior to administratively closing an investigation into alleged excessive force, the investigating entity must document the investigative efforts undertaken and explain why closure meets the paragraph's requirements.

PPB's self-monitoring plan for Paragraph 129 includes amongst its data sources a Use of Force Cases Report from IA and a review of administratively closed use of force cases conducted by a Subject Matter Expert (SME). The plan's methodology calls for demonstrating that all excessive force allegations were administratively closed for one of the reasons contemplated by this paragraph, as verified by the SME, or that they resulted in findings. The Use of Force Cases Report showed that 41 use of force investigations were closed during the Reporting Period; 32 of them included one

or more allegations of excessive force that were closed administratively[53] while the other nine did not. The memorandum from PPB's SME addressed each of the 32 cases that included an administratively closed allegation and found that the closure was appropriate in each instance.

PPB's compliance report reflects the 32 cases with one or more administratively closed allegations of excessive force as well as the nine cases in which all such allegations resulted in a finding. With regard to the former, the report additionally breaks them down by the specific reason for their administrative closure. PPB reported that 30 of these cases were closed based on IPR's determination that there was clear and convincing evidence showing that the excessive force allegation(s) had no basis in fact, as contemplated by Paragraph 129, and that the remaining two were administratively closed for other reasons. One of these two cases was described as having been closed due to the retirement of the accused employee while the other was deemed not to involve any PPB employees at all.

The compliance report concluded that Substantial Compliance was achieved for this Reporting Period. **The Monitoring Team's evaluation determined that the City has maintained Substantial Compliance with the former provisions of this paragraph that were included in previous versions of the Settlement Agreement.**

**Paragraph 131**

This paragraph of the Settlement Agreement requires that the City adopt an Oversight System to perform administrative investigations for matters under their jurisdiction, make findings and conclusions on administrative complaints under their jurisdiction, and impose corrective action as applicable under any binding disciplinary rules. PPB's self-monitoring plan for Paragraph 131 identifies its objective as demonstrating that the City adopted such an Oversight System.

PPB's self-monitoring plan includes amongst its data sources: multiple different records associated with hearings of the Police Review Board (PRB); PPB directives, City Codes, and City Council resolutions that apply to the PRB and or the Citizen Review Committee (CRC); and internal PPB communications regarding offers of stipulated discipline associated with an administrative investigation, membership on the PRB and CRC, and appeals of administrative findings to the CRC.

Notably, the data sources also include the contents of Paragraph 131 in a previous version of the Settlement Agreement, which was not in effect during this Reporting Period. As is explained in PPB's compliance report, it is compliance with that previous language that PPB assessed, as opposed to compliance with the language currently in effect. This is because the Oversight System described in the current Settlement Agreement was not yet established during the Reporting Period. The Monitoring Team's evaluation of PPB's self-assessment focused, accordingly, on the evidence that was provided and the conclusions that were reached based on that evidence.

[53] One of these cases also included an allegation of excessive force that was not closed administratively.

The provisions of the previous Settlement Agreement with which PPB demonstrated its compliance include a series of requirements regarding the following aspects of PRB procedures: 1) composition of PRB reviews of use of force cases; 2) rotation protocol for Citizen Review Committee (CRC) members participating on the PRB; 3) confidentiality requirements, as well as requirements for each PRB member's ability to make appropriate recommendations to the Chief of Police; 4) eligibility for cases in which the member elects to accept investigative findings and discipline; 5) qualifications for all community members who participate on the PRB; 6) authority to remove PRB members and CRC members who serve on the PRB; 7) unaffected status of CRC membership in case of removal from participation on the PRB; 8) duration of service of CRC members serving on the PRB; and 9) recusal of CRC members during appeals of cases for which they participated on the PRB.

PPB provided a thorough, detailed, and organized set of materials that addressed all of the above requirements and demonstrated compliance with them. PPB's compliance report concluded that Substantial Compliance was achieved for this Reporting Period. **The Monitoring Team's evaluation determined that the City has maintained Substantial Compliance with the former provisions of this paragraph that were included in previous versions of the Settlement Agreement.**

**Paragraph 132**

This paragraph of the Settlement Agreement dictates that a majority vote of a panel of three or more CBPA members may return administrative investigations into misconduct by PPB sworn members that fall within the jurisdiction of the Oversight System to the OCPA investigator for further investigation. The paragraph further requires reasonable attempts by the investigating entity to conduct the additional investigation within 10 business days, or else provide a written statement to the CBPA explaining why additional time is needed.

PPB's self-monitoring plan for Paragraph 132 identifies its objective as demonstrating whether attempts to conduct additional investigation or obtain additional information were made within 10 business days or were accompanied by a required written explanation that was sent to the CBPA. The plan lists as data sources a PRB facilitator memorandum and any communications regarding the reinitiation of an excessive force investigation. Its testing methodology calls for verifying such communications as well as whether any needed further investigation was conducted within the required timeframe or accompanied by a required written explanation that was provided to the CBPA.

A signed statement from one PRB Coordinator and memoranda to the Chief of Police that were authored by another coordinator affirmed that no requests for further investigation had been made by any PRBs during this Reporting Period with respect to the cases that those PRBs had been hearing. PRB's compliance report concluded that Substantial Compliance was achieved for this Reporting Period. **The Monitoring Team's evaluation determined that the City has**

**maintained Substantial Compliance with the former provisions of this paragraph that were included in previous versions of the Settlement Agreement.**

**Paragraph 133**

According to Paragraph 133 of the Settlement Agreement, if an identified PPB officer's use of force gives rise to a finding of liability in a civil trial, the City must complete a series of tasks in response (some of which are conditional). These tasks include: 1) ensuring PPB enters the civil liability finding in EIS; 2) reevaluating the officer's fitness to participate in all current and prospective specialized units; 3) conducting a full investigation into the allegation of misconduct if no such investigation has previously been conducted; 4) if an investigation has already concluded based upon the same allegation of misconduct, but it has failed to reach a sustained finding, identifying whether any new evidence exists in the record of the civil trial to justify reopening the investigation and, if so, reinitiating the investigation; and 5) if the previous entry in this list of tasks occurred, and if no new evidence from the civil trial justifies reopening the investigation, working to identify the reason why the administrative finding was contrary to the civil trial finding and publishing a summary of the results of the inquiry.

PPB's self-monitoring plan for Paragraph 133 identifies as its data sources a Liability Manager memorandum as well as Internal Affairs SOPs 19 and 32. SOP 19 establishes guidelines for assigning administrative investigations referred to IA by IPR or received from PPB members or the public, while SOP 32 establishes procedures for reviewing tort claims and lawsuits for potential policy violations, including the steps required if an officer's use of force results in a finding of liability in a civil trial. The self-monitoring plan's methodology calls for verifying, in cases where the use of force gave rise to a finding of liability in a civil trial, that the civil liability finding was entered in EIS, that the involved officer's fitness was reevaluated, and that any required investigation, reopening determination, or published summary was completed.

The memorandum to the Commander of Professional Standards Division that was authored by a PPB Liability Analyst affirmed that no use of force incidents by a PPB officer gave rise to a finding of liability in a civil trial during the Reporting Period. Accordingly, PPB's compliance report reflected that the following provisions from this paragraph were all inapplicable (N/A): an entry into EIS; an evaluation of the involved officer's fitness for duty; the presence of an associated investigation opened by IA; the presence of new evidence to justify the reopening of an associated investigation, and the reopening of the investigation if justified; in case an associated investigation failed to reach a Sustained finding, the identification by the investigating entity of why the administrative finding was contrary to the one reached in the civil trial and the publishing of the reason.

PPB's compliance report found that Substantial Compliance was achieved for this Reporting Period. **The Monitoring Team's evaluation determined that the City has maintained Substantial**

**Compliance with the former provisions of this paragraph that were included in previous versions of the Settlement Agreement.**

**With regard to the Conduct of Investigations discrete section of the Settlement Agreement, the Monitoring Team's evaluation of PPB's compliance report found that PPB has adequately demonstrated that it has maintained Substantial Compliance with the former provisions of this section that were included in previous versions of the Settlement Agreement.**

**Paragraph 137 (Discipline and Accountability)**

**Paragraph 137**

Paragraph 137 of the Settlement Agreement requires PPB to adopt and implement a binding discipline framework that promotes, among other things, discipline that is reasonably predictable and consistent. The framework must explicitly incorporate consideration of consistent mitigating and aggravating factors. In accordance with this paragraph's requirements, PPB utilizes a Corrective Action Guide (CAG) as its framework for reaching decisions about discipline for its members. PPB's self-monitoring plan for Paragraph 137 identifies its objective as providing evidence to demonstrate that PPB ensures it follows binding discipline rules for sustained allegations of misconduct in order to reach disciplinary decisions that are based on the nature of the allegation as well as mitigating and aggravating factors, and that are reasonably predictable and consistent.

