**Juan C. Chavez**, OSB #136428
Email: jchavez@ojrc.info
PO Box 5748
Portland, OR 97208
Telephone: 503-944-2270 ext. 212
Facsimile: 971-275-1839

Attorney for *Amicus* Mental Health Alliance

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF PORTLAND,<br><br>Defendant. | Case No. 3:12-cv-02265-SI<br><br><br>*AMICUS* MENTAL HEALTH ALLIANCE'S JULY 2026 FAIRNESS HEARING BRIEF |

**INTRODUCTION**

*Amicus Curiae* Mental Health Alliance ("MHA") provides this brief submission as an update regarding ¶ 195 of the Settlement Agreement.

**DISCUSSION**

**A.    The Struggle for Community Oversight of Our Police Bureau Continues**

MHA has long held concerns about the health of the Community Board for Police Accountability ("CBPA") and the Office of Community-Based Police Accountability ("OCPA"). From delays, to attempts to tip the scales into the sole-favor of the Portland Police Association through the selection board process, to trauma uninformed provisions to force community

members into police ride-alongs, and back to delays, the project of bringing community policing oversight continues to be fraught and tenuous.

### 1. An Oversight Vacuum

More than five years later, that system remains non-operational. The CBPA did not convene its first meeting until February 11, 2026, eight months after Council approved an initial slate of members in June 2025, with the intervening period consumed by vacancies and incomplete screening. Today, the Board has no chair, no experienced staff, no dedicated meeting facility, and no full budget. Without a Director, OCPA cannot hire or direct the investigators, attorneys, and administrative personnel its charter functions require. Several Board members appointed in February hold one-year terms expiring February 10, 2027. Absent a chair and staff, those members will likely complete their terms without adjudicating a single matter.

The City has twice sought to raid OCPA's unspent startup appropriation as available revenue. A May 2026 Council proposal to redirect OCPA funding failed, and a further budget proposal identified OCPA "underspending" as a potential funding source before it was removed by amendment following public opposition. MHA acknowledges that the enacted measure did not appropriate OCPA funds, but the recurrence of such proposals is material. Underspending during a startup period does not reflect surplus. It reflects the City's own failure to enable the CBPA to utilize its own resources.

Meanwhile, the Independent Police Review has slowed its work in anticipation of transition, and the Citizen Review Committee has not heard a case in the past year. The result is an oversight vacuum. Following the July 2025 death of Damon Lamarr Johnson, who was held in a prone restraint by Portland Police officers despite clear signs of a mental health and respiratory crisis, no independent community body reviewed the matter.

Whatever the City's intentions, the cumulative effect of its conduct is a system six years delayed that cannot receive, investigate, or adjudicate a complaint. Compliance with Paragraph 195 cannot be measured by planning documents, meetings, and procedural steps alone. It must be measured by whether the promised institution is able to hold fair and impartial hearings and whether its independence and appropriated resources are protected during startup. The City cannot be considered in compliance, and the Court must take action to ensure that the City lives up to its obligation.

2. **Lost Data History**

The City's failure to stand up and fully fund the OCPA has consequences beyond the breakdown in complaint investigation and independently adjudicated discipline. The Inspector General performs additional functions like performance tracking, data verification, performance and policy auditing, and independent assessment of Bureau strategy. Each of these functions bears directly on the objectives of the Settlement Agreement, and none can be performed by the Bureau on its own behalf.

As Dr. Jonathan Brown will testify, the data the Bureau already collects is not being put to meaningful use. Since the inception of the Settlement Agreement, the Bureau has improved its use-of-force reporting and now publishes quarterly datasets and summaries. But the data is presented as raw counts, divorced from the circumstances in which policing events occur. Absent appropriate denominators, calculated rates and ratios, and statistical models controlling for obvious confounders, those figures cannot support inferences about Bureau performance. Portland's results are further presented in isolation, without comparison to peer jurisdictions, national benchmarks, or the published criminological literature, which is a practice that would be unacceptable in any other field in which performance is measured against a standard.

The City has likewise made a significant capital investment in body-worn cameras and developed directives governing their use, yet the resulting archive of footage remains largely unexploited as an oversight resource. The Independent Monitor has reported that those directives are disregarded as often as they are followed. Dkt. 554-1, p. 55, *Semi-Annual Compliance Report July 1, 2025 – December 31, 2025* (June 16, 2026) ("[A]udits assessing adherence to the BWC policy that was ultimately implemented by PPB revealed numerous deviations that are neither minor nor occasional.")

This work requires an entity that is governmental, independent, civilian-led, and professionally staffed. Only a governmental body subject to enforceable rules on privacy and data release can adequately protect the privacy interests of residents, victims, and officers, and preserve the integrity of pending criminal investigations. Only civilian control can sustain objectivity against the institutional incentives toward concealment that operate in every organization, not just police bureaus.

Continuing to allow the CBPA to flounder defers those benefits, and diverting Charter-allocated funds to other purposes is inconsistent with both the Charter and the Settlement Agreement. The City of Seattle, which entered a Department of Justice consent decree on roughly the same timeline, has since exited that decree with a functioning oversight system that is comprehensive, adequately funded, civilian-controlled, and operationally transparent.

### CONCLUSION

As always, MHA is grateful to the Court for granting us time to be heard on this important matter.

DATED: July 27, 2026                  /s/ *Juan C. Chavez*
                                      Juan C. Chavez
                                      Of Counsels to *Amicus* Mental Health Alliance