The self-monitoring plan lists as data sources the CAG as well as Corrective Action Recommendation (CAR) memoranda, Imposed Corrective Action memoranda, and PRB memoranda. Collectively, PPB provided a combination of these types of memoranda from a total of 18 different cases. PPB's compliance report confirmed that the CAG had been referenced with respect to all 18 of the cases and that mitigating and aggravating factors had been assessed in 15 of the 18 cases. The report concluded that Substantial Compliance was achieved for this Reporting Period. **The Monitoring Team's evaluation found that PPB has maintained Substantial Compliance in accordance with the self-monitoring plan for this paragraph of the Settlement Agreement.**

**With regard to the Discipline and Accountability discrete section of the Settlement Agreement, the Monitoring Team's evaluation of PPB's compliance report found that PPB has adequately demonstrated that it has maintained Substantial Compliance with the section.**

**Paragraphs 148, 150, and 193 (PPB Stops Data and Annual Reports)**

**Paragraph 148**
This paragraph of the Settlement Agreement requires continued documentation by PPB officers of demographic data regarding the subjects of police encounters, the provision of such information to the Portland Committee on Community Engaged Policing (PCCEP), and the making of such information available to the public. It further requires PPB to consider enhancements to its data collection efforts and to report on efforts made toward such enhancements to the DOJ on a quarterly basis.[54]

With regard to PPB's internal requirement for officers to collect demographic data of subjects whom they stop, PPB provided Directive 0900.00 General Reporting Guidelines, which includes such a requirement in the form of the Stops Data Collection Report. Relatedly, PPB provided a template of a form titled, "Demographic Collection form", which is equipped to gather all of the demographic data elements required by this paragraph. Regarding the collected data itself, PPB's Stops Data Collection 2024 Annual Report—which was released during the previous Reporting Period—was also provided, and it demonstrates the performance in actual practice of Paragraph 148's data collection requirements.

With regard to the Settlement Agreement's requirement for PPB to share the demographic data it collects about stops with PCCEP, PPB provided a memorandum indicating its historical practice of notifying PCCEP of the availability of the Annual Stops Report once it had been made available publicly (i.e. on the City's website). Additional information was provided indicating that such a notification did not occur during this Reporting Period because no annual report was released then, either. Relatedly, PPB's self-monitoring plan for this paragraph focuses on whether the required stop data was "made available to PCCEP" rather than whether it was provided to PCCEP. This small but significant distinction was identified by the Monitoring Team as an area of concern in our previous evaluation of PPB's efforts at self-monitoring its compliance with Paragraph 148.[55] We reiterate the importance of PPB providing its demographic stop data to PCCEP in order to comply with the specific requirement included in this part of the Settlement Agreement. We also acknowledge, however, that the lack of any such provision did not necessarily amount to a deviation from Paragraph 148 during this Reporting Period.

---

[54] The City previously informed the Monitoring Team that the transmission to the DOJ of reports on PPB's efforts made toward enhancements of its data collection have not occurred for some time; and the DOJ previously indicated to the Monitoring Team that they no longer consider such transmissions to be necessary. Although the lack of this reporting, on its own, may amount to only a minor violation of the Settlement Agreement, the Monitoring Team continues to believe that it is important that it be acknowledged.

[55] The Monitoring Team has discussed this concern with PPB, including how to remedy it.

PPB's Stops Data Collection 2024 Annual Report—the latest one that had been completed as of the end of this Reporting Period—is available to the public on the City's website.[56] In addition to its annual report, PPB also posts quarterly reports about stops on the City's website; these reports contain some, though not all, of the data elements required to be collected by Paragraph 148. PPB additionally provided inter-office memoranda indicating that consideration was given to the enhancement of its data collection efforts, as required by this paragraph, in both Q2 and Q3 2025. It was determined, in each of those quarters, that "no enhancements were needed in the current review period to comply with race, age, sex, and perceived mental health data collection requirements."

PPB's compliance report references Directive 0900.00 General Reporting Guidelines as its requirement for officers to collect demographic data, as contemplated by this paragraph of the Settlement Agreement. The compliance report indicates that none of the required data collected by PPB was provided to PCCEP during this Reporting Period, noting that no annual report containing the data had been completed during the period. Although no annual report had, therefore, been made available to the public during the Reporting Period either, the compliance report states that PPB's Q2 and Q3 2025 Stops Data Collection Quarterly Reports were both available publicly.[57] Finally, the compliance report indicates that enhancements to PPB's collection of data were considered during both Q2 and Q3 2025.

PPB's compliance report concluded that PPB was in Substantial Compliance with Paragraph 148 for this Reporting Period. Despite a continued concern with PPB's self-monitoring plan, which we believe might impact future compliance with Paragraph 148, **our evaluation found that PPB has maintained Substantial Compliance in accordance with the self-monitoring plan for this paragraph of the Settlement Agreement.**

**Paragraph 150**

PPB is required by this paragraph to issue a publicly available annual report, including a summary of its problem-solving and community policing activities. PPB must share a draft of the report with PCCEP before its finalization and release to the public; and, once it is released, PPB must hold at least one meeting annually in each precinct area to present the report, in addition to presenting it at a City Council meeting. The presentations must focus on, among other things, PPB's efforts in community policing in regard to the use of force, as well as PPB's policies and laws governing pedestrian stops, stops and detentions, and bias-free policing, including a civilian's responsibilities and freedoms during such encounters. The Monitoring Team's evaluation of PPB's self-assessment

---

56 According to a memorandum provided by PPB, this report was published on the City's website as of June 27, 2025.

57 PPB's compliance report further indicates that its Q2 and Q3 2025 Stops Data Collection Quarterly Reports include data on the age and sex of subjects who were stopped by PPB. This appears to be inaccurate. Although the report should be corrected, this inaccuracy—which is directly related to a concern pointed out by the Monitoring Team in our previous evaluation of PPB's efforts at self-monitoring its compliance with Paragraph 148—does not amount to a deviation from the specific requirements of the paragraph.

of compliance with this paragraph in our previous report, covering the Reporting Period from January 1, 2025 to June 30, 2025, found that PPB had maintained Substantial Compliance during that period. PPB appropriately found that it had: issued an annual report with the summary information required by the paragraph; shared a draft of the report with PCCEP prior to publishing it to the public; and held meetings, as required, at each precinct area presenting the annual report and educating the community about certain aspects of PPB's policies and the law.

With respect to the current Reporting Period, from July 1, 2025 to December 31, 2025, PPB's self-monitoring plan remained essentially the same as the one it followed in making its previous assessment. In contrast with that assessment, however, PPB's compliance report for this Reporting Period appropriately noted that the 2025 Annual Report had not yet been released as of the end of the period (which is not surprising, as each report is designed to address an entire calendar year). As such, there was no opportunity during this Reporting Period for PPB to demonstrate compliance with the requirements of the paragraph that arise only in conjunction with each new annual report. PPB reflected this in its compliance report by indicating that those requirements were not applicable.

The one requirement in Paragraph 150 that PPB did seek to self-assess its compliance with during this Reporting Period was tied to the issuance of its 2024 Annual Report. Although all of the paragraph's other requirements tied to that report were met during the previous Reporting Period, the requirement for PPB to present its 2024 Annual Report at a City Council meeting was addressed during this Reporting Period – on August 7, 2025.[58] PPB's self-monitoring plan relied on a recording of the City Council session that day as well as an analysis of it to verify that all of the topics PPB was required by this paragraph to include in its presentation were covered during the meeting. This analysis was conducted by PPB staff, and the results were documented and provided in support of PPB's compliance with this paragraph.[59]

Based on its finding that most of the paragraph's requirements were inapplicable during the current Reporting Period, as well as its finding of compliance with the one requirement that did apply during the period, PPB's compliance report concluded that PPB was in Substantial Compliance with Paragraph 150 for this Reporting Period. **The Monitoring Team's evaluation found that PPB has maintained Substantial Compliance in accordance with the self-monitoring plan for this paragraph of the Settlement Agreement.**

---

[58] Although this requirement was mentioned in our last semi-annual compliance report in reference to Paragraph 150, our evaluation of PPB's self-assessment of compliance with it is addressed here, given that the meeting at issue occurred during this Reporting Period.

[59] The person who conducted these reviews was listed in the document as an analyst with the Office of the Inspector General; no further identification of them and/or the preparer of the document was provided.

**Paragraph 193**

Paragraph 193 of the Settlement Agreement requires PPB to release annual reports prior to September 20 of each calendar year. It further requires PPB to hold at least one meeting in each geographic precinct to present the report prior to that date.[60] The Monitoring Team's evaluation of PPB's self-assessment of compliance with this paragraph in our previous report, covering the Reporting Period from January 1, 2025 to June 30, 2025, found that PPB had maintained Substantial Compliance during that period. PPB appropriately found that its 2024 Annual Report was published during that time, and that the required precinct meetings were held then as well—all prior to September 20, 2025.

With respect to the current Reporting Period, from July 1, 2025 to December 31, 2025, PPB's self-monitoring plan remained essentially the same as the one it followed in making its previous assessment. In contrast with that assessment, however, PPB's compliance report for this Reporting Period appropriately noted that the 2025 Annual Report had not yet been released as of the end of the period (which is not surprising, as each report is designed to address an entire calendar year); relatedly, no precinct meetings presenting the 2025 Annual Report were held during the Reporting Period. Given that PPB substantially complied with the annual deadline in this paragraph during its previous semi-annual self-assessment, and that the next opportunity to demonstrate compliance with it had not yet arisen as of the end of the current semi-annual Reporting Period, PPB's latest self-assessment appropriately found no deviations from this paragraph's requirements.

PPB's compliance report concluded that PPB was in Substantial Compliance with Paragraph 193 for this Reporting Period. **The Monitoring Team's evaluation found that PPB has maintained Substantial Compliance in accordance with the self-monitoring plan for this paragraph of the Settlement Agreement.**

**With regard to the PPB Stops Data and Annual Reports discrete section of the Settlement Agreement, the Monitoring Team's evaluation of PPB's compliance report found that PPB has adequately demonstrated that it has maintained Substantial Compliance with the section.**

**<u>Paragraph 189 (Outside Review of 2020 Protest Response)</u>**

**Paragraph 189**

The City's self-monitoring plan for this paragraph of the Settlement Agreement aimed to verify that the City completed three primary requirements (in sum): 1) the provision of funding for an outside entity to assess the City's response to crowd control events in 2020; 2) the use of the assessment to

---

60 Additional requirements surrounding PPB's Annual Reports and their presentations to the community are included in Paragraph 150 of the Settlement Agreement.

prepare a training needs assessment; and 3) the completion of requirements #1 and #2 consistent with a scope of work agreed upon by the City and the DOJ. In order to demonstrate its completion of these requirements, the City provided documentation of City Council's authorization of funding for an independent review as described in the Settlement Agreement; a completed training needs assessment pertaining to the recommendations made in the independent review; and the contract entered into with an outside entity, which includes the scope of work that addressed both the independent review and the training needs assessment.

The City's compliance report concluded that it was in Substantial Compliance with Paragraph 189 for this Reporting Period. **The Monitoring Team's evaluation found that PPB has maintained Substantial Compliance in accordance with the self-monitoring plan for this paragraph of the Settlement Agreement.**

**With regard to the Outside Review of 2020 Protest Response discrete section of the Settlement Agreement, the Monitoring Team's evaluation of the City's compliance report found that the City has adequately demonstrated that it has maintained Substantial Compliance with the section.**

# Terminated Discrete Sections[61]

Pursuant to the Settlement Agreement, and since the Monitoring Team's last semi-annual compliance report, the following paragraphs (which the Settlement Agreement groups into "discrete sections" as indicated) have been terminated:

- 88-90 (community-based mental health services);
- 94-96 (behavioral health unit advisory committee);
- 141-144 and 151-152 (PCCEP);
- 191 (training dean)

**<u>Paragraphs 88-90 (Community-Based Mental Health Services)</u>**
**This discrete section was terminated on March 13, 2026, in accordance with Paragraph 257 of the Settlement Agreement.**

**<u>Paragraphs 94-96 (Behavioral Health Unit Advisory Committee)</u>**
**This discrete section was terminated on March 13, 2026, in accordance with Paragraph 257 of the Settlement Agreement.**

**<u>Paragraphs 141-144, 151-152 (PCCEP)</u>**
**This discrete section was terminated on March 13, 2026, in accordance with Paragraph 257 of the Settlement Agreement.**

**<u>Paragraph 191 (Training Dean)</u>**
**This discrete section was terminated on March 13, 2026, under Federal Rule of Civil Procedure (FRCP) 60(b)(5).**[62]

---

[61] According to Paragraph 251 of the Settlement Agreement, "A discrete section that is terminated is no longer subject to enforcement, monitoring, or self-monitoring, and the requirements under the discrete section are no longer part of this Agreement." For a full description of partial termination of the Agreement, including how discrete sections become subject to termination, see Paragraphs 249-259 of the Settlement Agreement.

[62] As stated in a joint stipulated motion filed with the Court by the Parties to terminate this discrete section, "Rule 60(b)(5) provides that courts may provide relief from a judgment when 'the judgment has been satisfied' or when 'applying it prospectively is no longer equitable.'"

# Outcome Measurements

## Introduction

Paragraph 222 of the Settlement Agreement calls on the Monitoring Team to conduct semi-annual qualitative and quantitative outcome assessments to measure whether implementation of the Agreement has created each of five intended outcomes:[63]

1. Capable systems and resources for responding to persons in mental health crisis;
2. Competent accountability and oversight systems;
3. Effective training for police officers that increases the knowledge, skills, and abilities necessary for effective and successful delivery of service to persons in mental health crisis;
4. Proper management of the use of force to meet constitutional standards; and
5. Robust systems of community engagement.

The Monitoring Team recognizes that policing is quite often dynamic in nature and does not easily lend itself to simple or immutable standards that amount to a singular definition of success. Keeping this in mind, we approach these assessments with the goal of utilizing qualitative and quantitative data to help reflect the specific ways in which PPB is achieving the intended outcomes of the Settlement Agreement while also identifying areas where opportunity for improvement remains.

## Outcome Assessment Addressed in This Report

The Monitoring Team begins its outcome assessments, based on those metrics identified in the Settlement Agreement that were most readily available to us as of the end of this Reporting Period, with an examination of PPB's uses of force over time. We present data on trends in force events, subjects of force, applications of force, types of force used, and categories of force.

## Data Sources

PPB and the Monitoring Team held multiple meetings in February and March 2026 to discuss the specific data requirements enumerated in the Settlement Agreement. For the ideal assessment, we would be able to access data extending from the present day back to the period of time prior to the initiation of the Agreement (e.g. 2013). For some data sources, PPB was indeed able to provide reliable data going that far back in time. Unsurprisingly (and appropriately), however, between 2013 and 2026 PPB also implemented multiple changes to their information technology systems, Directives and Standard Operating Procedures, data capture forms, and data measurement

[63] Paragraph 222 sets forth 26 metrics, spread across five categories (use of force data; mental health interaction data; training data; performance data; and accountability data), that will inform the outcome assessments.

definitions, improving the breadth of available data while also balancing the resources required to collect and analyze it. The type of changes we are referencing here, implemented by PPB, generally represent progress and growth by the agency and are therefore laudable. They do also naturally result in an uneven data landscape in which the data for recent periods are more detailed, reliable, and accessible through standard data analysis tools than data from earlier in the life of the Settlement Agreement (for instance).

PPB has begun providing the Monitoring Team with the data we need to conduct outcome assessments, and they are continuing to work with us on the data collection process. The analysis of data presented in this report is focused on the publicly available use of force data that PPB provides through its open data portal, which covers the time frame from Q3 2017 to Q3 2025.[64] The use of force data available on the open data portal consists of a data set in which each row of data represents an interaction between a single PPB member and a single subject in which multiple applications of force may have been used.[65] Thus, if multiple members use force against one subject, or one PPB member uses force against multiple subjects, there will be multiple rows in the data set to represent the complete force event.

PPB's open data includes information about the number of applications of force, the type of force used, resistance by the subject, the subject's demographics, whether the subject was experiencing a mental health crisis (actual or perceived), whether the subject was under the influence of drugs or alcohol, any subject weapon(s), the initial call category, the officer's tenure, the officer's precinct assignment at the time of the force event, the type of call (self-initiated by PPB or dispatched), and the year, month, and time of day of the force event.

## Outcome Assessment Results

The Monitoring Team began this outcome assessment by asking several discrete, foundational questions about the use of force by members of PPB and how it has changed between Q3 2017 and Q3 2025. More specifically, we built on initial work done in this area by the Compliance Officer/Community Liaison (COCL) by asking the following questions:

1. How many force events did PPB engage in?
2. How many individuals were the subject of a PPB use of force?

---

[64] The PPB Open Data portal is comprised of multiple interactive dashboards addressing multiple policing topics such as crime statistics, staffing numbers, arrest statistics, use of force data, deadly force incidents, stops data, precinct demographics, and bias crime statistics.

[65] If an officer uses more than eight (8) applications of force against a subject in one force event, the data limits the number of applications of force on a single row of data to eight, and it includes additional rows of data as needed to represent all applications of force used by one officer against one subject in one force event. Of the 12,260 rows of data covering Q3 2017 to Q3 2025, the Monitoring Team identified 9 rows (0.07% of rows) representing cases in which an officer used more than 8 applications of force against a subject.

3. What portion of those subjects were in actual or perceived mental health crisis?
4. How many applications of force did PPB engage in?[66]

The Monitoring Team assessed the answers to each of these questions by calculating the number of force events, applications of force, subjects of force, and mental health status of the subjects on a quarterly basis between Q3 2017 and Q3 2025. The totals are presented below in trend graphs to show how these metrics have changed over time.

## Force Events

Force events declined substantially between Q3 2017 and Q3 2025. Because quarterly force events exhibit a cyclical pattern, with elevated numbers of events during the second quarter (April – June) of each year, the Monitoring Team calculated the average number of quarterly force events for making comparisons. Between Q3 2017 and Q2 2018, the average number of force events per quarter was 239. Between Q4 2023 and Q3 2024, that average had dropped to 163—a 31.8 percent reduction in force events.

The last four quarters (Q4 2024 to Q3 2025) presented in the figure below averaged 105 force events. However, on September 11, 2024, PPB changed the classification of several Category IV types of force to De Minimis force; PPB also changed the classification of a few Category IV types of force to Category III.[67] Unlike Category IV uses of force, De Minimis force does not have the same reporting requirements as more serious uses of force, thereby reducing the number of total force events reported after this change.[68] In light of this, a portion of the reduction in force events during the last four quarters of the series is simply due to the change in use of force classification

---

[66] An application of force is a unique use of force by one officer, typically against one subject. An officer may have more than one application of force against a subject in one force event. Similarly, each force event may have more than one subject and/or more than one officer involved. Therefore, multiple officers may use force against a single subject, and one officer may use multiple applications of force against one or more subjects within the same force event.

[67] When PPB introduced the De Minimis force category, the following force types of force were reclassified from Category IV force to De Minimis force: handcuffing against resistance, control against resistance, and hobble restraints. At the same time, other types of force, such as pointing a firearm and vehicle box-in techniques, were reclassified from Category IV force to Category III force. Finally, controlled takedowns were also removed as a Category IV use of force, and all takedowns are now classified under Category III. The Monitoring Team assessed the volumes and trends in force applications for these types of force to determine whether the introduction of De Minimis force was associated with notable changes in the other force categories. Our findings indicate that the introduction of the De Minimis force category in Q3 2024, and the corresponding reclassifications of Category IV types of force, did not, on their own, produce any marked changes in the volume of Category III uses of force.

[68] These uses of force must be reported on a General Offense (GO) form, unless the application of force causes an injury to the subject or the subject complains of an injury. However, the data reported in PPB's open data are based on applications of force reported on the Force Data Collection Report (FDCR), which excludes De Minimis force applications.

and does not represent a substantively greater reduction in Force Events from Q4 2023 to Q3 2024. In this section, references to the "introduction of De Minimis force" will be used to signify both the reclassification of some Category IV types of force to De Minimis force and the concomitant reclassification of some Category IV types of force to Category III force.

The reduction in force events suggests that there has either been a change in how PPB uses force or a change in the types of encounters PPB members have with the public, without PPB members changing their broader pattern and practice of using force. The Monitoring Team acknowledges that there are situations where the use of force by police is called for as a matter of public safety, such as when a subject presents an immediate threat of harm to others. Therefore, it is instructive to assess the number of force events in ways that account for variations in the overall volume of work that PPB members are engaged in.



The PPB Open Data portal includes quarterly counts of calls for service and custodies.[69] These allow the Monitoring Team to standardize the number of force events two different ways: by the number of calls for service PPB responded to and the number of subjects taken into custody. The number of calls for service is substantially greater than the number of custodies in any given quarter. For example, in the most recent quarter of data available (Q3 2025), there were 78,538 calls for service and 3,609 custodies. Therefore, the Monitoring Team presents the force events in the figure below as a rate per 1,000 calls for service, and as a percentage of custodies.




There were 2.2 force events per 1,000 calls for service in Q3 2017. The rate rose and dropped precipitously several times between Q3 2017 and Q3 2024 but did not demonstrate any increasing or decreasing trends across those seven years. However, with the introduction of De Minimis force in late Q3 2024, force events per 1,000 calls for service dropped to a level between 1.4 and 1.6—roughly a 30 percent decline from previous levels.

[69] A custody occurs when an individual is detained by PPB and is not free to leave, often involving physical restraint, or a detention where a reasonable person would not feel at liberty to leave. This includes criminal arrests, juvenile detentions, and peace officer holds for mental health crises.

Force events occurred in approximately 3.5 percent of custodies in Q3 2017. While the rate rose and declined during the end of 2017 and first half of 2018, it more than doubled from 3.0 percent in Q3 2018 to 6.8 percent in Q2 2021. Force events as a percentage of calls for service then dropped to 5.3 percent in Q4 2021 and hovered around 5.0 percent until Q4 2024. With the introduction of De Minimis force, the number of force events as a percentage of custodies reduced further to an average of 2.9 percent, a level not seen in seven years—since Q3 2018.

The Monitoring Team found that both calls for service and custodies declined notably in Q1 2020, around the beginning of the COVID-19 pandemic (see figure below). These reductions correspond to a jump in the rate of force events per 1,000 calls for service and as a percentage of custodies at the same time. However, the post-pandemic trends in calls for service are relatively flat, and the trend for custodies shows a relatively small upswing.




In contrast, the number of force events demonstrates a relatively consistent decline over the entire period. If the reduction in force events was purely caused by changes in either calls for service or

custodies, we would expect to have seen force events decline markedly around the time of the COVID-19 pandemic and then either remain at a consistently lower level or increase slightly, as did calls for service and custodies. This is not the observed pattern, however, which leads us to conclude that changes in calls for service and custodies were not solely responsible for the decline in force events. Despite this conclusion, the Monitoring Team cannot rule out that these changes may have been contributing factors to reducing force events over time as they also reduced the total number of PPB encounters that could result in force events. While there are many possible explanations—aside from changes in calls for service and custodies—for the consistent decline in force events observed between Q3 2017 and Q3 2024, there are two that warrant further exploration.

First, despite the patterns the Monitoring Team found regarding total calls for service and custodies, the nature of these calls and custodies might have changed over time, requiring PPB to use force less often. To determine if this is a plausible explanation, we would need to further explore the characteristics of calls for service and custodies to determine if the types of calls and custodies were changing in addition to the total volume of calls. The second possible explanation hinges on whether PPB has changed the pattern or practice of using force in substantive ways that produce fewer force events, fewer applications of force, or lower levels of force over time. To determine if this explanation is likely, we would need to explore the trends in categories of force used and in the number of applications of force. We turn now to these topics.

## Categories of Force

The Monitoring Team examined the quarterly trends in categories of force between Q3 2017 and Q3 2025. PPB classifies force according to four different categories, and each use of force event (which might include more than one application of force) is categorized according to the most severe application of force that occurred during the event.

De Minimis force is defined in PPB Directive 0910.00 Use of Force Reporting, Review, and Investigation as, "Minimally intrusive application of a restraint, (e.g., handcuffs or a hobble), or the use of an empty hand coercive technique to separate, guide and/or gain control of a subject. De Minimis Force is not readily capable of causing or reasonably likely to cause physical injury or persistent pain."

Category III force is defined as, "All member use of force resulting in physical injury, complaint of pain or physical injury, less lethal weapon use without serious physical injury, and any other force that requires After-Action review." Category III uses of force include, but are not limited to, takedowns, strikes with hands or feet, canine contact, pointing of a firearm, box-in maneuvers and PIT maneuvers to intervene with moving vehicles, the use of less lethal weapons such as kinetic impact projectiles (e.g., bean bag or sponge rounds), baton pushes, strikes, and jabs, or two (2) or fewer conductive electrical weapon (CEW) applications to persons not in mental health crisis.

Category II force is defined as, "All member use of force resulting in serious physical injury, hospitalization, disability, or warranting an elevated review." Category II uses of force include, but are not limited to, more than one simultaneous CEW application, three (3) or more applications of CEW in total to a person, any CEW application to a person in actual or perceived mental health crisis, canine bites, any force used resulting in loss of consciousness, any force used on restricted persons (e.g. children under 15, pregnant persons, or medically fragile persons), any strike, blow, or kick to handcuffed or otherwise restrained subjects with or without injury, or ramming a vehicle as an intervention strategy.

Category I force is defined as, "Deadly force use, in-custody death, and death resulting from member use of force." Category I uses of force include, but are not limited to, all critical firearm discharges (except those authorized to stop an aggressive animal or end the suffering of a badly injured animal), neck holds, and all intentional head, neck, and throat strikes with a hard object or when a member strikes the head of a person against a hard object. Category I uses of force are not included in the Use of Force data analyzed here but are available through PPB's open data website.[70]

The publicly available data on PPB uses of force include a field identifying the highest category of force used in the force event. The Monitoring Team tabulated the quarterly counts of force events by category of force between Q4 2017 and Q3 2025; the trends in use of force categories are presented in the figures below.[71]

*[This area has intentionally been left blank.]*

---

[70] Category I uses of force are reported in a different database (from non-deadly uses of force), which does not include many of the same measured characteristics as are reported regarding other uses of force. With the increased ability to deepen our analysis that we anticipate having in future Reporting Periods, the Monitoring Team, in turn, anticipates incorporating Category I use of force data into our analyses.

[71] The data on force events in Q3 2017 were incomplete, with 70 uncategorized events. These events comprised a substantial portion of the data; we therefore excluded Q3 2017 from these analyses.




*[This area has intentionally been left blank.]*




The following table presents the changes in force events, by force category, between the Q4 2017 – Q2 2018 period and both the Q4 2023 – Q3 2024 and Q4 2024 – Q3 2025 periods.

***Average Number of, and Percentage Change in, Force Events by Category of Force***

| Category of Force | Q4 2017 - Q3 2018 (1) | Q4 2023 - Q3 2024 (2) | Q4 2024 - Q3 2025 (3) | (1) - (2) % Change | (1) - (3) % Change |
|---|---|---|---|---|---|
| **II** | 20.25 | 20.00 | 11.00 | -1% | -46% |
| **III** | 58.50 | 87.00 | 93.25 | 49% | 59% |
| **IV** | 153.75 | 55.75 | 0.00[a] | -64% | -100%[a] |
| **Total** | 232.50 | 163.25 | 104.50 | -30% | -55% |

[a] As noted throughout the outcome assessment, the reduction of Category IV force to zero (0) between Q4 2024 and Q3 2025 does not indicate that these force events no longer occur. Rather, they have been reclassified as De Minimis force and are no longer reported in the same manner as Category II & III force events.

Quarterly Category II uses of force remained relatively stable across the eight years included in this analysis, averaging approximately 20 force events per quarter, except for a marked decline in the Q4 2024 – Q3 2025 period. These represent approximately 10 percent of force events on average.

Quarterly Category III force events increased by 49 percent between the period of Q4 2017 – Q3 2018 (quarterly average of 58.50 events) and the period of Q4 2023 – Q3 2024 (quarterly average of 87.00 events). Then these events increased another 10 percentage points in Q4 2024 – Q3 2025, to a quarterly average of 93.25 events. Examination of the trend chart shows that the percentage of force events comprised of Category III events has risen from 25 percent between Q4 2017 and Q3 2018 to 89 percent between Q4 2024 and Q3 2025. Although the sharp increase in the percentage of Category III force events in 2024 and 2025 coincides with the introduction of De Minimis force and the removal of many Category IV force events, we note that the number of Category III force events also demonstrates a consistent trend between Q4 2017 and Q3 2025, increasing by 59 percent across the entire period.

Finally, quarterly Category IV uses of force have been declining consistently from 2017 through 2025. There was a 64 percent decline in Category IV uses of force, from a quarterly average of 153.75 between Q4 2017 and Q3 2018 to a quarterly average of 55.75 between Q4 2023 and Q3 2024. With the introduction of De Minimis force in Q3 2024, Category IV uses of force drop to zero between Q4 2024 and Q3 2025 (because this category of force no longer exists).

These results show that while PPB has reduced the overall number of force events in any given quarter of data, the composition of those events by categories of force has also been changing. Category IV uses of force were in decline prior to the introduction of De Minimis force in Q3 2024. In the first four quarters of data examined, Category IV uses of force comprised 66 percent of the uses of force reported by PPB but had reduced to 34 percent of the uses of force by the Q4 2023 – Q3 2024 period, before being transitioned to either De Minimis force or Category III force. In contrast, Category III uses of force have risen substantially over this eight-year period, from 29 percent of force events in the first four-quarter period to 89 percent of force events in the last four-quarter period. Category II uses of force have demonstrated a recent decline in the last year of the series, but it is too early to tell if this represents a temporary change or a more persistent shift to fewer Category II uses of force.

The Monitoring Team therefore concludes from these results that while overall force events have been declining, this change may have been driven by a reduction in the number of Category IV, or low-level, force events. Upon further inspection, it is clear there has been an increase in the number of Category III uses of force, both in absolute number and in their share of all PPB force events. Thus, while PPB is engaging in fewer force events, that change can be attributed, in part, to the reduction in calls for service and custodies as well as the reduction in uses of low-level force. When PPB used force recently, these data suggest that the level of force used could have been objectively higher than it had been in the past; or that PPB could have increased its adherence to reporting

requirements, such that force events which may previously have been incorrectly classified as Category IV are now more likely to be classified as a higher category of force.

## Applications of Force

The number of PPB's applications of force, like the number of force events, has declined over time. Between Q3 2017 and Q2 2018, the average number of quarterly applications of force was 787.25. Between Q4 2023 and Q3 2024, that number fell to a quarterly average of 596—a 17.2 percent decline.[72] In contrast to the decline in the number of applications of force, the applications of force per force event increased 12.0 percent from 3.26 applications per event between Q3 2017 and Q2 2018 to 3.65 applications per event between Q4 2023 and Q3 2024. After the introduction of De Minimis force in Q3 2024, the applications per force event dropped to 2.33 between Q4 2024 and Q3 2025—a 36.1 percent decrease.

While total applications of force declined over time, applications per force event remained more consistent and increased slightly over time. PPB members continued to use force at approximately the same rate per force event until the introduction of De Minimis force, at which point there was a reduction of roughly 1.32 applications per force event, or 36.1 percent. This change is associated with the introduction of De Minimis force, when, after Q3 2024, PPB stopped reporting many of the formerly-Category IV types of force on the FDCR and in the publicly available data.[73] Furthermore, these findings about applications of force are consistent with the findings previously established. While PPB has reduced the number of force events overall, this reduction was largely a function of reducing low-level Category IV force events, while Category III force events increased in prevalence. Here, too, the Monitoring Team finds that while the total number of force applications declined, PPB was applying force slightly more frequently during the encounters in which force events occurred.

---

[72] It is important to note that this analysis of trends does not include applications of force associated with public order events during Q2 2024, because the force used during public order events is both quantitatively and qualitatively different from force events not associated with public order events. The inclusion of force used during public order events would create outlier data points in the trend analysis and, thereby, make clear interpretation of the quarterly trends more difficult. In the Force Data Summary Report covering that quarter, PPB reported 222 applications of force associated with public order events. The applications included 169 documented as "control against resistance," 33 documented as "baton push," and 20 documented as "takedown (II and III)."

[73] With the introduction of De Minimis force, PPB no longer reports De Minimis force applications on the Force Data Collection Report (FDCR) form. Instead, De Minimis force applications are reported on the General Offense (GO) report. While PPB continues to report De Minimis force applications in their documentation, these applications of force are no longer tabulated in the force data PPB provides online; they are, therefore, also not included in this report.




## Subjects of Force

As force events have declined, so too have the number of subjects of force. Between Q3 2017 and Q2 2018 there were, on average, 238 subjects of force per quarter. That number dropped to 160 subjects per quarter on average between Q4 2023 and Q3 2024, not including the 188 subjects of force PPB engaged with during public order events in Q2 2024.[74]

Between Q4 2024 and Q3 2025, the average number of subjects of force dropped to 111, a 53.4 percent decline; however, a portion of this decline, too, is likely due to the introduction of De Minimis force, which resulted in the exclusion of subjects of De Minimis force events from the data set in the last four quarters. The decline in subjects of force between Q3 2017 – Q2 2018 and Q4

[74] In the Q2 2024 Force Analysis Summary Report, PPB reported 339 subjects of force, 188 of whom were encountered during public order events. The subjects of force in public order events were excluded from the trend analysis because force events associated with public order events are both quantitatively and qualitatively different from force events not associated with public order events. The inclusion of subjects encountered during public order events would create outlier data points in the trend analysis and, thereby, make clear interpretation of the quarterly trends more difficult.

2023 – Q3 2024 was 32.8 percent, not including subjects of force during Q2 2024 public order events.




The average number of subjects in actual or perceived mental health crisis increased from 34.3 subjects (14.3%) per quarter between Q3 2017 and Q2 2018 to 36.5 subjects (20.2%) per quarter between Q4 2020 and Q3 2021; it then declined again to 10.3 subjects (9.2%) per quarter between Q4 2024 and Q3 2025.[75]

The average number of force subjects in mental health crisis dropped by 70.1 percent between the first four quarters and the last four quarters, a change of 24 subjects per quarter. Comparatively, the average number of subjects not in actual or perceived mental health crisis declined from 204 per quarter in the first four-quarter period to 101 per quarter in the last four-quarter period—a decline

[75] In the Q2 2024 Force Data Analysis Summary, PPB did not provide an estimate of the number of subjects of force during public order events that were in actual or perceived mental health crisis. Therefore, the Monitoring Team was unable to make any adjustments accordingly. The analysis presented here on subjects in actual or perceived mental health crisis includes all subjects identified in the publicly available use of force data.

of 50.5 percent. This shows that there was a greater proportional decline in force used against subjects in actual or perceived mental health crisis than there was in force against those not in mental health crisis. The Monitoring Team found that PPB used force against fewer subjects overall between Q3 2017 and Q3 2025. Findings also showed that PPB's reduction in force used was proportionally larger amongst individuals in actual or perceived mental health crisis. Along with these findings, the Monitoring Team notes that the data do not provide enough details about the circumstances of the underlying force events from which to draw a definitive conclusion regarding the appropriateness of the force used during them.




## Discussion

The Monitoring Team used publicly available data from PPB to begin assessing outcomes associated with the implementation of the Settlement Agreement. The analyses presented here characterize PPB's use of force in terms of force events, categories of force, applications of force, and subjects of force with respect to their actual or perceived mental health crisis status. The results point to six (6) findings:

1. Uses of force have declined over time, in the absolute number of force events, the number of applications of force, and the number of subjects of force.
2. The overall decline in force events appears to be, in part, a function of fewer calls for service and custodies since the beginning of the COVID-19 pandemic.
3. Force events have changed substantially in their classifications by category of force, with Category IV uses of force declining until they stopped being reported in the data in Q4 2024, and Category III uses of force increasing in both absolute numbers and their share of all uses of force.
4. While total applications of force have declined, that decline is largely a function of the decline in total force events. When examined as applications of force per force event, PPB has seen a slight increase in the number of applications of force.
5. The total number of subjects of force has been decreasing, consistent with a reduction in force events overall.
6. The number of subjects of force in actual or perceived mental health crisis has declined at a greater rate than the number of subjects not in actual or perceived mental health crisis.

The examinations of data reported here offer important, if only initial, insights relevant to broader measurements of whether the Settlement Agreement's implementation has created desirable outcomes. The overall reduction in force events over time is evidence that PPB is using force less often in their encounters with the public. This reduction could be due to several potential reasons:

a) There were fewer incidents in the City that required police to respond; or fewer incidents that required them to respond with force.
b) PPB's training reduced officers' reliance on force and increased their reliance on de-escalation techniques (which either lowered the level of force deemed necessary or lowered the likelihood of force being used at all).
c) Social services and/or unarmed responders have increased their reach to individuals who may need them, such as those in actual or perceived mental health crisis, thereby decreasing the need to rely on a response by PPB.

The results presented here indicate that there has been a reduction in calls for service to PPB over time. Beginning with the start of the COVID-19 pandemic, there was a notable drop in calls for service, which remained consistent until there was a rise again in Q2 and Q3 2025. Whether the increase in calls for service continues, and whether it is associated with an increase in force events, remains to be seen.

One potential contributing factor to the reduction in calls for service at PPB is the launch of Portland Street Response (PSR). Piloted in February 2021, PSR has provided Portland with an alternative service provider to connect individuals struggling with homelessness and mental health crises using teams of medics and peer-support specialists. PSR is part of the broader county-wide

crisis triage system and may be dispatched by the Bureau of Emergency Communication (BOEC) to 9-1-1 calls that meet PSR eligibility criteria. PSR's role in serving the greater Portland community has grown over time with additional funding, additional staffing, and expanded hours. The Monitoring Team identified that BOEC dispatchers are correctly applying eligibility criteria to utilize PSR's capabilities, thereby alleviating some of the demand for responses to calls that has historically been met by PPB. In other words, there are systems in place that are reducing the need for PPB to be the first responder to certain non-crime and public safety concerns.

Based on the data examined for this report, the Monitoring Team found that the number of individuals in actual or perceived mental health crisis who are subjects of PPB uses of force has declined in recent years. While we note that the number of subjects of force from PPB have declined in general, the percentage reduction among those in mental health crisis is greater than the percentage reduction among individuals not in mental health crisis. This indicates that: 1) the number of calls for service involving individuals with mental health crisis is declining; 2) PPB is becoming more adept at handling such calls without using force; or 3) some combination of the previous two items in this list is occurring. While services such as PSR help reduce the number of calls for service involving individuals in mental health crisis, PPB also provides Enhanced Crisis Intervention Team (ECIT) training and staffing to better address communication and de-escalation during crisis interventions. PPB's expanded use of ECIT teams, therefore, may also contribute to the reduction in uses force against individuals in mental health crisis.

The findings presented in this analysis indicate that Category IV force had been declining substantially prior to the transition to De Minimis force in Q3 2024. Additionally, the number of force events involving Category III uses of force has been increasing in absolute numbers as well as in the percentage share of all uses of force. One potential explanation for this could be that the increase in Category III uses of force occurred because better training has helped PPB members turn encounters that previously would have been Category I or II (more severe) uses of force into Category III (less severe) uses of force. If this were the case, we would expect to find reductions in the number of Category I and II force events at the same time that we see the increases in Category III force events. The data, however, do not corroborate this hypothesis.

PPB reported an average of 5.8 Category I force events annually between 2017 and 2025. From 2017 through 2019, there were 6 events annually, followed by a low of 2 events in 2020. In 2021 and 2022, Category I force increased to 8 and 9 events, respectively. Then, from 2023 through 2025, Category I force dropped to 4, 7, and 4 events, respectively. Similarly, the findings above indicate approximately 20 Category II force events per quarter from 2017 through 2024, with a decline of approximately 9 events per quarter in 2025. Taken together, these findings indicate that even if Category I and II events had entirely transitioned to Category III uses of force, they would likely account for approximately 26 force events per quarter and, therefore, would not fully equate to the increase of approximately 35 Category III force events. The results, therefore, show that the reduction in the total number of force events would have been even greater had PPB maintained its

use of Category III force at a stable level. While all other categories of force either declined or stayed stable over time, Category III stands out as the sole level of force that has increased substantially over time.

The Monitoring Team acknowledges that these data do not include all of the variables that might bear relevance to the observed increase in Category III force. If, for instance, PPB officers were to encounter increasingly combative or assaultive subjects over time then higher-category uses of force may reasonably be expected. The same is true if officers were to encounter subjects armed with a weapon more frequently over time. Additionally, we acknowledge that the data used here do not allow for a determination of whether PPB members have increased their fidelity in reporting applications of force over time, which also could have led to a potential increase in Category III uses of force.

The Monitoring Team looks forward to building on these initial outcome assessments in the future and continuing to share our conclusions as they relate to the outcomes created by the implementation of the Settlement Agreement.

# Work to Be Completed; Anticipated Barriers to Substantial Compliance

As the Monitoring Team completes its third semi-annual compliance report and quickly turns its focus to the next Review Period (Q1-Q2 2026), we remain excited to continue hearing and learning from diverse perspectives of stakeholders throughout Portland's many communities. We have consistently sought to remain informed by different voices from across the City throughout the Monitorship, and we look forward to continuing to live up to that commitment, including as described in the Settlement Agreement. We will continue to remain as accessible as we feasibly can to anyone who wishes to reach us regarding issues relevant to the Settlement Agreement and its implementation.

The Monitoring Team also looks forward to continuing to work with PPB and the City on effectively demonstrating their efforts to comply with the Settlement Agreement's provisions. In this report, as in our previous one, some of the deviations from the Agreement that we found might not have been caused by a proven lack of adherence to the Agreement's requirements, but rather by the lack of a sufficient demonstration (through appropriate documentation, materials, or other evidence, for instance) that adherence to requirements was, in fact, achieved. Though some of these barriers still remain, we also believe it is important to acknowledge that they have significantly decreased during this Reporting Period, partially with the assistance of more open dialogue between the City, PPB, and the Monitoring Team. Having seen this dynamic improve in successive Reporting Periods, we look forward to maintaining a focus on continuing its positive trajectory as we progress in our work assessing the City's compliance with the Settlement Agreement. Furthermore, we look forward to productive discussions with the City and PPB aimed at implementing this report's recommendations and exploring any other solutions to overcome barriers to compliance as expediently as possible.

With respect to such barriers, the Monitoring Team believe it is worth noting that a potential ambiguity related to the replacement in the Settlement Agreement of accountability mechanisms in the City that are currently operational (i.e. IPR, the PRB, and the CRC) with one that is not yet operational (i.e. the Oversight System, comprised of the CBPA and the OCPA) may be worthy of addressing. During this Reporting Period, the described ambiguity led to PPB's production of self-monitoring reports that assessed compliance with provisions of the Settlement Agreement that were no longer in effect at any point during the Reporting Period (and that included references to and/or requirements for IPR, the PRB, and the CRC). Conversely, these reports did not address the specific requirements for the Oversight System that are included in the version of the Settlement Agreement that was in effect during the Reporting Period (even though PPB's self-monitoring plans did).

As indicated by our finding in this report of Partial Compliance for Paragraph 195, which calls for the operationalization of the Oversight System, much work has yet to be completed before the

OCPA is staffed, trained, and ready to meet its responsibility to conduct investigations; and much work also has yet to be completed before the CBPA is ready to receive and adjudicate those investigations. Until further progress is achieved in those areas, the City will not have the possibility of complying with the other paragraphs in the Settlement Agreement that are based on a functioning Oversight System. On the other hand, simply assessing the City's compliance with the language of those paragraphs that is in the current Settlement Agreement (as opposed to the language that is in previous versions of it) would result in no assessments whatsoever of the City's compliance with the requirements involving IPR, the PRB, and the CRC, as none of them are included in the current Settlement Agreement despite their continued operation and role in ensuring accountability on the part of PPB.

Given all of this, the Monitoring Team suggests that it would be prudent for the Parties to clarify—in the Settlement Agreement—what is expected of the City in terms of its compliance with those paragraphs that refer to the Oversight System and that establish responsibilities dependent on, or otherwise related to, the functioning operation of that system. Doing so would address this ambiguity and provide a clearer roadmap for the City to follow in the future in ensuring that its self-monitoring plans appropriately match up with the evidence it relies on to demonstrate and assess its compliance with the affected paragraphs.

In the next Reporting Period, the Monitoring Team looks forward to building on the initial work it conducted in measuring outcomes, as described in the Settlement Agreement and represented in this report. We have had many productive discussions with PPB and the City regarding our assessment methodologies as well as the capacity to gather the numerous different data elements that we seek to obtain and rely on in order to complete the outcome measurements. As we conduct more of these measurements, we will remain mindful of Paragraph 223 of the Settlement Agreement, which calls for the inclusion of input from community members and groups that have information or expertise relevant to an outcome assessment. We believe that these measurements can provide a meaningful perspective on the effects of the Settlement Agreement's implementation over time, and we anticipate that conducting them will comprise a significant component of our work in the upcoming Reporting Period.

Finally, as more Settlement Agreement paragraphs transition into self-monitored status—as a result of successful efforts by PPB and the City to demonstrate their compliance with those paragraphs—the Monitoring Team continues to believe that a focus on ensuring robust self-monitoring processes is warranted. We look forward to working with the City and PPB on confirming that their self-monitoring plans and reports meet the standards set out for them by the Settlement Agreement.

# Appendix

# Settlement Agreement Paragraph Summaries[76]

| Paragraph # | Summary |
|---|---|
| 66 | PPB policy must include the principles that officers shall use only the force reasonably necessary under the totality of the circumstances and develop skills to resolve conflicts without force or with the least amount of appropriate force. |
| 67 | PPB policy must include the principles that officers shall use disengagement/de-escalation, account for information indicating a person is mentally ill, de-escalate force as resistance decreases, and receive discipline for objectively unreasonable force. |
| 69 | All use-of-force incidents must be timely and thoroughly reported, reviewed by supervisors, and meet criteria for specialized incidents including lethal force or in-custody deaths. |
| 70 | Supervisors must respond to use of force incidents, ensure proper investigation, coordinate medical care, notify relevant divisions, and complete After-Action Reports within 72 hours. |
| 72 | PPB must implement and annually review for revision a supervisor checklist capturing all required review elements for use of force incidents. |
| 73 | After-Action Reports must be reviewed through the chain of command, address training and policy issues, and require corrective actions and referrals as needed. |
| 74 | The Force Inspector must audit use-of-force reports and Reviews to ensure officers use and report force in compliance with PPB use of force and reporting policies. |
| 75 | The Force Inspector must audit use-of-force reports and Reviews to assess supervisors on policy compliance, completeness, timeliness, and systemic concerns, making corrections and notifications as appropriate. |
| 76 | The Force Inspector must perform quarterly analysis of force data to identify patterns of force application that deviate from PPB policy and correct any deficiencies discovered. |
| 77 | PPB must conduct quarterly audits of use-of-force reports and reviews to assess supervisors in the chain of command for policy compliance and identify trends or systemic issues. |
| 78 | PPB training shall instill expectations that officers are committed to the constitutional rights of persons with actual or perceived mental illness, and to build community partnerships to increase public trust and safety. |

[76] The summaries in this chart were crafted by the Monitoring Team for reference and convenience; they are not authoritative representations of the Settlement Agreement's provisions, nor are they intended to be interpreted as such.

| | |
|---|---|
| 79 | The Training Division shall conduct a needs assessment annually as part of the annual review and update to PPB's training plan. |
| 81 | The Training Division maintains a central file system, accessible to supervisors, to electronically track, maintain and report on training curricula and officer performance. |
| 84 | PPB must train officers and supervisors in crisis intervention, de-escalation, communication, procedural justice, and encounters with individuals in mental health crisis. |
| 85 | PPB, in coordination with COCL, must audit training programs using defined metrics including needs assessments, training plans, effectiveness, attendance, and policy accessibility. |
| 86 | PPB must conduct quarterly analysis of patterns and trends of use of force, identify proposed revisions to policy, training, and/or evaluation, and identify and remediate any training deficiencies. |
| 88 | The City's partners in the provision of community- based addiction and mental health services are expected to help remedy the lack of community-based addiction and mental health services to Medicaid clients and uninsured area residents. |
| 89 | Local CCOs are expected to establish one or more drop-off centers for first responders and walk-in centers for individuals with addiction or behavioral health needs. These centers should focus on appropriate discharge planning and community-based treatment. |
| 90 | CCOs must create mental health-focused subcommittees with City agency participation to pursue improvements, including data sharing, rapid access clinics, expanded diversion options, peer services, and tele-psychiatry. |
| 94 | PPB must establish an ABHU Advisory Committee with representation from City and community stakeholders to advise on behavioral health-related policies, practices, and oversight bodies. |
| 95 | The ABHU Advisory Committee must provide guidance and recommendations to improve CI Team, MCPT, SCT, BOEC Crisis Triage, and PPB contact with people in crisis, aiming to de-escalate potentially violent encounters. |
| 96 | The ABHU Advisory Committee must issue implementation status reports on ABHU and Crisis Triage and recommend improvements, and PPB must use these recommendations to inform changes. |
| 115 | The City must fully implement a Crisis Triage system within BOEC in accordance with policies determined under paragraph 113 of the settlement agreement. |

| | |
|---|---|
| 116 | PPB must require supervisors to document prompt reviews of employee performance in the Employee Information System (EIS) and analyze conduct data of units and supervisors to identify patterns of activity. |
| 117 | PPB must use force audit data to conduct analyses at supervisor- and team-levels. |
| 118 | PPB must perform case management review of officers using force in 20 percent of arrests in the last six months or using force three times more than the average force of officers on the same shift. |
| 121 | PPB and the City shall complete all administrative investigations of officer misconduct within 180 days of identifying the misconduct. |
| 122 | PPB and the Oversight System will conduct administrative investigations concurrently with criminal investigations of alleged officer misconduct, if any, concerning the same incident. |
| 123 | PPB or the Oversight System must provide the Monitoring Team and DOJ with a written review of any delays causing investigations to exceed the timelines in the settlement agreement and implement an action plan for reducing them. |
| 124 | PPB shall review and revise its protocols for compelled statements to Professional Standards Division or the Oversight System to comply with applicable law and professional standards pursuant to *Garrity v. New Jersey*. |
| 125 | The City will issue a communication restriction order (CRO) to all witness and involved officers following a lethal force event. |
| 126 | PPB will require witness officers to lethal force events to give an on-scene briefing to any supervisor and/or member of the Detective Division. |
| 127 | PPB will request involved officers in lethal force and in-custody death events to provide a voluntary on-scene walk-through and interview. |
| 128 | The City must implement a plan to reduce the redundant interview of witnesses by Independent Police Review (IPR) and Internal Affairs (IA) and enable independent investigation by IPR when necessary. |
| 129 | The City and PPB must ensure all allegations of excessive use of force receive full IA investigations, unless IPR finds clear and compelling evidence the allegation has no basis in fact. |
| 131 | The Police Review Board (PRB) must operate in line with charter, maintain procedural integrity, and address policy or training issues. |
| 132 | Investigating entities (i.e., IA and IPR) must make reasonable attempts to complete additional investigation requests from PRB within 10 business days. |
| 133 | PPB shall document findings of civil liability in the Employee Information System, reevaluate officer fitness for specialized units, and perform a full IA investigation. |

| | |
|---|---|
| 137 | PPB must define consistent disciplinary frameworks and apply them proportionately and equitably. |
| 141 | The City must establish the Portland Committee on Community Engaged-Policing (PCCEP) within 90 days of the relevant amendment's Effective Date. |
| 142 | PCCEP must be authorized to solicit information, make recommendations, advise leadership, contribute to PPB's Community Engagement Plan, and receive public comment in accordance with the PCCEP Plan. |
| 143 | PCCEP members must be broadly representative of the community and free from actual or perceived conflicts of interest with the City. |
| 144 | The City must provide administrative support necessary for PCCEP to perform its duties under the Agreement and the PCCEP Plan. |
| 148 | PPB must collect demographic information and must provide that information to PCCEP and to the public, and PPB must consider data collection enhancements. |
| 150 | PPB must issue a public annual report, provide a draft of it to PCCEP prior to finalizing it, and hold public meetings to provide education on community engagement efforts. |
| 151 | PCCEP must meet as needed and hold regular public Town Hall meetings, and the City must advise PCCEP to ensure compliance with applicable public meetings laws. |
| 152 | The City must provide PCCEP members with appropriate training necessary to comply with City and State law requirements. |
| 188 | The City must revise Force Data Collection Report and After-Action Report forms to capture when forms are edited and completed. |
| 189 | The City must fund an external entity to publicly report a critical assessment of the City's response to crowd control events in 2020. |
| 190 | The City must provide a separate line item for overtime costs necessary to train PPB officers. |
| 191 | The City must hire a qualified civilian to direct all educational aspects of PPB's Training Division. |
| 192 | PPB must assess command decisions during protest events to ensure accountability and policy compliance. |
| 193 | PPB must release its Annual Report and hold required precinct meetings no later than September 20 of each year. |
| 194 | PPB must implement and enforce a body-worn camera program department-wide, with clear usage and review protocols. |
| 195 | The City must establish an independent civilian oversight body with authority to review, investigate, and recommend accountability measures. |

# Random Sampling and Margins of Error

In conducting its assessments of compliance with the Settlement Agreement, the Monitoring Team recognizes that a complete and comprehensive review of all relevant incidents and documentation from the Reporting Period is not always feasible. To address this, the Monitoring Team used random sampling techniques in its assessments of some of the Agreement's paragraphs to select a subset of incidents to review. Random sampling and its associated statistical analysis techniques allow us to reliably estimate PPB's level of compliance with the Agreement using a smaller subset of cases instead of reviewing all cases. Such techniques are consistent with those used in national survey studies to generate estimates of public sentiment and are considered industry standard practice.

One limitation of random sampling methods is that results from sampled data may differ to some degree from true compliance rates arrived at when all data available in a population of relevant cases is reviewed. To acknowledge this potential in the context of our analysis, the Monitoring Team calculated the potential size of such a difference between the sample and the population. The Margin of Error (MOE) quantifies the potential size of the difference between the sample and the population and provides a range of values within which the true population value likely falls, with a known level of statistical confidence. We used a 95 percent confidence level in this report, representing a high degree of statistical reliability, and consistent with industry standards.

For example, the Monitoring Team may identify that PPB has achieved 94 percent compliance with one requirement of the Agreement. Based on the sample data and the size of the population of incidents the sample was drawn from, we might determine with 95 percent confidence that the MOE for this finding is +/- 5 percentage points. Therefore, we would report the finding as 94 percent (+/- 5.0%), which can be interpreted as indicating that PPB's true compliance rate for that requirement of the Agreement most likely lies between 89 and 99 percent.

To be clear, the MOE does not provide a range of values that are equally likely to be true. One benefit of random sampling is that the compliance estimate generated from the sample remains the best estimate of the true result. While the MOE provides a range of values within which the true population value might fall, values at the upper or lower bounds of the MOE are slightly less likely to be true than those closer to the sample percentage.

**Margin of Error (MOE) Formula**

Compliance estimates are presented in this report as percentages. Where random sampling was used, the Monitoring Team applied the following formula to calculate the margin of error[77] for each metric presented in this report:

$$MOE = \pm Z_\alpha \sqrt{\frac{p(1-p)}{n} * \frac{(N-n)}{N-1}}$$

*Equation 1*

Where:

- $Z_\alpha$ is the z-score from the standard normal distribution corresponding to a 95% confidence level, or $\alpha = .05$, in a two-tailed test. In this report, $Z_\alpha$ = 1.96.
- $p$ is the compliance rate (i.e., percentage) calculated from the sampled data.
- $N$ is the number of cases or incidents in the population from which the sample was drawn. For example, in this report the Monitoring Team sampled non-deadly use of force cases from a population of 207 Category 2 or 3 cases PPB members were involved in, as well as 147 cases where PPB members used only De Minimis force, for a total population of 354 cases ($N$).
- $n$ is the number of cases or incidents sampled for the purpose of the analysis. For example, the Monitoring Team sampled 49 cases ($n$) involving non-deadly use of force from the population of 354 cases ($N$) PPB members were involved in, or approximately 13.8 percent of the population.

In some sections of our report, the Monitoring Team needed to use a subsample of our original sample. For example, when reviewing the results of the OIG audits, it was apparent that Electronic Control Weapons (ECWs) such as Tasers were not deployed in every force incident. Compliance assessments about whether PPB members followed PPB policy as well as the requirements of the Settlement Agreement with respect to ECW usage required examining a smaller subset of OIG audits in which ECWs were deployed. During this Reporting Period, our sample included six such cases. Where a subsample of cases, such as the ECW cases in the OIG audits, was used for compliance assessments, the Monitoring Team did not know the total number of audited cases in the population in which an ECW was deployed. Equation 1 for the MOE above could therefore not be calculated as specified because the value of *N* was unknown. Instead, the Monitoring Team used an MOE formula that does not include the finite population correction term, but retains all other terms as defined above in Equation 1:

---

[77] The MOE formula includes a finite population correction factor, $\frac{(N-n)}{N-1}$, because the population we draw the sample from is finite in nature, and because the sample is drawn without replacement.

$$MOE = \pm Z_{\alpha}\sqrt{\frac{p(1-p)}{n}}$$

*Equation 2*

In addition to the revision in Equation 2, the Monitoring Team encountered many instances where all sampled cases exhibited compliance with the Settlement Agreement. In these cases, the sample proportion ($p$) in both Equation 1 and 2 is 1.0, and the MOE is reduced to 0, meaning that when a compliance rate is 100% (or 0%), the MOE shrinks to zero. In these instances, the Monitoring Team did not report an estimated MOE with the results.

Finally, the Monitoring Team notes that the compliance assessments for many paragraphs of the Agreement did not require sampling data. For example, we reviewed all cases involving a use of lethal force or an in-custody death occurring during the Review Period. When sampling was not used, the compliance assessment findings represent the results from the population and are not subject to the same random sampling error that necessitates the MOE calculations above. Therefore, the Monitoring Team did not report MOE results in analyses using the entire population of cases.

# Glossary of Acronyms

| Acronym | Definition |
|---|---|
| AAR | After-Action Report |
| BHRT | Behavioral Health Response Teams |
| BHU | Behavioral Health Unit |
| BHUAC | Behavioral Health Unit Advisory Committee |
| BOEC | Bureau of Emergency Communications |
| BWC | Body-Worn Camera |
| CAD | Computer-Assisted Dispatch |
| CAG | Corrective Action Guide |
| CAR | Corrective Action Recommendation |
| CBPA | Community Board for Police Accountability |
| CEW | Conducted Electric Weapon |
| COCL | Compliance Officer/Community Liaison |
| CRC | Citizen Review Committee |
| CRO | Communication Restriction Order |
| DOJ | United States Department of Justice |
| ECIT | Enhanced Crisis Intervention Team |
| ECW | Electronic Control Weapon |
| EIS | Employee Information System |
| FDCR | Force Data Collection Report |
| IA | Internal Affairs |
| IMLLC | Independent Monitor, LLC |
| IPR | Independent Police Review |
| LMS | Learning Management System |
| MCCL | Multnomah County Crisis Line |
| OIG | Office of the Inspector General |
| OIS | Officer-Involved Shooting |
| PAC | Police Accountability Commission |
| PCCEP | Portland Committee on Community-Engaged Policing |
| PPA | Portland Police Association |
| PPB | Portland Police Bureau |
| PRB | Police Review Board |
| PSD | Professional Standards Division |
| PSR | Portland Street Response |
| RU | Responsibility Unit |
| SOP | Standard Operating Procedure |
| TAC | Training Advisory Council |